SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Paul D. Leake
Lisa Laukitis
Shana A. Elberg
Evan A. Hill
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
Fax: (212) 735-2000

*Proposed Counsel to Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re* | **Chapter 11** |
| **ENDO INTERNATIONAL plc,** *et al.*, | **Case No. 22-22549 (___)** |
| **Debtors.**[1] | **(Joint Administration Pending)** |

**MOTION OF THE DEBTORS**
**FOR ENTRY OF INTERIM AND FINAL ORDERS**
**(I) AUTHORIZING DEBTORS TO (A) PAY PREPETITION**
**WAGES, SALARIES, EMPLOYEE BENEFITS, AND OTHER**
**COMPENSATION AND (B) CONTINUE EMPLOYEE BENEFITS**
**PROGRAMS AND PAY RELATED ADMINISTRATIVE OBLIGATIONS;**
**(II) AUTHORIZING FINANCIAL INSTITUTIONS TO HONOR AND PROCESS**
**RELATED CHECKS AND TRANSFERS; AND (III) GRANTING RELATED RELIEF**

Endo International plc and its debtor affiliates, as debtors and debtors in possession

(collectively, the "Debtors" and, together with their non-debtor affiliates, the "Company") in the

above-captioned chapter 11 cases (the "Chapter 11 Cases"), respectfully represent in support of

this motion (the "Motion") as follows:

---

[1]     The last four digits of Debtor Endo International plc's tax identification number are 3755. Due to the large number of debtors in these chapter 11 cases, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/endo/. The location of the Debtors' service address for purposes of these chapter 11 cases is: 1400 Atwater Drive, Malvern, PA 19355.

**RELIEF REQUESTED**

1.　　By this Motion, and pursuant to sections 105(a), 363(b), 541(b)(7), and 541(d) of title 11 of the United States Code (the "Bankruptcy Code"), Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rule 9013-1 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules"), the Debtors seek entry of interim and final orders, substantially in the forms attached hereto as Exhibit A (the "Proposed Interim Order") and Exhibit B (the "Proposed Final Order"), respectively, (i) authorizing, but not directing, the Debtors, in their sole discretion, to (a) pay Prepetition Employee Obligations and related Processing Costs (each as defined below) arising under or related to Compensation and Benefits Programs (as defined below) and (b) continue their Compensation and Benefits Programs in effect as of the Petition Date (as defined below) (and as may be amended, renewed, replaced, modified, revised, supplemented, and/or terminated from time to time in the ordinary course of business) and pay related administrative obligations; (ii) authorizing and directing the Banks (as defined below) to honor and process related checks and transfers; and (iii) granting related relief.

2.　　The Debtors believe that, as of the Petition Date, there may be amounts accrued and owing under or related to Compensation and Benefits Programs (the "Prepetition Employee Obligations"), which the Debtors estimate to be approximately $21,765,400.[2]  Of this amount, approximately $21,038,400 will become due and payable during the 21 days of the Chapter 11 Cases (the "Interim Period").  Although the Debtors believe that all Compensation and Benefits Programs are vital to the Debtors' business, pursuant to the Proposed Interim Order, the

---

[2]　　For purposes of this Motion, the Debtors estimated their obligations under the Compensation and Benefits Programs using the exchange rate for the applicable local currency to U.S. dollars on August 10, 2022.

Debtors seek authority to make payments on account of Prepetition Employee Obligations and Processing Costs only to the extent the Debtors believe is necessary to prevent immediate and irreparable harm to the Debtors' business during the Interim Period and no amounts on account of Prepetition Employee Obligations in excess of the $15,150 cap under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code (the "Employee Cap").

3.       By this Motion, the Debtors also seek the authority, solely upon the entry of the Proposed Final Order, to (a) honor, pay, satisfy, or remit all claims and prepetition obligations related to the following Compensation and Benefits Programs: Retention Programs (for non-insider Employees only), Outside Director Compensation, Outside Director Expenses, Employee Bonus Plans other than the Spot Awards (for non-insider Employees only), and the Severance Plan (for non-insider Employees only).[3]  In addition, the Debtors request authority, solely upon entry of the Proposed Final Order, to pay Prepetition Employee Obligations above the Employee Cap.

## JURISDICTION AND VENUE

4.       This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.).  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

5.       Pursuant to the Bankruptcy Rule 7008, the Debtors consent to entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter a final order or judgment consistent with Article III of the United States Constitution.

---

[3]       By this Motion, the Debtors are not seeking to continue severance programs for insiders (as defined in section 101(31) of the Bankruptcy Code).  The Debtors reserve the right, however, to seek approval of such a program in accordance with section 503(c) of the Bankruptcy Code through a separate motion.  In addition, the Debtors are not seeking to pay amounts for any insider Employees who were terminated prepetition.

6.      Venue of the Chapter 11 Cases and this Motion is proper in this District under 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

### I.      General Background

7.      On the date hereof (the "Petition Date"), the Debtors each commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors have requested that the Chapter 11 Cases be jointly administered.

8.      The Debtors are authorized to continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

9.      As of the date of this Motion, no trustee, examiner, or statutory committee of creditors has been appointed in the Chapter 11 Cases.

10.     Additional information regarding the Debtors, including their business operations, their corporate and capital structure, and the events leading to the commencement of the Chapter 11 Cases is set forth in the *Declaration of Mark Bradley in Support of Chapter 11 Petitions and First Day Papers* (the "First Day Declaration") filed contemporaneously herewith and incorporated herein by reference.

### II.     The Debtors' Workforce

#### A.      Employees

11.     The Debtors operate a global specialty pharmaceutical company that develops and delivers high-quality, life enhancing branded and generic products to customers in

the U.S. and abroad.[4]  As of the Petition Date, the Debtors employ approximately 1,560 employees

(the "Employees"), of which approximately 170 are engaged in research and development,

clinical, and regulatory work; 480 are in sales, marketing, and business development; 450 are in

manufacturing; 200 are in quality assurance; and 260 are employed in general and administrative

roles and other capacities.  The vast majority of the Debtors' workforce is based in the U.S., with

approximately 100 Employees located in Canada, and approximately 90 in England, Ireland, and

Luxembourg.[5]

12.     The Employees comprise: (a) approximately 1,180 salaried Employees (the

"Salaried Employees"), which consist of approximately 990 salaried exempt Employees and 190

salaried non-exempt Employees; and (b) approximately 370 hourly Employees (the "Hourly

Employees").   Of these, approximately 1,540 Employees are full-time (the "Full-Time

Employees") and 6 are part-time (the "Part-Time Employees").   Approximately 230 of the

Debtors' Employees (or about 15% of their total workforce) at the Company's manufacturing

---

[4]     The Debtors' non-debtor affiliates (the "Non-Debtor Affiliates") based in India also employ approximately
1,470 employees.  As described in the contemporaneously filed *Motion of Debtors for Interim and Final
Orders (I) Authorizing the Debtors to (A) Continue Using Existing Cash Management Systems, Bank
Accounts, and Business Forms And (B) Implement Changes to Their Cash Management System in the
Ordinary Course of Business; (II) Granting Administrative Expense Priority for Postpetition Intercompany
Claims; (III) Granting a Waiver With Respect to the Requirements of 11 U.S.C. § 345(b); And (IV) Granting
Related Relief* (the "Cash Management Motion"), the Indian Non-Debtor Affiliates are funded via
Intercompany Transactions (as defined in the Cash Management Motion) with the Debtors, and then satisfy
their own payroll and employee benefit obligations.  Thus, their employees are not covered by this Motion.

[5]     In addition, approximately 20 Employees are on short-term disability, long-term disability or severance.
While such Employees are not receiving wages, some may be receiving other benefits, including, but not
limited to, severance payments, disability payments from health and welfare benefit plans or programs,
workers' compensation benefits from state-mandated programs, severance benefits, continuation of medical,
dental and vision benefits and/or certain life insurance benefits, depending on the type of leave and/or years
of service.  Additionally, the Debtors currently have 1 expatriate employee (the "Expatriate Employee") who
is temporarily assigned to work outside his home country.  The Expatriate Employee is afforded a unique
suite of benefits, described further below.

facility in Rochester, Michigan (the "Union Employees") are members of United Steelworkers Local Union 176 and are subject to a collective bargaining agreement (the "CBA").[6]

13.     In November 2020, the Debtors announced plans to optimize the Company's retail generics business cost structure by, among other things, exiting their manufacturing sites in Irvine, California and Chestnut Ridge, New York (the "2020 Restructuring Initiative"). Sales of the Debtors' Irvine and Chestnut Ridge facilities closed in the fourth quarter of 2021. In addition, in April of 2022, the Debtors announced further plans to streamline and simplify certain functions, including their commercial organization, to increase their overall organizational effectiveness and better align with current and future needs (the "2022 Restructuring Initiative"). These actions were initiated with the expectation of generating cost savings, a portion of which will be reinvested in 2022 to support the Company's key strategic priority to expand and enhance its product portfolio. In connection with the 2020 Restructuring Initiative and the 2022 Restructuring Initiative, the Debtors are recognizing ongoing, phased reductions in their Employee workforce, and have incurred certain corresponding obligations, discussed further below.

14.     The Debtors' Employees perform a wide variety of critical functions, including sales, marketing, clinical development, research and development, quality control operations, manufacturing, information technology, administrative, compliance, legal, finance, and management related tasks. The Employees include personnel who are intimately familiar with the Debtors' businesses, processes, and systems, who possess unique skills and experience related to the core business segments of the Debtors, and/or who have developed relationships with

---

[6]     The Debtors' current CBA with the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial & Service Workers International Union, on behalf of USW Local 176, expires February 28, 2024.

wholesalers, distributors, suppliers, and other key counterparties that are essential to the Debtors'

business.  The skills and expertise of the Debtors' Employees, as well as their relationships with

the Debtors' customers and vendors and knowledge of the Debtors' infrastructure, are essential to

the Debtors' ongoing operations and ability to operate their business effectively during the Chapter

11 Cases.

15.     Any interruption in payment of the Employees will impose hardship on

Employees and likely jeopardize their continued performance and loyalty to the Debtors.  Such

interruptions would likely have a devastating effect on Employee morale and expose the Debtors

to potential safety and legal compliance risks due to the highly regulated nature of the Debtors'

business.  Thus, the Debtors believe that having the authority to satisfy Prepetition Employee

Obligations (including any Processing Costs related thereto) and continue their Compensation and

Benefits Programs in the ordinary course is essential to maintain morale and enhance the Debtors'

ability to retain their Employees during the Chapter 11 Cases.

**B.     Supplemental Workforce**

16.     In addition to their regular workforce, the Debtors utilize the services of

independent contractors (the "Independent Contractors"), including consultants or other

professionals retained to complete discrete projects, or temporary employees engaged through

third parties to provide both long-term and short-term support with a variety of business functions.

Independent Contractors primarily perform services in finance, manufacturing, research and

development, information technology, quality control, and sales and marketing, but Independent

Contractors may also hold non-specialized positions and later be replaced by an Employee.

Independent Contractors are either (i) engaged on an "as-needed" basis through outside agencies

such as Beacon Hill Staffing (collectively, the "Employment Agencies") or (ii) directly employed

7

and paid by the Debtors. Currently, the Debtors engage approximately 200 Independent Contractors.

17. The Debtors believe that many of the Employees and Independent Contractors rely on their compensation and benefits to pay their daily living expenses. These individuals could experience significant financial hardship if the Court does not permit the Debtors to continue paying their compensation and providing them with health and other benefits as described in this Motion.

### C.    Compensation and Benefits Programs

18. In the ordinary course of business, the Debtors make certain payments, contributions, deductions, and withholdings under or related to Wages, Independent Contractor Obligations, Deductions, Withholdings, Payroll Taxes, Processing Costs, Employee Bonus Plans, Retention Programs, Reimbursable Expenses, Relocation and Expatriate Expenses, Outside Director Compensation, Outside Director Expenses, Health Care Benefits, Health Savings and Flexible Spending Plans, Insurance Plans and Disability Plans, COBRA Benefits, Retirement Plans, Paid Time Off, the Severance Plan, and Other Benefits (each as defined below and, collectively, the "Compensation and Benefits Programs") for current and former Employees.

### 1.    Wages, Salaries and Other Base Compensation

#### (a)    Wages

19. The Debtors' payroll obligations generally include wages, salaries, taxes, and payments on account of paid time off (the "Wages"). In the U.S., the Debtors' Salaried Employees are paid on a bi-weekly basis, and Hourly Employees are paid either weekly or bi-weekly, on Fridays. All Employees in Canada are paid bi-weekly on Wednesdays, and those based in Ireland, Luxembourg, and the United Kingdom are paid on a monthly basis on the 30th day of

the month or on the last business day of the month should the 30th fall on a weekend.[7]  All Employees in the U.S. and Canada are paid one week in arrears.  All other Employees are paid at the end of each month on a current basis, meaning their monthly pay includes accrued compensation up to and including the date of the payroll issuance.[8]  In the ordinary course, the Debtors periodically evaluate Employees for merit-based raises, promotions, and increases to the Employee's targets for the Debtors' various incentive-based Employee Bonus Programs (discussed below), typically on an annual basis.  Wage increases for the Debtors' Union Employees are generally made pursuant to the CBA.

