SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Paul D. Leake
Lisa Laukitis
Shana A. Elberg
Evan A. Hill
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
Fax: (212) 735-2000

*Proposed Counsel to Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re* | **Chapter 11** |
| **ENDO INTERNATIONAL plc, *et al.*,** | **Case No. 22-22549 (___)** |
| **Debtors.**[1] | **(Joint Administration Pending)** |

**MOTION OF THE DEBTORS FOR ENTRY
OF INTERIM AND FINAL ORDERS (I) AUTHORIZING
DEBTORS TO HONOR PREPETITION OBLIGATIONS TO
CUSTOMERS AND RELATED THIRD PARTIES AND TO OTHERWISE
CONTINUE CUSTOMER PROGRAMS; (II) GRANTING RELIEF FROM STAY
TO PERMIT SETOFF IN CONNECTION WITH THE CUSTOMER PROGRAMS;
(III) AUTHORIZING FINANCIAL INSTITUTIONS TO HONOR AND PROCESS
RELATED CHECKS AND TRANSFERS; AND (IV) GRANTING RELATED RELIEF**

Endo International plc and its debtor affiliates, as debtors and debtors in possession

(collectively, the "Debtors" and together with their non-debtor affiliates, the "Company") in the

above-captioned chapter 11 cases (the "Chapter 11 Cases"), respectfully represent in support of

this motion (the "Motion") as follows:

---

[1]     The last four digits of Debtor Endo International plc's tax identification number are 3755.  Due to the large number of debtors in these chapter 11 cases, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Endo. The location of the Debtors' service address for purposes of these chapter 11 cases is: 1400 Atwater Drive, Malvern, PA 19355.

## RELIEF REQUESTED

1.     By this Motion, and pursuant to sections 105(a), 363(b) and 553 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Local Rule 9013-1 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules"), the Debtors seek entry of interim and final orders, substantially in the forms attached hereto as Exhibit A (the "Proposed Interim Order") and Exhibit B (the "Proposed Final Order"), respectively, (a) authorizing, but not directing, the Debtors, in their sole discretion, to honor certain prepetition obligations owed to Customers under the Customer Programs (each as defined below) and to otherwise continue, renew, replace, modify, implement, revise and/or terminate Customer Programs in the ordinary course of business; (b) granting relief from the automatic stay to permit setoff in connection with the Customer Programs; (c) authorizing and directing the Banks (as defined below) to honor and process related checks and transfers; and (d) granting related relief.

## JURISDICTION AND VENUE

2.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.).  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

3.     Venue of the Chapter 11 Cases and this Motion is proper in this District under 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

### I.    General Background

4.    On the date hereof (the "Petition Date"), the Debtors each commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors have requested that the Chapter 11 Cases be jointly administered.

5.    The Debtors are authorized to continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.    No trustee, examiner or statutory committee of creditors has been appointed in the Chapter 11 Cases.

7.    Additional information regarding the Debtors, including their business operations, their corporate and capital structure, and the events leading to the commencement of the Chapter 11 Cases is set forth in the *Declaration of Mark Bradley in Support of Chapter 11 Petitions and First Day Papers* (the "First Day Declaration") filed contemporaneously herewith and incorporated herein by reference.

### II.    The Debtors' Products and Customer Base

8.    The Debtors comprise four distinct business segments, owned and operated by four different groups of Debtors (as well as certain non-Debtor affiliates).  The first segment, "Branded Pharmaceuticals," manufactures, markets, and sells brand name pharmaceutical products (the "Branded Products") across two product categories: (a) "Medical Therapeutics," which consists of the "Specialty Products" portfolio, a differentiated and durable portfolio which includes Xiaflex®, Aveed®, and Supprelin LA®, and the "Established Products" portfolio, a diverse range of approximately 20 products, including Testopel®, Lidoderm®, Percocet®, and Edex®; and (b) "Medical Aesthetics," which consists solely of Qwo®, the first and only injectable treatment

3

for moderate-to-severe cellulite. The second segment, "Sterile Injectables," develops, manufactures, markets, and sells a diverse portfolio of sterile injectable products (the "Sterile Injectable Products"), including Vasostrict® and Adrenalin®. The third, "Generics," develops, manufactures, and sells approximately 125 product families (the "Generic Products") across various therapeutic areas. Finally, the "International" segment manages the supply of, markets, and sells approximately 50 products (the "International Products," and together with the Branded Products, Sterile Injectables Products, and Generics Products, the "Products") for a wide variety of therapeutic uses, including attention deficit hyperactivity disorder, pain, women's health, oncology, neurology, and transplantation.

9.       The Debtors' direct customers for their Products are primarily: (a) specialty distributors (the "Distributors") that are responsible for the distribution of Products to end customers; (b) specialty pharmacies (the "Pharmacies") that manage Product prescriptions from intake through shipment; and (c) wholesalers (the "Wholesalers") that warehouse and distribute both retail and non-retail Products, facilitate pricing, and provide routine reporting to the Debtors. The Debtors also contract directly with (a) group purchasing organizations (the "GPOs") that facilitate Product pricing and discounts to institutional end customers, including hospitals, long-term care facilities, physicians clinics, and limited retail customers and (b) pharmacy benefit managers (the "PBMs," and together with the Distributors, Pharmacies, Wholesalers, and GPOs, the "Customers") that ensure coverage and access to certain Products for patients.

10.      For the fiscal year ending December 31, 2021, the Debtors generated net sales of approximately (a) $893.7 million from the Branded Products, (b) $1.3 billion from the Sterile Injectable Products, (c) $740.6 million from the Generic Products, and (iv) $93.0 million from the International Products.

4

### III.    The Customer Programs

11.    To preserve the Debtors' critical relationships with the Customers and maximize customer loyalty, in the ordinary course of business, the Debtors provide certain programs, practices, incentives, discounts, promotions and other accommodations (collectively, the "Customer Programs" and the obligations incurred thereunder, the "Customer Obligations"). The Customer Programs include Chargebacks, Rebates and Fees, Prompt Pay Discounts, Product Returns, Co-Pay Reduction Rebates, and Other Customer Programs (each as defined below).  As explained in greater detail below, the Customer Programs utilized by the Debtors are customary in the pharmaceutical industry and essential to preserving the value of the Debtors' businesses.

12.    Maintaining the goodwill of their Customers through the use of these Customer Programs is critical to the Debtors' ongoing operations and the preservation and maximization of stakeholder value, particularly in such a competitive industry.  If the Debtors are unable to preserve the loyalty of their Customers, the Debtors' businesses would likely suffer material harm.  It is essential, therefore, that the Debtors fulfill their Customer Obligations and continue the Customer Programs to ensure customer satisfaction and maintain the goodwill of their Customers, which is critical to the Debtors' ongoing operations and to preserving and maximizing stakeholder value.  Indeed, absent the ability to continue the Customer Programs and to satisfy Customer Obligations, the Debtors risk losing their current market share, negatively impacting their future business and revenue growth and adversely affecting the Chapter 11 Cases.

