SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Paul D. Leake
Lisa Laukitis
Shana A. Elberg
Evan A. Hill
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
Fax: (212) 735-2000

*Proposed Counsel to Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re* | **Chapter 11** |
| **ENDO INTERNATIONAL plc**, *et al.*, | **Case No. 22-22549 (___)** |
| **Debtors.**[1] | **(Joint Administration Pending)** |

**MOTION OF THE DEBTORS FOR ENTRY OF INTERIM
AND FINAL ORDERS (I) AUTHORIZING PAYMENT
OF CERTAIN PREPETITION SPECIFIED TRADE CLAIMS;
(II) AUTHORIZING FINANCIAL INSTITUTIONS TO HONOR AND PROCESS
RELATED CHECKS AND TRANSFERS; AND (III) GRANTING RELATED RELIEF**

Endo International plc and its debtor affiliates, as debtors and debtors in possession

(collectively, the "Debtors" and together with their non-debtor affiliates, the "Company") in the

above-captioned chapter 11 cases (the "Chapter 11 Cases"), respectfully represent in support of

this motion (the "Motion") as follows:

---

[1]    The last four digits of Debtor Endo International plc's tax identification number are 3755. Due to the large number of debtors in these chapter 11 cases, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Endo. The location of the Debtors' service address for purposes of these chapter 11 cases is: 1400 Atwater Drive, Malvern, PA 19355.

## **RELIEF REQUESTED**

1.      By this Motion, and pursuant to sections 105(a), 363(b), and 503(b) of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and Local Rule 9013-1 of the Local Bankruptcy Rules for the Southern District of New York (the "<u>Local Rules</u>") the Debtors seek entry of interim and final orders, substantially in the forms attached hereto as **<u>Exhibit A</u>** (the "<u>Proposed Interim Order</u>") and **<u>Exhibit B</u>** (the "<u>Proposed Final Order</u>"), respectively, (i) authorizing, but not directing, the Debtors, in their sole discretion, to pay certain Specified Trade Claims (as defined below) in the ordinary course of business of (a) common carriers, warehousemen, toll processors, mechanics, and freight forwarders, in each case that may have or may be capable of asserting liens against the Debtors' property (collectively, the "<u>Lienholders</u>"); (b) certain vendors entitled to administrative expense status under section 503(b)(9) of the Bankruptcy Code (the "<u>503(b)(9) Vendors</u>") in the ordinary course; (c) third party, unaffiliated vendors that, upon information and belief, have minimal or no assets within the United States (the "<u>Foreign Vendors</u>"); and (d) essential vendors, contractors, and suppliers (the "<u>Critical Vendors</u>") in an aggregate amount not to exceed $20 million on an interim basis and $30 million on a final basis (each of the foregoing, as applicable, the "<u>Critical Vendors Claims Cap</u>"); (ii) approving procedures related to the payment of the Specified Trade Claims; (iii) authorizing and directing the Banks (as defined below) to honor and process related checks and transfers; and (iv) granting related relief.[2]

---

[2]      To minimize the amount of payments required, the Debtors request authority to identify Critical Vendors for purposes of this Motion and the relief requested herein in the ordinary course of their business.  Identifying and publicly disclosing the Critical Vendors now would likely cause all such vendors to demand payment in full.  The Debtors shall provide this Court, the U.S. Trustee, counsel to the Ad Hoc First Lien Group (as defined in the *Interim Order (I) Authorizing Debtors to Use Cash Collateral; (II) Granting Adequate Protection to Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related*

2.      The Debtors believe that the limited relief requested on an interim basis is the minimum amount necessary to avoid the immediate and irreparable harm that would befall the Debtors' estates if the Debtors were unable to pay any claims of the Lienholders, 503(b)(9) Vendors, Foreign Vendors, and Critical Vendors  (collectively, the "Specified Trade Claimants" and their claims, the "Specified Trade Claims") prior to the final hearing on this Motion.  While the Debtors are seeking limited relief on an interim basis, they submit that the full relief requested pursuant to the Proposed Final Order is critical to maximizing the value of the Debtors' estates beyond the initial interim period.[3]

## JURISDICTION AND VENUE

3.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.).  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

4.      Venue of the Chapter 11 Cases and this Motion is proper in this District under 28 U.S.C. §§ 1408 and 1409.

---

*Relief* entered on the docket of the Chapter 11 Cases (the "Interim Cash Collateral Order")), counsel to the Ad Hoc Cross-Holder Group (as defined in the Interim Cash Collateral Order), and any official committee appointed in the Chapter 11 Cases with reasonable and timely access to information, including a list of Critical Vendors, which such parties shall keep confidential and treat as for professional eyes only, sufficient to enable such parties to monitor payments made, obligations satisfied, and other actions taken.

[3]      Certain parties may receive payment on account of their prepetition claims pursuant to other motions that have been or may be filed by the Debtors.  To the extent that a party receives payment on account of its prepetition claim pursuant to an order approving any such motion, this Motion shall not apply to such prepetition claim.

## BACKGROUND

**I.   General Background**

5.     On the date hereof (the "<u>Petition Date</u>"), the Debtors each commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors have requested that the Chapter 11 Cases be jointly administered.

6.     The Debtors are authorized to continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7.     No trustee, examiner or statutory committee of creditors has been appointed in the Chapter 11 Cases.

8.     Additional information regarding the Debtors, including their business operations, their corporate and capital structure, and the events leading to the commencement of the Chapter 11 Cases is set forth in the *Declaration of Mark Bradley in Support of Chapter 11 Petitions and First Day Papers* (the "<u>First Day Declaration</u>") filed contemporaneously herewith and incorporated herein by reference.

**II.   Overview**

9.     The following table summarizes the types of claims that the Debtors request authority to pay pursuant to this Motion:

| Category (each defined below) | Description |
|---|---|
| **Lienholder Claims** | Claims by vendors that provide shipping, transport, warehouses, freight forwarding, and mechanical services who have lien rights under applicable non-bankruptcy law |
| **503(b)(9) Claims** | Claims by vendors based on the delivery of goods or materials within the 20 days before the Petition Date |
| **Foreign Vendor Claims** | Claims by third-party vendors that have minimal or no assets in the United States |
| **Critical Vendor Claims** | Claims by suppliers of equipment, goods, and services essential to the Debtors' business that are not otherwise Lienholders, 503(b)(9) Vendors, or Foreign Vendors |

10.     Each of the foregoing categories of claimants will be discussed in turn.

## III.    The Lienholders

### A.    Common Carriers

11.     In the ordinary course of operations, the Debtors' supply and delivery system depends upon the use of common carriers operated by third parties, including ocean freight, trucking services, air transport, and rail carriers (the "Common Carriers"), to receive shipments of raw materials from their vendors and transport materials and products throughout the manufacturing process.  As a result of the services they provide, the Common Carriers regularly possess certain of the Debtors' raw materials, goods, and equipment in the ordinary course of the Debtors' operations.

12.     Under some state laws, Common Carriers may have a possessory lien on the goods in their possession, which secures payment of claims incurred in connection with the storage or transportation of goods.[4]  In addition, pursuant to section 363(e) of the Bankruptcy Code, the Common Carriers, as bailees, may be entitled to adequate protection for valid possessory liens.  If the Debtors fail to pay the Common Carriers in a timely manner, the Common Carriers may seek to assert liens against the Debtors' raw materials, goods, and equipment in the Common Carriers' possession, which could potentially block the Debtors' access to the goods that are in transport.  While the Debtors reserve all rights to contest such actions, such actions would severely damage the Debtors' ability to operate their businesses for the benefit of all stakeholders.

---

[4]      For example, section 7-307 of the Uniform Commercial Code provides, in pertinent part, that a "carrier has a lien on the goods covered by a bill of lading or on the proceeds thereof in its possession for charges after the date of the carrier's receipt of the goods for storage or transportation, including demurrage and terminal charges, and for expenses necessary for preservation of the goods incident to their transportation or reasonably incurred in their sale pursuant to law."  U.C.C. § 7-307(a) (2003).

5

B.    **Warehouses**

13.    The Debtors also supplement their own storage and distribution facilities with third-party warehouse facilities (the "Warehouses") to store goods. The Debtors have multiple Warehouses across the globe, including in the United States, Canada, and United Kingdom. The Warehouses regularly hold products and materials owned by the Debtors. As with the Common Carriers, under applicable laws, warehousemen may be able to assert liens on the goods in their possession to secure the charges or expenses incurred in connection with the storage of those goods under applicable laws. While the Debtors reserve all rights to contest such actions, it cannot be disputed that such actions would severely damage the Debtors' ability to operate their businesses for the benefit of all stakeholders.

C.    **Toll Processors**

14.    In the ordinary course of business, the Debtors also utilize the services of certain third-party toll processors (the "Toll Processors") with respect to the Debtors' finished products. As is typical for most toll processing arrangements, the Debtors supply the formula, raw materials and, in certain cases, equipment or other property to the Toll Processors, which the Toll Processors then use to blend, package, and/or produce and manufacture the Debtors' final products. The Debtors either provide their API (as defined below) directly to the Toll Processors or indirectly through a third party.

15.    The Debtors utilize the Toll Processors for current commercialized products and for pipeline development projects where the drug has not yet come to market. In certain cases, the Debtors have a co-development agreement with the Toll Processors or utilize the Toll Processors' specialized equipment for the production of the Debtors' products. The Toll Processors are vital to the Debtors' continued operations due to their strong familiarity and experience in dealing with the specialty materials required by the Debtors' businesses. Toll

Processors may similarly be able to assert contractual or statutory liens on the Debtors' formula, materials and equipment in the Toll Processors' possession to secure the charges or expenses incurred by the Debtors prepetition. While the Debtors reserve all rights to contest such liens, their assertion would similarly damage the Debtors' ability to operate their businesses for the benefit of all stakeholders.

### D.   Mechanics

16.   The Debtors also require maintenance and repair work with respect to their equipment, and in some cases, rely on outside mechanics and repairmen (collectively, the "Mechanics") to perform maintenance and repair work. The Debtors' equipment is vital to their operations, and these Mechanics may be able to assert mechanics', possessory, or similar liens on such equipment. Consequently, the Mechanics may assert liens on the equipment they have repaired or, in certain cases, refuse to return equipment repaired off-site to the Debtors unless they are paid prepetition amounts owed to them. Either outcome could put the Debtors' businesses could be in jeopardy, as such equipment is vital to the Debtors' continued operations.

### E.   Freight Forwarders

17.   The Debtors utilize the services of freight forwarders and customs processors (the "Freight Forwarders") to handle the import of the Debtors' raw materials and the export of the Debtors' products. The Freight Forwarders provide vital services that enable the relevant Debtors to comply with the complex customs laws and regulations of the United States when importing materials from outside the United States. Among other things, the Freight Forwarders provide the back-office services necessary for customs clearance, prepare import summaries, facilitate exportation of the Debtors' products, obtain tariff numbers, pay duties and taxes, and perform numerous other critical services for the Debtors. The relevant Debtors pay the Freight Forwarders for their services and reimburse the Freight Forwarders for any funds advanced

7

on behalf of the Debtors to pay fees to the United States Customs Service, as well as for charges of certain ocean, air, and land shippers, and certain miscellaneous storage and handling expenses.

