SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Paul D. Leake
Lisa Laukitis
Shana A. Elberg
Evan A. Hill
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
Fax: (212) 735-2000

*Proposed Counsel to Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ***In re*** | **Chapter 11** |
| **ENDO INTERNATIONAL plc, *et al.*,** | **Case No. 22-22549 (___)** |
| **Debtors.**[1] | **(Joint Administration Pending)** |

**MOTION OF THE DEBTORS FOR ENTRY OF
INTERIM AND FINAL ORDERS (I) AUTHORIZING
THE DEBTORS TO (A) CONTINUE USING EXISTING
CASH MANAGEMENT SYSTEMS, BANK ACCOUNTS, AND
BUSINESS FORMS AND (B) IMPLEMENT CHANGES TO THEIR CASH
MANAGEMENT SYSTEM IN THE ORDINARY COURSE OF BUSINESS;
(II) GRANTING ADMINISTRATIVE EXPENSE PRIORITY FOR POSTPETITION
INTERCOMPANY CLAIMS; (III) GRANTING A WAIVER WITH RESPECT TO THE
REQUIREMENTS OF 11 U.S.C. § 345(b); AND (IV) GRANTING RELATED RELIEF**

Endo International plc and its debtor affiliates, as debtors and debtors in possession

(collectively, the "Debtors" and, together with their non-debtor affiliates, the "Company") in the

above-captioned chapter 11 cases (the "Chapter 11 Cases"), respectfully represent in support of

this motion (the "Motion") as follows:

---

[1]    The last four digits of Debtor Endo International plc's tax identification number are 3755.  Due to the large number of debtors in these chapter 11 cases, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Endo.  The location of the Debtors' service address for purposes of these chapter 11 cases is: 1400 Atwater Drive, Malvern, PA 19355.

## RELIEF REQUESTED

1.      By this Motion, and pursuant to sections 105(a), 345(b), 363(b), 363(c), 364(b), 503(b) and 507(b) of title 11 of the United States Code (the "Bankruptcy Code"), Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rule 9013-1 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules"), the Debtors seek entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** (the "Proposed Interim Order") and **Exhibit B** (the "Proposed Final Order"), respectively, (i) authorizing, but not directing, the Debtors to (a) continue using their Cash Management System, Bank Accounts, and Business Forms (each as defined below), and (b) implement changes to their Cash Management System in the ordinary course of business; (ii) granting superpriority administrative expense status for Intercompany Claims (as defined below) arising from postpetition Intercompany Transactions (as defined below); (iii) to pay any prepetition and postpetition fees and expenses owed to the Banks to the extent due and owing pursuant to the prepetition agreements governing the Bank Accounts, including the Bank Fees (as defined below); (iv) granting a waiver with respect to the requirements of section 345(b) of the Bankruptcy Code; and (v) granting related relief.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.).  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

3.      Pursuant to Bankruptcy Rule 7008, the Debtors consent to entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter a final order or judgment consistent with Article III of the United States Constitution.

4.      Venue of the Chapter 11 Cases and this Motion is proper in this District under 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

### I.      GENERAL BACKGROUND

5.      On the date hereof (the "Petition Date"), the Debtors each commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors have requested that the Chapter 11 Cases be jointly administered.

6.      The Debtors are authorized to continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7.      As of the date of this Motion, no trustee, examiner or statutory committee of creditors has been appointed in the Chapter 11 Cases.

8.      Additional information regarding the Debtors, including their business operations, their corporate and capital structure, and the events leading to the commencement of the Chapter 11 Cases is set forth in the *Declaration of Mark Bradley in Support of Chapter 11 Petitions and First Day Papers* (the "First Day Declaration") filed contemporaneously herewith and incorporated herein by reference.

### II.     THE DEBTORS' CASH MANAGEMENT SYSTEM

#### A.      Overview of the Company's Integrated Business Operations

9.      The Company operates a global specialty pharmaceutical business that develops and delivers high quality, life-enhancing branded and generic products to customers in the U.S. and abroad.  The centerpiece of the Company's business operations is its vertically integrated operating model, which includes established R&D capabilities in translational research, early and late-stage clinical development and complex formulation development, integrated global

manufacturing, quality and supply chain operations with a proven record of compliance and operational excellence, and scalable sales and marketing capabilities and capacity.  This operating model allows the Company to reduce costs, passing savings along to customers, and improve operational efficiencies in what is a highly competitive and highly regulated industry.

10.    The Company's global portfolio of intellectual property rights are held by certain Debtors in the U.S. and abroad (the "IP Holders"), and then licensed to certain other Debtors and non-debtor affiliates (the "Non-Debtor Affiliates") that manufacture the Company's products at facilities located in Pennsylvania, New Jersey, Michigan and India[2] (the "Manufacturers").[3]  The Company's manufactured goods are then generally sold to the respective IP Holder or to Debtor Endo Ventures Limited ("EVL")—the principal of the Company's supply chain planning and procurement functions—at a mark-up to the Manufacturer's cost.  EVL performs a variety of supply chain oversight and quality assurance functions for substantially all of the Company's products, finalizes the products for distribution to third parties, and transfers those products to Paladin Labs, Inc. ("PLI"), Endo Aesthetics LLC ("Aesthetics"), Endo Pharmaceuticals Inc. ("EPI"), and Par Pharmaceutical, Inc. ("PPI") (collectively, including EVL, the "Distributors") for distribution of the finished goods to third parties.  Other than EVL, the Distributors are also responsible for collecting sale proceeds for their respective segments.[4]

11.    The Debtors' vertically integrated business model would not be possible without the use of their centralized cash management system (the "Cash Management System") for the collection, concentration, management, disbursement and investment of funds used in their

---

[2]    The entities that operate the Company's manufacturing facilities in India are not Debtors in these Chapter 11 Cases.

[3]    The Company also contracts with third parties that manufacture certain products.

[4]    The majority of the Company's receipts come in check form and are from the three key U.S. pharmaceutical distributors—McKesson Corporation, Cardinal Health, Inc., and AmerisourceBergen Corporation.

global operations.  Through the Cash Management System, sale proceeds are redistributed to the appropriate Debtor entities according to the terms of the Amended and Restated Master Cash Management Agreement, dated June 19, 2017, and the Master Cash Management and Netting Agreement, dated June 17, 2021 (the "Cash Management Agreements"), which govern transactions between Debtor Endo Finance Operations LLC (the "Pool Leader") and substantially all of the Company's other U.S. entities (each, a "Participant").[5]  Under the Cash Management Agreements, the Pool Leader acts as a central banker for the other U.S. Debtor participants, and makes advances and holds deposits in furtherance of that purpose.  The Pool Leader generally advances funds to the Concentration Accounts held by Participants, which are then used to fund each Debtor's operations, including by automatic transfer to that Debtor's other Payroll Accounts on an as-needed basis to fund third party payments.  Any receipts held by the Collection Accounts are then automatically swept to the Concentration Accounts, and ultimately returned to a master cash-pooling account held by the Pool Leader (the "Pool Leader Account").

12.     Each Participant Debtor may advance funds from its Bank Account to the Pool Leader or withdraw such deposited funds at any time, and each Debtor is also able to borrow funds from the Pool Leader as necessary to fund operations.  Deposited, withdrawn, and borrowed amounts are tracked and recorded, and deposited and borrowed amounts bear interest in accordance with the terms of the Cash Management Agreements.  Intercompany balances are also created when payments are made by certain Debtors on behalf of other Participant Debtors with no independent bank accounts.  All such Intercompany Transactions and Intercompany Claims (each defined below) related to the Cash Management Agreements, including deposits,

---

[5]     The lone non-U.S. Participant is Debtor Endo Luxembourg International Financing S.à.r.l.  Additionally, Non-Debtor Affiliate CPEC LLC (a Delaware entity) is a Participant under the 2017 Cash Management Agreement, but does not maintain a bank account.

withdrawals, borrowed amounts, and interest accrued or owing on account thereof, are appropriately recorded in each applicable Debtor's books and records by the Debtors' treasury and accounting teams, and any existing balances are typically settled in the ordinary course of business. Through this recording and tracking of each Debtor's various credits and debits, each of the Debtor entities ultimately receives their appropriate share for their various contributions throughout the Company's supply chain.

### B.    The Bank Accounts

13.    In connection with the Cash Management System, the Debtors maintain fifty-one (51) bank and other investment accounts (collectively, together with any other bank or investment accounts that the Debtors may open in the ordinary course of business, the "Bank Accounts") with multiple banks (collectively, the "Banks"). A list of the Bank Accounts and Banks as of the Petition Date is attached hereto as **Exhibit D**.[6] The Bank Accounts can generally be divided into six types according to their primary function, as follows:[7]

| Account(s) | Description |
|---|---|
| Collection Accounts<br><br>*BofA accounts ending 8474, 4621, 9208 and 4582* | The Debtors maintain four (4) primary collection accounts at Bank of America N.A. ("BofA") responsible for receiving payments from customers and other third parties (the "Collection Accounts"), which are then disbursed throughout the Company to fund operations. Through these accounts, Debtor PPI collects receipts for the Company's generics and sterile injectables segments; Debtors EPI and Aesthetics collect receipts for the Company's branded segment; and Debtor PLI collects receipts for the Company's Canadian operations as part of the international segment. The Collection Accounts are zero-balance accounts as funds are swept daily into one of the Concentration Accounts (defined below).<br><br>As of the Petition Date, the Collection Accounts had a combined balance of approximately $13,520. |
| Concentration Accounts | The Debtors maintain seven (7) concentration accounts at BofA (the "Concentration Accounts"), which serve as the main accounts for the Company's cash pooling |

---

[6]    In addition, the Company also maintains ten (10) accounts held by its Non-Debtor Affiliates based in India (the "Indian Non-Debtor Affiliates"). As of the Petition Date, these accounts collectively held approximately $102,858,778.

