SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Paul D. Leake
Lisa Laukitis
Shana A. Elberg
Evan A. Hill
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
Fax: (212) 735-2000

*Proposed Counsel to Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re* | **Chapter 11** |
| **ENDO INTERNATIONAL plc,** *et al.*, | **Case No. 22-22549 (___)** |
| **Debtors.**[1] | **(Joint Administration Pending)** |

**MOTION OF THE DEBTORS FOR
THE ENTRY OF INTERIM AND FINAL
ORDERS (I) AUTHORIZING DEBTORS TO USE
CASH COLLATERAL; (II) GRANTING ADEQUATE
PROTECTION TO PREPETITION SECURED
PARTIES; (III) MODIFYING THE AUTOMATIC
STAY; AND (V) GRANTING RELATED RELIEF**

Endo International plc and its debtor affiliates, as debtors and debtors in possession

(collectively, the "Debtors" and together with their non-debtor affiliates, the "Company") in the

above-captioned chapter 11 cases (the "Cases"), respectfully represent in support of this motion

(the "Motion") as follows:

---

[1]    The last four digits of Debtor Endo International plc's tax identification number are 3755. Due to the large
number of debtors in these chapter 11 cases, a complete list of the debtor entities and the last four digits of
their federal tax identification numbers is not provided herein. A complete list of such information may be
obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/endo/.
The location of the Debtors' service address for purposes of these chapter 11 cases is: 1400 Atwater Drive,
Malvern, PA 19355.

## RELIEF REQUESTED

1.      By this Motion, and pursuant to sections 105(a), 361, 362, 363, 507(b) and 552 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 4001-2 and 9013-1 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules"), the Debtors seek entry of an interim order, substantially in the form attached hereto as **Exhibit A** (the "Interim Order"),[2] and a final order (the "Final Order" and, together with the Interim Order, the "Cash Collateral Orders"), (a) authorizing the Debtors to use the Prepetition Collateral (as defined below), including "cash collateral" (as defined in section 363(a) of the Bankruptcy Code and the Interim Order, the "Cash Collateral"); (b) authorizing the Debtors to grant the Adequate Protection Obligations to the Prepetition Secured Parties (each as defined below); (c) vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Cash Collateral Orders; (d) scheduling a final hearing on the Motion (the "Final Hearing") within approximately 25 days of the commencement of these Cases to consider entry of the Final Order; and (e) granting related relief.

2.      In support of the Motion, the Debtors respectfully submit the declaration of Ray Dombrowski (the "Dombrowski Declaration"), which is being filed contemporaneously herewith.  Additional information regarding the Debtors, including their business operations, their corporate and capital structure, and the events leading to the commencement of the Cases is set

---

[2]      Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Interim Order.

forth in the *Declaration of Mark Bradley in Support of Chapter 11 Petitions and First Day Papers* (the "Declaration") filed contemporaneously herewith and incorporated herein by reference.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference M-431*, dated January 31, 2012 (Preska, C.J.).  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

4.      Venue of the Cases and this Motion is proper in this District under 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

### I.      General Background

5.      On the date hereof (the "Petition Date"), the Debtors each commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors have requested that the Cases be jointly administered.

6.      The Debtors are authorized to continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7.      No trustee, examiner, or statutory committee of creditors (any such committee, the "Committee") has been appointed in the Cases.

### II.      Prepetition Capital Structure

8.      As of the Petition Date, the Debtors' consolidated long-term debt obligations totaled approximately $8.15 billion arising under (a) one credit agreement, which consists of a revolving credit facility and a term loan facility, (b) four series of secured notes, and (c) four series of unsecured notes.  As of the Petition Date, the Debtors' funded debt obligations are summarized as follows:

| Debt Instrument (as defined herein) | Facility Type/Notes Series | Maturity Date | Outstanding Principal Amount (in USD$ millions) |
|---|---|---|---|
| Revolving Credit Facility | Revolver | Various | $277.2 |
| Term Loan Facility | Term loan | March 2028[3] | $1,975 |
| First Lien Notes | 5.875% Senior Secured Notes due 2024 | Oct. 2024 | $300 |
| | 7.500% Senior Secured Notes due 2027 | April 2027 | $2,015.5 |
| | 6.125% Senior Secured Notes due 2029 | April 2029 | $1,295 |
| Second Lien Notes | 9.500% Senior Secured Second Lien Notes due 2027 | July 2027 | $940.6 |
| Unsecured Notes | 5.375% Senior Notes due 2023 | Jan. 2023 | $6.1 |
| | 6.00% Senior Notes due 2028 | June 2028 | $1,260.4 |
| | 6.00% Senior Notes due 2025 | Feb. 2025 | $21.6 |
| | 6.00% Senior Notes due 2023 | July 2023 | $56.4 |
| | | Total: | $8,147.8 |

9.      The primary components of the Debtors' funded debt obligations are described in greater detail below.

### A.      Revolving Credit Facility and Term Loan Facility

10.     On April 27, 2017, Debtors Endo International plc ("Parent"), Endo Luxembourg Finance Company I S.à r.l. ("Lux Borrower"), and Endo LLC ("Co-Borrower," and together with Lux Borrower, the "Borrowers") entered into that certain credit agreement (as amended by the first amendment, dated as of March 28, 2019, the "Prior Credit Agreement," as amended and restated by the Amendment and Restatement Agreement (as defined below) and as may be further amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), with JPMorgan Chase Bank, N.A., as swing line lender, issuing bank (in such capacity, the "Issuing Bank"), and administrative agent (in such

---

[3]     Subject to an earlier springing maturity if the aggregate principal amount outstanding of the 7.500% Notes and the Second Lien Notes (each as defined below), in each case, is greater than or equal to $500 million and such notes are not refinanced or repaid prior to the date that is 91 days prior to the stated maturity thereof.

capacity, the "Administrative Agent"), and the lenders party thereto from time to time (such lenders, immediately prior to the date hereof, the "Prepetition First Lien Lenders" and, together with the Administrative Agent, Issuing Bank, First Lien Collateral Trustee (as defined below), and each of the other Secured Parties (as defined in the Credit Agreement), the "Prepetition First Lien Loan Secured Parties"). The Credit Agreement provides for a senior secured revolving credit facility (the "Revolving Credit Facility") and a senior secured term loan facility (the "Term Loan Facility" and, together with the Revolving Credit Facility, the "Credit Facilities"). In connection with the Credit Agreement, certain subsidiaries of Parent entered into that certain subsidiary guaranty, dated as of April 27, 2017 (as may be amended, amended and restated, supplemented or otherwise modified from time to time, the "Subsidiary Guaranty"), among Parent, the Borrowers, the various guarantor parties thereto (including any subsidiary of Parent that executed a joinder thereto, the "Guarantors"), and the Administrative Agent.

11.     On March 25, 2021, Parent, the Borrowers, and certain of the Prepetition First Lien Loan Secured Parties entered into that certain Amendment and Restatement Agreement (the "Amendment and Restatement Agreement") which amended and restated the Prior Credit Agreement in order to, among other things, (a) refinance in full the existing term loans under the Prior Credit Agreement, which had approximately $3.295 billion of principal outstanding, with the proceeds from (i) a new tranche of senior secured term loans in an aggregate principal amount of $2 billion maturing in March 2028 (subject to an earlier springing maturity if the aggregate principal amount outstanding of the 7.500% Notes and the Second Lien Notes (each as defined below), in each case, is greater than or equal to $500 million and such notes are not refinanced or repaid prior to the date that is 91 days prior to the stated maturity thereof) and (ii) $1.295 billion of newly issued 6.125% Senior Secured Notes due 2029 (the "6.125% Notes"), and (b) extend the

maturities of approximately $675.3 million of existing revolving commitments under the Revolving Credit Facility to March 2026. After giving effect to the Amendment and Restatement Agreement, the Credit Agreement provided for a $1 billion Revolving Credit Facility (in total availability) and a $2 billion Term Loan Facility. Borrowings under the Revolving Credit Facility bear interest, at the Parent and Borrowers' election, at a rate *per annum* equal to (a) the London Interbank Offered Rate ("LIBOR") plus an applicable margin between 1.50% and 3.00% depending on the Company's total net leverage ratio or (b) the Alternate Base Rate (as defined in the Credit Agreement) plus an applicable margin between 0.50% and 2.00% depending on the Company's total net leverage ratio. Borrowings under the Term Loan Facility bear interest, at the Parent and Borrowers' election, at a rate *per annum* equal to (a) LIBOR plus 5.00%, subject to a LIBOR floor of 0.75%, or (b) the Alternate Base Rate plus 4.00%, subject to an Alternate Base Rate floor of 1.75%.

12.     To secure the obligations arising under the Credit Agreement and the First Lien Notes (as defined below), Co-Borrower and certain Guarantors entered into, among other things, that certain US Pledge and Security Agreement, dated as of April 27, 2017 (as acknowledged and confirmed by that certain Acknowledgment and Confirmation, dated as of March 25, 2021, and as may be amended, restated, supplemented, or otherwise modified from time to time, the "US Pledge and Security Agreement," together with all other first-lien security documents executed and/or delivered by the Parent, Borrowers, and Guarantors, to or in favor of the Prepetition First Loan Secured Parties, including, without limitation, all intellectual property security agreements, mortgages, and pledges, the "First Lien Prepetition Security Documents"), granting Wilmington Trust, N.A., in its capacity as collateral trustee (in such capacity and including any successors thereto, the "First Lien Collateral Trustee"), first-priority liens on and

6

security interests in substantially all of the Debtors' assets, including all proceeds thereof (the "Prepetition Collateral").[4]

13.     As of the Petition Date, (a) approximately $277 million was outstanding under the Revolving Credit Facility and (b) approximately $1.98 billion was outstanding under the Term Loan Facility.

**B.     First Lien Notes and Second Lien Notes**

14.     6.125% Notes: On March 25, 2021, Debtors Lux Borrower and Endo U.S. Inc. ("Endo US" and together with Lux Borrower, the "6.125% Notes Issuers"), issued the 6.125% Notes (the "6.125% Notes," and the holders thereof, the "6.125% Senior Secured Noteholders") pursuant to that certain Indenture, dated as of March 25, 2021 (as may be amended, restated, supplemented, or otherwise modified from time to time, the "6.125% Notes Indenture"), by and among Computershare Trust Company, National Association, as trustee ("Computershare" and in such capacity and including any predecessors and successors thereto, "6.125% Notes Indenture Trustee" and, together with the holders of 6.125% Notes and the First Lien Collateral Trustee, collectively, the "6.125% Notes Secured Parties"), the guarantors party thereto (the "6.125% Notes Guarantors"), and the 6.125% Notes Issuers.  The 6.125% Notes are secured on a *pari passu* basis by first-priority liens on, and security interests in, the Prepetition Collateral in accordance with the terms of the First Lien Prepetition Security Documents and the First Lien Collateral Trust Agreement (as defined below).  As of the Petition Date, approximately $1.295 billion was outstanding under the 6.125% Notes Indenture.

---

[4]     In addition to securing the obligations under the Credit Agreement, the US Pledge and Security Agreement secures the obligations arising under the 6.125% Notes Indenture, 7.500% Notes Indenture, and the 5.875% Notes Indenture (each as defined below) with grants of first-priority liens and security interests.  The term "Secured Obligation" as used in the US Pledge and Security Agreement's grant clause is defined by reference to the First Lien Collateral Trust Agreement (as defined below).  In that agreement, Secured Obligations include any debt designated as secured debt, including certain future debt.

15.    <u>7.500% Notes</u>: On March 28, 2019, Debtor Par Pharmaceuticals, Inc. ("<u>Par</u> <u>Pharma</u>") issued $1.5 billion aggregate principal amount of 7.500% senior secured notes due on April 1, 2027 (the "<u>7.500% Notes</u>," and the holders thereof, the "<u>7.500% Senior Secured</u> <u>Noteholders</u>"), pursuant to that certain Indenture, dated March 28, 2019 (as amended, restated, supplemented, or otherwise modified from time to time, the "<u>7.500% Notes Indenture</u>"), by and among Par Pharma, as issuer (the "<u>7.500% Notes Issuer</u>"), the guarantors party thereto (the "<u>7.500% Notes Guarantors</u>"), and Computershare, as trustee (in such capacity and including any predecessors and successors thereto, the "<u>7.500% Notes Indenture Trustee</u>" and, together with the holders of 7.500% Notes and the First Lien Collateral Trustee, the "<u>7.500% Notes Secured</u> <u>Parties</u>"). The 7.500% Notes are secured on a *pari passu* basis by first-priority liens on, and security interests in, the Prepetition Collateral in accordance with the terms of the First Lien Prepetition Security Documents and the First Lien Collateral Trust Agreement (as defined below). In June 2020, the Company executed certain transactions which included, among others, an additional issuance of 7.500% Notes under the 7.500% Notes Indenture in the aggregate principal amount of approximately $516 million (hereinafter, the "<u>2020 Refinancing Transactions</u>"). As of the Petition Date, approximately $2 billion was outstanding under the 7.500% Notes Indenture.

16.    <u>5.875% Notes</u>: On April 27, 2017, Debtors Endo Designated Activity Company ("<u>Endo DAC</u>"), Endo Finance LLC ("<u>Endo Finance</u>"), and Endo Finco Inc. ("<u>Endo</u> <u>Finco</u>," and together with Endo Finance and Endo DAC, the "<u>5.875% Notes Issuers</u>") issued $300 million aggregate principal amount of 5.875% senior secured notes due October 15, 2024 (the "<u>5.875% Notes</u>," and the holders thereof, the "<u>5.875% Senior Secured Noteholders</u>"; the 5.875% Notes, together with the 7.500% Notes and the 6.125% Notes, the "<u>First Lien Notes</u>"), pursuant to that certain Indenture, dated April 27, 2017 (as amended, restated, supplemented, or otherwise

modified from time to time, the "5.875% Notes Indenture"), by and among Computershare, as trustee (in such capacity and including any predecessors and successors thereto, the "5.875% Notes Indenture Trustee" and, together with the holders of 5.875% Notes and the First Lien Collateral Trustee, the "5.875% Notes Secured Parties"; and the 5.875% Notes Secured Parties, the 7.500% Notes Secured Parties, and the 6.125% Notes Secured Parties, collectively, the "Prepetition First Lien Notes Secured Parties," and together with the Prepetition First Lien Loan Secured Parties, the "Prepetition First Lien Secured Parties"), the guarantors party thereto (the "5.875% Notes Guarantors"), and the 5.875% Notes Issuers. The 5.875% Notes are secured on a *pari passu* basis by first-priority liens on, and security interests in, the Prepetition Collateral in accordance with the terms of the First Lien Prepetition Security Documents and the First Lien Collateral Trust Agreement (defined below). As of the Petition Date, approximately $300 million was outstanding under the 5.875% Notes Indenture.

17.     Second Lien Notes: On June 16, 2021, Debtors Endo DAC, Endo Finance, and Endo Finco (the "Second Lien Notes Issuers") issued $940.6 million aggregate principal amount of 9.50% senior secured second lien notes due July 31, 2027 (the "Second Lien Notes," and the holders thereof, the "Second Lien Noteholders"), pursuant to that certain Indenture, dated June 16, 2020 (as amended, restated, supplemented, or otherwise modified from time to time, the "Second Lien Indenture," and together with the 5.875% Notes Indenture, 7.500% Notes Indenture, and 6.125% Notes Indenture, the "Secured Notes Indentures"), by and among, Wilmington Savings Fund Society, FSB, as trustee (in such capacity and including any predecessors and successors thereto, the "Second Lien Indenture Trustee"), the Second Lien Notes Issuers, and the guarantors party thereto (the "Second Lien Notes Guarantors"). The Second Lien Notes are secured by a second-priority lien on, and on a junior basis with respect to, the Prepetition Collateral

in accordance with the terms of the Second Lien Prepetition Security Documents and the Second Lien Collateral Trust Agreement (each as defined below). As of the Petition Date, approximately $941 million was outstanding under the Second Lien Indenture.

18.     To secure the obligations arising under the Second Lien Indenture, Co-Borrower and certain Guarantors entered into, among other things, that certain Second Lien US Pledge and Security Agreement, dated as of June 16, 2020, as may be amended, restated, supplemented, or otherwise modified from time to time (such agreement, together with all other second lien security documents executed and/or delivered by the Parent, Borrowers, and Guarantors, to or in favor of Wilmington Savings Fund Society, FSB, as trustee, and the Second Lien Noteholders, including, without limitation, all intellectual property security agreements, mortgages, and pledges, the "Second Lien Prepetition Security Documents"), granting Wilmington Trust, N.A., in its capacity as collateral trustee (in such capacity, the "Second Lien Collateral Trustee," and together with Second Lien Indenture Trustee, Second Lien Noteholders, and the Prepetition First Lien Secured Parties, the "Prepetition Secured Parties"), second-priority liens on, and security interests in, the Prepetition Collateral.

## C.     Collateral Trust Agreements

19.     On April 27, 2017, the Prepetition Loan Parties, the Prepetition First Lien Notes Parties, the Administrative Agent, the First Lien Indenture Trustee, and the First Lien Collateral Trustee entered into a collateral trust agreement (as amended, restated, supplemented or otherwise modified from time to time, including pursuant to any joinders, the "First Lien Collateral Trust Agreement"). The First Lien Collateral Trust Agreement governs, among other things, the respective rights, interests and obligations of the Prepetition First Lien Secured Parties with respect to the Prepetition Collateral and covers certain other matters relating to the administration of

security interests.  On June 16, 2020, the Prepetition Second Lien Notes Parties, the Second Lien

Indenture Trustee, and the Second Lien Collateral Trustee entered into that certain second lien

collateral trust agreement (the "Second Lien Collateral Trust Agreement").  The Second Lien

Collateral Trust Agreement governs, among other things, the interests and obligations of the

holders of Second Lien Notes and the Second Lien Collateral Trustee with respect to the

Prepetition Collateral and covers certain other matters relating to the administration of security

interests.  Both the First Lien Collateral Trust Agreement and the Second Lien Collateral Trust

Agreement provide that the Prepetition Secured Parties may exercise remedies with respect to the

Prepetition Collateral (subject, in all respects, to the 1L-2L Intercreditor Agreement (as defined

below)) by directing the First Lien Collateral Trustee or the Second Lien Collateral Trustee, as

applicable, pursuant to an Act of Required Secured Parties (as defined in each of the First Lien

Collateral Trust Agreement and Second Lien Collateral Trust Agreement, respectively).[5]

  **D.**  **1L-2L Intercreditor Agreement**

  20.  The First Lien Collateral Trustee, the Second Lien Collateral Trustee, the

Prepetition Loan Parties, the Prepetition First Lien Notes Parties, and the Prepetition Second Lien

Notes Parties are parties to that certain Intercreditor Agreement, dated as of June 16, 2020 (as

amended, restated, or otherwise modified from time to time, the "1L-2L Intercreditor

---

[5]  Under the First Lien Collateral Trust Agreement, an "Act of Required Secured Parties" means a written direction delivered to the First Lien Collateral Trustee "by or with the written consent of either the holders of or the Secured Debt Representatives representing the holders of more than 50% of the sum of: (a) the aggregate outstanding principal amount of Secured Debt (including the face amount of outstanding letters of credit whether or not then available or drawn); and (b) other than in connection with the exercise of remedies, the aggregate unfunded commitments to extend credit which, when funded, would constitute Secured Debt." First Lien Collateral Trust Agreement § 1.1.  The definition of the term "Act of Required Secured Parties" as used in the Second Lien Collateral Trust Agreement with respect to the Prepetition Second Lien Notes Secured Parties is identical to the definition of the "Act of Required Secured Parties" as used in the First Lien Collateral Trust Agreement with respect to the Prepetition First Lien Secured Parties. *See* Second Lien Collateral Trust Agreement § 1.1.

Agreement"). The 1L-2L Intercreditor Agreement governs, among other things, the relative rights, interests, obligations, priority and positions of the Prepetition First Lien Secured Parties on the one hand, and the Prepetition Second Lien Notes Secured Parties on the other hand. The 1L-2L Intercreditor Agreement provides, among other things, that the First Priority Representative (as defined in the 1L-2L Intercreditor Agreement) will have the exclusive right to exercise rights and remedies with respect to the Prepetition Collateral on behalf of the holders of the First Priority Secured Parties. If the First Priority Representative consents to the use of Cash Collateral, then the Second Priority Representative (as defined in Section 1.1 of the 1L-2L Intercreditor Agreement) is deemed to agree, on behalf of itself and the other Second Priority Secured Parties, to the use of Cash Collateral. *See* 1L-2L Intercreditor Agreement § 5.2.

### E.   Unsecured Notes

21.   Certain of the Debtors have also issued the following unsecured notes with Wells Fargo acting as indenture trustee for each (collectively, the "Unsecured Notes"):[6]

(a)   5.375% Senior Notes due 2023 issued by Endo Finance and Endo Finco and guaranteed by the Guarantors, pursuant to that certain indenture, dated June 30, 2014;

(b)   6.000% Senior Notes due 2025 issued by Endo DAC, Endo Finance and Endo Finco and guaranteed by the Guarantors, pursuant to that certain indenture, dated January 27, 2015;

(c)   6.000% Senior Notes due 2023 issued by Endo DAC, Endo Finance and Endo Finco and guaranteed by the Guarantors, pursuant to that certain indenture, dated July 9, 2015; and

---

[6]   In connection with the 2020 Refinancing Transactions, Endo DAC, Endo Finance and Endo Finco, as applicable, solicited, and obtained, the consent of the holders of the 6.000% 2023 unsecured notes, the 6.000% 2025 unsecured notes, and the 5.375% 2023 unsecured notes to, among other things, eliminate certain of the (a) restrictive covenants, (b) affirmative covenants, and (c) events of default. On May 28, 2020 and June 4, 2020, the foregoing issuers and unsecured noteholders entered into supplemental indentures memorializing these terms.

       (d)      6.000% Senior Notes due 2028 issued by Endo DAC, Endo Finance, and Endo Finco and guaranteed by the Guarantors, pursuant to that certain indenture, dated June 16, 2020.

22.      As of the Petition Date, approximately $1.345 billion was outstanding under the Unsecured Notes.

### III.      The Debtors Have an Immediate Need to Access Cash Collateral

23.      The Debtors require immediate access to Cash Collateral so they can continue operating during these Cases and preserve the value of their estates for the benefit of all stakeholders.  As described in greater detail above, the Prepetition Secured Parties have liens on substantially all of the Debtors' assets, including on the proceeds thereof.  In the normal course of business, the Debtors use cash on hand and cash flow from operations and other sources to fund working capital, capital expenditures, and for maintenance of their business and properties.  In connection with the prospect of a chapter 11 filing, the Debtors, with the assistance of their advisors, analyzed their projected cash needs.  The Debtors determined that the budget annexed to the Interim Order as **Exhibit 1** (the "Approved Budget") reasonably reflects anticipated cash needs over the first 13 weeks of the Cases.

### IV.      The Prepetition Secured Parties Have Consented to the Use of Cash Collateral

24.      As a condition of obtaining the Prepetition Secured Parties' consent to use Cash Collateral, the Debtors agreed to provide certain customary forms of adequate protection.  After extensive good-faith, arm's-length negotiations among the Debtors and the Prepetition Secured Parties, the Debtors agreed to provide the Adequate Protection Obligations (as defined below), subject in each case to the Carve Out (as defined below) and Permitted Prior Liens (as defined in the Interim Order), to the extent of any diminution in value of the Prepetition Secured Parties' respective interests in the Prepetition Collateral (including Cash Collateral) resulting from the imposition of the automatic stay, the Debtors' use, sale, or lease of the Prepetition Collateral

during the Cases, and/or for any other reason for which adequate protection may be granted under the Bankruptcy Code (the "Diminution in Value").

25.     The Interim Order provides numerous benefits to the Debtors and their stakeholders.  Crucially, the terms of the Interim Order will allow the Debtors to access Cash Collateral on a consensual basis during the critical initial days of these Cases when the Debtors' management is focused on stabilizing the business during the transition into chapter 11.  In light of the severe consequences if the Debtors were unable to immediately access Cash Collateral, the Adequate Protection Obligations are reasonable and appropriate under the circumstances.

