SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Paul D. Leake
Lisa Laukitis
Shana A. Elberg
Evan A. Hill
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
Fax: (212) 735-2000

*Proposed Counsel to Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re* | **Chapter 11** |
| **ENDO INTERNATIONAL plc, *et al.*,** | **Case No. 22-22549 (___)** |
| **Debtors.**[1] | **(Joint Administration Pending)** |

**DECLARATION OF RAY DOMBROWSKI IN SUPPORT OF
DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS PURSUANT
TO 11 U.S.C. §§ 105, 361, 362, 363, AND 364 (I) AUTHORIZING USE OF
CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION,
(III) SCHEDULING A FINAL HEARING AND (IV) GRANTING RELATED RELIEF**

I, Ray Dombrowski, hereby declare as follows:

1.      I am a Managing Director at Alvarez & Marsal North America, LLC (together with

employees of its affiliates (all of which are wholly-owned by its parent company and employees),

its wholly owned subsidiaries, and independent contractors, "A&M"), a global restructuring

advisory services.  Since May 2021, A&M has served as financial advisor to Endo International

---

[1]     The last four digits of Debtor Endo International plc's tax identification number are 3755.  Due to the large number of debtors in these chapter 11 cases, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/endo/.  The location of the Debtors' service address for purposes of these chapter 11 cases is: 1400 Atwater Drive, Malvern, PA 19355.

plc ("Endo Parent") and its affiliated debtors and debtors in possession (collectively, the "Debtors"

and, together with their non-debtor affiliates, the "Company" or "Endo").

2.      I submit this declaration ("Declaration") in support of *Debtors' Motion for the*

*Entry of Interim and Final Orders (I) Authorizing Debtors' Use of Cash Collateral; (II) Granting*

*Adequate Protection to Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV)*

*Granting Related Relief* (the "Motion")[2] and entry of the Interim Order.

3.      Except as otherwise indicated, the statements in this Declaration are based on: (a)

my personal knowledge of the Debtors' operations; (b) my review of relevant documents;

(c) information provided to me by employees of A&M working under my supervision;

(d) information provided to me by, or discussions with, members of the Debtors' management

team, other employees, or the Debtors' other advisors; and/or (e) my general experience and

knowledge.  I am authorized to submit this declaration.  If called upon to testify, I can and will

testify competently as to the facts set forth herein.

## BACKGROUND AND QUALIFICATIONS

4.      I have been a Managing Director with A&M North American Corporate

Restructuring ("NACR") in New York since 2001.  I have more than 25 years of financial

restructuring experience, and specialize in assisting corporations in developing and implementing

financial turnaround strategies.

5.      I have served in interim Chief Financial Officer, Chief Executive Officer, and Chief

Restructuring Officer roles and have advised large and mid-size companies in and out of

bankruptcy.  For example, I served as Chief Restructuring Officer of Chemtura Corporation, for

which I received the TMA Turnaround of the Year award, and Chief Restructuring Officer of

---

[2]      Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion or the
proposed interim order attached thereto as **Exhibit A** (the "Interim Order"), as applicable.

Patriot Coal Corporation, for which I received the TMA Transaction of the Year – Mega Company award.  I also served as Chief Executive Officer and Chief Restructuring Officer of OW Bunker, for which I received the M&A Advisor Energy Restructuring of the Year award.  My other clients have included SIRVA, SLI, Allegheny Energy, VecTour, Dresser Rand, APR, Verestar, Great Basin Gold, Oxford Resources, Triumph Group, Horizon Lines, Maritime Equity Partners, and Marchon Eyeware as well as the unsecured creditors' committees of Kodak, Westinghouse, and SunEdison.

6.      Before joining A&M, I served as Senior Vice President and Chief Financial Officer of Ogden Corp. and as a senior executive with Bell Atlantic in various roles.  I hold a bachelor's degree from the U.S. Merchant Marine Academy as well as a J.D. and an LLM in taxation from Temple University.

