**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| *In re* | **Chapter 11** |
| **ENDO INTERNATIONAL plc, *et al.*,** | **Case No. 22-22549 (___)** |
| **Debtors.**[1] | **(Joint Administration Pending)** |

### DECLARATION OF MARK BRADLEY IN SUPPORT
### OF CHAPTER 11 PETITIONS AND FIRST DAY PAPERS

I, Mark Bradley, hereby declare under penalty of perjury that the following is true
to the best of my knowledge, information, and belief:

1.      I am the Chief Financial Officer of Endo International plc ("Endo Parent") and its
debtor affiliates, as debtors and debtors in possession (collectively, the "Debtors" and, together
with their non-debtor affiliates, the "Company" or "Endo") in the above-captioned chapter 11
cases (the "Chapter 11 Cases").  Endo operates a global specialty biopharmaceutical business that
produces and sells both generic and branded products.  Endo Parent, the lead Debtor, is an Irish
public limited company and is the publicly-traded, ultimate parent of Endo's global enterprise
headquartered in Dublin, Ireland.

2.      I joined Endo in January 2007 as a Finance Director and have held several
prominent roles of increasing responsibility since joining Endo, including Senior Director of
Finance, Senior Vice President of Corporate Development, and Treasurer.  Prior to joining Endo,

---

[1]      The last four digits of Debtor Endo International plc's tax identification number are 3755.  Due to the large
number of debtors in these chapter 11 cases, a complete list of the debtor entities and the last four digits of
their federal tax identification numbers is not provided herein.  A complete list of such information may be
obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Endo.
The location of the Debtors' service address for purposes of these chapter 11 cases is: 1400 Atwater Drive,
Malvern, PA 19355.

I spent nearly seven years as a management consultant, most recently with Deloitte Consulting, providing a broad range of strategic and operational advice and services to senior executives across a number of industries. In addition, I served as a Finance Director for an industrial products company for approximately two years. I spent the first five years of my career in public accounting at Ernst & Young LLP and received my CPA in October 1993. I hold a Bachelor of Science degree in Accounting from Saint Joseph's University and a Master of Business Administration from The University of Texas at Austin.

3.      On the date hereof (the "Petition Date"), the Debtors each commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors intend to continue in the possession of their respective properties and the management of their respective businesses as debtors in possession. To minimize any business disruption caused by the commencement of the Chapter 11 Cases, the Debtors seek various types of relief through "first day" applications and motions filed contemporaneously herewith (collectively, the "First Day Papers"). I submit this declaration (this "Declaration") in support of the Debtors' (a) voluntary petitions for relief under chapter 11 of the Bankruptcy Code and (b) the First Day Papers. I am over the age of 18, competent to testify, and authorized to submit this Declaration on behalf of the Debtors.

4.      As a result of my time with the Debtors, my review of relevant documents, and my discussions with other members of the Debtors' management team, I am generally familiar with the Debtors' day-to-day operations, business affairs, books and records, and the information in the First Day Papers. The statements in this Declaration are, except where specifically noted, based on (a) my personal knowledge of the Debtors' operations and finances based on information provided by the Debtors, (b) my review of relevant documents, including information provided by

other parties, (c) information provided to me by, or discussions with, the members of the Debtors' management team or their advisors, and/or (d) my opinion based upon my experience. If called upon to testify, I would testify competently to the facts as set forth in this Declaration.

5.      This Declaration is divided into three parts. *Part I* provides background information about the Debtors, their business operations, their corporate and capital structures, and the circumstances surrounding the commencement of the Chapter 11 Cases. *Part II* describes the Debtors' prepetition restructuring efforts and the path forward that the Debtors have charted for the Chapter 11 Cases. *Part III* sets forth the relevant facts in support of each of the First Day Papers.

## PART I: BACKGROUND

### I.      The Debtors' Business

#### A.      Business Overview and Business Segments

6.      Endo is one of the country's leading specialty pharmaceutical companies. Endo commenced operations in 1997 by acquiring certain pharmaceutical products, related rights, and assets from The DuPont Merck Pharmaceutical Company. Today, Endo develops, manufactures, and sells life-enhancing branded and generic products to customers in a wide range of medical fields, including endocrinology, orthopedics, urology, oncology, neurology, and other specialty areas.

7.      Endo has four principal operating segments: (a) branded pharmaceuticals ("Branded Pharmaceuticals"), (b) sterile injectables ("Sterile Injectables"), (c) generic pharmaceuticals ("Generic Pharmaceuticals"), and (d) international pharmaceuticals ("International Pharmaceuticals"). All products, except for those in the International Pharmaceuticals segment, are sold in the U.S. only. A brief description of each segment is set forth below.

### 1. Branded Pharmaceuticals

8.   The Branded Pharmaceutical segment focuses on products that have inherent scientific, regulatory, legal, and technical complexities, and markets such products under recognizable brand names that are trademarked.  After the completion of required clinical trials and testing, the Company seeks approvals from regulatory bodies, such as through the submission of applications to the Food and Drug Administration (the "FDA") for the marketing and sale of new drugs, called "New Drug Applications" ("NDAs") or applications to introduce new products into the U.S. market, called "Biologics License Applications."

9.   The Branded Pharmaceuticals segment includes a variety of branded products across three product categories: (a) "Medical Therapeutics," which consists of a differentiated and durable portfolio of products that treat and manage conditions in the areas of urology, orthopedics, endocrinology, and bariatrics; (b) "Medical Aesthetics," which consists solely of Qwo®, the first and only injectable treatment for moderate-to-severe cellulite; and (c) "Established Products," a diversified portfolio of approximately ten products that are not actively promoted.

10.   Key product offerings in the Medical Therapeutics portfolio include the following:

| Medical Therapeutics Portfolio | Description | Revenues (in millions) FY 2021 |
|---|---|---|
| XIAFLEX® | A non-surgical treatment for Dupuytren's contracture (for adult patients with an abnormal buildup of collagen in the fingers that limits or disables hand function) and Peyronie's disease (for adult men with a collagen plaque and a penile curvature deformity).  In early 2020, Endo announced that it had initiated Xiaflex development programs for the treatment of plantar fibromatosis and adhesive capsulitis, which are continuing to progress.  In the last quarter of 2021, the Company initiated a phase 2 study of its plantar fibromatosis development program. | $432 |
| SUPPRELIN® LA | A soft, flexible 12-month hydrogel implant based on Endo's hydrogel polymer technology that delivers histrelin acetate, a | $114 |

| | gonadotropin-releasing hormone agonist, and is indicated for the treatment of central precocious puberty in children. | |
|---|---|---|
| NASCOBAL® | A prescription nasal spray used as a supplement to treat vitamin B12 deficiency. | $82 |
| AVEED® | A long-acting testosterone undecanoate for injection for the treatment of hypogonadism that is dosed only five times per year after the first month of therapy. | |

11.    Key product offerings in the Established Products portfolio include the following:

| Established Products Portfolio | Description | Revenues (in millions) FY 2021 |
|---|---|---|
| PERCOCET® | An opioid analgesic approved for the treatment of moderate-to-moderately-severe pain. | $104 |
| TESTOPEL® | A long-acting implantable pellet indicated for testosterone replacement therapies in conditions associated with a deficiency or absence of endogenous testosterone. | $44 |
| EDEX® | A penile injection used to treat erectile dysfunction caused by conditions affecting nerves, blood vessels, emotions and/or a combination of factors. | $113[2] |
| LIDODERM® | A topical patch product containing lidocaine that is approved for the relief of pain associated with post-herpetic neuralgia, a condition thought to result after nerve fibers are damaged during a case of herpes zoster (commonly known as shingles). | |

12.    Endo's pain products, including its opioid products are not, and have not been, actively promoted in the U.S. since 2016.  In December 2016, Endo eliminated its entire U.S. pain product field sales force.

### 2.  Sterile Injectables

13.    The Sterile Injectables segment includes a portfolio of more than 30 product families.  In this portfolio, there are several sterile injectable products that are protected by certain

---

[2]    Other established products are included in this aggregate revenue figure.

patent rights and have inherent scientific, regulatory, legal and technical complexities, as well as other generic injectable products that are difficult to formulate or manufacture or face complex legal and regulatory challenges.  Endo's sterile injectables products are manufactured in sterile facilities and are administered at hospitals, clinics and long-term care facilities.  Key product offerings in this business segment include the following:

| Sterile Injectable Products Portfolio | Description | Revenues (in millions) FY 2021 |
| --- | --- | --- |
| VASOSTRICT® | This product is indicated to increase blood pressure in adults with vasodilatory shock who remain hypotensive despite fluids and catecholamines.  Vasostrict was the first vasopressin injection with an NDA approved by the FDA. | $902 |
| ADRENALIN® | A non-selective alpha and beta adrenergic agonist indicated for emergency treatment of certain allergic reactions, including anaphylaxis. | $125 |
| Ertapenem for injection | An injection indicated for the treatment of certain moderate to severe infections (the authorized generic of Merck Sharp & Dohme Corp.'s Invanz®). | $240[3] |
| APLISOL® | A sterile aqueous solution of a purified protein derivative for intradermal administration as an aid in the diagnosis of tuberculosis. | |
| Ephedrine sulfate injection | An alpha and beta adrenergic agonist and a norepinephrine-releasing agent indicated for the treatment of hypotension occurring in the setting of anesthesia. | |

### 3.  Generic Pharmaceuticals

14.    The Generic Pharmaceutical segment focuses on first-to-file or first-to-market opportunities that are difficult to formulate or manufacture.  Generic products are the pharmaceutical and therapeutic equivalents of branded products and are generally marketed under their generic (chemical) names rather than their brand names.  Generic Pharmaceuticals' product

---

[3]    Other sterile injectables are included in this aggregate revenue figure.

portfolio includes solid oral extended-release (*e.g.*, pills), solid oral immediate-release, liquids, semi-solids, patches (medicated adhesive patches designed to deliver the pharmaceutical through the skin), powders, ophthalmics (sterile pharmaceutical preparations administered for ocular conditions), sprays, and other products that treat and manage a wide range of medical conditions. This segment includes over 130 generic product families.

15.     Endo's generic portfolio also contains certain authorized generics, which are generic versions of branded products licensed by brand drug companies under an NDA and marketed as generics. Authorized generics do not face the same regulatory barriers to introduction and are not prohibited from sale during the 180-day marketing exclusivity period granted to the first-to-file Abbreviated NDA applicant. Endo's authorized generics include, among others, lidocaine patch 5% (the authorized generic of Endo's Lidoderm®), lubiprostone capsules (the authorized generic of Mallinckrodt Pharmaceuticals' Amitiza®), and sucralfate oral suspension 1 gm/10 ml (the authorized generic of AbbVie Inc.'s Carafate®).

### 4.  International Pharmaceuticals

16.     International Pharmaceuticals sells a variety of specialty pharmaceutical products outside the U.S., primarily in Canada through Debtor Paladin Labs Inc. The key products of this segment serve various therapeutic areas, including attention deficit hyperactivity disorder, pain, women's health, oncology and transplantation. In 2021, approximately 3% of Endo's total revenue was from customers outside the U.S. Revenues generated by this segment are primarily attributable to consumers located in Canada.

### B.  Debtors' Major Customers

17.     The vast majority of Endo's sales are to three wholesale distributors. For the year ended December 31, 2021 and through the first half of 2022, the fulfillment of orders by, AmerisourceBergen Corporation, McKesson Corporation, and Cardinal Health, Inc., collectively,

accounted for approximately 90% of Endo's revenues.[4] These three distributors, in turn, sell Endo products to retail drug store chains, pharmacies, and managed care organizations, including health maintenance organizations, nursing homes, hospitals, clinics, pharmacy benefit management companies, and mail order customers.

### C.    Workforce

18.    As of the Petition Date, the Debtors had approximately 1,560 employees.  Of this number, approximately 170 are engaged in research and development ("R&D") and regulatory work, 480 in sales and marketing, 450 in manufacturing, 200 in quality assurance, and 260 in general and administrative capacities.[5]  The Debtors also employ approximately 190 people outside of the United States.  With the exception of certain production personnel at the Debtors' Rochester, Michigan manufacturing facility, its employees are generally not represented by unions.

### D.    Regulatory Matters

19.    The Debtors are subject to extensive and rigorous regulatory oversight by numerous governmental entities.  The Federal Food, Drug, and Cosmetic Act ("FFDCA"), the Controlled Substances Act ("CSA"), and other federal and state statutes and regulations govern or influence the testing, manufacturing, packaging, labeling, storage, recordkeeping, approval, advertising, promotion, sale, and distribution of pharmaceutical products.  The Debtors must comply with these laws and the regulations, guidance documents and standards promulgated by, among others, the FDA, the Department of Health and Human Services, the Drug Enforcement Agency ("DEA"), the Bureau of Customs and Border Protection, and state boards of pharmacy.

---

[4]        As set forth below, PPI, EPI, PLI, and Endo Aesthetics LLC are the primary recipients of such payments.

[5]        The number of employees referenced in this paragraph does not include non-Debtor employees.

20.     Certain of the Debtors' subsidiaries sell products that are "controlled substances" as defined in the CSA and implementing regulations.  The DEA regulates chemical compounds as Schedule I, II, III, IV, or V substances, with Schedule I substances considered to present the highest risk of substance abuse and Schedule V substances the lowest risk.  The active ingredients in some of the Company's products are listed by the DEA as Schedule II or III substances under the CSA. Consequently, their manufacture, shipment, storage, sale and use are subject to a high degree of regulation.

21.     Outside the U.S., Endo is subject to laws and regulations that differ from those under which it operates in the U.S.  In most cases, non-U.S. regulatory agencies evaluate and monitor the safety, efficacy and quality of pharmaceutical products, govern the approval of clinical trials and product registrations and regulate pricing and reimbursement.  Certain international markets have differing product preferences and requirements and operate in an environment of government-mandated, cost-containment programs, including price controls, such as the Patented Medicine Prices Review Board in Canada.

## II.     The Debtors' Prepetition Capital Structure[6]

22.     Endo Parent is a holding company that conducts business through its operating subsidiaries and, as noted above, is the ultimate parent of each Debtor in the Chapter 11 Cases.  A full corporate organizational chart depicting the ownership structure of the Debtors and certain of

---

[6]     For further details regarding the Company's prepetition capital structure, please see the *Debtors' Motion for the Entry of Interim and Final Orders (I) Authorizing Debtors' Use of Cash Collateral; (II) Granting Adequate Protection to Secured Parties; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* filed contemporaneously herewith.

the Debtors' non-debtor affiliates is attached hereto as **Exhibit A**.  The following is a simplified

organizational chart depicting Endo's principal holding and operating entities.[7]



23.     As of the Petition Date, the Debtors' consolidated long-term debt obligations

totaled approximately $8.15 billion arising under (a) one credit agreement, which consists of a

revolving credit facility and a term loan facility, (b) four series of secured notes, and (c) four series

of unsecured notes.  The following is a summary of the Debtors' funded debt obligations as of the

Petition Date:

---

[7]      The simplified organizational chart is for illustrative purposes only.  Please refer to the full corporate
organizational chart attached hereto as **Exhibit A** for further details.

| Debt Instrument (as defined herein) | Facility Type/Notes Series | Maturity Date | Approximate Outstanding Principal Amount (in USD$ millions) |
|---|---|---|---|
| Revolving Credit Facility | Revolver | Various | $277.2 |
| Term Loan Facility | Term loan | Mar. 2028[8] | $1,975 |
| First Lien Notes | 5.875% Senior Secured Notes due 2024 | Oct. 2024 | $300 |
| | 7.500% Senior Secured Notes due 2027 | Apr. 2027 | $2,015.5 |
| | 6.125% Senior Secured Notes due 2029 | Apr. 2029 | $1,295 |
| Second Lien Notes | 9.500% Senior Secured Second Lien Notes due 2027 | July 2027 | $940.6 |
| Unsecured Notes | 5.375% Senior Notes due 2023 | Jan. 2023 | $6.1 |
| | 6.00% Senior Notes due 2028 | June 2028 | $1,260.4 |
| | 6.00% Senior Notes due 2025 | Feb. 2025 | $21.6 |
| | 6.00% Senior Notes due 2023 | July 2023 | $56.4 |
| | | Total: | $8,147.8 |

## A.    Revolving Credit Facility and Term Loan Facility

24.    On April 27, 2017, Debtors Endo Parent, Endo Luxembourg Finance Company I S.à r.l. ("Lux Borrower"), and Endo LLC ("Co-Borrower," and together with Lux Borrower, the "Borrowers") entered into that certain Credit Agreement (as amended by the First Amendment, dated as of March 28, 2019, the "Prior Credit Agreement," as amended and restated by the Amendment and Restatement Agreement (as defined below) and as may be further amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), with JPMorgan Chase Bank, N.A., as swing line lender, issuing bank (in such capacity, the "Issuing Bank"), and administrative agent (in such capacity, the "Administrative Agent"), and the lenders party thereto from time to time (such lenders, immediately prior to the date hereof, the "Prepetition First Lien Lenders" and, together with the Administrative Agent,

---

[8]    Subject to an earlier springing maturity if the aggregate principal amount outstanding of the 7.500% Notes and the Second Lien Notes (each as defined below), in each case, is greater than or equal to $500 million and such notes are not refinanced or repaid prior to the date that is 91 days prior to the stated maturity thereof.

Issuing Bank, First Lien Collateral Trustee (as defined below), and each of the other Secured Parties (as defined in the Credit Agreement), the "Prepetition First Lien Loan Secured Parties"). The Credit Agreement provides for a senior secured revolving credit facility (the "Revolving Credit Facility") and a senior secured term loan facility (the "Term Loan Facility" and, together with the Revolving Credit Facility, the "Credit Facilities").  In connection with the Credit Agreement, certain subsidiaries of Endo Parent entered into that certain subsidiary guaranty, dated as of April 27, 2017 (as may be amended, amended and restated, supplemented or otherwise modified from time to time, the "Subsidiary Guaranty"), among Endo Parent, the Borrowers, the various guarantor parties thereto (including any subsidiary of Endo Parent that executed a joinder thereto, the "Guarantors"), and the Administrative Agent.

25.    On March 25, 2021, Endo Parent, the Borrowers, and certain of the Prepetition First Lien Loan Secured Parties entered into that certain Amendment and Restatement Agreement (the "Amendment and Restatement Agreement") which amended and restated the Prior Credit Agreement in order to, among other things, (a) refinance in full the existing term loans under the Prior Credit Agreement, which had approximately $3.295 billion of principal outstanding, with the proceeds from (i) a new tranche of senior secured term loans in an aggregate principal amount of $2 billion maturing in March 2028 (subject to an earlier springing maturity if the aggregate principal amount outstanding of the 7.500% Notes and the Second Lien Notes (each as defined below), in each case, is greater than or equal to $500 million and such notes are not refinanced or repaid prior to the date that is 91 days prior to the stated maturity thereof) and (ii) $1.295 billion of newly issued 6.125% Senior Secured Notes due 2029 (the "6.125% Notes"), and (b) extend the maturities of approximately $675.3 million of existing revolving commitments under the Revolving Credit Facility to March 2026.  After giving effect to the Amendment and Restatement

Agreement, the Credit Agreement provided for a $1 billion Revolving Credit Facility (in total availability) and a $2 billion Term Loan Facility. Borrowings under the Revolving Credit Facility bear interest, at Endo Parent and the Borrowers' election, at a rate *per annum* equal to (a) the London Interbank Offered Rate ("LIBOR") plus an applicable margin between 1.50% and 3.00% depending on the Company's total net leverage ratio or (b) the Alternate Base Rate (as defined in the Credit Agreement) plus an applicable margin between 0.50% and 2.00% depending on the Company's total net leverage ratio. Borrowings under the Term Loan Facility bear interest, at Endo Parent and the Borrowers' election, at a rate *per annum* equal to (a) LIBOR plus 5.00%, subject to a LIBOR floor of 0.75%, or (b) the Alternate Base Rate plus 4.00%, subject to an Alternate Base Rate floor of 1.75%.

26.     To secure the obligations arising under the Credit Agreement and the First Lien Notes (as defined below), Co-Borrower and certain Guarantors entered into, among other things, that certain US Pledge and Security Agreement, dated as of April 27, 2017 (as acknowledged and confirmed by that certain Acknowledgment and Confirmation, dated as of March 25, 2021, and as may be amended, restated, supplemented, or otherwise modified from time to time, the "US Pledge and Security Agreement," together with all other first-lien security documents executed and/or delivered by Endo Parent, the Borrowers, and Guarantors, to or in favor of the Prepetition First Loan Secured Parties, including, without limitation, all intellectual property security agreements, mortgages, and pledges, the "First Lien Prepetition Security Documents"), granting Wilmington Trust, N.A., in its capacity as collateral trustee (in such capacity and including any successors thereto, the "First Lien Collateral Trustee"), first-priority liens on and security interests in

substantially all of the Debtors' assets, including all proceeds thereof (the "Prepetition Collateral").[9]

27.    As of the Petition Date, (a) approximately $277 million was outstanding under the Revolving Credit Facility and (b) approximately $1.98 billion was outstanding under the Term Loan Facility.

**B.    First Lien Notes and Second Lien Notes**

28.    6.125% Notes: On March 25, 2021, Debtors Lux Borrower and Endo U.S. Inc. ("Endo US" and together with Lux Borrower, the "6.125% Notes Issuers"), issued the 6.125% Notes (the "6.125% Notes," and the holders thereof, the "6.125% Senior Secured Noteholders") pursuant to that certain Indenture, dated as of March 25, 2021 (as may be amended, restated, supplemented, or otherwise modified from time to time, the "6.125% Notes Indenture"), by and among Computershare Trust Company, National Association, as trustee ("Computershare" and in such capacity and including any predecessors and successors thereto, "6.125% Notes Indenture Trustee" and, together with the holders of 6.125% Notes and the First Lien Collateral Trustee, collectively, the "6.125% Notes Secured Parties"), the guarantors party thereto (the "6.125% Notes Guarantors"), and the 6.125% Notes Issuers. The 6.125% Notes are secured on a *pari passu* basis by first-priority liens on, and security interests in, the Prepetition Collateral in accordance with the terms of the First Lien Prepetition Security Documents and the First Lien Collateral Trust Agreement. As of the Petition Date, approximately $1.295 billion was outstanding under the 6.125% Notes Indenture.

---

[9]    In addition to securing the obligations under the Credit Agreement, the US Pledge and Security Agreement secures the obligations arising under the 6.125% Notes Indenture, 7.500% Notes Indenture, and the 5.875% Notes Indenture (each as defined below) with grants of first-priority liens and security interests. The term "Secured Obligation" as used in the US Pledge and Security Agreement's granting clause is defined by reference to the First Lien Collateral Trust Agreement (as defined below). In that agreement, Secured Obligations include any debt designated as secured debt, including certain future debt.

29.    <u>7.500% Notes</u>: On March 28, 2019, Debtor Par Pharmaceuticals, Inc. ("<u>Par Pharma</u>") issued $1.5 billion aggregate principal amount of 7.500% senior secured notes due on April 1, 2027 (the "<u>7.500% Notes</u>," and the holders thereof, the "<u>7.500% Senior Secured Noteholders</u>"), pursuant to that certain Indenture, dated March 28, 2019 (as amended, restated, supplemented, or otherwise modified from time to time, the "<u>7.500% Notes Indenture</u>"), by and among Par Pharma, as issuer (the "<u>7.500% Notes Issuer</u>"), the guarantors party thereto (the "<u>7.500% Notes Guarantors</u>"), and Computershare, as trustee (in such capacity and including any predecessors and successors thereto, the "<u>7.500% Notes Indenture Trustee</u>" and, together with the holders of 7.500% Notes and the First Lien Collateral Trustee, the "<u>7.500% Notes Secured Parties</u>").  The 7.500% Notes are secured on a *pari passu* basis by first-priority liens on, and security interests in, the Prepetition Collateral in accordance with the terms of the First Lien Prepetition Security Documents and the First Lien Collateral Trust Agreement.  In June 2020, the Company executed certain transactions which included, among others, an additional issuance of 7.500% Notes under the 7.500% Notes Indenture in the aggregate principal amount of approximately $516 million (hereinafter, the "<u>2020 Refinancing Transactions</u>").  As of the Petition Date, approximately $2 billion was outstanding under the 7.500% Notes Indenture.

30.    <u>5.875% Notes</u>: On April 27, 2017, Debtors Endo Designated Activity Company ("<u>Endo DAC</u>"), Endo Finance LLC ("<u>Endo Finance</u>"), and Endo Finco Inc. ("<u>Endo Finco</u>," and together with Endo Finance and Endo DAC, the "<u>5.875% Notes Issuers</u>") issued $300 million aggregate principal amount of 5.875% senior secured notes due October 15, 2024 (the "<u>5.875% Notes</u>," and the holders thereof, the "<u>5.875% Senior Secured Noteholders</u>"; the 5.875% Notes, together with the 7.500% Notes and the 6.125% Notes, the "<u>First Lien Notes</u>"), pursuant to that certain Indenture, dated April 27, 2017 (as amended, restated, supplemented, or otherwise

modified from time to time, the "5.875% Notes Indenture"), by and among Computershare as trustee (in such capacity and including any predecessors and successors thereto, the "5.875% Notes Indenture Trustee" and, together with the holders of 5.875% Notes and the First Lien Collateral Trustee, the "5.875% Notes Secured Parties"; and the 5.875% Notes Secured Parties, the 7.500% Notes Secured Parties, and the 6.125% Notes Secured Parties, collectively, the "Prepetition First Lien Notes Secured Parties," and together with the Prepetition First Lien Loan Secured Parties, the "Prepetition First Lien Secured Parties"), the guarantors party thereto (the "5.875% Notes Guarantors"), and the 5.875% Notes Issuers.  The 5.875% Notes are secured on a *pari passu* basis by first-priority liens on, and security interests in, the Prepetition Collateral in accordance with the terms of the First Lien Prepetition Security Documents and the First Lien Collateral Trust Agreement.  As of the Petition Date, approximately $300 million was outstanding under the 5.875% Notes Indenture.

31.    Second Lien Notes: On June 16, 2021, Debtors Endo DAC, Endo Finance, and Endo Finco (the "Second Lien Notes Issuers") issued $940.6 million aggregate principal amount of 9.50% senior secured second lien notes due July 31, 2027 (the "Second Lien Notes," and the holders thereof, the "Second Lien Noteholders"), pursuant to that certain Indenture, dated June 16, 2020 (as amended, restated, supplemented, or otherwise modified from time to time, the "Second Lien Indenture," and together with the 5.875% Notes Indenture, 7.500% Notes Indenture, and 6.125% Notes Indenture, the "Secured Notes Indentures"), by and among, Wilmington Savings Fund Society, FSB, as trustee (in such capacity and including any predecessors and successors thereto, the "Second Lien Indenture Trustee"), the Second Lien Notes Issuers, and the guarantors party thereto (the "Second Lien Notes Guarantors").  The Second Lien Notes are secured by a second-priority lien on, and on a junior basis with respect to, the Prepetition Collateral in

accordance with the terms of the Second Lien Prepetition Security Documents and the Second Lien Collateral Trust Agreement (each as defined below).  As of the Petition Date, approximately $941 million was outstanding under the Second Lien Indenture.

32.     To secure the obligations arising under the Second Lien Indenture, Co-Borrower and certain Guarantors entered into, among other things, that certain Second Lien US Pledge and Security Agreement, dated as of June 16, 2020, as may be amended, restated, supplemented, or otherwise modified from time to time (such agreement, together with all other second lien security documents executed and/or delivered by Endo Parent, the Borrowers, and Guarantors, to or in favor of Wilmington Savings Fund Society, FSB, as trustee, and the Second Lien Noteholders, including, without limitation, all intellectual property security agreements, mortgages, and pledges, the "Second Lien Prepetition Security Documents"), granting Wilmington Trust, N.A., in its capacity as collateral trustee (in such capacity, the "Second Lien Collateral Trustee," and together with Second Lien Indenture Trustee, Second Lien Noteholders, and the Prepetition First Lien Secured Parties, the "Prepetition Secured Parties"), second-priority liens on, and security interests in, the Prepetition Collateral.

C.     **Collateral Trust Agreements**

33.     On April 27, 2017, the Prepetition Loan Parties, the Prepetition First Lien Notes Parties, the Administrative Agent, the First Lien Indenture Trustee, and the First Lien Collateral Trustee entered into a collateral trust agreement (as amended, restated, supplemented or otherwise modified from time to time, including pursuant to any joinders, the "First Lien Collateral Trust Agreement").  The First Lien Collateral Trust Agreement governs, among other things, the respective rights, interests and obligations of the Prepetition First Lien Secured Parties with respect to the Prepetition Collateral and covers certain other matters relating to the administration of security interests.

17

34.     On June 16, 2020, the Prepetition Second Lien Notes Parties, the Second Lien

Indenture Trustee, and the Second Lien Collateral Trustee entered into that certain second lien

collateral trust agreement (the "Second Lien Collateral Trust Agreement").   The Second Lien

Collateral Trust Agreement governs, among other things, the interests and obligations of the

holders of Second Lien Notes and the Second Lien Collateral Trustee with respect to the

Prepetition Collateral and covers certain other matters relating to the administration of security

interests.   Both the First Lien Collateral Trust Agreement and the Second Lien Collateral Trust

Agreement provide that the Prepetition Secured Parties may exercise remedies with respect to the

Prepetition Collateral (subject, in all respects, to the 1L-2L Intercreditor Agreement (as defined

below)) by directing the First Lien Collateral Trustee or the Second Lien Collateral Trustee, as

applicable, pursuant to an Act of Required Secured Parties (as defined in each of the First Lien

Collateral Trust Agreement and the Second Lien Collateral Trust Agreement, respectively).[10]

### D.     1L-2L Intercreditor Agreement

35.     The First Lien Collateral Trustee, the Second Lien Collateral Trustee, the

Prepetition Loan Parties, the Prepetition First Lien Notes Parties, and the Prepetition Second Lien

Notes Parties are parties to that certain Intercreditor Agreement, dated as of June 16, 2020 (as

amended, restated, or otherwise modified from time to time, the "1L-2L Intercreditor

Agreement").  The 1L-2L Intercreditor Agreement governs, among other things, the relative rights,

---

[10]     Under the First Lien Collateral Trust Agreement, an "Act of Required Secured Parties" means a written
direction delivered to the First Lien Collateral Trustee "by or with the written consent of either the holders
of or the Secured Debt Representatives representing the holders of more than 50% of the sum of: (a) the
aggregate outstanding principal amount of Secured Debt (including the face amount of outstanding letters of
credit whether or not then available or drawn); and (b) other than in connection with the exercise of remedies,
the aggregate unfunded commitments to extend credit which, when funded, would constitute Secured Debt."
First Lien Collateral Trust Agreement § 1.1.  The definition of the term "Act of Required Secured Parties"
as used in the Second Lien Collateral Trust Agreement with respect to the Prepetition Second Lien Notes
Secured Parties is identical to the definition of the "Act of Required Secured Parties" as used in the First Lien
Collateral Trust Agreement with respect to the Prepetition First Lien Secured Parties.  *See* Second Lien
Collateral Trust Agreement § 1.1.

interests, obligations, priority and positions of the Prepetition First Lien Secured Parties on the one

hand, and the Prepetition Second Lien Notes Secured Parties on the other hand.  The 1L-2L

Intercreditor Agreement provides, among other things, that the First Priority Representative (as

defined in the 1L-2L Intercreditor Agreement) will have the exclusive right to exercise rights and

remedies with respect to the Prepetition Collateral on behalf of the holders of the First Priority

Secured Parties.  If the First Priority Representative consents to the use of Cash Collateral, then

the Second Priority Representative (as defined in Section 1.1 of the 1L-2L Intercreditor

Agreement) is deemed to agree, on behalf of itself and the other Second Priority Secured Parties,

to the use of Cash Collateral.  *See* 1L-2L Intercreditor Agreement § 5.2.

### E.    Unsecured Notes

36.    Certain of the Debtors have also issued the following unsecured notes with Wells

Fargo acting as indenture trustee for each (collectively, the "Unsecured Notes"):[11]

- 5.375% Senior Notes due 2023 issued by Endo Finance and Endo Finco and guaranteed by the Guarantors, pursuant to that certain indenture, dated June 30, 2014;

- 6.000% Senior Notes due 2025 issued by Endo DAC, Endo Finance, and Endo Finco and guaranteed by the Guarantors, pursuant to that certain indenture, dated January 27, 2015;

- 6.000% Senior Notes due 2023 issued by Endo DAC, Endo Finance, and Endo Finco and guaranteed by the Guarantors, pursuant to that certain indenture, dated July 9, 2015; and

- 6.000% Senior Notes due 2028 issued by Endo DAC, Endo Finance, and Endo Finco and guaranteed by the Guarantors, pursuant to that certain indenture, dated June 16, 2020.

---

[11]    In connection with the 2020 Refinancing Transactions, Endo DAC, Endo Finance and Endo Finco, as applicable, solicited, and obtained, the consent of the holders of the 6.000% 2023 unsecured notes, the 6.000% 2025 unsecured notes, and the 5.375% 2023 unsecured notes to, among other things, eliminate certain of the (a) restrictive covenants, (b) affirmative covenants, and (c) events of default.  On May 28, 2020 and June 4, 2020, the foregoing issuers and unsecured noteholders entered into supplemental indentures memorializing these terms.

37.     As of the Petition Date, approximately $1.345 billion was outstanding under the Unsecured Notes.

F.     **Equity**

38.     As of April 28, 2022, Endo had approximately 235 million shares of common stock issued.  At the close of trading immediately before the Petition Date, the share price was $0.37. Endo Parent trades on the NASDAQ under the ticker "ENDP."

III.     **Events Precipitating the Chapter 11 Cases**

39.     A confluence of factors has put downward pressure on the Company's financial performance and necessitated a comprehensive solution that may be achieved only through a chapter 11 process.  Principal among these factors are (a) an adverse litigation outcome relating to Vasostrict—one of the Company's leading revenue generators over the last several years—that resulted in the early termination of federal patent protection for that product and the subsequent loss of substantial revenue; (b) a slower than expected growth for Xiaflex due to, among other factors, the COVID-19 pandemic; and (c) the litigation overhang on the Company from the thousands of lawsuits related to its marketing and sale of prescription opioids.

A.     **Declining Business Performance Leads to Overleveraged Capital Structure**

40.     The Company's recent financial performance has deteriorated.  Last week, in connection with the Company's second quarter public filings, it reported an approximately 20% year-over-year decline in revenue and 53% decline in adjusted EBITDA.  This decline was largely due to the precipitous drop in sales of Vasostrict, which accounted for approximately 30% of the Company's 2021 revenue.

