UNITED STATES BANKRUPTCY COURT                  NOT FOR PUBLICATION
SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------------- x
In re:                                           :
                                                 :    Case No. 22-22549 (JLG)
Endo International plc, et al.,                   :    Chapter 11
                                                 :
                                                 :    (Jointly Administered)
                                 Debtors.¹        :
-------------------------------------------------------- x
```

**MEMORANDUM DECISION AND ORDER GRANTING IN PART THE MOTION OF THE DEBTORS FOR AN ORDER (I) WAIVING THE REQUIREMENT THAT EACH DEBTOR FILES A SEPARATE LIST OF ITS 20 LARGEST UNSECURED CREDITORS; (II) AUTHORIZING THE DEBTORS TO FILE A SINGLE CONSOLIDATED LIST OF THEIR 50 LARGEST UNSECURED, NON-INSIDER CREDITORS; (III) AUTHORIZING THE DEBTORS AND THE CLAIMS AND NOTICING AGENT TO REDACT PERSONALLY IDENTIFIABLE INFORMATION FOR INDIVIDUALS; (IV) AUTHORIZING THE CLAIMS AND NOTICING AGENT TO WITHHOLD PUBLICATION OF CLAIMS FILED BY INDIVIDUALS UNTIL FURTHER ORDER OF THE COURT; (V) ESTABLISHING PROCEDURES FOR NOTIFYING CREDITORS OF THE COMMENCEMENT OF THE DEBTORS' CHAPTER 11 CASES; AND (VI) GRANTING RELATED RELIEF**

**A P P E A R A N C E S :**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
*Attorneys for the Debtors and Debtors in Possession*
One Manhattan West
New York, New York 10001
By:    Paul D. Leake, Esq.
       Lisa Laukitis, Esq.
       Shana A. Elberg, Esq.
       Evan A. Hill, Esq.

---

[1]    The last four digits of Debtor Endo International plc's tax identification number are 3755.  Due to the large number of debtors in these Chapter 11 Cases, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra kroll.com/Endo.  The location of the Debtors' service address for purposes of these Chapter 11 Cases is: 1400 Atwater Drive, Malvern, PA 19355.

WILLIAM K. HARRINGTON
UNITED STATES TRUSTEE, REGION 2
201 Varick Street, Room 1006
New York, New York 10014
By:   Paul K. Schwartzberg, Esq.
        Susan A. Arbeit, Esq.
        Andy Velez-Rivera, Esq.
        Tara Tiantian, Esq.

COOLEY LLP
*Lead Counsel for the Official Committee of Opioid Claimants*
55 Hudson Yards
New York, New York 10001
By:   Cullen D. Speckhart, Esq.
        Michael Klein, Esq.
        Evan Lazerowitz, Esq.

AKIN GUMP STRAUSS HAUER & FELD LLP
*Special Counsel to the Official Committee of Opioid Claimants*
One Bryant Park
New York, New York 10036
By:   Arik Preis, Esq.
        Mitchell P. Hurley, Esq.
        Theodore James Salwen, Esq.
        Kate Doorley, Esq.

LEVENFELD PEARLSTEIN, LLC
*Counsel for Ad Hoc Committee of NAS Children*
2 North LaSalle St., Suite 1300
Chicago, Illinois 60602
By:   Harold D. Israel, Esq. (admitted *pro hac vice*)

ASK LLP
*Counsel to the Ad Hoc Group of Personal Injury Victims*
60 East 42nd Street, 46th Floor
New York, New York 10165
By:   Edward E. Neiger, Esq.
        Jennifer A. Christian, Esq.
        Marianna Udem, Esq.

**HON. JAMES L. GARRITY, JR.**
**U.S. BANKRUPTCY JUDGE**

### Introduction[2]

The Debtors have filed a motion seeking various forms of relief relating to the noticing of creditors in these Chapter 11 Cases (the "Motion").[3]  Part of the relief that the Debtors are seeking in the Motion is the Court's authorization (i) to redact the home addresses and email addresses of certain Individual Non-Litigation Claimants and Equity Holders located in the United States (the "US"), Canada, the United Kingdom ("UK"), and the European Union ("EU"); and (ii) to redact the names, home addresses, and email addresses of certain Individual Litigation Claimants located in the US, Canada, the UK, the EU, and Australia, from any document filed with the Court and/or otherwise made publicly available by the Debtors and the Claims and Noticing Agent, including the List of Creditors, the Claims Registers and Schedules and Statements.

Those aspects of the Motion are now before the Court.  The Office of the United States Trustee (the "UST") filed an objection to the Motion (the "UST Objection").[4]  The Debtors filed

---

[2]    Capitalized terms not defined herein shall have the meaning ascribed to them in the Motion and in the Declaration of Mark Bradley in Support of Chapter 11 Petitions and First Day Orders, ECF No. 38 (the "Bradley Decl."). References to "ECF No. ___" are references to documents filed on the electronic docket in case number 22-22549.

[3]    *Motion of the Debtors for an Order (I) Waiving the Requirement That Each Debtor Files a Separate List of Its 20 Largest Creditors; (II) Authorizing the Debtors to File a Single Consolidated List of Their 50 Largest Unsecured Non-Insider Creditors; (III) Authorizing the Debtors and the Claims and Noticing Agent to Redact Personally Identifiable Information for Individuals; (IV) Authorizing the Claims and Noticing Agent to Withhold Publication of the Claims Filed by Individuals Until Further Order of the Court; (V) Establishing Procedures for Notifying Creditors of the Commencement of the Chapter 11 Cases; and (VI) Granting Related Relief*, ECF No. 6.

[4]    *United States Trustee's Objection to Debtors' Motion for Entry of a Final Order (I) Waiving the Requirement That Each Debtor File a Separate List of Its 20 Largest Unsecured Creditors; (II) Authorizing the Debtors to File a Single Consolidated List of Their 50 Largest Unsecured, Non-Insider Debtors; (III) Authorizing the Debtors and the Claims and Noticing Agent to Redact Personally Identifiable Information for Individuals; (IV) Authorizing the Claims and Noticing Agent to Withhold Publications of Claims Filed by Individuals Until Further Order of the Court; (V) Establishing Procedures for Notifying Creditors of the Commencement of the Debtors' Chapter 11 Cases; and (VI) Granting Related Relief*, ECF No. 176.

a reply to the UST Objection (the "Reply").[5]  The Official Committee of Opioid Claimants filed a

statement in response to the UST Objection and in support of the Motion (the "OCC Statement").[6]

The Ad Hoc Committee of NAS Children[7] and the Ad Hoc Group of Personal Injury Victims[8] each

joined in the OCC Statement.  On September 28, 2022, the Court heard argument on the Motion.

To the extent set forth herein, the Court GRANTS the Motion.

---

[5]    *The Debtors' Reply in Support of the Motion of the Debtors for an Order (I) Waiving the Requirement That Each Debtor Files a Separate List of Its 20 Largest Unsecured Creditors; (II) Authorizing the Debtors to File a Single Consolidated List of Their 50 Largest Unsecured, Non-Insider Creditors; (III) Authorizing the Debtors and the Claims and Noticing Agent to Redact Personally Identifiable Information for Individuals; (IV) Authorizing the Claims and Noticing Agent to Withhold Publication of Claims Filed by Individuals Until Further Order of the Court; (V) Establishing Procedures for Notifying Creditors of the Commencement of the Debtors' Chapter 11 Cases; and (VI) Granting Related Relief*, ECF No. 274.  The Debtors support the Reply with the Declaration of Eve-Christie Vermynck, who is a solicitor and attorney admitted to practice in England, Wales, Paris, and New York (the "Vermynck Decl.").  *Declaration of Eve-Christie Vermynck*, Reply, Ex. A.  Additionally, the Debtors also attach to their Reply the Declaration of David McCredie, who is a solicitor admitted in Australia (the "McCredie Decl.").  *Declaration of David McCredie*, Reply, Ex B.

[6]    *Statement of the Official Committee of Opioid Claimants in Support of Motion of the Debtors for Entry of a Final Order Authorizing (I) the Debtors and the Claims and Noticing Agent to Redact Personally Identifiable Information for Individuals and (II) the Claims and Noticing Agent to Withhold Publication of Claims Filed by Individuals Until Further Order of the Court*, ECF No. 277.

[7]    *Joinder of the Ad Hoc Committee of NAS Children in Support of the Statement of the Official Committee of Opioid Claimants in Support of Motion of the Debtors for Entry of a Final Order Authorizing (i) the Debtors and the Claims and Noticing Agent to Redact Personally Identifiable Information for Individuals and (ii) the Claims and Noticing Agent to Withhold Publication of Claims Filed by Individuals Until Further Order of the Court*, ECF No. 290 (the "NAS Joinder").  The NAS Committee is comprised of parents and guardians advocating on behalf of children born with Neonatal Abstinence Syndrome ("NAS"), a medical diagnosis that irises from testing and observation of conditions associated with opioid use and its sudden withdrawal, which in turn is commonly known as neonatal opioid withdrawal syndrome.  *Verified Statement of the Ad Hoc Committee of NAS Children Pursuant to Bankruptcy Rule 2019*, ECF No. 134 at 2 & n.2.

