UNITED STATES BANKRUPTCY COURT                    NOT FOR PUBLICATION
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- x

*In re:*                                              :    Case No. 22-22549 (JLG)
                                                      :
Endo International plc, *et al.*,                     :    Chapter 11
                                                      :
                                        Debtors.[1]   :
                                                      :

------------------------------------------------------- x

**MEMORANDUM DECISION AUTHORIZING DEBTORS TO CONTINUE CERTAIN
EMPLOYEE BENEFIT PROGRAMS AND RELATED ADMINISTRATIVE
OBLIGATIONS**


<u>**A P P E A R A N C E S**</u> **:**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
*Attorneys for the Debtors and Debtors in Possession*
One Manhattan West
New York, New York 10001
<u>By:</u>     Paul D. Leake, Esq.
              Lisa Laukitis, Esq.
              Shana A. Alberg, Esq.
              Evan A. Hill, Esq.


WILLIAM K. HARRINGTON
UNITED STATES TRUSTEE, REGION 2
201 Varick Street, Room 1006
New York, New York 10014
<u>By:</u>     Paul K. Schwartzberg, Esq.

---

[1]    The last four digits of Endo International plc's tax identification number are 3755. Due to the large number of debtors in these Chapter 11 Cases, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.rakroll.com/Endo. The location of the Debtors' service address for purposes of these Chapter 11 Cases is: 1400 Atwater Drive, Malvern, PA 19355.

**HON. JAMES L. GARRITY, JR.**
**U.S. BANKRUPTCY JUDGE**

## Introduction[2]

The Debtors have filed a motion in these Chapter 11 Cases seeking authorization to pay prepetition wages, salaries, and employee benefits, to continue certain employee benefit programs, and to pay related administrative obligations under those programs (the "Motion").[3] As relevant, in the Motion, the Debtors seek authority to honor, pay, satisfy, or remit all claims and prepetition and post-petition obligations to rank-and-file, non-insider[4] eligible Employees under three programs: (1) the Long-Term Incentive Plan (the "LTIP"), (2) the Severance Plan, and (3) the Retention Programs (collectively, the "Contested Benefit Plans").[5]

In support of the Motion, as filed, the Debtors relied on the declaration of Mark Bradley, the Debtors' Chief Financial Officer, filed in support of the Chapter 11 Cases (the "Bradley Declaration").[6] The Debtors have since filed the declarations of Mark G. Barberio, the Chairman of the Board of Directors (the "Board") and a member of the Debtors' Compensation & Human Capital Committee (the "Compensation Committee") (the "Barberio Declaration"),[7] and Brian L.

---

[2]    Capitalized terms not defined herein shall have the meanings ascribed to them in the Bradley Declaration.

[3]    *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Pay Prepetition Wages, Salaries, Employee Benefits, and Other Compensation and (B) Continue Employee Benefits, and Other Compensation and (B) Continue Employee Benefits Programs and Pay Related Administrative Obligations; (II) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers; and (III) Granting Related Relief*, ECF No. 7. Hereinafter, references to "ECF No. ___" are references to documents filed on the electronic docket in case number 22-22549.

[4]    For these purposes the term "insiders" is as defined in section 101(31) of title 11 of the United States Code (the "Bankruptcy Code").

[5]    These programs are distinct from the incentive/retention programs that the Debtors maintain on behalf of potential insiders. The Debtors have not sought any relief with respect to those programs in the Motion, and no relief is granted to them herein with respect to those programs.

[6]    *Declaration of Mark Bradley in Support of Chapter 11 Petitions and First Day Papers*, ECF No. 38.

[7]    *Declaration of Mark G. Barberio in Support of Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Pay Prepetition Wages, Salaries, Employee Benefits, and Other Compensation and*

Cumberland, a managing director at Alvarez & Marsal North America, LLC, a global consulting

and restructuring advisory services firm, who has served as financial advisor to the Debtors since

May 2021 (the "Cumberland Declaration"),[8] in support of the Motion.

The Office of the United States Trustee (the "U.S. Trustee") filed an objection to the

Motion (the "Objection")[9] and a supplement to the Objection that focuses on the Contested

Benefit Plans (the "UST Supplement").[10] The Debtors filed a reply to the Objection,[11] and a

reply to the UST Supplement (the "Reply").[12] In support of the Reply, the Debtors submitted a

supplemental declaration of Tracy Basso, the Debtors' Chief Human Resources Officer (the

"Basso Declaration.").[13]

---

*(B) Continue Employee Benefits Programs and Pay Related Administrative Obligations; (II) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers; and (III) Granting Related Relief*, ECF No. 536.

[8]    *Declaration of Brian L. Cumberland in Support of Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Pay Prepetition Wages, Salaries, Employee Benefits, and Other Compensation and (B) Continue Employee Benefits Programs and Pay Related Administrative Obligations; (II) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers; and (III) Granting Related Relief*, ECF No. 537.

[9]    *United States Trustee's Objection to Debtors' Motion for Entry of a Final Order (I) Authorizing Debtors to (A) Pay Prepetition Wages, Salaries, Employee Benefits, and Other Compensation and (B) Continue Employee Benefits Programs and Pay Related Administrative Obligations; (II) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers; and (III) Granting Related Relief*, ECF No. 207.

[10]    *United States Trustee's Supplement to Objection to Debtors' Motion for Entry of Orders (I) Authorizing Debtors to (A) Pay Prepetition Wages, Salaries, Employee Benefits, and Other Compensation and (B) Continue Employee Benefits Programs and Pay Related Administrative Obligations; (II) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers; and (III) Granting Related Relief*, ECF No. 574.