20.    In the U.S. and Canada, payroll is funded via direct debit from the Debtors' designated payroll accounts[9] by Automatic Data Processing, Inc. ("ADP"), as payroll administrator.  For U.S. Employees, ADP debits the relevant payroll accounts on the Thursday immediately prior to the Friday when Employees are paid and, in Canada, the direct debit occurs on the preceding Monday prior to the Wednesday payment.  As of the Petition Date, substantially all of the Employees are paid their salaries or hourly Wages by direct deposit into their bank

---

[7]    The Expatriate Employee is generally paid in accordance with the payroll schedule applicable to the jurisdiction in which the Expatriate Employee is currently assigned to work.

[8]    Certain Hourly, Union Employees work overtime for which they generally are entitled to payment at a rate of 1.5 to 2 times their normal hourly wage, pursuant to the CBA.  Union Employees may also be entitled to a shift differential equal to a percentage of their normal Hourly rate.  Certain other non-union, Hourly Employees may also be entitled to overtime pay at rates that vary based upon the jurisdiction in which they are employed.  All Hourly Employees who have worked overtime must generally submit their overtime hours to the appropriate manager for approval.  The Debtors anticipate that the amount of overtime that may be due and owing as of the Petition Date is minimal, but request authority to pay such amounts,  and continue paying overtime rates and any shift differentials moving forward, in the ordinary course of the Debtors' business and in accordance with past practice and the CBA.

[9]    Employees are directly employed by one Debtor entity in each jurisdiction in which the Debtors operate.  As explained in the Cash Management Motion, U.S.-based corporate Employees are typically employed by, and paid through the payroll account of, Debtor Endo Pharmaceuticals Inc. ("EPI"), and other Employees are employed and paid by the specific Debtor entities associated with the business segments in which the Employee operates.

accounts.[10]  Each payroll period, ADP initiates direct debits from the Debtors' payroll accounts in an amount equal to their gross payroll obligations, including Deductions and Withholdings (each as defined below).  In turn, ADP initiates direct deposits to each of the Debtors' Employees in the net amount each particular Employee is owed, and remits the Deductions and Withholdings to the relevant third parties.  Consequently, once the Debtors make the gross payments to ADP, they have satisfied their payroll obligations.

21.     The Debtors employ Ernst & Young to assist with the calculations of any Deductions and Withholdings for payroll relating to the Debtors' Employees based in Ireland and Luxembourg.  However, payroll for these Employees is funded directly by the Debtors via direct deposit from the Debtors' payroll accounts to the Employees' accounts, and all Deductions and Withholdings are remitted directly by the Debtors to the relevant third parties.

22.     In the United Kingdom, payroll is funded to the Debtors' payroll service provider, Moore Kingston Smith ("MKS").  The Debtors typically fund MKS one week prior to the payroll date.  MKS then pays the UK employees and remits all Deductions and Withholdings to the relevant third parties.

23.     As of mid-July 2022, the Debtors' weekly, bi-weekly, and monthly payroll was approximately $270,000, $6,270,000, and $790,000, respectively. The Debtors estimate that as of the Petition Date they owe approximately $4,100,000 in unpaid wages and salaries to Employees.[11]

---

[10]     While substantially all of the Debtors' current Employees are enrolled in direct deposit, in certain limited circumstances it may be necessary for the Debtors to issue a check to an Employee on account of prepetition wages or benefits.  Accordingly, by this Motion, the Debtors also request authority to issue checks to Employees on account of such amounts should the need arise.

[11]     Employees in the U.S., Canada, and Europe are paid at different frequencies; this is why payroll amounts are not necessarily larger in proportion to the longer periods of time for payroll cycles.

**(b)     Independent Contractor Obligations**

24.     The Debtors generally pay the Independent Contractors or the Employment Agencies through which they are hired within 30 to 60 days after receipt of an appropriate invoice. Both the Independent Contractors and Employment Agencies are paid through the Debtors' accounts payable system, on either a weekly, bi-weekly, or monthly basis, depending on the Independent Contractor or Employment Agency.

25.     The Debtors estimate that, as of the Petition Date they owe approximately $5,000,000 to Independent Contractors and $4,900,000 to Employment Agencies (the "Independent Contractor Obligations").  The Debtors are seeking authority to pay any Independent Contractor Obligations that may exist because the Debtors believe it is necessary to pay such outstanding obligations to the Independent Contractors to ensure uninterrupted services to the Debtors' business and to the Employment Agencies so that they will continue to provide adequate staffing to the Debtors.

**(c)     Deductions, Withholdings, Payroll Taxes and Processing Costs**

26.     For each applicable pay period, the Debtors routinely deduct certain amounts from Employee paychecks, including, without limitation, pre- and after-tax deductions payable pursuant to certain of the Compensation and Benefits Programs discussed herein (such as an Employee's share of health care insurance premiums, contributions under flexible spending plans, 401(k) contributions, legally ordered deductions and miscellaneous deductions) (collectively, the "Deductions").

27.     On average, the Debtors deduct a total of approximately $36,000 / $810,000 / $54,000 from Employees' paychecks per weekly,  / bi-weekly, /  and monthly pay period, respectively.  In the U.S. and Canada, these Deductions are remitted by ADP to the appropriate third-party recipients on each payroll date.  In the United Kingdom, these deductions are remitted

by MKS.   In all other jurisdictions, the Debtors remit all Deductions directly to the applicable third-party.  The Debtors estimate that as of the Petition Date they have forwarded the Deductions already deducted from prior payrolls to the appropriate third-party recipients before the Petition Date.  As noted above, amounts that are deducted from payroll but not yet remitted are included in the Prepetition Employee Obligations number above and will be remitted to the appropriate third-party recipients postpetition.[12]

28.    In addition to the Deductions, applicable law requires the Debtors to withhold amounts related to federal, state, and local income taxes, any applicable international taxes, and Social Security and Medicare taxes for remittance to the appropriate federal, state, local, or international taxing authority (collectively, the "Withholdings").  The Debtors must then match the withheld amounts from their own funds for Social Security and Medicare taxes and pay, based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance (collectively, the "Employer Payroll Taxes" and, together with the Withholdings, the "Payroll Taxes").  In the aggregate, the Payroll Taxes, which are not included in the outstanding Prepetition Employee Obligations amounts set forth above, total approximately $80,000 / $1,640,000 / $340,000 per weekly / bi-weekly / monthly pay period (including both the Employee and employer portions), respectively.  Generally, ADP takes all Payroll Taxes from the payments debited from the Debtors' payroll accounts and remits such amounts to the appropriate authorities.  In Ireland and Luxembourg, all Withholdings are held and remitted directly by the Debtors to the applicable authority.  In the United Kingdom, MKS remits payroll taxes to the appropriate authorities.

---

[12]    As explained in greater detail below, the Debtors believe that such withheld funds, to the extent that they were in the Debtors' possession as of the Petition Date and/or remain in the Debtors' possession, are not property of the Debtors' bankruptcy estates.

29.     As of the Petition Date, the Debtors estimate that they will owe, or be required to remit, approximately $3,300,000 on account of prepetition Payroll Taxes, of which $2,700,000 will become due and owing in the Interim Period.  The Debtors seek authority to pay any Payroll Taxes as they come due in the ordinary course of business.  The Debtors also seek authority to forward any prepetition Deductions or Withholdings (and to continue to forward Deductions and Withholdings on a postpetition basis whether or not related to the prepetition period) to the applicable third-party recipients in the ordinary course of business and consistent with past practice.

30.     Finally, the Debtors also incur administrative costs incident to various Compensation and Benefits Programs, such as payments to ADP, their payroll service provider; bswift®, which assists with benefit elections and administration for various Compensation and Benefit Programs; and other parties (collectively, the "Processing Costs").  Over the previous six (6) months, the Debtors' average Processing Costs were approximately $50,000 per month.  The Debtors estimate that as of the Petition Date, approximately $63,000 was outstanding on account of Processing Costs, excluding any administrative fees specifically noted below.  Payment of the Processing Costs, including any amounts outstanding as of the Petition Date, to the extent any exist, is justified because the failure to pay any such amounts might disrupt services of third-party providers with respect to the various Compensation and Benefits Programs.  By paying the Processing Costs (including any prepetition amounts), the Debtors may avoid even temporary disruptions of such services and thereby ensure that the Employees obtain all of their compensation and benefits without interruption.

## 2.     Employee Bonus Plans

31.     To encourage Employees to maximize their efforts and performance, in addition to an annual review of their Employees' base pay, the Debtors have historically

maintained various incentive programs to bring value to the Debtors' estates by encouraging Employees to achieve company-side, business segment and/or individual goals and targets. Specifically, the Compensation & Human Capital committee of Endo International plc's ("PLC") board of directors (the "Compensation Committee") has oversight over the Long-Term Incentive Plan, Corporate IC Plan, Sales IC Plans, and Spot Awards (each as defined below, and collectively, the "Employee Bonus Plans") for eligible Employees.   Approximately 1,540 of the Debtors' Employees are eligible for awards under the Employee Bonus Plans.

32.     The Debtors believe that the Employee Bonus Plans are critical tools that will enable the Debtors to maximize the value of their estates by motivating Employees through programs that they have come to rely on as a part of their regular compensation.  The Debtors seek authority to continue to honor their obligations under these Employee Bonus Plans in the ordinary course; *provided* that the Debtors are not requesting authority to pay obligations under the Employee Bonus Plans, other than the Spot Award payments, prior to entry of the Proposed Final Order or to make any payments to insiders not permitted under section 503(c) of the Bankruptcy Code.  In addition, the Debtors will not make any payments under the Employee Bonus Plans to eligible Employees prior to the entry of the Proposed Final Order to the extent that such payments together with all compensation owed to the applicable Employee would exceed the Employee Cap.

### (a)     Long Term Incentive Plan

33.     Since 2015, the Debtors have maintained the Company's current Long-Term Incentive Program (the "LTIP") designed to align the interests of eligible Employees with the Company's long-term goals, attract and motivate talented Employees by offering a comprehensive compensation package that is in line with the market, and recognize Employees' substantial contributions to the Company's overall performance.  Annual LTIP awards are typically granted in March, and are based upon a comprehensive evaluation of an Employee's

overall performance and contributions to the Company's financial and strategic objectives. LTIP awards for new hires are typically granted to eligible recipients the month following their date of hire. Historically, through the LTIP, the Debtors issued PLC equity-based awards to participating Employees, including RSU's, PSU's, and stock options, that would then vest over a three or four year period. However, in recent years, a majority of the Company's LTIP awards have been issued in cash, which generally vest in 1/6 increments every 6 months over a three year period. Cash awards under the LTIP are forfeited upon an Employees' resignation, include various vesting stages for involuntary termination, vest immediately in the case of an Employee's death, and continue to vest according to the original schedule if the Employee leaves the Company because of disability or retirement. If an Employee is involuntarily terminated without cause, unvested LTIP awards are forfeited. Upon a change of control of the Company, if LTIP awards are assumed or substituted in the change of control and an Employee is terminated without cause, unvested LTIP awards vest on the date of the termination of the Employee's service. Upon a change of control of the Company, if the LTIP awards are not assumed or substituted in the change of control and an Employee is terminated without cause, unvested LTIP awards will vest upon the date of the official change of control and will be paid as soon as administratively feasible.

34.     As of the Petition Date, the Debtors had an aggregate of approximately $36,000,000 in outstanding, unvested cash awards under the LTIP, payable in installments typically in March and September of each year through 2024.[13]   Further, the Debtors have historically issued approximately $38,370,000 in cash awards under the LTIP per year, and anticipate issuing approximately $370,000 in cash awards to approximately 40 Employees for the

---

[13]     Any outstanding, unvested equity awards will be treated in accordance with the Company's remaining shareholders as of the Petition Date, and the Company does not intend to make any additional equity awards moving forward under the LTIP.

rest of year 2022.  By this Motion, and pursuant to the Final Order, the Debtors request authority to continue honoring and paying any granted, but unvested cash awards pursuant to the LTIP.  The Debtors further request authority to continue issuing cash awards under the LTIP in the ordinary course of business as part of their annual and new hire compensation review processes.  For the avoidance of doubt, no payments will be made to insiders under the LTIP.

(b)      <strong>Corporate IC Plan</strong>

35.     The Debtors have also established a short-term performance-based incentive compensation plan that rewards certain Employees for achievement of annual goals and objectives, as well as longer-range strategic goals (the "Corporate IC Plan").  All Employees are eligible to participate in the Corporate IC Plan unless they are eligible for a bonus under a Sales IC Plan (discussed below) or another annual bonus plan.  The Corporate IC Plan pool is established annually as the aggregate of eligible Employees' target awards – set as a percentage of each Employee's base salary – as modified by the Company's achievement of certain financial goals and strategic objectives, and can vary significantly from year to year.  Pursuant to the CBA, all of the Debtors' Union Employees that are Full-Time are eligible to participate in a separate IC program with a target incentive of $2,500, subject to similar modification based on Company-wide performance at the discretion of Company management.  Distributions under the Corporate IC Plan are based on business results and individual achievement, including the following considerations:

- achievement of individual goals and objectives, the risks and challenges involved and the impact of the results;

- value of the individual's contribution to the department, project team, function and Company, including the difficulty of the goal achievement; and

- behaviors aligned with the Company's core values.