13.    As further described below, the Debtors estimate that the aggregate value of accrued prepetition Customer Obligations is approximately $526.7 million, $350.7 million of which is likely to come due during the Interim Period.  The $526.7 million total comprises (a) $227.9 million in accrued Chargebacks (as defined below), all of which is expected to come due during the Interim Period; (b) $102.7 million in accrued Rebates and Fees (as defined below),

$65.3 million of which may come due during the Interim Period; (c) $19.8 million in accrued Prompt Pay Discounts (as defined below), $11.5 million of which may come due during the Interim Period; (d) $52.6 million in accrued Product Returns (as defined below), $12.9 million of which may come due during the Interim Period; (e) $16.6 million in accrued Co-Pay Reduction Rebates (as defined below), $3.2 million of which may come due during the Interim Period; and (f) $107.1 million in Other Customer Programs (as defined below), $29.9 million of which may come due during the Interim Period.  Though the amounts considered are substantial, Chargebacks, Rebates and Fees, Prompt Pay Discounts, Product Returns, and certain Other Customer Programs are typically satisfied by deductions by Customers from payments against outstanding accounts receivable, which the Debtors then review and honor through setoffs within the Debtors' accounting system.  Cash outlays comprise only a fraction of the relief requested herein.

### A.    Chargeback Programs

14.    The Debtors negotiate certain agreements to establish contract pricing and chargebacks (the "Chargeback Agreements") with their Customers.  The Chargeback Agreements govern the terms of sale of Products by Distributors to certain eligible retail pharmacies, hospitals, mail-order pharmacies, hospice providers, long-term care providers, and other institutions (the "Dispensers").  In addition, certain of the Customers may also negotiate agreements to establish contract pricing and/or distribution arrangements directly with the Debtors (the "Purchase Agreements").

15.    Based on the existence of certain Chargeback Agreements or statutory rights, Distributors may be entitled to sell the Debtors' Products to certain eligible Dispensers at a special discounted rate (the "Chargeback Program").  The special discounted rate is less than the wholesale acquisition cost ("WAC") that the Distributors pay the Debtors.  Thus, when the

Distributors sell the Products to eligible Dispensers at a rate lower than WAC, the Debtors are subject to an obligation to compensate the Distributor for the deficiency (a "Chargeback").[2]

16.      When the Distributors ship Products to certain eligible Dispensers, they submit a Chargeback request to the Debtors, which the Debtors promptly review and pay. However, in some cases, due to standard invoicing terms, the Debtors do not receive payment in the amount of the WAC from the Distributors for approximately 30 to 60 days after the Products are shipped to the Distributors, even though a Chargeback may be generated before such payment. Due to the Debtors' long relationships with most of their Customers, the Customers typically deduct the amount of the Chargeback from payments against outstanding accounts receivable, and the Debtors then review and honor such Chargeback deductions through setoffs within the Debtors' own accounting system.

17.      The Debtors also accumulate Chargebacks under their agreement with CMS for Medicaid and relevant statutes.  The Debtors are required to comply with the United States Department of Health and Human Services' 340B Drug Pricing Program (the "340B Program") established under Section 340B of the Public Health Service Act.  Under this program, the Debtors must sell their Products at specified prices that reflect a substantial discount to WAC.  Failure to comply with the 340B Program may result in fines and penalties, and exclusion from other federal programs.  Certain hospitals, clinics, and other entities, as set forth in relevant statutes, provide a minimum share, set by the 340B Program regulations, of their services to low-income patients and receive federal funds from CMS to help cover the costs of providing care to uninsured patients (such hospitals, clinics and other entities, the "340B Entities").  Pursuant to the 340B Program, the

---

[2]      For certain Products, a rebate may be generated instead of a Chargeback.  If a Distributor has a Product in stock and the WAC of such Product is adjusted higher, the Distributor is sent an invoice for the difference in WAC or such amount may be offset from such Distributor's accrued fees.

340B Entities are entitled to receive the Debtors' Products at a discounted price set by statute, which is calculated on a quarterly basis.  340B Entities purchase the Debtors' Products from one of the Debtors' Distributors at the discounted price, and the Distributor then submits a Chargeback to the Debtors for the difference between the WAC price that the Distributor paid to the Debtors and the discounted price paid by the 340B Entity to the Distributor (the "340B Distributor Chargebacks").

18.    On average, the Debtors accrue approximately $211.0 million in Chargebacks, including the 340B Distributor Chargebacks, every month.  The Debtors estimate that the aggregate amount of Chargebacks accrued and owing as of the Petition Date under the Chargeback Program is $227.9 million.

19.    The Debtors request authority to pay and honor, including through implementing or agreeing to setoffs, prepetition Chargebacks owed to the Customers as they come due in the ordinary course of business and consistent with past practice.  The Debtors estimate that the aggregate amount of prepetition Chargebacks so honored during the interim period will be $227.9 million.  Failure to pay and honor the prepetition Chargebacks would likely result in serious and irreparable harm to the Debtors, including more restrictive contract terms, loss of Customer loyalty or market share, and an erosion of Customer satisfaction and goodwill.  If the Debtors are unable to provide the Products on competitive terms, Customers will seek other manufacturers or other alternatives to meet their demand.

20.    Additionally, the Debtors request authority to continue to perform, including through implementing or agreeing to setoffs, under the Chargeback Program on a postpetition basis in the ordinary course of business and consistent with past practice.

B.      **Rebate and Fee Program**

21.     The Debtors also negotiate certain arrangements that contain rebates and fees, including volume price rebates (collectively, the "Rebates and Fees"), with their Customers (the "Rebate and Fee Program").  These Rebates and Fees are mostly part of arrangements that also contain pricing terms and Chargebacks, but are also a part of agreements with payers, the United States federal government, or Canadian local governments.

22.     As with Chargebacks, Rebates and Fees may be deducted by the Customers from payments against outstanding accounts receivable, which the Debtors then review and honor through setoffs within the Debtors' accounting system through the issuance of credits against then-outstanding accounts receivable.  The Debtors also pay Rebates and Fees through cash settlement via check or electronic transfer directly to Customers. On average, the Debtors accrue approximately $34.9 million in Rebates and Fees every month for Products.  The Debtors estimate that the aggregate amount of Rebates and Fees accrued and owing as of the Petition Date for the Products is $102.7 million.

23.     The Debtors request authority to pay and honor, including through implementing or agreeing to setoffs, prepetition Rebates and Fees owed to the Customers as they come due in the ordinary course of business and consistent with past practice.  The Debtors estimate that the aggregate amount of prepetition Rebates and Fees so honored during the interim period will be $65.3 million.  As with Chargebacks, failure to pay and honor the prepetition Rebates and Fees will likely result in serious and irreparable harm to the Debtors, including more restrictive contract terms, loss of Customer loyalty or market share, and an erosion of Customer satisfaction and goodwill; *provided* that the Debtors shall provide updates to the Ad Hoc First Lien Group as to the foregoing upon reasonable request.

9

24.     Additionally, the Debtors request authority to continue to pay and honor, including through implementing or agreeing to setoffs, the Rebates and Fees on a postpetition basis in the ordinary course of business and consistent with past practice; *provided* that the Debtors shall provide updates to the Ad Hoc First Lien Group as to the foregoing upon reasonable request.

C.      **Prompt Pay Discount Program**

25.     The Debtors also negotiate payment terms as part of most Purchase Agreements, often including prompt pay discounts ("Prompt Pay Discounts") for Product purchases by the Customers (the "Prompt Pay Discount Program").  Prompt Pay Discounts offer Customers a reduction in the sales price if the Customers pay the amounts owed earlier than their agreed upon payment terms require and within certain early payment windows.  The Prompt Pay Discount Program is implemented through a write-off to a specific reserve in the Debtors' accounting system established when Products are purchased, and does not require a cash outlay from the Debtors.