18.     For outbound products, payments to certain Freight Forwarders are managed through the United Parcel Services ("UPS").  For those accounts, Freight Forwarders send invoices to UPS, which then notifies the Debtors of the amounts due.  On a monthly basis, and prior to the applicable due date for such invoices, the Debtors transfer the outstanding invoiced amounts to UPS.  UPS thereafter makes payment to the applicable Freight Forwarder prior to the applicable due date on account of such invoices.[5]

19.     As of the Petition Date, the Debtors estimate that the Lienholders' claims (the "Lienholder Claims") total approximately $32 million.

## IV.     The 503(b)(9) Vendors

20.     The Debtors have identified certain claims which are entitled to priority status under sections 503(b)(9) and 507(a)(2) of the Bankruptcy Code (the "503(b)(9) Claims") due to the fact that they are undisputed obligations for goods received by the Debtors in the ordinary course of business in the 20 days prior to the Petition Date.  As of the Petition Date, the Debtors estimate that the 503(b)(9) Claims total approximately $10 million.

21.     The Debtors seek, in their discretion, to pay certain 503(b)(9) Claims as they come due in the ordinary course, instead of satisfying these claims upon confirmation of a chapter 11 plan.  The Debtors believe that by altering the timing of payments that certain 503(b)(9) Vendors are entitled to receive as a matter of statute, such payments can induce the individual 503(b)(9) Vendors to adhere to favorable trade terms and do business with the Debtors on a go-forward basis.  The Debtors believe that this relief is in the best interests of the Debtors' estates

---

[5]     For the avoidance of doubt, UPS is not directly liable for such invoices.

because (a) favorable trade terms will prevent the contraction of the Debtors' liquidity, and (b) this Court's time and resources will not be burdened with motions from individual 503(b)(9) Vendors requesting payment on account of their 503(b)(9) Claims or seeking reclamation of goods received by the Debtors in the 20 days prior to the Petition Date.

## V.    Foreign Vendors

22.    The Debtors purchase goods and services from Foreign Vendors.[6]  In the ordinary course of business, the Debtors rely on Foreign Vendors to provide certain critical goods and services including supplying raw materials, manufacturing the Debtors' products, packaging of labels, warehousing, distribution, customer service, certain financial functions, and certain research and development activities.

23.    If the Debtors are unable to pay prepetition amounts due and owing to the Foreign Vendors (the "Foreign Vendor Claims"), the Foreign Vendors may take action against the Debtors based upon an erroneous belief that the Foreign Vendors are not subject to the automatic stay provisions of section 362(a) of the Bankruptcy Code.  Although the automatic stay protects the Debtors' assets wherever they are located in the world, the Court is well aware of the difficulty—if not impossibility—of enforcing the stay in foreign jurisdictions if the creditor to which enforcement is sought has no presence in the United States.  In the absence of enforcement of the automatic stay, the Foreign Vendors could, among other things, initiate a lawsuit in a foreign court and obtain a judgment against the Debtors to collect prepetition amounts owed to them or seek to attach or seize foreign assets of the Debtors, even prior to obtaining a judgment.

---

[6]    The term "Foreign Vendors" does not include foreign vendors, service providers, or other non-governmental entities if such entities are known to have material assets within the United States that would likely be subject to the jurisdiction of this Court and therefore subject to this Court's orders.

24.      In addition, in the absence of payment of the Foreign Vendors Claims, there is a distinct risk that certain Foreign Vendors may simply decline to provide necessary goods and services, thereby jeopardizing the Debtors' ability to sustain uninterrupted domestic and international operations.  The cumulative impact of such events could have an adverse effect on the Debtors' operations and, particularly, on the ability of the Debtors to maintain a postpetition business as usual atmosphere.  Therefore, the Debtors have determined, in the exercise of their business judgment, that payment of the Foreign Vendor Claims is essential to avoid costly disruptions to the Debtors' operations and ability to timely and adequately fill customer orders.

25.      The Debtors therefore seek the authority, but not the direction, in their sole discretion, to pay some or all of the Foreign Vendor Claims.  As of the Petition Date, the Debtors had accrued but not yet paid approximately $4 million in fees to Foreign Vendors.

## VI.    The Critical Vendors

26.      In the ordinary course of business, the Debtors are highly dependent on Critical Vendors to provide certain critical goods and services including, without limitation, manufacturing, packaging, supplies, customer service, certain financial functions, certain research and development activities and medical affairs.  The Debtors seek authority to pay prepetition amounts due and owing to the Critical Vendors (the "Critical Vendor Claims") in order to maintain business as usual and serve their customers, and ultimately, the patients that utilize their products. The Critical Vendors may be broadly grouped into five categories: (i) Materials Critical Vendors, (ii) R&D Critical Vendors, (iii) System Infrastructure Critical Vendors, (iv) Maintenance Services

Critical Vendors, and (v) Corporate and Commercial Services Critical Vendors.  Each category is

defined and further described below.[7]

### A.      Materials Critical Vendors

27.      Certain Critical Vendors provide materials and services that are crucial to

the manufacture and production of the Debtors' pharmaceutical drug products (the "Materials

Critical Vendors").  The Debtors rely on the Materials Critical Vendors to provide the requisite

volume of (a) raw materials and controlled and non-controlled active pharmaceutical ingredients

("API") that go into the Debtors' products, (b) the drug plastics, bulk liquid, coating solution,

flavors, inactive ingredients, glass, necessary packaging, and device components that hold and

affect delivery of the products (the "Excipients"), (c) systems to transport the products, and

(d) from certain contract manufacturing organizations (the "CMOs"), finished goods and samples.

The raw materials, API, Excipients, packaging, and manufacturing services supplied by the

Materials Critical Vendors are necessary to operate the Debtors' businesses.  Certain of the

Materials Critical Vendors are sole source providers of their respective materials to the Debtors

because they are the only sources capable of producing and shipping the volume and specification

of materials required for the Debtors' operations and either cannot be replaced by other suppliers

or cannot be replaced at competitive prices.

28.      Moreover, the manufacturing services provided by the CMOs and the raw

materials, API, Excipients, packaging, and transportation systems supplied by the other Materials

Critical Vendors are highly regulated by the United States Food and Drug Administration (the

"FDA"), the Department of Health and Human Services, the United States Drug Enforcement

---

[7]      To illustrate the critical nature of the services and materials provided by the Critical Vendors, this Motion
provides examples of certain categories of Critical Vendors.  However, for the avoidance of doubt, this
Motion is intended to encompass a wide range of Critical Vendors and not just those described with
particularity herein.

Administration, the Environmental Protection Agency, the Customs Service, and state boards of pharmacy.  The Debtors' products are subject to extensive quality control, and the quality is tested at multiple stages in the production process.  Even in cases where a Materials Critical Vendor is not a sole source provider, the highly regulated environment in which the Debtors operate will not allow the Debtors to quickly or efficiently substitute the raw materials or API of another vendor.  Any substitution, alteration, or other change could impact the purity and regulatory compliance of the Debtors' product and, therefore, the Debtors' ability to run their businesses and supply the drug to the market.  For certain products, no viable alternative therapy is available, and an immediate impact would be felt both by the Debtors and the patients who rely on their medications.

29.     Further, each aspect of the Debtors' packaging, from the drug's final formulation down to the label and type of ink used, is also subject to regulatory review and approval.  Packaging itself is a critical part of the Debtors' product, as the form and material construction of package chosen for each drug affects the stability of the final dosage form, which can be impacted by a number of variables, including oxygen transmittance and temperature fluctuation.  For such reasons, and similar to their raw materials and API vendors, the Debtors cannot readily change certain of their drug product and packaging vendors.

30.     The Debtors also utilize systems to transport products safely and within applicable regulations, including qualified temperature monitors to monitor the temperature during the shipment of certain products.  Due to these regulatory hurdles and technical transfer requirements, the Debtors believe any change of Materials Critical Vendors would cause a delay of several months, on the low end, to upwards of several years, on the high end, before the Debtors would be authorized to manufacture and distribute affected products.  Such an extended timeline leaves the Debtors in a difficult situation because they also believe that if they fail to pay the

Materials Critical Vendors on a timely basis, existing relationships will be strained and many of the Materials Critical Vendors may stop providing services.

31.     Absent paying the Materials Critical Vendors, the Debtors believe their businesses will suffer serious disruption.  Such disruption would cause significant harm to the Debtors' businesses and, ultimately, patients who use the Debtors' drugs in their treatments. Accordingly, the Debtors have an immediate need to pay the Materials Critical Vendors.  The failure to do so would not only threaten the Debtors and their ability to reorganize, but would also jeopardize the Debtors' ability to properly serve patients in the U.S. and abroad.

**B.     R&D Critical Vendors**

32.     Certain other Critical Vendors provide the Debtors with research and clinical trial services that allow the Debtors to (a) bring new products to market and (b) develop new uses or indications for existing products (the "R&D Critical Vendors").  The R&D Critical Vendors perform research, provide clinical supplies, recruit patients, manage research data, and test the Debtors' products, among other related services.  The work conducted by the R&D Critical Vendors is regulated by numerous global regimes that govern the Debtors' development of new drug products and commercialization and sale of existing products.

33.     For example, the FDA requires immediate reporting of certain adverse events that occur during trials, and the R&D Critical Vendors are essential to the process of identifying and reporting such events in a timely manner.  Furthermore, many of the clinical trials facilitated by the R&D Critical Vendors will take years to complete and analyze, and certain of such clinical trials are in advanced stages.  Given the highly regulated and specialized nature of these clinical trials, substituting any R&D Critical Vendors would be difficult or impossible: alternate vendors would lack the institutional knowledge required to quickly replace current R&D Critical Vendors and would need to meet regulatory hurdles, which, as with the Materials Critical

13

Vendors, could take prolonged periods of time. In the meantime, patients participating in the clinical trials would be denied access to vital drug therapies.

34.     The services of the R&D Critical Vendors are also fundamental to the Debtors' marketing and sales efforts and, ultimately, patient outcomes. The research and clinical trial results are key factors in both a medical provider's decision to prescribe or use the Debtors' products and a payer's decision to reimburse the cost of the Debtors' products. The R&D Critical Vendors' services are also integral to the creation and preservation of the Debtors' intellectual property rights. Delay or discontinuation of clinical trials could jeopardize critical intellectual property rights that are necessary for the manufacturing, sale and marketing of the Debtors' products.

35.     The Debtors believe that if they fail to pay the R&D Critical Vendors on a timely basis, existing relationships with such service providers will be negatively impacted, and many, if not all, of the R&D Critical Vendors may stop providing services entirely. The cessation of the R&D Critical Vendors' work would have an immediate and devastating impact on the Debtors' businesses and the patients who rely on the Debtors' products.

### C.      System Infrastructure Critical Vendors

36.     The Debtors engage with other Critical Vendors to provide certain hardware, software, and other services that are critical to the Debtors' upkeep of their business infrastructure (the "System Infrastructure Critical Vendors"). The System Infrastructure Critical Vendors provide and maintain services that, among other things, test and track the quality and location of all components of the Debtors' supply chain, from delivery of the raw materials to the packaging and sale of the finished goods.