[7]    In addition to the accounts categorized below, the Debtors maintain a $1.6 million certificate of deposit with American Express, which acts as collateral for the Debtors' American Express travel cards.

| Account(s) | Description |
|---|---|
| *BofA accounts ending 8458, 6353, 4566, 3994, 5764, 4605, and 9224* | arrangement (described below) into which funds are swept daily from the participating Debtors' various zero balance accounts used for general operations, payroll, disbursement, receipts and accounts payable. Funds are automatically transferred to and from the Concentration Accounts on an as-needed basis from the Pool Leader Account (defined below). Debtor PLI's account is not subject to the cash pooling arrangement, but acts as a Concentration Account for the Company's Canadian business. <br><br> As of the Petition Date, the Concentration Accounts had a combined balance of approximately $28,195,524. |
| <u>Payroll Accounts</u>[8] <br><br> *BofA accounts ending 8461, 4618 and 4579* | The payroll accounts include three (3) specifically designated accounts held by EPI, PPI, and Aesthetics (the "<u>Payroll Accounts</u>"), used to fund the Debtors' payroll obligations for the Debtors' U.S. corporate employees, and employees associated with the branded, generics, and aesthetics segments. For the Debtors' U.S. operations, Automatic Data Processing LLC pulls funds from the Payroll Accounts sufficient to satisfy the Debtors' payroll obligations via direct debit, either weekly or biweekly depending on the applicable employees' location. The Debtors' international payroll obligations are funded on a monthly basis via direct deposit by the respective Debtors to the employees' accounts. <br><br> As of the Petition Date, the Payroll Accounts had a combined balance of approximately $0. |
| <u>Intercompany Accounts</u> <br><br> *BofA accounts ending 8025, 2027, 2020, 6018, 1011, 7019, 5019, 0012, 2019C, 2203, 5013, 8725, 8015, 1199, 4595, 1010, 3017, and 9307* <br><br> *WF accounts ending 9015 and 9007* | The Debtors maintain twenty (20) accounts at BofA and Wells Fargo Bank, N.A. ("<u>WF</u>") that do not collect customer receipts, make significant vendor payments, or otherwise engage in routine cash transfers with third parties (the "<u>Intercompany Accounts</u>"). The Intercompany Accounts are primarily utilized to facilitate Intercompany Transactions, or to resolve existing Intercompany Claims and balances via cash transfers between other Debtors or Non-Debtor Affiliates, including as part of the Company's semi-annual claims reconciliation and resolution process. The Intercompany Accounts include the Pool Leader Account (as defined below), which acts as the primary cash pooling account for the Company's U.S. operations and facilitates transfers of cash to fund international operations. <br><br> As of the Petition Date, the Intercompany Accounts had a combined balance of approximately $799,760,821, and included within this balance is approximately $658,150,434 in the Pool Leader Account. |
| <u>Disbursement Accounts</u> <br><br> *BofA accounts ending 8017, 2012, 2019A, 2019B, 5018, 4010, 2015, 8438, 4609, 8420,* | The remainder of the Debtors' non-Investment Accounts can be generally classified as disbursement and accounts payable accounts at BofA (the "<u>Disbursement Accounts</u>"), which are used by the Debtors for making a variety of third party payments to facilitate daily operations. In the case of U.S. cash pooling Participants, the Disbursement Accounts are generally funded via automatic transfer from the Debtor's respective Concentration Account. In the case of Non-Participant (as defined below), international Debtors, the accounts are typically funded via manual |

[8]   The Disbursement Accounts held by Par Laboratories Europe Ltd. ("<u>Par Labs</u>") (#0010) and EVL (#2012) are also used to meet payroll obligations for approximately eighty two (82) of the Debtor's employees in Ireland and the United Kingdom. PLI's Collection Account (#9208) is also used to fund, among other things, payroll for approximately one hundred (100) of the Debtors' Canadian Employees. The Intercompany Account held by Endo Luxembourg International Financing S.a.r.l (#8015) is used to fund payroll for two of the Debtors' Luxembourg-based Employees.

| Account(s) | Description |
|---|---|
| *1323, 0010, 9109, 2285, and 0861* | wire initiated by the Debtors' treasury team or via ACH initiated by the Debtors' AP team, in an amount sufficient to fund the necessary third party payments. |
| | As of the Petition Date, the Disbursement Accounts had a combined balance of approximately $228,719,084. |
| Investment Accounts<br><br>*BofA account ending 6448*[9]<br><br>*E-Trade account ending 5038* | The Debtors' investment accounts are funded with excess cash produced by the Company's operations as well as borrowings made in connection with the Debtors' secured and unsecured funded debt obligations (the "Investment Accounts"). As more fully described below, the funds in the Investment Accounts are invested at the Debtors' discretion pursuant to and in compliance with their Investment Practices (defined below). |
| | As of the Petition Date, the total amount of cash invested through the Investment Accounts was $103,125; this entire Investment Account balance is due to the E-Trade Investment Account, as the BofA Investment Account had a $0 balance as of the Petition Date. |

14.    The vast majority of the Bank Accounts (48 of 51) are held with BofA, with two others maintained through WF, both of which are designated as authorized depositories by the United States Trustee for Region 2 ("Authorized Depositories"). Debtor Endo International plc ("PLC") maintains one Investment Account with E*Trade Financial Corporation ("E*Trade").[10] Although E*Trade is not a not an Authorized Depository, it is a highly regulated, nationally chartered bank and is subject to supervision by national banking regulators. Moreover, E*Trade is now part of Morgan Stanley. And while Morgan Stanley is not an Authorized Depository, it has a market capitalization of nearly $190 billion, approximately $1.2 trillion in assets, and is ranked 31st on the Forbes Global 2000 list for 2021.

---

[9]    As of the Petition Date, the Debtors also had four additional Investment Accounts at BofA that are inactive.

[10]   The Company's E*Trade Investment Account is a brokerage account used solely in connection with the Debtors' Long Term Incentive Plan (the "LTIP"). Specifically, when employees cash out stock options that they have been issued under the LTIP, cash sufficient to cover those payments will be held in the E*Trade account. The Debtors may elect to issue such payments to employees via their ordinary course Payroll Accounts, rather than directly from the E*Trade account, in which case the E*Trade account will reflect a positive cash balance. As of the Petition Date, the Debtors E*Trade account balance was approximately $103,125.

C.    **The Cash Management System**

15.    The Debtors' vertically integrated business model depends upon the use of the Cash Management System, and the Debtors have used the basic structure of the Cash Management System for approximately 5 years.  A diagram setting forth the Cash Management System is attached hereto as **Exhibit C** (the "Cash Management Schematic").

16.    The Cash Management System is tailored to meet the Debtors' operating needs and is similar to those commonly employed by businesses comparable in size and scale to the Debtors.  The Cash Management System facilitates the Debtors' cash monitoring, forecasting and reporting, enables the Debtors to streamline use of their cash and invested funds, and allows the Debtors to facilitate tracking between certain entities and business units.  The Debtors' treasury team maintains daily oversight over their Cash Management System and implements cash management controls for entering, processing and releasing funds, including in connection with the Intercompany Transactions.[11]   In addition, the Debtors' treasury and accounting teams regularly reconcile the Debtors' books and records to ensure that all transfers are properly recorded, and periodically settle intercompany balances arising between and among the Debtors and the Non-Debtor Affiliates.  While many of the Debtors' internal and external payments are automated, the Debtors' treasury and accounts payable teams are also responsible for approving and initiating manual wires and checks when necessary.

17.    The domestic component of the Cash Management System is governed by the Cash Management Agreements between the Pool Leader and the Participants as described above.  The Company's Canadian operations primarily include Debtors Paladin Labs Canadian

---

[11]    The Debtors' treasury team is based out of their U.S. headquarters in Malvern, Pennsylvania.  The Indian Non-Debtor Affiliates employ a separate treasury team responsible for overseeing the independent cash needs and management of those entities, but the opening and closing of bank accounts in India is closely coordinated by the Debtors' U.S. treasury team.

Holding Inc. and PLI (collectively, the "Paladin Debtors").  While the Paladin Debtors are not party to the Cash Management Agreements, PLI maintains one Concentration Account into which funds from its Collection Account, which collects third-party receipts generated by distribution of the Company's products in Canada, are swept on a daily basis.  The PLI Concentration Account sweeps are recorded in the Company's enterprise resource planning system via manual and automated journal entries.

18.     The remainder of the Company's international operations, including the other foreign Debtors and Non-Debtor Affiliates, that do not participate in the pooling arrangement (each a "Non-Participant") are primarily funded via transfers to the respective accounts of those entities via the Intercompany Transactions discussed further below.  Endo Luxembourg Finance Company I S.à r.l ("FinCo I") receives funding as needed from the Pool Leader Account and disburses cash via Intercompany Loans to, and other Intercompany Transactions with, the other Non-Participant Debtors to fund operations.

19.     Because of the highly competitive nature of the Debtors' business and their vertically integrated business model, it is critical that the Cash Management System remain intact during these Chapter 11 Cases to ensure seamless continuation of transactions and uninterrupted collection of revenues.  Without the continued service of their Cash Management System, the Debtors would be unable to continue to fund and operate their business and could immediately cease operating.

D.     **The Investment Practices**

20.     Cash balances held in the Investment Accounts historically have been invested by the applicable banking institutions at the Debtors' direction in accordance with a written investment policy approved by the Board of Directors (the "Board") of PLC (the "Investment Practices").  To ensure that the Investment Practices are consistent with the

financial objectives of the Company and reflect market conditions, the Investment Practices are reviewed annually by the PLC's Chief Financial Officer or treasurer and thereafter presented to and approved by the Board of PLC.[12]   The Investment Practices are intended to achieve two primary objectives: (a) preserve the safety and value of principal while maintaining liquidity and (b) earn reasonable returns on the Debtors' surplus funds.

21.    To achieve these objectives, the Investment Practices generally require that funds be invested in certain specified types of securities, including U.S. government and treasury obligations, repurchase agreements that are 100% collateralized by U.S. treasuries or other governmental securities, bank deposits and money market accounts, time deposits, certificates of deposit or banker acceptances, commercial paper, mutual funds, corporate debt securities and municipal notes and bonds.  Investments in securities other than U.S. government and treasury obligations or that are not fully collateralized by U.S. treasuries or other governmental securities are subject to certain maximum exposure caps.

22.    While the Investment Practices permit investments in securities that are beyond the scope of section 345 of the Bankruptcy Code, the Investment Accounts currently hold secure investments, comprised of exclusively interest-bearing deposit accounts.  In the month prior to the Petition Date, the Debtors' investments generated a return of approximately 0.01%  The Debtors intend to maintain all funds in their Investment Accounts in money market fund investments and/or interest-bearing deposit accounts for the duration of these Chapter 11 Cases. As further set forth in this Motion, the Debtors request a waiver of the requirements of section 345 of the Bankruptcy Code.

---

[12]    Mark Bradley and Jack Boyle serve as the CFO and treasurer, respectively, for PLC.  However, in their role as CFO and treasurer of PLC, pursuant to the Investment Practices policy, they oversee investments made by all Debtor entities.  Under the Investment Practices, Mark Bradley approves investments made for amounts greater than $75 million, and Jack Boyle approves all other investments for amounts less than $75 million.

E.    **The Business Forms**

23.    In the ordinary course of business, the Debtors use a variety of checks, correspondence and other business forms (including, without limitation, letterhead, purchase orders and invoices) (collectively, the "Business Forms").  The majority of the Debtors' Business Forms are electronically generated by the Banks, or by the Debtors themselves, on an as-needed basis.  Thus, in the event the Debtors generate new Business Forms during the pendency of these Chapter 11 Cases, the Debtors will include a legend referring to the Debtors as "Debtors-In-Possession" on such newly created Business Forms.  However, to the extent the Debtors use any pre-existing Business Forms, to minimize expenses to their estates, the Debtors believe it is appropriate to continue to use such Business Forms as they were in existence immediately before the Petition Date—without reference to the Debtors' status as debtors in possession—rather than incur the expense and delay of ordering entirely new business forms.

F.    **Bank Fees**

24.    In the ordinary course of business, the Debtors incur and pay, honor and/or allow to be deducted from the Bank Accounts certain service charges and other fees, costs and expenses charged by the Banks (the "Bank Fees").  The Bank Fees average approximately $13,500 per month.  Payment of the Bank Fees is in the best interests of the Debtors and all parties in interest, as it will prevent unnecessary disruption to the Cash Management System and ensure that the receipt of the Debtors' funds is not delayed.

III.    **INTERCOMPANY TRANSACTIONS**

25.    As explained above, the Company is a global pharmaceutical company that relies on its vertically integrated business model and supply chain to maximize value and deliver high quality medicines to its customers.  Given the size and global nature of their operations, the Debtors, in the ordinary course of business, engage in certain Intercompany Loans (defined below)

and other transactions with one another and with their Non-Debtor Affiliates (collectively with the Intercompany Loans, the "Intercompany Transactions") that may result in claims arising against one another (the "Intercompany Claims"). The Debtors' treasury and intercompany teams work collaboratively to monitor and resolve accumulated Intercompany Claims and balances to facilitate the flow of cash to fund the Company's operations. Semi-annually—typically in June and December—the Company conducts batch reconciliations and settlements of accrued intercompany balances, primarily for interest payments associated with outstanding Intercompany Loans and smaller trade payables. In addition, certain Intercompany Claims and balances, including for intercompany sales or third party trade payables, are settled monthly, or even weekly, on a cash or cashless basis, as necessary to fund operations. Certain recurring examples of these Intercompany Transactions and Intercompany Claims are discussed in greater detail below.