## IV.     Concise Statement of Material Terms of the Interim Order

26.     In accordance with Bankruptcy Rule 4001(b) and Local Rule 4001-2(a), the material terms of the Interim Order and the location of such terms therein are summarized below:[7]

| Material Terms | Summary of Material Terms |
|---|---|
| **Entities with an Interest in Cash Collateral** *Bankruptcy Rule 4001(b)(1)(B)(i)* | The Prepetition Secured Parties. Interim Order ¶ 3. |
| **Purposes for Use of Cash Collateral** *Bankruptcy Rule 4001(b)(1)(B)(ii)* | The Debtors are authorized to use Cash Collateral, consistent with the Approved Budget, for working capital purposes, other general corporate purposes of the Debtors, and the satisfaction of costs and expenses of administering these Cases. Interim Order ¶ G. |
| **Amount of Cash Collateral to Be Used** *Local Rule 4001-2(a)(1)* | See Approved Budget attached to the Interim Order as **Exhibit 1**. |
| **Approved Budget Provisions** *Bankruptcy Rule 4001(b)(1)(B)(iii); Local Rules 4001-2(a)(2), (d)* | The Debtors' use of Cash Collateral will be subject to the Approved Budget and Permitted Variances (as defined in the Interim Order).  The Approved Budget shall set forth the Debtors' projected cash receipts and disbursements.  The Interim Order provides for bi-weekly testing of the Debtors' aggregate disbursements on a rolling basis (excluding restructuring professional fees, customer rebates, and U.S. Trustee fees), subject to permitted variances of 120% of the projected disbursements in the aggregate as set forth in the Approved Budget. Interim Order ¶ 3. |

---

[7]     This summary is qualified in its entirety by the provisions of the Interim Order.  In the event of any inconsistency between this summary and the Interim Order, the terms of the Interim Order shall control.

| Material Terms | Summary of Material Terms |
|---|---|
| **Proposed Adequate Protection**<br>*Bankruptcy Rule 4001(b)(1)(B)(iv); Local Rules 4001-2(a)(4), (6)*<br><br>**Economic Terms, Including Fees and Expenses of the Prepetition Secured Parties and Their Respective Professionals**<br>*Local Rules 4001-2(a)(3), (16)* | As adequate protection for their proposed use of Cash Collateral as set forth in the Interim Order, the Debtors propose to provide the following to the Prepetition First Lien Secured Parties (the "First Lien Adequate Protection Obligations"):<br><br>a.   to the extent of any Diminution in Value of the Prepetition First Lien Secured Parties' interests in the Prepetition Collateral and subject in all cases to the Carve Out (as defined below) and the Permitted Prior Liens, valid, binding, continuing, fully-perfected first-priority senior, additional and replacement security interests in and liens on (such liens and security interests, the "First Lien Adequate Protection Liens"): (i) the Prepetition Collateral and (ii) all of the Debtors' other now-owned and hereafter-acquired real and personal property, assets and rights of any kind or nature, wherever located, whether encumbered or unencumbered, including, without limitation, to the maximum extent permitted under applicable law, a 100% equity pledge of any first-tier foreign subsidiaries and unencumbered assets of the Debtors, if any, and all prepetition property and post-petition property of the Debtors' estates, and the proceeds, products, rents and profits thereof, whether arising from section 552(b) of the Bankruptcy Code or otherwise, including, without limitation, all equipment, all goods, all accounts, cash, payment intangibles, bank accounts and other deposit or securities accounts of the Debtors (including any accounts opened prior to, on, or after the Petition Date), insurance policies and proceeds thereof, equity interests, instruments, intercompany claims, accounts receivable, other rights to payment, all general intangibles, all contracts and contract rights, securities, investment property, letters of credit and letter of credit rights, chattel paper, all interest rate hedging agreements, all owned real estate, real property leaseholds, fixtures, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property, all commercial tort claims, and all claims and causes of action (including causes of action arising under section 549 of the Bankruptcy Code, claims arising on account of transfers of value from a Debtor to (x) another Debtor and (y) a non-Debtor affiliate incurred on or following the Petition Date), and any and all proceeds, products, rents, and profits of the foregoing (all property identified in this paragraph being collectively referred to as the "Collateral"); subject only to the Permitted Prior Liens, in which case the First Lien Adequate Protection Liens shall be immediately junior in priority to such Permitted Prior Liens and to the Carve Out;<br><br>b.   allowed superpriority administrative expense claims in each of the Cases ahead of and senior to any and all other administrative expense claims in such Cases to the extent of any Diminution in Value (the "First Lien Adequate Protection Superpriority Claims"), but junior only to the Carve Out;<br><br>c.   adequate protection payments consisting of: (i) no later than eight (8) business days after the date of the Interim Order, the first such adequate protection payment shall be paid in an amount in cash equal to the amount comprising all accrued and unpaid interest under (A) the Credit Agreement from the date of the last interest payment made by the Borrowers under the Credit Agreement through and including the date of the Interim Order and (B) each of the First Lien Indentures from the date of the last interest payment made by the First Lien Notes Issuers under the applicable First Lien Indenture through and including the date of the Interim Order, calculated based on a rate of (x) for the Credit Agreement, (1) if denominated in Dollars, ABR plus the Applicable Rate (each as defined in the Credit Agreement) or (2) if |

| Material Terms | Summary of Material Terms |
|---|---|
| | denominated in Canadian Dollars, the Canadian Prime Rate plus the Applicable Rate (each as defined in the Credit Agreement), and (y) for each First Lien Indenture, the applicable rate of interest set forth on the face of the Note (as defined in each of the First Lien Indentures); and (ii) on the last business day of each calendar month following entry of the Interim Order, each such adequate protection payment shall be paid in cash in an amount comprising all accrued and unpaid interest, calculated based on a rate of (A) for the Credit Agreement, (x) if denominated in Dollars, ABR plus the Applicable Rate plus 200 basis points  or (y) if denominated in Canadian Dollars, the Canadian Prime Rate plus the Applicable Rate plus 200 basis points, and (B) for each First Lien Indenture, the applicable rate of interest set forth on the face of the Note (as defined in each of the First Lien Indentures) plus 100 basis points (all payments referenced in this sentence, collectively, the "<u>First Lien Adequate Protection Payments</u>"); |
| | d.   certain operational covenants concerning maintenance of the Debtors' cash management systems and operating covenants under the Credit Agreement; |
| | e.   payment of certain fees and expenses of professionals of the Prepetition First Lien Secured Parties; and |
| | f.   certain reporting obligations. |
| | As adequate protection for their proposed use of Cash Collateral as set forth in the Interim Order, the Debtors propose to provide the following to the Prepetition Second Lien Notes Secured Parties (the "<u>Second Lien Adequate Protection Obligations</u>," together with the First Lien Adequate Protection Obligations, the "<u>Adequate Protection Obligations</u>"): |
| | a.   Second Lien Adequate Protection Liens (as defined in the Interim Order) on the Prepetition Collateral and the Collateral, which shall be immediately junior in priority only to the Permitted Prior Liens, the Carve Out, the First Lien Adequate Protection Liens, and the Prepetition First Liens (as defined in the Interim Order); |
| | b.   Second Lien Adequate Protection Superpriority Claims (as defined in the Interim Order), which shall be immediately junior in priority to the Carve Out and the First Lien Adequate Protection Superpriority Claims; |
| | c.   Operational covenants similar to those granted to the Prepetition First Lien Secured Parties; |
| | d.   Subject to the limitations and conditions set forth in the Interim Order, payment of certain fees and expenses of professionals to the Prepetition Second Lien Notes Secured Parties (as defined in the Interim Order); and |
| | e.   certain reporting obligations. |
| | Interim Order ¶¶ 4 & 5. |
| **Effect on the Existing Liens of the Adequate Protection**<br>*Local Rule 4001-2(a)(4)* | The First Lien Adequate Protection Liens are senior to the Prepetition Second Lien Notes Liens (as defined in the Interim Order) and are junior only to the Permitted Prior Liens and the Carve Out.  The Second Lien Adequate Protection Liens shall |

| Material Terms | Summary of Material Terms |
|---|---|
| | be junior only to the Permitted Prior Liens, the Carve Out, the First Lien Adequate Protection Liens, and the Prepetition First Liens.<br><br>Interim Order ¶¶ 4 & 5. |
| **Carve Out**<br>*Local Rule 4001-2(a)(5)* | The Interim Order provides a "Carve Out" from the Prepetition Collateral to cover the following expenses: (i) all fees required to be paid to the Clerk of the Court and to the Office of the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $250,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (collectively, the "Debtor Professionals") and any Committee pursuant to section 328 or 1103 of the Bankruptcy Code (collectively, the "Committee Professionals") and the FCR (as defined in the Interim Order) (if any) and persons or firms retained by the FCR pursuant to an order of the Court (collectively, the "FCR Professionals" and, together with the Debtor Professionals and the Committee Professionals, the "Professional Persons") at any time before or on the first business day following delivery by the Ad Hoc First Lien Group (as defined in the Interim Order) of a Carve Out Trigger Notice (as defined in the Interim Order), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice, (the amounts set forth in clauses (i) through (iii), the "Pre-Carve Out Trigger Notice Cap"); (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $25 million incurred after the first business day following delivery by the Ad Hoc First Lien Group of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise; and (v) all amounts required to be paid to (x) PJT Partners LP on account of any transaction fees earned under that certain engagement letter between PJT Partners LP and the Debtors, dated as of September 21, 2021, and (y) transaction fees (if any) earned by the Committee Professionals or the FCR Professionals, payable under sections 328, 330, and/or 331 of the Bankruptcy Code, to the extent not yet paid or due as of the delivery of a Carve Out Trigger Notice and allowed by a separate order of this Court at any time (the amounts set forth in clause (iv) above and this clause (v) being the "Post-Carve Out Trigger Notice Cap").<br><br>Interim Order ¶ 6. |
| **Termination Events**<br>*Bankruptcy Rule 4001(b)(1)(B)(iii); Local Rule 4001-2(a)(10)*<br><br>**Duration of Use of Cash Collateral / Termination Date**<br>*Bankruptcy Rule 4001(b)(1)(B)(iii); Local Rule 4001-2(a)(10)* | The Debtors' right to use Cash Collateral pursuant to the Interim Order shall terminate on a Termination Date. As used in the Interim Order, the following events constitute a "Termination Event" under the Interim Order:<br>i. A Final Order acceptable to the Debtors and the Ad Hoc First Lien Group is not entered by the Court by 11:59 p.m. on September 30, 2022;<br>ii. The violation of any material term of the Interim Order or the material violation of the Interim Order by the Debtors that is not cured within five (5) business days of receipt by the Debtors of notice from the Ad Hoc First Lien Group of such default, violation or breach (which may be provided to the Debtors by e-mail);<br>iii. Entry of any order modifying, reversing, revoking, staying for a period in excess of four (4) business days, rescinding, vacating, or amending the Interim Order in a manner materially adverse to the rights, interests, |

| Material Terms | Summary of Material Terms |
|---|---|
| | priorities, or entitlements of the Prepetition First Lien Secured Parties or that materially modifies any of the Debtors' obligations to the Prepetition First Lien Secured Parties, in each case, without the express written consent of the Ad Hoc First Lien Group; |
| | iv.    Any of the Cases is dismissed or converted to a case under chapter 7 of the Bankruptcy Code, or without the express written consent of the Ad Hoc First Lien Group, a trustee under chapter 11 of the Bankruptcy Code, an examiner with expanded powers is appointed in any of the Cases, or the Cases are transferred or there is a change of venue outside of the Second Circuit or Third Circuit, or any Debtor files any motion, pleading, or proceeding (or solicits, supports, or encourages any other party to file any motion, pleading, or proceeding) seeking or consenting to the granting of, or an order is entered granting, any of the foregoing, except where a dismissal or conversion is for a Debtor that, at the time of such dismissal, has dormant business activities and a fair market value of less than $250,000; |
| | v.    Any Debtor files any motion, pleading, or proceeding seeking or consenting to the granting of, or an order is entered granting, any claim, lien (except for the Permitted Prior Liens) or other interest that is *pari passu* with or senior to any of the Prepetition First Liens, First Lien Adequate Protection Liens or First Lien Adequate Protection Superpriority Claims; |
| | vi.    Any Debtor files any motion, pleading, or proceeding (or solicits, supports, or encourages any other party to file any motion, pleading, or proceeding) seeking or consenting to the granting of, or an order is entered granting, (i) the invalidation, subordination, or other challenge to the Prepetition Secured Indebtedness, the Prepetition Liens, Adequate Protection Liens, the Adequate Protection Superpriority Claims or (ii) any relief under sections 506(c) or 552 of the Bankruptcy Code with respect to any Prepetition Collateral or any Collateral, including the Cash Collateral, or against any of the Prepetition Secured Parties, provided that if the Debtors provide any response to any discovery request or make a witness available for deposition in connection with the foregoing, such action shall not be a violation of this clause; |
| | vii.    Any Debtor files any motion, pleading, or proceeding that would, if the relief sought therein were granted, result in a Termination Event (other than a Termination Event under paragraph 8(g) of the Interim Order), and such motion, pleading, or proceeding is not dismissed or withdrawn (as applicable) within three (3) business days after receipt by the Debtors of notice (which may be by e-mail) that the Ad Hoc First Lien Group has determined that such motion, pleading, or proceeding, if the relief sought therein were granted, would give rise to such a Termination Event; |
| | viii.    The entry by this Court of an order granting relief from the automatic stay imposed by section 362 of the Bankruptcy Code to any entities other than the Prepetition Secured Parties with respect to any material portion of the Collateral (except for the Permitted Prior Liens), provided, however, this clause shall only be triggered if at least three (3) business days before the hearing to approve such order, the Ad Hoc First Lien Group provides written notice to the Debtors (which may be provided to the Debtors by e-mail) that the Ad Hoc First Lien Group objects to such relief under the circumstances described in paragraph 8(h) of the Interim Order; |
| | ix.    The entry of a subsequent order of the Court authorizing the use of Cash Collateral by any Debtor that is not a Prepetition Loan Party in violation |

| Material Terms | Summary of Material Terms |
|---|---|
| | of the Interim Order without the written consent of the Ad Hoc First Lien Group; |
| | x.     The failure by the Debtors to make any payment required pursuant to the Interim Order when due; provided that such failure remains uncured for at least three (3) business days following a written notice (which may be provided to the Debtors by e-mail) from the Ad Hoc First Lien Group; |
| | xi.     The failure by the Debtors to deliver to the First Lien Collateral Trustee, Ad Hoc First Lien Group, or the Ad Hoc First Lien Advisors any of the documents or other information reasonably required to be delivered to such applicable party pursuant to the Interim Order within five (5) business days following a request thereof from the First Lien Collateral Trustee, Ad Hoc First Lien Group, or the Ad Hoc First Lien Advisors pursuant to the terms of the Interim Order; |
| | xii.     The Debtors' failure to (i) comply with an Approved Budget as set forth in the Interim Order except with respect to Permitted Variances or (ii) at the end of any week, maintain Liquidity in an amount equal to or greater than the Minimum Liquidity Amount (as defined in the Interim Order); |
| | xiii.     The entry of an order of this Court approving the terms of any debtor in possession financing for any of the Debtors that is entered into without the written consent of the Ad Hoc First Lien Group; |
| | xiv.     The Debtors shall file a chapter 11 plan that is not acceptable to the Ad Hoc First Lien Group or shall seek to modify, amend or waive any provision of a chapter 11 plan previously deemed acceptable by the Ad Hoc First Lien Group without the written consent of the Ad Hoc First Lien Group; |
| | xv.     Any Debtor files any motion, pleading, or proceeding (or solicits, supports, or encourages any other party to file any motion, pleading, or proceeding) seeking or consenting to the granting of, or an order is entered granting, any termination and/or shortening, reduction of the Debtors' exclusive periods to file and/or solicit a chapter 11 plan pursuant to the Bankruptcy Code (collectively, the "<u>Exclusive Periods</u>") or the Debtors otherwise do not seek to extend the Exclusive Periods if and when applicable, in each case, unless otherwise agreed in writing by the Ad Hoc First Lien Group; |
| | xvi.     Termination of the RSA in accordance with its terms; and |
| | xvii.     The failure of the Debtors to meet any of the deadlines (or such later dates as may be approved in writing by the Ad Hoc First Lien Group) set forth on <u>**Exhibit 2**</u> (collectively, the "<u>Milestones</u>") provided that a termination right relating to the failure to meet any of the Milestones shall be subject to the same conditions and waivers set forth in the RSA. |
| | Upon the occurrence of a Termination Date, subject to Remedies Notice Period (as defined in the Interim Order), the Debtors' authorization to use Cash Collateral will terminate. During the Remedies Notice Period, the Debtors may continue to use Cash Collateral for certain purposes, and the Debtors will be entitled to seek an emergency hearing with the Court to (i) contest the existence of a Termination Event, (ii) seek nonconsensual use of Cash Collateral, and/or (iii) continue the automatic stay; *provided* that if a hearing to consider the foregoing is requested to be heard before the end of the Remedies Notice Period but is scheduled for a later date by the Court, the Remedies Notice Period shall be automatically extended to the date of such hearing.<br><br>Interim Order ¶¶ 8 & 9. |

| Material Terms | Summary of Material Terms |
|---|---|
| **Waiver / Modification of Automatic Stay** *Bankruptcy Rule 4001(b)(1)(B)(iii); Local Rule 4001-2(a)(10)* | The automatic stay is modified solely to (a) permit the Debtors to take acts as may be reasonably necessary to implement the terms of the Interim Order and (b) permit the Prepetition Secured Parties to exercise rights and remedies under certain circumstances. |
| | Interim Order ¶¶ 9 & 13. |
| **Stipulations of the Debtors** *Bankruptcy Rule 4001(b)(1)(B)(iii); Local Rule 4001-2(a)(18)* | The Interim Order contains certain stipulations and releases by the Debtors, including as to the amount and validity of the claims and liens of the Prepetition Secured Parties (the "Debtors' Stipulations"). |
| | Interim Order ¶¶ E.1 through E.5. |
| **Provisions that Could Restrict the Rights and Powers of the Debtor In Possession or Any Committee Appointed Under Section 1102 or 1114 of the Bankruptcy Code** *Local Rule 4001-2(a)(8)* | Subject to a Challenge and the Challenge Period (each as defined in the Interim Order), the Debtors' Stipulations shall be binding upon (i) the Debtors, their estates, and their respective successors and (ii) all parties in interest, including any Committee. |
| | Interim Order ¶ 19. |
| **Limitations on the Prepetition Secured Parties' Obligation to Fund Certain Activities of the Debtors or Any Committee Appointed Under Sections 1102 or 1114 of the Bankruptcy Code** *Local Rule 4001-2(a)(9)* | None of the Collateral, the Prepetition Collateral, including Cash Collateral, or the Carve Out or proceeds of any of the foregoing may be used: (a) to investigate (including by way of examinations or discovery proceedings), initiate, assert, prosecute, join, commence, support, or finance the initiation or prosecution of any claim, counterclaim, action, suit, arbitration, proceeding, application, motion, objection, defense, adversary proceeding, or other litigation of any type (i) against any of the Prepetition Secured Parties (in their capacities as such), and each of their respective affiliates, officers, directors, employees, agents, representatives, attorneys, consultants, financial advisors, affiliates, assigns, or successors, with respect to any transaction, occurrence, omission, action, or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, any so-called "lender liability" claims and causes of action, or seeking relief that would impair the rights and remedies of the Prepetition Secured Parties under the Prepetition Documents (as defined in the Interim Order), Intercreditor Agreements (as defined in the Interim Order), the Interim Order, or any other applicable document or agreement, including, without limitation, for the payment of any services rendered by the professionals retained by the Debtors or any Committee appointed (if any) in these Cases in connection with the assertion of or joinder in any claim, counterclaim, action, suit, arbitration, proceeding, application, motion, objection, defense, adversary proceeding, or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment, determination, declaration, or similar relief that would impair the ability of any of the Prepetition Secured Parties to recover on the Prepetition Collateral or the Collateral or seeking affirmative relief against any of the Prepetition Secured Parties related to the Prepetition Secured Indebtedness (as defined in the Interim Order); (ii) invalidating, setting aside, avoiding, or subordinating, in whole or in part, the Prepetition Secured Indebtedness or the Prepetition Secured Parties' respective Prepetition Liens (as defined in the Interim Order) or security interests in the Prepetition Collateral or the Collateral, as applicable; or (iii) for monetary, injunctive, or other affirmative relief against any of the Prepetition Secured Parties or the Prepetition Secured Parties' respective liens on or security interests in the Prepetition Collateral or the Collateral that would impair the ability of any of the |

| Material Terms | Summary of Material Terms |
|---|---|
| | Prepetition Secured Parties to assert or enforce any lien, claim, right, or security interest or to realize or recover on the Prepetition Secured Indebtedness, to the extent applicable; (b) for objecting to or challenging in any way the legality, validity, priority, perfection, or enforceability of the claims, liens, or interests (including, without limitation, the Prepetition Liens) held by or on behalf of each of the Prepetition Secured Parties related to the Prepetition Secured Indebtedness; (c) for asserting, commencing, or prosecuting any claims or causes of action whatsoever, including, without limitation, any Avoidance Actions related to or in connection with the Prepetition Secured Indebtedness or the Prepetition Liens; or (d) for prosecuting an objection to, contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of: (i) any of the Prepetition Liens or any other rights or interests of any of the Prepetition Secured Parties related to the Prepetition Secured Indebtedness or the Prepetition Liens, *provided* that no more than $50,000 of the proceeds of the Collateral, or the Prepetition Collateral, including the Cash Collateral, in the aggregate, may be used solely by any Committee appointed (if any) in these Cases, if any, solely to investigate, within the Challenge Period, the claims, causes of action, adversary proceedings, or other litigation against the Prepetition Secured Parties solely concerning the legality, validity, priority, perfection, enforceability or extent of the claims, liens, or interests (including, without limitation, the Prepetition Liens) held by or on behalf of each of the Prepetition Secured Parties related to the Prepetition Secured Indebtedness; *provided*, *further*, that any such Committee shall not assert an administrative expense claim against the Debtor for any fees and expenses incurred in excess of $50,000; and *provider*, *further*, that nothing in paragraph 20 of the Interim Order shall prohibit the Debtors from exercising rights conferred to them in the Interim Order.<br><br>Interim Order ¶ 20. |
| **Funding of Non-Debtor Affiliates**<br>*Local Rule 4001-2(a)(15)* | Cash Collateral may not be used (i) directly by any non-Debtor entity, or (ii) to pay any fees, costs, or expenses on behalf of any non-Debtor entity, in each case, except as necessary to fund the non-Debtors' manufacturing, research and development, general operations, and capital expenditures on a monthly basis in the ordinary course of the Debtors' and non-Debtors' business and consistent with the historical practices of such entities and solely in accordance with the Approved Budget.<br><br>Interim Order ¶ 3(f). |
| **Liens on Avoidance Actions**<br>*Bankruptcy Rule 4001(b)(1)(B)(iv)* | Subject to entry of the Final Order, the Prepetition Secured Parties' adequate protection package shall include adequate protection liens on the proceeds of the Debtors' claims and causes of action (but not on the actual claims and causes of action) arising under chapter 5 of the Bankruptcy Code (other than claims and causes of action under section 549) (collectively, the "Avoidance Actions").<br><br>Interim Order ¶ 4(b). |
| **Section 506(c) Waiver**<br>*Bankruptcy Rule 4001(b)(1)(B)(iii)* | Subject to entry of the Final Order, all rights to surcharge any Prepetition Collateral under section 506(c) of the Bankruptcy Code or any other applicable principle of equity or law shall be irrevocably waived, and such waiver shall be binding upon the Debtors and all parties in interest in these Cases.<br><br>Interim Order ¶ 11. |

| Material Terms | Summary of Material Terms |
|---|---|
| **Provisions Affecting Consideration of the Equities of the Case under Section 552(b)(1)** *Bankruptcy Rule 4001(b)(1)(B)(iii)* | Subject to entry of the Final Order, the Prepetition Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Secured Parties with respect to proceeds, products, offspring or profits of any of the Prepetition Collateral. <br><br> Interim Order ¶ 24. |
| **No Marshaling** *Bankruptcy Rule 4001(b)(1)(B)(iii)* | Subject to entry of the Final Order, the Prepetition Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Prepetition Collateral. <br><br> Interim Order ¶ 25. |

## **BASIS FOR RELIEF**

I.    **The Debtors' Proposed Use of Cash Collateral is Warranted and Should be Approved.**

27.    The Debtors' use of property of their estates, including the Cash Collateral, is governed by section 363 of the Bankruptcy Code.[8]  Under section 363(c)(2) of the Bankruptcy Code, a debtor may use cash collateral as long as "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."  11 U.S.C. § 363(c)(2).