7.      A&M specializes in interim management, crisis management, turnaround consulting, operational due diligence, creditor advisory services, and financial and operational restructuring.  A&M's debtor advisory services have included a wide range of activities targeted at stabilizing and improving a company's financial position, including developing or validating forecasts, business plans, and related assessments of a business's strategic position; monitoring and managing cash, cash flow and supplier relationships; assessing and recommending cost reduction strategies; and designing and negotiating financial restructuring packages.  Since its inception in 1983, A&M has been a global provider of turnaround advisory services to companies in crisis or those in need of performance improvement in specific financial and operational areas.

8.      A&M has served as one of the principal financial advisors to the Debtors.  As an advisor to the Debtors, I have been working with Skadden, Arps, Slate, Meagher & Flom LLP and PJT Partners, Inc. to advise the Debtors on their business operations, including with respect to tax

and accounting matters, cash management, treasury operations, strategic alternatives, restructuring

matters, and the diligence and preparation related to these Chapter 11 Cases.  In that role, my team

and I have engaged extensively with the Debtors' management and key employees on a day-to-

day basis.

9.      On the Petition Date, the Debtors filed the Motion seeking authority to use Cash

Collateral (as defined in the Motion).

## I.      THE DEBTORS' IMMEDIATE NEED FOR CASH COLLATERAL.

10.      As of the Petition Date, the Debtors had approximately $1.032 billion of cash on

hand (including the $85 million in the Company's Bank of America account ending in *2027 which

shall be included in the calculation of the Minimum Liquidity Amount).  The Debtors require

immediate access to Cash Collateral to ensure they are able to continue operating in the ordinary

course throughout these Chapter 11 Cases.  Based on my review of the Debtors' cash position and

understanding of their business, I believe that without immediate access to Cash Collateral, the

Debtors will be unable to adequately fund their operations at the outset of these Chapter 11 Cases,

which could result in impairment to the value of their business.  Specifically, without immediate

access to Cash Collateral, the Debtors do not have sufficient unencumbered assets to maintain their

near term operating expenses as further described below.  Consequently, the Debtors will lack cash

necessary to meet their working capital needs and pay the various disbursements identified in the

Approved Budget (as defined in the Motion).

11.      The disbursements reflected in the Approved Budget are critical and include,

among other items, payroll, materials and freight, research and development, marketing, taxes,

rent, utilities, insurance, and other operating disbursements, all of which are crucial to maintaining

the Debtors' operations.  The Debtors' inability to make these payments as they come due,

including payments to key vendors and employees, could result in a loss of the Debtors' workforce, loss of customers, and damaged relationships with key vendors. These disbursements are reasonable and consistent with what I believe is necessary to prevent irreparable harm to the Debtors' estates while maintaining and maximizing enterprise value.

## II.    THE PARTIES' GOOD FAITH NEGOTIATIONS WITH RESPECT TO CASH COLLATERAL USAGE.

12.    Before the Petition Date, the Debtors and their advisors engaged in extensive, good-faith negotiations with the Ad Hoc First Lien Group regarding the terms of the Debtors' consensual use of Cash Collateral, including the Adequate Protection Obligations. Through these negotiations, the Debtors were able to achieve financial flexibility and overall certainty of funding. The Debtors were particularly focused on not ceding inappropriate case controls and preserving rights of the estate and parties in interest. Under the Interim Order, the Debtors have flexibility to run a robust sale and marketing process of their assets, as reflected in the Milestones, among other provisions. Ultimately, the Debtors and Ad Hoc First Lien Group both made concessions in an effort to achieve consensus.

13.    In addition, before the Petition Date, the Debtors shared a draft of the Interim Order with counsel to other secured parties, including counsel for the Ad Hoc Cross-Holder Group, First Lien Indenture Trustee, and Second Lien Indenture Trustee and counsel to the Administrative Agent. The Debtors worked with these parties to incorporate additional changes to the Interim Order based on their feedback.