41.     The drop in Vasostrict sales is primarily attributable to increased generic competition as a result of the Company losing a recent lawsuit in the U.S. District Court for the District of Delaware ("District of Delaware").  Beginning in April 2018, Par Sterile Products, LLC

20

("PSP LLC") and Par Pharmaceutical, Inc. ("PPI") received notice letters from Eagle Pharmaceuticals, Inc. ("Eagle"), among others, advising of the filing of Abbreviated NDAs ("ANDAs") and NDAs for generic versions of Vasostrict. In May 2018, PSP LLC, PPI, and Endo Par Innovation Company, LLC filed lawsuits against Eagle and others in the District of Delaware. A trial was held in July 2021, and in August 2021, the district court held that Eagle's proposed generic product would not infringe PPI's patent claims. The Company has appealed this ruling.

42. During the first quarter of 2022, multiple competitive generic alternatives to Vasostrict were launched, beginning with Eagle's generic that was launched at risk and began shipping toward the end of January 2022.[12] Since then, additional competitive alternatives entered the market, including an authorized generic. As of the Petition Date, there are five participants currently competing in the market (including the Company). These third-party launches began to significantly impact both the Company's market share and product price toward the middle of the first quarter of 2022. The Company expects competition to continue to increase in the second half of 2022 and beyond.

43. Further, beginning late in the first quarter of this year, COVID-19-related hospital utilization levels began to decline, resulting in significantly decreased market volumes for both branded and competing generic alternatives to Vasostrict.[13]

44. Consequently, the revenue from Vasostrict declined significantly. For the first half of this year, Vasostrict revenue declined approximately 55% (or $230 million) year-over-year.

---

[12]   An "at risk" launch is when a company introduces a generic drug product before conclusion (including appeals) of any patent infringement litigation.

[13]   When compared to pre-COVID-19 levels, Vasostrict has generally experienced increased sales volumes as a result of the COVID-19 pandemic based primarily on increased utilization levels associated with treating patients infected with COVID-19, including those with vasodilatory shock.

And in the second quarter of this year, Vasostrict revenue declined by nearly 82% year-over-year. On a long-term basis, the Company expects Vasostrict sales to continue to fall.

45.   Additionally, certain of the Company's physician administered products, including Xiaflex (the Company's flagship product in its Branded Pharmaceuticals' portfolio), have also experienced lower-than-expected sales volumes due to, among other things, the lower number of in-person patient office visits resulting from the COVID-19 pandemic, as well as medical and administrative staff shortages in physicians' offices. These more recent trends have also dampened the future growth expectation for Xiaflex.

46.   Due largely to the foregoing issues and those discussed below, the Debtors' existing capital structure has become unsustainable. As of June 30, 2022, the Company had approximately $8.15 billion of funded debt outstanding, which is approximately 7x its last twelve months of adjusted EBITDA (approximately $1.22 billion) and greater than 10x its anticipated 2022 EBITDA (approximately $775 million), excluding capitalization of contingent liabilities that could potentially significantly increase such leverage figures. The Company's expected decline in profitability will further exacerbate the leverage issues facing the Company.

47.   Additionally, the cost to service the Company's existing debt balance has constrained its ability to reinvest in its business. The Company currently spends over $550 million per year on cash interest expense, and an additional $20 million on mandatory debt amortization (excluding maturities). The cost of servicing such debt has limited the Company's free-cash flow available for operations and capital expenditures. In addition to the Company's already prohibitive debt service costs, approximately 28% of its debt is tied to floating interest rates. In an increasing interest rate environment, these floating interest rates further add to the Company's already elevated cash interest expense.

48.     The Company operates in a highly competitive pharmaceutical space in which its competitors are constantly pursuing internal R&D, external acquisitions, and business development opportunities.  Over the past couple of years, the Company's elevated leverage has constrained its ability to invest in its pipeline and pursue value-enhancing development opportunities.  As this is the lifeblood of any pharmaceutical company, the Company needs to reduce its debt service burden and leverage in order to effectively compete for future opportunities.  Thus, to emerge as a healthy enterprise that is able to compete, the Company must address the issues related to its overleveraged capital structure in a focused and constructive manner without disruption to its operations.

**B.      Unsustainable Litigation**

**1.  Opioid Lawsuits**

49.     Certain of the Debtors have been named as defendants in over 3,500 lawsuits seeking to hold such Debtors liable for their marketing and sale of certain FDA-approved opioid products (the "Opioid Lawsuits"), including, without limitation, Opana® and Opana® ER (together, the "Opana Medications"), which were approved by the FDA in 2006.

50.     In 2016, the Company ceased promoting the Opana Medications and all other opioid products to healthcare providers in the U.S., eliminated its entire U.S. pain salesforce, and discontinued all R&D of new opioid products.  In 2017, at the request of the FDA, the Company voluntarily removed Opana® ER from the market, despite the FDA and DEA having never taken any enforcement steps against the Company in connection with the Opana Medications.  Since June 2019, the Debtors have not sold any Opana Medications.  However, as described further below, certain of the Debtors continue to manufacture and sell generic opioid medication (the "Generic Opioids").

51.     The majority of the Opioid Lawsuits are filed on behalf of governmental entities, including states, counties, municipalities, and other political subdivisions; plaintiffs also include private hospitals, individuals seeking damages for alleged personal injuries, and third-party payors seeking damages for alleged economic injuries (collectively, the "Opioid Plaintiffs").  The overwhelming majority of the Opioid Lawsuits have been filed in the U.S.; a handful have been filed in Canada as proposed class actions.  The Opioid Lawsuits are primarily directed at the Company's historical marketing and sale of the Opana Medications, but some complaints include allegations about other products and/or opioid medications generally.  The Opioid Plaintiffs assert a variety of claims, including, without limitation, statutory and/or common law claims for public nuisance, alleged violations of consumer protection or unfair trade practices laws, racketeering, and common law fraud and negligence, among other claims (collectively, the "Opioid Claims"). The Opioid Claims are generally based on allegations that the defendant Debtors, among others, (a) made misrepresentations and/or omissions in connection with their sale and marketing of prescription opioid medications, and (b) failed to take adequate steps to identify and report suspicious orders and to prevent abuse and diversion.

52.     The Opioid Plaintiffs allege that the defendant Debtors' misleading marketing led health care providers to prescribe opioids inappropriately, which in turn led to addiction, misuse, and abuse.  The Opioid Plaintiffs seek various remedies, including:  (a) declaratory and/or injunctive relief;  (b) compensatory, punitive and/or treble damages;  and  (c) restitution, disgorgement, civil penalties, abatement, and attorneys' fees and costs.  Many Opioid Plaintiffs, particularly the government entities, seek very substantial recovery for costs they allegedly incurred or expect to incur in the future to address the consequences of opioid-related addiction,

including the provision of various public services that they allege are related to opioid addiction, or otherwise abate the opioid crisis.

53.     Notably, the Debtors' opioid products did not reach any patients except through a lengthy set of third-party intermediaries and gatekeepers, including regulators, distributors, insurers, pharmacists and doctors.  Indeed, as noted above and consistent with previous years, 90% of Endo's revenue for the year ended 2021 was attributable to three distributors: AmerisourceBergen, McKesson Corporation, and Cardinal Health, Inc.  The Debtors had limited insight into precisely where their products ended up, who used them, or whether anyone abused them contrary to their FDA-approved labeling.  In short, there is a long chain of intervening events that occur between the Debtors' manufacture or sale of an opioid medication and any eventual illegal abuse.

54.     Additionally, my understanding is that the Opana Medications—the focus of the Opioid Plaintiffs' theory of misleading marketing by Endo—never accounted for more than 0.93% of the U.S. opioid market.  Further, from 2012 to 2017, the main period in which the Opioid Plaintiffs allege the defendant Debtors engaged in wrongful conduct, the Opana Medications' share of the total U.S. opioid market ranged from a mere 0.25% to 0.53%.

55.     In the eight years since the first opioid suit was filed against the Company: no verdicts have been rendered against any Debtor on the merits; there have been around a dozen settlements; and the one case against the Company that did reach judgment on the merits (which included among the plaintiffs the most populous county in the United States) was rendered in the Company's favor on all counts, including on claims of public nuisance, false advertising, and unfair competition.  *See People v. Purdue Pharma L.P.*, Case No. 30-2014-00725287-CU-BT-CXC, 2021 WL 7186146 (Cal. Super. Dec. 14, 2021).  The remaining Opioid Lawsuits against the

Company are at various stages of development, and the very few that have advanced close to the trial stage, settled for vastly less than the amount of alleged damages or other monetary relief sought.

56.     Since 2019, the Company and/or its subsidiaries have executed 12 settlement agreements to resolve Opioid Claims brought by Opioid Plaintiffs.  Notably, since late 2021, the Company and/or certain of its subsidiaries have executed numerous significant opioid-related settlement agreements with governmental Opioid Plaintiffs, including with the offices of the New York Attorney General, Alabama Attorney General, Texas Attorney General, Florida Attorney General, Louisiana Attorney General, West Virginia Attorney General, Arkansas Attorney General, Mississippi Attorney General, and the San Francisco City Attorney.  As of the Petition Date, the Company has paid approximately $242 million pursuant to certain of its opioid-related settlements.

57.     While the foregoing settlements have made some inroads in reducing the number of pending Opioid Lawsuits, the Debtors still face more than 3,100 Opioid Lawsuits.  Given the immense number of lawsuits, the complexity of the issues involved, the various stages of development of each case, and the cost to defend each one to judgment, the Debtors determined that they needed to utilize the tools afforded by the Bankruptcy Code to bring some level of resolution to these matters.  The continued costs and uncertainty around these litigations are a serious drain on the Company's resources and jeopardize its going concern value.  To date, the Company estimates they have incurred expenses of approximately $344 million in defending the Opioid Lawsuits.  In addition to this financial drain, defending against the Opioid Lawsuits has required the Debtors' management team and key employees to devote substantial time and focus

on, among other things, defense strategies, settlement proposals, diligence, discovery, and depositions.  In short, the continued litigation of the Opioid Lawsuits is simply unsustainable.

### 2.   Other Material Litigation

58.      The Debtors also face other litigation unrelated to the Opioid Lawsuits.  Most of these lawsuits fall within four major categories: claims related to (a) generic pricing; (b) transvaginal mesh; (c) other antitrust; and (d) ranitidine.[14]

### (a)      Generic Pricing

59.      Private plaintiffs (specifically, direct purchasers, end-payers, and indirect purchaser resellers), state attorneys general and other governmental entities have filed complaints against certain Debtors, as well as other pharmaceutical manufacturers, alleging price-fixing and other anticompetitive conduct with respect to a variety of generic pharmaceutical products.  The various complaints generally assert claims under (1) federal and/or state antitrust law, (2) state consumer protection statutes, and/or (3) state common law, and seek damages, treble damages, civil penalties, disgorgement, declaratory and injunctive relief, and costs and attorneys' fees.  These lawsuits, which include putative class actions as well as non-class action lawsuits, have been filed in various federal and state courts in the U.S.; there is also a proposed class action in Canada.  Most of the U.S. cases (those filed in or removed to U.S. federal courts) are currently pending in a Multidistrict litigation ("MDL") in the U.S. District Court for the Eastern District of Pennsylvania.  Some claims are based on alleged product-specific conspiracies and other claims allege broader, multiple-product conspiracies.  Under these overarching theories, plaintiffs generally seek to hold all alleged participants in a particular alleged conspiracy jointly and

---

[14]      In addition to these categories of lawsuits, the Company is a defendant to, among other lawsuits, a putative securities class action.

severally liable for all harms caused by the alleged conspiracy, not just harms related to the products manufactured and/or sold by a particular defendant.

### (b)   Mesh Claims

60.   The Company and certain of its subsidiaries, including American Medical Systems Holdings, Inc. ("AMS") (which subsequently converted to Astora Women's Health Holding LLC and merged into Astora Women's Health LLC), have been named as defendants in multiple lawsuits in various state and federal courts in the U.S., and in Canada, Australia, and other countries. These lawsuits generally allege personal injury resulting from the use of transvaginal surgical mesh products designed to treat pelvic organ prolapse or stress urinary incontinence. The plaintiffs generally allege that the products caused personal injury, including chronic pain, incontinence, inability to control bowel function, and permanent deformities.

61.   As of June 30, 2022, various master settlement agreements and other agreements have resolved approximately 71,000 filed and unfiled U.S. mesh claims. As of June 30, 2022, the Company had made approximately $3.6 billion of payments related to its mesh liabilities, $67.5 million of which remained in qualified settlement funds related to these liabilities.

### (c)   Other Antitrust Claims

62.   In addition to the generic pricing cases described above, the Company also faces various other antitrust and related claims under Sections 1 and 2 of the Sherman Act, Section 5 of the Federal Trade Commission Act, state antitrust and consumer protection statutes, and/or state common law. These cases generally seek monetary relief (*e.g.*, damages, treble damages, disgorgement of profits, restitution, attorneys' fees and costs), equitable relief, and/or injunctive relief. A brief description of each follows:

> (i)   Opana® ER: Direct and indirect purchasers of Opana® ER, individual retailers, and health care benefit plans filed complaints against EHSI, EPI, Impax Laboratories, LLC ("Impax") and Penwest Pharmaceuticals Co.

(which EPI had acquired) alleging violations of antitrust law arising from an agreement reached by EPI and Impax to settle certain patent infringement litigation and EPI's introduction of reformulated Opana® ER, a pain relief medication. The cases were consolidated into an MDL in the U.S. District Court for the Northern District of Illinois. Both classes of plaintiffs were certified in June 2021. In July 2022, a jury returned a verdict in favor of EHSI and EPI. Recently, the plaintiffs filed a motion for judgment as a matter of law or a new trial.

(ii) AndroGel®: Beginning in 2009, the FTC and multiple private plaintiffs sued the entity now known as Endo Generics Holdings, Inc. ("EGHI") (f/k/a Par Pharmaceutical Companies, Inc. ("PPCI")) and PPI, among others, alleging violations of antitrust law arising from the settlement of certain patent litigation concerning the generic version of AndroGel, a testosterone medication. While the majority of these cases were consolidated into an MDL and voluntarily dismissed or settled, there remains one lawsuit pending in the U.S. District Court for the Eastern District of Pennsylvania that was filed in August 2019 by several alleged direct purchasers.

(iii) Exforge®: Proposed classes of direct and indirect purchasers and certain retailers have filed complaints in the U.S. District Court for the Southern District of New York against PPI, EPI, and Endo Parent, among others, alleging violations of antitrust law arising out of the settlement of certain patent litigation concerning the generic version of Exforge, a hypertension medication. The claims against EPI and Endo Parent have been dismissed. Certain plaintiffs' motions for class certification are pending, as are defendants' motions for summary judgment.

(iv) Seroquel XR®: Proposed classes of direct and indirect purchasers and certain retailers have filed putative class action complaints in the U.S. District Court for the Southern District of New York against PPI, among others, alleging violations of antitrust law arising out of the settlement of certain patent litigation concerning generic versions of Seroquel XR, an antipsychotic medication. In August 2020, the cases were transferred to the U.S. District Court for the District of Delaware. In January 2021, the defendants, including PPI, filed motions to dismiss. In July 2022, the court dismissed certain claims asserted under state law but otherwise denied the defendants' motions to dismiss.

(v) Xyrem®: A proposed class of indirect purchasers and others have filed individual and putative class actions against PPI, among others, in connection with the settlement of certain patent litigations concerning generic versions of Xyrem, a narcolepsy drug. Those cases filed in federal court are currently coordinated in an MDL pending in the U.S. District Court for the Northern District of California; these cases are currently in discovery. More recently, Aetna filed a complaint against PPI in California state court alleging similar claims.

(vi)  <u>Amitiza®</u>: A proposed class of direct purchasers have filed putative class action complaints in the U.S. District Court for the District of Massachusetts against PPI alleging violations of antitrust law arising out of the settlement of certain patent litigation concerning generic versions of Amitiza, a constipation and irritable bowel syndrome treatment.  In December 2021, PPI filed a motion to dismiss.

(vii)  <u>Colcrys®</u>: A proposed class of purchasers has filed a putative class action complaint in the U.S. District Court for the Eastern District of Pennsylvania alleging violations of federal antitrust law in connection with the settlement of certain patent litigation related to generic versions of Colcrys, an anti-inflammatory drug.  In February 2022, the defendants filed a motion to dismiss the amended complaint, which the court granted in part and denied in part in March 2022.  The case is currently in discovery.

(viii)  <u>Impax</u>: The FTC has filed a lawsuit in the U.S. District Court for the District of Columbia alleging that the 2017 settlement of a contract dispute between EPI and Impax (now Amneal) constituted unfair competition in violation of Section 5(a) of the FTC Act.  In March 2022, the court granted the defendants' motion to dismiss; in May 2022, the FTC appealed to the U.S. Court of Appeals for the District of Columbia.

### (d)  Ranitidine Claims

63.  The Company's subsidiary PPI was named in an MDL pending in the U.S. District Court for the Southern District of Florida along with numerous other manufacturers and distributors of branded and generic ranitidine.  The lawsuits generally allege that under certain conditions the active ingredient in ranitidine medications can break down to form an alleged carcinogen.  The complaints assert a variety of claims, including but not limited to various product liability, breach of warranty, fraud, negligence, statutory and unjust enrichment claims.  These plaintiffs generally seek various remedies including, without limitation, compensatory, punitive, and/or treble damages; restitution, disgorgement, civil penalties, and abatement; attorneys' fees and costs; and injunctive and/or other relief.  The MDL court has dismissed all claims against PPI and other generic manufacturers, but appeals remain pending in the U.S. Court of Appeals for the Eleventh Circuit.  PPI has also been named in similar complaints filed in certain state courts, including California, Pennsylvania, and Illinois.

64.      Defending these and other pending lawsuits has resulted in significant professional fees and costs.  In the aggregate, the Company spends approximately $21 million on litigation-related fees and expenses per month—notably, on an annual basis, this is approximately 2x capital invested in R&D in 2021.  These lawsuits, in addition to the Opioid Lawsuits, create even more uncertainty over the Company's ability to resolve its litigation exposure, either consensually or by litigating each lawsuit through judgment and all levels of appeals.

## **PART II: PREPETITION NEGOTIATIONS & PATH FORWARD**

**I.      Prepetition Restructuring Efforts**

65.      In January 2018, the Company retained Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") as its legal advisor in connection with potential strategic alternatives to address the Opioid Lawsuits.  Thereafter, the Company also engaged other restructuring advisors, retaining PJT Partners ("PJT") in February 2018 and Alvarez & Marsal ("A&M") in May 2021 as its financial advisors.

66.      Over the last few years, the Company's restructuring efforts have evolved.  Until the beginning of this year, the Company was principally focused on attempting to negotiate an out-of-court settlement with the governmental Opioid Plaintiffs, as the thousands of Opioid Lawsuits represented enterprise-threatening litigation.  The Company believed a broad-based resolution with these plaintiffs was necessary to provide clarity to stakeholders by removing the uncertainty around this litigation, including the associated risk of one or more large adverse judgments.

67.      As the Company's financial condition continued to deteriorate and little headway was being made towards a consensual comprehensive resolution with the governmental Opioid Plaintiffs, the Company more actively started exploring strategic alternatives to address its capital structure and other contingent liabilities. In connection with these efforts, in September 2021, the Company began discussions with advisors to an ad hoc group consisting primarily of holders of

Second Lien Notes and Unsecured Notes (the "Ad Hoc Cross-Holder Group").[15]  The Company

also authorized PJT to launch of a formal sales process at this time.  After preparing robust

marketing materials, PJT contacted approximately 76 parties, including 36 strategic and 40

financial buyers regarding potential interest in an acquisition of the Company.  The Company

informed potentially interested parties that they were receptive to bids to acquire the business, as

a whole or by business segment.  Of the potential bidders contacted, 23 executed non-disclosure

agreements and 8 ultimately submitted indications of interest.  Five bidders received management

presentations and were granted access to a virtual data room.  The Company determined to pause

this sale process in January 2022 to expand its exploration of strategic alternatives with the Ad

Hoc Cross-Holder Group and a Plaintiffs' Executive Committee ("PEC") and an executive

committee of state attorneys' general (the "State AG Committee," and together with the PEC, the

"Opioid Committees").

68.    In April 2022, the Company began discussions with advisors to an ad hoc group

consisting primarily of Prepetition First Lien Lenders and Prepetition First Lien Noteholders

(the "Ad Hoc First Lien Group," and together with the Ad Hoc Cross-Holder Group, the "Ad Hoc

Groups").

### A.    Prepetition Opioid Settlement Negotiations

69.    Since 2019, the Company has at various times been actively negotiating with the

Opioid Committees to attempt to negotiate a broad-based resolution of Opioid Claims.  In March

2020, the Company agreed to pay for professionals to advise the State AG Committee in settlement

negotiations with the Company.  Since then, the Company's and Opioid Committees' advisors (a)

---

[15]     Upon information and belief, there are also some Prepetition First Lien Lenders and Prepetition First Lien
Noteholders in the Ad Hoc Cross-Holder Group.

held many calls, (b) exchanged hundreds of emails, (c) exchanged voluminous documents, and (d) discussed various constructs for a potential global settlement.

70.     At bottom, several threshold challenges impacted these discussions.  For example, the Opioid Committees did not have the ability to bind, control, or deliver the agreement of other Opioid Plaintiffs to any resolution that the Company reached with the Opioid Committees. Therefore, in an out-of-court context, the Company did not have a clear path to achieve full closure with respect to the Opioid Lawsuits.  In addition, the State AG Committee sought injunctive terms that the Company believed were overly burdensome and more stringent than those agreed to with other opioid defendants.  Thus, despite extensive efforts by both sides, the parties were unable to reach agreement on injunctive terms at the time.

71.     Another impediment to these negotiations was that the parties were unable to reach an agreement on settlement value.  In the Company's view, the Opioid Committees' settlement demands consistently were out of proportion to the Company's view of its liability and its ability to pay.  While the Company believes the Opioid Plaintiffs' theories of liability are without merit, it nonetheless was prepared to make a significant, long-term financial contribution to the Opioid Plaintiffs to resolve the Opioid Lawsuits.  However, the Opioid Committees were demanding settlement amounts that the Company did not believe it could afford, especially in light of the Company's significant other obligations and contingent liabilities.

72.     The negotiations with the Opioid Committees slowed around the time when the Company announced its 2022 first quarterly earnings.  As discussed above, the Company's revenue and earnings dropped during this time period, primarily as a result of the loss of patent exclusivity with respect to the Company's Vasostrict product.  Taking into account this impact on the Company's financial performance, it became clear that (a) the Company's unsecured creditors

may not be entitled to any recovery in chapter 11, (b) the Company would burn a substantial

portion of its approximately $1 billion of cash over the next 24 months, and (c) the Company may

be unable to refinance its debt in the future as it became due, especially when considering the need

to address its contingent liabilities.  This confluence of factors—namely, among others, the

inability to reach an agreement with the Opioid Committees on an out-of-court resolution,

numerous upcoming trials, discovery demands, and associated legal expenditures, deteriorating

financial performance, and a burdensome capital structure—led the Company to further explore

its chapter 11 alternatives.

### B.    Negotiations with the Ad Hoc Groups

73.    Beginning in late 2021, the Company commenced active discussions regarding

potential restructuring frameworks with the Ad Hoc Cross-Holder Group.  The Company

previously agreed to pay for the Ad Hoc Cross-Holder Group's advisors, including counsel,

investment bankers, and/or financial advisors, to assist in their development of a workable

solution.  However, as the Company's circumstances changed and its prospects and profitability

deteriorated, and taking into account the Company's nearly $7 billion of indebtedness secured by

liens on substantially all of the Company's assets, the Company ramped up diligence efforts in late

April 2022 with the Ad Hoc First Lien Group.  Since that time, the Company and its advisors have

worked tirelessly with the Ad Hoc First Lien Group, engaging in substantial diligence efforts and

exploring various strategic alternatives.  During this period, the Company also continued to engage

with, and provide diligence to, the Ad Hoc Cross-Holder Group.

74.    During the first half of 2022, advisors to the Company and the Ad Hoc Groups

exchanged various proposals regarding the implementation of a potential transaction.  During these

negotiations, while the Company discussed a chapter 11 plan of reorganization proposal with the

Ad Hoc Cross-Holder Group, the Company reached the conclusion that pursuing a plan pathway

presented unique challenges for the Company in light of the composition of its creditor constituencies, the lack of necessary consensus to achieve a feasible plan, and the nature of its contingent liabilities.

75.     As a result, by July 2022, the Company determined to focus on a sale of its business through section 363 of the Bankruptcy Code (a "363 Sale") as the most viable path forward. Thereafter, the Company evaluated 363 Sale proposals received from both the Ad Hoc First Lien Group and the Ad Hoc Cross-Holder Group, and ultimately determined to pursue a restructuring support agreement (the "RSA") with the Ad Hoc First Lien Group memorializing the terms of a 363 Sale that would provide other bidders, including the Ad Hoc Cross-Holder Group, with the opportunity to submit higher or better bids.

### C.     The RSA and the Stalking Horse Bid

76.     The Stalking Horse Bid. Once the Debtors' path towards a 363 Sale came into focus, the Debtors and the Ad Hoc First Lien Group worked quickly to develop and negotiate the RSA, a sale term sheet (the "Term Sheet"), and bidding procedures.  The centerpiece of the RSA is a stalking horse bid (the "Stalking Horse Bid") to be provided by one or more entities formed in a manner acceptable to the Ad Hoc First Lien Group (the "Stalking Horse Bidder" or "Purchaser") to purchase substantially all of the Company's assets.  The Stalking Horse Bid will provide a value "floor" to entice further bidding.

77.     The Debtors determined that moving forward with the Stalking Horse Bid represents the best available path to address the Debtors' challenges.  The Stalking Horse Bid, if consummated, would ensure that the Debtors' business continues as a going concern, save over a thousand jobs, and enable the Purchaser to fund over time hundreds of millions of dollars of consideration to be placed in trusts for Opioid Plaintiffs who elect to voluntarily participate in such trusts.

78.     As more fully set forth in the RSA filed contemporaneously herewith, the Stalking Horse Bid includes an offer to purchase substantially all of the Debtors' assets for an aggregate purchase price composed of (a) a credit bid in full satisfaction of the Prepetition First Lien Indebtedness (approximately $6 billion), (b) $5 million in cash on account of certain unencumbered Transferred Assets (as defined in the RSA), (c) $122 million to wind-down the Debtors' operations following the sale closing date (the "Wind-Down Amount"), (d) pre-closing professional fees, and (e) the assumption of certain liabilities.  Importantly, as part of the Stalking Horse Bid, the Stalking Horse Bidder will also make offers of employment to all of the Company's active employees.

79.     Auction Process. To ensure that the Stalking Horse Bid is the highest or best offer for the Company's assets, the Debtors have developed bidding and auction procedures (the "Bidding Procedures") that will facilitate a competitive process for the Company's assets.  As set forth in the Term Sheet, the Stalking Horse Bidder is not entitled to a break-up fee and is only entitled to reimbursement for reasonable and documented fees and expenses incurred by it in connection with, among other things, the negotiation and execution of the Sale Transaction (as defined in the RSA), not to exceed $7 million, to the extent not otherwise provided under the Cash Collateral Order.  Further, the Stalking Horse Bidder has agreed to act as the "back-up" bidder in the event it is not selected as the successful bidder pursuant to the Bidding Procedures.

80.     The Debtors are hopeful that the Stalking Horse Bid will stoke interest in their assets—interest that was evidenced in the prior marketing process. The Debtors also plan to leverage the fulsome marketing materials that were previously prepared as they commence the 363 Sale process as soon as practicable after the Petition Date.

81.  <u>Voluntary Opioid Trusts.</u>  The RSA contemplates that the Purchaser will furnish an avenue for certain holders of opioid-related claims against the Company (the "<u>Opioid Claimants</u>") to voluntarily elect to receive consideration.  Specifically, the Ad Hoc First Lien Group has committed to cause the Purchaser, following the sale closing, to establish and fund trusts (comprised of a public opioid trust and private opioid trust) in the aggregate amount of $550 million in cash consideration over ten years for the benefit of certain public and private Opioid Claimants (the "<u>Voluntary Opioid Trusts</u>"), which Opioid Claimants can voluntarily participate in at their election.  Opioid Claimants who elect to participate in the Voluntary Opioid Trusts will affirmatively agree to release their opioid-related claims against, among others, the Debtors, the Prepetition First Lien Secured Parties, and their related parties.  The Voluntary Opioid Trusts consist of a public trust, which will be funded with $450 million over ten years, for the benefit of governmental Opioid Claimants (the "<u>Public Trust</u>"); a private trust, which will be funded with $85 million, for the benefit of private Opioid Claimants; and a trust (which will be administrated through a sub-trust of the public opioid trust) for the benefit of Native American Tribe Opioid Claimants, which will be funded with $15 million.  As of the Petition Date, a total of 34 States (including the States comprising the State AG Committee) and the District of Columbia reached an agreement  with the Ad Hoc First Lien Group regarding the terms of the Public Trust.

82.  <u>Wind-Down Amount</u>.  The RSA and related transaction documents also require the Stalking Horse Bidder to provide the Wind-Down Amount to implement an orderly wind down of the Debtors' operations following the Closing Date (as defined in the RSA), subject to a budget (the "<u>Wind-Down Budget</u>").  The Wind-Down Amount assumes a nine month wind-down process, and includes funding for various items, such as director fees, professional fees, liquidation proceedings in non-U.S. jurisdictions, and other administrative expenses arising after the Closing

Date.  Notably, the Debtors negotiated an amount of $122 million for their wind-down process, subject to adjustments described in the Wind-Down Budget.

83.    <u>Consensual Cash Collateral Use.</u>  Following intensive negotiations, the Ad Hoc First Lien Group, the Ad Hoc Cross-Holder Group, and other secured party representatives have consented to the Debtors' use of Cash Collateral in accordance with an agreed form of order.  Consensual use of cash collateral will facilitate the Debtors' Chapter 11 Cases and lay the groundwork for a robust marketing and sale process.

## II.    The Debtors' Path Forward

84.    The Debtors' objective in these Chapter 11 Cases is simple—to complete an open and transparent sale and auction process that will allow them to maximize the value of their business.  To achieve this objective, the Debtors will seek to forge as much consensus as possible among their stakeholders and take certain actions designed to clear a path toward a successful sale.

85.    For example, as to the Ad Hoc Cross-Holder Group, the Debtors have attempted to facilitate the group's participation in the Debtors' process by (a) providing extensive diligence and access to management and the Debtors' professionals over numerous months, (b) negotiating at the outset of these Chapter 11 Cases a fair adequate protection package for the holders of Second Lien Notes, and (c) establishing an auction process with substantial runway for the Ad Hoc Cross-Holder Group, if it so desires, to prepare and submit its own bid.

86.    As to the Opioid Plaintiffs, the Debtors have engaged in extensive and constructive discussions with the State AG Committee regarding consensual injunctive terms (the "<u>Voluntary Operating Injunction</u>") that would govern the conduct of the Debtors and their successors as it relates to opioid products.  Notably, as of the Petition Date, the Ad Hoc First Lien Group, the Debtors, and 34 States and the District of Columbia (the same parties that have reached an

agreement on the terms of the Public Trust) reached an agreement with respect to the terms of the Voluntary Operating Injunction.

87.     In addition, shortly after the Petition Date the Debtors intend to seek relief from this Court to enjoin all Opioid Lawsuits filed against the Debtors by governmental plaintiffs (the "Preliminary Injunction").  The Preliminary Injunction against the Opioid Lawsuits is critical to the success of these Chapter 11 Cases as certain of the non-settling Opioid Plaintiffs may attempt to argue that their actions may be subject to the "police powers" exception to the Bankruptcy Code's automatic stay.  However, allowing such litigation to continue would significantly erode the Debtors' liquidity throughout these Chapter 11 Cases and would distract management's attention away from pursuing the sale process and managing the Debtors' day-to-day operations in chapter 11.

88.     The Debtors have engaged Roger Frankel of Frankel Wyron LLP as future claims representative (the "Proposed FCR") to represent the interests of individuals with potential future claims relating to the Company's opioid products, transvaginal mesh products, and ranitidine products.[16]  Mr. Frankel's appointment as FCR was a result of, in part, Mr. Frankel's extensive work as future claims representative in other major cases involving substantial opioid and other liabilities.  To date, the Proposed FCR has retained counsel, an investment banker, and a claims estimation consultant to better understand the Debtors' businesses, nature of the claims, and certain pending litigation.  The Debtors have worked constructively with the Proposed FCR and his advisors over the last several weeks, including by granting them access to a data room for purposes

---

[16]     Shortly after the Petition Date, the Debtors intend to file a motion seeking the appointment of Mr. Frankel as the future claimants' representative.

of conducting due diligence and by continuing to provide additional documents and respond to additional diligence requests from the advisors on a rolling basis.

89.     Finally, the Debtors intend to file a motion seeking Court approval to launch their 363 Sale process as embodied in the RSA.  In this regard, the Debtors will request a bidding procedures hearing during which the Debtors will seek this Court's approval of the Debtors' proposed sale process and the Stalking Horse Bid.  The Debtors intend to conduct an open, transparent and fulsome sale and marketing process to ensure that the Debtors and their stakeholders receive the maximum value possible for their assets while preserving the Debtors' business as a going concern (as a whole or in parts).

## PART III: FIRST DAY PAPERS

90.     To facilitate their restructuring efforts, to minimize any adverse effects of commencing the Chapter 11 Cases, and to promote a smooth transition into chapter 11, the Debtors have filed the First Day Papers, each as listed on **Exhibit B** attached hereto, concurrently with this Declaration and respectfully request that this Court enter the proposed orders granting such First Day Papers.  I have reviewed each of the First Day Papers and proposed orders and the facts set forth therein are true and correct to the best of my knowledge, information, and belief.  I believe that the relief sought in each First Day Paper (a) is vital to enable the Debtors to make the transition to, and operate in, chapter 11 with minimum interruption or disruption to their businesses or loss of productivity or value and (b) constitutes a critical element in maximizing value during the Chapter 11 Cases.

## I.    Administrative Papers

91.     The Debtors have filed six "administrative" papers that seek to (a) jointly administer the Chapter 11 Cases for procedural purposes only, (b) authorize the Debtors to file a consolidated list of creditors, (c) authorize the Debtors to retain Kroll Restructuring Administration

LLC (f/k/a Prime Clerk LLC) ("Kroll") as claims and noticing agent, (d) authorize case management procedures, (e) extend the time period by which the Debtors must file their schedules and statements, and (f) enforce the automatic stay and related notice to non-debtor stakeholders.

### A.   Joint Administration Motion

92.   The Debtors have requested that the Chapter 11 Cases be jointly administered for procedural purposes only.  As set forth above, the Debtors are affiliated with each other.  Joint administration of these cases will avoid the unnecessary time and expense of duplicative motions, applications, orders, and other papers and related notices that otherwise would need to be filed in all of the cases absent joint administration.  Accordingly, joint administration will save considerable time and expense.