[8]    *Joinder of the Ad Hoc Group of Personal Injury Victims in Support of the Statement of the Official Committee of Opioid Claimants in Support of Motion of the Debtors for Entry of a Final Order Authorizing (I) the Debtors and the Claims and Noticing Agent to Redact Personally Identifiable Information for Individuals and (II) the Claims and Noticing Agent to Withhold Publication of Claims Filed by Individuals Until Further Order of the Court*, ECF No. 292 (the "Ad Hoc Group Joinder"). The Ad Hoc Group of Personal Injury Victims is comprised of five individuals, each of whom holds one or more unsecured, unliquidated, opioid-related personal injury claims against one or more of the Debtors.  *Verified Statement of the Ad Hoc Group of Personal Injury Victims Pursuant to Bankruptcy Rule 2019*, ECF No. 285.

## Jurisdiction

The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* dated January 31, 2012 (Preska, C.J.). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

## Background

On August 16, 2022 (the "Petition Date"), Endo International plc ("Endo Parent") and each of its debtor affiliates (collectively, the "Debtors" and, together with their non-debtor affiliates, the "Company" or "Endo") commenced voluntary chapter 11 cases in this Court (the "Chapter 11 Cases") by filing petitions for relief under chapter 11 of the Bankruptcy Code. On August 17, 2022, the Court entered an order authorizing the joint administration and procedural consolidation of the Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b).[9] The Debtors are authorized to continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On September 2, 2022, the UST appointed an Official Committee of Unsecured Creditors (the "UCC")[10] and an Official Committee of Opioid Claimants (the "OCC")[11] in the Chapter 11 Cases. No trustee or examiner has been appointed in the Chapter 11 Cases.

Endo is a leading specialty pharmaceutical company. It operates a global biopharmaceutical business that produces and sells both generic and branded products. Endo Parent, the lead Debtor, is an Irish public limited company headquartered in Dublin, Ireland, and

---

[9]    *Order (I) Directing Joint Administration of the Chapter 11 Cases Pursuant to Bankruptcy Rule 1015(b); (II) Waiving the Requirements of Section 342(c)(1) of the Bankruptcy Code and Bankruptcy Rule 2002(n); and (III) Granting Related Relief*, ECF No. 45.

[10]    *Appointment of Official Creditors' Committee of Unsecured Creditors*, ECF No. 161.

[11]    *Appointment of Official Committee of Opioid Claimants*, ECF No. 163.

is the publicly traded parent of Endo's global enterprise.  Bradley Decl. ¶¶ 1, 6.  It is a holding company that conducts business through its operating subsidiaries.  Collectively, the Debtors operate in five countries, including the US, Canada, Ireland, the UK, and Luxembourg.  The non-debtor affiliates also have material operations in India.  *Id*. ¶¶ 22, 106.

Certain of the Debtors have been named as defendants in over 3,500 lawsuits (the "Opioid Lawsuits") filed by plaintiffs (the "Opioid Claimants"), seeking to hold such Debtors liable for their marketing and sale of certain FDA-approved opioid products, including, without limitation, Opana® and Opana® ER.  *Id*. ¶ 49.  An "overwhelming majority" of these Opioid Lawsuits have been filed in the US, with only a "handful" having been filed as proposed class actions in Canada. *Id*. ¶ 51.  The Opioid Claimants include individuals seeking damages for alleged personal injuries (the "Opioid PI Claimants").  *Id*.  In addition to the Opioid Lawsuits, the Company and certain of its subsidiaries, including Astora Women's Health LLC ("Astora"),[12] have been named as defendants in multiple lawsuits in various state and federal courts in the US, as well as in Canada, Australia, and unspecified other countries.  *Id*. ¶ 60.  These lawsuits assert claims for personal injuries resulting from the use of transvaginal surgical mesh products designed to treat pelvic organ prolapse or stress urinary incontinence.  The plaintiffs (the "Surgical Mesh PI Claimants") generally allege that the products caused extensive personal injury, including chronic pain, incontinence, inability to control bowel function, and permanent deformities.  *Id*.  The Company's subsidiary, Par Pharmaceutical, Inc. ("PPI"), was named in a multidistrict-litigation case pending in the United States District Court for the Southern District of Florida along with numerous other manufacturers and distributors of branded and generic ranitidine.  *Id*. ¶ 63.  PPI has also been

---

[12]    American Medical Systems Holdings, Inc. converted to Astora Women's Health Holding LLC and merged into Astora.

named in similar complaints filed in certain state courts, including California, Pennsylvania, and Illinois (collectively, the "Ranitidine PI Claims"). *Id.*

## The Motion

Under the Motion, as filed, the Debtors seek authorization pursuant to section 107(c)(1) of the Bankruptcy Code to redact personally identifiable information, including, without limitation, the names and addresses of any individual listed on, or appearing in, any document: (a) made publicly available on the Debtors' case website; (b) filed with the Court; or (c) otherwise submitted to the Claims and Noticing Agent, including the List of Creditors, the Claims Registers, and the Schedules. Motion ¶ 15. The Debtors propose to provide, under seal, unredacted copies of filings to the Court, the UST, official committees, and any other party designated by the Court, subject to a case-by-case review as to whether disclosure would violate any foreign data-protection regime. *Id.* ¶ 21.

The Debtors contend that the Court should grant them such relief because, given the nature of the Chapter 11 Cases, they are unfamiliar with the personal circumstances of each of their creditors to know with sufficient certainty whether a release of their personal information could potentially jeopardize their safety or violate any foreign jurisdictions' privacy data protection regulations. *Id.* ¶ 18. As to the latter, they note that certain of their employees and individual litigation claimants are located in the EU, the UK, Australia, and other countries, which closely regulate the disclosure of personal information. *Id.* ¶ 20. They contend that the United Kingdom Data Protection Act of 2018 and the United Kingdom General Data Protection Regulation (together, the "UK GDPR"), the European General Data Protection Regulation (the "EU GDPR," together with the UK GDPR, the "GDPR"),[13] and similar laws in other jurisdictions impose

---

[13] The UK GDPR and the EU GDPR are separate legislative regimes applicable in each jurisdiction. The Court will address them together, as the provisions of the EU GDPR were incorporated directly into the UK law as the UK

significant constraints on the disclosure of "personally identifiable information" that may restrict
their ability to process and disclose personal information relating to the Debtors' employees and
individual claimants located in such foreign jurisdictions. *Id.* They also contend that, as with any
large employer, certain employees' personal circumstances, including circumstances unrelated to
their employment, would be negatively impacted by the disclosure of their residential addresses,
and that disclosure of personal addresses would likely hinder the Debtors' efforts to attract and
retain the employees necessary to preserve the value of the Debtors' estates for the benefit of their
creditors and other parties-in-interest. *Id.* ¶ 19.

The UST Objection

The UST raises three points in support of its objection. First, it contends that the relief that
the Debtors are seeking in the Motion runs afoul of section 107(c) because, among other things,
the Debtors do not define or otherwise limit the scope of "personally identifiable information."
UST Obj. at 1, 8. It also asserts that the Debtors failed to submit competent evidence of undue
risk of identity theft or other unlawful injury to the individuals they seek to protect via redaction
under section 107(c) and have not explored narrower alternative relief. *Id.* at 9–10. It notes that
"insofar as the business address of an individual creditor may already be public information, the
address is not entitled to protection," and because the Debtors did not limit their requested
redactions to residential addresses, public business addresses could be redacted. *Id.* at 10.

Next, the UST contends, in substance, that the Debtors overstate the scope of the
constraints on the disclosure of "personally identifiable information" under the GDPR. Article 6

---

GDPR, following the UK's departure from the EU. Vermynck Decl., ¶ 9. As such, the Court will use the term
"GDPR" to refer to both regulations.

of the GDPR provides that personal-data processing is lawful where, among other things, "processing is necessary for compliance with a legal obligation to which the controller is subject." UST Obj. at 12 (quoting EU GDPR, Art. 6(c)). The UST concedes that the Debtors qualify as a "controller" under the GDPR but contends that, since the Debtors assertedly "have the duty to make public all information contained in their Court filings in these cases," they may process personal information under the exceptions at Article 6(c) of the GDPR. *Id.* at 12–13.[14] The UST also asserts that Article 49(1)(e) of the GDPR permits a data controller to transfer personal data to a third country or an international organization where, among other things, "the transfer is necessary for the establishment, exercise or defense of legal claims." *Id.* at 13 (quoting EU GDPR, art. 49(1)(e)). It contends that, because the Debtors' initiation of these Chapter 11 Cases subjects them to the disclosure requirements of section 521 of the Bankruptcy Code, Rules 1007(b) and 9009 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and the applicable official forms, the Debtors' filing of unredacted personal information meets the "necessary" standard of Article 49(1)(e). *Id.* at 14.

Finally, the UST contends that despite being headquartered in Ireland—an EU member state—the Debtors chose to file the Chapter 11 Cases in the US, and, as such, the Bankruptcy Code, not the GDPR, or other foreign law, controls the scope of the disclosure of personally identifiable information for individuals in these Chapter 11 Cases. *Id.* at 14. The UST maintains that section 107 of the Bankruptcy Code codifies the long-standing US common law right of public access to court records and that the scope of the privacy restrictions under the GDPR far exceeds

---

[14]    The UST also asserts that "the GDPR does not appear to protect the personal information of individuals who are non-EU residents located outside the EU, including U.S. citizens residing in the U.S." *Id.* at 13. The UST cites to Article 3(2) of the EU GDPR Art. 3(2), which states, "This Regulation applies to the processing of personal data of data subjects who are in the Union by a controller or processor not established in the Union . . . ."

those contained in section 107(c).  *Id.* at 7, 14–16.  For that reason, it asserts that the Court should

exercise its discretion and deny the Debtors' request that it recognize the GDPR and apply it in

these Chapter 11 Cases.  *Id.* at 14–16.