[11]    *Debtors' Reply to the Objections to Debtors' Motion for Entry of Orders (I) Authorizing Debtors to (A) Pay Prepetition Wages, Salaries, Employee Benefits, and Other Compensation and (B) Continue Employee Benefits Programs and Pay Related Administrative Obligations; (II) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers; and (III) Granting Related Relief*, ECF No. 275.

[12]    *Debtor's Reply to the United States Trustee's Supplement to Objection to Debtors' Motion for Entry of Final Orders (I) Authorizing Debtors to (A) Pay Prepetition Wages, Salaries, Employee Benefits, and Other Compensation and (B) Continue Employee Benefits Programs and Pay Related Administrative Obligations; (II) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers; and (III) Granting Related Relief*, ECF No. 603.

[13]    (*Supplemental Declaration of Tracy Basso in Support of Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Pay Prepetition Wages, Salaries, Employee Benefits, and Other Compensation and (B) Continue Employee Benefits Programs and Pay Related Administrative Obligations; (II) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers; and (III) Granting Related Relief*), Reply, Ex. A.

The Court heard argument on the Motion. For the reasons set forth herein, the Court overrules and denies the Objection and authorizes the Debtors to honor, pay, satisfy, or remit all claims and prepetition obligations to non-insider eligible Employees under the Contested Benefit Plans, to the extent set forth in the Debtors' Proposed Final Order.[14]

## Jurisdiction

The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* dated January 31, 2012 (Preska, C.J.). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

## Background

On August 16, 2022 (the "Petition Date"), Endo International plc ("Endo Parent") and each of its debtor affiliates (collectively, the "Debtors" and, together with their non-debtor affiliates, the "Company" or "Endo") commenced voluntary chapter 11 cases in this Court (the "Chapter 11 Cases") by filing petitions for relief under chapter 11 of the Bankruptcy Code. On August 17, 2022, the Court entered an order authorizing the joint administration and procedural consolidation of the Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b).[15] The Debtors are authorized to continue to operate their businesses and to manage their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On September 2, 2022, the U.S. Trustee appointed an Official Committee of Unsecured Creditors

---

[14]    (Proposed *Final Order (I) Authorizing Debtors to (A) Pay Prepetition Wages, Salaries, Employee Benefits and Other Compensation and (B) Continue Employee Benefits Programs and Pay Related Administrative Obligations; (II) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers; and (III) Granting Related Relief*), Reply, Ex. B.

[15]    *Order (I) Directing Joint Administration of the Chapter 11 Cases Pursuant to Bankruptcy Rule 1015(b); (II) Waiving the Requirements of Section 342(c)(1) of the Bankruptcy Code and Bankruptcy Rule 2002(n); and (III) Granting Related Relief*, ECF No. 45.

4

(the "UCC")[16] and an Official Committee of Opioid Claimants (the "OCC")[17] in the Chapter 11

Cases. No trustee or examiner has been appointed in the cases.

Endo is a leading global specialty pharmaceutical company that develops and delivers

branded and generic products to customers in the U.S. and abroad. Bradley Declaration ¶ 1. As

of the Petition Date, the Debtors employ approximately 1,560 employees (the "Employees"), of

which approximately 170 are engaged in research and development, as well as clinical and

regulatory work; 480 are in sales, marketing, and business development; 450 are in

manufacturing; 200 are in quality assurance; and 260 are employed in general and administrative

roles and other capacities. *Id.* ¶ 145. The vast majority of the Debtors' workforce is based in the

United States (the "U.S."), with approximately 100 Employees located in Canada, and

approximately 90 in England, Ireland, and Luxembourg. *Id.*

In November 2020, the Debtors announced plans to optimize the Company's retail

generics business cost structure by, among other things, exiting their manufacturing sites in

Irvine, California and Chestnut Ridge, New York (the "2020 Restructuring Initiative"). *Id.* ¶ 173.

Sales of the Debtors' Irvine and Chestnut Ridge facilities closed in the fourth quarter of 2021. *Id.*

In April of 2022, the Debtors announced further plans to streamline and simplify certain

functions, including their commercial organization, to increase their overall organizational

effectiveness and better align with current and future needs (the "2022 Restructuring Initiative").

*Id.* In taking those actions, the Company expected to generate cost savings, a portion of which

was to be reinvested in 2022 to support the Company's key strategic priority to expand and

enhance its product portfolio. *Id.* In connection with the 2020 Restructuring Initiative and the

---

[16]    *Notice of Appointment of Official Committee of Unsecured Creditors*, ECF No. 161.

[17]    *Notice of Appointment of Official Committee of Opioid Claimants*, ECF No. 163.

2022 Restructuring Initiative, the Debtors recognize ongoing, phased reductions in their Employee workforce, and have incurred certain corresponding obligations. *Id.*

Historically, the Debtors have maintained various incentive programs to bring value to the Debtors' estates by encouraging Employees to achieve company-side, business segment and/or individual goals and targets. *Id.* ¶ 163. Approximately 1,540 of the Debtors' Employees are eligible for awards under the Contested Benefit Plans. *Id.* The Court briefly describes the Contested Benefit Plans at issue herein.