36.     Employees  must be active with the Company (or on an approved leave of absence) as of March 1st of the payment year in order to be eligible for a payment under the Corporate IC Plan for the prior year.[14]  Payments are then generally made on or before March 15th. Thus, there were no amounts accrued and unpaid to eligible Employees for 2021 as of the Petition Date.  The Debtors estimate that approximately 1,330 Employees are eligible for awards under the Corporate IC Plan for 2022, and on average, over the previous two years, the Debtors paid approximately $40,700,000 annually on account of cash awards under the Corporate IC Plan.

### (c)     Sales IC Plans

37.     The Debtors also employ various sales incentive plans that reward Employees who effectively promote products in their respective market segments, and Employees in managerial roles for the performance of their designated sales force (the "Sales IC Plans").[15] For sales Employees, sales goals and objectives are generally established by managers in the particular segment on an Employee-by-Employee basis.  Awards for those managers or supervisors are typically tied to objectives relating to the overall function and administration of their designated sales program.  Payments under the Sales IC plans are typically paid quarterly following analysis of sales results and Employee performance, and Employees are generally eligible to receive payments if they are employed on the last day of the applicable quarterly period. In general, sales Employees are eligible for participation in the Sales IC Plan after completing the required training period, during which they are also eligible for a training bonus.

38.     Currently, approximately 220 Employees are eligible for awards under the Sales IC Plans.  The Debtors estimate that on average they pay approximately $5,000,000 per

---

[14]     Employees hired before November 30 may be eligible for a prorated award.

[15]     The Sales IC Plans also encompass a single commission style plan for a small group of Employees responsible for recruiting individuals to work for the Company.

quarter on account of cash awards under the Sales IC Plans and that they owed approximately

$85,000 to eligible Employees under the Sales IC Plan as of the Petition Date.

### (d)   Spot Awards

39.     The Debtors also recognize Employees that have made exceptional and

noteworthy contributions to the goals of the Company through a points-based special thanks and

recognition program (the "Global Recognition Program")[16] and other spot awards (collectively,

the "Spot Awards").   Under the Global Recognition Program, which is managed by Halo

Recognition, all regular, non-commercial business Employees below the Vice President level

qualify to be nominated by the Employees' applicable managers (each, a "Points Owner").   For

"Above & Beyond" level awards, which include points ranging in value from $5-$225, the Points

Owner may grant a particular award without additional approval.   However, for "Pinnacle" level

awards, which include points ranging in value from $250-$2,500, the Points Owner may

recommend that an Employee receive a particular award, with the award ultimately requiring

Senior Vice President-level approval.   Points can then be redeemed by Employees for gift cards,

merchandise, travel packages, and other items, depending on the country in which they are

employed.   The Debtors also infrequently issue other Spot Awards, under which single, targeted

cash payments are made to recognize extraordinary contributions or achievements by eligible

Employees, such as Service Milestone Awards granted to Employees that have been with the

Company for more than five years, and small new hire gifts.

40.     The Debtors paid approximately $140,000 in Spot Awards and related

administrative fees in 2021, and have a total Spot Award budget of approximately $180,000 for

---

[16]     The Company employs a variation of the Global Recognition Program for sales Employees, with a similar points-based structure.

2022. Further, as of the Petition Date there were approximately $100,000 in unredeemed points outstanding under the Global Recognition Program.

### 3.      Non-Insider Retention Programs

41.      In the ordinary course of business, the Debtors have historically instituted several retention programs to provide supplemental compensation to certain eligible Employees, none of whom are Insiders (collectively, the "Retention Programs").[17]   The Debtors' issued retention awards to Employees the Debtors believe are essential to achieving the goals and objectives of the organization, including in connection with the restructuring initiatives and maximizing value for all stakeholders.   The awards are generally set as a percentage of the recipient's annual salary, based on various factors such as the recipient's seniority, performance, criticality to the Debtors' businesses, and retention risk.   The Debtors' Retention Programs include the following:

### (a)      2020 Non-Insider Retention Programs

42.      In connection with the 2020 Restructuring Initiative, in November 2020, the Debtors implemented a retention program (the "2020 Retention Program") to ensure a smooth transition of the Company's manufacturing operation in Irvine, California and Chestnut Ridge,

---

[17]      In the interest of full disclosure, separate from and unrelated to the retention programs described herein, and in advance of an earlier potential chapter 11 filing date, the Debtors prepaid certain continuity and incentive amounts for calendar year 2022 to certain potential Insiders.   As disclosed in the Form 10-Q of Endo International plc, dated November 5, 2021, on or about November 1, 2021, continuity and incentive pre-payments were made to certain named executive officers in the aggregate amount of $33,353,062.   In addition, on or around the same time, the Debtors made continuity and incentive pre-payments for calendar year 2022 to certain other potential Insiders not disclosed in the aforementioned 10-Q in the aggregate amount of $26,010,508.   On or about July 15, 2022, the Debtors made certain continuity and incentive pre-payments for calendar year 2023 to certain potential Insiders that are not named executive officers in the aggregate amount of $13,483,968.   On August 12, 2022, certain continuity and incentive pre-payments were made for calendar year 2023 to certain named executive officers in the aggregate amount of $22,092,045.   In each case, these continuity and incentive pre-payments were, and are, subject to clawback by the Debtors if the employee voluntarily leaves the employ of the Debtors during the applicable time periods covered by the pre-payments.   By this Motion, the Debtors do not seek approval or authorization from the Court or any other relief with respect to such payments, which were made prior to the Petition Date.

New York, and to accomplish the overall goals of the 2020 Restructuring Initiative. The majority of the retention payments relating to the 2020 Retention Program have already been made. Approximately 5 employees have outstanding awards under the 2020 Retention Program, totaling approximately $145,000 through April of 2023.

**(b)     2021 Non-Insider Retention Program**

43.     In light of the overwhelming competitive nature of the pharmaceutical industry, the Debtors implemented a program to provide, generally, equal scheduled payments in June 2022, December 2022, and June 2023 (the "2021 Retention Program"). Approximately 300 Employees have outstanding awards under the 2021 Retention Program, totaling approximately $17,500,000, through June of 2023.

**(c)     2022 Non-Insider Retention Program**

44.     In connection with the 2022 Restructuring Initiative, in July 2022, the Debtors implemented an additional retention program (the "2022 Retention Program") with a scheduled payout in September 2023. The 2022 Retention Program includes payments of approximately $17,100,000 to 390 employees.

**(d)     Other Non-Insider Retention**

45.     The Debtors have also historically issued a variety of additional retention awards on an ad hoc basis for various purposes, including as a new hire incentive, for accepting a particular work assignment, or as a bonus for completion of a special project (the "Other Retention Programs"). These awards were granted at the discretion of the particular Employee's supervisor or Company management, and generally include lump sums payable in installments if the Employee remains with the Company as of the applicable retention date.

46.     The Debtors have awarded other retention programs including incentive awards, sign-on bonus and other retention awards. Approximately 30 Employees have outstanding

20

awards under the Other Retention Programs, totaling approximately $640,000, and the applicable payout and retention dates range through December 2025.

47.     In the aggregate, outstanding awards under the Retention Programs total approximately $35,385,000.  By this Motion, and solely pursuant to the Final Order, the Debtors request authority, but not direction, to make any outstanding payments under the Retention Programs as they come due in the ordinary course.  For the avoidance of doubt, eligibility for payments under all of the Retention Programs is subject to the condition that the participating Employee does not terminate voluntarily or is not terminated by the Debtors for cause before such date, and no payments under the Retention Programs will be made to insiders.

### 4.     Business and Other Expense Reimbursements

#### (a)     Reimbursable Expenses

48.     In the ordinary course of business, the Debtors reimburse Employees for certain reasonable and customary expenses incurred in their roles with the Debtors (collectively, the "Reimbursable Expenses"), including, without limitation, expenses related to travel and other business expenses permitted pursuant to the Debtors' travel and business expense policies.  In an effort to control costs, the Debtors' policies require Employees to adhere to guidelines designed to ensure that the Reimbursable Expenses are reasonable and necessary.  The Reimbursable Expenses are, thus, ordinary course expenses that Employees incur in performing their job functions and are vital to the continued operation of the Debtors' business and the preservation of value of the Debtors' estates.

49.     The Debtors generally require that Employees book any business-related travel expenses through the Company's designated travel agency, which expenses are then paid directly by the Debtors.  In addition, the Debtors have an arrangement whereby American Express issues company credit cards (the "T&E Cards") to Employees for business travel and certain other

related expenses (the "T&E Card Expenses").  Employees have personal liability for amounts due under the T&E Cards.  The Debtors have also issued a number of procurement cards through Bank of America (the "P-Cards") to select Employees, to be used for de minimis business expenses such as emergency supplies, professional memberships, meeting and conference expenses, food and beverages, and postage (the "P-Card Expenses").  The P-Cards have a monthly credit limit of between $5,000 and $10,000, depending on the Employee cardholder.  Employees are required to charge any Reimbursable Expenses to a T&E Card or P-Card whenever possible.  In limited circumstances where use of those cards is not feasible, Employees will then pay any other travel or business expenses directly, and submit an expense report for reimbursement by the Debtors.

50.     The Debtors process and administer Reimbursable Expenses through a software management system managed by Concur.  T&E Card Expenses and P-Card Expenses are automatically uploaded into this system, and the cardholder Employees are able to review the T&E Card Expenses and P-Card Expenses, make any necessary adjustments or corrections, enter any additional Reimbursable Expenses that are not T&E Card Expenses or P-Card Expenses along with the supporting documentation required by the applicable policy, and then submit expense reports for review and approval by the Employee's manager or other immediate supervisor in accordance with the Debtors' established expense reimbursement policies.

51.     During the first five full months of 2022, the Debtors estimate that in the aggregate the Employees incurred, on average, approximately $1,050,000 per month in Reimbursable Expenses.  The majority of Reimbursable Expenses relate to meals with health care professionals, business travel, and internal meetings and other events.  The vast majority of Reimbursable Expenses are charged to T&E Cards or P-Cards and, on a monthly basis, amounts outstanding are paid by the Debtors to American Express and Bank of America via ACH transfer

and direct debit, respectively[18].  In 2022, substantially all Reimbursable Expenses were charged to T&E Cards and P-Cards; only approximately 4% were incurred directly by Employees.  Although the Debtors request that Employees submit reimbursement requests promptly, not all Employees do so.  The Debtors estimate that they may owe approximately $1,500,000 on account of prepetition Reimbursable Expenses as of the Petition Date, including amounts to be reimbursed directly to the Employees and to be paid to American Express and Bank of America.  The Debtors have no outstanding prepetition obligations on account of P-Card Reimbursable Expenses and, therefore, the Debtors are not seeking this Court's authority to pay any amounts with respect to prepetition P-Card expenses under the Proposed Interim Order or Final Order.

52.     By this Motion, the Debtors are seeking the authority, but not the direction, to continue to pay any Reimbursable Expenses that the Employees have incurred or will incur during the Chapter 11 Cases.  Prior to the entry of the Proposed Final Order, the Debtors will only pay prepetition Reimbursable Expenses as they become due and payable and for which Employees would be liable if not paid.

### (b)     Relocation and Expatriate Expenses

53.     In the ordinary course of business, the Debtors pay or reimburse Employees for relocation expenses incurred at the Debtors' request or for the Debtors' benefit (the "Relocation Expenses") pursuant to established written policies.  The Debtors use a third-party provider of relocation services, Cornerstone Relocation Group ("Cornerstone"), to assist Employees with a variety of services associated with their relocation, and typically make payments of any Relocation Expenses directly to Cornerstone.  Generally, the amount of Relocation Expenses payable by the

---

[18]     Shortly following the Petition Date, the Debtors' will open two additional Bank of America accounts as collateral accounts for their P-Card balances.  Each account has a $200,000 minimum balance and is being required by Bank of America due to the Debtors' perceived increased credit risk.

Debtors varies based on the Employee's level of seniority, and Employees are required to repay any Relocation Expenses if they resign or are terminated for cause within two years of the relocation. The Debtors believe that as of the Petition Date they have no unpaid Relocation Expenses outstanding. By this Motion, the Debtors request authority, but not direction, to pay any prepetition Relocation Expenses, and to continue to pay any postpetition Relocation Expenses, as they may come due in the ordinary course of business.

54.       In addition, the Debtors cover certain expenses incurred by the Expatriate Employee (the "Expatriate Expenses"). Among other things, the Debtors pay for certain housing, tax preparation, and other miscellaneous expenses incurred by the Expatriate Employee as part of the transition to the employee's temporary location. The Debtors believe that as of the Petition Date they owe approximately $3,400 on account of unpaid Expatriate Expenses. By this Motion, the Debtors are requesting authority, but not direction, to pay those prepetition amounts, and continue to pay postpetition Expatriate Expenses, as they come due in the ordinary course of business.

**5.        Outside Director Compensation and Outside Director Expenses**

55.       Debtor PLC, the Company's ultimate parent and the direct or indirect owner of each of the other Debtors, currently maintains an eight member board of directors (the "Board") comprised of PLC's chief executive officer and seven directors that are not Employees of the Debtors (collectively, the "Outside Directors"). Certain of the Outside Directors serve on the Audit & Finance; Compensation; Nominating, Governance & Corporate Responsibility; Compliance; and Strategic Planning committees of the Board (each, a "Committee").