26.     On average, the Debtors accrue approximately $9.4 million in Prompt Pay Discounts every month for Products.  The Debtors estimate that the aggregate amount of Prompt Pay Discounts accrued as of the Petition Date for the Products is $19.8 million.  The Debtors request authority to honor the prepetition Prompt Pay Discounts as they come due in the ordinary course of business and consistent with past practice.  The Debtors estimate that the aggregate amount of prepetition Prompt Pay Discounts so honored during the interim period will be $11.5 million.  Paying and honoring the Prompt Pay Discounts is vital to preserving Customer loyalty and goodwill, as it demonstrates the Debtors' ability to provide the Products on competitive terms. Failure to pay and honor these obligations will likely cause some of the Customers to seek other generic manufacturers or other alternatives to the Debtors' Branded Products, Sterile Injectable Products, and International Products to meet their demand.

10

27.     Additionally, the Debtors request authority to continue to honor the Prompt Pay Discounts on a postpetition basis in the ordinary course of business and consistent with past practice.

**D.     Product Return Program**

28.     Similar to other pharmaceutical manufacturers, certain of the Debtors' Products are eligible for expired product returns and failed or damaged product returns (the "Product Return Program" and such returns, "Product Returns").  Though there are variations for certain customers and Products, short-dated and expired Products in original, sealed, unopened packaging may generally be returned within six months prior to the expiration and up to 12 months after the expiration date.  The Debtors also accept returns on certain Products they sell without any contract, which returns are valued based on a weighted average selling price for the lot number returned.

29.     As with Chargebacks and Rebates and Fees, Product Returns may be deducted by Customers from payments against outstanding accounts receivable.  The Debtors review and honor such deductions through setoffs through the issuance of credits against then-outstanding accounts receivable.

30.     The Product Return Program is administered by Inmar RX Solutions Inc. ("Inmar"), pursuant to that certain Master Services Agreement dated as of March 12, 2021 (as amended and supplemented from time to time), by and between Inmar and Debtors Endo Pharmaceuticals Inc. and Par Pharmaceutical, Inc.  The Debtors pay Inmar certain fees for the administration of the Product Return Program, including the processing, sorting, and disposition of the Product Returns.  On average, each month the Debtors accrue approximately (a) $1.2 million in Product Returns for the Branded Products, (b) $2.1 million in Product Returns for the Sterile Injectable Products, and (c) $4.2 million in Product Returns for the Generic Products.  Most of the

Product Returns are processed by Inmar, and the remainder are processed by the Debtors directly. The Debtors also paid Inmar approximately $180,000 in the fiscal year ending December 31, 2021 on account of its administrative obligations under the Product Return Program.

31.     Certain Product Returns in Canada are made by Customers shipping directly to GFL Environmental Services Inc. ("GFL"), a third party administrator, for destruction. GFL invoices the Debtors on a monthly basis. The Debtors paid GFL approximately $33,000 in the fiscal year ending December 31, 2021.

32.     The Debtors estimate that the aggregate amount of the Product Returns accrued and owing as of the Petition Date for the Products is $52.6 million. The Debtors request the authority to pay and honor, including through implementing or agreeing to setoffs, the prepetition Product Returns and prepetition amounts owed to Inmar as they come due in the ordinary course of business and consistent with past practice; *provided* that the Debtors shall provide updates to the Ad Hoc First Lien Group as to the foregoing upon reasonable request. The Debtors estimate that the aggregate amount of prepetition Product Returns so honored during the interim period will be $12.9 million, and the aggregate amount of prepetition amounts owed to Inmar and GFL so honored will be $20,000 and $5,000, respectively. Paying and honoring Product Returns and the administrator of the Product Return Program is vital to maintaining Customer satisfaction and loyalty. Failure to do so would likely cause Customers to purchase from other manufacturers, resulting in decreased market share and revenues which would severely impact the long-term business outlook of the Debtors.

33.     Additionally, the Debtors request the authority to continue to pay and honor, including through implementing or agreeing to setoffs, the Product Returns and to pay Inmar on account of such Product Returns on a postpetition basis in the ordinary course of business and

consistent with past practices; *provided* that the Debtors shall provide updates to the Ad Hoc First Lien Group as to the foregoing upon reasonable request.

E.      **Co-Pay Reductions**

34.     The Debtors provide certain patients with co-pay assistance for Xiaflex®, Supprelin LA®, Nascobal®, Aveed®, and Edex® to offset their out-of-pocket costs ("Co-Pay Reductions"). Co-Pay Reductions are offered to commercially insured patients to help offset the co-payments set by health insurers for prescription medication. Patients eligible for Co-Pay Reductions receive a coupon, either online, from a healthcare provider or at the point of sale. When a patient purchases one of the Debtors' Products at the pharmacy with either a point of sale discount or a discount coupon, the pharmacy submits redemption information to the applicable vendor with whom the Debtors have contracted with to provide coupon adjudication services for the Debtors' Products.

35.     The vendors used by the Debtors are ConnectiveRX (Xiaflex®, Nascobal®), Marketshare Movers (Supprelin LA®, Aveed®), Relay Health and CoverMyMeds (Nascobal®), McKesson (Edex®), and Bayshore (International Products). In each case, the vendor reimburses the pharmacy for the discount and is in turn reimbursed by the Debtors (the "Co-Pay Reduction Rebate"). The Debtors pay each vendor a fee for service and costs for the production of the coupons. The Debtors estimate that as of the Petition Date, approximately $16.6 million has accrued but has not been invoiced or paid for Co-Pay Reductions. The Debtors seek authority to pay Co-Pay Reductions when they become due and to continue to utilize and pay ConnectiveRX, Marketshare Movers, Relay Health, CoverMyMeds, McKesson, and Bayshore on both a prepetition and postpetition basis in the ordinary course of business and consistent with past practices; *provided* that the Debtors shall provide updates to the Ad Hoc First Lien Group as to the foregoing upon reasonable request. The Debtors estimate that the aggregate amount of prepetition

Co-Pay Reductions so honored during the interim period will be $3.2 million, and the aggregate amount of prepetition amounts owed to ConnectiveRX, Marketshare Movers, Relay Health, CoverMyMeds, McKesson, and Bayshore so honored will be $0.  Paying and honoring Co-Pay Reductions and the vendors that administer the Co-Pay Reduction Rebates is vital to maintaining Customer satisfaction and loyalty.

        **F.**    **Other Customer Programs**

36.     The Debtors' other customer programs (collectively, the "Other Customer Programs") include (a) rebates and refunds in connection with Medicaid, (b) certain price adjustments due to promotions, shelf stock adjustments, and the failure to provide adequate supply that are not covered in any other category (the "Price Adjustments"), and (c) allowances that the Debtors negotiate with Customers along with pricing, Chargebacks, and Rebates and Fees, such as stocking allowances for new Products or Products added to an existing contract, certain allowances for inventory on hand at the Customer or in-transit to a Distributor in the event of decreases in WAC or contract price, and certain other negotiated price protections related to increases in contract price.  Payments on account of Other Customer Programs for Medicaid are paid by check or wire, while allowances to Customers are generally honored by setoffs within the Debtors' accounting system through the issuance of credits against then-outstanding accounts receivable.  In addition to the Other Customer Programs discussed in greater detail below, the Debtors pay approximately $1.2 million each month for Price Adjustments, and estimate that the aggregate amount of Price Adjustments accrued and owing as of the Petition Date is $10.9 million.