37.     Because of the highly regulated industry in which the Debtors operate, the Debtors are required to continually test and maintain certain quality control standards during all

stages of production.  The Debtors must also be able to test quality, record and track all aspects of

the production and sale of their therapies.  The System Infrastructure Critical Vendors' services

are essential for compliance with the multitude of ongoing regulatory requirements, including

tracking and reporting obligations and product quality testing.  The Debtors estimate that changing

to new System Infrastructure Critical Vendors could take years and cost multiple millions of

dollars due to the significant logistical efforts and data migration undertaking needed to transfer

to any alternate vendor.

38.    The Debtors believe that if they fail to pay the Critical Vendor Claims owed

to the System Infrastructure Critical Vendors on a timely basis, existing relationships with such

service providers would be negatively impacted, and many of the System Infrastructure Critical

Vendors would stop providing services.  Without the System Infrastructure Critical Vendors, the

Debtors run the risk that their production will be delayed because of the substantial time required

to migrate their data and transfer to a new service provider, which would likely take, at a minimum,

several months.  In addition, stopping the System Infrastructure Critical Vendors' services would

create a significant risk of regulatory liability, including adverse governmental actions, which

would have a detrimental impact on the Debtors' ability to produce, sell, and market their goods.

### D.    Maintenance Services Critical Vendors

39.    Other Critical Vendors  provide essential maintenance services with respect

to the manufacturing, global regulatory compliance, and other operational needs of the Debtors

(the "Maintenance Services Critical Vendors").  Certain of the Maintenance Services Critical

Vendors provide preventative maintenance and critical repair services for the Debtors'

manufacturing equipment, including custom equipment.  Other Maintenance Services Critical

Vendors are engaged by the Debtors to preserve and repair the Debtors' information technology

systems, which are indispensable to protecting confidential and proprietary information and

supporting supply chain processes, quality assurance, regulatory reporting, and other day-to-day operations.  Still other Maintenance Services Critical Vendors provide equipment calibration services, which are required to ensure regulatory compliance for product component specifications during the manufacturing process.

40.     The Maintenance Services Critical Vendors have long-term specialized knowledge of the Debtors' highly complex and customized equipment and systems, and the Debtors would be unable to quickly replace such vendors, particularly in a scenario requiring immediate critical repairs.  The Debtors believe that if they fail to pay the Maintenance Services Critical Vendors on a timely basis, existing relationships with such service providers would be negatively impacted, and many, if not all, of the Maintenance Services Critical Vendors would stop providing services entirely.  An interruption in such services would significantly disrupt the Debtors' supply chain and manufacturing processes, adversely impact the Debtors' global regulatory compliance, and jeopardize the confidential and proprietary information that define the Debtors' competitive business position.

**E.     Corporate and Commercial Services Critical Vendors**

41.     Other Critical Vendors provide essential data collection and control, external technological support, marketing, and other services to the Debtors (the "Corporate and Commercial Services Critical Vendors").  The Corporate and Commercial Services Critical Vendors' services are critical to the Debtors' business, and even the temporary lack of any of the services provided by the Corporate and Commercial Services Critical Vendors could cascade into a significant disruption of the Debtors' operations during the crucial first few weeks of the Chapter 11 Cases.  Such a disruption could cause irreparable harm to the Debtors' businesses, goodwill, and market share, which in turn could limit the Debtors' ability to maximize the value of the estate for the benefit of all creditors.

16

## VII.    Identification and Conditions to Payment of Specified Trade Claimants

### A.    Identification Factors for Critical Vendors

42.    The Debtors and their advisors spent significant time and effort reviewing and analyzing their books and records, consulting operations managers and purchasing personnel, reviewing contracts and supply agreements, and analyzing applicable law, regulations and historical practice to identify certain critical business relationships and suppliers of goods and services—the loss of which would immediately and irreparably harm their businesses, by, among other things, shrinking their market share, reducing enterprise value, and ultimately impairing the Debtors' viability as a going-concern.  In determining which vendors should receive status as Specified Trade Claimants, the Debtors and their advisors have carefully considered a variety of factors, including:

- The extent to which suppliers may be able to obtain or have obtained trade liens on assets of the Debtors or an administrative expense claim pursuant to section 503(b)(9) of the Bankruptcy Code;

- Which suppliers were sole source or limited source suppliers, without whom the Debtors could not continue to operate without disruption;

- Which suppliers would be prohibitively expensive to replace;

- Which suppliers would present an unacceptable risk to the Debtors' operations should they cease the provision of truly essential services or supplies;

- Whether the suppliers are party to an executory contract with the Debtors that requires the suppliers' ongoing performance pending assumption or rejection under section 365 of the Bankruptcy Code notwithstanding the Debtors' failure to make the prepetition payment; and

- The extent to which suppliers are beyond the jurisdiction of this Court and can thus, notwithstanding the automatic stay, exercise remedies that would disrupt the Debtors' operations and businesses.

The Debtors also considered the financial condition of each supplier and where that information was known, including the level of dependence each supplier has on the Debtors' continued businesses.

43.     Through this process, the Debtors were able to identify prepetition amounts due and owing to the Specified Trade Claimants that the Debtors, in their best judgement, believe are necessary to pay in order to maintain business as usual and serve their customers, and ultimately, the patients that use their products. Based upon their books and records, the Debtors estimate that they pay their vendors and suppliers, in the ordinary course of business, approximately $134 million each month. On average, the Specified Trade Claims' monthly spend accounts for approximately 50% of that amount. The Debtors estimate that as of the Petition Date, the Specified Trade Claims totaled approximately $76 million. Without authority to pay the Specified Trade Claimants, the Debtors would be unable to conduct their businesses and fulfill obligations to their customers. Such a result would be detrimental to the Debtors' reputation and businesses.

44.     The Debtors' trade relationships with their Specified Trade Claimants are not generally governed by long-term contracts. Thus, the Debtors believe that such trade relationships may materially deteriorate, causing disruption to the Debtors' operations if the Debtors are unable to pay the Specified Trade Claims. The Debtors' business is ill-equipped to switch vendors or suppliers on short notice and faces significant risks to its supply chain if certain prepetition amounts cannot be paid. Due to the regulated nature of the Debtors' business and its relationship with sole source providers, the Debtors have limited-to-no options for replacement suppliers. Replacing suppliers is time-consuming, cost prohibitive and in certain circumstances, plainly not feasible. Moreover, any failure of a supplier to provide the necessary goods for delivery

to the Debtors' customers likely would create shortages in the Debtors' supply chain and adversely affect the customers' willingness to do business with the Debtors in the future, thereby impacting cash flow, profitability and the ability of the Debtors to restructure their business.

**B.    Conditions of Payments to Specified Trade Claimants**

45.    In light of these circumstances, subject to the Court's approval, the Debtors intend to pay, in their sole discretion, Specified Trade Claims only to the extent necessary to preserve their businesses.  The Debtors propose, in their sole discretion, to condition payment of any Specified Trade Claims upon agreement by the Specified Trade Claimant to supply goods or services to the Debtors on such Specified Trade Claimant's Customary Trade Terms (as defined below) for a period following the date of the agreement or on such other terms and conditions as are acceptable to the Debtors.  As used herein, "Customary Trade Terms" means, with respect to a Specified Trade Claimant, (a) the normal and customary trade terms, practices and programs (including, but not limited to, credit limits, pricing, cash discounts, timing of payments and programs), that were most favorable to the Debtors and in effect between such Specified Trade Claimant and the Debtors prior to the Petition Date or (b) such other trade terms as agreed to by the Debtors and such Specified Trade Claimant.  The Debtors, however, reserve the right to negotiate different trade terms with any Specified Trade Claimants, as a condition to payment of any Specified Trade Claims, whether or not memorialized by a trade agreement, to the extent the Debtors determine that such trade terms are necessary to procure essential goods or services or are otherwise in the best interests of the Debtors' estates.

46.    The Debtors further propose that in the event the Debtors are making a payment pursuant to this Motion, the Debtors will send a letter, substantially in the form attached as **Exhibit 1** to the Proposed Interim Order, to each of the Specified Trade Claimants to which they are making such payment, along with a copy of the order granting this Motion.  Such a letter,

once agreed to and accepted by a Specified Trade Claimant, shall be the agreement between the parties that governs their postpetition trade relationship, whether on Customary Trade Terms or on terms different from their Customary Trade Terms.[8]  The Debtors will make such terms and acceptances available to the Ad Hoc First Lien Group upon reasonable request.

47.      As a further condition of receiving payment of a Specified Trade Claim, the Debtors propose that each Specified Trade Claimant must agree to take whatever action is necessary or appropriate to remove any existing trade liens at such Specified Trade Claimant's sole cost and expense and waive any right to assert a trade lien on account of the paid Specified Trade Claim.  The foregoing shall be determined by the Debtors in their sole discretion.

48.      Maintaining normal trade credit terms will improve the Debtors' chances of preserving working capital and liquidity—enabling the Debtors to maintain their competitiveness and to maximize the value of their businesses.  Absent the relief requested herein, many of the Debtors' vendors may attempt to place the Debtors on cash-in-advance terms, which the Debtors estimate could drain their estates of resources that would otherwise be available for other funding needs during the critical first weeks of the Chapter 11 Cases.

## BASIS FOR RELIEF

### I.    The Court Should Authorize the Payment of Specified Trade Claims as a Sound Exercise of the Debtors' Business Judgment.

49.      Section 363(b) of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Under section 363 of the Bankruptcy

---

[8]      The Debtors' entry into a Trade Agreement shall not change the nature or priority of the underlying Specified Trade Claims and shall not constitute an assumption, rejection, affirmation or adoption of any contract or prepetition or postpetition agreement between the Debtors and a Trade Claimant.  For the avoidance of doubt, if an agreement relating to Trade Claims is deemed an executory contract within the meaning of section 365 of the Bankruptcy Code, the Debtors do not, at this time, seek to assume such contract.

Code, a court may authorize a debtor to pay certain prepetition claims where a sound business purpose exists for doing so. *See In re Ionosphere Clubs, Inc.,* 98 B.R. 174 (Bankr. S.D.N.Y. 1989) (finding that there must be a sound business justification to justify payment of prepetition wages); *Armstrong World Indus., Inc. v. James A. Phillips, Inc. (In re James A. Phillips, Inc.)*, 29 B.R. 391, 397 (S.D.N.Y. 1983) (relying on section 363 of the Bankruptcy Code to allow contractor to pay prepetition claims of suppliers).

50.    The business judgment rule is satisfied "when the following elements are present: (1) a business decision, (2) disinterestedness, (3) due care, (4) good faith, and (5) according to some courts and commentators, no abuse of discretion or waste of corporate assets." *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc.* (*In re Integrated Res., Inc.*), 147 B.R. 650, 656 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993) (internal quotations omitted). In fact, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). Courts in this District have consistently and appropriately been loath to interfere with corporate decisions absent a showing of bad faith, self-interest or gross negligence and will uphold a board's decisions as long as they are attributable to any "rational business purpose." *In re Integrated Res. Inc.*, 147 B.R. at 656.

51.    Payment of the Specified Trade Claims as provided herein represents a sound exercise of the Debtors' business judgment. As detailed above, the Specified Trade Claimants provide goods and services that are vital to the continued operation of the Debtors' businesses. Failure to pay the Specified Trade Claimants would strain existing relationships with

the Specified Trade Claimants, run the risk that such vendors will stop providing services, and have an immediate and deleterious effect on the Debtors' businesses and the value of their estates. Without the Specified Trade Claimants' goods and services, the Debtors could be forced to halt their business operations and potentially forgo existing favorable trade terms.