26.     *Intercompany Transactions*. In the ordinary course of business, the Debtors and Non-Debtor Affiliates engage in a variety of IP licensing, contract manufacturing, research and development ("R&D") services, sale and purchase transactions with one another as the Company's products progress from initial manufacture to ultimate sale and distribution. All of the material transactions are governed by individual licensing, R&D or manufacturing services, distribution, supply, or sales contracts amongst the respective Debtors and Non-Debtor Affiliates, all of which establish the relevant mark-up or fee payable to the applicable seller or service provider.

27.     While trade payables associated with particular products are incurred primarily by the Manufacturer or Distributor entities responsible for manufacturing or distributing those products, certain costs and expenses are borne by various Debtors on behalf of their affiliates. Pursuant to a global Services Agreement (the "Services Agreement") among substantially all of

the Debtors and the Non-Debtor Affiliates,[13] certain Debtors and Non-Debtor Affiliates perform a variety of business development, information technology, human resources, legal, and other administrative services on behalf of other Debtor and Non-Debtor Affiliates, and such expenses are then allocated to the respective Service Recipient (as defined in the Services Agreement) along with a set mark-up, all of which are recorded as Intercompany Claims and periodically reconciled and resolved by the Debtors' treasury and intercompany teams.

28.     Further, Debtors EVL and PLC make a significant number of third party selling, general, and administrative payments ("SG&A Payments") on behalf of the Debtors' operating subsidiaries, which are recorded as Intercompany Claims. The cash needs of EVL and PLC to fund these SG&A Payments are typically satisfied on as-needed basis using cash generated by the U.S. Debtors, via weekly manual wire. Specifically, on a weekly basis, the Debtors' treasury and accounts payable teams review outstanding intercompany balances, including those in favor of EVL and PLC arising from intercompany sales, third party expense payments, and residual profit allocation attributable to the Company's transfer pricing arrangement, and initiate a manual wire and/or ACH payments from various U.S. Debtors that, in turn, pull cash from the Pool Leader.

29.     Pursuant to the Company's intercompany arrangements, EVL and the respective IP Holder, Manufacturer, and Distributor entities engage in intercompany sale and purchase transactions as products progress through the Company's supply chain. In exchange for the services performed by EVL, as well as the risk associated with those services, a portion of the Company's operating profit after considering routine profits earned by Manufacturers and Distributors is earned by EVL. The remaining operating profit is earned by the Debtor IP Holders

---

[13]     The Indian Non-Debtor Affiliates are not parties to the Services Agreement.

22-22549-jlg   Doc 16   Filed 08/17/22   Entered 08/17/22 01:40:22   Main Document
Pg 15 of 59


associated with the particular products.[14]  When the Distributor receives proceeds from third party sales of a particular product, Intercompany Claims and balances are automatically created reflecting approximate net positions of each respective Debtor and Non-Debtor Affiliate in this process.  Those intercompany balances are manually adjusted on an annual basis by the Debtors' transfer-pricing team and generally settled via cash transfer during the Company's bi-annual batch reconciliation process, though the Company has and may continue to settle intercompany balances on a more frequent basis, depending on the facts and circumstances.  Many of these settlements would occur as part of the normal course weekly or monthly cash settlement process between the counterparties prior to the bi-annual batch reconciliation process.  Continuation of the Company's transfer pricing, cost-sharing, and intercompany sale and service arrangements supports and standardizes the Company's global business operations and vertically integrated supply chain, and allows the Company to ensure that it complies with tax laws in the jurisdictions in which it operates.

30.     *Indian Non-Debtor Affiliates*.  The operations of the Indian Non-Debtor Affiliates are primarily funded via periodic cash transfers from Debtors EVL and PPI. Specifically, typically on a monthly basis, the Indian Non-Debtor Affiliates provide a summary report of their operating cash needs, which includes invoices from Indian Non-Debtor Affiliate entities Par Active Technologies Private Limited ("Par Active"), Par Biosciences Pvt Ltd, and Par Formulations Private Limited ("Par Formulations"), to the Debtors' treasury team, along with the amounts earned by, and owing to, the Indian Non-Debtor Affiliates for R&D and other services they perform and products they manufacture and sell to EVL and PPI as part of the Company's

---

[14]     With respect to products for which EVL does not perform such services, the Company's residual profit is allocated entirely to the respective IP Holder.

15

transfer pricing arrangement.  The premiums charged by the Indian Non-Debtor Affiliates for these services and products are governed by that certain Advanced Pricing Agreement (the "APA") between Non-Debtor Affiliate Par Formulations, on behalf of itself and the other Indian Non-Debtor Affiliates, and the local Indian taxing authorities.[15]  The Debtors' treasury team then initiates cash payments – typically monthly – to fund the Indian Non-Debtor Affiliates' operations for the following month, and in satisfaction of the amounts owed for the prior month for intercompany sales, R&D, and other services (the "Indian Goods and Services"), in accordance with the APA.[16]  The Debtors, through EVL and PPI, have historically transferred an average of approximately $12 million per month to the Indian Non-Debtor Affiliates for Indian Goods and Services.

31.      Additionally, the Indian Non-Debtor Affiliates have historically received approximately $5 million per month through External Commercial Borrowing Agreements (the "ECB Loans"), which have predefined draw down and repayment schedules.  The ECB Loans are the product of arm's-length negotiations entered into between FinCo I, as lender, and Par Formulations and Par Active as borrowers.  The ECB Loans were extended to fund capital expenditures aimed at expanding the development and manufacture of certain pharmaceutical products.  The last remaining ECB Loan payment due during 2022 to the Indian Non-Debtor Affiliates will be paid in December 2022 in the amount of approximately $2.2 million.

32.      Because of the Company's substantial manufacturing and R&D presence in India, continuing payments to the Indian Non-Debtor Affiliates in the ordinary course is essential

---

[15]    The APA also governs the interest rate applicable to the Intercompany Loans from FinCo I to Par Formulations, discussed below.

[16]    These transfers are made in USD, and are then converted to INR by the Indian Non-Debtor Affiliates as needed.

to prevent disruption in the Company's global operations.[17]  Specifically, a substantial and growing portion of the Company's R&D and manufacturing is conducted by the Indian Non-Debtor Affiliates, and these entities sell a significant portion of the Company's products to EVL for distribution by other Debtors in the generics segment.  On a monthly basis, the market value of the products the Debtors purchase from the Indian Non-Debtor Affiliates is substantially more than the aggregate payments the Debtors make to the Indian Non-Debtor Affiliates, including for the products themselves and other general funding needs.  Indeed, each month, the approximate revenue generated by products manufactured by the Indian Non-Debtor Affiliates is several times greater than the total payments made to the Indian Non-Debtor Affiliates.  Because the Indian Non-Debtor affiliates do not generate or collect external revenues or receipts, other than *de minimis* proceeds from scrap sales, they require continued payment for those intercompany sales and other cash funding from the Debtors.  The Indian Non-Debtor Affiliates are a key component of the Company's product development and manufacturing operations, and the continued intercompany payments to these entities will help protect the corresponding cash generated for the other Debtors in that business segment.

33.    The Debtors' Canadian operations, conducted by the Paladin Debtors, similarly engage in Intercompany Transactions with certain other Debtors.  However, unlike the Indian Non-Debtor Affiliates, the Paladin Debtors are typically able to meet all ordinary course operating expenses using third-party receipts collected by the Paladin Debtors themselves.  The Debtors also periodically execute other manual wires to satisfy the cash needs of certain other

---

[17]    Due to the current cash balance in the Indian Non-Debtor Affiliates' accounts, the Debtors do not anticipate making any intercompany transfers on account of Indian Goods and Services to the Indian Non-Debtor Affiliates until at least December 2022.  As of the Petition Date, the Indian Non-Debtor Affiliates hold a credit balance of approximately $50 million on account of Indian Goods and Services, which will be delivered by the Indian Non-Debtor Affiliates to the Debtors within the next six months.

foreign Debtors, on an ad-hoc, as needed basis. The amounts of these ad-hoc wire transfers vary from month-to-month and are recorded via journal entry.

34.     *Intercompany Loans*. The Debtors also fund a portion of their international operations through a system of interest bearing and non-interest bearing intercompany loans (the "Intercompany Loans"). The Intercompany Loans have historically been issued by entities including FinCo I and Endo Luxembourg Finance Company II S.à.r.l. ("FinCo II").[18] For example, FinCo II was the issuer on an intercompany term loan to Debtor Paladin Labs Canadian Holding Inc., which was used to fund the Paladin Debtors' distribution efforts in Canada (the "Canadian Loan"). Interest on the Canadian Loan is payable annually or semi-annually. Interest payments on the Company's other interest bearing Intercompany Loans – generally payable on a semi-annual basis – are typically resolved as part of the semi-annual reconciliation process executed by the intercompany and treasury teams in June and December.

35.     FinCo I is also the lender on intercompany revolvers with several non-U.S. Debtors as borrowers, including PLC and Endo DAC. The borrower entities draw down on these revolving Intercompany Loans as necessary to satisfy ongoing cash needs, including payments to third-party vendors and interest payments on the Company's third-party funded debt. The borrowers will then pay down their outstanding obligations on the revolvers periodically, including as part of the semi-annual reconciliation process.

36.     The Intercompany Transactions are made between and among the Debtors and certain of their Non-Debtor Affiliates in the ordinary course of the Debtors' businesses. While certain Intercompany Transactions are settled by book entry, others, including Intercompany

---

[18]     FinCo II was absorbed by Debtor Endo Luxembourg Holding Company S.à r.l., and that entity now holds all assets and liabilities that were previously attributable to FinCo II.

Transactions between the Debtors and Non-Debtor Affiliates, are settled by the actual transfer of cash. The Debtors' treasury and intercompany teams track all fund transfers by and among the Debtors and the Non-Debtor Affiliates both manually and electronically through their accounting system and can ascertain, trace and account for Intercompany Transactions.

37.     The Intercompany Transactions provide substantial benefits to the Debtors through, among other things, reduced shared overhead costs, simplification of the complex process of paying the Debtors' employees, vendors, and other parties on a timely basis across the Company's global operations, and an ability to enter into transactions with affiliates in a manner that is compliant with the tax laws of various jurisdictions. In addition, the Intercompany Transactions are necessary for the Debtors to support the operations of their Non-Debtor Affiliates. For example, Debtor EVL funds the operating costs of the Company's manufacturing and R&D facilities in India, and supports the Indian Non-Debtor Affiliates' operations by purchasing finished products from these entities and acting as the quality and supply chain principal for those products' distribution. Without this source of funding from the Debtors, both as a source of liquidity and as a customer, the Indian Non-Debtor Affiliates would suffer material adverse consequences to their manufacturing capabilities, and thereby harm the Debtors' global operations.