28.    Here, the Debtors have negotiated consensual use of Cash Collateral with the Prepetition Secured Parties, including the First Lien Collateral Trustee and Second Lien Collateral Trustee, pursuant to the terms of the Cash Collateral Orders.  *See* Dombrowski Declaration ¶¶ 13-14.  Because the Debtors have the consent of the entities with an interest in the

---

[8]    Section 363(a) of the Bankruptcy Code defines "cash collateral" as: "Cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title."  11 U.S.C. § 363(a).

Cash Collateral, the Court should approve such use under section 363(c)(2)(A) of the Bankruptcy
Code.

29.    The Adequate Protection Obligations, along with the other terms in the
Interim Order, taken as a whole, are (a) fair and reasonable under the circumstances, (b) reflect the
Debtors' reasonable exercise of business judgment consistent with their fiduciary duties, and (c)
protect against any Diminution in Value.  Accordingly, the Court should authorize the Debtors'
use of Cash Collateral.  *See* Dombrowski Declaration § III.

**II.     The Debtors' Proposed Adequate Protection is Appropriate and Should be Approved.**

30.    Under section 363(c) of the Bankruptcy Code, the Debtors may only use
Cash Collateral subject to the Prepetition Secured Parties' consent or the grant of adequate
protection.  11 U.S.C.  § 363(c)(2).  Section 363(e) of the Bankruptcy Code provides that upon
request of an entity that has an interest in property to be used by a debtor, the court shall prohibit
or condition such use as is necessary to provide adequate protection of such interest.  *Id.* § 363(e).
Section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as
cash payment or periodic cash payments, additional liens, replacement liens, or the "indubitable
equivalent of such entity's interest in such property."  *Id.* § 361.  The list set forth in section 361
of the Bankruptcy Code, however, is non-exhaustive and courts decide what constitutes sufficient
adequate protection on a case-by-case basis.  *See, e.g.*, *In re Beker Indus. Corp.*, 58 B.R. 725, 736
(Bankr. S.D.N.Y. 1986) ("[A]pplication [of section 361] is left to the vagaries of each case.");
*Contrarian Funds LLC v. Aretex LLC (In re WestPoint Stevens)*, *Inc.,* 600 F.3d 231, 257 (2d Cir.
2010) (quoting *New England Dairies, Inc.* v. *Dairy Mart Convenience Stores, Inc. (In re Dairy
Mart Convenience Stores, Inc.)*, 351 F.3d 86, 90 (2d Cir. 2003)).

31.    The concept of adequate protection is designed to shield a secured creditor
from diminution in the value of its interest in collateral during the chapter 11 case.  *See In re*

*WorldCom, Inc.*, 304 B.R. 611, 618-19 (Bankr. S.D.N.Y. 2004) ("The legislative history for section 361 of the Bankruptcy Code, which sets forth how adequate protection may be provided under section 363, makes clear that the purpose is to insure that the secured creditor receives the value for which the creditor bargained for prior to the debtor's bankruptcy."); *In re Pine Lake Vill. Apartment Co.*, 19 B.R. 819, 825−26 (Bankr. S.D.N.Y. 1982) (noting that a secured creditor has the right to receive adequate protection for any decline in value of its collateral).

32. Here, the Prepetition Secured Parties have consented to the use of Cash Collateral on the basis that the Debtors agreed to provide the Adequate Protection Obligations. In the exercise of the Debtors' sound business judgment, the Debtors determined that the Adequate Protection Obligations were appropriate and reasonable under the circumstances. Furthermore, this agreement, which was done in connection with the Restructuring Support Agreement, dated August 16, 2022, entered into by the Debtors and certain of the Prepetition First Lien Secured Parties ("RSA"), provided the Debtors with a smooth landing into chapter 11 with a prearranged deal. This path, of which the consensual use of Cash Collateral is a foundation, created certainty for the Debtors' employees and vendors on the first day of these Cases. Without such consent, the Debtors would have been starting these Cases with material litigation and discord, which could have significantly harmed the Debtors and their prospect for a viable path forward for these Cases. Consequently, the Debtors negotiated extensively with the Prepetition Secured Parties, at arms' length and in good faith, for consensual access to Cash Collateral on terms that provide substantial benefits to the Debtors' estates and allow the Debtors to focus on maximizing value for all stakeholders. *See* Dombrowski Dec. ¶¶ 13-14.

33. For the foregoing reasons, the Adequate Protection Obligations are (a) fair and reasonable, (b) necessary to satisfy the requirements of sections 363(c)(2) and 363(e) of the

Bankruptcy Code, (c) sufficient to protect against any Diminution in Value and (d) in the best interests of the Debtors and their estates.  Accordingly, the Adequate Protection Obligations should be approved.

### III.    The Automatic Stay Should be Modified on a Limited Basis.

34.    The relief requested herein contemplates a modification of the automatic stay provisions of section 362 of the Bankruptcy Code.  Under the Interim Order, the Debtors are granting to the Prepetition Secured Parties the security interests and liens described above, and to perform other actions as may be requested to assure the perfection and priority of such security interests and liens.  The Interim Order further provides that the automatic stay is modified and vacated to the extent necessary to permit the First Lien Collateral Trustee to exercise, upon the occurrence of an Event of Default[9], certain rights and remedies available under the Cash Collateral Orders, all in accordance with the First Lien Collateral Trust Agreement and the 1L-2L Intercreditor Agreement.  Stay modifications of this kind are ordinary and standard features for the use of cash collateral, and in the Debtors' business judgment, are reasonable and fair under the circumstances.  Accordingly, the Debtors request that the Court grant the requested relief from the automatic stay as provided in the Cash Collateral Orders.

### IV.    Debtors' Request for Final Hearing

35.    Pursuant to Bankruptcy Rule 4001(b)(2), the Debtors request that the Court set the Final Hearing as soon as practicable, but in no event later than 25 days following the entry of the Interim Order and establish the deadline prior to the Final Hearing for parties to file objections to the Motion.

---

[9]    As defined in Section 1.1 of the First Lien Collateral Trust Agreement and Second Lien Collateral Trust Agreement.

## V.   Interim Relief is Necessary to Avoid Immediate and Irreparable Harm

36.     Bankruptcy Rule 4001(b) provides that a final hearing on a motion to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the court is empowered to conduct an interim expedited hearing on a motion to use cash collateral at which it may authorize a debtor to use cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.  *See* Fed. R. Bankr. P. 4001(b)(2).  Section 363(c)(3) of the Bankruptcy Code authorizes the court to conduct a preliminary hearing and to authorize the use of cash collateral "if there is a reasonable likelihood that the [debtor] will prevail at the final hearing under [section 363(e) of the Bankruptcy Code]." *Id.* § 363(c)(3).  Local Rule 4001-2(c) further requires that a debtor show that immediate or irreparable harm will be caused to the debtor's estate if immediate relief is not granted before the final hearing.

37.     Pending the Final Hearing, the Debtors require immediate access to Cash Collateral to satisfy the day-to-day operational needs of the Debtors' businesses.  Therefore, absent immediate access to Cash Collateral, the Debtors cannot continue their day-to-day operations— they could not pay necessary expenses, such as, among other things, employee wages, critical vendors, utility companies, other working capital needs, and the administrative costs required to fund these Cases.  Any lapse in the Debtors' operations, even if transitory, could have a devastating economic impact on the going concern value of the Debtors' business.  And the value of the Debtors' business depends on long-term relationships with suppliers, customers and employees that may be threatened if the Debtors are unable to immediately satisfy their obligations as they become due.  Furthermore, access to Cash Collateral will address key constituents' concerns regarding the Debtors' financial health and ability to continue operations in light of the Cases.  Accordingly, the Debtors have an immediate need to access Cash Collateral.

26

## WAIVER OF STAY UNDER BANKRUPTCY RULE 4001(a)(3)

38.     The Debtors also request that the Court waive the stay imposed by Bankruptcy Rule 4001(a)(3), which provides, in part, that "[a]n order granting a motion for relief from an automatic stay made in accordance with [a motion to use property of the estate pursuant to section 363(e)] is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 4001(a)(3).  As described above, the relief that the Debtors seek in this Motion is necessary for the Debtors to operate without interruption and to preserve value for their estates.  Accordingly, the Debtors respectfully request that the Court waive the 14-day stay imposed by Bankruptcy Rule 4001(a)(3).

## RESERVATION OF RIGHTS

39.     Nothing contained herein is or should be construed as: (a) an admission as to the validity of any claim against the Debtors, (b) a waiver of the Debtors' rights to dispute the amount of, basis for, or validity of any claim against the Debtors, (c) a waiver of any claims or causes of action that may exist against any creditor or interest holder, (d) promise to pay any claim, (e) an approval, assumption, adoption, or rejection of any agreement, contract, program, policy, or lease between the Debtors and any third party under section 365 of the Bankruptcy Code, or (f) otherwise affecting the Debtors' rights under section 365 of the Bankruptcy Code to assume or reject any executory contract or unexpired lease.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

## NOTICE

40.     Notice of this Motion shall be given to (a) the U.S. Trustee; (b) Administrative Agent's counsel; (c)  counsel to the indenture trustee under each of the Debtors'

outstanding bond issuances; (d) Gibson, Dunn & Crutcher LLP, as counsel to the Ad Hoc First

Lien Group (as defined in the First Day Declaration); (e) Paul, Weiss, Rifkind, Wharton &

Garrison LLP, as counsel to the Ad Hoc Cross-Holder Group (as defined in the First Day

Declaration); (f) the U.S. Attorney for the Southern District of New York; (g) the attorneys general

for all 50 states and the District of Columbia; (h) the Debtors' 50 largest unsecured creditors on a

consolidated basis; (i) the Internal Revenue Service; (j) the Securities and Exchange Commission;

(k) any party that has requested notice pursuant to Bankruptcy Rule 2002; (l) First Lien Collateral

Trustee's counsel; (m) Second Lien Collateral Trustee' counsel; (n) the proposed future claimants

representative in the Chapter 11 Cases; and (o) any other party entitled to notice pursuant to Local

Rule 9013-1(b).  The Debtors submit that no other or further notice need be provided.

## NO PRIOR REQUEST

41.    No prior request for the relief sought herein has been made to this or any

other court.

### [REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

WHEREFORE the Debtors respectfully request that the Court (a) enter the Interim

Order, in substantially the form attached hereto as **Exhibit A**, and (b) grant such other and further

relief as may be just and proper.

Dated: August 16, 2022
      New York, New York        SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

                    By:    */s/ Paul D. Leake*           
                           Paul D. Leake
                           Lisa Laukitis
                           Shana A. Elberg
                           Evan A. Hill
                           One Manhattan West
                           New York, New York 10001
                           Telephone: (212) 735-3000
                           Fax: (212) 735-2000

                           *Proposed Counsel for the Debtors*
                           *and Debtors in Possession*

**<u>Exhibit A</u>**

**Interim Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re* | Chapter 11 |
| **ENDO INTERNATIONAL plc,** *et al.*, | Case No. 22-22549 (___) |
| Debtors.[1] | (Joint Administration Pending) |

### INTERIM ORDER (I) AUTHORIZING DEBTORS TO USE CASH COLLATERAL; (II) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; (III) MODIFYING AUTOMATIC STAY; AND (IV) GRANTING RELATED RELIEF

Upon the motion (the "**Motion**") of the above-referenced debtors, as debtors in possession (collectively, the "**Debtors**") in the above-captioned cases (the "**Cases**"), pursuant to sections 105, 361, 362, 363, 503 and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rules 4001-2 and 9013-1 of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Rules**"), seeking, among other things:

(a)  authorization for the Debtors, pursuant to sections 105, 361, 362, 363, 503 and 507 of the Bankruptcy Code to (i) use cash collateral, as such term is defined in section 363(a) of the Bankruptcy Code, and all other Prepetition Collateral (as defined below), solely in accordance with the terms of this interim order (together with all annexes and exhibits hereto, the "**Interim Order**"), and (ii) grant adequate protection to the Prepetition Secured Parties (as defined below) as set forth herein;

(b)  modification of the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of this Interim Order;

---

[1]  The last four digits of Debtor Endo International plc's tax identification number are 3755. Due to the large number of debtors in these chapter 11 cases, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Endo. The location of the Debtors' service address for purposes of these chapter 11 cases is: 1400 Atwater Drive, Malvern, PA 19355.

(c)     except to the extent of the Carve Out (as defined herein), and subject to entry of the Final Order, the waiver of all rights to surcharge any Prepetition Collateral or Collateral (as defined herein) under section 506(c);

(d)     to the extent set forth herein, and subject to entry of the Final Order, for the "equities of the case" exception under Bankruptcy Code section 552(b) to not apply to any of the Prepetition Secured Parties with respect to the proceeds, products, offspring, or profits of any of the Prepetition Collateral or Collateral under section 552(b) of the Bankruptcy Code or any other applicable principle of equity or law;

(e)     that this Court schedule a final hearing (the "**Final Hearing**") to consider entry of a final order granting the relief requested in the Motion on a final basis (the "**Final Order**");

(f)     waiver of any applicable stay with respect to the effectiveness and enforceability of this Interim Order (including a waiver pursuant to Bankruptcy Rule 6004(h)); and

(g)     granting related relief;

and the interim hearing having been held by the Court on [_____], 2022 (the "**Interim Hearing**"); pursuant to Bankruptcy Rule 4001 and Local Rules 4001-2 and 9013-1, notice of the Motion and the relief sought therein having been given by the Debtors as set forth in this Interim Order; and the Court having considered the *Declaration of Mark Bradley in Support of Chapter 11 Petitions and First Day Papers* (the "**Declaration**") and *Declaration of Ray Dombrowski in Support of Debtors' Motion for Interim and Final Orders pursuant to 11 U.S.C. §§ 105, 361, 362, 363, and 364 (I) Authorizing Use of Cash Collateral, (II) Granting Adequate Protection, (III) Scheduling a Final Hearing and (IV) Granting Related Relief*, the Approved Budget (as defined herein), offers of proof, evidence adduced, and the statements of counsel at the Interim Hearing; and the Court having considered the interim relief requested in the Motion, and it appearing to the Court that granting the relief sought in the Motion on the terms and conditions herein contained is necessary and essential to enable the Debtors to preserve the value of the Debtors' businesses and assets and that such relief is fair and reasonable and that entry of this Interim Order is in the best

interest of the Debtors and their respective estates and creditors; and due deliberation and good

cause having been shown to grant the relief sought in the Motion;

**IT IS HEREBY FOUND AND DETERMINED THAT:[2]**

A.      ***Petition Date***.  On August 16, 2022 (the "**Petition Date**"), each of the Debtors filed

voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the United States

Bankruptcy Court for the Southern District of New York (the "**Court**").

B.      ***Debtors in Possession***.  Each Debtor has continued with the management and

operation of its respective businesses and properties as a debtor in possession pursuant to sections

1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the chapter

11 cases.

C.      ***Jurisdiction and Venue***.  The Court has jurisdiction over the Motion, these Cases,

and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334 and *Amended*

*Standing Order of Reference M-431*, dated January 31, 2012 (Preska, C.J.).  Venue for these Cases

is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This Court may enter a final order consistent

with Article III of the United States Constitution.  This is a core proceeding pursuant to 28 U.S.C.

§ 157(b).

D.      ***Committee***.  As of the date hereof, no committee has been appointed in these Cases

pursuant to section 1102 of the Bankruptcy Code (any committee appointed under Bankruptcy

Code section 1102, a "**Committee**").

E.      ***Debtors' Stipulations*** .  Subject only to the rights of parties in interest specifically

set forth in paragraph 19 of this Interim Order (and subject to the limitations thereon contained in

---

[2]   Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of
fact when appropriate.  *See* Bankruptcy Rule 7052.

such paragraph), the Debtors admit, stipulate and agree that (collectively, paragraphs E.1 through E.5 below are referred to herein as the "**Debtors' Stipulations**"):

     1.     *First Lien Facilities.*

        (a)     *First Lien Loans.*

           i.     Under that certain Credit Agreement, dated as of April 27, 2017 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, including, without limitation, by that certain Amendment and Restatement Agreement, dated as of March 25, 2021, the "**Credit Agreement**" and, together with all other documentation executed in connection therewith, including without limitation, the Collateral Documents and each other Loan Document (each as defined in the Credit Agreement) executed in connection therewith, the "**Credit Documents**"), among Endo International PLC ("**Parent**"), Endo Luxembourg Finance Company I S.à r.l. ("**Lux Borrower**"), Endo LLC ("**Co-Borrower**" and, together with Lux Borrower, the "**Borrowers**"), JPMorgan Chase Bank, N.A., as administrative agent (in such capacity as the "**Administrative Agent**"), issuing bank (in such capacity, the "**Issuing Bank**") and swingline lender and the lenders from time to time party thereto (such lenders immediately prior to the date hereof, the "**Prepetition First Lien Lenders**" and, together with the Administrative Agent, Issuing Bank, First Lien Collateral Trustee (as defined below), and each of the other Secured Parties (as defined in the Credit Agreement), the "**Prepetition First Lien Loan Secured Parties**"), certain of the Prepetition Loan Parties (as defined below) borrowed loans thereunder (the "**Prepetition First Lien Loans**") in the total aggregate principal amount outstanding of $5,869,913,457.85.  As used herein, the "**Prepetition Loan Parties**" shall mean, collectively, Parent, Lux Borrower, Co-Borrower, and other Loan Parties (as defined in the Credit Agreement).

ii.       As of the Petition Date, the Prepetition Loan Parties were jointly and severally indebted to the Prepetition First Lien Loan Secured Parties pursuant to the Credit Documents, without objection, defense, counterclaim, or offset of any kind, (w) in the aggregate principal amount of not less than $277,200,000 on account of outstanding Revolving Loans (as defined in the Credit Agreement), (x) in the aggregate principal amount of not less than $1,975,000,000 on account of Term Loans (as defined in the Credit Agreement), (y) in the aggregate principal amount of not less than $7,234,457.85 on account of outstanding LC Exposure (as defined in the Credit Agreement) *plus* (z) in the case of each of the preceding clauses (w), (x), and (y), accrued and unpaid interest with respect thereto and any additional fees, costs, premiums, expenses (including any attorneys', accounts', consultants', appraisers', financial advisors', and other professionals' fees and expenses), reimbursement obligations, indemnification obligations, guarantee obligations, other contingent obligations, and other charges of whatever nature, whether or not contingent, whenever arising, due, or owing, in each case pursuant to the terms of the Credit Agreement and all other Obligations (as defined in the Credit Agreement) owing under or in connection with the Credit Documents (clauses (w), (x), (y), and (z), collectively, the "**Prepetition First Lien Secured Loan Indebtedness**").

(b)       *First Lien Notes*.

i.       Under that certain Indenture, dated as of April 27, 2017 (the "**5.875% Notes Indenture**" and, together with all other related documents, instruments, and agreements, in each case as supplemented, amended, restated, or otherwise modified from time to time, the "**5.875% Notes Documents**"), for the 5.875% Senior Secured Notes due 2024 (the "**5.875% Notes**"), by and among Endo Designated Activity Company ("**Endo DAC**") Endo Finance LLC ("**Endo Finance**") and Endo Finco Inc. ("**Endo FinCo**"), as issuers (collectively,

the "**5.875% Notes Issuers**"), each of the guarantors party thereto (the "**5.875% Notes Guarantors**"), and Computershare Trust Company, National Association, as trustee (in such capacity and including any predecessors and successors thereto, the "**5.875% Notes Indenture Trustee**" and, together with the holders of 5.875% Notes and the First Lien Collateral Trustee, the "**5.875% Notes Secured Parties**"), certain of the Prepetition 5.875% Note Parties (as defined herein) issued notes in the total aggregate principal amount outstanding of $300,000,000. As used herein, the "**Prepetition 5.875% Note Parties**" shall mean, collectively, Endo DAC, Endo Finance, Endo FinCo, and the 5.875% Notes Guarantors.

   ii.  Under that certain Indenture, dated as of March 28, 2019 (the "**7.500% Notes Indenture**" and, together with all other related documents, instruments, and agreements, in each case as supplemented, amended, restated, or otherwise modified from time to time, the "**7.500% Notes Documents**"), for the 7.500% Senior Secured Notes due 2027 (the "**7.500% Notes**"), by and among Par Pharmaceuticals, Inc., ("**Par Pharma**") as issuer (the "**7.500% Notes Issuer**"), each of the guarantors party thereto (the "**7.500% Notes Guarantors**"), and Computershare Trust Company, National Association, as trustee (in such capacity and including any predecessors and successors thereto, the "**7.500% Notes Indenture Trustee**" and, together with the holders of 7.500% Notes and the First Lien Collateral Trustee, the "**7.500% Notes Secured Parties**"), certain of the Prepetition 7.500% Note Parties (as defined herein) issued notes in the total aggregate principal amount outstanding of $2,015,479,000. As used herein, the "**Prepetition 7.500% Note Parties**" shall mean, collectively, Par Pharma and the 7.500% Notes Guarantors.

   iii.  Under that certain Indenture, dated as of March 25, 2021 (the "**6.125% Notes Indenture**" and, together with all other related documents, instruments, and

agreements, in each case as supplemented, amended, restated, or otherwise modified from time to time, the "**6.125% Notes Documents**"; the 5.875% Notes Indenture, the 7.500% Notes Indenture, and the 6.125% Notes Indenture, collectively, the "**First Lien Indentures**"; and the 5.875% Notes Documents, the 7.500% Notes Documents, and the 6.125% Notes Documents, collectively, the "**First Lien Notes Documents**"), for the 6.125% Senior Secured Notes due 2029 (the "**6.125% Notes**" and together with the 5.875% Notes and the 7.500% Notes, the "**First Lien Notes**"), by and among Lux Borrower and Endo U.S. Inc. ("**Endo US**"), as issuers (collectively, in such capacities, the "**6.125% Notes Issuers**" and, together with the 5.875% Notes Issuers and the 7.500% Notes Issuer, the "**First Lien Notes Issuers**"), the guarantors party thereto (the "**6.125% Notes Guarantors**" and, together with the 5.875% Notes Guarantors and the 7.500% Notes Guarantors, the "**First Lien Notes Guarantors**"; the First Lien Notes Issuers and the First Lien Notes Guarantors, collectively, the "**Prepetition First Lien Notes Parties**"), and Computershare Trust Company, National Association, as trustee (in such capacity and including any predecessors and successors thereto, the "**6.125% Notes Indenture Trustee**" and in its capacities as the 5.875% Notes Indenture Trustee, the 7.500% Notes Indenture Trustee, and the 6.125% Notes Indenture Trustee, collectively, the "**First Lien Indenture Trustee**"; the 6.125% Notes Indenture Trustee and the holders of 6.125% Notes and the First Lien Collateral Trustee, collectively, the "**6.125% Notes Secured Parties**"; and the 5.875% Notes Secured Parties, the 7.500% Notes Secured Parties, and the 6.125% Notes Secured Parties, collectively, the "**Prepetition First Lien Notes Secured Parties**"), certain of the Prepetition 6.125% Note Parties (as defined herein) issued notes in the total aggregate principal amount outstanding of $1,295,000,000. As used herein, the "**Prepetition 6.125% Note Parties**" shall mean, collectively, Lux Borrower, Endo US, and the 6.125% Notes Guarantors.

iv.        As used herein, (a) the "**Prepetition First Lien Agents**" shall mean, collectively, the Administrative Agent and the First Lien Indenture Trustee; (b) the "**Prepetition Documents**" shall mean, collectively, the Credit Documents, the First Lien Notes Documents, and the Second Lien Notes Documents (as defined below); and (c) the "**Prepetition First Lien Secured Parties**" shall mean, collectively, the Prepetition First Lien Loan Secured Parties and the Prepetition First Lien Notes Secured Parties.

v.        As of the Petition Date, the Prepetition First Lien Notes Parties were jointly and severally indebted to the Prepetition First Lien Notes Secured Parties pursuant to the First Lien Notes Documents, without objection, defense, counterclaim, or offset of any kind, (w) in the aggregate principal amount of not less than $300,000,000 on account of the 5.875% Notes, (x) in the aggregate principal amount of not less than $ 2,015,479,000 on account of the 7.500% Notes, (y) in the aggregate principal amount of not less than $1,295,000,000 on account of the 6.125% Notes, *plus* (z) in the case of each of the preceding clauses (w), (x), and (y), accrued and unpaid interest with respect thereto and any additional fees, premiums, costs, expenses (including any attorneys', accountants', consultants', appraisers', financial advisors', and other professionals' fees and expenses), reimbursement obligations, indemnification obligations, guarantee obligations, other contingent obligations, and other charges of whatever nature, whether or not contingent, whenever arising, due, or owing, and all other Secured Obligations (as defined in each of the First Lien Indentures) owing, in each case pursuant to the terms of the First Lien Notes Documents (collectively, the "**Prepetition First Lien Notes Indebtedness**" and, together with the Prepetition First Lien Secured Loan Indebtedness, the "**Prepetition First Lien Indebtedness**").