14.    The Debtors believe consensual Cash Collateral usage is critical to their ability to preserve and maximize the value of the Debtors' estates. First, litigating non-consensual Cash Collateral usage at the outset of these Chapter 11 Cases would create unnecessary uncertainty and divert management's attention from continuing to operate the Debtors' businesses during the

crucial first days of these Chapter 11 Cases, while also damaging the Debtors and their stakeholders by depleting resources that could otherwise be available to operate the business. For that reason, I believe a fight over non-consensual use of Cash Collateral would damage the Debtors' estates even if the Debtors were to ultimately prevail in that dispute. Second, the Debtors' consensual use of Cash Collateral under the terms of the Cash Collateral Orders will send a reassuring message to the Debtors' vendors, employees, customers, other key stakeholders, and the marketplace more generally, creating a context in which the Debtors will more likely be able to smoothly transition into these Chapter 11 Cases. Finally, a dispute over Cash Collateral use would likely set the stage for further value-destructive disputes and litigation as these Chapter 11 Cases proceed.

15.     Despite these considerations, the Debtors were prepared to engage in a dispute if necessary, and the Debtors approached the negotiations from that position. After many rounds of negotiation, the Debtors and the Prepetition Secured Parties were able to arrive at the consensual terms memorialized in the proposed Interim Order. In my opinion, the terms memorialized in the Interim Order are the most favorable the Debtors reasonably could have achieved under the circumstances.

## III.    THE PREPETITION SECURED PARTIES ARE ADEQUATELY PROTECTED AND SUCH ADEQUATE PROTECTION IS APPROPRIATE.

### A.    Use of Cash Collateral Preserves the Prepetition Collateral.

16.     The Debtors' ability to access and use Cash Collateral is also necessary to preserve the value of the Prepetition Collateral. I am advised that the Prepetition Secured Parties have liens on substantially all of the assets of the Debtors who are Prepetition Loan Parties. To preserve and maximize the value of the Debtors' operations, the Debtors require the use of Cash Collateral. Without such use, the Debtors would be unable to make the various upcoming payments reflected

in the Approved Budget, potentially damaging key relationships with employees, vendors, and customers, and undermining the Debtors' efforts to conduct a value-maximizing sale of their assets. Further, without access to cash, the Debtors might cease to operate, the going concern value of the Debtors could be lost, and the Debtors might be forced to liquidate their assets—including the Prepetition Collateral—for far less value than could be realized in a reorganization.

17.    In sum, I believe the Debtors' consensual use of Cash Collateral will preserve their ongoing operations and critical relationships, avoid the needless destruction of value that would result from an inability to utilize their Cash Collateral, and further benefit the Debtors and their stakeholders by maintaining the value of non-cash Prepetition Collateral and the Debtors' estates. In light of the Debtors' need for access to Cash Collateral, and the benefits of the Debtors obtaining such access on a consensual basis, I believe the Debtors' agreement to the terms of the Interim Order (including the adequate protection provisions, as described further below) constitutes an exercise of sound business judgment.

**B.    The Debtors are Offering Customary and Appropriate Adequate Protection.**

18.    As set forth in the Motion, the Debtors agreed to the Adequate Protection Obligations (as defined in the Motion) in return for consensual Cash Collateral usage on the terms set forth in the Interim Order. Based upon my experience and my involvement with the Cash Collateral negotiations, I believe the Adequate Protection Obligations are reasonable and appropriate under the circumstances of these Chapter 11 Cases. First, the package is narrowly tailored to ensure the protection of the Prepetition Secured Parties' interests while avoiding any erosion of the rights of other stakeholders or unsecured creditors. Second, as is customary, the Adequate Protection Liens and the Adequate Protection Superpriority Claims are limited to the extent of any Diminution in Value in the Prepetition Collateral. Given the crucial nature of the

7

Debtors' continued access to Cash Collateral at the outset of the Chapter 11 Cases, in addition to the benefits provided to the Debtors' from using such Cash Collateral on a consensual basis, it is my belief that the terms of the Interim Order reflect the Debtors' exercise of sound business judgment.

## **CONCLUSION**

19.    Access to Cash Collateral is critical to the Debtors' ability to continue their business operations, conduct the sale process contemplated by the RSA, and preserve value for all stakeholders.  Absent the interim relief requested in the Motion, I believe that the Debtors' business operations will be immediately and  irreparably harmed.  For these reasons, I believe the terms of Cash Collateral usage set forth in the Interim Order are in the best interest of the Debtors and their estates.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: August 16, 2022

*/s/ Ray Dombrowski*_____
Ray Dombrowski