### B.   Consolidated List of Creditors Motion

93.   The Debtors seek entry of an order (a) waiving the requirement that each Debtor files a list of its 20 largest unsecured creditors on the Petition Date, (b) authorizing the Debtors to file a single consolidated list of their 50 largest unsecured, non-insider creditors in lieu of each of the Debtors filing a list of its 20 largest unsecured creditors, (c) authorizing the Debtors and Kroll, the Debtors' proposed claims and noticing agent to redact personally identifiable information for any individual listed or appearing in any document filed with the Court and/or otherwise made publicly available by the Debtors and the claims and noticing agent, (d) authorizing the claims and noticing agent to withhold publication of claims filed by individuals until entry of an order establishing deadlines for filing proofs of claim and granting related relief, (e) authorizing the Debtors to implement certain procedures for the mailing and publication of the notice to creditors and other parties-in-interest announcing the commencement of the Chapter 11 Cases, and (f) granting related relief.

94.     Because the Debtors are all affiliates and certain of them share many creditors, I believe that filing a consolidated list of the Debtors' 50 largest unsecured, non-insider creditors would facilitate the U.S. Trustee's review of creditors' claims and, to the extent necessary, the appointment of a creditors' committee in the Chapter 11 Cases. By contrast, the filing of separate lists of the 20 largest unsecured claims for each Debtors (76 in aggregate) would serve no purpose and would be of limited utility since the top creditors of the Debtors overlap, and certain Debtors may have fewer than 20 significant unsecured creditors. As such, the Debtors believe that filing a single consolidated list of the 50 largest unsecured, non-insider creditors in the Chapter 11 Cases is more appropriate and would utilize the Debtors' resources more efficiently.

95.     I believe multiple factors demonstrate the need to redact personally identifiable information for any individual listed or appearing in any document filed with the Court and/or otherwise made publicly available by the Debtors and the claims and noticing agent. First, the Debtors are not familiar with the personal circumstances of each of the Debtors' creditors to know with sufficient certainty whether a release of their personal information could potentially jeopardize their safety or violate any foreign jurisdictions' privacy data protection regulations. While the Debtors understand the concerns that arise from imposing potential impediments on certain creditors' ability to communicate and organize, they maintain that measures can be implemented to facilitate any necessary communications while maintaining a baseline of confidentiality and protection.

96.     Second, the Debtors are sensitive to the privacy and safety concerns of their former and current employees and other individuals. These concerns are compounded and paramount in the Chapter 11 Cases given the extensive media coverage and attention the Debtors have received and anticipate they will continue receiving. In addition, as with any large employer, certain

employees' personal circumstances, including circumstances unrelated to their employment, would be negatively impacted by the disclosure of their residential addresses.  Such disclosure of personal addresses would likely hinder the Debtors' efforts to attract and retain the employees necessary to preserve the value of the Debtors' estates for the benefit of their creditors and other parties-in-interest.

97.     Third, based on discussions with the Company's advisors, including Skadden, I understand that the European General Data Protection Regulation (the "EU GDPR") and the United Kingdom Data Protection Act of 2018 and the United Kingdom General Data Protection Regulation (together, the "UK GDPR"), and similar laws in other countries impose significant constraints on the processing of information relating to identified or identifiable individuals (which includes names and home addresses of individuals). I further understand that the EU GDPR and UK GDPR applies to all organizations processing personal data in the context of an establishment in a European Economic Area member state and the United Kingdom and that violators risk severe penalties.

98.     I believe that redaction from any paper filed or to be filed with the Court in these Chapter 11 Cases, including the List of Creditors, the Claims Registers, and the Schedules would protect sensitive information that could be used to perpetrate identity theft or to locate survivors of domestic violence, harassment, or stalking. Additionally, I believe that such redaction will help to ensure compliance with the EU GDPR, and thereby help to insulate the Debtors from potential civil liability and significant financial penalties.

99.     I further believe that cause exists to authorize the claims and noticing agent to withhold publication of claims filed by individuals until entry of an order establishing deadlines for filing proofs of claim and/or other further order of the Court, because under the circumstances,

there is a risk that proofs of claim filed by individuals will contain personal information.  In addition, I understand that absent a contrary order from the Court, the claims and noticing agent is required to provide public access to the claims registers, including complete proofs of claim with attachments, if any, without charge.

### C. Application to Retain Kroll as Claims and Noticing Agent

100.  The Debtors seek authority to retain Kroll as claims and noticing agent in the Chapter 11 Cases.  I understand that requesting such appointment is required by the local rules of this Court, given that the Debtors anticipate that there will be more than 250 creditors and/or parties-in-interest listed on their creditor matrix.  I believe that Kroll's retention is the most effective and efficient manner of noticing these creditors and parties-in-interest of the filing of the Chapter 11 Cases and other developments in the Chapter 11 Cases.  In addition, Kroll will transmit, receive, docket, and maintain proofs of claim filed in connection with the Chapter 11 Cases. Accordingly, I believe that retention of Kroll, an independent third party with significant experience in this role, to act as an agent of this Court, is in the best interests of the Debtors and their estates and their creditors.[17]

### D. Case Management Procedures Motion

101.  The Debtors have proposed certain notice, case management, and administrative procedures (the "Case Management Procedures") that, among other things, (a) establish requirements for filing and serving notices, motions, applications, declarations, objections, responses, memoranda, briefs, supporting documents, and other documents filed in the Chapter 11 Cases (collectively, the "Court Filings"); (b) delineate standards for notices of hearings and agenda

---

[17]     The Debtors also intend to file a subsequent application to retain Kroll to perform certain administrative services under section 327 of the Bankruptcy Code.

letters; (c) fix periodic omnibus hearing dates and articulate mandatory guidelines for the scheduling of hearings and objection deadlines; and (d) limit matters that are required to be heard by the Court.  Given the size and scope of these Chapter 11 Cases, I believe the Case Management Procedures will facilitate service of Court Filings in a manner that will be less burdensome and costly than serving such pleadings on every potentially interested party, which, in turn, will maximize the efficiency and orderly administration of these Chapter 11 Cases, while at the same time ensuring that appropriate notice is provided, particularly to parties who have expressed an interest in these Chapter 11 Cases and those directly affected by a request for relief.

**E.      Schedules and Statements Motion**

102.     The Debtors are requesting that the Court (a) extend the Debtors' 14-day period to file schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "Schedules and Statements") by an additional 30 days, through and including September 29, 2022, 2022; (b) extend the time to file reports of financial information with respect to entities in which the Debtors hold a controlling or substantial interest as set forth in Bankruptcy Rule 2015.3(d) (the "2015.3 Reports") to 45 days after the meeting of creditors to be held pursuant to section 341 of the Bankruptcy Code; and (c) waive the requirements to (i) file a list of equity security holders as provided in Bankruptcy Rule 1007(a)(3) and (ii) provide notice of the commencement of these Chapter 11 Cases (the "Notice of Commencement") to equity security holders as required under Bankruptcy Rule 2002(d).

103.     I believe that, given the substantial burdens already imposed on the Debtors' management by the commencement of these Chapter 11 Cases, the limited number of employees available to collect the information, the competing demands upon such employees, and the time and attention the Debtors must devote to the restructuring process, cause exists to extend the

deadline to file the Debtors' Schedules and Statements and 2015.3 Reports. The requested extension will enhance the accuracy of the Schedules and Statements and 2015.3 Reports when filed and help avoid the potential necessity of substantial subsequent amendments. I do not believe that any party-in-interest will be prejudiced by the requested extension of time.

104. Further, I believe that preparing a list of all of Endo's equity security holders with last-known addresses and sending notice to all such parties will be burdensome, expensive, time consuming, and serve little or no beneficial purpose. To the extent equity security holders are entitled to vote on a chapter 11 plan, those parties will be provided with the appropriate plan-related notices and will have an opportunity to participate in these Chapter 11 Cases. Further, the Notice of Commencement will be published (i) once in the national edition of the *Wall Street Journal*, the national edition of *The New York Times* and *USA Today* at the discretion of the Debtors and (ii) on both the website to be established by the claims and noticing agent and the Debtors' website.

### F.   Enforcement of the Automatic Stay

105. The Debtors are requesting that the Court enter an order (i) enforcing and restating the automatic stay provisions of section 362 of the Bankruptcy Code, the anti-termination and anti-modification provisions of section 365 of the Bankruptcy Code, the anti-discrimination provisions of section 525 of the Bankruptcy Code, and the anti-*ipso facto* provision of section 541(c) of the Bankruptcy Code; (ii) approving the form and manner of notice to the non-U.S. customers, suppliers, and other stakeholders of the Debtors, confirming that the Debtors are subject to the supervision of this Court and the protections of the Bankruptcy Code, including the aforementioned provisions; and (iii) approving the form and manner of notice to the non-U.S. customers, suppliers, and other stakeholders of the Debtor's non-debtor affiliates confirming that

the non-debtor affiliates are not included in the Chapter 11 Cases, and thus are not subject to the supervision of this Court or the provisions of the Bankruptcy Code.

106.    As described herein, Endo Parent's headquarters is located in Dublin, Ireland. Collectively, the Debtors operate in five countries, including the United States, Canada, Ireland, the United Kingdom, and Luxembourg.  The non-debtor affiliates have material operations in India.  As a result of the Debtors' and non-debtor affiliates' international operations, they have material assets abroad, and many of the parties with which the Debtors and non-debtor affiliates do business are located outside the United States.

107.    In the ordinary course of business, the Debtors and non-debtor affiliates rely on foreign suppliers to provide certain critical goods and services, including supplying raw materials, manufacturing of the Company's products, packaging and labeling, warehousing, distribution, customer service, certain financial functions, and certain research and development activities. These foreign vendors supply goods or services to the Debtors and non-debtor affiliates that either cannot be obtained from other sources or cannot be obtained from other sources in sufficient quantity, quality, or without significant delays.

108.    These goods and services are essential to the Debtors' and non-debtor affiliates' operations.  Without continued support from their foreign suppliers, the Debtors and non-debtor affiliates would face severe interruptions in their daily operations.  Concurrently herewith, the Debtors have filed the Critical Vendor Motion, described further below.  Pursuant to the Critical Vendor Motion, the Debtors seek authority to continue their business in the ordinary course and satisfy certain prepetition and postpetition claims of foreign trade creditors against the Debtors (but not the non-debtor affiliates) as and when they come due.  It is my belief that such relief will

help deter parties from attempting to exercise remedies or take adverse action against the Debtors in foreign jurisdictions on account of the commencement of these Chapter 11 Cases.

109.    I believe that foreign creditors and contract counterparties operating in various jurisdictions may be unfamiliar with chapter 11 processes, including the scope of a debtor in possession's authority to operate its business, and the import of the automatic stay.  As discussed in detail in the Critical Vendor Motion, certain of the Debtors' foreign creditors could attempt to assert liens against the Debtors' assets.  These creditors, and others, may attempt to seize assets located outside of the United States or take other actions violating the automatic stay to the detriment of the Debtors, their estates, and other creditors.  Furthermore, the Debtors provide certain goods and services to customers located outside of the United States.  The Debtors owe certain of these customers prepetition and ongoing obligations, which such parties may attempt to enforce in violation of the automatic stay.  Additionally, upon the commencement of these Chapter 11 Cases, foreign counterparties to certain leases and executory contracts could attempt to terminate such leases or contracts, including pursuant to *ipso facto* provisions in contravention of sections 362 and 365 of the Bankruptcy Code.  Similarly, governmental units outside of the United States may deny, suspend, terminate, or otherwise place conditions upon certain licenses, permits, charters, franchises, or other similar grants held by a Debtor and required for the Debtors' ongoing business operations, in violation of section 525 of the Bankruptcy Code.  Accordingly, I believe that providing notice to the Debtors' non-U.S. customers, suppliers, and other stakeholders of the protections of the Bankruptcy Code will benefit the Debtors' estates by proactively reducing unnecessary and costly disputes with such non-U.S. parties.

110.    Moreover, the non-debtor affiliates similarly have a substantial body of non-U.S. customers, suppliers, and other stakeholders that are vital to their international operations, many

of whom may be unsure of the impact of these Chapter 11 Cases on the non-debtor affiliates.  It is my belief that certain of these foreign stakeholders may be hesitant or, worse yet, refuse to deal with the non-debtor affiliates under the mistaken assumption that the non-debtor affiliates are part of these Chapter 11 Cases and subject to the protective provisions of the Bankruptcy Code.  This would substantially impair and impede the operations of the non-debtor affiliates, which would have a corresponding detrimental impact on the Debtors given the Company's substantial reliance on intercompany relationships to operate its global business.  Accordingly, I believe it is equally important to notify these foreign stakeholders that the non-debtor affiliates are not part of these Chapter 11 Cases, and thus not subject to the supervision of this Court or the protections of the Bankruptcy Code.

## II.     Operational Pleadings

111.    The Debtors have filed ten "operational" pleadings that seek to (a) authorize the Debtors to continue using their Cash Management System (as defined below), (b) authorize the Debtors to pay Employees (as defined below), (c) authorize the Debtors to maintain insurance coverage and pay related obligations, (d) authorize the Debtors to pay Taxes and Fees (as defined below), (e) authorize the Debtors to pay their Utility Providers (as defined below) and provide adequate assurance of payment to those Utility Providers, (f) authorize the Debtors to continue to maintain their Customer Programs (as defined below), (g) authorize the Debtors to pay certain vendor claims, (h) establish procedures for trading in the Debtors' equity securities, (i) authorize the Debtors' foreign representatives to act on their behalf in certain foreign proceedings, and (j) authorize the Debtors to use Cash Collateral.[18]

---

[18]      Contemporaneously herewith the Debtors have filed a declaration in support of their request for postpetition use of Cash Collateral.

### A.  Cash Management Motion

112.    The Debtors seek entry of interim and final orders (a) authorizing, but not directing, the Debtors to (i) continue to operate their existing cash management system (the "Cash Management System") and use their bank accounts and business forms, and (ii) implement changes to their cash management system in the ordinary course of business; (b) granting superpriority administrative expense status for intercompany claims arising from postpetition intercompany transactions; (c) granting a waiver with respect to the requirements of section 345(b) of the Bankruptcy Code; and (d) granting related relief.

113.    The Debtors' Cash Management System is similar to the centralized cash management systems used by other comparably sized and situated companies to manage cash flow. The Debtors use their Cash Management System in the ordinary course to transfer and distribute funds and to facilitate cash monitoring, forecasting, and reporting.  The Debtors' treasury team maintains daily oversight over their Cash Management System and implements cash management controls for entering, processing and releasing funds, including in connection with intercompany transactions.  In addition, the Debtors' treasury and accounting teams regularly reconcile the Debtors' books and records to ensure that all transfers are properly recorded, and periodically settle intercompany balances arising between and among the Debtors and their non-debtor affiliates. While many of the Debtors' internal and external payments are automated, the Debtors' treasury and accounts payable teams are also responsible for approving and initiating manual wires and checks when necessary.

114.    The domestic component of the Cash Management System is governed by an Amended and Restated Master Cash Management Agreement, dated June 19, 2017, and Master Cash Management and Netting Agreement, dated June 17, 2021 (the "Cash Management Agreements"), between Debtor Endo Finance Operations LLC (the "Pool Leader") and

substantially all of the Company's other U.S. entities (each, a "Participant").   Under the Cash

Management Agreements, the Pool Leader acts as a central banker for the other U.S. Debtor

participants, makes advances, and holds deposits in furtherance of that purpose.  The Pool Leader

generally advances funds to the Concentration Accounts (as defined below) held by Participants,

which are then used to fund each Debtor's operations, including by automatic transfer to that

Debtor's other Payroll Accounts (as defined below) on an as-needed basis to fund third party

payments.  Any receipts held by the Collection Accounts (as defined below) are then automatically

swept to the Concentration Accounts, and ultimately returned to a master cash-pooling account

held by the Pool Leader (the "Pool Leader Account").

115.    The Company's Canadian operations primarily include Debtors Paladin Labs

Canadian Holding Inc. and Paladin Labs, Inc. ("PLI" and together with Paladin Labs Canadian

Holding Inc., the "Paladin Debtors").   While the Paladin Debtors are not party to the Cash

Management Agreements, PLI maintains one Concentration Account into which funds from its

Collection Account, which collects third-party receipts generated by distribution of the Company's

products in Canada, are swept on a daily basis.  The PLI Concentration Account sweeps are

recorded in the Company's enterprise resource planning system via manual and automated journal

entries.

116.    The remainder of the Company's international operations, including the other

foreign Debtors and Non-Debtor Affiliates, that do not participate in the pooling arrangement

(each a "Non-Participant") are primarily funded via transfers to the respective accounts of those

entities via the Intercompany Transactions discussed further below.  Endo Luxembourg Finance

Company I S.à r.l ("FinCo I") receives funding as needed from the Pool Leader Account and

disburses cash via Intercompany Loans to, and other Intercompany Transactions with, the other Non-Participant Debtors to fund operations.

117.   In connection with the Cash Management System, the Debtors maintain 51 bank and other investment accounts (collectively, together with any other bank or investment accounts that the Debtors may open in the ordinary course of business, the "Bank Accounts") with multiple banks (collectively, the "Banks").  The Bank Accounts may generally be divided into six types of account according to their primary function, each of which is described below.

118.   *Collection Accounts.*  The Debtors maintain four primary collection accounts at Bank of America N.A. ("BofA") responsible for receiving payments from customers and other third parties (the "Collection Accounts"), which are then disbursed throughout the Company to fund operations.  Through these accounts, Debtor PPI collects receipts for the Company's generics and sterile injectables segments; Debtors EPI and Endo Aesthetics LLC ("Aesthetics") collect receipts for the Company's branded segment; and Debtor PLI collects receipts for the Company's Canadian operations as part of the international segment.  The Collection Accounts are zero-balance accounts as funds are swept daily into one of the Concentration Accounts (defined below).  As of the Petition Date, the Collection Accounts had a combined balance of approximately $0.

119.   *Concentration Accounts.*  The Debtors maintain seven concentration accounts at BofA (the "Concentration Accounts"), which serve as the main accounts for the Company's cash pooling arrangement (described below) into which funds are swept daily from the participating Debtors' various zero-balance accounts used for general operations, payroll, disbursement, receipts and accounts payable.  Funds are automatically transferred to and from the Concentration Accounts on an as-needed basis from the Pool Leader Account.  Debtor PLI's account is not subject to the cash pooling arrangement, but acts as a Concentration Account for the Company's

Canadian business. As of the Petition Date, the Concentration Accounts had a combined balance of approximately $28,195,524.

120.   *Payroll Accounts.*   The payroll accounts include three specifically designated accounts held by EPI, PPI, and Aesthetics (the "Payroll Accounts"), used to fund the Debtors' payroll obligations for the Debtors' U.S. corporate employees, and employees associated with the branded, generics, and aesthetics segments. For the Debtors' U.S. operations, Automatic Data Processing LLC pulls funds from the Payroll Accounts sufficient to satisfy the Debtors' payroll obligations via direct debit, either weekly or biweekly depending on the applicable employees' location. The Debtors' international payroll obligations are funded on a monthly basis via direct deposit by the respective Debtors to the employees' accounts. As of the Petition Date, the Payroll Accounts had a zero balance.

121.   *Intercompany Accounts.*   The Debtors maintain 20 accounts at BofA and Wells Fargo Bank, N.A. ("WF") that do not collect customer receipts, make significant vendor payments, or otherwise engage in routine cash transfers with third parties (the "Intercompany Accounts"). The Intercompany Accounts are primarily utilized to facilitate Intercompany Transactions, or to resolve existing Intercompany Claims and balances via cash transfers between other Debtors or non-debtor affiliates, including as part of the Company's semi-annual claims reconciliation and resolution process. The Intercompany Accounts include the Pool Leader Account, which acts as the primary cash pooling account for the Company's U.S. operations and facilitates transfers of cash to fund international operations. As of the Petition Date, the Intercompany Accounts had a combined balance of approximately $799,760,821, which includes the Pool Leader Account balance of approximately $658,150,434.

122.    *Disbursement Accounts.*  The remainder of the Debtors' non-Investment Accounts (as defined below) can be generally classified as disbursement and accounts payable accounts at BofA (the "Disbursement Accounts"), which are used by the Debtors for making a variety of third-party payments to facilitate daily operations.  In the case of U.S. cash pooling Participants, the Disbursement Accounts are generally funded via automatic transfer from the Debtor's respective Concentration Account.  In the case of Non-Participant, international Debtors, the accounts are typically funded via manual wire initiated by the Debtors' treasury team or via ACH initiated by the Debtors' accounts payable team, in an amount sufficient to fund the necessary payments to third parties.  As of the Petition Date, the Disbursement Accounts had a combined balance of approximately $228,719,084.

123.    *Investment Accounts.*  The Debtors' investment accounts are funded with excess cash produced by the Company's operations as well as borrowings made in connection with the Debtors' secured and unsecured funded debt obligations (the "Investment Accounts").  As more fully described below, the funds in the Investment Accounts are invested at the Debtors' discretion pursuant to and in compliance with the Debtors' investment policy.  As of the Petition Date, the total amount of cash invested through the Investment Accounts was approximately $103,125.

124.    *Investment Practices.*  Cash balances held in the Investment Accounts historically have been invested by the applicable banking institutions at the Debtors' direction in accordance with a written investment policy approved by the Board of Directors (the "Board") of Endo Parent (the "Investment Practices").  To ensure that the Investment Practices are consistent with the financial objectives of the Company and reflect market conditions, the Investment Practices are reviewed annually by me or treasurer and thereafter presented to and approved by the Board.  The Investment Practices are intended to achieve two primary objectives: (a) preserve the safety and

value of principal while maintaining liquidity and (b) earn reasonable returns on the Debtors'
surplus funds.

125.    To achieve these objectives, the Investment Practices generally require that funds
be invested in certain specified types of securities, including U.S. government and treasury
obligations, repurchase agreements that are 100% collateralized by U.S. treasuries or other
governmental securities, bank deposits and money market accounts, time deposits, certificates of
deposit or banker acceptances, commercial paper, mutual funds, corporate debt securities and
municipal notes and bonds.  Investments in securities other than U.S. government and treasury
obligations or that are not fully collateralized by U.S. treasuries or other governmental securities
are subject to certain maximum exposure caps.

126.    While I understand that the Investment Practices permit investments in securities
that are beyond the scope of section 345 of the Bankruptcy Code, the Investment Accounts
currently hold secure investments, comprised of exclusively money market funds.  In the month
prior to the Petition Date, the Debtors' investments generated a return of approximately 0.01%.
The Debtors intend to maintain all funds in their Investment Accounts in money market fund
investments for the duration of these Chapter 11 Cases and are requesting a waiver of the
requirements of section 345 of the Bankruptcy Code.

127.    *Business Forms.*  In the ordinary course of business, the Debtors use a variety of
checks, correspondence and other business forms (including, without limitation, letterhead,
purchase orders and invoices) (collectively, the "Business Forms").  The majority of the Debtors'
Business Forms are electronically generated by the Banks, or by the Debtors themselves, on an as-
needed basis.  Thus, in the event the Debtors generate new Business Forms during the pendency
of these Chapter 11 Cases, the Debtors will include a legend referring to the Debtors as "Debtors-

In-Possession" on such newly created Business Forms.  However, to the extent the Debtors use any pre-existing Business Forms, to minimize expenses to their estates, I believe it is appropriate to continue to use such Business Forms as they were in existence immediately before the Petition Date—without reference to the Debtors' status as debtors in possession—rather than incur the expense and delay of ordering entirely new business forms.

128.    *Bank Fees.*  In the ordinary course of business, the Debtors incur and pay, honor and/or allow to be deducted from the Bank Accounts certain service charges and other fees, costs and expenses charged by the Banks (the "Bank Fees").  The Bank Fees average approximately $13,500 per month.  I believe that payment of the Bank Fees is in the best interests of the Debtors and all parties in interest, as it will prevent unnecessary disruption to the Cash Management System and ensure that the receipt of the Debtors' funds is not delayed.

129.    *Intercompany Transactions.*  Given the size and global nature of their operations, the Debtors, in the ordinary course of business, engage in certain Intercompany Loans (defined below) and other transactions with one another and with their non-debtor affiliates (collectively, the "Intercompany Transactions") that may result in claims arising against one another (the "Intercompany Claims").  The Debtors' treasury and intercompany teams work collaboratively to monitor and resolve accumulated Intercompany Claims and balances to facilitate the flow of cash to fund the Company's operations.  Semi-annually—typically in June and December—the Company conducts batch reconciliations and settlements of accrued intercompany balances, primarily for interest payments associated with outstanding Intercompany Loans and smaller trade payables.  In addition, certain Intercompany Claims and balances, including for intercompany sales or third-party trade payables, are settled monthly, or even weekly, on a cash or cashless basis, as

necessary to fund operations. Certain recurring examples of these Intercompany Transactions and Intercompany Claims are discussed in greater detail below.

130. *Intercompany Cash Management Claims*. In the ordinary course of business and pursuant to the Cash Management Agreements, the Debtors move cash within the Cash Management System between the U.S. Debtors. Each Participant Debtor may advance funds from its Bank Account to the Pool Leader or withdraw such deposited funds at any time, and each Debtor is also able to borrow funds from the Pool Leader as necessary to fund operations. Deposited, withdrawn, and borrowed amounts are tracked and recorded, and deposited and borrowed amounts bear interest in accordance with the terms of the Cash Management Agreements. Intercompany balances are also created when payments are made by certain Debtors on behalf of other Participant Debtors with no independent bank accounts. All such Intercompany Transactions and Intercompany Claims related to the Cash Management Agreements, including deposits, withdrawals, borrowed amounts, and interest accrued or owing on account thereof, are appropriately recorded in each applicable Debtor's books and records by the Debtors' treasury and accounting teams, and any existing balances are typically settled in the ordinary course of business.

131. *Intercompany Transactions.* In the ordinary course of business, the Debtors and non-debtor affiliates engage in a variety of IP licensing, contract manufacturing, R&D services, and sale and purchase transactions with one another as the Company's products progress from initial manufacture to ultimate sale and distribution. All of the material transactions are governed by individual licensing, R&D or manufacturing services, distribution, supply, or sales contracts amongst the respective Debtors and non-debtor affiliates, all of which establish the relevant mark-up or fee payable to the applicable seller or service provider.

132.    While trade payables associated with particular products are incurred primarily by the Manufacturer or Distributor entities responsible for manufacturing or distributing those products, certain costs and expenses are borne by various Debtors on behalf of their affiliates. Pursuant to a global Services Agreement (the "Services Agreement") among substantially all of the Debtors and the non-debtor affiliates, certain Debtors and non-debtor affiliates perform a variety of business development, information technology, human resources, legal, and other administrative services on behalf of other Debtors and non-debtor affiliates, and such expenses are then allocated to the respective Service Recipient (as defined in the Services Agreement) along with a set mark-up, all of which are recorded as Intercompany Claims and periodically reconciled and resolved by the Debtors' treasury and intercompany teams.

133.    Further, Debtors Endo Ventures Limited ("EVL") and Endo Parent make a significant number of third party selling, general, and administrative payments ("SG&A Payments") on behalf of the Debtors' operating subsidiaries, which are recorded as Intercompany Claims.  The cash needs of EVL and Endo Parent to fund these SG&A Payments are typically satisfied on as-needed basis using cash generated by the U.S. Debtors, via a weekly manual wire. Specifically, on a weekly basis, the Debtors' treasury and accounts payable teams review outstanding intercompany balances, including those in favor of EVL and Endo Parent arising from intercompany sales, third party expense payments, and residual profit allocation attributable to the Company's transfer pricing arrangement, and initiate a manual wire and/or ACH payments from various U.S. Debtors that, in turn, pull cash from the Pool Leader.

134.    Pursuant to the Company's intercompany arrangements, EVL and the respective intellectual property holder, manufacturer, and distributor entities engage in intercompany sale and purchase transactions as products progress through the Company's supply chain.  In exchange for

the services performed by EVL, as well as the risk associated with those services, a portion of the Company's operating profit after considering routine profits earned by Manufacturers and Distributors is earned by EVL. The remaining operating profit is earned by the Debtor intellectual property holders associated with the particular products. When the distributor receives proceeds from third party sales of a particular product, Intercompany Claims and balances are automatically created reflecting approximate net positions of each respective Debtor and non-debtor affiliate in this process. Those intercompany balances are manually adjusted on an annual basis by the Debtors' transfer-pricing team and generally settled via cash transfer during the Company's bi-annual batch reconciliation process. Many of these settlements would occur as part of the normal course weekly or monthly cash settlement process between the counterparties prior to the bi-annual batch reconciliation process. Continuation of the Company's transfer pricing, cost-sharing, and intercompany sale and service arrangements supports and standardizes the Company's global business operations and vertically integrated supply chain, and allows the Company to ensure that it complies with tax laws in the jurisdictions in which it operates.

135.    *Indian Non-Debtor Affiliates.* The operations of the non-debtor affiliates based in India (the "Indian Non-Debtor Affiliates") are primarily funded via periodic cash transfers from Debtors EVL and PPI. Specifically, typically on a monthly basis, the Indian Non-Debtor Affiliates provide a summary report of their operating cash needs, which includes invoices from Indian Non-Debtor Affiliate entities Par Active Technologies Private Limited, Par Biosciences Pvt Ltd, and Par Formulations Private Limited ("Par Formulations"), to the Debtors' treasury team, along with the amounts earned by, and owing to, the Indian Non-Debtor Affiliates for R&D and other services they perform and products they manufacture and sell to EVL and PPI as part of the Company's transfer pricing arrangement. The premiums charged by the Indian Non-Debtor Affiliates for these

services and products are governed by that certain Advanced Pricing Agreement (the "APA")

between non-debtor affiliate Par Formulations, on behalf of itself and the other Indian Non-Debtor

Affiliates, and the local Indian taxing authorities.  The Debtors' treasury team then initiates cash

payments – typically monthly – to fund the Indian Non-Debtor Affiliates' operations for the

following month, and in satisfaction of the amounts owed for the prior month for intercompany

sales, R&D, and other services (the "Indian Goods and Services"), in accordance with the APA.

The Debtors, through EVL and PPI, have historically transferred an average of approximately $12

million per month to the Indian Non-Debtor Affiliates for Indian Goods and Services.

Additionally, the Indian Non-Debtor Affiliates have also historically received approximately $5

million per month of funding through External Commercial Borrowing Agreements (the "ECB

Loans"), which have predefined draw down and repayment schedules.  The ECB Loans are the

product of arm's-length negotiations entered into between Debtor FinCo I, as lender, and Debtors

Par Formulations and Par Active Technologies Private Limited, as borrowers.  The ECB Loans

were extended to fund capital expenditures aimed at expanding the development and manufacture

of certain pharmaceutical products.  The last remaining ECB Loan payment due during 2022 to

the Indian Non-Debtor Affiliates will be paid in December 2022 in the amount of approximately

$2.2 million.

136.    Because of the Company's substantial manufacturing and R&D presence in India,

I believe that continuing these payments in the ordinary course is essential to prevent disruption in

the Company's global operations.[19]   Specifically, a substantial and growing portion of the

---

[19]    Due to the current cash balance in the Indian Non-Debtor Affiliates' accounts, the Debtors do not anticipate
making any intercompany transfers on account of Indian Goods and Services to the Indian Non-Debtor
Affiliates until at least December 2022.  As of the Petition Date, the Indian Non-Debtor Affiliates hold a
credit balance of approximately $50 million on account of Indian Goods and Services, which will be delivered
by the Indian Non-Debtor Affiliates to the Debtors within the next six months.

Company's R&D and generic manufacturing is conducted by the Indian Non-Debtor Affiliates, and these entities sell a significant portion of the Company's products to EVL for distribution by other Debtors in the generics segment. On a monthly basis, the market value of the products the Debtors purchase from the Indian Non-Debtor Affiliates is substantially more than the aggregate payments the Debtors make to the Indian Non-Debtor Affiliates, including for the products themselves and other general funding needs. Indeed, each month, the approximate revenue generated by products manufactured by the Indian Non-Debtor Affiliates is several times greater than the total payments made to the Indian Non-Debtor Affiliates. Because the Indian Non-Debtor Affiliates do not generate or collect external revenues or receipts, other than de minimis proceeds from scrap sales, they require continued payment for those intercompany sales and other cash funding from the Debtors. The Indian Non-Debtor Affiliates are critical to the viability of the Company's current and future product development and manufacturing operations, and I believe the continued intercompany payments to these entities will help protect the corresponding cash generated for the other Debtors in that business segment.

137.    *Canadian Operations.*    The Debtors' Canadian operations, conducted by the Paladin Debtors, similarly engage in Intercompany Transactions with certain other Debtors. However, unlike the Indian Non-Debtor Affiliates, the Paladin Debtors are typically able to meet all ordinary course operating expenses using third-party receipts collected by the Paladin Debtors themselves. The Debtors also periodically execute other manual wires to satisfy the cash needs of certain other foreign Debtors, on an ad-hoc, as needed basis. The amounts of these ad-hoc wire transfers vary from month-to-month and are recorded via journal entry.

138.    *Intercompany Loans.*    The Debtors also fund a portion of their international operations through a system of interest bearing and non-interest bearing intercompany loans (the

"Intercompany Loans").  The Intercompany Loans have historically been issued by Debtors FinCo

I and Endo Luxembourg Finance Company II S.a.r.l. ("FinCo II").  For example, FinCo II was the

issuer on an intercompany term loan to Debtor Paladin Labs Canadian Holding Inc., which was

used to fund the Paladin Debtors' distribution efforts in Canada.  Additionally, FinCo I is the lender

on a series of intercompany delayed-draw term loans to Indian Non-Debtor Affiliates Par

Formulations and Par Active Technologies Private Limited to fund certain capital expenditures

associated with the build out of the Company's manufacturing presence in India (collectively, the

"Indian Intercompany Loans").  Interest on the Indian Intercompany Loans is payable annually or

semi-annually and, as of the Petition Date, the Indian Intercompany Loans were all fully drawn.

Interest payments on the Company's other interest-bearing Intercompany Loans – generally

payable on a semi-annual basis – are typically resolved as part of the semi-annual reconciliation

process executed by the intercompany and treasury teams in June and December.

139.    FinCo I is also the lender on intercompany revolvers with several non-U.S. Debtors

as borrowers, including Endo Parent and Endo DAC.  The borrower entities draw down on these

revolving Intercompany Loans as necessary to satisfy ongoing cash needs, including payments to

third-party vendors and interest payments on the Company's third-party funded debt.  The

borrowers will then pay down their outstanding obligations on the revolvers periodically, including

as part of the semi-annual reconciliation process.

140.    The Intercompany Transactions are made between and among the Debtors and

certain of their non-debtor affiliates in the ordinary course of the Debtors' businesses.  While

certain Intercompany Transactions are settled by book entry, others, including Intercompany

Transactions between the Debtors and non-debtor affiliates, are settled by the actual transfer of

cash.  The Debtors' treasury and accounting teams track all fund transfers by and among the

Debtors and the non-debtor affiliates both manually and electronically through their accounting system and can ascertain, trace and account for Intercompany Transactions.