The Debtors' Reply

In their Reply to the UST Objection, the Debtors provide additional information regarding

the number and location of individuals that are impacted by the Motion, limit the scope of the

relief they are seeking under the Motion, and elaborate on their request that the Court give effect

to foreign law in these cases.

The Debtors are aware of the identity and contact details of approximately 8,600 individual

non-litigation claimants and equity holders located in the US, Canada, the UK, and the EU

(collectively, the "Individual Non-Litigation Claimants and Equity Holders"), as follows:

> (i) 185 current employees located in the UK and the EU (the "UK/EU Current
> Employees") and 1,550 current employees located in the US and Canada (together
> with the UK/EU Current Employees, the "Current Employees");
>
> (ii) 100 former employees who were employed within six years prior to the Petition
> Date, located in the UK and the EU (the "UK/EU Former Employees") and 6,600
> former employees who were employed within six years prior to the Petition Date,
> located in the US and Canada (together with the UK/EU Former Employees, the
> "Former Employees");
>
> (iii) 10 individual equity holders located in the UK and the EU (the "UK/EU
> Individual Equity Holders") and 60 individual equity holders located in the US and
> Canada (together with the UK/EU Individual Equity Holders, the "Individual
> Equity Holders"); and
>
> (iv) 30 individual vendors and contract counterparties located in the UK and the
> EU (the "UK/EU Individual Vendors and Contract Counterparties") and 1,200
> individual vendors and contract counterparties located in the US and Canada
> (together with the UK/EU Individual Vendors and Contract Counterparties, the
> "Individual Vendors and Contract Counterparties").

Reply ¶ 8.

The Debtors also are aware of the identity and contact information for thousands of individual litigation claimants located in the US, Canada, the UK, the EU, and Australia (collectively, the "Individual Litigation Claimants"). Reply ¶¶ 9–16. The Court briefly discusses those claimants below.

Individual US/Canada Litigation Claimants

The Debtors, including Astora, are aware of the identity and contact details of hundreds of individuals who either filed individual claims against the Debtors or are members of a class action, seeking damages for alleged personal injuries in their capacities as: (a) Opioid PI Claimants, (b) Surgical Mesh PI Claimants, or (c) Ranitidine PI Claimants (collectively, the "Individual US/Canada Litigation Claimants"). Reply ¶ 10.

Individual UK/EU Litigation Claimants

The Debtors, including Astora, have been named as defendants by (a) 13 Surgical Mesh PI Claimants in actions brought in the High Court of England and Wales, (b) 56 Surgical Mesh PI Claimants in actions brought in Scotland's Court of Session, and (c) a number of Surgical Mesh PI Claimants in actions in the Netherlands and Ireland (collectively, the "Individual UK/EU Litigation Claimants"). They are aware of the identity and contact information of each of the Individual UK/EU Litigation Claimants. *Id.* ¶ 11.

Individual Australian Litigation Claimants

The Debtors are aware of the identity and contact details of:

(i) two Surgical Mesh PI Claimants named in a class action that they have commenced on their own right and on behalf of other women in the Federal Court of Australia (Proceeding NSD 35/2018) (the "Australian Court") asserting Surgical Mesh PI Claims against Astora (the "Australian Class Action Proceeding");

11

(ii) three Surgical Mesh PI Claimants who have filed applications in the Supreme Court of Queensland seeking leave to commence proceedings against Astora in that court; and

(iii) one Surgical Mesh PI Claimant in a proceeding against Astora in the Supreme Court of New South Wales.

*Id.* ¶¶ 12–15. Hereinafter, the Court shall refer to the foregoing Surgical Mesh PI Claimants and the solicitors who act for them as the "Named Individual Australian Litigation Claimants."

Baker McKenzie acts as Astora's Australian counsel in the Australian Class Action Proceeding. In that capacity, it holds the names and contact details of more than 3,000 women who may be class members in the Australian Class Action Proceeding (the "Additional Individual Australian Litigation Claimants") in certain documents (the "Australian Documents") subject to an implied undertaking under Australian law (the "*Harman* Undertaking") that they will not use that information for any purpose other than the conduct of the Australian Class Action Proceeding, and subject to state/territory and commonwealth privacy regimes that limit Astora's ability to make use of the Additional Individual Australian Litigation Claimant details. *See* McCredie Decl. ¶¶ 9–10.[15] On September 9, 2022, Astora filed an interlocutory application (as further amended, the "Interlocutory Application"), in the Australian Class Action Proceeding, seeking orders from the Australian Court that it be permitted to use the Additional Individual Australian Litigation Claimant contact details for the purpose of serving such individuals with the notice of commencement of Astora's chapter 11 case and of other documents where such individuals are parties-in-interest, and to disclose the names and contact details of the Additional Individual

---

[15]  In relation to the Named Individual Australian Litigation Claimants, the Debtors are not subject to any form of undertaking such as that which applies in respect of the Additional Individual Australian Litigation Claimants. The Debtors advise that applicable Australian laws, including privacy laws, do not restrict Astora from disclosing the names and home addresses of the Named Individual Australian Litigation Claimants and counsel address where required by the orders of this Bankruptcy Court. Reply at 22 n.7. The Debtors seek authorization from the Court to redact the names of the Named Individual Australian Litigation Claimants for the same substantive reasons it seeks such permission in respect of the U.S./Canada Litigation Claimants as set out herein. *Id.*

Australian Litigation Claimants in Astora's chapter 11 case. *Id.* ¶¶ 12–14. In an order dated September 28, 2022 (the "Australian Court Order"),[16] the Australian Court specifically released Astora from the *Harman* Undertaking for the purposes of (i) providing notice to parties-in-interest in these Chapter 11 Cases, (ii) preparing and filing a list of creditors and any other documents to be filed in the Bankruptcy Court in these Chapter 11 Cases (the "Bankruptcy Filings") "in which any information contained in such documents which is sourced from the Australian Documents shall be redacted," and (iii) "providing copies of the Bankruptcy Filings in which information obtained from the Australian Documents is not redacted, to the Bankruptcy Court, the United States Trustee, and the Official Committee of Unsecured Creditors in the Endo Group Chapter 11 on the basis that such documents are held in confidence subject to the orders of the Bankruptcy Court." Australian Court Order ¶ 1(a)–(d).

<u>Modified Request for Relief</u>

In response to the UST Objection, the Debtors refined their request for relief. Pursuant to the Motion, as modified, they are seeking authority under section 107(c) of the Bankruptcy Code and Bankruptcy Rule 1007(j) (solely with respect to information contained in the filings described in Bankruptcy Rule 1007), to make the following redactions:

<u>Individual Equity Holders, Vendors and Contract Counterparties</u>

Redact the individual's home address and email address and notate "Address on File" instead.

<u>Former Employees</u>

Redact the individual's home address and email address and notate the Debtors' address of service instead.

---

[16]    *See Notice of Order Entered by Federal Court of Australia*, Ex. 2, ECF No. 320.

<u>Current Employees</u>

Redact the individual's home address and email address and instead notate the individual's applicable business address.

<u>Individual Litigation Claimants</u>

Redact the individual's name, home address, and email address and instead notate the address of the individual's counsel, and if the individual has no counsel of record, notate "Address on File."

The Debtors assert that, for the redacted documents filed with respect to the Individual

Equity Holders, Vendors and Counterparties, and the Current and Former Employees, they will

(i) provide unredacted filings to the Court, the UST, the UCC, the OCC and any other party designated by further order of the Court, subject to applicable foreign law;

(ii) provide any other party in interest unredacted filings upon request made to the Debtors that the Debtors determine in good faith is reasonably related to the Chapter 11 Cases, subject to applicable foreign law; and

(iii) provide five days' advance notice to the UST, the UCC, and the OCC, prior to determining whether to deny or grant any request for such unredacted filing.

Reply at 5–6. They say that they will do the same for the redacted documents filed with respect

to the Individual Litigation Claimants[17] and that they also will consult with the OCC prior to

determining whether to deny or grant any requests concerning opioid litigation claimants' redacted

information. *Id.* at 6–7.

The Debtors contend that the Court should authorize them to make the requested redactions

because disclosure of such personal information is protected under section 107(c) and, as to the

Additional Individual Australian Litigation Claimants, such disclosure would violate the

Australian Court Order. They also contend that disclosure of such personally identifiable

---

[17]    However, the Debtors do not seek authorization to disclose the contact information of the Additional Individual Australian Litigation Claimants to the OCC. *Transcript Regarding Hearing Held on 9/28/2022*, ECF No. 336 at 82:5–83:23.