<u>Long-Term Incentive Plan</u>

The Company's current LTIP is designed to align the interests of eligible Employees with the Company's long-term goals, attract and motivate talented Employees by offering a comprehensive compensation package that is in line with the market, and recognize Employees' substantial contributions to the Company's overall performance. Bradley Declaration ¶ 165. Historically, through the LTIP, the Debtors issued Endo Parent equity-based awards to participating Employees, including stock options ("Options"), restricted stock units ("RSUs"), and performance share units ("PSUs" and, together with Options and RSUs, "Equity Compensation") that would then vest over a three- or four-year period. In February 2020, the Company changed to an all-cash LTIP. Barberio Declaration ¶ 11. At that time, compensating employees with Equity Compensation had become problematic because the Company's share price had fallen from a high of $96 per share in 2015 to approximately $6 per share. Many Employees had already paid income tax on and lost significant value on their existing shares and share-related holdings and were skeptical of non-cash compensation as an effective incentive. *Id.* Moreover, because maintaining Endo's historic compensation levels required ever-larger grants

6

of Equity Compensation, Endo's shareholders expressed concerns regarding share usage and dilution resulting from Endo's reduced share price. *Id.*

As of the Petition Date, the Debtors had an aggregate of approximately $36,000,000 in outstanding, unvested cash awards under the LTIP, payable in installments typically in March and September of each year through 2024. Bradley Declaration ¶ 166. Further, the Debtors have historically issued approximately $38,370,000 in cash awards under the LTIP per year and anticipate issuing approximately $370,000 in cash awards to approximately 40 Employees for the rest of year 2022. *Id.* By this Motion, the Debtors request authority to continue honoring and paying any granted but unvested cash awards pursuant to the LTIP. The Debtors further request authority to continue issuing cash awards under the LTIP in the ordinary course of business as part of their annual and new hire compensation review processes. For the avoidance of doubt, no payments will be made to insiders under the LTIP. Motion ¶ 34.

<u>Non-Insider Retention Programs</u>

The Debtors have historically instituted several retention programs to provide supplemental compensation to certain eligible non-insider Employees (collectively, the "Retention Programs"). Bradley Declaration ¶ 174. The awards are generally set as a percentage of the recipient's annual salary, based on various factors such as the recipient's seniority, performance, criticality to the Debtors' businesses, and retention risk. *Id.*

In the aggregate, the outstanding awards under the Retention Programs described herein total approximately $35,385,000. *Id.* ¶ 179. By this Motion, the Debtors request authority to make any outstanding payments under the programs as they come due in the ordinary course. *Id.* Eligibility for payments under all of the Retention Programs is subject to the condition that the participating Employee does not terminate voluntarily or is not terminated by the Debtors for

cause before such date, and no payments under the Retention Programs will be made to insiders.

*Id.*

The Debtors' Retention Programs include the following:

2020 Retention Programs

In connection with the 2020 Restructuring Initiative, in November 2020, the Debtors implemented a retention program (the "2020 Retention Program") to ensure a smooth transition of the Company's manufacturing operation in Irvine, California and Chestnut Ridge, New York, and to accomplish the overall goals of the 2020 Restructuring Initiative. Bradley Declaration ¶ 175. The Debtors assert that the majority of the retention payments relating to the 2020 Retention Program have already been made, but that approximately 5 employees have outstanding awards under the 2020 Retention Program, totaling approximately $145,000 through April of 2023. *Id.*

2021 Retention Program

The Debtors say that in response to "the overwhelmingly competitive nature of the pharmaceutical industry," they implemented a program to provide "generally equal scheduled payments in June 2022, December 2022, and June 2023" (the "2021 Retention Program"). *Id.* ¶ 176. They report that approximately 300 Employees have outstanding awards under the 2021 Retention Program, totaling approximately $17,500,000, through June of 2023. *Id.*

2022 Retention Program

In connection with the 2022 Restructuring Initiative, in July 2022, the Debtors implemented an additional retention program (the "2022 Retention Program") with a scheduled payout in September 2023. The 2022 Retention Program includes payments of approximately $17,100,000 to 390 employees. *Id.* ¶ 177.

Other Retention Programs

Historically, the Debtors have issued a variety of additional retention awards on an ad hoc basis for various purposes, including as a new hire incentive, for accepting a particular work assignment, or as a bonus for completion of a special project (the "Other Retention Programs"). *Id.* ¶ 178. These awards were granted at the discretion of an employee's supervisor or Company management, and they generally include lump sums payable in installments if the Employee remains with the Company as of the applicable retention date. The Debtors have granted awards under other retention programs, including incentive awards, sign-on bonuses, and other retention awards. *Id.* Approximately 30 Employees have outstanding awards

8

under the Other Retention Programs, totaling approximately $640,000, and the applicable payout and retention dates range through December 2025. *Id*.

Severance Plan

In 2015, the Company memorialized certain aspects of its past practice of providing severance payments and benefits under certain circumstances by putting in place a written severance policy applicable to Employees that are not subject to individual employment agreements with the Company. Bradley Declaration ¶ 211. In 2020 and 2021, the Company amended, restated, and modified its existing severance plan to account for certain changes affecting the Company in the ordinary course of business (the "Severance Plan"). *Id*. In the ordinary course, under the Severance Plan, the Debtors make a lump-sum payment to a terminated Employee through the Debtors' bi-weekly, weekly, or monthly payroll process after the terminated Employee executes a release of claims against the Debtors and certain other conditions are satisfied. *Id*. ¶ 212. Generally, that payment includes an amount based on the Employee's annual base salary or annualized regular rate of compensation that varies depending upon the Employee's position and length of service, any unpaid annual bonus earned for the fiscal year preceding the year in which the Employee was terminated, and accrued but unused vacation time. *Id*. Terminated Employees may also be entitled to payment of their COBRA premiums upon signing a release and separation agreement and electing continuing coverage, as well as certain outplacement services (collectively, the "Severance Obligations"). *Id*.