56.       The Outside Directors have historically received an annual cash retainer and an annual equity retainer in the form of fully-vested ordinary shares in PLC. For 2021, the Company paid a cash retainer of $150,000 to each Outside Director in June 2021, along with an

equity retainer with a grant date value of $300,000. The Compensation Committee approved modifications to the Company's Outside Director Compensation package, effective January 1, 2022, that eliminate the equity component and instead provide solely for quarterly (in lieu of annual) cash payments totaling $450,000 annually. In addition, an Outside Director who serves on a Committee receives additional compensation of $15,000 per year, and the chair receives $25,000. The Compensation Committee's prepetition modifications also included adding a monthly cash retainer of $10,000 for members of the Company's Strategic Planning Committee, and $15,000 for that committee's chair, effective November 1, 2021. Finally, the non-executive chairman of the Board receives $150,000 for serving in that role, and, while the Company does not currently have a senior Outside Director on the Board, the compensation structure allows for an additional cash retainer of $60,000 per year to any such senior Outside Directors.[19]

57.     The cash compensation of the Outside Directors described in the prior paragraph above (collectively, the "Outside Director Compensation") is paid on a quarterly basis, in advance. All Outside Director Compensation has been paid through the third quarter of 2022. Thus, as of the Petition Date the Debtors have no unpaid Outside Director Compensation outstanding. By this Motion, solely upon entry of the Proposed Final Order, the Debtors request authority, but not direction, to continue paying the Outside Director Compensation in the ordinary course of business.

58.     The Debtors also reimburse certain expenses incurred by the Outside Directors in connection with the performance of their duties (the "Outside Director Expenses").

---

[19]     The position of senior Outside Director was created in 2018 by the Nominating, Governance & Corporate Responsibility committee to support the Chairman of the Board, in instances where the Chairman is not independent. Since the current Chairman of the Board is an Outside Director, there is no senior Outside Director.

In addition to being eligible for reimbursement of Reimbursable Expenses under the Debtors' Company-wide travel and expense reimbursement policies, Outside Directors are also entitled to a fee of $5,000 per trip to the Company's international headquarters in Ireland, other than for regularly scheduled Board meetings, along with an additional $2,500 per meeting for any additional Board meetings. In addition, the Debtors pay or reimburse certain Outside Directors for additional expenses, including foreign tax preparation services and fees for director education programs. The Debtors believe that as of the Petition Date they owe approximately $42,000 on account of unpaid Outside Director Expenses. By this Motion, solely upon entry of the Proposed Final Order, the Debtors request authority, but not direction, to continue paying the Outside Director Expenses, including any prepetition amounts related thereto, in the ordinary course of business, consistent with past practice.

### 6. Employee Benefits

59.     The Debtors maintain a number of Employee benefit programs, including health, dental, life, disability, and long-term care insurance, retirement savings plans, and other similar programs, as described below. Certain of these benefits require payments by the Debtors and may be unpaid as of the Petition Date because certain obligations may have accrued either in whole or in part prior to the Petition Date, but do not become payable in the ordinary course of the Debtors' businesses until after the Petition Date.

### (a) Health Care Benefits

60.     In the ordinary course of their business, the Debtors provide medical, dental, and vision insurance coverage, prescription drug insurance, and other related benefits to their Employees (collectively, the "Health Care Benefits"). The Debtors provide Health Care Benefits to the Employees through a mix of fully-insured and self-insured plans, including: (a) medical and prescription insurance benefits provided by Aetna, Medavie Blue Cross ("MBC"), DVK

Luxembourg, VitalityHealth, Cigna, and Irish Life (collectively, the "Medical Plans");[20] (b) dental insurance benefits provided by Delta Dental and MBC (collectively, the "Dental Plans"); and (c) vision insurance coverage provided by VSP Vision Care and MBC[21] (collectively, the "Vision Plans").[22] Eligible Employees generally may participate in the Medical Plans, Dental Plans, and Vision Plans as of the date of hire.

61.    Under the self-insured Medical Plans and Dental Plans, Aetna and Delta Dental (collectively, the "Self-Insured Providers") pay the covered Employee's healthcare costs directly to the doctor or other healthcare provider (other than any required deductible or similar payment) and then seek reimbursement from the Debtors on either a weekly or bi-weekly basis (the "Medical Insurance Claims"). At the end of each weekly or bi-weekly period, the Debtors pay the Self-Insured Providers for the Medical Insurance Claims that have been made, along with an additional fee for administering the plan (the "Medical Insurance Fees"). Additionally, in connection with the self-insured plans, the Debtors maintain stop-loss insurance through HM Life (the "Stop-Loss Provider"), which provides coverage for accumulated claims above a predetermined threshold (the "Stop-Loss Insurance").

62.    Last month the Debtors paid the Self-Insured Providers approximately $1,900,000 on account of Medical Insurance Claims and approximately $140,000 in Medical Insurance Fees. It is difficult for the Debtors to estimate with a degree of certainty the amount of

---

[20]    Medical Plans through Aetna, MBC, DVK Luxembourg, VitalityHealth, and Irish Life are offered to Employees in the U.S., Canada, Luxembourg, the United Kingdom, and Ireland, respectively. The Debtors also offer a separate, fully-insured Medical Plan to their Expatriate Employee through Cigna, which includes dental and vision components.

[21]    The MBC Medical Plan offered to the Debtors' Canadian Employees also includes dental, vision, long-term disability, and accidental death and dismemberment benefits.

[22]    Medical Plans offered by Aetna include prescription coverage offered through a separate plan managed by Express Scripts.

estimated Medical Insurance Claims that may be currently pending because of the nature of the Medical Insurance Providers' claims funding processes. However, the Debtors estimate that approximately $2,200,000 of Medical Insurance Claims and Medical Insurance Fees are outstanding as of the Petition Date, including unreimbursed amounts the Medical Insurance Providers already paid to healthcare providers, as well as amounts for medical services provided to eligible Employees but not yet paid by the Medical Insurance Providers. Additionally, the Debtors pay approximately $170,000 per month to the Stop-Loss Provider in premiums for the Stop-Loss Insurance (the "Stop-Loss Premiums"), and approximately $0 in Stop-Loss Premiums were outstanding as of the Petition Date.

63.    Under the remaining fully-insured Health Care Plans and Vision Plans, the Debtors pay approximately $160,000 in monthly premiums and $180,000 in annual premiums (collectively, the "Medical Insurance Premiums") to MBC, Irish Life, DVK Luxembourg, VitalityHealth,[23] Cigna, and VSP Vision Care, and approximately $0 of Medical Insurance Premiums were outstanding as of the Petition Date. The Debtors seek authority to pay all Medical Insurance Claims, Medical Insurance Fees, Stop-Loss Premiums, and Medical Insurance Premiums as they become due in the ordinary course of business.[24]

---

[23]    Employees based in Ireland, Luxembourg, and the United Kingdom that participate in the Irish Life, DVK Luxembourg, and Vitality Medical Plans (respectively) pay premiums directly to those providers; the Debtors then reimburse those Employees for any such Medical Insurance Premiums paid.

[24]    The Debtors also provide their Employees with the option to enroll in supplemental medical plans through Voya, which provide cash payments to the Employees in the event of significant and unexpected medical events beyond the scope of standard coverage (the "Supplemental Medical Plans"). Employees pay the full cost of coverage under these plans through post-tax payroll Deductions and the Debtors do not pay any fees to Voya for administering these programs. Thus, the Debtors have no obligations under the Supplemental Medical Plans. However, out of an abundance of caution, the Debtors request authority to continue offering the Supplemental Medical Plans, and remitting the applicable Deductions (through ADP), in the ordinary course.

**(b)**      **Health Savings and Flexible Spending Plans**

64.     The Debtors offer eligible U.S.-based Employees the ability to contribute a portion of their pre-tax compensation to pay for certain health care expenses or dependent care expenses through certain health savings and flexible spending programs.  Employees who enroll in the high deductible Medical Plans offered by Aetna are eligible to contribute pre-tax compensation to a health savings account ("HSA") that can be used to pay for certain eligible health expenses (the "HSA Plan").  Through ADP, the Debtors make periodic contributions to an enrolled Employee's HSA totaling $500 for employee-only coverage or $1,000 for all other coverage levels.  Federal law sets the maximum amount that can be contributed by an Employee to his or her HSA while obtaining the pre-tax benefits associated with making such contributions.[25]  Funds in an HSA roll over from year to year and belong to the Employee even after he or she ceases working for the Debtors.

65.     In addition, eligible U.S. Employees have the option of participating in a tax-advantaged flexible spending accounts benefit plan (the "FSA Plans" and, together with the HSA Plan, the "Health Savings and Flexible Spending Plans") pursuant to which Employees voluntarily contribute amounts to three types of Flexible Spending Accounts:

- *Health Care FSA*: Employees who enroll in the low deductible Medical Plans offered by Aetna are eligible to contribute up to $2,850 annually to a Health Care FSA to cover qualified medical, dental, and vision expenses for a calendar year.  The contributed money does not carry over—at the end of the year, unused money is lost.

- *Combination FSA*: Employees who enroll in the high deductible Medical Plans offered by Aetna are eligible to contribute up to $2,850 each year to a Combination FSA.  The Combination FSA is designed to work together with the HSA.  Until an Employee meets the IRS-required medical deductible of

---

[25]      In 2022, the maximum total contributions per Employee per account is capped at $3,650 per year for employee-only coverage and $7,300 for all other coverage levels.  Employees aged 55 or older may contribute an additional $1,000 per year.

$1,400 per individual and $2,800 per family, the Combination FSA can be used to cover eligible dental and vision expenses only. Once these minimum amounts are exceeded, the Combination FSA can be used to pay for qualified medical and prescription drug expenses. Like the Health Care FSA, contributed funds do not carry over from year to year.

- *Dependent Care FSA*: Employees do not have to elect a Medical Plan to contribute to a Dependent Care FSA. Employees can contribute up to $5,000 per year ($2,500 if married and filing separate tax returns) to help cover qualified dependent care expenses, such as child daycare for children up to age 13 or elder care. Like the Health Care FSA and Combination FSA, unused money does not carry over from year to year.

66. Eligible Employees may elect to participate in the Health Savings and Flexible Spending Plans when they become eligible to participate in the Medical Plans.[26] Under those plans, bswift® records participating Employees' elections, and, through ADP, the Debtors withhold corresponding amounts from those Employees' pre-tax payroll as Deductions and remit those amounts to PayFlex. The Debtors estimate that they withhold an aggregate amount of approximately $8,800 per month from participating Employees in connection with the Health Savings and Flexible Spending Plans. PayFlex then provides participating Employees with debit cards linked to a PayFlex account to pay for eligible expenses. PayFlex charges the Debtors a monthly administrative fee of $2,300. The Debtors believe that as of the Petition Date they have no unpaid amounts owing to PayFlex on account of administering the Health Savings and Flexible Spending Plans.

67. The Debtors seek authority to pay all prepetition amounts owed to PayFlex and to continue honoring the Health Savings and Flexible Spending Plans, including with respect to amounts deducted from Employees' pay prepetition, in the ordinary course of business during the Chapter 11 Cases.

---

[26] As of the Petition Date, approximately 460 eligible Employees participate in the Health Savings and Flexible Spending Plans.

### (c)     Insurance Plans and Disability Plans

68.     The Debtors provide eligible Employees based in the U.S. or Canada with basic life and accidental death and dismemberment insurance coverage including term life policies with a benefit generally equal to a multiple of between one and two times the Employee's annual base salary (up to a cap ranging from $500,000 to $1,000,000) at no cost to the Employee. The Debtors provide their Employees in Ireland and the United Kingdom with basic life insurance coverage in an amount equal to four times base salary (collectively, the "Basic Life Insurance and AD&D Plans"). The Debtors' Basic Life Insurance and AD&D Plans are offered through MBC in Canada, Cigna in the U.S., Irish Life in Ireland, and Liverpool Victoria ("LVE") in the United Kingdom (the "Providers").[27]

69.     The Debtors also provide eligible Employees with self-insured, short-term disability coverage (the "Short-Term Disability Plan"). Coverage for Employees based in Canada, Ireland, Luxembourg, the United States, and the United Kingdom is offered on a self-insured basis. In the U.S., coverage is offered through Cigna. Eligible Employees are automatically enrolled in the Short-Term Disability Plan on the first day of their employment. When a claim is duly made, the Short-Term Disability Plan will pay eligible Employees from 100% to 60% of eligible weekly earnings for up to six months, through the Debtors' ordinary course payroll process. Thus, any benefits under the Short-Term Disability Plan are reflected in the Debtors' gross payroll figures,

---

[27]     The Debtors also offer certain eligible Employees the opportunity to purchase additional life, AD&D, auto, home, and pet insurance coverage through a variety of voluntary plans offered through Cigna, Farmers Group Select, Nationwide, and Transamerica (the "Voluntary Insurance Plans" and, together with the Basic Life Insurance and AD&D Plans, the "Insurance Plans"). The Voluntary Insurance Plans are generally paid for and owned directly by participating Employees, including after they leave the Company. The premiums are funded solely by Deductions taken from participating Employees' paychecks, which are transferred by ADP to the plan's administrator. The Debtors do not bear any incremental administrative costs when an Employee elects to purchase supplemental insurance through the Voluntary Insurance Plans. Thus, the Debtors have no obligations under the Voluntary Insurance Plans. However, out of an abundance of caution, the Debtors request authority to continue offering the Voluntary Insurance Plans, and remitting the applicable Deductions (through ADP), in the ordinary course.

discussed above.  As of the Petition Date, approximately 5 Employees were receiving benefits under the Short-Term Disability Plans.  Additionally, the Debtors incur monthly administrative costs of approximately $1,300 to Cigna under the U.S. Short Term Disability Plan, and there was no outstanding liability as of the Petition Date.