37.     The Debtors estimate that the aggregate amount of prepetition Price Adjustments so honored during the interim period will be $2.1 million.  Like with the Debtors' other customer programs, paying and honoring Price Adjustments is important for maintaining Customer satisfaction and loyalty.

14

### G.     Medicaid

38.     Medicaid is a health program, jointly funded by state and federal governments and managed by the states, that assists low-income individuals and families in obtaining healthcare.  The Medicaid Drug Rebate Program, a federal and state partnership that offsets the costs of certain prescription medications dispensed to Medicaid patients, requires the Debtors to enter into a national rebate agreement with the Secretary of the Department of Health and Human Services.  In return, Medicaid covers certain of the Products.  In addition, the Debtors have agreements with certain states for rebates under other state programs that serve low-income individuals and families not eligible for Federal Medicaid, as well as supplemental rebate agreements for rebates in excess of those required by federal statute.  Under these programs, individual states collect product utilization data for products paid for under the various state and federal programs and invoice the Debtors for rebates (the "Medicaid Rebates"), which are calculated based on a statutory formula or, for supplemental rebates, on the contractual formula. The Debtors pay the Medicaid Rebates to the various states on a quarterly basis.  The Debtors estimate that approximately $83.5 million has been accrued but has not been invoiced for Medicaid Rebates as of the Petition Date, and that the aggregate amount of prepetition Medicaid Rebates so honored during the interim period will be $27.8 million.

39.     If the Debtors fail to fulfill their Medicaid obligations, including payment of the Medicaid Rebates as they become due, they risk becoming excluded from all federal programs, as well as being subject to penalties and fines.  As such, honoring the Medicaid Rebates is integral to the Debtors' businesses.  Accordingly, the Debtors respectfully request authorization to continue making Medicaid Rebate payments in the ordinary course of business during the Chapter 11 Cases with respect to both prepetition and postpetition sales of their Products.

15

### H.   Medicare Part D

40.    Medicare is a federally administered, national insurance program that primarily serves Americans over the age of 65.  Medicare Part D provides prescription drug benefits to eligible patients.  The Debtors are party to several contracts with private insurance companies, managed care organizations, and PBMs with Medicare Part D business lines ("Medicare Part D Plans"), under which the Debtors pay certain rebates and, in certain cases, administrative or other fees related to Medicare Part D ("Medicare Part D Rebates").  The Debtors pay these rebates and fees under the Medicare Part D Plans monthly or quarterly, based on individual contract terms.  As of the Petition Date, the Debtors estimate that they had accrued but not yet paid approximately $12.7 million in Medicare Part D Rebates, and that the aggregate amount of prepetition Medicare Part D Rebates so honored during the interim period will be $1,000.  The Debtors respectfully request authorization to continue making Medicare Part D Rebate payments in the ordinary course of business during the Chapter 11 Cases with respect to both prepetition and postpetition sales of their Products.  The Debtors are also party to a Medicare Part D Coverage Gap Program Discount Agreement with the Centers for Medicare & Medicaid Services ("CMS"), required under the Patient Protection and Affordable Care Act, as modified by the Affordable Care Act, should manufacturers wish to have coverage for their products under Medicare Part D, pursuant to which the Debtors provide rebates to a certain third party provider of services of CMS, Third Party Administrator ("TPA").  TPA, in turn, administers a program whereby the Medicare Part D Plans provide discounted prescription medications to Medicare Part D beneficiaries within a so-called "coverage gap" (the "Coverage Gap Program").  TPA consolidates claims arising under the Coverage Gap Program and sends an invoice to the Debtors.  TPA is not required to, and does not, provide updates to the Debtors regarding claims that have not yet been included in invoices.  Such Coverage Gap Program invoices are commingled in the

Debtors' accounting system with all other Medicare Part D Rebates, and the Debtors do not seek additional monetary relief for the Coverage Gap Program beyond the limits requested for the Medicare Part D Rebates.  By this Motion, the Debtors seek authority to continue the Coverage Gap Program and to pay any amounts that may become due under the Coverage Gap Program in the ordinary course of business; *provided* that the Debtors shall provide updates to the Ad Hoc First Lien Group as to the foregoing upon reasonable request.

**I.     Federal Supply Schedule**

41.     Based on its agreement with CMS for Medicaid and relevant statutes, the Debtors must also comply with the Department of Veterans Affairs Federal Supply Schedule (the "FSS"), which requires the Debtors to make Products available to federal agencies such as, but not limited to, the Department of Veterans Affairs, Department of Defense, the Coast Guard, Federal Bureau of Prisons and the Public Health Service at deeply discounted prices.  In addition, the Debtors also may offer voluntary additional discounts on the FSS or to the Department of Defense mail order and military treatment facilities (collectively, the "FSS Programs").  For drugs with a "New Drug Application," there is a statutory maximum amount that certain government entities can be charged for pharmaceuticals based on a specific formula.  For multisource prescription drugs or non-prescription products, the prices and discounts are negotiated with the Department of Veterans Affairs, and often equal the lowest commercial institutional price.  Since the price the Debtors charge under the FSS is lower than WAC, the Distributors charge back the Debtors for the difference (the "FSS Rebates"). Failure to comply with the FSS Programs may result in substantial fines and penalties and exclusion from other federal programs, which would diminish the Debtors' customer bases as well as harm the Debtors' relationship with the Distributors.

42.     The Debtors seek authority to continue to sell their Products under the FSS Programs in the ordinary course of business.  The Debtors' estimated average monthly liability for

FSS Rebates is approximately $33.7 million, though FSS Rebates are netted against accounts receivable and thus generally do not result in a cash payment. The Debtors seek authority to continue honoring all FSS Rebates in the ordinary course of business and to apply any prepetition FSS Rebates that may be outstanding against open invoices of their Products in the ordinary course of business.

### J. Industrial Funding Fee

43. The Debtors also collect for the United States Department of Veterans Affairs an additional 0.5% fee on all FSS purchases (the "Industrial Funding Fee"). The Debtors' estimated average quarterly liability for Industrial Funding Fees is $200,000. Manufacturers collect this fee from purchasers at the time of sale, via the FSS Rebates process, and remit payment to the Department of Veterans Affairs on a quarterly basis. The Debtors seek to continue paying the Industrial Funding Fee, whether incurred pre- or postpetition, over to the Department of Veterans Affairs in the ordinary course of business.

### BASIS FOR RELIEF

### I. The Court Should Authorize the Debtors to Maintain the Customer Programs as a Sound Exercise of the Debtors' Business Judgment

44. Section 363(b) of the Bankruptcy Code permits a debtor to use estate property "other than in the ordinary course of business" after notice and a hearing. 11 U.S.C. § 363(b)(1). Courts have authorized relief under section 363(b) where a debtor demonstrates a sound business justification for such relief. *See In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992) (holding that a judge deciding a section 363(b) application must find from the evidence presented before him or her a good business reason to grant such application); *see also Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983) ("The rule we adopt requires that a judge determining a § 363(b) application expressly find from the

evidence presented before him at the hearing a good business reason to grant such an application."); *In re Ionosphere Clubs, Inc.*, 98 B.R. 165, 175 (Bankr. S.D.N.Y. 1989) ("[T]he debtor must articulate some business justification, other than mere appeasement of major creditors.").