52.     Moreover, in an exercise of their business judgment and where appropriate, the Debtors seek to condition payment of the Specified Trade Claims on the Specified Trade Claimants' agreement to continue to provide essential goods and services to the Debtors on Customary Trade Terms.  Retaining or reinstating favorable trade terms will help enable the Debtors to maximize the value of their businesses.  The Debtors submit that it is appropriate and in the best interests of their estates and stakeholders to pay the Specified Trade Claims as provided herein.

53.     Courts in this District have granted similar relief in other chapter 11 cases as that requested here with respect to payment of Specified Trade Claims.  *See, e.g., In re Revlon, Inc.*, Case No. 22-10760 (DSJ) (Bankr. S.D.N.Y. July 21, 2022); *In re Garrett Motion Inc.*, Case No. 20-12212 (MEW) (Bankr. S.D.N.Y. Oct. 20, 2020); *In re JCK Legacy Company (f/k/a The McClatchy Company)*, Case No. 20-10418 (MEW) (Bankr. S.D.N.Y. Feb. 14, 2020); *In re Purdue Pharma L.P.*, Case No. 19-23649 (RDD) (Bankr. S.D.N.Y. Oct. 16, 2019) (the "Purdue Order"); *In re Aegerion Pharm. Inc.*, Case No. 19-11632 (MG) (Bankr. S.D.N.Y. June 27, 2019) (the "Aegerion Order"); *In re Windstream Holdings, Inc.*, Case No. 19-22312 (RDD) (Bankr. S.D.N.Y. April 22, 2019).

**II.     In the Alternative, the Court Should Authorize the Payment of Specified Trade Claims Pursuant to Section 105(a) and the Doctrine of Necessity.**

54.     Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

11 U.S.C. § 105(a).  The bankruptcy court's power to authorize the pre-plan satisfaction of prepetition claims, whose payment is critical to the debtor's business, is firmly established under the well-settled "doctrine of necessity," which "recognizes the existence of the judicial power to authorize a debtor in a reorganization case to pay prepetition claims where such payment is essential to the continued operation of the debtor." *Ionosphere Clubs*, 98 B.R. at 170; *see also In re C.A.F. Bindery, Inc.*, 199 B.R. 828, 835 (Bankr. S.D.N.Y. 1996) (stating that the doctrine of necessity "permits the bankruptcy court to authorize the payment of prepetition claims prior to confirmation" when "the payment is 'critical to the debtor's reorganization.'") (citation omitted); *In re Fin. News Network Inc.*, 134 B.R. 732, 735-36 (Bankr. S.D.N.Y. 1992) ("The 'doctrine of necessity' stands for the principle that a bankruptcy court may allow pre-plan payments of prepetition obligations where such payments are critical to the debtor's reorganization.").

55.     Although the "doctrine of necessity" predates the Bankruptcy Code, *see Miltenberger v. Logansport Ry. Co.*, 106 U.S. 286, 309 (1882), the modern application of the doctrine of necessity is grounded in specific provisions of the Bankruptcy Code, including sections 105(a), 1107(a) and 1108.  *See In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (fiduciary duties implicit in section 1107(a) of the Bankruptcy Code justify the "preplan satisfaction of a prepetition claim" where necessary to preserve going concern value).  The doctrine, largely unchanged from the Court's reasoning in *Miltenberger*, is a widely accepted component of bankruptcy jurisprudence.  *See, e.g.*, *In re Just For Feet*, 242 B.R. 821, 824-825 (finding that payment of prepetition claims to certain trade vendors was "essential to the survival of the debtor during the chapter 11 reorganization"); *In re Quality Interiors, Inc.*, 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991) ("[P]ayment by a debtor-in-possession of pre-petition claims outside of a confirmed plan of reorganization is generally prohibited by the Bankruptcy Code," but "[a]

general practice has developed . . . where bankruptcy courts permit the payment of certain pre-petition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize without such payment."); *In re Eagle-Picher Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (approving payment of prepetition unsecured claims of tool makers as "necessary to avert a serious threat to the Chapter 11 process").

56.     Payment of Specified Trade Claims is necessary to ensure continued operation of the Debtors' businesses and, in turn, preserve and enhance the value of the Debtors' estates.  The Debtors have carefully reviewed their accounts payable and undertaken a process to identify vendors, suppliers, and service providers essential to ongoing operations.  Without the Specified Trade Claimants' goods and services, the Debtors may be forced to halt most, if not all, ongoing business immediately while they search for substitute vendors, if any even exist, and the Debtors could be forced to forego existing favorable trade terms.  The Debtors submit that payment of the Specified Trade Claims as provided herein is necessary to the success of their reorganization and to help maximize the value of their estates.

## III.   The Court Should Authorize the Payment of Lienholder Claims and 503(b)(9) Claims.

57.     To the extent that the Lienholders' claims (the "Lienholder Claims") are secured by a lien on certain of the Debtors' assets or a Lienholder is entitled to assert possessory liens securing their claims under applicable state law, the Lienholder is entitled to receive (a) payment in full of its prepetition claim pursuant to any confirmed plan or plans in the Chapter 11 Cases and (b) the postpetition interest accruing on such claim to the extent such claim is oversecured.  To the extent Lienholder Claims remain unpaid, they may assert a lien on the goods in their possession, refuse to deliver goods to the Debtors or their customers, or refuse to continue to do business with the Debtors in the future, which likely would cause irreparable harm to the

24

Debtors' businesses.  Even a short delay in the Debtors' supply chain could undermine the Debtors' ability to fulfill their customers' needs and adversely impact relationships with their customers.  As a result, the Debtors' ability to effect a successful restructuring may be jeopardized.  This risk is only heightened by the fact that the Debtors' customers may be tempted to source their business needs elsewhere due to the Debtors' commencement of the Chapter 11 Cases.  Therefore, the Debtors respectfully request authority to pay, in their discretion, any of the Lienholder Claims.

58.     Section 503(b)(9) of the Bankruptcy Code provides administrative priority for the "value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which goods have been sold to the debtor in the ordinary course of such debtor's business."  11 U.S.C. § 503(b)(9).  Claims subject to section 503(b)(9) of the Bankruptcy Code must be paid in full for the debtors to confirm a chapter 11 plan.  *See* 11 U.S.C. § 1129(a)(9)(A).  The Bankruptcy Code does not prohibit a debtor from paying claims arising under section 503(b)(9) before confirmation of a chapter 11 plan.  The Debtors believe that timely payment of 503(b)(9) Claims will preserve the Debtors' valued relationship with such 503(b)(9) Vendors and reduce the chance that the Debtors will face harmful supply disruptions during the initial and most critical phase of the Chapter 11 Cases.  The Debtors therefore seek authority, but not the direction, in their sole discretion, to pay any of the 503(b)(9) Claims.

59.     Courts in this District have granted similar relief in other chapter 11 cases as that requested here with respect to payment of Lienholder Claims and 503(b)(9) Claims.  *See, e.g.*, *In re Revlon, Inc.*, Case No. 22-10760 (DSJ) (Bankr. S.D.N.Y. July 21, 2022) (authorizing payment of Lienholder Claims and 503(b)(9) Claims); Garrett Order (same); Purdue Order (same); Aegerion Order (same); *In re Windstream Holdings, Inc.*, Case No. 19-22312 (RDD) (Bankr. S.D.N.Y. April 22, 2019) (same); *In re Aegean Marine Petrol. Network Inc.*, Case No. 18-13374

(MEW) (Bankr. S.D.N.Y. Dec. 6, 2018) (same); *In re Sears Holdings Corp.*, Case No. 18-23538

(RDD) (Bankr. S.D.N.Y. Nov. 20, 2018) (same).

**IV.    The Court Should Authorize and Direct Banks to Honor and Pay Checks Issued and Electronic Funds Transferred to Pay the Specified Trade Claims.**

60.    The Debtors also request that the Court authorize and direct the Debtors'

banks and other financial institutions (collectively, the "Banks") to receive, process, honor and

pay all checks presented for payment of, and to honor all fund transfer requests made by the

Debtors related to, the claims that the Debtors request authority to pay in this Motion, regardless

of whether the checks were presented or fund transfer requests were submitted before, on or after

the Petition Date; *provided* that funds are available in the Debtors' accounts to cover the checks

and fund transfers and that the Banks are authorized to rely on the Debtors' designation of any

particular check as approved by the Proposed Interim Order and the Proposed Final Order.

61.    The Debtors have sufficient liquidity to pay the amounts set forth in this

Motion in the ordinary course of business and have implemented controls to ensure that prepetition

claims will not be paid out except as authorized by this Court.  The Debtors therefore submit that

the payment processing procedures described in this Motion are appropriate.

## RESERVATION OF RIGHTS

62.    Nothing contained herein is or should be construed as: (a) an implication or

admission as to the validity of any claim against the Debtors, (b) a waiver of the Debtors' or any

other party-in-interest's rights to dispute the amount of, basis for, or validity of any claim against

the Debtors, (c) a waiver of any claims or causes of action that may exist against any creditor or

interest holder, (d) a promise to pay any claim, (e) a concession by the Debtors that any liens

(contractual, common law, statutory or otherwise) satisfied pursuant to this Motion are valid (and

all rights to contest the extent, validity or perfection or seek avoidance of all such liens are

expressly reserved), (f) an approval, assumption, adoption, or rejection of any agreement, contract, program, policy, or lease between the Debtors and any third party under section 365 of the Bankruptcy Code, (g) a waiver of the obligation of any party in interest to file a proof of claim, or (h) otherwise affecting the Debtors' rights under section 365 of the Bankruptcy Code to assume or reject any executory contract or unexpired lease.  If this Court grants the relief sought herein, any payment made pursuant to this Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

### **DEBTORS HAVE SATISFIED BANKRUPTCY RULE 6003(b)**

63.      Bankruptcy Rule 6003 provides that the relief requested in this Motion may be granted if the "relief is necessary to avoid immediate and irreparable harm."  Fed. R. Bankr. P. 6003; *see also In re First NLC Fin. Servs., LLC*, 382 B.R. 547, 549-50 (Bankr. S.D. Fla. 2008) (holding that Bankruptcy Rule 6003 permits entry of retention orders on an interim basis to avoid irreparable harm).  The Second Circuit has interpreted the language "immediate and irreparable harm" in the context of preliminary injunctions.  In that context, the Second Circuit has instructed that irreparable harm "is a continuing harm which cannot be adequately redressed by final relief on the merits and for which 'money damages cannot provide adequate compensation.'"  *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002) (quoting *N.Y. Pathological & X-Ray Labs., Inc. v. INS*, 523 F.2d 79, 81 (2d Cir. 1975)).  Furthermore, the "harm must be shown to be actual and imminent, not remote or speculative."  *Id.*; *see also Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d

Cir. 1998).  The Debtors submit that, for the reasons set forth above, the relief requested in this

Motion is necessary to avoid immediate and irreparable harm.