38.     Accordingly, the Intercompany Transactions are critical to (a) ensuring liquidity is available when and where needed by the Debtors and their Non-Debtor Affiliates, (b) enabling the Debtors to maintain their operations and the corresponding operational efficiencies and tax compliance and (c) ensuring that the Debtors continue to realize the revenue generated by their and their Non-Debtor Affiliates' operations. If the Intercompany Transactions were to be discontinued, the Cash Management System and related administrative controls would be severely disrupted to the Debtors' detriment because such discontinuance would affect the Debtors' ability

to continue operating their vertically integrated business model and funding their necessary operations.

**BASIS FOR RELIEF**

I.   **THE CONTINUED USE OF THE CASH MANAGEMENT SYSTEM, BANK ACCOUNTS AND BUSINESS FORMS IS IN THE BEST INTERESTS OF THE DEBTORS' ESTATES.**

A.   **The Debtors Should Be Permitted to Continue the Cash Management System.**

39.   Section 363(c)(1) of the Bankruptcy Code authorizes a debtor to "use property of the estate in the ordinary course of business without notice or a hearing." The purpose of section 363(c)(1) is to provide a debtor with the flexibility to engage in the ordinary transactions required to operate its business without unneeded oversight by its creditors or the bankruptcy court. *Med. Malpractice Ins. Ass'n v. Hirsch (In re Lavigne)*, 114 F.3d 379, 384 (2d. Cir. 1997); *Chaney v. Official Comm. of Unsecured Creditors of Crystal Apparel, Inc. (In re Crystal Apparel, Inc.)*, 207 B.R. 406, 409 (S.D.N.Y. 1997). Included within the purview of section 363(c) of the Bankruptcy Code is a debtor's ability to continue the "routine transactions necessitated by a debtor's cash management system." *Amdura Nat'l Distrib. Co. v. Amdura Corp. (In re Amdura Corp.)*, 75 F.3d 1447, 1453 (10th Cir. 1996).

40.   To assure a smooth and orderly transition into chapter 11, it is essential that the Cash Management System continue to function during the pendency of these Chapter 11 Cases in the same manner as it functioned prepetition. Because of the Debtors' corporate and financial structure, it would be extremely difficult and expensive to establish and maintain a separate cash management system for each Debtor. Requiring the Debtors to adopt and implement new cash management systems at this early and critical stage of the Chapter 11 Cases would be disruptive and harmful to their operations. Any disruption would have a severe and irrevocable impact on the Debtors' estates. If the Debtors were required to dismantle the Cash Management System, it

would wreak havoc on their day-to-day operations and their accounting practices and impair the

Debtors' ability to generate timely reports of transactions and balances.  Therefore, maintaining

the existing Cash Management System is in the best interest of all parties in interest.

41.     Even if continuation of the Cash Management System and the other relief

requested herein is outside of the ordinary course of business, the Court may approve it pursuant

to section 363(b) of the Bankruptcy Code.  In particular, section 363(b)(1) of the Bankruptcy Code

provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease,

other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).

42.     The debtor's decision to use, sell or lease assets outside the ordinary course

of business must be based upon the sound business judgment of the debtor.  *See In re Chateaugay*

*Corp.*, 973 F.2d 141, 143 (2d Cir. 1992) (holding that a judge deciding a section 363(b) application

must find from the evidence presented before him or her a good business reason to grant such

application); *see also Comm. of Equity Sec. Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d

1063, 1071 (2d Cir. 1983); *In re Global Crossing Ltd.*, 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003);

*In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989) (noting the standard for

determining a section 363(b) motion is "a good business reason").

43.     The business judgment rule is satisfied "when the following elements are

present: (1) a business decision, (2) disinterestedness, (3) due care, (4) good faith and (5) according

to some courts and commentators, no abuse of discretion or waste of corporate assets."  *Official*

*Comm. of Subordinated Bondholders v. Integrated Res., Inc.* (*In re Integrated Res., Inc.*), 147 B.R.

650, 656 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993) (internal quotations

omitted).  In fact, "[w]here the debtor articulates a reasonable basis for its business decisions (as

distinct from a decision made arbitrarily or capriciously), courts will generally not entertain

objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). Indeed, "[o]vercoming the presumptions of the business judgment rule on the merits is a near-Herculean task." *In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005). Courts in this District have consistently and appropriately been loath to interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence and will uphold a board's decisions as long as they are attributable to any "rational business purpose." *In re Integrated Res. Inc.*, 147 B.R. at 656.

44.     The Court may also rely on its general equitable powers to grant the relief requested in the Motion. Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

45.     Maintaining the existing Cash Management System is an appropriate exercise of the Debtors' business judgment and is in the best interests of the Debtors' estates and all parties in interest. The Cash Management System enables the Debtors to transfer their revenue toward the payment of their obligations, without which the Debtors' business operations would come to a standstill. As described above, the Cash Management System is comprehensive, and given that funds from the Debtors' domestic operations are pooled and used to fund the Debtors' domestic and international operations, alterations to the way in which they collect and disburse cash throughout the Cash Management System will result in the severe disruption of their operations, which ultimately will frustrate the Debtors' reorganization efforts.

46.     Courts in this District have granted similar relief in other chapter 11 cases. *See, e.g.*, *In re GBG USA Inc.*, Case No. 21-11369 (MEW) (Bankr. S.D.N.Y. Sep. 1, 2021)

(authorizing debtors to continue cash management system in ordinary course); *In re Garrett Motion Inc.*, Case No. 20-12212 (MEW) (Bankr. S.D.N.Y. Oct. 20, 2020) (same); *In re Centric Brands Inc.*, Case No. 20-22637 (SHL) (Bankr. S.D.N.Y. June 10, 2020) (same); *In re LSC Commc'ns, Inc.*, Case No. 20-10950 (SHL) (Bankr. S.D.N.Y. May 12, 2020) (same); *In re Purdue Pharm. L.P.*, Case No. 19-23649 (RDD) (Bankr. S.D.N.Y. Nov. 25, 2019) (same).

**B.**     **The Debtors Should Be Permitted to Continue Using Their Existing Bank Accounts.**

47.     The Debtors request that the Court waive the requirements of the *Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees* promulgated by the Office of the United States Trustee (the "U.S. Trustee") for the Southern District of New York (the "UST Guidelines"), which require the closure of the Bank Accounts and the opening of new bank accounts.  The Debtors seek an order authorizing the Banks, including, but not limited to, those listed on **Exhibit D** hereto, to continue to treat, service, and administer the Bank Accounts as accounts of the Debtors as debtors in possession without interruption and in the ordinary course of business, and to receive, process, and honor and pay all checks, drafts, wires, or ACH Transfers issued or initiated by or on behalf of the Debtors (to the extent the Debtors have sufficient funds, whether deposited prior to or after the Petition Date in the requisite Bank Account or otherwise available to cover and permit payment thereof) after the Petition Date.  Pursuant to the relief requested in this Motion, the Banks shall have no liability for relying on representations by the Debtors or honoring any disbursement that is either (a) at the direction of the Debtors to honor such prepetition disbursement, (b) in the good faith belief that this Court has authorized such prepetition disbursement, or (c) as a result of any operational processing errors or other mistakes which are the result of human error or made despite implementation of reasonable item handling

procedures, including, without limitation, any inadvertent dishonoring of any payment or other disbursement directed to be made by the Debtors.

48.     In addition, as described above, the Debtors incur Bank Fees in connection with the maintenance of their Bank Accounts within the Cash Management System.  The Bank Fees average approximately $13,500 per month.  As of the Petition Date, Debtors believe the only outstanding Bank Fees are those accrued and unpaid from this month.  Payment of any prepetition Bank Fees is in the best interests of the Debtors and all parties in interest in these Chapter 11 Cases, as it will prevent unnecessary disruption to the Cash Management System and ensure that the Debtors' receipt of funds are not delayed.  Further, because the Banks likely have setoff rights for the Bank Fees, payment of prepetition Bank Fees should not alter the rights of unsecured creditors in these Chapter 11 Cases.

49.     The Debtors believe that these Chapter 11 Cases will be more orderly if they are permitted to maintain the Bank Accounts with the same account numbers during these Chapter 11 Cases.  By preserving business continuity and avoiding the disruption and delay to the Debtors' disbursement obligations, all parties in interest, including employees, vendors, and customers, will be best served by the relief requested.  In addition, to the extent necessary, the Debtors request authorization to (a) open new bank accounts at their existing Banks or other Authorized Depositories designated by the U.S. Trustee or (b) close any existing Bank Accounts as they may deem necessary and appropriate; *provided that* in the event the Debtors open a new bank account they shall open one at an Authorized Depository and shall timely indicate the opening of such account on the Debtors' monthly operating report and shall provide five business days' notice to the U.S. Trustee, counsel to the Ad Hoc First Lien Group, counsel to the Ad Hoc Cross-Holder Group, and any statutory committee appointed in the Chapter 11 Cases of the opening of any new

bank accounts at an Authorized Depository or closing of any Bank Account; *provided, further* that the Debtors shall consult with counsel to the Ad Hoc First Lien Group (y) before closing any Bank Account that maintains a balance or (z) opening of any new bank account at an Authorized Depository.  The Debtors are not authorized to open any new investment accounts, as these investment accounts do not comply with sections 345(a) or 345(b) of the Bankruptcy Code.

50.    Courts in this District have granted similar relief in other chapter 11 cases. *See, e.g.*, *In re GBG USA Inc.*, Case No. 21-11369 (MEW) (Bankr. S.D.N.Y. Sep. 1, 2021) (authorizing debtors to continue using existing bank accounts postpetition, pay prepetition bank fees, and granting related relief); *In re Garrett Motion Inc.*, Case No. 20-12212 (MEW) (Bankr. S.D.N.Y. Oct. 20, 2020) (same); *In re Centric Brands Inc.*, Case No. 20-22637 (SHL) (Bankr. S.D.N.Y. June 10, 2020) (same); *In re LSC Commc'ns, Inc.*, Case No. 20-10950 (SHL) (Bankr. S.D.N.Y. May 12, 2020) (same); *In re Purdue Pharm. L.P.*, Case No. 19-23649 (RDD) (Bankr. S.D.N.Y. Nov. 25, 2019) (same).

### C.    The Debtors Should Be Permitted to Continue Using Their Existing Business Forms.

51.    To minimize expenses, the Debtors request that, to the extent they intend to use any Business Forms created prior to the Petition Date, they be authorized to continue to use such Business Forms and checks, substantially in the forms existing immediately before the Petition Date, without reference to their status as debtors in possession.  Forcing the Debtors to modify their existing, already printed stock of Business Forms to include a legend referring to the Debtors as "Debtors-In-Possession" would be an unnecessary waste of time and resources. However, because the majority of the Debtors' Business Forms are electronically generated, in the event the Debtors or their Banks generate new Business Forms and/or checks during the pendency of these Chapter 11 Cases other than their existing stock, such Business Forms and checks will

25

include a legend referring to the Debtors as "Debtors-In-Possession." To the extent practicable, the Debtors will work with their systems personnel and their Banks to determine what computer system changes are required to reflect their status as debtors in possession on electronically generated Business Forms and checks and will implement such changes.

52.     Indeed, because parties doing business with the Debtors undoubtedly will be aware of the Debtors' status as debtors in possession as a result of the publicized nature of these Chapter 11 Cases and the notice of commencement the Debtors are distributing to such parties, changing their existing Business Forms would be unnecessary and unduly burdensome. For this reason, the Debtors seek permission to use their already printed Business Forms without including additional language while the Debtors work to ensure that all newly created Business Forms, moving forward, will include the "Debtors-In-Possession" legend.