(c)    *First Lien Collateral*.  As consideration for the loans and other financial accommodations made in the Credit Agreement and the First Lien Indentures, certain of the Debtors entered into certain of the Collateral Documents and the Security Documents (as defined in the First Lien Indentures).   Pursuant to and in accordance with the Collateral Documents, Security Documents, and other Prepetition Documents, the Prepetition First Lien Indebtedness is secured by valid, binding, properly perfected, enforceable, and non-avoidable first-priority (other than liens permitted under the Credit Agreement and the First Lien Indentures) security interests in and liens (such security interests and liens, the "**Prepetition First Liens**") on the "Collateral" (as defined in the applicable Collateral Document and Security Document, and together with any other property of any of Debtors granted or pledged pursuant to any of the Collateral Documents or Security Documents to secure the Prepetition First Lien Indebtedness, the "**Prepetition Collateral**") consisting of substantially all of each Prepetition Loan Party's assets.

(d)    *Validity, Perfection, and Priority of Prepetition First Liens and Prepetition First Lien Indebtedness*.  Each of the Debtors acknowledges and agrees that, in each case as of the Petition Date, and pursuant to and in accordance with the Collateral Documents, Security Documents, and other Prepetition Documents: (i) the Prepetition First Liens encumber all of the Prepetition Collateral, as the same existed on the Petition Date; (ii) the Prepetition First Liens are valid, binding, properly perfected, enforceable, non-avoidable liens on and security interests in the Prepetition Collateral in favor of the First Lien Collateral Trustee and are senior to the security interests in and liens on the Prepetition Collateral granted to or for the benefit of the Prepetition Second Lien Notes Secured Parties (as defined below); (iii) the Prepetition First Liens are subject and subordinate only to valid, perfected, enforceable, and nonavoidable prepetition liens (if any) that are senior to the liens or security interests of the First Lien Collateral Trustee as

of the Petition Date by operation of law or permitted by the Prepetition Documents (such liens, the "**Permitted Prior Liens**"); (iv) the Prepetition First Liens were granted to the First Lien Collateral Trustee for the benefit of the Prepetition First Lien Secured Parties for fair consideration and reasonably equivalent value and were granted contemporaneously with, or covenanted to be provided as an inducement for, the making of the Prepetition First Lien Indebtedness; (v) the Prepetition First Lien Indebtedness constitutes legal, valid, binding, and non-avoidable obligations of the Debtors; (vi) no offsets, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Prepetition First Liens or Prepetition First Lien Indebtedness exist, and no portion of the Prepetition First Liens or Prepetition First Lien Indebtedness is subject to any challenge, cause of action, or defense, including impairment, set-off, right of recoupment, avoidance, attachment, disallowance, disgorgement, reduction, recharacterization, recovery, subordination (whether equitable or otherwise), attack, offset, contest, defense, counterclaims, cross-claims, or "claim" (as defined in the Bankruptcy Code), pursuant to the Bankruptcy Code or applicable nonbankruptcy law; and (vii) the Debtors and their estates have no claims, objections, challenges, causes of actions, recoupments, counterclaims, cross-claims, setoff rights, and/or choses in action, including "lender liability" causes of action or avoidance claims under chapter 5 of the Bankruptcy Code, whether arising under applicable state law or federal law (including any recharacterization, subordination, avoidance, disgorgement, recovery, or other claims arising under or pursuant to sections 105, 510, or 542 through 553 of the Bankruptcy Code), against the Prepetition First Lien Secured Parties or any of their respective affiliates, agents, representatives, attorneys, advisors, professionals, officers, directors, and employees arising out of, based upon, or related to their obligations under the Credit Documents, the First Lien Notes Documents, the Prepetition First Lien Indebtedness or the Prepetition First Liens.

2.     *Second Lien Notes.*

(a)     Under that certain Indenture, dated as of June 16, 2020 (the "**Second Lien Indenture**" and, together with all other related documents, instruments, and agreements, in each case as supplemented, amended, restated, or otherwise modified from time to time, the "**Second Lien Notes Documents**"), for the 9.500% Senior Secured Second Lien Notes due 2027 (the "**Second Lien Notes**"), by and among Endo DAC, Endo Finance, and Endo FinCo, as issuers (collectively, in such capacities, the "**Second Lien Notes Issuers**"), the guarantors party thereto (the "**Second Lien Notes Guarantors**" and, together with the Second Lien Notes Issuers, the "**Prepetition Second Lien Notes Parties**"), and Wilmington Savings Fund Society, FSB, as trustee (in such capacity and including any predecessors and successors thereto, the "**Second Lien Indenture Trustee**" and, together with the holders of Second Lien Notes and the Second Lien Collateral Trustee (as defined below), the "**Prepetition Second Lien Notes Secured Parties**," and together with the Prepetition First Lien Secured Parties, the "**Prepetition Secured Parties**"). In connection with the Second Lien Indenture, certain of the Debtors entered into the Security Documents (as defined in the Second Lien Indenture).

(b)     As of the Petition Date, the Prepetition Second Lien Notes Parties were jointly and severally indebted to the Prepetition Second Lien Notes Secured Parties pursuant to the Second Lien Notes Documents, without objection, defense, counterclaim, or offset of any kind, in the aggregate principal amount of not less than $940,590,000 *plus* accrued and unpaid interest with respect thereto and any additional fees, premiums, costs, expenses (including any attorneys', accountants', consultants', appraisers', financial advisors', and other professionals' fees and expenses), reimbursement obligations, indemnification obligations, guarantee obligations, other contingent obligations, and other charges of whatever nature, whether or not

11

contingent, whenever arising, due, or owing, in each case pursuant to the terms of the Second Lien

Notes Documents and all other Obligations (as defined in the Second Lien Indenture) owing under

or in connection with the Second Lien Notes Documents (collectively, the "**Prepetition Second**

**Lien Notes Indebtedness**" and, together with the Prepetition First Lien Secured Loan

Indebtedness and the Prepetition First Lien Notes Indebtedness, the "**Prepetition Secured**

**Indebtedness**").

(c)      *Second Lien Collateral*.      As consideration for the financial

accommodations made in connection with the Second Lien Indenture, certain of the Debtors

entered into the Security Documents (as defined in the Second Lien Indenture and referred to

herein as the "**Second Lien Collateral Documents**").  Pursuant to and in accordance with the

Second Lien Collateral Documents and the other Second Lien Notes Documents, the Prepetition

Second Lien Notes Indebtedness is secured by valid, binding, properly perfected, enforceable, and

non-avoidable second-priority security interests in and liens (other than liens permitted under the

Second Lien Indenture) on the Prepetition Collateral consisting of substantially all of each

Prepetition Loan Party's assets in favor of the Second Lien Collateral Trustee pursuant to the

Second Lien Collateral Documents (the "**Prepetition Second Lien Notes Liens**" and together with

the Prepetition First Liens, the "**Prepetition Liens**").

(d)      *Validity, Perfection, and Priority of Prepetition Second Lien Notes*

*Liens and Prepetition Second Lien Notes Indebtedness*.  Each of the Debtors acknowledges and

agrees that, in each case as of the Petition Date, and pursuant to and in accordance with the Second

Lien Collateral Documents and other Second Lien Notes Documents: (i) the Prepetition Second

Lien Notes Liens encumber all of the Prepetition Collateral, as the same existed on the Petition

Date; (ii) the Prepetition Second Lien Notes Liens are valid, binding, properly-perfected,

12

enforceable, and non-avoidable liens on and security interests in the Prepetition Collateral in favor

of the Second Lien Collateral Trustee; (iii) the Prepetition Second Lien Notes Liens are subject

and subordinate only to the Permitted Prior Liens and the Prepetition First Liens; (iv) the

Prepetition Second Lien Notes Liens were granted to the Second Lien Collateral Trustee for the

benefit of the Prepetition Second Lien Notes Secured Parties for fair consideration and reasonably

equivalent value and were granted contemporaneously with, or covenanted to be provided as an

inducement for, the making of the Second Lien Notes Indebtedness; (v) the Prepetition Second

Lien Notes Indebtedness constitutes legal, valid, binding, and non-avoidable obligations of the

Debtors; (vi) no offsets, challenges, objections, defenses, claims, or counterclaims of any kind or

nature to any of the Prepetition Second Lien Notes Liens or Prepetition Second Lien Notes

Indebtedness exist, and no portion of the Prepetition Second Lien Notes Liens or Prepetition

Second Lien Notes Indebtedness is subject to any challenge, cause of action, or defense including

impairment, set-off, right of recoupment, avoidance, attachment, disallowance, disgorgement,

reduction, recharacterization, recovery, subordination (whether equitable or otherwise), attack,

offset, contest, defense, counterclaims, cross-claims, or "claim" (as defined in the Bankruptcy

Code), pursuant to the Bankruptcy Code or applicable nonbankruptcy law; and (vii) the Debtors

and their estates have no claims, objections, challenges, causes of actions, recoupments,

counterclaims, cross-claims, setoff rights, and/or choses in action, including "lender liability"

causes of action or avoidance claims under chapter 5 of the Bankruptcy Code, whether arising

under applicable state law or federal law (including any recharacterization, subordination,

avoidance, disgorgement, recovery, or other claims arising under or pursuant to sections 105, 510,

or 542 through 553 of the Bankruptcy Code), against the Prepetition Second Lien Notes Secured

Parties or any of their respective affiliates, agents, representatives, attorneys, advisors,

professionals, officers, directors, and employees arising out of, based upon, or related to their loans under the Second Lien Notes Documents, the Prepetition Second Lien Notes Indebtedness, or the Prepetition Second Lien Notes Liens.

3.     *Cash Collateral*.  All of the Debtors' cash, including, without limitation, all of the (a) cash proceeds of accounts receivable, (b) cash proceeds of the Prepetition Collateral, (c) cash proceeds of Excluded Assets (as defined in the Credit Agreement) (to the extent such cash proceeds would not otherwise constitute Excluded Assets), and (d) cash (i) in the Debtors' Deposit Accounts (as defined in the Credit Agreement) pledged pursuant to any Collateral Document as of the Petition Date or (ii) pursuant to Bankruptcy Code section 552(b), deposited into the Debtors' Deposit Accounts after the Petition Date, constitutes cash collateral of the Prepetition Secured Parties within the meaning of Bankruptcy Code section 363(a) (the "**Cash Collateral**"); *provided that*, notwithstanding anything to the contrary in this paragraph 3, (x) cash or Deposit Accounts comprising Excluded Assets and (y) the Deposit Accounts owned by Debtors formed or incorporated in Luxembourg shall constitute Cash Collateral only to the extent that, in each case of clauses (x) and (y), the Prepetition Secured Parties have an interest in such cash or Deposit Accounts within the meaning of Bankruptcy Code section 363(a) or 552(b) of the Bankruptcy Code and/or applicable law.

4.     *Bank Accounts*.  The Debtors acknowledge and agree that, as of the Petition Date, none of the Debtors has either opened or maintains any bank accounts other than the accounts listed in the exhibit attached to any order authorizing the Debtors to continue to use the Debtors' existing cash management system.

5.     *Intercreditor Agreements.*

(a)     *First Lien Collateral Trust Agreement.*   The Prepetition Loan Parties, the Prepetition First Lien Notes Parties, the Administrative Agent, the First Lien Indenture Trustee, and Wilmington Trust, National Association, as collateral trustee (in such capacity and including any successors thereto, the "**First Lien Collateral Trustee**") are parties to that certain Collateral Trust Agreement, dated as of April 27, 2017 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**First Lien Collateral Trust Agreement**").   The First Lien Collateral Trust Agreement governs, among other things, the respective rights, interests and obligations of the Prepetition First Lien Secured Parties with respect to the Prepetition Collateral.

(b)     *Second Lien Collateral Trust Agreement.*   The Prepetition Second Lien Notes Parties, the Second Lien Indenture Trustee, and Wilmington Trust, National Association, as collateral trustee (in such capacity and including any successors thereto, the "**Second Lien Collateral Trustee**") are parties to that certain Second Lien Collateral Trust Agreement, dated as of June 16, 2020 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Second Lien Collateral Trust Agreement**" and, together with the First Lien Collateral Trust Agreement, the "**Collateral Trust Agreements**").

(c)     *1L-2L Intercreditor Agreement*.   The First Lien Collateral Trustee, the Second Lien Collateral Trustee, the Prepetition Loan Parties, the Prepetition First Lien Notes Parties, and the Prepetition Second Lien Notes Parties are parties to that certain Intercreditor Agreement, dated as of June 16, 2020 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**1L-2L Intercreditor Agreement**" and together with the Collateral Trust Agreements, the "**Intercreditor Agreements**"), which governs, among other

things, the relative rights, interests, obligations, priority and positions of the Prepetition First Lien Secured Parties on the one hand, and the Prepetition Second Lien Notes Secured Parties on the other hand.

(d)     Each of the Prepetition Loan Parties, the Prepetition First Lien Notes Parties, and the Prepetition Second Lien Notes Parties acknowledged and agreed to, and are bound by, the Intercreditor Agreements.   Pursuant to section 510 of the Bankruptcy Code, the Intercreditor Agreements, and any other applicable intercreditor or subordination provisions contained in any of the Prepetition Documents or any other Secured Debt Documents (as defined in each Collateral Trust Agreement) shall (i) remain in full force and effect, (ii) continue to govern the relative obligations, priorities, rights and remedies, as applicable, of (x) the Prepetition First Lien Secured Parties in the case of the First Lien Collateral Trust Agreement, (y) the Prepetition Second Lien Notes Secured Parties in the case of the Second Lien Collateral Trust Agreement, and (z) the Prepetition First Lien Secured Parties and the Prepetition Second Lien Notes Secured Parties in the case of the 1L-2L Intercreditor Agreement and (iii) not be deemed to be amended, altered or modified by the terms of this Interim Order.

F.     ***Adequate Protection.***   Pursuant to sections 105, 361, 362 and 363(e) of the Bankruptcy Code, the Prepetition Secured Parties are entitled to adequate protection of their respective interests in the Prepetition Collateral, including the Cash Collateral, to the extent of any postpetition diminution in value of their respective interests in the Prepetition Collateral as of the Petition Date resulting from the use of Cash Collateral, the use, sale or lease of any of the Prepetition Collateral, and/or the imposition of the automatic stay pursuant to section 362(a) of the Bankruptcy Code ("**Diminution in Value**").   The foregoing shall not, nor shall any other provision of this Interim Order be construed as, a determination or finding that there has been or will be any

16

Diminution in Value of the Prepetition Collateral (including Cash Collateral) and the rights of all parties as to such issues are hereby preserved.

G.    ***Need to Use Cash Collateral***.  The Debtors have requested entry of this Interim Order pursuant to Bankruptcy Rule 4001(b)(2) and Local Rule 4001-2 and have an immediate need to obtain use of the Prepetition Collateral, including the Cash Collateral (subject to and in compliance with the Approved Budget (as defined below)) in order to, among other things, (A) permit the orderly continuation of their businesses, (B) pay certain First Lien Adequate Protection Payments (as defined below), and (C) pay the costs of administration of their estates and satisfy other working capital and general corporate purposes of the Debtors.  An immediate and critical need exists for the Debtors to use the Cash Collateral, consistent with the Approved Budget, for working capital purposes, other general corporate purposes of the Debtors, and the satisfaction of costs and expenses of administering the Cases.  The ability of the Debtors to obtain liquidity through the use of the Cash Collateral is vital to the Debtors and their efforts to maximize the value of their estates.  Absent entry of this Interim Order, the Debtors' estates and reorganization efforts will be immediately and irreparably harmed.

H.    ***Notice***.  In accordance with Bankruptcy Rules 2002, 4001(b) and (c), and 9014, and the Local Rules, notice of the Interim Hearing and the emergency relief requested in the Motion has been provided by the Debtors.  Under the circumstances, the notice given by the Debtors of the Motion, the relief requested herein, and of the Interim Hearing complies with Bankruptcy Rules 2002, 4001(b) and (c), and 9014 and Local Rules 4001-2 and 9013-1.

I.    ***Consent by Prepetition Secured Parties***.  The Prepetition First Lien Secured Parties have consented and the Prepetition Second Lien Notes Secured Parties have consented under the

applicable Intercreditor Agreements to the Debtors' use of Cash Collateral, in accordance with and subject to the terms and conditions provided for in this Interim Order.

J.    ***Relief Essential; Best Interest***.   The Debtors have requested entry of this Interim Order pursuant to Bankruptcy Rule 4001(b)(2) and Local Rule 4001-2.  The relief requested in the Motion (and as provided in this Interim Order) is necessary, essential and appropriate for the continued operation of the Debtors' businesses and the management and preservation of the Debtors' assets and the property of their estates.  It is in the best interest of the Debtors' estates that the Debtors be allowed to use the Cash Collateral under the terms hereof.  The Debtors have demonstrated good and sufficient cause for the relief granted herein.

K.    ***Arm's Length, Good Faith Negotiations***.   The terms of this Interim Order were negotiated in good faith and at arm's length between the Debtors and the Prepetition Secured Parties.  The Prepetition Secured Parties have acted without negligence or violation of public policy or law in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting, or obtaining requisite approvals of the use of Cash Collateral, including in respect of the granting of the Adequate Protection Liens (as defined below) and all documents related to and all transactions contemplated by the foregoing.

Now, therefore, upon the record of the proceedings heretofore held before this Court with respect to the Motion, the evidence adduced at the Interim Hearing, and the statements of counsel thereat, and based upon the foregoing findings and conclusions,

**IT IS HEREBY ORDERED THAT:**

1.    ***Motion Granted.***  The Motion is granted on an interim basis as set forth herein, and the use of Cash Collateral on an interim basis is authorized, subject to the terms of this Interim Order.

2.     ***Objections Overruled.***  Any objections to the Motion with respect to the entry of this Interim Order that have not been withdrawn, waived or settled and all reservations of rights included therein, are hereby denied and overruled with prejudice.

3.     ***Authorization to Use Cash Collateral; Budget.***

(a)     *Authorization*.  Subject to the terms and conditions of this Interim Order, the Court hereby authorizes the Debtors' use of Cash Collateral during the period beginning with the Petition Date and ending on a Termination Date (as defined below), in each case, solely and exclusively in a manner consistent with this Interim Order and the Approved Budget (as defined below), and for no other purposes.

(b)     *Approved Budget; Budget Period*.  As used in this Interim Order: (i) "**Approved Budget**" means the last budget delivered to the Administrative Agent, the First Lien Indenture Trustee and the First Lien Collateral Trustee, and delivered and agreed with the Ad Hoc First Lien Group (as defined below) prior to the Petition Date, including for the 13-week period reflected on the budget attached as **<u>Exhibit 1</u>** hereto, as such Approved Budget may be modified from time to time by the Debtors with the prior written consent of the Ad Hoc First Lien Group, which consent shall not be unreasonably withheld, conditioned, or delayed, and to the extent modified, reasonable notice to the Administrative Agent and the Ad Hoc Cross-Holder Group; and (ii) "**Budget Period**" means the cumulative period from the first day of the Approved Budget through the Testing Date (as defined below).

(c)     *Budget Testing*.  The Debtors may use Cash Collateral strictly in accordance with the Approved Budget, subject to Permitted Variances (as defined below).  Beginning with the period ending on the second (2nd) Friday following the Petition Date, Permitted Variances shall be tested every other Friday for the Budget Period ended on the preceding Friday (each such date,

a "**Testing Date**").  On or before 5:00 p.m. (prevailing Eastern time) on each Testing Date, the

Debtors shall prepare and deliver to the Prepetition First Lien Agents, the Administrative Agent's

Advisors,[3] the First Lien Indenture Trustee's Advisors (defined below), the First Lien Collateral

Trustee's Advisors (defined below), the Ad Hoc First Lien Group, the Ad Hoc First Lien Advisors

(as defined below), and the Ad Hoc Cross-Holder Advisors (as defined below) in form and

substance reasonably satisfactory to the Ad Hoc First Lien Group, a variance report (the "**Variance

Report**") setting forth: (i) the Debtors' actual disbursements (the "**Actual Disbursements**"), on a

line-by-line and aggregate basis during the applicable Budget Period (including, for the avoidance

of doubt, actual disbursements to any non-Debtor entity, subject to, and in accordance with,

paragraph 3(f) of this Interim Order); (ii) the Debtors' actual cash receipts (the "**Actual Cash

Receipts**") on a line-by-line and aggregate basis during the applicable Budget Period; (iii) a

comparison (whether positive or negative, in dollars and expressed as a percentage) for the

applicable Budget Period of the Actual Cash Receipts (and each line item thereof) and the Actual

Disbursements (and each line item thereof) to the amount of the Debtors' projected cash receipts

(and each line item thereof) set forth in the Approved Budget for such applicable Budget Period

and the Debtors' projected disbursements (and each line item thereof), respectively, set forth in

the Approved Budget for such applicable Budget Period; (iv) a cumulative comparison (whether

positive or negative, in dollars and expressed as a percentage) covering the Budget Period as of

the applicable Testing Date setting forth the Actual Cash Receipts (and each line item thereof) and

---

[3]     The "**Administrative Agent's Advisors**" shall mean (a) Simpson Thacher & Bartlett LLP and (b) a financial
advisor to represent the interests of the Administrative Agent and assist the Administrative Agent and
Simpson Thacher & Bartlett LLP in connection with the Cases, subject in all respects to the Administrative
Agent's and Debtors' reservations of rights regarding such retention and the reimbursement of reasonable
fees and expenses as set forth in paragraph 4(g); *provided, however*, notwithstanding anything to the contrary
herein, information shall only be shared under this Interim Order to the financial advisor of the Administrative
Agent (if any) to the extent such party is bound by obligations of confidentiality pursuant to a confidentiality
agreement with the Debtors.

the Actual Disbursements (and each line item thereof) for the applicable portion of such Budget

Period and a comparison thereof to the amount of the Debtors' projected cash receipts (and each

line item thereof) set forth in the Approved Budget for the applicable portion of such Budget Period

and the Debtors' projected disbursements (and each line item thereof), respectively, set forth in

the Approved Budget for the applicable portion of such Budget Period; and (v) as to each variance

contained in the Variance Report, use reasonable efforts to indicate whether such variance is

temporary or permanent and an analysis and explanation in reasonable detail for any variance in

excess of 5% and $1 million.  Notwithstanding anything to the contrary herein, the Variance Report

shall only be shared with the Prepetition First Lien Agents and the Ad Hoc First Lien Group to the

extent such parties are bound by obligations of confidentiality pursuant to (x) the Credit Agreement

with respect to the Administrative Agent and Private Side Lenders (as defined below) or (y) a

confidentiality agreement with the Debtors; *provided* the Variance Report shall be shared with the

Administrative Agent's Advisors, the First Lien Indenture Trustee's Advisors, the First Lien

Collateral Trustee's Advisors, the Ad Hoc First Lien Advisors, and the Ad Hoc Cross-Holder

Advisors, and, pursuant to the confidentiality provisions of the Credit Agreement, with the Private

Side Lenders.

(d)      *Permitted Variances and Minimum Liquidity Amount*.  The Debtors shall

not permit (i) aggregate Actual Disbursements to be more than 120% of the projected

disbursements set forth in the Approved Budget, in each case, for the relevant Budget Period (such

deviation up to 120% in the aggregate for a Budget Period, the "**Permitted Variances**"); *provided*

that the cash disbursements considered for determining compliance with this covenant shall

exclude the Debtors' disbursements in respect of (x) the restructuring professional fees (including,

without limitation, fees and expenses of the advisors to the Debtors, any committees appointed

21

under Bankruptcy Code section 1102, the future claims representative ("**FCR**") (including, for the avoidance of doubt, the representative itself), the Prepetition Secured Parties on account of professional fees under paragraphs 4(g) and 5(e) of this Interim Order, and professional fee payments to other creditors or creditor groups), (y) cash outflows for customer chargebacks, rebates and fees, prompt pay discounts, product returns, co-pay reduction rebates and other customer programs, and (z) U.S. Trustee's fees; and (ii) the Debtors' unrestricted cash and cash equivalents ("**Liquidity**") to be less than $600,000,000 at the end of any week (such amount, the "**Minimum Liquidity Amount**"); *provided, however*, the $85 million in the Company's Bank of America account ending in *2027 shall be included in the calculation of the Minimum Liquidity Amount.