141.     The Intercompany Transactions are required to facilitate the process of paying the Debtors' employees, vendors, and other parties on a timely basis across the Company's global operations, and an ability to enter into transactions with affiliates in a manner that is compliant with the laws of various jurisdictions.  In addition, the Intercompany Transactions are necessary for the Debtors to support the operations of their non-debtor affiliates.  For example, Debtor EVL funds the operating costs of the Company's manufacturing and R&D facilities in India, and supports the Indian Non-Debtor Affiliates' operations by purchasing finished products from these entities and acting as the quality and supply chain principal for those products' distribution. Without this source of funding from the Debtors, both as a source of liquidity and as a customer, the Indian Non-Debtor Affiliates would suffer material adverse consequences to their manufacturing capabilities, and thereby harm the Debtors' global operations.

142.     Accordingly, the Intercompany Transactions are critical to (a) ensuring liquidity is available when and where needed by the Debtors and their non-debtor affiliates, (b) enabling the Debtors to maintain their cost-efficient operations and the corresponding operational and tax compliance, and (c) ensuring that the Debtors continue to realize the revenue generated by their and their non-debtor affiliates' operations.  If the Intercompany Transactions were to be discontinued, the Debtors' Cash Management System and related administrative controls as well as the Debtors' ability to continue operating their vertically integrated business model and funding their necessary operations would be severely disrupted.

143.     Because of the disruption that would result if the Debtors were forced to close their existing bank accounts, I believe that it is critical that the existing cash management system remain in place in order for the Debtors to continue to operate their business in chapter 11.

**B.     Employee Motion**

144.     The Debtors seek entry of interim and final orders authorizing, but not directing, the Debtors to (a) pay prepetition wages, salaries, other compensation, reimbursable employee expenses, and severance obligations, and (b) continue employee benefits programs in the ordinary course, including payment of certain prepetition obligations related thereto.

145.     The Debtors employ approximately 1,560 employees (the "Employees"), of which approximately 170 are engaged in R&D, clinical, and regulatory work; 480 are in sales, marketing, and business development; 450 are in manufacturing; 200 are in quality assurance; and 260 are employed in general and administrative roles and other capacities.  The vast majority of the Debtors' workforce is based in the U.S., with approximately 100 Employees located in Canada, and approximately 90 in England, Ireland, and Luxembourg.

146.     The Employees comprise: (a) approximately 1,180 salaried Employees (the "Salaried Employees"), which consist of approximately 990 salaried exempt Employees and 190 salaried non-exempt Employees; and (b) approximately 370 hourly Employees (the "Hourly Employees").   Of these, approximately 1,540 Employees are full-time (the "Full-Time Employees") and 6 are part-time (the "Part-Time Employees").   Approximately 230 of the Debtors' Employees (or about 15% of their total workforce) at the Company's manufacturing facility in Rochester, Michigan (the "Union Employees") are members of United Steelworkers Local Union 176 and are subject to a collective bargaining agreement (the "CBA").  The Debtors also retain from time to time specialized individuals as independent contractors to complete

discrete projects, as well as temporary employees from several staffing agencies to fulfill certain duties.

147.    The Debtors' Employees perform a wide variety of critical functions, including sales, marketing, clinical development, research and development, quality control operations, manufacturing, information technology, administrative, compliance, legal, finance, and management related tasks. The Employees include personnel who are intimately familiar with the Debtors' businesses, processes, and systems, who possess unique skills and experience related to the core business segments of the Debtors, and/or who have developed relationships with wholesalers, distributors, suppliers, and other key counterparties that are essential to the Debtors' business. I believe the skills and expertise of the Debtors' Employees, as well as their relationships with the Debtors' customers and vendors and knowledge of the Debtors' infrastructure, are essential to the Debtors' ongoing operations and ability to operate their business effectively during these Chapter 11 Cases.

148.    In the ordinary course of business, the Debtors make certain payments, contributions, deductions, and withholdings under or related to wages, independent contractor obligations, payroll taxes, processing costs, employee bonus plans, retention programs, reimbursable expenses, relocation and expatriate expenses, outside director compensation, outside director expenses, health care benefits, health savings and flexible spending plans, insurance plans and disability plans, COBRA benefits, retirement plans, paid time off, the severance plan, and other benefits (each as further described below and, collectively, the "Compensation and Benefits Programs") for current and former Employees.

149.    *Wages.* The Debtors' payroll obligations generally include wages, salaries, taxes, and payments on account of paid time off (the "Wages"). In the U.S., the Debtors' Salaried

65

Employees are paid on a bi-weekly basis, and Hourly Employees are paid either weekly or bi-weekly, on Fridays.  All Employees in Canada are paid bi-weekly on Wednesdays, and those based in Ireland, Luxembourg, and the United Kingdom are paid on a monthly basis.  All Employees in the U.S. and Canada are paid one week in arrears.  All other Employees are paid at the end of each month on a current basis, meaning their monthly pay includes accrued compensation up to and including the date of the payroll issuance.  In the ordinary course, the Debtors periodically evaluate Employees for merit-based raises, promotions, and increases to the Employee's targets for the Debtors' various incentive-based Employee Bonus Programs (discussed below), typically on an annual basis.  Wage increases for the Debtors' Union Employees are generally made pursuant to the CBA.

150.    In the U.S. and Canada, payroll is funded via direct debit from the Debtors' designated payroll accounts by Automatic Data Processing, Inc. ("ADP"), as payroll administrator. For U.S. Employees, ADP debits the relevant payroll accounts on the Thursday immediately prior to the Friday when Employees are paid and, in Canada, the direct debit occurs on the Monday preceding the Wednesday on which Employees are paid.  As of the Petition Date, substantially all of the Employees are paid their salaries or hourly Wages by direct deposit into their bank accounts. Each payroll period, ADP initiates direct debits from the Debtors' payroll accounts in an amount equal to the Debtors' gross payroll obligations, including Deductions and Withholdings (each as defined below).  In turn, ADP initiates direct deposits to each of the Debtors' Employees in the net amount each particular Employee is owed, and remits the Deductions and Withholdings to the relevant third parties.  Consequently, once the Debtors make the gross payments to ADP, they have satisfied their payroll obligations.

151.     The Debtors employ Ernst & Young and Moore Kingston Smith to assist with the calculations of any Deductions and Withholdings for payroll relating to the Debtors' remaining Employees based in Ireland and Luxembourg.  However, payroll for these Employees is funded directly by the Debtors via direct deposit from the Debtors' payroll accounts to the Employees' accounts, and all Deductions and Withholdings are remitted directly by the Debtors to the relevant third parties.

152.     In the United Kingdom, payroll is funded to the Debtors' payroll service provider, Moore Kingston Smith ("MKS").  The Debtors typically fund MKS one week prior to the payroll date.  MKS then pays the UK employees and remits all Deductions and Withholdings to the relevant third parties.

153.     As of mid-July 2022, the Debtors' weekly, bi-weekly, and monthly payroll was approximately $270,000, $6,270,000, and $790,000, respectively.[20]  The Debtors estimate that as of the Petition Date they owe approximately $4,100,000 in unpaid wages and salaries to Employees.

154.     *Contractor Obligations.*  In addition to their regular workforce, the Debtors utilize the services of independent contractors (the "Independent Contractors"), including consultants or other professionals retained to complete discrete projects, or temporary employees engaged through third parties to provide both long-term and short-term support with a variety of business functions.  Independent Contractors primarily perform services in finance, manufacturing, R&D, information technology, quality control, and sales and marketing, but Independent Contractors may also hold non-specialized positions and later be replaced by an Employee.  Independent

---

[20]     Employees in the U.S., Canada, and Europe are paid at different frequencies; this is why payroll amounts are not larger in proportion to longer periods of time for differing payroll cycles.

Contractors are either (i) engaged on an "as-needed" basis through outside agencies such as Beacon

Hill Staffing (collectively, the "Employment Agencies") or (ii) directly employed and paid by the

Debtors.  Currently, the Debtors engage approximately 200 Independent Contractors.

155.    The Debtors generally pay the Independent Contractors or the Employment

Agencies through which they are hired within 30 to 60 days after receipt of an appropriate invoice.

Both the Independent Contractors and Employment Agencies are paid through the Debtors'

accounts payable system, on either a weekly, bi-weekly, or monthly basis, depending on the

Independent Contractor or Employment Agency.

156.    The Debtors estimate that, as of the Petition Date they owe approximately

$5,000,000 to Independent Contractors and $4,900,000 to Employment Agencies.

157.    I believe that many of the Employees and Independent Contractors rely on their

compensation and benefits to pay their daily living expenses.  These individuals could experience

significant financial constraints if this Court does not permit the Debtors to continue paying their

compensation and providing them with health and other benefits as described below.

158.    *Deductions, Withholdings, Payroll Taxes, and Processing Costs*.  For each

applicable pay period, the Debtors routinely deduct certain amounts from Employee paychecks,

including, without limitation, pre- and after-tax deductions payable pursuant to certain of the

Compensation and Benefits Programs discussed and defined herein (such as an Employee's share

of health care insurance premiums, contributions under flexible spending plans, 401(k)

contributions, legally ordered deductions and miscellaneous deductions) (collectively, the

"Deductions").

159.    On average, the Debtors deduct a total of approximately $36,000 / $810,000 /

$54,000 from Employees' paychecks per weekly / bi-weekly / monthly pay period, respectively.

In the U.S. and Canada, these Deductions are remitted by ADP to the appropriate third-party recipients on each payroll date. In all other jurisdictions, the Debtors remit all Deductions directly to the applicable third-party. The Debtors estimate that as of the Petition Date they have forwarded the Deductions already deducted from prior payrolls to the appropriate third-party recipients before the Petition Date. Amounts that are deducted from payroll but not yet remitted will be remitted to the appropriate third-party recipients postpetition.

160.    In addition to the Deductions, applicable law requires the Debtors to withhold amounts related to federal, state, and local income taxes, any applicable international taxes, and Social Security and Medicare taxes for remittance to the appropriate federal, state, local, or international taxing authority (collectively, the "Withholdings"). The Debtors must then match the withheld amounts from their own funds for Social Security and Medicare taxes and pay, based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance (collectively, the "Employer Payroll Taxes" and, together with the Withholdings, the "Payroll Taxes"). In the aggregate, the Payroll Taxes, total approximately $80,000 / $1,640,000 / $340,000 per weekly / bi-weekly / monthly pay period (including both the Employee and employer portions). Generally, ADP takes all Payroll Taxes from the payments debited from the Debtors' payroll accounts and remits such amounts to the appropriate authorities. In Ireland and Luxembourg, all Withholdings are held and remitted directly by the Debtors to the applicable authority. In the United Kingdom, MKS remits payroll taxes to the appropriate authorities.

161.    As of the Petition Date, the Debtors estimate that they will owe, or be required to remit, approximately $3,300,000 on account of prepetition Payroll Taxes, of which $2,700,000 will become due and owing in the Interim Period.

162.    Finally, the Debtors also incur administrative costs incident to various Compensation and Benefits Programs, such as payments to ADP, their payroll service provider; bswift®, which assists with benefit elections and administration for various Compensation and Benefit Programs; and other parties (collectively, the "Processing Costs").  Over the previous six months, the Debtors' average Processing Costs were approximately $50,000 per month.  The Debtors estimate that as of the Petition Date, approximately $63,000 was outstanding on account of Processing Costs, excluding any administrative fees specifically noted below.  I believe that payment of the Processing Costs, including any amounts outstanding as of the Petition Date, to the extent any exist, is justified because the failure to pay any such amounts might disrupt services of third-party providers with respect to the various Compensation and Benefits Programs.  By paying the Processing Costs (including any prepetition amounts), the Debtors may avoid even temporary disruptions of such services and thereby ensure that the Employees obtain all of their compensation and benefits without interruption.

163.    *Employee Bonus Plans.*  To encourage Employees to maximize their efforts and performance, in addition to an annual review of their Employees' base pay, the Debtors have historically maintained various incentive programs to bring value to the Debtors' estates by encouraging Employees to achieve company-side, business segment and/or individual goals and targets.  Specifically, the Compensation & Human Capital committee of Endo Parent's board of directors (the "Compensation Committee") has oversight over the Long-Term Incentive Plan, Corporate IC Plan, Sales IC Plans, and Spot Awards (each as defined below, and collectively, the "Employee Bonus Plans") for eligible Employees.   Approximately 1,540 of the Debtors' Employees are eligible for awards under the Employee Bonus Plans.

164.    I believe that the Employee Bonus Plans are critical tools that will enable the Debtors to maximize the value of their estates by motivating Employees through programs that they have come to rely on as a part of their regular compensation.

165.    *Long-Term Incentive Plan.*    Since 2015, the Debtors have maintained the Company's current Long-Term Incentive Program (the "LTIP") designed to align the interests of eligible Employees with the Company's long-term goals, attract and motivate talented Employees by offering a comprehensive compensation package that is in line with the market, and recognize Employees' substantial contributions to the Company's overall performance.  Annual LTIP awards are typically granted in March, and are based upon a comprehensive evaluation of an Employee's overall performance and contributions to the Company's financial and strategic objectives.  LTIP awards for new hires are typically granted to eligible recipients the month following their date of hire.  Historically, through the LTIP, the Debtors issued Endo Parent equity-based awards to participating Employees, including RSUs, PSUs, and stock options, that would then vest over a three-year or four-year period.  However, in recent years, a majority of the Company's LTIP awards have been issued in cash, which awards generally vest in 1/6 increments every six months over a three-year period.  Cash awards under the LTIP are forfeited upon an Employee's resignation or termination, vest immediately in the case of an Employee's death, and continue to vest according to the original schedule if the Employee leaves the Company because of disability or retirement.

166.    As of the Petition Date, the Debtors had an aggregate of approximately $36,000,000 in outstanding, unvested cash awards under the LTIP, payable in installments typically in March and September of each year through 2024.    Further, the Debtors have historically issued

approximately $38,370,000 in cash awards under the LTIP per year, and anticipate issuing

approximately $370,000 in cash awards to approximately 40 Employees for the rest of year 2022

167.    *Corporate IC Plan.*  The Debtors have also established a short-term performance-

based incentive compensation plan that rewards certain Employees for achievement of annual

goals and objectives, as well as longer-range strategic goals (the "Corporate IC Plan").   All

Employees are eligible to participate in the Corporate IC Plan unless they are eligible for a bonus

under a Sales IC Plan (discussed below) or another annual bonus plan.  The Corporate IC Plan

pool is established annually as the aggregate of eligible Employees' target awards – set as a

percentage of each Employee's base salary – as modified by the Company's achievement of certain

financial goals and strategic objectives, and can vary significantly from year to year.  Pursuant to

the CBA, all of the Debtors' Union Employees that are Full-Time are eligible to participate in a

separate IC program with a target incentive of $2,500, subject to similar modification based on

Company-wide performance at the discretion of Company management.  Distributions under the

Corporate IC Plan are based on business results and individual achievement, including the

following considerations:

- achievement of individual goals and objectives, the risks and challenges involved and the impact of the results;
- value of the individual's contribution to the department, project team, function and Company, including the difficulty of the goal achieved; and
- behaviors aligned with the Company's core values.

168.    Employees  must be active with the Company (or on an approved leave of absence)

as of March 1st of the payment year in order to be eligible for a payment under the Corporate IC

Plan for the prior year.  Payments are then generally made on or before March 15th.  Thus, there

were no amounts accrued and unpaid to eligible Employees for 2021 as of the Petition Date.  The

Debtors estimate that approximately 1,330 Employees are eligible for awards under the Corporate

IC Plan for 2022, and on average, over the previous two years, the Debtors paid approximately $40,700,000 annually on account of cash awards under the Corporate IC Plan.

169.    *Sales IC Plans.*  The Debtors also employ various sales incentive plans that reward Employees who effectively promote products in their respective market segments, and Employees in managerial roles for the performance of their designated sales force (the "Sales IC Plans").  For sales Employees, sales goals and objectives are generally established by managers in the particular segment on an Employee-by-Employee basis.  Awards for those managers or supervisors are typically tied to objectives relating to the overall function and administration of their designated sales program.  Payments under the Sales IC Plans are typically paid quarterly following analysis of sales results and Employee performance, and Employees are generally eligible to receive payments if they are employed on the last day of the applicable quarterly period.  In general, sales Employees are eligible for participation in the applicable Sales IC Plan after completing the required training period, during which they are also eligible for a training bonus.

170.    Currently, approximately 220 Employees are eligible for awards under the Sales IC Plans.  The Debtors estimate that on average they pay approximately $5,000,000 per quarter on account of cash awards under the Sales IC Plans and that they owed approximately $85,000 to eligible Employees under the Sales IC Plan as of the Petition Date.

171.    *Spot Awards.*  The Debtors also recognize Employees that have made exceptional and noteworthy contributions to the goals of the Company through a points-based special thanks and recognition program (the "Global Recognition Program") and other spot awards (collectively, the "Spot Awards").  Under the Global Recognition Program, which is managed by Halo Recognition, all regular, non-commercial business Employees below the Vice President level qualify to be nominated by the Employees' applicable managers (each, a "Points Owner").  For

"Above & Beyond" level awards, which include points ranging in value from $5-$225, the Points

Owner may grant a particular award without additional approval.  However, for "Pinnacle" level

awards, which include points ranging in value from $250-$2,500, the Points Owner may

recommend that an Employee receive a particular award, with the award ultimately requiring

Senior Vice President-level approval.  Points can then be redeemed by Employees for gift cards,

merchandise, travel packages, and other items, depending on the country in which they are

employed.  The Debtors also infrequently issue other Spot Awards, under which single, targeted

cash payments are made to recognize extraordinary contributions or achievements by eligible

Employees, such as Service Milestone Awards granted to Employees that have been with the

Company for more than five years, and small new hire gifts.

172.    The Debtors paid approximately $140,000 in Spot Awards and related

administrative fees in 2021, and have a total Spot Award budget of approximately $180,000 for

2022.  Further, as of the Petition Date there were approximately $100,000 in unredeemed points

outstanding under the Global Recognition Program.

173.    *Restructuring Initiatives.*  In November 2020, the Debtors announced plans to

optimize the Company's retail generics business cost structure by, among other things, exiting

their manufacturing sites in Irvine, California and Chestnut Ridge, New York (the "2020

Restructuring Initiative").  Sales of the Debtors' Irvine and Chestnut Ridge facilities closed in the

fourth quarter of 2021.  In addition, in April of 2022, the Debtors announced further plans to

streamline and simplify certain functions, including their commercial organization, to increase

their overall operational effectiveness and better align with current and future needs (the "2022

Restructuring Initiative").  These actions were initiated with the expectation of generating cost

savings, a portion of which will be reinvested in 2022 to support the Company's key strategic

priority to expand and enhance its product portfolio. In connection with the 2020 Restructuring Initiative and the 2022 Restructuring Initiative, the Debtors are recognizing ongoing, phased reductions in their Employee workforce, and have incurred certain corresponding obligations.

174.    *Non-Insider Retention Programs.*   In the ordinary course of business, the Debtors have historically instituted several retention programs to provide supplemental compensation to certain eligible Employees, none of whom are Insiders (collectively, the "Retention Programs"). The Debtors issue retention awards to Employees the Debtors believe are essential to achieving the goals and objectives of the organization and maximizing value for all stakeholders. The awards are generally set as a percentage of the recipient's annual salary, based on various factors such as the recipient's seniority, performance, criticality to the Debtors' businesses, and retention risk.

175.    *2020 Non-Insider Retention Program.*   In connection with the Company's 2020 Restructuring Initiative, in November 2020, the Debtors implemented a retention program (the "2020 Retention Program") to ensure a smooth transition of the Company's manufacturing operation in Irvine, California and Chestnut Ridge, New York, and to accomplish the overall goals of the 2020 Restructuring Initiative. The majority of payments relating to the 2020 Retention Program have already been made. Approximately 5 Employees have outstanding awards under the 2020 Retention Program, totaling approximately $145,000 through April of 2023.

176.    *2021 Non-Insider Retention Program.*   In light of the overwhelmingly competitive nature of the pharmaceutical industry, in June 2021, the Debtors implemented a program to provide, generally equal scheduled payments in June 2022, December 2022, and June 2023 (the "2021 Retention Program"). Approximately 300 employees have outstanding awards under the 2021 Retention Program, totaling approximately $17,500,000, through June of 2023.

177.    *2022 Non-Insider Retention Program.*  In connection with the 2022 Restructuring Initiative, in July 2022, the Debtors implemented an additional retention program (the "2022 Retention Program") with a scheduled payout in September of 2023. This 2022 Retention Program includes payments of approximately $17,100,000 to 390 employees.

178.    *Other Non-Insider Retention.*  The Debtors have also historically issued a variety of additional retention awards on an ad hoc basis for various purposes, including as a new hire incentive, for accepting a particular work assignment, or as a bonus for completion of a special project (the "Other Retention Programs").  These awards were granted at the discretion of the particular Employee's supervisor or Company management, and generally include lump sums payable in installments if the Employee remains with the Company as of the applicable retention date.  Approximately 30 Employees have outstanding awards under the Other Retention Programs, totaling approximately $640,000, and the applicable payout and retention dates range through December 2025.

179.    In the aggregate, outstanding awards under the Retention Programs total approximately $35,385,000.  The Debtors request authority, but not direction, to make any outstanding payments under the Retention Programs as they come due in the ordinary course.  For the avoidance of doubt, eligibility for payments under all of the Retention Programs is subject to the condition that the participating Employee does not terminate voluntarily or is not terminated by the Debtors for cause before such date, and no payments under the Retention Programs will be made to insiders.

180.    *Business and Other Expense Reimbursements: Reimbursable Expenses.*  In the ordinary course of business, the Debtors reimburse Employees for certain reasonable and customary expenses incurred in their roles with the Debtors (collectively, the "Reimbursable

Expenses"), including, without limitation, permitted expenses related to travel and other business expenses.  In an effort to control costs, the Debtors' policies require Employees to adhere to guidelines designed to ensure that the Reimbursable Expenses are reasonable and necessary.  The Reimbursable Expenses are, thus, ordinary course expenses that Employees incur in performing their job functions and are vital to the continued operation of the Debtors' business and the preservation of value of the Debtors' estates.

181.    The Debtors generally require that Employees book any business-related travel expenses through the Company's designated travel agency, which expenses are then paid directly by the Debtors.  In addition, the Debtors have an arrangement whereby American Express issues company credit cards (the "T&E Cards") to Employees for business travel and certain other related expenses (the "T&E Card Expenses").[21]  The Debtors have also issued a number of procurement cards through Bank of America (the "P-Cards") to select Employees, to be used for de minimis business expenses such as emergency supplies, professional memberships, meeting and conference expenses, food and beverages, and postage (the "P-Card Expenses").  The P-Cards have a monthly credit limit of between $5,000 and $10,000, depending on the Employee cardholder.  Employees are required to charge any Reimbursable Expenses to a T&E Card or P-Card whenever possible.  In limited circumstances where use of those cards is not feasible, Employees may pay Reimbursable Expenses directly, and submit an expense report for reimbursement by the Debtors.

182.    The Debtors process and administer Reimbursable Expenses through a software management system managed by Concur.  T&E Card Expenses and P-Card Expenses are automatically uploaded into this system, and the cardholder Employees are able to review the T&E

---

[21]    Shortly following the Petition Date, the Debtors' will open two additional Bank of America accounts as collateral accounts for their P-Card balances.  Each account has a $200,000 minimum balance and is being required by Bank of America due to the Debtors' perceived increased credit risk.

Card Expenses and P-Card Expenses, make any necessary adjustments or corrections, enter any additional Reimbursable Expenses that are not T&E Card Expenses or P-Card Expenses along with the supporting documentation required by the applicable policy, and then submit expense reports for review and approval by the Employee's manager or other immediate supervisor in accordance with the Debtors' established expense reimbursement policies.

183.    During the first five (5) full months of 2022, the Debtors estimate that in the aggregate the Employees incurred, on average, approximately $1,050,000 per month in Reimbursable Expenses.  The majority of Reimbursable Expenses are for meals with health care professionals; hotels, other travel-related expenditures; and expenses incurred in connection with internal business meetings and other events.  The vast majority of Reimbursable Expenses are charged to T&E Cards or P-Cards and, on a monthly basis, amounts outstanding are paid by the Debtors to American Express and Bank of America via ACH transfer and direct debit, respectively. In 2022, substantially all Reimbursable Expenses were charged to T&E Cards and P-Cards; only approximately 4% were incurred directly by Employees.  Although the Debtors request that Employees submit reimbursement requests promptly, not all Employees do so.  The Debtors estimate that they may owe approximately $1,500,000 on account of prepetition Reimbursable Expenses as of the Petition Date, including amounts to be reimbursed directly to the Employees and to be paid to American Express and Bank of America.

184.    *Relocation and Expatriate Expenses.*  In the ordinary course of business, the Debtors pay or reimburse Employees for relocation expenses incurred at the Debtors' request or for the Debtors' benefit (the "Relocation Expenses") pursuant to established written policies.  The Debtors use a third-party provider of relocation services, Cornerstone Relocation Group ("Cornerstone"), to assist Employees with a variety of services associated with their relocation,

and typically make payments of any Relocation Expenses directly to Cornerstone.  Generally, the amount of Relocation Expenses payable by the Debtors varies based on the Employee's level of seniority, and Employees are required to repay any Relocation Expenses if they resign or are terminated for cause within two years of the relocation.  The Debtors believe that as of the Petition Date they have no unpaid Relocation Expenses outstanding.

185.    In addition, the Debtors cover certain expenses (the "Expatriate Expenses") incurred by one expatriate employee (the "Expatriate Employee") who is temporarily assigned to work outside his home country.  Among other things, the Debtors pay for certain housing, tax preparation, and other miscellaneous expenses incurred by the Expatriate Employee as part of the transition to the employee's temporary location.  The Debtors believe that as of the Petition Date they owe approximately $3,400 on account of unpaid Expatriate Expenses.

186.    *Outside Director Compensation and Outside Director Expenses.*  Endo Parent currently maintains an eight member Board comprised of Endo Parent's chief executive officer and seven directors that are not Employees of the Debtors (collectively, the "Outside Directors"). Certain of the Outside Directors serve on the Audit & Finance; Compensation; Nominating, Governance & Corporate Responsibility; Compliance; and Strategic Planning committees of the Board (each, a "Committee").

187.    The Outside Directors have historically received an annual cash retainer and an annual equity retainer in the form of fully vested ordinary shares in Endo Parent.  For 2021, the Company paid a cash retainer of $150,000 to each Outside Director in June 2021, along with an equity retainer with a grant date value of $300,000.  The Compensation Committee approved modifications to the Company's Outside Director Compensation package, effective January 1, 2022, that eliminate the equity component and instead provide solely for quarterly (in lieu of

annual) cash payments that total $450,000 per year. In addition, an Outside Director who serves on a Committee receives additional compensation of $15,000 per year, and the chair receives $25,000. The Compensation Committee's prepetition modifications also included adding a monthly cash retainer of $10,000 for members of the Company's Strategic Planning Committee, and $15,000 for that committee's chair, effective November 1, 2021. Finally, the non-executive chairman of the Board receives $150,000 for serving in that role, and, while the Company does not currently have a senior Outside Director on the Board, the compensation structure allows for an additional cash retainer of $60,000 per year to any such senior Outside Directors.

188.    The cash compensation of the Outside Directors described in the prior paragraph above (collectively, the "Outside Director Compensation") will be paid on a quarterly basis, in advance, moving forward. All Outside Director Compensation has been paid through the third quarter of 2022. Thus, as of the Petition Date the Debtors have no unpaid Outside Director Compensation outstanding.

189.    The Debtors also reimburse certain expenses incurred by the Outside Directors in connection with the performance of their duties (the "Outside Director Expenses"). In addition to being eligible for reimbursement of Reimbursable Expenses under the Debtors' Company-wide travel and expense reimbursement policies, Outside Directors are also entitled to a fee of $5,000 per trip to the Company's international headquarters in Ireland, other than for regularly scheduled Board meetings, along with an additional $2,500 per meeting for any additional Board meetings. In addition, the Debtors pay or reimburse certain Outside Directors for additional expenses, including foreign tax preparation services and fees for director education programs. The Debtors believe that as of the Petition Date they owe approximately $42,000 on account of unpaid Outside Director Expenses.

190.     *Employee Benefits.*  The Debtors maintain a number of Employee benefit programs, including health, dental, life, disability, and long-term care insurance, retirement savings plans, and other similar programs, as described below.  Certain of these benefits require payments by the Debtors and may be unpaid as of the Petition Date because certain obligations may have accrued either in whole or in part prior to the Petition Date, but do not become payable in the ordinary course of the Debtors' businesses until after the Petition Date.

191.     *Health Care Benefits.*  In the ordinary course of their business, the Debtors provide medical, dental, and vision insurance coverage, prescription drug insurance, and other related benefits to their Employees (collectively, the "Health Care Benefits").  The Debtors provide Health Care Benefits to the Employees through a mix of fully insured and self-insured plans, including: (a) medical and prescription insurance benefits provided by Aetna, Medavie Blue Cross ("MBC"), DVK Luxembourg, VitalityHealth, Cigna, and Irish Life (collectively, the "Medical Plans");  (b) dental insurance benefits provided by Delta Dental and MBC (collectively, the "Dental Plans"); and (c) vision insurance coverage provided by VSP Vision Care and MBC  (collectively, the "Vision Plans").  Eligible Employees generally may participate in the Medical Plans, Dental Plans, and Vision Plans as of the date of hire.

192.     Under the self-insured Medical Plans and Dental Plans, Aetna and Delta Dental (collectively, the "Self-Insured Providers") pay the covered Employee's healthcare costs directly to the doctor or other healthcare provider (other than any required deductible or similar payment) and then seek reimbursement from the Debtors on either a weekly or bi-weekly basis (the "Medical Insurance Claims").  At the end of each weekly or bi-weekly period, the Debtors pay the Self-Insured Providers for the Medical Insurance Claims that have been made, along with an additional fee for administering the plan (the "Medical Insurance Fees").  Additionally, in connection with

the self-insured plans, the Debtors maintain stop-loss insurance through HM Life (the "Stop-Loss Provider"), which provides coverage for accumulated claims above a predetermined threshold (the "Stop-Loss Insurance").

193.    Last month the Debtors paid the Self-Insured Providers approximately $1,900,000 per month on account of Medical Insurance Claims and approximately $140,000 per month in Medical Insurance Fees.  It is difficult for the Debtors to estimate with a degree of certainty the amount of estimated Medical Insurance Claims that may be currently pending because of the nature of the Medical Insurance Providers' claims funding processes.  However, the Debtors estimate that approximately $2,200,000 of Medical Insurance Claims and Medical Insurance Fees are outstanding as of the Petition Date, including unreimbursed amounts the Medical Insurance Providers already paid to healthcare providers, as well as amounts for medical services provided to eligible Employees but not yet paid by the Medical Insurance Providers. Additionally, the Debtors pay approximately $170,000 per month to the Stop-Loss Provider in premiums for the Stop-Loss Insurance (the "Stop-Loss Premiums"), and approximately $0 in Stop-Loss Premiums were outstanding as of the Petition Date.

194.    Under the remaining fully insured Health Care Plans and Vision Plans, the Debtors pay approximately $160,000 in monthly premiums and $180,000 in annual premiums (collectively, the "Medical Insurance Premiums") to MBC, Irish Life, DVK Luxembourg, VitalityHealth, Cigna, and VSP Vision Care, and approximately $0 of Medical Insurance Premiums were outstanding as of the Petition Date.  The Debtors seek authority to pay all Medical Insurance Claims, Medical Insurance Fees, Stop-Loss Premiums, and Medical Insurance Premiums as they become due in the ordinary course of business.

195.    *Health Savings and Flexible Spending Plans.*  The Debtors offer eligible U.S.-based Employees the ability to contribute a portion of their pre-tax compensation to pay for certain health care expenses or dependent care expenses through certain health savings and flexible spending programs.  Employees who enroll in the high deductible Medical Plans offered by Aetna are eligible to contribute pre-tax compensation to a health savings account ("HSA") that can be used to pay for certain eligible health expenses (the "HSA Plan").  Through ADP, the Debtors make periodic contributions to an enrolled Employee's HSA totaling $500 for employee-only coverage or $1,000 for all other coverage levels.  Federal law sets the maximum amount that can be contributed by an Employee to his or her HSA while obtaining the pre-tax benefits associated with making such contributions.  Funds in an HSA roll over from year to year and belong to the Employee even after he or she ceases working for the Debtors.

196.    In addition, eligible U.S. Employees have the option of participating in a tax-advantaged flexible spending accounts benefit plan (the "FSA Plans" and, together with the HSA Plan, the "Health Savings and Flexible Spending Plans") pursuant to which Employees voluntarily contribute amounts to three types of Flexible Spending Accounts:

- *Health Care FSA*:  Employees who enroll in the low deductible Medical Plans offered by Aetna are eligible to contribute up to $2,850 annually to a Health Care FSA to cover qualified medical, dental, and vision expenses for a calendar year.  The contributed money does not carry over—at the end of the year, unused money is lost.
- *Combination FSA*:  Employees who enroll in the high deductible Medical Plans offered by Aetna are eligible to contribute up to $2,850 each year to a Combination FSA.  The Combination FSA is designed to work together with the HSA.  Until an Employee meets the IRS-required medical deductible of $1,400 per individual and $2,800 per family, the Combination FSA can be used to cover eligible dental and vision expenses only.  Once these minimum amounts are exceeded, the Combination FSA can be used to pay for qualified medical and prescription drug expenses.  Like the Health Care FSA, contributed funds do not carry over from year to year.
- *Dependent Care FSA*:  Employees do not have to elect a Medical Plan to contribute to a Dependent Care FSA.  Employees can contribute up to $5,000

per year ($2,500 if married and filing separate tax returns) to help cover qualified dependent care expenses, such as child daycare for children up to age 13 or elder care. Like the Health Care FSA and Combination FSA, unused money does not carry over from year to year.

197. Eligible Employees may elect to participate in the Health Savings and Flexible Spending Plans when they become eligible to participate in the Medical Plans. Under those plans, bswift® records participating Employees' elections, and, through ADP, the Debtors withhold corresponding amounts from those Employees' pre-tax payroll as Deductions and remit those amounts to PayFlex. The Debtors estimate that they withhold an aggregate amount of approximately $8,800 per month from participating Employees in connection with the Health Savings and Flexible Spending Plans. PayFlex then provides participating Employees with debit cards linked to a PayFlex account to pay for eligible expenses. PayFlex charges the Debtors a monthly administrative fee of $2,300. The Debtors believe that as of the Petition Date they have no unpaid amounts owing to PayFlex on account of administering the Health Savings and Flexible Spending Plans.