information with respect to individuals located in the UK and EU would violate the GDPR.  Reply ¶¶ 20–32, 39–44, 48–71.  The GDPR applies to the processing of "personal data" in the context of an establishment of a "data controller" or "data processor" in the UK and the EU, regardless of where the processing takes place.  Vermynck Decl. ¶ 10.[18]  Under the GDPR, the data controller determines the purposes for which and the means by which "personal data" is processed, and the data processor processes "personal data" only on behalf of the controller.  There is no dispute that the Debtors are "data controllers"—since they have received "personal data" relating to citizens of the UK and the EU—and that their agents that hold and otherwise process such "personal data" solely on the Debtors' instructions and on behalf of the Debtors are "data processors."  *Id.* ¶ 12.  Article 6 of the GDPR restricts the "processing" of "personal data."  The Debtors maintain that for purposes of this case, such "processing" includes (a) the use of names and contact information of the Individual Non-Litigation Claimants and Equity Holders not located in the US, as well as the UK/EU Individual Litigation Claimants for the purpose of serving them with any notice related to the Chapter 11 Cases, and (b) the Debtors or Noticing Agent filing any unredacted or redacted paper in the Chapter 11 Cases or serving a limited number of parties a redacted version that contains the "personal data" of these individual claimants.  *Id.* ¶¶ 12, 25.  The Debtors contend

---

[18]    The EU GDPR applies to all EU member countries and protects all European Union member countries' citizens, imposes significant constraints on the "processing" of "personal data" relating to these individuals.  Vermynck Decl. ¶ 9.  The EU GDPR also applies to the three European Economic Area member states that are not in the EU: Liechtenstein, Iceland, and Norway.  Erin Hilliard, *The GDPR: A Retrospective and Prospective Look at the First Two Years*, 35 BERKELEY TECH. L.J. 1245, 1267 (2020); *In re Celsius Network LLC*, No. 22-10964, 2022 WL 4492928, at *10 (Bankr. S.D.N.Y. Sept. 28, 2022).  The UK GDPR applies to the UK and protects all UK citizens, and it imposes relatively equivalent constraints on the "processing" of these individuals' "personal data."  Vermynck Decl. ¶ 9.  For these purposes, the term "personal data" means "any information relating to an identified or identifiable living individual ('data subject'); an identifiable natural person is one who can be identified, directly or indirectly[.]"  *Id.* (quoting EU GDPR Art. 4(1)).  The term "processing" means "any operation or set of operations which is performed on personal data or on sets of personal data, whether or not by automated means, such as such as collection, recording, organization, structuring, storage, adaptation or alteration, retrieval, consultation, use, disclosure by transmission, dissemination or otherwise making available, alignment or combination, restriction, erasure or destruction of personal data by 'data controllers' or 'data processors.'"  *Id.* (quoting EU GDPR Art. 4(2)).

that Article 6(1)(f) may apply to the processing of the personal data of the Individual Non-

Litigation Claimants and Equity Holders located in the UK and EU and the UK/EU Individual

Litigation Claimants. *Id.* ¶¶ 17–19; 23–25.[19] They assert that, consistent with their obligations

under the GDPR to restrict data processing only to that which is necessary to achieve the permitted

purpose and to balance the rights and freedoms of these individuals, to comply with Article 6(1)(f),

in any paper filed with the Court, they must (a) redact the home addresses and email addresses of

the Individual Non-Litigation Claimants and Equity Holders located in the UK and EU, and (b) the

names and home addresses and email addresses of the UK/EU Litigation Claimants. *Id.* ¶¶ 19, 25.

They contend that, absent such relief, they risk processing "personal data" without a legal basis

and in breach of the GDPR and thereby exposing themselves to severe monetary penalties that

could threaten the Debtors' operations during this sensitive stage of their restructuring. *Id.*[20]

---

[19]    Article 6(1)(f) of the GDPR states that the "processing" of "personal data" is lawful when:

> (f) processing is necessary for the purposes of the legitimate interests pursued by the controller or
> by a third party, except where such interests are overridden by the interests or fundamental rights
> and freedoms of the data subject which require protection of personal data, in particular where the
> data subject is a child.

This provision is subject to Article 5(1) of the GDPR. Article 5(1)(c) provides that "personal data" must be "adequate,
relevant and limited to what is necessary in relation to the purposes for which they are processed." Article 5(1)(b)
states that the purpose for which an individual or entity collects, and processes "personal data" must be "specified,
explicit and legitimate." Vermynck Decl. ¶ 18. The Debtors assert that, contrary to the UST's assertions,
Article 6(1)(c) of the GDPR ("compliance with a legal obligation") is not applicable to the Chapter 11 Cases because
the legal obligation must exist under the UK and the EU laws, which is not the case in the context of the Chapter 11
Cases. *Id.* ¶ 16.

[20]    A violation of the GDPR could result in proceedings or actions against the breaching organization by
governmental entities or others, including class action privacy litigation in certain jurisdictions, significant fines,
penalties, judgments, and reputational damages to such organization. Vermynck Decl., ¶ 11. If an organization is
found to have processed information in breach of the UK GDPR, the organization may be subject to an administrative
fine up to the higher of £17,500,000 or 4 percent of worldwide annual turnover—i.e., total annual revenues—of the
preceding financial year. *See* United Kingdom Data Protection Act 2018, section 157(5)(a) (as amended by Data
Protection, Privacy and Electronic Communications (Amendments etc.) (EU Exit) Regulations 2019). Similarly, for
a breach of the EU GDPR, the organization may be fined up to the higher of €20,000,000 or 4 percent of worldwide
annual turnover—i.e., total annual revenues—of the preceding financial year. *See* General Data Protection Regulation
(EU) 2016/679, art. 83(5); Vermynck Decl. ¶ 11.

### Applicable Legal Principles

Bankruptcy Code § 521 and its implementing rules impose a duty on all debtors to file schedules and statements.  11 U.S.C. § 521(a).  Bankruptcy Rule 1007(b) requires the schedules and statements to be "prepared as prescribed by the appropriate Official Forms."  FED. R. BANKR. P. 1007(b).  Official Form 206, the Schedules for non-individual debtors, requires complete disclosure of a creditor's name and mailing address, (Sch. E-F), and as to secured creditors, their email addresses as well (Sch. D).  As applicable, Official Form 207, the Statement of Financial Affairs for non-individual debtors, also requires full disclosure of a creditor's or other individual's name, address, and email address, (Part 2, Part 3 (Item 4), Part 6 (Items 11 and 13), Part 11, Part 13 (Items 27–30).  As relevant, Bankruptcy Rule 9009 states:

> The Official Forms prescribed by the Judicial Conference of the United States shall be used without alteration, except as otherwise provided in these rules, in a particular Official Form, or in the national instructions for a particular Official Form. Official Forms may be modified to permit minor changes not affecting wording or the order of presenting information, including changes that:
>
> > (1) expand the prescribed areas for responses in order to permit complete responses;
> >
> > (2) delete space not needed for responses; or
> >
> > (3) delete items requiring detail in a question or category if the filer indicates—either by checking "no" or "none" or by stating in words—that there is nothing to report on that question or category.

FED. R. BANKR. P. 9009(a).

There is a strong presumption and public policy in favor of public access to court records. *See, e.g.*, *Nixon v. Warner Commc'n, Inc.*, 435 U.S. 589, 597–98 (1978); *Neal v. The Kansas City Star (In re Neal)*, 461 F.3d 1048, 1053 (8th Cir.2006); *Gitto v. Worcester Telegram & Gazette Corp. (In re Gitto Global Corp.)*, 422 F.3d 1, 6 (1st Cir.2005); *In re Borders Grp., Inc.*, 462 B.R. 42, 46 (Bankr. S.D.N.Y. 2011); *In re Food Mgmt. Grp., LLC*, 359 B.R. 543, 553 (Bankr. S.D.N.Y.

2007).  The right of public access is "rooted in the public's First Amendment right to know about

the administration of justice." *Video Software Dealers Ass'n v. Orion Pictures Corp. (In re Orion*

*Pictures Corp.)*, 21 F.3d 24, 26 (2d Cir.1994) (stating that public access "helps safeguard 'the

integrity, quality, and respect in our judicial system,' and permits the public 'to keep a watchful

eye on the workings of public agencies'" (first quoting *In re Analytical Sys.*, 83 B.R. 833, 835

(Bankr. N.D. Ga. 1987); and then quoting *Nixon*, 435 U.S. at 598)).  "The public interest in

openness of court proceedings is at its zenith when issues concerning the integrity and transparency

of bankruptcy court proceedings are involved." *In re Food Mgmt. Grp., LLC*, 359 B.R. at 553; *see*

*also In re Gitto Global Corp.*, 422 F.3d at 7 ("This governmental interest is of special importance

in the bankruptcy arena, as unrestricted access to judicial records fosters confidence among

creditors regarding the fairness of the bankruptcy system."); *In re Bell & Beckwith*, 44 B.R. 661,

664 (Bankr. N.D. Ohio 1984) ("This policy of open inspection, established in the Bankruptcy Code

itself, is fundamental to the operation of the bankruptcy system and is the best means of avoiding

any suggestion of impropriety that might or could be raised.").

Section 107(a) of the Bankruptcy Code codifies the common law right of public access to

judicial records.  *Togut v. Deutsche Bank AG (In re Anthracite Capital Inc.)*, 492 B.R. 162, 170,

173 (Bankr S.D.N.Y. 2013); *see also Gitto Global*, 422 F.3d at 7–8 (noting that section 107

supplants the common law right of public access).  Pursuant to section 107(a), papers filed in

bankruptcy cases and the Court's dockets are "public records, open to examination by an entity at

reasonable times without charge."   11 U.S.C. § 107(a); *Anthracite Capital*, 492 B.R. at 170.

Section 107(c)(1) provides a limited exception to that general rule.  It states that:

> The bankruptcy court, for cause, may protect an individual, with respect to the
> following types of information to the extent the court finds that disclosure of such
> information would create undue risk of identity theft or other unlawful injury to the
> individual or the individual's property:

18

(A) Any means of identification (as defined in section 1028(d) of title 18) contained in a paper filed, or to be filed, in a case under this title.

(B) Other information contained in a paper described in subparagraph (A).