In connection with the 2020 Restructuring Initiative and the 2022 Restructuring Initiative, the Debtors have incurred certain additional Severance Obligations with respect to Employees that were terminated in connection with the corresponding reductions in force. *Id*. ¶ 213. In

addition to the benefits afforded to eligible Employees under the Severance Plan, individuals

scheduled for termination prior to a pending incentive plan vesting event are entitled to receive:

> (i) a cash in-lieu-of payment for Corporate Incentive Compensation Plan participants terminated on or after October 1st of the plan year, and prior to March 1st of the payment year, and

> (ii) accelerated vesting of select tranches of outstanding awards previously issued to certain terminated Employees under the LTIP, depending on the relevant date of their respective terminations.

*See id.*

The Debtors assert that having the authority to maintain the Severance Plan, along with

the additional Severance Obligations incurred as part of the 2020 Restructuring Initiative and

the 2022 Restructuring Initiative, is essential to their business in order to retain, motivate, and

provide security to their Employees. *Id.* ¶ 214. They assert that the majority of the Severance

Obligations relating to the 2020 Restructuring Initiative have already been paid, and that

currently, there are no former non-insider Employees who have outstanding payments due under

the non-insider Severance Plan. Bradley Declaration ¶ 215; Motion ¶ 86. Under a settlement that

the Debtors reached with the UCC and the OCC, any payments pursuant to the Severance Plan

will be capped at $17 million through December 2023, with certain reporting requirements

triggered prior to incurring any aggregate Severance Obligations in excess of $5 million.

Reply ¶ 17. By this Motion, the Debtors are seeking authority to continue the Severance Plan

solely with respect to the Debtors' non-insider Employees in the ordinary course of business.

Motion ¶ 86.

## The Motion

The Debtors contend that the Court should grant the Motion because the Contested

Benefit Plans are part of the ordinary course of their business and because they have

demonstrated sound business judgment in seeking authorization to make any outstanding payments under those programs as they come due in the ordinary course. *See* Motion ¶¶ 95-97. Alternatively, they contend that to the extent that the Court finds that any of the Contested Benefit Plans were not devised in the ordinary course of business, each is clearly and unequivocally justified under section 503(c)(3) of the Bankruptcy Code since each plan is "justified by the facts and circumstances of the case." *See* Reply ¶ 19.

The U.S. Trustee contends that the payments called for under the Contested Benefit Plans and at issue in the Motion are not ordinary course payments because "the Long-Term Incentive Plan recently switched from equity-based awards to cash payments, the Debtors only recently implemented the Retention Plans in contemplation of their bankruptcy filings, and the Debtors recently modified their Severance Plan to add additional cash benefits to severed employees." UST Supplement at 2. The U.S. Trustee argues that the Debtors cannot demonstrate that the Contested Benefit Plans are "justified by the facts and circumstances of the case" because (i) the Restructuring Support Agreement contemplates zero payment to general unsecured creditors, (ii) a private opioid settlement trust to pay certain opioid victims would be funded only with $85 million ten years from the Closing Date, or as little as $27,367,725.11 if funded on the Closing Date, and (iii) the Debtors made over $94 million in payments to insiders in the nine months prior to commencing these cases (with $35 million coming in the month prior to the Petition Date). *Id.* at 2-3. The U.S. Trustee also asserts that the Debtors have not disclosed sufficient information regarding the Contested Benefit Plans. It maintains that, for example, the Debtors have not disclosed the metrics for their LTIPs, and that without that information, the Court, the U.S. Trustee, and the parties in interest are not able to determine if such plans are reasonable and justified by the facts and circumstances of the case. *Id*. at 3.

The Court considers those matters below.

## Discussion

Section 363(b)(1) of the Bankruptcy Code permits a debtor to use estate property "other than in the ordinary course of business" after notice and a hearing. 11 U.S.C. § 363(b)(1). This provision is designed to allow a debtor in possession "the flexibility to engage in ordinary transactions without unnecessary creditor and bankruptcy court oversight, while protecting creditors by giving them an opportunity to be heard when transactions are not ordinary." *In re Roth Am., Inc.*, 975 F.2d 949, 952 (3d Cir. 1992); *see also United States ex rel. Harrison v. Est. of Deutscher (In re H & S Transp. Co.)*, 115 B.R. 592, 599 (M.D. Tenn. 1990) ("Section 363 is designed to strike [a] balance, allowing a business to continue its daily operations without excessive court or creditor oversight and protecting secured creditors and others from dissipation of the estate's assets.").

Neither the Bankruptcy Code nor the legislative history defines the term "ordinary" under section 363. *See, e.g., In re Roth Am.*, 975 F.2d at 952. However, "[t]he term 'ordinary course of business' generally has been accepted 'to embrace the reasonable expectations of interested parties of the nature of transactions that the debtor would likely enter in the course of its normal, daily business.'" *Med. Malpractice Ins. Ass'n v. Hirsch (In re Lavigne)*, 114 F.3d 379, 384 (2d Cir. 1997) (quoting *In re Watford*, 159 B.R. 597, 599 (M.D. Ga.1993), *aff'd*, 61 F.3d 30 (11th Cir. 1995) (unpublished table decision)); *see also Armstrong World Indus., Inc. v. James A. Phillips, Inc. (In re James A. Phillips, Inc.)*, 29 B.R. 391, 394 (S.D.N.Y. 1983) ("The touchstone of 'ordinariness' is thus the interested parties' reasonable expectations of what transactions the debtor in possession is likely to enter in the course of its business."). Thus, the "key" to assessing whether a transaction is an ordinary course transaction is "to distinguish

between routine operations (which a debtor can pursue without the need for individualized court approval) and transactions that are sufficiently unusual, unique or significant from the perspective of creditors that they require court approval." *In re Vill. Red Rest. Corp.*, No. 18-10960, 2021 WL 3889793, at *17 (Bankr. S.D.N.Y. Aug. 31, 2021). !