70.    The Debtors also offer eligible Employees access to long-term disability coverage (the "Long-Term Disability Plans" and, together with the Short-Term Disability Plan, the "Disability Plans").  Eligible Employees are automatically enrolled in the Long-Term Disability Plans on the date of hire.  The Long-Term Disability Plans are fully-insured by Cigna, MBC, LVE, Baloise, and Irish Life, and the premiums are paid by the Debtors.  When a claim is duly made, the Long-Term Disability Plans will pay eligible Employees between 50% and 70% of their monthly earnings.[28]  The Debtors incur approximately $50,000 per month in premiums for the Long-Term Disability Plans.  The Long-Term Disability Plans provide Employees with coverage for a period running after the expiration of coverage under the respective Short-Term Disability Plans and lasting for as long as the Employee is disabled.

71.    The Debtors believe that as of the Petition Date they have no unpaid obligations with respect to the Insurance Plans and Disability Plans.  The Debtors seek authority to pay all prepetition amounts and to continue honoring the Insurance Plans and Disability Plans, including with respect to amounts deducted from Employees' pay prepetition, in the ordinary course of business during the Chapter 11 Cases.

---

[28]    U.S. based Employees can also purchase additional Long-Term Disability coverage, which is entirely funded by participating Employees.

**(d)      COBRA**

72.      Pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985 (as amended, "<u>COBRA</u>"), the Debtors offer eligible former Employees the opportunity to elect to continue insurance coverage ("<u>COBRA Benefits</u>") under certain of the Debtors' Health Care Benefits plans.  As of the Petition Date, approximately 95 of the Debtors' former Employees have elected to receive COBRA Benefits, and there are approximately 70 former Employees that remain eligible to enroll in COBRA Benefits but have yet to do so.  The Debtors may pay all of an electing Employee's COBRA premiums for a period of time following termination, and thereafter a portion of those premiums, for Employees that are eligible under the Severance Plan (discussed below). Otherwise, participating Employees pay 100% of the premiums owed for the COBRA Benefits, plus a 2% administrative fee, directly to bswift®, which administers the Debtors' COBRA Benefits.   The Debtors pay bswift® approximately $36,000 per month for fees relating to administration of the COBRA Benefits.  The administration fees are paid at the beginning of the month for the month of service, therefore, as of the Petition Date, the Debtors do not believe they owe any accrued and unpaid amounts associated with the administration of the COBRA Benefits. The Debtors seek to continue to pay the administrative costs associated with COBRA benefits on a postpetition basis.

**(e)      Retirement Plans**[29]

73.      The Debtors offer a 401(k) retirement savings plan to all regular, full-time and part-time Employees of the Debtors located in the U.S. (the "<u>401(k) Plan</u>").  The 401(k) Plan

---

[29]      Through Schwab, the Debtors have also historically offered certain senior Employees the opportunity to participate in several unfunded, non-qualified deferred compensation plans, including the 401(k) Restoration Plan, the Executive Deferred Compensation Plan, and the Directors Deferred Compensation Plan (the "<u>Deferred Compensation Plans</u>").  Through the Deferred Compensation Plans, eligible Employees elect to defer a portion of their eligible compensation for the following year, to be invested similar to a traditional 401(k), including portions of their incentive-based compensation and restricted stock unit grants.  The

*(cont'd)*

is a qualified defined contribution savings plan administered by Charles Schwab ("Schwab"). The Debtors generally match an Employee's voluntary contributions dollar-for-dollar up to the first 3%, and 50 cents for every dollar of the next 2%, of the Employee's eligible compensation subject to limits under the Internal Revenue Code. Matching contributions are made by the Debtors each pay period. For Employees hired on or after January 1, 2018, Company matching contributions are 50% vested after one year and 100% vested after two years. Company contributions to Employees hired before this date are immediately vested.

74. The Debtors also offer a separate retirement savings plan to Employees in Canada through Manulife, along with a statutory pension plan (the "Paladin Plans"). The retirement Paladin Plan consists of two components: a registered retirement savings plan under which an Employee contributes a percentage of his or her base salary, and a deferred profit-sharing plan, pursuant to which the Debtors match that contribution up to 4% of the Employee's salary. The Debtors' matching contributions become fully vested after two years of consecutive employment for the particular Employee. The government pension component contemplates mandatory contributions totaling approximately 12.3% of the Employee's salary (up to a maximum amount of $7,552 per year), split evenly between the Employees and the Debtors.

75. The Debtors offer a separate defined contribution plan to their Ireland-based Employees through Irish Life (the "Irish Retirement Plan"). Under the Irish Retirement Plan, the Debtors make a core contribution equal to 4% of the Employee's qualifying compensation, and

---

Debtors do not contribute to the Deferred Compensation Plans, and eligible Employees are always 100% vested in any contributions. As of the Petition Date, the total balance of the Deferred Compensation Plans was approximately $1.8 million. Effective January 1, 2022, the Compensation Committee voted to freeze the Deferred Compensation Plans to new participants and new contributions. Compensation for 2022 for which eligible Employees previously made deferral elections will continue to be deferred by the Debtors. However, pursuant to this Motion, the Debtors do not seek authority to make any payments under the Deferred Compensation Plans, nor continue the Deferred Compensation Plans in the ordinary course.

also match Employee contributions from an additional 1-4%. Employees can then make additional, unmatched contributions above that threshold. The Debtors' contributions become fully vested after two years of consecutive employment for the particular Employee.

76.     Finally, the Debtors offer two Luxembourg-based Employees retirement, death, and disability benefits through a fully-insured pension scheme administered by Bâloise Vie Luxembourg S.A. ("Bâloise"), whereby the Debtors pay set premiums on an annual basis calculated as a percentage of the Employee's salary, in addition to optional monthly contributions by eligible Employees. Those contributions are then invested by Bâloise and paid out at varying levels upon the retirement, death, or disability of the participating Employee. The Debtors also offer one Employee based in the U.K. with retirement benefits through a similar pension scheme administered by Nest, whereby the Debtors and the Employee make set monthly contributions, in each case calculated as a percentage of the Employee's base salary (8% and 2%, respectively) (collectively, the "Other Retirement Plans" and, together with the Irish Retirement Plan, the 401(k) Plan, and the Paladin Plans, the "Retirement Plans").

77.     The Debtors estimate their matching and other contributions under the Retirement Plans to be approximately $710,000 per month. The Debtors also pay the various plan administrators certain fees for administering the Retirement Plans. The Debtors believe that as of the Petition Date they owe approximately $260,000 on account of employer contributions and administrative fees under the Retirement Plans.

### (f)    Paid Time Off

78.     The Debtors provide all full-time and part-time Employees working at least 20 hours per week with paid time off ("Paid Time Off") for rest, relaxation, personal pursuits and days of personal significance. The number of days of Paid Time Off that eligible Employees are

allotted generally ranges from approximately 15 to 30 days per year,[30] based on length of service with the Debtors and the number of hours per week the Employee is regularly scheduled to work. The Debtors' U.S. Employees receive an advanced allotment of half of their annual Paid Time Off days on January 1 and the balance on July 1 each year, but such time is accrued in accordance with the set guidelines for years of service and hours worked. All eligible Employees generally may carry over up to five (5) accrued but unused Paid Time Off days to the next calendar year that must be used on or before March 31 or June 30, depending upon the location.[31] The Debtors generally do not compensate Employees for unused Paid Time Off except that any unused, accrued and vested Paid Time Off will be paid upon termination of employment in accordance with the Debtors' past practices and the Severance Plan (discussed below).[32] Accordingly, the Debtors do not believe that an Employee's right to accrued Paid Time Off constitutes "claims" for purposes of the Bankruptcy Code. In the event that such accrued amounts are considered "claims," the value of the accrued but unused Paid Time Off as of the Petition Date would be approximately $18,200,000.

79.    Additionally, under a prior version of the Company's Paid Time Off policy, all eligible Employees accumulated Paid Time Off without forfeiture. As of the Petition Date,

---

[30]    Union Employees' Paid Time Off is determined by the CBA. All Employees receive the minimum amount of days required under applicable law, regardless of their seniority or their scheduled hours.

[31]    In certain jurisdictions in which the Debtors operate, Employees do not forfeit accrued Paid Time Off. For example, Employees in California generally do not forfeit vacation time at the end of the calendar year.

[32]    As part of the 2020 Restructuring Initiative, the Company paid certain terminated Employees for advanced, but unearned and unaccrued Paid Time Off. However, Employees are generally not compensated by the Debtors for Paid Time Off that is advanced, but not yet earned and accrued at termination, and the Company reserves the right to recoup any used Paid Time Off that was not accrued at termination.

there is approximately $5,110,000 of the total accrued Paid Time Off on account of this grandfathered policy, which has been frozen to new participants.[33]

80.     The Debtors also provide Employees with certain other paid absences, including, among other things, paid holiday, floating holiday, bereavement pay, parent and adoption leave for mothers and fathers, paid time off for absences due to witness duty, payment for absences due to jury duty, paid and unpaid leave of absences to meet various personal situations, and statutorily required time off such as military duty and family and medical leave.

81.     The Debtors seek to allow Employees to utilize their Paid Time Off accrued as of the Petition Date on a go-forward basis and to continue the prepetition policy of paying out unused Paid Time Off upon an Employee's termination consistent with the Debtors' past practices and the Severance Plan.  For the avoidance of doubt, the Debtors will not pay any amounts arising from prepetition unused Paid Time Off to any Employee if such payment would result in any individual Employee receiving payments in excess of the Employee Cap on account of prepetition claims prior to the entry of the Proposed Final Order.

### (g)     Severance Plan

82.     In 2015, the Company memorialized certain aspects of its past practice of providing severance payments and benefits under certain circumstances by putting in place a written severance policy applicable to Employees that are not subject to individual employment agreements with the Company.[34]  In 2020 and 2021, in connection with the Company's general

---

[33]     Because the policy compensates Employees for accrued but unused Paid Time Off at their current hourly rate, this figure is subject to change.

[34]     In addition, the local laws of certain of the jurisdictions in which the Debtors operate may have statutes in place requiring the Debtors to pay severance.  For example, under Irish law (which is applicable to 82 Employees as of the Petition Date), the Debtors are required to provide statutory severance up to a maximum amount of €600 per week and €31,200 per year.

practice of updating its corporate policies, including its Employee benefits plans, the Company amended, restated, and modified its existing severance plan to account for certain changes affecting the Company in the ordinary course of business (the "Severance Plan").

83.     Typically, under the Severance Plan, the Debtors make a lump-sum payment to a terminated Employee through the Debtors' bi-weekly, weekly, or monthly payroll process after the terminated Employee executes a release of claims against the Debtors and certain other conditions are satisfied.  That payment generally includes an amount based on the Employee's annual base salary or annualized regular rate of compensation that varies depending upon the Employee's position and length of service, any unpaid annual bonus earned for the fiscal year preceding the year in which the Employee was terminated, and accrued but unused vacation time.  Terminated Employees may also be entitled to payment of their COBRA premiums upon signing a release and separation agreement and electing continuing coverage, as well as certain outplacement services (collectively, the "Severance Obligations").

84.     Additionally, in connection with the 2020 Restructuring Initiative and the 2022 Restructuring Initiative, the Debtors have incurred certain additional Severance Obligations with respect to Employees that were terminated in connection with the corresponding reductions in force.  Specifically, in addition to the benefits afforded to eligible Employees under the Severance Plan, individuals scheduled for termination prior to a pending incentive plan vesting event are entitled to receive (i) a cash in-lieu-of payment for Corporate IC Plan participants terminated on or after October 1st of the plan year, and prior to March 1st of the payment year, and (ii) accelerated vesting of select tranches of outstanding awards previously issued to certain terminated Employees under the LTIP, depending on the relevant date of his or her termination.

85.     The Debtors believe that having the authority to maintain the Severance Plan, along with the additional Severance Obligations incurred as part of the 2020 Restructuring Initiative and the 2022 Restructuring Initiative, is essential to their business in order to retain, motivate and provide security to, their Employees.  Honoring all Severance Obligations to the former non-insider Employees who have already been terminated prior to the Petition Date will minimize disruptions to the Debtors and smooth their transition into the Chapter 11 Cases. Furthermore, it is important that the Debtors fulfill their obligations incurred postpetition under the Severance Plan to reassure their Employees that the Debtors intend to honor their obligations to Employees during the Chapter 11 Cases—both during and after their tenure with the Debtors. Paying severance amounts is required to assuage any fears of the Employees and motivate them to continue working for the Debtors during the course of the Chapter 11 Cases, which work, in turn, is required to achieve the Debtors' chapter 11 objectives.