45.     The business judgment rule is satisfied "when the following elements are present: (a) a business decision, (b) disinterestedness, (c) due care, (d) good faith and (e) according to some courts and commentators, no abuse of discretion or waste of corporate assets." *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993) (internal quotations omitted).  Once a debtor has articulated a valid business justification, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, good faith and in the honest belief that the action taken was in the best interests of the company.'"  *Id.* (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).  In fact, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct."  *Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).  Courts in this District have consistently and appropriately been loath to interfere with corporate decisions absent a showing of bad faith, self-interest or gross negligence and will uphold a board's decisions as long as they are attributable to any "rational business purpose."  *Integrated Res.*, 147 B.R. at 656.

46.     The Debtors submit that the requested relief represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm, and is justified under sections 363(b) of the Bankruptcy Code.  If the Debtors are prohibited from

19

honoring the Customer Obligations and maintaining their Customer Programs consistent with their past business practices, their Customers may lose confidence in the Debtors' ability to provide the Products on competitive terms, and will likely cause some of the Customers to seek other generic manufacturers or other alternatives to the Debtors' Branded Products and Sterile Injectable Products to meet their demand.  In addition, the damage from refusing to honor these obligations far exceeds the cost associated with honoring prepetition obligations and continuing these practices.  The relief requested herein will protect the Debtors' goodwill with their Customers during this critical time and enhance the Debtors' ability to generate revenue.  Consequently, all of the Debtors' creditors will benefit if the requested relief is granted.

47.     Accordingly, the Debtors request that they, in their discretion, be authorized to (a) fulfill and honor (through payment, setoff, credit, or otherwise) such of their Customer Obligations, whether arising prepetition or postpetition, as they deem appropriate, and (b) continue, renew, replace, implement new, and/or terminate the Customer Programs and any other customer practices as they deem appropriate, without further application to the Court.

## II.     In the Alternative, the Court Should Grant the Motion Pursuant to the Doctrine of Necessity

48.     Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  The bankruptcy court's power to authorize the pre-plan satisfaction of prepetition claims whose payment is critical to the debtor's business is firmly established under the well-settled "doctrine of necessity," which "recognizes the existence of the judicial power to authorize a debtor in a reorganization case to pay prepetition claims where such payment is essential to the continued operation of the debtor." *Ionosphere Clubs*, 98 B.R. at 170; *see also In re C.A.F. Bindery, Inc.*, 199 B.R. 828, 835 (Bankr. S.D.N.Y. 1996) (stating that the doctrine of

necessity "permits the bankruptcy court to authorize the payment of prepetition claims prior to confirmation" when "the payment is 'critical to the debtor's reorganization.'") (citation omitted); *In re Fin. News Network Inc.*, 134 B.R. 732, 735-36 (Bankr. S.D.N.Y. 1992) ("The 'doctrine of necessity' stands for the principle that a bankruptcy court may allow pre-plan payments of prepetition obligations where such payments are critical to the debtor's reorganization.").

49.    Although the "doctrine of necessity" predates the Bankruptcy Code, *see Miltenberger v. Logansport Ry. Co.*, 106 U.S. 286, 309 (1882), the modern application of the doctrine of necessity is grounded in specific provisions of the Bankruptcy Code, including sections 105(a), 1107(a) and 1108.  *See In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (fiduciary duties implicit in section 1107(a) of the Bankruptcy Code justify the "preplan satisfaction of a prepetition claim" where necessary to preserve going concern value).  The doctrine, largely unchanged from the Court's reasoning in *Miltenberger*, is a widely accepted component of bankruptcy jurisprudence.  *See In re Just for Feet, Inc.*, 242 B.R. 821, 826 (D. Del. 1999) (approving payment of key inventory suppliers' prepetition claims when such suppliers could destroy the debtor's business by refusing to deliver new inventory on the eve of debtor's key sales season); *Mich. Bureau of Workers' Disability Comp. v. Chateaugay Corp. (In re Chateaugay Corp.)*, 80 B.R. 279, 285-86 (S.D.N.Y. 1987) (affirming order authorizing payment of prepetition wages, salaries, expenses and benefits); *In re Payless Cashways, Inc.*, 268 B.R. 543, 546-47 (Bankr. W.D. Mo. 2001) (authorizing payment of critical prepetition suppliers' claims when such suppliers agreed to provide postpetition trade credit).

50.    Continuing the Customer Programs is vital to preserving the Debtors' businesses and maximizing the value of the Debtors' estates.  If the Debtors are prohibited from honoring the Customer Programs, Customers from across the Debtors' supply chain may lose

21

confidence in the Debtors' ability to honor orders and may become reluctant to do business with the Debtors in the future. Ultimately, the damage from disregarding these obligations would far exceed the cost associated with honoring the Customer Programs, including prepetition amounts owing in connection therewith. The relief requested herein will protect the Debtors' goodwill and avoid Customers and other third parties integral to the sale of the Debtors' Products being driven away during this critical time.

51.      Courts in this District have granted similar relief in other chapter 11 cases. *See, e.g.*, *In re Purdue Pharm. L.P.*, Case No. 19-23649 (RDD) (Bankr. S.D.N.Y. Sept. 18, 2019); *In re Aegerion Pharm. Inc.*, Case No. 19-11632 (MG) (Bankr. S.D.N.Y. June 27, 2019); *In re Synergy Pharm. Inc.*, Case No. 18-14010 (JLG) (Bankr. S.D.N.Y. Jan. 23, 2019); *In re Aralez Pharm. US Inc.*, Case No. 18-12425 (MG) (Bankr. S.D.N.Y. Sept. 14, 2018); *In re Cenveo Inc.*, Case No. 18-22178 (RDD) (Bankr. S.D.N.Y. Mar. 8, 2018); *In re 21st Century Oncology Holdings Inc.*, Case No. 17-22770 (RDD) (Bankr. S.D.N.Y. June 20, 2017); *In re BCBG Max Azria Glob. Holdings LLC*, Case No. 17-10466 (SCC) (Bankr. S.D.N.Y. Mar. 29, 2017); *In re Avaya Inc.*, Case No. 17-10089 (SMB) (Bankr. S.D.N.Y. Feb. 10, 2017).

## III.    The Court Should Authorize the Debtors to Continue Their Setoff Practices

52.      The Debtors should be authorized to continue permitting Customers to setoff amounts owed to the Debtors against credits that the Debtors owe to Customers in connection with Customer Programs. A right to setoff exists where: (a) the debtor owes a debt to the creditor that arose prepetition; (b) the debtor has a claim against the creditor that arose prepetition and (c) the debt and claim are mutual. *See In re Ionosphere Clubs, Inc.*, 164 B.R. 839 (Bankr. S.D.N.Y. 1994). Setoff rights allow "entities that owe each other money to apply their mutual debts against each other, thereby avoiding 'the absurdity of making A pay B when B owes A.'" *Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 19 (1995) (citations omitted). These non-

bankruptcy setoff rights are preserved in bankruptcy (subject to certain exceptions) through section

553 of the Bankruptcy Code, which states, in relevant part:

> Except as otherwise provided in this section and in sections 362 and
> 363 of this title, this title does not affect any right of a creditor to
> offset a mutual debt owing by such creditor to the debtor that arose
> before the commencement of the case under this title against a claim
> of such creditor against the debtor that arose before the
> commencement of the case.