### **WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(h)**

64.     The Debtors also request that the Court waive the stay imposed by

Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of

property other than cash collateral is stayed until the expiration of 14 days after entry of the order,

unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  As described above, the relief that

the Debtors seek in this Motion is necessary for the Debtors to operate without interruption and to

preserve value for their estates.  Accordingly, the Debtors respectfully request that the Court waive

the fourteen stay imposed by Bankruptcy Rule 6004(h), to the extent applicable, as the exigent

nature of the relief sought herein justifies immediate relief.

### **NOTICE**

65.     Notice of this Motion shall be given to (a) the U.S. Trustee; (b) counsel to

the administrative agent under the Debtors' prepetition credit agreement; (c) counsel to the

indenture trustee under each of the Debtors' outstanding bond issuances; (d) Gibson, Dunn &

Crutcher LLP as counsel to the Ad Hoc First Lien Group (as defined in the First Day Declaration);

(e) Paul, Weiss, Rifkind, Wharton & Garrison LLP as counsel to the Ad Hoc Cross-Holder Group

(as defined in the First Day Declaration); (f) the U.S. Attorney for the Southern District of New

York; (g) the attorneys general for all fifty states and the District of Columbia; (h) the Debtors'

fifty largest unsecured creditors on a consolidated basis; (i) the Internal Revenue Service; (j) the

Securities and Exchange Commission; (k) the proposed future claimants representative in the

Chapter 11 Cases; (l) the Banks; (m) any party that has requested notice pursuant to Bankruptcy

Rule 2002; and (n) any other party entitled to notice pursuant to Rule 9013-1(b) of the Local

Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York.

The Debtors submit that no other or further notice need be provided.

## **NO PRIOR REQUEST**

66.    No prior request for the relief sought herein has been made to this or any other court.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

WHEREFORE the Debtors respectfully request that the Court (a) enter the

Proposed Interim Order and Proposed Final Order in substantially the forms attached hereto and

(b) grant such other and further relief as may be just and proper.

Dated:  August 16, 2022
      New York, New York         SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By:   _/s/ Paul D. Leake_____
      Paul D. Leake
      Lisa Laukitis
      Shana A. Elberg
      Evan A. Hill
      One Manhattan West
      New York, New York 10001
      Telephone: (212) 735-3000
      Fax: (212) 735-2000

      *Proposed Counsel for the Debtors*
      *and Debtors in Possession*

**Exhibit A**

**Proposed Interim Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re* | **Chapter 11** |
| **ENDO INTERNATIONAL plc,** *et al.*, | **Case No. 22-22549 (___)** |
| **Debtors.**[1] | **(Joint Administration Pending)** |

## INTERIM ORDER (I) AUTHORIZING PAYMENT OF CERTAIN PREPETITION SPECIFIED TRADE CLAIMS; (II) AUTHORIZING FINANCIAL INSTITUTIONS TO HONOR AND PROCESS RELATED CHECKS AND TRANSFERS; AND (III) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the debtors and debtors in possession (collectively, the "Debtors" and together with their non-debtor affiliates, the "Company") in the above-captioned cases (the "Chapter 11 Cases") for an order (a) authorizing, but not directing, the Debtors, in their sole discretion, to pay certain Specified Trade Claims in the ordinary course on a postpetition basis, and approving procedures related thereto, of (i) Lienholders; (ii) 503(b)(9) Vendors; (iii) Foreign Vendors; and (iv) Critical Vendors, in an aggregate amount not to exceed the Critical Vendors Claims Cap; (b) authorizing and directing the Banks to honor and process related checks and transfers; and (c) granting related relief, all as more fully set forth in the Motion; and the Court having reviewed the Motion and the First Day Declaration and having heard the statements of counsel regarding the relief requested in the Motion at a hearing before the Court (the "Hearing"); and the Court having found that (a) the Court has jurisdiction over this matter

---

[1]    The last four digits of Debtor Endo International plc's tax identification number are 3755.  Due to the large number of debtors in these chapter 11 cases, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Endo. The location of the Debtors' service address for purposes of these chapter 11 cases is: 1400 Atwater Drive, Malvern, PA 19355.

[2]    Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b) and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.); (b) this is a core proceeding pursuant to 28 U.S.C. § 157(b); (c) venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and (d) due and proper notice of the Motion and the Hearing was sufficient under the circumstances; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein, in that such relief provides a material net benefit to the Debtors' estates and creditors after taking into account the Bankruptcy Code's priority scheme, such relief is necessary to avoid immediate and irreparable harm to the Debtors and their estates as contemplated by Bankruptcy Rule 6003(b) and is a proper exercise of business judgment and in the best interests of the Debtors, their estates, creditors and all parties in interest; now, therefore,

## IT IS HEREBY ORDERED THAT:

1.      The Motion is GRANTED on an interim basis as set forth herein.

2.      The Debtors are authorized, but not directed, to pay prepetition Specified Trade Claims comprising of all outstanding (a) Lienholder Claims, 503(b)(9) Claims, and Foreign Vendor Claims and (b) Critical Vendor Claims, subject to the Critical Vendors Claims Cap.  In the event the Debtors will exceed the Critical Vendors Claims Cap, the Debtors shall file a notice with the Court describing the overage amount; *provided* that, in advance of exceeding the Critical Vendors Claims Cap, the Debtors shall provide notice to the Ad Hoc First Lien Group of their intent to do so.

3.      The Debtors, in their sole discretion, may condition payment of any Specified Trade Claims upon agreement by the Specified Trade Claimant to supply goods or services to the Debtors on such Specified Trade Claimant's Customary Trade Terms (as defined below) for a period following the date of the agreement or on such other terms and conditions as

2

are acceptable to the Debtors.  As used herein, "Customary Trade Terms" means, with respect to a Specified Trade Claimant, (a) the normal and customary trade terms, practices and programs (including, but not limited to, credit limits, pricing, cash discounts, timing of payments and programs), that were most favorable to the Debtors and in effect between such Specified Trade Claimant and the Debtors in the 18-month period prior to the Petition Date or (b) such other trade terms as agreed to by the Debtors and such Specified Trade Claimant.

4.      The form of Trade Agreement attached hereto as **Exhibit 1** is approved in its entirety.  Except as otherwise set forth herein, the Debtors shall condition payment of Specified Trade Claims pursuant to this Order upon the execution of a Trade Agreement.  Notwithstanding anything to the contrary herein, the Debtors are authorized, but not directed, in their sole discretion, to enter into such Trade Agreements when and if the Debtors determine, in the exercise of their business judgment, that it is appropriate to do so.  A Trade Agreement, once agreed to and accepted by a Specified Trade Claimant, shall be the legally binding contractual relationship between the parties governing the commercial trade relationship as provided therein; *provided* that the Debtors may agree to implement such modifications to the form of Trade Agreement the Debtors deem necessary or advisable in the reasonable exercise of their business judgment to obtain Customary Trade Terms from the applicable Specified Trade Claimant; *provided*, *further*, that the Debtors may pay a Specified Trade Claim without the applicable Specified Trade Claimant having executed a Trade Agreement only if the Debtors determine, in their reasonable business judgment, that a Trade Agreement is unnecessary to ensure the applicable Specified Trade Claimant's continued performance on Customary Trade Terms; *provided*, *further*, that the Debtors will, upon reasonable request, provide updates to the Ad Hoc First Lien Group regarding (a) material

modifications to or terminations of Trade Agreements and (b) material disputes with respect to any Specified Trade Claimant.

5.      Any party who accepts payment from the Debtors of a Specified Trade Claim (each, a "Payment") (regardless of whether a Trade Agreement has been executed) shall be deemed to have agreed to the terms and provisions of this Order and shall be deemed to have waived, to the extent so paid, any and all prepetition claims, of whatever type, kind or priority, against the Debtors, their properties and estates, their directors, officers and employee up to the amount paid.

6.      If the Debtors, in their sole discretion, determine that a Specified Trade Claimant has not complied with the terms and provisions of the Trade Agreement or has failed to continue to provide Customary Trade Terms following the date of the agreement, or on such terms as were individually agreed to between the Debtors and such Specified Trade Claimant, the Debtors may terminate a Trade Agreement, together with the other benefits to the Specified Trade Claimant as contained in this Order; *provided*, *however*, that the Trade Agreement may be reinstated (a) if such determination is subsequently reversed by the Court for good cause after it is shown that the determination was materially incorrect after notice and a hearing following a motion from the Specified Trade Claimant, (b) the underlying default under the Trade Agreement is fully cured by the Specified Trade Claimant not later than five business days after the date the initial default occurred or (c) the Debtors, in their sole discretion, reach a subsequent agreement with the Specified Trade Claimant; *provided*, *further*, that the Debtors will, upon reasonable request, provide updates to the Ad Hoc First Lien Group regarding (i) material modifications to or terminations of Trade Agreements and (ii) material disputes with respect to any Specified Trade Claimant.

4

7.      If a Trade Agreement is terminated as set forth above, or if a Specified Trade Claimant that has received Payment later refuses to continue to supply goods or services for the applicable period in compliance with the Trade Agreement or this Order, then (a) the Debtors may, in their sole discretion, declare that the Payment is a voidable postpetition transfer pursuant to section 549(a) of the Bankruptcy Code that the Debtors may recover in cash or in goods from such Specified Trade Claimant, (b) the creditor shall immediately return such Payments to the extent that the aggregate amount of such Payments exceeds the postpetition obligations then outstanding without giving effect to alleged setoff rights, recoupment rights, adjustments or offsets of any type whatsoever, and (c) the creditor's Specified Trade Claim shall be reinstated in such an amount so as to restore the Debtors and the Specified Trade Claimants to their original positions as if the Trade Agreement had never been entered into and no Payment had been made.

8.      All Trade Agreements shall be deemed to have terminated, together with other benefits to Specified Trade Claimants as contained in this Order, upon entry of an order converting the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code.

9.      Any party who accepts Payment from the Debtors (regardless of whether a Trade Agreement has been executed) shall, at the Debtors' request take all actions necessary to remove any mechanics' liens, possessory liens or similar state law trade liens on the Debtors' assets such party may have based upon such Specified Trade Claims at such party's sole expense.

10.     The Debtors shall provide this Court, the U.S. Trustee, counsel to the Ad Hoc First Lien Group, counsel to the Ad Hoc Cross-Holder Group, and any official committee appointed in the Chapter 11 Cases with reasonable and timely access to information, including a list of Critical Vendors, which such parties shall keep confidential and treat as for professional

eyes only, sufficient to enable such parties to monitor payments made, obligations satisfied, and other actions taken.

11.     The Debtors shall maintain a matrix/schedule of payments made pursuant to this Order, including the following information: (a) the names of the payee; (b) the nature, date and amount of the payment; (c) the category or type of payment as characterized in the Motion; and (d) the Debtor or Debtors that made the payment. The Debtors shall provide a copy of such matrix/schedule to the Court, the U.S. Trustee, counsel to the Ad Hoc First Lien Group, counsel to the Ad Hoc Cross-Holder Group, and any statutory committee appointed in the Chapter 11 Cases every 30 days beginning upon entry of this Order.

12.     All Banks are (a) authorized and directed to receive, process, honor and pay any and all checks, drafts, electronic transfers and other forms of payment used by the Debtors on account of the Specified Trade Claims, whether presented before, on or after the Petition Date; and (b) prohibited from placing any hold on, or attempting to reverse, any automatic transfer on account of the Specified Trade Claims.  The Banks shall rely on the representations of the Debtors as to which checks and fund transfers should be honored and paid pursuant to this Order without any duty of further inquiry and without liability for following the Debtors' instructions.