53.     Courts in this District have granted similar relief in other chapter 11 cases. *See, e.g.*, *In re GBG USA Inc.*, Case No. 21-11369 (MEW) (Bankr. S.D.N.Y. Sep. 1, 2021) (authorizing debtors to continue using existing business forms, but labeling newly-issued forms with 'debtor-in-possession'); *In re Garrett Motion Inc.*, Case No. 20-12212 (MEW) (Bankr. S.D.N.Y. Oct. 20, 2020) (same); *In re Centric Brands Inc.*, Case No. 20-22637 (SHL) (Bankr. S.D.N.Y. June 10, 2020) (same); *In re LSC Commc'ns, Inc.*, Case No. 20-10950 (SHL) (Bankr. S.D.N.Y. May 12, 2020) (same); *In re Purdue Pharm. L.P.*, Case No. 19-23649 (RDD) (Bankr. S.D.N.Y. Sept. 18, 2019) (same).

## II.     CAUSE EXISTS TO WAIVE THE REQUIREMENTS OF SECTION 345(B) OF THE BANKRUPTCY CODE.

54.     Section 345 of the Bankruptcy Code governs a debtor's deposit and investment of cash during a chapter 11 case, and authorizes deposits or investments of money as "will yield the maximum reasonable net return on such money, taking into account the safety of

such deposit or investment." 11 U.S.C. § 345(a). For deposits or investments that are not "insured or guaranteed by the United States or by a department, agency, or instrumentality of the United States or backed by the full faith and credit of the United States," section 345(b) of the Bankruptcy Code requires the estate to obtain, from the entity with which the money is deposited or invested, a bond in favor of the United States and secured by the undertaking of an adequate corporate surety, unless the Court, for cause, orders otherwise.

55.     All of the Bank Accounts are held with Authorized Depositories other than one Investment Account with E*Trade. Although E*Trade is not an Authorized Depository, it is now part of Morgan Stanley. And while Morgan Stanley is not an Authorized Depository, it is a highly regulated, nationally chartered bank subject to supervision by national banking regulators and one of the country's most prominent investment institutions.

56.     The Investment Accounts exclusively invest in money market funds.[19] While not technically treasuries or comparable securities backed by the full faith and credit of the U.S. as provided for by section 345(b) of the Bankruptcy Code, such securities are generally considered safe investments, and transferring these investments into treasuries or similar securities would not further protect the Debtors' investments in a meaningful manner.

57.     Thus, to the extent these investments and accounts do not strictly comply with section 345(b) of the Bankruptcy Code, the Debtors request that they be permitted to maintain such accounts in accordance with existing practices for cause. In evaluating whether "cause" exists, courts have considered a number of factors, including, among others, the sophistication and size of a debtor's business, the amounts of the investments involved, bank ratings, the complexity

---

[19]   As discussed above, the E*Trade Investment Account simply holds cash sufficient to cover the price of stock options that have been redeemed by employees under the LTIP.

of the case, the debtor's safeguards for the funds, the debtor's ability to reorganize in the face of

failure of one or more of the financial institutions, the benefit to the debtor of a waiver or

modification of the section 345(b) requirements, the potential harm to the estate and the

reasonableness of such a waiver or modifications under the circumstances.  *See In re Serv.*

*Merchandise Co., Inc.*, 240 B.R. 894, 896 (Bankr. M.D. Tenn. 1999).

58.     "Cause" exists in these Chapter 11 Cases.  *First*, the sole account not held

at an Authorized Depository is maintained at E*Trade, a reputable, financially sound institution

that is subject to supervision by national and international banking regulators.  *Second*, the funds

in all Investment Accounts are invested in money market funds, investments that are generally

considered safe and liquid, and the Debtors intend to maintain those funds in money market fund

investments for the duration of these Chapter 11 Cases.  As such, the Debtors submit that all of the

Investment Accounts are safe and secure and pose no substantial risk to the Debtors' estates.  *Third*,

the process of strictly satisfying the requirements of section 345(b) would lead to needless

inconvenience and inefficiencies in the management of the Debtors' businesses.  The Debtors are

part of a large, sophisticated enterprise and have an experienced treasury team in place that has

determined that the Investment Practices will benefit the Debtors and the value of the Debtors'

estates.  *Fourth*, a bond secured by the undertaking of an adequate corporate surety would be

prohibitively expensive (if such a bond could be obtained at all).  Based on the foregoing, the facts

of these Chapter 11 Cases warrant a waiver of the requirements of the Bankruptcy Code section

345(b) to the extent the Cash Management System does not technically comply with its

requirements.  *Fifth*, only $103,125 will remain in the account as of the Petition Date.

59.     To the extent the Court finds the Bank Accounts are not in strict compliance

with the requirements of section 345(b), and a waiver is unwarranted, the Debtors request that the

Court grant an extension of the Debtors' time to come into compliance for forty-five (45) days (or such later time as may be agreed to by the U.S. Trustee or as otherwise approved by the Court), to allow the Debtors to engage in discussions with the U.S. Trustee to determine what modifications to those accounts, if any, are necessary under the circumstances. Courts in this District have granted similar relief in other chapter 11 cases. *See, e.g.*, *In re GBG USA Inc.*, Case No. 21-11369 (MEW) (Bankr. S.D.N.Y. Aug. 2, 2021) (granting extension of 45 days from interim order to comply with section 345 requirements to the extent debtor's bank accounts not already in compliance); *In re Garrett Motion Inc.*, Case No. 20-12212 (MEW) (Bankr. S.D.N.Y. Oct. 20, 2020) (same); *In re Centric Brands Inc.*, Case No. 20-22637 (SHL) (Bankr. S.D.N.Y. June 10, 2020) (same); *In re LSC Commc'ns, Inc.*, Case No. 20-10950 (SHL) (Bankr. S.D.N.Y. May 12, 2020) (same); *In re Purdue Pharm. L.P.*, Case No. 19-23649 (RDD) (Bankr. S.D.N.Y. Sept. 18, 2019) (granting extension of 30 days from interim order to comply with section 345 requirements).

### III. ALLOWING THE DEBTORS TO CONTINUE ENGAGING IN INTERCOMPANY TRANSACTIONS AND GRANTING ADMINISTRATIVE EXPENSE PRIORITY FOR POSTPETITION INTERCOMPANY CLAIMS IS APPROPRIATE.

60.     Section 363(c)(1) of the Bankruptcy Code authorizes a debtor to "enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business…and [] use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c)(1). Additionally, under section 503(b)(1)(A) of the Bankruptcy Code, "[a]fter notice and a hearing, there shall be allowed, administrative expenses…including the actual, necessary costs and expenses of preserving the estate…." 11 U.S.C. § 503(b)(1)(A).

61.     The Debtors seek authority to enter into such Intercompany Transactions in the ordinary course of business. Allowing the Debtors to engage in postpetition Intercompany Transactions is in the best interests of the Debtors' estates. Because the Debtors engage in the Intercompany Transactions on a regular basis and such transactions are common among similar

enterprises, the Debtors respectfully submit that postpetition Intercompany Transactions arising in the ordinary course of business are authorized as a matter of law pursuant to section 363(c)(1) of the Bankruptcy Code for which no additional relief is required.

62.     As described above, the Debtors' corporate enterprise is structured on the basis of ongoing Intercompany Transactions such that, while different entities perform different day-to-day functions, the business runs smoothly as a collective group.  To meet funding requirements, cash is transferred among the Bank Accounts, and at any given time, there may be balances due and owing among Debtors and between Debtors and their Non-Debtor Affiliates.  These balances represent extensions of intercompany credit.  Further, the operations of the Non-Debtor Affiliates are dependent on access to and participation in the Cash Management System.  In particular, and as discussed in detail above, the operations of the Indian Non-Debtor Affiliates are entirely reliant on Intercompany Transactions with the Debtors, and their continued funding is necessary to ensure that the Company's generics business is able to operate postpetition.  Absent such funding, the R&D services performed by the Indian Non-Debtor Affiliates, and the generic products they manufacture, for the Company – and the corresponding hundreds of millions in revenues that inure to the Debtors' benefit – would cease.  Thus, requiring the Company to extract the Indian Non-Debtor Affiliates from the Cash Management System would create an unnecessary administrative and financial burden on the Debtors' estates and would have a direct, adverse impact on the value of the Debtors and the Company's generics business.

63.     The Debtors will continue to maintain records of all Intercompany Transactions and current intercompany accounts receivable and payable.  In addition, as set forth above, the Debtors possess the capacity to draw the necessary distinctions between prepetition and

postpetition obligations and payments, including those related to the Intercompany Transactions. The Debtors will continue to maintain such records during the Chapter 11 Cases.

64.    Moreover, to ensure that each individual Debtor will not fund, at the expense of its creditors, the operation of another entity, the Debtors request that, pursuant to sections 503(b)(1), 364(b), and 364(c)(1) of the Bankruptcy Code, the Court order: (a) that all valid postpetition payments from a Debtor to another Debtor or from a Non-Debtor Affiliate to a Debtor on account of a postpetition Intercompany Transaction shall be accorded superpriority administrative expense status, subject and junior to any claims, including adequate protection claims, granted in connection with the use of cash collateral in accordance with any interim and final orders, as applicable, approving the use of such cash collateral; and (b) unless prohibited by applicable law, transfers made by a Debtor to a Non-Debtor Affiliate pursuant to a postpetition Intercompany Transaction shall be deemed a claim against, and loan to, such Non-Debtor Affiliate (and not a contribution of capital).   If Intercompany Claims are accorded superpriority administrative expense status, each entity using funds that flow through the Cash Management System will continue bearing the ultimate responsibility for its ordinary course transactions with affiliates.   As such, the Debtors believe such relief is necessary to ensure that a particular Debtor's estate will not be required to fund the operations of other Debtors and Non-Debtor Affiliates without adequate recompense.

65.    For the reasons set forth herein, continuing the Intercompany Transactions is in the best interests of the Debtors, their estates, and parties in interest, and the postpetition Intercompany Claims should be granted superpriority administrative expense status.  Courts in this District have granted similar relief in other chapter 11 cases.  *See, e.g.*, *In re Garrett Motion Inc.*, Case No. 20-12212 (MEW) (Bankr. S.D.N.Y. Oct. 20, 2020) (authorizing debtors to continue

intercompany transactions in the ordinary course, including with non-debtors, and granting administrative expense priority to postpetition intercompany claims); *In re Centric Brands Inc.*, Case No. 20-22637 (SHL) (Bankr. S.D.N.Y. June 10, 2020) (authorizing debtors to continue intercompany transactions in the ordinary course, including with non-debtors, with the caveat of two Canadian non-debtor entities that had certain transfer rules such as caps on monthly transfers, and granting administrative expense priority to postpetition intercompany claims); *In re LSC Commc'ns, Inc.*, Case No. 20-10950 (SHL) (Bankr. S.D.N.Y. May 12, 2020) (authorizing debtors to continue intercompany transactions in the ordinary course, including with non-debtors, and granting administrative expense priority to postpetition intercompany claims).