(e)     *Proposed Budget Reporting*.  By no later than 5:00 p.m. (prevailing Eastern Time) on the Friday of each fourth calendar week following entry of this Interim Order, the Debtors shall deliver to the Administrative Agent, the Administrative Agent's Advisors, the First Lien Indenture Trustee, the First Lien Indenture Trustee's Advisors, the Ad Hoc First Lien Group, the Ad Hoc First Lien Advisors, the Ad Hoc Cross-Holder Group, and the Ad Hoc Cross-Holder Advisors a rolling 13-week cash flow forecast of the Debtors in a form consistent with the initial Approved Budget or otherwise agreed to by the Ad Hoc First Lien Group (each, a "**Proposed Budget**"), which Proposed Budget (including any subsequent revisions to any such Proposed Budget), solely upon written approval by the Ad Hoc First Lien Group, which approval shall not be unreasonably withheld, conditioned, or delayed, shall become the Approved Budget.  In the event the conditions for the most recently delivered Proposed Budget to constitute the Approved Budget are not met as set forth herein, the prior Approved Budget shall remain in full force and effect; *provided, however*, in the event the Ad Hoc First Lien Group does not approve of a

22

Proposed Budget within ten (10) business days of its delivery, upon five (5) business days' written notice to the Ad Hoc First Lien Advisors, the Administrative Agent, and the Ad Hoc Cross-Holder Advisors, the Debtors may request an immediate hearing with the Court to seek Court approval of the Proposed Budget to be deemed an Approved Budget for purposes of this Interim Order. Notwithstanding anything to the contrary herein, the Proposed Budget shall only be shared with those members of the Ad Hoc First Lien Group and the Ad Hoc Cross-Holder Group that are bound by obligations of confidentiality pursuant to a confidentiality agreement with the Debtors; *provided* the Proposed Budget shall be shared with the Ad Hoc First Lien Advisors and the Ad Hoc Cross-Holder Advisors that are bound by confidentiality obligations to the Debtors and with the Administrative Agent, the Administrative Agent's Advisors, First Lien Indenture Trustee, First Lien Indenture Trustee's Advisors, First Lien Collateral Trustee, First Lien Collateral Trustee's Advisors and, pursuant to the confidentiality provisions of the Credit Agreement, with the Private Side Lenders.

(f)     *Miscellaneous*.  For the avoidance of doubt, except as otherwise set forth in the Approved Budget, Cash Collateral may not be used (i) directly by any non-Debtor entity, or (ii) to pay any fees, costs, or expenses on behalf of any non-Debtor entity, in each case, except as necessary to fund the non-Debtors' manufacturing, research and development, general operations, and capital expenditures on a monthly basis in the ordinary course of the Debtors' and non-Debtors' business and consistent with the historical practices of such entities and solely in accordance with the Approved Budget.

4.     ***Adequate Protection for the Prepetition First Lien Secured Parties.***

(a)     Subject only to the Carve Out (as defined below) and the terms of this Interim Order, pursuant to sections 361, 362, and 363(e) of the Bankruptcy Code, and in

consideration of the stipulations and consents set forth herein, as adequate protection of the interests of the Prepetition First Lien Secured Parties in the Prepetition Collateral (including Cash Collateral), in each case, to the extent of any Diminution in Value of such interests, resulting from, among other things, the Carve Out, the Debtors' sale, lease, or use of the Prepetition Collateral (including Cash Collateral), the imposition of the automatic stay, and/or for any other reason for which adequate protection may be granted under the Bankruptcy Code, each of the Administrative Agent, for the benefit of itself and the other Prepetition First Lien Loan Secured Parties, the First Lien Indenture Trustee, for the benefit of itself and the other Prepetition First Lien Notes Secured Parties, and the First Lien Collateral Trustee, for the benefit of itself and the other Prepetition First Lien Secured Parties, is hereby granted the following:

(b)     *First Lien Adequate Protection Liens*.   Pursuant to Bankruptcy Code sections 361(2) and 363(c)(2), to the extent of any Diminution in Value of the Prepetition First Lien Secured Parties' interests in the Prepetition Collateral and subject in all cases to the Carve Out, effective as of the Petition Date and in each case perfected without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages or other similar documents, or by possession or control, the Debtors are authorized to grant, and hereby deemed to have granted, to the Administrative Agent, for the benefit of itself and the other Prepetition First Lien Loan Secured Parties, to the First Lien Indenture Trustee, for the benefit of the Prepetition First Lien Note Secured Parties, and to the First Lien Collateral Trustee, for the benefit of itself and the other Prepetition First Lien Secured Parties, valid, binding, continuing, enforceable, fully-perfected, nonavoidable, first-priority senior (except as otherwise provided in this paragraph below with respect to the Permitted Prior Liens), additional and replacement security interests in and liens on

24

(all such liens and security interests, the "**First Lien Adequate Protection Liens**") (i) the Prepetition Collateral and (ii) all of the Debtors' other now-owned and hereafter-acquired real and personal property, assets and rights of any kind or nature, wherever located, whether encumbered or unencumbered, including, without limitation, to the maximum extent permitted under applicable law, a 100% equity pledge of any first-tier foreign subsidiaries and unencumbered assets of the Debtors, if any, and all prepetition property and post-petition property of the Debtors' estates, and the proceeds, products, rents and profits thereof, whether arising from section 552(b) of the Bankruptcy Code (subject to paragraph 24 of this Interim Order) or otherwise, including, without limitation, all equipment, all goods, all accounts, cash, payment intangibles, bank accounts and other deposit or securities accounts of the Debtors (including any accounts opened prior to, on, or after the Petition Date), insurance policies and proceeds thereof, equity interests, instruments, intercompany claims, accounts receivable, other rights to payment, all general intangibles, all contracts and contract rights, securities, investment property, letters of credit and letter of credit rights, chattel paper, all interest rate hedging agreements, all owned real estate, real property leaseholds, fixtures, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property, all commercial tort claims, and all claims and causes of action (including, only upon entry of a Final Order, causes of action arising under section 549 of the Bankruptcy Code, claims arising on account of transfers of value from a Debtor to (x) another Debtor and (y) a non-Debtor affiliate incurred on or following the Petition Date), and any and all proceeds, products, rents, and profits of the foregoing (all property identified in this paragraph being collectively referred to as the "**Collateral**"), subject only to the Permitted Prior Liens, in which case the First Lien Adequate Protection Liens shall be immediately junior in priority to such Permitted Prior Liens and to the Carve Out; notwithstanding the foregoing, the Collateral shall

exclude all claims and causes of action arising under any section of chapter 5 of the Bankruptcy Code other than claims and causes of action arising under section 549 of the Bankruptcy Code as set forth in this paragraph (the "**Avoidance Actions**"), and upon entry of a Final Order, the Collateral shall include any and all proceeds of and other property that is recovered or becomes unencumbered as a result of (whether by judgment, settlement, or otherwise) any Avoidance Action.

(c)    *First Lien Adequate Protection Superpriority Claims*.  As further adequate protection, and to the extent provided by sections 503(b) and 507(b) of the Bankruptcy Code, the Debtors are authorized to grant, and hereby deemed to have granted effective as of the Petition Date, to the Administrative Agent, for the benefit of itself and the other Prepetition First Lien Loan Secured Parties, to the First Lien Indenture Trustee, for the benefit of the Prepetition First Lien Note Secured Parties, and to the First Lien Collateral Trustee, for the benefit of itself and the other Prepetition First Lien Secured Parties, allowed superpriority administrative expense claims in each of the Cases ahead of and senior to any and all other administrative expense claims in such Cases to the extent of any Diminution in Value (the "**First Lien Adequate Protection Superpriority Claims**"), junior only to the Carve Out.  Subject to the Carve Out, the First Lien Adequate Protection Superpriority Claims shall not be junior or *pari passu* to any claims and shall have priority over all administrative expense claims and other claims against each of the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expense claims of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(c), 726, 1113 and 1114 of the Bankruptcy Code.

26

(d)    *First Lien Adequate Protection Payments*.  As further adequate protection, the Debtors are authorized and directed to pay to the Administrative Agent for the ratable benefit of the Prepetition First Lien Loan Secured Parties and to the First Lien Indenture Trustee for the ratable benefit of the Prepetition First Lien Note Secured Parties, adequate protection payments in cash as follows: (i) no later than eight (8) business days after the date of this Interim Order, the first such adequate protection payment shall be paid in an amount in cash equal to the amount comprising all accrued and unpaid interest under (A) the Credit Agreement from the date of the last interest payment made by the Borrowers under the Credit Agreement through and including the date of this Interim Order and (B) each of the First Lien Indentures from the date of the last interest payment made by the First Lien Notes Issuers under the applicable First Lien Indenture through and including the date of this Interim Order, calculated based on a rate of (x) for the Credit Agreement, (1) if denominated in Dollars, ABR *plus* the Applicable Rate (each as defined in the Credit Agreement) or (2) if denominated in Canadian Dollars, the Canadian Prime Rate *plus* the Applicable Rate (each as defined in the Credit Agreement), and (y) for each First Lien Indenture, the applicable rate of interest set forth on the face of the Note (as defined in each of the First Lien Indentures); provided that for purposes of the First Lien Adequate Protection Payments (defined below) payable under the First Lien Indentures, and notwithstanding anything to the contrary in the First Lien Indentures, the record date to establish the holders of First Lien Notes receiving such payment shall be August 15, 2022; and (ii) on the last business day of each calendar month following entry of this Interim Order, each such adequate protection payment shall be paid in cash in an amount comprising all accrued and unpaid interest, calculated based on a rate of (A) for the Credit Agreement, (x) if denominated in Dollars, ABR *plus* the Applicable Rate *plus* 200 basis points or (y) if denominated in Canadian Dollars, the Canadian Prime Rate *plus* the Applicable

27

Rate *plus* 200 basis points, and (B) for each First Lien Indenture, the applicable rate of interest set forth on the face of the Note (as defined in each of the First Lien Indentures) *plus* 100 basis points (all payments referenced in this sentence, collectively, the "**First Lien Adequate Protection Payments**"); provided that for purposes of the First Lien Adequate Protection Payments payable under the First Lien Indentures, and notwithstanding anything to the contrary in the First Lien Indentures, the record date to establish the holders of First Lien Notes receiving such payments shall be, with respect to each payment date, the 25th day of the calendar month in which such payment is due. With respect to payments under the First Lien Indentures, any calculation of interest payable pursuant to this Paragraph 4(d) shall be computed on the basis of a 360-day calendar year of 12 30-day months. Upon receipt of the Adequate Protection Payments set forth in this paragraph, the Administrative Agent and the First Lien Indenture Trustee are authorized and directed, without further order of the Court, to distribute such payments to the Prepetition First Lien Loan Secured Parties and the Prepetition First Lien Notes Secured Parties, respectively in accordance with this Order. For the avoidance of doubt, the payment of adequate protection payments pursuant to this paragraph shall be without prejudice to (x) the rights of any of the Prepetition First Lien Secured Parties to assert claims for payment of make-whole, prepayment premium, or similar amount set forth in the Credit Agreement or the First Lien Indentures, as applicable and the rights of the Debtors or any other party in interest to object to or otherwise contest such claims, and (y) whether any such payments should be recharacterized or reallocated pursuant to the Bankruptcy Code as payments of principal, interest or otherwise. All First Lien Adequate Protection Payments made to or for the benefit of the Prepetition First Lien Secured Parties shall be subject in all respects to the terms of the 1L-2L Intercreditor Agreement.

(e)    *Right to Seek Additional Adequate Protection*.   This Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of any of the Prepetition First Lien Secured Parties to request further or alternative forms of adequate protection at any time or the rights of the Debtors or any other party to contest such request. Subject to the Carve Out, nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition First Lien Secured Parties is insufficient to compensate for any Diminution in Value of their interests in the Prepetition Collateral during the Cases.  Nothing contained herein shall be deemed a finding by the Court, or an acknowledgment by any of the Prepetition First Lien Secured Parties that the adequate protection granted herein does in fact adequately protect any of the Prepetition First Lien Secured Parties against any Diminution in Value of their respective interests in the Prepetition Collateral (including the Cash Collateral).

(f)    *Other Covenants*.   The Debtors shall maintain their cash management arrangements in a manner consistent with this Court's order(s) granting the Debtors' cash management motion.  The Debtors shall comply with the covenants contained in Sections 5.03 and 5.05 of the Credit Agreement regarding conduct of business, including, without limitation, preservation of rights, qualifications, licenses, permits, privileges, franchises, governmental authorizations and intellectual property rights material to the conduct of its business and the maintenance of properties and insurance.

(g)    *Fees and Expenses*.   As additional adequate protection, the Debtors shall, and are authorized and directed to pay in full in cash and in immediately available funds: (i) within eight (8) business days after the Debtors' receipt of invoices thereof, the reasonable and documented professional fees and expenses, arising before the Petition Date, of (A) (x) one (1)

legal counsel and (y) other third-party consultants and financial advisors solely to the extent

required by the terms of an executed engagement letter with the Debtors for each of (i) the

Administrative Agent (including the Administrative Agent's Advisors; *provided*, *that* the

Administrative Agent reserves all rights with respect to the retention of a financial advisor in

connection with the cases; and *provided further* that the Debtors have not agreed to reimburse the

fees and expenses of any Administrative Agent Advisors other than Simpson Thacher & Bartlett

LLP and the Debtors reserve their rights with respect to the reimbursement of fees and expenses

of any Administrative Agent Advisor other than Simpson Thacher & Bartlett LLP), (ii) the First

Lien Indenture Trustee (including reasonable and documented fees and expense of ArentFox

Schiff LLP), and (iii) the First Lien Collateral Trustee (including reasonable and documented fees

and expenses of Alston & Bird LLP, solely in its capacity as counsel to the First Lien Collateral

Trustee), respectively, and (B) the ad hoc group of Prepetition First Lien Lenders and holders of

First Lien Notes, acting as an ad hoc group (the "**Ad Hoc First Lien Group**") (including, without

limitation, the reasonable and documented fees and expenses incurred by Evercore Group, LLC,

Gibson, Dunn & Crutcher LLP, FTI Consulting, Inc., Arthur Cox LLP, any conflicts counsel or

co-counsel, and, from and after the Petition Date, one local legal counsel in each non-U.S. based

jurisdiction the Debtors are incorporated and/or domiciled to the extent such professionals are

reasonably necessary to represent the interests of the Ad Hoc First Lien Group in connection with

the Cases) (collectively, the "**Ad Hoc First Lien Advisors**") which, solely as to any financial

advisor or investment banker, are subject to the terms of any engagement letter or reimbursement

agreement previously agreed to by the Debtors in writing (*provided, that*, for the avoidance of

doubt, the Debtors cannot revoke or modify their consent after entry of this Interim Order so long

as this Interim Order is in effect) or Prepetition Document, *provided, however*, individual

30

Prepetition First Lien Lenders and the individual holders of the First Lien Notes shall not be

entitled to reimbursement for fees and expenses of their own advisors pursuant to this Interim

Order; and (ii) subject to paragraph 26 and the limitations set forth in this paragraph 4(g)(i), on a

monthly basis, within eight (8) business days of the Debtors' receipt of invoices thereof, the

reasonable and documented fees and expenses, arising subsequent to the Petition Date, incurred

by the Administrative Agent (including the reasonable and documented fees and expenses of

Simpson Thacher & Bartlett LLP), the First Lien Indenture Trustee (including the reasonable and

documented fees and expenses of ArentFox Schiff LLP (the "**First Lien Indenture Trustee's**

**Advisors**")), the First Lien Collateral Trustee (including reasonable and documented fees and

expenses of Alston & Bird LLP (the "**First Lien Collateral Trustee's Advisors**"), solely in its

capacity as counsel to the First Lien Collateral Trustee), and the Ad Hoc First Lien Group, acting

as an ad hoc group ((including, but not limited to, the reasonable and documented fees and

expenses of the Ad Hoc First Lien Advisors) which, solely as to any financial advisor or investment

banker, are subject to the terms of any engagement letter or reimbursement agreement previously

agreed to by the Debtors in writing (*provided, that*, for the avoidance of doubt, the Debtors cannot

revoke or modify their consent after entry of this Interim Order so long as this Interim Order is in

effect) or Prepetition Document, *provided, however*, individual Prepetition First Lien Lenders and

the individual holders of the First Lien Notes shall not be entitled to reimbursement for fees and

expenses of their own advisors pursuant to this Interim Order).  None of the foregoing fees and

expenses shall be subject to separate approval by this Court or require compliance with the *U.S.*

*Trustee Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses*

*Filed under 11 U.S.C. § 330 by Attorneys in Larger Chapter 11 Cases*, effective November 1,

2013 (the "**U.S. Trustee Guidelines**"), and no recipient of any such payment shall be required to

file any interim or final fee application with respect thereto or otherwise seek the Court's approval of any such payments.

(h)     *Reporting Requirements.*  As additional adequate protection, the Debtors shall (x) for so long as Parent is required to file periodic reports with the U.S. Securities and Exchange Commission (the "**SEC**") pursuant to Section 13 or 15(d) of the Exchange Act, promptly provide the Administrative Agent's Advisors, the First Lien Indenture Trustee's Advisors and the Ad Hoc First Lien Advisors with a copy of any such report that Parent files with the SEC (it being understood that the filing of such report with the SEC on EDGAR or any successor platform being sufficient), (y) for so long as Parent is not required to file periodic reports with the SEC pursuant to Section 13 or 15(d) of the Exchange Act (as defined in the First Lien Indentures), comply with the reporting requirements in sections 5.01(a) and (b) of the Credit Agreement and section 4.03(c) of each of the First Lien Indentures, *provided*, *however*, in no event shall such reporting provided under clauses (x) or (y) be required to (i) contain any consolidating and other financial statements and data that would be required by Sections 3-10, 3-16, 13-01 and 13-02 of Regulation S-X under the Securities Act (as defined in the First Lien Indentures), (ii) include any certifications that would be required under the Sarbanes Oxley Act of 2002, (iii) comply with Regulation G under the Exchange Act or Item 10(e) of Regulation S-K with respect to any "non-GAAP" financial information contained therein, (iv) contain any information and data required by Item 402(b) of Regulation S-K under the Securities Act and information regarding executive compensation and related party disclosure related to SEC Release Nos.  33-8732A, 34-54302A and IC-27444A), and (v) include any unqualified auditor opinion in respect of any financial statements contained therein; and (z) provide, subject to any applicable limitations set forth below, to the Administrative Agent's Advisors, the First Lien Indenture Trustee's Advisors, the First Lien Collateral Trustee's Advisors,

and the Ad Hoc First Lien Advisors (*provided*, that any reporting provided to the Ad Hoc First Lien Advisors under this paragraph 4(h) shall only be shared with those members of the Ad Hoc First Lien Group that are bound by obligations of confidentiality pursuant to a confidentiality agreement with the Debtors; *provided further*, that any reporting provided to the Administrative Agent's Advisors under this paragraph 4(h) may be shared only with the Administrative Agent and other Prepetition First Lien Lenders that have identified themselves as "private side" lenders and not Public Lenders (under and as defined in the Credit Agreement) (the "**Private Side Lenders**") and are bound by obligations of confidentiality pursuant to the Credit Agreement):

> i.       bi-weekly (i.e., every other week) (or more frequently as may be agreed to between the Debtors' advisors and the Ad Hoc First Lien Group) calls with the Ad Hoc First Lien Advisors, the Administrative Agent's Advisors, the First Lien Indenture Trustee's Advisors, the First Lien Collateral Trustee's Advisors, and the Debtors' advisors, which shall be in form and scope reasonably agreed to by the Debtors and the Ad Hoc First Lien Advisors;

> ii.      at the times specified in paragraph 3(c) hereof, the Variance Report required by paragraph 3(c) hereof;

> iii.     a copy of each update to the Debtors' business plan as soon as reasonably practicable after it is presented to the board of directors of the Parent;

> iv.      in-person or teleconference meetings between (a) the Debtors and, to the extent appropriate, their advisors, including any consultant, turnaround management, broker or financial advisory firm retained by any Debtor in any of the Cases, (b) the Administrative Agent's Advisors, (c) the First Lien Indenture Trustee's Advisors, (d) the First Lien Collateral Trustee's Advisors, and (e) the Ad Hoc First Lien Advisors, at such time as the Ad Hoc First Lien Advisors may reasonably request, but in the case of any meetings involving the Debtors'

management, to be limited to one such in-person or teleconference meeting per month (or more

frequently as the Debtors may agree in their reasonable discretion), and at places reasonably

acceptable to the Debtors (to the extent such presentations are in-person);

> v.      timely delivery of each Proposed Budget as set forth in this Interim

Order;

> vi.      notice of the occurrence of the Debtors' Liquidity falling below the

Minimum Liquidity Amount at the end of any week and the amount of such Liquidity as of such

time;

> vii.      within 45 days after each month end, beginning with the quarter

ended September 30, 2022, on a consolidated basis for Debtors and non-Debtors combined, a

quarterly and year-to-date income statement and balance sheet;

> viii.      the Debtors will grant access to any data room established in

connection with third-party diligence commenced in connection with any restructuring of one or

more of the Debtors on a professional eyes' only basis to the Administrative Agent's Advisors, the

First Lien Indenture Trustee's Advisors, the First Lien Collateral Trustee's Advisors, and the Ad

Hoc First Lien Advisors; and

> ix.      as soon as reasonably practicable after written request from the Ad

Hoc First Lien Advisors, the Debtors will, to the extent appropriate and acting reasonably, provide

the Ad Hoc First Lien Advisors with reasonable access to any consultant, turnaround management,

broker or financial advisory firm retained by any Debtor in any of the Cases;

*provided* that nothing in this paragraph 4(h) shall require the Debtors (or any of their advisors) to

take any action that would conflict with any applicable requirements of law or any binding

agreement, or that would waive any attorney-client or similar privilege (it being understood and

agreed that (i) the Debtors shall use commercially reasonable efforts to take any such action required under this paragraph 4(h) in a way that would not conflict with any applicable requirements of law or any binding agreement, or that would waive any attorney-client or similar privilege and (ii) if any such Debtor (or any such advisor), in reliance on this proviso, elects to withhold any information that would otherwise be required to be provided pursuant to this paragraph 4(h), the Debtors shall provide written notice to the Ad Hoc First Lien Advisors of such election and specify in such notice the basis for the Debtors' (or the applicable advisor's) election to withhold such information and identify in such notice the type of information it has elected to withhold to the extent not prohibited by applicable law).

(i)      *Miscellaneous*.  Except for (i) the Carve Out and (ii) as otherwise provided in paragraph 4, the First Lien Adequate Protection Liens and First Lien Adequate Protection Superiority Claims granted to the Prepetition First Lien Secured Parties pursuant to paragraph 4 of this Interim Order shall not be subject, junior, or *pari passu* to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under the Bankruptcy Code, including, without limitation, pursuant to section 551 or otherwise, and shall not be subordinated to or made *pari passu* with any lien, security interest or administrative claim under the Bankruptcy Code, including, without limitation, pursuant to section 364 or otherwise.

5.      ***Adequate Protection for the Prepetition Second Lien Notes Secured Parties.***

(a)      Subject only to the Carve Out and the terms of this Interim Order, pursuant to sections 361, 362, and 363(e) of the Bankruptcy Code, and in consideration of the stipulations and consents set forth herein, as adequate protection of the interests of the Prepetition Second Lien Notes Secured Parties in the Prepetition Collateral (including Cash Collateral), in each case, to the extent of any Diminution in Value of such interests, resulting from, among other things, the Carve

Out, the Debtors' sale, lease, or use of the Prepetition Collateral (including Cash Collateral) and/or the imposition of the automatic stay, and/or for any other reason for which adequate protection may be granted under the Bankruptcy Code, the Second Lien Indenture Trustee, for the benefit of the Prepetition Second Lien Notes Secured Parties and the Second Lien Collateral Trustee, for the benefit of itself and the other Prepetition Second Lien Notes Secured Parties, is hereby granted the following:

(b)     *Second Lien Adequate Protection Liens*.   Pursuant to Bankruptcy Code sections 361(2) and 363(c)(2), to the extent of any Diminution in Value of the Prepetition Second Lien Notes Secured Parties' interests in the Prepetition Collateral and subject in all cases to the Carve Out, effective as of the Petition Date and in each case perfected without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages or other similar documents, or by possession or control, the Debtors are authorized to grant, and hereby deemed to have granted, to the Second Lien Indenture Trustee, for the benefit of the Prepetition Second Lien Notes Secured Parties, and to the Second Lien Collateral Trustee, for the benefit of itself and the other Prepetition Second Lien Notes Secured Parties, valid, binding, continuing, enforceable, fully-perfected, nonavoidable, senior (except as otherwise provided in this paragraph), additional and replacement security interests in and liens on (all such liens and security interests, the "**Second Lien Adequate Protection Liens**" and, together with the First Lien Adequate Protection Liens, the "**Adequate Protection Liens**") (i) the Prepetition Collateral and (ii) the Collateral, which Second Lien Adequate Protection Liens shall be junior only to the Permitted Prior Liens, the Carve Out, the First Lien Adequate Protection Liens, and the Prepetition First Liens.  For the avoidance of doubt, the Second Lien Adequate Protection Liens shall be junior in priority, first, to the Permitted Prior

36

Liens; second, to the Carve Out; third, to the First Lien Adequate Protection Liens; and, fourth, to the Prepetition First Liens.