198. *Insurance Plans and Disability Plans.* The Debtors provide eligible Employees based in the U.S. or Canada with basic life and accidental death and dismemberment insurance coverage including term life policies with a benefit generally equal to a multiple of between one and two times the Employee's annual base salary (up to a cap ranging from $500,000 to $1,000,000) at no cost to the Employee. The Debtors provide their Employees in Ireland and the United Kingdom with basic life insurance coverage in an amount equal to four times base salary (collectively, the "Basic Life Insurance and AD&D Plans"). The Debtors' Basic Life Insurance and AD&D Plans are offered through MBC in Canada, Cigna in the U.S., Irish Life in Ireland, and Liverpool Victoria ("LVE") in the United Kingdom (the "Providers").

199.    The Debtors also provide eligible Employees with self-insured, short-term disability coverage (the "Short-Term Disability Plan").  Coverage for Employees based in Canada, Ireland, Luxembourg, and the United Kingdom is offered on a self-insured basis.  In the U.S., coverage is offered through Cigna.  Eligible Employees are automatically enrolled in the Short-Term Disability Plan on the first day of their employment.  When a claim is duly made, the Short-Term Disability Plan will pay eligible Employees from 100% to 60% of eligible weekly earnings for up to six months, through the Debtors' ordinary course payroll process.  Thus, any benefits under the Short-Term Disability Plan are reflected in the Debtors' gross payroll figures, discussed above.  As of the Petition Date, approximately 5 Employees were receiving benefits under the Short-Term Disability Plans.  Additionally, the Debtors incur monthly administrative costs of approximately $1,300 to Cigna under the U.S. Short Term Disability Plan, and approximately $0 was outstanding as of the Petition Date.

200.    The Debtors also offer eligible Employees access to long-term disability coverage (the "Long-Term Disability Plans" and, together with the Short-Term Disability Plan, the "Disability Plans").  Eligible Employees are automatically enrolled in the Long-Term Disability Plans on the date of hire.  The Long-Term Disability Plans are fully insured by Cigna, MBC, LVE, Baloise, and Irish Life, and the premiums are paid by the Debtors.  When a claim is duly made, the Long-Term Disability Plans will pay eligible Employees between 50% and 70% of their monthly earnings.  The Debtors incur approximately $50,000 per month in premiums for the Long-Term Disability Plans.  The Long-Term Disability Plans provide Employees with coverage for a period running after the expiration of coverage under the respective Short-Term Disability Plans and lasting for as long as the Employee is disabled.

201.    The Debtors believe that as of the Petition Date they have no unpaid obligations with respect to the Insurance Plans and Disability Plans.

202.    *COBRA.*  Pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985 (as amended, "COBRA"), the Debtors offer eligible former Employees the opportunity to elect to continue insurance coverage ("COBRA Benefits") under certain of the Debtors' Health Care Benefits plans.  As of the Petition Date, approximately 95 of the Debtors' former Employees have elected to receive COBRA Benefits, and there are approximately 70 former Employees that remain eligible to enroll in COBRA Benefits but have yet to do so.  The Debtors may pay all of an electing Employee's COBRA premiums for a period of time following termination, and thereafter a portion of those premiums, for Employees that are eligible under the Severance Plan (discussed below).  Otherwise, participating Employees pay 100% of the premiums owed for the COBRA Benefits directly to bswift, which administers the Debtors' COBRA Benefits.  The Debtors pay bswift approximately $36,000 per month for fees relating to administration of the COBRA Benefits.  These fees are paid at the beginning of the month for the month of service.  Therefore, as of the Petition Date, the Debtors do not believe they owe any accrued and unpaid amounts associated with the administration of the COBRA Benefits.

203.    *Retirement Plans.*  The Debtors offer a 401(k) retirement savings plan to all regular, full-time and part-time Employees of the Debtors located in the U.S. (the "401(k) Plan").  The 401(k) Plan is a qualified defined contribution savings plan administered by Charles Schwab ("Schwab").  The Debtors generally match an Employee's voluntary contributions dollar-for-dollar up to the first 3%, and 50 cents for every dollar of the next 2%, of the Employee's eligible compensation subject to limits under the Internal Revenue Code.  Matching contributions are made by the Debtors each pay period.  For Employees hired on or after January 1, 2018, Company

matching contributions are 50% vested after one year and 100% vested after two years. Company contributions to Employees hired before this date are immediately vested.

204.    The Debtors also offer a separate retirement savings plan to Employees in Canada through Manulife, along with a statutory pension plan (the "Paladin Plans"). The retirement Paladin Plan consists of two components: a registered retirement plan under which an Employee contributes a percentage of his or her base salary, and a deferred profit-sharing plan, pursuant to which the Debtors match that contribution up to 4% of the Employee's salary. The Debtors' matching contributions become fully vested after two years of consecutive employment for the particular Employee. The pension component contemplates mandatory contributions totaling approximately 12.3% of the Employee's salary, split evenly between the Employees and the Debtors.

205.    The Debtors also offer a separate defined contribution plan to their Ireland-based Employees through Irish Life (the "Irish Retirement Plan"). Under the Irish Retirement Plan, the Debtors make a core contribution equal to 4% of the Employee's qualifying compensation, and also match Employee contributions from an additional 1-4%. Employees can then make additional, unmatched contributions above that threshold. The Debtors' contributions become fully vested after two years of consecutive employment for the particular Employee.

206.    Finally, the Debtors offer two Luxembourg-based Employees retirement, death, and disability benefits through a fully insured pension scheme administered by Bâloise Vie Luxembourg S.A. ("Bâloise"), whereby the Debtors pay set premiums on an annual basis calculated as a percentage of the Employee's salary, in addition to optional monthly contributions by eligible Employees. Those contributions are then invested by Bâloise and paid out at varying levels upon the retirement, death, or disability of the participating Employee. The Debtors also

offer one Employee based in the U.K. with retirement benefits through a similar pension scheme administered by Nest, whereby the Debtors and the Employee make set monthly contributions, in each case calculated as a percentage of the Employee's base salary (8% and 2%, respectively) (collectively, the "Other Retirement Plans" and, together with the Irish Retirement Plan, the 401(k) Plan, and the Paladin Plans, the "Retirements Plans").

207.    The Debtors estimate their matching and other contributions under the Retirement Plans to be approximately $710,000 per month.   The Debtors also pay the various plan administrators certain fees for administering the Retirement Plans. The Debtors believe that as of the Petition Date they owe approximately $260,000 on account of employer contributions and administrative fees under the Retirement Plans.

208.    *Paid Time Off.*  The Debtors provide all full-time and part-time Employees working at least 20 hours per week with paid time off ("Paid Time Off") for rest, relaxation, personal pursuits and days of personal significance.  The number of days of Paid Time Off that eligible Employees are allotted generally ranges from approximately 15 to 30 days per year, based on length of service with the Debtors and the number of hours per week the Employee is regularly scheduled to work.  The Debtors' U.S. Employees receive an advanced allotment of half of their annual Paid Time Off days on January 1 and the balance on July 1 each year, but such time is accrued in accordance with the set guidelines for years of service and hours worked.  All eligible Employees generally may carry over up to five (5) accrued but unused Paid Time Off days to the next calendar year that must be used on or before March 31 or June 30, depending upon the location.  The Debtors generally do not compensate Employees for unused Paid Time Off except that any unused, accrued and vested Paid Time Off will be paid upon termination of employment in accordance with the Debtors' past practices and the Severance Plan (discussed below).

Accordingly, the Debtors do not believe that an Employee's right to accrued Paid Time Off constitutes "claims" for purposes of the Bankruptcy Code. In the event that such accrued amounts are considered "claims," the value of the accrued but unused Paid Time Off as of the Petition Date would be approximately $18,200,000.

209.    Additionally, under a prior version of the Company's Paid Time Off policy, all eligible Employees accumulated Paid Time Off without forfeiture. As of the Petition Date, there is approximately $5,110,000 in additional accrued Paid Time Off under this grandfathered policy, which has been frozen to new participants.

210.    The Debtors also provide Employees with certain other paid absences, including, among other things, paid holiday, bereavement pay, parent and adoption leave for mothers and fathers, paid time off for absences due to witness duty, payment for absences due to jury duty, paid and unpaid leave of absences to meet various personal situations, and statutorily required time off such as military duty and family and medical leave. The foregoing types of leave do not provide for accrual.

211.    *Severance Plan.*  In 2015, the Company memorialized certain aspects of its past practice of providing severance payments and benefits under certain circumstances by putting in place a written severance policy applicable to Employees that are not subject to individual employment agreements with the Company. In 2020 and 2021, in connection with the Company's general practice of updating its corporate policies, including its Employee benefits plans, the Company amended, restated, and modified its existing severance plan to account for certain changes affecting the Company in the ordinary course of business (the "Severance Plan").

212.    Typically, under the Severance Plan, the Debtors make a lump-sum payment to a terminated Employee through the Debtors' bi-weekly, weekly, or monthly payroll process after

the terminated Employee executes a release of claims against the Debtors and certain other conditions are satisfied. That payment generally includes an amount based on the Employee's annual base salary or annualized regular rate of compensation that varies depending upon the Employee's position and length of service, any unpaid annual bonus earned for the fiscal year preceding the year in which the Employee was terminated, and accrued but unused vacation time. Terminated Employees may also be entitled to payment of their COBRA premiums upon signing a release and separation agreement and electing continuing coverage, as well as certain outplacement services (collectively, the "Severance Obligations").

213.    Additionally, in connection with the 2020 Restructuring Initiative and the 2022 Restructuring Initiative, the Debtors have incurred certain additional Severance Obligations with respect to Employees that were terminated in connection with the corresponding reductions in force. Specifically, in addition to the benefits afforded to eligible Employees under the Severance Plan, individuals scheduled for termination prior to a pending incentive plan vesting event are entitled to receive (i) a cash in-lieu-of payment for Corporate IC Plan participants terminated on or after October 1st of the plan year, and prior to March 1st of the payment year, and (ii) accelerated vesting of select tranches of outstanding awards previously issued to certain terminated Employees under the LTIP, depending on the relevant date of his or her termination.

214.    I believe that having the authority to maintain the Severance Plan, along with the additional Severance Obligations previously incurred, is essential to the Debtors' business in order to retain, motivate and provide security to, their Employees. Honoring all Severance Obligations to the former non-insider Employees who have already been terminated prior to the Petition Date will minimize disruptions to the Debtors and smooth their transition into these Chapter 11 Cases. Furthermore, it is important that the Debtors fulfill their obligations incurred postpetition under

the Severance Plan to reassure their Employees that the Debtors intend to honor their obligations to Employees during these Chapter 11 Cases—both during and after their tenure with the Debtors. Paying severance amounts is required to assuage any fears of the Employees and motivate them to continue working for the Debtors during the course of these Chapter 11 Cases, which work, in turn, is required to achieve the Debtors' chapter 11 objectives.

215.    Currently, there are no former non-insider Employees who have outstanding payments due under the Severance Plan.  The Debtors believe that as of the Petition Date they have no unpaid obligations outstanding on account of the Severance Plan.

216.    *Vehicle Services.*  The Debtors provide certain U.S. and Canadian sales related employees, including directors, managers, and sales representatives, with vehicle services (collectively, the "Vehicle Services").  In the United States, vehicles are leased for certain employees through Wheels, Inc.  In addition, MAP, Inc. provides management and maintenance of a related fuel program for leased vehicles, and CEI Group provides accident management services for the vehicles.  Both MAP, Inc. and Wheels, Inc. will be replaced by Emkay in the latter half of 2022, however the process of phasing out those vendors has not been completed as of the Petition Date.  The U.S. Vehicle Services include the lease of approximately 300 vehicles, and costs related to the leasing, management, fuel, and accident services total approximately $480,000 per month.  While no vehicles are leased to Canadian employees, the Company's Canadian sales team is provided with a car allowance.  Element Fleet provides for the management of the Canadian related Vehicle Services.

217.    Although the Company plans to phase out the services provided by Map, Inc. and Wheels, Inc. over the second half of the 2022 year, the Debtors seek authority to continue providing Vehicle Services in the interim until those services are phased out, as Vehicle Services

are necessary to avoid any interruptions of the Debtors' services.  The Debtors intend to continue

to honor the U.S. and Canadian Vehicle Services after the Petition Date in the ordinary course of

the Debtors' business.

218.    *Other Benefits.*  The Debtors provide eligible Employees with the opportunity to

obtain various other miscellaneous voluntary and optional benefits (the "Other Benefits").  For

example, the Debtors sponsor an education assistance program for eligible Employees whereby

Employees are reimbursed for up to 36 credit hours-worth of approved career-related higher

education classes or $7,000-worth of education expenses in a calendar year, whichever is met first.

Other examples include (a) a work life balance program through Aetna; (b) an employee and

family assistance program offered to Canadian Employees; (c) a legal assistance plan designed to

give Employees access to attorneys for legal services for personal needs, such as will preparation,

estate planning and family law offered through MetLife Legal Plans; (d) a discount program that

gives Employees access to exclusive prices, discounts and offers from hundreds of local and

national merchants; (e) an information service called Health Advocate that assists Employees with

navigating complex health care and insurance-related issues; and (f) access to Gympass services

as well as fitness centers at the Debtors' facilities located in Malvern, Pennsylvania.

219.    The Debtors believe that the amounts owing on the Petition Date under these Other

Benefits, including any amounts owed to third party administrators, are approximately $122,000.

The Debtors intend to continue to honor such practices, programs, and policies after the Petition

Date as such practices, programs, and policies may be modified, amended or supplemented from

time to time in the ordinary course of the Debtors' business.

220.    I believe the Employees provide the Debtors with essential services that are

necessary to conduct the Debtors' business, and absent the payment of the Compensation and

Benefits Programs owed to the Employees, the Debtors will likely experience increased Employee turnover and instability at this critical time. I believe that without these payments, the Employees may become demoralized and unproductive because of the potential significant financial strain and other hardships the Employees may face. I believe the enterprise value may be materially impaired to the detriment of all keyholders in such a scenario. I, therefore, believe that payment of the prepetition obligations with respect to the Employee Compensation and Benefits Programs is a necessary and critical element of the Debtors' efforts to preserve value and will give the Debtors the greatest likelihood of retaining their Employees as the Debtors seek to operate their business in these cases.

### C.    Insurance Motion

221.    The Debtors seek entry of interim and final orders authorizing (a) the Debtors to maintain, continue, renew or purchase, as applicable and in their sole discretion, the Insurance Policies (as defined below), workers' compensation insurance policies, Bonding Program (as defined below), and Letters of Credit (as defined below) (collectively, the "Insurance Programs") on an uninterrupted basis and in accordance with the practices and procedures in effect before the Petition Date, (b) financial institutions to receive, process, honor and pay checks or wire transfers used by the Debtors to pay the foregoing, and (c) the Debtors' to modify the automatic stay with respect to Workers' Compensation Claims (as defined below) to allow Workers' Compensation Claims to proceed under the applicable workers' compensation insurance policies.

222.    *The Debtors' Insurance Policies.* In the ordinary course of business, the Debtors maintain certain insurance policies that are administered by various insurers (the "Insurers"), which provide coverage to the Debtors for, among other things, general liability, products liability, cyber, crime, casualty, marine, workers' compensation and employment practices liability, directors' and officers' liability, first-party property losses, and various other liability and property

losses, liabilities, and claims (such insurance policies issued for the policy periods that include the Petition Date are referred to herein collectively as the "Insurance Policies").  In addition, from time to time, Insurers perform certain audits to identify and mitigate risks associated with the Debtors' operations and also conduct inspections of certain property and equipment.  The Insurers work with the Debtors to address and mitigate any issues and also reports back to the Broker (as defined below), the Insurers' underwriters, and local and state governmental units, if applicable.

223.    The majority of the Insurance Policies are held in the name of Debtor Endo International plc and cover both the Debtors and their non-debtor affiliates, but certain Insurance Policies are held by other Debtors directly.  I believe the Insurance Policies are essential to the preservation of the Debtors' businesses, property, and assets, and that, in some cases, the coverage may be required by law or regulation, or obligated by contract.  I further believe the Insurance Policies provide coverage that is typical in scope and amount for businesses that are similarly situated within the Debtors' industry.

224.    The Debtors and their non-debtor affiliates typically obtain the Insurance Policies through Marsh LLC (the "Broker"), pursuant to a certain Engagement Letter (the "Broker Contract").  The Broker Contract is generally renegotiated annually at contract expiration to take into account changes in coverage requirements.  The Broker assists in obtaining comprehensive insurance coverage and provides related services, including procuring and negotiating the Insurance Policies on what I believe to be advantageous terms and at competitive rates.

225.    In exchange for the receipt of these services, the Debtors are obligated to pay certain fees.  The Broker Contract provides for annual fees payable to the Broker of $395,000 *plus* commission for services related to covered policy placements and administration.  The amount of

commission is up to 5% of gross premiums for coverages obtained through wholesale brokers.  As of the Petition Date, the Debtors have paid the annual fee of $395,000.

226.    The manner in which the Debtors pay premiums, Broker's fees, and other costs associated with the Insurance Policies depends on the Insurance Policy.  For Insurance Policies held in the name of a Debtor other than Debtor Endo International plc, the named insured Debtor pays the Broker or the applicable Insurer directly.  The majority of the Debtors' Insurance Policies, however, are held in the name of Debtor Endo International plc and provide coverage for the Debtors and non-debtor affiliates as subsidiaries of the named insured.  Therefore, Debtor Endo International plc pays the applicable Insurer or the Broker (which in turn pays the applicable Insurer) on account of the collective insurance related obligations of itself, the Debtors, and certain of the non-debtor affiliates.  Debtor Endo International plc then allocates costs to non-debtor affiliates to account for each non-debtor affiliate's portion of the insurance policy premiums.

227.    The total amount paid in annual premiums and payments associated with the Insurance Policies is approximately $37,103,000 which includes fees, commissions, and reimbursements.  The Insurance Policies renew at various times throughout each year, and the majority of the Insurance Policies were renewed in September 2021.  However, select Insurance Policies were renewed in August and October of 2021 as well as April, July, and August of 2022.

228.    For most Insurance Policies, the Debtors pay the annual premiums at the beginning of the applicable policy period.  However, some Insurance Policies (the "Monthly Premium Policies") may occasionally permit monthly premium payments.  Pursuant to the terms of the Monthly Premium Policies, the Debtors have paid all the applicable premiums for the Monthly Premium Policies.  The Debtors are not aware of any pending requests for payment under the Insurance Policies.

229.    *The Debtors' Workers Compensation Insurance Policies.*   Under applicable law, the Debtors are required, through self-insurance or third-party insurers, to provide their employees and retirees with workers' compensation insurance coverage for claims arising from or related to their employment with the Debtors (the "Workers' Compensation Claims"), and to satisfy the Debtors' obligations arising under or related to these programs (the "Workers' Compensation Obligations").

230.    The Debtors maintain workers' compensation insurance policies with Everest Premier Insurance Company ("Everest").   The policies are administered by Sedgwick Claims Management Services ("Sedgwick").   The Debtors pay any related premiums to Everest indirectly, through the Broker.   Under these policies, Everest provides insurance for Workers' Compensation Claims in excess of the $250,000 deductible per accident.   To secure the Debtors' obligation to pay amounts up to the deductible, the Debtors maintain an escrow account (the "Loss Fund") with Sedgwick.   Periodically, as the balance of the Loss Fund is depleted, the Debtors are required by Sedgwick to make deposits into the Loss Fund.   On average, the Debtors pay $20,000 per month into the Loss Fund.   As of the Petition Date, the balance of the Loss Fund is approximately $21,000.

231.    The Debtors' Workers' Compensation Claims incurred prior to the 2020 policy period (the "Legacy Claims") are not paid using the Loss Fund.   Instead, the Debtors pay all applicable deductibles on Legacy Claims incurred during the 2018 and 2019 policy years directly to Everest.   The Debtors pay all applicable deductibles on Legacy Claims incurred prior to the 2018 policy period directly to The Travelers Companies, Inc. ("Travelers").   As of the Petition Date, Travelers holds cash collateral in the amount of approximately $386,000 for Legacy Claims incurred prior to the 2018 policy period.

232.    As of July 1, 2022, the Debtors have approximately 23 and 11 open Workers'

Compensation Claims against them on account of and relating to the workers' compensation

insurance policies with Everest and Travelers, respectively.  The Debtors estimate that, as of July

1, 2022, they have accrued liabilities in the approximate amounts of $524,000 and $162,000 on

account of Workers' Compensation Claims relating to the workers' compensation insurance

policies with Everest and Travelers, respectively.

233.    *The Debtors' Bonding Program.*  In the ordinary course of business, the Debtors

are required by certain applicable statutes, rules, and regulations to maintain bonds in favor of

certain third parties to secure the Debtors' payment or performance of certain obligations, often to

governmental units or other public agencies (the "Bonding Program").  The Bonding Program

covers a range of obligations, including, among other things, obligations related to various states'

boards of pharmacy or other state agencies and U.S. Customs and Border Protection (the "Covered

Obligations").  I believe that the Bonding Program provides coverage that is typical in scope and

amount for businesses within the Debtors' industry.

234.    As of the Petition Date, the Debtors' outstanding surety bonds were issued by the

following sureties: Hartford Financial Services Group, Liberty Mutual Group, and Travelers (each

individually, a "Surety," and collectively, the "Sureties").  Generally, the surety bonds' premiums

are determined annually.  The Debtors pay such premiums upon issuance and upon renewal.  The

total payments associated with the surety bonds, including annual premiums, is approximately

$10,155.

235.    The surety bonds shift the risk of the Debtors' nonperformance covered by the

applicable surety bond to the Surety.  If the Debtors fail to pay Covered Obligations, then the

applicable Surety will pay the Debtors' obligations up to a specified amount.  Unlike an insurance

policy, if a Surety incurs a loss on a surety bond, the Surety is entitled to recover the full amount of that loss from the Debtors.

236.    To continue their business operations, the Debtors must be able to provide financial assurances to federal, state, and foreign governments, regulatory agencies, and other third parties. This, in turn, requires the Debtors to maintain the existing Bonding Program, including paying the premiums and any related fees as they come due, renewing or potentially acquiring additional bonding capacity as needed in the ordinary course of their businesses, requesting releases from obsolete bonding obligations, and executing other agreements in connection with the Bonding Program.  I believe that the success of the Debtors' efforts to operate effectively and efficiently will depend on the maintenance of the Bonding Program on an uninterrupted basis.  And importantly, no feasible alternative to maintaining the Bonding Program exists.

237.    As of the Petition Date, I believe that all premium payments due and owing under the Bonding Program have been paid in full and I am not aware of any pending requests for payment by the Sureties.  Nevertheless, the Debtors request that they be authorized to maintain the Bonding Program in the same manner as they did prepetition and to pay any prepetition claims arising under the Bonding Program.  The Debtors further request authority to honor the current bonds in place and renew, replace, modify, extend, or add to the Bonding Program as needed, including through the issuance of new surety bonds, postpetition.

238.    *Letters of Credit.*  The Debtors have 14 letters of credit (the "Letters of Credit") outstanding, totaling approximately $7,234,000.  The Letters of Credit cover a range of obligations, including, but not limited to, obligations related to regulatory requirements, insurance provider requirements, fleet management, freight logistics, and property leases.  As of the Petition Date, the Debtors do not believe there are any payments due and owing on account of the Letters

of Credit, and the Debtors are not aware of any pending requests for payment on the Letters of Credit.

239.    I believe the nature of the Debtors' businesses makes it essential for the Debtors to maintain their Insurance Programs on an ongoing and uninterrupted basis.  Further, I believe the nonpayment or delayed payment of any premiums, deductibles, or related fees under the Insurance Programs could result in: (a) the cancellation, or attempted cancellation, of the Insurance Policies, surety bonds, or the Letters of Credit; or (b) the Debtors' inability to obtain renewal or replacement of the Insurance Policies, surety bonds, or the Letters of Credit.  If any of the Insurance Programs lapse, the Debtors could be in violation of state or federal law and the loss of licenses and the ability for the Debtors to operate their business.

240.    I understand that as a prerequisite for operations, certain governmental agencies require the Debtors to maintain certain Insurance Policies and surety bonds.  Moreover, I understand that numerous contracts with third-party suppliers, distributors and contractors obligate the Debtors to demonstrate certain levels of insurance coverage and to remain current with respect to certain Insurance Policies.

241.    If the Debtors are unable to make any payments that may be owed on account of the Insurance Policies, including on account of a premium adjustment, I believe that the unpaid third-party insurance carriers may seek relief from the automatic stay to terminate such Insurance Policies.  The Debtors then would be required to obtain replacement insurance on an expedited basis and at a significant cost.  I believe that even if these Insurance Providers were not permitted to terminate the agreements, any interruption of payment would have an adverse effect on the Debtors' ability to obtain future policies at reasonable rates.  Moreover, I believe that any interruption in such coverage would expose the Debtors to a variety of risks, including the possible

(a) incurrence of direct liability for the payment of claims that otherwise would have been covered by the Insurance Programs, (b) incurrence of material costs and other losses that otherwise would have been reimbursed, such as attorneys' fees for certain covered claims, (c) inability to obtain similar types and levels of insurance coverage, (d) incurrence of higher costs for reestablishing lapsed policies or obtaining new insurance coverage and (e) incurrence of direct liability for failing to maintain required insurance coverage.

### D.    Taxes Motion

242.    The Debtors seek entry of interim and final orders authorizing, but not directing, the Debtors, in their sole discretion, to pay various tax liabilities and fees including franchise taxes, income taxes, license and reporting taxes, gross receipt taxes, goods and services taxes, regulatory taxes, real and personal property taxes, sales and use taxes, value-added taxes, and any other types of taxes, fees, assessments, or similar charges, and any penalty, interest, or similar charges in respect of such taxes and fees (collectively, the "Taxes and Fees") owed to certain international, federal, state, and local governmental entities (each individually, an "Authority," and collectively, the "Authorities") incurred by the Debtors in the ordinary course of business.  Following the Petition Date, the Debtors intend to make future payments on account of Taxes and Fees in the ordinary course.

243.    It is my understanding that the Debtors were substantially current in the payment of assessed and undisputed Taxes and Fees that came due and payable prior to the Petition Date; however, certain Taxes and Fees attributable to the prepetition period are not yet due.  As discussed below, as of the Petition Date, the Debtors estimate that they have accrued liabilities, which are not yet due and outstanding, in the approximate amount of $5,380,000 on account of Taxes and Fees.  This sum is comprised of the following, each of which is defined and further described below: (a) $7,000 in accrued Administrator Fees; (b) $497,000 in accrued U.S. Sales and Use

Taxes, GST Taxes, and VAT Taxes; (c) $1,942,000 in accrued U.S. Income Taxes, U.S. Franchise Taxes, and foreign income and franchise tax liabilities; (d) $2,900,000 in accrued license, reporting, and regulatory Taxes and Fees; and (e) $34,000 in accrued real and property Taxes and Fees.

244.    *Administrator Fees*.  With respect to certain Taxes and Fees, the Debtors either pay the applicable Authority directly or contract with third-party providers or administrators (collectively, the "<u>Administrators</u>") to administer and deliver payments to the applicable Authorities.  For their services, the Debtors pay the Administrators certain fees (the "<u>Administrator Fees</u>") in the ordinary course of business.  As of the Petition Date, the Debtors estimate that they owe the Administrators an aggregate amount of approximately $7,000 on account of accrued and unpaid prepetition Administrator Fees.

245.    *U.S. Sales and Use Taxes, GST Taxes, and VAT Taxes*.  In the ordinary course, the Debtors collect and remit certain United States taxes related to the sale, use, and consumption of goods and services arising from the sale, use, and purchase of products, inventory, supplies, or other goods in the Debtors' businesses (the "<u>U.S. Sales and Use Taxes</u>").  Specifically, the Debtors collect and remit sales and use taxes to certain Authorities in connection with the operation of their businesses and the sale and distribution of the Debtors' products.  Within the United States, the Debtors are subject to gross receipt taxes in Ohio, Oregon, and Washington.  The Debtors also incur use taxes when they purchase materials and services from a vendor that is not registered to collect sales taxes for the state where the property is delivered or the services are provided.  In these circumstances, vendors are not obligated to charge or remit sales taxes.  As purchasers, however, the Debtors must self-assess and pay the use taxes to the appropriate Authority.

246.    In addition to the foregoing, and in connection with their global businesses, the Debtors also incur, collect, and remit other sales-related taxes in certain foreign jurisdictions. In Canada, the Debtors are subject to goods and services taxes ("GST Taxes"), which are general consumption taxes imposed on the purchase of goods and services. The Debtors also incur, collect, and remit certain value-added taxes ("VAT Taxes") in certain foreign jurisdictions, specifically, in Belgium, Ireland, Italy, Spain, and United Kingdom. VAT Taxes are general consumption taxes imposed at the point of entry or the point of sale of goods and services, depending on the applicable Authority. The manner in which the Debtors pay VAT Taxes varies depending on the applicable jurisdiction. Specifically, in Ireland, Debtors file a consolidated VAT Tax return for Endo Global Aesthetics Limited, Endo Global Biologics Limited, and Endo Ventures Limited. In all other jurisdictions, VAT Taxes owed by Endo Ventures Limited are paid by Endo Ventures Limited as a registered VAT payer for those jurisdiction. As of the Petition Date, the Debtors estimate that they currently have $497,000 in outstanding accrued prepetition amounts on account of U.S. Sales and Use Taxes, GST Taxes, and VAT Taxes.

247.    *Income and Franchise Taxes*. The Debtors are subject to federal and state income tax liabilities in the United States ("U.S. Income Taxes"). Certain Debtors pay the applicable Authorities for U.S. Income Taxes owed on behalf of a consolidated tax group of certain other Debtors. Any U.S. Income Taxes that are owed are paid to the applicable Authority on a quarterly, annually, or ad hoc basis as they come due, depending on the jurisdiction. In addition, the Debtors are subject to franchise tax liabilities in the United States as a result of their business operations ("U.S. Franchise Taxes"). Generally, any U.S. Franchise Taxes owed by the Debtors are paid either quarterly or annually to the applicable Authorities.

248.    The Debtors are also subject to income tax liabilities in certain foreign jurisdictions as a result of certain of the Debtors' foreign business operations, specifically, in Cyprus, Canada, Ireland, Netherlands, Luxembourg, and the United Kingdom.  Generally any foreign income taxes owed by the Debtors are paid on a frequency determined by the laws of the corresponding foreign jurisdiction.  As of the Petition Date, the Debtors estimate that they currently have $1,942,000 in outstanding accrued prepetition amounts on account of U.S. Income Taxes, U.S. Franchise Taxes, and foreign income and franchise tax liabilities.

249.    *License, Reporting, and Regulatory Taxes and Fees*.  In the United States, many state and local Authorities require the Debtors to pay license, reporting, excise, and regulatory Taxes and Fees as a condition to the Debtors conducting business within the applicable jurisdiction.  Specifically, the Debtors are obligated to pay these types of Taxes and Fees to maintain licenses and permits issued by Authorities that govern the regulation and use of air, water, wastewater, solid waste, and hazardous waste.  The Debtors are also obligated to pay Taxes and Fees in connection with certain United States regulatory and filing requirements, which are generally paid in arrears to the applicable Authorities on an annual basis.  License, reporting, excise, and regulatory Taxes and Fees are paid to the applicable Authority, depending on the jurisdiction, either on a periodic basis as invoices are received or on an ad hoc basis as they come due.  The manner in which the Debtors' license, reporting, and regulatory Taxes and Fees are paid varies.  The Debtors pay certain Taxes and Fees directly to the applicable Authority, and other Taxes and Fees through certain Administrators.  For example, the Debtors contract with GTM to administer and deliver Taxes and Fees for state business licenses to the applicable Authority.  In addition, certain outside counsel of the Debtors administer and deliver payments of certain environmental permit fees to the applicable Authority.

250.    The Debtors are also obligated to pay Taxes and Fees specifically related to their pharmaceutical production and distribution, including, but not limited to, fees imposed by the United States Food and Drug Administration (the "FDA Fees"), and fees pursuant to the Patient Protection and Affordable Care Act (the "Branded Prescription Drug Fee"), and state opioid excise taxes in the ordinary course of business (the "Opioid Excise Taxes").  The Debtors pay the FDA Fees, Branded Prescription Drug Fee, and Opioid Excise Taxes on behalf of the other Debtors.

251.    The return and payments for the Branded Prescription Drug Fee are generally due on September 30 of each year.  In September 2022, the Debtors will be obligated to pay a Branded Prescription Drug Fee in the amount of $3,314,439 for the 2022 annual period.  As of the Petition Date, the Debtors estimate that they currently have (b) no prepetition amounts outstanding on account of any FDA Fees, (c) $2,321,000 in outstanding accrued prepetition amounts on account of the Branded Prescription Drug Fee, and (d) $479,000 in outstanding accrued prepetition amounts on account of Opioid Excise Taxes.

252.    *Foreign License, Reporting, and Regulatory Taxes and Fees*.  Outside the United States, the Debtors incur, in the ordinary course of business, certain regulatory Taxes and Fees as a condition to the Debtors conducting business within the applicable foreign jurisdiction.  Ireland, Austria, Spain, the Netherlands, and the United Kingdom require the Debtors to pay various license, reporting, and regulatory Taxes and Fees as a condition to the Debtors conducting business in their respective countries.  The Debtors typically remit the foreign regulatory Taxes and Fees to the relevant Authorities, depending on the jurisdiction, on a monthly, quarterly, annual, other recurring, or ad hoc basis as they come due.  Specifically, certain Irish Authorities require the Debtors to pay various regulatory Taxes and Fees as a condition to the Debtors conducting business

in Ireland.  The Debtors are presently subject to fees imposed by the Irish Takeover Panel, Health

Products Regulatory Authority, and Ireland's Environmental Protection Agency.

253.    As of the Petition Date, the Debtors estimate that they currently have no outstanding

accrued prepetition amounts on account of such license, reporting, and regulatory Taxes and Fees

in Ireland, Austria, Spain, the Netherlands, and the United Kingdom.  Following the Petition Date,

the Debtors intend to make future payments on account of such postpetition Taxes and Fees in the

ordinary course.

254.    *Miscellaneous License, Reporting, and Regulatory Taxes and Fees*.  In the United

States and foreign jurisdictions, the Debtors also incur various other Taxes and Fees on account of

licenses, reporting requirements, and applicable regulations, including, but not limited to, duties

on foreign supplies imported into such territory, merchandise processing fees, harbor maintenance

fees,    environmental    fees,    and    health    products    regulatory    authority    fees

(collectively, the "Miscellaneous Taxes and Fees").  As of the Petition Date, the Debtors estimate

that they currently have approximately $100,000 in outstanding accrued prepetition amounts on

account of the Miscellaneous Taxes and Fees.

255.    As of the Petition Date, the Debtors estimate that they currently have $2,900,000

in outstanding accrued prepetition amounts on account of the license, reporting, and regulatory

Taxes and Fees (including the Miscellaneous Taxes and Fees) in the United States, Ireland,

Austria, Spain, the Netherlands, and the United Kingdom.