11 U.S.C. § 107(c)(1); *see also In re French*, 401 B.R. 295, 306 (Bankr. E.D. Tenn. 2003) (noting "that the sole purpose [of] § 107(c) was to establish public access to court documentation with very limited exceptions.")  Section 1028(d) of title 18 provides a non-exhaustive list of personally identifiable information, including:

(A) name, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number;

(B) unique biometric data, such as fingerprint, voice print, retina or iris image, or other unique physical representation;

(C) unique electronic identification number, address, or routing code; or

(D) telecommunication identifying information or access device (as defined in section 1029(e)).

18 U.S.C. § 1028(d)(7). Bankruptcy Rule 1007(j) provides:

On motion of a party in interest and for cause shown the court may direct the impounding of the lists filed under this rule, and may refuse to permit inspection by any entity.  The court may permit inspection or use of the lists, however, by any party in interest on terms prescribed by the court.

FED. R. BANKR. P. 1007(j).  These lists include schedules revealing the identities of all creditors, schedules of assets and liabilities, and statements of financial affairs.  *Id*. 1007(b). Bankruptcy Rule 1007(j) permits the Court to protect information "from disclosure to competitors or others who might make inappropriate or unfair use of the information." 9 COLLIER ON BANKRUPTCY P 1007.10 (16th ed. 2022).  By its terms, Bankruptcy Rule 1007(j) does not set forth the standard for an order impounding a list, nor does it explain when redaction rather than

wholesale sealing is appropriate. *In re Celsius Network LLC*, No. 22-10964, 2022 WL 4492928, at *10 (Bankr. S.D.N.Y. Sept. 28, 2022).

The Debtors carry the burden of showing there is a sufficient basis to overcome the presumption of ready access to legal records and public policy in favor of public access to court records. *See In re Food Mgmt. Grp., LLC*, 359 B.R. at 561. When, as here, the Debtors are seeking protection under section 107(c), they cannot meet their burden simply by speculating "that disclosure 'may,' as opposed to 'would' as the statutory language requires, create undue risk of identity theft or other unlawful injury." *In re Celsius Network LLC*, 2022 WL 4492928 at *10. However, "[s]ection 107(c) references 'risk,' and assessment of risk is forward looking. While a specific potential harm must be identified, the standard does not require evidence of injury having occurred in the past or under similar circumstances." *In re Motion Seeking Access to 2019 Statements*, 585 B.R. 733, 751 (D. Del. 2018) (citations omitted), *aff'd sub nom. In re A C & S Inc*, 775 F. App'x 78 (3d Cir. 2019).

## Discussion

In the Motion, as modified by the Reply, the Debtors seek authority pursuant to section 107(c) of the Bankruptcy Code and Bankruptcy Rule 1007(j) to redact the following information from any paper filed with the Court and/or otherwise made publicly available by the Debtors and their Claims and Noticing Agent:

> (i) the home addresses and email addresses of Individual Non-Litigation Claimants and Equity Holders located in the US, Canada, the UK, and the EU; and

> (ii) the names, home addresses and email addresses of Individual Litigation Claimants located in the US, Canada, the UK, the EU and Australia.

Reply at 5–7. They contend such relief is warranted under section 107(c) and Rule 1007(j) because the disclosure of an individual's home address heightens that individual's risk of being a victim of

identity theft or stalking and intimate partner violence, and because the disclosure of an individual's status as an Individual Litigation Claimant could result in serious adverse repercussions to such individual.  They also ask the Court to recognize and give effect to the Australian Court Order[21] and the GDPR.  The Court considers those matters below.

Home Addresses and Email Addresses of Individual Non-Litigation
Claimants and Equity Holders Located in the US, Canada, the UK, and the EU

The type of information protected from disclosure under section 107(c) includes information "that may be used, alone or in conjunction with other information to identify a specific individual."  *In re Barbaran*, No. 06-00457-ELG, 2022 WL 1487066, at *4 (Bankr. D.D.C. May 9, 2022) (citing *In re Motions Seeking Access to 2019 Statements*, 585 B.R. at 748 (citing 18 U.S.C. § 1028(d))).  Home addresses fall within that category of information, as it is taken as a "given" that they constitute personally identifiable information that is vital information to perpetrators of

---

[21]  The Debtors filed the Motion and Reply while the Interlocutory Application was pending and before the Australian Court entered the Australian Court Order.  The Australian Court entered its Reasons for Judgment on October 6, 2022.  *See Notice of Order and Reasons for Judgment Entered by Federal Court of Australia*, ECF No. 381.  In the Reply, the Debtors discussed the proceedings before the Australian Court (Reply ¶¶ 39-44) and advised that

> While it remains a matter for the Australian Court, it is hoped that the Australian Court will consider it appropriate to grant the Debtor Astora (a) use of the Additional Australian Litigation Claimants' contact information for the purpose of serving such individuals with the notice of commencement of Astora's chapter 11 case and (b) a limited permission to disclose the names and contact details of the Additional Australian Litigation Claimants in the Chapter 11 Case, in accordance with the Debtors' requested relief set forth in the chart above.  Where the Australian Court requires additional limitations on the use or disclosure of the Additional Australian Litigation Claimants' information or additional protections for those individuals, the Debtor Astora will inform this Court and may make further application to this Court or the Australian Court as appropriate.

*Id.* ¶ 44.  The Australian Court Order gives Astora the relief that the Debtors sought.  Although the Debtors have not expressly requested that the Court recognize and give effect to the Australian Court Order, the Court finds that the Debtors have satisfactorily raised the issue, and it is therefore appropriate to engage in a comity analysis for the limited purpose of determining whether to grant redaction relief consistent with the Australian court's ruling.  *CSL Australia Party Ltd. v. Britannia Bulkers PLC*, No. 08 Civ. 8290, 2009 WL 2876250, *3 (S.D.N.Y. Sept. 8, 2009) (noting that, in the bankruptcy context, the burden of establishing that international comity exists rests on the party asserting it, but the decision whether to grant international comity ultimately lies within the court's discretion); *cf. Maersk, Inc. v. Neewra, Inc.*, No. 05 Civ. 4356, 2008 WL 1986046, *2 (S.D.N.Y. May 7, 2008) (determining that a magistrate judge inappropriately raised the issue of international comity sua sponte in granting preclusive effect to a Kuwaiti judgment of $1,860,000).

identity theft, stalking, and intimate partner violence alike, and that publishing such information facilitates an identity thief's search for data and a stalker's or abuser's ability to find his or her target. *See, e.g.*, Hearing Transcript, *In re Art Van Furniture, LLC*, No. 20-10553 (Bankr. D. Del. Mar. 10, 2020) ("at this point and given the risks associated with having any kind of private information out on the internet, [redaction] has really become routine [and] I think obvious relief.") (ECF No. 82 at 25:13-16);[22] *see also* Hearing Transcript at 60:22–25, *In re Forever 21, Inc.*, No. 19-12122 (Bankr. D. Del. Dec. 19, 2019), ECF No. 605 ("We live in a new age in which the theft of personal identification is a real risk, as is injury to persons who, for personal reasons, seek to have their addresses withheld.").

Moreover, there is good reason for authorizing the Debtors to redact the home addresses and email addresses as requested herein, as the Debtors have demonstrated that the risks of identity theft, stalking, and intimate partner violence are real, not theoretical.[23]  In a report dated January 2019, the Department of Justice's Bureau of Justice Statistics estimated that 10 percent of persons 16 years of age and over reported being a victim of identity theft during a 12-month period, with total losses equaling $17.5 billion.[24]  Moreover, a report issued in November 2018 by the Centers for Disease Control found that approximately 16 percent of women and 5.8 percent of men are victims of stalking at some point in their lifetime, and approximately 1 in 3 people have

---

[22]    In that light, Chief Judge Sontchi noted that consideration of a request to redact under redactions under section 107(c) is not a "burden of proof" issue so "much as a common sense issue." Hearing Transcript at 25:6–7, *In re Art Van Furniture, LLC*, No. 20-10533 (Bankr. D. Del. Mar. 10, 2020), ECF No. 82.

[23]    In *In re Windstream*, Judge Robert Drain of this Court noted that the consequences of releasing private information could be "very serious," and "[o]nce [private information is] out there, it's out there." Hearing Transcript at 88:6-12, 89:5-8, *In re Windstream Holdings, Inc.*, No. 19-22312 (Bankr. S.D.N.Y. Feb. 26, 2019).  Likewise, in *GTT Commc'ns, Inc.*, my colleague Judge Michael Wiles noted that personally identifiable information, including addresses "has been misused in other cases, and I'll be darned if I'm going to let it be misused in one of mine." Hr'g Tr. at 78:12-19, *GTT Commc'ns., Inc.*, No. 21-11880 (Bankr. S.D.N.Y Nov. 4, 2021).

[24]    *See* Erika Harrell, *Victims of Identity Theft, 2016*, 2019 BUREAU OF JUSTICE STATISTICS 1, https://www.bjs.gov/content/pub/pdf/vit16.pdf.

experienced violence and/or stalking by an intimate partner during their lifetime.[25]  The Court can take judicial notice of the fact that identity theft is a world-wide problem.  *See, e.g.*, Daniel F. Miller et al., *Negligence at the Breach: Information Fiduciaries and the Duty to Care for Data*, 54 CONN. L. REV. 105 (2022); *see also In re Celsius Network, LLC*, 2022 WL 4492928 at *12–13 (extending relief under section 107(c) to individuals located in the US, European Economic Area ("EEA"), and UK); *Cox v. City of Charleston*, 250 F. Supp. 2d 582, 591 (D.S.C. 2003) ("Moreover, this court can take judicial notice that identity theft is an increasing worldwide problem").