The evidence demonstrates, and the Court finds, that the Debtors manage and fund the Contested Benefit Plans as part of their routine operations, and thus, in the ordinary course of their business. It is undisputed that "[e]mployee compensation is considered and set on an annual basis, with updates made as necessary in response to developments to the Company's economic and financial outlook." Barberio Declaration ¶ 6. In undertaking that exercise, the Debtors employ "a comprehensive and measured approach to Employee compensation intended to yield total Employee compensation around the 50th percentile relative to Endo's market peers, inclusive of base salary and bonus opportunities, with long-term incentives used to align Employee and Company goals and reward outstanding Employee performance with additional compensation." *Id.* On an annual basis, the Debtors review and update their compensation programs "as necessary in response to developments to the Company's economic and financial outlook." *Id.*[18] In undertaking that exercise, Endo

aims to (i) pay Employees commensurate with the market in which Endo operates, with compensation updated yearly based on detailed and multi-layered review of

---

[18]    Mr. Barberio summarizes the very comprehensive and thorough process that Endo employs in fixing Employee compensation, as follows:

The compensation review begins in Endo's Human Resources department, which reviews Endo's past and current compensation practices, compensation surveys produced by reputable third parties, and other available data to produce compensation proposals that are then considered and approved by the Compensation Committee of the Board, which meets quarterly.

Each year, Endo's Human Resources professionals begin with existing compensation detail and then review updated survey information. Each year, Endo participates in and acquires the results of fulsome compensation surveys produced by Mercer Life Sciences, for Employees based in the United States, and Willis Towers Watson, for Employees based in the United States, Canada, and Ireland. The Mercer Life Sciences surveys provide Endo with data from 51 different companies in the pharmaceutical industry, reflected in three different surveys—All Industries, Life Sciences—

extensive industry data for each geographical area where Employees are located, and (ii) reward outstanding Employees who align their own goals and performance with those of the Company.

*Id*. ¶ 10.

The Debtors have maintained the LTIP since 2015 in order to offer "a comprehensive compensation package that is in line with the market and recognize Employees' substantial contributions to the Company's overall performance." Bradley Declaration ¶ 165. *See also* Barberio Declaration ¶ 29 ("We use the LTIP to align Employee incentives with those of the Company—if Employees take outstanding action to help the Company outperform its competitors, we allow them to out-earn their peers."). For eligible Employees, the LTIP is part of ordinary course, total direct compensation, along with their base salary and applicable bonus under either the Corporate Incentive Compensation Plan or Sales Incentive Compensation Plan, both of which have already been approved on a final basis by this Court. Basso Declaration ¶ 7. Currently, the LTIP is used and historically has been used by the Debtors to incentivize and reward the development of high-potential Employees across all departments, and it does not depend on Company-wide performance. *Id*. ¶ 9. The record reflects that the LTIP is a necessary

---

Pharmaceutical, and Endo Pharma Selected Market—that provide salary data for over 5,000 job titles each. The Willis Towers Watson U.S. surveys provide data from 1,042 different companies across all sectors, with salary data provided for over 13,000 job titles, and 102 companies in the pharmaceutical and health sciences industries, with salary data provided for nearly 8,000 job titles.

The data supplied by these surveys is taken and analyzed by Employees in Endo's Human Resources department, who compare Endo's employee job descriptions and titles to related job descriptions and titles in the surveys and produce detailed proposals that are ultimately reviewed and approved by Endo's Chief Human Resources Officer. Additional consideration is given to factors such as an Employee's time of service at the Company and annual performance reviews.

After approval from the Chief Human Resources Officer, proposed Employee compensation is sorted into bands and a summary is presented to the Compensation Committee for final approval.

Barberio Declaration ¶¶ 6-9.

14

part of the Debtors' ordinary course compensation, is highly individualized, is intended to incentivize the development of high potential Employees, and, excepting incidental overlap for certain sales Employees, does not overlap with either the Corporate Incentive Compensation Plan or Sales Incentive Compensation Plan. *Id.* ¶ 10.[19]

The evidence also shows that in February 2020, in the wake of the precipitous loss in Endo equity value, the Compensation Committee, in the ordinary course of its review of Employee compensation matters, and after considering a range of other options, authorized the Debtors to use cash-based long-term incentives to (i) address shareholder concerns regarding share usage and dilution resulting from Endo's reduced share price and (ii) serve as a separate mechanism to allow for predictable, realizable value opportunities for all LTIP-eligible Employees. Endo had previously used cash-based long-term incentives for a small subset of Employees but expanded the practice to align incentives for additional Employees with those of the Company. Barberio Declaration ¶ 11.

In 2015, the Debtors acquired Par Pharmaceutical ("Par"), a company which already had a universal severance policy for its employees before being acquired by Endo. After the acquisition, the Company created the Severance Plan for all of its Employees, "memorializ[ing] certain aspects of the Company's past practice and adopt[ing] other aspects of the newly

---

[19]    Ms. Basso explains that "[t]he metrics pursuant to which LTIP grants are awarded are highly individualized" and that the Debtors employ the following process in fixing the amount of the payments:

> [D]uring each year's compensation planning cycle, managers meet with the individual Employees under their supervision for annual performance reviews. The performance reviews look backward and forward: for the backward portion, the manager reviews the Employee's performance against the previous year's goals, in response to which the manager will recommend a corresponding level of LTIP grant, which will then vest in six month increments over the next three years; for the forward portion, the manager and Employee work together to help the Employee set goals for development over the coming year. In other words, during the 2023 compensation planning cycle which is anticipated to take place from December 2022 – March 2023, eligible Employees will receive LTIP grants for 2022 performance and set goals for 2023 performance.