86.     The majority of the Severance Obligations relating to the 2020 Restructuring Initiative have already been paid.  Currently, there are no former non-insider Employees who have outstanding payments due under the Severance Plan.  The Debtors believe that as of the Petition Date they have no unpaid obligations outstanding on account of the Severance Plan.  By this Motion, the Debtors are seeking authority to continue the Severance Plan solely with respect to the Debtors' non-insider Employees in the ordinary course of business and solely upon entry of the Proposed Final Order.  At this time, the Debtors are not seeking to make any postpetition payments under the Severance Plan to insiders but reserve the right to seek Court approval prior to making such payments in the future.

**(h)     Vehicle Services**

87.     The Debtors provide certain U.S. and Canadian sales related employees, including directors, managers, and sales representatives, with vehicle services (collectively, the

"Vehicle Services").   In the United States, vehicles are leased for certain employees through Wheels, Inc.   In addition, MAP, Inc. provides management and maintenance of a related fuel program for leased vehicles, and CEI Group provides accident management services for the vehicles.   Both MAP, Inc. and Wheels, Inc. will be replaced by Emkay in the latter half of 2022, however the process of phasing out those vendors has not been completed as of the Petition Date. The U.S. Vehicle Services include the lease of approximately 300 vehicles, and costs related to the leasing, management, fuel, and accident services total approximately $480,000 per month. While no vehicles are leased to Canadian employees, the Company's Canadian sales team is provided with a car allowance.[35]   Element Fleet provides for the management of the Canadian related Vehicle Services.

88.   Although the Company plans to phase out the services provided by Map, Inc. and Wheels, Inc. over the second half of the 2022 year, the Debtors seek authority to continue providing Vehicle Services in the interim until those services are phased out, as Vehicle Services are necessary to avoid any interruptions of the Debtors' services.  The Debtors believe that as of the Petition Date they owe approximately $90,000 on account of vehicle services.   The Debtors intend to continue to honor the U.S. and Canadian Vehicle Services after the Petition Date in the ordinary course of the Debtors' business.

### (i)    Other Benefits

89.   The Debtors provide eligible Employees with the opportunity to obtain various other miscellaneous voluntary and optional benefits (the "Other Benefits").  For example, the Debtors sponsor an education assistance program for eligible Employees whereby Employees are reimbursed for up to 36 credit hours-worth of approved career-related higher education classes

---

[35]    The Canadian employees' gross wages figures include the Canadian Vehicle Services costs.

or $7,000-worth of education expenses in a calendar year, whichever is met first. Other examples

include (a) a work life balance program through Aetna; (b) an employee and family assistance

program offered to Canadian Employees; (c) a legal assistance plan designed to give Employees

access to attorneys for legal services for personal needs, such as will preparation, estate planning

and family law offered through MetLife Legal Plans; (d) a discount program that gives Employees

access to exclusive prices, discounts and offers from hundreds of local and national merchants; (e)

an information service called Health Advocate that assists Employees with navigating complex

health care and insurance-related issues; (f) an employee referral bonus program; (g) tuition

reimbursement; (h) employee donation and company match program; and (i) access to Gympass

services as well as fitness centers at the Debtors' facilities located in Malvern, Pennsylvania.

90.      The Debtors believe that the amounts owing on the Petition Date under

these Other Benefits, including any amounts owed to third party administrators, are approximately

$122,000.  The Debtors intend to continue to honor such practices, programs, and policies after

the Petition Date as such practices, programs, and policies may be modified, amended or

supplemented from time to time in the ordinary course of the Debtors' business.

## BASIS FOR RELIEF

I.    **The Court Should Authorize Continuation of the Compensation and Benefits Programs and Payment of the Prepetition Employee Obligations and Processing Costs**

A.    **Payment of Certain Prepetition Employee Obligations is Required by Law**

91.      Sections 541(b)(7) and 541(d) of the Bankruptcy Code provide grounds for

granting the relief requested with respect to Withholdings and Deductions. These amounts include

amounts earmarked by law, including for taxes and support payments, and Employee contributions

to Compensation and Benefits Programs, such as the Retirement Plans. These amounts are held

in trust and are not part of the Debtors' estates, and are required to be paid.  *See* 11 U.S.C.

41

§ 541(b)&(d); 26 U.S.C. § 7501(a).  Failure to pay could subject the Debtors' directors and officers

to personal liability.  *See In re DuCharmes & Co.*, 852 F.2d 194, 196 (6th Cir. 1988) (noting that

individual officers of a company may be held personally liable for failure to pay trust fund taxes).

92.     Because many of the Withholdings and Deductions are not property of the

Debtors' estates, their application or payment for their intended purposes will not adversely affect

the Debtors' estates or their creditors.  To prevent potentially irreparable harm to Employee morale

and, in certain cases, to comply with the clear and unambiguous requirements of section 541(b)(7)

of the Bankruptcy Code, the Debtors desire to apply and remit the Withholdings and Deductions

for the purposes for which the Withholdings and Deductions were taken.

**B.     Payment of Prepetition Employee Obligations is Appropriate Under Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code**

93.     On an interim basis, the Debtors are seeking relief to pay Prepetition

Employee Obligations for each Employee only up to the Employee Cap.  Accordingly, under a

chapter 11 plan, such claims would have to receive full value.   11 U.S.C. § 1129(a)(9)(B).

Therefore, such payment now would not prejudice other parties in interest.

94.     On a final basis, the Debtors are seeking relief to pay Prepetition Employee

Obligations in excess of such cap.  The Debtors believe that such cap applies to only a limited

number of individuals under section 507(a)(4) of the Bankruptcy Code, and no corporations,

independent contractors or employee benefit plans under sections 507(a)(4) and 507(a)(5) of the

Bankruptcy Code.   Such individuals are not insiders (as defined in Section 101(31) of the

Bankruptcy Code).  Rather, they are high-performing salespeople and other key Employees whose

continued retention and motivation are important for the Debtors' business success.  Accordingly,

the Debtors respectfully submit that payments in excess of the priority cap are appropriate and

should be authorized pursuant to the Proposed Final Order granting this Motion.

**C.      Maintaining Compensation and Benefits Programs and Paying Prepetition Employee Obligations and Related Processing Costs is a Sound Exercise of the Debtors' Business Judgment**

95.      Section 363(b) of the Bankruptcy Code permits a debtor to use estate property "other than in the ordinary course of business" after notice and a hearing.  11 U.S.C. § 363(b)(1).  Courts have authorized relief under section 363(b) where a debtor demonstrates a sound business justification for such relief.  *See In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992) (holding that a judge deciding a section 363(b) application must find from the evidence presented before him or her a good business reason to grant such application); *see also Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983) ("The rule we adopt requires that a judge determining a § 363(b) application expressly find from the evidence presented before him at the hearing a good business reason to grant such an application."); *In re Ionosphere Clubs, Inc.*, 98 B.R. 165, 175 (Bankr. S.D.N.Y. 1989) ("[T]he debtor must articulate some business justification, other than mere appeasement of major creditors.").  Once a debtor has articulated a valid business justification, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'"  *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).

96.      The Debtors have determined, in the sound exercise of their business judgment, that continuing their Compensation and Benefits Programs and paying the Prepetition Employee Obligations (and related Processing Costs) is critical to the success of the Chapter 11 Cases.  Any delay or disruption in the provision of the Compensation and Benefits Programs likely will destroy the Debtors' relationships with the Employees and irreparably impair workforce morale at the very time when the dedication, confidence, and cooperation of the Employees is most

critical.  In addition, bolstering the morale of the Employees and ensuring the uninterrupted availability of their services will assist the Debtors in (a) maintaining a "business as usual" atmosphere to the extent possible and (b) preserving the Debtors' relationships with a variety of important constituencies, including key Employees and vendors.  Finally, the Debtors must continue their corporate policies of permitting certain Employees to incur business-related expenses and thereafter seek reimbursement by submitting appropriate invoices to maintain necessary oversight and quality control and enable many key Employees to perform their jobs effectively.

97.    Accordingly, there can be no doubt that the Debtors must do their utmost to retain their workforce by, among other things, continuing to honor all wage, benefit and related obligations, including any amounts arising under the Compensation and Benefits Programs that accrued prepetition.[36]

**D.    The Court Also May Grant the Motion Pursuant to Section 105(a) of the Bankruptcy Code and the Doctrine of Necessity**

98.    Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  The bankruptcy court's power to authorize the pre-plan satisfaction of prepetition claims whose payment is critical to the debtor's business is firmly established under the well-settled "doctrine of necessity," which "recognizes the existence of the judicial power to authorize a debtor in a reorganization case to pay prepetition claims where such payment is

---

[36]    The same holds true for the payment of the Outside Director Compensation and the Outside Director Expenses.  The Debtors must have a functioning Board in place to continue in operation and successfully implement their chapter 11 strategy.  The Debtors believe Outside Directors would be likely to leave if they are not paid their compensation.  To lose key Outside Directors at the early stages of the Chapter 11 Cases would jeopardize the Debtors' chapter 11 strategy.  Accordingly, the payment of these amounts in the overall context of the Chapter 11 Cases is a sound exercise of the Debtors' business judgment.

essential to the continued operation of the debtor." *In re Ionosphere*, 98 B.R. at 170; *see also In re C.A.F. Bindery, Inc.*, 199 B.R. 828, 835 (Bankr. S.D.N.Y. 1996) (stating that the doctrine of necessity "permits the bankruptcy court to authorize the payment of prepetition claims prior to confirmation" when "the payment is 'critical to the debtor's reorganization.'") (citation omitted); *In re Fin. News Network Inc.*, 134 B.R. 732, 735-36 (Bankr. S.D.N.Y. 1992) ("The 'doctrine of necessity' stands for the principle that a bankruptcy court may allow pre-plan payments of prepetition obligations where such payments are critical to the debtor's reorganization."). Although "normally, a debtor only pays pre-petition unsecured claims through a confirmed plan of reorganization . . . most courts will allow such payments under the 'doctrine of necessity,' if the debtor establishes that in its business judgment making such payments is critical to the survival of the debtor's business." *In re C.A.F. Bindery, Inc.*, 199 B.R. 828, 835 (Bankr. S.D.N.Y. 1996); *see also Mich. Bureau of Workers' Disability Comp. v. Chateaugay Corp. (In re Chateaugay Corp.)*, 80 B.R. 279, 285-86 (S.D.N.Y. 1992) (approving lower court order authorizing payment of prepetition wages, salaries, expenses, and benefits).

99.     Paying Prepetition Employee Obligations and any prepetition Processing Costs will benefit the Debtors' estates and their stakeholders by allowing the Debtors' business operations to continue without interruption.  Indeed, the Debtors believe that without the requested relief, their Employees may seek alternative opportunities.  Such a development would deplete the Debtors' workforce, hindering the Debtors' ability to implement their chapter 11 strategy.  The loss of valuable Employees and the resulting need to recruit new personnel to replenish the Debtors' workforce would be distracting and counterproductive at this critical time, during which the Debtors are stabilizing operations and restructuring their obligations in chapter 11.  Further, if the Debtors lose valuable Employees, they will incur significant expenses in locating, recruiting,

and training replacements that would far exceed the costs of the Compensation and Benefits Programs for a lost Employee.

*               *               *

100.    In light of the foregoing, the Debtors respectfully submit that the continuation of their Compensation and Benefits Programs and payment of the Prepetition Employee Obligations and the Processing Costs is essential for the Debtors' chapter 11 strategy, represents an exercise of the Debtors' sound business judgment and is in the best interests of the Debtors' estates, their creditors and all stakeholders.  Courts in this District have granted similar relief in other chapter 11 cases.  *See, e.g.*, *In re Purdue Pharm. L.P.*, Case No. 19-23649 (RDD) (Bankr. S.D.N.Y. Sept. 18, 2019); *In re Aegerion Pharm. Inc.*, Case No. 19-11632 (MG) (Bankr. S.D.N.Y. June 27, 2019); *In re Synergy Pharm. Inc.,* Case No. 18-14010 (JLG) (Bankr. S.D.N.Y. Jan. 24, 2019); *In re Cenveo, Inc.,* Case No. 18-22178 (RDD) (Bankr. S.D.N.Y. Feb. 6, 2018); *In re 21st Century Oncology Holdings, Inc.,* Case No. 17-22770 (RDD) (Bankr. S.D.N.Y. June 20, 2017); *In re Answers Holdings, Inc.,* Case No. 17-10496 (SMB) (Bankr. S.D.N.Y. Apr. 4, 2017); *In re BCBG Max Azria Glob. Holdings, LLC,* Case No. 17-10466 (SCC) (Bankr. S.D.N.Y. Mar. 29, 2017); *In re Sabine Oil & Gas Corp.,* Case No. 15-11835 (SCC) (Bankr. S.D.N.Y. July 16, 2015); *In re Chassix Holdings, Inc.,* Case No. 15-10578 (MEW) (Bankr. S.D.N.Y. Mar. 13, 2015).