11 U.S.C. § 553.

53.     Although setoff rights are preserved under section 553, they are also subject

to the restrictions imposed by section 362 of the Bankruptcy Code, which specifically stays "the

setoff of any debt ow[ed] to the debtor that arose before the commencement of the case under this

title against any claim against the debtor." 11 U.S.C. § 362(a).  The court may grant relief from

the automatic stay "for cause." 11 U.S.C. § 362(d).  Furthermore, the Bankruptcy Code expressly

recognizes creditors with a right to setoff as holding secured claims.  Section 506(a) of the

Bankruptcy Code provides that "[a]n allowed claim of a creditor . . . that is subject to setoff under

section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in

the estate's interest in such property . . ." 11 U.S.C. § 506(a).

54.     Here, cause exists to grant such relief to allow the Debtors to permit setoff

of amounts that Customers owe to the Debtors against credits the Debtors owe to Customers in

connection with Customer Programs, and allow the Customers to exercise their contractual right

of setoff regarding undisputed prepetition mutual debts outstanding.  Courts have held that the

existence of a valid setoff right is a *prima facie* showing of cause for relief from the automatic

stay.  *In re Red Rock Services Co., LLC*, 480 B.R. 576, 616 (Bankr. E.D. Pa. 2012); *In re Ealy*,

392 B.R. 408, 414 (Bankr. E.D. Ark. 2008); *In re Nuclear Imaging Systems, Inc.*, 260 B.R. 724,

730 (Bankr. E.D. Pa. 2000).

**IV.      The Court Should Authorize and Direct Banks to Honor and Process Related
            Checks and Transfers**

55.      The Debtors also request that the Court authorize and direct the Debtors'

banks and other financial institutions (collectively, the "Banks") to receive, process, honor and

pay all checks presented for payment of, and to honor all fund transfer requests made by the

Debtors related to, the claims that the Debtors request authority to pay in this Motion, regardless

of whether the checks were presented or fund transfer requests were submitted before, on or after

the Petition Date, provided that funds are available in the Debtors' accounts to cover the checks

and fund transfers and that the Banks are authorized to rely on the Debtors' designation of any

particular check as approved by the Proposed Interim Order and the Proposed Final Order.

56.      The Debtors have sufficient liquidity to pay the amounts set forth in this

Motion in the ordinary course of business and have implemented controls to ensure that prepetition

claims will not be paid out except as authorized by this Court.  The Debtors therefore submit that

the payment-processing procedures described in this Motion are appropriate.

## <u>RESERVATION OF RIGHTS</u>

57.      Nothing contained herein is or should be construed as: (a) an implication or

admission as to the validity of any claim against the Debtors, (b) a waiver of the Debtors' or any

other party-in-interest's rights to dispute the amount of, basis for, or validity of any claim against

the Debtors, (c) a waiver of any claims or causes of action that may exist against any creditor or

interest holder, (d) a promise to pay any claim, (e) a concession by the Debtors that any liens

(contractual, common law, statutory or otherwise) satisfied pursuant to this Motion are valid (and

all rights to contest the extent, validity or perfection or seek avoidance of all such liens are

expressly reserved), (f) an approval, assumption, adoption, or rejection of any agreement, contract,

program, policy, or lease between the Debtors and any third party under section 365 of the

Bankruptcy Code, (g) a waiver of the obligation of any party in interest to file a proof of claim, or (h) otherwise affecting the Debtors' rights under section 365 of the Bankruptcy Code to assume or reject any executory contract or unexpired lease. If this Court grants the relief sought herein, any payment made pursuant to this Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

## DEBTORS HAVE SATISFIED BANKRUPTCY RULE 6003(B)

58.    Bankruptcy Rule 6003 provides that the relief requested in this Motion may be granted if the "relief is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003; *see also In re First NLC Fin. Servs., LLC*, 382 B.R. 547, 549-50 (Bankr. S.D. Fla. 2008) (holding that Bankruptcy Rule 6003 permits entry of retention orders on an interim basis to avoid irreparable harm). The Second Circuit has interpreted the language "immediate and irreparable harm" in the context of preliminary injunctions. In that context, the Second Circuit has instructed that irreparable harm "is a continuing harm which cannot be adequately redressed by final relief on the merits and for which 'money damages cannot provide adequate compensation.'" *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002) (quoting *N.Y. Pathological & X-Ray Labs., Inc. v. INS*, 523 F.2d 79, 81 (2d Cir. 1975)). Furthermore, the "harm must be shown to be actual and imminent, not remote or speculative." *Id.*; *see also Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1998). The Debtors submit that, for the reasons already set forth herein, the relief requested in this Motion is necessary to avoid immediate and irreparable harm.

## WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(H)

59.    The Debtors also request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of

property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  As described above, the relief that the Debtors seek in this Motion is necessary for the Debtors to operate without interruption and to preserve value for their estates.  Accordingly, the Debtors respectfully request that the Court waive the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent applicable, as the exigent nature of the relief sought herein justifies immediate relief.

## NOTICE

60.     Notice of this Motion shall be given to (a) the U.S. Trustee; (b) counsel to the administrative agent under the Debtors' prepetition credit agreement; (c) counsel to the indenture trustee under each of the Debtors' outstanding bond issuances; (d) Gibson, Dunn & Crutcher LLP as counsel to the Ad Hoc First Lien Group (as defined in the First Day Declaration); (e) Paul, Weiss, Rifkind, Wharton & Garrison LLP as counsel to the Ad Hoc Cross-Holder Group (as defined in the First Day Declaration); (f) the U.S. Attorney for the Southern District of New York; (g) the attorneys general for all 50 states and the District of Columbia; (h) the Debtors' 50 largest unsecured creditors on a consolidated basis; (i) the Internal Revenue Service; (j) the Securities and Exchange Commission; (k) the proposed future claimants representative in the Chapter 11 Cases; (l) the Banks; (m) any party that has requested notice pursuant to Bankruptcy Rule 2002; and (n) any other party entitled to notice pursuant to Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York. The Debtors submit that no other or further notice need be provided.

## NO PRIOR REQUEST

61.     No prior request for the relief sought herein has been made to this or any other court.

WHEREFORE the Debtors respectfully request that the Court (a) enter the

Proposed Interim Order and Proposed Final Order in substantially the forms attached hereto and

(b) grant such other and further relief as may be just and proper.

Dated: August 16, 2022                    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
       New York, New York

                                           _/s/ Paul D. Leake_____
                          By:   Paul D. Leake
                                Lisa Laukitis
                                Shana A. Elberg
                                Evan A. Hill
                                One Manhattan West
                                New York, New York 10001
                                Telephone: (212) 735-3000
                                Fax: (212) 735-2000

                                *Proposed Counsel for the Debtors*
                                *and Debtors in Possession*

**<u>Exhibit A</u>**

**Proposed Interim Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re* | **Chapter 11** |
| **ENDO INTERNATIONAL plc,** *et al.*, | **Case No. 22-22549 (___)** |
| **Debtors.**[1] | **(Joint Administration Pending)** |

**INTERIM ORDER (I) AUTHORIZING DEBTORS TO
HONOR PREPETITION OBLIGATIONS TO CUSTOMERS AND
RELATED THIRD PARTIES AND TO OTHERWISE CONTINUE
CUSTOMER PROGRAMS; (II) GRANTING RELIEF FROM STAY TO
PERMIT SETOFF IN CONNECTION WITH THE CUSTOMER PROGRAMS;
(III) AUTHORIZING FINANCIAL INSTITUTIONS TO HONOR AND PROCESS
RELATED CHECKS AND TRANSFERS; AND (IV) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the debtors and debtors in possession (collectively, the "Debtors" and together with their non-debtor affiliates, the "Company") in the above-captioned cases (the "Chapter 11 Cases") for an order (a) authorizing, but not directing, the Debtors, in their sole discretion, to honor certain prepetition obligations owed to Customers under the Customer Programs and to otherwise continue, renew, replace, modify, implement, revise and/or terminate Customer Programs in the ordinary course of business; (b) granting relief from stay to permit setoff in connection with the Customer Programs; (c) authorizing and directing the Banks to honor and process related checks and transfers; and (d) granting related relief, all as more fully set forth in the Motion; and the Court having reviewed the Motion and the First Day

---

[1]   The last four digits of Debtor Endo International plc's tax identification number are 3755. Due to the large number of debtors in these chapter 11 cases, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.primeclerk.com/endo/. The location of the Debtors' service address for purposes of these chapter 11 cases is: 1400 Atwater Drive, Malvern, PA 19355.