13.     Any party receiving payment from the Debtors is authorized and directed to rely on the representations of the Debtors as to which payments are authorized by this Order.

14.     Notwithstanding anything to the contrary contained herein, any payment to be made hereunder, and any authorization contained, hereunder herein, shall be subject to and in accordance with any interim and final orders, as applicable, approving the use of cash collateral (the "Cash Collateral Order") and any budget in connection with any such use of cash collateral.

6

To the extent there is any inconsistency between the terms of the Cash Collateral Order and any action taken or proposed to be taken hereunder, the terms of the Cash Collateral Order shall control.

15.     Nothing herein shall impair or prejudice the Debtors' or any other party-in-interest's ability to contest the extent, perfection, priority, validity or amounts of any claims or liens held by any Specified Trade Claimant and the Debtors' rights to contest the extent, validity or perfection or seek the avoidance of all such liens or the priority of such claims are fully preserved.

16.     Nothing contained herein is or should be construed as: (a) an implication or admission as to the validity of any claim against the Debtors, (b) a waiver of the Debtors' or any other party-in-interest's rights to dispute the amount of, basis for, or validity of any claim against the Debtors, (c) a waiver of any claims or causes of action that may exist against any creditor or interest holder, (d) a promise to pay any claim, (e) a concession by the Debtors that any liens (contractual, common law, statutory or otherwise) satisfied pursuant to the Motion are valid (and all rights to contest the extent, validity or perfection or seek avoidance of all such liens are expressly reserved), (f) an approval, assumption, adoption, or rejection of any agreement, contract, program, policy, or lease between the Debtors and any third party under section 365 of the Bankruptcy Code, (g) a waiver of the obligation of any party in interest to file a proof of claim, or (h) otherwise affecting the Debtors' rights under section 365 of the Bankruptcy Code to assume or reject any executory contract or unexpired lease.  If this Court grants the relief sought herein, any payment made pursuant to this Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

17.     Nothing in the Motion or this Order, nor as a result of any Payment made pursuant to this Order, shall be deemed or construed as a waiver of the right of the Debtors, or shall impair the ability of the Debtors, to contest the validity and amount of any payment made pursuant to this Order.

18.     Nothing herein shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by any party.

19.     Nothing in the Motion or this Order shall be deemed to authorize the Debtors to make any Payments not otherwise due prior to the date of the hearing to consider entry of an order granting the relief requested in the Motion on a final basis (the "Final Hearing").

20.     The Court finds and determines that the requirements of Bankruptcy Rule 6003 are satisfied and that the relief requested is necessary to avoid immediate and irreparable harm.

21.     Under the circumstances of the Chapter 11 Cases, notice of the Motion is adequate under Bankruptcy Rule 6004(a).

22.     Notwithstanding Bankruptcy Rule 6004(h), this Order shall be effective and enforceable immediately upon entry.

23.     The Debtors are authorized and empowered to take all action necessary to effectuate the relief granted in this Order (including, without limitation, making copies of this Order, the Motion and any materials or other information related thereto available in any local language in a jurisdiction in which the Debtors or their affiliates operate).

24.     A final hearing (the "Final Hearing") on the relief requested in the Motion shall be held on [_____], 2022, at __:__ _.m. (prevailing Eastern time).  Any party in interest objecting to the relief sought at the Final Hearing shall file written objections no later than

8

[_____], 2022 at [ ]:[ ] p.m..  If no objections or responses are filed and served by the

Objection Deadline, the Court may enter a final order without any further notice of a hearing.

25.     This Court shall retain jurisdiction with respect to all matters arising from

or related to the implementation, interpretation or enforcement of this Order.

Dated: [●], 2022
[●], New York


_____
THE HONORABLE [_____]
UNITED STATES BANKRUPTCY JUDGE

## **Exhibit 1**

**Form of Trade Agreement**

## TRADE AGREEMENT

The Debtors (as defined herein) and [__]  hereby enter into the following trade agreement (this "Trade Agreement") dated as of this [ , 202_].

## Recitals

WHEREAS on August 16, 2022 (the "Petition Date"), Endo International plc and its debtor affiliates, as debtors and debtors in possession (collectively, the "Debtors" and together with their non-debtor affiliates, the "Company"), commenced the chapter 11 cases (the "Bankruptcy Case") by filing voluntary petitions for relief under title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Court").

WHEREAS on [__], 2022, the Court entered the *Interim Order (I) Authorizing Payment of Certain Prepetition Specified Trade Claims; (II) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers; and (III) Granting Related Relief* (the "Order") [Docket No. ] authorizing the Debtors, under certain conditions, to pay the prepetition claims of certain vendors subject to the terms and conditions set forth therein.

WHEREAS pursuant to the Order, to receive payment on account of prepetition claims, each Specified Trade Claimant must agree to continue to supply goods or services to the Debtors on "Customary Trade Terms."  As used herein, "Customary Trade Terms" means, with respect to a Specified Trade Claimant, (a) the normal and customary trade terms, practices and programs (including, but not limited to, credit limits, pricing, cash discounts, timing of payments and programs), that were most favorable to the Debtors and in effect between such Specified Trade Claimant and the Debtors in the 18-month period prior to the Petition Date or (b) such other trade terms as agreed to by the Debtors and such Specified Trade Claimant.

WHEREAS the Debtors and [__] (collectively, the "Parties") agree to the following terms as a condition of payment on account of certain prepetition claims that [__] may hold against the Debtors.

## Agreement

1.      The Parties hereby agree that [__] is a "Specified Trade Claimant" (as defined in the Order) (herein [__] will be referred to as "Specified Trade Claimant").

2.      [OPTION 1: The balance of Specified Trade Claimant's aggregate prepetition claim(s) against the Debtors is $[__] (the "Agreed Trade Claim").  The Agreed Trade Claim does not constitute a claim allowed by the Bankruptcy Court in this case, and signing this Trade Agreement does not excuse the Specified Trade Claimant from any requirement of filing a proof of claim in the Bankruptcy Case.

3.      Following execution of this Trade Agreement, the Debtors will pay the Specified Trade Claimant $[__] (the "Payment Amount") in [partial/full] satisfaction of the Agreed Trade Claim.  The Payment Amount will be paid pursuant to the Customary Trade Terms set forth below,

and will be applied to any invoices previously received by the Debtors on account of the Agreed Trade Claim.

4.     OPTION 2: The parties hereby agree that the Specified Trade Claimant delivered to the Debtors, and the Debtors received, goods valued at $[__] within twenty (20) days before the Petition Date, for which the Specified Trade Claimant did not receive payment (the "Agreed 503(b)(9) Claim"). $[__] of the Payment Amount will be applied toward the Agreed 503(b)(9) Claim. The Agreed 503(b)(9) Claim does not constitute a claim allowed by the Bankruptcy Court in this case, and signing this Trade Agreement does not excuse the Specified Trade Claimant from any requirement of filing a proof of claim in the Bankruptcy Case.]

5.     For a period from the date this Trade Agreement is executed until the earlier of (a) the effective date of a chapter 11 plan for the Debtors or (b) [DATE], the Specified Trade Claimant shall supply goods [and/or] services to the Debtors based on the following Customary Trade Terms: [CUSTOMIZE PER VENDOR]

6.     The Parties further agree, acknowledge and represent that:

(a)     the Parties have reviewed the terms and provisions of the Order and consent to be bound by such terms and that this Trade Agreement is expressly subject to the Order;

(b)     any payments made on account of the Agreed Trade Claim shall be subject to the terms and conditions of the Order, including any orders of the Court granting the relief requested in the Order on a final basis, as applicable;

(c)     if the Specified Trade Claimant refuses to supply goods or services to the Debtors as provided herein or otherwise fails to perform any of their obligations hereunder, the Debtors may exercise all rights and remedies available under the Order, the Bankruptcy Code, or applicable law;

(d)     the Specified Trade Claimant will not separately seek payment for any claims pursuant to section 503(b)(9) of the Bankruptcy Code or other similar claims outside of the terms of the Order or this Trade Agreement unless Specified Trade Claimant's participation in the vendor payment program authorized by the Order is terminated;

(e)     in consideration for receiving the Payment Amount, the Specified Trade Claimant shall not file or otherwise assert against the Debtors, their estates or any other person or entity or any of their respective assets or property (real or personal) any lien (regardless of the statute or other legal authority upon which the lien is asserted) related to any remaining prepetition amounts allegedly owed to the Specified Trade Claimant by the Debtors arising from agreements entered into before the Petition Date. Furthermore, if the Specified Trade Claimant has taken steps to file or assert a lien before entering into this Trade Agreement, the Specified Trade Claimant agrees to take all necessary steps to remove the lien as soon as possible at its sole cost and expense;

2

(f)     if the Specified Trade Claimant fails to comply with the terms and provisions of this Trade Agreement, the Debtors may, in their discretion, and without further order of the Bankruptcy Court; (i) declare that any payment of the Payment Amount is a voidable postpetition transfer pursuant to section 549(a) of the Bankruptcy Code that the Debtors may recover in cash or in goods from the Specified Trade Claimant (including by setoff against postpetition obligations); (ii) declare that the Specified Trade Claimant shall immediately return the Payment Amount to the Debtors without giving effect to any alleged setoff rights, recoupment rights, adjustments or other offsets of any type whatsoever, and Specified Trade Claimant's claim shall be reinstated to such amount as so to restore the Debtors and the Specified Trade Claimant to their original positions as if the Trade Agreement had never been entered into and the Payment Amount had not been paid; and/or (iii) if there exists an outstanding postpetition balance due from the Debtors to Specified Trade Claimant, the Debtors may elect to recharacterize and apply the Payment Amount to such outstanding postpetition balance and the Specified Trade Claimant shall be required to repay to the Debtors such paid amounts that exceed the postpetition obligations then outstanding without the right of any setoffs, claims, provisions for payment of any claims, or otherwise;

(g)     if the Specified Trade Claimant fails to comply with the terms and provisions of this Trade Agreement, the Debtors may, in their discretion, declare that such Trade Agreement has terminated; *provided* that the Trade Agreement may be reinstated if:

(i)      after notice and a hearing (following a motion filed by the respective Specified Trade Claimant), the Bankruptcy Court reverses the Debtors' decision to terminate the Trade Agreement for good cause shown that the Debtors' determination was materially incorrect;

(ii)     the Specified Trade Claimant fully cures the underlying default of the Trade Agreement within five (5) business days from the date of receipt of notice of termination of the Trade Agreement; or

(iii)    the Debtors, in their sole discretion, reach a commercially acceptable agreement with the breaching party.

(h)     the Parties hereby submit to the exclusive jurisdiction of the Court to resolve any dispute arising under or in connection with this Trade Agreement.

7.      Subject to the requirements of the Bankruptcy Code, further orders of the Court, or applicable law, and unless it otherwise becomes public without a breach of this Trade Agreement, the Specified Trade Claimant agrees to hold in confidence and not disclose to any party: (a) any and all payments made by the Debtors pursuant to this Trade Agreement; (b) the terms of payment set forth herein; (c) the Customary Trade Terms; and (d) this Trade Agreement (collectively, the "Confidential Information"); *provided* that if any party seeks to compel the Specified Trade Claimant's disclosure of any or all of the Confidential Information, through judicial action or otherwise, or the Specified Trade Claimant intends to disclose any or all of the Confidential

3

Information, the Specified Trade Claimant shall immediately provide the Debtors with prompt written notice so that the Debtors may seek an injunction, protective order or any other available remedy to prevent such disclosure; *provided*, *further*, that if such remedy is not obtained, the Specified Trade Claimant shall furnish only such information as the Specified Trade Claimant is legally required to provide.