## <u>RESERVATION OF RIGHTS</u>

66.     Nothing contained herein is or should be construed as: (a) an implication or admission as to the validity of any claim against the Debtors, (b) a waiver of the Debtors' or any other party-in-interest's rights to dispute the amount of, basis for, or validity of any claim against the Debtors, (c) a waiver of any claims or causes of action that may exist against any creditor or interest holder, (d) a promise to pay any claim, (e) a concession by the Debtors that any lien (contractual, common law, statutory, or otherwise) satisfied pursuant to the Motion are valid (and all rights to contest the extent, validity, or perfection or seek avoidance of all such liens are expressly reserved), (f) an approval, assumption, adoption, or rejection of any agreement, contract, program, policy, or lease between the Debtors and any third party under section 365 of the Bankruptcy Code, (g) a waiver of the obligation of any party in interest to file a proof of claim, or (h) otherwise affecting the Debtors' rights under section 365 of the Bankruptcy Code to assume or reject any executory contract or unexpired lease.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as

an admission to the validity of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

### DEBTORS HAVE SATISFIED BANKRUPTCY RULE 6003(b)

67.     Bankruptcy Rule 6003 provides that the relief requested in this Motion may be granted if the "relief is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003; *see also In re First NLC Fin. Servs., LLC*, 382 B.R. 547, 549-50 (Bankr. S.D. Fla. 2008) (holding that Bankruptcy Rule 6003 permits entry of retention orders on an interim basis to avoid irreparable harm). The Second Circuit has interpreted the language "immediate and irreparable harm" in the context of preliminary injunctions. In that context, the Second Circuit has instructed that irreparable harm "is a continuing harm which cannot be adequately redressed by final relief on the merits and for which 'money damages cannot provide adequate compensation.'" *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002) (quoting *N.Y. Pathological & X-Ray Labs., Inc. v. INS*, 523 F.2d 79, 81 (2d Cir. 1975)). Furthermore, the "harm must be shown to be actual and imminent, not remote or speculative." *Id.*; *see also Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1998).  The Debtors submit that, for the reasons already set forth herein, the relief requested in this Motion is necessary to avoid immediate and irreparable harm.

### WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(h)

68.     The Debtors also request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). As described above, the relief that the Debtors seek in this Motion is necessary for the Debtors to operate without interruption and to preserve value for their estates.  Accordingly, the Debtors respectfully request that the Court waive

the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent applicable, as the exigent nature of the relief sought herein justifies immediate relief.

## **NOTICE**

69.     Notice of this Motion shall be given to (a) the Office of the United States Trustee for the Southern District of New York; (b) counsel to the administrative agent under the Debtors' prepetition credit agreement; (c) counsel to the indenture trustee under each of the Debtors' outstanding bond issuances; (d) Gibson, Dunn & Crutcher LLP as counsel to the Ad Hoc First Lien Group (as defined in the First Day Declaration); (e) Paul, Weiss, Rifkind, Wharton & Garrison LLP, as counsel to the Ad Hoc Cross-Holder Group (as defined in the First Day Declaration); (f) the U.S. Attorney for the Southern District of New York; (g) the attorneys general for all fifty (50) states and the District of Columbia; (h) the Debtors' fifty (50) largest unsecured creditors on a consolidated basis; (i) the Internal Revenue Service; (j) the Securities and Exchange Commission; (k) any party that has requested notice pursuant to Bankruptcy Rule 2002; (l) the Banks; (m) the proposed future claimants representative in the Chapter 11 Cases; and (n) any other party entitled to notice pursuant to Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York.  The Debtors submit that no other or further notice need be provided.

## **NO PRIOR REQUEST**

70.     No prior request for the relief sought herein has been made to this or any other court.

## **[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

WHEREFORE the Debtors respectfully request that the Court (a) enter the

Proposed Interim Order and Proposed Final Order in substantially the forms attached hereto as

**Exhibit A** and **Exhibit B** and (b) grant such other and further relief as may be just and proper.

Dated: August 16, 2022
      New York, New York        SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

                  By:   _/s/ Paul D. Leake_____
                      Paul D. Leake
                      Lisa Laukitis
                      Shana A. Elberg
                      Evan A. Hill
                      One Manhattan West
                      New York, New York 10001
                      Telephone: (212) 735-3000
                      Fax: (212) 735-2000

                      *Proposed Counsel for the Debtors*
                      *and Debtors in Possession*

**<u>Exhibit A</u>**

**Proposed Interim Order**

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re*<br><br>**ENDO INTERNATIONAL plc,** *et al.*,<br><br>**Debtors.**[1] | **Chapter 11**<br><br>**Case No. 22-22549 (___)**<br><br>**(Joint Administration Pending)**<br><br>Related Docket No. ___ |

**INTERIM ORDER (I) AUTHORIZING THE
DEBTORS TO (A) CONTINUE USING EXISTING CASH
MANAGEMENT SYSTEMS, BANK ACCOUNTS, AND BUSINESS
FORMS AND (B) IMPLEMENT CHANGES TO THEIR CASH
MANAGEMENT SYSTEM IN THE ORDINARY COURSE OF BUSINESS;
(II) GRANTING ADMINISTRATIVE EXPENSE PRIORITY FOR POSTPETITION
INTERCOMPANY CLAIMS; (III) GRANTING A WAIVER WITH RESPECT TO THE
REQUIREMENTS OF 11 U.S.C. § 345(b); AND (IV) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the debtors and debtors in possession (collectively, the

"Debtors" and, together with their non-debtor affiliates, the "Company") in the above-captioned

chapter 11 cases (the "Chapter 11 Cases") for an interim order (this "Interim Order") and a final

order (i) authorizing the Debtors to (a) continue using their Cash Management System, Bank

Accounts, and Business Forms, (b) pay any prepetition and postpetition fees and expenses owed

to the Banks, including the Bank Fees, to the extent due and owing pursuant to the prepetition

agreements governing the Bank Accounts, (c) implement changes to their Cash Management

System in the ordinary course of business, (d) continue Intercompany Transactions in the ordinary

course of business; (ii) granting administrative expense priority for claims arising from

---

[1]    The last four digits of Debtor Endo International plc's tax identification number are 3755.  Due to the large number of debtors in these chapter 11 cases, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Endo.  The location of the Debtors' service address for purposes of these chapter 11 cases is: 1400 Atwater Drive, Malvern, PA 19355.

[2]    Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

postpetition Intercompany Transactions; (iii) granting a waiver with respect to the requirements of

section 345(b) of the Bankruptcy Code; and (iv) granting related relief, all as more fully set forth

in the Motion; and the Court having reviewed the Motion and the First Day Declaration and having

heard the statements of counsel regarding the relief requested in the Motion at a hearing before the

Court, if any (the "Hearing"); and the Court having found that (a) the Court has jurisdiction over

this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference

M-431, dated January 31, 2012 (Preska, C.J.); (b) this is a core proceeding pursuant to 28 U.S.C.

§ 157(a)-(b) and 1334(b); (c) venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and

1409; and (d) due and proper notice of the Motion and the Hearing was sufficient under the

circumstances; and the Court having determined that the legal and factual bases set forth in the

Motion establish just cause for the relief granted herein; and it appearing that the relief requested

in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates

and is in the best interests of the Debtors, their estates, creditors and other parties-in-interest after

taking into account the priority scheme of the Bankruptcy Code; and upon all of the proceedings

had before the Court and after due deliberation and sufficient cause appearing therefor

**IT IS HEREBY ORDERED THAT**

1.      The Motion is GRANTED on an interim basis as set forth herein.

2.      To the extent that the Bank Accounts and Investment Accounts do not

strictly adhere to the requirements of the U.S. Trustee Guidelines or Bankruptcy Code sections

345(a) or 345(b), the Debtors' time to comply with such requirements is hereby extended for a

period of 45 days from the date of this Interim Order; *provided*, *however*, that such extension is

without prejudice to the Debtors' right to (i) request a further extension of such relief or any waiver

of the requirements of Bankruptcy Code section 345(b) and (ii) assert that any particular Bank

Account and Investment Account complies with Bankruptcy Code section 345(b); *provided*,

*further*, for the avoidance of doubt, the Banks will not be required to bond deposits held in the Bank Accounts, as required by section 345(b) of the Bankruptcy Code.  For the avoidance of doubt, the U.S. Trustee's right to oppose any such request or assertion by the Debtors consistent with items (i) and (ii) in this paragraph is expressly reserved.

3.      The Debtors are authorized, but not directed, in their sole discretion, to (a) continue operating the Cash Management System, including through Intercompany Transactions, and (b) make ordinary course changes to their Cash Management System; *provided that* the Debtors shall provide reasonable notice to counsel to the Ad Hoc First Lien Group and U.S. Trustee prior to making any material change to the Cash Management System.

4.      The Debtors are further authorized, but not directed, pursuant to the terms of this Interim Order, to continue using any or all of their existing Bank Accounts in the names and with the account numbers existing immediately before the Petition Date.

5.      The Debtors are authorized, on the terms set forth in this Interim Order, to open any new bank accounts or close any existing Bank Accounts as they may deem necessary and appropriate; *provided that* in the event the Debtors open a new bank account they shall open one at an Authorized Depository and shall timely indicate the opening of such account on the Debtors' monthly operating report and shall provide five business days' notice to the U.S. Trustee, counsel to the Ad Hoc First Lien Group, counsel to the Ad Hoc Cross-Holder Group, and any statutory committee appointed in the Chapter 11 Cases of the opening of any new bank accounts at an Authorized Depository or closing of any Bank Account; *provided, further* that the Debtors shall consult with counsel to the Ad Hoc First Lien Group (y) before closing any Bank Account that maintains a balance or (z) opening of any new bank account at an Authorized Depository.  The

Debtors are not authorized to open any new investment accounts, as these investment accounts do not comply with sections 345(a) or 345(b) of the Bankruptcy Code.

6.     The Banks are authorized to continue to treat, service, and administer the Bank Accounts as accounts of the respective Debtor as a debtor in possession without interruption and in the usual and ordinary course and to receive, process and honor and pay any and all postpetition checks, drafts, book transfers, wires or automated clearinghouse transfers ("ACH Transfers") drawn on the Bank Accounts by the holders or makers thereof, as the case may be, to the extent the Debtors have good funds standing to their credit with such Bank.

7.     Notwithstanding anything to the contrary in any other order of this Court, the Banks (a) are authorized to accept and honor all representations from the Debtors as to which checks, drafts, book transfers, wires, or ACH Transfers should be honored or dishonored, consistent with any order of this Court and governing law, whether such checks, drafts, book transfers, wires, or ACH Transfers are dated prior to, on or subsequent to the Petition Date, and whether the Banks believe the payment is or is not authorized by an order of this Court and (b) have no duty to inquire as to whether such payments are authorized by an order of this Court.

8.     The Banks shall not be deemed in violation of this Order and shall have no liability to any party for (i) relying on such representations by the Debtors or (ii) honoring any disbursement that is subject to this Order, in the case of this clause (ii), either (a) at the direction of the Debtors to honor such prepetition disbursement, (b) in the good faith belief that this Court has authorized such prepetition disbursement, or (c) as a result of any operational processing errors or other mistakes which are the result of human error or made despite implementation of reasonable item handling procedures, including, without limitation, any inadvertent dishonoring of any payment or other disbursement directed to be made by the Debtors. To the extent that the Debtors direct that

any disbursement be dishonored or the Banks inadvertently dishonor any disbursements, the Debtors may issue replacement disbursements consistent with the orders of this Court.

9. In accordance with current practice and the agreement governing the Bank Accounts, the Banks are authorized to "charge back" to the Debtors' accounts any amounts incurred by the Banks resulting from returned checks or other returned items. The Debtors are authorized without any further order of this Court to pay any fees and expenses owed to the Banks, including any Bank Fees or reasonable and documented legal expenses (to the extent due and owing pursuant to the prepetition agreements governing the Bank Accounts), payable prepetition or postpetition (as administrative expenses), in each case regardless of whether such items were deposited prepetition or postpetition or relate to prepetition or postpetition items.