(c)       *Second Lien Adequate Protection Superpriority Claims*.   As further adequate protection, and to the extent provided by sections 503(b) and 507(b) of the Bankruptcy Code, the Debtors are authorized to grant, and hereby deemed to have granted, effective as of the Petition Date, to the Second Lien Indenture Trustee, for the benefit of the Prepetition Second Lien Notes Secured Parties, and to the Second Lien Collateral Trustee, for the benefit of itself and the other Prepetition Second Lien Notes Secured Parties, allowed superpriority administrative expense claims in each of the Cases ahead of and senior to any and all other administrative expense claims in such Cases to the extent of any Diminution in Value (the "**Second Lien Adequate Protection Superpriority Claims**" and together with the First Lien Adequate Protection Superpriority Claims, the "**Adequate Protection Superpriority Claims**"), but junior to the Carve Out and the First Lien Adequate Protection Superpriority Claims.  Subject to the Carve Out and the First Lien Adequate Protection Superpriority Claims, the Second Lien Adequate Protection Superpriority Claims will not be junior to any claims and shall have priority over all administrative expense claims and other claims against each of the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expense claims of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(c), 726, 1113 and 1114 of the Bankruptcy Code.  The Second Lien Adequate Protection Superpriority Claims may be paid under any plan of reorganization in any combination of cash, debt, equity or other property having a value on the effective date of such plan equal to the allowed amount of such claims.

(d)     *Right to Seek Additional Adequate Protection*.   This Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of any of the Prepetition Second Lien Notes Secured Parties to request further or alternative forms of adequate protection at any time or the rights of the Debtors or any other party to contest such request which rights shall, in all cases, be subject to the Second Lien Collateral Trust Agreement and the 1L-2L Intercreditor Agreement.   Subject to the Carve Out, nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition Second Lien Notes Secured Parties is insufficient to compensate for any Diminution in Value of their interests in the Prepetition Collateral during the Cases.   Nothing contained herein shall be deemed a finding by the Court, or an acknowledgment by any of the Prepetition Second Lien Notes Secured Parties that the adequate protection granted herein does in fact adequately protect any of the Prepetition Second Lien Notes Secured Parties against any Diminution in Value of their respective interests in the Prepetition Collateral (including the Cash Collateral).

(e)     *Fees and Expenses*.   As additional adequate protection, the Debtors shall, and are authorized and directed, subject in all respects to the conditions and limitations set forth in this paragraph, to pay in full in cash and in immediately available funds: (i) within eight (8) business days after the Debtors' receipt of invoices thereof, the reasonable and documented professional fees and expenses, arising before the Petition Date, of (A) one (1) legal counsel and (B) other third-party consultants and financial advisors solely to the extent required by the terms of an executed engagement letter with the Debtors for each of (x) the Second Lien Indenture Trustee (including the reasonable and documented fees and expenses incurred by Wilmer Cutler Pickering Hale and Dorr LLP, solely in its capacity as counsel to the Second Lien Indenture

Trustee ("**WilmerHale**"), (y) the Second Lien Collateral Trustee (including the reasonable and documented fees of Alston & Bird, LLP, solely in its capacity as counsel to the Second Lien Collateral Trustee), and (z) the ad hoc group of holders of Prepetition First Lien Indebtedness, Second Lien Notes and Unsecured Notes (as defined in the Motion), acting as an ad hoc group and, for purposes of this Order, acting in its capacity as a secured creditor (the "**Ad Hoc Cross-Holder Group**"), (including, without limitation, the reasonable and documented fees and expenses incurred by Paul, Weiss, Rifkind, Wharton & Garrison LLP, AlixPartners LLP, Perella Weinberg Partners L.P., Matheson LLP, IQVIA, Inc., and, from and after the Petition Date, one local legal counsel in each non-U.S. based jurisdiction the Debtors are incorporated and/or domiciled to the extent such professionals are reasonably necessary to represent the interests of the Ad Hoc Cross-Holder Group in connection with the Cases, in each case, solely in their capacity as advisors to the Ad Hoc Cross-Holder Group, with each member acting in its capacity as a secured creditor (collectively, the "**Ad Hoc Cross-Holder Advisors**")) which, solely as to any financial advisor or investment banker, are subject to the terms of any engagement letter or reimbursement agreement previously agreed to by the Debtors in writing (*provided, that*, for the avoidance of doubt, the Debtors cannot revoke or modify their consent after entry of this Interim Order so long as this Interim Order is in effect) or Prepetition Document, *provided, however*, the individual holders of the Second Lien Notes shall not be entitled to reimbursement for fees and expenses of their own advisors pursuant to this Interim Order; and (ii) subject to paragraph 26 and the limitations set forth in this paragraph 5(e)(i), on a monthly basis, within eight (8) business days of the Debtors' receipt of invoices thereof, the reasonable and documented fees and expenses, arising subsequent to the Petition Date, incurred by the Second Lien Indenture Trustee (including the reasonable and documented fees and expenses of WilmerHale), the Second Lien Collateral Trustee (including the

reasonable and documented fees and expenses of Alston & Bird LLP, solely in its capacity as

counsel to the Second Lien Collateral Trustee), and the Ad Hoc Cross-Holder Group, acting as an

ad hoc group ((including, but not limited to, the reasonable and documented fees and expenses of

the Ad Hoc Cross-Holder Advisors) which, solely as to any financial advisor or investment banker,

are subject to the terms of any engagement letter or reimbursement agreement previously agreed

to by the Debtors in writing (*provided, that*, for the avoidance of doubt, the Debtors cannot revoke

or modify their consent after entry of this Interim Order so long as this Interim Order is in effect)

or Prepetition Document, *provided, however*, the individual holders of the Second Lien Notes shall

not be entitled to reimbursement for fees and expenses of their own advisors) solely for so long as,

and only to the extent that, the Ad Hoc Cross-Holder Advisors and the Ad Hoc Cross-Holder

Group, or any member thereof (as to the Ad Hoc Cross-Holder Advisors' fees and expenses), the

Second Lien Indenture Trustee or the Second Lien Indenture Trustee acting on behalf of any other

party (as to WilmerHale's fees and expenses), and the Second Lien Collateral Trustee or the

Second Lien Collateral Trustee acting on behalf of any other party (as to Alston & Bird, LLP's

fees and expenses), (1) does not take any action in violation of the 1L-2L Intercreditor Agreement,

(2) does not encourage, solicit, or support any third party to take any action that would violate the

1L-2L Intercreditor Agreement if such action were taken by the Ad Hoc Cross-Holder Group or

any member thereof, the Second Lien Indenture Trustee, the Second Lien Collateral Trustee, or

any other Prepetition Second Lien Notes Party including, without limitation, in each case of (1)

and (2), any direct or indirect challenge of the Prepetition First Lien Secured Parties' right to credit

bid or pursue a transaction pursuant to which the First Lien Collateral Trustee credit bids up to the

full amount of the Prepetition First Lien Secured Parties' respective claims, (3) does not object, or

encourage, solicit, or support any third party to object, to any bidding procedures order (as long as

such bidding procedures order (i) has a timeline that is not materially shorter than the timeline set

forth in the bidding procedures previously provided to the Ad Hoc Cross-Holder Advisors, (ii)

does not provide for the payment of any break-up fee or similar fee (other than any expense

reimbursement) that other bidders are required to overbid, (iii) does not require cash payments

from the Prepetition Second Lien Notes Secured Parties to the Prepetition First Lien Secured

Parties in an amount in excess of the First Priority Obligations (as defined in the 1L-2L

Intercreditor Agreement), and (iv) does not impose unduly burdensome requirements on the

Prepetition Second Lien Notes Secured Parties' or their designee's ability to participate in the sale

process as a potential purchaser of the Debtors' assets as compared to other bidders (other than the

Stalking Horse Bidder), or any sale order, in each case, supported by the Debtors and the Ad Hoc

First Lien Group or the entry of this Interim Order or the Final Order, (4) does not take any position

in or out of court in furtherance of, or to advance the interests of, any holder of Unsecured Notes

or unsecured claims (including, without limitation, any Ad Hoc Cross-Holder Group member in

its capacity as a holder of Unsecured Notes or unsecured claims) that would be prohibited by the

1L-2L Intercreditor Agreement if such position were taken by a holder of Second Lien Notes, and

(5) does not file, or encourage, solicit, or support any third party to file, any Challenge (as defined

below).  None of the foregoing fees and expenses shall be subject to separate approval by this

Court or require compliance with the U.S. Trustee Guidelines, and no recipient of any such

payment shall be required to file any interim or final fee application with respect thereto or

otherwise seek the Court's approval of any such payments.  Any payments made pursuant to this

paragraph shall be without prejudice to whether any such payments should be recharacterized or

reallocated pursuant to section 506(b) of the Bankruptcy Code as payments of principal, interest

or otherwise.

(f)      *Reporting Requirements*.  As additional adequate protection, the Debtors shall (x) for so long as Parent is required to file periodic reports with the SEC pursuant to Section 13 or 15(d) of the Exchange Act, promptly provide the Ad Hoc Cross-Holder Advisors with a copy of any such report that Parent files with the SEC (it being understood that the filing of such report with the SEC on EDGAR or any successor platform being sufficient), (y) for so long as Parent is not required to file periodic reports with the SEC pursuant to Section 13 or 15(d) of the Exchange Act (as defined in the First Lien Indentures), comply with the reporting requirements in section 4.03(c) of the Second Lien Indenture, *provided, however,* in no event shall such reporting provided under clauses (x) or (y) be required to (i) contain any consolidating and other financial statements and data that would be required by Sections 3-10, 3-16, 13-01, and 13-02 of Regulation S-X under the Securities Act (as defined in the First Lien Indentures), (ii) include any certifications that would be required under the Sarbanes Oxley Act of 2002, (iii) comply with Regulation G under the Exchange Act or Item 10(e) of Regulation S-K with respect to any "non-GAAP" financial information contained therein, (iv) contain any information and data required by Item 402(b) of Regulation S-K under the Securities Act and information regarding executive compensation and related party disclosure related to SEC Release Nos. 33-8732A, 34-54302A, and IC-27444A, and (v) include any unqualified auditor opinion in respect of any financial statements contained therein; and (z) provide, subject to any applicable limitations set forth below, the following additional reporting to the Second Lien Indenture Trustee, the Second Lien Collateral Trustee, and the Ad Hoc Cross-Holder Advisors (*provided*, that any reporting provided to WilmerHale, and the Ad Hoc Cross-Holder Advisors  under this paragraph 5(f) shall only be shared with those advisors that are bound by obligations of confidentiality pursuant to a confidentiality agreement entered into with the Debtors):

42

i.        at the times specified in paragraph 3(c) hereof, the Variance Report required by paragraph 3(c) hereof;

ii.        timely delivery of each Proposed Budget as set forth in this Interim Order;

iii.        notice of the occurrence of the Debtors' Liquidity falling below the Minimum Liquidity Amount at the end of any week and the amount of such Liquidity as of such time;

iv.        within 45 days after each month end, beginning with the quarter ended September 30, 2022, on a consolidated basis for Debtors and non-Debtors combined, a quarterly and year-to-date income statement and balance sheet; and

*provided* that nothing in this paragraph 5(f) shall require the Debtors (or any of their advisors) to take any action that would conflict with any applicable requirements of law or any binding agreement, or that would waive any attorney-client or similar privilege (it being understood and agreed that (i) the Debtors shall use commercially reasonable efforts to take any such action required under this paragraph 5(f) in a way that would not conflict with any applicable requirements of law or any binding agreement, or that would waive any attorney-client or similar privilege and (ii) if any such Debtor (or any such advisor), in reliance on this proviso, elects to withhold any information that would otherwise be required to be provided pursuant to this paragraph 5(f), the Debtors shall provide written notice to the Ad Hoc Cross-Holder Advisors of such election and specify in such notice the basis for the Debtors' (or the applicable advisor's) election to withhold such information and identify in such notice the type of information it has elected to withhold to the extent not prohibited by applicable law).

(g)        *Miscellaneous*.  Except for (i) the Carve Out, (ii) the First Lien Adequate Protection Liens, (iii) First Lien Adequate Protection Superpriority Claims, and (iv) as otherwise provided in paragraph 5, and subject to the Intercreditor Agreements, the Second Lien Adequate Protection Liens, and Second Lien Adequate Protection Superpriority Claims granted to the Prepetition Second Lien Notes Secured Parties pursuant to paragraph 5 of this Interim Order shall not be subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under the Bankruptcy Code, including, without limitation, pursuant to section 551 or otherwise, and shall not be subordinated to any lien, security interest or administrative claim under the Bankruptcy Code, including, without limitation, pursuant to section 364 or otherwise.

6.        ***Carve Out***

(a)        *Priority of Carve Out*.  Each of the Prepetition Liens, Adequate Protection Liens, and Adequate Protection Superpriority Claims shall be subject and subordinate to payment of the Carve Out (as defined below).

(b)        *Definition of Carve Out*.  As used in this Interim Order, the "**Carve Out**" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee (the "**U.S. Trustee**") under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $250,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "**Allowed Professional Fees**") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (collectively, the "**Debtor**

44

**Professionals**") and any Committee pursuant to section 328 or 1103 of the Bankruptcy Code (collectively, the "**Committee Professionals**") and the FCR (if any) and persons or firms retained by the FCR pursuant to an order of the Court (collectively, the "**FCR Professionals**" and, together with the Debtor Professionals and the Committee Professionals, the "**Professional Persons**") at any time before or on the first business day following delivery by the Ad Hoc First Lien Group of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice, (the amounts set forth in clauses (i) through (iii), the "**Pre-Carve Out Trigger Notice Cap**"); (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $25 million incurred after the first business day following delivery by the Ad Hoc First Lien Group of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise; and (v) all amounts required to be paid to (x) PJT Partners LP on account of any transaction fees earned under that certain engagement letter between PJT Partners LP and the Debtors, dated as of September 21, 2021, and (y) transaction fees (if any) earned by the Committee Professionals or the FCR Professionals, payable under sections 328, 330, and/or 331 of the Bankruptcy Code, to the extent not yet paid or due as of the delivery of a Carve Out Trigger Notice and allowed by a separate order of this Court at any time (the amounts set forth in clause (iv) above and this clause (v) being the "**Post-Carve Out Trigger Notice Cap**").  For purposes of the foregoing, "**Carve Out Trigger Notice**" shall mean a written notice delivered by email (or other electronic means) by the Ad Hoc First Lien Group to the Debtors, their lead restructuring counsel (Skadden, Arps, Slate, Meagher & Flom LLP), the U.S. Trustee, and counsel to any Committee (if any), which notice may be delivered following the occurrence and during the continuation of a Termination Event (as defined below) stating that the Post-Carve Out Trigger Notice Cap has been invoked.

45

(c)    *Carve Out Reserves.* Notwithstanding the occurrence of a Termination Event (as defined below), on the day on which a Carve Out Trigger Notice is given by the Ad Hoc First Lien Group (the "**Termination Declaration Date**"), the Carve Out Trigger Notice shall constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees plus reasonably estimated fees and expenses not yet allowed for the period through and including the Termination Declaration Date (the "**Allowed and Estimated Professional Fees**").  The Debtors shall deposit and hold such amounts in a segregated account in trust to pay the Allowed and Estimated Professional Fees (the "**Pre-Carve Out Trigger Notice Reserve**") prior to any and all other claims.  On the Termination Declaration Date, the Carve Out Trigger Notice shall also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor, after funding the Pre-Carve Out Trigger Notice Reserve, to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap.  The Debtors shall deposit and hold such amounts in a segregated account in trust to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "**Post-Carve Out Trigger Notice Reserve**" and, together with the Pre-Carve Out Trigger Notice Reserve, the "**Carve Out Reserves**") prior to any and all other claims.  All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in the Pre-Carve Out Trigger Notice Cap (the "**Pre-Carve Out Amounts**"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, any such excess shall be paid to the Prepetition First Lien Secured Parties in accordance with their respective rights and priorities as of the Petition Date.  All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to

46

pay all the amounts set forth in the Post-Carve Out Trigger Notice Cap (the "**Post-Carve Out**

**Amounts**"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been

reduced to zero, any such excess shall be used first to pay any unpaid Pre-Carve Out Amounts

until paid in full, and then paid to the Prepetition First Lien Secured Parties in accordance with

their respective rights and priorities as of the Petition Date.  Notwithstanding anything to the

contrary in the Prepetition Documents or this Interim Order: (i) following delivery of a Carve Out

Trigger Notice, the First Lien Collateral Trustee shall not sweep or foreclose on cash (including

cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve

Out Reserves have been fully funded, but shall have a security interest in any residual interest in

the Carve Out Reserves, with any excess paid to the First Lien Collateral Trustee for application

in accordance with the Prepetition Documents and Intercreditor Agreements; (ii)(A) disbursements

by the Debtors from the Carve Out Reserves shall not increase or reduce the Prepetition Secured

Indebtedness, (B) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional

Fees shall not affect the priority of the Carve Out, and (C) in no way shall the Approved Budget,

Proposed Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of

the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees

due and payable by the Debtors; and (iii) the Carve Out shall be senior to all liens and claims

securing the Prepetition Secured Indebtedness, the Adequate Protection Liens, the Adequate

Protection Superpriority Claims, any claims arising under section 507(b) of the Bankruptcy Code,

and any and all other forms of adequate protection, liens, or claims securing the Prepetition

Secured Indebtedness.  Notwithstanding anything to the contrary herein, if either of the Carve Out

Reserves is not funded in full in the amounts set forth herein, then any excess funds in one of the

Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out

Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth herein, prior to making any payments to the Prepetition Secured Parties. Unless otherwise ordered by the Court, the automatic stay provisions of Bankruptcy Code section 362 are hereby modified to permit the Prepetition First Lien Secured Parties to retain and apply all collections or remittances from any Carve Out Reserve subject to and in accordance with this Interim Order, the Credit Documents, the First Lien Notes Documents, and the Intercreditor Agreements to the extent the Prepetition First Lien Secured Parties are entitled to any excess from the Carve Out Reserves.

(d)     *Professional Fee Reserve Account.*  Upon entry of this Interim Order, the Debtors shall establish a separate segregated account not subject to the control or liens of any party, which shall be for the sole purpose of paying unpaid Allowed Professional Fees (the "**Professional Fee Reserve Account**").  Within ten (10) business days of a Professional Person submitting an invoice to the Debtors for professional fees, the Debtors shall fund the Professional Fee Reserve Account in an amount equal to 20% of the professional fees set forth in such invoice, including, without limitation, any additional amounts required to be held back pursuant to an order of the Court (such professional fees, expenses, and additional amounts, the "**Reserve Amounts**").  Upon release of any Reserve Amounts from the Professional Fee Reserve Account and payment thereof to the applicable Professional Person, the Professional Fee Reserve Account shall be decreased on a dollar-for-dollar basis for the amount paid to such Professional Person.  Upon the delivery of a Carve Out Trigger Notice, all funds in the Professional Fee Reserve Account shall be used first to pay the Pre-Carve Out Amounts.  If, after payment in full of all amounts included in the Pre-Carve Out Trigger Notice Cap and Post-Carve Out Trigger Notice Cap, the Professional Fee Reserve Account has not been reduced to zero, all remaining funds shall be returned to the

Prepetition Secured Parties. For the avoidance of doubt, the Debtors' obligations to pay Allowed Professional Fees shall not be limited or deemed limited to funds held in the Professional Fee Reserve Account.

(e)       *No Direct Obligation To Pay Allowed Professional Fees*.   Subject to the terms of the restructuring support agreement, dated August 16, 2022, by and between the Debtors and certain of the Prepetition First Lien Secured Parties (the "**RSA**"), the Prepetition Secured Parties reserve the right to object to the allowance of any fees and expenses, whether or not such fees and expenses were incurred in accordance with the Approved Budget. Except for permitting the funding of the Carve Out Reserves as provided herein, none of the Prepetition Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person or any fees or expenses of the U.S. Trustee or Clerk of the Court incurred in connection with the Cases or any successor cases under any chapter of the Bankruptcy Code ("**Successor Cases**"). Nothing in this Interim Order or otherwise shall be construed to obligate the Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(f)       *Payment of Carve Out After the Termination Declaration Date*.   Any payment or reimbursement made after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar for-dollar basis; *provided, however*, if the Debtor Professionals use their retainers to pay such Allowed Professional Fees, such payments shall not reduce the Carve Out.

7.       ***Access and Information***.   Subject to the Prepetition Documents, upon reasonable prior written notice (as applicable, including via acknowledged electronic mail) during normal

business hours, the Debtors shall permit the Ad Hoc First Lien Advisors, to (a) have reasonable access to information regarding the operations, business affairs, and financial condition of the Debtors, (b) have reasonable access to and inspect the Debtors' properties, and (c) discuss the Debtors' affairs, finances, and condition with the Debtors' advisors; it being understood that nothing in this paragraph shall require the Debtors (or any of their advisors) to take any action that would conflict with any applicable requirements of law or any binding agreement, or that would waive any attorney-client or similar privilege.