256.    *Real and Personal Property Taxes.*  It is my understanding that where the Debtors

have operations and real and personal property, the Debtors may be subject to property taxes levied

by state and local governments.  Nonpayment of such property taxes could also result in additional

fees and penalties.  The Debtors pay amounts owed to the Authorities for real and personal property

taxes directly.  As of the Petition Date, the Debtors estimate that they currently have $34,000 in outstanding accrued prepetition amounts on account of the real and personal property taxes.

257.    It is my understanding that many of the Taxes and Fees constitute so-called trust fund obligations that the Debtors are required to collect from third parties and held in trust for payment to the applicable Authorities. I understand that the funds that would be used to pay the trust Taxes and Fees are not property of the Debtors' estates.

258.    It is my understanding that payment of Taxes and Fees, such as property taxes is critical, as failure to pay certain property taxes may give rise to liens in favor of the Authority on the Debtors' relevant property to secure payment of those taxes.  Nonpayment of property taxes could also result in additional fees and penalties.  I have also been advised that the nonpayment of certain of the Taxes and Fees that constitute trust fund obligations and are not property of the Debtors' estates may result in personal liability for the Debtors' officers and directors. Efforts by the applicable Authorities to collect such trust fund amounts would unnecessarily divert the Debtors' officers and directors from tasks relating to the restructuring and ongoing management of the Debtors' business.

259.    Lastly, the applicable Authorities may cause the Debtors to be audited if the Taxes and Fees are not paid immediately.  Such audits will unnecessarily divert the Debtors' attention away from the reorganization process and may cause expenses and distraction in excess of the relatively minimal amount of the Taxes and Fees.  In all cases, I believe that the Debtors' failure to pay Taxes and Fees could have an adverse impact on their ability to operate in the ordinary course of business.

E.    **Utilities Motion**

260.    The Debtors seek entry of interim and final orders (a) prohibiting the Debtors' utilities (the "Utility Providers") from altering, refusing, or discontinuing service on account of

prepetition amounts outstanding or on account of any perceived inadequacy of the Debtors' proposed adequate assurance, (b) determining that the Utility Providers have been provided with adequate assurance of payment, (c) approving the Debtors' adequate assurance procedures and (d) determining that the Debtors are not required to provide any additional adequate assurance beyond what is proposed.

261.   *The Utility Services*.   In connection with the operation of their business and management of their properties, the Debtors purchase utility services, including, but not limited to, electricity, natural gas, waste, sewer, water, and telecommunications (collectively, the "Utility Services") from the Utility Providers.  Over the 12-month period ending on June 30, 2022, the Debtors paid an average of approximately $690,000 per month to their current Utility Providers. To the best of the Debtors' knowledge, there are no material defaults or arrearages with respect to the Debtors' undisputed Utility Services invoices, other than payment interruptions that may be caused by the commencement of the Chapter 11 Cases.

262.   *Proposed Adequate Assurance Deposit*.   The Debtors intend to pay all undisputed postpetition obligations owed to the Utility Providers in a timely manner.  Cash held by the Debtors and the cash generated in the ordinary course of business will provide sufficient liquidity to pay Utility Service obligations in accordance with prepetition practice.  Further, the Debtors have proposed using an existing account of the Debtors that is not being used for operations in which the Debtors will place a deposit equal to approximately two weeks of Utility Services, calculated as a historical average over the past 12 months (the "Adequate Assurance Deposit").  As of the Petition Date, the Debtors estimate the Adequate Assurance Deposit will equal $269,081.  I believe that this account and the additional procedures set forth in the motion adequately protect the rights that I have been advised are provided to the Utility Providers under the Bankruptcy Code, while

also protecting the Debtors' need to continue to receive, for the benefit of their estates, the Utility Services upon which their businesses depend.

263.    I believe that any interruption in Utility Services could force the Debtors to address payment requests by Utility Providers in a disorganized manner, distracting management from focusing on the Chapter 11 Cases and thereby jeopardizing the Debtors' reorganization efforts.

**F.    Customer Programs Motion**

264.    The Debtors seek entry of interim and final orders (i) authorizing, but not directing, the Debtors, in their sole discretion, to honor certain prepetition obligations owed to Customers under the Customer Programs (each as defined below) and to otherwise continue, renew, replace, modify, implement, revise and/or terminate Customer Programs in the ordinary course of business; (ii) granting relief from the automatic stay to permit setoff in connection with the Customer Programs; and (iii) authorizing and directing the banks and other financial institutions to honor and process related checks and transfers.

265.    The Debtors' direct customers for their products are primarily: (i) specialty distributors (the "Distributors") that are responsible for the distribution of products to end customers; (ii) specialty pharmacies (the "Pharmacies") that manage product prescriptions from intake through shipment; and (iii) wholesalers (the "Wholesalers") that warehouse and distribute both retail and non-retail products, facilitate pricing, and provide routine reporting to the Debtors. The Debtors also contract directly with (i) group purchasing organizations (the "GPOs") that facilitate product pricing and discounts to institutional end customers, including hospitals, long-term care facilities, physicians clinics, and limited retail customers and (ii) pharmacy benefit managers (the "PBMs," and together with the Distributors, Pharmacies, Wholesalers, and GPOs, the "Customers") that ensure coverage and access to certain products for patients.

266.    To preserve the Debtors' critical relationships with the Customers and maximize customer loyalty, in the ordinary course of business, the Debtors provide certain programs, practices, incentives, discounts, promotions and other accommodations (collectively, the "Customer Programs" and the obligations incurred thereunder, the "Customer Obligations").  The Customer Programs include Chargebacks, Rebates and Fees, Prompt Pay Discounts, Product Returns, Co-Pay Reduction Rebates, and Other Customer Programs (each as defined below).  As explained in greater detail below, the Customer Programs utilized by the Debtors are customary in the pharmaceutical industry and essential to preserving the value of the Debtors' businesses.

267.    As further described below, the Debtors estimate that the aggregate value of accrued prepetition Customer Obligations is approximately $526.7 million, $350.7 million of which is likely to come due during the Interim Period.  The $526.7 million total comprises (a) $227.9 million in accrued Chargebacks (as defined below), all of which is expected to come due during the Interim Period; (b) $102.7 million in accrued Rebates and Fees (as defined below), $65.3 million of which may come due during the Interim Period; (c) $19.8 million in accrued Prompt Pay Discounts (as defined below), $11.5 million of which may come due during the Interim Period; (d) $52.6 million in accrued Product Returns (as defined below), $12.9 million of which may come due during the Interim Period; (e) $16.6 million in accrued Co-Pay Reduction Rebates (as defined below), $3.2 million of which may come due during the Interim Period; and (f) $107.1 million in Other Customer Programs (as defined below), $29.9 million of which may come due during the Interim Period.  Though the amounts considered are substantial, Chargebacks, Rebates and Fees, Prompt Pay Discounts, Product Returns, and certain Other Customer Programs are typically satisfied by deductions by Customers from payments against outstanding accounts

receivable, which the Debtors then review and honor through setoffs within the Debtors' accounting system. Cash outlays comprise only a fraction of the requested relief.

268.    *Chargeback Programs*.  The Debtors negotiate certain agreements to establish contract pricing and chargebacks (the "Chargeback Agreements") with their Customers.  The Chargeback Agreements govern the terms of sale of products by Distributors to certain eligible retail pharmacies, hospitals, mail-order pharmacies, hospice providers, long-term care providers, and other institutions (the "Dispensers").  In addition, certain of the Customers may also negotiate agreements to establish contract pricing and/or distribution arrangements directly with the Debtors (the "Purchase Agreements").

269.    Based on the existence of certain Chargeback Agreements or statutory rights, Distributors may be entitled to sell the Debtors' products to certain eligible Dispensers at a special discounted rate (the "Chargeback Program").  The special discounted rate is less than the wholesale acquisition cost ("WAC") that the Distributors pay the Debtors.  Thus, when the Distributors sell the products to eligible Dispensers at a rate lower than WAC, the Debtors are subject to an obligation to compensate the Distributor for the deficiency (a "Chargeback").[22]

270.    When the Distributors ship products to certain eligible Dispensers, they submit a Chargeback request to the Debtors, which the Debtors promptly review and pay.  However, in some cases, due to standard invoicing terms, the Debtors do not receive payment in the amount of the WAC from the Distributors for approximately thirty (30) to sixty (60) days after the products are shipped to the Distributors, even though a Chargeback may be generated before such payment. Due to the Debtors' long relationships with most of their Customers, the Customers typically

---

[22]    For certain products, a rebate may be generated instead of a Chargeback.  If a Distributor has a product in stock and the WAC of such product is adjusted higher, the Distributor is sent an invoice for the difference in WAC or such amount may be offset from such Distributor's accrued fees.

deduct the amount of the Chargeback from payments against outstanding accounts receivable, and the Debtors then review and honor such Chargeback deductions through setoffs within the Debtors' own accounting system.

271.    The Debtors also accumulate Chargebacks under their agreement with CMS for Medicaid and relevant statutes.  The Debtors are required to comply with the United States Department of Health and Human Services' 340B Drug Pricing Program (the "340B Program") established under Section 340B of the Public Health Service Act.  Under this program, the Debtors must sell their products at specified prices that reflect a substantial discount to WAC.  Failure to comply with the 340B Program may result in fines and penalties, and exclusion from other federal programs.  Certain hospitals, clinics, and other entities, as set forth in relevant statutes, provide a minimum share, set by the 340B Program regulations, of their services to low-income patients and receive federal funds from CMS to help cover the costs of providing care to uninsured patients (such hospitals, clinics and other entities, the "340B Entities").  Pursuant to the 340B Program, the 340B Entities are entitled to receive the Debtors' products at a discounted price set by statute, which is calculated on a quarterly basis.  340B Entities purchase the Debtors' products from one of the Debtors' Distributors at the discounted price, and the Distributor then submits a chargeback to the Debtors for the difference between the WAC price that the Distributor paid to the Debtors and the discounted price paid by the 340B Entity to the Distributor (the "340B Distributor Chargebacks").

272.    On average, the Debtors accrue approximately $211.0 million in Chargebacks, including the 340B Distributor Chargebacks, every month.  The Debtors estimate that the aggregate amount of Chargebacks accrued and owing as of the Petition Date under the Chargeback Program is $227.9 million.

273.    The Debtors request authority to pay and honor, including through implementing or agreeing to setoffs, prepetition Chargebacks owed to the Customers as they come due in the ordinary course of business and consistent with past practice. The Debtors estimate that the aggregate amount of prepetition Chargebacks so honored during the interim period will be $227.9 million. I believe that failure to pay and honor the prepetition Chargebacks would likely result in serious and irreparable harm to the Debtors, including more restrictive contract terms, loss of Customer loyalty or market share, and an erosion of Customer satisfaction and goodwill. If the Debtors are unable to provide the products on competitive terms, Customers will seek other manufacturers or other alternatives to meet their demand.

274.    Additionally, the Debtors request authority to continue to perform, including through implementing or agreeing to setoffs, under the Chargeback Program on a postpetition basis in the ordinary course of business and consistent with past practice.

275.    *Rebate and Fee Program.*  The Debtors also negotiate certain arrangements that contain rebates and fees, including volume price rebates (collectively, the "Rebates and Fees"), with their Customers (the "Rebate and Fee Program"). These Rebates and Fees are mostly part of arrangements that also contain pricing terms and Chargebacks, but are also a part of agreements with payers, the United States federal government, or Canadian local governments.

276.    As with Chargebacks, Rebates and Fees may be deducted by the Customers from payments against outstanding accounts receivable, which the Debtors then review and honor through setoffs within the Debtors' accounting system through the issuance of credits against then-outstanding accounts receivable. The Debtors also pay Rebates and Fees through cash settlement via check or electronic transfer directly to Customers. On average, the Debtors accrue approximately $34.9 million in Rebates and Fees every month for products. The Debtors estimate

that the aggregate amount of Rebates and Fees accrued and owing as of the Petition Date for the products is $102.7 million.

277.     The Debtors request authority to pay and honor, including through implementing or agreeing to setoffs, prepetition Rebates and Fees owed to the Customers as they come due in the ordinary course of business and consistent with past practice.  The Debtors estimate that the aggregate amount of prepetition Rebates and Fees so honored during the interim period will be $65.3 million.  As with Chargebacks, I believe that failure to pay and honor the prepetition Rebates and Fees will likely result in serious and irreparable harm to the Debtors, including more restrictive contract terms, loss of Customer loyalty or market share, and an erosion of Customer satisfaction and goodwill.

278.     Additionally, the Debtors request authority to continue to pay and honor, including through implementing or agreeing to setoffs, the Rebates and Fees on a postpetition basis in the ordinary course of business and consistent with past practice.

279.     *Prompt Pay Discount Program*.  The Debtors also negotiate payment terms as part of most Purchase Agreements, often including prompt pay discounts ("Prompt Pay Discounts") for product purchases by the Customers (the "Prompt Pay Discount Program").  Prompt Pay Discounts offer Customers a reduction in the sales price if the Customers pay the amounts owed earlier than their agreed upon payment terms require and within certain early payment windows. The Prompt Pay Discount Program is implemented through a write-off to a specific reserve in the Debtors' accounting system established when products are purchased, and does not require a cash outlay from the Debtors.

280.     On average, the Debtors accrue approximately $9.4 million in Prompt Pay Discounts every month for products.  The Debtors estimate that the aggregate amount of Prompt

Pay Discounts accrued as of the Petition Date for the products is $19.8 million. The Debtors request authority to honor the prepetition Prompt Pay Discounts as they come due in the ordinary course of business and consistent with past practice. The Debtors estimate that the aggregate amount of prepetition Prompt Pay Discounts so honored during the interim period will be $11.5 million. I believe that paying and honoring the Prompt Pay Discounts is vital to preserving Customer loyalty and goodwill, as it demonstrates the Debtors' ability to provide the products on competitive terms. Failure to pay and honor these obligations will likely cause some of the Customers to seek other generic manufacturers or other alternatives to the Debtors' branded products, sterile injectable products, and international products to meet their demand.

281.    Additionally, the Debtors request authority to continue to honor the Prompt Pay Discounts on a postpetition basis in the ordinary course of business and consistent with past practice.

282.    *Product Return Program.* Similar to other pharmaceutical manufacturers, certain of the Debtors' products are eligible for expired product returns and failed or damaged product returns (the "Product Return Program" and such returns, "Product Returns"). Though there are variations for certain customers and products, short-dated and expired products in original, sealed, unopened packaging may generally be returned within six (6) months prior to the expiration and up to twelve (12) months after the expiration date. The Debtors also accept returns on certain products they sell without any contract, which returns are valued based on a weighted average selling price for the lot number returned.

283.    As with Chargebacks and Rebates and Fees, Product Returns may be deducted by Customers from payments against outstanding accounts receivable. The Debtors review and honor

such deductions through setoffs through the issuance of credits against then-outstanding accounts receivable.

284.     The Product Return Program is administered by Inmar RX Solutions Inc. ("Inmar"), pursuant to that certain Master Services Agreement dated as of March 12, 2021 (as amended and supplemented from time to time), by and between Inmar and Debtors Endo Pharmaceuticals Inc. and Par Pharmaceutical, Inc.  The Debtors pay Inmar certain fees for the administration of the Product Return Program, including the processing, sorting, and disposition of the Product Returns.  On average, each month the Debtors accrue approximately (i) $1.2 million in Product Returns for branded products, (ii) $2.1 million in Product Returns for sterile injectable products, and (iii) $4.2 million in Product Returns for generic products.  Most of the Product Returns are processed by Inmar, and the remainder are processed by the Debtors directly.  The Debtors also paid Inmar approximately $180,000 in the fiscal year ending December 31, 2021 on account of its administrative obligations under the Product Return Program.

285.     Certain Products Returns in Canada are made by Customers shipping directly to GFL Environmental Services Inc. ("GFL"), a third  party administrator, for destruction.  GFL invoices the Debtors on a monthly basis.  The Debtors paid GFL approximately $33,000 in the fiscal year ending December 31, 2021.

286.     The Debtors estimate that the aggregate amount of the Product Returns accrued and owing as of the Petition Date for the products is $52.6 million.  The Debtors request the authority to pay and honor, including through implementing or agreeing to setoffs, the prepetition Product Returns and prepetition amounts owed to Inmar and GFL as they come due in the ordinary course of business and consistent with past practice.  The Debtors estimate that the aggregate amount of prepetition Product Returns so honored during the interim period will be $12.9 million, and the

aggregate amount of prepetition amounts owed to Inmar and GFL so honored will be $20,000 and $5,000, respectively.  Paying and honoring Product Returns and the administrator of the Product Return Program is vital to maintaining Customer satisfaction and loyalty.  I believe that failure to do so would likely cause Customers to purchase from other manufacturers, resulting in decreased market share and revenues which would severely impact the long-term business outlook of the Debtors.

287.    Additionally, the Debtors request the authority to continue to pay and honor, including through implementing or agreeing to setoffs, the Product Returns and to pay Inmar on account of such Product Returns on a postpetition basis in the ordinary course of business and consistent with past practices.

288.    *Co-Pay Reductions*.  The Debtors provide certain patients with co-pay assistance for Xiaflex®, Supprelin LA®, Nascobal®, Aveed®, and Edex® to offset their out-of-pocket costs ("Co-Pay Reductions").  Co-Pay Reductions are offered to commercially insured patients to help offset the co-payments set by health insurers for prescription medication.  Patients eligible for Co-Pay Reductions receive a coupon, either online, from a healthcare provider or at the point of sale.  When a patient purchases one of the Debtors' products at the pharmacy with either a point of sale discount or a discount coupon, the pharmacy submits redemption information to the applicable vendor with whom the Debtors have contracted with to provide coupon adjudication services for the Debtors' products.

289.    The vendors used by the Debtors are ConnectiveRX (Xiaflex®, Nascobal®), Marketshare Movers (Supprelin LA®, Aveed®), Relay Health and CoverMyMeds (Nascobal®), McKesson (Edex®), and Bayshore (International Products).  In each case, the vendor reimburses the pharmacy for the discount and is in turn reimbursed by the Debtors (the "Co-Pay Reduction

Rebate"). The Debtors pay each vendor a fee for service and costs for the production of the coupons. The Debtors estimate that as of the Petition Date, approximately $16.6 million has accrued but has not been invoiced or paid for Co-Pay Reductions. The Debtors seek authority to pay Co-Pay Reductions when they become due and to continue to utilize and pay ConnectiveRX, Marketshare Movers, Relay Health, CoverMyMeds, McKesson, and Bayshore on both a prepetition and postpetition basis in the ordinary course of business and consistent with past practices. The Debtors estimate that the aggregate amount of prepetition Co-Pay Reductions so honored during the interim period will be $3.2 million, and the aggregate amount of prepetition amounts owed to ConnectiveRX, Marketshare Movers, Relay Health, CoverMyMeds, and McKesson so honored will be $0. It is my understanding that paying and honoring Co-Pay Reductions and the vendors that administer the Co-Pay Reduction Rebates is vital to maintaining Customer satisfaction and loyalty.

290.    *Other Customer Programs*. The Debtors' other customer programs (collectively, the "Other Customer Programs") include (a) rebates and refunds in connection with Medicaid, (b) certain price adjustments due to promotions, shelf stock adjustments, and the failure to provide adequate supply that are not covered in any other category (the "Price Adjustments"), and (c) allowances that the Debtors negotiate with Customers along with pricing, Chargebacks, and Rebates and Fees, such as stocking allowances for new products or products added to an existing contract, certain allowances for inventory on hand at the Customer or in-transit to a Distributor in the event of decreases in WAC or contract price, and certain other negotiated price protections related to increases in contract price. Payments on account of Other Customer Programs for Medicaid are paid by check or wire, while allowances to Customers are generally honored by setoffs within the Debtors' accounting system through the issuance of credits against then-

outstanding accounts receivable.  In addition to the Other Customer Programs discussed in greater detail below, the Debtors pay approximately $1.2 million each month for Price Adjustments, and estimate that the aggregate amount of Price Adjustments accrued and owing as of the Petition Date is $10.9 million.

291.    The Debtors estimate that the aggregate amount of prepetition Price Adjustments so honored during the interim period will be $2.1 million.  Like with the Debtors' other customer programs, I believe that paying and honoring Price Adjustments is important for maintaining Customer satisfaction and loyalty.

292.    *Medicaid*.  Medicaid is a health program, jointly funded by state and federal governments and managed by the states, that assists low-income individuals and families in obtaining healthcare.  The Medicaid Drug Rebate Program, a federal and state partnership that offsets the costs of certain prescription medications dispensed to Medicaid patients, requires the Debtors to enter into a national rebate agreement with the Secretary of the Department of Health and Human Services.  In return, Medicaid covers certain of the products.  In addition, the Debtors have agreements with certain states for rebates under other state programs that serve low-income individuals and families not eligible for federal Medicaid, as well as supplemental rebate agreements for rebates in excess of those required by federal statute.  Under these programs, individual states collect product utilization data for products paid for under the various state and federal programs and invoice the Debtors for rebates (the "Medicaid Rebates"), which are calculated based on a statutory formula or, for supplemental rebates, on the contractual formula. The Debtors pay the Medicaid Rebates to the various states on a quarterly basis.  The Debtors estimate that approximately $83.5 million has been accrued but has not been invoiced for Medicaid

Rebates as of the Petition Date, and that the aggregate amount of prepetition Medicaid Rebates so honored during the interim period will be $27.8 million.

293.    If the Debtors fail to fulfill their Medicaid obligations, including payment of the Medicaid Rebates as they become due, they risk becoming excluded from all federal programs, as well as being subject to penalties and fines.  As such, I believe that honoring the Medicaid Rebates is integral to the Debtors' businesses.  Accordingly, the Debtors respectfully request authorization to continue making Medicaid Rebate payments in the ordinary course of business during the Chapter 11 Cases with respect to both prepetition and postpetition sales of their products.

294.    *Medicare Part D*.  Medicare is a federally administered, national insurance program that primarily serves Americans over the age of sixty-five (65).  Medicare Part D provides prescription drug benefits to eligible patients.  The Debtors are party to several contracts with private insurance companies, managed care organizations, and PBMs with Medicare Part D business lines ("Medicare Part D Plans"), under which the Debtors pay certain rebates and, in certain cases, administrative or other fees related to Medicare Part D ("Medicare Part D Rebates"). The Debtors pay these rebates and fees under the Medicare Part D Plans monthly or quarterly, based on individual contract terms.  As of the Petition Date, the Debtors estimate that they had accrued but not yet paid approximately $12.7 million in Medicare Part D Rebates, and that the aggregate amount of prepetition Medicare Part D Rebates so honored during the interim period will be $1,000.  The Debtors respectfully request authorization to continue making Medicare Part D Rebate payments in the ordinary course of business during the Chapter 11 Cases with respect to both prepetition and postpetition sales of their products.  The Debtors are also party to a Medicare Part D Coverage Gap Program Discount Agreement with the Centers for Medicare & Medicaid Services ("CMS"), required under the Patient Protection and Affordable Care Act, as modified by

the Affordable Care Act, should manufacturers wish to have coverage for their products under

Medicare Part D, pursuant to which the Debtors provide rebates to a certain third party provider

of services of CMS, Third Party Administrator ("TPA").  TPA, in turn, administers a program

whereby the Medicare Part D Plans provide discounted prescription medications to Medicare Part

D beneficiaries within a so-called "coverage gap" (the "Coverage Gap Program").  TPA

consolidates claims arising under the Coverage Gap Program and sends an invoice to the Debtors.

TPA is not required to, and does not, provide updates to the Debtors regarding claims that have

not yet been included in invoices.  Such Coverage Gap Program invoices are commingled in the

Debtors' accounting system with all other Medicare Part D Rebates, and the Debtors do not seek

additional monetary relief for the Coverage Gap Program beyond the limits requested for the

Medicare Part D Rebates.

> 295.   *Federal Supply Schedule*.  Based on its agreement with CMS for Medicaid and

relevant statutes, the Debtors must also comply with the Department of Veterans Affairs Federal

Supply Schedule (the "FSS"), which requires the Debtors to make products available to federal

agencies such as, but not limited to, the Department of Veterans Affairs, Department of Defense,

the Coast Guard, Federal Bureau of Prisons and the Public Health Service at deeply discounted

prices.  In addition, the Debtors also may offer voluntary additional discounts on the FSS or to the

Department of Defense mail order and military treatment facilities (collectively, the "FSS

Programs").  For drugs with a "New Drug Application," there is a statutory maximum amount that

certain government entities can be charged for pharmaceuticals based on a specific formula.  For

multisource prescription drugs or non-prescription products, the prices and discounts are

negotiated with the Department of Veterans Affairs, and often equal the lowest commercial

institutional price.  Since the price the Debtors charge under the FSS is lower than WAC, the

Distributors charge back the Debtors for the difference (the "FSS Rebates"). Failure to comply with the FSS Programs may result in substantial fines and penalties and exclusion from other federal programs, which would diminish the Debtors' customer bases as well as harm the Debtors' relationship with the Distributors.

296.    The Debtors seek authority to continue to sell their products under the FSS Programs in the ordinary course of business. The Debtors' estimated average monthly liability for FSS Rebates is approximately $33.7 million, though FSS Rebates are netted against accounts receivable and thus generally do not result in a cash payment. The Debtors seek authority to continue honoring all FSS Rebates in the ordinary course of business and to apply any prepetition FSS Rebates that may be outstanding against open invoices of their products in the ordinary course of business.

297.    *Industrial Funding Fee.* The Debtors also collect for the United States Department of Veterans Affairs an additional 0.5% fee on all FSS purchases (the "Industrial Funding Fee"). The Debtors' estimated average quarterly liability for Industrial Funding Fees is $200,000. Manufacturers collect this fee from purchasers at the time of sale, via the FSS Rebates process, and remit payment to the Department of Veterans Affairs on a quarterly basis. The Debtors seek to continue paying the Industrial Funding Fee, whether incurred pre- or postpetition, over to the Department of Veterans Affairs in the ordinary course of business.

### G.    Critical Vendor Motion

298.    The Debtors seek entry of interim and final orders (i) authorizing, but not directing, the Debtors, in their sole discretion, to pay certain Specified Trade Claims (as defined below) in the ordinary course of business of (a) common carriers, warehousemen, toll processors, mechanics, and freight forwarders, in each case that may have or may be capable of asserting liens against the Debtors' property (collectively, the "Lienholders"); (b) certain vendors entitled to administrative

121

expense status under section 503(b)(9) of the Bankruptcy Code (the "503(b)(9) Vendors") in the ordinary course; (c) third party, unaffiliated vendors that, upon information and belief, have minimal or no assets within the United States (the "Foreign Vendors"); and (d) essential vendors, contractors, and suppliers (the "Critical Vendors") in an aggregate amount not to exceed $20 million on an interim basis and $30 million on a final basis (each of the foregoing, as applicable, the "Critical Vendors Claims Cap"); (ii) approving procedures related to the payment of the Specified Trade Claims; and (iii) authorizing and directing the banks and other financial institutions to honor and process related checks and transfers.

299.    *Common Carriers.*  In the ordinary course of operations, the Debtors' supply and delivery system depends upon the use of common carriers operated by third parties, including ocean freight, trucking services, air transport, and rail carriers (the "Common Carriers"), to receive shipments of raw materials from their vendors and transport materials and products throughout the manufacturing process.  As a result of the services they provide, the Common Carriers regularly possess certain of the Debtors' raw materials, goods, and equipment in the ordinary course of the Debtors' operations.

300.    My understanding is that under some state laws, Common Carriers may have a possessory lien on the goods in their possession, which secures payment of claims incurred in connection with the storage or transportation of goods.  The Common Carriers, as bailees, may also be entitled to adequate protection for valid possessory liens.  I understand that if the Debtors fail to pay the Common Carriers in a timely manner, the Common Carriers may seek to assert liens against the Debtors' raw materials, goods, and equipment in the Common Carriers' possession, which could potentially block the Debtors' access to the goods that are in transport.  I believe that

such actions would severely damage the Debtors' ability to operate their businesses for the benefit of all stakeholders.

301.   *Warehouses*.   The Debtors also supplement their own storage and distribution facilities with third-party warehouse facilities (the "Warehouses") to store goods.  The Debtors have multiple Warehouses across the globe, including in the United States, Canada, and United Kingdom.  The Warehouses regularly hold products and materials owned by the Debtors.  As with the Common Carriers, warehousemen may be able to assert liens on the goods in their possession to secure the charges or expenses incurred in connection with the storage of those goods under applicable laws.  Again, I believe that such actions would severely damage the Debtors' ability to operate their businesses for the benefit of all stakeholders.

302.   *Toll Processors*.   In the ordinary course of business, the Debtors also utilize the services of certain third-party toll processors (the "Toll Processors") with respect to the Debtors' finished products.  As is typical for most toll processing arrangements, the Debtors supply the formula, raw materials and, in certain cases, equipment or other property to the Toll Processors, which the Toll Processors then use to blend, package, and/or produce and manufacture the Debtors' final products.  The Debtors either provide their API (as defined below) directly to the Toll Processors or indirectly through a third party.

303.   The Debtors utilize the Toll Processors for current commercialized products and for pipeline development projects where the drug has not yet come to market.  In certain cases, the Debtors have a co-development agreement with the Toll Processors or utilize the Toll Processors' specialized equipment for the production of the Debtors' products.  The Toll Processors are vital to the Debtors' continued operations due to their strong familiarity and experience in dealing with the specialty materials required by the Debtors' businesses.  My understanding is that Toll

Processors may similarly be able to assert contractual or statutory liens on the Debtors' formula, materials and equipment in the Toll Processors' possession to secure the charges or expenses incurred by the Debtors prepetition, which would damage the Debtors' ability to operate their businesses for the benefit of all stakeholders.

304.    *Mechanics*.  The Debtors also require maintenance and repair work with respect to their equipment, and in some cases, rely on outside mechanics and repairmen (collectively, the "Mechanics") to perform maintenance and repair work.  The Debtors' equipment is vital to their operations, and these Mechanics may be able to assert mechanics', possessory, or similar liens on such equipment.  Consequently, the Mechanics may assert liens on the equipment they have repaired or, in certain cases, refuse to return equipment repaired off-site to the Debtors unless they are paid prepetition amounts owed to them.  Either outcome could put the Debtors' businesses could be in jeopardy, as such equipment is vital to the Debtors' continued operations.

305.    *Freight Forwarders*.  The Debtors utilize the services of freight forwarders and customs processors (the "Freight Forwarders") to handle the import of the Debtors' raw materials and the export of the Debtors' products.  The Freight Forwarders provide vital services that enable the relevant Debtors to comply with the complex customs laws and regulations of the United States when importing materials from outside the United States.  Among other things, the Freight Forwarders provide the back-office services necessary for customs clearance, prepare import summaries, facilitate exportation of the Debtors' products, obtain tariff numbers, pay duties and taxes, and perform numerous other critical services for the Debtors.  The relevant Debtors pay the Freight Forwarders for their services and reimburse the Freight Forwarders for any funds advanced on behalf of the Debtors to pay fees to the United States Customs Service, as well as for charges of certain ocean, air, and land shippers, and certain miscellaneous storage and handling expenses.

306.    For outbound products, payments to certain Freight Forwarders are managed through the United Parcel Services ("UPS").  For those accounts, Freight Forwarders send invoices to UPS, which then notifies the Debtors of the amounts due.  On a monthly basis, and prior to the applicable due date for such invoices, the Debtors transfer the outstanding invoiced amounts to UPS.  UPS thereafter makes payment to the applicable Freight Forwarder prior to the applicable due date on account of such invoices.

307.    As of the Petition Date, the Debtors estimate that the Lienholders' claims total approximately $32 million.

308.    *The 503(b)(9) Vendors*.  The Debtors have identified certain claims which are entitled to priority status under sections 503(b)(9) and 507(a)(2) of the Bankruptcy Code (the "503(b)(9) Claims") due to the fact that they are undisputed obligations for goods received by the Debtors in the ordinary course of business in the twenty days prior to the Petition Date.  As of the Petition Date, the Debtors estimate that the 503(b)(9) Claims total approximately $10 million.

309.    The Debtors seek, in their discretion, to pay certain 503(b)(9) Claims as they come due in the ordinary course, instead of satisfying these claims upon confirmation of a chapter 11 plan.  I believe that by altering the timing of payments that certain 503(b)(9) Vendors are entitled to receive as a matter of statute, such payments can induce the individual 503(b)(9) Vendors to adhere to favorable trade terms and do business with the Debtors on a go-forward basis.  I believe that this relief is in the best interests of the Debtors' estates because (a) favorable trade terms will prevent the contraction of the Debtors' liquidity, and (b) this Court's time and resources will not be burdened with motions from individual 503(b)(9) Vendors requesting payment on account of their 503(b)(9) Claims or seeking reclamation of goods received by the Debtors in the twenty days prior to the Petition Date.

310.    *Foreign Vendors*.    The Debtors purchase goods and services from Foreign Vendors.[23]  In the ordinary course of business, the Debtors rely on Foreign Vendors to provide certain critical goods and services including supplying raw materials, manufacturing the Debtors' products, packaging of labels, warehousing, distribution, customer service, certain financial functions, and certain research and development activities.

311.    If the Debtors are unable to pay prepetition amounts due and owing to the Foreign Vendors (the "Foreign Vendor Claims"), the Foreign Vendors may take action against the Debtors based upon an erroneous belief that the Foreign Vendors are not subject to the automatic stay provisions of section 362(a) of the Bankruptcy Code.  I believe the Foreign Vendors could, among other things, initiate a lawsuit in a foreign court and obtain a judgment against the Debtors to collect prepetition amounts owed to them or seek to attach or seize foreign assets of the Debtors, even prior to obtaining a judgment.

312.    In addition, in the absence of payment of the Foreign Vendors Claims, there is a distinct risk that certain Foreign Vendors may simply decline to provide necessary goods and services, thereby jeopardizing the Debtors' ability to sustain uninterrupted domestic and international operations.  The cumulative impact of such events could have an adverse effect on the Debtors' operations and, particularly, on the ability of the Debtors to maintain a postpetition business as usual atmosphere.  I believe that payment of the Foreign Vendor Claims is essential to avoid costly disruptions to the Debtors' operations and ability to timely and adequately fill customer orders.

---

[23]    The term "Foreign Vendors" shall not include foreign vendors, service providers or other non-governmental entities if such entities are known to have material assets within the United States that would be subject to the jurisdiction of this Court and that would otherwise be available to satisfy a judgment entered by the Court if such entities were to violate the automatic stay provisions of section 362 of the Bankruptcy Code or take any actions contrary to an order of this Court.

313.    As of the Petition Date, the Debtors had accrued but not yet paid approximately $4 million in fees to Foreign Vendors.

314.    *The Critical Vendors*.  In the ordinary course of business, the Debtors are highly dependent on Critical Vendors to provide certain critical goods and services including, without limitation, manufacturing, packaging, supplies, customer service, certain financial functions, certain research and development activities and medical affairs.  The Debtors seek authority to pay prepetition amounts due and owing to the Critical Vendors (the "Critical Vendor Claims") in order to maintain business as usual and serve their customers, and ultimately, the patients that utilize their products.  The Critical Vendors may be broadly grouped into five categories: (i) Materials Critical Vendors, (ii) R&D Critical Vendors, (iii) System Infrastructure Critical Vendors, (iv) Maintenance Services Critical Vendors, and (v) Corporate and Commercial Services Critical Vendors.  Each category is defined and further described below.