The Court finds that the Debtors have demonstrated cause under section 107(c) of the Bankruptcy Code to redact the home addresses and email addresses of Individual Non-Litigation Claimants and Equity Holders located in the US, Canada, the UK, and the EU from any paper filed with the Court and/or otherwise made publicly available by the Debtors and their Claims and Noticing Agent and instead, (x) notate "Address on File" (Individual Equity Holders, Vendors and Contract Counterparties), (y) notate the Debtors' address of service (Former Employees), and (z) notate the individual's applicable business address (Current Employees).  In addition, the Debtors will (i) provide unredacted filings to the Court, the UST, the UCC, the OCC and any other party designated by further order of the Court; (ii) provide any other party in interest unredacted filings upon request made to the Debtors that the Debtors determine in good faith is reasonably related to the Chapter 11 Cases; and (iii) provide five (5) days' advance notice to the UST, the UCC, and the OCC, prior to determining whether to deny or grant any request for such unredacted filing.

---

[25]    *See* SHARON G. SMITH ET AL., CDC, NATIONAL INTIMATE PARTNER AND SEXUAL VIOLENCE SURVEY: 2015 DATA BRIEF—UPDATED RELEASE 5–6 (Nov. 2018).  A copy of the report is annexed as Exhibit K to the Reply.

Names, Home Addresses and Email Addresses of Individual Litigation
Claimants Located in the US, Canada, the UK, the EU and Australia.

The Court recognizes that the right of public access to judicial records gives rise to a "strong presumption and public policy in favor of public access to court records." *In re Borders Grp*., 462 B.R. at 46. But that right is not absolute. The court may protect private information in a judicial record upon an appropriate showing that the privacy interests outweigh the presumption of public access to the information and the judicial efficiencies realized through its use. Factors that courts consider in doing that test include:

> [T]he type of record requested, the information it does or might contain, the potential for harm in any subsequent nonconsensual disclosure, the injury from disclosure to the relationship in which the record was generated, the adequacy of safeguards to prevent unauthorized disclosure, the degree of need for access, and whether there is an express statutory mandate, articulated public policy, or other recognizable public interest militating toward access.

*In re Crawford*, 194 F.3d 954, 959 (9th Cir. 1999).

It is self-evident that "[i]ndividuals have privacy interests in their medical records." *In re Motions Seeking Access to 2019 Statements,* 585 B.R. at 752. The need to preserve those privacy interests is uniquely significant in "opioid" cases like these Chapter 11 Cases. The anecdotal evidence clearly demonstrates that Opioid PI Claimants, including those suffering from opioid use disorder ("OUD"), confront repercussions every day as a result of their affliction with OUD, since illicit drug use disorders are more likely to be viewed as a personal choice or a sign of weakness or "bad character." OCC Statement ¶ 3. "People with opioid use disorders are often perceived as dangerous and unpredictable, subject to high levels of social exclusion and may be considered unworthy of receiving government assistance with food or housing." Ali Cheetham et al., *The*

24

*Impact of Stigma on People with Opioid Use Disorder, Opioid Treatment, and Policy*, 13

SUBSTANCE ABUSE & REHAB. Jan. 25, 2022, at 1.[26]

Moreover, as the OCC contends, the societal reaction—potentially leading to loss of jobs

or housing situations—associated with being publicly revealed as suffering from OUD (or having

loved ones who have died from opioid overdose) remains both a real and credible risk that many

Opioid PI Claimants must consider in determining whether to participate in the Chapter 11 Cases.

OCC Statement ¶ 3.  The risk is particularly acute for mothers of children either diagnosed with

NAS or presenting conditions associated with maternal opioid use.[27]  That is because multiple

states have enacted laws requiring the reporting of NAS diagnoses,[28] as well as instituting civil

penalties for the use of opioids, among other drugs, during pregnancy.[29]  Although Individual

---

[26]    The United States Food and Drug Administration (the "FDA") reported that, in an FDA meeting with individuals suffering from OUD, "[m]ost participants shared experiencing stigma due to OUD. . . . A few participants also discussed the impact of stigma when securing housing or pursuing career opportunities due to criminal convictions on their record."   CENTER FOR DRUG EVALUATION & RESEARCH, U.S. FOOD & DRUG ADMIN., THE VOICE OF THE PATIENT: OPIOID USE DISORDER 9 (2018), https://www.fda.gov/media/124391/download.

[27]    *See* Rebecca Stone, *Pregnant Women and Substance Use: Fear, Stigma and Barriers to Care*, 3 HEALTH & J., Feb. 12, 2015, at 3 ("Contrary to claims that arresting and prosecuting pregnant women will encourage them to desist from substance use and thus improve maternal and fetal health, fear of detection and punishment presents a significant barrier to care for mothers and pregnant women. Women have reported that they delayed or avoided prenatal care altogether out of fear of punishment . . . ."); Andrea Weber et al., *Substance Use in Pregnancy: Identifying Stigma and Improving Care*, SUBSTANCE ABUSE & REHAB., Nov 23, 2021, at 113 ("Several studies have found that laws criminalizing substance use in pregnancy do not achieve intended outcomes (reduced substance use in pregnancy and reduced neonatal withdrawal syndromes) but rather people delay or avoid seeking prenatal care and substance use treatment altogether, due to fear of punishment such as involvement with [the child welfare system], loss [of] parental rights, or incarceration.").

[28]    *See, e.g.*, GA. CODE ANN. § 31-12-2 ("The [Georgia Department of Public Health] shall require notice and reporting of incidents of neonatal abstinence syndrome. A health care provider, coroner, or medical examiner, or any other person or entity the department determines has knowledge of diagnosis or health outcomes related, directly or indirectly, to neonatal abstinence syndrome shall report incidents of neonatal abstinence syndrome to the department."); 12 VA. ADMIN. CODE § 5-90-80(E) (Within one month of diagnosis, "[n]eonatal abstinence syndrome shall be reported by physicians and directors of medical care facilities when a newborn has been diagnosed with neonatal abstinence syndrome, a condition characterized by clinical signs of withdrawal from exposure to prescribed or illicit drugs" through the state health department's "online Confidential Morbidity Report portal").

[29]    *See State Laws and Policies: Substance Use During Pregnancy*, GUTTMACHER INST. (Aug. 1, 2022), https://www .guttmacher.org/state-policy/explore/substance-use-during-pregnancy ("24 states and the District of Columbia consider substance use during pregnancy to be child abuse under civil child-welfare statutes, and 3 consider it grounds for civil commitment.").

Litigation Claimants in the UK, Canada and EU, and the Named Individual Australian Litigation Claimants may not face civil penalties under local laws like those confronting the US Opioid PI Claimants, the disclosure of their names, including the names of the Surgical Mesh PI Claimants is every bit as prejudicial to those claimants. That is because in filing claims in these Chapter 11 Cases, those claimants necessarily would identify themselves as Opioid PI Claimants or Surgical Mesh PI Claimants and in doing so, run the risk of prejudice and embarrassment associated with being holders of such claims. Those factors clearly weigh against the unfettered disclosure of the identities of the Individual Litigation Claimants. So does the fact that such disclosure is not necessary to the orderly operation of these cases. As modified, the Motion is narrowly tailored to ensure that parties' ability to communicate with others is minimally affected while creating safeguards to limit personally identifiable information from becoming public.

"Under § 107(c), a bankruptcy court can deny access to even a person's name when that name appears in a filing that would necessarily associate them with an unfavorable medical condition." *In re Motions Seeking Access to 2019 Statements,* 585 B.R. at 752; *see also In re L.K.*, No. 05-13887, 2009 WL 1955455, at *2 (Bankr. E.D.N.Y. July 6, 2009) (redacting a debtor's full name and using initials under 11 U.S.C. § 107(b)(2) (limiting disclosure of scandalous matters) where an adversary proceeding contained medical and mental-health information). It is an

---

The OCC also cites an online news article that asserts there are "dozens of states with laws on the books that criminalize drug use during pregnancy." Emma Coleman, *Many States Prosecute Pregnant Women for Drug Use. New Research Says That's a Bad Idea*, ROUTE FIFTY (Dec. 5, 2019), https://www.route-fifty.com/health-human-services/2019/12/pregnant-women-drug-use/161701/. For that claim, the article relies on a statistical analysis of a proposed correlation between NAS and the "punitive" policies (including reporting laws) described in the Guttmacher Institute report, *supra*, which found that the punitive policies "were not associated with a reduction in NAS rates, and in fact, these policies may have been associated with an increase in rates of NAS." Laura J. Faherty, MD, MPH, MS et al., *Association of Punitive and Reporting State Policies Related to Substance Use in Pregnancy with Rates of Neonatal Abstinence Syndrome*, JAMA NETW. OPEN (Nov. 13, 2019), https://jamanetwork.com/journals /jamanetworkopen/fullarticle/2755304?utm_source=For_The_Media&amp%3butm_medium=referral&amp%3butm _campaign=ftm_links&amp%3butm_term=111319. While the characterization of civil child-welfare laws as criminal is not strictly accurate, the Court appreciates the arguments that punitive NAS policies can serve as a disincentive for mothers to file opioid claims, and that such punitive NAS policies (particularly reporting laws) may conceivably imply the threat of prosecution under separate, broader criminal statutes.