Basso Declaration ¶ 9.

acquired company's historical practice." *Id.* ¶ 21. Thus, the Severance Plan has been part of the

Debtors' ordinary course of business for at least seven years. Additionally, "[i]n 2020 and 2021,

in connection with the Company's general practice of updating its corporate policies, the

Company amended, restated, and modified its existing Non-Insider Severance Plan to account

for certain changes affecting the Company in the ordinary course of business." *Id.*

 The Company has used the Retention Programs to maintain its workforce through

the 2020 and 2022 Restructuring Initiatives and the Chapter 11 Cases. The Company explains

that human capital is a critical asset, and workforce continuity is crucial. Endo cannot function

without its Employees, and attracting and training new talent is both more expensive and less

effective than keeping the talent already in house. Barberio Declaration ¶ 13. Indeed, over the

last four years, the Company has experienced an annual turnover rate of 10% in its workforce,

with the number rising to 11.5% in 2021, but the turnover has not been evenly distributed

Company-wide. The departments closest to the Company's contingency planning efforts have

been hit hardest, with certain U.S. departments losing so many Employees that it threatened their

ability to function effectively. *Id.* In the view of Company leadership, this meant that as the

Company approached a chapter 11 filing and more Employees became aware of these plans,

retaining internal talent and attracting high caliber external talent would only grow more

difficult. *See id.*

 The Company implemented the 2020 Retention Program—in the ordinary course of its

business—to counter the projected increase in attrition in connection with the 2020 Restructuring

Initiative. In doing so, the Company learned that retention payments serve a valuable retentive

purpose and can help the Company maintain workforce continuity in the face of challenges and

uncertainty, and, if anything, future retention programs needed to be more broadly applicable.

*See id.* ¶ 14. In 2021, Endo began to focus additional resources on contingency planning efforts

in connection with a possible financial restructuring of its businesses. The Company was in an

uncertain position in both reality and perception, and such uncertainty was and is deeply

damaging to Employee morale. *See id.* ¶ 15.

In 2021, as Endo considered the possibility of a bankruptcy filing and subsequent sales

process, the Company, as part of its Employee-related planning, approved the 2021 Retention

Program. That program is intended to incentivize Endo's Employees to remain with the

Company through June 2023, with payments spaced at regular intervals in December 2021, June

2022, December 2022, and June 2023. *Id.* ¶ 17. As (i) Endo's timeline for a restructuring shifted

and it became clear that any chapter 11 process might not be completed by June 2023 and (ii) the

Company's attrition rates among Employees included those receiving payments under the 2021

Retention Program, the Company decided to implement an additional retention program on a

broader basis. *See id.* ¶ 18. The Company approved the 2022 Retention Program in July 2022,

just over a month prior to the commencement of the Chapter 11 Cases. Under the 2022 Retention

Program, up to 390 Employees may receive payouts in the approximate aggregate amount

of $17,100,000 on the timeline agreed to with the UCC and OCC, with the goal being that

affected Employees stay with the Company through the closing of the sale of Endo's assets by

September 2023. *See id.* ¶ 19; *see also* Reply ¶ 27.

Where, as here, the Debtors have demonstrated that they maintain the Contested Benefit

Plans in the ordinary course of their business, the Court must determine whether the Debtors

have met their burden of demonstrating that their decision to continue funding those plans is

supported by their reasonable exercise of business judgment. *See, e.g.*, *In re Chateaugay Corp.*,

973 F.2d 141, 143 (2d Cir. 1992); *see also Comm. of Equity Sec. Holders v. Lionel Corp. (In re*

*Lionel Corp.)*, 722 F.2d 1063, 1070-71 (2d Cir. 1983) (holding that the application of section 363(b) must be supported by "some articulated business justification, other than appeasement of major creditors" and that "a judge determining a § 363(b) application [must] expressly find from the evidence presented before him at the hearing a good business reason to grant such an application"); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) ("[T]he debtor must articulate some business justification, other than mere appeasement of major creditors . . . ."). The Debtors plainly have met that burden. In seeking authorization to continue to fund the Contested Benefit Plans, the Debtors are not seeking to appease "major creditors." Rather, they are seeking leave to fund benefit programs that they correctly determined are vital to the Debtors' operations. It is settled that a debtor can satisfy the business judgment standard if "the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)). The Debtors easily satisfy that standard.

Section 503(b)(1)(A) of the Bankruptcy Code provides that there shall be allowed administrative expenses for "the actual, necessary costs and expenses of preserving the estate." *See* 11 U.S.C. 503(b)(1)(A). As explained above, maintaining the Contested Benefit Plans is necessary to preserve the value of the Debtors' estates. The Debtors have demonstrated that any cessation of payments under those plans could irreparably impair the Debtors' relationships with their employees and sink employee morale at a time when employee confidence in the business is undoubtedly critical. Accordingly, the Court finds that the payments contemplated under the Contested Benefit Plans constitute actual and necessary costs of preserving the Debtors' estates under section 503(b)(1)(A).

18

Moreover, and in any event, the Debtors have demonstrated that the relief they are seeking with respect to the Contested Business Plans passes muster under section 503(c)(3) of the Bankruptcy Code. The terms of that section are conjunctive, prohibiting payments outside of the ordinary course of business only if the payments are "not justified by the facts and circumstances of the case . . . ." 11 U.S.C. 503(c)(3); *see In re Aralez Pharms. US Inc.*, No. 18-12425, 2018 WL 6060356, at \*3 (Bankr. S.D.N.Y. Nov. 19, 2018) (citing *In re Borders Grp., Inc.*, 453 B.R. 459, 474 (Bankr. S.D.N.Y. 2011)). Even assuming, *arguendo*, that some or all of the payments at issue under the Contested Benefit Plans fall outside the ordinary course of the Debtors' business, the Debtors have demonstrated that all the payments called for under those plans are "justified by the facts and circumstances of the case" as required under section 503(c)(3).