### E.    The Debtors Are Not Seeking to Make Severance Payments Outside the Scope of Sections 502(b)(7) and 503(c) of the Bankruptcy Code

101.    By this Motion, the Debtors are seeking authority to continue their Severance Plan with respect to non-insiders in the ordinary course.[37]  The Debtors believe that

---

[37]    Making such payments will not prejudice any party in interest because the full amount of severance owed to an employee terminated postpetition is generally payable as an administrative expense.  *See Straus-Duparquet, Inc. v. Local Union No. 3, Int'l Bhd. of Elec. Workers, AFL-CIO*, 386 F.2d 649, 651 (2d Cir. 1967); *see also In re Spectrum Info. Techs., Inc*., 193 B.R. 400, 405-06 (Bankr. E.D.N.Y. 1996) (confirming that despite criticism, *Straus-Duparquet* remains the law in the Second Circuit with respect to severance pay
*(cont'd)*

46

continuation of their Severance Plan is important for Employee morale and retention and will help provide comfort to the Employees during the Debtors' critical transition of their businesses into chapter 11.

102.    At this time, the Debtors are not requesting authority to, and will not make any payments in excess of, the limit established by section 502(b)(7) of the Bankruptcy Code.  The Debtors are also not requesting authority to make any payments under the Severance Plan for any "insider" (as defined in section 101(31) of the Bankruptcy Code) that would not be allowed without court approval under section 503(c) of the Bankruptcy Code, which relates to transfers to insiders for severance or otherwise outside the ordinary course of business.

103.    Because section 503(c) of the Bankruptcy Code is not implicated, the Court may grant the requested relief if it finds that the Severance Plan satisfies the requirements of section 363(b) of the Bankruptcy Code.  *See In re Mesa Air Grp., Inc.*, Case No. 10-10018 (MG) (Bankr. S.D.N.Y. Sept. 24, 2010) (noting that compensation plans within the ordinary course of business are governed by section 363 of the Bankruptcy Code, not section 503(c)).  For the reasons stated, discretion to continue the Severance Plan—like all of the relief sought in this Motion—is critical and necessary to assuage Employee fears and motivate them to achieve the Debtors' chapter 11 objectives.  Accordingly, the requested relief should be approved.

---

being administrative priority); *but see also Trustees of Amalgamated Ins. Fund v. McFarlin's, Inc.*, 789 F.2d 98, 104 (2d Cir. 1986) (distinguishing severance pay as compensation "'earned' when the employees are dismissed" and therefore entitled to administrative priority from compensation for "past services" not entitled to priority); *Cohen v. Drexel Burnham Lambert Grp.* (*In re Drexel Burnham Lambert Grp.*), 138 B.R. 687, 696, 710 (Bankr. S.D.N.Y. 1992) (under the Bankruptcy Code, drawing a distinction between the former Act and current Code, and between severance pay allowable as an administrative expense and severance pay owed pursuant to an executory contract); *In re Hooker Invs. Inc.*, 145 B.R. 138, 147 (Bankr. S.D.N.Y. 1993) (questioning applicability of *Straus-Duparquet* to executives' high termination payments).

## II.      Authorizing and Directing Banks is Appropriate

104.      The Debtors also request that the Court authorize and direct the Debtors'

banks and other financial institutions (collectively, the "Banks") to receive, process, honor, and

pay all prepetition and postpetition checks issued or to be issued, and fund transfers requested or

to be requested, by the Debtors for the Prepetition Employee Obligations and any prepetition

Processing Costs.  The Debtors also seek authority to issue new postpetition checks, or effect new

fund transfers, for Prepetition Employee Obligations and any prepetition Processing Costs, to

replace any prepetition checks or fund transfer requests that may be dishonored or rejected and to

reimburse their Employees and Retirees or the applicable payee, as the case may be, for any fees

or costs incurred by them in connection with a dishonored or voided check or funds transfer.

105.      As a result of the commencement of the Debtors' chapter 11 cases, in the

absence of an order of the Court providing otherwise, the Debtors' checks, wire transfers, and

direct deposit transfers for Prepetition Employee Obligations and any prepetition Processing Costs

may be dishonored or rejected by the Banks.

106.      The Debtors represent that each of these checks or transfers is or will be

drawn on the Debtors' payroll and general disbursement accounts and can be readily identified as

relating directly to payment of the Prepetition Employee Obligations and any prepetition

Processing Costs.  Accordingly, the Debtors believe that prepetition checks and transfers other

than those for Prepetition Employee Obligations and any prepetition Processing Costs will not be

honored inadvertently.

### RESERVATION OF RIGHTS

107.      Nothing contained herein is or should be construed as: (a) an implication or

admission as to the validity of any claim against the Debtors, (b) a waiver of the Debtors' or any

other party-in-interest's rights to dispute the amount of, basis for, or validity of any claim against

the Debtors, (c) a waiver of any claims or causes of action that may exist against any creditor or interest holder, (d) a promise to pay any claim, (e) a concession by the Debtors that any lien (contractual, common law, statutory, or otherwise) satisfied pursuant to the Motion are valid (and all rights to contest the extent, validity, or perfection or seek avoidance of all such liens are expressly reserved), (f) an approval, assumption, adoption, or rejection of any agreement, contract, program, policy, or lease between the Debtors and any third party under section 365 of the Bankruptcy Code, (g) a waiver of the obligation of any party in interest to file a proof of claim, or (h) otherwise affecting the Debtors' rights under section 365 of the Bankruptcy Code to assume or reject any executory contract or unexpired lease.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

### DEBTORS HAVE SATISFIED BANKRUPTCY RULE 6003(B)

108.     Bankruptcy Rule 6003 provides that the relief requested in this Motion may be granted if the "relief is necessary to avoid immediate and irreparable harm."  Fed. R. Bankr. P. 6003; *see also In re First NLC Fin. Servs., LLC*, 382 B.R. 547, 549-50 (Bankr. S.D. Fla. 2008) (holding that Bankruptcy Rule 6003 permits entry of retention orders on an interim basis to avoid irreparable harm).  The Second Circuit has interpreted the language "immediate and irreparable harm" in the context of preliminary injunctions.  In that context, the Second Circuit has instructed that irreparable harm "'is a continuing harm which cannot be adequately redressed by final relief on the merits' and for which 'money damages cannot provide adequate compensation.'" *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002) (quoting *N.Y. Pathological & X-Ray Labs., Inc. v. INS*, 523 F.2d 79, 81 (2d Cir. 1975)).  Furthermore, the "harm must be shown to be actual and imminent, not remote or speculative." *Id.*; *see also Rodriguez v. DeBuono*, 175 F.3d

227, 234 (2d Cir. 1998).  The Debtors submit that, for the reasons already set forth herein, the relief requested in this Motion is necessary to avoid immediate and irreparable harm.

## WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(H)

109.    The Debtors also request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  As described above, the relief that the Debtors seek in this Motion is necessary for the Debtors to operate without interruption and to preserve value for their estates.  Accordingly, the Debtors respectfully request that the Court waive the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent applicable, as the exigent nature of the relief sought herein justifies immediate relief.

## NOTICE

110.    Notice of this Motion shall be given to (a) the Office of the United States Trustee for the Southern District of New York; (b) counsel to the administrative agent under the Debtors' prepetition credit agreement; (c) counsel to the indenture trustee under each of the Debtors' outstanding bond issuances; (d) Gibson, Dunn & Crutcher as counsel to the Ad Hoc First Lien Group (as defined in the First Day Declaration); (e) Paul, Weiss, Rifkind, Wharton & Garrison LLP, as counsel to the Ad Hoc Cross-Holder Group (as defined in the First Day Declaration); (f) the U.S. Attorney for the Southern District of New York; (g) the attorneys general for all 50 states and the District of Columbia; (h) the Debtors' 50 largest unsecured creditors on a consolidated basis; (i) the Internal Revenue Service; (j) the Securities and Exchange Commission; (k) the proposed future claimants representative in the Chapter 11 Cases; (l) any party that has requested notice pursuant to Bankruptcy Rule 2002; and (m) any other party entitled to notice pursuant to Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court

for the Southern District of New York.  The Debtors submit that no other or further notice need be

provided.

## **NO PRIOR REQUEST**

111.    No prior request for the relief sought herein has been made to this or any

other court.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

WHEREFORE the Debtors respectfully request that the Court (a) enter the Proposed Interim Order and Proposed Final Order in substantially the forms attached hereto as **Exhibit A** and **Exhibit B** and (b) grant such other and further relief as may be just and proper.

Dated: August 16, 2022
New York, New York

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By:    _/s/ Paul D. Leake_____
Paul D. Leake
Lisa Laukitis
Shana A. Elberg
Evan A. Hill
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
Fax: (212) 735-2000

*Proposed Counsel for the Debtors
and Debtors in Possession*

**<u>Exhibit A</u>**

**Proposed Interim Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| *In re* | **Chapter 11** |
| **ENDO INTERNATIONAL plc,** *et al.,* | **Case No. 22-22549 (___)** |
| **Debtors.**[1] | **(Joint Administration Pending)** |

**INTERIM ORDER (I) AUTHORIZING DEBTORS TO (A) PAY
PREPETITION WAGES, SALARIES, EMPLOYEE BENEFITS AND
OTHER COMPENSATION AND (B) CONTINUE EMPLOYEE BENEFITS
PROGRAMS AND PAY RELATED ADMINISTRATIVE OBLIGATIONS;
(II) AUTHORIZING FINANCIAL INSTITUTIONS TO HONOR AND PROCESS
RELATED CHECKS AND TRANSFERS; AND (III) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the debtors and debtors in possession (collectively, the "Debtors" and together with their non-debtor affiliates, the "Company") in the above-captioned cases (the "Chapter 11 Cases") for an interim order (this "Interim Order") and a final order (a) authorizing, but not directing, the Debtors, in their sole discretion, to (i) pay Prepetition Employee Obligations and related Processing Costs arising under or related to Compensation and Benefits Programs and (ii) continue their Compensation and Benefits Programs in effect as of the Petition Date (and as maybe be amended, renewed, replaced, modified, revised, supplemented and/or terminated from time to time in the ordinary course of business) and pay related administrative obligations; (b) authorizing and directing the Banks to honor and process related checks and transfers; and (c) granting related relief, all as more fully set forth in the Motion;

---

[1]     The last four digits of Debtor Endo International plc's tax identification number are 3755.  Due to the large number of debtors in these chapter 11 cases, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/endo/. The location of the Debtors' service address for purposes of these chapter 11 cases is: 1400 Atwater Drive, Malvern, PA 19355.

[2]     Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

and the Court having reviewed the Motion and the First Day Declaration and having heard the statements of counsel regarding the relief requested in the Motion at a hearing before the Court, if any (the "Hearing"); and the Court having found that (a) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.); (b) this is a core proceeding pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b); (c) venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and (d) due and proper notice of the Motion and the Hearing was sufficient under the circumstances; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates and is in the best interests of the Debtors, their estates, creditors, and other parties-in-interest after taking into account the priority scheme of the Bankruptcy Code; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor;

**IT IS HEREBY ORDERED THAT**

1.      The Motion is GRANTED on an interim basis as set forth herein.

2.      The Debtors are hereby authorized, but not directed, in their sole discretion, to pay all amounts required under or related to the Compensation and Benefits Programs, including any Prepetition Employee Obligations and any prepetition Processing Costs; *provided that*, prior to the entry of an order approving the relief requested in the Motion on a final basis (the "Final Order"), the Debtors shall not (a) pay any amounts in excess of the $15,150 cap under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code (the "Employee Cap") on account of prepetition Wages or (b) pay any amounts before the applicable due dates.

3.      The Debtors are authorized, but not required, in their sole discretion, (a) to continue to pay and honor their obligations arising under or related to their Compensation and

Benefits Programs as such Compensation and Benefits Programs were in effect as of the Petition

Date and (b) upon notice to counsel to the Ad Hoc First Lien Group, to amend, renew, replace,

modify, revise, supplement and/or terminate such Compensation and Benefits Programs in the

ordinary course of business; *provided that*, this Interim Order does not authorize any action that is

otherwise prohibited by the Bankruptcy Code, and, beginning on the date that is seven days after

entry of this Interim Order and on a weekly basis thereafter, the Debtors shall provide a report

describing any payments on account of any prepetition Reimbursable Expenses to counsel to the

Ad Hoc First Lien Group, counsel to the Ad Hoc Cross-Holder Group, counsel to the U.S. Trustee,

and counsel to any Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases

(collectively, the "Notice Parties"), including the name and job title of each employee to be

reimbursed and a description of each expense. The Debtors shall confer with any Notice Party who

objects to such payments to make any adjustments necessary to resolve such objection..

4.      Notwithstanding the authority provided in paragraphs 2 and 3 above,

pending entry of the Final Order, the Debtors are not authorized to remit, pay, satisfy, or honor

prepetition or postpetition obligations that have accrued or will accrue on account of the following:

Outside Director Compensation, Outside Director Expenses, Employee Bonus Plans other than

Spot Awards, Retention Programs, and the Severance Plan.  The Debtors, following consultation

with the Ad Hoc First Lien Group, shall provide seven days' notice to the Notice Parties of any

proposed Spot Awards, including the name and job title of each employee to be paid or awarded.

The Debtors shall not make any such payment pending the resolution of a timely objection from

any Notice Party, including, without limitation, the Ad Hoc First Lien Group. Notwithstanding the

foregoing, the Debtors shall not make any payments of Spot Awards to insiders (as defined in

section 101(31) of the Bankruptcy Code) without further order of this Court.

5.      For the avoidance of doubt, no payment to any Employee may be made pursuant to this Interim Order to the extent that it is a transfer in derogation of section 503(c) of the Bankruptcy Code. This Interim Order does not implicitly or explicitly approve of any bonus plan, incentive plan, severance plan, or other plan covered by section 503(c) of the Bankruptcy Code, and a separate motion will be filed for any request that could fall within section 503(c) of the Bankruptcy Code.