[2]   Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

Declaration and having heard the statements of counsel regarding the relief requested in the Motion at a hearing before the Court (the "Hearing"); and the Court having found that (a) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b) and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.); (b) this is a core proceeding pursuant to 28 U.S.C. § 157(b); (c) venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and (d) due and proper notice of the Motion and the Hearing was sufficient under the circumstances; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein, in that such relief provides a material net benefit to the Debtors' estates and creditors after taking into account the Bankruptcy Code's priority scheme, such relief is necessary to avoid immediate and irreparable harm to the Debtors and their estates as contemplated by Bankruptcy Rule 6003(b) and is a proper exercise of business judgment and in the best interests of the Debtors, their estates, creditors and all parties in interest; now, therefore,

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is GRANTED on an interim basis as set forth herein.

2.      The Debtors are authorized, but not directed, in their sole discretion, to continue the Customer Programs in the ordinary course of business and without further order of this Court, to perform and honor all prepetition obligations thereunder that come due during the Interim Period, including making all payments, satisfying all obligations and permitting all setoffs in connection therewith, in each case, in the ordinary course of business and in the same manner and on the same basis as if the Debtors performed and honored such obligations prior to the Petition Date; *provided* that the Debtors shall provide updates to the Ad Hoc First Lien Group as to the foregoing upon reasonable request.

3.     The Debtors are authorized, but not directed, to the extent that such claims or amounts come due during the Interim Period, to (a) continue utilizing third parties in connection with administering and maintaining the Customer Programs as described in the Motion and to pay or caused to be paid such claims as and when such obligations are due and (b) pay prepetition amounts owing in the ordinary course of business to third parties in connection with administering and maintaining the Customer Programs; *provided* that the Debtors shall provide updates to the Ad Hoc First Lien Group as to the foregoing upon reasonable request.

4.     The Debtors are authorized, but not directed, in their sole discretion, to continue, renew, replace, modify, implement, revise and/or terminate their Customer Programs as they deem appropriate, in their sole discretion, and in the ordinary course of business, without further application to this Court; *provided* that the Debtors shall provide updates to the Ad Hoc First Lien Group.

5.     All Banks are (a) authorized and directed to receive, process, honor and pay any and all checks, drafts, electronic transfers and other forms of payment used by the Debtors on account of the Customer Programs, whether presented before, on or after the Petition Date; and (b) prohibited from placing any hold on, or attempting to reverse, any automatic transfer on account of the Customer Programs.  The Banks shall rely on the representations of the Debtors as to which checks and fund transfers should be honored and paid pursuant to this Order without any duty of further inquiry and without liability for following the Debtors' instructions.

6.     Any party receiving payment from the Debtors is authorized and directed to rely on the representations of the Debtors as to which payments are authorized by this Order.

7.     The Debtors shall maintain a matrix/schedule of cash payments made pursuant to this Order, including the following information: (a) the names of the payee; (b) the

nature, date and amount of the payment; (c) the category or type of payment as characterized in

the Motion; and (d) the Debtor or Debtors that made the payment. The Debtors shall provide a

copy of such matrix/schedule to the U.S. Trustee, counsel to the Ad Hoc First Lien Group, counsel

to the Ad Hoc Cross-Holder Group, and any statutory committee appointed in these Chapter 11

Cases every 30 days beginning upon entry of this Order.

8.     Nothing contained herein is or should be construed as: (a) an implication or

admission as to the validity of any claim against the Debtors, (b) a waiver of the Debtors' or any

other party-in-interest's rights to dispute the amount of, basis for, or validity of any claim against

the Debtors, (c) a waiver of any claims or causes of action that may exist against any creditor or

interest holder, (d) a promise to pay any claim, (e) a concession by the Debtors that any liens

(contractual, common law, statutory or otherwise) satisfied pursuant to the Motion are valid (and

all rights to contest the extent, validity or perfection or seek avoidance of all such liens are

expressly reserved), (f) an approval, assumption, adoption, or rejection of any agreement, contract,

program, policy, or lease between the Debtors and any third party under section 365 of the

Bankruptcy Code, (g) a waiver of the obligation of any party in interest to file a proof of claim, or

(h) otherwise affecting the Debtors' rights under section 365 of the Bankruptcy Code to assume or

reject any executory contract or unexpired lease.  If this Court grants the relief sought herein, any

payment made pursuant to this Court's order is not intended to be and should not be construed as

an admission to the validity of any claim or a waiver of the Debtors' rights to subsequently dispute

such claim.

9.     Notwithstanding anything to the contrary contained herein, any payment to

be made hereunder, and any authorization contained, hereunder herein, shall be subject to and in

accordance with any interim and final orders, as applicable, approving the use of cash collateral

(the "Cash Collateral Order") and any budget in connection with any such use of cash collateral. To the extent there is any inconsistency between the terms of the Cash Collateral Order and any action taken or proposed to be taken hereunder, the terms of the Cash Collateral Order shall control.

10.     Nothing in the Motion or this Order, nor as a result of any payment made pursuant to this Order, shall be deemed or construed as a waiver of the right of the Debtors, or shall impair the ability of the Debtors, to contest the validity and amount of any payment made pursuant to this Order.

11.     Nothing herein shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by any party.

12.     Nothing in the Motion or this Order shall be deemed to authorize the Debtors to make any payments not otherwise due prior to the date of the hearing to consider entry of an order granting the relief requested in the Motion on a final basis (the "Final Hearing").

13.     The Court finds and determines that the requirements of Bankruptcy Rule 6003 are satisfied and that the relief requested is necessary to avoid immediate and irreparable harm.

14.     Under the circumstances of the Chapter 11 Cases, notice of the Motion is adequate under Bankruptcy Rule 6004(a).

15.     Notwithstanding Bankruptcy Rule 6004(h), this Order shall be effective and enforceable immediately upon entry.

16.     The Debtors are authorized and empowered to take all action necessary to effectuate the relief granted in this Order.

17.     The Final Hearing on the Motion shall be held on _____ __, 201__ at __:__ a.m./p.m. (prevailing Eastern Time).  Any objections or responses to the entry of

the Proposed Final Order shall be filed and served upon counsel for the Debtors so as to be received by 4:00 p.m. (prevailing Eastern Time) by no later than seven days before the Final Hearing (the "Objection Deadline").  If no objections or responses are filed and served by the Objection Deadline, the Court may enter a final order without any further notice of a hearing.