8.      The undersigned hereby represent and warrant that: (a) they have full authority to execute this Trade Agreement on behalf of the respective Parties; (b) the respective Parties have full knowledge of, and have consented to, this Trade Agreement; and (c) they are fully authorized to bind the Party to all of the terms and conditions of this Trade Agreement.

9.      This Trade Agreement sets forth the entire understanding of the Parties regarding the subject matter hereof and supersedes all prior oral or written agreements between them.  This Trade Agreement may not be changed, modified, amended or supplemented, except in a writing signed by both Parties.

10.      This Trade Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same agreement.  Signatures by facsimile or electronic signatures shall count as original signatures for all purposes.

AGREED AND ACCEPTED AS OF THE DATE SET FORTH ABOVE:

**[APPLICABLE DEBTOR]**                    **[TRADE CLAIMANT]**

_____          _____

4

**<u>Exhibit B</u>**

**Proposed Final Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re* | **Chapter 11** |
| **ENDO INTERNATIONAL plc, *et al.*,** | **Case No. 22-22549 (___)** |
| **Debtors.**[1] | **(Joint Administration Pending)** |

**FINAL ORDER (I) AUTHORIZING PAYMENT
OF CERTAIN PREPETITION SPECIFIED TRADE CLAIMS;
(II) AUTHORIZING FINANCIAL INSTITUTIONS TO HONOR AND PROCESS
RELATED CHECKS AND TRANSFERS; AND (III) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the debtors and debtors in possession (collectively, the "Debtors" and together with their non-debtor affiliates, the "Company") in the above-captioned cases (the "Chapter 11 Cases") for an order (a) authorizing, but not directing, the Debtors, in their sole discretion, to pay certain Specified Trade Claims in the ordinary course on a postpetition basis, and approving procedures related thereto, of (i) Lienholders; (ii) 503(b)(9) Vendors; (iii) Foreign Vendors; and (iv) Critical Vendors in an aggregate amount not to exceed the Critical Vendors Claims Cap; (b) authorizing and directing the Banks to honor and process related checks and transfers; and (c) granting related relief, all as more fully set forth in the Motion; and the Court having reviewed the Motion and the First Day Declaration and having heard the statements of counsel regarding the relief requested in the Motion at a hearing before the Court (the "Hearing"); and the Court having found that (a) the Court has jurisdiction over this matter

---

[1]     The last four digits of Debtor Endo International plc's tax identification number are 3755.  Due to the large number of debtors in these chapter 11 cases, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/endo/. The location of the Debtors' service address for purposes of these chapter 11 cases is: 1400 Atwater Drive, Malvern, PA 19355.

[2]     Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b) and the Amended Standing Order of Reference

M-431, dated January 31, 2012 (Preska, C.J.); (b) this is a core proceeding pursuant to 28 U.S.C.

§ 157(b); (c) venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and (d) due

and proper notice of the Motion and the Hearing was sufficient under the circumstances; and the

Court having determined that the legal and factual bases set forth in the Motion establish just cause

for the relief granted herein, in that such relief provides a material net benefit to the Debtors'

estates and creditors after taking into account the Bankruptcy Code's priority scheme, such relief

is necessary to avoid immediate and irreparable harm to the Debtors and their estates as

contemplated by Bankruptcy Rule 6003(b) and is a proper exercise of business judgment and in

the best interests of the Debtors, their estates, creditors and all parties in interest; now, therefore,

### IT IS HEREBY ORDERED THAT:

1.      The Motion is GRANTED on a final basis as set forth herein.

2.      The Debtors are authorized, but not directed, to pay prepetition Specified

Trade Claims comprising of all outstanding (a) Lienholder Claims, 503(b)(9) Claims, and Foreign

Vendor Claims and (b) Critical Vendor Claims, subject to the Critical Vendors Claims Cap.  In the

event the Debtors will exceed the Critical Vendors Claims Cap, the Debtors shall file a notice with

the Court describing the overage amount; *provided* that, in advance of exceeding the Critical

Vendors Claims Cap, the Debtors shall provide notice to the Ad Hoc First Lien Group of their

intent to do so.

3.      The Debtors, in their sole discretion, may condition payment of any

Specified Trade Claims upon agreement by the Specified Trade Claimant to supply goods or

services to the Debtors on such Specified Trade Claimant's Customary Trade Terms (as defined

below) for a period following the date of the agreement or on such other terms and conditions as

are acceptable to the Debtors.  As used herein, "Customary Trade Terms" means, with respect to

a Specified Trade Claimant, (a) the normal and customary trade terms, practices and programs

(including, but not limited to, credit limits, pricing, cash discounts, timing of payments and

programs), that were most favorable to the Debtors and in effect between such Specified Trade

Claimant and the Debtors in the 18-month period prior to the Petition Date or (b) such other trade

terms as agreed to by the Debtors and such Specified Trade Claimant.

4.      The form of Trade Agreement attached hereto as **Exhibit 1** is approved in

its entirety.  Except as otherwise set forth herein, the Debtors shall condition payment of Specified

Trade Claims pursuant to this Order upon the execution of a Trade Agreement.  Notwithstanding

anything to the contrary herein, the Debtors are authorized, but not directed, in their sole discretion,

to enter into such Trade Agreements when and if the Debtors determine, in the exercise of their

business judgment, that it is appropriate to do so.  A Trade Agreement, once agreed to and accepted

by a Specified Trade Claimant, shall be the legally binding contractual relationship between the

parties governing the commercial trade relationship as provided therein; *provided* that the Debtors

may agree to implement such modifications to the form of Trade Agreement the Debtors deem

necessary or advisable in the reasonable exercise of their business judgment to obtain Customary

Trade Terms from the applicable Specified Trade Claimant; *provided*, *further*, that the Debtors

may pay a Specified Trade Claim without the applicable Specified Trade Claimant having

executed a Trade Agreement only if the Debtors determine, in their reasonable business judgment,

that a Trade Agreement is unnecessary to ensure the applicable Specified Trade Claimant's

continued performance on Customary Trade Terms; *provided*, *further*, that the Debtors will, upon

reasonable request, provide updates to the Ad Hoc First Lien Group regarding (i) material

3

modifications to or terminations of Trade Agreements and (ii) material disputes with respect to any Specified Trade Claimant.

5.     Any party who accepts payment from the Debtors of a Specified Trade Claim (each, a "Payment") (regardless of whether a Trade Agreement has been executed) shall be deemed to have agreed to the terms and provisions of this Order and shall be deemed to have waived, to the extent so paid, any and all prepetition claims, of whatever type, kind or priority, against the Debtors, their properties and estates, their directors, officers and employee up to the amount paid.

6.     If the Debtors, in their sole discretion, determine that a Specified Trade Claimant has not complied with the terms and provisions of the Trade Agreement or has failed to continue to provide Customary Trade Terms following the date of the agreement, or on such terms as were individually agreed to between the Debtors and such Specified Trade Claimant, the Debtors may terminate the Trade Agreement, together with the other benefits to the Specified Trade Claimant as contained in this Order; *provided*, *however*, that the Trade Agreement may be reinstated (a) if such determination is subsequently reversed by the Court for good cause after it is shown that the determination was materially incorrect after notice and a hearing following a motion from the Specified Trade Claimant, (b) the underlying default under the Trade Agreement is fully cured by the Specified Trade Claimant not later than five business days after the date the initial default occurred or (c) the Debtors, in their sole discretion, reach a subsequent agreement with the Specified Trade Claimant; *provided*, *further*, that the Debtors will, upon reasonable request, provide updates to the Ad Hoc First Lien Group regarding (i) material modifications to or terminations of Trade Agreements and (ii) material disputes with respect to any Specified Trade Claimant.

7.      If a Trade Agreement is terminated as set forth above, or if a Specified Trade Claimant that has received Payment later refuses to continue to supply goods or services for the applicable period in compliance with the Trade Agreement or this Order, then (a) the Debtors may, in their sole discretion, declare that the Payment is a voidable postpetition transfer pursuant to section 549(a) of the Bankruptcy Code that the Debtors may recover in cash or in goods from such Specified Trade Claimant, (b) the creditor shall immediately return such Payments to the extent that the aggregate amount of such Payments exceeds the postpetition obligations then outstanding without giving effect to alleged setoff rights, recoupment rights, adjustments or offsets of any type whatsoever, and (c) the creditor's Specified Trade Claim shall be reinstated in such an amount so as to restore the Debtors and the Specified Trade Claimants to their original positions as if the Trade Agreement had never been entered into and no Payment had been made.

8.      All Trade Agreements shall be deemed to have terminated, together with other benefits to Specified Trade Claimants as contained in this Order, upon entry of an order converting the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code.

9.      Any party who accepts Payment from the Debtors (regardless of whether a Trade Agreement has been executed) shall, at the Debtors' request take all actions necessary to remove any mechanics' liens, possessory liens or similar state law trade liens on the Debtors' assets such party may have based upon such Specified Trade Claims at such party's sole expense.

10.     As ordered in the Interim Order, the Debtors shall provide this Court, the U.S. Trustee, counsel to the Ad Hoc First Lien Group, counsel to the Ad Hoc Cross-Holder Group, and any official committee appointed in the Chapter 11 Cases with reasonable and timely access to information, including, without limitation, a list of Critical Vendors and updates regarding (a) material modifications to or terminations of Trade Agreements and (b) material disputes with

5

respect to any Specified Trade Claimant, which such parties shall keep confidential and treat as for professional eyes only, sufficient to enable such parties to monitor payments made, obligations satisfied, and other actions taken.

11.     As ordered in the Interim Order, the Debtors shall maintain a matrix/schedule of payments made pursuant to this Order, including the following information: (a) the names of the payee; (b) the nature, date and amount of the payment; (c) the category or type of payment as characterized in the Motion; and (d) the Debtor or Debtors that made the payment. The Debtors shall provide a copy of such matrix/schedule to the Court, the U.S. Trustee, counsel to the Ad Hoc First Lien Group, counsel to the Ad Hoc Cross-Holder Group, and any statutory committee appointed in the Chapter 11 Cases every 30 days beginning upon entry of the Interim Order.

12.     All Banks are (a) authorized and directed to receive, process, honor and pay any and all checks, drafts, electronic transfers and other forms of payment used by the Debtors on account of the Specified Trade Claims, whether presented before, on or after the Petition Date; and (b) prohibited from placing any hold on, or attempting to reverse, any automatic transfer on account of the Specified Trade Claims.  The Banks shall rely on the representations of the Debtors as to which checks and fund transfers should be honored and paid pursuant to this Order without any duty of further inquiry and without liability for following the Debtors' instructions.

13.     Any party receiving payment from the Debtors is authorized and directed to rely on the representations of the Debtors as to which payments are authorized by this Order.