10. The Debtors are authorized to use their existing Business Forms and are not required to (a) obtain new stock reflecting their status as debtors in possession or (b) print "Debtor-in-Possession," the Debtors' Chapter 11 Case numbers, or any other information on any of their existing Business Forms or wire transfers; *provided* that once the Debtors' existing Business Forms have been used, the Debtors shall, when re-ordering or issuing new Business Forms during the pendency of these Chapter 11 Cases, include a legend referencing the Debtors as "Debtors-In-Possession" and the lead Debtor's bankruptcy case number on all new Business Forms; *provided, further*, that all electronic Business Forms, including without limitation correspondence and checks, shall immediately include the designation "Debtor in Possession" and the lead Debtor's bankruptcy case number.

11. Any payment from a Bank Account at the request of the Debtors made by a Bank prior to the Petition Date (including any ACH Transfers such Bank is or becomes obligated to settle), or any instruments issued by such Bank on behalf of any Debtor pursuant to a "midnight

5

deadline" or otherwise, shall be deemed to be paid prepetition, whether or not actually debited from the Bank Account prepetition.

12.     The Debtors are authorized, but not directed, subject to the terms of this Interim Order, to (a) continue the Intercompany Transactions in the ordinary course of business, including with the Non-Debtor Affiliates, and (b) honor and make payments in respect of Intercompany Claims arising after the Petition Date in accordance with the Intercompany Transactions and past practice.  All Intercompany Claims arising after the Petition Date shall be granted a superpriority administrative expense claim pursuant to section 507(b) of the Bankruptcy Code, subject and junior to any claims, including adequate protection claims, granted in connection with the use of cash collateral in accordance with any interim and final orders, as applicable, approving the use of such cash collateral (the "Cash Collateral Order").

13.     Notwithstanding anything to the contrary contained herein, any payment to be made hereunder, and any authorization contained, hereunder herein, shall be subject to the Cash Collateral Order and any budget in connection with any such use of cash collateral.  To the extent there is any inconsistency between the terms of the Cash Collateral Order and any action taken or proposed to be taken hereunder, the terms of the Cash Collateral Order shall control.

14.     The Debtors shall maintain records of all transfers within the Cash Management System, including the Intercompany Transactions, and all such transfers shall be documented in their books and records so that all prepetition and postpetition transactions may be traced and recorded to the same extent maintained by the Debtors before the Petition Date.  Upon a reasonable request by the Ad Hoc First Lien Group, the Debtors shall provide access to such books and records to counsel for the Ad Hoc First Lien Group within ten (10) business days and

the Debtors will use reasonable best efforts to provide such access within eight (8) business days of such request.

15.     The Debtors are authorized to invest and deposit funds in accordance with their prepetition Investment Practices without the need for any additional or different practices not utilized prior to the Petition Date, notwithstanding that certain of such practices may not strictly comply in all respects with the investment and deposit guidelines set forth in section 345 of the Bankruptcy Code.

16.     Notwithstanding the Debtors' use of a consolidated cash management system, the Debtors shall calculate quarterly fees payable under 28 U.S.C. § 1930(a)(6), together with interest, if any, under 31 U.S.C. § 3171, based on the disbursements actually made by each Debtor.

17.     Nothing contained in the Motion or this Order, nor any payment made pursuant to the authority granted by this Order, shall constitute or be construed as (a) an admission as to the validity of any claim against the Debtors, (b) a waiver of the Debtors' rights to dispute the amount of, basis for, or validity of any claim against the Debtors, (c) a waiver of any claims or causes of action that may exist against any creditor or interest holder, (d) a promise to pay any claim, (e) an approval, assumption, adoption, or rejection of any agreement, contract, program, policy, or lease between the Debtors and any third party under section 365 of the Bankruptcy Code, or (f) otherwise affecting the Debtors' rights under section 365 of the Bankruptcy Code to assume or reject any executory contract or unexpired lease.

18.     Nothing in the Motion or this Order, nor as a result of any payment made pursuant to this Order, shall be deemed or construed as a waiver of the right of the Debtors, or

shall impair the ability of the Debtors, to contest the validity and amount of any payment made pursuant to this Order.

19.     Nothing herein shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by any party.

20.     Nothing in the Motion or this Interim Order shall be deemed to authorize the Debtors to make any payments not otherwise due prior to the date of the hearing to consider entry of an order granting the relief requested in the Motion on a final basis (the "Final Hearing").

21.     The Court finds and determines that the requirements of Bankruptcy Rule 6003 are satisfied and that the relief requested is necessary to avoid immediate and irreparable harm.

22.     Under the circumstances of these Chapter 11 Cases, notice of the Motion is adequate under Bankruptcy Rule 6004(a).

23.     Notwithstanding Bankruptcy Rule 6004(h), this Order shall be effective and enforceable immediately upon entry.

24.     The Debtors are authorized and empowered to take all action necessary to effectuate the relief granted in this Order.

25.     The Final Hearing on the Motion shall be held on _____ __, 202__ at __:__ a.m./p.m. (prevailing Eastern Time).  Any objections or responses to the entry of the Proposed Final Order shall be filed and served upon counsel for the Debtors so as to be received by 4:00 p.m. (prevailing Eastern Time) by no later than seven (7) days before the Final Hearing (the "Objection Deadline").  If no objections or responses are filed and served by the Objection Deadline, the Court may enter a final order without any further notice of a hearing.

26.     This Court shall retain jurisdiction with respect to all matters arising from

or related to the implementation, interpretation, or enforcement of this Order.

Dated: [●], 2022
       New York, New York


_____
THE HONORABLE [___]
U.S. BANKRUPTCY JUDGE

**<u>Exhibit B</u>**

**Proposed Final Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

*In re*

**ENDO INTERNATIONAL plc,** *et al.*,

**Debtors.**[1]

**Chapter 11**

**Case No. 22-22549 (___)**

**(Joint Administration Pending)**

Related Docket No. ___

---

**FINAL ORDER (I) AUTHORIZING THE
DEBTORS TO (A) CONTINUE USING EXISTING CASH
MANAGEMENT SYSTEMS, BANK ACCOUNTS, AND BUSINESS
FORMS AND (B) IMPLEMENT CHANGES TO THEIR CASH
MANAGEMENT SYSTEM IN THE ORDINARY COURSE OF BUSINESS;
(II) GRANTING ADMINISTRATIVE EXPENSE PRIORITY FOR POSTPETITION
INTERCOMPANY CLAIMS; (III) GRANTING A WAIVER WITH RESPECT TO THE
REQUIREMENTS OF 11 U.S.C. § 345(b); AND (IV) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the debtors and debtors in possession (collectively, the

"Debtors" and, together with their non-debtor affiliates, the "Company") in the above-captioned

chapter 11 cases (the "Chapter 11 Cases") for an interim order and a final order (this "Final Order")

(i) authorizing the Debtors to (a) continue using their Cash Management System, Bank Accounts,

and Business Forms, (b) pay any prepetition and postpetition fees and expenses owed to the Banks,

including the Bank Fees, to the extent due and owing pursuant to the prepetition agreements

governing the Bank Accounts; (c) implement changes to their Cash Management System in the

ordinary course of business, (d) continue Intercompany Transactions in the ordinary course of

business; (ii) granting administrative expense priority for claims arising from postpetition

---

[1]    The last four digits of Debtor Endo International plc's tax identification number are 3755.  Due to the large
number of debtors in these chapter 11 cases, a complete list of the debtor entities and the last four digits of their
federal tax identification numbers is not provided herein.  A complete list of such information may be obtained
on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Endo.  The location
of the Debtors' service address for purposes of these chapter 11 cases is: 1400 Atwater Drive, Malvern, PA 19355.

[2]    Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

Intercompany Transactions; (iii) granting a waiver with respect to the requirements of section 345(b) of the Bankruptcy Code; and (iv) granting related relief, all as more fully set forth in the Motion; and the Court having reviewed the Motion and the First Day Declaration and held a hearing to consider the relief requested in the Motion (the "Hearing"); and the Court having found that (a) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.); (b) this is a core proceeding pursuant to 28 U.S.C. § 157(a)-(b) and 1334; (c) venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and (d) due and proper notice of the Motion has been provided to the notice parties and it appearing that no other or further notice need be provided; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates and is in the best interests of the Debtors, their estates, creditors, and other parties-in-interest after taking into account the priority scheme of the Bankruptcy Code; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor;

**IT IS HEREBY ORDERED THAT**

1.      The Motion is GRANTED on a final basis as set forth herein.

2.      To the extent that the Bank Accounts and Investment Accounts do not strictly adhere to the requirements of the U.S. Trustee Guidelines or Bankruptcy Code sections 345(a) or 345(b), the Debtors' time to comply with such requirements is hereby extended for a period of 45 days from the date of the entry of the Interim Order; *provided*, *however*, that such extension is without prejudice to the Debtors' right to (i) request a further extension of such relief or any waiver of the requirements of Bankruptcy Code section 345(b) and (ii) assert that any particular Bank Account and Investment Account complies with Bankruptcy Code section 345(b);

*provided*, *further*, for the avoidance of doubt, the Banks will not be required to bond deposits held in the Bank Accounts, as required by section 345(b) of the Bankruptcy Code. For the avoidance of doubt, the U.S. Trustee's right to oppose any such request or assertion by the Debtors consistent with items (i) and (ii) in this paragraph is expressly reserved.

3.     The Debtors are authorized, but not directed, in their sole discretion, to (a) continue operating the Cash Management System, including through Intercompany Transactions, and (b) make ordinary course changes to their Cash Management System; *provided that* the Debtors shall provide reasonable notice to counsel to the Ad Hoc First Lien Group and U.S. Trustee prior to making any material change to the Cash Management System.

4.     The Debtors are further authorized, but not directed, pursuant to the terms of this Final Order, to continue using any or all of their existing Bank Accounts in the names and with the account numbers existing immediately before the Petition Date.

5.     The Debtors are authorized, on the terms set forth in this Final Order, to open any new bank accounts or close any existing Bank Accounts as they may deem necessary and appropriate; *provided that* in the event the Debtors open a new bank account they shall open one at an Authorized Depository and shall timely indicate the opening of such account on the Debtors' monthly operating report and shall provide five business days' notice to the U.S. Trustee, counsel to the Ad Hoc First Lien Group, counsel to the Ad Hoc Cross-Holder Group, and any statutory committee appointed in the Chapter 11 Cases of the opening of any new bank accounts at an Authorized Depository or closing of any Bank Account; *provided, further* that the Debtors shall consult with counsel to the Ad Hoc First Lien Group (y) before closing any Bank Account that maintains a balance or (z) opening of any new bank account at an Authorized Depository. The

Debtors are not authorized to open any new investment accounts, as these investment accounts do not comply with sections 345(a) or 345(b) of the Bankruptcy Code.

6.      The Banks are authorized to continue to treat, service, and administer the Bank Accounts as accounts of the respective Debtor as a debtor in possession without interruption and in the usual and ordinary course and to receive, process and honor and pay any and all postpetition checks, drafts, book transfers, wires or automated clearinghouse transfers ("ACH Transfers") drawn on the Bank Accounts by the holders or makers thereof, as the case may be, to the extent the Debtors have good funds standing to their credit with such Bank.

7.      Notwithstanding anything to the contrary in any other order of this Court, the Banks (a) are authorized to accept and honor all representations from the Debtors as to which checks, drafts, book transfers, wires, or ACH Transfers should be honored or dishonored, consistent with any order of this Court and governing law, whether such checks, drafts, book transfers, wires, or ACH Transfers are dated prior to, on or subsequent to the Petition Date, and whether the Banks believe the payment is or is not authorized by an order of this Court and (b) have no duty to inquire as to whether such payments are authorized by an order of this Court.