8.      **Termination.**   Subject to the Remedies Notice Period (as defined below) and paragraph 6, the Debtors' right to use the Cash Collateral pursuant to this Interim Order shall automatically cease without further court proceedings on the Termination Date (as defined herein). As used herein, "Termination Events" means any of the events set forth in paragraphs 8(a) through (q) of this Interim Order (each such events a "**Termination Event**"):

(a)      A Final Order acceptable to the Debtors and the Ad Hoc First Lien Group is not entered by the Court by 11:59 p.m. on September 30, 2022;

(b)      The violation of any material term of this Interim Order or the material violation of this Interim Order by the Debtors that is not cured within five (5) business days of receipt by the Debtors of notice from the Ad Hoc First Lien Group of such default, violation or breach (which may be provided to the Debtors by e-mail);

(c)      Entry of any order modifying, reversing, revoking, staying for a period in excess of four (4) business days, rescinding, vacating, or amending this Interim Order in a manner materially adverse to the rights, interests, priorities, or entitlements of the Prepetition First Lien Secured Parties or that materially modifies any of the Debtors' obligations to the Prepetition First

Lien Secured Parties, in each case, without the express written consent of the Ad Hoc First Lien Group;

(d)       Any of the Cases is dismissed or converted to a case under chapter 7 of the Bankruptcy Code, or without the express written consent of the Ad Hoc First Lien Group, a trustee under chapter 11 of the Bankruptcy Code, an examiner with expanded powers is appointed in any of the Cases, or the Cases are transferred or there is a change of venue outside of the Second Circuit or Third Circuit, or any Debtor files any motion, pleading, or proceeding (or solicits, supports, or encourages any other party to file any motion, pleading, or proceeding) seeking or consenting to the granting of, or an order is entered granting, any of the foregoing, except where a dismissal or conversion is for a Debtor that, at the time of such dismissal, has dormant business activities and a fair market value of less than $250,000;

(e)       Any Debtor files any motion, pleading, or proceeding seeking or consenting to the granting of, or an order is entered granting, any claim, lien (except for the Permitted Prior Liens) or other interest that is *pari passu* with or senior to any of the Prepetition First Liens, First Lien Adequate Protection Liens or First Lien Adequate Protection Superpriority Claims;

(f)       Any Debtor files any motion, pleading, or proceeding (or solicits, supports, or encourages any other party to file any motion, pleading, or proceeding) seeking or consenting to the granting of, or an order is entered granting, (i) the invalidation, subordination, or other challenge to the Prepetition Secured Indebtedness, the Prepetition Liens, Adequate Protection Liens, the Adequate Protection Superpriority Claims or (ii) any relief under sections 506(c) or 552 of the Bankruptcy Code with respect to any Prepetition Collateral or any Collateral, including the Cash Collateral, or against any of the Prepetition Secured Parties, *provided* that if the Debtors

provide any response to any discovery request or make a witness available for deposition in connection with the foregoing, such action shall not be a violation of this clause;

(g)    Any Debtor files any motion, pleading, or proceeding that would, if the relief sought therein were granted, result in a Termination Event (other than a Termination Event under this paragraph 8(g)), and such motion, pleading, or proceeding is not dismissed or withdrawn (as applicable) within three (3) business days after receipt by the Debtors of notice (which may be by e-mail) that the Ad Hoc First Lien Group has determined that such motion, pleading, or proceeding, if the relief sought therein were granted, would give rise to such a Termination Event;

(h)    The entry by this Court of an order granting relief from the automatic stay imposed by section 362 of the Bankruptcy Code to any entities other than the Prepetition Secured Parties with respect to any material portion of the Collateral (except for the Permitted Prior Liens), *provided, however,* this clause shall only be triggered if at least three (3) business days before the hearing to approve such order, the Ad Hoc First Lien Group provides written notice to the Debtors (which may be provided to the Debtors by e-mail) that the Ad Hoc First Lien Group objects to such relief under the circumstances described in this paragraph 8(h);

(i)    The entry of a subsequent order of the Court authorizing the use of Cash Collateral by any Debtor that is not a Prepetition Loan Party in violation of this Interim Order without the written consent of the Ad Hoc First Lien Group;

(j)    The failure by the Debtors to make any payment required pursuant to this Interim Order when due; *provided* that such failure remains uncured for at least three (3) business days following a written notice (which may be provided to the Debtors by e-mail) from the Ad Hoc First Lien Group;

(k)     The failure by the Debtors to deliver to the First Lien Indenture Trustee, First Lien Collateral Trustee, Ad Hoc First Lien Group, or the Ad Hoc First Lien Advisors any of the documents or other information reasonably required to be delivered to such applicable party pursuant to this Interim Order within five (5) business days following a request thereof from the First Lien Indenture Trustee, First Lien Collateral Trustee, Ad Hoc First Lien Group, or the Ad Hoc First Lien Advisors pursuant to the terms of this Interim Order;

(l)     The Debtors' failure to (i) comply with an Approved Budget as set forth in this Interim Order except with respect to Permitted Variances or (ii) at the end of any week, maintain Liquidity in an amount equal to or greater than the Minimum Liquidity Amount;

(m)     The entry of an order of this Court approving the terms of any debtor in possession financing for any of the Debtors that is entered into without the written consent of the Ad Hoc First Lien Group;

(n)     The Debtors shall file a chapter 11 plan that is not acceptable to the Ad Hoc First Lien Group or shall seek to modify, amend or waive any provision of a chapter 11 plan previously deemed acceptable by the Ad Hoc First Lien Group without the written consent of the Ad Hoc First Lien Group;

(o)     Any Debtor files any motion, pleading, or proceeding (or solicits, supports, or encourages any other party to file any motion, pleading, or proceeding) seeking or consenting to the granting of, or an order is entered granting, any termination and/or shortening, reduction of the Debtors' exclusive periods to file and/or solicit a chapter 11 plan pursuant to the Bankruptcy Code (collectively, the "**Exclusive Periods**") or the Debtors otherwise do not seek to extend the Exclusive Periods if and when applicable, in each case, unless otherwise agreed in writing by the Ad Hoc First Lien Group;

(p)     Termination of the RSA in accordance with its terms; and

(q)     The failure of the Debtors to meet any of the deadlines (or such later dates as may be approved in writing by the Ad Hoc First Lien Group) set forth on **Exhibit 2** (collectively, the "**Milestones**") provided that a termination right relating to the failure to meet any of the Milestones shall be subject to the same conditions and waivers set forth in the RSA.

9.     ***Remedies after a Termination Date.***

(a)     Notwithstanding anything contained herein, the Debtors' authorization to use Cash Collateral hereunder shall automatically terminate (except for purposes of funding the Carve Out, as provided in paragraph 6) on the date (such date, the "**Termination Date**") that is the earlier of (i) the effective date of any chapter 11 plan with respect to the Debtors confirmed by the Court; (ii) the date on which all or substantially all of the assets of the Debtors are sold in a sale under any chapter 11 plan or pursuant to section 363 of the Bankruptcy Code; or (iii) five (5) business days from the date (the "**Termination Declaration Date**") on which written notice of the occurrence of any Termination Event is given by the Ad Hoc First Lien Group (which notice may be given by electronic mail (or other electronic means)) to Debtors' counsel, each Committee counsel (if appointed), and the U.S. Trustee (the "**Termination Declaration**," and such period commencing on the Termination Declaration Date and ending five (5) business days later, the "**Remedies Notice Period**"); *provided* that, until expiration of the Remedies Notice Period, the Debtors may (a) continue to use Cash Collateral to make payments in respect of expenses reasonably necessary to keep the business of the Debtors operating, solely in accordance with the Approved Budget and this Interim Order, (b) contest or cure any alleged Termination Date, and (c) seek other relief as provided for in this paragraph; and *provided*, *further*, that the Debtors may continue to use Cash Collateral during or after expiration of the Remedies Notice Period solely to

54

the extent necessary to fund the Carve Out Reserves subject to paragraph 6 hereof.  The automatic stay in the Cases otherwise applicable to the Prepetition Secured Parties is hereby modified such that, upon the expiration of the Remedies Notice Period, the First Lien Collateral Trustee (with the prior written approval of the Ad Hoc First Lien Group) and the other Prepetition First Lien Secured Parties shall be entitled to exercise all rights and remedies in accordance with the Prepetition Documents, Intercreditor Agreements, and this Interim Order with respect to the Debtors' use of Cash Collateral.

(b)     During the Remedies Notice Period, if applicable, the Debtors, the Committees (if appointed), and/or any party in interest shall be entitled to seek an emergency hearing with the Court to (i) contest the existence of a Termination Event, (ii) seek nonconsensual use of Cash Collateral, and/or (iii) continue the automatic stay; *provided* that if a hearing to consider the foregoing is requested to be heard before the end of the Remedies Notice Period but is scheduled for a later date by the Court, the Remedies Notice Period shall be automatically extended to the date of such hearing.  Upon expiration of the Remedies Notice Period, if applicable, the First Lien Collateral Trustee (with the prior written approval of the Ad Hoc First Lien Group), and the other Prepetition First Lien Secured Parties shall be permitted to exercise all rights and remedies in accordance with the Prepetition Documents, Intercreditor Agreements, and this Interim Order, and as otherwise available at law or in equity without further order of or application or motion to this Court consistent with this Interim Order.

(c)     Nothing herein shall alter the burden of proof set forth in the applicable provisions of the Bankruptcy Code at any hearing on any request by the Debtors or other party in interest to re-impose or continue the automatic stay under Bankruptcy Code section 362(a), use Cash Collateral, or to obtain any other injunctive relief.  Any delay or failure of the First Lien

Collateral Trustee and/or the other Prepetition First Lien Secured Parties to exercise rights under the Prepetition Documents, the Intercreditor Agreements, or this Interim Order shall not constitute a waiver of its respective rights hereunder, thereunder or otherwise. The occurrence of the Termination Date or a Termination Event shall not affect the validity, priority, or enforceability of any and all rights, remedies, benefits, and protections provided to any of the Prepetition Secured Parties under this Interim Order, which rights, remedies, benefits, and protections shall survive the Termination Date or the delivery of a Termination Declaration.

10.     ***Payments Free and Clear***.  Any and all payments or proceeds remitted to the Prepetition First Lien Secured Parties and the Prepetition Second Lien Notes Secured Parties pursuant to the provisions of this Interim Order or any subsequent order of this Court shall be irrevocable (subject to paragraphs 4(d), 4(g), 5(e), and 19 of this Interim Order), received free and clear of any claim, charge, assessment or other liability, including without limitation, subject to entry of the Final Order, any such claim or charge arising out of or based on, directly or indirectly, Bankruptcy Code sections 506(c) (whether asserted or assessed by, through or on behalf of the Debtor) or 552(b).

11.     ***Limitation on Charging Expenses Against Collateral.***  Subject to entry of the Final Order, all rights to surcharge the interests of the Prepetition Secured Parties in any Prepetition Collateral or any Collateral under section 506(c) of the Bankruptcy Code or any other applicable principle or equity or law shall be and are hereby finally and irrevocably waived, and such waiver shall be binding upon the Debtors and all parties in interest in the Cases.

12.     ***Reservation of Rights of the Prepetition Secured Parties***.  Except as expressly set forth in this Interim Order, the entry of this Interim Order is without prejudice to, and does not constitute or operate as a waiver of, expressly or implicitly, or otherwise impair any rights or

remedies of any of the Prepetition First Lien Secured Parties or the Prepetition Second Lien Notes Secured Parties arising under or related to any of the Credit Documents, the First Lien Notes Documents, and/or the Second Lien Notes Documents, applicable law, these Cases (and any issue or dispute arising therein), or otherwise.  This Interim Order and the transactions contemplated hereby shall be without prejudice to (a) the rights of any of the Prepetition Secured Parties to, subject to the Intercreditor Agreements, seek additional or different adequate protection, move to vacate the automatic stay, move for the appointment of a trustee or examiner, move to dismiss or convert the Cases, or to take any other action in the Cases and to appear and be heard in any matter raised in the Cases, or any party in interest from contesting any of the foregoing and (b) any and all rights, remedies, claims and causes of action which the Prepetition Secured Parties may have against any non-Debtor party.  For all adequate protection purposes throughout the Cases, each of the Prepetition Secured Parties shall be deemed to have requested relief from the automatic stay and adequate protection for any Diminution in Value from and after the Petition Date and, for the avoidance of doubt, such request will survive termination of this Interim Order.  Without limiting the foregoing, any delay in, or failure of, the Administrative Agent, any of the Prepetition First Lien Loan Secured Parties, the First Lien Indenture Trustee, the First Lien Collateral Trustee, and/or any of the Prepetition First Lien Notes Secured Parties, or the Second Lien Indenture Trustee, the Second Lien Collateral Trustee, and/or any of the Prepetition Second Lien Notes Secured Parties to seek relief or otherwise assert or exercise any of their rights or remedies shall not constitute a waiver of any right or remedy and all such rights and remedies are reserved and preserved in all respects.

13. ***Modification of Automatic Stay***.  The Debtors are authorized to perform all acts and to make, execute, and deliver any and all instruments as may be reasonably necessary to

implement the terms and conditions of this Interim Order and the transactions contemplated hereby.  The stay of section 362 of the Bankruptcy Code is hereby modified to permit the parties to accomplish the transactions contemplated by this Interim Order.

14.     ***Survival of Interim Order***.  The provisions of this Interim Order shall be binding upon any trustee appointed during the Cases or upon a conversion to cases under chapter 7 of the Bankruptcy Code, and any actions taken pursuant hereto shall survive entry of any order which may be entered converting the Cases to chapter 7 cases, dismissing the Cases under section 1112 of the Bankruptcy Code or otherwise, confirming or consummating any plan(s) of reorganization or liquidation or otherwise, or approving or consummating any sale of any Prepetition Collateral or Collateral, whether pursuant to section 363 of the Bankruptcy Code or included as part of any plan.  The terms and provisions of this Interim Order, as well as the priorities in payments, liens, and security interests granted pursuant to this Interim Order shall continue notwithstanding any conversion of the Cases to chapter 7 cases under the Bankruptcy Code, dismissal of the Cases, confirmation or consummation of any plan(s) of reorganization or liquidation, approval or consummation of any sale, or otherwise.  Subject to the limitations described in paragraphs 4(d), 4(g), 5(e), and 19 of this Interim Order, the adequate protection payments made pursuant to this Interim Order shall not be subject to counterclaim, setoff, subordination, recharacterization, defense or avoidance in the Cases or any subsequent chapter 7 cases or other proceeding (other than a defense that the payment has actually been made).

15.     ***No Third-Party Rights***.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

16.   ***Release***.   Subject to the rights and limitations set forth in paragraph 19 of this

Interim Order, effective upon entry of the Interim Order, each of the Debtors and the Debtors'

estates, on its own behalf and on behalf of each of their predecessors, their successors, and assigns,

shall, to the maximum extent permitted by applicable law, unconditionally, irrevocably, and fully

forever release, remise, acquit, relinquish, irrevocably waive, and discharge each of the Prepetition

Secured Parties (each in their respective roles as such), and each of their respective affiliates,

former, current, or future officers, employees, directors, agents, representatives, owners, members,

partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants,

attorneys, affiliates, assigns, agents, and predecessors in interest, each in their capacity as such, of

and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of

action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies,

proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type,

whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued,

fixed, contingent, pending, or threatened, including, without limitation, all legal and equitable

theories of recovery, arising under common law, statute, or regulation or by contract, of every

nature and description that exist on the date hereof with respect to or relating to the Prepetition

First Lien Loans, the First Lien Notes, the Prepetition Second Lien Notes, the Prepetition Liens,

the Prepetition Secured Indebtedness, the Prepetition Documents, the Intercreditor Agreements, or

this Interim Order, as applicable, and/or the transactions contemplated hereunder or thereunder

including, without limitation, (i) any so-called "lender liability" or equitable subordination claims

or defenses, (ii) any and all claims and causes of action arising under the Bankruptcy Code, and

(iii) any and all claims and causes of action regarding the validity, priority, extent, enforceability,

perfection, or avoidability of the liens or claims of the Prepetition Secured Parties; *provided,*

*however,* no such parties will be released to the extent determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted primarily from such parties' gross negligence, fraud, or willful misconduct.

17. ***Binding Effect***. The terms of this Interim Order shall be valid and binding upon the Debtors, all creditors of the Debtors and all other parties in interest from and after the entry of this Interim Order by this Court. Notwithstanding anything in this Interim Order or any other agreement or document to the contrary, upon entry of this Interim Order, the Ad Hoc First Lien Advisors shall provide written confirmation (the "**Requisite Group Notice**") to the Debtors, the First Lien Indenture Trustee, and the First Lien Collateral Trustee that (a) the Ad Hoc First Lien Group represents the holders of more than 50% of the sum of the aggregate outstanding principal amount of Secured Debt (as defined in the First Lien Collateral Trust Agreement) (including the face amount of outstanding letters of credit whether or not available or drawn) (the "**Required Holders**") and (b) each member of the Ad Hoc First Lien Group consents to the delivery by the Ad Hoc First Lien Advisors of any consents and waivers as a block on behalf of each member of the Ad Hoc First Lien Group pursuant to this Interim Order. The Debtors, the Administrative Agent, the First Lien Indenture Trustee and the First Lien Collateral Trustee shall be permitted to rely upon the Requisite Group Notice. The Ad Hoc First Lien Advisors shall promptly provide written notice to the Debtors, the Administrative Agent, the First Lien Indenture Trustee, and the First Lien Collateral Trustee if, at any time, the Ad Hoc First Lien Group no longer constitutes Required Holders (a "**Subsequent Group Notice**"). In the event the Ad Hoc First Lien Advisors provide a Subsequent Group Notice, consent and waiver rights under this Interim Order in favor of the Ad Hoc First Lien Group shall be deemed to be in favor of the Required Holders (which consent or waiver may be provided by the First Lien Collateral Trustee, acting pursuant to an Act

60

of Required Secured Parties (as defined in the First Lien Collateral Trust Agreement)), unless and until the Ad Hoc First Lien Advisors provide a Requisite Group Notice providing written confirmation that the Ad Hoc First Lien Group constitutes holders representing Required Holders. Notwithstanding anything to the contrary in this Interim Order, nothing in this Interim Order prejudices the Prepetition First Lien Secured Parties' respective rights under the First Lien Collateral Trust Agreement.

18.     ***Reversal, Stay, Modification or Vacatur***.  In the event the provisions of this Interim Order are reversed, stayed, modified or vacated by court order following notice and any further hearing, such reversals, modifications, stays or vacatur shall not affect the rights and priorities of the Prepetition Secured Parties granted pursuant to this Interim Order.  Notwithstanding any such reversal, stay, modification or vacatur by court order, any indebtedness, obligation or liability incurred by the Debtors pursuant to this Interim Order arising prior to the First Lien Collateral Trustee's or Second Lien Collateral Trustee's receipt of notice of the effective date of such reversal, stay, modification or vacatur shall be governed in all respects by the original provisions of this Interim Order, and the Prepetition Secured Parties shall continue to be entitled to all of the rights, remedies, privileges and benefits, including any payments authorized herein and the security interests and liens granted herein, with respect to all such indebtedness, obligation or liability, and the validity of any payments made or obligations owed or credit extended or lien or security interest granted pursuant to this Interim Order is and shall remain subject to the protection afforded under the Bankruptcy Code.

19.     ***Reservation of Certain Third-Party Rights and Bar of Challenge and Claims***.

(a)     Subject to the Challenge Period (as defined herein), the stipulations, admissions, waivers, and releases contained in this Interim Order, including the Debtors'

Stipulations, shall be binding upon the Debtors, their estates, and any of their respective successors

in all circumstances and for all purposes, and the Debtors are deemed to have irrevocably waived

and relinquished all Challenges (as defined below) as of the Petition Date.  The stipulations,

admissions, and waivers contained in this Interim Order, including, the Debtors' Stipulations, shall

be binding upon all other parties in interest, including any Committee and any other person acting

on behalf of the Debtors' estates, unless and to the extent that a party in interest with proper

standing granted by order of the Court (or other court of competent jurisdiction) has timely and

properly filed an adversary proceeding or contested matter under the Bankruptcy Rules (i) before

the earlier of (A) except as to any Committee, seventy-five (75) calendar days after entry of the

Final Order, and (B)  in the case of any such adversary proceeding or contested matter filed by any

Committee, sixty (60) calendar days after the entry of the Final Order, subject to further extension

by written agreement of the Debtors and the Ad Hoc First Lien Group or further extension by the

Court for cause shown upon a motion filed and served within the applicable period (in each case,

a "**Challenge Period**" and, the date of expiration of each Challenge Period, a "**Challenge Period**

**Termination Date**"); *provided*, *however*, that if, prior to the end of the Challenge Period, (x) the

cases convert to chapter 7, or (y) a chapter 11 trustee is appointed, then, in each such case, the

Challenge Period shall be extended by the later of (I) the time remaining under the Challenge

Period plus ten (10) days or (II) such other time as ordered by the Court solely with respect to any

such trustee, commencing on the occurrence of either of the events discussed in the foregoing

clauses (x) and (y); (ii) seeking to avoid, object to, or otherwise challenge the findings or Debtors'

Stipulations regarding:  (A) the validity, enforceability, extent, priority, or perfection of the

mortgages, security interests, and liens of the Prepetition Secured Parties; or (B) the validity,

enforceability, allowability, priority, secured status, or amount of the Prepetition Secured

Indebtedness (any such claim, a "**Challenge**"); and (iii) in which the Court enters a final order in favor of the plaintiff sustaining any such Challenge in any such timely filed adversary proceeding or contested matter.

(b)        Upon the expiration of the Challenge Period without the filing of a Challenge (or if any such Challenge is filed and overruled): (i) any and all such Challenges by any party (including, without limitation, any Committee, the FCR, any chapter 11 trustee, and/or any examiner or other estate representative appointed or elected in these Cases, and any chapter 7 trustee and/or examiner or other estate representative appointed or elected in any Successor Case) shall be deemed to be forever barred; (ii) the Prepetition Secured Indebtedness shall constitute allowed claims, not subject to counterclaim, setoff, recoupment, reduction, subordination, recharacterization, defense, or avoidance for all purposes in the Debtors' Cases and any Successor Cases; (iii) the Prepetition Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, and perfected secured claims, not subject to recharacterization, subordination, or avoidance; and (iv) all of the Debtors' stipulations and admissions contained in this Interim Order, including the Debtors' Stipulations, and all other waivers, releases, affirmations, and other stipulations as to the priority, extent, and validity as to the Prepetition Secured Parties' claims, liens, and interests contained in this Interim Order shall be in full force and effect and forever binding upon the Debtors, the Debtors' estates, and all creditors, interest holders, and other parties in interest in these Cases and any Successor Cases.

(c)        If any such adversary proceeding or contested matter is timely and properly filed under the Bankruptcy Rules, the stipulations and admissions contained in this Interim Order, including the Debtors' Stipulations, shall nonetheless remain binding and preclusive on any Committee and any other person or entity except to the extent that such

stipulations and admissions were expressly challenged in such adversary proceeding or contested matter prior to the Challenge Period Termination Date. Nothing in this Interim Order vests or confers on any person (as defined in the Bankruptcy Code), including, without limitation, any Committee appointed in the Cases, standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation, any challenges (including a Challenge) with respect to the Prepetition Documents, the Intercreditor Agreements, the Prepetition Liens, the Prepetition Secured Indebtedness, and a separate order of the Court conferring such standing on any Committee or other party-in-interest shall be a prerequisite for the prosecution of a Challenge by such Committee or such other party-in-interest.

20.     ***Limitation on Use of Collateral and Cash Collateral.***  Notwithstanding anything to the contrary set forth in this Interim Order, except as expressly permitted by this Interim Order, or any other document, none of the Collateral, the Prepetition Collateral, including Cash Collateral, or the Carve Out or proceeds of any of the foregoing may be used: (a) to investigate (including by way of examinations or discovery proceedings), initiate, assert, prosecute, join, commence, support, or finance the initiation or prosecution of any claim, counterclaim, action, suit, arbitration, proceeding, application, motion, objection, defense, adversary proceeding, or other litigation of any type (i) against any of the Prepetition Secured Parties (in their capacities as such), and each of their respective affiliates, officers, directors, employees, agents, representatives, attorneys, consultants, financial advisors, affiliates, assigns, or successors, with respect to any transaction, occurrence, omission, action, or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, any so-called "lender liability" claims and causes of action, or seeking relief that would impair the rights and remedies of the Prepetition Secured Parties under the Prepetition Documents, Intercreditor Agreements, this Interim Order, or

any other applicable document or agreement, including, without limitation, for the payment of any

services rendered by the professionals retained by the Debtors or any Committee appointed (if any)

in these Cases in connection with the assertion of or joinder in any claim, counterclaim, action,

suit, arbitration, proceeding, application, motion, objection, defense, adversary proceeding, or

other contested matter, the purpose of which is to seek, or the result of which would be to obtain,

any order, judgment, determination, declaration, or similar relief that would impair the ability of

any of the Prepetition Secured Parties to recover on the Prepetition Collateral or the Collateral or

seeking affirmative relief against any of the Prepetition Secured Parties related to the Prepetition

Secured Indebtedness; (ii) invalidating, setting aside, avoiding, or subordinating, in whole or in

part, the Prepetition Secured Indebtedness or the Prepetition Secured Parties' respective

Prepetition Liens or security interests in the Prepetition Collateral or the Collateral, as applicable;

or (iii) for monetary, injunctive, or other affirmative relief against any of the Prepetition Secured

Parties or the Prepetition Secured Parties' respective liens on or security interests in the Prepetition

Collateral or the Collateral that would impair the ability of any of the Prepetition Secured Parties

to assert or enforce any lien, claim, right, or security interest or to realize or recover on the

Prepetition Secured Indebtedness, to the extent applicable; (b) for objecting to or challenging in

any way the legality, validity, priority, perfection, or enforceability of the claims, liens, or interests

(including, without limitation, the Prepetition Liens) held by or on behalf of each of the Prepetition

Secured Parties related to the Prepetition Secured Indebtedness; (c) for asserting, commencing, or

prosecuting any claims or causes of action whatsoever, including, without limitation, any

Avoidance Actions related to or in connection with the Prepetition Secured Indebtedness or the

Prepetition Liens; or (d) for prosecuting an objection to, contesting in any manner, or raising any

defenses to, the validity, extent, amount, perfection, priority, or enforceability of: (i) any of the

Prepetition Liens or any other rights or interests of any of the Prepetition Secured Parties related to the Prepetition Secured Indebtedness or the Prepetition Liens, *provided* that no more than $50,000 of the proceeds of the Collateral, or the Prepetition Collateral, including the Cash Collateral, in the aggregate, may be used solely by any Committee appointed (if any) in these Cases, if any, solely to investigate, within the Challenge Period, the claims, causes of action, adversary proceedings, or other litigation against the Prepetition Secured Parties solely concerning the legality, validity, priority, perfection, enforceability or extent of the claims, liens, or interests (including, without limitation, the Prepetition Liens) held by or on behalf of each of the Prepetition Secured Parties related to the Prepetition Secured Indebtedness; *provided*, *further*, that any such Committee shall not assert an administrative expense claim against the Debtor for any fees and expenses incurred in excess of $50,000; and *provider, further*, that nothing in this paragraph shall prohibit the Debtors from exercising rights conferred to them in this Interim Order.