315.    Certain Critical Vendors provide materials and services that are crucial to the manufacture and production of the Debtors' pharmaceutical drug products (the "Materials Critical Vendors").  The Debtors rely on the Materials Critical Vendors to provide the requisite volume of (a) raw materials and controlled and non-controlled active pharmaceutical ingredients ("API") that go into the Debtors' products, (b) the drug plastics, bulk liquid, coating solution, flavors, inactive ingredients, glass, necessary packaging, and device components that hold and affect delivery of the products (the "Excipients"), (c) systems to transport the products, and (d) from certain contract manufacturing organizations (the "CMOs"), finished goods and samples.  The raw materials, API, Excipients, packaging, and manufacturing services supplied by the Materials Critical Vendors are necessary to operate the Debtors' businesses.  Certain of the Materials Critical Vendors are sole source providers of their respective materials to the Debtors because they are the only sources

capable of producing and shipping the volume and specification of materials required for the Debtors' operations and either cannot be replaced by other suppliers or cannot be replaced at competitive prices.

316.    Moreover, the manufacturing services provided by the CMOs and the raw materials, API, Excipients, packaging, and transportation systems supplied by the other Materials Critical Vendors are highly regulated by the FDA, the Department of Health and Human Services, the United States Drug Enforcement Administration, the Environmental Protection Agency, the Customs Service, and state boards of pharmacy.  The Debtors' products are subject to extensive quality control, and the quality is tested at multiple stages in the production process.  Even in cases where a Materials Critical Vendor is not a sole source provider, the highly regulated environment in which the Debtors operate will not allow the Debtors to quickly or efficiently substitute the raw materials or API of another vendor.  Any substitution, alteration, or other change could impact the purity and regulatory compliance of the Debtors' product and, therefore, the Debtors' ability to run their businesses and supply the drug to the market.  For certain products, no viable alternative therapy is available, and an immediate impact would be felt both by the Debtors and the patients who rely on their medications.

317.    Further, each aspect of the Debtors' packaging, from the drug's final formulation down to the label and type of ink used, is also subject to regulatory review and approval.  Packaging itself is a critical part of the Debtors' product, as the form and material construction of package chosen for each drug affects the stability of the final dosage form, which can be impacted by a number of variables, including oxygen transmittance and temperature fluctuation.  For such reasons, and similar to their raw materials and API vendors, the Debtors cannot readily change certain of their drug product and packaging vendors.

318.     The Debtors also utilize systems to transport products safely and within applicable regulations, including qualified temperature monitors to monitor the temperature during the shipment of certain products.  Due to these regulatory hurdles and technical transfer requirements, the Debtors believe any change of Materials Critical Vendors would cause a delay of several months, on the low end, to upwards of several years, on the high end, before the Debtors would be authorized to manufacture and distribute affected products.  Such an extended timeline leaves the Debtors in a difficult situation because they also believe that if they fail to pay the Materials Critical Vendors on a timely basis, existing relationships will be strained and many of the Materials Critical Vendors may stop providing services.

319.     Absent paying the Materials Critical Vendors, I believe the Debtors' businesses will suffer serious disruption.  Such disruption would cause significant harm to the Debtors' businesses and, ultimately, patients who use the Debtors' drugs in their treatments.  Accordingly, the Debtors have an immediate need to pay the Materials Critical Vendors.

320.     Certain other Critical Vendors provide the Debtors with research and clinical trial services that allow the Debtors to (a) bring new products to market and (b) develop new uses or indications for existing products (the "R&D Critical Vendors").  The R&D Critical Vendors perform research, provide clinical supplies, recruit patients, manage research data, and test the Debtors' products, among other related services.  The work conducted by the R&D Critical Vendors is regulated by numerous global regimes that govern the Debtors' development of new drug products and commercialization and sale of existing products.

321.     For example, the FDA requires immediate reporting of certain adverse events that occur during trials, and the R&D Critical Vendors are essential to the process of identifying and reporting such events in a timely manner.  Furthermore, many of the clinical trials facilitated by

the R&D Critical Vendors will take years to complete and analyze, and certain of such clinical trials are in advanced stages. Given the highly regulated and specialized nature of these clinical trials, substituting any R&D Critical Vendors would be difficult or impossible: alternate vendors would lack the institutional knowledge required to quickly replace current Research and Development Critical Vendors and would need to meet regulatory hurdles, which, as with the Materials Critical Vendors, could take prolonged periods of time. In the meantime, patients participating in the clinical trials would be denied access to vital drug therapies.

322.    The services of the R&D Critical Vendors are also fundamental to the Debtors' marketing and sales efforts and, ultimately, patient outcomes. The research and clinical trial results are key factors in both a medical provider's decision to prescribe or use the Debtors' products and a payer's decision to reimburse the cost of the Debtors' products. The R&D Critical Vendors' services are also integral to the creation and preservation of the Debtors' intellectual property rights. Delay or discontinuation of clinical trials could jeopardize critical intellectual property rights that are necessary for the manufacturing, sale and marketing of the Debtors' products.

323.    I believe that if the Debtors fail to pay the R&D Critical Vendors on a timely basis, existing relationships with such service providers will be negatively impacted, and many, if not all, of the R&D Critical Vendors may stop providing services entirely. The cessation of the R&D Critical Vendors' work would have an immediate and devastating impact on the Debtors' businesses and the patients who rely on the Debtors' products.

324.    The Debtors engage with other Critical Vendors to provide certain hardware, software, and other services that are critical to the Debtors' upkeep of their business infrastructure (the "System Infrastructure Critical Vendors"). The System Infrastructure Critical Vendors provide and maintain services that, among other things, test and track the quality and location of

all components of the Debtors' supply chain, from delivery of the raw materials to the packaging and sale of the finished goods.

325.     Because of the highly regulated industry in which the Debtors operate, the Debtors are required to continually test and maintain certain quality control standards during all stages of production.  The Debtors must also be able to test quality, record and track all aspects of the production and sale of their therapies.  The System Infrastructure Critical Vendors' services are essential for compliance with the multitude of ongoing regulatory requirements, including tracking and reporting obligations and product quality testing.  The Debtors estimate that changing to new System Infrastructure Critical Vendors could take years and cost multiple millions of dollars due to the significant logistical efforts and data migration undertaking needed to transfer to any alternate vendor.

326.     I believe that if the Debtors fail to pay the Critical Vendor Claims owed to the System Infrastructure Critical Vendors on a timely basis, existing relationships with such service providers would be negatively impacted, and many of the System Infrastructure Critical Vendors would stop providing services.  Without the System Infrastructure Critical Vendors, the Debtors run the risk that their production will be delayed because of the substantial time required to migrate their data and transfer to a new service provider, which would likely take, at a minimum, several months.  In addition, stopping the System Infrastructure Critical Vendors' services would create a significant risk of regulatory liability, including adverse governmental actions, which would have a detrimental impact on the Debtors' ability to produce, sell, and market their goods.

327.     Other Critical Vendors provide essential maintenance services with respect to the manufacturing, global regulatory compliance, and other operational needs of the Debtors (the "Maintenance Services Critical Vendors").  Certain of the Maintenance Services Critical Vendors

provide preventative maintenance and critical repair services for the Debtors' manufacturing equipment, including custom equipment. Other Maintenance Services Critical Vendors are engaged by the Debtors to preserve and repair the Debtors' information technology systems, which are indispensable to protecting confidential and proprietary information and supporting supply chain processes, quality assurance, regulatory reporting, and other day-to-day operations. Still other Maintenance Services Critical Vendors provide equipment calibration services, which are required to ensure regulatory compliance for product component specifications during the manufacturing process.

328.    The Maintenance Services Critical Vendors have long-term specialized knowledge of the Debtors' highly complex and customized equipment and systems, and the Debtors would be unable to quickly replace such vendors, particularly in a scenario requiring immediate critical repairs. I believe that if the Debtors fail to pay the Maintenance Services Critical Vendors on a timely basis, existing relationships with such service providers would be negatively impacted, and many, if not all, of the Maintenance Services Critical Vendors would stop providing services entirely. An interruption in such services would significantly disrupt the Debtors' supply chain and manufacturing processes, adversely impact the Debtors' global regulatory compliance, and jeopardize the confidential and proprietary information that define the Debtors' competitive business position.

329.    Other Critical Vendors provide essential data collection and control, external technological support, marketing, and other services to the Debtors (the "Corporate and Commercial Services Critical Vendors"). The Corporate and Commercial Services Critical Vendors' services are critical to the Debtors' business, and even the temporary lack of any of the services provided by the Corporate and Commercial Services Critical Vendors could cascade into

a significant disruption of the Debtors' operations during the crucial first few weeks of these Chapter 11 Cases. Such a disruption could cause irreparable harm to the Debtors' businesses, goodwill, and market share, which in turn could limit the Debtors' ability to maximize the value of the estate for the benefit of all creditors.

330.   *Identification Factors for Critical Vendors*.   The Debtors and their advisors spent significant time and effort reviewing and analyzing their books and records, consulting operations managers and purchasing personnel, reviewing contracts and supply agreements, and analyzing applicable law, regulations and historical practice to identify certain critical business relationships and suppliers of goods and services—the loss of which would immediately and irreparably harm their businesses, by, among other things, shrinking their market share, reducing enterprise value, and ultimately impairing the Debtors' viability as a going-concern. In determining which vendors should receive status as Specified Trade Claimants, the Debtors and their advisors have carefully considered a variety of factors, including:

- The extent to which suppliers may be able to obtain or have obtained trade liens on assets of the Debtors or an administrative expense claim pursuant to section 503(b)(9) of the Bankruptcy Code;

- Which suppliers were sole source or limited source suppliers, without whom the Debtors could not continue to operate without disruption;

- Which suppliers would be prohibitively expensive to replace;

- Which suppliers would present an unacceptable risk to the Debtors' operations should they cease the provision of truly essential services or supplies;

- Whether the suppliers are party to an executory contract with the Debtors that requires the suppliers' ongoing performance pending assumption or rejection under section 365 of the Bankruptcy Code notwithstanding the Debtors' failure to make the prepetition payment; and

- The extent to which suppliers are beyond the jurisdiction of this Court and can thus, notwithstanding the automatic stay, exercise remedies that would disrupt the Debtors' operations and businesses.

331.    The Debtors also considered the financial condition of each supplier, where that information was known, including the level of dependence each supplier has on the Debtors' continued businesses.

332.    Through this process, the Debtors were able to identify prepetition amounts due and owing to the Specified Trade Claimants that I believe are necessary to pay in order to maintain business as usual and serve their customers, and ultimately, the patients that use their products. Based upon their books and records, the Debtors estimate that they pay their vendors and suppliers, in the ordinary course of business, approximately $134 million each month.  On average, the Specified Trade Claims' monthly spend accounts for approximately 50% of that amount.  The Debtors estimate that as of the Petition Date, the Specified Trade Claims totaled approximately $76 million.  Without authority to pay the Specified Trade Claimants, the Debtors would be unable to conduct their businesses and fulfill obligations to their customers.  Such a result would be detrimental to the Debtors' reputation and businesses.

333.    The Debtors' trade relationships with their Specified Trade Claimants are not generally governed by long-term contracts.  Thus, the Debtors believe that such trade relationships may materially deteriorate, causing disruption to the Debtors' operations if the Debtors are unable to pay the Specified Trade Claims.  It is my belief that the Debtors' business is ill-equipped to switch vendors or suppliers on short notice and faces significant risks to its supply chain if certain prepetition amounts cannot be paid.  Due to the regulated nature of the Debtors' business and its relationship with sole source providers, the Debtors have limited-to-no options for replacement suppliers.  Replacing suppliers is time-consuming, cost prohibitive and in certain circumstances, plainly not feasible.  Moreover, any failure of a supplier to provide the necessary goods for delivery to the Debtors' customers likely would create shortages in the Debtors' supply chain and adversely

affect the customers' willingness to do business with the Debtors in the future, thereby impacting cash flow, profitability and the ability of the Debtors to restructure their business.

334.    *Conditions of Payments to Specified Trade Claimants*.   In light of these circumstances, subject to the Court's approval, the Debtors intend to pay, in their sole discretion, any claims of the Lienholders, 503(b)(9) Vendors, Foreign Vendors, and Critical Vendors (collectively, the "Specified Trade Claimants" and their claims, the "Specified Trade Claims") only to the extent necessary to preserve their businesses.   The Debtors propose, in their sole discretion, to condition payment of any Specified Trade Claims upon agreement by the Specified Trade Claimant to supply goods or services to the Debtors on such Specified Trade Claimant's customary trade terms for a period following the date of the agreement or on such other terms and conditions as are acceptable to the Debtors.

335.    I believe that maintaining normal trade credit terms will improve the Debtors' chances of successfully reorganizing because purchasing goods on credit preserves working capital and liquidity—enabling the Debtors to maintain their competitiveness and to maximize the value of their businesses.   Absent the relief requested herein, many of the Debtors' vendors may attempt to place the Debtors on cash-in-advance terms, which I believe could drain the Debtors' estates of resources that would otherwise be available for other funding needs during the critical first weeks of the Debtors' bankruptcy.

### H.    Motion to Preserve Tax Attributes

336.    The Debtors seek entry of interim and final orders (a) approving notice and objection procedures for certain transfers of one or more ordinary shares ("Ordinary Shares") of Endo International plc or of any beneficial interest therein (including, but not limited to, any contingent purchase, warrant, convertible debt, put, stock subject to risk of forfeiture, contract to acquire stock or similar interest, regardless of whether it is contingent or otherwise not currently

exercisable (an "Option")) (collectively, "Equity Securities"), that must be complied with before

such transfers of Equity Securities are deemed effective, and (b) granting related relief so as to

protect the potential value of the Debtors' net operating losses (the "NOLs") (such NOLs, together

with disallowed interest carryovers, capital losses, unrealized built-in losses, and certain other tax

credits and tax attributes, the "Tax Attributes").

337.    The Debtors have generated, and may currently be generating, U.S. federal and

state NOLs and Tax Attributes.  As of December 31, 2021, the Debtors had approximately

$32,726,000 of NOLs available to offset taxable income for U.S. federal income tax purposes and

approximately $237,414,000 of NOLs available to offset taxable income for U.S. state income tax

purposes.  In addition, as of December 31, 2021, the Debtors had approximately $347,501,000 of

disallowed interest carryovers and approximately $13,339,000 of tax credits available to offset

taxable income for U.S. federal income tax purposes and approximately $3,256,000 of tax credits

available to offset taxable income for U.S. state income tax purposes.

338.    It is my understanding that the Debtors do not believe that Endo International plc

has undergone an ownership change prior to the Petition Date.  Accordingly, the Debtors believe

that they continue to have significant Tax Attributes that would be adversely affected (and perhaps

effectively eliminated) by the occurrence of an ownership change during the pendency of the

Chapter 11 Cases.  If such an ownership change were to occur, the availability and value of such

Tax Attributes would be adversely impacted.  Therefore, it is in the best interests of the Debtors

and their stakeholders to restrict the trading of Equity Securities that could result in an ownership

change occurring *before* the Debtors' Tax Attributes are fully utilized.  Such a restriction would

protect the Debtors' ability to use the Tax Attributes during the pendency of the Chapter 11 Cases

or, potentially, in the event of a future transaction, to offset gain or other income recognized in connection with the Debtors' sale or ownership of their assets, which may be significant in amount.

339.     It is my understanding that because the Debtors may still be at risk of losing the ability to use even a portion of their Tax Attributes (which Tax Attributes could be used to reduce the tax burden of the section 363 sale on the estates) as a result of an ownership change, the Debtors believe they require the ability to monitor, and possibly object to, changes in ownership of Equity Securities that may adversely affect the Debtors' ability to utilize their Tax Attributes.  Thus, to preserve the Debtors' flexibility to maximize the use of the Tax Attributes to the fullest extent possible, the Debtors seek limited relief that will enable the Debtors to closely monitor certain transfers of Equity Securities, so as to be in a position to act expeditiously if necessary to preserve their Tax Attributes.  It is my understanding that if no such restrictions are imposed by the court, the Debtors' ability to use their Tax Attributes could be severely limited or even eliminated.

### I.     Foreign Representatives Motion

340.     The Debtors seek entry of an order authorizing the Foreign Representatives (as defined below) to act on behalf of the Debtors' estates in the Foreign Proceedings (as defined below), including that the Foreign Representatives be expressly authorized to (x) seek recognition of the Chapter 11 Cases and certain of this Court's orders in Canada, the UK and Australia (y) request that the Foreign Courts (as defined below) grant comity to the Foreign Representatives, and (z) seek any other appropriate relief from the Foreign Courts that is just and proper in furtherance of the protection of the Debtors' estates.

341.     *Appointment of Foreign Representative in Canadian Proceedings*.  Paladin Labs Inc. and Paladin Labs Canadian Holding Inc. (the "Canadian Debtors") and certain other Debtors, namely Endo International plc, Endo Ventures Limited, Par Pharmaceuticals, Inc. Par Pharmaceuticals Companies, Inc., Generics Bidco I, LLC, DAVA Pharmaceuticals, LLC, and

Endo Pharmaceuticals Inc. (collectively with the Canadian Debtors, the "Canadian Defendants")
are named as defendants in nine actions commenced across Canada (collectively, the "Canadian
Actions"). The Canadian Actions consist of actions relating to (a) the marketing and sale of certain
FDA-approved opioid products and (b) generic pricing.

342.    In addition, the Canadian Debtors have assets and operations in Canada. As such,
I believe it is necessary to ensure that the Chapter 11 Cases, as well as the orders of this Court
entered herein, are recognized for the Canadian Debtors and the stay is enforced in Canada for the
Canadian Defendants.

343.    Each of the Canadian Debtors has authorized Paladin Labs Inc. ("Paladin") to act
as the Canadian foreign representative (the "Canadian Foreign Representative") by written
resolution. Upon Court appointment as the Canadian Foreign Representative, Paladin intends to
commence an ancillary proceeding (the "Canadian Proceeding") with respect to the Chapter 11
Cases for the Canadian Debtors in the Ontario Superior Court of Justice (Commercial List) in
Toronto, Ontario, Canada (the "Canadian Court") pursuant to the Companies' Creditors
Arrangement Act (Canada) R.S.C. 1985, c. C-36 (as amended, the "CCAA").[24]  The purpose of
the Canadian Proceeding is to request that the Canadian Court recognize the Chapter 11 Cases as
a "foreign main proceeding" under the provisions of the CCAA to, among other things, ensure the
stay of proceedings in Canada in favor of the Canadian Debtors and the Canadian Defendants.

344.    It is my understanding that Canadian law provides that a person or entity must be
duly authorized as a "foreign representative" to commence such an ancillary proceeding. I further

---

[24]    The Debtors intend to propose that KSV Restructuring Inc. be appointed by the Canadian Court as
information officer in the Canadian Proceedings (the "Information Officer"). The Information Officer will
serve as an officer of the Canadian Court and report to the Canadian Court and the Canadian Debtors'
stakeholders from time to time (including at the hearing on the initial application) on the status of the Chapter
11 Cases, the Debtors' proposed restructuring, and any other information that may be material to the
Canadian Court.

understand that a duly certified order of this Court authorizing Paladin to act as the Canadian Foreign Representative with respect to the Chapter 11 Cases would satisfy Canadian law, thereby enabling Paladin to seek recognition as the foreign representative in the Canadian Proceeding and apply to have the Chapter 11 Cases recognized by the Canadian Court.

345.    *Appointment of Foreign Representative in English and Australian Proceedings.* Astora Women's Health LLC ("Astora LLC") is a named defendant in actions commenced across the United Kingdom (the "UK Actions") and in Australia (the "Australian Actions").  These cases relate to the surgical mesh product manufactured and distributed as part of Astora LLC's predecessor entity's women's health business.  On March 31, 2016, Astora LLC terminated the operation of that business, and has not manufactured or distributed surgical mesh products, or any other products, since that time.

346.    Although Astora LLC has ceased operations it continues to defend the actions, some of which are very active.  Recognition would be sought in order to implement a stay of ongoing litigation, with the intention that the plaintiffs in such cases file claims in Astora LLC's bankruptcy instead of continuing with ongoing litigation.  I believe that the filing and handling of such claims through Astora LLC's bankruptcy case would be substantially more efficient for the Debtors' estates than continuing to incur costs in connection with any defense of unstayed litigation in the United Kingdom and Australia.  Such efficiencies would inure to the benefit of all of the Debtors' stakeholders.

347.    Astora LLC has authorized me to act as the UK foreign representative (the "UK Foreign Representative") and the Australian foreign representative (the "Australian Foreign Representative", and together with the Canadian Foreign Representative and the UK Foreign Representative, the "Foreign Representatives") by written resolution.

348.    Upon Court appointment as the UK Foreign Representative and the Australian Foreign Representative, I intend to commence ancillary proceedings with respect to the Chapter 11 Cases in:

(i)    the Business of Property Courts of England and Wales (Chancery Division) in England (the "UK Court") pursuant to the Cross-border Insolvency Regulations of 2006 (the "CBIR"); and

(ii)    the Federal Court of Australia (the "Australian Court" and together with the Canadian Court and the UK Court, the "Foreign Courts") pursuant to the Cross-Border Insolvency Act 2008 (Cth) (the "CBIA").

349.    The purpose of these proceedings is to request that the UK Court and the Australian Court recognize the Chapter 11 Cases as "foreign main proceedings" or, alternatively, "foreign non-main proceedings" under the provisions of the CBIR and CBIA, respectively, to, among other things, ensure the stay of certain pending litigations in England, Scotland and Australia against the Debtors.

350.    My understanding is that an order of this Court authorizing me to act as the UK Foreign Representative and the Australian Foreign Representative with respect to these Chapter 11 Cases would, once entered and certified, satisfy the relevant requirements under UK and Australian law, thereby enabling me to seek recognition as the foreign representative and apply to have the Chapter 11 Cases recognized by the UK Court and the Australian Court.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

I declare under penalty of perjury that the Declaration is true and correct.

Dated:          August 16, 2022
                Malvern, Pennsylvania

                                        By:      /s/ *Mark Bradley*
                                        Name:  Mark Bradley
                                        Title:   Chief Financial Officer

## **EXHIBIT A**

### **Corporate Organizational Chart**



* All subsidiary companies 100% owned unless otherwise indicated by the footnote.
(1) Endo DAC owns 45% of Common Shares and 100% Non-Qualified Preferred Shares and Endo Ventures Cyprus Limited owns 55% Common Shares
(2) Endo Ventures Limited owns 98.99%
Endo Bermuda Ventures Limited owns 1.01%
(3) Unaffiliated Party (ARCA Biopharma, Inc.) owns a 35% Membership Interest
(4) Par, LLC owns 0.001%
(5) Par Pharmaceutical, Inc. owns 0.001%
(6) Par Biosciences Private Limited owns 0.001%
(7) Actient Pharmaceuticals LLC owns 95% Common Shares
Slate Pharmaceuticals, LLC owns 5% Common Shares and 100% of Preferred Shares

**<u>EXHIBIT B</u>**

**List of Papers Seeking First Day Relief**

1.      Motion of the Debtors for Entry of an Order (I) Directing Joint Administration of the Chapter 11 Cases Pursuant to Bankruptcy Rule 1015(b); (II) Waiving the Requirements of Section 342(c)(1) of the Bankruptcy Code and Bankruptcy Rule 2002(n); and (III) Granting Related Relief

2.      Motion of the Debtors for Entry of an Order (I) Extending the Time to File Schedules and Statements of Financial Affairs; (II) Extending the Time to File Reports of Financial Information Required Under Bankruptcy Rule 2015.3; (III) Waiving Requirement to File List of Equity Security Holders and Provide Notice of Commencement to Equity Security Holders; and (IV) Granting Related Relief

3.      Motion of the Debtors for Entry of an Order (I) Enforcing and Restating Sections 362, 365, 525, and 541 of the Bankruptcy Code; (II) Approving Form and Manner of Notice to Non-U.S. Customers, Suppliers, and Other Stakeholders of the Debtors; (III) Approving Form and Manner of Notice to Non-U.S. Customers, Suppliers, and Other Stakeholders of the Non-Debtor Affiliates; and (IV) Granting Related Relief

4.      Motion of the Debtors for Entry of Interim and Final Orders (I) Prohibiting Utilities From Altering, Refusing, or Discontinuing Service; (II) Deeming Utilities Adequately Assured of Future Performance; and (III) Establishing Procedures for Determining Requests for Additional Adequate Assurance

5.      Motion of the Debtors for Entry of an Order (I) Waiving the Requirement That Each Debtor Files a Separate List of its 20 Largest Unsecured Creditors; (II) Authorizing the Debtors to File a Single Consolidated List of Their 50 Largest Unsecured, Non-Insider Creditors; (III) Authorizing the Debtors and the Claims and Noticing Agent to Redact Personally Identifiable Information for Individuals; (IV) Authorizing the Claims and Noticing Agent to Withhold Publication of Claims Filed by Individuals Until Further Order of the Court; (V) Establishing Procedures for Notifying Creditors of the Commencement of the Debtors' Chapter 11 Cases; and (VI) Granting Related Relief

6.      Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Pay Prepetition Wages, Salaries, Employee Benefits and Other Compensation and (B) Continue Employee Benefits Programs and Pay Related Administrative Obligations;

(II) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers; and (III) Granting Related Relief

7.      Motion of the Debtors for Entry of an Order (I) Authorizing the Foreign Representatives to Act for the Debtors in Foreign Proceedings and (II) Granting Related Relief

8.      Motion of the Debtors for Entry of an Order Authorizing the Establishment of Certain Notice, Case Management, and Administrative Procedures

9.      Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to Honor Prepetition Obligations to Customers and Related Third Parties and to Otherwise Continue Customer Programs; (II) Granting Relief from Stay to Permit Setoff in Connection with the Customer Programs; (III) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers; and (IV) Granting Related Relief

10.     Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing Payment of Certain Prepetition Specified Trade Claims; (II) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers; and (III) Granting Related Relief

11.     Motion of the Debtors for Entry of Interim and Final Orders Authorizing (I) Debtors to Pay Certain Prepetition Taxes, Governmental Assessments, and Fees; and (II) Financial Institutions to Honor and Process Related Checks and Transfer

12.     Motion of the Debtors for Entry of Interim and Final Orders Authorizing (I) the Debtors to Continue and Renew Their Insurance Programs and Honor all Obligations in Respect Thereof; (II) Financial Institutions to Honor and Process Related Checks and Transfers; and (III) the Debtors to Modify the Automatic Stay With Respect to Workers' Compensation Claims

13.     Application of the Debtors for an Order (I) Appointing Kroll Restructuring Administration LLC as Claims and Noticing Agent *Nunc Pro Tunc* to the Petition Date; and (II) Granting Related Relief

14.     Motion of the Debtors for Entry of Interim and Final Orders (I) Establishing Notice and Objection Procedures for Trading in Equity Securities of the Debtors; and (II) Granting Related Relief

15.     Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Using Existing Cash Management Systems, Bank Accounts, and Business Forms and (B) Implement Changes To Their Cash Management System In The Ordinary Course Of Business; (II) Granting Administrative Expense Priority for Postpetition Intercompany Claims; (III) Granting a Waiver With Respect to the Requirements of 11 U.S.C. § 345(b); and (IV) Granting Related Relief

16.     Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors' Use of Cash Collateral; (II) Granting Adequate Protection to Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief

## Exhibit C

**Committees Organized Prepetition**

Pursuant to Local Rule 1007-2(a)(3), to the best of the Debtors' knowledge and belief, the following committees have been formed prior to the Petition Date:

| Committee | Counsel for Committee |
|---|---|
| Ad Hoc First Lien Group | Gibson, Dunn & Crutcher LLP, 200 Park Avenue, New York, NY 10166 (Attn: Scott J. Greenberg, Michael J. Cohen, Jason Z. Goldstein, & Joshua K. Brody) |
| Ad Hoc Cross-Holder Group | Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, NY 10019 (Attn. Andrew N. Rosenberg, Alice B. Eaton, Andrew M. Parlen, & Alexander Woolverton) |

## <u>Exhibit D</u>

## **Top Unsecured Creditors**

Pursuant to Local Rule 1007-2(a)(4), the following is a list of creditors holding, as of the Petition Date, the fifty (50) largest, unsecured claims against the Debtors, on a consolidated basis, excluding claims of insiders as defined in 11 U.S.C. § 101.

Certain of the Debtors are named as defendants in various litigation matters, including over 3,100 actions in connection with the marketing and sale of opioid medications (collectively, "<u>Pending Actions</u>").  Any claims asserted against any Debtor in respect of the Pending Actions (the "<u>Pending Action Claims</u>") are contingent, unliquidated in amount, and disputed.  All creditors asserting Pending Action Claims will be included in the Debtors' list of creditors.  This consolidated list of Top Unsecured Creditors does not include these contingent, unliquidated, and disputed claims.

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim — If the claim is fully unsecured, fill in only unsecured claim amount.  If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 1 | WELLS FARGO BANK , NATIONAL ASSOCIATION - 6.00% SENIOR NOTES DUE 2028 AS INDENTURE TRUSTEE CORPORATE TRUST SERVICES— ADMINISTRATOR FOR ENDO 6.000 SENIOR NOTES DUE 2028 150 EAST 42ND STREET, 40TH FLOOR NEW YORK, NY 10017 | ATTN: TINA GONZALEZ TITLE: VICE PRESIDENT PHONE: 617-574-6363 EMAIL: TINA.GONZALEZ@WELLSFARGO.COM | 6.00% SENIOR NOTES DUE 2028 | | | | $1,269,399,075 |

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim — If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 2  AMERISOURCEBERGEN CORPORATION 9075 CENTRE POINT DRIVE  SUITE 140 WEST CHESTER, OH 45069 | ATTN: MELISSA RAND TITLE: SENIOR COUNSEL PHONE: 610-727-2734 EMAIL: MELISSA.RAND@AMERISOURCEBERGEN.COM | DISTRIBUTOR FEES | UNLIQUIDATED | | | $200,612,057 |
| 3  MCKESSON CORPORATION 9954 MARYLAND DR STE 4000 HENRICO, VA 23233 | ATTN: BEN CARLSEN TITLE: MANAGING LEAD COUNSEL PHONE: 404-461-4232 EMAIL: BEN.CARLSEN@MCKESSON.COM | DISTRIBUTOR FEES | UNLIQUIDATED | | | $193,515,782 |
| 4  CARDINAL HEALTH 7000 CARDINAL PLACE DUBLIN, OH 43017 | ATTN: DEBRA A. WILLET TITLE: VICE PRESIDENT & ASSOCIATE GENERAL COUNSEL PHONE: 614-757-3428 EMAIL: DEBRA.WILLET@CARDINALHEALTH.COM | DISTRIBUTOR FEES | UNLIQUIDATED | | | $151,356,517 |

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim<br><br>If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 5 | WELLS FARGO BANK , NATIONAL ASSOCIATION - 6.00% SENIOR NOTES DUE 2023<br>AS INDENTURE TRUSTEE<br>CORPORATE TRUST SERVICES—ADMINISTRATOR FOR ENDO HEALTH SOLUTIONS INC.<br>150 EAST 42ND STREET, 40TH FLOOR<br>NEW YORK, NY 10017 | ATTN: TINA GONZALEZ<br>TITLE: VICE PRESIDENT<br>PHONE: 617-574-6363<br>EMAIL: TINA.GONZALEZ@WELLSFARGO.COM | 6.00% SENIOR NOTES DUE 2023 | | | | $58,419,055 |
| 6 | COMMISSIONER OF SOCIAL SERVICES DRUG REHAB PROGRAM PO BOX 2951 HARTFORD, CT 06104 | ATTN: DR. KILOLO KIJAKAZI<br>TITLE: ACTING COMMISIONER<br>PHONE: 203-576-7416<br>EMAIL: | CUSTOMER BALANCES | UNLIQUIDATED | | | $22,977,562 |
| 7 | WELLS FARGO BANK , NATIONAL ASSOCIATION - 6.00% SENIOR NOTES DUE 2025<br>AS INDENTURE TRUSTEE<br>CORPORATE TRUST SERVICES—ADMINISTRATOR FOR ENDO HEALTH SOLUTIONS INC.<br>150 EAST 42ND STREET, 40TH FLOOR<br>NEW YORK, NY 10017 | ATTN: TINA GONZALEZ<br>TITLE: VICE PRESIDENT<br>PHONE: 617-574-6363<br>EMAIL: TINA.GONZALEZ@WELLSFARGO.COM | 6.00% SENIOR NOTES DUE 2025 | | | | $22,275,410 |

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 8    CONNECTIVERX<br>200 JEFFERSON PARK<br>WHIPPANY, NJ 07981 | ATTN: JIM CORRIGAN<br>TITLE: CHIEF EXECUTIVE OFFICER<br>PHONE: 201-358-7200<br>EMAIL: JCORRIGAN@CONNECTIVERX.COM | CUSTOMER BALANCES | UNLIQUIDATED | | | $15,795,879 |
| 9    MORRIS AND DICKSON COMPANY LTD<br>410 KAY LANE<br>SHREVEPORT, LA 71115 | ATTN: JODY HATCHER<br>TITLE: CHIEF EXECUTIVE OFFICER<br>PHONE: 318-797-7900<br>EMAIL: JHATCHER@MORRISDICKSON.COM | DISTRIBUTOR FEES | UNLIQUIDATED | | | $12,854,435 |
| 10   COLORADO HEALTH CARE POLICY<br>1570 GRANT STREET<br>DENVER, CO 80203 | ATTN: KIM BIMESTEFER<br>TITLE: EXECUTIVE DIRECTOR<br>PHONE: 303-866-4411<br>EMAIL: KIM.BIMESTEFER@STATE.CO.US | PAYOR REBATES | UNLIQUIDATED | | | $12,604,165 |
| 11   CVS/ PHARMACY, INC.,<br>ONE CVS DRIVE<br>WOONSOCKET, RI 02895 | ATTN: BRIAN E. WHALEN<br>TITLE: SVP, PHARMACY TRADE & SUPPLY CHAIN<br>PHONE: 401-770-4661<br>EMAIL: BRIAN.WHALEN@CVSHEALTH.COM | DISTRIBUTOR FEES | UNLIQUIDATED | | | $12,540,335 |