understatement to say that in identifying the Individual UK/EU/Canadian Litigation Claimants and the Named Individual Australian Litigation Claimants in filed documents, the Debtors will be associating them with an "unfavorable medical condition."  For that reason, and because in this case, there is no need for proving unfettered access to the contact information of the Individual Litigation Claimants, the Court finds that the Debtors have demonstrated grounds under section 107(c) to redact the names, home addresses and email addresses of the Individual Litigation Claimants located in the US, the UK, Canada and the EU, and of the Named Individual Australian Litigation Claimants from any paper filed with the Court and/or otherwise made publicly available by the Debtors and their Claims and Noticing Agent.

There is an additional ground for granting such relief.  In publishing the names of those claimants, the Debtors will heighten the risk to them of identity theft.  *See Attias v. CareFirst, Inc.*, 865 F.3d 620, 628 (D.C. Cir. 2017) (describing the risk of medical information disclosures leading to "'medical identity theft' in which a fraudster impersonates the victim and obtains medical services in her name"); *see also* Gregory S. Gaglione, *The Equifax Data Breach: An Opportunity to Improve Consumer Protection and Cybersecurity Efforts in America*, 67 BUFF. L. REV. 1133, 1181 n.257 (2019) (noting that medical identity theft "can cause the victim to receive improper medical care, have his or her medical insurance depleted, become disqualified for health or life insurance, or even become disqualified for some jobs").  As the Debtors noted, publishing a list of claimants' names in a searchable format would further compound the risk of identity theft, since that format would render the claimants' information more susceptible to data mining.  *See* Paul G. Stiles & Michael A. Fitts, *Research and Confidentiality: Legal Issues and Risk Management Strategies*, 17 PSYCH. PUB. POL. & L. 333, 337, 381 n.81 (2011) (noting that large data sets can be vulnerable "to data mining efforts for the purpose of identity theft").

Accordingly, pursuant to section 107(c), the Court authorizes the Debtors to redact the names, home addresses, and email addresses of the Individual Litigation Claimants located in the US, EU, and UK and of the Named Individual Australian Litigation Claimants from any paper filed with the Court and/or otherwise made publicly available by the Debtor and the Claims and Noticing Agent, and to notate instead "Name on File" and "Address on File."  In addition, the Debtors will (i) provide unredacted filings to the Court, the UST, the UCC, the OCC, and any other party designated by further order of the Court; (ii) provide any other party in interest unredacted filings upon request made to the Debtors that the Debtors determine in good faith is reasonably related to the Chapter 11 Cases; (iii) with respect to any requests concerning opioid litigation claimants' redacted information, the Debtors shall consult with the OCC, prior to determining whether to deny or grant such request; and (iv) provide five (5) days' advance notice to the UST, the UCC, and the OCC, prior to determining whether to deny or grant any request for such unredacted filing.

Application of the GDPR

Having determined that the home addresses and email addresses of Individual Non-Litigation Claimants and Equity Holders located in the US, Canada, the UK, and the EU and the names, home addresses and email addresses of Individual Litigation Claimants located in the US, Canada, the UK, the EU are protected from disclosure under section 107(c) of the Bankruptcy Code, the Court need not, and will not, consider whether to give effect to the GDPR and apply it in these Chapter 11 Cases.[30]

---

[30]    In *In re Celsius Network LLC*, 2022 WL 4492928, Chief Judge Martin Glenn considered whether to apply the UK GDPR and the EU GDPR in that chapter 11 case.  In that case, the debtors ran an online platform wherein their customers could deposit different types of cryptocurrency assets into accounts associated with their email addresses, as opposed to the industry standard of assigning account numbers.  The debtors sought leave under section 107 of the Bankruptcy Code to redact the following information from any paper filed with the Court:

<u>The Court Will Extend Comity to the Australian Court Order</u>

The Supreme Court has held that a foreign judgment should not be challenged in the US if

the foreign forum provides: "[A] full and fair trial abroad before a court of competent jurisdiction,

conducting the trial upon regular proceedings, after due citation or voluntary appearance of the

defendant, and under a system of jurisprudence likely to secure an impartial administration of

justice between the citizens of its own country and those of other countries, and there is nothing to

show either prejudice in the court, or in the system of laws under which it [is] sitting . . . ." *Hilton

v. Guyot*, 159 U.S. 113, 202–03 (1895); *see also In re Bd. of Dirs. of Hopewell Int'l Ins. Ltd.*, 238

B.R. 25, 60, 66–68 (Bankr. S.D.N.Y. 1999), *aff'd*, 275 B.R. 699 (S.D.N.Y. 2002) (concluding that

comity should be accorded to foreign court orders as long as "it is shown that the foreign court is

a court of competent jurisdiction, and that the laws and public policy of the forum state and the

---

(i) the home addresses and email addresses of any citizens of the US located in the US, including the Debtors' employees, individual shareholders, and individual customers, and

(ii) the names, home addresses, and email addresses of any citizens of the UK or EEA member countries and any individual whose citizenship is unknown

*Id.* at *10.  The Court rejected the debtors' contention that the home addresses and email addresses of their individual customers was commercial information under section 107(b)(1) of the Bankruptcy Code but authorized the redaction of such information for individual customers worldwide under section 107(c)(1) of the Code.  In so ruling, Judge Glenn found that the debtors had demonstrated that "[s]uch information, in combination with [the customers'] names, could make individual account holders more vulnerable to identify theft and render account holders' crypto assets more susceptible to criminal theft." *Id.* at *13.  He also found that the debtors had demonstrated that the public disclosure of the home addresses and email addresses of certain employees, directors, and officers would create undue risk of unlawful injury under section 107(c). *Id.* at *11–13.  However, the Court found that standing alone, the disclosure of the names of the debtors' employees, individual shareholders, and individual customers did not create undue risk of unlawful injury to them for purposes of section 107(c). *Id.* at *12.  In that light, Judge Glenn denied the debtors' request to redact the names of individual creditors located in the US and abroad.  In so ruling, the Court "remain[ed] unconvinced, beyond speculation, that the disclosure of names alone (without email or physical addresses) presents an imminent risk of harm." *Id.* at *14.  Moreover, the Court found no justification for affording greater protection to individuals in the EU and UK under the UK GDPR and the EU GDPR, than that afforded to their counterparts in the US. *Id.* at * 13 ("Ultimately, the Debtors provide no legal authority explicitly dictating why the UK GDPR and the EU GDPR should apply to the bankruptcy cases of the Debtors filed in the United States, or specifically, why the foreign laws would take precedence in a situation where United States law requires the disclosure of the information.").  In contrast to *Celsius,* here the Court does not need to reach the issue of the applicability of the GDPR, because the Court has determined that application of section 107(c) of the Bankruptcy Code protects the disclosure of the names of the Individual UK/EU Litigation Claimants.

rights of its residents will not be violated" (quoting *In re Gee*, 53 B.R. 891, 901 (Bankr. S.D.N.Y.

1985))).  In *Hilton*, the Supreme Court made clear that deference to a foreign court under principles

of comity contemplates a clear and formal record:

> the foreign judgment appears to have been rendered by a competent court, having
> jurisdiction of the cause and of the parties, and upon due allegations and proofs,
> and opportunity to defend against them, and its proceedings are according to the
> course of a civilized jurisprudence, and are stated in a clear and formal record . . .
> unless some special ground is shown for impeaching the judgment, as by showing
> that it was affected by fraud or prejudice, or that, by the principles of international
> law, and by the comity of our own country, it should not be given full credit and
> effect.

*Hilton v. Guyot*, 159 U.S. at 113; *see also Lloyd v. Am. Exp. Lines, Inc.*, 580 F.2d 1179, 1189 (3d

Cir. 1978) ("The test of acceptance . . . of foreign judgments for which domestic recognition is

sought, is whether the foreign proceedings accord with civilized jurisprudence, and are stated in

a clear and formal record.").

The Debtors filed the Australian Court Order and Reasons for Judgment, which establish

a clear and formal record, that is consistent with the relevant factors and favors granting comity.

The proceedings took place in the Federal Court of Australia, a competent court with jurisdiction

of the cause and parties.  The record demonstrates that the Australian Court's "proceedings are

according to the course of a civilized jurisprudence and are stated in a clear and formal record."

*In re PT Bakrie Telecom Tbk*, 628 B.R. 859, 879 (Bankr. S.D.N.Y. 2021).  For example, in making

its ruling, the Australian Court reviewed applicable US law and carefully outlined Australian legal

principles that permit the Australian Court to use its discretion to release a party from the implied

undertaking.  *See* Reasons for Judgment ¶¶ 17–18, 24–27.  Before granting the relief, the

Australian Court also considered whether the individuals whose personal information was at stake

would want to get notice of the Chapter 11 Cases.  In concluding that they would, the Australian

Court determined that the creditors would be likely to accept the inclusion of their names in the list of creditors. *Id.* at ¶ 32.