The "facts and circumstances" justification test "creates a standard no different than the business judgment standard under section 363(b) of the Bankruptcy Code." *In re Velo Holdings, Inc.*, 472 B.R. 201, 209 (Bankr. S.D.N.Y. 2012); *In re Dana Corp.*, 358 B.R. 567, 576-77 (Bankr. S.D.N.Y. 2006) (describing six factors that courts may consider when determining whether the structure of a compensation proposal meets the "sound business judgment test" in accordance with section 503(c)(3) of the Bankruptcy Code). The business judgment standard is satisfied if the proposal is "within the fair and reasonable business judgment of the [d]ebtors and thus within the zone of acceptability," *In re Dana*, 358 B.R. at 572, and "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).

19

In *Dana,* this Court (Lifland, J.) listed the following factors that courts consider when determining if the structure of a compensation proposal and the process for its development meet the business judgment test:

(1) Is there a reasonable relationship between the plan proposed and the results to be obtained?

(2) Is the cost of the plan reasonable in the context of the debtor's assets, liabilities and earning potential?

(3) Is the scope of the plan fair and reasonable; does it apply to all employees; does it discriminate unfairly?

(4) Is the plan or proposal consistent with industry standards?

(5) What were the due diligence efforts of the debtor in investigating the need for a plan; analyzing which key employees need to be incentivized; what is available; what is generally applicable in a particular industry?

(6) Did the debtor receive independent counsel in performing due diligence and in creating and authorizing the incentive compensation?

*See In re Dana*, 358 B.R. at 576-77; *see also In re Borders Grp., Inc.*, 453 B.R. 459, 474 (Bankr. S.D.N.Y. 2011) (citing *Dana* factors in assessing whether compensation plan was justified by the facts and circumstances of the case); *In re Glob. Home Prods., LLC*, 369 B.R. 778, 786 (Bankr. D. Del. 2007) ("The court [in *Dana*], citing numerous cases, listed the factors courts use to determine . . . if the structure of a compensation proposal and the process for developing the proposal meet the 'sound business judgment' test . . . .").  As explained below, application of the *Dana* factors to the evidence before the Court demonstrates that the development of the Contested Benefit Plans is "justified by the facts and circumstances of the case" since they are the product of the Debtors' sound business judgment.

There is a reasonable relationship between the Contested Benefit Plans and the Debtors' goal of fairly compensating their Employees. The LTIP is designed to align the interests of

eligible Employees with the Company's long-term goals, as well as to attract and motivate

talented employees. Barberio Declaration ¶ 29. As discussed above, the program was achieving

that goal until 2020, when the "Equity Compensation" component of the LTIP lost so much

value that the provision of that compensation as part of the LTIP did not benefit either the

Employees or the Debtors. At that point, the Board, after considering a range of options, in the

exercise of its sound business judgment, authorized the use of cash-based long-term incentives to

(i) address shareholder concerns regarding share usage and dilution resulting from Endo's

reduced share price and (ii) serve as a separate mechanism to allow for predictable, realizable

value opportunities for all LTIP-eligible Employees. Endo had previously used cash-based long-

term incentives for a small subset of Employees but expanded the practice to align incentives for

additional Employees with those of the Company. *See id.* ¶ 11. As noted previously, the Debtors'

leadership implemented the non-insider Retention Programs in order to retain talent in the face of

increasing turnover rates amidst the Company's distressed financial situation. As Mr.

Cumberland noted, the 2020 Retention Program "achieved its objective of retaining key

Employees, resulting in a lower than projected voluntary turnover rate for covered Employees."

Cumberland Declaration ¶ 13. This in turn fostered the implementation of the 2021 and 2022

Retention Programs. Finally, the Debtors have demonstrated that the Severance Plan and the

additional Severance Obligations incurred in connection with the Restructuring Initiatives each

serve an important purpose in helping the Company retain and attract talent. Employees—and

potential new hires—are aware of the Company's distressed situation. They are aware that the

Company has considered and taken and will continue to consider and take action to position the

Company for the future—actions that may involve involuntary terminations. "What is in the best

interest of the Company is not always in the best interest of individual Employees, and [Endo's]

Employees must know that they are protected if their role is made redundant by a decision of which they had no part." Barberio Declaration ¶ 24.

The Court finds that the cost of the plan is reasonable in the context of the Debtors' assets, liabilities, and earning potential. In reaching that conclusion, the Court notes that Debtors have worked closely with the UCC and OCC to address their questions and respond to diligence requests regarding, among other things, the Contested Benefit Plans. Reply ¶ 5. Through that process, the Debtors have made concessions to the committees and have agreed to cap payments under the plans to amounts acceptable to the committees. *See, e.g.*, *id.* ¶¶ 9, 17. The Court finds it significant that the committees, as parties in interest with economic stakes in these Chapter 11 Cases, do not object to the Motion as modified to address their concerns with the cost of the programs.

The scope of the Contested Benefit Plans is fair and reasonable, as they apply to all non-insider Employees. The LTIP is awarded based on "Employees' substantial contributions to the Company's overall performance." Bradley Declaration ¶ 165. The non-insider Retention Programs are granted for "various purposes, including as a new hire incentive, for accepting a particular work assignment, or as a bonus for completion of a special project." *Id.* ¶ 178. Additionally, "[t]he Debtors issue retention awards to Employees the Debtors believe are essential to achieving the goals and objectives of the organization and maximizing value for all stakeholders." *Id.* ¶ 174.