6.      The Debtors are authorized, but not directed, in their sole discretion, to (a) continue utilizing third parties for certain services solely as described in the Motion and to pay or cause to be paid such claims as and when such obligations are due and (b) pay prepetition amounts owing in the ordinary course of business to third parties in connection with administering and maintaining the Compensation and Benefits Programs.

7.      The Debtors are authorized to forward any unpaid amounts on account of deductions or payroll taxes to the appropriate third-party recipients or taxing authorities in accordance with the Debtors' prepetition practices and policies.

8.      All Banks are (a) authorized and directed to receive, process, honor, and pay any and all checks, drafts, electronic transfers, and other forms of payment used by the Debtors on account of the Compensation and Benefits Programs, whether presented before, on or after the Petition Date; and (b) prohibited from placing any hold on, or attempting to reverse, any automatic transfer on account of the Compensation and Benefits Programs.  The Banks shall rely on the representations of the Debtors as to which checks and fund transfers should be honored and paid pursuant to this Order without any duty of further inquiry and without liability for following the Debtors' instructions.

9.    Any party receiving payment from the Debtors is authorized and directed to rely on the representations of the Debtors as to which payments are authorized by this Interim Order.

10.    Notwithstanding anything to the contrary contained herein, any payment to be made hereunder, and any authorization contained herein, shall be subject to and in accordance with any interim and final orders, as applicable, approving the use of cash collateral (the "<u>Cash Collateral Order</u>") and any budget in connection with any such use of cash collateral.  To the extent there is any inconsistency between the terms of the Cash Collateral Order and any action taken or proposed to be taken hereunder, the terms of the Cash Collateral Order shall control.

11.    The Debtors shall maintain a matrix/schedule of payments made pursuant to this Order, including the following information: (a) the names of the payee; (b) the nature, date and amount of the payment; (c) the category or type of payment as characterized in the Motion; and (d) the Debtor or Debtors that made the payment. The Debtors shall provide a copy of such matrix/schedule to the U.S. Trustee, counsel to the Ad Hoc First Lien Group, counsel to the Ad Hoc Cross-Holder Group, and any statutory committee appointed in the Chapter 11 cases every 30 days beginning upon entry of this Order.

12.    Nothing contained in the Motion or this Interim Order, nor any payment made pursuant to the authority granted by this Interim Order, shall constitute or be construed as (a) an admission as to the validity of any claim against the Debtors, (b) a waiver of the Debtors' rights to dispute the amount of, basis for, or validity of any claim against the Debtors, (c) a waiver of any claims or causes of action that may exist against any creditor or interest holder, (d) promise to pay any claim, (e) an approval, assumption, adoption, or rejection of any agreement, contract, program, policy, or lease between the Debtors and any third party under section 365 of the

5

Bankruptcy Code, or (f) otherwise affecting the Debtors' rights under section 365 of the Bankruptcy Code to assume or reject any executory contract or unexpired lease.

13.     Nothing in the Motion or this Interim Order, nor as a result of any payment made pursuant to this Interim Order, shall be deemed or construed as a waiver of the right of the Debtors, or shall impair the ability of the Debtors, to contest the validity and amount of any payment made pursuant to this Interim Order.

14.     Nothing herein shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by any party.

15.     Nothing in the Motion or this Interim Order shall be deemed to authorize the Debtors to make any payments not otherwise due prior to the date of the hearing to consider entry of an order granting the relief requested in the Motion on a final basis (the "Final Hearing").

16.     The Court finds and determines that the requirements of Bankruptcy Rule 6003 are satisfied and that the relief requested is necessary to avoid immediate and irreparable harm.

17.     Under the circumstances of the Chapter 11 Cases, notice of the Motion is adequate under Bankruptcy Rule 6004(a).

18.     Notwithstanding Bankruptcy Rule 6004(h), this Interim Order shall be effective and enforceable immediately upon entry.

19.     The Debtors are authorized and empowered to take all action necessary to effectuate the relief granted in this Interim Order.

20.     The Final Hearing on the Motion shall be held on _____ __, 202__ at __:__ a.m./p.m. (prevailing Eastern Time).  Any objections or responses to the entry of the Proposed Final Order shall be filed and served upon counsel for the Debtors so as to be received

by 4:00 p.m. (prevailing Eastern Time) by no later than seven days before the Final Hearing (the "Objection Deadline")  If no objections or responses are filed and served by the Objection Deadline, the Court may enter a final order without any further notice of a hearing.

21.    This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation, interpretation, or enforcement of this Interim Order.

Dated:  [●], 20__
          [●], New York

_____
THE HONORABLE [___]
U.S. BANKRUPTCY JUDGE

**<u>Exhibit B</u>**

**Proposed Final Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| *In re* | **Chapter 11** |
| **ENDO INTERNATIONAL plc, *et al.*,** | **Case No. 22-22549 (___)** |
| **Debtors.**[1] | **(Joint Administration Pending)** |

**FINAL ORDER (I) AUTHORIZING DEBTORS TO (A) PAY
PREPETITION WAGES, SALARIES, EMPLOYEE BENEFITS AND
OTHER COMPENSATION AND (B) CONTINUE EMPLOYEE BENEFITS
PROGRAMS AND PAY RELATED ADMINISTRATIVE OBLIGATIONS;
(II) AUTHORIZING FINANCIAL INSTITUTIONS TO HONOR AND PROCESS
RELATED CHECKS AND TRANSFERS; AND (III) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the debtors and debtors in possession (collectively, the "Debtors" and together with their non-debtor affiliates, the "Company") in the above-captioned cases (the "Chapter 11 Cases") for an interim order and a final order (this "Final Order") (a) authorizing, but not directing, the Debtors, in their sole discretion, to (i) pay Prepetition Employee Obligations and related Processing Costs arising under or related to Compensation and Benefits Programs and (ii) continue their Compensation and Benefits Programs in effect as of the Petition Date (and as may be amended, renewed, replaced, modified, revised, supplemented and/or terminated from time to time in the ordinary course of business) and pay related administrative obligations; (b) authorizing and directing the Banks to honor and process related checks and transfers; and (c) granting related relief, all as more fully set forth in the Motion; and the Court

---

[1] The last four digits of Debtor Endo International plc's tax identification number are 3755. Due to the large number of debtors in these chapter 11 cases, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/endo/. The location of the Debtors' service address for purposes of these chapter 11 cases is: 1400 Atwater Drive, Malvern, PA 19355.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

having reviewed the Motion and the First Day Declaration and held a hearing to consider the relief

requested in the Motion (the "Hearing"); and the Court having found that (a) the Court has

jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing

Order of Reference M-431, dated January 31, 2012 (Preska, C.J.); (b) this is a core proceeding

pursuant to 28 U.S.C. § 157(a)-(b) and 1334(b); (c) venue is proper before the Court pursuant to

28 U.S.C. §§ 1408 and 1409; and (d) due and proper notice of the Motion has been provided to the

Notice Parties and it appearing that no other or further notice need be provided; and the Court

having determined that the legal and factual bases set forth in the Motion establish just cause for

the relief granted herein; and it appearing that the relief requested in the Motion is necessary to

avoid immediate and irreparable harm to the Debtors and their estates and is in the best interests

of the Debtors, their estate, creditors, and other parties-in-interest after taking into account the

priority scheme of the Bankruptcy Code; and upon all of the proceedings had before the Court and

after due deliberation and sufficient cause appearing therefor;

### IT IS HEREBY ORDERED THAT

1.      The Motion is GRANTED on a final basis as set forth herein.

2.      The Debtors are hereby authorized, but not directed, in their sole discretion,

to pay all amounts required under or related to the Compensation and Benefits Programs, including

any Prepetition Employee Obligations and any prepetition Processing Costs.

3.      The Debtors are authorized, but not required, in their sole discretion, (a) to

continue to pay and honor their obligations arising under or related to their Compensation and

Benefits Programs as such Compensation and Benefits Programs were in effect as of the Petition

Date and (b) upon notice to counsel to the Ad Hoc First Lien Group, to amend, renew, replace,

modify, revise, supplement and/or terminate such Compensation and Benefits Programs in the

ordinary course of business; *provided that*, this Final Order does not authorize any action that is

otherwise prohibited by the Bankruptcy Code, and, beginning on the date that is seven days after entry of this Final Order and on a weekly basis thereafter, the Debtors shall provide a report describing any payments on account of any prepetition Reimbursable Expenses to counsel to the Ad Hoc First Lien Group, counsel to the Ad Hoc Cross-Holder Group, counsel to the U.S. Trustee, and counsel to any Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases (collectively, the "Notice Parties"), including the name and job title of each employee to be reimbursed and a description of each expense. The Debtors shall confer with any Notice Party who objects to such payments to make any adjustments necessary to resolve such objection.

4.      Notwithstanding the authority provided in paragraphs 2 and 3 above, pending entry of this Final Order, the Debtors are not authorized to remit, pay, satisfy, or honor prepetition or postpetition obligations that have accrued or will accrue on account of the following: Outside Director Compensation, Outside Director Expenses, Employee Bonus Plans other than Spot Awards, Retention Programs, and the Severance Plan.   The Debtors shall, following consultation with the Ad Hoc First Lien Group,  provide seven days' notice to the Notice Parties of any proposed Spot Awards, including the name and job title of each employee to be paid or awarded.   The Debtors shall not make any such payment pending the resolution of a timely objection from any Notice Party, including, without limitation, the Ad Hoc First Lien Group. Notwithstanding the foregoing, the Debtors shall not make any payments of Spot Awards to insiders (as defined in section 101(31) of the Bankruptcy Code) without further order of this Court.

5.      The Debtors are authorized, but not directed, in their sole discretion, to (a) continue utilizing third parties for certain services solely as described in the Motion and to pay or cause to be paid such claims as and when such obligations are due and (b) pay prepetition

amounts owing in the ordinary course of business to third parties in connection with administering and maintaining the Compensation and Benefits Programs.

6.      The Debtors are authorized to forward any unpaid amounts on account of deductions or payroll taxes to the appropriate third-party recipients or taxing authorities in accordance with the Debtors' prepetition practices and policies.

7.      All Banks are (a) authorized and directed to receive, process, honor, and pay any and all checks, drafts, electronic transfers, and other forms of payment used by the Debtors on account of the Compensation and Benefits Programs, whether presented before, on, or after the Petition Date; and (b) prohibited from placing any hold on, or attempting to reverse, any automatic transfer on account of the Compensation and Benefits Programs. The Banks shall rely on the representations of the Debtors as to which checks and fund transfers should be honored and paid pursuant to this Final Order without any duty of further inquiry and without liability for following the Debtors' instructions.

8.      Any party receiving payment from the Debtors is authorized and directed to rely on the representations of the Debtors as to which payments are authorized by this Final Order.

9.      Notwithstanding anything to the contrary contained herein, any payment to be made hereunder, and any authorization contained herein, shall be subject to and in accordance with any interim and final orders, as applicable, approving the use of cash collateral (the "Cash Collateral Order") and any budget in connection with any such use of cash collateral. To the extent there is any inconsistency between the terms of the Cash Collateral Order and any action taken or proposed to be taken hereunder, the terms of the Cash Collateral Order shall control.

10.      As directed in the Interim Order, the Debtors shall maintain a matrix/schedule of payments made pursuant to this Order, including the following information:

(a) the names of the payee; (b) the nature, date and amount of the payment; (c) the category or type of payment as characterized in the Motion; and (d) the Debtor or Debtors that made the payment. As directed in the Interim Order, the Debtors shall provide a copy of such matrix/schedule to the U.S. Trustee, counsel to the Ad Hoc First Lien Group, counsel to the Ad Hoc Cross-Holder Group, and any statutory committee appointed in the Chapter 11 Cases every 30 days beginning upon entry of the Interim Order.

11.     Nothing contained in the Motion or this Final Order, nor any payment made pursuant to the authority granted by this Final Order, shall constitute or be construed as (a) an admission as to the validity of any claim against the Debtors, (b) a waiver of the Debtors' rights to dispute the amount of, basis for, or validity of any claim against the Debtors, (c) a waiver of any claims or causes of action that may exist against any creditor or interest holder, (d) promise to pay any claim, (e) an approval, assumption, adoption, or rejection of any agreement, contract, program, policy, or lease between the Debtors and any third party under section 365 of the Bankruptcy Code, or (f) otherwise affecting the Debtors' rights under section 365 of the Bankruptcy Code to assume or reject any executory contract or unexpired lease.

12.     Nothing in the Motion or this Final Order, nor as a result of any payment made pursuant to this Final Order, shall be deemed or construed as a waiver of the right of the Debtors, or shall impair the ability of the Debtors, to contest the validity and amount of any payment made pursuant to this Final Order.

13.     Nothing herein shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by any party.

14.     Notwithstanding Bankruptcy Rule 6004(h), this Final Order shall be effective and enforceable immediately upon entry.

15.     The Debtors are authorized and empowered to take all action necessary to effectuate the relief granted in this Final Order.

16.     This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation, interpretation, or enforcement of this Final Order.

Dated: [●], 20__
      [●], New York

 

_____
THE HONORABLE [___]
U.S. BANKRUPTCY JUDGE