18.     This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

Dated: [●], 2022
          [●], New York

_____
THE HONORABLE [_____]
U.S. BANKRUPTCY JUDGE

6

**<u>Exhibit B</u>**

**Proposed Final Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re* | **Chapter 11** |
| **ENDO INTERNATIONAL plc, *et al.*,** | **Case No. 22-22549 (___)** |
| **Debtors.**[1] | **(Joint Administration Pending)** |

**FINAL ORDER (I) AUTHORIZING DEBTORS TO
HONOR PREPETITION OBLIGATIONS TO CUSTOMERS AND
RELATED THIRD PARTIES AND TO OTHERWISE CONTINUE
CUSTOMER PROGRAMS; (II) GRANTING RELIEF FROM STAY TO
PERMIT SETOFF IN CONNECTION WITH THE CUSTOMER PROGRAMS;
(III) AUTHORIZING FINANCIAL INSTITUTIONS TO HONOR AND PROCESS
RELATED CHECKS AND TRANSFERS; AND (IV) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the debtors and debtors in possession (collectively, the "Debtors" and together with their non-debtor affiliates, the "Company") in the above-captioned cases (the "Chapter 11 Cases") for an order (a) authorizing, but not directing, the Debtors, in their sole discretion, to honor certain prepetition obligations owed to Customers under the Customer Programs and practices and to otherwise continue, renew, replace, modify, implement, revise and/or terminate Customer Programs in the ordinary course of business; (b) granting relief from stay to permit setoff in connection with the Customer Programs; (c) authorizing and directing Banks to honor and process related checks and transfers; and (d) granting related relief, all as more fully set forth in the Motion; and the Court having reviewed

---

[1]     The last four digits of Debtor Endo International plc's tax identification number are 3755.  Due to the large number of debtors in these chapter 11 cases, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.primeclerk.com/endo/.  The location of the Debtors' service address for purposes of these chapter 11 cases is: 1400 Atwater Drive, Malvern, PA 19355.

[2]     Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

the Motion and the First Day Declaration and having heard the statements of counsel regarding

the relief requested in the Motion at a hearing before the Court, if any (the "Hearing"); and the

Court having found that (a) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§

157(a)-(b) and 1334(b) and the Amended Standing Order of Reference M-431, dated January 31,

2012 (Preska, C.J.); (b) this is a core proceeding pursuant to 28 U.S.C. § 157(b); (c) venue is proper

before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and (d) due and proper notice of the

Motion and the Hearing was sufficient under the circumstances; and the Court having determined

that the legal and factual bases set forth in the Motion establish just cause for the relief granted

herein, in that such relief provides a material net benefit to the Debtors' estates and creditors after

taking into account the Bankruptcy Code's priority scheme and such relief is a proper exercise of

business judgment and in the best interests of the Debtors, their estates, creditors and all parties in

interest; now, therefore,

### IT IS HEREBY ORDERED THAT:

1.     The Motion is GRANTED on a final basis as set forth herein.

2.     The Debtors are authorized, but not directed, in their sole discretion, to

continue the Customer Programs in the ordinary course of business and without further order of

this Court, to perform and honor all prepetition obligations thereunder, including making all

payments, satisfying all obligations and permitting all setoffs in connection therewith, in each case,

in the ordinary course of business and in the same manner and on the same basis as if the Debtors

performed and honored such obligations prior to the Petition Date; *provided* that the Debtors shall

provide updates to the Ad Hoc First Lien Group as to the foregoing upon reasonable request.

3.     The Debtors are authorized, but not directed, to (a) continue utilizing third

parties in connection with administering and maintaining the Customer Programs as described in

the Motion and to pay or caused to be paid such claims as and when such obligations are due and

(b) pay prepetition amounts owing in the ordinary course of business to third parties in connection with administering and maintaining the Customer Programs; *provided* that the Debtors shall provide updates to the Ad Hoc First Lien Group as to the foregoing upon request.

4.      The Debtors are authorized, but not directed, in their sole discretion, to continue, renew, replace, modify, implement, revise and/or terminate their Customer Programs as they deem appropriate, in their sole discretion, and in the ordinary course of business, without further application to this Court; *provided* that the Debtors shall provide updates to the Ad Hoc First Lien Group as to the foregoing upon reasonable request.

5.      All Banks are (a) authorized and directed to receive, process, honor and pay any and all checks, drafts, electronic transfers and other forms of payment used by the Debtors on account of the Customer Programs, whether presented before, on or after the Petition Date; and (b) prohibited from placing any hold on, or attempting to reverse, any automatic transfer on account of the Customer Programs. The Banks shall rely on the representations of the Debtors as to which checks and fund transfers should be honored and paid pursuant to this Order without any duty of further inquiry and without liability for following the Debtors' instructions.

6.      Any party receiving payment from the Debtors is authorized and directed to rely on the representations of the Debtors as to which payments are authorized by this Order.

7.      As directed in the Interim Order, the Debtors shall maintain a matrix/schedule of cash payments made pursuant to this Order, including the following information: (a) the names of the payee; (b) the nature, date and amount of the payment; (c) the category or type of payment as characterized in the Motion; and (d) the Debtor or Debtors that made the payment.  As directed in the Interim Order, the Debtors shall provide a copy of such matrix/schedule to the U.S. Trustee, counsel to the Ad Hoc First Lien Group, counsel to the Cross-

Holder Group, and any statutory committee appointed in the Chapter 11 Cases every 30 days

beginning upon entry of the Interim Order.

8. Nothing contained herein is or should be construed as: (a) an implication or

admission as to the validity of any claim against the Debtors, (b) a waiver of the Debtors' or any

other party-in-interest's rights to dispute the amount of, basis for, or validity of any claim against

the Debtors, (c) a waiver of any claims or causes of action that may exist against any creditor or

interest holder, (d) a promise to pay any claim, (e) a concession by the Debtors that any liens

(contractual, common law, statutory or otherwise) satisfied pursuant to the Motion are valid (and

all rights to contest the extent, validity or perfection or seek avoidance of all such liens are

expressly reserved), (f) an approval, assumption, adoption, or rejection of any agreement, contract,

program, policy, or lease between the Debtors and any third party under section 365 of the

Bankruptcy Code, (g) a waiver of the obligation of any party in interest to file a proof of claim, or

(h) otherwise affecting the Debtors' rights under section 365 of the Bankruptcy Code to assume or

reject any executory contract or unexpired lease. If this Court grants the relief sought herein, any

payment made pursuant to this Court's order is not intended to be and should not be construed as

an admission to the validity of any claim or a waiver of the Debtors' rights to subsequently dispute

such claim.

9. Notwithstanding anything to the contrary contained herein, any payment to

be made hereunder, and any authorization contained, hereunder herein, shall be subject to and in

accordance with any interim and final orders, as applicable, approving the use of cash collateral

(the "Cash Collateral Order") and any budget in connection with any such use of cash collateral.

To the extent there is any inconsistency between the terms of the Cash Collateral Order and any

action taken or proposed to be taken hereunder, the terms of the Cash Collateral Order shall control.

5

10.     Nothing in the Motion or this Order, nor as a result of any payment made pursuant to this Order, shall be deemed or construed as a waiver of the right of the Debtors, or shall impair the ability of the Debtors, to contest the validity and amount of any payment made pursuant to this Order.

11.     Nothing herein shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by any party.

12.     Notwithstanding Bankruptcy Rule 6004(h), this Order shall be effective and enforceable immediately upon entry.

13.     The Debtors are authorized and empowered to take all action necessary to effectuate the relief granted in this Order.

14.     This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

Dated: [●], 20__
        [●], New York


_____
THE HONORABLE [___]
U.S. BANKRUPTCY JUDGE