14.     Notwithstanding anything to the contrary contained herein, any payment to be made hereunder, and any authorization contained, hereunder herein, shall be subject to and in accordance with any interim and final orders, as applicable, approving the use of cash collateral (the "Cash Collateral Order") and any budget in connection with any such use of cash collateral.

6

To the extent there is any inconsistency between the terms of the Cash Collateral Order and any action taken or proposed to be taken hereunder, the terms of the Cash Collateral Order shall control.

15.      Nothing herein shall impair or prejudice the Debtors' or any other party-in-interest's ability to contest the extent, perfection, priority, validity or amounts of any claims or liens held by any Specified Trade Claimant and the Debtors' rights to contest the extent, validity or perfection or seek the avoidance of all such liens or the priority of such claims are fully preserved.

16.      Nothing contained herein is or should be construed as: (a) an implication or admission as to the validity of any claim against the Debtors, (b) a waiver of the Debtors' or any other party-in-interest's rights to dispute the amount of, basis for, or validity of any claim against the Debtors, (c) a waiver of any claims or causes of action that may exist against any creditor or interest holder, (d) a promise to pay any claim, (e) a concession by the Debtors that any liens (contractual, common law, statutory or otherwise) satisfied pursuant to the Motion are valid (and all rights to contest the extent, validity or perfection or seek avoidance of all such liens are expressly reserved), (f) an approval, assumption, adoption, or rejection of any agreement, contract, program, policy, or lease between the Debtors and any third party under section 365 of the Bankruptcy Code, (g) a waiver of the obligation of any party in interest to file a proof of claim, or (h) otherwise affecting the Debtors' rights under section 365 of the Bankruptcy Code to assume or reject any executory contract or unexpired lease.  If this Court grants the relief sought herein, any payment made pursuant to this Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

17.     Nothing herein shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by any party.

18.     The Court finds and determines that the requirements of Bankruptcy Rule 6003 are satisfied and that the relief requested is necessary to avoid immediate and irreparable harm.

19.     Under the circumstances of the Chapter 11 Cases, notice of the Motion is adequate under Bankruptcy Rule 6004(a).

20.     Notwithstanding Bankruptcy Rule 6004(h), this Order shall be effective and enforceable immediately upon entry.

21.     The Debtors are authorized and empowered to take all action necessary to effectuate the relief granted in this Order (including, without limitation, making copies of this Order, the Motion and any materials or other information related thereto available in any local language in a jurisdiction in which the Debtors or their affiliates operate).

22.     This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation, interpretation or enforcement of this Order.

Dated: [●], 2022
[●], New York

_____
THE HONORABLE [_____]
UNITED STATES BANKRUPTCY JUDGE

## Exhibit 1

**Form of Trade Agreement**

# TRADE AGREEMENT

The Debtors (as defined herein) and [__]  hereby enter into the following trade agreement (this "Trade Agreement") dated as of this [ , 202_].

## Recitals

WHEREAS on August 16, 2022 (the "Petition Date"), Endo International plc and its debtor affiliates, as debtors and debtors in possession (collectively, the "Debtors" and together with their non-debtor affiliates, the "Company"), commenced the chapter 11 cases (the "Bankruptcy Case") by filing voluntary petitions for relief under title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Court").

WHEREAS on [__], 202_, the Court entered the *Final Order (I) Authorizing Payment of Certain Prepetition Specified Trade Claims; (II) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers; and (III) Granting Related Relief* (the "Order") [Docket No. _] authorizing the Debtors, under certain conditions, to pay the prepetition claims of certain vendors subject to the terms and conditions set forth therein.

WHEREAS pursuant to the Order, to receive payment on account of prepetition claims, each Specified Trade Claimant must agree to continue to supply goods or services to the Debtors on "Customary Trade Terms."  As used herein, "Customary Trade Terms" means, with respect to a Specified Trade Claimant, (a) the normal and customary trade terms, practices and programs (including, but not limited to, credit limits, pricing, cash discounts, timing of payments and programs), that were most favorable to the Debtors and in effect between such Specified Trade Claimant and the Debtors in the 18-month period prior to the Petition Date or (b) such other trade terms as agreed to by the Debtors and such Specified Trade Claimant.

WHEREAS the Debtors and [__] (collectively, the "Parties") agree to the following terms as a condition of payment on account of certain prepetition claims that [__] may hold against the Debtors.

## Agreement

1.      The Parties hereby agree that [__] is a "Specified Trade Claimant" (as defined in the Order) (herein [__] will be referred to as "Specified Trade Claimant").

2.      [OPTION 1: The balance of Specified Trade Claimant's aggregate prepetition claim(s) against the Debtors is $[__] (the "Agreed Trade Claim").  The Agreed Trade Claim does not constitute a claim allowed by the Bankruptcy Court in this case, and signing this Trade Agreement does not excuse the Specified Trade Claimant from any requirement of filing a proof of claim in the Bankruptcy Case.

3.      Following execution of this Trade Agreement, the Debtors will pay the Specified Trade Claimant $[__] (the "Payment Amount") in [partial/full] satisfaction of the Agreed Trade Claim.  The Payment Amount will be paid pursuant to the Customary Trade Terms set forth below,

and will be applied to any invoices previously received by the Debtors on account of the Agreed Trade Claim.

4.      OPTION 2: The parties hereby agree that the Specified Trade Claimant delivered to the Debtors, and the Debtors received, goods valued at $[__] within twenty (20) days before the Petition Date, for which the Specified Trade Claimant did not receive payment (the "Agreed 503(b)(9) Claim"). $[__] of the Payment Amount will be applied toward the Agreed 503(b)(9) Claim. The Agreed 503(b)(9) Claim does not constitute a claim allowed by the Bankruptcy Court in this case, and signing this Trade Agreement does not excuse the Specified Trade Claimant from any requirement of filing a proof of claim in the Bankruptcy Case.]

5.      For a period from the date this Trade Agreement is executed until the earlier of (a) the effective date of a chapter 11 plan for the Debtors or (b) [DATE], the Specified Trade Claimant shall supply goods [and/or] services to the Debtors based on the following Customary Trade Terms: [CUSTOMIZE PER VENDOR]

6.      The Parties further agree, acknowledge and represent that:

(a)      the Parties have reviewed the terms and provisions of the Order and consent to be bound by such terms and that this Trade Agreement is expressly subject to the Order;

(b)      any payments made on account of the Agreed Trade Claim shall be subject to the terms and conditions of the Order, including any orders of the Court granting the relief requested in the Order on a final basis, as applicable;

(c)      if the Specified Trade Claimant refuses to supply goods or services to the Debtors as provided herein or otherwise fails to perform any of their obligations hereunder, the Debtors may exercise all rights and remedies available under the Order, the Bankruptcy Code, or applicable law;

(d)      the Specified Trade Claimant will not separately seek payment for any claims pursuant to section 503(b)(9) of the Bankruptcy Code or other similar claims outside of the terms of the Order or this Trade Agreement unless Specified Trade Claimant's participation in the vendor payment program authorized by the Order is terminated;

(e)      in consideration for receiving the Payment Amount, the Specified Trade Claimant shall not file or otherwise assert against the Debtors, their estates or any other person or entity or any of their respective assets or property (real or personal) any lien (regardless of the statute or other legal authority upon which the lien is asserted) related to any remaining prepetition amounts allegedly owed to the Specified Trade Claimant by the Debtors arising from agreements entered into before the Petition Date. Furthermore, if the Specified Trade Claimant has taken steps to file or assert a lien before entering into this Trade Agreement, the Specified Trade Claimant agrees to take all necessary steps to remove the lien as soon as possible at its sole cost and expense;

2

(f) if the Specified Trade Claimant fails to comply with the terms and provisions of this Trade Agreement, the Debtors may, in their discretion, and without further order of the Bankruptcy Court; (i) declare that any payment of the Payment Amount is a voidable postpetition transfer pursuant to section 549(a) of the Bankruptcy Code that the Debtors may recover in cash or in goods from the Specified Trade Claimant (including by setoff against postpetition obligations); (ii) declare that the Specified Trade Claimant shall immediately return the Payment Amount to the Debtors without giving effect to any alleged setoff rights, recoupment rights, adjustments or other offsets of any type whatsoever, and Specified Trade Claimant's claim shall be reinstated to such amount so as to restore the Debtors and the Specified Trade Claimant to their original positions as if the Trade Agreement had never been entered into and the Payment Amount had not been paid; and/or (iii) if there exists an outstanding postpetition balance due from the Debtors to Specified Trade Claimant, the Debtors may elect to recharacterize and apply the Payment Amount to such outstanding postpetition balance and the Specified Trade Claimant shall be required to repay to the Debtors such paid amounts that exceed the postpetition obligations then outstanding without the right of any setoffs, claims, provisions for payment of any claims, or otherwise;

(g) if the Specified Trade Claimant fails to comply with the terms and provisions of this Trade Agreement, the Debtors may, in their discretion, declare that such Trade Agreement has terminated; *provided* that the Trade Agreement may be reinstated if:

(i) after notice and a hearing (following a motion filed by the respective Specified Trade Claimant), the Bankruptcy Court reverses the Debtors' decision to terminate the Trade Agreement for good cause shown that the Debtors' determination was materially incorrect;

(ii) the Specified Trade Claimant fully cures the underlying default of the Trade Agreement within five (5) business days from the date of receipt of notice of termination of the Trade Agreement; or

(iii) the Debtors, in their sole discretion, reach a commercially acceptable agreement with the breaching party.

(h) the Parties hereby submit to the exclusive jurisdiction of the Court to resolve any dispute arising under or in connection with this Trade Agreement.

7.    Subject to the requirements of the Bankruptcy Code, further orders of the Court, or applicable law, and unless it otherwise becomes public without a breach of this Trade Agreement, the Specified Trade Claimant agrees to hold in confidence and not disclose to any party: (a) any and all payments made by the Debtors pursuant to this Trade Agreement; (b) the terms of payment set forth herein; (c) the Customary Trade Terms; and (d) this Trade Agreement (collectively, the "Confidential Information"); *provided* that if any party seeks to compel the Specified Trade

Claimant's disclosure of any or all of the Confidential Information, through judicial action or otherwise, or the Specified Trade Claimant intends to disclose any or all of the Confidential Information, the Specified Trade Claimant shall immediately provide the Debtors with prompt written notice so that the Debtors may seek an injunction, protective order or any other available remedy to prevent such disclosure; *provided*, *further*, that if such remedy is not obtained, the Specified Trade Claimant shall furnish only such information as the Specified Trade Claimant is legally required to provide.

8.      The undersigned hereby represent and warrant that: (a) they have full authority to execute this Trade Agreement on behalf of the respective Parties; (b) the respective Parties have full knowledge of, and have consented to, this Trade Agreement; and (c) they are fully authorized to bind the Party to all of the terms and conditions of this Trade Agreement.

9.      This Trade Agreement sets forth the entire understanding of the Parties regarding the subject matter hereof and supersedes all prior oral or written agreements between them.  This Trade Agreement may not be changed, modified, amended or supplemented, except in a writing signed by both Parties.

10.      This Trade Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same agreement.  Signatures by facsimile or electronic signatures shall count as original signatures for all purposes.

AGREED AND ACCEPTED AS OF THE DATE SET FORTH ABOVE:

**[APPLICABLE DEBTOR]**                    **[TRADE CLAIMANT]**


_____          _____