8.      The Debtors are authorized to use their existing Business Forms and are not required to (a) obtain new stock reflecting their status as debtors in possession or (b) print "Debtor-in-Possession," the Debtors' Chapter 11 Case numbers, or any other information on any of their existing Business Forms or wire transfers; *provided* that once the Debtors' existing Business Forms have been used, the Debtors shall, when re-ordering or issuing new Business Forms during the pendency of these Chapter 11 Cases, include a legend referencing the Debtors as "Debtors-In-Possession" and the lead Debtor's bankruptcy case number on all new Business Forms; *provided, further*, that all electronic Business Forms, including without limitation correspondence and

3

checks, shall immediately include the designation "Debtor in Possession" and the lead Debtor's bankruptcy case number.

9.      The Banks shall not be deemed in violation of this Order and shall have no liability to any party for (i) relying on such representations by the Debtors or (ii) honoring any disbursement that is subject to this Order, in the case of this clause (ii), either (a) at the direction of the Debtors to honor such prepetition disbursement, (b) in the good faith belief that this Court has authorized such prepetition disbursement, or (c) as a result of any operational processing errors or other mistakes which are the result of human error or made despite implementation of reasonable item handling procedures, including, without limitation, any inadvertent dishonoring of any payment or other disbursement directed to be made by the Debtors.  To the extent that the Debtors direct that any disbursement be dishonored or the Banks inadvertently dishonor any disbursements, the Debtors may issue replacement disbursements consistent with the orders of this Court.

10.      In accordance with current practice and the agreement governing the Bank Accounts, the Banks are authorized to "charge back" to the Debtors' accounts any amounts incurred by the Banks resulting from returned checks or other returned items.  The Debtors are authorized without any further order of this Court to pay any fees and expenses owed to the Banks, including any Bank Fees or reasonable and documented legal expenses (to the extent due and owing pursuant to the prepetition agreements governing the Bank Accounts), payable prepetition or postpetition (as administrative expenses), in each case regardless of whether such items were deposited prepetition or postpetition or relate to prepetition or postpetition items.

11.      Any payment from a Bank Account at the request of the Debtors made by a Bank prior to the Petition Date (including any ACH Transfers such Bank is or becomes obligated

to settle), or any instruments issued by such Bank on behalf of any Debtor pursuant to a "midnight deadline" or otherwise, shall be deemed to be paid prepetition, whether or not actually debited from the Bank Account prepetition.

12.     The Debtors are authorized, but not directed, subject to the terms of this Final Order, to (a) continue the Intercompany Transactions in the ordinary course of business, including with the Non-Debtor Affiliates, and (b) honor and make payments in respect of Intercompany Claims arising after the Petition Date in accordance with the Intercompany Transactions and past practice.  All Intercompany Claims arising after the Petition Date shall be granted a superpriority administrative expense claim pursuant to section 507(b) of the Bankruptcy Code, subject and junior to any claims, including adequate protection claims, granted in connection with the use of cash collateral in accordance with any interim and final orders, as applicable, approving the use of such cash collateral (the "Cash Collateral Order").

13.     Notwithstanding anything to the contrary contained herein, any payment to be made hereunder, and any authorization contained, hereunder herein, shall be subject to the Cash Collateral Order and any budget in connection with any such use of cash collateral.  To the extent there is any inconsistency between the terms of the Cash Collateral Order and any action taken or proposed to be taken hereunder, the terms of the Cash Collateral Order shall control.

14.     The Debtors shall maintain records of all transfers within the Cash Management System, including the Intercompany Transactions, and all such transfers shall be documented in their books and records so that all prepetition and postpetition transactions may be traced and recorded to the same extent maintained by the Debtors before the Petition Date.  Upon a reasonable request by the Ad Hoc First Lien Group, the Debtors shall provide access to such books and records to counsel for the Ad Hoc First Lien Group within ten (10) business days and

the Debtors will use reasonable best efforts to provide such access within eight (8) business days of such request.

15.     The Debtors are authorized to invest and deposit funds in accordance with their prepetition Investment Practices without the need for any additional or different practices not utilized prior to the Petition Date, notwithstanding that certain of such practices may not strictly comply in all respects with the investment and deposit guidelines set forth in section 345 of the Bankruptcy Code.

16.     Notwithstanding the Debtors' use of a consolidated cash management system, the Debtors shall calculate quarterly fees payable under 28 U.S.C. § 1930(a)(6), together with interest, if any, under 31 U.S.C. § 3171, based on the disbursements actually made by each Debtor.

17.     Nothing contained in the Motion or this Order, nor any payment made pursuant to the authority granted by this Order, shall constitute or be construed as (a) an admission as to the validity of any claim against the Debtors, (b) a waiver of the Debtors' rights to dispute the amount of, basis for, or validity of any claim against the Debtors, (c) a waiver of any claims or causes of action that may exist against any creditor or interest holder, (d) a promise to pay any claim, (e) an approval, assumption, adoption, or rejection of any agreement, contract, program, policy, or lease between the Debtors and any third party under section 365 of the Bankruptcy Code, or (f) otherwise affecting the Debtors' rights under section 365 of the Bankruptcy Code to assume or reject any executory contract or unexpired lease.

18.     Nothing in the Motion or this Order, nor as a result of any payment made pursuant to this Order, shall be deemed or construed as a waiver of the right of the Debtors, or

6

shall impair the ability of the Debtors, to contest the validity and amount of any payment made pursuant to this Order.

19.     Nothing herein shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by any party.

20.     Notwithstanding Bankruptcy Rule 6004(h), this Order shall be effective and enforceable immediately upon entry.

21.     The Debtors are authorized and empowered to take all action necessary to effectuate the relief granted in this Order.

22.     This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

Dated:   [●], 2022
         New York, New York

_____
THE HONORABLE [__]
U.S. BANKRUPTCY JUDGE

**<u>Exhibit C</u>**

**Cash Management Schematic**

# Cash Management Schematic
## Debtor Cash Management System







**Legend**

| | | |
|---|---|---|
| Collection Account | Payroll / Disbursements Account | Intercompany Account |
| Disbursements Account | Pool Leader Account | Activity Details |
| Payroll Account | Investment Account | |

Intercompany Transactions

Same Entity Operational Funding

Transaction Activity

ZBA / Sweep Cash Pool Activity [3]

**Notes**

[1] This account is used to fund Intercompany Transactions to three Indian Non-Debtor Affiliates and one U.S. Debtor entity.
[2] Account is funded through Intercompany Transactions which occur semi-annually or as needed.
[3] Any Bank Account that is subject to the ZBA/Sweep Cash Pool Activity mechanism is reflective of a ZBA cash sweep mechanism within each respective legal entity whereby funds are swept into the Concentration Account for all Bank Accounts except Disbursement Accounts.
[4] Investment Accounts are funded on a discretionary basis through excess cash.
[5] Reflects accounts that receive Intercompany Transactions from BAML-0012.
[6] Reflects restricted cash of $85 million in connection with TLC acquisition.
[7] Accounts anticipated to be closed shortly after the Petition Date.

# Cash Management Schematic
## Debtor Cash Management System





## **Exhibit D**

**Bank Accounts**

**Project Zed**
**Debtor Bank Accounts**

| No. | Account Number (Last 4 Digits) | Bank | Legal Entity |
|---|---|---|---|
| 1 | *5764 | Bank of America | Astora Women's Health LLC |
| 2 | *1323 | Bank of America | Auxilium Pharmaceuticals Inc |
| 3 | *6353 | Bank of America | Auxilium Pharmaceuticals Inc |
| 4 | *9007 | Wells Fargo | BioSpecifics Technologies Corp |
| 5 | *9015 | Wells Fargo | BioSpecifics Technologies Corp |
| 6 | *8458 | Bank of America | Endo Aesthetics LLC |
| 7 | *8461 | Bank of America | Endo Aesthetics LLC |
| 8 | *8474 | Bank of America | Endo Aesthetics LLC |
| 9 | *4609 | Bank of America | Endo Aesthetics LLC |
| 10 | *2285 | Bank of America | Endo Finance LLC |
| 11 | *2203 | Bank of America | Endo Finance Operations LLC |
| 12 | *4595 | Bank of America | Endo Health Solutions Inc |
| 13 | *6448 | Bank of America | Endo Luxembourg Finance Company I S.a.r.l. |
| 14 | *8420 | Bank of America | Endo Pharmaceuticals Inc |
| 15 | *4566 | Bank of America | Endo Pharmaceuticals Inc |
| 16 | *4579 | Bank of America | Endo Pharmaceuticals Inc |
| 17 | *4582 | Bank of America | Endo Pharmaceuticals Inc |
| 18 | *1199 | Bank of America | Endo US Inc |
| 19 | *0861 | Bank of America | Generics Bidco I, LLC |
| 20 | *3994 | Bank of America | Generics Bidco I, LLC |
| 21 | *8725 | Bank of America | Hawk Acquisition Ireland Limited |
| 22 | *8438 | Bank of America | Par Pharmaceuticals Inc |
| 23 | *4605 | Bank of America | Par Pharmaceuticals Inc |
| 24 | *4618 | Bank of America | Par Pharmaceuticals Inc |
| 25 | *4621 | Bank of America | Par Pharmaceuticals Inc |
| 26 | *5038 | E*TRADE | Endo International PLC |
| 27 | *2012 | Bank of America | Endo Ventures Limited |
| 28 | *2020 | Bank of America | Endo Ventures Limited |
| 29 | *2019 | Bank of America | Endo Bermuda Finance Limited |
| 30 | *2015 | Bank of America | Endo Designated Assignment Company |
| 31 | *5018 | Bank of America | Endo Global Aesthetics Limited |
| 32 | *4010 | Bank of America | Endo Global Biologics Limited |
| 33 | *7019 | Bank of America | Endo Global Ventures |
| 34 | *8017 | Bank of America | Endo International PLC |
| 35 | *8025 | Bank of America | Endo International PLC |
| 36 | *0012 | Bank of America | Endo Luxembourg Finance Company I S.a.r.l. |
| 37 | *6018 | Bank of America | Endo Luxembourg Holding Company S.a.r.l. |
| 38 | *5019 | Bank of America | Endo Procurement Operations Ltd |
| 39 | *5013 | Bank of America | Endo Ventures Bermuda Limited |
| 40 | *2019 | Bank of America | Endo Ventures Limited |
| 41 | *2027 | Bank of America | Endo Ventures Limited |
| 42 | *0010 | Bank of America | Par Laboratories Europe Ltd |
| 43 | *8015 | Bank of America | Endo Luxembourg International Financing S.a.r.l. |
| 44 | *2019 | Bank of America | Endo Luxembourg Finance Company I S.a.r.l. |
| 45 | *1011 | Bank of America | Endo Luxembourg Holding Company S.a.r.l. |
| 46 | *9109 | Bank of America | Paladin Labs Inc. |
| 47 | *9208 | Bank of America | Paladin Labs Inc. |
| 48 | *9307 | Bank of America | Paladin Labs Inc. |
| 49 | *9224 | Bank of America | Paladin Labs Inc. |
| 50 | *1010 | Bank of America | Endo Luxembourg Finance Company II S.a.r.l.[1] |
| 51 | *3017 | Bank of America | Endo Luxembourg Finance Company II S.a.r.l.[1] |

**Note:**

[1] Accounts anticipated to be closed shortly after the Petition Date.