21.    ***Enforceability; Waiver of Any Applicable Stay***.  This Interim Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof.  Notwithstanding Bankruptcy Rule 6004(h), 6006(d), 7062 or 9014 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

22.    ***Proofs of Claim***.  Notwithstanding anything to the contrary contained in any prior or subsequent order of the Court, including, without limitation, any order establishing a deadline for the filing of proofs of claim or requests for payment of administrative expenses under section 503(b) of the Bankruptcy Code, (i) the Prepetition Secured Parties shall not be required to file any proof of claim or request for payment of administrative expenses with respect to any of the

Prepetition Secured Indebtedness, the Adequate Protection Liens, or the Adequate Protection Superpriority Claims; and the failure to file any such proof of claim or request for payment of administrative expenses shall not affect the validity, priority, or enforceability of any of the Prepetition Documents or of any other indebtedness, liabilities, or obligations arising at any time thereunder or under this Interim Order or prejudice or otherwise adversely affect the Prepetition Secured Parties' rights, remedies, powers, or privileges under any of the Prepetition Documents, this Interim Order, or applicable law, (ii) the First Lien Collateral Trustee and the Prepetition First Lien Agents (on behalf of themselves and the other Prepetition First Lien Secured Parties) are hereby authorized and entitled, in their sole discretion, but not required, to file (and amend and/or supplement, as they see fit) in the applicable Debtor's Case, a single master proof of claim in the Cases for any and all claims of the Prepetition First Lien Secured Parties arising from the applicable Credit Documents and/or First Lien Notes Documents, and (iii) the Second Lien Collateral Trustee and Second Lien Indenture Trustee (on behalf of themselves and the other Prepetition Second Lien Notes Secured Parties) are hereby authorized and entitled, in their sole discretion, but not required, to file (and amend and/or supplement, as they see fit) in the applicable Debtor's Case, a single master proof of claim in the Cases for any and all claims of the Prepetition Second Lien Notes Secured Parties arising from the applicable Second Lien Notes Documents; *provided*, that nothing herein shall waive the right of any Prepetition Secured Party to file its own proofs of claim against any of the Debtors.  The provisions set forth in this paragraph are intended solely for the purpose of administrative convenience and shall not affect the substantive rights of any party-in-interest or their respective successors-in-interest.

23.    ***Intercreditor Agreements***.  Pursuant to section 510 of the Bankruptcy Code, the Intercreditor Agreements and any other applicable intercreditor, subordination and/or turnover

67

provisions contained in any of the Prepetition Documents or any of the Secured Debt Documents (as defined in each Collateral Trust Agreement), shall (a) remain in full force and effect, (b) continue to govern the relative obligations, priorities, rights and remedies of (i) the Prepetition First Lien Secured Parties in the case of the First Lien Collateral Trust Agreement, (ii) the Prepetition Second Lien Notes Secured Parties in the case of the Second Lien Collateral Trust Agreement, and (iii) the Prepetition First Lien Secured Parties and the Prepetition Second Lien Notes Secured Parties in the case of the 1L-2L Intercreditor Agreement, and (c) not be deemed to be amended, altered or modified by the terms of this Interim Order.

24.     ***Section 552(b) of the Bankruptcy Code***.  Subject to entry of the Final Order, the (i) Prepetition Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and (ii) the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to any of the Prepetition Secured Parties with respect to proceeds, products, offspring or profits of any of the Prepetition Collateral or the Collateral.

25.     ***No Marshaling.***  Subject to entry of the Final Order, the Prepetition Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Prepetition Collateral or the Collateral.

26.     ***Expense Invoices; Disputes; Indemnification***.

(a)     Any of the Debtors' obligations to pay, in accordance with this Interim Order, the principal, interest, fees, payments, expenses, or any other amounts described in the Prepetition Documents or this Interim Order as such amounts become due, shall not require the Debtors or any party to obtain further Court approval.  For the avoidance of doubt, such payments include, without limitation, subject to the conditions and limitations set forth in this Interim Order, the Administrative Agent's fees, including the fees of Simpson Thacher & Bartlett LLP, each First

Lien Indenture Trustee's fees, the First Lien Collateral Trustee's fees, the Ad Hoc First Lien

Group's fees, including the Ad Hoc First Lien Advisor fees, the Second Lien Indenture Trustee's

fees, the Second Lien Collateral Trustee's fees, the Ad Hoc Cross-Holder Group's fees, including

the Ad Hoc Cross-Holder Advisor fees, and the reasonable and documented fees and expenses of

counsel and other professionals and any other principal, interest, fees, payments, expenses as set

forth in paragraphs 4 and 5 of this Interim Order, whether or not such fees arose before or after the

Petition Date, all to the extent provided in this Interim Order.

> (b)     The Prepetition Loan Parties shall be jointly and severally obligated to pay

all reasonable and documented fees and expenses described above, which obligations shall

constitute Prepetition Secured Indebtedness.   The Debtors shall pay the reasonable and

documented professional fees and expenses of professionals to the extent provided for in

paragraphs 4 and 5 of this Interim Order without the necessity of filing formal fee applications or

complying with the U.S. Trustee Guidelines, including such amounts arising before the Petition

Date; *provided, that* copies of invoices for such professional fees, expenses and disbursements (the

"**Invoiced Fees**") shall be served by email on the Debtors, the U.S. Trustee, and counsel to any

Committee, who shall have five (5) business days (the "**Review Period**") to review and assert any

objections thereto.  Invoiced Fees shall be in the form of an invoice summary for professional fees

and categorized expenses incurred during the pendency of the Cases, and such invoice summary

shall not be required to contain time entries, but shall include a list of professionals providing

services, with rates and hours worked, and a general, brief description of the nature of the matters

for which services were performed, and which may be redacted or modified to the extent necessary

to delete any information subject to the attorney-client privilege, any work product doctrine,

privilege or protection, common interest doctrine privilege or protection, any other evidentiary

privilege or protection recognized under applicable law, or any other confidential information, and

the provision of such invoices shall not constitute any waiver of the attorney-client privilege, work

product doctrine, privilege or protection, common interest doctrine privilege or protection, or any

other evidentiary privilege or protection recognized under applicable law.   The Debtors, any

Committee, or the U.S. Trustee may dispute the payment of any portion of the Invoiced Fees (the

"**Disputed Invoiced Fees**") if, within the Review Period, a Debtor, any Committee that may be

appointed in these Cases, or the U.S. Trustee notifies the submitting party in writing setting forth

the specific objections to the Disputed Invoiced Fees (to be followed by the filing with the Court,

if necessary, of a motion or other pleading, with at least ten (10) business days' prior written notice

to the submitting party of any hearing on such motion or other pleading).  For avoidance of doubt,

the Debtors shall promptly pay in full all Invoiced Fees other than the Disputed Invoiced Fees.

(c)     Subject to any restrictions imposed by applicable law, nothing in this

Interim Order shall abrogate the indemnification provisions set forth in any of the Credit

Documents or any of the First Lien Notes Documents.

27.     ***Letters of Credit under the Credit Agreement.***  Following entry of this Interim

Order, the Debtors shall be authorized, but not directed, to request that the Issuing Banks (as

defined in the Credit Agreement) extend, renew, or otherwise amend letters of credit issued under

the Credit Agreement ("**Letters of Credit**"), in accordance with the practices and procedures in

the Credit Agreement, and to take all actions reasonably appropriate with respect thereto (including

seeking that the applicable beneficiaries of such letters of credit approve the same), and the Issuing

Banks in their discretion are each authorized to extend, renew, or otherwise amend the Letters of

Credit in accordance with the terms of the Credit Agreement, *provided* that no Issuing Bank or any

other Prepetition First Lien Loan Secured Party shall have any obligation to extend, renew, or

otherwise amend the Letters of Credit and the obligations of the parties with respect to the Letters of Credit shall not be modified by this Interim Order.

28.    ***Credit Bidding and Sale Provisions***.    Subject to paragraph 19 of this Interim Order, pursuant to section 363(k) of the Bankruptcy Code, (i)  the First Lien Collateral Trustee shall have the right to credit bid (either directly or through one or more acquisition vehicles), up to the full amount of the Prepetition First Lien Secured Parties' respective claims, including, for the avoidance of doubt, any secured claims arising under this Interim Order in favor of the Prepetition First Lien Secured Parties (including, without limitation, any claim secured by any Adequate Protection Lien), and (ii) subject to the terms of the 1L-2L Intercreditor Agreement, the Second Lien Collateral Trustee shall have the right to credit bid (either directly or through one or more acquisition vehicles), up to the full amount of the Prepetition Second Lien Notes Secured Parties' respective claims, including, for the avoidance of doubt, any secured claims arising under this Interim Order in favor of the Prepetition Second Lien Notes Secured Parties (including, without limitation, any claim secured by any Adequate Protection Lien), in each case, in any sale of all or any portion of the Prepetition Collateral or the Collateral, including, without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any chapter 11 plan; *provided, however,* that any credit bid by the Second Lien Collateral Trustee or its designee shall comply in all respects with the 1L-2L Intercreditor Agreement and the terms set forth in any bidding procedures and bidding procedures order entered by the Court.  No Debtor shall object to, or solicit, support, or encourage any objection to, any rights set forth in this paragraph and all relevant provisions of any Intercreditor Agreement shall apply and be binding with respect to any and all rights set forth in this paragraph.

29.     ***Information Sharing.***  Notwithstanding anything to the contrary herein, to the extent that information is required to or requested to be shared pursuant to this Interim Order to parties that are subject to a confidentiality agreement with the Debtors (including, without limitation, pursuant to paragraphs 3(c), 3(e), 4(h), and 5(f)), such information is not required to be shared until the Debtors and the relevant recipients have, acting in good faith, agreed as to the application or non-application of any cleansing or blowout provision, if any, in any such confidentiality agreement, and until any such agreement has been reached, the Debtors reserve the right not to disclose any such information; *provided* that the foregoing restrictions do not apply to the Administrative Agent and Private Side Lenders to the extent they receive confidential information hereunder pursuant to the confidentiality provisions of the Credit Agreement.

30.     ***Headings***  The headings in this Interim Order are for purposes of reference only and shall not limit or otherwise affect the meaning of this Interim Order.

31.     ***Retention of Jurisdiction.***  The Court has and will retain jurisdiction to enforce this Interim Order and with respect to all matters arising from or related to the implementation of this Interim Order.

32.     ***Final Hearing***  A final hearing on the relief requested in the Motion shall be held on [_____], 2022, at __:__ _.m. (prevailing Eastern time).  Any party in interest objecting to the relief sought at the Final Hearing shall file written objections no later than [_____], 2022 at [ ]:[ ] p.m.

Dated: _____, 2022


_____
UNITED STATES BANKRUPTCY JUDGE

## Exhibit 1

**Approved Budget**

**Project Zed**
Approved Budget
Weekly Cash Flow – Debtor Monthly View[1]

*(USD in $ millions, unless otherwise indicated)*

| Debtor | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Month | 8/15 - 8/31 Aug-22 | Sep-22 | Oct-22 | Nov-22 | Dec-22 | Jan-23 | Feb-23 | Mar-23 | Apr-23 | May-23 | Jun-23 | Jul-23 | Total |
| **Operating Receipts** | | | | | | | | | | | | | |
| Product Sales Receipts | $54 | $368 | $260 | $201 | $247 | $223 | $204 | $222 | $184 | $188 | $208 | $197 | $2,555 |
| Other Receipts | – | 18 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 23 |
| **Total Operating Receipts** | **$54** | **$386** | **$260** | **$201** | **$247** | **$224** | **$205** | **$222** | **$184** | **$189** | **$209** | **$197** | **$2,578** |
| **Operating Disbursements** | | | | | | | | | | | | | |
| Payroll & Payroll Related | ($13) | ($33) | ($26) | ($18) | ($18) | ($18) | ($18) | ($59) | ($23) | ($18) | ($18) | ($18) | ($284) |
| Materials & Freight | (16) | (63) | (32) | (22) | (22) | (22) | (22) | (22) | (22) | (22) | (22) | (22) | (309) |
| R&D, Marketing & Royalties | (4) | (31) | (68) | (24) | (25) | (22) | (48) | (26) | (48) | (26) | (22) | (48) | (390) |
| Rebates | (16) | (85) | (68) | (33) | (80) | (38) | (22) | (67) | (29) | (34) | (37) | (26) | (533) |
| G&A and Other | (6) | (67) | (59) | (23) | (23) | (23) | (23) | (23) | (23) | (23) | (23) | (23) | (343) |
| **Total Operating Disbursements** | **($55)** | **($279)** | **($252)** | **($120)** | **($169)** | **($124)** | **($134)** | **($197)** | **($145)** | **($124)** | **($123)** | **($137)** | **($1,859)** |
| **Net Cash Flow From Operations** | **($2)** | **$107** | **$8** | **$81** | **$78** | **$100** | **$71** | **$25** | **$39** | **$65** | **$86** | **$60** | **$719** |
| **Intercompany to Non-Debtors – From / (To)** | – | – | – | – | ($17) | ($15) | ($15) | ($15) | ($15) | ($15) | ($15) | ($15) | ($122) |
| **Non-Operating** | | | | | | | | | | | | | |
| Debt Service[2] | ($135) | ($45) | ($47) | ($45) | ($45) | ($48) | ($43) | ($48) | ($43) | ($51) | ($46) | ($48) | ($645) |
| Other Non-Operating | (0) | (25) | – | – | – | – | – | – | – | – | – | – | (26) |
| **Total Non-Operating** | **($135)** | **($70)** | **($47)** | **($45)** | **($45)** | **($48)** | **($43)** | **($48)** | **($43)** | **($51)** | **($46)** | **($48)** | **($671)** |
| **Restructuring Costs** | | | | | | | | | | | | | |
| Professional Fees | ($8) | ($14) | ($18) | ($47) | ($25) | ($25) | ($25) | ($25) | ($25) | ($25) | ($25) | ($25) | ($288) |
| Utility Deposit | (0) | – | – | – | – | – | – | – | – | – | – | – | (0) |
| **Total Restructuring Costs** | **($9)** | **($14)** | **($18)** | **($47)** | **($25)** | **($25)** | **($25)** | **($25)** | **($25)** | **($25)** | **($25)** | **($25)** | **($288)** |
| **Net Cash Flow** | **($146)** | **$23** | **($57)** | **($12)** | **($9)** | **$12** | **($12)** | **($63)** | **($45)** | **($26)** | **($0)** | **($28)** | **($361)** |
| **Cash Balance[3]** | | | | | | | | | | | | | |
| Beginning Cash Balance - Book | $1,032 | $886 | $910 | $853 | $841 | $832 | $844 | $832 | $769 | $724 | $698 | $698 | $1,032 |
| Net Cash Flow | (146) | 23 | (57) | (12) | (9) | 12 | (12) | (63) | (45) | (26) | (0) | (28) | (361) |
| **Ending Cash Balance - Book** | **$886** | **$910** | **$853** | **$841** | **$832** | **$844** | **$832** | **$769** | **$724** | **$698** | **$698** | **$671** | **$671** |
| ( +/- ) Outstanding Checks | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 |
| **Ending Cash Balance - Bank** | **$895** | **$918** | **$861** | **$849** | **$841** | **$853** | **$840** | **$777** | **$733** | **$707** | **$707** | **$679** | **$679** |

**Notes:**
(1) Forecast assumes a preliminary injunction is in place in connection with the opioid litigation. Litigation costs would be significantly higher in the event an injunction is not granted.
(2) For the post-petition period, interest is calculated using ABR (with Prime Rate constant at 5.5%), plus adequate protection payments pursuant to the proposed Cash Collateral order
(3) Includes $85 million of funds pledged under the TLC agreement

**Project Zed**
Approved Budget
13-Week Cash Flow – Debtor Entities

*(USD in $000s, unless otherwise indicated)*

| Debtor | Targeted Ch. 11 Filing Week | | | | | | | | | | | | | 13-Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | |
| Forecast Week No. | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 | Week 8 | Week 9 | Week 10 | Week 11 | Week 12 | Week 13 | 13-Week |
| Week Ended | 8/19 | 8/26 | 9/2 | 9/9 | 9/16 | 9/23 | 9/30 | 10/7 | 10/14 | 10/21 | 10/28 | 11/4 | 11/11 | Total |
| **Operating Receipts** | | | | | | | | | | | | | | |
| Product Sales Receipts | $20,115 | $33,525 | $36,779 | $55,168 | $91,947 | $91,947 | $91,947 | $64,892 | $64,892 | $64,892 | $64,892 | $51,103 | $51,103 | $783,200 |
| Other Receipts | – | – | 18,471 | – | – | – | – | 471 | – | – | – | 471 | – | 19,414 |
| **Total Operating Receipts** | **$20,115** | **$33,525** | **$55,250** | **$55,168** | **$91,947** | **$91,947** | **$91,947** | **$65,363** | **$64,892** | **$64,892** | **$64,892** | **$51,574** | **$51,103** | **$802,614** |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| Payroll & Payroll Related | ($672) | ($12,806) | ($8,087) | ($13,716) | ($672) | ($8,540) | ($2,479) | ($15,898) | ($672) | ($8,540) | ($672) | ($10,402) | ($672) | ($83,826) |
| Materials & Freight | (1,485) | (14,440) | (14,945) | (17,737) | (20,392) | (2,333) | (7,600) | (9,488) | (9,715) | (5,124) | (7,490) | (10,465) | (4,853) | (126,066) |
| R&D, Marketing & Royalties | – | (4,035) | (6,414) | (4,035) | (4,035) | (7,940) | (8,511) | (9,939) | (9,939) | (8,651) | (39,232) | (6,357) | (6,357) | (115,445) |
| Rebates | (2,111) | (13,719) | (14,924) | (17,409) | (17,409) | (17,409) | (17,409) | (16,891) | (16,891) | (16,891) | (16,891) | (13,046) | (10,162) | (191,161) |
| G&A and Other | (811) | (5,143) | (5,586) | (19,628) | (7,257) | (13,850) | (20,746) | (25,917) | (25,917) | (14,134) | (8,893) | (10,392) | (20,164) | (161,755) |
| **Total Operating Disbursements** | **($5,078)** | **($50,143)** | **($49,956)** | **($72,524)** | **($49,764)** | **($50,072)** | **($56,744)** | **($78,133)** | **($51,351)** | **($48,099)** | **($74,676)** | **($49,505)** | **($42,207)** | **($678,253)** |
| **Net Cash Flow From Operations** | **$15,037** | **($16,618)** | **$5,294** | **($17,356)** | **$42,182** | **$41,875** | **$35,203** | **($12,770)** | **$13,540** | **$16,793** | **($9,785)** | **$2,069** | **$8,896** | **$124,361** |
| **Intercompany to Non-Debtors – From / (To)** | – | – | – | – | – | – | – | – | – | – | – | – | – | – |
| **Non-Operating** | | | | | | | | | | | | | | |
| Debt Service[1] | ($113,998) | – | ($21,071) | – | – | – | ($45,152) | – | – | – | – | ($46,657) | – | ($226,878) |
| Other Non-Operating | (400) | – | (25,254) | – | – | – | – | – | – | – | – | – | – | (25,654) |
| **Total Non-Operating** | **($114,398)** | **–** | **($46,325)** | **–** | **–** | **–** | **($45,152)** | **–** | **–** | **–** | **–** | **($46,657)** | **–** | **($252,533)** |
| **Restructuring Costs** | | | | | | | | | | | | | | |
| Professional Fees | ($8,286) | – | – | ($3,197) | ($3,783) | – | ($6,581) | ($6,195) | – | – | ($11,985) | ($5,000) | ($6,195) | ($51,222) |
| Utility Deposit | (300) | – | – | – | – | – | – | – | – | – | – | – | – | (300) |
| **Total Restructuring Costs** | **($8,586)** | **–** | **–** | **($3,197)** | **($3,783)** | **–** | **($6,581)** | **($6,195)** | **–** | **–** | **($11,985)** | **($5,000)** | **($6,195)** | **($51,522)** |
| **Net Cash Flow** | **($107,947)** | **($16,618)** | **($41,031)** | **($20,554)** | **$38,400** | **$41,875** | **($16,530)** | **($18,965)** | **$13,540** | **$16,793** | **($21,770)** | **($49,588)** | **$2,701** | **($179,693)** |
| **Cash Balance[2]** | | | | | | | | | | | | | | |
| Beginning Cash Balance - Book | $1,031,990 | $924,043 | $907,425 | $866,394 | $845,840 | $884,240 | $926,115 | $909,585 | $890,620 | $904,160 | $920,953 | $899,184 | $849,596 | $1,031,990 |
| Net Cash Flow | (107,947) | (16,618) | (41,031) | (20,554) | 38,400 | 41,875 | (16,530) | (18,965) | 13,540 | 16,793 | (21,770) | (49,588) | 2,701 | (179,693) |
| **Ending Cash Balance - Book** | **$924,043** | **$907,425** | **$866,394** | **$845,840** | **$884,240** | **$926,115** | **$909,585** | **$890,620** | **$904,160** | **$920,953** | **$899,184** | **$849,596** | **$852,297** | **$852,297** |
| ( +/- ) Outstanding Checks | 500 | 8,527 | 8,527 | 8,527 | 8,527 | 8,527 | 8,527 | 8,527 | 8,527 | 8,527 | 8,527 | 8,527 | 8,527 | 8,527 |
| **Ending Cash Balance - Bank** | **$924,543** | **$915,952** | **$874,921** | **$854,367** | **$892,767** | **$934,642** | **$918,112** | **$899,147** | **$912,687** | **$929,480** | **$907,711** | **$858,123** | **$860,823** | **$860,823** |

**Notes:**

(1) For the post-petition period, interest is calculated using ABR (with Prime Rate constant at 5.5%), plus adequate protection payments pursuant to the proposed Cash Collateral order

(2) Includes $85 million of funds pledged under the TLC agreement

**<u>Exhibit 2</u>**

**Milestones**

**Milestones**

(Capitalized terms used but not defined in the Interim Order have the meaning set forth in the RSA.)

| Milestone | Date |
|---|---|
| The Bankruptcy Court shall have entered the Cash Collateral Order on an interim basis. | Not later than 11:59 p.m. prevailing Eastern Time on the date that is five (5) Business Days after the Petition Date. |
| The Bankruptcy Court shall have entered the Cash Collateral Order on a final basis. | Not later than 11:59 p.m. prevailing Eastern Time on the date that is forty-five (45) calendar days after the Petition Date. |
| The Bankruptcy Court shall have entered the Bidding Procedures Order. | Not later than 11:59 p.m. prevailing Eastern Time on the date that is one-hundred (100) calendar days after the Petition Date. |
| The Bankruptcy Court shall have entered the Sale Order. | Not later than 11:59 p.m. prevailing Eastern Time on the date that is two-hundred forty-five (245) calendar days after the Petition Date. |
| The Closing Date shall have occurred. | Not later than 11:59 p.m. prevailing Eastern Time on the date that is three-hundred five (305) calendar days after the Petition Date (the "**Outside Date**"), *provided* that: (x) to the extent that a milestone above is extended in accordance with the terms of the RSA or by an Order of the Bankruptcy Court, or otherwise take longer to satisfy then is set forth in the applicable Milestone and the Consenting First Lien Creditors do not terminate this Agreement on account thereof, then the Outside Date shall in each instance automatically be extended by an equivalent number of days; (y) to the extent that the Purchaser is not the prevailing bidder at an auction, but the purchase agreement with respect to the prevailing bidder is terminated and the Debtors either seek to close the Sale Transaction with the Purchaser as a backup bidder or an alternative Sale with another backup bidder, the Outside Date shall be automatically extended to the date that is one- |

| | hundred eighty (180) calendar days from the date that the purchase agreement with the prevailing bidder is terminated; and (z) to the extent the Closing Date is not achieved by the Outside Date (after giving effect to any extensions) solely due to any regulatory or third-party approval or consent remaining outstanding, the Outside Date shall be extended by one-hundred twenty (120) additional calendar days. |
|---|---|