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim. If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 12  NYS DEPARTMENT OF HEALTH EMPIRE STATE PLAZA ALBANY, NY 12237 | ATTN: MARY T. BASSETT TITLE: COMMISSIONER PHONE: 518-402-7950 EMAIL: CMR@HEALTH.NY.GOV | PAYOR REBATES | UNLIQUIDATED | | | $9,006,690 |
| 13  OPTUM, INC. 11000 OPTUM CIRCLE EDEN PRAIRIE, MN 55344 | ATTN: HEATHER CIANFROCCO TITLE: CHIEF EXECUTIVE OFFICER PHONE: 412-480-4104 EMAIL: HEATHER.CIANFROCCO@UHC.COM | CUSTOMER BALANCES | UNLIQUIDATED | | | $8,880,617 |
| 14  WELLS FARGO BANK , NATIONAL ASSOCIATION - 5.375% SENIOR NOTES DUE 2023 AS INDENTURE TRUSTEE CORPORATE TRUST SERVICES— ADMINISTRATOR FOR ENDO HEALTH SOLUTIONS INC. 150 EAST 42ND STREET, 40TH FLOOR NEW YORK, NY 10017 | ATTN: TINA GONZALEZ TITLE: VICE PRESIDENT PHONE: 617-574-6363 EMAIL: TINA.GONZALEZ@WELLSFARGO.COM | 5.375% SENIOR NOTES DUE 2023 | | | | $ 6,319,865 |

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim. If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 15 | TPA<br>17 TECHNOLOGY CIRCLE<br>COLUMBIA, SC 29203 | ATTN: JOE JOHNSON<br>TITLE: PRESIDENT AND CHIEF OPERATING OFFICER<br>PHONE: 803-735-1034<br>EMAIL: | CUSTOMER BALANCES | UNLIQUIDATED | | | $6,133,385 |
| 16 | CALIFORNIA DEPARTMENT OF HEALTH CARE<br>1500 CAPITOL AVE MS 7602<br>SACRAMENTO, CA 95814 | ATTN: TOMAS J. ARAGON<br>TITLE: DIRECTOR<br>PHONE: 800-495-3232<br>EMAIL: TOMAS.ARAGON@SFDPH.ORG | PAYOR REBATES | UNLIQUIDATED | | | $6,082,026 |
| 17 | MALLINCKRODT PHARMACEUTICALS<br>675 MCDONNELL BLVD<br>HAZELWOOD, MO 63042 | ATTN: MARK CASEY<br>TITLE: EXECUTIVE VICE PRESIDENT AND CHIEF LEGAL OFFICER<br>PHONE: 617-225-0078<br>EMAIL: MARK.CASEY@CYTYC.COM | PROFIT SHARING | UNLIQUIDATED | | | $5,787,813 |
| 18 | MERCK SHARP AND DOHME INTERNATIONAL<br>POSTBUS 581<br>HAARLEM, 2003 PC<br>NETHERLAND | ATTN: CAROLINE LITCHFIELD<br>TITLE: EXECUTIVE VICE PRESIDENT AND CHIEF FINANCIAL OFFICER<br>PHONE: 908-359-0188<br>EMAIL: CAROLINE_LITCHFIELD@MERCK.COM | PROFIT SHARING / TRADE DEBT | UNLIQUIDATED | | | $4,166,712 |

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 19  PA DEPARTMENT OF HUMAN SERVICES625 FORESTER STREETHARRISBURG, PA 17120 | ATTN: MEG SNEADTITLE: SECRETARY OF HUMAN SERVICESPHONE: 920-739-0884EMAIL: COSTELLOMEG@GMAIL.COM | PAYOR REBATES | UNLIQUIDATED | | | $3,951,986 |
| 20  WALGREENS 200 WILMOT ROAD DEERFIELD, IL 60015 | ATTN: LISA BADGLEY TITLE: SENIOR VICE PRESIDENT PHONE: 847-945-0611 EMAIL: LISA.BADGLEY@WALGREENS.COM | DISTRIBUTOR FEES | UNLIQUIDATED | | | $3,093,085 |
| 21  UROGPO LLC 600 SUPERIOR AVENUE EAST STE 1500 CLEVELAND, OH 44114 | ATTN: DAVID COURY TITLE: CHIEF EXECUTIVE OFFICER PHONE: 216-292-9998 EMAIL: DAVID.COURY@UROGPO.US.COM | CUSTOMER BALANCES | UNLIQUIDATED | | | $3,044,956 |
| 22  NORTH CAROLINA DHHS DRUG REBATE - C 2001 MAIL SERVICE CENTER RALEIGH, NC 27699-2000 | ATTN: KODY KINSLEY TITLE: SECRETARY OF HEALTH AND HUMAN SERVICES PHONE: 919-855-4800 EMAIL: | PAYOR REBATES | UNLIQUIDATED | | | $2,784,703 |

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts,  bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim — If the claim is fully unsecured, fill in only unsecured claim amount.  If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 23   ALLERGAN USA INC<br>5 GIRALDA FARMS<br>MADISON, NJ 07940 | ATTN: RICHARD A GONZALEZ<br>TITLE: CHIEF EXECUTIVE OFFICER<br>PHONE: 862-261-7000<br>EMAIL: RICHARD.GONZALEZ@ABBVIE.COM | PROFIT SHARING | UNLIQUIDATED | | | $2,716,312 |
| 24   AGENCY FOR HEALTH CARE ADMINISTRATION<br>2727 MAHAN DRIVE<br>TALLAHASSEE, FL 32308 | ATTN: CODY L. FARRILL<br>TITLE: CHIEF OF STAFF<br>PHONE: 850-412-3600<br>EMAIL: CODY.FARRILL@DOT.STATE.FL.US | CUSTOMER BALANCES | UNLIQUIDATED | | | $2,708,094 |
| 25   STATE OF KENTUCKY - DMS<br>275 E. MAIN ST. 6W-A<br>FRANKFORT, KY 40621 | ATTN: ERIC FRIEDLANDER<br>TITLE: SECRETARY<br>PHONE: 502-561-9179<br>EMAIL: FRIEDLANDER@LOUISVILLEKY.GOV | PAYOR REBATES | UNLIQUIDATED | | | $2,109,882 |
| 26   VIRGINIA DEPT. OF MED ASSISTANCE SERVICES<br>600 EAST BROAD STREET<br>RICHMOND, VA 23219 | ATTN: MICHAEL H. COOK ESQ.<br>TITLE: CHAIR, BOARD OF MEDICAL ASSISTANCE SERVICES<br>PHONE: 804-786-7933<br>EMAIL: | PAYOR REBATES | UNLIQUIDATED | | | $2,095,558 |

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim. If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 27   DEERFIELD GENERICS LP<br>345 PARK AVENUE SOUTH 12TH FL<br>NEW YORK, NY 10010 | ATTN: KAREN HEIDELBERGER<br>TITLE: INVESTMENT AND PARTNERSHIP<br>PHONE: 212-984-7112<br>EMAIL: KARENH1@DEERFIELD.COM | PROFIT SHARING | UNLIQUIDATED | | | $2,021,455 |
| 28   SMITH DRUG COMPANY<br>9098 FAIRFOREST RD<br>SPARTANBURG, SC 29301 | ATTN: WADE LEWIS<br>TITLE: PRESIDENT<br>PHONE: 864-574-8161<br>EMAIL: WLEWIS@SMITHDRUG.COM | CUSTOMER BALANCES | UNLIQUIDATED | | | $1,985,505 |
| 29   BAYER AG<br>KAISER WILHELM ALLEE<br>LEVERKUSEN,  51373<br>GERMANY | ATTN: WERNER BAUMANN<br>TITLE: CHIEF EXECUTIVE OFFICER<br>PHONE: 972-377-1950<br>EMAIL:<br>WERNER.BAUMANN@BAYERHEALTHCARE.COM | TRADE DEBT | | | | $1,961,911 |
| 30   TREASURER STATE OF OHIO<br>30 E. BROAD STREET - 9TH FLOOR<br>COLUMBUS, OH 43215 | ATTN: ROBERT SPRAGUE<br>TITLE: TREASURER<br>PHONE: 800-228-1102<br>EMAIL: RSPRAGUE@CI.FINDLAY.OH.US | PAYOR REBATES | UNLIQUIDATED | | | $1,944,839 |

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim. If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 31   ASCENT<br>77 DRESSER STREET<br>SOUTH BOSTON, MA 02127 | ATTN: MARK SAGON<br>TITLE: MANAGING PARTNER<br>PHONE: 646-964-3850<br>EMAIL: MPSAGON@GMAIL.COM | CUSTOMER BALANCES | UNLIQUIDATED | | | $1,831,832 |
| 32   ANDA INC.<br>2915 WESTON ROAD<br>WESTON, FL 33331 | ATTN: SVEN DETHLEFS<br>TITLE: EXECUTIVE VICE PRESIDENT<br>PHONE: 972-391-4817<br>EMAIL: SVEN.DETHLEFS@TEVAPHARM.COM | CUSTOMER BALANCES | UNLIQUIDATED | | | $1,818,276 |
| 33   JOHNSON CONTROLS INC<br>4700 EXCHANGE COURT STE 300<br>BOCA RATON, FL 33431 | ATTN: GEORGE R. OLIVER<br>TITLE: CHAIRMAN AND CEO<br>PHONE: 888-981-4544<br>EMAIL: GEORGE.OLIVER@JCI.COM | TRADE DEBT | | | | $1,489,674 |
| 34   ARIZONA HEALTH CARE COST CONTAINMENT SYSTEMS<br>801 E JEFFERSON ST<br>PHOENIX, AZ 85034 | ATTN: JAMI SNYDER<br>TITLE: DIRECTOR<br>PHONE:<br>EMAIL: JAMI.SNYDER@AZAHCCCS.GOV | CUSTOMER BALANCES | UNLIQUIDATED | | | $1,460,536 |

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim — If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 35   LOUISIANA DEPARTMENT OF HEALTH 628 N. 4TH STREET BATON ROUGE, LA 70802 | ATTN: DR. COURTNEY N. PHILLIPS TITLE: SECRETARY PHONE: 225-287-2135 EMAIL: COURTNEY.PHILLIPS@LA.GOV | PAYOR REBATES | UNLIQUIDATED | | | $1,407,395 |
| 36   TEXAS HEALTH AND HUMAN SERVICES COMMISSION NORTH AUSTIN COMPLEX 4601 W. GUADALUPE ST. AUSTIN, TX 78751 | ATTN: CECILE ERWIN YOUNG TITLE: EXECUTIVE COMMISSIONER PHONE: 512-695-5057 EMAIL: CECILE.YOUNG@HHSC.STATE.TX.US | CUSTOMER BALANCES | UNLIQUIDATED | | | $1,399,777 |
| 37   NJ ENCOUNTER MCO DRUG REBATE PROGRAM PO BOX 712 TRENTON, NJ 08625 | ATTN: JENNIFER LANGER JACOBS TITLE: ASSISTANT COMMISSIONER PHONE: 609-588-2604 EMAIL: JENNIFER.JACOBS@DHS.NJ.GOV | CUSTOMER BALANCES | UNLIQUIDATED | | | $1,355,191 |
| 38   INDIANA MEDICAID DRUG REBATES 950 N MERIDIAN ST SUITE 1150 INDIANAPOLIS, IN 46204 | ATTN: DANIEL RUSYNIAK TITLE: SECRETARY PHONE: 248-524-9731 EMAIL: DANIEL.RUSYNIAK@FSSA.IN.GOV | CUSTOMER BALANCES | UNLIQUIDATED | | | $1,344,156 |

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim | | |
| | | | | | If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
|---|---|---|---|---|---|---|---|
| 39 | ABON 140 LEGRAND AVE NORTHVALE, NJ 07647 | ATTN: ROBERT B. FORD TITLE: CHIEF EXECUTIVE OFFICER PHONE: 469-330-0100 EMAIL: ROBERT.FORD@ABBOTT.COM | PROFIT SHARING / TRADE DEBT | UNLIQUIDATED | | | $1,341,293 |
| 40 | MD DHMHHERBERT R. O'CONOR STATEOFFICE BUILDING201 W. PRESTON STREETBALTIMORE, MD 21201 | ATTN: DENNIS R SCHRADERTITLE: SECRETARYPHONE: 410-961-3793EMAIL: DENNIS.SCHRADER@MARYLAND.GOV | CUSTOMER BALANCES | UNLIQUIDATED | | | $1,212,946 |
| 41 | ILLINOIS DEPARTMENT OF PUBLIC AID RECOVERY UNIT/DRP EEO/AA OFFICE 401 S. CLINTON STREET, 7TH FLOOR CHICAGO, IL 60607 | ATTN: TYLER WHITE TITLE: DRUG REBATE UNIT MANAGER PHONE: 217-524-4508 EMAIL: TYLER.P.WHITE@ILLINOIS.GOV | PAYOR REBATES | UNLIQUIDATED | | | $1,208,840 |
| 42 | VEEVA SYSTEMS INC 4280 HACIENDA DRIVE PLEASANTON, CA 94588-2719 | ATTN: PETER GASSNER TITLE: CHIEF EXECUTIVE OFFICER PHONE: 925-461-8415 EMAIL: PETER.GASSNER@GMAIL.COM | TRADE DEBT | | | | $1,170,644 |

12

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim  If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 43  CMS FEDERAL REBATES MCOS  7500 SECURITY BOULEVARD  BALTIMORE, MD 21244 | ATTN: KAREN JACKSON  TITLE: CHIEF OPERATING OFFICER  PHONE: 202-619-0630  EMAIL: KAREN.JACKSON@CMS.HHS.GOV | CUSTOMER BALANCES | UNLIQUIDATED | | | $1,164,345 |
| 44  MISSOURI DIVISION MED SERVICES  912 WILDWOOD  JEFFERSON CITY , MO 65102 | ATTN: PAULA F. NICKELSON  TITLE: ACTING DIRECTOR  PHONE: 753-751-6001  EMAIL: | CUSTOMER BALANCES | UNLIQUIDATED | | | $1,135,212 |
| 45  FHSC-SC DRUG REBATE  PO BOX 60009  CHARLOTTE , SC 28260-0009 | ATTN: ROBERT M. KERR  TITLE: DIRECTOR  PHONE: 803-898-2580  EMAIL: RKERR@SCDHHS.GOV | CUSTOMER BALANCES | UNLIQUIDATED | | | $944,061 |
| 46  DHS MANAGED CARE REBATE 052  PO BOX 64837  ST. PAUL , MN 55164-0837 | ATTN: SUSAN WINKELMANN  TITLE: ASSISTANT DIRECTOR  PHONE: 651-431-6500  EMAIL: SUSAN.WINKELMANN@STATE.MN.US | PAYOR REBATES | UNLIQUIDATED | | | $934,307 |

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim  If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 47   DEPT OF VA<br>810 VERMONT AVE., NW<br>WASHINGTON, DC 20420 | ATTN: DENIS MCDONOUGH<br>TITLE: VA SECRETARY<br>PHONE: 202-273-5400<br>EMAIL: | CUSTOMER BALANCES | UNLIQUIDATED | | | $891,249 |
| 48   ASTRAZENECA LP<br>1800 CONCORD PIKE  PO BOX 15437<br>WILMINGTON, DE 19850-5437 | ATTN: ARADHANA SARIN<br>TITLE: CHIEF FINANCIAL OFFICER<br>PHONE: 800-456-3669<br>EMAIL:<br>ARADHANA.SARIN@ASTRAZENECA.COM | PROFIT SHARING | UNLIQUIDATED | | | $885,504 |
| 49   EXPRESS SCRIPTS<br>ONE EXPRESS WAY<br>SAINT LOUIS, MO 63121 | ATTN: AMY BRICKER<br>TITLE: PRESIDENT<br>PHONE: 636-346-7911<br>EMAIL: ABRICKER@EXPRESS-SCRIPTS.COM | CUSTOMER BALANCES | UNLIQUIDATED | | | $866,330 |
| 50   STATE OF MICHIGAN-DCH<br>CAPITOL VIEW BUILDING 201 TOWNSEND STREET<br>LANSING , MI  48913 | ATTN: ELIZABETH HERTEL<br>TITLE: DIRECTOR<br>PHONE: 517-281-3574<br>EMAIL: ELIZABETH.HERTEL@MICHIGAN.GOV | CUSTOMER BALANCES | UNLIQUIDATED | | | $855,441 |

## Exhibit E

### Consolidated List of the Holders of the Debtors' Five Largest Secured Claims

Pursuant to Local Rule 1007-2(a)(5), to the best of the Debtors' knowledge and belief, the following is a list of the creditors holding the five largest secured claims against the Debtors, on a consolidated basis, excluding claims of insiders.

The information contained herein shall not constitute an admission of liability, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt. The descriptions of the collateral securing the underlying obligations are intended only as brief summaries. In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control. This list has been prepared from the books and records of the Debtors for filing in the Debtors' Chapter 11 Cases. The exhibit estimates outstanding claim amounts (including principal and interest) as of the Petition Date.

| # | Name of Creditor | Creditor Name, and complete mailing address, including zip code of employee, agents, or department of creditor familiar with claim who may be contacted | Contact of counsel to the creditor, with complete mailing address, including zip code | Debt Tranche | Principal Amt (USD in $000s)[1] | Collateral Description and Value |
|---|---|---|---|---|---|---|
| 1 | Computershare Trust Company, N.A., (As Indentured Trustee) | Computershare Trust Company, National Association Attn: Megan Ford 9062 Old Annapolis Road Columbia, MD 21045 megan.ford@computershare.com | ArentFox Schiff LLP Attn: Beth M. Brownstein, Andrew Silfen, Nicholas A. Marten 1301 Avenue of the Americas New York, NY 10019 beth.brownstein@afslaw.com, andrew.silfen@afslaw.com, nicholas.marten@afslaw.com | 7.500% Senior Secured Notes due 2027 | $2,015,479 | Collateral Description: Substantially all of the assets of the Debtors  Value: Unknown |

---

[1]    Does not reflect accrued interest.

| # | Name of Creditor | Creditor Name, and complete mailing address, including zip code of employee, agents, or department of creditor familiar with claim who may be contacted | Contact of counsel to the creditor, with complete mailing address, including zip code | Debt Tranche | Principal Amt (USD in $000s)[1] | Collateral Description and Value |
|---|---|---|---|---|---|---|
| 2 | JPMorgan Chase Bank, N.A., as Administrative Agent, Issuing Bank and Swingline Lender. | JPMorgan Chase Bank, N.A., Attn: Ryan Bowman 10 S. Dearborn, Chicago, IL 60603 ryan.t.bowman@jpmorgan.com | Simpson Thacher & Bartlett LLP Attn: Sandeep Qusba 425 Lexington Avenue New York, NY 10017 squsba@stblaw.com | Term Loan Facility Due 2028 | $1,975,000 | Collateral Description: Substantially all of the assets of the Debtors  Value: Unknown |
| 3 | Computershare Trust Company, N.A., (As Indentured Trustee) | Computershare Trust Company, National Association Attn: Megan Ford 9062 Old Annapolis Road Columbia, MD 21045 megan.ford@computershare.com | ArentFox Schiff LLP Attn: Beth M. Brownstein, Andrew Silfen, Nicholas A. Marten 1301 Avenue of the Americas New York, NY 10019 beth.brownstein@afslaw.com, andrew.silfen@afslaw.com, nicholas.marten@afslaw.com | 6.125% Senior Secured Notes due 2029 | $1,295,000 | Collateral Description: Substantially all of the assets of the Debtors  Value: Unknown |
| 4 | Wilmington Savings Fund Society, FSB (As Indentured Trustee) | Wilmington Savings Fund Society, FSB Attn: John Michol 500 Delaware Avenue Wilmington, DE 19801 jmcnichol@wsfsbank.com | Wilmer Cutler Pickering Hale & Dorr LLP Attn: Andrew N. Goldman, Benjamin Loveland 60 State Street Boston, Massachusetts 02109 andrew.goldman@wilmerhale.com, benjamin.loveland@wilmerhale.com | 9.500% Senior Secured Second Lien Notes due 2027 | $940,590 | Collateral Description: Substantially all of the assets of the Debtors  Value: Unknown |

| # | Name of Creditor | Creditor Name, and complete mailing address, including zip code of employee, agents, or department of creditor familiar with claim who may be contacted | Contact of counsel to the creditor, with complete mailing address, including zip code | Debt Tranche | Principal Amt (USD in $000s)[1] | Collateral Description and Value |
|---|---|---|---|---|---|---|
| 5 | Computershare Trust Company, N.A., (As Indentured Trustee) | Computershare Trust Company, National Association<br>Attn: Megan Ford<br>9062 Old Annapolis Road<br>Columbia, MD 21045<br>Megan.Ford@computershare.com | ArentFox Schiff LLP<br>Attn: Beth M. Brownstein, Andrew Silfen, Nicholas A. Marten<br>1301 Avenue of the Americas<br>New York, NY 10019<br>beth.brownstein@afslaw.com,<br>andrew.silfen@afslaw.com,<br>nicholas.marten@afslaw.com | 5.875% Senior Secured Notes Due 2021 | $300,000 | Collateral Description: Substantially all of the assets of the Debtors<br><br>Value: Unknown |

## Exhibit F

### Summary of the Debtors' Assets and Liabilities

Pursuant to Local Rule 1007-2(a)(6), the below is a summary of the Debtors' assets and liabilities. The amounts reflected below were derived by totaling the indicated amounts reflected in each Debtor's books and records. The following financial data shall not constitute an admission of liability by the Debtors. The Debtors reserve all rights to assert that any debt or claim included herein is a disputed claim or debt or challenge the priority, nature, amount or status of any claim or debt.

On a consolidated basis, the total value of the Debtors' assets is approximately $6,330,717,000 and the total amount of the Debtors' liabilities is approximately $9,535,279,000, as of July 31, 2022.

**Exhibit G**

**Summary of the Publicly Held Securities of the Debtors**

Pursuant to Local Rule 1007-2(a)(7), to the best of the Debtors' knowledge and belief, the Debtors have the below publicly traded stock, debentures, or securities:

| Publicly Held Security | Issued | Outstanding | Approximate Number of Record Holders |
|---|---|---|---|
| Ordinary Shares | 235,139,243 | 235,139,243 | 670 |
| 5.375% Senior Notes due 2023 | $6,127,000 | Undetermined | Undetermined |
| 6.00% Senior Notes due 2023 | $56,436,000 | Undetermined | Undetermined |
| 5.875% Senior Secured Notes due 2024 | $300,000,000 | Undetermined | Undetermined |
| 6.00% Senior Notes due 2025 | $21,578,000 | Undetermined | Undetermined |
| 7.50% Senior Secured Notes due 2027 | $2,015,479,000 | Undetermined | Undetermined |
| 9.50% Senior Secured Second Lien Notes due 2027 | $940,590,000 | Undetermined | Undetermined |
| 6.00% Senior Notes due 2028 | $1,260,416,000 | Undetermined | Undetermined |
| 6.125% Senior Secured Notes due 2029 | $1,295,000,000 | Undetermined | Undetermined |

Common shares held by officers and directors[1]:

| Name | Number of Shares |
|---|---|
| Mark G. Barberio | 38,187 |
| Jennifer M. Chao | 24,921 |
| Blaise Coleman | 782,195 |
| Shane M. Cooke | 100,034 |
| Nancy J. Hutson, Ph.D. | 116,140 |
| Michael Hyatt | 355,560 |

| Name | Number of Shares |
|---|---|
| William P. Montague | 122,025 |
| M. Christine Smith, Ph.D. | 32,819 |
| Mark T. Bradley | 101,477 |
| Matthew J. Maletta | 351,085 |
| Patrick Barry | 169,711 |

---

[1]     Director and officer holdings from DEF 14A, filed as of April 28, 2022.

## Exhibit H

**Summary of Debtors' Property Held by Third Parties**

Pursuant to Local Rule 1007-2(a)(8), the following is a list of property that is in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, secured creditor, or agent for any such entity.  The Debtors are working to confirm that no other such party is in possession of any of the Debtors' property and reserve the right to supplement this exhibit if additional property is identified. The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to challenge the priority, nature, amount or status of any claim or debt.

| Property | Entity Holding Property |
|---|---|
| Various Bank Accounts | Certain of the Debtors' bank accounts may be subject to control agreements or claims of setoff by certain of the Debtors' lenders under the Prepetition Debt. |
| Various Security Deposits | Certain of the Debtors' lessors, utility companies, regulatory agencies, and others. |
| Various Other Assets | In the ordinary course of business, on any given day, property of the Debtors (including security deposits, product held on consignment or other collateral with counterparties to certain commercial relationships) is likely to be in the possession of various third parties, including maintenance providers, shippers, common carriers, materialmen, custodians, public officers, secured creditors, customers or agents, where the Debtors' ownership interest is not affected.  Because of the constant movement of this property, providing a comprehensive list of the persons or entities in possession of the property, their addresses and telephone numbers, and the location of any court proceeding affecting the property would be impractical. |

**Exhibit I**

**Summary of Debtors' Property From Which the Debtors Operate Their Business**

Pursuant to Local Bankruptcy Rule 1007-2(a)(9), the following lists the location of the premises owned, leased, or held under other arrangement from which the Debtors operate their businesses as of the Petition Date.

| Address | City | ST/PRV | Zip | Country | Type [OWNED/LEASED] |
|---|---|---|---|---|---|
| 100 Boulevard Alexis-Nihon Suites 600, 630, and 640 | Saint-Laurent | QB | QC H4M | Canada | Lease |
| 100 Red Schoolhouse Road | Chestnut Ridge | NY | 10977 | United States | Lease |
| 101 - 111 Rock Road | Horsham | PA | 19044 | United States | Lease |
| 102 Rock Road | Horsham | PA | 19044 | United States | Lease |
| 102 Witmer Road | Horsham | PA | 19044 | United States | Lease |
| 1400 Atwater Drive Atwater Corporate Center | Malvern | PA | 19355 | United States | Lease |
| 2 Righter Parkway | Wilmington | DE | 19803 | United States | Lease |
| 300 Tice Boulevard, Suite 230 | Woodcliff Lake | NJ | 07677 | United States | Lease |
| 5 Place de la Gare | | | L-1616 | Luxembourg | Lease |
| 6 Ram Ridge Road | Chestnut Ridge | NY | 10977 | United States | Owned |
| 640 Lee Road | Wayne | PA | 19087 | United States | Lease |
| 70 High Street | Rye | NY | 10580 | United States | Owned |
| 70 Maple Avenue | Rye | NY | 10580 | United States | Lease |

## Exhibit J

**Location of the Debtors' Substantial Assets and Books and Records and Nature and
Location of Debtors' Assets Outside the United States**

Pursuant to Local Rule 1007-2(a)(10), the following lists the locations of the Debtors'
substantial assets, the location of their books and records, and the nature, location, and value of
any assets held by the Debtors outside the territorial limits of the United States.

**Location and Nature of Debtors' Substantial Assets:**

- The Debtors have assets of more than $6.3 billion, as provided in Exhibit F, with substantial
  assets in the United States, Canada, and Ireland.

**Books and Records:**

- The Debtors' books and records are located at 1400 Atwater Drive, Malvern, PA 19355
  and First Floor, Minerva House, Simmonscourt Road, Ballsbridge, Dublin 4, Ireland.

**Debtors' Assets Outside the United States**

- Debtors or Debtor-owned entities operate in eight countries outside the United States, with
  significant operations in Canada, India, and Ireland.

## **Exhibit K**

### **Summary of Legal Actions Against the Debtors**

Pursuant to Local Rule 1007-2(a)(11), the Debtors do not believe that there are actions or proceedings, pending or threatened, in which a judgment against the Debtors or a seizure of their property is imminent. However, certain of the Debtors are named as defendants in various litigation matters, including over 3,100 actions across the country in connection with the marketing and sale of opioid medications (the "Pending Actions"). Any creditor that asserts a claim against any Debtor in respect of a Pending Action will be included in the Debtors' list of creditors.

## **Exhibit L**

### **Debtors' Senior Management**

Pursuant to Local Bankruptcy Rule 1007-2(a)(12), the following provides the names of the individuals who constitute the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their responsibilities and relevant experience as of the Petition Date.

| Name | Position | Position Relevant Experience |
|---|---|---|
| Blaise Coleman | President and Chief Executive Officer | Blaise Coleman was appointed President and Chief Executive Officer and a member of the Board of Directors, effective March 2020. He previously served as Executive Vice President and Chief Financial Officer since December 2016. He joined Endo in January 2015 as Vice President of Corporate Financial Planning & Analysis, and was then promoted to Senior Vice President, Global Finance Operations in November 2015. Prior to joining Endo, Mr. Coleman held a number of finance leadership roles with AstraZeneca, most recently as the Chief Financial Officer of the AstraZeneca/Bristol-Myers Squibb US Diabetes Alliance. Prior to that, he was the Head of Finance for the AstraZeneca Global Medicines Development organization based in Mölndal, Sweden. Mr. Coleman joined AstraZeneca in 2007 as Senior Director Commercial Finance for the US Cardiovascular Business. He joined AstraZeneca from Centocor, a wholly-owned subsidiary of Johnson & Johnson, where he held positions in both the Licenses & Acquisitions and Commercial Finance organizations. Mr. Coleman's move to Centocor in early 2003 followed 7 years' experience with the global public accounting firm, PricewaterhouseCoopers LLP. Mr. Coleman is a Certified Public Accountant; he holds a Bachelor of Science degree in accounting from Widener University and an M.B.A. from the Fuqua School of Business at Duke University. |

| Name | Position | Position Relevant Experience |
|---|---|---|
| James P. Tursi, M.D. | Executive Vice President and Global Head of Research and Development | James P. Tursi, M.D. was appointed Executive Vice President, Global Research & Development, effective January 2022. In this role, Dr. Tursi is responsible for leading global research & development, medical affairs and regulatory operations. Prior to joining Endo, he held senior leadership roles at Ferring Pharmaceuticals U.S., Antares Pharmaceuticals and Aralez Pharmaceuticals. Prior to Aralez, Dr. Tursi was Chief Medical Officer and Vice President of Clinical R&D at Auxilium Pharmaceuticals until its acquisition by Endo in 2015. Dr. Tursi practiced medicine and surgery for over 10 years and created a medical education company, I Will Pass®, which assisted physicians in the process of board certification. He performed his residency in Gynecology and Obstetrics at the Johns Hopkins Hospital, holds a bachelor of Science degree in Chemistry and biology from Ursinus College and a Doctor of Medicine degree from the Medical College of Pennsylvania. Dr. Tursi is a member of the Ideal Image and Agile Therapeutics boards of Directors. |
| Patrick Barry | Executive Vice President and President, Global Commercial Operations | Patrick Barry was appointed Executive Vice President and President, Global Commercial Operations, effective April 2020. In this role, he has responsibility for the Company's global commercial organization across each of Endo's four reportable business segments, including Branded Pharmaceuticals, Sterile Injectables, Generic Pharmaceuticals and International Pharmaceuticals. He formerly served as Executive Vice President and Chief Commercial Officer, U.S. Branded Business since February 2018, after joining Endo in December 2016 as Senior Vice President, U.S. Branded Pharmaceuticals. Prior to joining Endo, Mr. Barry worked at Sanofi S.A. from 1992 until December 2016, holding roles of increasing responsibility in areas such as Sales Leadership, Commercial Operations, Marketing, Launch Planning and Training and Leadership Development. Most recently, he served at Sanofi S.A. as its General Manager and Head of North America General Medicines starting in September 2015 and as Vice President and Head of U.S. Specialty from April 2014 until August 2015. During this time, Mr. Barry oversaw three complex and diverse businesses with responsibility for leading sales and marketing activities for branded and generic products across the U.S. and Canada. He has a diverse therapeutic experience including aesthetics and dermatology, oncology, urology, orthopedics and medical device and surgical experience. He has an M.B.A. from Cornell University, Johnson School of Management and a B.A. in Public Relations and Marketing from McKendree University. |

| Name | Position | Position Relevant Experience |
|---|---|---|
| Mark Bradley | Executive Vice President and Chief Financial Officer | Mark Bradley was appointed Executive Vice President and Chief Financial Officer, effective March 2020. He previously served as Senior Vice President, Corporate Development & Treasurer since June 2017. Mr. Bradley joined Endo in January 2007 as a Finance Director and has held various positions of increasing responsibility since joining the Company. Prior to joining Endo, he spent nearly 7 years as a management consultant, most recently with Deloitte Consulting, providing a broad range of strategic and operational advice and services to senior executives across a number of industries. In addition, Mr. Bradley served as a Finance Director for an industrial products company for approximately 2 years. He spent the first 5 years of his career in public accounting at Ernst & Young LLP. Mr. Bradley is a licensed Certified Public Accountant and holds a Bachelor of Science degree in Accounting from Saint Joseph's University and a Master of Business Administration from The University of Texas at Austin. |
| Matthew J. Maletta | Executive Vice President, Chief Legal Officer and Company Secretary | Matthew J. Maletta was appointed Executive Vice President and Chief Legal Officer, effective May 2015, where he has global responsibility for all legal matters affecting the Company. He was also appointed Company Secretary, effective June 2020. Prior to joining Endo in 2015, Mr. Maletta served as Vice President, Associate General Counsel and Corporate Secretary of Allergan. In this position, he served as an advisor to the Chief Executive Officer and Board of Directors and supervised several large transactions, including the $70 billion acquisition of Allergan by Actavis in 2015. Mr. Maletta also played a key role defending Allergan from an unsolicited takeover bid by Valeant Pharmaceuticals and Pershing Square Capital Management in 2014. Mr. Maletta joined Allergan in 2002 and during his tenure, held roles of increased responsibility, including serving as the lead commercial attorney for Allergan's aesthetics businesses for several years and as Head of Human Resources in 2010. Prior to joining Allergan, Mr. Maletta was in private practice, focusing on general corporate matters, finance, governance, securities and transactions. He holds a B.A. degree in political science from the University of Minnesota, summa cum laude and Phi Beta Kappa, and a J.D. degree, cum laude, from the University of Minnesota Law School. |

**<u>Exhibit M</u>**

**Estimated Weekly Payroll**

Pursuant to Local Rule 1007-2(b)(1)-(2)(A) and (C), the following provides the estimated amount of weekly payroll to the Debtors' Employees (not including officers, directors, and stockholders) and the estimated amount to be paid to officers, stockholders, directors, and financial and business consultants retained by the Debtors for the 30-day period following the Petition Date.

| Payments | Payment Amount |
|---|---|
| Payments to employees (not including officers, directors, and stockholders) | $22,075,000 |
| Payments to officers, directors, and stockholders | $590,000 |
| Payments to financial and business consultants retained by the Debtors | - |

## Exhibit N

**Cash Receipts and Disbursements, Net Cash Gain or Loss, Unpaid Obligations and Receivables**

Pursuant to Local Rule 1007-2(b)(3), the following provides, for the 30-day period following the Petition Date, the estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue but remain unpaid, other than professional fees.

| Type | Amount (USD in Millions) |
|---|---|
| Cash Receipts | $235.0 |
| Cash Disbursements | $365.3 |
| Net Cash Loss | $(130.3) |
| Unpaid Obligations (excluding professional fees) [1] | $134.0 |
| Unpaid Receivables (excluding professional fees) [2] | $730.0 |

[1] Estimated based on average monthly expenditures to the Debtors Vendors and Suppliers

[2] Estimated Net Accounts Receivable based on Debtor AR Aging Data