Furthermore, granting comity to the Australian Court Order would not offend the public policies underlying the Bankruptcy Code. The record demonstrates that there are significant similarities between the US and Australian proceedings. Specifically, both countries' insolvency proceedings require notification to creditors, as well as the compilation of a list of creditors. The Australian Court observed, "[t]he closest Australian equivalent to a US Chapter 11 proceeding is voluntary administration," in which a voluntary administrator is appointed to oversee the bankruptcy. That administrator is required "to give notice of the existence of the administration, the rights as creditors, and creditors' meetings to as many of the company's creditors as reasonably practicable." Reasons For Judgment, ¶ 75. Additionally, the directors of a company are required to list all the company's creditors in a report to the administrator, which the administrator must then lodge with the Australian securities commission. *Id.* ¶ 76. The Australian Court noted that, because no external administrator is appointed under chapter 11, the company itself "has obligations in the US to notify creditors and to file a list of creditors that are analogous to an Australian voluntary administrator's duty to notify creditors and the company directors' obligations to prepare a [report], which the voluntary administrator then lodges with [the securities commission]." *Id.* ¶ 77. In sum, the Australian Court determined that there are "closely analogous obligations in Australia and the US" and thus concluded that it was appropriate for the Australian Court to cooperate with Astora's request "to comply with its US Chapter 11 obligations without breaching Australian privacy legislation." *Id.* ¶ 78. Accordingly, the Australian court has clearly expressed that American and Australian insolvency proceedings both contain important

notification requirements for the benefit of creditors, and its decision was made in accordance with that shared public policy.  *See In re PT Bakrie Telecom Tbk*, 628 B.R. at 878.

At the crux of the matter, the Australian Court Order directly advances the privacy protections afforded by Section 107(c).  The Australian Court reasoned that "Australian creditors of Astora would be likely to accept the inclusion of their names in the list of [chapter 11] creditors, noting that their names would be redacted in the public documents and held in confidence by those persons entitled to receive the unredacted versions."  Reasons For Judgment, ¶ 32.  However, it went on to reason, "Given the inherently personal nature of a date of birth and the ever-present risk of this information becoming the subject of identity theft [the Australian Court] determined that this information, together with information of height, weight and [Australian] Medicare numbers must not be included in any information disclosed for the Permitted Purposes."  *Id.* ¶ 79.  The Australian Court Order and Reasons for Judgment provide essentially the same relief this Court has granted to the EU and UK Surgical Mesh PI Claimants under Section 107(c).  The Australian Court specifically considered the same protection against identity theft that Congress has enshrined in statute.  *Cf.* 11 U.S.C. § 107(c) ("The bankruptcy court, for cause, may protect an individual, with respect to the following types of information to the extent the court finds that disclosure of such information would create undue risk of identity theft.")  Likewise, the concern about the "inherently personal nature" of the restricted information mirrors the aforementioned American privacy interest in medical information, which is protected under Section 107(c).  *In re Motion Seeking Access to 2019 Statements*, 585 B.R. at 752.  Consistent with the foregoing, absent the Australian Court Order, this Court would grant essentially the same relief, requiring redaction of individual litigants' names under Section 107(c) in the ground that names would allow the public to infer that individual Astora claimants had received pelvic mesh implants.  *See id.*

32

The only differences between the Australian Court Order and the relief this Court grants to the Individual Litigation Claimants in the EU and UK are the Australian Court's restriction on the disclosure of the contact information of the Additional Individual Australian Litigation Claimants to the OCC, and the restriction on the use of certain biographical information and Australian Medicare numbers. The Australian Court reasoned that, because none of the Astora creditors "have any claims based on the production of opioid based pain medication because they were not products manufactured or distributed by Astora," the OCC does not need to receive disclosure of those creditors' information. Reasons For Judgment, ¶ 80. That reasoning accords with the relevant American privacy interests. *See In re Motion Seeking Access to 2019 Statements*, 585 B.R. at 752. As for dates of birth, height, weight, and Australian Medicare numbers, the Australian Court properly reasoned that dissemination of that information might facilitate identity theft. *Cf.* 11 U.S.C. § 107(c). Moreover, no party has sought that information in these proceedings, and it does not bear on the issue of creditor notification. Thus, the Australian restrictions on the uses of personally identifiable information are proper and warrant the extension of comity.

As a final matter, the Australian decision was not fraudulently obtained, and the record contains nothing even remotely suggesting fraud. The Court finds that all the requirements for extending comity to the Australian Court Order are met here, and therefore the contact information of the Additional Individual Australian Litigation Claimants should be redacted consistent with that order. For the avoidance of doubt, the Additional Individual Australian Litigation Claimants' personally identifiable information may be used only in: (i) providing notice in this case; (ii) preparing any list of creditors and any documents to be filed in the Bankruptcy Court "in which any information contained in such documents which is sourced from the Australian Documents shall be redacted"; and (iii) providing unredacted copies to the Bankruptcy Court, the UST, and

33

the UCC, provided that date of birth, height, weight, and Australian Medicare numbers are not disclosed in any information. Australian Court Order ¶ 1(a)–(d). For purposes of redacting any list of creditors or any documents to be filed in this Court, the Debtors shall redact the Additional Individual Australian Litigation Claimants' contact information consistent with the redactions that the Court has authorized herein for the Individual Litigation Claimants.

To summarize, the Court GRANTS the Motion and, pursuant to section 107(c) of the Bankruptcy Code and Bankruptcy Rule 1007(j), authorizes the Debtors as follows:

> To redact the home addresses and email addresses of Individual Non-Litigation Claimants and Equity Holders located in the US, Canada, the UK, and the EU from any paper filed with the Court and/or otherwise made publicly available by the Debtors and their Claims and Noticing Agent and instead,
>
>> (x) notate "Address on File" (Individual Equity Holders, Vendors and Contract Counterparties),
>>
>> (y) notate the Debtors' address of service (Former Employees), and
>>
>> (z) notate the individual's applicable business address (Current Employees).
>
> In addition, the Debtors will (i) provide unredacted filings to the Court, the UST, the UCC, the OCC and any other party designated by further order of the Court; (ii) provide any other party in interest unredacted filings upon request made to the Debtors that the Debtors determine in good faith is reasonably related to the Chapter 11 Cases; and (iii) provide five (5) days' advance notice to the UST, the UCC, and the OCC, prior to determining whether to deny or grant any request for such unredacted filing.
>
> To redact the names, home addresses, and email addresses of the Individual Litigation Claimants located in the US, EU, and UK, and the Named Individual Australian Litigation Claimants, from any paper filed with the Court and/or otherwise made publicly available by the Debtor and the Claims and Noticing Agent, and to notate instead "Name on File" and "Address on File." In addition, the Debtors will (i) provide unredacted filings to the Court, the UST, the UCC, the OCC, and any other party designated by further order of the Court; (ii) provide any other party in interest unredacted filings upon request made to the Debtors that the Debtors determine in good faith is reasonably related to the Chapter 11 Cases; (iii) with respect to any requests concerning Opioid Litigation Claimants' redacted information, the Debtors shall consult with the OCC, prior to determining whether

34

to deny or grant such request; and (iv) provide five (5) days' advance notice to the UST, the UCC, and the OCC, prior to determining whether to deny or grant any request for such unredacted filing.

To redact the names, home addresses, and email addresses of the Additional Individual Australian Litigation Claimants from any paper filed with the Court and/or otherwise made publicly available by the Debtor and the Claims and Noticing Agent, and to notate instead "Name on File" and "Address on File." In addition, the Debtors will provide unredacted filings to the Court, the UST, and the UCC, except that those filings shall not include the date of birth, height, weight, and Medicaid Numbers of the Additional Individual Australian Litigation Claimants.

<u>Withholding Publication of Certain Proofs of Claims</u>

In the Motion, the Debtors also requests the following form of relief:

In the event that it is determined that there will be recovery available for general unsecured creditors, the Debtors intend to seek a Bar Date Order that would, among other things, approve a tailored individual claim form and specific procedures designed to prevent the unintentional disclosure of . . . sensitive information. To avoid inadvertent disclosure of such information in any proofs of claim that may be filed by individuals before entry of any Bar Date Order, the Debtors also respectfully request that the Claims and Noticing Agent be authorized to (a) withhold publication of claims filed by individuals until entry of any Bar Date Order . . . *provided* that such proofs of claims . . . shall, upon request, be provided under seal to the Court, the U.S. Trustee, counsel to any official committee appointed in the Chapter 11 Cases, and any other party designated by further order of the Court, as appropriate.

Motion ¶ 25. The UST responded to this requested relief in a footnote, expressly reserving its rights "with respect to the Debtors' bar date motion." UST Obj. at 8 n.3. The UST did not specifically respond to the Motion's request to withhold publication of individuals' proofs of claims. *Id.*

The Debtors' Reply also refers to this contingent relief in a slightly modified fashion:

Separately, in the event that the Debtors seek entry of an order establishing deadlines for filing proofs of claim and granting related relief (the "Bar Date Order"), the Debtors intend to seek approval of a tailored individual claim form and specific procedures designed to prevent the unintentional disclosure of sensitive personal health information. To avoid inadvertent disclosure of such information in any proofs of claim that may be filed by personal injury claimants before entry of any Bar Date Order, the Debtors respectfully request that the Debtors' claims

35

and noticing agent . . . be authorized to withhold publication of claims filed by such claimants until entry of any Bar Date Order. The Debtors will provide unredacted proofs of claim to the Court, the U.S. Trustee, the OCC, the UCC, and any other party designated by further order of the Court.

Reply ¶ 6.

The Court grants the Debtors' request to withhold publication of individuals' proofs of claims to prevent the inadvertent disclosure of personally identifiable information, until such time as any bar date order is entered. Subject to terms of this Memorandum Decision and Order, the Debtors will provide unredacted versions of the proofs of claim to the Court, the UST, Trustee, the OCC, and the UCC.

## **Conclusion**

The Court GRANTS the Motion to the extent set forth herein.

IT IS SO ORDERED.

Dated: New York, New York
        November 2, 2022

/s/ *James L. Garrity, Jr.*
Hon. James L. Garrity, Jr.
U.S. Bankruptcy Judge