The Contested Benefit Plans are consistent with industry standards. Mr. Cumberland reviewed each Contested Benefit Plan alongside market surveys, indicating that such plans are consistent with industry standards. Mr. Cumberland found that the LTIP's grants "equal 31% of base salary on average, with a median of 19% . . . [,]" which is "reasonably sized as a percentage

of base salary and of target total direct compensation" after comparing it with incentive pay practices at other public companies, based on a WorldatWork survey. Cumberland Declaration ¶ 17, 18. In reviewing the Retention Programs, Mr. Cumberland found that "the cost per participant across the two programs is between the 50th and 75th percentile relative to the Peer Group." *Id.* ¶ 15. Even though the programs fall on the slightly higher end among the Peer Group and that "the percentage of employees eligible for the 2021 and 2022 Retention Programs is greater than the majority of comparable programs," Mr. Cumberland found "the Company's decision to expand the covered Employee population [and the programs, in general, to be] reasonable in light of the Company's significant retention challenges . . . and [are] consistent with steps that other companies experiencing long periods of distress have taken." *Id.* Finally, Mr. Cumberland concluded that the Severance Plan is "generous, but aligned with market standards at every level of Employee seniority, both in severance pay and outplacement of benefits." *Id.* ¶ 20. Since January 1, 2016, Endo has paid out approximately $159.4 million in severance to 2,131 former Employees. *Id.* ¶ 21.

The Debtors engaged in significant due diligence efforts in investigating the need for the Contested Benefit Plans. Every year, the Debtors' Human Resources department and Compensation Committee review Endo's compensation practices and update them as necessary in response to developments to the Company's economic and financial outlook. Barberio Declaration ¶ 6. Thus, as noted previously, each Contested Benefit Plan and subsequent corresponding update has been implemented as a result of the Company's diligence in assessing the economic challenges facing the Company. For example, the Debtors amended the LTIP to award cash payments instead of stock in response to the precipitous drop of its stock price. *Id.* ¶ 11. The non-insider Retention Programs were implemented in response to the 2020 and 2022

Restructuring Initiatives and to significant turnover rates. *Id.* ¶ 13. Finally, the Severance Plan

was implemented subsequent to the Company's acquisition of Par, and the subsequent updates in

2020 and 2021 occurred in connection with terminations made as a result of the 2020 and 2022

Restructuring Initiatives. *Id.* ¶¶ 21-22. Thus, each plan was implemented and has been

maintained as a result of the Debtors' significant diligence and rigorous process for maintaining

its compensation programs.

Finally, in 2021, the Debtors retained Mr. Cumberland as an independent financial

advisor, in part, "to opine on the reasonableness" of the Contested Benefit Plans. Cumberland

Declaration ¶ 11. As reflected in his thorough and unchallenged analysis, the plans are

reasonable and in line with market standards. *See id.* ¶ 8.

To summarize, the Court finds that the Debtors have demonstrated that the Contested

Benefit Plans, and the payments called for thereunder, are "justified by the facts and

circumstances of the case." Accordingly, to the extent section 503(c)(3) is relevant to the

Motion, the Debtors have established grounds for relief under that section.

In reaching this conclusion, the Court finds no merit to the U.S. Trustee's contention that

the Court should deny the Debtors' request to maintain and fund the Contested Benefit Plans

because (i) the Restructuring Support Agreement contemplates zero payment to general

unsecured creditors, (ii) a private opioid settlement trust to pay certain opioid victims would only

be funded with $85 million ten years from the Closing Date, or as little as $27,367,725.11 if

funded on the Closing Date, and (iii) the Debtors made over $94 million in payments to insiders

in the nine months prior to commencing these cases (with $35 million coming in the month prior

to the Petition Date). UST Supplement at 2-3.

There is no merit to the first two points because the evidence is clear that without providing the Employees the benefits under the Contested Benefit Plans, there is a high likelihood that the Debtors will not be able to retain their work force and, as such, will have difficulties attempting to implement the exit strategy for the Chapter 11 Cases contemplated in the Restructuring Support Agreement, including the establishment and funding of opioid settlement trusts for the benefit of opioid victims. It is telling that although neither the UCC nor OCC has "signed on" to the transactions contemplated by the Restructuring Support Agreement (and reserve all their rights with respect thereto), both support the relief that the Debtors are seeking with respect to the Contested Benefit Plans.

Moreover, in filing the Motion, the Debtors are not seeking approval of the $94 million in prepetition payments to alleged insiders, or of any other transactions relating to insiders. Indeed, in the Motion, the debtors repeatedly assert that they are seeking approval of the payments for non-insiders only. Motion ¶ 3.[20]

### Conclusion

Based on the foregoing, the Court overrules and denies the Objection and authorizes the Debtors to honor, pay, satisfy, or remit all claims and prepetition obligations to non-insider eligible Employees under the Contested Benefit Plans, to the extent set forth in the Debtors' Proposed Final Order.

---

[20]    The Debtors assert the following:

> By this Motion, the Debtors also seek the authority, solely upon the entry of the Proposed Final Order, to (a) honor, pay, satisfy, or remit all claims and prepetition obligations related to the following Compensation and Benefits Programs: Retention Programs (for non-insider Employees only) . . . Employee Bonus Plans other than the Spot Awards (for non-insider Employees only), and the Severance Plan (for non-insider Employees only).

Motion ¶ 3.

The Debtors are directed to submit the Proposed Final Order.


Dated: New York, New York
      November 14, 2022

/s/ *James L. Garrity, Jr.*
Hon. James L. Garrity, Jr.
U.S. Bankruptcy Judge