**Hearing Date: December 15, 2022 at 11:00 a.m. (Prevailing Eastern Time)**
**Objection Deadline: December 8, 2022 at 4:00 p.m. (Prevailing Eastern Time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Paul D. Leake
Lisa Laukitis
Shana A. Elberg
Evan A. Hill
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
Fax: (212) 735-2000

*Counsel to Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re* | Chapter 11 |
| **ENDO INTERNATIONAL plc, *et al.*,** | **Case No. 22-22549 (JLG)** |
| **Debtors.**[1] | **(Jointly Administered)** |

## NOTICE OF HEARING ON THE DEBTORS' MOTION FOR AN ORDER (I) ESTABLISHING BIDDING, NOTICING, AND ASSUMPTION AND ASSIGNMENT PROCEDURES, (II) APPROVING CERTAIN TRANSACTION STEPS, (III) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS AND (IV) GRANTING RELATED RELIEF

**PLEASE TAKE NOTICE** that the debtors and debtors-in-possession in the above-captioned jointly administered bankruptcy cases (collectively, the "Debtors") hereby file the *Debtors' Motion for an Order (I) Establishing Bidding, Noticing, and Assumption and Assignment Procedures, (II) Approving Certain Transaction Steps, (III) Approving the Sale of Substantially all of the Debtors' Assets and (IV) Granting Related Relief* (the "Motion").[2]

---

[1]    The last four digits of Debtor Endo International plc's tax identification number are 3755. Due to the large number of debtors in these chapter 11 cases, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Endo. The location of the Debtors' service address for purposes of these chapter 11 cases is: 1400 Atwater Drive, Malvern, PA 19355.

[2]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

PLEASE TAKE FURTHER NOTICE that the hearing (the "Hearing") on the Motion will be held on **December 15, 2022, at 11:00 a.m. (Prevailing Eastern Time)** before the Honorable James L. Garrity, Jr., United States Bankruptcy Judge for the Southern District of New York, in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), Courtroom 723, One Bowling Green, New York, NY 10004-1408.

PLEASE TAKE FURTHER NOTICE that the Hearing will be conducted both in person and "live" via Zoom for Government. Parties wishing to participate in person or via a "live" or "listen only" line must make an electronic appearance through the "eCourtAppearances" tab on the Court's website, https://www.nysb.uscourts.gov/ecourt-appearances, no later than **December 13, 2022, at 11:00 a.m. (Prevailing Eastern Time)** (the "Appearance Deadline"). Following the Appearance Deadline, the Court will circulate by e-mail the Zoom link to those parties who have made an electronic appearance. Parties wishing to appear in person at the Hearing must submit an electronic appearance through the Court's website by the Appearance Deadline and not by emailing or otherwise contacting the Court.

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion or the relief requested therein must be made in writing, filed with the Bankruptcy Court, One Bowling Green, New York, NY 10004-1408, and served so as to be received by the following parties no later than **December 8, 2022, at 4:00 p.m. (Prevailing Eastern Time)**:

(i)     the Honorable James L. Garrity, Jr., United States Bankruptcy Judge for the Southern District of New York, United States Bankruptcy Court for the Southern District of New York One Bowling Green, Courtroom 723, New York, NY 10004-1408;

(ii)    counsel for the Debtors, Skadden, Arps, Slate, Meagher & Flom LLP, One Manhattan West, New York, NY 10001, Attn:  Paul D. Leake, Esq. (paul.leake@skadden.com); and Lisa Laukitis, Esq. (lisa.laukitis@skadden.com);

(iii)   co-counsel for the Debtors, Togut, Segal & Segal LLP, One Penn Plaza, Suite 3335, New York, NY 10119, Attn: Albert Togut, Esq.  (altogut@teamtogut.com) and Kyle J. Ortiz, Esq. (kortiz@teamtogut.com);  and

(iv)    the Office of the United States Trustee for the Southern District of New York (the "United States Trustee"), 201 Varick Street, Suite 1006, New York, NY 10014, Attn: Paul Schwartzberg,    Esq.    (Paul.Schwartzberg@usdoj.gov)    and    Susan    Arbeit,    Esq. (Susan.Arbeit@usdoj.gov).

**PLEASE TAKE FURTHER NOTICE** that a copy of the Motion along with its underlying exhibits thereto can be viewed and/or obtained by:  (i) accessing the Court's website at www.nysb.uscourts.gov, (ii) contacting the Office of the Clerk of the Court at United States Bankruptcy Court for the Southern District of New York, or (iii)  on the website of the Debtors' claims    and    noticing    agent,    Kroll    Restructuring    Administration    LLC,    at https://restructuring.ra.kroll.com/Endo; or by contacting Kroll directly at (877) 542-1878 (toll free for callers within the United States and Canada) and (929) 284-1688 (for international callers).

**PLEASE TAKE FURTHER NOTICE** that if no Objections to the approval of the Motion are timely filed and received in accordance with the above procedures, the Court may grant the relief requested in the Motion without further notice of a hearing.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

Dated:    November 23, 2022
          New York, New York

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

*/s/ Paul D. Leake*
Paul D. Leake
Lisa Laukitis
Shana A. Elberg
Evan A. Hill
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
Fax: (212) 735-2000

*Counsel to Debtors and Debtors in Possession*

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Paul D. Leake
Lisa Laukitis
Shana A. Elberg
Evan A. Hill
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
Fax: (212) 735-2000

*Counsel to Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re* | **Chapter 11** |
| **ENDO INTERNATIONAL PLC, et al.,** | **Case No. 22-22549 (JLG)** |
| **Debtors.**[1] | **(Jointly Administered)** |

---

### DEBTORS' MOTION FOR AN ORDER (I) ESTABLISHING BIDDING, NOTICING, AND ASSUMPTION AND ASSIGNMENT PROCEDURES, (II) APPROVING CERTAIN TRANSACTION STEPS, (III) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS AND (IV) GRANTING RELATED RELIEF

---

[1]    The last four digits of Debtor Endo International plc's tax identification number are 3755. Due to the large number of debtors in these chapter 11 cases, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Endo. The location of the Debtors' service address for purposes of these chapter 11 cases is: 1400 Atwater Drive, Malvern, PA 19355.

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT .......................................................................................1

RELIEF REQUESTED...................................................................................................5

JURISDICTION AND VENUE ........................................................................................6

BACKGROUND ...........................................................................................................7

I.       Marketing and Sale Process ...........................................................................7

II.      The Stalking Horse Agreement......................................................................9

III.     Reconstruction Steps...................................................................................12

IV.    The Bidding Procedures...............................................................................26

V.      Extraordinary Provisions Under the Sale Guidelines .......................................29

VI.    Key Dates and Deadlines .............................................................................30

VII.   Sale Notice Procedures ...............................................................................32

        A.     Delivery of the Sale Notice to the Sale Notice Parties ...........................32

        B.     Supplemental Notice Plan.................................................................32

        C.     Noticing Cost Efficiencies ................................................................34

VIII.  Assumption and Assignment Procedures........................................................36

BASIS FOR RELIEF....................................................................................................36

I.       The Bidding Procedures Are Fair and Are Designed to Maximize the Value Received for the Assets.............................................................................36

II.      The Debtors Should Be Authorized to Carry Out the Reconstruction Steps.....................40

III.     The Expense Reimbursement Amount Is Reasonable and Appropriate and Should Be Approved. .......................................................................................46

IV.    The Sale Notice Procedures Should Be Approved .........................................47

V.      Approval of the Sale Is Warranted under Section 363(b) of the Bankruptcy Code. .........49

        A.     A Sound Business Justification Exists for the Sale. ...............................50

B.     The Sale Is Fair and Reasonable Under the Circumstances. ...............................53

C.     The Successful Bidder Should be Entitled to the Protections of Section 363(m) of the Bankruptcy Code. ...............................................................53

VI.     The Proposed Sale Satisfies the Requirements of Section 363(f) of the Bankruptcy Code for a Sale Free and Clear of All Encumbrances, Including Successor Liability Claims. ......................................................................................................55

VII.     Credit Bidding Should Be Authorized Under Section 363(k) of the Bankruptcy Code. ...............................................................................................................................57

VIII.     Assumption and Assignment of the Assigned Contracts Should Be Authorized. .............58

A.     The Assumption and Assignment Procedures Reflect the Debtors' Reasonable Business Judgment. ...................................................................................58

B.     Defaults Will Be Cured in Connection with the Sale. ..........................................60

C.     Adequate Assurance of Future Performance Will Be Provided to Counterparties. .....................................................................................................60

D.     The Treatment of the Business Contracts Pursuant to the Reconstruction Steps Is Appropriate. ...............................................................................................61

RESERVATION OF RIGHTS ..................................................................................................62

WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(h) ..................................................63

NOTICE ......................................................................................................................................63

NO PRIOR REQUEST ...............................................................................................................64

## TABLE OF AUTHORITIES

### CASES

*Chemetron Corp. v. Jones*, 72 F.3d 341 (3d Cir. 1995) ............................................ 47

*In re Beker Indus., Inc.*, 63 B.R. 474 (Bankr. S.D.N.Y. 1986) .................................... 56

*In re Best Prods. Co.*, 140 B.R. 353 (Bankr. S.D.N.Y. 1992) ..................................... 48

*In re Bos. Generating, LLC*, 440 B.R. 302, 321 (Bankr. S.D.N.Y. 2010) .............................. 40, 56

*In re Bygaph, Inc.*, 56 B.R. 596 (Bankr. S.D.N.Y. 1986) ........................................... 60

*In re Celsius Network LLC*, No. 22-10964 (MG), 2022 WL 14193879 (Bankr. S.D.N.Y. Oct. 24, 2022) ............................................................................................ 36

*In re Chateaugay Corp.*, No. 92 CIV. 7054 (PKL), 1993 WL 159969 (S.D.N.Y. May 10, 1993) ................................................................................................. 54

*In re Colony Hill Assocs.*, 111 F.3d 269 (2d Cir. 1997) ............................................ 55

*In re Ditech Holding Corp.*, No. 19-10412 (JLG) (Bankr. S.D.N.Y. Apr. 23, 2019) .................. 39

*In re Dura Auto. Sys., Inc.*, No. 06-11202 (KJC), 2007 WL 7728109 (Bankr. D. Del. Aug. 15, 2007) ................................................................................................... 37

*In re Garrett Motion Inc.*, No. 20-12212 (MEW) (Bankr. S.D.N.Y. Oct. 24, 2020) ............. 38, 39

*In re Gen. Motors Corp.*, 407 B.R. 463 (Bankr. S.D.N.Y. 2009) ................................... 50

*In re Klein Sleep Prods., Inc.*, 78 F.3d 18 (2d Cir. 1996) ........................................... 58

*In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983) ........................................ 40, 49, 50

*In re Mallinckrodt plc*, No. 20-12522 (JTD) (Bankr. D. Del. Nov. 25, 2020) ................ 45, 48, 59

*In re NII Holdings, Inc.*, No. 14-12611 (SCC) (Bankr. S.D.N.Y. Feb. 17, 2015) ........................ 45

*In re Penn Traffic Co.*, 524 F.3d 373 (2d Cir. 2008) ................................................... 58

*In re Purdue Pharma L.P.*, No. 19-23649 (RDD) (Bankr. S.D.N.Y. Feb. 2, 2020) ............... 48, 59

*In re QHC Facilities*, No. 21-01643-als11 (Bankr. S.D. Iowa Feb. 11, 2022) ............................ 38

*In re Residential Cap., LLC*, No. 12-12020 (MG), 2015 WL 2256683 (Bankr. S.D.N.Y. May 11, 2015) ............................................................................................... 48

*In re Stadium Mgmt. Corp.*, 895 F.2d 845 (1st Cir. 1990) ........................................................ 54

*In re Synergy Pharm., Inc.*, No. 18-14010 (JLG) (Bankr. S.D.N.Y. Jan. 17, 2019) ..................... 39

*In re TK Holdings Inc.*, No. 17-11375 (BLS) (Bankr. D. Del. Nov. 14, 2017) ................ 44, 45, 48

*In re Valaris plc*, No. 20-34114 (MI) (Bankr. S.D. Tex. Dec. 21, 2020) ...................................... 45

*In re White Star Petroleum Holdings, LLC*, No. 19-12521-JDL (Bankr. W.D. Okla. July 12, 2019) ......................................................................................................................................... 39

*Licensing by Paolo, Inc. v. Sinatra (In re Gucci)*, 126 F.3d 380 (2d Cir. 1997) ......................... 54

*Mullane v. Cent. Hanover Bank & Tr.*, 339 U.S. 306 (1950) ....................................................... 47

*Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650 (S.D.N.Y. 1992) ................................................................................................ 46

*Official Comm. of Unsecured Creditors of LTV Aerospace & Def. Co. v. LTV Corp. (In re Chateaugay Corp.)*, 973 F.2d 141 (2d Cir. 1992) ............................................................. 49, 50

*Vancouver Women's Health Collective Soc'y v. A.H. Robins Co., Inc.*, 820 F.2d 1359 (4th Cir. 1987) ......................................................................................................................................... 48

## STATUTES

11 U.S.C. § 105 ...................................................................................................................... 7, 36

11 U.S.C. § 363 ........................................................................................................................ passim

11 U.S.C. § 365 ........................................................................................................... 7, 58, 60, 62

11 U.S.C. § 503 .............................................................................................................................. 7

28 U.S.C. § 1334 ............................................................................................................................ 6

28 U.S.C. § 1408 ............................................................................................................................ 7

28 U.S.C. § 1409 ............................................................................................................................ 7

28 U.S.C. § 157 .............................................................................................................................. 6

Companies Act 2014 (Act No. 38/2014) (Ir.) ........................................................... 17, 20, 23, 43

## RULES

Fed. R. Bankr. P. 2002 ............................................................................................................. passim

Fed. R. Bankr. P. 6004 ............................................................................................................. 7, 63

Fed. R. Bankr. P. 6006 ........................................................................................................... 7

Fed. R. Bankr. P. 9007 ........................................................................................................... 7

Fed. R. Bankr. P. 9008 ..................................................................................................... 7, 48

LBR 6006-1 .............................................................................................................................. 7

LBR 9006-1 .............................................................................................................................. 7

LBR 9013-1 ............................................................................................................................ 64

## OTHER AUTHORITIES

Amended Standing Order of Reference M-431 ............................................................... 6

Guidelines for the Conduct of Assets Sales ............................................................... 7, 29

Endo International plc and its debtor affiliates, as debtors and debtors in possession (collectively, the "Debtors" and together with their non-Debtor affiliates, the "Company")[2] in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), respectfully represent in support of this bidding procedures and sale motion (this "Motion") as follows:

## PRELIMINARY STATEMENT

1.      After careful consideration of all potential restructuring alternatives, the Debtors have devised a value-maximizing process for the sale of substantially all of their assets (the "Sale"). To that end, the Debtors have reached an agreement with holders of a majority of their first-lien debt to serve (through a separate entity) as the stalking-horse bidder in connection with a chapter 11 sale process. The proposed Stalking Horse Bidder has agreed to:

(a)      credit bid the full amount of the $5.9 billion of Prepetition First Lien Indebtedness;

(b)      offer employment to all of the Debtors' employees on their current terms;

(c)      assume and cure a significant number of trade contracts;

(d)      establish voluntary trusts funded with up to $550 million over time, which will be disbursed to eligible opioid claimants who elect to participate in such trusts;

(e)      provide at least $122 million in cash to wind down the Debtors' operations following the sale; and

(f)      fund pre-closing professional fees.

2.      Further, the Debtors have set up an extensive marketing process that will allow them to work to attract a higher or otherwise better bid over the course of lengthy, approximately four-month formal marketing period.[3] During that time, the Debtors hope to attract an overbid that

---

[2]    Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the First-Day Declaration, the RSA, the Bidding Procedures, the Bidding Procedures Order, or the Stalking Horse Agreement (each as defined herein), as applicable.

[3]    Beyond that, bidders have had ample notice, in addition to the formal marketing period, based upon the Debtors' pre-bankruptcy marketing process and the fact that the Debtors have announced their in-court marketing process upon and after the commencement of these cases in August 2022. Indeed, as of the date hereof, PJT has already received multiple inbound inquiries about the Debtors' assets. Aguizy Decl. ¶ 17 (as defined below).

will provide a recovery to more junior creditors—such as second lien and unsecured creditors and other litigation claimants. The proposed Sale will thus provide an open and transparent process to determine the ultimate value of the Debtors' estates, facilitating the subsequent resolution of their chapter 11 cases.

3.     To implement the Sale in a tax-efficient manner, the Debtors have developed a series of reconstruction steps that will result in significant tax savings to the estates (which would otherwise bear the cost of such taxes) in connection with the Sale. Moreover, those steps can benefit the Debtors (and, by extension, their creditors) whoever the successful bidder is, and whether that bid is for the whole, or certain portions of the, Company. In addition, the transaction steps have been designed to protect the existing third-party unsecured creditors from prejudice arising from implementation of the steps, including by ensuring that the value of any unencumbered assets (whether arising from lien avoidance or higher bids) makes its way back to the entities at which the third-party unsecured creditors hold claims. Importantly, the types of pre-sale transactions contemplated are relatively common in Ireland, are permitted and guided by Irish tax law and published practices of the Irish Tax Authority, and are a well-recognized way to move a business or part of a business to a new entity, which entity may or may not be sold at a later date. *See* Maher Decl. ¶¶ 7–13 (as defined below). The specific transaction steps are described in detail below and in the exhibits hereto, and the Debtors seek approval of those steps in this Motion.

4.     Notwithstanding the material benefits to the Debtors' estates to pursuing the Sale, even prior to filing this Motion, parties have attacked the Sale, accusing the Debtors of agreeing to turn themselves over to their first lien lenders, thereby abandoning their fiduciary duties to unsecured creditors. *See* Limited Obj. of the Off. Comm. of Unsecured Creditors to the Debtors' Cash Collateral Motion ¶ 4 [Docket No. 337]. Those objections are misguided. The Debtors did

not choose this path lightly. They did so after extensive consideration and careful study of all of the alternatives available, and in recognition of the major challenges that accompanied other alternatives and the value maximizing nature of the Sale.

5.      In that regard, the primary alternative to a sale—a plan of reorganization—likely involves potentially years of litigation with an uncertain conclusion, tremendous amounts of professional fees, and serious risks to the Debtors' businesses. Specifically, confirming and consummating a chapter 11 plan of reorganization in lieu of a sale would require, at a minimum, two major litigations—(a) a fight over the dischargeability of alleged fraud claims held by governmental opioid plaintiffs; [4] and (b) multiple complex litigations in connection with confirmation of a plan (*e.g.*, valuation, feasibility, scope, and amount of priority tax claims). Although the Debtors strongly believe they would prevail in these litigations, the timetable for each could be expected to be in excess of a year and a setback in either of them could make confirming a plan very difficult and/or impossible. In addition, if the Debtors were to pursue such a long, expensive and uncertain plan path, there are no guarantees that the Ad Hoc First Lien Group would support such a process and/or vote in favor of a plan, leading to yet more long, expensive, and uncertain confirmation litigation with that constituency as well (even assuming such a plan were to be feasible from a legal and business perspective).

6.      Accordingly, were the Debtors to pursue a plan and the Court were to make adverse rulings in any or all of these litigations, confirmation of that plan could be either very difficult or impossible and the Debtors would likely be required to pivot, after much expense and delay, to a

---

[4]     This risk of this nondischargeability litigation is real and exists today. The Debtors have already received a number of requests from governmental entities seeking additional time to file an adversary proceeding to determine the dischargeability of their alleged claims and the Debtors filed a motion on November 14, 2022, extending the time for such entities to file dischargeability complaints. *See* [Docket No. 688]. Based on the covered actions subject to the preliminary injunction staying litigation of governmental opioid claims, these governmental units number in the thousands.

363 sale, at best, or resort to a liquidation in the worst case. In the Debtors' business judgment, the very material funds that would be expended in pursuing that plan scenario (ranging in the hundreds of millions of dollars in other opioid bankruptcies and with no guarantee of success) are much better spent providing recovery to creditors in these cases. The Sale—a path entirely within the Debtors' rights to pursue—largely moots the need for the parties to litigate, and the Court to decide, these issues—saving time, money and effort, removing uncertainty, and – importantly – providing a path for the Debtors' operating businesses to emerge from bankruptcy with an intact workforce by the middle of next year.

7.    Accordingly, the Debtors seek the following relief to pursue and effectuate the Sale:

- *Bidding Procedures*: The Debtors seek the Court's approval of bidding procedures that would govern the sale of all of their assets.

- *Stalking Horse Expense Reimbursement*: The Debtors seek approval of the expense reimbursement payment required under the purchase agreement with their first-lien creditors, which the Debtors have determined to designate as a stalking-horse bid.

- *Reconstruction Steps*: The Debtors seek approval to engage in certain reconstruction steps that will facilitate the closing of the Sale in a tax efficient manner.

- *Noticing Procedures*: The Debtors are seeking approval for a comprehensive noticing program to known and unknown creditors, including through extensive community outreach, and television, internet, and social media.

- *Assumption and Assignment Procedures*: The Debtors seek approval for procedures that will govern assumption and assignment of their executory contracts and unexpired leases in connection with a sale.

8.    The Debtors firmly believe that the sale process contemplated by this motion is the best path forward and has been tailored to maximize the value received for the Debtors' assets. Thus, the Debtors respectfully request that the Court approve the Bidding Procedures Order as set forth herein.

## RELIEF REQUESTED

9.      By this Motion, the Debtors seek entry of the following:

(a)     the Bidding Procedures Order, substantially in the form attached hereto as **Exhibit A** (the "Bidding Procedures Order"), among other things:

     (i)     authorizing and approving the proposed bidding procedures substantially in the form attached as **Exhibit 1** to Exhibit A (the "Bidding Procedures") in connection with the sale or sales of substantially all of the Debtors' assets (the "Assets") pursuant to section 363 of the Bankruptcy Code (the "Sale"), including certain dates and deadlines thereunder for the Sale process;

     (ii)    authorizing and approving the terms and conditions of the Expense Reimbursement Amount (as defined below) as set forth under that certain purchase and sale agreement with Tensor Limited (the "Buyer" or the "Stalking Horse Bidder"), attached hereto as **Exhibit B** (the "Stalking Horse Agreement" or the "PSA," and such bid memorialized therein, the "Stalking Horse Bid");[5]

     (iii)   authorizing the Debtors to (A) carry out certain reconstruction steps as described in (1) **Exhibit 4** attached to Exhibit A (the "Reconstruction Steps Exhibit") and (2) the term sheets for the key transaction documents attached as **Exhibit 5** to Exhibit A, in each case, subject to any amendments thereto made prior to the selection of the Successful Bid(s) (the "Reconstruction Steps"); and (B) execute, deliver, implement, and fully perform any and all obligations, instruments, documents, and papers, and to take any and all actions reasonably necessary or appropriate to consummate the Reconstruction Steps;

     (iv)    authorizing and approving (A) the form of notice of the auction, if any, for the sale of the Assets (the "Auction"), the Sale, and the hearing to consider the Sale (the "Sale Hearing"), substantially in the form attached as **Exhibit 2** to Exhibit A (the "Sale Notice"); and (B) the procedures for distributing such Sale Notice to known claimants and the comprehensive plan for providing notice to unknown claimants (the "Supplemental Notice Plan" and together with the method of distributing the Sale Notice to known claimants, the "Sale Notice Procedures");

     (v)     authorizing procedures (such procedures, the "Assumption and Assignment Procedures") to facilitate the fair and orderly assumption, assumption and assignment, and rejection of certain executory contracts (the "Contracts") or unexpired leases (the "Leases"), and approving the form and manner of service of the notice regarding such assumption, assumption and assignment,

---

[5]    To be clear, the Debtors do not currently seek approval of the PSA itself. The Debtors will seek approval of the winning bid at the Sale Hearing (each as defined below).

or rejection of the Contracts and Leases to counterparties (such notice, substantially in the form attached as **Exhibit 3** to Exhibit A, the "Assumption and Assignment Notice");

(vi)   granting related relief; and

(b)   following entry of, and compliance with, the Bidding Procedures Order, entry at the Sale Hearing of a sale order (the "Sale Order")[6]:

(i)   authorizing and approving the Sale to the Successful Bidder or Successful Bidders (as defined below), free and clear of all liens, claims, encumbrances, and other interests;

(ii)   authorizing and approving the assumption and assignment of the Assigned Contracts (as defined below); and

(iii)   granting related relief.

10.    In support of this Motion, the Debtors rely on (a) the *Declaration of Mark Bradley in Support of Chapter 11 Petitions and First Day Papers* (the "First Day Declaration"), filed at Docket No. 38; (b) the *Declaration of Mark G. Barberio in Support of Entry of the Bidding Procedures Order* (the "Barberio Declaration"); (c) the *Declaration of Tarek elAguizy in Support of Entry of the Bidding Procedures Order* (the "Aguizy Declaration"); (d) *Declaration of Peter Maher in Support of Entry of the Bidding Procedures Order* (the "Maher Declaration"); and (e) the *Declaration of Jeanne C. Finegan, APR in Connection with Sale Motion and Bar Date Motion* (the "Finegan Declaration"); each filed contemporaneously herewith.

## JURISDICTION AND VENUE

11.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.). This is a core proceeding pursuant to 28 U.S.C. § 157(b).

---

[6]    The proposed form of the Sale Order will be filed with the Court prior to the Sale Hearing.

12.     Venue of the Chapter 11 Cases and this Motion is proper in this District under 28 U.S.C. §§ 1408 and 1409.

13.     The legal predicates for the relief requested herein are sections 105, 363, 365, and 503 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006, 9007, and 9008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Rules 6006-1 and 9006-1(b) of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules"), and the *Guidelines for the Conduct of Assets Sales* promulgated by General Order M-383 of the Court (the "Sale Guidelines").

## BACKGROUND

### I.     Marketing and Sale Process

14.     In the years leading up to the chapter 11 filing, the Debtors comprehensively considered a variety of strategic alternatives to address a confluence of factors that put downward pressure on the Debtors' financial performance. First Day Decl. ¶ 39. In connection with its evaluation of strategic alternatives, the Debtors retained several restructuring advisors beginning in early 2018, including Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") as legal counsel and PJT Partners LP ("PJT") as investment banker. First Day Decl. ¶ 65.

15.     In the second half of 2021, after expending significant efforts but making little headway towards a comprehensive resolution with governmental plaintiffs pursuing opioid-related claims, the Debtors began exploring a sale transaction to address its capital structure and other contingent liabilities and commenced active discussions regarding potential restructuring frameworks with advisors to an ad hoc group holding significant amounts of Second Lien Notes and Unsecured Notes, in addition to a portion of the Prepetition First Lien Indebtedness (the "Ad Hoc Cross-Holder Group"). First Day Decl. ¶ 67.

16.     In addition, in September 2021, PJT launched a formal marketing process, contacting approximately 76 parties, including 36 strategic buyers (*e.g.*, pharmaceutical companies) and 40 financial buyers (such as private equity firms) regarding potential interest in an acquisition of the Debtors' businesses. Aguizy Decl. ¶ 11.  The Debtors informed potential bidders that bids could be for the whole company or by business segment. Of the potential bidders contacted, 38 executed non-disclosure agreements and eight ultimately submitted indications of interest. Aguizy Decl. ¶ 11. Five bidders received management presentations and were granted access to a virtual data room. Aguizy Decl. ¶ 11. Ultimately, the Debtors determined to pause their sale process in January 2022 to focus their efforts on other potential strategic alternatives. First Day Decl. ¶ 67.

17.     From October 2021 until April 2022, the Debtors primarily engaged with the Ad Hoc Cross-Holder Group on potential restructuring transaction structures that could be implemented through a bankruptcy. *See* First Day Decl. ¶¶ 68, 73–74.  However, in April 2022, as the Debtors' business projections continued to decline, the Debtors also began heavily engaging with the advisors to an ad hoc group consisting primarily of Prepetition First Lien Lenders and Prepetition First Lien Noteholders (the "Ad Hoc First Lien Group," and together with the Ad Hoc Cross-Holder Group, the "Ad Hoc Groups")[7] regarding a potential transaction. First Day Decl. ¶¶ 68, 73. The Company evaluated proposals received from both the Ad Hoc First Lien Group and the Ad Hoc Cross-Holder Group, and ultimately determined to pursue a restructuring support agreement (the "RSA") with the Ad Hoc First Lien Group setting forth the framework for an in-court sale to the Stalking Horse Bidder, subject to higher or otherwise better bids to be solicited through a prolonged marketing process. First Day Decl. ¶ 74.

---

[7]     The Ad Hoc First Lien Group holds a majority of the Debtors' outstanding Prepetition First Lien Indebtedness.

## II.    The Stalking Horse Agreement

18.    The terms of the Stalking Horse Agreement were negotiated and agreed by the Debtors and the Stalking Horse Bidder without collusion, in good faith, and from arm's-length bargaining positions, with each side represented by sophisticated advisors. Barberio Decl. ¶¶ 11–14. The Debtors submit that the terms of the Stalking Horse Agreement are fair and reasonable. Barberio Decl. ¶ 15. By establishing a minimum acceptable bid, the Stalking Horse Agreement, together with the Bidding Procedures, provides certainty in an auction process and sets a baseline for other bidders to compete against.

19.    The key terms of the Stalking Horse Agreement are as follows[8]:

| Provision | Summary |
|---|---|
| **Parties**<br>*Preamble* | Tensor Limited, as the buyer ("<u>Buyer</u>"); Endo International plc ("<u>Endo</u>") and other entities listed in the PSA, as sellers ("<u>Sellers</u>"), as well as the participating debtors related to Endo ("<u>Participating Endo Debtors</u>" and, with the Sellers, "<u>Endo Companies</u>"). |
| **Purchase Price**<br>*Section 2.7* | Purchase Price consists of:<br>(a) a credit bid, pursuant to Section 363(k) of the Bankruptcy Code, in full satisfaction of the Prepetition First Lien Indebtedness,<br>(b) $5 million in cash on account of unencumbered Transferred Assets,<br>(c) the Wind-Down Amount in cash,<br>(d) the Pre-Sale Professional Fee Reserve Amounts in cash, and<br>(e) the assumption at Closing of the Assumed Liabilities, including, for the avoidance of doubt, the Non-U.S. Sale Transaction Taxes. |
| **Transferred Assets**<br>*Section 2.1* | "<u>Transferred Assets</u>" are set forth in Section 2.1 of the PSA and include all right, title and interest of the Company Group, the Sellers or Participating Endo Debtors in, to or under the properties and assets of the Company Group (other than the properties and assets of the Indian Subsidiaries, but including the equity of such subsidiaries), the Sellers or Participating Endo Debtors of every kind and description (but excluding in each case, for the avoidance of doubt, any Excluded Assets and the Irish Specified Equity Interests which shall be transferred in accordance with Section 2.1(a)(i)). |

---

[8]    This summary description and any further descriptions in this Motion of the provisions of the Stalking Horse Agreement are for summary purposes only, do not restate the terms of the Stalking Horse Agreement in their entirety, and in the event of any inconsistency with the Stalking Horse Agreement, the Stalking Horse Agreement will govern. Capitalized terms used but not defined in this section shall have the meanings ascribed to them in the Stalking Horse Agreement.

| Provision | Summary |
|---|---|
| **Excluded Assets**<br><br>*Section 2.2* | "Excluded Assets" are set forth in Section 2.2 of the PSA and include the assets expressly excluded from the Transferred Assets, all of which shall be retained by the Endo Companies, including, among other things:<br>(a) the Endo Companies' documents prepared in connection with the PSA or the transactions contemplated thereby or relating to the Bankruptcy Cases or the Canadian Recognition Case, and any books and records that any Endo Company is required by Law to retain;<br>(b) except as set forth in Section 2.1(b)(xv), all rights, claims and causes of action to the extent relating to any Excluded Asset or any Excluded Liability;<br>(c) shares of capital stock or other equity interests of any Endo Company or securities convertible into or exchangeable for shares of capital stock or other equity interests of any Endo Company (other than the Specified Equity Interests, including the Irish Specified Equity Interests and the Indian Equity Interests, which shall be transferred in accordance with Section 2.1(a)(i));<br>(d) all rights of the Endo Companies under the PSA and the Ancillary Agreements; and (e) all Excluded Contracts; and<br>(f) all Intellectual Property exclusively used or held for use in connection with the foregoing clauses (a) through (e). |
| **Assumed Liabilities**<br><br>*Section 2.3* | "Assumed Liabilities" are set forth in Section 2.3 of the PSA and include, among other things:<br>(i) all Liabilities for Non-U.S. Sale Transaction Taxes;<br>(ii) all Liabilities of the Endo Companies under the Transferred Contracts and the transferred Business Permits in respect of periods following, the Closing Date, including any Cure Claims regardless of when such Cure Claims are due and payable;<br>(iii) all Liabilities arising under any collective bargaining laws, agreements or arrangements in relation to Business Employees;<br>(iv) (A) all Liabilities with respect to any Assumed Plan, together with any Liabilities with respect to any funding arrangements relating thereto, (B) the Buyer's obligation to provide COBRA continuation coverage as described in the PSA, (C) all Liabilities with respect to Transferred Employees (subject to certain exclusions set forth in the PSA), (D) all Liabilities relating to employees hired by the Buyer who are not Business Employees, and (E) all Liabilities assumed by the Buyer pursuant to Section 5.4 regarding employee matters;<br>(v) all Liabilities arising out of or in connection with the failure by the Buyer or any one if its Affiliates to comply with its or their obligations under (A) TUPE or (B) under any applicable Canadian Labor Laws;<br>(vi) all Liabilities arising from or in connection with the employment or termination of employment of (A) any Automatic Transfer Employee who objects to the transfer of their employment to the Buyer or any of its Affiliates, and (B) any Offer Employee who refuses an offer of employment from the Buyer or one of its Affiliates;<br>(vii) all Liabilities arising out of, relating to or incurred in connection with the conduct or ownership of the Business or the Transferred Assets from and after the Closing Date;<br>(viii) all (a) accrued trade and non-trade payables, (b) open purchase orders (except a purchase order entered into in connection with any Excluded Contract), (c) Liabilities arising under drafts or checks outstanding at Closing, (d) accrued royalties, and (e) all Liabilities arising from rebates, returns, recalls, chargebacks, coupons, discounts, failure to supply claims and similar obligations, in each case, to the extent (x) incurred in the Ordinary Course of Business and otherwise in compliance with the terms and conditions of the PSA and (y) not arising under or otherwise relating to any Excluded Asset;<br>(ix) all indemnification obligations to the Endo Companies' directors, officers, and employees who have served in such role on or after the Petition Date solely for any defense costs (but not to satisfy any judgment); |

| Provision | Summary |
|---|---|
| | (x) any and all liabilities of any Seller resulting from the failure to comply with any applicable "bulk sales," "bulk transfer" or similar law; and |
| | (xi) certain intercompany liabilities owed to the Debtors listed in the Disclosure Letter. |
| **Excluded Liabilities**<br><br>*Section 2.4* | "Excluded Liabilities" are set forth in Section 2.4 of the PSA, pursuant to which the Buyer is not assuming any Liability that is not an Assumed Liability. Such Excluded Liabilities include, among other things:<br>(a) any and all Liabilities for Excluded Taxes;<br>(b) any and all Liabilities of the Endo Companies under any Excluded Contract whether accruing prior to, at, or after the Closing Date;<br>(c) any and all Liabilities relating to or arising from the Retained Litigation;<br>(d) any and all Liabilities retained by the Endo Companies pursuant to Section 5.4 regarding employee matters or (ii) arising in respect of or relating to any Business Employee to the extent arising prior to Closing except any Liabilities assumed by Buyer pursuant to Section 2.3 and Section 5.4;<br>(e) any and all Liabilities, arising or accrued at any time, in any way attributable to the employment or service of former employees, directors or consultants of the Sellers or any current or former Subsidiary of the Endo Companies who do not become Transferred Employees, subject to certain exceptions set forth in the PSA;<br>(f) any Indebtedness of the Endo Companies;<br>(g) any Liability to distribute to any Endo Company's shareholders or otherwise apply all or any part of the consideration received hereunder;<br>(h) any and all Liabilities arising under any Environmental Law or any other Liability in connection with any environmental, health, or safety matters arising from or related to (i) the ownership or operation of the Transferred Assets before the Closing Date, (ii) any action or inaction of the Sellers or of any third party relating to the Transferred Assets before the Closing Date, (iii) any formerly owned, leased or operated properties of the Endo Companies, or (iv) any condition first occurring or arising before the Closing Date with respect to the Transferred Assets, including, without limitation, the presence or release of Hazardous Materials on, at, in, under, to or from any Real Property;<br>(i) any and all Liability for: (i) costs and expenses incurred by the Endo Companies or owed in connection with the administration of the Bankruptcy Cases; (ii) all costs and expenses of the Endo Companies incurred in connection with the negotiation, execution and consummation of the transactions contemplated under this Agreement; and (iii) third-party claims against the Endo Companies, pending or threatened, including any warranty or product claims and any third-party claims, pending or threatened, actual or potential, or known or unknown, relating to the businesses conducted by the Endo Companies prior to Closing;<br>(j) any Liability of the Endo Companies under this Agreement or the Ancillary Agreements; and<br>(k) any Liability to the extent relating to an Excluded Asset. |
| **Conditions to Closing**<br><br>*Section 7.3(e)* | The PSA provides that all Regulatory Approvals and Product Approvals (i) associated with the Products and (ii) any other Regulatory Approvals and Product Approvals the absence of which would be reasonably likely to result in a material adverse effect on the Business shall have been transferred to or obtained by the Buyer, and the Buyer shall have received applicable documentation reasonably necessary to evidence the transfer or receipt of such approvals; *provided, however*, that this condition shall be deemed satisfied to the extent that the Buyer can reasonably be expected to operate the Business after the Closing in compliance with applicable Law and consistent with Law or past practice and with the terms of the PSA and the Transition Services Agreement, until the applicable approval is transferred or obtained. |
| **Expense Reimbursement** | The PSA provides for the payment of an "Expense Reimbursement Amount" in certain circumstances, as detailed below: |

| Provision | Summary |
|---|---|
| *Section 8.3* | If the PSA is terminated in accordance with the terms set forth in (i) Section 8.1(a)(ii)(C) (regarding termination of the PSA in the event the Stalking Horse Bidder is not the Successful Bidder, the Debtors enters into or consummates an Alternative Transaction, or the Court approves an Alternative Transaction or denies the Sale Motion as it relates to the PSA), not later than two (2) Business Days following the consummation of an Alternative Transaction, or (ii) Section 8.1(a)(iv)(C) (regarding termination of the PSA in the event the Sellers exercise the Fiduciary Out (as described below)), not later than two (2) Business Days following receipt of documentation referenced in the PSA, in each of the cases in clause (i) and (ii), the Endo Companies shall pay to the Buyer in cash an amount equal to the reasonable and documented out-of-pocket costs, fees and expenses incurred by the Required Holders' Advisors in an amount not to exceed $7,000,000 (the "Expense Reimbursement Amount"); *provided, however,* individual Required Holders shall not be entitled to reimbursement for fees and expenses of their own advisors, in connection with the development, execution, delivery and approval by the Bankruptcy Court of the PSA and the transactions contemplated hereby.<br><br>The Parties agree and understand that in no event shall the Endo Companies be required to pay the Expense Reimbursement Amount on more than one occasion. Notwithstanding anything to the contrary in the PSA, other than in the case of Fraud or Willful Breach of the PSA or any Ancillary Agreement by an Endo Company, the payment of the Expense Reimbursement Amount from or on behalf of the Endo Companies in the circumstances in which it is payable shall be the sole and exclusive remedy of the Buyer against the Endo Companies and their Affiliates and none of the Endo Companies or any of their respective Affiliates shall have any further liability or obligation (whether at law, or equity, in contract, in tort or otherwise) in connection with the PSA's termination. |
| **Fiduciary Out**<br><br>*Section 8.1(a)(iv)(C)* | (a)    The PSA may be terminated at any time prior to the Closing: (…)<br>(iv)    by Seller Parent, if: (…)<br>(C)    the Seller Parent determines, in good faith and after consultation with its advisors, that continued performance under the PSA or any Ancillary Agreement would be inconsistent with the exercise of its fiduciary duties. |

## III.    Reconstruction Steps

20.    The Debtors' goal in the proposed Sale is maximizing value. An important part of achieving that goal is to implement the transaction in a tax efficient way within the policies of and reliefs afforded by Irish tax law and Irish Revenue Commissioners guidance and practices. Irish law provides a mechanism to achieve that end—a "reconstruction" transaction. That mechanism is often used outside of bankruptcy and there is no reason that it cannot be used in bankruptcy as well. Given the nature of the corporate steps that would be required to take advantage of the business transfer, this Court's approval is necessary to implement it. A successful implementation

could defer material amounts of taxes that would otherwise be incurred on a Sale and thereby increase the value of the estate.

21.      Accordingly, in connection with preparing for the sale to the Stalking Horse Bidder or in connection with a higher bid, the Debtors seek authority to implement the Reconstruction Steps, as more fully set forth in the (a) Reconstruction Steps Exhibit, attached as Exhibit 4 to Exhibit A, and (b) the term sheets for the key transaction documents for the Reconstruction Steps, attached as Exhibit 5 to Exhibit A.[9]

***Objectives of the Reconstruction Steps***

22.      The Reconstruction Steps are intended to accomplish the following:

- Allow the Debtors to pursue the Sale in a tax efficient manner under Irish law (primarily by facilitating the sale of the equity in the Newcos (as defined below), which would hold the assets of the relevant Transferor Debtors (as defined below), rather than only the sale of the assets of such Debtors);[10]

- Provide the same tax benefit to the estate, whoever the successful bidder may be (not just the Stalking Horse Bidder);

- Avoid prejudicing any *existing third-party creditors* of any of the relevant Transferor Debtors participating in the Reconstruction Steps or their current parent entities; and

- Avoid negatively impacting *potential bidders* in the Sale, including those interested in purchasing only certain business segments or assets.

---

[9]    The Reconstruction Steps Exhibit and summaries of certain transaction documents are provided for illustrative purposes only and the steps, necessary implementation requirements, and terms and conditions described therein remain subject to change in all respects. To the extent necessary, the Debtors will file an amended exhibit detailing any revisions by the response deadline for any objections to this Motion.

[10]   In exchange for the Stalking Horse Bidder indemnifying the Debtor against any non-U.S. tax liabilities triggered by the Sale—a very material concession to the Debtors' estates—the Debtors committed to pursue Court approval of the Reconstruction Steps. Barberio Decl. ¶ 23. Absent approval of the mutually agreed transaction steps to implement and consummate a tax-efficient transaction under Irish law, the Required Consenting First Lien Creditors can terminate the Restructuring Support Agreement.

*Overall Transaction Structure and Logic*

23.    In order to best contextualize the objectives of the Reconstruction Steps, it is helpful to summarize the current state of the Debtors' assets and liabilities. The Debtors have approximately $5.9 billion in Prepetition First Lien Indebtedness, which, absent any successful challenge to such liens or claims (and nothing in the Reconstruction Steps will have any impact on the rights of parties to assert a challenge), is senior to all other claims against the Debtors. As a result, absent an overbid or a successful lien challenge, there is no value available for unsecured creditors. The Reconstruction Steps are designed so that, if there is ultimately value available for unsecured creditors (as a result of an overbid or a successful lien challenge), that value will travel back to the Debtor entities at which the unsecured creditors have claims.

24.    Under Irish law, absent any structuring, the typical consequence of an asset sale is that a seller is liable for tax at 33% on any chargeable gain that arises and the buyer pays stamp duty at 7.5% on stampable assets. Maher Decl. ¶ 6. In this case, that tax would be very substantial. Just like in the United States, tax would be paid on the difference between the disposal proceeds (or market value) paid for such asset and the acquisition costs of the asset. Maher Decl. ¶ 6. The Reconstruction Steps would allow Endo to mitigate that tax, just as any corporate taxpayer is entitled to do under Irish law (and as many taxpayers commonly do).

25.    The basic structure of the Reconstruction Steps is for each of three existing Debtors, Endo Ventures Limited, Endo Global Biologics Limited, and Endo Global Aesthetics Limited (in such capacities as transferor, the "Transferor Debtors") to transfer its business and assets, including employees in the case of Endo Ventures Limited, (the "Specified Assets"), subject to the secured creditors' liens, to a newly incorporated entity outside of the Endo group (each a "Newco," and collectively, the "Newcos") (such transfer, each, a "Business Transfer") in consideration for the

14

issuance of shares by the Newco to the respective direct parent company of the Transferor Debtors. On completion of the Business Transfer, shares in the Newcos held by the third party would be surrendered and cancelled, and the Newcos would become wholly owned by the direct parent company of the respective Transferor Debtors. At the same time, the Newcos would file chapter 11 petitions and would seek to have their cases administered by the Court with the Chapter 11 Cases of the existing Debtors, so that the Court has jurisdiction over the Newcos.

26.    Irish tax rules permit a taxpayer to restructure its business in a tax neutral manner and include certain relief that is specifically designed to enable such restructurings, provided certain conditions are met. *See* Maher Decl. ¶¶ 7–8. Because the Reconstruction Steps would satisfy the conditions for such tax relief, no taxes on any chargeable gain or stamp duty would be triggered by the Reconstruction Steps under Irish law. Any gain arising on the Reconstruction Steps would be rolled over and potentially be taxed if the assets are later disposed of.

27.    A buyer could then acquire the equity in the Newcos, the sale of which would trigger no taxable gain, either (a) because no gain actually arises on the disposal of the equity (where the value of the Newcos and the purchase price paid is minimal), or (b) if there is a gain, because the Debtors satisfy the conditions to rely on the "participation exemption" with respect to the disposal of the equity, which would exempt the gain from being taxed. A participation exemption is a common feature of tax systems internationally and exempts disposals of qualifying participations in subsidiaries from being taxed. No (or low) stamp duty would apply to such purchase of the equity in the Newcos because the equity would have no (or low) value, given that the Newcos' assets are subject to liens securing almost $6 billion in debt.

28.    Thereafter, once a buyer owns the equity in the Newcos, the buyer and the Newcos will be part of the same group for Irish tax purposes. Irish tax legislation facilitates intra-group

transfers of assets in a tax neutral manner. *See* Maher Decl. ¶ 14. Therefore, the Newcos can effect

an intra-group transfer of the assets to the buyer, which will be deemed to be a no gain/no loss

transaction (*i.e.*, a transaction at the tax basis) such that tax is not triggered.

29.    In connection with the Reconstruction Steps, the Debtors also propose to undertake

a number of steps that would protect the existing rights and entitlements of third-party unsecured

creditors.

***Specific Terms of the Reconstruction Steps***

30.    The Reconstruction Steps and their sequencing can be summarized as follows[11]:

- *Step 1 (Formation of Newcos)*: A third party outside the Endo group, with no economic interest in the Debtors, will form the three Newcos and initially hold the ordinary share capital in each (the "Subscription Shares").



- *Step 2 (Imposition of Holdcos)*: Three newly formed limited liability holding companies (the "Holdcos") will be incorporated and imposed as direct parent companies of each of the Transferor Debtors, *i.e.*, Endo Ventures Limited, Endo Global Biologics Limited, and Endo Global Aesthetics Limited.

---

[11]    These steps are more fully depicted graphically in the Reconstruction Steps Exhibit at Exhibit 4 to Exhibit A.



- *Step 3 (Conversions to Unlimited Companies)*: Prior to any asset transfer, the Transferor Debtors will convert from Irish limited liability companies to Irish unlimited liability companies.

  o Under Irish law, the conversion of a Transferor Debtor will result in the direct sole shareholder of that Transferor Debtor (*i.e.*, the relevant Holdco) becoming liable, in the event of an insolvent liquidation of the Transferor Debtors, to contribute to the assets of that Transferor Debtor in an amount equal to any deficit.[12]

- *Step 4 (Business Transfer)*: Each Transferor Debtor will undertake a Business Transfer, transferring the Specified Assets to one of the three Newcos,[13] in exchange for the issuance by that Newco of ordinary shares to the Holdco that is

---

[12]    Section 1278 of the Irish Companies Act 2014 (the "Companies Act") provides that in the event of an unlimited company being wound up, every present and past member shall be liable to contribute to the assets of the unlimited company to an amount sufficient for payment of its debts and liabilities, and the costs, charges and expenses of the winding-up.

[13]    The Debtors are continuing to review whether all three entities or just two of the entities will be part of the Reconstruction Steps but intend to make a determination in advance of the hearing on the Motion.

the direct parent of that Transferor Debtor (the "Consideration Shares"). At the time of such transfer, the existing third-party shareholder of the Newcos would surrender the Subscription Shares for no consideration, leaving the Consideration Shares (then held by the relevant Holdco) as the only outstanding equity in each of the Newcos.



The transfer of the Specified Assets will be governed by separate Business Transfer Agreements (each, a "BTA")[14] and such transfer will occur subject only to Prepetition Liens and any Permitted Prior Liens (each as defined in the Cash Collateral Order), but no third-party prepetition claims will transfer.[15] The Newcos and the Transferor Debtors will also enter into separate transition services agreements (each, a "TSA"),[16] to enable the parties to fulfil their obligations under the BTA.

In connection with the Business Transfer, each of the Transferor Debtors intends to assign or novate certain intercompany executory contracts (i.e., with other Debtors and their affiliates) to the Newcos. With respect to third-party contracts, the beneficial interest in such third-party contracts will be granted to the Newcos pursuant to the BTA, but any formal assignment will only occur on completion of the Sale.

---

[14]   The material terms of the BTAs are as set forth in the term sheet attached as **Exhibit 5-A** to Exhibit A. The term sheet is provided for summary purposes only and the terms remain subject to change in all respects.

[15]   The Prepetition Liens and Permitted Prior Liens must transfer with the assets in order to (a) ensure that the rights of the secured creditors to credit bid are not compromised by the transfer and (b) prevent an unintended accrual of value in the Newcos on the completion of the Reconstruction Steps, which would result in a 1% stamp duty liability being incurred by any purchaser of the shares in the Newcos. Because the Newcos are being utilized as a vehicle to effectuate an eventual sale, their bankruptcy cases will ultimately be dismissed. Transferring any third-party prepetition claims against the Transferor Debtors to the Newcos would deter any bidder from utilizing this structure.

[16]   The material terms of the TSAs are substantially as set forth in the term sheet attached as **Exhibit 5-B** to Exhibit A. The term sheet is provided for summary purposes only and the terms remain subject to change in all respects.

- *Step 5 (Newco / Holdco Chapter 11 Filing)*: Substantially contemporaneously with the completion of the Business Transfers, the Holdcos and Newcos will file for chapter 11 and be jointly administered in these Chapter 11 Cases. The Newcos will continue to operate the businesses of the Transferor Debtors until the Sale closing. Following the ultimate closing of the Sale, the Newco Chapter 11 Cases will be dismissed.

- *Step 6 (Irrevocable Equity Subscription)*: Following the Business Transfers, each Holdco will enter into an irrevocable, conditional subscription agreement (each, a "Subscription Agreement") with the Transferor Debtor that it owns pursuant to which that Holdco will irrevocably agree that if the Newco that it has acquired pursuant to Step 4 is sold for more than nominal value (whether due to an overbid, a successful lien challenge, or otherwise) (the value in excess of nominal being the "Excess Value"), that Holdco will use the Excess Value to subscribe for new shares in that Transferor Debtor.[17] As a result, the creditors of each Transferor Debtor then share in the Excess Value in the same order of priority that such creditors had before the execution of the Reconstruction Steps (*i.e.*, each Transferor Debtor will ultimately receive any unencumbered value that it would have had without the Reconstruction Steps being implemented).

31.     In order for the Reconstruction Steps to achieve the desired outcome under Irish tax law, they must be completed before the Debtors have made a determination as to the identity of the ultimate buyer. It is for this reason that the Debtors and the Stalking Horse Bidder will delay actual execution of the Stalking Horse Agreement until after the Reconstruction Steps are complete.[18]

32.     Subsequently—*i.e.*, after implementation of the Reconstruction Steps and in connection with the Sale Hearing—the Debtors will seek the Court's approval to sell the Consideration Shares and, if approved by the Court, immediately thereafter and conditional upon such sale, the assets of the Newcos to the Successful Bidder, in each case, free and clear of liens,

---

[17]    The material terms of the Subscription Agreements are set forth in the term sheet attached as **Exhibit 5-C** to Exhibit A. The term sheet is provided for summary purposes only and the terms remain subject to change in all respects.

[18]    Because the Required Consenting First Lien Creditors are obligated under the RSA to support the transaction, and the Debtors are requesting that the Bidding Procedures Order will direct the Stalking Horse Bidder to enter into the Stalking Horse Agreement upon completion of the Reconstruction Steps, the Debtors do not believe that delaying execution has any impact on the relief sought hereunder.

claims, and encumbrances under section 363(f) of the Bankruptcy Code. Following the sale of the Newcos' assets, the Debtors and/or the Buyer will move to dismiss the Newco Chapter 11 Cases. A fuller description and diagrams of these transactions are set forth in the Reconstruction Steps Exhibit, attached as Exhibit 4 to Exhibit A.

### *The Reconstruction Steps Are Designed to Avoid Prejudice to Any Creditor of the Debtors*

33.     In implementing the Reconstruction Steps, the Debtors are cognizant of the need to avoid prejudicing existing third-party unsecured creditors. Accordingly, the Debtors have designed the Reconstruction Steps to ensure that the existing third-party creditors of the Transferor Debtors that are involved in the transfer of any of their assets in the steps (a) will not be diluted by new prepetition unsecured claims as a result of the Reconstruction Steps; and (b) will have access to the value of the transferred assets in accordance with their existing rights and priorities. Each of these goals is expressly contemplated and accomplished by several of Reconstruction Steps as follows:

### 1.     Imposing Holdcos to Protect the Parents' Creditors' Existing Entitlements from Potential Dilution

34.     Prior to the Business Transfers, the Transferor Debtors will convert to private unlimited liability companies (see Step 3 above) which will obligate their parent companies to cover the Transferor Debtor's liabilities in the event of an insolvent liquidation thereof. *See* Section 1278 of the Companies Act. Although the conversion to an unlimited liability company would provide a benefit to the creditors of the Transferor Debtors by providing them access to the value of the assets at their respective direct parent entities, absent any other steps or protections, it potentially changes the creditor makeup of the parent entities which could dilute recoveries for original creditors of the parent entities.

35.     To avoid any such potential dilution issues, the Debtors propose to first interpose a new limited liability holding company above each Transferor Debtor (see Step 2 above)—the Holdcos. As newly formed entities, those Holdcos have no creditors of their own. By utilizing the Holdcos, the Debtors will ensure that the conversion of the Transferor Debtors from limited to unlimited liability companies does not dilute the existing claims pool at the Transferor Debtor entities' parents (see Step 3 above).

36.     After the Reconstruction Steps are implemented, the Transferor Debtors will continue to be part of the larger Endo group, which group will continue to be a substantial operating company with continued need to move cash throughout the system to enable functioning of the group in the ordinary course. As part of the Cash Management Order,[19] the Debtors had taken steps—at the request of the Official Committee of Unsecured Creditors and the Official Committee of Opioid Claimants (collectively, the "Committees")—to protect unsecured creditors from any prejudice resulting from intercompany transactions that arise in the ordinary course of operating Endo's business. *See* Cash Management Order ¶ 13. To provide third-party unsecured creditors with similar protections in connection with the Reconstruction Steps, the proposed Bidding Procedures Order provides that:

(a)     the Debtors shall maintain records of all Intercompany Transactions (as defined in the Cash Management Order) arising from or in connection with the Reconstruction Steps, and all such transfers shall be documented in their books and records so that they may be traced and recorded, and

(b)     solely for purposes of establishing or determining the entitlements to distributions (if any) of holders of claims against and interests in the applicable Debtor and for no other purpose, no settlements, setoffs, or payments made after the closing of the Reconstruction Steps on account of prepetition Intercompany Transactions shall

---

[19]    The "Cash Management Order" is the Final Order (I) Authorizing the Debtors to (A) Continue Using Existing Cash Management Systems, Bank Accounts, and Business Forms and (B) Implement Changes to their Cash Management System in the Ordinary Course of Business; (II) Granting Administrative Expense Priority for Postpetition Intercompany Claims; (III) Granting a Waiver with Respect to the Requirements of 11 U.S.C. § 345(b); and (IV) Granting Related Relief [Docket No. 324].

increase or reduce the amount of any prepetition Intercompany Claims (as defined in the Cash Management Order) against any Transferor Debtor.

These protections—previously negotiated for by the Committees in the context of cash management—are intended to protect third-party unsecured creditors from any prejudice that may otherwise arise from intercompany transactions arising after the implementation of the Reconstruction Steps and in the ordinary-course operations of the larger Endo group.

### 2.    Protecting The Transferor Debtors' Creditors Against Any Loss of Value as a Result of the Asset Transfers to the Newcos

37.    If the Transferor Debtors transferred their assets to the Newcos without any other protections, there would be potential for the Transferor Debtors' creditors to be harmed. To protect against this possibility, the Debtors understand that the Reconstruction Steps must ensure that any value to which the existing creditors of the Transferor Debtors are entitled makes its way back to the Transferor Debtors. The Reconstruction Steps ensure that result as follows:

38.    If the Prepetition First Lien Secured Parties' liens on all assets are valid and the Stalking Horse Bid is the winning bid at the Auction, by definition, the Prepetition First Lien Secured Parties are entitled to all of the value of the assets transferred to the Newcos. They will thus receive it because the Specified Assets will remain subject to their liens.

39.    If, however, certain of the liens of the Prepetition Secured Parties are successfully challenged and/or if a higher or otherwise better bid is received at the Auction (such that the Prepetition Secured Parties' allowed secured claims are paid in full), the resulting unencumbered value, which would be reflected in an increase in the value of the shares in the Newcos, rightfully belongs to the Transferor Debtors (referred to as Excess Value in Step 6 above). The Reconstruction Steps ensure that that value gets back to the Transferor Debtors.

40.     *First*, because no prepetition claims of any third-party creditors (including the Prepetition First Lien Secured Parties) travel with the assets to the Newcos, if any liens attaching to the assets transferred to the Newcos in Step 4 above are released or avoided, this will result in an increase in the value of the shares issued by such Newco to the Holdcos. If a bidder (whether the Prepetition First Lien Secured Parties or otherwise), as more fully described below, seeks to acquire the shares in the Newcos (and therefore indirectly acquire ownership of the unencumbered assets in any of the Newcos), they will be required to pay cash to the Holdcos on account of that equity value in the Newcos.

41.     *Second*, to ensure that such cash (now at one or more of the Holdcos) makes its way back into the relevant Transferor Debtor, (a) the Holdcos will be newly incorporated and have no other liabilities, (b) each Transferor Debtor will have converted into an unlimited liability company prior to the initial transfer of its assets (see Step 3 above),[20] obligating the appropriate Holdco to contribute to that Transferor Debtor an amount sufficient to pay the Transferor Debtor's debts in an insolvent liquidation (*see* Section 1278 of the Companies Act), and (c) each Holdco will enter into a conditional, irrevocable subscription agreement with their respective Transferor Debtor obligating the Holdco to invest any Excess Value as an equity contribution[21] back to their respective Transferor Debtor. As a result, the value of unencumbered assets in any of the Newcos is returned to the appropriate Transferor Debtor, and available to creditors of that Debtor.

42.     In addition, to further protect creditor entitlements with respect to the value of any unencumbered assets in the Newcos, the proposed Bidding Procedures Order provides that (a) in the event that the liens held by the Prepetition First Lien Secured Parties or holders of the Second

---

[20]   Conversion to unlimited status is necessary as a matter of Irish law to enable the transfers by the Transferor Companies to be completed.

[21]   Under Irish law, this equity contribution is accomplished by a subscription for additional shares in the subsidiary.

Lien Notes are successfully challenged resulting in any unencumbered value at the Newcos (such value, the "Unencumbered Value"), the Successful Bidder shall be authorized and directed to pay cash to the Holdcos on account of the Unencumbered Value; and (b) in the event that a topping bid to the Stalking Horse Bid is selected as the Successful Bid, the Successful Bidder shall be authorized and directed to pay cash to the Holdcos on account of any value attributable to the Newcos in excess of the value of the Prepetition Liens. Further, the Debtors shall have the right to request that the Successful Bidder allocate the purchase price on account of the equity value of the Newcos or any other asset (including, but not limited to, any asset on which liens may be successfully challenged).

### *The Reconstruction Steps Benefit the Debtors Regardless of the Bidder's Identity*

43.     Because the Debtors are focused on attracting a higher or otherwise better bid in the marketing process, the Reconstruction Steps were designed to be of benefit to the Debtors regardless of who is selected as the Successful Bidder(s). Nothing about the Reconstruction Steps is uniquely suited to a sale to the Stalking Horse Bidder. In fact, the tax benefits of the Reconstruction Steps can be realized in any sale for the whole, or certain portions, of the Company. And, if for some reason, another bidder would prefer to buy the assets directly from the Newcos without also acquiring the shares in the Newcos, they can purchase the Specified Assets directly from the Newcos.[22] Moreover, as discussed below, the Reconstruction Steps can also be unwound if there are purchasers that do not wish to take advantage of the benefit of the steps.

---

[22]     Of course, if a bidder were to structure its bid in a way that triggered the realization of a chargeable gain for the Debtors, the Debtors would need to take that fact into account in valuing the bid.

### *Corporate Approvals and Intercompany Arrangements*

44.    The Debtors also seek approval to execute, deliver, implement, and fully perform any and all obligations, instruments, documents, and papers, and to take any and all actions reasonably necessary or appropriate to consummate the Reconstruction Steps. Specifically, the Reconstruction Steps will require the Debtors to carry out various corporate and regulatory requirements, approvals, documentation, and intercompany agreements necessary to effectuate the contemplated Business Transfers, including, among other things:

(a)    the governing bodies of each entity involved in the Reconstruction Steps will approve resolutions approving the transactions and required corporate actions thereunder, including, but not limited to, the BTAs and the conversion of the Transferor Debtors into unlimited liability companies as described above;

(b)    the Debtors and the Newcos will enter into certain assignment agreements with respect to the intellectual property included in the Specified Assets;

(c)    the Debtors and the Newcos will assign from the Transferor Debtors or replicate in the Newcos required existing intercompany arrangements to ensure that funds can continue to move throughout the Debtor group in the ordinary course of business;[23]

(d)    the Debtors may make necessary changes to the Cash Management System (as defined in the Cash Management Order) in accordance with the Cash Management Order, to enable the Newcos to operate in the ordinary course of business as if the Newcos were the Transferor Debtors; and

(e)    to the extent the Debtors determine in their business judgement that it is necessary to do so, the Debtors, including the Newcos, may open new bank accounts in accordance with paragraph 4 of the Cash Management Order.[24]

### *Regulatory Approvals*

45.    Additionally, as the Transferor Debtors and certain other Debtors hold various licenses, approvals, and product authorizations with respect to the Specified Assets (which include

---

[23]    By this Motion, the Debtors are requesting that such intercompany arrangements be treated as Intercompany Transactions (as defined in the Cash Management Order).

[24]    Such bank accounts shall be treated as Bank Accounts (as defined in the Cash Management Order).

substantial intellectual property with respect to the Debtors' drug products), prior to the closing of the transactions under the Reconstruction Steps, the Transferor Debtors and the Newcos will need to comply with a number of healthcare-related regulatory requirements and approvals in various jurisdictions to implement the transfer of the Specified Assets, including with respect to certain Irish marketing and distribution authorizations; Indian manufacturing, import, and export licenses; Canadian product authorizations; and U.S. FDA product authorizations and establishment regulations.

46.    The corporate and regulatory requirements, approvals, documentation, and intercompany arrangements described in this Motion and the Reconstruction Steps Exhibit are intended to be summary only and do not reflect the full scope of such components necessary to implement the Reconstruction Steps. Further, such requirements, approvals, documentation, and arrangements may be subject to revision in advance of or following the close of the transactions contemplated by the Reconstruction Steps. As such, and as noted above, the Debtors are seeking approval to take any and all actions reasonably necessary or appropriate to consummate the Reconstruction Steps so as to timely implement such steps without the need to seek further Court approval for non-material changes to required documentation or actions.

## IV.    The Bidding Procedures

47.    Although the Debtors believe that the Stalking Horse Agreement represents fair terms for the acquisition of the Transferred Assets and provides numerous benefits for stakeholders, they are hopeful that the marketing process will result in higher or otherwise better bids that would enable more junior creditors to receive a recovery in these Chapter 11 Cases.

48.    The proposed Bidding Procedures are attached as Exhibit 1 to Exhibit A. For convenience, certain of the key terms of the Bidding Procedures are summarized in the chart below[25]:

| Provision | Summary |
|---|---|
| **Description of Assets**<br><br>*Pages 2–4* | The Debtors will only consider bids that are made for either:<br><br>   (a)  all or substantially all of the Debtors' Assets; or<br><br>   (b)  one or more of the following:<br><br>      (i)  one or more of the Debtors' Business Segments (including or excluding the Collagenase Clostridium Histolyticum ("<u>CCH</u>") Assets and/or the Legacy Opioid Assets);<br><br>      (ii)  all of the CCH Assets; and/or<br><br>      (iii) all of the Legacy Opioid Assets. |
| **Multi-Phase Process**<br><br>*Page 11* | The marketing, bidding and sale process will take place in the following phases:<br><br>**<u>Phase A</u>**<br><br>"Phase A" will commence on a date following entry of the Bidding Procedures Order to be determined by the Debtors and conclude upon the Indication of Interest Deadline. During Phase A, Prospective Bidders that timely submit (or are exempt from submitting) Preliminary Bid Documents in accordance with the Bidding Procedures will be eligible to receive access to the Data Room and the CIM.<br><br>**<u>Phase B</u>**<br><br>"Phase B" (assuming the Debtors do not make a Sale Acceleration Election) will commence following the Indication of Interest Deadline. During Phase B, Prospective Bidders that (a) have timely submitted Preliminary Bid Documents and an Indication of Interest, each of which are acceptable to the Debtors, or (b) are otherwise authorized to participate in Phase B as determined by the Debtors will have the opportunity to conduct additional due diligence and submit a Qualified Bid. |
| **Bidder Qualifications**<br><br>**(Phase A)**<br><br>*Pages 11–12* | To participate in the bidding process, Prospective Bidders must submit Preliminary Bid Documents, including, among other things, an executed confidentiality agreement, a statement of bona fide interest, and any other information that the Debtors may reasonably request. |
| **Indication of Interest**<br><br>**(Phase A)** | In order to be eligible to participate in Phase B, Prospective Bidders must submit a non-binding Indication of Interest acceptable to the Debtors by the Indication of Interest Deadline. The required contents of an Indication of Interest (*e.g.*, proposed purchase price, key assumptions, financing sources and prospective plans) are set forth in detail in the Bidding Procedures. |

---

[25]   This summary description and any further descriptions in this Motion of the provisions of the Bidding Procedures are for summary purposes only, do not restate the terms of the Bidding Procedures in their entirety, and in the event of any inconsistency with the Bidding Procedures, the Bidding Procedures will govern. Capitalized terms used but not defined in this section shall have the meanings ascribed to them in the Bidding Procedures.

| Provision | Summary |
|---|---|
| *Pages 13–16* | |
| **Sale Hearing Acceleration (events and elections)** *Page 16* | The Debtors are authorized (but not required) to elect to terminate the sale and marketing process and, upon notice to parties, accelerate the sale hearing, if: <br><br> (a) no parties submit an Indication of Interest prior to the Indication of Interest Deadline; or <br><br> (b) the Debtors, in their reasonable business judgment and in consultation with the Consultation Parties, determine that no Indication of Interest received prior to the Indication of Interest Deadline, viewed individually or together with other Indications of Interest, is reasonably likely to result in the submission of a Qualified Bid. <br><br> In the event that the Debtors make a Sale Acceleration Election, the Debtors will file and serve a notice, among other things, naming the Stalking Horse Bidder as the sole Successful Bidder. |
| **Qualified Bid Requirements (Phase B)** *Pages 17–24* | To qualify as a Qualified Bidder, Acceptable Bidders must deliver a Bid by the Bid Deadline that meets all of the criteria set forth in the Bidding Procedures. These criteria include the provision of: certain information regarding the identity of the bidder, a description of the assets being bid upon, the proposed cash purchase price, the proposed liabilities to be assumed, a bid (as may be aggregated, if applicable) that exceeds the Minimum Bid Amount, a good faith deposit, a Proposed PSA, evidence of financial ability to close, certain representations and warranties and details regarding outstanding authorizations and approvals. The complete list of required contents of a Qualified Bid is set forth in detail in the Bidding Procedures. |
| **Auction** *Pages 27–29* | Assuming the Debtors do not make a Sale Acceleration Election and more than one Qualified Bid is timely received, an Auction will be conducted. The Bidding Procedures set forth the details for participation in the Auction, minimum bidding increments and other procedures with respect to the Auction. |
| **Successful Bids and Back-Up Bids** *Pages 29–30* | **Successful Bid** <br><br> In consultation with the Consultation Parties, and subject to approval by the Court, the Debtors will determine which Qualified Bid or combination of Qualified Bids constitutes the highest or otherwise best offer for the purchase of the Assets, considering all factors, including certain factors described in the Bidding Procedures. <br><br> **Back-Up Bids** <br><br> In consultation with the Consultation Parties, and subject to approval by the Court, the Debtors will determine which Qualified Bid or combination of Qualified Bids constitute the next highest or next best offer after the Successful Bid(s), and such bid(s) shall remain open and irrevocable until the Back-Up Bid Outside Date. If the Sale with a Successful Bidder is terminated prior to the Back-Up Bid Outside Date, the Back-Up Bidder(s) shall be deemed the new Successful Bidder(s) and shall be obligated to consummate each Back-Up Bid as if it were a Successful Bid at the Auction. |

## V.    Extraordinary Provisions Under the Sale Guidelines

49.    Collectively, the Bidding Procedures and the Stalking Horse Agreement contain, and the proposed Sale Order is contemplated to contain, the following provisions, which the Sale Guidelines require to be separately disclosed[26]:

(a)    <u>Agreements with Management</u>. The Stalking Horse Agreement requires that the Buyer shall provide to each individual who, as of the Closing Date, is employed by, or has an outstanding offer of employment to be employed by, the Company, including the Debtors' current management team, an offer of employment for such position and with such responsibilities, base salary, incentive compensation and other benefits that are no less favorable than such terms as of prior to the Closing.

(b)    <u>No Good Faith Deposit</u>. Pursuant to the Bidding Procedures, the Stalking Horse Bidder shall not be required to post a Good Faith Deposit. Additionally, the Debtors reserve their rights to waive the requirement to provide a Good Faith Deposit with respect to any Bid by the Ad Hoc Cross-Holder Group.[27]

(c)    <u>Record Retention</u>. Under the Stalking Horse Agreement, the Excluded Assets include the Endo Companies' documents prepared in connection with the PSA or the transactions contemplated thereby or relating to the Chapter 11 Cases, and any books and records that any Debtor is required by Law to retain; *provided, however*, that upon request of Buyer prior to or subsequent to the Closing, the Endo Companies will provide Buyer with copies or other appropriate access to the information in such documentation to the extent reasonably related to Buyer's operation and administration of the Business.

(d)    <u>Sale of Avoidance Actions</u>. As set forth in the Stalking Horse Agreement, the Transferred Assets include all of the rights and claims of the Sellers in any avoidance claims other than those (i) asserted against a Governmental Unit (as defined in section 101 of the Bankruptcy Code) in connection with a settlement of an opioid claim; or (ii) relating to the payment of interest in respect of any unsecured indebtedness for borrowed money.

(e)    <u>Requested Findings as to Successor Liability</u>.

(i)    The proposed Bidding Procedures Order will request a finding that the Newcos shall not be liable for any claims against the Transferor Debtors or any of their predecessors or affiliates, and shall not have any successor,

---

[26]    The following list of possible Extraordinary Provisions, as such term is defined in the Sale Guidelines, is not intended to be an admission that any of these items are unusual relief in a sale of significant assets of a large chapter 11 debtor pursuant to section 363 of the Bankruptcy Code. Extraordinary Provisions that are not applicable here have not been included in the following list.

[27]    Any such determination will be made prior to the deadline to object to the Bidding Procedures.

transferee, or vicarious liabilities of any kind or character in connection with, or in any way relating to, the Transferor Debtors, the Specified Assets, or the Reconstruction Steps.

(ii)    The proposed Sale Order will request a finding that the Stalking Horse Bidder is not a successor to any Seller or the bankruptcy estate by reason of any theory of law or equity, and the Buyer shall not assume or in any way be responsible for any Liability of the Sellers, any of their Affiliates, or the bankruptcy estate, except as expressly provided in the PSA.

(f)    <u>Sale Free and Clear</u>. The Stalking Horse Agreement provides that the Sale Order shall provide for the sale of the Transferred Assets free and clear of all interests as provided under section 363(f) of the Bankruptcy Code.

(g)    <u>Requested Findings as to Fraudulent Conveyance</u>. The proposed Sale Order will request a finding that the consideration provided by the Successful Bidder pursuant to the final purchase agreement for the purchase the applicable Assets and the assumption of the applicable liabilities constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act, and under the laws of the United States, any state, territory, possession, or the District of Columbia.

(h)    <u>Relief from Bankruptcy Rules 6004(h) and 6006(d)</u>. The Debtors seek relief from the 14-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d), as further described herein.

## VI.    Key Dates and Deadlines

50.    The Debtors respectfully request that the Court approve the proposed timeline for the sale process set forth in the Bidding Procedures, attached as Exhibit 1 to Exhibit A, and have set forth certain key dates thereof below. The Debtors believe the proposed timeline is sufficient for an extensive marketing process:

| Date | Description |
|---|---|
| **December 15, 2022, at 11:00 a.m. (prevailing Eastern Time)** | Hearing to consider approval of these Bidding Procedures and entry of Bidding Procedures Order |

| Date | Description |
|---|---|
| **February 21, 2023, at 4:00 p.m. (prevailing Eastern Time)**[28] | Indication of Interest Deadline |
| For the Sale Notice Parties, **February 27, 2023, at 4:00 p.m. (prevailing Eastern Time)** (the "**Sale Objection Deadline**") For all other parties (not Sale Notice Parties), **April 21, 2023, at 4:00 p.m. (prevailing Eastern Time)** (the "**Supplemental Sale Objection Deadline**") | Deadline to object to the proposed Sale, including any objection to the sale of the Transferred Assets free and clear of liens, claims, interests, and encumbrances pursuant to section 363(f) of the **Bankruptcy Code** and entry of a Sale Order (each objection, a "**Sale Objection**") |
| **April 18, 2023, at 4:00 p.m. (prevailing Eastern Time)** | Deadline for any Prospective Bidders to submit a Qualified Bid in writing to the Bid Notice Parties (such deadline, the "**Bid Deadline**") |
| **April 27, 2023, at 10:00 a.m. (prevailing Eastern Time)** | Auction to be held at the offices of Skadden, Arps, Slate Meagher & Flom LLP |
| **[May 3], 2023, at [___] (prevailing Eastern Time)** | Date of Sale Hearing (unless accelerated) |

---

[28]    Subject to extension if the Reconstruction Steps have not been completed by this date.

## VII.    Sale Notice Procedures

51.    The Debtors' proposed Sale Notice Procedures will provide actual notice of the Sale to known parties in interest, as well as publication and other constructive notice to unknown parties.

52.    The Sale Notice Procedures constitute adequate and reasonable notice of the key dates and deadlines for the sale process. Accordingly, the Debtors request that the Court find that the Sale Notice Procedures are adequate and appropriate under the circumstances and comply with the requirements of Bankruptcy Rule 2002.

### A.    Delivery of the Sale Notice to the Sale Notice Parties

53.    The Sale Notice, substantially in the form attached as Exhibit 2 to Exhibit A, will: (a) include a general description of the Assets for sale; (b) prominently display the date, time, and place (as applicable) of the (i) Indication of Interest Deadlines, (ii) Accelerated Sale Hearing, (iii) Bid Deadline, (iv) Auction and (v) Sale Hearing; and (c) prominently display the deadlines and procedures for filing a Sale Objection. The Debtors propose to provide actual notice to the known parties listed in the Finegan Declaration and the Bidding Procedures, which parties they estimate could number in the hundreds of thousands. Finegan Decl. ¶ 19.

54.    On or before January 17, 2023, the Debtors shall file the Sale Notice with the Court, serve the Sale Notice on the Sale Notice Parties (as defined in the Bidding Procedures) by first class U.S. mail, and cause the Sale Notice to be published on the dedicated restructuring website hosted at https://restructuring.ra.kroll.com/Endo.

### B.    Supplemental Notice Plan

55.    The Sale Notice Procedures include the Supplemental Notice Plan, comprised of a multi-faceted supplemental outreach plan and media notice plan (the "Media Notice Plan")

designed to provide publication notice to the Debtors' unknown creditors, whose claims could relate to, among other things, use of the Debtors' opioid, transvaginal mesh and ranitidine products. *See* Finegan Decl. ¶¶ 3, 7.

56.     The Supplemental Notice Plan will provide notice to areas where potential parties in interest, including with respect to claims arising out of the Debtors' production, manufacture, or distribution of (a) opioids; (b) transvaginal mesh; and (c) ranitidine litigations, may now be located, including the United States and certain non-U.S. jurisdictions. As further described in the Finegan Declaration, the Supplemental Notice Plan is multi-faceted, and seeks to reach the target audiences in a variety of different ways, including: (i) broadcast, cable, and connected television, radio (terrestrial and streaming); (ii) a social media ads and hashtags; (iii) various online display banner ads, internet search terms, and YouTube video ads; (iv) static and digital billboards located in high traffic areas; (v) traditional print media such as magazines and newspapers; (vi) press releases; and (vii) community outreach via a one-page notice to institutions and third-party organizations that service likely users of Endo's products (*e.g.*, addiction and substance abuse treatment centers, pharmacies, prisons, schools, veterans' organizations). *See generally* Finegan Decl. ¶¶ 20–72.

57.     The Finegan Declaration, which describes the Supplemental Notice Plan, includes detailed descriptions of the types of media and community outreach to be utilized in the Supplemental Notice Plan. The Finegan Declaration also describes the adequacy of the plan (effective reach measured as a percentage of the target audience and frequency of message exposure), as well as a variety of other details regarding the scope and manner in which the plan will be implemented. In short, the Media Notice Plan component of the Supplemental Notice Plan will reach an estimated 90% of all adults in the United States and more than 80% of all adults in

Canada. Finegan Decl. ¶ 4. Print and social media notice will also be provided in other countries

where the Debtors' products have been sold. Finegan Decl. ¶ 4. The scope and selection of media

channels and geographical considerations have been guided by careful analysis of multiple data

sources providing information concerning all opioid, ranitidine, and transvaginal mesh distribution.

Finegan Decl. ¶ 5. The Debtors will launch the Supplemental Notice Plan to claimants and parties-

in-interest on or about February 1, 2023, and the Supplemental Notice Plan will run for no less

than 65 days, until approximately 14 days prior to the Sale Objection Deadline. The total estimated

cost of the Supplemental Notice Plan is expected to be approximately $16,300,000 in the aggregate.

Finegan Decl. ¶ 6. The Debtors will continue to work following the filing of this Motion to identify

cost efficiencies that may enable this amount to be reduced.

### C.     Noticing Cost Efficiencies

58.     As reflected in the *Motion of Debtors for Entry of an Order (I) Establishing*

*Deadlines for Filing Proofs of Claim; (II) Approving the Procedures for Filing Proofs of Claim;*

*(III) Approving the Proofs of Claim Forms; (IV) Approving the Form and Manner of Notice*

*Thereof; and (V) Approving the Confidentiality Protocol* (the "Bar Date Motion"), filed

contemporaneously herewith, and the Finegan Declaration, the Supplemental Notice Plan will also

simultaneously provide notice of the deadlines for all entities and persons to file a proof of claim

with respect to prepetition claims (the "Bar Dates"). The Debtors also intend to send the Bar Date

Notice Packages (as defined in the Bar Date Motion) together with the Sale Notice to the Sale

Notice Parties. As set forth in the Bar Date Motion, the Debtors have determined that, as the

quantum and approximate value of opioid claims will ultimately need to be determined in

connection with the implementation of the trusts to be funded by the Stalking Horse Bidder or any

other Successful Bidder implementing an opioid claim trust in connection with its bid, seeking the

establishment of the Bar Dates now and noticing such Bar Dates simultaneously with notice of the Sale will be the most cost-effective way to ensure timely implementation of such trusts in connection with the Sale. Further, to the extent there is a higher or otherwise better bid that provides a recovery for other general unsecured creditors, a Bar Date would be critical to enabling unsecured creditors to recovery in that instance.

59.     By providing simultaneous notice to creditors of both the Bar Dates and the Sale, the Sale Notice Procedures, including the delivery of the Sale Notice and the Bar Date Notice Package and implementation of the Supplemental Notice Plan, will provide adequate notice for all parties in interest while resulting in substantial cost efficiencies for the benefit of the Debtors' estates. Specifically, including information regarding the Bar Dates in the Supplemental Notice Plan for notice of the Sale will save the estates millions of dollars by simultaneously disseminating info on both case milestones. For example, there will be no incremental media costs due to need to utilize the proposed 60-second spots for TV regardless of the inclusion of Bar Dates in such programming.

60.     For direct notice of the Sale Notice and the Bar Date Packages, the Debtors' claims and noticing agent expects the total cost of mailing the Sale Notice alone to be up to approximately $325,000 based on the current understanding of the total creditor population. Inclusion of the Bar Date package will increase such amount to up to approximately $1.1 million, and the costs of processing related proofs of claim is estimated at approximately $5 to $15 million.[29] However, these costs are minimal compared to the costs of implementing a separate, comprehensive noticing and claim processing procedure at the time of the implementation of the opioid trusts, costs which the Stalking Horse Bidder has not agreed to assume in connection with the funding of the trusts or

---

[29]    The actual cost of processing proofs of claim is dependent on the total number of claims actually filed.

if it is determined ultimately that there is value available for distribution to other unsecured creditors.[30]

## VIII.    Assumption and Assignment Procedures

61.    In addition to the Sale Notice Procedures, the Debtors also seek approval of the Assumption and Assignment Procedures to facilitate the fair and orderly assumption, assumption and assignment, or rejection of certain of the Contracts and Leases as may be designated in the Stalking Horse Agreement or any other Successful Bid. The proposed Assumption and Assignment Procedures are set forth in the Assumption and Assignment Notice attached as Exhibit 3 to Exhibit A.

## <u>BASIS FOR RELIEF</u>

62.    The Debtors submit that application of the section 363(b) standard for sales outside of the ordinary course of a debtor's business is met here.

## I.    The Bidding Procedures Are Fair and Are Designed to Maximize the Value Received for the Assets.

63.    The Bidding Procedures are appropriate under sections 105 and 363 of the Bankruptcy Code because they provide for an orderly, uniform, and competitive bidding process through which interested parties may submit offers to purchase the Assets and provide potential bidders with sufficient notice and an opportunity to conduct appropriate due diligence. Indeed, the Bidding Procedures are designed to promote what courts have deemed to be the paramount goal of a chapter 11 sale: maximizing the value of sale proceeds received by the estate. *In re Celsius Network LLC*, No. 22-10964 (MG), 2022 WL 14193879, at *6, 7 (Bankr. S.D.N.Y. Oct. 24, 2022) ("[G]enerally, the Court will entertain a motion for approval . . . of proposed bidding procedures

---

[30]    The incremental claim processing costs are also largely a timing issue, as, if not incurred now in connection with the Bar Dates, such expenses would be incurred later in the Chapter 11 Cases, assuming there are recoveries for unsecured creditors through a trust or otherwise that would necessitate a bar date.

if such procedures are, as a matter of reasonable business judgment, likely to maximize the sale price," and finding bidding procedures there "work[ed] to ensure a fair bidding process and to maximize the sale price of the property in the auction" (second alteration in original) (quoting the Sale Guidelines and Bankruptcy Code section 363(b))); *In re Dura Auto. Sys., Inc.*, No. 06-11202 (KJC), 2007 WL 7728109, at *90 (Bankr. D. Del. Aug. 15, 2007) (citing cases and noting that "courts recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales").

64. With their advisors at PJT and Skadden, the Debtors have designed the Bidding Procedures as a two-phase process that will be familiar to the types of acquirers to whom the Debtors are marketing their assets. Aguizy Decl. ¶ 16. In the first phase, the Debtors will solicit indications of interest in order to understand which assets a prospective bidder might be interested in purchasing. In the second phase, the Debtors and their advisors will work with prospective bidders to advance their diligence efforts, refine their bids, and maximize the likelihood that a bid superior to the Stalking Horse Agreement will be submitted. In the event that no reasonably actionable indications of interest are received at the end of the first phase, the Debtors retain the right to accelerate the Sale Hearing, which will help to further reduce transaction costs and minimize administrative expense.

65. Importantly, the Debtors have designed their process to focus on the type of bids that are most likely to top the Stalking Horse Bid. Specifically, the Bidding Procedures counsel prospective acquirers to bid on the whole company or on certain Business Segments or significant asset packages (such as the CCH Assets and the Legacy Opioid Assets). Aguizy Decl. ¶ 12. The Debtors, in conjunction with their advisors, ran a comprehensive prepetition marketing process

last year and, as a result, have developed a thorough understanding of both the strategic- and sponsor-based interest across all of their Assets that has informed their view on the process design. Aguizy Decl. ¶¶ 11, 13. To that end, the proposed process both prioritizes the Debtors' most valuable and desirable Assets while avoiding the drawbacks associated with focusing on smaller, individual product-level bids. Aguizy Decl. ¶ 13.

66.     Permitting bids for smaller asset packages than the ones currently proposed is unlikely to be successful or value-maximizing for a variety of reasons. Among other things, engaging bidders interested in smaller asset packages would likely draw out the process and have a deleterious effect on business operations. Aguizy Decl. ¶ 13. For one, the diligence required to separate out such assets from the Debtors' complex, global operations would be extremely time-intensive without much corresponding benefit, as aggregating such bids would be highly unlikely to produce an overbid. Further, the time and effort involved in conducting diligence and engaging with bidders for individual assets or smaller asset packages could undermine the Debtors' ability to obtain an overbid and otherwise force the Debtors to accept greater execution risk. Aguizy Decl. ¶ 13. For example, bidders may be less inclined to devote the time and other resources to submitting a bid where they believe that a seller is running a parallel auction that is inconsistent with their proposed bid. Aguizy Decl. ¶ 13.

67.     Courts in this district and other districts have approved procedures similar to the proposed Bidding Procedures. *See, e.g.*, *In re Garrett Motion Inc.*, No. 20-12212 (MEW) (Bankr. S.D.N.Y. Oct. 24, 2020), ECF No. 282 (requiring submission of non-binding indications of interest prior to submission of qualified bids and permitting Debtors to accelerate sale hearing); *see also In re QHC Facilities*, No. 21-01643-als11 (Bankr. S.D. Iowa Feb. 11, 2022), ECF Nos. 164–65 (amending bidding procedures order to provide for designation of stalking-horse bid

38

as successful bid and acceleration of sale hearing if no preliminary bids are submitted by applicable deadline); *In re White Star Petroleum Holdings, LLC*, No. 19-12521-JDL (Bankr. W.D. Okla. July 12, 2019), ECF No. 290 (requiring submission of non-binding indications of interest prior to submission of qualified bids and permitting Debtors to accelerate sale hearing).

68.     Further, and as described above, the Debtors submit that the sale timeline and marketing period thereunder is reasonable. As noted above, the Debtors, with the assistance of PJT and their other advisors, developed a reasonable sale timeline for a potential sale of substantially all assets. In developing the sale timeline outlined above, the Debtors and their advisors took various factors into account, including, but not limited to, potential need to navigate complex regulatory review processes in a number of jurisdictions, the time needed to market the assets, and the time potential buyers would need to complete diligence and submit final bids. Moreover, as noted above, the Debtors' assets were marketed extensively as part of the prepetition sale process. Notably, the Debtors believe that numerous parties that may have an interest in bidding are already familiar with the Assets for purposes of formulating their bids.

69.     Courts in this district and others have approved bid procedures containing sale timelines similar (if not shorter) than the sale timeline proposed herein. *See, e.g.*, *In re Garrett Motion Inc.*, No. 20-12212 (MEW), ECF No. 282 (approving approximately 55-day sale timeline); *In re Ditech Holding Corp.*, No. 19-10412 (JLG) (Bankr. S.D.N.Y. Apr. 23, 2019), ECF No. 456 (approving 58-day sale timeline); *In re Synergy Pharm., Inc.*, No. 18-14010 (JLG) (Bankr. S.D.N.Y. Jan. 17, 2019), ECF No. 181 (approving 53-day sale timeline).

70.     Accordingly, the Bidding Procedures should be approved, because, under the circumstances, they are reasonable, appropriate, and in the best interests of the Debtors, their estates, and all parties in interest.

## II.    The Debtors Should Be Authorized to Carry Out the Reconstruction Steps.

71.    In order to facilitate the Stalking Horse Agreement and any other Successful Bid, the Debtors seek authorization to undertake certain preliminary structuring steps that will streamline an ultimate sale in a tax efficient manner, thereby helping to maximize value received from the Sale. The Debtors believe that the current transaction provides material value to the estates. Importantly, the Debtors have also taken great care to ensure that these Reconstruction Steps may be reversed in the very unlikely event that it is ultimately determined to be in the best interests of the estates. *See* Maher Decl. ¶ 14. Accordingly, the Reconstruction Steps should be approved as an appropriate exercise of the Debtors' business judgment.

72.    Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). The use of estate property should be authorized under section 363(b) so long as a sound business purpose exists for the transaction. *See In re Bos. Generating, LLC*, 440 B.R. 302, 321 (Bankr. S.D.N.Y. 2010) (citing *In re Lionel Corp.*, 722 F.2d 1063, 1070 (2d Cir. 1983)).

73.    Sound business justifications exist for preliminary intercompany restructuring transactions that are implemented in advance and in contemplation of a sale of assets or other transformative reorganization under the Bankruptcy Code when such intercompany transactions will provide substantial benefit to the estates (*e.g.*, in the form of aiding an efficient transaction structure or realizing substantial tax efficiencies).

74.    Implementation of the Reconstruction Steps prior to the selection of a Successful Bid(s) represents a sound exercise of the Debtors' business judgment for three primary reasons.

75.    *First*, the Reconstruction Steps will streamline an acquisition by replicating the existing Debtor corporate structure by moving the assets of three Debtor entities into newly formed entities, whose equity can be acquired by a counterparty. In addition to the business reasons for the sale, this structure will result in material tax efficiencies and any such savings generated should accrue to the Debtors' estates. Reflecting that these Reconstruction Steps will enable a tax efficient structure for the Sale, the Stalking Horse Bidder has agreed to indemnify the Debtors for any non-U.S. taxes that are nonetheless triggered by the Sale—representing a key benefit to the Debtors' estates. Barberio Decl. ¶ 23. It should be noted that failure to obtain approval of the mutually agreed transaction steps to implement and consummate a tax-efficient transaction under Irish law would provide a termination right to the Required Consenting First Lien Creditors under the RSA.

76.    Importantly, as a matter of Irish law, the Debtors must seek approval *now* of the Reconstruction Steps; they cannot wait until the Sale Order is entered and the ultimate transaction is approved. This is because the relevant conditions under applicable Irish law require the relevant steps to be taken in advance of a Successful Bidder having been selected as the purchaser of the Debtors' assets. Relatedly, in order to maximize the effectiveness of the Reconstruction Steps, these steps must be completed before the Debtors have made a determination as to the identity of the ultimate buyer. Accordingly, the Stalking Horse Agreement will not be executed until after the Reconstruction Steps have been completed. Although this is not typical in bankruptcy sale processes, because (a) the Stalking Horse Bidder will be credit bidding already existing debt, (b) the Required Consenting First Lien Creditors are already bound, pursuant to the RSA, to cooperate with the Debtors in effectuating the Sale, and (c) the Bidding Procedures Order will direct the Stalking Horse Bidder to execute the Stalking Horse Agreement within three business

41

days after completion of the Reconstruction Steps, the Debtors believe that a delay in executing the Stalking Horse Agreement is appropriate.

77.    ***Second***, even though these Reconstruction Steps are being undertaken in advance of entry of a Sale Order, the Debtors submit that implementation of such steps is in the best interest of parties in interest. The Reconstruction Steps are required in order to ensure that the purchase and sale of the Specified Assets will maximize the return to creditors on an after-tax basis regardless of the identity of the Successful Bidder. The tax deferral realized by the Reconstruction Steps will help to bolster the estates' administrative solvency and ensure that proceeds received from a topping bid can be allocated to junior creditors' recoveries.

78.    The Debtors submit that the corporate and regulatory approvals and intercompany arrangements necessary to implement the Reconstruction Steps are necessary to enable the Newcos to conduct the businesses of the Transferor Debtors in the ordinary course. Barberio Decl. ¶ 25. To the extent such actions are not ordinary course, the Debtors submit that the benefits to the Debtors' estates and parties in interest in the context of the overall Sale process achieved by the Reconstruction Steps justifies the Debtors to take any and all actions reasonably necessary or appropriate to consummate the Reconstruction Steps. Barberio Decl. ¶ 25.

79.    ***Third***, the Debtors have built specific measures into the Reconstruction Steps to avoid prejudicing junior, third-party creditors of the Debtors. Indeed, a large part of the complexity in the Reconstruction Steps arises from the careful structuring the Debtors have undertaken in order to preserve creditor entitlements. In particular:

(a)    **Protection of junior creditors of the current parent entities of the Transferor Debtors**: In order to protect the creditors of the current parent entities of the Transferor Debtors (the "Current Parents") from dilution as a result of the Transferor Debtors converting to unlimited liability status under Irish law, the

42

limited liability[31] Holdcos will be inserted into the corporate structure directly above each Transferor Debtor. This serves to avoid any dilution of creditors at the Current Parents as they will not be exposed to the creditor claims of the Transferor Debtors upon an insolvent liquidation of the Transferor Debtors, if any, because, under Irish law, the Holdcos (rather than the Current Parents) will then be the shareholders that may be held liable for those claims;[32]

(b)    **Protection of junior creditors of the Transferor Debtors**: If, in the absence of the Reconstruction Steps, junior creditors of the Transferor Debtors would otherwise have been entitled to share in the value of the Specified Assets (whether due to an overbid, a successful lien challenge, or otherwise), that entitlement is preserved because (i) bidders are required pay cash to the Holdcos on account of any Excess Value, and (ii) under the Subscription Agreement, any Excess Value will be applied in subscribing for shares in the Transferor Debtors, and any such Excess Value will therefore be recovered by the creditors of the Transferor Debtors in the same manner they would have recovered prior to the Reconstruction Steps. Accordingly, all original creditor entitlements with respect to such value are preserved following the Reconstruction Steps.

80.    Finally, the Reconstruction Steps can be unwound without any material adverse effects on the Debtors or their estates if it is determined that doing so provides the best result for the Debtors' estates and parties in interest. *See* Maher Decl. ¶ 14. The Debtors believe that, given the material benefits of the Reconstruction Steps to the Sale process, such steps should be approved and implemented. However, the process to unwind the Reconstruction Steps, if necessary, is relatively straightforward—in short, the Newcos would essentially transfer the Specified Assets back to the Transferor Debtors. Such process would likely take approximately the same amount of time as the Reconstruction Steps are estimated to take. As such, the Debtors have ensured that the estates will see significant benefits in the Sale process if the Reconstruction Steps are approved as

---

[31]    Pursuant to section 655(2)(a) of the Companies Act, in the event of a private limited liability company being wound up, no contribution shall be required from any member exceeding the amount, if any, unpaid on the shares in respect of which he or she is liable as a present or past member.

[32]    For the avoidance of doubt, the existing third-party prepetition secured and unsecured claims of the Transferor Debtors will not transfer to the Newcos under the Reconstruction Steps.

requested herein but have eliminated any material downside risk with respect to such approval and implementation at this stage.

81.     Implementation of preliminary transaction steps have been approved in a number of other cases in advance of a sale transaction. For example, in *In re TK Holdings Inc.* ("*Takata*"), the debtors sought and received approval to implement certain preparatory, pre-restructuring transactions with respect to their Mexican affiliates to timely and efficiently implement the global sale of Takata to the purchaser. These pre-restructuring steps included (a) the creation of a new Mexican trading company, (b) the transfer of certain assets and liabilities of certain debtor to a non-debtor affiliate, (c) transferring certain Mexican employees between and among the Mexican debtors and certain of their Mexican non-Debtor affiliates, (d) submitting necessary applications for certain licenses and permits, and (v) incurring related professional fees. *See* Motion for Authority to Effect Certain Pre-Restructuring Steps and Transactions with Respect to the Debtors' Mexican Affiliates Necessary for the Global Transaction ¶ 10, *In re TK Holdings Inc.*, No. 17-11375 (BLS) (Bankr. D. Del. Nov. 14, 2017), ECF No. 1157.

82.     The steps were necessary in *Takata* so that the purchaser could buy the equity of the new trading company and the transferee affiliates in order to acquire the Mexican debtors' assets other than those involved in substantial mass tort litigation. *Id*. ¶¶ 11, 24. In approving the transactions, the *Takata* court noted that it was satisfied that the debtors had carried their burden with respect to the requested relief, based on the record of the "business rationale and the need to move forward with these transactions," and the fact that the debtors, in conjunction with their key creditor constituencies, had built various protections into the transactions to ensure that creditors were not unfairly prejudiced. *See* Hr'g Tr. at 122:11–133:3; 134:14–135:5, *id.*, ECF No. 1324;

44

Order, *id.*, ECF No. 1314. Copies of the motion and the entered order approving the pre-restructuring steps in *Takata* are attached hereto as **Exhibit C**.

83.     Further, in *In re Mallinckrodt plc*, the debtors received approval for certain intercompany restructuring transactions involving an intercompany transfer of intellectual property in order to avoid $12 million to $15 million per month in additional tax liabilities absent such changes to their intellectual property holding structure. *In re Mallinckrodt plc*, No. 20-12522 (JTD) (Bankr. D. Del. Nov. 25, 2020), ECF No. 633. Based on the "representations and the record presented" from the Debtors and their creditors that the restructuring transactions, as structured, would prejudice no creditors and reflected a significant benefit to the estate in the way of the tax efficiencies, the *Mallinckrodt* court was "satisfied that the requested relief [was] appropriate" under section 363(b). *See* Hr'g Tr. 14:15–21:11, *In re Mallinckrodt plc*, Adv Proc. No. 20-50850, Case No. 20-12522 (JTD) (Bankr. D. Del. Nov. 23, 2020), ECF No. 168; *see also In re NII Holdings, Inc.*, No. 14-12611 (SCC) (Bankr. S.D.N.Y. Feb. 17, 2015), ECF No. 472 (approving pre-closing transaction structuring where equity in debtor subsidiary was transferred to newly formed debtor entity to maximize the proceeds to the Debtors' estates); *In re Valaris plc*, No. 20-34114 (MI) (Bankr. S.D. Tex. Dec. 21, 2020), ECF No. 844 (approving intercompany transaction steps to transfer equity interests in certain debtor subsidiaries to other debtor subsidiaries for tax reasons, even where it would result in $700 million of taxable income to the debtors, which the debtors intended to offset with net operating losses).

84.     Accordingly, executing the Reconstruction Steps constitutes a sound exercise of business judgment, is in the best interests of the estates, was structured to not prejudice parties in interest, can be unwound, is consistent with precedent, and should be authorized.

### III.    The Expense Reimbursement Amount Is Reasonable and Appropriate and Should Be Approved.

85.    The Debtors have agreed to provide minimal bid protections to the Required Holders and the Stalking Horse Bidder in the form of the Expense Reimbursement Amount. Bidding incentives such as the Expense Reimbursement Amount are commonplace in connection with sales of significant assets under section 363 of the Bankruptcy Code.

86.    Courts in this District analyze the appropriateness of bidding incentives under the "business judgment rule" standard, with well-established law that bid protections similar to the Expense Reimbursement Amount should be approved as long as (a) the relationship between the parties is not tainted by self-dealing, (b) the fee does not hamper bidding, and (c) the amount of the fee is reasonable in relation to the size of the transaction. *See Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 658 (S.D.N.Y. 1992). All three of these requirements are met here.

87.    The Debtors, the Required Holders, and the Stalking Horse Bidder, each represented by sophisticated advisors, negotiated the terms of the Expense Reimbursement Amount at arms'-length. Barberio Decl. ¶ 11. Capped at $7 million in a multi-billion-dollar sale transaction requiring extensive costs and efforts by the Required Holders and Stalking Horse Bidder, the Expense Reimbursement Amount is reasonable and appropriate under the circumstances. Notably, there is no break-up fee sought. Moreover, the Debtors are already covering these same fees under the terms of the Cash Collateral Order.[33] Cash Collateral Order

---

[33]    The "Cash Collateral Order" is the Amended Final Order (I) Authorizing Debtors Use of Cash Collateral; (II) Granting Adequate Protection to Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief [Docket No. 535].

¶ 4(g). As a result, this obligation does not require the Debtors to incur any additional liability than what they are already subject to.

88.     For these reasons, the Expense Reimbursement Amount should be approved.

## IV.    The Sale Notice Procedures Should Be Approved

89.     Pursuant to Bankruptcy Rules 2002(a) and (c), the Debtors are required to notify creditors of the Sale, including a disclosure of the time and place of any auction, the terms and conditions of the Sale, and the deadline for filing any objections thereto. *See* Fed. R. Bankr. P. 2002 (a), (c).

90.     The Debtors submit that the Sale Notice Procedures described above fully comply with Bankruptcy Rule 2002 and are reasonably calculated to provide timely and adequate notice of the Bidding Procedures, the Auction, and the Sale Hearing to the Debtors' creditors and all other interested parties that are entitled to notice, as well as those parties that have expressed a bona fide interest in acquiring the Assets.

91.     The Supplemental Notice Plan should be approved because it comports with applicable due process standards for notice in mass tort cases approved by this and other courts. An "unknown" creditor is one whose "interests are either conjectural or future or, although they could be discovered upon investigation, do not in due course of business come to the knowledge" of the debtor. *Mullane v. Cent. Hanover Bank & Tr.*, 339 U.S. 306, 317 (1950). "It is well established that, in providing notice to unknown creditors, constructive notice of the bar claims date by publication satisfies the requirements of due process." *Chemetron Corp. v. Jones*, 72 F.3d 341, 348 (3d Cir. 1995). Moreover, in bankruptcy cases, when determining whether a creditor is "known" or "unknown," the appropriate form of notice, and how much to spend on notice, courts balance the interests of the debtor's existing and potential creditors as well as other parties in

interest. *Vancouver Women's Health Collective Soc'y v. A.H. Robins Co., Inc.*, 820 F.2d 1359, 1364 (4th Cir. 1987) (noting that a bankruptcy estate's resources are limited and the "court must use discretion in balancing these interests when deciding how much to spend on notification").

92.    Bankruptcy Rule 9008 also provides that a court shall determine the form and manner of publication notice, the newspapers used, and the frequency of publication. However, debtors are not required to publish notice in an excessive number of publications. *See In re Best Prods. Co.*, 140 B.R. 353, 357-58 (Bankr. S.D.N.Y. 1992) (finding it impracticable to expect a debtor to publish notice in every newspaper that an unknown creditor possibly may read). "The proper inquiry in evaluating notice is whether the party giving notice acted reasonably in selecting means likely to inform persons affected, not whether each person actually received notice." *In re Residential Cap., LLC*, No. 12-12020 (MG), 2015 WL 2256683, at *6 (Bankr. S.D.N.Y. May 11, 2015) (quoting *In re Best Prods. Co.*, 140 B.R. at 357–58). As such, courts have approved a wide spectrum of publication notice programs in mass tort cases with varying media, effective reach rates, and message frequencies, depending on the facts of the case. *See, e.g.*, *In re Purdue Pharma L.P.*, No. 19-23649 (RDD) (Bankr. S.D.N.Y. Feb. 2, 2020), ECF No. 800 (approving supplemental notice plan utilizing traditional media, print, social media, and community outreach to reach approximately 95% of the adult U.S. population and 80% of the Canadian population at a frequency of eight times); *In re Mallinckrodt*, No. 20-12522 (JTD), ECF No. 2911 (approving supplemental notice plan utilizing various forms of traditional media, print, social media, and community outreach to reach 95% of target population at a frequency of six times); *In re TK Holdings*, No. 17-11375, ECF No. 959 (approving supplemental notice plan utilizing various forms of traditional, print, and internet media outreach designed to reach 95% of target audience at a frequency of four times).

93.     Accordingly, the Debtors respectfully request that the Court approve the notice procedures set forth herein, including the form and manner of service of the Sale Notice, and that no other or further notice of the Bidding Procedures, the Auction, and Sale Hearing is necessary or required.

## V.     Approval of the Sale Is Warranted under Section 363(b) of the Bankruptcy Code.

94.     A debtor will be authorized to sell assets outside of the ordinary course of business pursuant to section 363 of the Bankruptcy Code and prior to obtaining a confirmed plan of reorganization if the debtor demonstrates a sound business purpose for doing so. *See, e.g.*, *Official Comm. of Unsecured Creditors of LTV Aerospace & Def. Co. v. LTV Corp. (In re Chateaugay Corp.)*, 973 F.2d 141, 143-45 (2d Cir. 1992) (holding that bankruptcy court's approval of subsidiary corporation's sale of its assets before confirmation of chapter 11 plan was not abuse of discretion because, among other things, good business reason existed for sale); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070–71 (2d Cir. 1983) (setting forth factors guiding a finding of a good business reason for a section 363 sale).[34] Once a court is satisfied that there is a sound business justification for the proposed sale, the court must then determine whether (a) the debtor has provided the interested parties with adequate and reasonable notice, (b) the sale price is fair and reasonable, and (c) the purchaser is proceeding in good faith.

---

[34]   The *Lionel* court provided the following nonexclusive list of factors to guide a determination that "good business reason" justifies such a sale, including

   (a)   the proportionate value of the asset to the estate as a whole,

   (b)   the amount of elapsed time since the filing,

   (c)   the likelihood that a plan of reorganization will be proposed and confirmed in the near future,

   (d)   the effect of the proposed disposition on future plans of reorganization,

   (e)   the proceeds to be obtained from the disposition vis-à-vis any appraisals of the property,

   (f)   which of the alternatives of use, sale, or lease the proposal envisions and,

   (g)   "most importantly," whether the asset is increasing or decreasing in value.

*See In re Gen. Motors Corp.*, 407 B.R. 463, 493–94 (Bankr. S.D.N.Y. 2009). For the below reasons, the Debtors believe that the proposed Sale is a sound exercise of the Debtors' business judgment and should be approved.

### A.    A Sound Business Justification Exists for the Sale.

95.    A sound business purpose for the sale of a debtor's assets outside the ordinary course of business exists where such sale is necessary to preserve the value of the estate for the benefit of creditors and interest holders. *See In re Chateaugay Corp.*, 973 F.2d at 143–45 (finding that the bankruptcy court had considered the relevant factors, including the fact that the debtors had engaged in an "in-depth exploration of all viable alternatives," the sales procedure was "properly calculated to obtain a fair and reasonable recovery for the assets in question," the debtors had taken into account "the interests of equity and the various creditor groups," and an immediate sale was "necessary to obtain maximum value" for the debtors' assets (citation omitted)); *In re Lionel*, 722 F.2d at 1070–71. The Debtors have articulated a clear business justification for the Sale. As explained in greater detail above and in the declarations in support of the Sale, the Debtors determined, while acting in the interest of their estates and in accordance with their fiduciary duties, that the Sale as conducted in accordance with the Bidding Procedures will maximize value of the estate and is in the best interests of the Debtors' stakeholders, creditors, estates, and other parties in interest.

96.    Indeed, as described above, proceeding with a sale in advance of a chapter 11 plan is a proper exercise of the Debtors' business judgment. Pursuing the primary alternative path—a chapter 11 plan of reorganization—at the outset would cause the estates to incur significant

amounts of incremental professional fees resulting from prosecuting major litigations on several fronts that would not be implicated by the Sale.[35]

97.    Specifically, first, confirming a chapter 11 plan of reorganization would require overcoming substantial litigation regarding whether governmental opioid claims are non-dischargeable. Although Endo strongly disputes liability on these claims and is optimistic of its chances of defeating non-dischargeability actions, doing so would undoubtedly involve significant amounts of litigation, which would necessarily require substantial professional fee expenditure and transpire over a protracted, unpredictable time period, likely beyond the Debtors' maximum plan exclusivity periods. If Endo were unable to succeed in overcoming the non-dischargeability litigation, its only viable path forward would be to pivot to a sale, just like it is pursuing here, but at a time when a sale may be a much less value-maximizing option than it is today as a result of the Debtors having endured expensive and protracted litigation and having been exposed to the risk of extensive business degradation and headcount attrition as a result of such process.

98.    In addition, a plan process would likely result in a contested valuation hearing. As the Court is aware, it is common for out-of-the-money creditors to challenge the Debtors' valuation in an effort to generate a recovery. Here, the Court could expect competing assertions about valuation from both the Second Lien Noteholders and unsecured creditors, creating a challenging dynamic on a basic issue related to plan confirmation.

99.    Moreover, the Debtors would also face the assertion of potentially hundreds of millions of dollars of priority tax claims asserted by the IRS related to certain transfer pricing and other disputes with the Debtors. Again, the Debtors believe that they would succeed in such a

---

[35]    The Debtors reserve their right to seek confirmation of a plan of reorganization or liquidation after closing of the Sale in order to wind down their estates or administer any assets that are not acquired in the Sale.

priority tax litigation with the IRS, but it would be drawn out, expensive, and subject to uncertainty. These issues typically take many years to litigate or resolve outside of the bankruptcy context. Even using bankruptcy tools, this litigation would likely be lengthy, expensive, and contentious.

100.     Finally, if the Debtors were to pursue such a long, expensive, and uncertain plan path, there are no guarantees that the Ad Hoc First Lien Group would support such a process and/or vote in favor of a plan, leading to yet more long, expensive, and uncertain confirmation litigation with that constituency as well.

101.     The Debtors' proposed sale approach renders all of this litigation irrelevant. Any saved professional fees can go to bolstering creditors' recoveries. And the Debtors and their stakeholders will not have to suffer the uncertainty if it turns out that any of these litigations do not go the Debtors' way, potentially making a chapter 11 plan of reorganization infeasible.

102.     By contrast, a sale under section 363 of the Bankruptcy Code is a well-trodden path used by thousands of debtors in bankruptcy courts all over the country and a well-acknowledged (and best) way to determine value. *See, e.g.*, B*ank of Am. Nat. Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999) ("[T]he best way to determine value is exposure to a market."); *In re Iridium Operating LLC*, 373 B.R. 283, 293 (Bankr. S.D.N.Y. 2007) ("[T]he public trading market constitutes an impartial gauge of investor confidence and remains the best and most unbiased measure of fair market value and, when available to the Court, is the preferred standard of valuation."). It involves the Court's consideration and application of familiar bankruptcy law principles, little different than in countless cases before it. Although a sale may involve some degree of litigation, the Debtors should not be bogged down for the many months or years that the alternative plan path would entail. After conclusion of an extensive marketing process, the Debtors

will receive appropriate compensation for their assets. Creditors will benefit from the recoveries that they are entitled to under the absolute priority rule.

103.    Accordingly, the Court should find that, under these circumstances, a sale under section 363 of the Bankruptcy Code is an appropriate exercise of business judgment and is supported by a sound business purpose.

**B.      The Sale Is Fair and Reasonable Under the Circumstances.**

104.    The Debtors also meet the additional requirements necessary to approve a sale under section 363 of the Bankruptcy Code.

105.    First, the Debtors will provide adequate notice of the Sale to the Sale Notice Parties, including all relevant Counterparties *See* Finegan Decl. ¶¶ 18–19. The Debtors submit that the Sale Notice Procedures are reasonable and adequate under the circumstances.

106.    Second, the Debtors will have completed a long, fulsome, and deliberate effort to market the Assets prior to finalizing the terms of the Sale pursuant to the Successful Bid, guided by their professional advisors.

107.    Accordingly, the Debtors believe the Bidding Procedures will result in a fair and reasonable sale price for the Assets, and therefore it is a valid exercise of the Debtors' business judgment to seek the relief requested by this Motion.

**C.      The Successful Bidder Should be Entitled to the Protections of Section 363(m) of the Bankruptcy Code.**

108.    Third, the Debtors are confident that the Successful Bidder will be proceeding in good faith. Section 363(m) of the Bankruptcy Code protects a good faith purchaser's interest in property purchased from a debtor notwithstanding that the sale conducted under section 363(b) of the Bankruptcy Code is later reversed or modified on appeal.

109.    Section 363(m) of the Bankruptcy Code furthers the policy of providing "finality to judgments by protecting good faith purchasers, the innocent third parties who rely on the finality of bankruptcy judgments in making their offers and bids." *In re Chateaugay Corp.*, No. 92 CIV. 7054 (PKL), 1993 WL 159969, at *3 (S.D.N.Y. May 10, 1993) (quoting *In re Stadium Mgmt. Corp.*, 895 F.2d 845, 847 (1st Cir. 1990)). The Second Circuit has held that a purchaser's good faith is shown by the integrity of his or her conduct during the course of the sale proceedings, finding that where there is a lack of such integrity, a good faith finding may not be made. *See, e.g.*, *Licensing by Paolo, Inc. v. Sinatra (In re Gucci)*, 126 F.3d 380, 390 (2d Cir. 1997) (holding that a purchaser's good faith is lost by "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders" (citations omitted)).

110.    The Successful Bidder will be a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code, and the Stalking Horse Agreement (or any marked version thereof) is or would be a good faith agreement on arm's-length terms entitled to the protections of section 363(m) of the Bankruptcy Code.

111.    First, the consideration to be received by the Debtors pursuant to the Stalking Horse Agreement is substantial, fair, and reasonable. Because the Bidding Procedures require the consideration of any Successful Bid other than the Stalking Horse Bidder to exceed that of the Minimum Bid Amount, the consideration received by such other proposed asset purchase agreement would also be substantial, fair, and reasonable.

112.    Second, as mentioned, the Stalking Horse Bidder is not affiliated with the Debtors, and the parties entered into the Stalking Horse Agreement in good faith, and after extensive, arm's-length negotiations (during which both parties were represented by competent counsel).

113.    Finally, none of the Debtors, Required Holders, nor the Stalking Horse Bidder have engaged in any conduct that would cause or permit the Stalking Horse Agreement to be avoided under section 363(n) of the Bankruptcy Code. *See, e.g.*, *In re Colony Hill Assocs.*, 111 F.3d 269, 276 (2d Cir. 1997). If, following an Auction, the Stalking Horse Bidder is not the Successful Bidder, the Debtors will have negotiated the final asset purchase agreement with the Successful Bidder in good faith and at arms' length.

114.    Accordingly, the Debtors believe that the Successful Bidder (including the Stalking Horse Bidder as applicable) should be entitled to the full protections of section 363(m) of the Bankruptcy Code.

## VI.    The Proposed Sale Satisfies the Requirements of Section 363(f) of the Bankruptcy Code for a Sale Free and Clear of All Encumbrances, Including Successor Liability Claims.

115.    Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of another party's interest in the property if: (a) applicable non-bankruptcy law permits such a free and clear sale; (b) the holder of the interest consents; (c) the interest is a lien and the sale price of the property exceeds the value of all liens on the property; (d) the interest is in bona fide dispute; or (e) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest. *See* 11 U.S.C. § 363(f). Because section 363(f) of the Bankruptcy Code is stated in the disjunctive, satisfaction of any one of its five requirements will suffice to warrant approval of the proposed sale. Here, the Debtors submit that at least sections 363(f)(2), (3) and (5) of the Bankruptcy Code are met.

116.    First, section 363(f)(2) of the Bankruptcy Code is met because all Sale Notice Parties, including all parties known by the Debtors to have asserted a lien, claim, or encumbrance on the Transferred Assets, will receive the Sale Notice after it is served by the Debtors on or before

January 17, 2023. To the extent the relevant Sale Notice Parties have not objected by the applicable Sale Objection Deadlines, each of which are well in excess of the 21-days' notice required under Bankruptcy Rule 2002(a)(2), they will be deemed to have consented to the Sale free and clear of all liens, claims, and encumbrances.

117.    Second, section 363(f)(3) of the Bankruptcy Court is met because the Bidding Procedures and the Debtors' extensive and continuing efforts to market the Transferred Assets ensure that the purchase price paid for the Transferred Assets is the best available. Where the purchase price for a debtor's assets is the best available purchase price under the circumstances, a court may authorize the sale free and clear of existing liens, claims, and encumbrances pursuant to section 363(f)(3) of the Bankruptcy Code even if the purchase price is less than the face amount of liens, claims, and encumbrances. *See In re Bos. Generating, LLC*, 440 B.R. at 332; *In re Beker Indus., Inc.*, 63 B.R. 474, 477–78 (Bankr. S.D.N.Y. 1986).

118.    Third, section 363(f)(5) of the Bankruptcy Code is met because all interests in the Transferred Assets may be satisfied by a claim for money, and thus the Court may compel interested parties to accept money satisfaction for their interests. Upon the closing of the Sale, any party with a lien or other encumbrance will have a corresponding security interest in the proceeds of the Sale, as such liens, claims, and encumbrances will attach to the proceeds of the Sale with the same validity, priority, and force and effect as each such encumbrance had immediately prior to the closing of the Sale.

119.    Accordingly, the Debtors believe that the Sale will satisfy the statutory prerequisites of section 363(f) of the Bankruptcy Code and the Sale should be approved free and clear of all liens, claims, and encumbrances against the Assets.

120.     For these reasons, the Successful Bidder (including the Stalking Horse Bidder as applicable) should not be liable under any theory of successor liability relating to the Transferred Assets, but instead, should hold the Transferred Assets free and clear of liens, claims, and encumbrances (other than as identified as assumed liabilities by the final purchase and sale agreement for the Successful Bid), including successor liability claims.

## VII.    Credit Bidding Should Be Authorized Under Section 363(k) of the Bankruptcy Code.

121.     A secured creditor is allowed to "credit bid" the amount of its claim in a sale. Section 363(k) of the Bankruptcy Code provides, in relevant part, that unless the court for cause orders otherwise, the holder of a claim secured by property that is the subject of the sale may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset suchclaim against the purchase price of such property. 11 U.S.C. § 363(k). Thus, credit bidding is a statutory right of secured creditors that cannot be restricted absent cause shown.

122.     Although the Debtors understand that various parties may seek to challenge the liens of the Prepetition Secured Parties (as defined in the Cash Collateral Order), the Cash Collateral Order provides for a mechanism to resolve such challenge in advance of the Sale Hearing. *See* Cash Collateral Order ¶ 19. As such, the Court may approve the Bidding Procedures and the Stalking Horse Agreement, if such bid is the Successful Bid, despite the possibility of a potential lien challenge litigation.

123.     Accordingly, the credit bid contemplated by the Stalking Horse Agreement and the ability to credit bid pursuant to the Bidding Procedures should be authorized.

**VIII.   Assumption and Assignment of the Assigned Contracts Should Be Authorized.**

    **A.    The Assumption and Assignment Procedures Reflect the Debtors' Reasonable Business Judgment.**

124.    Section 365(a) of the Bankruptcy Code provides that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Upon finding that a debtor has exercised its sound business judgment in determining to assume an executory contract or unexpired lease, courts will approve the assumption under section 365(a) of the Bankruptcy Code if the transaction is in the best interests of the estate. *See In re Penn Traffic Co.*, 524 F.3d 373, 383 (2d Cir. 2008) ("That the debtor's interests are paramount in the balance of control is underscored by the business judgment standard employed by courts in determining whether to permit the debtor to assume or reject the contract."); *In re Klein Sleep Prods.*, *Inc.*, 78 F.3d 18, 25 (2d Cir. 1996) ("Th[e] decision [to allow a debtor to assume an unexpired lease] required a judicial finding—up-front—that it was in the best interests of the estate (and the unsecured creditors) for the debtor to assume the lease.").

125.    The assumption and assignment of the Contracts and Leases to be assumed and assigned in connection with the Successful Bid (the "Assigned Contracts") is an exercise of the Debtors' sound business judgment because the transfer of the Assigned Contracts is necessary to obtain the best value for the Assets.

126.    Notably, the Assumption and Assignment Procedures contemplate that indemnification provisions in the Assigned Contracts will be deemed amended to render null and void any rights to reimbursement relating to an opioid-related litigation or dispute. Absent such relief, the Successful Bidder, including the Stalking Horse Bidder, may unintentionally assume liability for opioid-related claims, frustrating the free and clear nature of the Sale and one of the central purposes of the Chapter 11 Cases. In the event that certain Counterparties decide to object

58

to the deemed amendment of indemnity provisions, the Debtors reserve their right to reject such contracts rather than open themselves up to additional opioid-related claims. Similar relief has been approved in connection with assumption procedures in other recent opioid-related chapter 11 cases. *See, e.g.*, Eighth Amended Plan of Reorganization, *In re Purdue Pharma*, No. 19-23649 (RDD), ECF No. 3632 (approved amended plan of reorganization providing a mutual release of opioid-related claims between the debtors and the objecting distributors, manufacturers, and pharmacies); Second Amended Plan of Reorganization, *In re Mallinckrodt*; No. 20-12522 (JTD), ECF No. 5636 (approved amended plan of reorganization including a provision providing for the amendment to each assumed or assumed and assigned contract to sever any provisions giving rights to an obligation indemnify certain opioid claims or demands).

127.    Moreover, the Debtors propose extensive measures in the Assumption and Assignment Notice to ensure actual notice of the proposed amendments to all relevant Contract and Lease Counterparties. Among other things, the Assumption and Assignment Notice includes (a) detailed information surrounding the specific proposed changes to the proposed Assigned Contracts; and (b) clear bolded instructions that (i) Counterparties may object to the proposed amendment and (ii) if a Counterparty does not object, it will be bound by the amendments to any applicable Contract or Lease to the extent the Successful Bidder choose to assume such Contract or Lease. The Debtors submit that these instructions give all Counterparties the ability to opt out of the proposed amendments and allow the Successful Bidder the ability to reject such unamended Contract or Lease thereafter.

128.    The Debtors believe that such process is the most efficient and effective way to maximize the value of the estate while providing Counterparties with a reasonable opportunity to evaluate and, if such counterparty sees as fit, object accordingly.

### B. Defaults Will Be Cured in Connection with the Sale.

129. The consummation of the Sale, which will involve the assignment of the Assigned Contracts, is contingent upon the Debtors' compliance with the applicable requirements of section 365 of the Bankruptcy Code. Section 365(b)(1) of the Bankruptcy Code requires that any outstanding defaults under the Assigned Contracts must be cured or that adequate assurance be provided that such defaults will be promptly cured.

130. As set forth in detail above, the Debtors propose to file with the Court and serve on all Contract and Lease counterparties Assumption and Assignment Notices, which will indicate the Debtors' calculation of the proposed cure amount (the "Cure Cost") for each such proposed Assigned Contract. Counterparties to the proposed Assigned Contracts will have the opportunity to file a Cure Objection with regard to the proposed assumption and assignment of the proposed Assigned Contracts to the Successful Bidder. Further, the Bidding Procedures Order provides a clear process by which to resolve disputes over cure amounts or other defaults. Therefore, the Debtors are confident that any such cure of defaults under the Assigned Contracts will be achieved fairly, efficiently, and properly, consistent with the Bankruptcy Code.

### C. Adequate Assurance of Future Performance Will Be Provided to Counterparties.

131. Pursuant to section 365(f)(2) of the Bankruptcy Code, a debtor may assign an executory contract or unexpired lease of nonresidential real property if "adequate assurance of future performance by the assignee of such contract or lease is provided." 11 U.S.C. § 365(f)(2). The meaning of adequate assurance of future performance depends on the facts and circumstances of each case, but should be given practical, pragmatic construction. *See, e.g.*, *In re Bygaph, Inc.*, 56 B.R. 596, 605–06 (Bankr. S.D.N.Y. 1986) (finding that adequate assurance is present when

prospective assignee of lease from debtor has financial resources and has expressed willingness to devote sufficient funding to business to give it strong likelihood of success).

132.    As set forth in greater detail in the Bidding Procedures, for a bid to qualify as a Qualified Bid, an Acceptable Bidder must include with its bid adequate information regarding its ability (and the ability of its designated assignee, if applicable) to perform under the proposed Assigned Contracts. The Debtors will demonstrate adequate assurance of future performance of the Assigned Contracts with respect to the Successful Bidder(s) and counterparties will have an opportunity to file an objection with respect to adequate assurance issues in advance of the Sale Hearing.

**D.    The Treatment of the Business Contracts Pursuant to the Reconstruction Steps Is Appropriate.**

133.    As noted above, counterparties to the Business Contracts will not be harmed by the Reconstruction Steps. Among other things, the BTAs preserve the ability of potential purchasers of the Specified Assets to determine which contracts to take and which to leave behind as part of the acquisition of the Specified Assets. Under the BTAs, the Transferor Debtors will maintain legal title to, and thus remain legally obligated under the Business Contracts (which include certain Contracts and Leases subject to the Assumption and Assignment Procedures and thus potential Assigned Contracts), even though the Newcos will have the beneficial interest (including the economic benefit and burdens) in the Business Contracts until the closing of a Sale. Accordingly, the BTAs will ensure that relevant contract counterparties will maintain all legal rights and recourse under the Business Contracts, notwithstanding the transfer of the Specified Assets under the Reconstruction Steps. The performance obligations for such Business Contracts will continue to sit at the asset-holding entities (following the Reconstruction Steps, the Newcos), while the Business Contracts themselves can be easily assumed and assigned by a potential purchaser

61

directly from the legal title-holding Transferor Debtors. This structure eliminates a substantial number of intercompany assumptions and assignments between the Transferor Debtors and the Newcos which may prove timely and potentially costly, adversely impacting the Sale process.

134.    Further, the arrangements contemplated by the BTAs are contemplated to be short-lived and in furtherance of an efficient and streamlined assumption and assignment process. As such Business Contracts are to be assumed and assigned to the eventual purchaser in accordance with the Bidding Procedures and the Assumption and Assignment Procedures, the potential purchasers are the parties that will ultimately need to provide adequate assurance of future performance under the Business Contracts to contract counterparties, not the Newcos. Based on the foregoing, the Debtors submit that the assumption and assignment of the Assigned Contracts satisfy the requirements under section 365 of the Bankruptcy Code and should be approved.

## **RESERVATION OF RIGHTS**

135.    Nothing contained herein is or should be construed as: (a) an admission as to the validity of any claim against the Debtors, (b) a waiver of the Debtors' rights to dispute the amount of, basis for, or validity of any claim against the Debtors, (c) a waiver of any claims or causes of action that may exist against any creditor or interest holder, (d) a promise to pay any claim, (e) an approval, assumption, adoption, or rejection of any agreement, contract, program, policy, or lease between the Debtors and any third party under section 365 of the Bankruptcy Code, or (f) otherwise affecting the Debtors' rights under section 365 of the Bankruptcy Code to assume or reject any executory contract or unexpired lease. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

## WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(h)

136.     The Debtors also request that the Court waive the stay imposed by Bankruptcy

Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other

than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court

orders otherwise." Fed. R. Bankr. P. 6004(h). As described above, the relief that the Debtors seek

in this Motion is necessary for the Debtors to operate without interruption and to preserve value

for their estates. Accordingly, the Debtors respectfully request that the Court waive the 14-day

stay imposed by Bankruptcy Rule 6004(h), to the extent applicable, as the exigent nature of the

relief sought herein justifies immediate relief.

## NOTICE

137.     Notice of this Motion shall be given to (a) the U.S. Trustee; (b) the Administrative

Agent's counsel; (c) counsel to the indenture trustee under each of the Debtors' outstanding bond

issuances; (d) counsel to the Ad Hoc First Lien Group; (e) counsel to the Ad Hoc Cross-Holder

Group; (f) the First Lien Collateral Trustee's counsel; (g) the Second Lien Collateral Trustee'

counsel; (h) the Official Committee of Unsecured Creditors; (i) the Official Committee of Opioid

Claimants; (j) the proposed future claimants representative in the Chapter 11 Cases; (k) the United

States Attorney General; (l) the Office of the United States Attorney for the Southern District of

New York; (m) the Offices of Attorneys General and Offices of the Secretaries of State for all 50

U.S. states, the District of Columbia, and all U.S. territories; (n) the Internal Revenue Service;

(o) the Securities and Exchange Commission; (p) the Antitrust Division of the United States

Department of Justice; (q) the Federal Trade Commission; (r) any governmental authority in any

country in which the Debtors are organized, which is known to have a claim against the Debtors

in the Chapter 11 Cases; (s) all state and local taxing authorities in the jurisdictions in which the

Debtors operate; (t) all environmental authorities having jurisdiction over any of the Assets, including the Environmental Protection Agency, if applicable; (u) all known Counterparties to any Contracts or Leases that may be assumed or rejected in connection with a Sale; (v) all persons and entities known by the Debtors to have asserted any lien, claim, interest, or encumbrance on, in or against the Assets; (w) any party that has requested notice pursuant to Bankruptcy Rule 2002; and (x) any other party entitled to notice pursuant to Local Rule 9013-1(b). The Debtors submit that no other or further notice need be provided.

## <u>NO PRIOR REQUEST</u>

138.    No prior request for the relief sought herein has been made to this or any other court.

### *[Remainder of Page Intentionally Left Blank]*

WHEREFORE the Debtors respectfully request that the Court (a) enter the Bidding

Procedures Order, and following the Sale Hearing, the Sale Order as requested herein and (b) grant

such other and further relief as may be just and proper.

Dated: November 23, 2022
     New York, New York         SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

                   By:    */s/ Paul D. Leake*
                         Paul D. Leake
                         Lisa Laukitis
                         Shana A. Elberg
                         Evan A. Hill
                         One Manhattan West
                         New York, New York 10001
                         Telephone: (212) 735-3000
                         Fax: (212) 735-2000

                         *Counsel for the Debtors*
                         *and Debtors in Possession*

## Exhibit A

**Bidding Procedures Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re* | **Chapter 11** |
| **ENDO INTERNATIONAL PLC,** *et al.*, | **Case No. 22-22549 (JLG)** |
| **Debtors.** [1] | **(Jointly Administered)** |

## ORDER (I) ESTABLISHING BIDDING, NOTICING, AND ASSUMPTION AND ASSIGNMENT PROCEDURES, (II) APPROVING CERTAIN TRANSACTION STEPS, AND (III) GRANTING RELATED RELIEF

Upon the motion (the "Bidding Procedures Motion")[2] of the debtors in possession (collectively, the "Debtors") in the above-captioned cases for entry of an order (this "Order"), among other things:

(a)     authorizing and approving the proposed bidding procedures (the "Bidding Procedures") in connection with the Sale;

(b)     authorizing and approving the terms and conditions of the Expense Reimbursement Amount;

(c)     authorizing the Debtors to (A) carry out certain reconstruction steps as set forth in (1) **Exhibit 4** to this Order and (2) the term sheets for the key transaction documents attached as **Exhibit 5** to this Order, in each case, subject to any amendments thereto made prior to the selection of the Successful Bid(s) (the "Reconstruction Steps"); and (B) execute, deliver, implement, and fully perform any and all obligations, instruments, documents, and papers, and to take any and all actions reasonably necessary or appropriate to consummate the Reconstruction Steps;

---

[1]     The last four digits of Debtor Endo International plc's tax identification number are 3755.  Due to the large number of debtors in these chapter 11 cases, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Endo. The location of the Debtors' service address for purposes of these chapter 11 cases is: 1400 Atwater Drive, Malvern, PA 19355.

[2]     Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Bidding Procedures Motion, the Bidding Procedures, or the Stalking Horse Agreement, as applicable.

(d)     authorizing and approving (i) the form of notice of the Auction, the Sale, and Sale Hearing (the "Sale Notice"); and (ii) the procedures for distributing such Sale Notice to known claimants, and the comprehensive plan for providing notice to unknown claimants (the "Supplemental Notice Plan" and, together with the method of distributing the Sale Notice to known claimants, the "Sale Notice Procedures");

(e)     authorizing the Assumption and Assignment Procedures to facilitate the fair and orderly assumption, assumption and assignment, and rejection of the Contracts and the Leases; and approving the form and manner of service of the notice regarding such assumption, assumption and assignment, or rejection to counterparties (such notice, the "Assumption and Assignment Notice");

(f)     establishing certain dates and deadlines for the sale process, including scheduling the Auction, if any, in accordance with the Bidding Procedures, and the Sale Hearing; and

(g)     granting related relief;

all as set forth more fully in the Bidding Procedures Motion; and upon the First Day Declaration, the Barberio Declaration, the Aguizy Declaration, the Maher Declaration, and the Finegan Declaration; and the Court having reviewed the Bidding Procedures Motion and having heard the statements in support of the relief requested therein at a hearing before the Court; and the Court having found that (a) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b) and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.); (b) this is a core proceeding pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b); (c) venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and (d) the Sale Notice Procedures and opportunity for a hearing on the Bidding Procedures Motion were appropriate under the circumstances and no other notice need be provided; and the Court having determined that the legal and factual bases set forth in the Bidding Procedures Motion and the declarations submitted in support thereof establish just cause for the relief granted herein; and the Court having determined that the relief requested by the Bidding Procedures Motion is in the best interests of the Debtors, their estates, their creditors, and other parties in interest; now, therefore,

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A.       The Debtors have articulated good and sufficient business reasons for the Court to approve (i) the Bidding Procedures; (ii) the Expense Reimbursement Amount, (iii) the Reconstruction Steps; (iv) the Sale Notice, the Supplemental Notice Plan, and the Sale Notice Procedures; (v) the Assumption and Assignment Procedures and the Assumption and Assignment Notice; and (vi) the scheduled date of the Auction and the Sale Hearing.

B.       <u>Bidding Procedures</u>. The Bidding Procedures are fair, reasonable, appropriate, and will maximize the value of the proceeds from the sale of the Assets.

C.       The Bidding Procedures were negotiated in good faith and are reasonably designed to promote active bidding and participation at the Auction to maximize the value of the Assets. The Debtors have designed the Bidding Procedures such that the Debtors final purchase and sale agreement(s) with the Successful Bidder or Successful Bidders will be entered without collusion, in good faith, and from arm's-length bargaining positions.

D.       The Bidding Procedures comply with the requirements of the Guidelines for the Conduct of Asset Sales promulgated by General Order M-383 of this Court.

E.       <u>Stalking Horse Agreement</u>. The approval of the Stalking Horse Bidder as a "stalking-horse" bidder and the Stalking Horse Agreement as a "stalking-horse" sale agreement is in the best interests of the Debtors and the Debtors' estates and creditors, and the Debtors have demonstrated compelling and sound justifications for the relief sought hereunder. The Stalking Horse Agreement will enable the Debtors to secure a fair baseline price for the Assets at the Auction and, accordingly, will provide a clear benefit to the Debtors' estates, their creditors, and all other parties in interest.

F.      The Debtors and the Stalking Horse Bidder negotiated the Stalking Horse Agreement without collusion, in good faith, and from arm's-length bargaining positions. Neither party has engaged in any conduct that would cause or permit the agreement to be avoided under section 363(n) of the Bankruptcy Code.

G.      The Stalking Horse Bidder is not an "insider" or "affiliate" of any of the Debtors, as those terms are defined in section 101 of the Bankruptcy Code, and no common identity of incorporators, directors, or controlling stakeholders exist between the Stalking Horse Bidder and the Debtors.

H.      Expense Reimbursement Amount. The Debtors' ability to provide the Expense Reimbursement Amount is necessary to ensure that the Stalking Horse Bidder will continue to pursue the Sale as contemplated by the Stalking Horse Agreement. To the extent payable under the Stalking Horse Agreement, the Expense Reimbursement Amount is (a) an actual and necessary cost and expense to preserve the Debtors' estates within the meaning of section 503(b) of the Bankruptcy Code; (b) commensurate with the real and substantial benefits conferred upon the Debtors' estates by the Stalking Horse Bidder; (c) fair, reasonable, and appropriate in light of the size and nature of the proposed Sale and the efforts that have and will be expended by the Stalking Horse Bidder in connection with the Debtors' sale process; and (d) necessary to induce the Stalking Horse Bidder to enter into the Stalking Horse Agreement and to continue to pursue the Sale.

I.      Reconstruction Steps. The Debtors have demonstrated both (i) good, sufficient, and sound business purposes and justifications and (ii) compelling circumstances for the Reconstruction Steps in that, among other things, the immediate implementation of this Order and the implementation and consummation of the Reconstruction Steps are necessary to maximize the

4

value received in the Sale for the benefit of the Debtors' estates, creditors, and other parties in interest.

J.        To maximize the value received in the Sale, it is essential that the Reconstruction Steps will occur as set forth in **Exhibit 4** to this Order, including within the time constraints set forth herein and therein, respectively.

K.        <u>Sale Notice Procedures</u>. The Sale Notice Procedures are reasonably calculated to provide all interested parties with timely and proper notice of the proposed Sale, including: (i) the date, time, and place of the Auction (if one is held); (ii) the Bidding Procedures and certain dates and deadlines related thereto; (iii) the objection deadline for the Sale and the date, time, and place of the Sale Hearing; (iv) reasonably specific identification of the Assets; (v) instructions for promptly obtaining a copy of the Stalking Horse Agreement; (vi) representations describing the Sale as being free and clear of liens, claims, interests, and other encumbrances, with all such liens, claims, interests, and other encumbrances attaching with the same validity and priority to the sale proceeds; (vii) the commitment by the Stalking Horse Bidder to assume certain liabilities disclosed in the Stalking Horse Agreement; and (viii) notice of the proposed assumption and assignment of the Contracts and Leases to the Stalking Horse Bidder (or to another Successful Bidder (as defined in the Bidding Procedures) arising from the Auction, if any) and the right, procedures, and deadlines for objecting thereto, and no other or further notice of the Sale shall be required.

L.        The Sale Notice Procedures contain the type of information required under Bankruptcy Rule 2002 and Local Rule 6004-1, and comply in all respects with applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

M.     <u>Assumption and Assignment Procedures</u>. The Assumption and Assignment

Procedures are fair, reasonable, appropriate, and comply with the provisions of section 365 of the

Bankruptcy Code and Bankruptcy Rule 6006.

N.     <u>Notice</u>. Due, sufficient, and adequate notice of (i) the nature of the relief requested

and (ii) relevant dates and deadlines have been given in light of the circumstances for: (1) the

Bidding Procedures Motion, (2) the hearing to consider the Bidding Procedures Order (the

"<u>Bidding Procedures Hearing</u>"), (3) the Bidding Procedures, (4) the Debtors' entry into the

Stalking Horse Agreement; (5) the Reconstruction Steps, (6) the Assumption and Assignment

Procedures, and (7) the Auction. No other or further notice thereof is required. A reasonable

opportunity to object and be heard regarding the relief granted herein has been afforded to all

parties in interest.

O.     <u>Relief is Warranted</u>. The relief granted herein is in the best interests of the Debtors,

their estates, and other parties in interest.

P.     <u>Other Findings</u>. The findings and conclusions set forth herein constitute the Court's

findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this

proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of

fact constitute conclusions of law, they are adopted as such. To the extent any of the following

conclusions of law constitute findings of fact, they are adopted as such.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT**

1.     The Bidding Procedures Motion is GRANTED to the extent set forth herein.

**I.     The Bidding Procedures**

2.     The Bidding Procedures, substantially in the form attached to this Order as

**<u>Exhibit 1</u>**, are approved and incorporated into this Order by reference, as though fully set forth

herein. Accordingly, the failure to recite or reference any particular provision of the Bidding Procedures shall not diminish the effectiveness of such provision, it being the intent of the Court that the Bidding Procedures be authorized and approved in their entirety. The Debtors are authorized to take all actions necessary or appropriate to implement the Bidding Procedures.

## II.    Important Dates and Deadlines

3.     <u>Sale Hearing</u>. The Sale Hearing will commence on **May 3, 2023**, at **[●] (prevailing Eastern Time)**, before the Honorable James L. Garrity, Jr. of the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004-1408. The Sale Hearing may be accelerated if the Debtors make a Sale Acceleration Election in accordance with the Bidding Procedures (such accelerated hearing, the "<u>Accelerated Sale Hearing</u>"). Subject to the terms of the Bidding Procedures, the Debtors may, in their reasonable business judgment, (and subject to the terms of the RSA and Stalking Horse Agreement, to the extent such agreements remain in full force and effect), in consultation with the Consultation Parties and the Successful Bidder(s), adjourn or reschedule any Sale Hearing or Accelerated Sale Hearing, as applicable, with notice to the Core Notice Parties.

4.     <u>Sale Objection Deadline</u>. Any objections to the Sale (a "<u>Sale Objection</u>") by a Sale Notice Party must be made by **February 27, 2023, at 4:00 p.m. (prevailing Eastern Time)** (the "<u>Sale Objection Deadline</u>"). Sale Objections made by any other party must be made by **April 21, 2023, at 4:00 p.m. (prevailing Eastern Time)** (the "<u>Supplemental Sale Objection Deadline</u>"). In each case, any Sale Objections must be made, filed, and served in accordance with the Bidding Procedures.  The Sale Objection Deadline and the Supplemental Sale Objection Deadline may be extended by the Debtors with the consent of the Stalking Horse Bidder and the Required

Consenting First Lien Creditors, to the extent that the Stalking Horse Agreement and the

Restructuring Support Agreement remains in full force and effect, and the Court.

5.    <u>Competitive Bidding</u>. The following dates and deadlines regarding competitive

bidding are hereby established, in each case subject to extension in accordance with the Bidding

Procedures and subject to the terms of the RSA and the Stalking Horse Agreement, to the extent

that such agreements remain in full force and effect:

(a)    <u>Indication of Interest Deadline</u>: **February 21, 2023, at 4:00 p.m. (prevailing Eastern Time)**, the deadline by which all Prospective Bidders must timely submit to the Debtors' investment banker, PJT Partners LP, a non-binding indication of interest (the "<u>Indication of Interest Deadline</u>");

(b)    <u>Bid Deadline</u>: **April 18, 2023, at 4:00 p.m. (prevailing Eastern Time)**, the deadline by which all Qualified Bids must be actually received in writing by the Bid Notice Parties (the "<u>Bid Deadline</u>"); and

(c)    <u>Auction</u>: **April 27, 2023, at 10:00 a.m. (prevailing Eastern Time)**, is the date and time the Auction, if one is needed, will be held at the offices of Skadden, Arps, Slate Meagher & Flom LLP, One Manhattan West, New York, New York 10001, or at such other time and location (including via remote video) as designated by the Debtors, in consultation with the Consultation Parties and providing notice to the Core Notice Parties, and subject to the terms of the Bidding Procedures.

## III.    Stalking Horse Agreement and Expense Reimbursement Amount

6.    The Stalking Horse Bidder is a Qualified Bidder and the Stalking Horse Bid is a

Qualified Bid, in each case, pursuant to the Bidding Procedures for all purposes.

7.    The Stalking Horse Bidder is hereby directed to execute the Stalking Horse

Agreement in the form attached to the Bidding Procedures Motion (or an amended form as may

be agreed to between the Debtors and the Stalking Horse Bidder and filed with the Court prior to

the entry of the Bidding Procedures Order) no later than three (3) business days following the

completion of the Reconstruction Steps unless otherwise agreed to by the Debtors. To the extent

the Reconstruction Steps are not completed by three (3) business days prior to the Indication of

Interest Deadline, the Debtors, with the agreement of the Required Consenting First Lien

Creditors, shall extend the Indication of Interest Deadline to an appropriate date in order that the Indication of Interest Deadline shall, in all circumstances, occur following the completion of the Reconstruction Steps; *provided* that the Debtors may not, without the consent of (i) the Required Consenting First Lien Creditors, to the extent that the RSA remains in full force and effect, or (ii) the Stalking Horse Bidder, to the extent the Stalking Horse Agreement remains in full force and effect, extend any such date or deadline beyond the applicable milestone or outside date under the RSA or the Stalking Horse Agreement.

8.      The Debtors are hereby authorized and directed to pay the Expense Reimbursement Amount subject to the terms and conditions set forth in the Stalking Horse Agreement and this Order without any further order of this Court.

9.      Upon entry of this Order, the Expense Reimbursement Amount (if earned pursuant to the Stalking Horse Agreement) shall, until paid in full as set forth in the Stalking Horse Agreement, be entitled to administrative expense status pursuant to sections 503(b)(1) and 507(a)(2) of the Bankruptcy Code; *provided* that the Expense Reimbursement Amount is only payable (and is only entitled to administrative expense status, if applicable) in the event, and to the extent, that the Stalking Horse Bidder is entitled to such amounts under the Stalking Horse Agreement and without duplication of all outstanding fees and expenses due to the Prepetition First Lien Secured Parties under the Cash Collateral Order. The Debtors' obligation to pay the Expense Reimbursement Amount pursuant to the terms of the Stalking Horse Agreement and this Order shall survive termination of the Stalking Horse Agreement and shall be binding and enforceable against each of the Debtors, each of their respective estates, and any of their respective successors or assigns as if such successors or assigns were the Debtors.

10.     Notwithstanding anything to the contrary in this Order or any other order of this Court, the Stalking Horse Bidder shall not be required to file or serve a proof of claim with respect to claims arising under or in connection with the Stalking Horse Agreement with respect to the Expense Reimbursement Amount, and no bar date shall be imposed with respect to such claims.

11.     Absent further order of the Court, no person or entity, other than the Stalking Horse Bidder (solely to the extent set forth in this Order), shall be entitled to any expense reimbursement or break-up fee or similar protection by the Debtors for submitting a bid for Assets in accordance with the Bidding Procedures (a "Bid") or in any way participating in the sale process for the Assets.

## IV.    Reconstruction Steps

12.     The Debtors are authorized to execute, deliver, implement and fully perform any and all obligations, instruments, documents and papers and to take any and all actions reasonably necessary or appropriate to consummate the Reconstruction Steps.

13.     From and after the implementation of the Reconstruction Steps, the Newcos shall receive the Specified Assets and their value from the respective Transferor Debtors subject only to the liens, encumbrances, and other interests (collectively, "Interests") held by or on behalf of the Prepetition Secured Parties (as defined in the Cash Collateral Order), in each case (a) attached to, payable from, secured by, or having recourse to the Specified Assets (including, for the avoidance of doubt, any and all Interests granted to the Prepetition Secured Parties pursuant to the Cash Collateral Order and the Prepetition Secured Parties rights to credit bid in respect of the Specified Assets) or their value or the cash or non-cash proceeds thereof (including, without limitation, all profits derived from the Specified Assets, and all assets of any kind that are acquired by the Newcos after the implementation of the Reconstruction Steps with the proceeds of, or profits derived from, the Specified Assets) (collectively, the "Prepetition Secured Parties' Interests") and

(b) as they exist immediately before the implementation of any of the respective Reconstruction Steps (subject to the Intercreditor Agreements (as defined in the Cash Collateral Order), as applicable) (such date, the "Reconstruction Steps Implementation Date"), to the same extent and with the same priority as they existed as of such time.  For the avoidance of doubt, the Prepetition Secured Parties' Interests shall be legal, valid, binding, enforceable, non-avoidable, and fully perfected to the same extent as immediately before the Reconstruction Steps Implementation Date.

14.     For the avoidance of doubt, (i) the Prepetition Secured Parties' are entitled to credit bid in respect of the Transferred Assets (including, without limitation, the Specified Assets) to the same extent as immediately before the Reconstruction Steps Implementation Date notwithstanding the implementation of any of the Reconstruction Steps and (ii) the rights of any party-in-interest to seek standing or authority to pursue, and thereafter prosecute, a Challenge (as defined in the Cash Collateral Order) and to object to the Prepetition Secured Parties' rights to credit bid are hereby reserved and preserved; *provided* that such party-in-interest is already entitled to seek standing or authority to pursue, and thereafter prosecute, a Challenge and to object to the Prepetition Secured Parties' rights to credit bid pursuant to the terms of the Cash Collateral Order as of the date hereof.  Nothing in this Order or the Bidding Procedures shall impact the rights of any of the Prepetition Secured Parties to assert claims for payment of make-whole, prepayment premium, or similar amount set forth in the Prepetition Documents (as defined in the Cash Collateral Order), and all such rights (and the right of any party in interest to object to or otherwise contest such claims) are fully reserved and preserved.

15.     Except as expressly provided in the Reconstruction Steps, by virtue of engaging in the Reconstruction Steps, the Newcos shall not assume any liability or other obligation of their respective Transferor Debtors or any other Debtor.  Without limiting the generality of the

foregoing, and except as expressly provided in the Reconstruction Steps, the Newcos shall not be liable for any claims against the respective Transferor Debtors or any of their predecessors or affiliates, and shall not have any successor, transferee, or vicarious liabilities of any kind or character in connection with, or in any way relating to, the Newcos, the Specified Assets, or the Reconstruction Steps.

16.     Notwithstanding anything else to the contrary in this Order or in the Reconstruction Steps, all rights as of the Petition Date of any party in interest, including the substantive rights of any and all creditors on account of any claims or Interests against, attached to, payable from, secured by, or having recourse to the Transferor Debtors shall be unaffected by the implementation of the Reconstruction Steps or this Order and are hereby reserved and preserved.

17.     From and after implementation of the Reconstruction Steps, the Reconstruction Steps shall not be subject to avoidance under any provision of the Bankruptcy Code or applicable law.

18.     Notwithstanding anything else to the contrary in this Order, and without prejudice to the approval of and authorization for the Debtors to consummate the Reconstruction Steps, (a) the entry of this Order and the relief granted hereby is without prejudice to the rights of any of the Prepetition Secured Parties under the applicable Prepetition Documents and such rights are hereby reserved and preserved in all respects; and (b) nothing in this Order, any of the transactions contemplated by this Order (including, without limitation, the Reconstruction Steps), or any other document, agreement, or instrument contemplated by this Order (including, without limitation, any document, agreement, or instrument evidencing the Reconstruction Steps) shall alter, amend, limit, or otherwise modify, or be interpreted as a waiver of, (i) the terms and provisions of, and the rights and remedies of the Prepetition Secured Parties under the applicable Prepetition Documents

(including all such terms, provisions, rights, and remedies of the Prepetition Secured Parties existing as of the Petition Date and thereafter), and/or (ii) the rights and remedies of the Prepetition Secured Parties, including without limitation the right to exercise such rights and remedies, under the applicable Prepetition Documents, or the rights of any other creditor under any document applicable to such creditor's rights, or (as to both the Prepetition Secured Parties and such other creditors) under applicable law; and (iii) all such rights and remedies are hereby preserved in all respects.

19.    The First Lien Collateral Trustee and Second Lien Collateral Trustee are hereby authorized and directed to take any action and enter into any documentation necessary to allow the Prepetition Secured Parties' Interests to attach to the assets of the Newcos at the time the Reconstruction Steps are completed.

20.    Any Intercompany Transactions (as defined in the Cash Management Order) that are assigned from the Transferor Debtors to the Newcos or replicated in the Newcos in connection with the Reconstruction Steps, which would have been in the ordinary course of business as between the Transferor Debtors and the counterparty to such Intercompany Transaction absent such assignment or replication, shall continue to be treated as Intercompany Transactions in the ordinary course of business and be authorized in connection with paragraphs 2(a) and 11 of the Cash Management Order.

21.    The Debtors shall be permitted to make necessary changes to the Cash Management System (as defined in the Cash Management Order) to enable the Newcos to operate in the ordinary course of business as if the Newcos were the Transferor Debtors, *provided*, that the Debtors shall comply with the notice requirements set forth in paragraph 2 of the Cash Management Order.

22.     To the extent the Debtors determine in their business judgement that it is necessary to do so, the Debtors (including, for the avoidance of doubt, the Newcos), shall be authorized to open any new bank accounts in accordance with paragraph 4 of the Cash Management Order and such bank accounts shall be treated as Bank Accounts (as defined in the Cash Management Order).

23.     In the event that the Prepetition Liens are successfully challenged resulting in any unencumbered value at the Newcos (such value, the "Unencumbered Value"), the Successful Bidder(s) shall be authorized and directed to pay cash to the Holdcos on account of the Unencumbered Value.

24.     In the event that a topping bid to the Stalking Horse Bid is selected as the Successful Bid, the Successful Bidder(s) shall be authorized and directed to pay cash to the Holdcos on account of any value attributable to the Newcos in excess of the value of the Prepetition Liens.

25.     The Debtors shall maintain records of all Intercompany Transactions arising from or in connection with the Reconstruction Steps, and all such transfers shall be documented in their books and records so that they may be traced and recorded. Solely for purposes of establishing or determining the entitlements to distributions (if any) of holders of claims against and interests in the applicable Debtor and for no other purpose, no settlements, setoffs, or payments made after the closing of the Reconstruction Steps on account of prepetition Intercompany Transactions shall increase or reduce the amount of any prepetition Intercompany Claims against any Transferor Debtor.

26.     The Debtors shall have the right to request that bidders (other than the Stalking Horse Bidder with respect to the Stalking Horse Bid) allocate the purchase price on account of the equity value of the Newcos or any other asset (including, but not limited to, any asset on which liens may be successfully challenged).

27.     Each Holdco shall be authorized and directed to enter into an irrevocable, conditional subscription agreement with the Transferor Debtor that it owns pursuant to which such Holdco shall irrevocably agree that if the Newco that it has acquired pursuant to the Reconstruction Steps is sold for more than nominal value (the value in excess of nominal being the "Excess Value"), such Holdco will use the Excess Value to subscribe for new shares in that Transferor Debtor.

**V.      Sale Notice Procedures**

28.     The Sale Notice Procedures, substantially in the form set forth in (a) the Sale Notice attached to this Order as **Exhibit 2** and (b) the Supplemental Notice Plan described in the Finegan Declaration [Docket No. [●]], are approved. The Debtors are authorized to implement the Sale Notice Procedures as set forth in the Bidding Procedures Motion, the Bidding Procedures, the Sale Notice, and the Finegan Declaration.

**VI.     Assumption and Assignment Procedures**

29.     The (a) Assumption and Assignment Procedures, as set forth in the Assumption and Assignment Notice substantially in the form attached to this Order as **Exhibit 3**, and (b) the Assumption and Assignment Notice are approved.

30.     The Assumption and Assignment Procedures shall govern the assumption or assumption and assignment of all of the Debtors' Contracts and Leases to be assumed or assumed and assigned in connection with the Sale, subject to the payment of any amounts necessary to cure any defaults arising under any such Contract or Lease (the "Cure Costs").

VII.    **Other Related Relief**

31.    All objections to the relief granted herein that have not been withdrawn with prejudice, waived, or settled, and all reservations of rights included in such objections, are hereby overruled and denied on the merits with prejudice.

32.    Notwithstanding Bankruptcy Rules 6004(h), 6006(d), or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

33.    To the extent the provisions of this Order are inconsistent with the provisions of any exhibits referenced herein or with the Bidding Procedures Motion, the provisions of this Order shall control.

34.    The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Bidding Procedures Motion.

35.    The Stalking Horse Bidder has standing to seek to enforce the terms of this Order.

36.    The Court shall retain exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, or enforcement of this Order, including, but not limited to, any matter, claim, or dispute arising from or relating to the Expense Reimbursement Amount, the Stalking Horse Agreement, or the Bidding Procedures.

Dated:  [●], 2022
New York, New York

_____
HONORABLE JAMES L. GARRITY, JR.
UNITED STATES BANKRUPTCY JUDGE

## __Exhibit 1__

## Bidding Procedures

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Paul D. Leake
Lisa Laukitis
Shana A. Elberg
Evan A. Hill
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
Fax: (212) 735-2000

*Counsel to Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| *In re* | **Chapter 11** |
| **ENDO INTERNATIONAL PLC,** *et al.*, | **Case No. 22-22549 (JLG)** |
| **Debtors.**[1] | **(Jointly Administered)** |

**BIDDING PROCEDURES FOR**
**THE SALE OF SUBSTANTIALLY ALL ASSETS**

The procedures set forth herein (these "Bidding Procedures") will be employed in connection with a sale(s) or disposition(s) (each, a "Transaction" and collectively, the "Sale") of substantially all the assets owned by Endo International plc and its debtor affiliates, as debtors and debtors in possession (collectively, the "Debtors") in connection with the above-captioned chapter 11 cases (the "Chapter 11 Cases").

By the *Debtors' Motion for an Order (I) Establishing Bidding, Noticing, and Assumption and Assignment Procedures, (II) Approving Certain Transaction Steps, (III) Approving the Sale of Substantially All of the Debtors' Assets, and (IV) Granting Related Relief* [Docket No. __] (the "Sale Motion") the Debtors, as debtors in possession, sought, among

---

[1]    The last four digits of Debtor Endo International plc's tax identification number are 3755.  Due to the large number of debtors in these chapter 11 cases, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Endo. The location of the Debtors' service address for purposes of these chapter 11 cases is: 1400 Atwater Drive, Malvern, PA 19355.

other things, approval of these Bidding Procedures for soliciting bids for, conducting an auction (the "Auction") of, and consummating, the Sale, as further described herein.[2]

On [_____], 2022, the United States Bankruptcy Court for the Southern District of New York (the "Court"), entered the *Order (I) Establishing Bidding, Noticing, and Assumption and Assignment Procedures, (II) Approving Certain Transaction Steps, and (III) Granting Related Relief* [Docket No. __] (the "Bidding Procedures Order"), which, among other things, authorized (a) the Debtors to solicit bids for the Sale in accordance with these Bidding Procedures outlined herein and (b) the Debtors' entry into a purchase and sale agreement (as may be amended, supplemented, or otherwise modified from time to time, the "Stalking Horse Agreement") with one or more entities (or their designees) formed in a manner acceptable to the Required Holders in their sole discretion (the "Stalking Horse Bidder") for the sale of the Transferred Assets, free and clear of any and all liens, encumbrances, claims, and other interests, pursuant to which the Stalking Horse Bidder has committed to provide aggregate consideration consisting of (collectively, the "Stalking Horse Bid"): (i) a credit bid, pursuant to section 363(k) of title 11 of the United States Code (the "Bankruptcy Code") in full satisfaction of the Prepetition First Lien Indebtedness (the "Stalking Horse Credit Bid"); (ii) $5 million in cash on account of certain unencumbered Transferred Assets (the "Stalking Horse Cash Purchase Price"); (iii) the Wind-Down Amount; (iv) the Pre-Closing Professional Fee Reserve Amounts; and (v) assumption of the Assumed Liabilities. Pursuant to the Bidding Procedures Order, the Stalking Horse Bid is subject to higher or better offers, the outcome of the Auction and the approval of the Court.

The Restructuring Support Agreement, dated as of August 16, 2022 (the "RSA"),[3] currently contemplates that the Sale will be implemented pursuant to the terms and conditions of either (i) the Stalking Horse Agreement or, (ii) in the event one or more third-party purchaser(s) is determined to have submitted the highest or otherwise best offer or offers for the Assets (as defined below) in accordance with these Bidding Procedures, the purchase and sale agreement(s) agreed to by the Debtors and such third-party purchaser(s).

## DESCRIPTION OF THE ASSETS

The Debtors seek to sell substantially all of their assets (including the Debtors' intellectual property, certain customer and vendor contracts, accounts receivable and goodwill) and assign certain contracts material to the operation of the Debtors' businesses (collectively, the "Assets").

The Debtors will only consider bids (including bids from multiple bidders and multiple bids submitted by the same bidder) that are made for either:

(a)     all or substantially all of the Debtors' Assets; or

(b)     one or more of the following:

---

[2]   All capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Sale Motion, the RSA (as defined below), or the Stalking Horse Agreement (as defined below), as applicable.

[3]   As used herein, the term "RSA" refers to both the RSA and Restructuring Term Sheet (as defined in the RSA).

(i)     one or more of the Debtors' Business Segments (as defined below) (either including or excluding (1) the CCH Assets (as defined below) and/or (2) the Legacy Opioid Assets (as defined below));

(ii)    all of the CCH Assets; and/or

(iii)   all of the Legacy Opioid Assets.

The Debtors have four principal operating segments (each, a "<u>Business Segment</u>"):

(a) <u>Branded Pharmaceuticals</u>: The Debtors' branded business focuses on products that have inherent scientific, regulatory, legal, and technical complexities, and markets such products under recognizable brand names that are trademarked. Products in the Branded Pharmaceuticals segment include: XIAFLEX®, SUPPRELIN® LA, NASCOBAL®, AVEED®, QWO® (QWO®, together with XIAFLEX®, the "<u>CCH Assets</u>"), PERCOCET®, TESTOPEL®, EDEX®, and LIDODERM®.

(b) <u>Sterile Injectables</u>: The Sterile Injectables segment includes a product portfolio of more than 30 product families. In this portfolio, there are (i) branded sterile injectable products that are protected by certain patent rights and have inherent scientific, regulatory, legal and technical complexities, and (ii) generic sterile injectable products that are difficult to formulate or manufacture or face complex legal and regulatory challenges. The Debtors' sterile injectables products are manufactured in sterile facilities in vial dosages and are administered at hospitals, clinics and long-term care facilities. Products in the Sterile Injectables segment include: VASOSTRICT®, ADRENALIN®, Ertapenem for injection, APLISOL®, and Ephedrine sulfate injection.

(c) <u>Generic Pharmaceuticals</u>: Generic products are the pharmaceutical and therapeutic equivalents of branded products and are generally marketed under their generic (chemical) names rather than their brand names. For generic products, the Debtors' focus is on high-barrier-to-entry products, with an emphasis on complex sterile injectable products, such as ready-to-use products, and first-to-file or first-to-market opportunities that are difficult to formulate or manufacture. The Generic Pharmaceuticals' product portfolio includes solid oral extended-release (*e.g.*, pills), solid oral immediate-release, liquids, semi-solids, patches (medicated adhesive patches designed to deliver the pharmaceutical through the skin), powders, ophthalmics (sterile pharmaceutical preparations administered for ocular conditions), and sprays, and includes other products that treat and manage a wide range of medical conditions. This segment includes approximately 135 generic product families, including ENDOCET® (ENDOCET®, together with PERCOCET®, the "<u>Legacy Opioid Assets</u>").

(d) <u>International Pharmaceuticals</u>: The International Pharmaceuticals segment sells a variety of specialty pharmaceutical products outside the United States, primarily in Canada through Debtor Paladin Labs Inc.  The key products of this segment serve various therapeutic areas, including attention deficit hyperactivity disorder, pain, women's health, oncology, and transplantation.

Any party interested in submitting a bid for any of the Debtors' Assets should contact the Debtors' investment banker, PJT Partners LP, 280 Park Avenue, New York, New York

10017 (Attn: Tom Davidson (davidson@pjtpartners.com), Mark Buschmann (buschmann@pjtpartners.com), Tarek Aguizy (aguizy@pjtpartners.com), and Scott Mates (mates@pjtpartners.com)).

### IMPORTANT DATES AND DEADLINES[4]

The key dates for the sale process are set forth below. The Debtors, after consultation with the Consultation Parties and subject to the terms of the RSA and the Stalking Horse Agreement, may extend any of the deadlines, or delay any of the applicable dates, in these Bidding Procedures; *provided* that the Debtors may not, without the consent of the Required Consenting First Lien Creditors, to the extent that the RSA remains in full force and effect, or the Stalking Horse Bidder, to the extent that the Stalking Horse Agreement remains in full force and effect, extend any such deadline or date beyond the applicable milestone or outside date under the RSA or the Stalking Horse Agreement.

| | |
|---|---|
| **December 15, 2022, at 11:00 a.m. (prevailing Eastern Time)** | Hearing to consider approval of these Bidding Procedures and entry of Bidding Procedures Order |
| **January 17, 2023** | Deadline for the Debtors to provide: (a) the Assumption and Assignment Notice to non-Debtor contract counterparties (each, a "Counterparty" and together, the "Counterparties"); and (b) the Sale Notice to the Sale Notice Parties |
| **February 1, 2023** | Target date to launch the Supplemental Notice Plan |
| **February 16, 2023, at 4:00 p.m. (prevailing Eastern Time)** | Deadline for all Counterparties to object to Debtors' proposed Cure Costs (as defined in the Sale Motion), the Assumption and Assignment Procedures and the Adequate Assurance Information of the Stalking Horse Bidder with regard to the Proposed Assumed Contracts (each such objection, a "Cure Objection") |
| **February 21, 2023, at 4:00 p.m. (prevailing Eastern Time)** | Indication of Interest Deadline |
| For the Sale Notice Parties, **February 27, 2023, at 4:00 p.m. (prevailing Eastern Time)** (the "Sale Objection Deadline") For all other parties (not Sale Notice Parties), **April 21, 2023, at 4:00 p.m. (prevailing Eastern Time)** | Deadline to object to the proposed Sale, including any objection to the sale of the Transferred Assets free and clear of liens, claims, interests, and encumbrances pursuant to section 363(f) of the Bankruptcy Code and entry of a Sale Order (each objection, a "Sale Objection") |

---

[4]    Certain terms used in this section are defined elsewhere in these Bidding Procedures.

| | |
|---|---|
| (the "<u>Supplemental Sale Objection Deadline</u>") | |
| **April 18, 2023, at 4:00 p.m. (prevailing Eastern Time)** | Deadline for any Prospective Bidders to submit a Qualified Bid in writing to the Bid Notice Parties (such deadline, the "<u>Bid Deadline</u>") |
| **April 24, 2023, at 5:00 p.m. (prevailing Eastern Time)** | Deadline for the Debtors to notify each Acceptable Bidder of their status as Qualified Bidders |
| **April 27, 2023, at 10:00 a.m. (prevailing Eastern Time)** | Auction to be held at the offices of Skadden, Arps, Slate Meagher & Flom LLP |
| **[May 3], 2023, at [●] (prevailing Eastern Time)** | Date of Sale Hearing (unless accelerated) |

## **NOTICING**

**I.      Parties to Receive Notice**

      **A.      Consultation Parties**

      As provided for in these Bidding Procedures and the Bidding Procedures Order, the Debtors shall consult in good faith with counsel to (each of the following parties to the extent applicable, including such party's advisors, a "<u>Consultation Party</u>"):

(a)      the Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases;

(b)      the Official Committee of Opioid Claimants appointed in the Chapter 11 Cases;

(c)      the Future Claims Representative appointed in the Chapter 11 Cases;

(d)      the Required Consenting First Lien Creditors, but only if both (i) following the Bid Deadline, the Debtors receive one or more Qualified Bids that provide for the payment in full in cash of the Prepetition First Lien Indebtedness, and (ii) the Stalking Horse Bidder informs the Debtors in writing that it will not modify the Stalking Horse Bid after such time; and

(e)      the Ad Hoc Cross-Holder Group, but only if after the Bid Deadline, either (1) the Ad Hoc Cross-Holder Group does not submit a Bid, or (2) (A) the Ad Hoc Cross-Holder Group submits a Bid, (B) the Debtors receive one or more Qualified Bids that the Debtors determine are higher or otherwise better than the Bid submitted by

5

the Ad Hoc Cross-Holder Group, and (C) the Ad Hoc Cross-Holder Group informs the Debtors in writing that it will not modify its Bid after such time.

For the avoidance of doubt, any consultation rights afforded to the Consultation Parties by these Bidding Procedures shall not limit the Debtors' discretion in any way and shall not include the right to veto any decision made by the Debtors in the exercise of their reasonable business judgment.

**B.    Bid Notice Parties**

All bids must be submitted in writing to the following parties (collectively, the "Bid Notice Parties"):

(a)    the Debtors, c/o Endo International plc, 1400 Atwater Drive Malvern, PA 19355 60179 (Attn: Matthew Maletta (Maletta.Matthew@endo.com) and Brian Morrissey (Morrissey.Brian@endo.com));

(b)    the Debtors' attorneys, Skadden, Arps, Slate Meagher & Flom LLP, One Manhattan West, New York, New York 10001 (Attn: Paul D. Leake (Paul.Leake@skadden.com), Lisa Laukitis (Lisa.Laukitis@skadden.com), Shana A. Elberg (Shana.Elberg@skadden.com), and Liz Downing (Elizabeth.Downing@skadden.com)); and

(c)    the Debtors' investment banker, PJT Partners LP, 280 Park Avenue, New York, New York 10017 (Attn: Tom Davidson (davidson@pjtpartners.com), Mark Buschmann (buschmann@pjtpartners.com), Tarek Aguizy (aguizy@pjtpartners.com), and Scott Mates (mates@pjtpartners.com)).

**C.    Core Notice Parties**

The "Core Notice Parties" shall include the following known persons and entities:

(a)    the Consultation Parties;

(b)    the Stalking Horse Bidder;

(c)    counsel to the Ad Hoc First Lien Group;

(d)    counsel to the Ad Hoc Cross-Holder Group;

(e)    counsel to the Ad Hoc Group of Personal Injury Victims;

(f)    counsel to the Ad Hoc Committee of NAS Children;

(g)    counsel to the Multi-State Endo Executive Committee;

(h)    all known Counterparties to any Contracts or Leases (each as defined below) that may be assumed or rejected in connection with a Sale;

6

(i)     all persons and entities known by the Debtors to have asserted any lien, claim, interest, or encumbrance on, in or against the Assets (for whom identifying information and addresses are available to the Debtors);

(j)     the Office of the United States Trustee for the Southern District of New York;

(k)     the United States Attorney General; the Office of the United States Attorney for the Southern District of New York; and the Offices of Attorneys General and Offices of the Secretaries of State for all 50 U.S. states and all U.S. territories;

(l)     the Internal Revenue Service;

(m)     all other state and local taxing authorities for the jurisdictions in which the Debtors maintain or conduct business or own property;

(n)     all environmental authorities having jurisdiction over any of the Assets, including the Environmental Protection Agency, if applicable;

(o)     all regulatory authorities that regulate the Debtors' businesses;

(p)     the Antitrust Division of the United States Department of Justice;

(q)     the Federal Trade Commission;

(r)     the Securities Exchange Commission; and

(s)     any other governmental authority in any country in which the Debtors are organized, which is known to have a claim against the Debtors in the Chapter 11 Cases;

(t)     entities on the Master Services List (as defined in the Order Authorizing the Establishment of Certain Notice, Case Management, and Administrative Procedures [Docket No. 374]) (the "Case Management Order");

(u)     all parties who have requested notice pursuant to Bankruptcy Rule 2002; and

(v)     all other persons and entities as directed by the Court.

**D.    Sale Notice Parties**

The "Sale Notice Parties" shall include the following known persons and entities:

**1.    Known Actual Claimants and Parties in Interest**

(a)     The Core Notice Parties;

(b)     all claimants that have filed a proof of claim prior to the date of entry of the Bidding Procedures Order;

7

(c)    all creditors and other known holders of claims prior to the date of entry of the Bidding Procedures Order, including all claimants listed in the Schedules (as defined in the Order (I) Establishing Deadlines for Filing Proofs of Claim; (II) Approving Procedures for Filing Proofs of Claim; (III) Approving the Proof of Claim Forms; (IV) Approving the Form and Manner of Notice Thereof; and (V) Approving the Confidentiality Protocol [Docket No. __] (the "<u>Bar Date Order</u>")) as holding claims, at the addresses stated therein;

(d)    all Debt Agents (as defined in the Bar Date Order);

(e)    all parties to litigation with the Debtors that are known as of the date of entry of the Bidding Procedures Order, and/or their counsel, including:

    (i)    all known parties to litigation or administrative proceedings with the Debtors as of the date of entry of the Bidding Procedures Order (including, without limitation, all co-defendants in the Debtors' prepetition (a) opioid; (b) generic pricing; (c) transvaginal mesh; (d) other antitrust; and (e) ranitidine litigations) for whom identifying information and addresses are available to the Debtors, and their counsel;

    (ii)    all known parties to litigation that concluded after July 1, 2021 (for whom identifying information and addresses are available to the Debtors) and their counsel; and

(f)    all (i) current employees of the Debtors and (ii) all former employees of the Debtors terminated on or after January 1, 2016.

## 2.    Known Potential Claimants and Parties in Interest

(g)    subject to entry of an order authorizing the Debtors to obtain such information, all persons or parties who have filed a Proof of Claim related to opioids in *In re Purdue Pharma L.P.*, Case No. 19-23649 (Bankr. S.D.N.Y. 2019);

(h)    all parties known to the Debtors as having potential claims against the Debtors' estates (each for whom identifying information and addresses are available to the Debtors) including:

    (i)    all U.S. corporate pharmacy headquarters and pharmacy benefit managers in all 50 U.S. states and all U.S. territories;

    (ii)    users and prescribers of Endo products who are included in an adverse event report or who have filed a product complaint and provided contact information;

    (iii)    parties who have threatened, but not filed, litigation against the Debtors (including, but not limited to, product disputes, employment disputes, and contract disputes); and such parties' counsel;

(iv)    entities and individuals other than current, former, and retired employees, officers, and directors, that have requested indemnification, and such entities' or individuals' counsel;

(v)    individuals who: (1) filed potential claims via the census registry ordered in *In re: Zantac (Ranitidine) Products Liability Litigation Master Personal Injury Complaint*, No. 9:20-md-02924-RLR (S.D.F.L 2020); (2) reported using prescription ranitidine products during the time the Debtors' product was on the market; and (3) claim to have developed one of the designated cancers, and such parties' counsel;

(vi)    parties who have entered into either individualized or aggregate settlement agreements with the Debtors surrounding transvaginal mesh products, but whose distribution rights pursuant to such agreements were unclaimed or otherwise not finalized as of the Petition Date;

(vii)    governmental or regulatory bodies that, as of August 16, 2021, have commenced or maintained ongoing investigations regarding the Debtors' businesses of which the Debtors have been made aware; and

(viii)    all persons and entities known by the Debtors to have expressed an interest to the Debtors in a sale transaction involving any material portion of the Assets during the past 12 months.

For the avoidance of doubt, to the extent that the Debtors are unable to obtain address information for a Sale Notice Party, but are able to obtain address information for such party's counsel, such counsel will be deemed a Sale Notice Party.

### E.    Objection Recipients

All Sale Objections, Cure Objections, and Auction Result Objections (each as defined below), each as further discussed in the Bidding Procedures Order, shall be filed with the Court by the applicable objection deadline and served on the following parties (collectively, the "Objection Recipients"):

(a)    the Bid Notice Parties;

(b)    entities on the Master Service List; and

(c)    counsel to the Stalking Horse Bidder.

## II.    Notice Procedures

### A.    Sale Notice Procedures

The Debtors will provide actual notice of the Sale to known parties in interest (*i.e.*, the Sale Notice Parties) as well as publication and other notice to unknown parties (*e.g.*, potential litigation claimants with identities or addresses not presently known or reasonably ascertainable

by the Debtors) (together, the "Sale Notice Procedures"). The Sale Notice Procedures provide for the following:

   **Sale Notice.** On or before the date that is five business days after entry of the Bidding Procedures Order, the Debtors shall file with the Court, serve on the Sale Notice Parties by first class U.S. mail, postage prepaid, and cause to be published on the dedicated website hosted and maintained by Kroll Restructuring Administration LLC, the Debtors' claims and noticing agent in the Chapter 11 Cases (the "Noticing Agent"), located at https://restructuring.ra.kroll.com/Endo (such website, the "Case Website"), the notice of the Sale, substantially in the form attached to the Bidding Procedures Order as **Exhibit 2** (the "Sale Notice").

   The Sale Notice will (a) include a general description of the Assets for sale and Business Segments or Assets for which Bids will be considered; (b) prominently display the date, time, and place (as applicable) of the (i) Indication of Interest Deadline, (ii) Accelerated Sale Hearing, (iii) Bid Deadline, (iv) Auction and (v) Sale Hearing; and (c) prominently display the deadlines and procedures for filing a Sale Objection.

   **Supplemental Notice Plan.** In addition, the Sale Notice Procedures include a comprehensive media plan for providing publication notice to unknown claimants (such plan, the "Supplemental Notice Plan").[5] The target date to launch the Supplemental Notice Plan is February 1, 2023. The Supplemental Notice Plan is to run for no less than 65 calendar days.

### B.  Assumption and Assignment Notice

   The Debtors developed procedures (such procedures, the "Assumption and Assignment Procedures") to facilitate the fair and orderly assumption, assumption and assignment, and rejection of certain executory contracts (the "Contracts") or unexpired leases (the "Leases") as may be designated in the Stalking Horse Agreement or any other Successful Bid(s) (as defined below). Pursuant to the Bidding Procedures Order, the Assumption and Assignment Procedures contemplate: (a) the amendment of certain indemnification and reimbursement clauses in applicable Assumed Contracts; and (b) the release of the Debtors (and any of the Debtors' assignees or successors to the applicable Assumed Contracts) from any obligations, liabilities, claims, or other rights of recovery arising thereunder.

   The Assumption and Assignment Procedures provide for notice regarding such assumption, assumption and assignment, or rejection of the Contracts and Leases to Counterparties, and the Debtors' calculation of potential cure costs that would arise in connection with any proposed assumption and assignment (such notice, substantially in the form attached to the Bidding Procedures Order as **Exhibit 3**, the "Assumption and Assignment Notice"). The Debtors shall provide the Assumption and Assignment Notice in accordance with the Bidding Procedures Order.

---

[5] The Supplemental Notice Plan is described in the *Declaration of Jeanne C. Finegan, APR in Connection with Sale Motion and Bar Date Motion*, filed contemporaneously with the Sale Motion.

## PROSPECTIVE BIDDERS

Persons or entities interested in purchasing Assets of the Debtors ("Prospective Bidders") will be divided into the following two categories:

1. **Prospective Parts Bidders**: Prospective Bidders that indicate an intent to submit a bid to purchase one or more, but not all of the, Business Segments (including or excluding the CCH Assets and/or the Legacy Opioid Assets) or a bid for the CCH Assets and/or the Legacy Opioid Assets will be considered "Prospective Parts Bidders," and such bid will be referred to as a "Parts Bid".

2. **Prospective WholeCo Bidders**: Prospective Bidders that indicate an intent to submit a bid to purchase all or substantially all of the Debtors' Assets will be considered "Prospective WholeCo Bidders," and such bid will be referred to as a "WholeCo Bid".

## MULTI-PHASE PROCESS

As described in further detail below, the marketing, bidding and sale process for the Debtors' Assets will take place in the following phases:

1. **Phase A**: "Phase A" will commence on a date following entry of the Bidding Procedures Order to be determined by the Debtors and conclude upon the Indication of Interest Deadline. During Phase A, Prospective Bidders that timely submit (or are exempt from submitting) Preliminary Bid Documents in accordance with these Bidding Procedures will be eligible to receive access to the Debtors' electronic data room (the "Data Room") and the confidential information memorandum relating to the Sale (the "CIM"). Prospective Bidders that desire to conduct additional due diligence and/or submit a Qualified Bid must timely submit an Indication of Interest (as defined below) in accordance with these Bidding Procedures.

2. **Phase B**: "Phase B" will commence following the Indication of Interest Deadline, which for the avoidance of doubt, will be after the completion of the preliminary transaction steps. During Phase B, Prospective Bidders that (a) have timely submitted Preliminary Bid Documents and an Indication of Interest, each of which are acceptable to the Debtors, in consultation with the Consultation Parties, or (b) are otherwise authorized to participate in Phase B as determined by the Debtors, in consultation with the Consultation Parties, will have the opportunity to conduct additional due diligence and submit a Qualified Bid in accordance with these Bidding Procedures.

As described below, if a Sale Acceleration Event occurs following Phase A, the Debtors may elect to accelerate the hearing with respect to the Sale in accordance with these Bidding Procedures.

11

## I.     Phase A

### A.     Prospective Bidder Requirements

To participate in the bidding process or otherwise be considered for any purpose hereunder, a Prospective Bidder (other than the Stalking Horse Bidder and the Ad Hoc Cross-Holder Group, who shall be deemed to be a Prospective Bidder for purposes of these Bidding Procedures) must deliver or have previously delivered to the Bid Notice Parties the following preliminary documentation (collectively, the "Preliminary Bid Documents"):

(a)     an executed confidentiality agreement in form and substance acceptable to the Debtors;

(b)     a statement that such party has a bona fide interest in submitting a Parts Bid (including an identification of which Business Segments or assets such party is interested in submitting a Parts Bid for (the "Identified Assets")) or a statement that such party has a bona fide interest in submitting a WholeCo Bid;

(c)     the identity of the Prospective Bidder, including its legal name, jurisdiction, form of organization, and whether the Prospective Bidder is a competitor of the Debtors; and

(d)     any other information that the Debtors may reasonably request (including information with respect to a Prospective Bidder's financial wherewithal to consummate the Sale).

Within three (3) business days after a Prospective Bidder delivers Preliminary Bid Documents the Debtors shall provide copies of any such Preliminary Bid Documents to the Consultation Parties. Promptly after the Debtors' receipt of Preliminary Bid Documents, but in any event not later than five (5) business days thereafter, the Debtors will determine and notify each Prospective Bidder as to whether such Prospective Bidder has submitted acceptable Preliminary Bid Documents. For the avoidance of doubt, the Stalking Horse Bidder and the Ad Hoc Cross-Holder Group are exempted from the foregoing requirements.

### B.     Due Diligence

Only the Stalking Horse Bidder, the Ad Hoc Cross-Holder Group, and Prospective Bidders that have submitted Preliminary Bid Documents acceptable to the Debtors, will be eligible to receive access to the Data Room and the CIM.  Notwithstanding the foregoing, for any Prospective Bidder who is a competitor or customer of the Debtors or is affiliated with any competitors or customers of the Debtors (excluding, for the avoidance of doubt, the Ad Hoc Cross-Holder Group to the extent it or its members do not have a controlling interest in a competitor or customer of the Debtors), the Debtors reserve the right to withhold or modify any diligence materials that the Debtors determine are business-sensitive or otherwise inappropriate for disclosure to such bidder.

12

During Phase A, the Debtors will *not* make their management team available for discussions with any Prospective Bidders and the Debtors will determine, in their sole discretion, whether to respond to any other additional due diligence requests.

### C.    Indications of Interest

In order to be eligible to participate in Phase B, all Prospective Bidders must timely submit to the Debtors' investment banker, PJT Partners LP, a non-binding indication of interest (an "Indication of Interest") that is acceptable to the Debtors, in consultation with the Consultation Parties. The deadline for Prospective Bidders to submit an Indication of Interest will be: **February 21, 2023 at 4:00 p.m. (prevailing Eastern Time)** (as may be extended by the Debtors without further notice or a hearing, the "Indication of Interest Deadline").

Each Indication of Interest must include the following information:

(a)    **Identity**. Each Indication of Interest must disclose the identity of the Prospective Bidder, including its legal name, jurisdiction, and form of organization, and details regarding the ownership and capital structure of the Prospective Bidder, including details related to the Prospective Bidder's beneficial owners, ultimate beneficial owners, and controlling entities, and any of the principals, corporate officers, or other representatives that are authorized to appear for and act on behalf of the Prospective Bidder with respect to the contemplated transaction.

(i)    With respect to identity, an Indication of Interest submitted by the Ad Hoc Cross-Holder Group must only disclose (A) whether it anticipates using or forming a new corporate entity in order to consummate the Sale if it is designated the Successful Bidder, (B) the identity of each of the members of the Ad Hoc Cross-Holder Group that participated in the submission of the Indication of Interest as Prospective Bidders (the "Participating Members") and (C) the aggregate principal amount of debt held by such Participating Members under the Credit Agreement, each First Lien Notes indenture and each Second Lien Notes indenture.

(b)    **Assets**. Each Indication of Interest must provide a description of the key components of the Prospective Bidder's potential Bid (as defined below). Indications of Interest with respect to potential WholeCo Bids should specify that the Prospective WholeCo Bidder anticipates submitting a Bid for all or substantially all of the Debtors' Assets. Indications of Interest with respect to potential Parts Bids must expressly identify the assets or Business Segments that the Prospective Parts Bidder anticipates to bid upon.

(c)    **Purchase Price**. Each Indication of Interest must specify the proposed purchase price in U.S. dollars, stated on a total enterprise value basis, to be paid in cash (or if applicable, through non-cash consideration, including a credit bid and/or forgiveness of secured debt), assuming the business is acquired on a cash- and debt-free basis, free of liens, claims and encumbrances under section 363 of the Bankruptcy Code to the extent permitted by law and a normalized level of working

capital. Each Indication of Interest must provide details on how such Prospective Bidder calculated its proposed purchase price. The Debtors shall have the right to request that Prospective Bidders (other than the Stalking Horse Bidder with respect to the Stalking Horse Bid) allocate the proposed purchase price on account of the equity value of the Newcos (as defined in the Bidding Procedures Order) or any other asset (including, but not limited to, any asset on which liens may be successfully challenged).

(d)   **Key Assumptions**. Each Indication of Interest must include a description of key assumptions, including operational assumptions, or other key points that the Prospective Bidder utilized to support the Indication of Interest.

(e)   **Financing Sources and Proposed Capital Structure**. Except as set forth below, each Indication of Interest must include evidence acceptable to the Debtors demonstrating the financial wherewithal of the Prospective Bidder to close the Transaction (including current audited or verified financial statements of, or verified financial support obtained by, the Prospective Bidder or, if the Prospective Bidder is an entity formed for the purpose of acquiring the property to be sold, the party that will bear liability for a breach), the identification of any person or entity who is reasonably anticipated to provide debt or equity financing for the transaction, the anticipated amounts to be provided by each source of funds, any associated transaction costs, and any material conditions, if known or reasonably anticipated, to be satisfied in connection with such financing.

(i)   With respect to financing sources and proposed capital structure, any Indication of Interest submitted by the Ad Hoc Cross-Holder Group must only include the identification of any person or entity who is anticipated to provide debt or equity financing for the transaction, and any material conditions to be satisfied in connection with such financing.

(f)   **Prospective Plans**. Each Indication of Interest must disclose a Prospective Bidder's proposed plans for the business following consummation of the Transaction, including intentions for management, employees and facilities, as well as any relevant experience in similar transactions. In addition, if a Prospective Bidder anticipates submitting a Parts Bid, the Indication of Interest should provide that the Prospective Bidder agrees to cooperate with the Debtors and other Prospective Bidders with respect to other compatible Parts Bids, including if required by the Debtors, to provide services on commercially reasonable terms to such other Prospective Bidders in connection therewith.

(g)   **Conditions and Approvals**. Each Indication of Interest must describe any conditions that a Prospective Bidder anticipates will need to be satisfied prior to entry into a Proposed PSA (as defined below) or consummation of the Transaction. Each Indication of Interest must also specify any internal approvals that were obtained in connection with the submission of an Indication of Interest and any internal approvals that are expected to be required prior to entry into a Proposed PSA and consummation of the Transaction. In addition, each Indication of Interest

14

must list any additional third-party or external approvals that are expected to be required prior to entry into a Proposed PSA and consummation of the Transaction and the amount of time required to secure such approvals.

(i)     An Indication of Interest submitted by the Ad Hoc Cross-Holder Group shall not be required to specify the internal approval processes for each of its individual holders.

(h)     **Due Diligence Requirements**. Each Indication of Interest must outline the remaining due diligence that a Prospective Bidder deems necessary in order to submit a binding proposal. The outline should include, but is not limited to, a list of critical topics, issues, and questions that a Prospective Bidder must address, and any documents a Prospective Bidder must review prior to the submission of a binding proposal. Each Indication of Interest must also provide details regarding any third parties (including financial and legal advisors) that a Prospective Bidder has engaged or expects to engage in order to complete its due diligence.

(i)     **Timing**. Each Indication of Interest must provide an estimate of the amount of time a Prospective Bidder requires to complete its due diligence review of the Debtors, obtain all necessary internal and external approvals, execute a definitive agreement and close the Transaction.

(j)     **Opioid Trust(s).** Each Indication of Interest must include whether the Indication of Interest provides for the establishment of a trust (or trusts) or other consideration for the benefit of opioid claimants or other means to address opioid claims against the Debtors, as well as the terms, if applicable, of such trust or mechanism.

(k)     **Contact Information and Advisors**. Each Indication of Interest must include the name, telephone number, and email address of the contact person(s) who will be available to discuss the Indication of Interest. The Indication of Interest must also list which external advisors have been retained to support any further diligence efforts and the submission of a binding proposal.

(l)     **Other Information**. Each Indication of Interest should provide any other information that a Prospective Bidder considers relevant for the Debtors and their advisors in evaluating such Indication of Interest or that a Prospective Bidder believes will distinguish its organization and capabilities in consummating the Transaction.

**D.     Indication of Interest Review Process**

Within three (3) business days after a Prospective Bidder delivers an Indication of Interest the Debtors shall provide copies of any such Indications of Interest to the Consultation Parties and the Multi-State Endo Executive Committee. Promptly after the Debtors' receipt of an Indication of Interest, but in any event not later than five (5) business days thereafter, the Debtors will determine, in consultation with the Consultation Parties, and notify each Prospective Bidder as to whether such Prospective Bidder has submitted an Indication of Interest acceptable to the

Debtors. For the avoidance of doubt, the Stalking Horse Bidder is exempted from the requirement to submit an Indication of Interest.

If (i) a Prospective Bidder does not submit an Indication of Interest prior to the applicable Indication of Interest Deadline or (ii) the Debtors determine, in consultation with the Consultation Parties, that (1) an Indication of Interest fails to materially comply with the requirements described in these Bidding Procedures, or (2) an Indication of Interest, viewed individually or together with other Indications of Interest, is not reasonably likely to result in the submission of a Qualified Bid, then the Debtors are authorized (but not directed) to deny the Prospective Bidder further diligence access or the opportunity to participate in Phase B.

The Stalking Horse Bidder and each Prospective Bidder that has submitted an Indication of Interest acceptable to the Debtors in consultation with the Consultation Parties by the applicable Indication of Interest Deadline shall be an "Acceptable Bidder."

### E.    Sale Hearing Acceleration

If (a) no parties submit an Indication of Interest prior to the Indication of Interest Deadline or (b) the Debtors, in their reasonable business judgment and in consultation with the Consultation Parties and the Multi-State Endo Executive Committee, determine that no Indication of Interest received prior to the Indication of Interest Deadline, viewed individually or together with other Indications of Interest, is reasonably likely to result in the submission of a Qualified Bid (the events described in clauses (a) and (b), each a "Sale Acceleration Event"), then the Debtors are authorized to elect to terminate the sale and marketing process and accelerate the sale hearing (a "Sale Acceleration Election"). In the event that the Debtors make a Sale Acceleration Election, the Debtors will file with the Court, serve on the Core Notice Parties, and cause to be published on the Case Website, a notice: (i) indicating that the Debtors have terminated the marketing process; (ii) naming the Stalking Horse Bidder as the sole Successful Bidder (as defined below); and (iii) setting forth the date and time of the Accelerated Sale Hearing (as defined below).

For the avoidance of doubt and notwithstanding anything to the contrary herein, the Debtors may, in consultation with the Consultation Parties, elect not to make a Sale Acceleration Election even if a Sale Acceleration Event occurs.

### II.    Phase B Bidder Qualifications

### A.    Phase B Due Diligence

Except as provided below, the Debtors will provide to each Acceptable Bidder due diligence information, as reasonably requested by such Acceptable Bidder in writing, and the Debtors shall post substantially all written due diligence provided to any Acceptable Bidder to the Debtors' electronic data room to be accessible by all Acceptable Bidders who are submitting a bid to which such diligence relates; *provided* that the Debtors will provide to the Stalking Horse Bidder and the Ad Hoc Cross-Holder Group any and all due diligence information provided to any Acceptable Bidder to the extent such information has not already been provided to such party and, in each case, such information shall not be subject to cleansing.

16

Notwithstanding the foregoing, the following procedures shall apply to requests by Acceptable Bidders for due diligence information and to additional non-public information regarding the Debtors:

(a)     The Debtors will have the right to determine, in their sole discretion, whether to make members of their management team available for discussions and what, if any topics are to be discussed, with any Acceptable Bidders relating to a potential Bid.

(b)     The Debtors, in consultation with the Consultation Parties, may decline to provide such information to Acceptable Bidders who, in the Debtors' reasonable business judgment have not established, or who have raised doubt, that such Acceptable Bidders intend in good faith to, or have the capacity to, consummate the Transaction(s).

(c)     For any Acceptable Bidder (including any Qualified Bidder) who is a competitor or customer of the Debtors or is affiliated with any competitors or customers of the Debtors, the Debtors reserve the right to withhold or modify any diligence materials that the Debtors determine are business-sensitive or otherwise inappropriate for disclosure to such bidder.

(d)     The Debtors shall not be obligated to furnish any due diligence information after the Bid Deadline to any party that has not submitted a Qualified Bid (as defined below). Except as contemplated pursuant to the terms of a purchase and sale agreement with the Successful Bidder(s) (as defined below), the availability of additional due diligence to a Qualified Bidder will cease on the conclusion of the Auction.

All due diligence requests shall be directed to the Debtors' investment banker, PJT Partners LP, 280 Park Avenue, New York, New York 10017 (Attn: Tom Davidson (davidson@pjtpartners.com), Mark Buschmann (buschmann@pjtpartners.com), Tarek Aguizy (aguizy@pjtpartners.com), and Scott Mates (mates@pjtpartners.com)).

Prospective Bidders will not, directly or indirectly, contact or initiate or engage in discussions in respect of matters relating to the Debtors or a potential transaction with any other Prospective Bidder or any customer, supplier, or other Counterparties of the Debtors, in each case, without the prior written consent of the Debtors.

Each Acceptable Bidder (including any Qualified Bidder), other than the Stalking Horse Bidder, shall comply with all reasonable requests for additional information and due diligence access requested by the Bid Notice Parties regarding the ability of such Acceptable Bidder (including any Qualified Bidder) to consummate its contemplated transaction. Failure by an Acceptable Bidder (including any Qualified Bidder), other than the Stalking Horse Bidder, to comply with such reasonable requests for additional information and due diligence access may be a basis for the Debtors to determine, in consultation with the Consultation Parties, that such bidder (including any Qualified Bidder) is no longer an Acceptable Bidder or that the Bid (as defined below) made by such bidder will not be considered a Qualified Bid.

17

### B.    Qualified Bid Requirements

(A) The Stalking Horse Bid and (B) a WholeCo Bid or a Parts Bid submitted by an Acceptable Bidder (each, a "Bid") that is determined by the Debtors to meet the requirements set forth below will each be considered a "Qualified Bid." The Stalking Horse Bidder and any other Acceptable Bidder that submits a Qualified Bid will be considered a "Qualified Bidder."

To qualify as a Qualified Bidder, an Acceptable Bidder (other than the Stalking Horse Bidder) must deliver a Bid that meets the following criteria to the Bid Notice Parties by the Bid Deadline:

(a) **Identity**. Each Bid must fully disclose the legal identity of each person or entity (including such entity's shareholders, partners, investors, and ultimate controlling entities) bidding for the Assets or otherwise participating in the Auction in connection with such Bid (including any parent companies, equity holders, or other financial backers), and the complete terms of any such participation and must also disclose any connections, arrangements or agreements, whether oral or written, with the Debtors, any other known bidder, and any officer or director of the foregoing. Each such Bid must also include contact information for the specific person(s) the Debtors should contact in the event they have questions about the Bid.

(b) **Purchased Assets**. Each Bid must clearly include the following:

(i) A clear statement that expressly identifies the Assets being bid upon (which must be all or substantially all of the Assets, one or more Business Segments, the CCH Assets and/or the Legacy Opioid Assets), including any Contracts and Leases of the Debtors that would be assumed and assigned in connection with the proposed Sale (all such Contracts and Leases, the "Proposed Assumed Contracts");

(ii) the proposed cash purchase price of the Bid (the "Bidder Cash Purchase Price"); and

(iii) the proposed liabilities to be assumed, including any debt to be assumed (together with the Bidder Cash Purchase Price, as determined by the Debtors, the "Bid Value").

The Debtors reserve the right to (a) ask any Acceptable Bidder to allocate the value ascribed to a Bid for any particular Asset, and to ask about any significant assumptions on which such valuations are based and (b) request that Acceptable Bidders (other than the Stalking Horse Bidder with respect to the Stalking Horse Bid) allocate the Bidder Cash Purchase Price on account of the equity value of the Newcos (as defined in the Bidding Procedures Order) or any other asset (including, but not limited to, any asset on which liens may be successfully challenged).

18

(c)     **Consolidated Bid**. Each Bid for less than all of the Assets must identify whether or not the Acceptable Bidder is willing to aggregate its Bid into an acceptable consolidated bid with other Acceptable Bidders.

(d)     **Minimum Bid**. The Bid Value proposed in a Bid or sum of Bids (as such Bid or Bids may be aggregated with other Acceptable Bidders) must exceed the Stalking Horse Bid and, taking into account both the Bidder Cash Purchase Price and any cash to be retained by the Debtors, must (i) provide for the indefeasible payment in cash in an amount that exceeds the sum, without duplication, of the following amounts: (1) $5,862,679,000.00,[6] *plus* (2) $5 million in cash on account of certain unencumbered Transferred Assets, *plus* (3) the Wind-Down Amount, *plus* (4) the Expense Reimbursement Amount (collectively, the "Minimum Bid Amount"), and (ii) provide for the funding of (1) the Pre-Closing Professional Fee Reserve Amounts, *plus* (2) all outstanding fees and expenses due to the Prepetition First Lien Secured Parties (as defined in the Cash Collateral Order) under the Cash Collateral Order, *plus* (3) Non-U.S. Sale Transaction Taxes.[7] If the Acceptable Bidder believes that the Bid Value relative to the Stalking Horse Bid should include additional non-cash components (such as fewer contingencies than are in the Stalking Horse Agreement), the Bid must include a detailed analysis of the value of any such additional non-cash components and any back-up documentation to support such value.

(i)     The minimum amount of cash in a Bid submitted by the Ad Hoc Cross-Holder Group may be reduced by the amount of any Prepetition First Lien Indebtedness held by any holders of the Ad Hoc Cross-Holder Group that are not party to the RSA and that are participating in such bid (the "Participating 1L Debt Holders"), so long as (A) any Prepetition First Lien Indebtedness held by parties not participating in the Ad Hoc Cross-Holder Group's bid are paid in full in cash in accordance with the Minimum Bid Amount and the documentation governing the secured debt (including any other amounts required to be paid thereunder) and (B) any claims against the Debtors arising from such Prepetition First Lien Indebtedness held by the Participating 1L Debt Holders are released by such holders at the closing of the Sale; *provided* that any mechanics necessary to ensure that the claims of the non-Participating 1L Debt Holders of the Ad Hoc Cross-Holder Group are paid in full in cash upon the Closing need to be reasonably satisfactory to the Prepetition First Lien Agents (as defined in the Cash Collateral Order) and the Required Holders.

(e)     **Credit Bid**. Persons or entities holding a perfected security interest in the Assets may, pursuant to section 363(k) of the Bankruptcy Code, seek to submit a credit bid on such Assets, to the extent permitted by applicable law, any Bankruptcy Court

---

[6]     This figure assumes that all interest and fees are paid current through adequate protection payments pursuant to the Cash Collateral Order.

[7]     The Debtors will provide an estimate of such Non-U.S. Sale Transaction Taxes upon reasonable request.

orders and the documentation governing the Debtors' secured debt (including any amounts required to be paid pursuant to any intercreditor agreements).

The Stalking Horse Bid includes the Stalking Horse Credit Bid and is a Qualified Bid.

Solely to the extent that the RSA and/or the Stalking Horse Agreement remains in full force and effect, unless otherwise consented to by the Required Consenting First Lien Creditors, any other Acceptable Bidder (including any of the Prepetition Second Lien Notes Secured Parties (as defined in the Cash Collateral Order) or their respective designees) whose Bid contemplates a credit bid for any or all of the Debtors' Assets shall (i) deliver to PJT Partners LP at the time of the submission of its Indication of Interest written evidence of its financial wherewithal (as of the date of such commitment) to fund the Bidder Cash Purchase Price upon the closing of the Sale; and (ii) provide in its Bid for the payment in cash in at least the dollar amount equivalent of the sum of (1) the Minimum Bid Amount, *plus* (2) the Pre-Closing Professional Fee Reserve Amounts, *plus* (3) all outstanding fees and expenses due to the Prepetition First Lien Secured Parties under the Cash Collateral Order, *plus* (4) the Non-U.S. Sale Transaction Taxes.

For the avoidance of doubt, and without limiting any other Qualified Bid requirements set forth herein, any bid by any of the Prepetition Second Lien Notes Secured Parties or their respective designees, by credit bid or otherwise, shall, solely to the extent that the RSA and/or the Stalking Horse Agreement remains in full force and effect, provide at the closing of the applicable Transaction that (a) the Prepetition First Lien Indebtedness (including any amounts required to be paid pursuant to any intercreditor agreements), the Expense Reimbursement Amount, and all outstanding fees and expenses due under the Cash Collateral Order are indefeasibly paid in cash to the Prepetition First Lien Secured Parties, and (b) the Wind-Down Amount and Pre-Closing Professional Fee Reserve Amounts are indefeasibly paid in full in cash or from cash retained by the Debtors. For the further avoidance of doubt, nothing in this paragraph or in these Bidding Procedures shall impact any rights of the Prepetition First Lien Secured Parties under the Prepetition Documents (as defined in the Cash Collateral Order).

(f)     **Good Faith Deposit**. Each Bid must provide a deposit of ten percent (a "<u>Good Faith Deposit</u>") of the Acceptable Bidder's proposed Bid Value. The Debtors reserve their rights, in their sole discretion, to waive the requirement to provide a Good Faith Deposit with respect to any Bid by the Ad Hoc Cross-Holder Group; *provided* that such determination will be made prior to the deadline to object to the Bidding Procedures Motion. Good Faith Deposits shall be deposited prior to the Bid Deadline with an escrow agent selected by the Debtors (the "<u>Escrow Agent</u>"), pursuant to an escrow agreement to be provided by the Debtors to the Acceptable Bidders, and Qualified Bidders shall provide information reasonably requested by the Escrow Agent to establish the deposit, including "know your customer" information. All Good Faith Deposits of Acceptable Bidders shall be released in accordance with the provisions of these Bidding Procedures.

To the extent that an Acceptable Bidder increases its Bid at or prior to the Auction and such Acceptable Bidder is deemed a Successful Bidder or a Back-Up Bidder (as defined below), the bidder must pay an additional amount into escrow, on or before May 1, 2023, such that the final Good Faith Deposit for the Bid equals ten percent of the Bidder Cash Purchase Price.

(g)     **Proposed Purchase and Sale Agreement**. Each Bid must constitute an irrevocable offer and be in the form of a purchase and sale agreement reflecting the terms and conditions of the Bid (a "Proposed PSA"), which Proposed PSA must be marked to reflect the amendments and modifications made to the proposed form of the Stalking Horse Agreement, which amendments and modifications may not be materially more burdensome than the Stalking Horse Agreement or otherwise inconsistent with these Bidding Procedures. The Debtors, in their reasonable business judgement, will determine whether any such amendments and modifications are materially more burdensome. Significant alterations to the Stalking Horse Agreement are discouraged and may negatively impact a Bid.

Specifically, a Proposed PSA shall (i) specify the Bidder Cash Purchase Price in U.S. dollars; (ii) include all exhibits and schedules contemplated thereby (other than exhibits and schedules that by their nature must be prepared by the Debtors); (iii) identify the proposed Assets to be included, including any Proposed Assumed Contracts; and (iv) be executed by the Acceptable Bidder. Each Proposed PSA must provide a commitment to close on or before the date that is three business days after all closing conditions are met.

(h)     **Employee and Labor Terms**. Each Bid must include a statement of proposed terms for employees, including with respect to any affected collective bargaining agreements of the Debtors, whether the Acceptable Bidder intends to hire all employees who are primarily employed in connection with the Assets included in such Bid.

(i)     **Financial Information**. Each Bid must include written evidence from which the Debtors may reasonably conclude that the Acceptable Bidder has the necessary financial ability to close the Transaction and provide adequate assurance of future performance under all contracts to be assumed and assigned in such transaction (such information, "Adequate Assurance Information"). Such information may include, inter alia, the following:

(i)     a statement that the Acceptable Bidder is financially capable of consummating the Transaction contemplated by the Proposed PSA;

(ii)    written evidence of the Acceptable Bidder's internal resources and, if applicable, proof of any debt funding commitments from a recognized banking institution or equity commitments in an aggregate amount equal to the cash portion of such Bid or the posting of an irrevocable letter of credit from a recognized banking institution issued in favor of the Debtors in the

21

amount of the Bidder Cash Purchase Price of such Bid, in each case, as are needed to close the Transaction;

(iii)    the Acceptable Bidder's most current audited (if any) and latest unaudited financial statements or, if the Acceptable Bidder is an entity formed for the purpose of making a Bid, the current audited (if any) and latest unaudited financial statements of the equity holder(s) of the Acceptable Bidder or such other form of financial disclosure, and a guaranty from such equity holder(s);

(iv)    a description of the Acceptable Bidder's *pro forma* capital structure;

(v)    (1) the Acceptable Bidder's financial wherewithal and willingness to perform under Proposed Assumed Contracts and any other Contracts and Leases that may later be designated by the Acceptable Bidder (if named a Successful Bidder) for assumption and assignment in connection with the Transaction; and (2) the identity of any known proposed assignee of applicable Contracts or Leases (if different from the Acceptable Bidder) with contact information for such person or entity; and

(vi)    any such other form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors demonstrating that such Acceptable Bidder has the ability to close the Transaction (such as, for example, (1) a corporate organizational chart or similar disclosure identifying ownership and control of any proposed assignee of applicable Contracts and Leases; or (2) financial statements, tax returns, and annual reports of the Acceptable Bidder or any proposed assignee of the Contracts and Leases; or (3) recent credit rating agency reports).

(j)    **Opioid Trust(s).** Each Bid must disclose whether it provides for the establishment of a trust (or trusts) or other consideration for the benefit of opioid claimants or other means to address opioid claims against the Debtors as well as the terms, if applicable, of such trust or mechanism.

(k)    **Representations and Warranties**. Each Bid must include the following representations and warranties:

(i)    a statement that the Acceptable Bidder has had an opportunity to conduct any and all due diligence regarding the Debtors' business and the Assets prior to submitting its Bid;

(ii)    a statement that the Acceptable Bidder has relied solely upon its own independent review, investigation, and inspection of any relevant documents and the Assets in making its Bid and did not rely on any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express or implied, by operation of law or otherwise, regarding the Assets or the completeness of any information provided in

22

connection therewith, except as expressly stated in the representations and warranties contained in the Acceptable Bidder's Proposed PSA ultimately accepted and executed by the Debtors; and

(iii)    a statement that the Acceptable Bidder has not engaged in any collusion with respect to the submission of its Bid.

(l)    **Regulatory and Third-Party Approvals**. Each Bid must include a statement or evidence (i) that the Acceptable Bidder has made or will make in a timely manner all necessary filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, if applicable, and pay the fees associated with such filings; and (ii) identifying all required governmental and regulatory approvals and an explanation or evidence of the Acceptable Bidder's plan and ability to obtain all governmental and regulatory approvals and the proposed timing for the Acceptable Bidder to undertake the actions required to obtain such approvals, including, but not limited to, in the case of any WholeCo Bid or a Parts Bid that contemplates the purchase of equity in any of the Debtors' subsidiaries in India, to secure approval from the Government of India for the proposed foreign direct investment transaction in accordance with the (Indian) Consolidated Foreign Direct Investment Policy, 2020 (as amended from time to time) and the Foreign Exchange Management (Non-debt Instruments) Rules, 2019 (as amended from time to time), and other applicable laws, if any, and confirming that the Acceptable Bidder will provide all documents, information and necessary co-operation to the Government of India as may be required for securing such governmental and regulatory approvals. Each Acceptable Bidder must further agree that its legal counsel will coordinate in good faith with the Debtors' legal counsel to provide pertinent factual information regarding the Acceptable Bidder's operations reasonably required to analyze issues arising with respect to any applicable regulatory requirements and to discuss and explain the Acceptable Bidder's regulatory analysis, strategy, and timeline for securing all applicable approvals as soon as reasonably practicable.

(m)    **Authorization**. Each Bid must include written evidence reasonably acceptable to the Debtors demonstrating appropriate corporate authorization and approval from the Acceptable Bidder's board of directors with respect to the submission, execution, and delivery of a Bid, participation in the Auction, and consummation of the transaction contemplated by the Proposed PSA in accordance with the terms of the Bid and these Bidding Procedures.

(i)    Any Bid submitted by holders of Ad Hoc Cross-Holder Group (or by a collateral trustee at the direction of such holders) where a portion of the purchase price is in the form of a credit bid of such Second Lien Notes must only include written evidence reasonably acceptable to the Debtors demonstrating the aggregate principal amount of debt held by such holders under each Second Lien Notes indenture and must include written evidence reasonably acceptable to the Debtors demonstrating that the proposed credit bid complies with the documentation governing the Debtors' secured debt; *provided* that, for the avoidance of doubt, the Prepetition First Lien Secured

23

Parties are not bound by the Debtors' determination and reserve all rights with respect to compliance with the documentation governing the Debtors' secured debt.

(n)    **Back-Up Bidder**. Each Bid must expressly state that the Acceptable Bidder agrees to serve as a back-up bidder (each, a "Back-Up Bidder" and jointly, to the extent applicable, the "Back-Up Bidder(s)")) if such Acceptable Bidder is selected as a Back-Up Bidder with respect to the applicable Assets and liabilities.

(o)    **Irrevocable**. Each Bid must state that it is irrevocable until the conclusion of the Auction to the extent such Acceptable Bidder is not a Successful Bidder or a Back-Up Bidder. Further, each Bid must state that in the event the relevant Acceptable Bidder is chosen as a Successful Bidder or a Back-Up Bidder, it shall remain irrevocable until the earlier of (i) the date on which the Sale with the Successful Bidder(s) closes and (ii) the date that is 91 calendar days after the Sale Hearing (such date, the "Back-Up Bid Outside Date").

(p)    **No Bid Protections**. A Qualified Bid must not entitle the Qualified Bidder to any break-up fee, termination fee, expense reimbursement (except with respect to the Stalking Horse Bidder), or similar type of payment or reimbursement and, by submitting a Bid, the Acceptable Bidder waives the right to pursue a substantial contribution claim under section 503(b) of the Bankruptcy Code related in any way to the submission of its Bid or participation in any auction. Each Acceptable Bidder presenting a Bid will bear its own costs and expenses (including legal fees) in connection with any proposed sale.

(q)    **Contingencies**. Each Bid must not be conditioned on the obtaining or the sufficiency of financing, any internal approval, or on the outcome or review of due diligence. The Acceptable Bidders are expected to have completed all of their due diligence by the Bid Deadline, including all business, legal, accounting, and other confirmatory diligence. The extent and nature of any remaining due diligence should be set forth in a specific list attached to each Bid.

(r)    **Time Frame for Closing**. Each Bid must be reasonably likely (based on antitrust or other regulatory issues, experience, and other considerations) to be consummated, if selected as a Successful Bid, within a time frame acceptable to the Debtors. Each Bid shall state the expected date of closing of the Transaction.

(s)    **Compliance with Bankruptcy Code and Non-Bankruptcy Law; Adherence to Bidding Procedures**. By submitting a Bid, an Acceptable Bidder is agreeing to: (i) comply in all respects with the Bankruptcy Code and any applicable non-bankruptcy law; and (ii) abide by and honor the terms of these Bidding Procedures and the Bidding Procedures Order.

For the avoidance of doubt, the Stalking Horse Bid is deemed to be a Qualified Bid that complies with or is exempted from the foregoing requirements.

24

C.      **Bid Deadline**

Any Prospective Bidder must submit a Qualified Bid in writing to the Bid Notice Parties by the Bid Deadline, which shall be **4:00 p.m. (Prevailing Eastern Time) on April 18, 2023**. The Debtors may extend the Bid Deadline for any reason whatsoever, in their reasonable business judgment, after consultation with the Consultation Parties and subject to the terms of the RSA and the Stalking Horse Agreement, for all or certain bidders; *provided* that, to the extent the RSA and the Stalking Horse Agreement remain in full force and effect, the Debtors shall not, without the consent of the Required Consenting First Lien Creditors or the Stalking Horse Bidder, as applicable, extend the Bid Deadline beyond the applicable milestone or outside date under the RSA or the Stalking Horse Agreement.

## III.    **Bid Review Process**

The Debtors will evaluate Bids submitted by the Bid Deadline, in consultation with the Consultation Parties and the Multi-State Endo Executive Committee and, may, based upon their evaluation of the content of each Bid, engage in negotiations with Acceptable Bidders who submitted Bids, as the Debtors deem appropriate, in their reasonable business judgment, in consultation with the Consultation Parties, and in a manner consistent with their fiduciary duties and applicable law. In evaluating the Bids, the Debtors may take into consideration the following non-binding factors:

(a)      the amount of the cash purchase price set forth in the Bid;

(b)      the Bid Value;

(c)      the contracts included in or excluded from the Bid, including any Proposed Assumed Contracts;

(d)      the value to be provided to the Debtors under the Bid, including the net economic effect upon the Debtors' estates;

(e)      any benefit to the Debtors' bankruptcy estates from any assumption of liabilities or waiver of liabilities;

(f)      whether the Bid provides for indemnities for collateral trustees to the extent requested by such trustees in connection with the execution of any required enforcement of security to the extent such indemnity is requested by the First Lien Collateral Trustee;

(g)      the transaction structure and execution risk, including conditions to, timing of, and certainty of closing (including the closing of multiple Parts Bids within a reasonable time of one another); termination provisions; availability of financing and financial wherewithal to meet all commitments; and required governmental or other approvals;

(h)      the impact on employees and employee claims against the Debtors;

25

(i)      the impact on trade creditors;

(j)      in the case of a Bid for less than substantially all of the Debtors' Assets, whether the Bid contemplates the provision of any services to other Qualified Bidders that may be required to facilitate the Sale of all or substantially all of the Debtors' assets;

(k)      whether the Bid provides for the establishment of a trust (or trusts) or other consideration for the benefit of opioid claimants or other means to address opioid claims against the Debtors as well as the terms of such trust or mechanism; and

(l)      any other factors the Debtors may reasonably deem relevant.

The Debtors, in consultation with the Consultation Parties, will make a determination regarding which Bids qualify as a Qualified Bids, and will notify Acceptable Bidders whether they have been selected as Qualified Bidders before or on **April 24, 2023 at 5:00 p.m. (prevailing Eastern Time).**

For the avoidance of doubt, and solely to the extent that the RSA and/or the Stalking Horse Agreement remains in full force and effect, unless otherwise consented to by the Required Consenting First Lien Creditors in their sole discretion, a Bid (or sum of Bids) shall not qualify as a Qualified Bid unless such Bid(s) (a) provides for a Bidder Cash Purchase Price that is equal to or exceeds the Minimum Bid Amount and (b) contemplates the indefeasible payment to the Prepetition First Lien Secured Parties at the closing of the applicable Transaction in cash and in at least the dollar amount equivalent of the sum of (i) the Prepetition First Lien Indebtedness, *plus* (ii) the Expense Reimbursement Amount, *plus* (iii) all outstanding fees and expenses due under the Cash Collateral Order (without duplication of the Expense Reimbursement Amount), to be paid from the Bidder Cash Purchase Price and/or cash on the Debtors' balance sheet that is not subject to such Bid. For the further avoidance of doubt, for a bid that includes a credit bid of the Second Lien Notes to be a Qualified Bid, such bid must comply with the terms of the documentation governing the secured debt.

The Debtors reserve the right to, in advance of the Auction, work with: (a) any Prospective Bidder to cure any deficiencies in the Prospective Bidder's Preliminary Bid Documents, (b) any Prospective Bidder to cure any deficiencies in the Prospective Bidder's Indication of Interest causing such Prospective Bidder to not initially be deemed an Acceptable Bidder, and (c) any Acceptable Bidder to cure any deficiencies in the Acceptable Bidder's Bid causing such Bid to not initially be deemed a Qualified Bid. Without the prior written consent of the Debtors, a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase the cash purchase price or otherwise improve the terms of the Qualified Bid. If the Debtors, in consultation with the Consultation Parties, determine that there is more than one Qualified Bid, then the Debtors are authorized to conduct an Auction.

If the Debtors conduct an Auction, in consultation with the Consultation Parties, the Debtors shall make a determination regarding the following:

(a)      the highest or best Qualified Bid(s) (the "Baseline Bid") to serve as the starting point at the Auction; and

(b)  which bids have been determined to be Qualified Bids.

    The Debtors will consult with the Consultation Parties regarding the designation of the Baseline Bid and, at least 24 hours before the start of the Auction, confirm the identity of the designated Baseline Bid and provide copies of such Baseline Bid to the Consultation Parties, the Multi-State Endo Executive Committee and Qualified Bidders.

## **THE AUCTION**

    If the Debtors make a Sale Acceleration Election, the Debtors will not conduct an Auction for the Stalking Horse Bid. In addition, if the Debtors do not make a Sale Acceleration Election but no Qualified Bid other than the Stalking Horse Bid is received by the Bid Deadline, the Debtors will not conduct an Auction for the Stalking Horse Bid, and shall file with the Court, serve on the Core Notice Parties, and cause to be published on the Case Website a notice: (a) indicating that the Auction for the Stalking Horse Bid has been cancelled; (b) naming the Stalking Horse Bidder as the sole Successful Bidder; and (c) setting forth the date and time of the Sale Hearing.

    Except as provided in the Stalking Horse Agreement, nothing herein shall obligate the Debtors to consummate or pursue any transaction with a Qualified Bidder.

    If the Debtors conduct an Auction, the Auction will be conducted at the offices of Skadden, Arps, Slate Meagher & Flom LLP, One Manhattan West, New York, New York 10001 on **April 27, 2023, at 10:00 a.m. (prevailing Eastern Time)**, or at such other time and location (including via remote video) as designated by the Debtors, in consultation with the Consultation Parties and providing notice to the Core Notice Parties; *provided* that, to the extent the RSA and the Stalking Horse Agreement remain in full force and effect, the Debtors shall not, without the consent of the Required Consenting First Lien Creditors or the Stalking Horse Bidder, as applicable, schedule the Auction for a date that is beyond the outside date or the milestone date for the Auction set forth in the RSA or the Stalking Horse Agreement. The proceedings of the Auction will be transcribed, video recorded, or both transcribed and video recorded. Notwithstanding anything herein to the contrary, the Debtors, after consultation with the Consultation Parties, may at any time choose to adjourn the Auction by announcement at the Auction. The Debtors shall promptly file notice of such adjournment with the Court.

## I.  Auction Procedures

    The Auction shall be governed by the following procedures, subject to the Debtors' right to modify such procedures in their reasonable business judgment and in a manner consistent with their fiduciary duties and applicable law, in consultation with the Consultation Parties, including, for example and without limitation, other procedures necessary for the Debtors to consider any bids to purchase fewer than all of the Assets:

(a)  **Participation**. Only (i) Qualified Bidders, (ii) Consultation Parties, and (iii) Prepetition First Lien Agents, in each case, along with their respective representatives and advisors, are eligible to attend the Auction, subject to other limitations as may be reasonably imposed by the Debtors in accordance with these Bidding Procedures. Only Qualified Bidders will be entitled to make bids at the

27

Auction. The Debtors may, in their reasonable business judgment, establish a reasonable limit on the number of representatives and professional advisors that may appear on behalf of or accompany each Qualified Bidder and other parties in interest at the Auction.

(b)     **In-Person Bidding**. Unless the Debtors, in consultation with the Consultation Parties, determine to conduct the Auction via remote video in accordance with these Bidding Procedures, Qualified Bidders participating in the Auction must appear in person at the Auction, or through a duly authorized representative. All persons appearing in person at the Auction shall be in compliance with all health policies generally applicable to visitors at the offices of Skadden, Arps, Slate, Meagher & Flom LLP, which, as of the date hereof, requires visitors to be fully vaccinated against COVID-19.  The Auction will be conducted openly, and all Qualified Bidders shall have the right to submit additional bids and make modifications to their Proposed PSA at the Auction to improve their bids. The Debtors may, in their reasonable business judgment, negotiate with any and all Qualified Bidders participating in the Auction.

(c)     **No Collusion**. Each Qualified Bidder participating in the Auction will be required to confirm in writing and on the record at the Auction that (i) it has not engaged in any collusion with respect to the submission of any bid or the Auction, *provided* that Qualified Bidders participating in the Auction that are bidding on separate Assets may, with the Debtors' prior written consent, work together to submit a joint Bid, and (ii) its Qualified Bid represents a binding, good faith, and bona fide offer to purchase the Assets if selected as a Successful Bidder.

(d)     **Bidding Increments**. Bidding shall commence at the amount of the Baseline Bid(s). Qualified Bidders may submit successive bids higher than the previous bid, based on and increased from the Baseline Bid(s). The Debtors shall, in consultation with the Consultation Parties, announce at the outset of the Auction the minimum required increments for successive Qualified Bids (the "Minimum Overbids"). The Debtors may, in their reasonable business judgment, announce increases or reductions to Minimum Overbids at any time during the Auction. After the first round of bidding and between each subsequent round of bidding, the Debtors shall announce the Bid that they believe to be the highest or best offer (each such bid, a "Leading Bid"). Each round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a subsequent bid with full knowledge of the Leading Bid.

(e)     **Highest or Best Offer**. The Debtors shall have the right to determine, in their reasonable business judgment, in consultation with the Consultation Parties, which bid (or combination of bids) is the highest or best bid and reject, at any time, any bid that the Debtors deem to be inadequate or insufficient, not in conformity with the requirements of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules"), these Bidding Procedures, any order of the Court, or the best interests of the Debtors and their estates; *provided, however*,

that, solely to the extent that the RSA and/or the Stalking Horse Agreement remains in full force and effect, a Bid (or sum of Bids) shall not qualify as the highest or best Bid(s) unless (i) the Bid Value provides for a Bidder Cash Purchase Price that is equal to or exceeds the Minimum Bid Amount and (ii) the Bid contemplates the indefeasible payment to the Prepetition First Lien Secured Parties at the closing of the applicable Sale in cash and in at least the dollar amount equivalent of the sum of (1) the Prepetition First Lien Indebtedness, *plus* (2) the Expense Reimbursement Amount, *plus* (3) all outstanding fees and expenses due to the Prepetition First Lien Secured Parties under the Cash Collateral Order (without duplication of the Expense Reimbursement Amount), to be paid from the Bidder Cash Purchase Price and/or cash on the Debtors' balance sheet that is not subject to such Bid. For the further avoidance of doubt, for a bid that includes a credit bid of the Second Lien Notes to be a Qualified Bid, such bid must comply with the terms of the documentation governing the secured debt.

## II.   **Auction Results**

### A.   **Successful Bid**

In consultation with the Consultation Parties and the Multi-State Endo Executive Committee, and subject to approval by the Court the Debtors shall (a) determine, consistent with these Bidding Procedures, which Qualified Bid or combination of Qualified Bids constitutes the highest or otherwise best offer for the purchase of the Assets (each such bid, a "Successful Bid" and jointly, to the extent applicable, the "Successful Bid(s)"); and (b) notify all Qualified Bidders at the Auction of the identity of the bidder or bidders who submitted the Successful Bid (each such bidder, a "Successful Bidder" and jointly, to the extent applicable, the "Successful Bidder(s)"), the amount of the purchase price, and other material terms of the Successful Bid(s). In selecting the Successful Bid(s), the Debtors, in consultation with the Consultation Parties and the Multi-State Endo Executive Committee, may consider all factors, including the amount of the purchase price, the form and total amount of consideration being offered, the likelihood of each Qualified Bidder's ability to close a transaction and the timing thereof, the form and substance of the Proposed PSA requested by each Qualified Bidder, and the net benefit to the Debtors' estates. In addition, to the extent any Prospective Bidder submits a Bid that includes the establishment of one or more trusts for the benefit of opioid claimants on substantially similar terms to those agreed by the Stalking Horse Bidder, the Debtors shall take the provision of such trust into consideration in determining whether such Bid is the Successful Bid. For the avoidance of doubt, and solely to the extent that the RSA and/or the Stalking Horse Agreement remains in full force and effect, the Debtors shall not be allowed to determine that a Bid (or sum of Bids) qualifies as the Successful Bid unless (i) the Bid Value provides for a Bidder Cash Purchase Price that is equal to or exceeds the Minimum Bid Amount and (ii) the Bid contemplates the indefeasible payment to the Prepetition First Lien Secured Parties at the closing of the applicable Sale in cash and in at least the dollar amount equivalent of the sum of (1) the Prepetition First Lien Indebtedness, *plus* (2) the Expense Reimbursement Amount, *plus* (3) all outstanding fees and expenses due to the Prepetition First Lien Secured Parties under the Cash Collateral Order (without duplication of the Expense Reimbursement Amount), to be paid from the Bidder Cash Purchase Price and/or cash on the Debtors' balance sheet that is not subject to such Bid. For the further avoidance of doubt, for a bid

that includes a credit bid of the Second Lien Notes to be a Qualified Bid, such bid must comply with the terms of the documentation governing the secured debt.

Notwithstanding the foregoing or any other provision of these Bidding Procedures, (a) in the event that the liens held by the Prepetition First Lien Secured Parties or holders of the Second Lien Notes (each as defined in the Cash Collateral Order) are successfully challenged resulting in any unencumbered value at the Newcos (as defined in the Bidding Procedures Order), the Successful Bidders shall pay cash to the Holdcos (as defined in the Bidding Procedures Order) on account of the Unencumbered Value and (b) in the event that a topping bid to the Stalking Horse Bid is selected as the Successful Bid, the Successful Bidder shall be authorized and directed to pay cash to the Holdcos on account of any value attributable to the Newcos in excess of the value of the Prepetition Liens.

### B.    Back-Up Bids

In consultation with the Consultation Parties, and subject to approval by the Court, the Debtors shall (a) determine, consistent with these Bidding Procedures, which Qualified Bid or combination of Qualified Bids constitute the next highest or next best offer after the Successful Bid(s) (each such bid, a "Back-Up Bid" and jointly, to the extent applicable, the "Back-Up Bid(s)"); and (b) notify all Qualified Bidders at the Auction of the identities of the Back-Up Bidder(s), the amount of the purchase price, and other material terms of the Back-Up Bid(s). The Back-Up Bid(s) shall remain open and irrevocable until the Back-Up Bid Outside Date. If the Sale with a Successful Bidder is terminated prior to the Back-Up Bid Outside Date, the Back-Up Bidder(s) shall be deemed the new Successful Bidder(s) and shall be obligated to consummate each Back-Up Bid as if it were a Successful Bid at the Auction.

### C.    Notice of Auction Results

If the Debtors hold the Auction, the Debtors will, as soon as reasonably practicable after selecting the Successful Bid(s), file (but not serve) and publish on the Case Website a notice of the results of the Auction (such notice, the "Notice of Auction Results").

The Notice of Auction Results shall (a) identify the Successful Bidder(s) and Back-Up Bidder(s); (b) include a schedule of the Assets to be transferred pursuant to the Successful Bid(s) and the Back-Up Bid(s); (c) list all Proposed Assumed Contracts in the Successful Bid(s) and Back-Up Bid(s); (d) identify any known proposed assignee(s) of Proposed Assumed Contracts; (e) list any known Contracts and Leases that may later be designated by the Successful Bidder(s) for assumption and assignment in connection with the Sale; (f) identify the terms of the establishment of any opioid trust or trusts; and (g) set forth the deadline and procedures for filing objections in response to the Notice of Auction Results (such objections, the "Auction Results Objections").

The Successful Bidder(s) shall, on or before the date that is one calendar day after the filing of the Notice of Auction Results, submit to the Debtors fully executed revised documentation memorializing the terms of the Successful Bid(s). The Successful Bid(s) may not be assigned to any party without the consent of the Debtors.

## DISPOSITION OF GOOD FAITH DEPOSITS

### I.    Acceptable Bidders

On or before the date that is four business days after the Bid Deadline, the Escrow Agent shall return to each Acceptable Bidder that was determined not to be a Qualified Bidder, as confirmed by the Debtors, such Acceptable Bidder's Good Faith Deposit, plus any interest accrued thereon. Upon the authorized return of such Acceptable Bidder's Good Faith Deposit, the Bid of such Acceptable Bidder shall be deemed revoked and no longer enforceable. For the avoidance of doubt, the Stalking Horse Bidder shall not be required to post a Good Faith Deposit.

### II.    Qualified Bidders

(a)    **Forfeiture of Good Faith Deposit**. The Good Faith Deposit of a Qualified Bidder will be forfeited to the Debtors if (i) the applicable Qualified Bidder attempts to modify, amend, or withdraw its Qualified Bid, except as permitted by these Bidding Procedures, during the time the Qualified Bid remains binding and irrevocable under these Bidding Procedures; or (ii) the Qualified Bidder is selected as a Successful Bidder and fails to enter into the required definitive documentation or to consummate a Sale in accordance with these Bidding Procedures and the terms of the transaction documents with respect to the applicable Successful Bid. The Escrow Agent shall release the Good Faith Deposit by wire transfer of immediately available funds to an account designated by the Debtors on or before the date that is two business days after the receipt by the Escrow Agent of a written notice by an authorized officer of the Debtors stating that the Qualified Bidder has breached or failed to satisfy its obligations or undertakings.

(b)    **Return of Good Faith Deposit.** With the exception of the Good Faith Deposits of the Successful Bidder(s) and the Back-Up Bidder(s), the Escrow Agent shall return to any other Qualified Bidder any Good Faith Deposit, plus any interest accrued thereon, on or before the date that is ten business days after the filing of the Notice of Auction Results.

(c)    **Back-Up Bidder(s)**. In connection with the Debtors' designation of any Qualified Bidder as the Back-Up Bidder, such Qualified Bidder (other than the Stalking Horse Bidder) shall deposit into escrow the incremental Good Faith Deposit amount required under these Bidding Procedures. The Escrow Agent shall return any Back-Up Bidder's Good Faith Deposit, plus any interest accrued thereon, on or before the date that is ten business days after the occurrence of the Back-Up Bid Outside Date.

(d)    **Successful Bidder(s)**. Before the Debtors designate any Qualified Bidder as the Successful Bidder, such Qualified Bidder (other than the Stalking Horse Bidder) shall deposit into escrow the incremental Good Faith Deposit amount required under these Bidding Procedures. The Good Faith Deposit of the Successful Bidder(s) shall be applied against the cash portion of the purchase price of the Successful Bid(s) upon the consummation of the Sale.

31

III.    **Escrow Instructions**

The Debtors and, as applicable, the Acceptable Bidder, Qualified Bidder, and Back-Up Bidder(s) agree to execute an appropriate joint notice to the Escrow Agent providing instructions for the return of any Good Faith Deposit, to the extent such return is required by these Bidding Procedures. If either party fails to execute such written notice, the Good Faith Deposit may only be released by an order of the Court.

## SALE HEARING

At a hearing before the Court (the "Sale Hearing"), which may be accelerated if the Debtors make a Sale Acceleration Election in accordance with these Bidding Procedures (such accelerated hearing, the "Accelerated Sale Hearing") the Debtors will seek the entry of orders authorizing and approving, among other things, the following Sale (each, a "Sale Order"), to the extent applicable:

(a)     if a Sale Acceleration Event occurs and the Debtors make a Sale Acceleration Election, a sale of the Transferred Assets to the Stalking Horse Bidder pursuant to the terms and conditions set forth in the Stalking Horse Agreement;

(b)     if no other Qualified Bid is received by the Debtors, a sale of the Transferred Assets to the Stalking Horse Bidder pursuant to the terms and conditions set forth in the Stalking Horse Agreement; and

(c)     if at least one Qualified Bid that is not the Stalking Horse Bid is received by the Debtors, a sale of applicable Assets to the Successful Bidder(s) at the Auction (which bidder could be or include the Stalking Horse Bidder).

The Debtors may, in their reasonable business judgment, in consultation with the Consultation Parties and the Successful Bidder(s), adjourn or reschedule any Sale Hearing or Accelerated Sale Hearing, as applicable, with sufficient notice to the Core Notice Parties, including by (a) an announcement of such adjournment at the applicable Sale Hearing, the applicable Accelerated Sale Hearing, or at the Auction, if applicable, or (b) the filing of a notice of adjournment with the Court prior to the commencement of the Sale Hearing or Accelerated Sale Hearing, as applicable; *provided* that nothing herein shall authorize the Debtors to unilaterally extend any date or deadline set forth in the Stalking Horse Agreement or the RSA; *provided, further*, that, to the extent the RSA remains in full force and effect, the Sale Hearing shall not be rescheduled for a date that is beyond the outside date or the milestone date for the Sale Hearing set forth in the RSA.

Any objections to the Sale (a "Sale Objection") or to the proposed cure amount (the "Cure Costs") in connection with the proposed assumption or assumption and assignment of any Contract or Lease (a "Cure Objection") must (a) be in writing; (b) comply with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules; (c) state, with specificity, the legal and factual bases thereof; (d) if a Cure Objection that pertains to the proposed Cure Costs, state the cure amount alleged to be owed to the objecting Counterparty, together with the appropriate documentation including the cure amount the Counterparty believes is required to cure defaults under the relevant

32

Contract or Lease; (e) include any appropriate documentation in support thereof; and (f) be filed with the Court and served on the Objection Recipients by the applicable deadline.

If a Successful Bidder at the Auction is not the Stalking Horse Bidder, objections solely related to the identity of such Successful Bidder(s), changes to the Stalking Horse Agreement, and adequate assurance of future performance must be filed with the Court and served on the Objection Recipients so as to be received by **4:00 p.m. (Prevailing Eastern Time) on the date that is two calendar days after the date that the Debtors file the Notice of Auction Results**.

All Sale Objections not otherwise resolved by the parties shall be heard at the Sale Hearing or Accelerated Sale Hearing, as applicable. Any party who fails to file with the Court and serve on the Objection Recipients a Sale Objection by the applicable Sale Objection Deadline may be forever barred from asserting, at the Sale Hearing or Accelerated Sale Hearing, as applicable, or thereafter, any objection to the relief requested in the Sale Motion, or to the consummation and performance of the Sale contemplated by the Stalking Horse Agreement, or purchase and sale agreement with a Successful Bidder, including the transfer of the applicable sold Assets to the Stalking Horse Bidder, or the Successful Bidder(s) (including any Back-Up Bidder subsequently deemed a Successful Bidder), free and clear of all liens, claims, interests, and encumbrances pursuant to section 363(f) of the Bankruptcy Code. Notwithstanding the foregoing, in accordance with the terms of these Bidding Procedures Order, the Debtors may, in their discretion, and in consultation with the Stalking Horse Bidder or any Successful Bidder (as applicable), adjourn Cure Objections to be considered at a later hearing and assign Proposed Assumed Contracts while such objections remain outstanding.

## <u>CONSENT TO JURISDICTION AND AUTHORITY AS CONDITION TO BIDDING</u>

All Acceptable Bidders (which, for the avoidance of doubt, shall include the Stalking Horse Bidder) shall be deemed to have (a) consented to the exclusive jurisdiction of the Court to enter any order or orders, which shall be binding in all respects, in any way related to these Bidding Procedures, the Auction, or the implementation, interpretation, or enforcement of any agreement or any other document relating to the Sale; (b) waived any right to a jury trial in connection with any disputes relating to these Bidding Procedures, the Auction, or the implementation, interpretation, or enforcement of any agreement or any other document relating to the Sale; and (c) consented to the entry of a final order or judgment in any way related to these Bidding Procedures, an Auction, or the implementation, interpretation, or enforcement of any agreement or any other document relating to the Sale if it is determined that, absent the consent of the parties, the Court could not enter such final order or judgment consistent with Article III of the United States Constitution.

Any parties raising a dispute relating to these Bidding Procedures must request that such dispute be heard by the Court on an expedited basis.

## <u>FIDUCIARY OUT</u>

Notwithstanding anything to the contrary in these Bidding Procedures or the Bidding Procedures Order, nothing in these Bidding Procedures or the Bidding Procedures Order

shall require a Debtor or the board of directors or other governing body of a Debtor to take any action or to refrain from taking any action to the extent the board of directors or other governing body of such Debtor determines in good faith after consultation with counsel that continued performance under these Bidding Procedures or the Bidding Procedures Order (including taking any action or refraining from taking any action) would be inconsistent with the exercise of its fiduciary duties under applicable law. For the avoidance of doubt, the Debtors' ability to conduct the Sale process and to consider or advance Alternative Proposals in a manner consistent with the foregoing shall not be impaired by anything in these Bidding Procedures or the Bidding Procedures Order.

Notwithstanding anything to the contrary in these Bidding Procedures, through the acceptance of a Successful Bid, the Debtors and their respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the right to: (a) consider, respond to, and facilitate Alternative Proposals; (b) subject to the terms and conditions of these Bidding Procedures, provide access to non-public information concerning the Debtors to any entity or enter into confidentiality agreements or nondisclosure agreements with any entity; (c) maintain or continue discussions or negotiations with respect to any Alternative Proposal; (d) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiation of each Alternative Proposal; and (e) enter into or continue discussions or negotiations with holders of claims against or equity interests in a Debtor, any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee), or any other entity regarding each Alternative Proposal.

## RIGHTS UPON TERMINATION OF STALKING HORSE BID

If the RSA or Stalking Horse Agreement is terminated, the Debtors reserve the right to modify or waive any provisions of these Bidding Procedures and all rights of any of the Prepetition First Lien Secured Parties under the Bankruptcy Code and the Credit Documents, the First Lien Notes Documents, the First Lien Collateral Trust Agreement, and the Intercreditor Agreements (each term as defined in the Cash Collateral Order) shall be reserved in all respects; *provided* that the foregoing shall not in any way limit or waive any rights the Debtors may have under these Bidding Procedures or otherwise; *provided, further,* that, to the extent the RSA remains in effect, the foregoing shall not in any way limit or waive any rights the Prepetition First Lien Secured Parties may have under the RSA.

## RESERVATION OF RIGHTS

Except as otherwise provided in the Stalking Horse Agreement, these Bidding Procedures, or the Bidding Procedures Order, the Debtors further reserve the right, in their reasonable business judgment, and, solely to the extent that the Consultation Parties have consultation rights with respect thereto under these Bidding Procedures, in consultation with the Consultation Parties, and in a manner consistent with their fiduciary duties and applicable law, to: (a) determine which Bids are Qualified Bids; (b) determine which Qualified Bid(s) make up the Successful Bid(s) and which Qualified Bid(s) make up the Back-Up Bid(s); (c) reject any Bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of these Bidding Procedures or the requirements of the Bankruptcy Code, or (iii) contrary to the best interests of the Debtors and their estates; (d) waive terms and conditions set forth herein with respect to any or all

34

Prospective Bidders; (e) extend the deadlines set forth herein; (f) announce at the Auction modified or additional procedures for conducting the Auction; (g) provide reasonable accommodations to the Stalking Horse Bidder with respect to such terms, conditions, and deadlines of the bidding and Auction process to promote further bids by such bidder (including extending deadlines as may be required for the Stalking Horse Bidder to comply with any additional filing and review procedures with respect to any regulatory approvals, including antitrust-related approvals); and (h) modify these Bidding Procedures and implement additional rules that the Debtors determine, in their business judgment, will better promote the goals of the bidding process and discharge the Debtors' fiduciary duties and are not inconsistent with any Court order; *provided* that, to the extent the RSA and the Stalking Horse Agreement remain in full force and effect, the Debtors may not amend or otherwise modify these Bidding Procedures or the bidding process to (i) reduce or otherwise modify their obligations to consult with the Stalking Horse Bidder or Required Consenting First Lien Creditors, (ii) reduce or otherwise modify their obligations to obtain consent from the Stalking Horse Bidder or Required Consenting First Lien Creditors pursuant to the Stalking Horse Agreement or RSA, as applicable, or (iii) provide for any extensions of deadlines or, except as otherwise provided herein, material modifications of these Bidding Procedures without the prior written consent of the Stalking Horse Bidder or the Required Consenting First Lien Creditors, as applicable.

Nothing in these Bidding Procedures shall prejudice the substantive rights of any party, including with respect to the Debtors' evaluation of any bid. **Nothing herein shall obligate the Debtors to consummate or pursue any transaction with a Qualified Bidder other than the Stalking Horse Bidder subject to, and in accordance with the terms of, the Stalking Horse Agreement.**

## BIDDER ENGAGEMENT WITH OPIOID CLAIMANTS

Nothing in these Bidding Procedures is intended to impair or limit the ability of bidders or their advisors to engage in discussions or negotiations with the Official Committee of Opioid Claimants, other opioid claimants, the Multi-State Endo Executive Committee and each of their respective advisors regarding the bidding process, the sale process, and any potential trust in connection with a bidder's contemplated bid.

## SALE IS "AS IS/WHERE IS" AND FREE AND CLEAR OF ANY AND ALL ENCUMBRANCES

The Assets sold pursuant to these Bidding Procedures will be conveyed at the closing in their then-present condition, "**as is, with all faults, and without any warranty whatsoever, express or implied**." Except as may be set forth in the Stalking Horse Agreement or a Successful Bidder's purchase and sale agreement, the applicable Assets are sold free and clear of any and all liens, claims, interests, restrictions, charges and encumbrances of any kind or nature to the fullest extent permissible under the Bankruptcy Code, with such liens, claims, interests, restrictions, charges, and encumbrances to attach to the net proceeds of sale with the same validity and in the same order of priority.

## **CONFLICTS**

To the extent that any provision of these Bidding Procedures conflicts with or is in any way inconsistent with any provision of the Stalking Horse Agreement or the RSA while such agreements remain in full force and effect, the Stalking Horse Agreement or the RSA, as applicable, shall govern and control.

## Exhibit 2

**Sale Notice**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| *In re* | **Chapter 11** |
| **ENDO INTERNATIONAL PLC**, *et al.*, | **Case No. 22-22549 (JLG)** |
| Debtors.[1] | **(Jointly Administered)** |

## NOTICE OF SALE, BIDDING PROCEDURES, AUCTION, AND SALE HEARING FOR THE SALE OF SUBSTANTIALLY ALL ASSETS

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

1.      On November 23, 2022, Endo International plc and its debtor affiliates, as debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), filed with the United States Bankruptcy Court for the Southern District of New York (the "Court") the *Debtors' Motion for an Order (I) Establishing Bidding, Noticing, and Assumption and Assignment Procedures, (II) Approving Certain Transaction Steps, (III) Approving the Sale of Substantially All of the Debtors' Assets, and (IV) Granting Related Relief* [Docket No. __] (the "Sale Motion"), seeking an order (the "Bidding Procedures Order"),[2] among other things, approving certain bidding procedures (the "Bidding Procedures") in connection with the sale or sales of substantially all of the Debtors' assets (the "Assets") pursuant to section 363 of the Bankruptcy Code (the "Sale"), including certain dates and deadlines thereunder for the Sale process.

2.      On [__], 2022, the Court, entered the Bidding Procedures Order [Docket No. __].

**The Bidding Procedures provide the following:**

**I.      Stalking Horse Bidder.** The Debtors intend to enter into a purchase and sale agreement with Tensor Limited (the "Buyer" or the "Stalking Horse Bidder"), in the form attached to the Sale Motion as Exhibit B (the "Stalking Horse Agreement," and such bid memorialized therein, the "Stalking Horse Bid") for the sale of the Transferred Assets, free and clear of any and all liens, encumbrances, claims, and other interests, pursuant to which the Stalking Horse Bidder has committed to provide aggregate consideration consisting of: (i) a credit bid in full satisfaction of the Prepetition First Lien Indebtedness; (ii) $5 million in cash on account of certain unencumbered Transferred Assets; (iii) the Wind-Down Amount; (iv) the Pre-Closing Professional Fee Reserve Amounts; and (v) assumption of the Assumed Liabilities. Pursuant to the Bidding Procedures Order, the Stalking Horse Bid is subject to higher or better offers, the outcome of the Auction, and the approval of the Court.

---

[1]    The last four digits of Debtor Endo International plc's tax identification number are 3755. Due to the large number of debtors in these chapter 11 cases, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Endo. The location of the Debtors' service address for purposes of these chapter 11 cases is: 1400 Atwater Drive, Malvern, PA 19355.

[2]    Capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in the Sale Motion or the Bidding Procedures.

**II.     Description of the Assets.** The Debtors seek to sell the substantially all of their Assets and assign certain contracts related to the operation of the Debtors' businesses. The Debtors will only consider bids that are made for either: (a) all or substantially all of the Debtors' Assets; or (b) one or more of the following: (i) one or more of the Debtors' Business Segments (either including or excluding (1) the Collagenase Clostridium Histolyticum Assets (as defined below) and/or (2) the Legacy Opioid Assets (as defined below)); (iii) all of the Collagenase Clostridium Histolyticum Assets; and/or (iv) all of the Legacy Opioid Assets.

## III.     Important Dates and Deadlines

3.     **Indication of Interest Deadline**. All Prospective Bidders must timely submit to the Debtors' investment banker, PJT Partners LP, a non-binding indication of interest (an "Indication of Interest") that is acceptable to the Debtors, in consultation with the Consultation Parties. The deadline for Prospective Bidders to submit an Indication of Interest will be: **February 21, 2023 at 4:00 p.m. (prevailing Eastern Time)** (the "Indication of Interest Deadline").

4.     **Bid Deadline**. If the Debtors do not elect to make a Sale Acceleration Election, any Prospective Bidder must submit a Qualified Bid in writing to the Bid Notice Parties by the Bid Deadline, which shall be **4:00 p.m. (Prevailing Eastern Time) on April 18, 2023**.

5.     **Sale Objection Deadline**. Sale Notice Parties must file any objections to the proposed Sale (such objections, the "Sale Objections") with the Court and serve such objections on the Objection Recipients (as defined below) by no later than **4:00 p.m. (prevailing Eastern Time)** on **February 27, 2023** (the "Sale Objection Deadline"). **By receiving this Sale Notice, you are subject to the Sale Objection Deadline as disclosed herein, unless extended by the Debtors or the Court.[3]**

6.     **Auction**. If the Debtors conduct an Auction, the Auction will be conducted at the offices of Skadden, Arps, Slate Meagher & Flom LLP, One Manhattan West, New York, New York 10001 on **April 27, 2023, at 10:00 a.m. (prevailing Eastern Time)**, or at such other time and location (including via remote video) as designated by the Debtors. If the Debtors hold the Auction, the Debtors will, as soon as reasonably practicable after selecting the Successful Bid(s), file (but not serve) and publish on the Case Website a notice of the results of the Auction (such notice, the "Notice of Auction Results"). If a Successful Bidder at the Auction is not the Stalking Horse Bidder, objections solely related to the identity of such Successful Bidder(s), changes to the Stalking Horse Agreement, and adequate assurance of future performance must be filed with the Court and served on the Objection Recipients so as to be received by **4:00 p.m. (Prevailing Eastern Time) on the date that is two calendar days after the date that the Debtors file the Notice of Auction Results**. The Notice of Auction Results will set forth the specific deadline and procedures for filing any such objections in response to the Notice of Auction Results.

7.     **Sale Hearing**. Unless accelerated upon a Sale Acceleration Election (as defined in the Bidding Procedures) made by the Debtors, the Sale Hearing shall be held before the Honorable James L. Garrity, Jr., on **[May 3], 2023**, at **[____] (prevailing Eastern Time)** at the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004-1408.

---

[3]     In addition to service of this Sale Notice, the Debtors will provide publication notice to parties who are not currently known to the Debtors via a comprehensive media plan across multiple mediums, including, but not limited to, broadcast television, social media advertising, and community outreach. Potential parties in interest receiving notice through such campaign are not Sale Notice Parties and thus may be subject to a different objection deadline as set forth in the Bidding Procedures Order (*i.e.*, the Supplemental Sale Objection Deadline).

**IV.    Procedures for Sale Objections**

8.      Sale Objections must be (a) be in writing; (b) comply with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the Local Bankruptcy Rules for the Southern District of New York; (c) state, with specificity, the legal and factual bases thereof; (d) include any appropriate documentation in support thereof; and (f) be filed with the Court and served on the following parties (the "<u>Objection Recipients</u>") by the Sale Objection Deadline: (i) the Debtors, c/o Endo International plc, 1400 Atwater Drive Malvern, PA 19355 60179 (Attn: Matthew Maletta (Maletta.Matthew@endo.com) and Brian Morrissey (Morrissey.Brian@endo.com)); (ii) the Debtors' attorneys, Skadden, Arps, Slate Meagher & Flom LLP, One Manhattan West, New York, New York 10001 (Attn: Paul D. Leake (Paul.Leake@skadden.com), Lisa Laukitis (Lisa.Laukitis@skadden.com), Shana A. Elberg (Shana.Elberg@skadden.com), and Elizabeth Downing (Elizabeth.Downing@skadden.com)); (iii) all persons and entities on the Master Service List (which may be obtained at the Debtors' Case Website at https://restructuring.ra.kroll.com/endo/); and (iv) counsel to the Stalking Horse Bidder, Gibson, Dunn & Crutcher LLP, 200 Park Ave, New York, New York 10166 (Attn: Scott Greenberg (SGreenberg@gibsondunn.com), Michael J. Cohen (MCohen@gibsondunn.com), and Joshua K. Brody (JBrody@gibsondunn.com)).

9.      Any party who fails to file with the Court and serve on the Objection Recipients a Sale Objection by the applicable Sale Objection Deadline may be forever barred from asserting, at the Sale Hearing or Accelerated Sale Hearing, as applicable, or thereafter, any objection to the relief requested in the Sale Motion, or to the consummation and performance of the Sale contemplated by the Stalking Horse Agreement, or purchase and sale agreement with a Successful Bidder free and clear of all liens, claims, interests, and encumbrances pursuant to section 363(f) of the Bankruptcy Code.

**V.    Additional Information.** This Sale Notice and any Sale Hearing are subject to the fuller terms and conditions of the Sale Motion, the Bidding Procedures Order, and the Bidding Procedures, each of which shall control, as applicable, in the event of any conflict. The Debtors encourage parties in interest to review such documents in their entirety. Copies of the Sale Motion, the Bidding Procedures Order, the Bidding Procedures, and the Sale Notice may be obtained at https://restructuring.ra.kroll.com/Endo.

Dated: [_____], 2022
New York, New York                       SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

                                 By:    *DRAFT*_____
                                        Paul D. Leake
                                        Lisa Laukitis
                                        Shana A. Elberg
                                        Evan A. Hill
                                        One Manhattan West
                                        New York, New York 10001
                                        Telephone: (212) 735-3000
                                        Fax: (212) 735-2000

                                        *Counsel for the Debtors and Debtors in Possession*

## Exhibit 3

**Assumption and Assignment Notice**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re* | **Chapter 11** |
| **ENDO INTERNATIONAL PLC, *et al.*,** | **Case No. 22-22549 (JLG)** |
| **Debtors.**[1] | **(Jointly Administered)** |

<div align="center">

**NOTICE OF PROPOSED ASSUMPTION AND**
**ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS**

</div>

---

**PLEASE TAKE NOTE OF THE FOLLOWING DEADLINES:**

**Cure Objection Deadline:** On or before **February 16, 2023, at 4:00 p.m. (prevailing Eastern Time)**, or such deadline set forth in the applicable Supplemental Assumption Notice.

**Auction Results Objection Deadline:** If the Stalking Horse Bidder is not the Successful Bidder at the Auction, on or before **4:00 p.m. (prevailing Eastern Time) on the date that is two days after the date that the Notice of Auction Results are published**.

---

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

1.     On November 23, 2022, Endo International plc and its debtor affiliates, as debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), filed with the United States Bankruptcy Court for the Southern District of New York (the "Court") the *Debtors' Motion for an Order (I) Establishing Bidding, Noticing, and Assumption and Assignment Procedures, (II) Approving Certain Transaction Steps, (III) Approving the Sale of Substantially All of the Debtors' Assets, and (IV) Granting Related Relief* [Docket No. __] (the "Sale Motion"), seeking an order (the "Bidding Procedures Order"),[2] among other things, (a) approving certain bidding procedures (the "Bidding Procedures") in connection with the sale or sales of substantially all of the Debtors' assets (the "Assets") pursuant to section 363 of the Bankruptcy Code (the "Sale"), including certain dates and deadlines thereunder for the Sale process; and (b) authorizing procedures (such procedures, the "Assumption and Assignment Procedures") to facilitate the fair and orderly assumption, assumption and

---

[1]     The last four digits of Debtor Endo International plc's tax identification number are 3755. Due to the large number of debtors in these chapter 11 cases, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Endo. The location of the Debtors' service address for purposes of these chapter 11 cases is: 1400 Atwater Drive, Malvern, PA 19355.

[2]     Capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in the Sale Motion or the Bidding Procedures Order.

assignment, and rejection of certain executory contracts (the "<u>Contracts</u>") or unexpired leases (the "<u>Leases</u>") of the Debtors.

2.     On [__], 2022, the Court, entered the Bidding Procedures Order [Docket No. __]. Pursuant to the Bidding Procedures Order, the Debtors hereby provide notice (this "<u>Assumption and Assignment Notice</u>") that they are seeking to assume and assign to Tensor Limited (the "<u>Stalking Horse Bidder</u>")[3], or, if the Stalking Horse Bidder is not the Successful Bidder at the Auction (if any), any other Successful Bidder(s), the Contracts or Leases listed on **Exhibit A** attached hereto (each, an "<u>Assigned Contract</u>"). **You are receiving this Assumption and Assignment Notice because you may be a counterparty to a Contract or Lease (a "<u>Counterparty</u>") that is proposed to be assumed and assigned to the Successful Bidder in connection with the Sale.**

3.     If the Debtors assume and assign to the Successful Bidder(s) an Assigned Contract to which you are a party, on the closing date of the Sale, or as soon thereafter as practicable, such Successful Bidder will pay you the amount the Debtors' records reflect is owing for **pre-bankruptcy filing arrearages** as set forth on **Exhibit A** (the "<u>Cure Cost</u>"). The Debtors' records reflect that all postpetition amounts owing under your Assigned Contract have been paid and will continue to be paid in the ordinary course until the assumption and assignment of the Assigned Contract, and that other than the Cure Cost, there are no other defaults under the Assigned Contract.

4.     The Debtors' inclusion of a Contract or Lease as an Assigned Contract on **Exhibit A** is not a guarantee that such Contract or Lease will ultimately be assumed and assigned to any Successful Bidder. Should it be determined that an Assigned Contract will not be assumed and assigned, the Debtors shall notify such party to the Assigned Contract in writing of such decision.

5.     Notwithstanding anything to the contrary herein, the proposed assumption and assignment of each of the Assigned Contracts listed on **Exhibit A** hereto (a) shall not be an admission as to whether any such Assigned Contract was executory or unexpired as of the Petition Date or remains executory or unexpired postpetition within the meaning of Bankruptcy Code section 365; and (b) shall be subject to the Debtors', the Stalking Horse Bidder's, or any Successful Bidder(s)'s right to conduct further confirmatory diligence with respect to the Cure Cost of each Assigned Contract and to modify such Cure Cost accordingly. In the event that the Debtors or any Successful Bidder determine that your Cure Cost should be modified, you will receive a notice pursuant to the Assumption and Assignment Procedures below, which will provide for additional time to object to such modification.

## I.     Treatment of Indemnity Claims

6.     **The closing of the Sale (the "<u>Closing</u>") shall constitute (a) an amendment to each Assigned Contract as necessary to render null and void any and all terms or provisions**

---

[3]   A copy of the purchase agreement between the Debtors and the Stalking Horse Bidder is attached as **Exhibit B** to the Sale Motion (the "<u>Stalking Horse Agreement</u>" or the "<u>PSA</u>," and such bid memorialized therein, the "<u>Stalking Horse Bid</u>").

thereof solely to the extent such terms or provisions create an obligation of any Debtor (or any assignee or successor thereof) or any insurance policy to which the Debtors are a party (an "<u>Endo Insurance Policy</u>"), or give rise to a right in favor of any non-Debtor for the indemnification or reimbursement of any individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, governmental unit, or other entity (such parties, "<u>Entities</u>") for costs, losses, damages, fees, expenses or any other amounts whatsoever relating to or arising from any actual or potential opioid-related litigation or dispute, whether accrued or unaccrued, asserted or unasserted, existing or hereinafter arising, based on or relating to, or in any manner arising from, in whole or in part, the development, production, manufacture, licensing, labeling, marketing, distribution or sale of opioid products or the use or receipt of any proceeds therefrom, or the use of opioids, including opioids that are not products developed, designed, manufactured, marketed or sold, in research or development, or supported by, the Debtors, (such activities, the "<u>Opioid-Related Activities</u>") or other conduct prior to the Closing; and (b) an agreement by each Counterparty to release the Debtors (and any assignee thereof or successor thereto) and all insurers under any Endo Insurance Policy from any and all obligations, liabilities, claims, causes of action, controversy, demand, right, lien, indemnity, contribution, reimbursement, guaranty, suit, obligation, liability, debt, damage, judgment, account, defense, remedy, offset, power, privilege, license or franchise, and other rights of recovery arising under or relating to such indemnification and reimbursement rights (all such actions, the "<u>Causes of Action</u>") to the extent relating to any conduct occurring prior to the Closing. As of the Closing, the following arising under or related to any related Assigned Contract shall be released and discharged with no consideration on account thereof: (i) any Cause of Action that either (A) is or could be asserted against any Debtor, including, without limitation, any Cause of Action that would otherwise be a Cure Objection pertaining to the Debtors' proposed Cure Cost; or (B) seeks to recover from any property of any Debtor, the Debtors' estate, or any Endo Insurance Policy; (ii) any Cause of Action that is for or based upon or arises from contribution, indemnification, reimbursement, setoff or recoupment or any other similar Causes of Action; and (iii) any Cause of Action that seeks to recover, directly or indirectly, any costs, losses, damages, fees, expenses or any other amounts whatsoever, actually or potentially imposed upon the holder of such Cause of Action in each case relating to or arising from any actual or potential litigation or dispute, whether accrued or unaccrued, asserted or unasserted, existing or hereinafter arising, based on or relating to, or in any manner arising from, in whole or in part, Opioid-Related Activities or otherwise relating to opioids (including, without limitation, any such Causes of Action asserted by any manufacturer, distributor, pharmacy, pharmacy-benefit manager, group purchasing organization or physician or other Counterparty). For the avoidance of doubt, unless otherwise agreed by the applicable Counterparty to any Assigned Contract, the foregoing shall not release or otherwise modify any term or provision of such applicable Assigned Contract to the extent of any indemnification or reimbursement rights accruing after the closing of the Sale for conduct occurring after the closing of the Sale.

7.     To the extent a Cure Objection to the amendments and releases described herein is not timely filed and properly served on the Debtors with respect to the applicable Contract or Lease in accordance with the procedures set forth in this Assumption and Assignment Notice: (a) the Counterparty to such Contract or Lease and all other applicable

**Entities shall be bound by and deemed to have assented to the terms set forth herein, including the amendment of such Contract or Lease as set forth in this Assumption and Assignment Notice and the assumption or assumption and assignment of such Contract or Lease, as so amended; (b) except to the extent such Contract or Lease is rejected by the Successful Bidder(s) as of the Closing, subject to the consensual resolution of any applicable unresolved objection regarding assumption or assumption and assignment, Cure Costs, adequate assurance of future performance, or other issues related to assumption or assumption and assignment of a Contract or Lease by such Counterparty and the Debtors, such Contract or Lease, solely as amended as described in this Assumption and Assignment Notice, shall be assumed by the Successful Bidder(s); and (c) as of the Closing, such Counterparty and all other applicable Entities shall be deemed to have released any and all, Causes of Action and other rights of recovery set forth in this Assumption and Assignment Notice.**

## II.    Assumption and Assignment Procedures

8.    The Assumption and Assignment Procedures set forth below regarding the assumption and assignment of the Assigned Contracts proposed to be assumed by the Debtors and assigned to the Successful Bidder(s) in connection with the Sale shall govern the assumption and assignment of all of the Assigned Contracts, subject to the payment of any Cure Costs:

(a)    **Cure Costs and Adequate Assurance of Future Performance.** The payment of the applicable Cure Costs by any party, as applicable, shall (i) effect a cure of all monetary defaults existing thereunder and (ii) compensate for any actual pecuniary loss to such Counterparty resulting from such default.

(b)    **Additions.** The Debtors may also designate additional executory contracts or unexpired leases as agreements to be assumed by the Debtors and assigned to a Successful Bidder (the "Additional Assigned Contracts") until five business days before the closing of the Sale. Following the addition of an Additional Assigned Contract, the Debtors shall as soon as reasonably practicable thereafter serve an Assumption and Assignment Notice on each of the counterparties to such Additional Assigned Contracts and their counsel of record, if any, indicating (i) that the Debtors intend to assume and assign the Counterparty's Contract or Lease, as applicable, to the Successful Bidder(s), and (ii) the corresponding Cure Cost. The Debtors shall provide any counterparties to such Additional Assigned Contracts an opportunity to be heard, if necessary, with respect to the assumption and assignment of their Assigned Contract if no other notice was received by such Counterparty prior to the Sale Hearing.

(c)    **Eliminations**. The Debtors may remove any Contract or Lease, as applicable, to be assumed by the Debtors and assigned to the Successful Bidder (the "Eliminated Agreements") until five business days before the closing of the Sale. Following the removal of an Eliminated Agreement, the Debtors shall as soon as reasonably practicable thereafter serve a notice (a "Removal Notice") on each of the impacted counterparties and their counsel of record, if any, indicating that the Debtors no longer intend to assign the Counterparty's Contract or Lease, as applicable, to the Successful Bidder(s) in connection with the Sale.

(d)    **Supplemental Contract Assumption Notice**. Although the Debtors intend to make a good faith effort to identify all Assigned Contracts that may be assumed and assigned in connection with the Sale, the Debtors may discover certain executory contracts inadvertently omitted from the Assigned Contracts list or the Successful Bidder(s) may identify other Contracts or Leases that they desire to have assumed and assigned in connection with the Sale. Accordingly, the Debtors reserve the right, but only in accordance with the Stalking Horse Agreement or the purchase and sale agreement with the Successful Bidder(s) (the "Successful Bidder Purchase Agreement"), as applicable, or as otherwise agreed by the Debtors and the Successful Bidder(s), at any time before the deadline for designation of additional Assigned Contracts or removal of potentially Assigned Contracts set forth in the Stalking Horse Agreement or the Successful Bidder Purchase Agreement, to (i) supplement the list of Assigned Contracts with previously omitted executory contracts, (ii) remove Assigned Contracts from the list of executory contracts ultimately selected as Assigned Contracts that a Successful Bidder proposes be assumed and assigned to it in connection with the Sale, or (iii) modify the previously stated Cure Cost associated with any Assigned Contracts. In the event the Debtors exercise any of these reserved rights, the Debtors will promptly serve a supplemental notice of contract assumption (a "Supplemental Assumption and Assignment Notice") on each of the counterparties to such contracts and their counsel of record, if any; *provided*, *however*, the Debtors may not add an executory contract to the list of Assigned Contracts that has been previously rejected by the Debtors by order of the Court. Each Supplemental Assumption and Assignment Notice will include the same information with respect to listed Assigned Contracts as was included in the Assumption and Assignment Notice, or in the event of a removal, the information required in a Removal Notice. Any Supplemental Assumption and Assignment Notice will be served as soon as reasonably practicable following the Successful Bidder's identification of any such omissions, removals, or modifications to any Assigned Contracts.

(e)    **Objections**. Objections, if any, to the proposed assumption and assignment or the Cure Cost proposed with respect thereto, must (i) be in writing; (ii) comply with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules; (iii) state, with specificity, the legal and factual bases thereof; (iv) if a Cure Objection that pertains to the proposed Cure Costs, state the cure amount alleged to be owed to the objecting Counterparty, together with the appropriate documentation including the cure amount the Counterparty believes is required to cure defaults under the relevant Contract or Lease; (v) include any appropriate documentation in support thereof; and (vi) be filed with the Court and served on, so actually be received by, the Objection Recipients (as defined below) by the applicable deadlines below or such deadline as set forth in the applicable Supplemental Assumption and Assignment Notice.

(i)    *Cure Objection Deadline*. Any objection to the Cure Cost, to assumption and assignment of an Assigned Contract, or adequate assurance of must be filed with the Bankruptcy Court on or before **February 16, 2023, at 4:00 p.m. (prevailing Eastern Time)** (the "Cure Objection Deadline"), **or such deadline set forth in the applicable Supplemental Assumption Notice**, and served on: (a) counsel for the Debtors, Skadden, Arps, Slate Meagher & Flom LLP, One Manhattan West, New York, New York 10001 (Attn: Paul D. Leake (Paul.Leake@skadden.com), Lisa Laukitis (Lisa.Laukitis@skadden.com), Shana A. Elberg (Shana.Elberg@skadden.com), and Elizabeth Downing (Elizabeth.Downing@skadden.com)); and (b) counsel to the Stalking Horse Bidder, Gibson, Dunn & Crutcher LLP, 200 Park Ave, New York, New York 10166 (Attn: Scott Greenberg (SGreenberg@gibsondunn.com), Michael J.

Cohen (MCohen@gibsondunn.com), and Joshua K. Brody (JBrody@gibsondunn.com)) (collectively, the "Cure Objection Recipients").

(ii)    *Auction Results Objection Deadline.* If the Debtors hold an Auction and if a Successful Bidder that is not the Stalking Horse Bidder prevails at the Auction, as soon as reasonably practicable after selecting such Successful Bidder(s), the Debtors will file (but not serve) and cause to be published on the Case Website a notice of results of the Auction (the "Notice of Auction Results"). Upon the filing of any Notice of Auction Results, objections *solely* to the identity of the Successful Bidder(s), changes to the Stalking Horse Agreement, or adequate assurance of future performance (each, a "Auction Results Objection") may be made. Any Auction Results Objection must be served on (A) counsel for the Debtors and (B) the Successful Bidder(s) and its counsel, if any (collectively, the "Auction Results Objection Recipients," and together with the Cure Objection Recipients, the "Objection Recipients"), so as to be received by **4:00 p.m. (Prevailing Eastern Time) on the date that is two days after the date that the Notice of Auction Results are published** (the "Auction Results Objection Deadline"); *provided, however*, that the Cure Objection Deadline shall not be extended.

(f)    Any party failing to timely file an objection to (i) the proposed Cure Cost, (ii) the proposed assumption and assignment of an Assigned Contract or Additional Assigned Contract listed on the Assumption and Assignment Notice or a Supplemental Assumption and Assignment Notice, or (iii) the amendment of the Assigned Contracts and releases of the Causes of Action and other rights of recovery as set forth in this Assumption and Assignment Notice; is deemed to have consented to (A) such Cure Cost, (B) the assumption and assignment of such Assigned Contract or Additional Assigned Contract (including the adequate assurance of future payment), (C) the amendment of the Assigned Contracts and releases of the Causes of Action and other rights of recovery as set forth in this Assumption and Assignment Notice; and (D) the related relief requested in the Sale Motion. Such party shall be forever barred and estopped from objecting to the Cure Cost, the assumption and assignment of the Assigned Contract, or Additional Assigned Contract, adequate assurance of future performance, or the related relief requested herein and in the Sale Motion, whether applicable law excuses such Counterparty from accepting performance by, or rendering performance to, the Successful Bidder(s), and from asserting any additional cure or other amounts against the Debtors and the Successful Bidder(s) with respect to such party's Assigned Contract or Additional Assigned Contract.

(g)    If a Cure Objection or Auction Results Objection, as applicable, filed by the Cure Objection Deadline or Auction Results Objection Deadline, as applicable, cannot otherwise be resolved by the parties prior to the Sale Hearing, such objections and all issues regarding the Cure Cost amount to be paid or the adequate assurance of future performance, as applicable, shall be determined by the Court at the Sale Hearing, or at a later hearing on a date to be scheduled by the Debtors in their discretion, and in consultation with the Successful Bidder(s).

## III.    Additional Information

9.    Unless otherwise provided in the Sale Order, the Debtors shall have no liability or obligation with respect to defaults relating to the Assigned Contracts arising, accruing, or relating to a period on or after the effective date of assignment.

10.     Copies of the Sale Motion, the Bidding Procedures Order, the Bidding Procedures, and the Sale Notice may be obtained free of charge at the website dedicated to the Debtors' chapter 11 cases maintained by their claims and noticing agent and administrative advisor, Kroll Restructuring Administration LLC, located at https://restructuring.ra.kroll.com/Endo.

*[Remainder of Page Intentionally Left Blank]*

Dated: [_____], 2022
New York, New York

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By:    *DRAFT*_____
       Paul D. Leake
       Lisa Laukitis
       Shana A. Elberg
       Evan A. Hill
       One Manhattan West
       New York, New York 10001
       Telephone: (212) 735-3000
       Fax: (212) 735-2000

       *Counsel for the Debtors*
       *and Debtors in Possession*

# EXHIBIT A

**Assigned Contracts**

## **Exhibit 4**

**Reconstruction Steps Summary**

# Description of Reconstruction Steps

*Note:* *This presentation is produced for illustrative purposes and the steps and implementation thereof described herein remain subject to material change in all respects*

# Reconstruction Steps

► In connection with seeking approval of the bidding procedures, the existing Debtors are seeking approval of the U.S. Bankruptcy Court for the completion of the Reconstruction Steps[1] to facilitate the sale to the Successful Bidder.

► These Reconstruction Steps will involve the transfer of the businesses of each of the three primary Irish asset-owning Debtors into three, newly formed Irish subsidiaries that will essentially carry on the same businesses of the transferring entities.

► Following Court approval and implementation of the Reconstruction Steps, these new subsidiaries would then be sold to the Successful Bidder as part of the Sale.

*1. Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Debtor's Motion for an Order (I) Establishing Bidding, noticing, and Assumption and Assignment Procedures, (II) Approving Certain Transaction Steps, (III) Approving the Sale of Substantially All of the Debtors' Assets and (IV) Granting Related Relief (the "Sale Motion"), or the Bidding Procedures Order, to which this presentation is attached.*



# Existing Simplified Endo Group Structure



The above chart is a very simplified version of the full Endo corporate structure. The Reconstruction Steps described in this deck involves only the 3 Irish entities in the red box. Accordingly, all of the diagrams through slide 16 deal only with those 3 Irish entities in the red box above and the Reconstruction Steps and new entities related to them. Slide 17 shows the simplified full post-sale corporate structure of Endo (assuming implementation of the Reconstruction Steps and a sale to a bidder), including the three Irish entities in the red box above and non-Irish entities that are not involved in the Reconstruction Steps.



# Existing Structure of Primary Irish Asset-Owning Debtors





3

# Structure of Irish Asset-Owning Debtors After Reconstruction Steps



4



# Reconstruction Steps: Step 1—Incorporation of Newcos

► **Step 1:** A third party service provider with no economic interest in the Debtors (the "Initial Shareholder") forms three new companies ("Newco 1", "Newco 2" and "Newco 3", and collectively, the "Newcos") as private limited companies incorporated and tax resident in Ireland.

► On incorporation, the ordinary share capital of each of the Newcos will be held by the Initial Shareholder (the "Subscription Shares").





# Reconstruction Steps: Step 2—Interposition of Holdcos

▶ **Step 2:** Three newly formed limited liability holding companies, New Holdco 1 Limited ("Holdco 1"), New Holdco 2 Limited ("Holdco 2"), and New Holdco 3 Limited ("Holdco 3," and collectively, the "Holdcos") will be created as private limited liability companies incorporated and tax resident in Ireland and imposed as direct parent companies of each of Endo Ventures Limited ("EVL"), Endo Global Biologics Limited ("EGBL"), and Endo Global Aesthetics Limited ("EGAL," and collectively, the "Transferor Debtors") by way of a share-for-share exchange.



6



# Reconstruction Steps: Step 3—Conversion

► Step 3: In order to satisfy certain Irish law requirements relating to reconstruction transactions, prior to the completion of the transfer of the business and assets, including employees in the case of EVL (the "Specified Assets"), of each Transferor Debtor (each, a "Business Transfer"), the Transferor Debtors will be required to change their corporate form from limited liability companies to unlimited liability companies (the "Conversion"). Under Irish law, the Conversion will make the Transferor Debtors' direct parent companies—the Holdcos—liable for the debts of the Transferor Debtors on any insolvent liquidation of the Transferor Debtors.

Endo International plc
(Ireland)

Endo Topfin Limited
(Ireland)

New Holdco 3 Limited
(Ireland)

Endo Ventures
**Unlimited**
(Ireland)

Assets

New Holdco 1 Limited
(Ireland)

New Holdco 2 Limited
(Ireland)

Endo Global Aesthetics
**Unlimited**
(Ireland)

Assets including Qwo

Endo Global Biologics
**Unlimited**
(Ireland)

Assets including Xiaflex

Initial Shareholder

Newco 1
(Ireland)

Newco 2
(Ireland)

Newco 3
(Ireland)

7



# Reconstruction Steps: Step 4—Business Transfer

► **Step 4:** Each of the Transferor Debtors transfers its Specified Assets to a Newco, in exchange for each Newco issuing ordinary shares (collectively, the "Consideration Shares") to each Holdco that is the direct parent of the Transferor Debtor that transferred its Specified Assets to the Newco.

► The Specified Assets will be transferred to each Newco subject only to the Prepetition Liens and any Permitted Prior Liens. For the avoidance of doubt, the claims underlying the Prepetition Liens and Permitted Prior Liens will not transfer to the Newcos but remain with the Transferor Debtors.

► At the time of each Business Transfer, the share held by the Initial Shareholder will be surrendered and cancelled so that it will not be a shareholder in the Newcos following the Business Transfers and the Newcos will be wholly owned by the Endo group immediately thereafter.



8



# Reconstruction Steps: Step 5—Chapter 11 Filing

► Substantially contemporaneously with the completion of the Business Transfers, the Newcos and the Holdcos will file for chapter 11 and be jointly administered in the Debtors' chapter 11 cases.

► The Newcos will continue to operate the businesses of the Transferor Debtors in substantially the same manner as they were operated by the Transferor Debtors.

9



# Structure after Step 5



10



# Reconstruction Steps: Step 6—Share Subscription

► Following the Business Transfers, each of the Holdcos and their corresponding Transferor Debtor will enter into an irrevocable, conditional subscription agreement (each, a "Subscription Agreement") pursuant to which the Holdcos will irrevocably agree that if a Newco is sold for more than nominal value (whether due to an overbid, a successful lien challenge, or otherwise) (the value in excess of nominal being the "Excess Value"), the relevant Holdco will use the Excess Value to subscribe for shares in the relevant Transferor Debtor.

► (a) In the event that the liens held by the Prepetition First Lien Secured Parties or holders of the Second Lien Notes are successfully challenged resulting in any unencumbered value at the Newcos (such value, the "Unencumbered Value"), the Successful Bidder shall be authorized and directed to pay cash to the Holdcos on account of the Unencumbered Value; and (b) in the event that a topping bid to the Stalking Horse Bid is selected as the Successful Bid, the Successful Bidder shall be authorized and directed to pay cash to the Holdcos on account of any value attributable to the Newcos in excess of the value of the Prepetition Liens.

► As a result, the creditors of the Transferor Debtors then share in the Excess Value in the same order of priority that existed at the Transferor Debtors before the execution of the Reconstruction Steps.



11



# Reconstruction Steps: Implementation

► As described in further detail herein, the implementation of the Reconstruction Steps includes, among other things, certain transitional arrangements between the Transferor Debtors and the Newcos to allow the businesses of the Transferor Debtors to operate in a manner which ensures business continuity and complies with applicable laws.



# Reconstruction Steps: Implementation (cont'd)

| Implementation of the Reconstruction Steps | |
|---|---|
| **Business Transfer Agreements** | • The Transferor Debtors, the Newcos, and the Holdcos will enter into business transfer agreements (each, a "<u>BTA</u>") effectuating the transfers of the Specified Assets.<br><br>• For the avoidance of doubt, although the transfers will occur subject only to Prepetition Liens and any Permitted Prior Liens, the claims underlying the Prepetition Liens and Permitted Prior Liens (as well as any other third-party prepetition claims) will not transfer to the Newcos but remain with the Transferor Debtors.<br><br>    • The Prepetition Liens and Permitted Prior Liens must transfer with the assets in order to (a) ensure that the rights of the secured creditors to credit bid are not compromised by the transfer and (b) prevent an unintended accrual of value in the Newcos on the completion of the Reconstruction Steps, which would result in a 1% stamp duty liability being incurred by any purchaser of the shares in the Newcos. Because the Newcos are being utilized as a vehicle to effectuate an eventual sale, their bankruptcy cases will ultimately be dismissed. Transferring any third-party prepetition claims against the Transferor Debtors to the Newcos would deter any bidder from utilizing this structure. |
| **Transitional Services Agreement** | • Each Transferor Debtor and the relevant Newco will enter into a Transitional Services Agreement ("<u>TSA</u>") to enable the parties to fulfill their obligations under the BTAs and allow the Endo business to operate in a manner which ensures business continuity following the Reconstruction Steps until consummation of the ultimate Sale (such period, the "<u>Interim Period</u>").<br><br>• Under the TSAs, the Transferor Debtors will provide whatever services may be required by the Newcos to carry out the businesses during the Interim Period that the Newcos cannot carry out themselves (e.g., providing access to IT systems).<br><br>• As the Transferor Debtors will have to carry out certain activities (*e.g.*, Irish regulated activities under third-party contracts, financial reporting requirements, tax filings) but will not have employees (as such employees will transfer to the Newcos as part of the Reconstruction Steps), the Newcos will supply certain services to the Transferor Debtors for the Interim Period to enable the Transferor Debtors to carry out those activities. |
| **Business Contracts** | • Pursuant to the BTAs, the Transferor Debtors will generally maintain the legal interest in third-party executory contracts and unexpired leases to which they are party (collectively, the "<u>Business Contracts</u>"), while the Newcos will have the beneficial interest (including the economic benefits and burdens) of such Business Contracts until the closing of the Sale.<br><br>• The Newcos will reimburse the Transferor Debtors for any costs or other liabilities arising under each Business Contract pursuant to the BTAs.<br><br>• EVL engages in certain regulated activities under Irish law related to its business operations. As Newco 3 is not anticipated to be able to obtain the requisite regulatory authorizations to conduct the Irish regulated activities by completion of the Reconstruction Steps, EVL will continue to carry on all Irish regulated activities (until such time as Newco 3 is in receipt of such authorizations) and be responsible for such performance under the relevant Business Contracts.<br><br>• For the avoidance of doubt, intercompany executory contracts at the Transferor Debtors will generally transfer in full to the Newcos. As a result, any administrative or other services that are currently provided to the Transferor Debtors by other Endo group companies (or vice versa) will continue under these agreements. |



# Reconstruction Steps: Implementation (cont'd)

| Implementation of the Reconstruction Steps | |
|---|---|
| **Intercompany Financing Arrangements** | • The Debtors and the Newcos will assign from the Transferor Debtors or replicate in the Newcos required existing intercompany arrangements to ensure that funds can continue to move throughout the Debtor group in the ordinary course of business. |
| **Employees** | • All employees of EVL (being the only employing Transferor Debtor) will transfer to Newco 3 on the same terms and conditions of employment (subject to certain exceptions).<br><br>• All rights and obligations arising from EVL employees' existing employment contracts will transfer to Newco 3, subject to certain exceptions (e.g., pension) due to unrelated changes in benefit offerings.<br><br>• As required under EU/Irish law, all employees will receive a formal notice of the employment transfer no later than 30 days before the transfer takes effect. |
| **Intellectual Property** | • IP that is owned by the Transferor Debtors will be transferred to the relevant Newcos as part of the Reconstruction Steps.<br><br>• IP that is in-licensed from a third party will be treated in the same manner as other third-party contracts under the TSA.<br><br>• The Endo group currently relies on implied licenses to facilitate the use of and access to IP held by, or licensed to, another member of the Endo group. It is expected that the same approach will be relied on following the Reconstruction Steps and no formal licensing arrangements will be entered. |
| **Insurance** | • Existing insurance arrangements in the Transferor Debtors will need to be extended, or replicated, by the Newcos. |
| **Regulatory** | • The Transferor Debtors and the Newcos will need to comply with a number of healthcare-related regulatory requirements and approvals in various jurisdictions to implement the transfer of the Specified Assets, including with respect to certain Irish marketing and distribution authorizations; Indian manufacturing, import, and export licenses; Canadian product authorizations; Austrian product authorizations; and U.S. FDA product authorizations and establishment regulations. |
| **Corporate Governance** | • The governing bodies of each entity involved in the Reconstruction Steps will approve resolutions approving the transactions and required corporate actions thereunder, including, but not limited to, the BTAs and the conversion of the Transferor Debtors into unlimited liability companies. |
| **Premises and Equipment** | • EVL is required under Irish regulatory authorizations to operate from its leased premises in Dublin. Such third-party lease will not be assigned to Newco 3, but Newco 3 will be granted a license to occupy the premises during the Interim Period. |

14



# Appendix: Subsequent Transaction Steps

# Subsequent Transaction Steps *(following approval and implementation of Reconstruction Steps)*

► **Step 7:** Following completion of the marketing process, approval of the U.S. Bankruptcy Court will be sought for the sale of the assets of the Debtors (including the equity in the Newcos and subsequent acquisition of the assets in the Newcos) to the Successful Bidder free and clear of all liens, claims and encumbrances under section 363 of the U.S. Bankruptcy Code (the "Sale Order").

► **Step 8:**

   – Holdco 1 sells the entire issued share capital of Newco 1;

   – Holdco 2 sells the entire issued share capital of Newco 2; and

   – Holdco 3 sells the entire issued share capital of Newco 3

to an acquisition company owned by the Successful Bidder (formed as a private limited company incorporated and tax resident in Ireland) ("Purchaser") for consideration equal to the market value of those shares.

► Any unencumbered assets at any Newcos will be paid for by the Successful Bidder by buying the Newco shares and paying cash to the relevant Holdco, which, in turn, has an obligation to return such cash to the relevant Transferor Debtor.

► **Step 9:** Purchaser acquires the business and assets of each of the Newcos free and clear of all liens, claims and encumbrances pursuant to the Sale Order.

► Purchaser simultaneously acquires the assets of the other Debtors free and clear of all liens, claims and encumbrances pursuant to the Sale Order.

► Dismissal of the chapter 11 cases relating to the Newcos will be sought following Step 9.



# Structure after Step 9: Completion of Sale

*1. Assets of all non-Irish Debtors to be acquired into one or more Purchaser entities*

endo



## **Exhibit 5-A**

**BTA Term Sheet**

### Endo International plc, et al.
### BUSINESS TRANSFER AGREEMENT TERM SHEET [12]

| Provision | Summary |
|---|---|
| **Parties** | (1) EGAL, Newco 1, and Holdco 1<br><br>(2) EGBL, Newco 2, and Holdco 2<br><br>(3) EVL, Newco 3, and Holdco 3 |
| **Consideration** | In each case, an allotment and issuance of ordinary share capital by the applicable Newco to the applicable Holdco |
| **Transferred Assets[34]** | • The business of the Transferor Debtor as a going concern<br><br>• All intragroup contracts as are determined necessary for the continuation of Transferor Debtor's business by Newco<br><br>• The beneficial and economic interest in all third-party contracts that are determined necessary for the continuation of Transferor Debtor's existing business by Newco<br><br>• The right to represent Newco as carrying on the business as presently carried on by Transferor Debtor<br><br>• Cash/cash equivalents held by Transferor Debtor<br><br>• All relevant documents, information, databases, and records relating to Transferor Debtor's business (including in respect of the Business Transfer Agreement between EVL, Newco 3, and Holdco 3 only, all files and other relevant information relating to employees)<br><br>• All intellectual property assets owned by Transferor Debtor (in accordance with the terms of a separate short-form IP assignment agreement) |

---

[1]    Terms are indicative only and subject to revision. Capitalized terms used but not defined herein shall have the meanings ascribed to them in the *Debtor's Motion for an Order (I) Establishing Bidding, noticing, and Assumption and Assignment Procedures, (II) Approving Certain Transaction Steps, (III) Approving the Sale of Substantially All of the Debtors' Assets and (IV) Granting Related Relief*, or the Bidding Procedures Order, to which this term sheet is attached.

[2]    There will be three separate business transfer agreements on substantially the same terms. For the purposes of this term sheet, the term:

- **"Transferor Debtor"** refers to Endo Global Aesthetics Limited ("EGAL"), Endo Global Biologics Limited ("EGBL"), or Endo Ventures Limited ("EVL") (as applicable)

- **"Newco"** refers to Newco 1, Newco 2, and Newco 3 (as applicable)

- **"Holdco"** refers to Holdco 1, Holdco 2, or Holdco 3 (as applicable)

[3]    It is likely that additional short-form confirmatory novation, assignment or transfer agreements will be required to perfect transfer of certain assets.

[4]    Transferred Assets will transfer subject to Prepetition Liens and Permitted Prior Liens (each as defined in the Cash Collateral Order). For the avoidance of doubt, the claims underlying the Prepetition Liens and Permitted Prior Liens will not transfer to the Newcos but remain with the Transferor Debtors.

|  | |
|---|---|
|  | • All plant, machinery, equipment, motor vehicles, furniture, fixtures, fittings, tools, and other chattels used in connection with the business, owned by Transferor Debtor<br><br>• All raw materials, stock-in-trade, work-in-progress, and spare parts of Transferor Debtor in connection with its business, including, to the extent permissible under applicable regulatory law and guidance, the stock of fully finished and partly finished products held by Transferor Debtor in connection with its business<br><br>• In respect of the Business Transfer Agreement between EVL, Newco 3 and Holdco 3 only, all compensation and employee benefit plans and all agreements with existing transferred employees.<br><br>• The goodwill related to Transferor Debtor's business<br><br>• All other property to which Transferor Debtor is entitled in connection with its business (other than any Excluded Assets) |
| **Excluded Assets** | • All shares of capital stock or other equity interests of any group company held by Transferor Debtor<br><br>• All contracts and assets which are determined unnecessary for the continuation of Transferor Debtor's existing business by Newco<br><br>• Certain regulatory authorizations (Newco will apply for new authorizations) |
| **Assumed Liabilities** | • All intercompany trade balances due to any other group company by Transferor Debtor as are mutually agreed between the parties (including the Required Consenting First Lien Creditors) to be beneficial for Newco to assume, including, but not limited to, enabling the flow of funds throughout the Debtor group to allow ordinary course trade payables to continue to be paid by other group companies<br><br>• All bank overdrafts and credit card balances of Transferor Debtor<br><br>• In respect of the Business Transfer Agreement between EVL, Newco 3 and Holdco 3 only, all accrued and future employee entitlements (including in respect of pension arrangements) of Transferor Debtor<br><br>• All operational obligations of Transferor Debtor under any third-party contracts that are determined necessary for the continuation of Transferor Debtor's existing business by Newco. For the avoidance of doubt, Transferor Debtor will maintain the legal interest in all third-party executory contracts to which they are party |
| **Excluded Liabilities** | • Any liabilities of Transferor Debtor of any kind whatsoever not specifically included in the definition of Assumed Liabilities, including, but not limited to, all liabilities of Transferor Debtor relating to an Excluded Asset |
| **Employee Matters (Business Transfer Agreement between** | All existing employees of EVL will be transferred to Newco 3 on their existing terms and conditions of employment (including positions, responsibilities, base salaries, short- and long-term incentive opportunities and employee benefits) and with recognition of previous service with EVL |

2

| **EVL, Newco 3 and Holdco 3 only)** | |
|---|---|

## Exhibit 5-B

**TSA Term Sheet**

**Endo International plc, et al.**
**TRANSITIONAL SERVICES AGREEMENT TERM SHEET**[12]

| Provision | Summary |
|---|---|
| **Parties** | (1) EGAL and Newco 1<br><br>(2) EGBL and Newco 2<br><br>(3) EVL and Newco 3 |
| **Consideration / Service Fees** | Service fees payable by each party to be consistent with internationally recognized arm's length principles/OECD transfer pricing guidelines |
| **Services to be provided by Newco to Transferor Debtor** | • All services under third party contracts which do not require direct interaction with the contract counterparty or which do not require regulatory authorizations (until such time as Newco is in receipt of such authorizations)<br><br>• In respect of the Transitional Services Agreement between EVL and Newco 3 only, secondment of Newco 3 employee to act as responsible person under Irish regulatory authorizations (under separate secondment agreement), and secondment of other employees as may be required (in each case until such time as Newco 3 is in receipt of any regulatory authorizations and on such receipt of any regulatory authorisation, Newco 3 will cease to provide the service to which that regulatory authorisation relates and shall instead perform that activity itself)<br><br>• All services which require regulatory authorizations (only once Newco is in receipt of such authorization(s) in respect of any service(s)) |

---

[1]    Terms are indicative only and subject to revision. Capitalized terms used but not defined herein shall have the meanings ascribed to them in the *Debtor's Motion for an Order (I) Establishing Bidding, noticing, and Assumption and Assignment Procedures, (II) Approving Certain Transaction Steps, (III) Approving the Sale of Substantially All of the Debtors' Assets and (IV) Granting Related Relief*, or the Bidding Procedures Order, to which this term sheet is attached.

[2]    There will be three separate transitional services agreements on substantially the same terms. For the purposes of this term sheet, the term:

- **"Transferor Debtor"** refers to Endo Global Aesthetics Limited ("EGAL"), Endo Global Biologics Limited ("EGBL"), or Endo Ventures Limited ("EVL") (as applicable)

- **"Newco"** refers to Newco 1, Newco 2, and Newco 3 (as applicable)

- **"Holdco"** refers to Holdco 1, Holdco 2, or Holdco 3 (as applicable)

| | |
|---|---|
| | • Access to any fixed assets, equipment, machinery etc. which Transferor Debtor may need in order to perform services outlined above.<br><br>• General and administrative management services in order to allow Transferor Debtor to perform services outlined above and in order to allow Transferor Debtor to comply with any reporting requirements (*e.g.*, tax returns, accounts filings) |
| **Services to be provided by Transferor Debtor to Newco** | • Contract management services with third parties<br><br>• All services which require regulatory authorization(s) (until such time as Newco is in receipt of such authorization(s))<br><br>• In respect of the Transitional Services Agreement between EVL and Newco 3 only, access to leasehold premises (under separate license agreement)<br><br>• All other services which may be required for the continuation of Transferor Debtor's business by Newco, including but not limited to:<br>    o Access to IT systems<br>    o HR management services |

**<u>Exhibit 5-C</u>**

**Subscription Agreement Term Sheet**

**Endo International plc, et al.**
**SUBSCRIPTION AGREEMENT TERM SHEET**[1]

| Provision | Summary |
|---|---|
| **Parties** | (1) EGAL and Holdco 1<br><br>(2) EGBL and Holdco 2<br><br>(3) EVL and Holdco 3<br><br>(Endo Global Aesthetics Limited ("EGAL"), Endo Global Biologics Limited ("EGBL"), and Endo Ventures Limited ("EVL") together referred to as the "Transferor Debtors," and Holdco 1, Holdco 2, and Holdco 3 together referred to as the "Holdcos") |
| **Condition** | The obligation on the part of each Holdco to subscribe for one or more ordinary shares in the capital of an Transferor Debtor that is its wholly owned subsidiary is conditional upon that Holdco receiving payment of an amount that exceeds a nominal sum ("Excess Value") on the sale by that Holdco of the entire issued share capital of its wholly owned subsidiary Newco (a "Sale for Value"). |
| **Subscription Terms** | On the occurrence of a Sale for Value, the relevant Holdco irrevocably agrees to subscribe for one or more ordinary shares in the capital of its subsidiary Transferor Debtor (the "Shares") for a subscription price that is equal to the Excess Value and the subsidiary Transferor Debtor irrevocably agrees to issue the Shares to Holdco. |
| **Subscription Price** | The subscription price for the Shares will be an amount equal to the Excess Value. |
| **Term** | 2 years |

---

[1] Terms are indicative only and subject to revision. Capitalized terms used but not defined herein shall have the meanings ascribed to them in the *Debtor's Motion for an Order (I) Establishing Bidding, noticing, and Assumption and Assignment Procedures, (II) Approving Certain Transaction Steps, (III) Approving the Sale of Substantially All of the Debtors' Assets and (IV) Granting Related Relief*, or the Bidding Procedures Order, to which this term sheet is attached.

## **Exhibit B**

**Stalking Horse Agreement**

# PURCHASE AND SALE AGREEMENT

by and among

Tensor Limited,

as the Buyer,

Endo International plc

the other Sellers set forth on <u>Annex A-1</u>

and the Participating Endo Debtors set forth on <u>Annex A-2</u>

Dated as of [●]

## TABLE OF CONTENTS

Page

ARTICLE I
DEFINITIONS

Section 1.1    Certain Defined Terms ........................................................................2
Section 1.2    Table of Definitions .........................................................................22


ARTICLE II
PURCHASE AND SALE

Section 2.1    Purchase and Sale of Assets ..............................................................28
Section 2.2    Excluded Assets................................................................................32
Section 2.3    Assumed Liabilities..........................................................................32
Section 2.4    Excluded Liabilities .........................................................................34
Section 2.5    Consents to Certain Assignments .....................................................35
Section 2.6    Contract Designation........................................................................36
Section 2.7    Consideration....................................................................................40
Section 2.8    Wind-Down Amount.........................................................................40
Section 2.9    Professional Fee Escrow Accounts ...................................................41
Section 2.10   Closing .............................................................................................41
Section 2.11   Purchase Price Allocation ................................................................46
Section 2.12   Designated Buyer(s).........................................................................46
Section 2.13   Withholding......................................................................................47
Section 2.14   Post-Closing Actions........................................................................47


ARTICLE III
REPRESENTATIONS AND WARRANTIES OF THE ENDO COMPANIES

Section 3.1    Organization .....................................................................................48
Section 3.2    Authority ..........................................................................................48
Section 3.3    No Conflict; Required Filings and Consents; Pre-Signing Matters.....................49
Section 3.4    Transferred Assets ............................................................................50
Section 3.5    Company Reports; Financial Statements; No Undisclosed Liabilities ................51
Section 3.6    Absence of Certain Changes or Events..............................................52
Section 3.7    Compliance with Law; Permits .........................................................53
Section 3.8    Litigation ..........................................................................................53
Section 3.9    Employee Plans ................................................................................54
Section 3.10   Labor and Employment Matters .......................................................56
Section 3.11   Real Property ....................................................................................57
Section 3.12   Intellectual Property and Data Privacy .............................................59
Section 3.13   Taxes ................................................................................................61
Section 3.14   Regulatory Matters...........................................................................62
Section 3.15   Environmental Matters......................................................................64
Section 3.16   Material Contracts.............................................................................65

i

Section 3.17    Accounts Receivable; Inventory ................................................................. 67
Section 3.18    Customers and Suppliers ........................................................................... 68
Section 3.19    Certain Payments ...................................................................................... 68
Section 3.20    Brokers ...................................................................................................... 69
Section 3.21    Exclusivity of Representations and Warranties ........................................ 69

ARTICLE IV
REPRESENTATIONS AND WARRANTIES OF THE BUYER

Section 4.1    Organization .............................................................................................. 70
Section 4.2    Authority ................................................................................................... 70
Section 4.3    No Conflict; Required Filings and Consents ............................................ 70
Section 4.4    Brokers ...................................................................................................... 71
Section 4.5    Credit Bid .................................................................................................. 71
Section 4.6    Buyer's Investigation and Reliance .......................................................... 72

ARTICLE V
COVENANTS

Section 5.1     Conduct of Business Prior to the Closing .............................................. 73
Section 5.2     Covenants Regarding Information ........................................................... 77
Section 5.3     Notification of Certain Matters ............................................................... 77
Section 5.4     Employee Matters .................................................................................... 77
Section 5.5     Consents and Filings; Further Assurances .............................................. 81
Section 5.6     Refunds and Remittances ........................................................................ 83
Section 5.7     Public Announcements ............................................................................. 84
Section 5.8     Bankruptcy Court Filings and Approval .................................................. 84
Section 5.9     Endo Marks .............................................................................................. 86
Section 5.10    IP License ................................................................................................. 86
Section 5.11    Assumed Liabilities; Adequate Assurance of Future Performance ......... 87
Section 5.12    Sale Free and Clear .................................................................................. 87
Section 5.13    Product Liability Insurance ...................................................................... 87
Section 5.14    Intellectual Property Registrations .......................................................... 88
Section 5.15    Corporate Existence ................................................................................. 88
Section 5.16    Regulatory Approvals ............................................................................... 88
Section 5.17    Communication with Customers and Suppliers ....................................... 89
Section 5.18    Post-Closing Cooperation ........................................................................ 89
Section 5.19    Buyer Expenses ........................................................................................ 89

ARTICLE VI
TAX MATTERS

Section 6.1    Transfer Taxes .......................................................................................... 89
Section 6.2    Tax Cooperation and Information ............................................................. 90
Section 6.3    Structure and Pre-Closing Steps .............................................................. 91
Section 6.4    Certain Tax Elections ............................................................................... 91
Section 6.5    Apportionment of Certain Taxes .............................................................. 92

Section 6.6    Retention of Tax Records ................................................................................ 92
Section 6.7    Tax Refunds ................................................................................................... 93
Section 6.8    Canadian Tax Treatment ................................................................................ 93
Section 6.9    Interim Payments of Taxes ............................................................................ 93

## ARTICLE VII
## CONDITIONS TO CLOSING

Section 7.1    General Conditions ......................................................................................... 93
Section 7.2    Conditions to Obligations of the Endo Companies ......................................... 94
Section 7.3    Conditions to Obligations of the Buyer .......................................................... 95

## ARTICLE VIII
## TERMINATION

Section 8.1    Termination .................................................................................................. 96
Section 8.2    Effect of Termination .................................................................................. 101
Section 8.3    Expense Reimbursement Amount ................................................................ 101

## ARTICLE IX
## GENERAL PROVISIONS

Section 9.1    Nonsurvival of Representations, Warranties and Covenants ............................ 102
Section 9.2    Indemnification by Buyer ............................................................................. 102
Section 9.3    Fees and Expenses ....................................................................................... 103
Section 9.4    Amendment and Modification ....................................................................... 103
Section 9.5    Waiver ........................................................................................................ 103
Section 9.6    Notices ........................................................................................................ 103
Section 9.7    Interpretation ............................................................................................... 104
Section 9.8    Entire Agreement ......................................................................................... 105
Section 9.9    Parties in Interest ........................................................................................ 105
Section 9.10   Governing Law ............................................................................................. 105
Section 9.11   Submission to Jurisdiction ............................................................................ 106
Section 9.12   Disclosure Generally .................................................................................... 106
Section 9.13   Assignment; Successors ............................................................................... 106
Section 9.14   Enforcement ................................................................................................. 107
Section 9.15   Currency ...................................................................................................... 107
Section 9.16   Severability .................................................................................................. 107
Section 9.17   Waiver of Jury Trial ..................................................................................... 107
Section 9.18   Counterparts ................................................................................................ 108
Section 9.19   Electronic Signature ..................................................................................... 108
Section 9.20   Time of Essence .......................................................................................... 108
Section 9.21   Damages Limitation ...................................................................................... 108
Section 9.22   No Recourse Against Nonparty Affiliates ...................................................... 108
Section 9.23   Bulk Sales ................................................................................................... 109
Section 9.24   No Presumption Against Drafting Party ......................................................... 109
Section 9.25   Conflicts; Privileges ..................................................................................... 109

Annex A-1     Sellers
Annex A-2     Participating Endo Debtors
Exhibit 1     Form of Bidding Procedures Order
Exhibit 2     Form of Bill of Sale
Exhibit 3     Form of IP Assignment Agreement
Exhibit 4     Form of Irish Stock Transfer Form
Exhibit 5     Form of Direction Letter

## PURCHASE AND SALE AGREEMENT

This **PURCHASE AND SALE AGREEMENT**, dated as of [●] (this "Agreement"), is made by and among Endo International plc, a public limited company incorporated in Ireland ("Seller Parent"), each of the Sellers (as defined below) and each of the Participating Endo Debtors set forth on Annex A-2 (the Sellers together with the Seller Parent, Participating Endo Debtors and the Indian Subsidiaries (as defined below), each an "Endo Company" and collectively the "Endo Companies") and Tensor Limited, a private limited company incorporated in Ireland with company number 723856 (the "Buyer").

## RECITALS

A.      The Endo Companies are engaged in the Branded Pharmaceuticals, Sterile Injectables, Generic Pharmaceuticals and International Pharmaceuticals business segments (together, as operated by the Endo Companies as of the date hereof and through the Closing Date, the "Business"). References to the "Business" as operated following the Closing Date, shall be read to exclude the Excluded Assets.

B.      Seller Parent and certain of the other Endo Companies (other than the NewCo Sellers and the Indian Subsidiaries) filed voluntary petitions (the "Petitions") for relief commencing a case under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") on August 16, 2022. The NewCo Sellers filed voluntary petitions for relief commencing a case under chapter 11 of the Bankruptcy Code in the Bankruptcy Court on [●].

C.      The Required Holders (as defined below) have expressed their support for a sale of the Business (in consideration for a credit bid on the terms set out herein, or to any buyer selected by the Endo Companies having submitted a bid consistent with the Bidding Procedures Order) as the best way to preserve and maximize value.

D.      The Endo Companies believe, following consultation with their legal and financial advisors and consideration of available alternatives, that, in light of the current circumstances, a sale of the Business as provided herein is necessary to preserve and maximize value, and is in the best interest of the Endo Companies and their respective stakeholders, including creditors.

E.      The NewCo Parents desire to sell to the Buyer all of the Irish Specified Equity Interests and the Buyer desires to purchase from the NewCo Parents the Irish Specified Equity Interests, immediately prior to Closing upon the terms and conditions hereinafter set forth.

F.      The Sellers desire to sell to the Buyer all of the Transferred Assets and transfer to the Buyer all of the Assumed Liabilities and the Buyer desires to purchase from the Sellers all of the Transferred Assets and assume all of the Assumed Liabilities, upon the terms and conditions hereinafter set forth.

G.      The Participating Endo Debtors desire to cooperate with the Sellers and the First Lien Collateral Trustee to facilitate the transfer of all of the Participating Debtor Assets to the Buyer through the exercise of the First Lien Collateral Trustee's rights or remedies with respect to the Participating Debtor Assets that are Collateral (as defined in the Collateral Trust Agreement).

H.      The execution and delivery of this Agreement and the Endo Companies' ability to consummate the transactions set forth in this Agreement are subject to, among other things, the entry of the Sale Order under, *inter alia*, Sections 363 and 365 of the Bankruptcy Code, as further set forth herein.  The Parties desire to consummate the proposed transaction as promptly as practicable after the Bankruptcy Court enters the Sale Order.

## AGREEMENT

In consideration of the foregoing and the mutual covenants and agreements herein contained, and intending to be legally bound hereby, the Parties agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1    Certain Defined Terms.  For purposes of this Agreement:

"Acquired Subsidiaries" means (a) the Indian Subsidiaries and (b) the Newco Sellers.

"Acquired Subsidiary Employees" means each individual who, as of the Closing Date, is employed by, or has an outstanding offer of employment to be employed by, the Acquired Subsidiaries.

"Action" means any claim, action, suit, arbitration or proceeding by or before any Governmental Authority.

"Affiliate" means, with respect to any Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such first Person.

"Alternative Transaction" means the sale, transfer or other disposition, directly or indirectly, including through an asset sale, share sale, merger, amalgamation, or other similar transaction, including a plan of reorganization approved by the Bankruptcy Court, or resulting from the Auction, of all or substantially all of the Transferred Assets (other than any Inventory sold or disposed of in the Ordinary Course of Business and, for the avoidance of doubt, any asset designated as an Excluded Asset pursuant to Section 2.2) and the assumption of the Assumed Liabilities, in a transaction or series of transactions with one or more Persons other than Buyer or any of its Affiliates.

"Ancillary Agreements" means, collectively, this Agreement, including the Bill(s) of Sale, the IP Assignment Agreement(s), the Transition Services Agreement, the Irish Stock Transfer Forms and the other instruments and agreements required to be executed and delivered by any of the Parties in connection with the transactions contemplated hereby.

"Antitrust Law" means the HSR Act, the Competition Act, the Investment Canada Act and any competition, merger control and antitrust Law of any other applicable supranational, national, federal, state, provincial or local Law designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolizing or restraining trade or lessening competition of any

2

other country or jurisdiction, to the extent applicable to the transactions contemplated by this Agreement.

"Assumed Plan" means each Employee Plan other than any equity-based awards granted under the Equity Incentive Plans, provided, that "Assumed Plan" shall include any long-term cash awards granted under the Amended and Restated 2015 Stock Incentive Plan (as the same exists as of the date hereof) or any other written long-term cash-based incentive awards of the Endo Companies that are either outstanding as of the date hereof or are entered into, established or adopted as permitted by Section 5.1(B)(ix).

"Auction" shall have the meaning set forth in the Bidding Procedures.

"Automatic Transfer Employee" means each individual who, as of the Closing Date, is employed (as defined in Irish TUPE or under any applicable Canadian Labor Laws), or has an outstanding offer of employment to be employed in Canada, by the Endo Companies (or any of them other than the Indian subsidiaries) whose employment would transfer automatically by operation of law on the Closing Date to the Buyer (or one of its Affiliates as the case may be) under TUPE or under any applicable Canadian Labor Laws.

"Avoidance Claims" means any Action available under the Bankruptcy Code, of whatever kind or nature, as set forth in Sections 544 through 551, inclusive, 553, 558 and any other applicable provisions of the Bankruptcy Code, and any related claims and actions arising under such sections or under applicable state law or non-U.S. law by operation of law or otherwise.

"Bankruptcy Cases" means the bankruptcy cases commenced by the Endo Companies under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

"Bankruptcy Code" means Title 11 of the United States Code, Sections 101 et seq., as in effect or as may be amended from time to time.

"Bidding Procedures" means the bidding procedures set forth in the Bidding Procedures Order, to be entered by the Bankruptcy Court.

"Bidding Procedures Motion" means the *Debtors' Motion for an Order (I) Establishing Bidding, Noticing, and Assumption and Assignment Procedures, (II) Approving Certain Transaction Steps, (III) Approving the Sale of Substantially All of the Debtors' Assets and (IV) Granting Related Relief* (as may be amended or supplemented) [Docket No. ●].

"Bidding Procedures Order" means the form of order attached hereto as Exhibit 1, or once entered, the Order of the Bankruptcy Court, which Order shall be substantially in the form attached hereto as Exhibit 1, with such changes as may be required by the Bankruptcy Court that are in form and substance reasonably acceptable to the Buyer and the Debtors; provided, that the Buyer may withhold its approval of the Bidding Procedures Order if such order does not contain the terms and relief described in the last paragraph of the section entitled "Bidding Procedures" set forth in the Restructuring Term Sheet.

"Books and Records" means all current and historical books and records in the possession or control of the Endo Companies (other than the Indian Subsidiaries) relating to the Business, in

3

whatever form kept (including electronic form), including the financial, corporate, operations and sale books, records, files, research, documents, clinical studies, books of account, sales and purchase records, lists of suppliers and customers, business reports, plans, projections and manuals, surveys, plans, files, records, assessments, correspondence, and other data and information, financial or otherwise, relating to the Business.

"Branded Pharmaceuticals" means the segment of the Endo Companies' business that includes the Sellers' specialty and established pharmaceutical product portfolios that are sold under their brand name.

"Business Day" means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by Law to be closed in the city of New York, New York, United States, Montreal, Quebec, Canada or Dublin, Ireland.

"Business Employee" means each Acquired Subsidiary Employee, Automatic Transfer Employee and Offer Employee.

"Buyer Material Adverse Effect" means any event, change, occurrence or effect that would prevent, materially delay or materially impede the performance by the Buyer of its obligations under this Agreement or the Ancillary Agreements or the timely consummation of the transactions contemplated hereby or thereby.

"Canadian Court" means the Ontario Superior Court of Justice (Commercial List).

"Canadian Labor Laws" means all Laws of a federal, provincial, territorial or other Governmental Authority in Canada in connection with transfer of employment by operation of law as applicable to individuals employed by any Endo Company as of the Closing Date, including, without limitation, section 2097 of the Civil Code of Quebec, S.Q. 1991, c. 64, and section 97 of the Act respecting labour standards, CQLR, c. N-1.1 (Que.).

"Canadian Recognition Case" means the recognition proceedings before the Canadian Court commenced by Paladin Labs Inc., in its capacity as foreign representative of the Bankruptcy Cases, pursuant to Part IV of the Companies' Creditors Arrangement Act (Canada).

"Canadian Sale Recognition Order" means an Order of the Canadian Court recognizing and giving full force and effect in Canada to the Sale Order, which Order shall be in form and substance acceptable to the Buyer and the Debtors.

"Canadian Securities Administrators" means the Canadian securities regulatory authorities in each of the provinces and territories of Canada, as applicable.

"Canadian Securities Laws" means the Canadian provincial or territorial securities laws and the rules, regulations and published policies thereunder.

"Canadian Sellers" means Paladin Labs Inc. and Paladin Labs Canadian Holding Inc.

"Canadian Tax Act" means the *Income Tax Act*, R.S.C. 1985 (5th Supp.) c.1 (Canada), as amended, and the regulations promulgated thereunder.

4

"Cash and Cash Equivalents" means all cash and cash equivalents, including checks, commercial paper, treasury bills, certificates of deposit and marketable securities, and any bank accounts and lockbox arrangements of the Endo Companies, other than any such cash or cash equivalents of the Indian Subsidiaries, as of the Closing.

"CASL" means Canada's anti-spam legislation (S.C. 2010, c. 23) (Canada), and its regulations, as amended.

"CCDs" means 106,328,900 compulsorily convertible debentures of Rs. 10 (ten Indian rupees) each of PFPL held by Par Pharmaceutical Inc.

"Claim" has the meaning set forth in Section 101(5) of the Bankruptcy Code.

"COBRA" means the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, and any rules or regulations promulgated thereunder.

"Code" means the Internal Revenue Code of 1986, as amended.

"Competing Bid" means any bid contemplating an Alternative Transaction.

"Competition Act" means the *Competition Act* (Canada), RSC 1985, c. C-34, as amended, and any regulations promulgated thereunder.

"Competition Act Approval" means in respect of the transactions contemplated by this Agreement, either:  (i) the issuance of an advance ruling certificate pursuant to section 102 of the Competition Act that has not been rescinded; or (ii) the expiry, waiver or termination of any applicable waiting periods under section 123 of the Competition Act.

"Consenting First Lien Creditors" has the meaning set forth in the Restructuring Support Agreement.

"Contract" means any contract, agreement, Lease, insurance policy, capitalized lease, license, sublicense, sales order, purchase order, instrument, or other commitment, that is binding under applicable Law.

"control," including the terms "controlled by" and "under common control with," means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, as trustee or executor, as general partner or managing member, by contract or otherwise.

"Cure Claims" means amounts that must be paid and obligations that otherwise must be satisfied, pursuant to sections 365(b)(1)(A) and (B) of the Bankruptcy Code, in connection with the assumption and assignment of the Transferred Contracts to be assumed by the Debtors and assigned to the Buyer, as determined (other than in the case of any Transferred Contracts that may be assumed and assigned pursuant to Section 5.6) pursuant to the process set forth in the Bidding Procedures Order.

"date hereof" or "date of this Agreement" means the date on which the Bidding Procedures Motion is first filed with the Bankruptcy Court.

"Debtors" means Seller Parent and its debtor Affiliates, as debtors and debtors in possession in the Bankruptcy Cases.

"Definitive Documents" has the meaning set forth in the Restructuring Support Agreement.

"Distribution Licenses" means all licenses, permits, authorizations and registrations issued by Health Canada and other Governmental Authorities, including, drug establishment licenses, natural health product site licenses, medical device establishment licenses, narcotics licenses, dealer's licenses, precursor licenses and cannabis drug licenses.

"Employee Plans" means (a) all "employee benefit plans" within the meaning of Section 3(3) of ERISA, whether or not subject to ERISA, and (b) all other compensation or employee benefit plans, contracts, policies, programs, practices and arrangements, whether written or unwritten, formal or informal, including all pension, retirement, supplemental retirement, profit-sharing, savings and thrift, bonus, stock bonus, stock option or other cash or equity-based incentive or deferred compensation, employment, severance pay, change in control, retention, vacation, sick leave, paid time off, welfare, disability, death, fringe and medical, retiree medical, surgical, hospitalization, accident death and dismemberment, life insurance, dental, collective bargaining, salary or other similar plans, contracts, policies, programs, practices or arrangements (whether written or unwritten), in each case, adopted, sponsored, entered into, maintained, contributed to, or required to be contributed to by (i) any Seller for the benefit of any Business Employee or an individual who would have been a Business Employee except that such individual was not employed by the Endo Companies as of the Closing Date or (ii) any Acquired Subsidiary; and in each and every case, other than government sponsored plans related to national or provincial insurance, social security, social insurance, social assistance, family allowance, pension, old age, survivor benefits, healthcare, sickness, prescription drugs, employment insurance, unemployment insurance, parental insurance, parental benefits, workers or workplace safety, work injury, workers medical benefits and other similar government sponsored plans (collectively, "Government-Sponsored Plans").

"Encumbrance" means any mortgage, deed of trust, pledge, hypothecation, assignment, licenses or sub-license, charge, deposit arrangement, encumbrance, easement, lien (statutory or other), claim, security interest, or other security arrangement or restriction of any kind and any other preference, priority or preferential arrangement of any kind or nature whatsoever, including any conditional sale contract or other title retention agreement, any option granted to sell or acquire an asset, any voting or transfer restrictions (in the case of Equity Interests) and any interest of a lessor under a capitalized lease and any synthetic or other financing lease having substantially the same economic effect as any of the foregoing.

"Endo Marks" means all Trademarks owned by the Endo Companies, including those Trademarks consisting of or containing the word "Endo" or "Paladin", and including the Trademarks set forth on Section 1.1(c) of the Disclosure Letter.

6

"Environmental Claim" means any action, cause of action, claim, suit, proceeding, investigation, Order, demand or notice by any Person alleging Liability (including Liability for investigatory costs, governmental response costs, remediation or clean-up costs, natural resources damages, property damages, personal injuries, attorneys' fees, consultants' fees, fines or penalties) arising out of, based on, resulting from or relating to (a) the presence, Release or threatened Release of, or exposure to any Hazardous Materials; (b) circumstances forming the basis of any violation, or alleged violation, of any Environmental Law; or (c) any other matters covered or regulated by, or for which liability is imposed under, Environmental Laws.

"Environmental Law" means any Law and any policy, practice or guideline of a Governmental Authority relating to pollution, the protection of, restoration or remediation of or prevention of harm to the environment or natural resources, or the protection of public or worker health and safety (solely as relating to exposure to Hazardous Materials), including civil law or common law responsibility for acts or omissions with respect to the environment.

"Environmental Permit" means any Permit or agreement with a Governmental Authority required under or issued pursuant to any Environmental Law.

"Equity Incentive Plans" mean the Amended and Restated Employee Stock Purchase Plan (as of the date hereof) and the Amended and Restated 2015 Stock Incentive Plan (as of the date hereof).

"Equity Interests" means any common stock, limited liability company interest, equity security (as defined in Section 101(16) of the Bankruptcy Code), equity, ownership, profit interest, unit, or share in the Endo Companies (including all options, warrants, rights, or other securities or agreements to obtain such an interest or share in the Endo Companies), whether or not arising under or in connection with any employment agreement and whether or not certificated, transferable, preferred, common, voting, or denominated "stock."

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

"ERISA Affiliate" means any entity that is a member of (a) a controlled group of corporations (as defined in Section 414(b) of the Code); (b) a group of trades or businesses under common control (as defined in Section 414(c) of the Code); (c) an affiliated service group (as defined under Section 414(m) of the Code); or (d) any group specified in Treasury Regulations promulgated under Section 414(o) of the Code, any of which includes or included any Endo Company.

"ETA" means the *Excise Tax Act*, R.S.C., 1985, c. E-15 (Canada), as amended, and the regulations promulgated thereunder.

"Exchange Act" means the U.S. Securities Exchange Act of 1934, as amended.

"Excluded Contracts" means all Contracts of each Seller that are not Transferred Contracts.

"Excluded Taxes" means any Taxes (other than Non-U.S. Sale Transaction Taxes) (i) that were in existence or assertable against an Endo Company prior to the Closing Date (other than to

the extent that any such Tax is triggered solely by the transactions contemplated by this Agreement or any steps necessary to effect the transactions contemplated by this Agreement that are agreed to by Buyer and the Sellers and taken by the Sellers prior to the Closing), (ii) related to the Transferred Assets or the operation of the Business that are incurred in, or attributable to, any taxable period, or portion thereof, ending on or prior to the Closing Date, (iii) of or imposed on any of the Sellers or their Affiliates (including, for the avoidance of doubt, any Taxes ultimately paid as a result of any ongoing or future audits of Sellers or their Affiliates in relation to any taxable period ending on or prior to the Closing Date), or (iv) in respect of any Excluded Assets.

"Existing Indian Directors" means the existing directors of the Indian Subsidiaries (immediately prior to the Closing Date).

"FDA" means the United States Food and Drug Administration, and any successor thereto.

"FFDCA" means the Federal Food, Drug and Cosmetic Act, 21 USC Section 301, et seq.

"Final Order" means an Order of the Bankruptcy Court or any other court of competent jurisdiction, which Order has not been modified, amended, reversed, vacated, or stayed (other than by any modification or amendment that is consented to in writing by the Buyer) and (a) as to which the time to appeal, petition for certiorari, or move for a new trial, stay, reargument, or rehearing shall have expired and as to which no appeal, petition for certiorari, or move for a new trial, stay, reargument, or rehearing shall then be pending or (b) if a timely appeal, writ of certiorari, new trial, stay, reargument, or rehearing thereof shall have been filed or sought, either (i) no stay of the Order shall be in effect, (ii) if such a stay shall have been granted, then (A) the stay shall have been dissolved, (B) a final order of the district court, circuit court or other court of competent jurisdiction having jurisdiction to hear such appeal shall have affirmed the Order and the time allowed to appeal from such affirmance or to seek review or rehearing thereof shall have expired and the taking or granting of any further hearing, appeal or petition for certiorari shall not be permissible, and if a timely appeal of such court Order or timely motion to seek review or rehearing of such Order shall have been made, any appellate court having jurisdiction to hear such appeal or motion (or any subsequent appeal or motion to seek review or rehearing) shall have affirmed the district court's (or lower appellate court's) order upholding the Order and the time allowed to appeal from such affirmance or to seek review or rehearing thereof shall have expired and the taking or granting of any further hearing, appeal or petition for certiorari shall not be permissible, or (C) certiorari shall have been denied, or (iii) a new trial, stay, reargument, or rehearing shall have expired; provided, that the possibility that a motion pursuant to Rule 60 of the Federal Rules of Civil Procedures or any analogous rule under the Federal Rules of Bankruptcy Procedure may be filed with respect to such Order shall not cause such Order not to be a Final Order.

"Fraud" means actual and intentional fraud by a Person with respect to any representation or warranty made by such Person expressly contained in this Agreement or any Ancillary Agreement.

"GAAP" means United States generally accepted accounting principles as in effect on the date hereof, applied on a consistent basis.

"Generic Pharmaceuticals" means the segment of the Endo Companies' business that includes a product portfolio of approximately one hundred twenty five (125) generic product families that treat and manage a wide variety of medical conditions.

"Goodwill" means all goodwill associated with the Business.

"Governmental Authority" means any United States or non-United States national, federal, provincial, territorial, state, municipal or local governmental, regulatory or administrative authority, agency, court or commission or any other judicial or arbitral body, including, without limitation the Bankruptcy Court.

"GST/HST" means any goods and services tax and harmonized sales tax payable under Part IX of the ETA (including, for greater certainty, the provincial component of any harmonized sales tax).

"Hazardous Materials" means any material, substance, chemical, or waste (or combination thereof) that is listed, defined, designated, regulated, classified as or otherwise determined to be, hazardous, toxic, radioactive, dangerous, a pollutant, a contaminant, petroleum, oil, or words of similar meaning or effect, or which may form the basis of Liability, under or pursuant to any Environmental Law.

"Health Canada" means the Department of Health of the federal government of Canada for which the Canadian federal Minister of Health is responsible.

"Health Care Laws" means all Laws and regulations relating to the manufacturing, processing, researching, testing, procuring, possessing, holding, development, marketing, storing, holding, packaging, selling, supplying, distributing, wholesaling, advertising, labelling, pricing, reimbursement, import and export of therapeutic products, good manufacturing practices, pharmacovigilance, good clinical practice and good laboratory practice including, without limitation: (a) the FFDCA, the Veterans Health Care Act of 1992, the Public Health Service Act, the Prescription Drug Marketing Act of 1987, any FDA regulations promulgated thereunder, or any similar Law of any other applicable Governmental Authority; (b) the Food and Drugs Act (Canada) and its associated regulations (including the Food and Drug Regulations, Medical Devices Regulations and Natural Health Products Regulations), the Consumer Packaging and Labelling Act (Canada) and its associated regulations, the Controlled Drugs and Substances Act (Canada) and its associated regulations, the Cannabis Act (Canada) and its associated regulations (c) the Controlled Substances Act, (d) the U.S. Anti-Kickback Statute (42 U.S.C. Section 1320a-7b(b)), the Stark Anti-Self-Referral Law (42 U.S.C. § 1395nn), the U.S. Civil False Claims Act (31 U.S.C. Section 3729 et seq.), Sections 1320a-7, 1320a-7a, and 1320a-7b of Title 42 of the United States Code and the regulations promulgated pursuant to such statutes and any comparable self-referral or fraud and abuse laws promulgated by any Governmental Authority; (e) the U.S. Health Insurance Portability and Accountability Act of 1996 (42 U.S.C. Section 1320d et seq.), as amended by the Health Information Technology for Economic and Clinical Health Act (42 U.S.C. Section 17921 et seq.), and the regulations promulgated thereunder ("HIPAA") and any Law or regulation the purpose of which is to protect the privacy of individually-identifiable patient information; (f) the Medicare statute (Title XVIII of the Social Security Act), as applicable; (g) the Medicaid statute (Title XIX of the Social Security Act), as applicable; (h) any applicable Law

or regulations relating to and/or governing publicly funded federal and provincial health care programs, drug insurance plans, pricing and reimbursement, including the Ontario Drug Benefit Act and the Drug Interchangeability and Dispensing Fee Act and associated regulations; (i) the Patient Protection and Affordable Care Act of 2010, as amended by the Health Care and Education Affordability Reconciliation Act of 2010; (j) the Sunshine/Open Payments Law (42 U.S.C. § 1320a-7h); (k) all Laws related to the conduct of human subjects research, clinical trials, and pre-clinical trials, including, without limitation, The United States Federal Common Rule (45 CFR Part 46), the Food & Drug Administration Common Rule (21 CFR Parts 50 and 56), International Conference on Harmonisation of Technical Requirements for Pharmaceuticals for Human Use (ICH), Good Clinical Practices (GCP), World Health Organization (WHO) clinical research standards and the United Nations Educational, Scientific and Cultural Organization (UNESCO) Universal Declaration on Bioethics and Human Research; (l) Directive 2001/83/EC on human medicines as may be amended and restated from time to time or any repealing legislation; (m) Directive 2002/20/EC on clinical trials and Regulation (EU) No. 536/2014 on clinical trials, and EU and national guidance relating to same, and national implementing legislation, including but not limited to, the European Communities (Clinical Trials on Medicinal Products For Human Use) Regulations, 2004 and European Union (Clinical Trials on Medicinal Products for Human Use) Regulations 2022, as amended; (n) the Irish Medicines Board Act 1995, as amended, and each of the Medicinal Products Regulations, as amended, made pursuant to the Irish Medicines Board Act 1995; (o) the Ethics in Public Office Acts, 1995 and 2001, as amended; (p) the Criminal Justice (Corruption Offences) Act 2018; (q) the Misuse of Drugs Act 1977, as amended and Misuse of Drugs Regulations 2017, as amended or (r) any and all other applicable comparable Laws of other Governmental Authorities.

"HSR Act" means the United States Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"ICA Approval" means in respect of the transactions contemplated by this Agreement, either (a) receipt by the Buyer of a notice from the responsible Minister under the Investment Canada Act that the Minister is satisfied that the Agreement and the other transactions contemplated hereby are likely to be of net benefit to Canada pursuant to the Investment Canada Act or (b) the time period provided for such notice under the Investment Canada Act shall have expired such that the responsible Minister under the Investment Canada Act shall be deemed pursuant to the Investment Canada Act to have been satisfied that the Agreement and the other transactions contemplated hereby are likely to be of net benefit to Canada pursuant to the Investment Canada Act and shall have sent a notice to that effect.

"IND" means an Investigational New Drug Application as defined in the FFDCA and applicable regulations promulgated thereunder by the FDA.

"Indebtedness" means without duplication, all outstanding obligations of a Person (including any obligations to pay principal, interest, breakage costs, penalties, fees, premiums, make-whole amounts, guarantees, reimbursements, damages, costs of unwinding and other liabilities) with respect to (a) indebtedness for borrowed money or loans or advances whether current or funded, fixed or contingent, secured or unsecured (excluding trade payables and other accounts payable, in each case in the Ordinary Course of Business); (b) indebtedness evidenced by notes, bonds, debentures, mortgages or similar instruments; (c) lease obligations required under

GAAP to be accounted for on the balance sheet of such Person as capital leases; (d) any letter of credit, bank guarantee, banker's acceptance or similar credit transaction; (e) deferred purchase price of property (tangible or intangible), goods or services (excluding trade payables and other accounts payable, in each case in the Ordinary Course of Business), including any earn-outs or purchase price adjustments relating to acquisitions (other than trade payables or accruals in the Ordinary Course of Business); (f) swap, currency, hedging, derivative or cap agreement or similar agreement; or (g) direct or indirect guarantees of obligations or any other form of credit support of obligations (including the grant of an Encumbrance on any asset of such Person to secure obligations) of the types described in clauses (a) through (f) above of any other Person.

"Indian Competition Act" means the (Indian) Competition Act, 2002, as amended, and any rules and regulations promulgated thereunder.

"Indian Nominee Directors" means the individuals nominated by the Buyer to be appointed as the directors on the board of directors of the Indian Subsidiaries on the Closing Date.

"Indian Subsidiaries" means collectively, PFPL, PAT and PBPL.

"Information Privacy and Security Laws" means all applicable Laws to the extent concerning the privacy, data protection and/or security of Personal Data, including, where applicable HIPAA, and all regulations promulgated thereunder, state data privacy and breach notification laws, state social security number protection laws, any applicable Laws concerning requirements for website and mobile application privacy policies and practices, data or web scraping, call or electronic monitoring or recording or any outbound communications (including, outbound calling and text messaging, telemarketing, and e-mail marketing), the national laws implementing the Directive on Privacy and Electronic Communications (2002/58/EC) (as amended by Directive 2009/136), the California Consumer Privacy Act of 2018, the General Data Protection Regulation (EU) 2016/679 of the European Parliament and of the Council of 27 April 2016 on the protection of natural persons with regard to the processing of Personal Data and on the free movement of such data (the "GDPR"), the Federal Trade Commission Act, the Gramm Leach Bliley Act, the Fair Credit Reporting Act, the Fair and Accurate Credit Transaction Act, the CAN-SPAM Act, the Telephone Consumer Protection Act, the Children's Online Privacy Protection Act, state consumer protection laws, the Payment Card Industry Data Security Standard, the Personal Information Protection and Electronic Documents Act (S.C. 2000, c. 5) (Canada), as amended, the Act respecting the protection of personal information in the private sector (CQLR, ch. P-39.1) (Québec), the Personal Information Protection Act (S.B.C. 2003, c. 63) (British Columbia) and CASL.

"Infringe" means infringe, misappropriate or otherwise violate.

"Intellectual Property" means all intellectual property rights of every kind and description throughout the world, including all U.S. and foreign:  (a) trade names, trademarks and service marks, business names, corporate names, domain names, trade dress, logos, slogans, design rights, and other similar designations of source or origin, together with the goodwill symbolized by any of the foregoing ("Trademarks"); (b) patents, patent applications, invention disclosures, industrial designs (including design registrations and design patents) and all related counterparts, continuations, continuations-in-part, divisionals, reissues, re-examinations, substitutions, renewals,

and extensions thereof ("Patents"); (c) copyrights and copyrightable subject matter (whether registered or unregistered) ("Copyrights"); (d) rights in computer programs (whether in source code, object code, or other form) and software systems, algorithms, databases, compilations and data, technology supporting the foregoing ("Software"); (e) rights in trade secrets and confidential or proprietary information, know-how, inventions, processes, formulae, models, and methodologies ("Trade Secrets"); (f) all rights in the foregoing and in other similar intangible assets; (g) all applications and registrations for any of the foregoing; and (h) all rights and remedies (including the right to sue for and recover damages) against past, present, and future Infringement, relating to any of the foregoing.

"Interests" means all Claims, Encumbrances, and other interests (as such term is used in Section 363(f) of the Bankruptcy Code).

"International Pharmaceuticals" means the segment of the Endo Companies' business that includes a variety of specialty pharmaceutical products sold outside the U.S., serving various therapeutic areas.

"Inventory" means all raw materials, works in progress, finished goods, supplies, packaging materials and other inventories owned by the Sellers.

"Investment Canada Act" means the *Investment Canada Act* (Canada), R.S.C., 1985, c. 28 (1st Supp.), as amended, and any regulations promulgated thereunder.

"Irish Specified Equity Interests" means the entire issued share capital of the NewCo Sellers.

"Irish TUPE" means the European Communities (Protection of Employees on Transfer of Undertakings) Regulations 2003 of Ireland.

"IRS" means the Internal Revenue Service of the United States.

"Knowledge" with respect to the Endo Companies means the actual knowledge, after making reasonable inquiry of their direct reports, of the persons listed in Section 1.1(b) of the Disclosure Letter.

"Law" means any applicable statute, law, ordinance, regulation, rule, code, injunction, judgment, decree or Order of any Governmental Authority and any mandatory standards and guidelines under European Union or Irish Law issued by any Governmental Authority as are applicable to the Business.

"Lease" means a lease, sublease, license, or other use or occupancy agreement with respect to the real property to which an Endo Company is a party as lessee, sublessee, tenant, subtenant or in a similar capacity.

"Leased Real Property" means the leasehold interests held by any Endo Company under the Leases (other than any Leases designated as an Excluded Asset pursuant to Section 2.6).

12

"Liability" means any debt, loss, claim, damage, demand, fine, judgment, penalty, liability or obligation of any kind (whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due).

"Material Adverse Effect" means any event, change, condition, occurrence or effect that has individually or in the aggregate (a) resulted in, or would be reasonably likely to result in, a material adverse effect on the business, properties, financial condition or results of operations of the Business, taken as a whole, or (b) prevented, materially delayed or materially impeded the performance by the Endo Companies of their respective obligations under this Agreement or the consummation of the transactions contemplated hereby, other than, in the case of clause (a), any event, change, condition, occurrence or effect to the extent arising out of, attributable to or resulting from, alone or in combination, any of the following (none of which, to the applicable extent, will constitute or be considered in determining whether there has been, a Material Adverse Effect):  (i) general changes or developments in the industries in which the Business operates, (ii) changes in general economic, financial market or geopolitical conditions or political conditions, (iii) natural or man-made disasters, calamities, major hostilities, outbreak or escalation of war or any act of terrorism or sabotage, (iv) any global or national health concern, epidemic, disease outbreak, pandemic (whether or not declared as such by any Governmental Authority, and including the "Coronavirus" or "COVID-19") or any Law issued by a Governmental Authority requiring business closures, quarantine or "sheltering-in-place" or similar restrictions that arise out of such health concern, epidemic, disease outbreak or pandemic (including the "Coronavirus" or "COVID-19") or any change in such Law, (v) the Excluded Liabilities, including the Retained Litigation, (vi) following the date of this Agreement, changes in any applicable Laws or GAAP or in the administrative or judicial enforcement or interpretation thereof, (vii) the announcement or other publicity or pendency of the transactions contemplated by this Agreement (it being understood that the exception in this clause (vii) shall not apply with respect to the representations and warranties in Section 3.3(a) intended to address the consequences of the execution and delivery of this Agreement or the consummation of the transactions contemplated by this Agreement), (viii) the filing or continuation of the Bankruptcy Cases and any Orders of, or action or omission approved by, the Bankruptcy Court (or any other Governmental Authority of competent jurisdiction in connection with any such Action), (ix) customary occurrences as a result of events leading up to and following the commencement of a proceeding under chapter 11 of the Bankruptcy Code, (x) a decline in the trading price or trading volume of any securities issued by the Endo Companies or any change in the ratings or ratings outlook for the Endo Companies (provided that the underlying causes thereof, to the extent not otherwise excluded by this definition, may be deemed to contribute to a Material Adverse Effect), or (xi) the failure to meet any projections, guidance, budgets, forecasts or estimates with respect to the Endo Companies (provided, that the underlying causes thereof, to the extent not otherwise excluded by this definition, may be deemed to contribute to a Material Adverse Effect); provided, however, that any event, change, condition, occurrence or effect set forth in clauses (i), (ii), (iv) or (vi) may be taken into account in determining whether there has been or is a Material Adverse Effect to the extent any such event, change, condition, occurrence or effect has a material and disproportionate adverse impact on the Business, taken as a whole, relative to the other participants in the industries and markets in which the Business operates.

"Minister" has the meaning set forth in Section 3 of the Investment Canada Act.

"NDA" means a new drug application as defined in the FFDCA and applicable regulations promulgated thereunder by the FDA or supplemental new drug application, and any amendments thereto submitted to the FDA.

"NewCo 1" means the private limited company incorporated and tax resident in Ireland formed for the purposes of acquiring the business of Endo Global Aesthetics Limited.

"NewCo 2" means the private limited company incorporated and tax resident in Ireland formed for the purposes of acquiring the business of Endo Global Biologics Limited.

"NewCo 3" means the private limited company incorporated and tax resident in Ireland formed for the purposes of acquiring the business of Endo Ventures Limited.

"New Holdcos" means New Holdco 1, New Holdco 2 and New Holdco 3.

"New Holdco 1" means the private limited company incorporated and tax resident in Ireland formed for the purposes of acting as a new holding company of Endo Global Aesthetics Limited.

"New Holdco 2" means the private limited company incorporated and tax resident in Ireland formed for the purposes of acting as a new holding company of Endo Global Biologics Limited.

"New Holdco 3" means the private limited company incorporated and tax resident in Ireland formed for the purposes of acting as a new holding company of Endo Ventures Limited.

"NewCo Debtor Cases" means the Bankruptcy Cases of the NewCo Sellers and the New Holdcos.

"NewCo Parents" means, together, (a) New Holdco 1 (being, immediately prior to the Closing, the legal and beneficial owner of the entire issued share capital of NewCo 1), (b) New Holdco 2, (being, immediately prior to the Closing, the legal and beneficial owner of the entire issued share capital of NewCo 2) and (b) New Holdco 3, (being, immediately prior to the Closing, the legal and beneficial owner of the entire issued share capital of NewCo 3).

"NewCo Sellers" means, together, (a) NewCo 1 (b) NewCo 2 and (c) NewCo 3.

"Non-U.S. Sale Transaction Taxes" means Taxes (including any Transfer Taxes allocated to the Buyer pursuant to Section 6.1) imposed by or payable to any Taxing Authority (Non-U.S.) arising by reason of the sale or transfer of the Transferred Assets and the assumption of the Assumed Liabilities, including for the avoidance of doubt, any such Taxes triggered on or with respect to any actions taken by the Endo Companies after August 16, 2022 but prior to the Closing Date (including those undertaken pursuant to Section 6.3) to the extent such actions were agreed to by the Buyer prior to such actions having been taken.

"Offer Employee" means each individual who, as of the Closing Date, is employed by, or has an outstanding offer of employment to be employed by, the Endo Companies, including any

Qualified Leave Recipients, and who is not an Acquired Subsidiary Employee or an Automatic Transfer Employee.

"Opioid Claim" has the meaning set forth in the Restructuring Support Agreement.

"Order" means any award, writ, injunction, judgment, order or decree entered, issued, made, or rendered by any Governmental Authority.

"Ordinary Course of Business" means the operation of the Business in the ordinary course in a manner that is materially consistent with past practices, as such practices may have been, are or may be, after the date of the Agreement, reasonably modified as necessary to respond to the "Coronavirus" or "COVID 19" and in compliance with applicable Law (taking into account the Restructuring (as defined in the Restructuring Support Agreement) and the pendency of the Bankruptcy Cases).

"Organizational Documents" means, with respect to any Person (other than an individual), (i) the certificate or articles of association, incorporation, organization, merger, amalgamation, limited partnership or limited liability company, or constitution or memorandum and articles of association and any joint venture, limited liability company, operating, stockholders or partnership agreement and other similar documents adopted or filed in connection with the creation, formation or organization of such Person; and (ii) all bylaws of such Person and voting agreements to which such Person is a party relating to the organization or governance of such Person.

"Participating Endo Debtor" means the entities incorporated in Luxembourg, as set forth on Annex A-2, but only to the extent such entity elects in writing (in its absolute discretion) to be a Participating Endo Debtor upon execution of this Agreement.

"Participating Debtor Assets" means all assets owned or controlled by the Participating Endo Debtors.

"Party" or "Parties" means, individually or collectively, the Buyer, the Seller Parent, the Sellers, and the Participating Endo Debtors.

"PAT" means Par Active Technologies Private Limited, a company incorporated under the laws of India, with its registered office at 9/215, Pudupakkam-Vandalur Main Road Pudupakkam, Kelambakkam Chennai- 603 103, Tamil Nadu.

"PBPL" means Par Biosciences Private Limited, a company incorporated under the laws of India, with its registered office at 9/215, Pudupakkam-Vandalur Main Road Pudupakkam, Kelambakkam Chennai- 603 103, Tamil Nadu.

"Permitted Encumbrance" means (a) statutory liens for unpaid Taxes that are (i) not yet delinquent or (ii) that are being contested in good faith and for which adequate reserves have been established in the Seller Financial Statements in accordance with GAAP, (b) liens arising by operation of law in favor of warehousemen, landlords, carriers, mechanics, materialmen, laborers, or suppliers, incurred in the Ordinary Course of Business, (c) liens on amounts deposited to secure any of the Endo Companies' obligations in connection with worker's compensation or other unemployment insurance (but excluding Encumbrances arising under ERISA or other pension

standards legislation) pertaining to any Endo Company's employees in the Ordinary Course of Business and not in connection with the borrowing of money relating to obligations as to which there is no default on the part of the Sellers for a period with respect to amounts not yet overdue or that are being contested in good faith and for which adequate reserves have been established in the Seller Financial Statements in accordance with GAAP, (d) liens on amounts deposited to secure any Endo Company's obligations in connection with the making or entering into of bids, tenders, or leases in the Ordinary Course of Business and not in connection with the borrowing of money or the deferred purchase price of property or services, (e) as to any Lease, any Encumbrance in the Ordinary Course of Business, which do not materially impair the title, value or use of such Lease, (f) licenses and similar grants of rights to Intellectual Property in the Ordinary Course of Business, (g) with respect to any Real Property that is a Transferred Asset, easements, rights of way, zoning, building and other land use restrictions, minor title defects or irregularities or any other similar encumbrances, that individually or in the aggregate, do not materially affect the current use or operation thereof, (h) any Encumbrance that will be extinguished at or prior to Closing to the extent so extinguished, and (i) restrictions or requirements set forth in any Order relating to the Transferred Assets.

"Person" means an individual, corporation, partnership, limited liability company, limited liability partnership, syndicate, person, trust, association, organization or other entity, including any Governmental Authority, and including any successor, by merger or otherwise, of any of the foregoing.

"Personal Data" means any and all information about or related to an individual that can be used to identify the individual, including Protected Health Information as defined under HIPAA and "personal data" as defined under the GDPR. Personal Data includes (u) information in any form, including paper, electronic and other forms, (v) any information that enables a Person to contact the individual (such as information contained in a cookie or an electronic device fingerprint), (w) personal identifiers such as name, address, Social Security Number, date of birth, driver's license number or state identification number, Taxpayer Identification Number and passport number, (x) credit or debit card numbers, account numbers, access codes, insurance policy numbers, (y) unique biometric data, such as fingerprint, retina or iris image, voice print or other unique physical representation and (z) individual medical or health information.

"Petition Date" means, with respect to the Endo Companies other than the NewCo Sellers, August 16, 2022, and with respect to the NewCo Sellers, [●].

"PFPL" means Par Formulations Private Limited, a company incorporated under the laws of India, with its registered office at 9/215, Pudupakkam-Vandalur Main Road Pudupakkam, Kelambakkam Chennai- 603 103, Tamil Nadu.

"Prepetition First Lien Indebtedness" means, collectively, the Prepetition First Lien Notes Indebtedness and the Prepetition First Lien Secured Loan Indebtedness (each as defined in that certain Restructuring Support Agreement, dated as of August 16, 2022, filed in the Bankruptcy Cases at Docket No. 20) (as may be amended, modified, or otherwise supplemented from time to time, the "Restructuring Support Agreement"); provided, that the Prepetition First Lien Indebtedness shall not include any amounts for unpaid interest or fees to the extent corresponding equivalent amounts were paid under the interim Docket No. 98 and final orders Docket No. 535

16

entered by the Bankruptcy Court authorizing the Debtors' use of Cash Collateral (as defined in Section 363(a) of the Bankruptcy Code) (collectively, the "Cash Collateral Order"); provided, further, that on the Closing Date the Debtors shall pay in full in cash all amounts under paragraph 4 of the Cash Collateral Order that are accrued and unpaid or outstanding as of and including the Closing Date.

"Prepetition First Lien Non-U.S. Indebtedness" means any Prepetition First Lien Indebtedness that is not Prepetition First Lien U.S. Indebtedness.

"Prepetition First Lien U.S. Indebtedness" means any Prepetition First Lien Indebtedness where the obligor for U.S. federal income tax purposes is an entity that is created or organized under the laws of the United States, any of the states thereof or the District of Columbia.

"Pre-Closing Professional Fee Reserve Amounts" means the amounts equal to the good faith estimates provided by each professional that the Debtors' estates are obligated to pay of all accrued and unpaid professional fees and expenses owing by any of the Debtors as of the Closing Date (excluding, for the avoidance of doubt, any accrued professional fees and expenses paid in cash on the Closing Date).

"Product Approvals" means the Regulatory Approvals for each Product, together with all supporting documents, submissions, correspondence, reports, pre-clinical studies and clinical studies relating to such Regulatory Approvals (including, without limitation, documentation of pharmacovigilance, good clinical practice, good laboratory practice and good manufacturing practice).

"Product Marketing Materials" means to the extent related to the Business, all labeling, advertising, promotional, selling and marketing materials in written or electronic form existing as of the date hereof and owned or controlled by an Endo Company.

"Product Regulatory Materials" means (a) all adverse event reports and other data, information and materials relating to adverse experiences with respect to each Product; (b) all written notices, filings, communications or other correspondence between any Endo Company, on the one hand, and any Governmental Authority, on the other hand, relating to each Product, including any safety reports or updates, complaint files and product quality reviews, and clinical or pre-clinical data derived from clinical studies conducted or sponsored by an Endo Company, which data relates to each Product; (c) all other information regarding activities pertaining to each Product's compliance with any law or regulation of any jurisdiction, including audit reports, corrective and preventive action documentation and reports, and relevant data and correspondence, maintained by or otherwise in the possession of any Endo Company as of the date hereof and (d) all Product Approvals.

"Products" means those products listed in Section 1.1(e) of the Disclosure Letter, to the extent currently manufactured, distributed, marketed or under development by any of the Endo Companies.

"Qualified Leave Recipient" means any Offer Employee who is not actively at work on the Closing Date as a result of a short-term or long-term approved leave of absence or other time-off, including (a) those on military leave, maternity leave, parental leave, family leave, medical leave,

workers' compensation and other statutory leaves; (b) those on short-term or long-term disability under the Sellers' short-term or long-term disability program; and (c) those on temporary lay-off or furlough.

"QST" means the Québec sales tax levied under Title I of the QST Legislation.

"QST Legislation" means the *Act respecting the Québec sales tax*, R.S.Q., c. T-0.1 (Québec), as amended, and the regulations promulgated thereunder.

"Real Property" means the Owned Real Property and the Leased Real Property.

"Regulatory Approvals" means any approvals (including pricing and reimbursement approvals), licenses, registrations, consents, certifications or authorizations of any Governmental Authority, in each case, necessary for the possession, holding, research, development, testing, manufacture, marketing, distribution, sale, procurement, supply, import or export of a Product (including any component or ingredient thereof), or other regulated activity in relation to a Product, including but not limited to NDAs, INDs, FDA establishment registrations, FDA drug listings, drug identification numbers, medical device licenses, natural product numbers, clinical trial approvals and all Distribution Licenses.

"Release" means any release, spill, emission, discharge, leaking, pouring, dumping or emptying, pumping, injection, deposit, disposal, dispersal, leaching or migration into the indoor or outdoor environment (including, without limitation, soil, ambient air, surface water, groundwater, surface or subsurface strata and all sewer systems) or into or out of any property.

"Representatives" means, with respect to any Person, the officers, directors, principals, employees, agents, auditors, advisors, bankers and other representatives of such Person.

"Required Consenting First Lien Creditors" has the meaning set forth in the Restructuring Support Agreement.

"Required Holders" means those creditors holding in excess of fifty percent (50%) of the sum of the aggregate outstanding principal amount of "Secured Debt" (as defined in that certain Collateral Trust Agreement, dated as of April 27, 2017 (as amended, amended and restated, supplemented, or otherwise modified from time to time, the "Collateral Trust Agreement"), among Endo International plc, Endo Luxembourg Finance Company I S.à.r.l., Endo LLC, Endo Designated Activity Company, Endo Finance LLC, Endo Finco Inc., the other grantors from time to time party thereto, JPMorgan Chase Bank, N.A., as administrative agent under the Credit Agreement, Wells Fargo Bank, National Association, as indenture trustee, Wilmington Trust, National Association, as collateral trustee (in such capacity, the "First Lien Collateral Trustee") and the other parties from time to time party thereto), including the face amount of outstanding letters of credit whether or not then available or drawn.

"Required Holders' Advisors" means Evercore Group, LLC, Gibson, Dunn & Crutcher LLP, FTI Consulting, Inc., Arthur Cox LLP, Stikeman Elliott LLP, Loyens & Loeff, S&R Associates, any regulatory counsel, conflicts counsel or co-counsel, and, from and after the Petition Date, one local legal counsel in each state within the U.S. and any non-U.S. based jurisdiction the Debtors are incorporated and/or domiciled to the extent such professionals are reasonably

necessary to represent the interests of the Required Holders in connection with the Bankruptcy Cases.

"Restructuring Term Sheet" means that certain term sheet filed as Exhibit A to the Restructuring Support Agreement.

"Retained Litigation" means all litigation, claims, and potential litigation claims arising against any Endo Company (other than the employees of the Indian Subsidiaries or claims related to Assumed Plans) from or related to events prior to the Closing, including lawsuits, pre-litigation claims, settled litigation claims, investigations and proceedings related to former employees, directors or consultants of the Endo Companies or any current or former Subsidiary of the Endo Companies (other than the employees of the Indian Subsidiaries or claims related to Assumed Plans) or to the manufacture or sale of opioid products or otherwise, and including, for the avoidance of doubt, any claims against any Endo Company arising out of or related to *Nexus Pharmaceuticals, Inc. vs. Nevakar, Inc. et al*, 1-22-cv-05683 (D.N.J. September 23, 2022).

"Sale Hearing" means the hearing conducted by the Bankruptcy Court to consider approval of the transactions contemplated by this Agreement and entry of the Sale Order.

"Sale Order" means the Order of the Bankruptcy Court approving the transactions contemplated by this Agreement. Among other things, the Sale Order will (a) provide that the Transferred Assets are sold free and clear of any and all liens, encumbrances, claims, and other interests (other than liabilities specifically designated as assumed liabilities under this Agreement), and (b) contain findings of fact and conclusions of law that the Buyer is a good faith purchaser entitled to and granted the protections of section 363(m) of the Bankruptcy Code. The Sale Order will contain the Sale Releases (as defined in the Restructuring Term Sheet). The terms of the Sale Order, including the Sale Releases, will be acceptable to the Buyer in its sole discretion and to the Debtors in their reasonable discretion.

"Sale Process" has the meaning set forth in the Restructuring Support Agreement.

"Sale Shares" shall mean: (a) 179,206 equity shares and 106,328,900 CCDs of PFPL to be transferred from Par Pharmaceutical Inc. to the Buyer; (b) one equity share of PFPL to be transferred from Par LLC to the Buyer or the Buyer's nominee; (c) one equity share of PBPL to be transferred from Par Pharmaceutical Inc. to the Buyer or the Buyer's nominee.

"SEC" means the U.S. Securities and Exchange Commission.

"Secured Debt Representative" has the meaning set forth in the Collateral Trust Agreement.

"Securities Act" means the U.S. Securities Act of 1933, as amended.

"Securities Laws" means, collectively, the Securities Act, the Exchange Act, the Sarbanes-Oxley Act of 2002, as amended, and the Canadian Securities Laws.

"Sellers" means Seller Parent and each of the Sellers set forth on Annex A-1.

"Specified Avoidance Claim" means any Avoidance Claim (i) asserted against a Governmental Unit (as defined in Section 101 of the Bankruptcy Code) in connection with a settlement of an Opioid Claim or (ii) relating to the payment of interest in respect of any unsecured Indebtedness for borrowed money.

"Specified Equity Interests" means (a) all Equity Interests (including any compulsorily convertible instruments) in the Indian Subsidiaries and (b) the Irish Specified Equity Interests.

"Specified Interests" means:  (a) solely with respect to the period prior to Closing, Permitted Encumbrances, Assumed Liabilities, Encumbrances set forth in Section 1.1(f) of the Disclosure Letter, Encumbrances disclosed on the Seller Financial Statements or notes thereto or securing Liabilities reflected in the Seller Financial Statements or notes thereto, Encumbrances incurred in the Ordinary Course of Business since the date of the Balance Sheet that would not reasonably be expected to be material to the Business (taken as a whole) and (b), from and after the Closing, after giving effect to the Sale Order, Permitted Encumbrances and Assumed Liabilities.

"Sterile Injectables" means the segment of the Endo Companies' business that includes a product portfolio of approximately thirty-five product families, including branded sterile injectable products and generic injectable products.

"Subsidiary" means, with respect to any Person, any other Person of which at least fifty percent (50%) of the outstanding voting securities or other voting equity interests are owned or controlled by such Person or by one or more of its respective Subsidiaries, and shall include the Indian Subsidiaries.

"Successful Bidder" shall have the meaning set forth in the Bidding Procedures.

"Tax Return" means any return, declaration, report, form, election, designation, statement, information statement and other document, including any section, schedule or attachment thereto or amendment thereof, filed or required to be filed with any Governmental Authority with respect to Taxes.

"Taxes" means (a) any and all taxes, including all net income, gross income, gross receipts, sales, use, ad valorem, transfer, franchise, profits, branch profits, profit share, license, lease, service, service use, value added (including GST/HST and QST), withholding, payroll, employment, social security, pension, fringe, fringe benefits, excise, estimated, severance, stamp, occupation, premium, property, windfall profits, wealth, net wealth, net worth, or other taxes or charges, fees, duties, levies, tariffs, imposts, tolls, customs or other assessments, in each case, in the nature of a tax, imposed by any Governmental Authority, together with any interest, penalties, inflationary adjustments, additions to tax, fines or other additional amounts imposed thereon, with respect thereto, (b) any and all liability for the payment of any items described in clause (a) arising from or as a result of being (or having been, or ceasing to be) a member of a fiscal unity, affiliated, consolidated, combined, unitary, or other similar group or being included in any Tax Return related to such group, (c) any and all liability for the payment of any amounts as a result of any successor or transferee liability or otherwise by operation of Law, in respect of any items described in clause (a) or (b) above, (d) any Tax liability in the capacity of an agent or a representative assessee of the Sellers pursuant to the provisions of the Indian Income Tax Act, 1961 and (e) any and all

liability for the payment of any items described in clause (a) or (b) above as a result of, or with respect to, any express obligation to indemnify any other Person pursuant to any tax sharing, tax indemnity or tax allocation agreement or similar agreement or arrangement with respect to taxes or other Contract (other than a commercial leasing or financing agreement or other similar agreement, in each case, entered into in the ordinary course of business that are not primarily related to Taxes).

"Taxing Authority" means any national, federal, provincial, territorial, state, municipal, local, or foreign government, any subdivision, agency, commission, or authority thereof, or any quasi-governmental, regulatory or administrative authority, agency or body exercising Tax authority or otherwise responsible for the imposition, collection, or administration of any Tax.

"Taxing Authority (Non-U.S.)" means any Taxing Authority other than a Taxing Authority (U.S.).

"Taxing Authority (U.S.)" means any Taxing Authority located in the United States, each state, territory, possession thereof, and the District of Columbia or any political subdivision of any of the foregoing.

"Transferred Contracts" means all Contracts of each Endo Company (other than the Contracts of the Indian Subsidiaries) that are determined to be "Transferred Contracts" pursuant to Section 2.6.

"Transferred Employee" means each Business Employee who becomes employed by the Buyer or any of its Affiliates or who continues to be employed by the Indian Subsidiaries either (a) as of the Closing Date or (b) at any time in connection with the transactions contemplated by this Agreement, including any Offer and Acceptance Employee who becomes employed by Buyer or any of its Affiliates after the Closing Date (including Acquired Subsidiary Employees and Automatic Transfer Employees).

"Transferred Intellectual Property" means all Intellectual Property owned by a Seller, including the Endo Marks and all Intellectual Property listed on Section 1.1(d) of the Disclosure Letter, but excluding Intellectual Property described in Section 2.2(f).

"Transition Services Agreement" means the transition services agreement to be entered into by the Buyer (or a designee thereof) and the applicable Endo Companies on the terms and conditions to be agreed, acting reasonably and in good faith, by the Buyer and such Endo Companies.

"TUPE" means Council Directive 23/2001/EEC (as amended) and any regulations implementing such Directive in any Member State of the European Union (including the European Communities (Protection of Employees on Transfer of Undertakings) Regulations 2003 of Ireland and/or any applicable Law relating to the transfer of an undertaking whether implemented pursuant to Council Directive 23/2001/EEC (as amended) within the European Union, or otherwise if outside the European Union (including the United Kingdom's Transfer of Undertakings (Protection of Employment) Regulations 2006).

"U.S. Trustee" means the Office of the United States Trustee for the Southern District of New York.

"Willful Breach" means a material breach of this Agreement that is a consequence of an act or failure to act with the actual knowledge that the taking of the act or failure to act would result in a material breach of this Agreement.

"Wind-Down Period" means the period commencing at the Closing Date and ending on the date on which the final Debtor ceases to exist under applicable Law in the jurisdiction in which it is incorporated, including but not limited to dissolution and winding-up processes under applicable Law.

Section 1.2    Table of Definitions.   The following terms have the meanings set forth in the Sections referenced below:

Definition                                                                                          Location

Acquired Leased Real Property ........................................................................2.1(b)(ix)
Acquired Owned Real Property ........................................................................ 2.1(b)(viii)
Acquired Subsidiaries ...........................................................................................1.1
Acquired Subsidiary Employees.............................................................................1.1
Action ................................................................................................................1.1
Affiliate .............................................................................................................1.1
Agreement ...............................................................................................Preamble
Alternative Transaction .......................................................................................1.1
Ancillary Agreements .........................................................................................1.1
Antitrust Law ....................................................................................................1.1
Apportioned Taxes.............................................................................................6.5
Assessments ...............................................................................................3.10(g)
Assumed Liabilities............................................................................................2.3(a)
Assumed Plan ....................................................................................................1.1
Auction .............................................................................................................1.1
Automatic Transfer Employee...............................................................................1.1
Avoidance Claims ..............................................................................................1.1
Backup Bidder .............................................................................................5.8(g)
Balance Sheet...............................................................................................3.5(d)
Bankruptcy Cases...............................................................................................1.1
Bankruptcy Code ...............................................................................................1.1
Bankruptcy Court................................................................................Recital B
Bidding Procedures.............................................................................................1.1
Bidding Procedures Order ...................................................................................1.1
Bill of Sale ..................................................................................................2.10(c)(i)
Books and Records..............................................................................................1.1
Branded Pharmaceuticals ....................................................................................1.1
Business................................................................................................Recital A
Business Day ....................................................................................................1.1
Business Employee .............................................................................................1.1

22

Business Permits ...................................................................................................2.1(b)(xii)
Buyer .........................................................................................................................Preamble
Buyer Fundamental Representations..........................................................................7.2(b)
Buyer Material Adverse Effect ...................................................................... 1.1, 7.2(b)
Buyer Plans.................................................................................................................5.4(j)
Buyer Refunds.................................................................................................................6.7
Canadian Buyer.............................................................................................................3.1(b)
Canadian Court ..................................................................................................................1.1
Canadian Labor Laws .......................................................................................................1.1
Canadian Recognition Case .............................................................................................1.1
Canadian Sale Recognition Order....................................................................................1.1
Canadian Securities Administrators.................................................................................1.1
Canadian Securities Laws.................................................................................................1.1
Canadian Sellers................................................................................................................1.1
Canadian Tax Act ..............................................................................................................1.1
Cash and Cash Equivalents ..............................................................................................1.1
Cash Collateral Order........................................................................................................1.1
Cash Component ................................................................................................................2.7
CASL..................................................................................................................................1.1
CCDs..................................................................................................................................1.1
Claim..................................................................................................................................1.1
Claims Processes............................................................................................................2.8(c)
Closing ...........................................................................................................................2.10(a)
Closing Date .................................................................................................................2.10(a)
COBRA ..............................................................................................................................1.1
Code ...................................................................................................................................1.1
Collateral Trust Agreement ..............................................................................................1.1
Collective Bargaining Agreement................................................................................3.10(b)
Committees/FCR...........................................................................................................2.8(c)
Company Reports..........................................................................................................3.5(a)
Competing Bid...................................................................................................................1.1
Competing Bid Obligations..........................................................................................5.8(e)
Competition Act.................................................................................................................1.1
Competition Act Approval ...............................................................................................1.1
Consent............................................................................................................................2.6(f)
Consenting First Lien Creditors.......................................................................................1.1
Contract .............................................................................................................................1.1
control................................................................................................................................1.1
controlled by .....................................................................................................................1.1
Copyrights .........................................................................................................................1.1
Coronavirus .......................................................................................................................1.1
COVID-19 .........................................................................................................................1.1
Cure Claims .......................................................................................................................1.1
Current Representation .................................................................................................9.25(a)
date hereof; date of this Agreement .................................................................................1.1
Debtors ...............................................................................................................................1.1

Definitive Documents ........................................................................................................ 1.1
Designated Buyer .......................................................................................................... 2.12(a)
Designated Person ......................................................................................................... 9.25(a)
Direction Letter .................................................................................................. 2.10(d)(i)(D)
Disclosure Letter ........................................................................................................ Article III
Dismissal Notice .................................................................................................................. 5.12
Disputed Cure Claims ................................................................................................... 2.6(c)
Distribution Licenses .......................................................................................................... 1.1
Employee Census ......................................................................................................... 3.10(a)
Employee Plans .................................................................................................................... 1.1
Encumbrance ........................................................................................................................ 1.1
Endo Companies ...................................................................................................... Preamble
Endo Company .......................................................................................................... Preamble
Endo Marks ........................................................................................................................... 1.1
Environmental Claim .......................................................................................................... 1.1
Environmental Law ............................................................................................................. 1.1
Environmental Permit ......................................................................................................... 1.1
Equity Incentive Plans ......................................................................................................... 1.1
Equity Interests ..................................................................................................................... 1.1
ERISA ..................................................................................................................................... 1.1
ERISA Affiliate ..................................................................................................................... 1.1
ETA ......................................................................................................................................... 1.1
Excess Cash ...................................................................................................................... 2.8(b)
Exchange Act ........................................................................................................................ 1.1
Excluded Assets .................................................................................................................... 2.2
Excluded Contracts ............................................................................................................. 1.1
Excluded Insurance ................................................................................................. 2.1(b)(xiii)
Excluded Liabilities ............................................................................................................. 2.4
Excluded Taxes ..................................................................................................................... 1.1
Executory Contract ........................................................................................................ 2.6(a)
Executory Contract List ................................................................................................. 2.6(a)
Existing Indian Directors .................................................................................................... 1.1
Expense Reimbursement Amount .................................................................................. 8.3(a)
FDA ........................................................................................................................................ 1.1
FDI Approval ................................................................................................. Section 2.10(d)
FFDCA ................................................................................................................................... 1.1
Final Order ............................................................................................................................ 1.1
First Lien Collateral Trustee .............................................................................................. 1.1
Foreign Asset Closing ................................................................................................ 2.1(a)(iv)
Fraud ...................................................................................................................................... 1.1
GAAP ..................................................................................................................................... 1.1
GDPR ..................................................................................................................................... 1.1
Generic Pharmaceuticals .................................................................................................... 1.1
Goodwill ................................................................................................................................ 1.1
Governmental Authority ..................................................................................................... 1.1
GST/HST ............................................................................................................................... 1.1

Hazardous Materials.................................................................................................1.1
Health Canada........................................................................................................1.1
Health Care Laws...................................................................................................1.1
HIPAA.....................................................................................................................1.1
HSR Act..................................................................................................................1.1
IND..........................................................................................................................1.1
Indebtedness...........................................................................................................1.1
Indian Nominee Directors......................................................................................1.1
Indian Subsidiaries................................................................................................1.1
Information Privacy and Security Laws.................................................................1.1
Infringe...................................................................................................................1.1
Intellectual Property..............................................................................................1.1
Intercompany Liabilities.................................................................................2.3(a)(xi)
Intercompany Receivables.............................................................................2.1(b)(xxiv)
Interests..................................................................................................................1.1
International Pharmaceuticals...............................................................................1.1
Inventory.................................................................................................................1.1
IP Assignment Agreement.............................................................................2.10(c)(iii)
IP Wind-Down Period...........................................................................................5.10
Irish Specified Equity Interests.............................................................................1.1
Irish Stock Transfer Form.............................................................................2.10(b)(i)
IRS..........................................................................................................................1.1
Knowledge..............................................................................................................1.1
Law.........................................................................................................................1.1
Lease......................................................................................................................1.1
Leased Real Property.............................................................................................1.1
Liability..................................................................................................................1.1
Mandatory Non-U.S. Plans..............................................................................3.9(a)
Material Adverse Effect.................................................................................1.1, 7.3(a)
Material Contracts.........................................................................................3.16(a)

MIP........................................................................................................................5.4(g)
MIP Reserve....................................................................................................5.4(g)
Named Parties........................................................................................................9.22
NDA.......................................................................................................................1.1
New Holdco 1.........................................................................................................1.1
New Holdco 2.........................................................................................................1.1
New Holdco 3.........................................................................................................1.1
New Holdcos..........................................................................................................1.1
NewCo 1.................................................................................................................1.1
NewCo 2.................................................................................................................1.1
NewCo 3.................................................................................................................1.1
NewCo Debtor Cases.............................................................................................1.1
NewCo Parents......................................................................................................1.1
NewCo Sellers.......................................................................................................1.1
Nonparty Affiliates................................................................................................9.22

Non-U.S. Sale Transaction Taxes .................................................................................1.1
Offer and Acceptance Employee ................................................................................5.4(b)
Offer Employee..........................................................................................................1.1
Opioid Claim .............................................................................................................1.1
Order .........................................................................................................................1.1
Ordinary Course of Business ......................................................................................1.1
Organizational Documents .........................................................................................1.1
Outside Date ................................................................................................ 8.1(a)(ii)(A)
Owned Real Property ..............................................................................................3.11(a)
Participating Debtor Assets ........................................................................................1.1
Participating Endo Debtor ..........................................................................................1.1
Participation Agreement.......................................................................................2.1(b)(xix)
Parties .......................................................................................................................1.1
Party .........................................................................................................................1.1
PAT ..........................................................................................................................1.1
Patents ......................................................................................................................1.1
PBPL ........................................................................................................................1.1
Permits ................................................................................................................... 3.7(b)
Permitted Encumbrance .............................................................................................1.1
Person .......................................................................................................................1.1
Personal Data ............................................................................................................1.1
Petition Date .............................................................................................................1.1
Petitions ...........................................................................................................Recital B
PFPL .........................................................................................................................1.1
Post-Closing Tax Period.............................................................................................6.5
Pre-Auction Designation Date ................................................................................. 2.6(d)
Pre-Closing Professional Fee Reserve Amounts .........................................................1.1
Pre-Closing Tax Period ..............................................................................................6.5
Prepetition First Lien Indebtedness.............................................................................1.1
Prepetition First Lien Non-U.S. Indebtedness.............................................................1.1
Prepetition First Lien U.S. Indebtedness.....................................................................1.1
Product Approvals......................................................................................................1.1
Product Marketing Materials ......................................................................................1.1
Product Regulatory Materials .....................................................................................1.1
Products ....................................................................................................................1.1
Professional Fee Escrow Accounts.............................................................................2.9
Purchase Price ...........................................................................................................2.7
Purchase Price Allocation..........................................................................................2.11
QST ............................................................................................................... 1.1, 1.1
Qualified Leave Recipient ..........................................................................................1.1
Real Property ............................................................................................................1.1
Recall....................................................................................................................3.14(g)
Regulatory Approvals ................................................................................................1.1
Release......................................................................................................................1.1
Representatives ..........................................................................................................1.1
Required Holders .......................................................................................................1.1

Required Holders' Advisors .................................................................................................1.1
Restructuring Support Agreement .......................................................................................1.1
Restructuring Term Sheet ....................................................................................................1.1
Retained Litigation ..............................................................................................................1.1
Sale Hearing ........................................................................................................................1.1
Sale Motion .......................................................................................................................5.8(a)
Sale Order ............................................................................................................................1.1
Sale Process .........................................................................................................................1.1
Sale Shares ..........................................................................................................................1.1
SEC .....................................................................................................................................1.1
Secured Debt Representative ...............................................................................................1.1
Securities Act ......................................................................................................................1.1
Securities Laws ...................................................................................................................1.1
Seller ...................................................................................................................................1.1
Seller Financial Statements ..............................................................................................3.5(b)
Seller Fundamental Representations .................................................................................7.3(a)
Seller Parent.................................................................................................................Preamble
Seller Plans .......................................................................................................................5.4(j)
Skadden ............................................................................................................................9.25(a)
Software...............................................................................................................................1.1
Specified Avoidance Claim .................................................................................................1.1
Specified Equity Interests ...................................................................................................1.1
Specified Interests ...............................................................................................................1.1
Sterile Injectables ................................................................................................................1.1
Subsidiary ............................................................................................................................1.1
Successful Bidder ................................................................................................................1.1
Tax Return ...........................................................................................................................1.1
Taxes ...................................................................................................................................1.1
Taxing Authority..................................................................................................................1.1
Taxing Authority (Non-U.S.) ..............................................................................................1.1
Taxing Authority (U.S.) .......................................................................................................1.1
TCA ..................................................................................................................................3.13(k)
Trade Secrets .......................................................................................................................1.1
Trademarks ..........................................................................................................................1.1
Transaction Steps .................................................................................................................6.3
Transfer Taxes .....................................................................................................................6.1
Transferred Assets .............................................................................................................2.1(b)
Transferred Cash ...........................................................................................................2.1(b)(xx)
Transferred Contracts ..........................................................................................................1.1
Transferred Employee ..........................................................................................................1.1
Transferred Intellectual Property ........................................................................................1.1
Transition Services Agreement ...........................................................................................1.1
TUPE ...................................................................................................................................1.1
U.S. Asset Closing ...........................................................................................................2.1(a)(v)
U.S. Trustee .........................................................................................................................1.1
under common control with..................................................................................................1.1

Undisputed Cure Claims ........................................................................................... 2.6(a)
Willful Breach............................................................................................................1.1
Wind-Down Amount................................................................................................ 2.8(a)
Wind-Down Budget ................................................................................................. 2.8(a)
Wind-Down Period ...................................................................................................1.1

## ARTICLE II
## PURCHASE AND SALE

Section 2.1    <u>Purchase and Sale of Assets</u>.

(a)    Upon the terms and subject to the conditions of this Agreement,

(i)    Immediately prior to the Closing, the NewCo Parents shall sell, assign, transfer, convey and deliver to the Buyer the NewCo Parents' right, title and interest as of the Closing Date in and to the Irish Specified Equity Interests (in each case, free and clear of any and all Interests, other than Permitted Encumbrances) pursuant to the Irish Stock Transfer Form;

(ii)    at the Closing, immediately and automatically following the actions contemplated by Section 2.1(a)(i), the Sellers shall sell, assign, transfer, convey and deliver to the holders of the Prepetition First Lien Non-U.S. Indebtedness, in exchange for the Prepetition First Lien Non-U.S. Indebtedness, all of the Sellers' respective right, title and interest as of the Closing Date in and to the Transferred Assets (excluding the Specified Equity Interests), other than to the extent conveyed under Sections 2.1(a)(i), 2.1(a)(iii), 2.1(a)(iv) and 2.1(a)(v) (in each case, free and clear of any and all Interests, other than Permitted Encumbrances and Assumed Liabilities);

(iii)    at the Closing, immediately and automatically following the actions contemplated by Section 2.1(a)(i), Par Pharmaceutical Inc. and Par LLC shall sell, assign, transfer, convey and deliver to the Buyer their respective right, title and interest as of the Closing Date in and to the Sale Shares (in each case, free and clear of any and all Interests, other than Permitted Encumbrances and Assumed Liabilities);

(iv)    at the Closing, immediately and automatically following the actions contemplated by Section 2.1(a)(i), the Participating Endo Debtors shall cooperate with the First Lien Collateral Trustee (or its delegate appointed pursuant to any Direction Letter) to enable it to (A) sell, assign, transfer and convey to the holders of the Prepetition First Lien Non-U.S. Indebtedness, in exchange for the Prepetition First Lien Non-U.S. Indebtedness, and (B) deliver to the Buyer pursuant to the Direction Letter all of the rights, titles and interests as of the Closing Date in and to the Participating Debtor Assets (other than to the extent conveyed under Section 2.1(a)(v)) (in each case, free and clear of any and all Interests, other than Permitted Encumbrances and Assumed Liabilities) (the "<u>Foreign Asset Closing</u>"), except as contemplated hereby or in the Bidding Procedures Order or the Sale Order;

(v)    at the Closing, immediately and automatically following the actions contemplated by Section 2.1(a)(iv), the Sellers shall cooperate with the First Lien Collateral Trustee or its agent appointed pursuant to any Direction Letter to enable them to sell, assign, transfer, convey and deliver to the Buyer (or to a Designated Buyer), in exchange for the

28

Prepetition First Lien U.S. Indebtedness, all of their rights, titles and interests as of the Closing Date in and to any assets owned or controlled by any of the Sellers (other than Endo Finance LLC and Endo Finco Inc.) that are created or organized under the laws of the United States, any of the states thereof or the District of Columbia (in each case, free and clear of any and all Interests, other than Permitted Encumbrances and Assumed Liabilities) (the "U.S. Asset Closing"), except as contemplated hereby or in the Bidding Procedures Order or the Sale Order; and

(vi)     the Buyer shall purchase, acquire and accept the Transferred Assets and assume the Assumed Liabilities.

(b)     "Transferred Assets" shall mean all right, title and interest of the Endo Companies, the Sellers or Participating Endo Debtors in, to or under the properties and assets of the Endo Companies (other than the properties and assets of the Indian Subsidiaries, which the Parties acknowledge will be received by the Buyer by virtue of the transfer of the Sale Shares), the Sellers or Participating Endo Debtors of every kind and description, wherever located, whether real, personal or mixed, tangible or intangible (but excluding in each case, for the avoidance of doubt, any Excluded Assets and the Irish Specified Equity Interests which shall be transferred in accordance with Section 2.1(a)(i)), including, without limitation, all right, title and interest of the Endo Companies, the Sellers or Participating Endo Debtors in, to or under the following (other than the right, title and interest in properties and assets of the Indian Subsidiaries, which the Parties acknowledge will be received by the Buyer by virtue of the transfer of the Sale Shares):

(i)      the Sale Shares;

(ii)     the Transferred Intellectual Property;

(iii)    the Product Marketing Materials;

(iv)    the Product Regulatory Materials;

(v)     the Transferred Contracts;

(vi)    the Books and Records;

(vii)   Goodwill;

(viii)  the Owned Real Property set forth in Section 2.1(b)(viii) of the Disclosure Letter (the "Acquired Owned Real Property");

(ix)    the Leased Real Property set forth in Section 2.1(b)(ix) of the Disclosure Letter (the "Acquired Leased Real Property"), including any leasehold improvements and all permanent fixtures, improvements, and appurtenances thereto and including any security deposits or other deposits delivered in connection therewith;

(x)     all machinery, equipment, furniture, furnishings, parts, spare parts, vehicles and other tangible personal property owned by the Endo Companies, including any tangible assets of Endo Companies located at any Acquired Leased Real Property or Acquired Owned Real

Property or any location set forth in Section 2.1(b)(x) of the Disclosure Letter and any other tangible assets on order to be delivered to any Endo Company;

(xi)    all Inventory of the Endo Companies whether or not obsolete or carried on the Endo Companies' books of account, in each case, with any transferable warranty and service rights related thereto;

(xii)    all Permits and Regulatory Approvals held by the Endo Companies, including Environmental Permits ("Business Permits") but only to the extent such Permits and Regulatory Approvals are transferrable under applicable Law;

(xiii)    all interests in insurance policies, binders and related agreements other than those insurance policies, binders and related agreements listed in Section 2.1(b)(xiii) of the Disclosure Letter (the "Excluded Insurance");

(xiv)    telephone and telephonic facsimile numbers and other directory listings used by the Endo Companies;

(xv)    (A) rights, claims or causes of action to the extent related to the Transferred Assets of the Endo Companies arising out of events occurring prior to the Closing, and (B) to the extent not covered in clause (A), all other rights, claims or causes of action of the Endo Companies except to the extent related to (x) Excluded Assets or (y) assets and properties of the Indian Subsidiaries;

(xvi)    copies of all Tax records related to the Transferred Assets or the Business and all Tax records of the Endo Companies;

(xvii)    all of the rights and claims of the Endo Companies in any claims or causes of action (to the extent capable of being transferred by applicable Law) that are (i) Avoidance Claims, in each case, other than a Specified Avoidance Claim; and (ii) against any of the Endo Companies' respective (w) current and former directors, officers and advisors; (x) current and former employees other than officers; (y) Subsidiaries or Affiliates; or (z) other parties that the Endo Companies otherwise conduct business with in the ordinary course; including with respect to clauses (i) and (ii) any and all proceeds thereof; and provided further that such rights and claims referenced in clauses (i) and (ii)(w) shall be released by the Buyer on the Closing Date;

(xviii)    all confidentiality agreements with former or current employees and agents of Endo Companies relating to the Business, and all restrictive covenant and confidentiality agreements with Business Employees (other than the Acquired Subsidiary Employees);

(xix)    any reversionary interest under the Participation Agreement, dated as of July 26, 2021, by and among Isosceles Insurance Ltd. acting in respect of Separate Account EN-01 and Endo Health Solutions Inc. (as may be amended, modified, or otherwise supplemented from time to time, the "Participation Agreement");

(xx)    all (i) Cash and Cash Equivalents, (ii) third-party accounts receivable, notes receivable, take-or-pay amounts receivable, and other receivables, and (iii) deposits (including maintenance deposits, customer deposits, and security deposits for rent, electricity, telephone or

30

otherwise) or prepaid or deferred charges and expenses, including all lease and rental payments that have been prepaid by any Endo Company (collectively, the "Transferred Cash");

(xxi)    all credits, prepaid expenses, security deposits, other deposits, refunds, prepaid assets or charges, rebates, setoffs, and loss carryforwards of the Endo Companies to the extent related to any Transferred Asset or any Assumed Liability;

(xxii)   all Tax refunds, rebates, credits or similar benefits of the Endo Companies (including, for the avoidance of doubt, all Tax refunds, rebates, credits or similar benefits in respect of Non-U.S. Sale Transaction Taxes) to the extent such Tax refunds, rebates, credits, or similar benefits may be transferred under applicable Law; provided, that Tax refunds, rebates, credits or similar benefits of the Endo Companies that relate to any Excluded Asset for a taxable period (or portion thereof) beginning after the Closing Date shall not be "Transferred Assets";

(xxiii)  all Assumed Plans, together with any funding arrangements relating thereto (including but not limited to all assets, trusts, insurance policies or insurance contracts and administration service contracts related thereto) and all rights and obligations thereunder; and

(xxiv)   intercompany receivables of and intercompany loans owed to the Debtors (the "Intercompany Receivables") other than any Intercompany Receivable owed by a Canadian Seller.

(c)     At any time at least five (5) Business Days prior to the Closing, the Buyer may, in its sole discretion by written notice to the Seller Parent, designate any of the Transferred Assets (other than any Contract, which are addressed in Section 2.6) as additional Excluded Assets, which notice shall set forth in reasonable detail the Transferred Assets so designated; provided, that there will be no modification to the Purchase Price if the Buyer elects to designate any Transferred Asset as an Excluded Asset (it being understood that, for the avoidance of doubt, with respect to any Transferred Asset designated as an Excluded Asset pursuant to this Section 2.1(c), any Intellectual Property owned or controlled by the Endo Companies and solely related to such Transferred Asset shall be automatically designated as an Excluded Asset); provided, further, that in no event may the following items be designated as Excluded Assets without the consent of the Sellers (which consent shall not be unreasonably withheld, conditioned or delayed):    (A) the items in Sections 2.1(b)(xvii), 2.1(b)(xix) or Section 2.1(b)(xxiii),  (B) any items (other than Contracts) that are solely related to any one of the Branded Pharmaceuticals, Sterile Injectables, Generic Pharmaceuticals or International Pharmaceuticals Business segments if the designation of such items as an Excluded Asset would reasonably be expected to materially impair the value of the Excluded Asset to the Sellers because it has been separated from such Business segment and (C) the insurance policy in effect as of the date hereof in respect of the liability of directors and officers of Seller Parent in their capacity as directors and officers of Seller Parent.  Notwithstanding any other provision hereof, the Liabilities of the Endo Companies under or related to any Transferred Asset designated as an additional Excluded Asset under this paragraph will constitute Excluded Liabilities.

Further, any Intercompany Receivables and any assets of any non-U.S. Debtor, other than the Intercompany Receivables in respect of the loans granted by Endo Luxembourg Finance Company I S.a.r.l ("Finco I") to PFPL; and (b) loans granted by Endo Luxembourg Finance

31

Company II S.a.r.l ("Finco II") to PFPL and PAT, which were subsequently transferred by Finco II to Finco I, that the Endo Companies and the Buyer mutually agree are not required to be transferred to the Buyer may be considered Excluded Assets so long as such designation is made at least five (5) days prior to Closing and provided, that, for Intercompany Receivables, the corresponding Intercompany Liabilities (as defined below) is also designated as an Excluded Liability.

Section 2.2     Excluded Assets.   Notwithstanding anything contained in Section 2.1 to the contrary, the Endo Companies are not selling, and the Buyer is not purchasing, any assets other than the Transferred Assets, and without limiting the generality of the foregoing, the term "Transferred Assets" shall expressly exclude the following assets of the Endo Companies, all of which shall be retained by the Endo Companies (collectively, the "Excluded Assets"):

(a)     the Endo Companies' documents prepared in connection with this Agreement or the transactions contemplated hereby or relating to the Bankruptcy Cases or the Canadian Recognition Case, and any books and records that any Endo Company is required by Law to retain; provided, however, that upon request of Buyer prior to or subsequent to the Closing, the Endo Companies will provide Buyer with copies or other appropriate access to the information in such documentation to the extent reasonably related to Buyer's operation and administration of the Business;

(b)     except as set forth in Section 2.1(b)(xv), all rights, claims and causes of action to the extent relating to any Excluded Asset or any Excluded Liability;

(c)     shares of capital stock or other equity interests of any Endo Company or securities convertible into or exchangeable or exercisable for shares of capital stock or other equity interests of any Endo Company (other than the Specified Equity Interests, including the Irish Specified Equity Interests which shall be transferred in accordance with Section 2.1(a)(i) and the Sale Shares which shall be transferred in accordance with Section 2.1(a)(i);

(d)     all rights of the Endo Companies under this Agreement and the Ancillary Agreements; and

(e)     all Excluded Contracts; and

(f)     all Intellectual Property exclusively used or held for use in connection with the foregoing clauses (a) through (e).

Section 2.3     Assumed Liabilities.

(a)     In connection with the purchase and sale of the Transferred Assets pursuant to this Agreement, at the Closing, the Buyer shall assume, pay, discharge, perform or otherwise satisfy only the following Liabilities (excluding in each case, for the avoidance of doubt, any Excluded Liabilities) (the "Assumed Liabilities"):

(i)     all Liabilities for Non-U.S. Sale Transaction Taxes;

32

(ii)    all Liabilities of the Endo Companies under the Transferred Contracts and the transferred Business Permits, in each case arising, to be performed or that become due on or after, or in respect of periods following, the Closing Date, including any Cure Claims regardless of when such Cure Claims are due and payable;

(iii)    all Liabilities arising under any collective bargaining laws, agreements or arrangements in relation to Business Employees;

(iv)    (A) all Liabilities with respect to any Assumed Plan and any Liabilities with respect to Business Employees that arise under any Government Sponsored Plans (other than the obligation to sponsor such Government Sponsored Plans or Liabilities under Government Sponsored Plans which relate to assessments for, or workers' compensation claims for injuries occurring in, the period prior to the Closing and which Buyer or its Affiliates are not required to assume by operation of Law), together with any Liabilities with respect to any funding arrangements relating thereto (including but not limited to all trusts, insurance policies or insurance contracts, and administration service contracts related thereto), (B) the Buyer's obligation to provide COBRA continuation coverage as described in <u>Section 5.4(i)</u>, (C) all Liabilities with respect to Transferred Employees, excluding workers' compensation claims for injuries occurring prior to the Closing, <u>provided</u>, that this clause (C) shall not include any Liability arising from any equity-based awards granted under the Equity Incentive Plans other than any long-term cash awards granted under the Amended and Restated 2015 Stock Incentive Plan or any other written long-term cash-based incentive awards of the Endo Companies that are either outstanding as of the date hereof or are entered into, established or adopted as permitted by Section 5.1(b)(ix), (D) all Liabilities relating to employees hired by the Buyer who are not Business Employees, and (E) all Liabilities assumed by the Buyer pursuant to <u>Section 5.4</u>;

(v)    all Liabilities arising out of or in connection with the failure by the Buyer or any one if its Affiliates to comply with its or their obligations under (A) TUPE (including the requirement to provide the Sellers with relevant measures information to allow them to inform and consult with the Automatic Transfer Employees or their representatives under TUPE) or (B) under any applicable Canadian Labor Laws (including to transfer to the Buyer or one of its Affiliates and to continue the employment of any employees whose employment is required to be transferred under applicable Canadian Labor Laws as of and from the Closing Date);

(vi)    all Liabilities arising from or in connection with the employment or termination of employment of (A) any Automatic Transfer Employee who objects to the transfer of their employment to the Buyer or any of its Affiliates, (B) any Offer Employee who refuses an offer of employment from the Buyer or one of its Affiliates and (C) any Transferred Employee to the extent arising on or after the Closing Date;

(vii)    all Liabilities (including, without limitation, under the applicable NDAs and INDs relating to the Products) arising out of, relating to or incurred in connection with the conduct or ownership of the Business or the Transferred Assets from and after the Closing Date;

(viii)    all (a) accrued trade and non-trade payables, (b) open purchase orders (except a purchase order entered into in connection with, or otherwise governed by, any Excluded Contract), (c) Liabilities arising under drafts or checks outstanding at Closing, (d) accrued royalties,

33

and (e) all Liabilities arising from rebates, returns, recalls, chargebacks, coupons, discounts, failure to supply claims and similar obligations, in each case, to the extent (and solely to the extent) (x) incurred in the Ordinary Course of Business and otherwise in compliance with the terms and conditions of this Agreement (including Section 6.1) and (y) not arising under or otherwise relating to any Excluded Asset; provided, that, for the avoidance of doubt, such liabilities in this Section 2.3(a)(viii) shall not include pre-petition Liabilities related to an Excluded Contract, or unrelated to an Assumed Plan or an ongoing business relationship;

(ix)    all indemnification obligations to the Endo Companies' directors, officers, and employees who have served in such role on or after the Petition Date solely for any defense costs (but not to satisfy any judgment);

(x)    any and all liabilities of any Seller resulting from the failure to comply with any applicable "bulk sales," "bulk transfer" or similar law; and

(xi)    intercompany liabilities owed to the Debtors (the "Intercompany Liabilities") listed in Section 2.3(a)(xi) of the Disclosure Letter, the assumption of which is beneficial to the Buyer.

(b)    Notwithstanding anything in this Agreement to the contrary, the Buyer may, until five (5) Business Days prior to the Closing Date, designate, in its sole discretion, any Intercompany Liabilities as Excluded Liabilities, provided that the corresponding Intercompany Receivable is also designated as an Excluded Asset.

(c)    Notwithstanding anything in this Agreement to the contrary, the Endo Companies hereby acknowledge and agree that the Buyer and the NewCo Sellers are not assuming, nor are in any way responsible for, the Excluded Liabilities. The transactions contemplated by this Agreement shall in no way expand the rights or remedies of any third party against the Buyer, the NewCo Sellers, or the Endo Companies as compared to the rights and remedies that such third party would have had against the Endo Companies, the Buyer, or the NewCo Sellers absent the Bankruptcy Cases or the Buyer's assumption of the applicable Assumed Liabilities.  Other than the Assumed Liabilities, the Buyer and the NewCo Sellers are not assuming and shall not be liable for any Liabilities of the Endo Companies.

Section 2.4    Excluded Liabilities.  Notwithstanding any other provision of this Agreement to the contrary, the Buyer is not assuming any Liability that is not an Assumed Liability (the "Excluded Liabilities"), and without limiting the generality of the foregoing, the term "Assumed Liabilities" shall expressly exclude the following Liabilities of the Endo Companies, all of which shall be retained by the Endo Companies:

(a)    any and all Liabilities for Excluded Taxes;

(b)    any and all Liabilities of the Endo Companies under any Excluded Contract whether accruing prior to, at, or after the Closing Date;

(c)    any and all Liabilities relating to or arising from the Retained Litigation;

34

(d)      any and all Liabilities retained by the Endo Companies pursuant to Section 5.4 or arising in respect of or relating to any Business Employee to the extent arising prior to Closing except any Liabilities assumed by Buyer pursuant to Section 2.3 and Section 5.4;

(e)      any and all Liabilities, arising or accrued at any time, in any way attributable to the employment or service of former employees, directors or consultants of the Endo Companies or any current or former Subsidiary of the Endo Companies who do not become Transferred Employees, except for (i) any Liabilities relating to the Assumed Plans, and (ii) the Buyer's obligation to provide COBRA continuation coverage as described in Section 5.4(i);

(f)      any Indebtedness of the Endo Companies (which shall not include any Liabilities of the type described in Section 2.3(a)(v) and Section 2.3(a)(vi), which shall be assumed by the Buyer);

(g)      any Liability to distribute to any Endo Company's shareholders or otherwise apply all or any part of the consideration received hereunder;

(h)      any and all Liabilities arising under any Environmental Law or any other Liability in connection with any environmental, health, or safety matters arising from or related to (i) the ownership or operation of the Transferred Assets before the Closing Date, (ii) any action or inaction of the Endo Companies or of any third party relating to the Transferred Assets before the Closing Date, (iii) any formerly owned, leased or operated properties of the Endo Companies, or (iv) any condition first occurring or arising before the Closing Date with respect to the Transferred Assets, including without limitation the presence or release of Hazardous Materials on, at, in, under, to or from any Real Property;

(i)      any and all Liabilities for:  (i) costs and expenses incurred by the Endo Companies or owed in connection with the administration of the Bankruptcy Cases (including the U.S. Trustee fees, the fees and expenses of attorneys, accountants, financial advisors, consultants and other professionals retained by Endo Companies, and any official or unofficial creditors' or equity holders' committee and the fees and expenses of the post-petition creditors or the pre-petition creditors incurred or owed in connection with the administration of the Bankruptcy Cases); (ii) all costs and expenses of the Endo Companies incurred in connection with the negotiation, execution and consummation of the transactions contemplated under this Agreement and the Ancillary Agreements or any Alternative Transaction; and (iii) third party claims against the Endo Companies, pending or threatened, including any warranty or product claims and any third party claims, pending or threatened, actual or potential, or known or unknown, relating to the businesses conducted by the Endo Companies prior to Closing;

(j)      any Liability of the Endo Companies under this Agreement or the Ancillary Agreements; and

(k)      any Liability to the extent relating to an Excluded Asset.

Section 2.5   Consents to Certain Assignments.

(a)      Notwithstanding anything in this Agreement or any Ancillary Agreement to the contrary, this Agreement and the Ancillary Agreements shall not constitute an agreement to

35

transfer or assign any asset, permit, claim or right or any benefit arising thereunder or resulting therefrom if an attempted assignment thereof, without the consent of a third party, would constitute a breach or other contravention under any agreement or Law to which any Seller is a party or by which it is bound, or in any way adversely affect the rights of the Sellers or, upon transfer, the Buyer under such asset, permit, claim or right, unless the applicable provisions of the Bankruptcy Code permits and/or the Sale Order authorizes the assumption and assignment of such asset, permit, claim, or right irrespective of the consent or lack thereof of a third party. If, with respect to any Transferred Asset, such consent is not obtained or such assignment is not attainable pursuant to the Bankruptcy Code or the Sale Order, then such Transferred Asset shall not be transferred hereunder, and, without prejudice to any of the conditions to the obligations of the Buyer as set forth in Section 7.3 hereof, the Closing shall proceed with respect to the remaining Transferred Assets and the Sellers and the Buyer shall each use their commercially reasonable efforts, and subject to Section 5.16, the Buyer shall reasonably cooperate with the Sellers, to obtain any such consent and to resolve the impracticalities of assignment after the Closing; provided that nothing in this Agreement or any Ancillary Agreement shall require any Seller, the Buyer or any of their respective Affiliates to make any payment (other than as required in the applicable contract or permit) or initiate any Action (other than Actions for relief from the Bankruptcy Court) to transfer any Transferred Asset as contemplated by this Agreement or any Ancillary Agreement.

(b)     If (i) notwithstanding the applicable provisions of Sections 363 and 365 of the Bankruptcy Code and the Sale Order and the commercially reasonable efforts of the Sellers and the Buyer, any consent is not obtained prior to Closing and as a result thereof the Buyer shall be prevented by a third party from receiving the rights and benefits with respect to a Transferred Asset intended to be transferred hereunder, (ii) any attempted assignment of a Transferred Asset would adversely affect the rights of the Sellers thereunder so that the Buyer would not in fact receive all the rights and benefits contemplated or (iii) any Transferred Asset is not otherwise capable of sale and/or assignment (after giving effect to the Sale Order and the Bankruptcy Code), then, in each case, the Sellers shall, subject to any approval of the Bankruptcy Court that may be required, at the written request of the Buyer, cooperate with the Buyer in any lawful and commercially reasonable arrangement under which the Buyer would, to the extent practicable, obtain the economic claims, rights and benefits under such asset and assume the economic burdens and obligations with respect thereto in accordance with this Agreement, including by subcontracting, sublicensing or subleasing to the Buyer. Without limiting the foregoing, Endo Companies shall promptly pay to the Buyer when received all monies received by the applicable Endo Companies under such Transferred Asset or any claim or right or any benefit arising thereunder and the Buyer shall indemnify, defend, hold harmless and promptly pay the Sellers for all Liabilities of the Sellers associated with such arrangement in accordance with the terms and conditions of such arrangements.

Section 2.6     Contract Designation.

(a)     No later than three (3) Business Days before the deadline for Debtors to provide the Assumption and Assignment Notice (as defined in the Bidding Procedures) to non-Debtor contract counterparties under the Bidding Procedures, the Sellers shall deliver to the Buyer a true, correct and complete, to the Knowledge of the Sellers, list (the "Executory Contract List") of all Contracts (including, for the avoidance of doubt, any insurance policies and binders that are Transferred Assets and any settlement agreements and leases with respect to real property) related

to the Transferred Assets and/or the Business or otherwise used, or held for use, in connection with the Transferred Assets, Assumed Liabilities and/or the Business, in each case excluding any Contracts in relation to the business, assets and properties of the Indian Subsidiaries (each, an "Executory Contract").  The Executory Contract List shall describe, in reasonable detail, the monetary amounts that must be paid and nonmonetary obligations that otherwise must be satisfied, including pursuant to Section 365(b)(1)(A) and (B) of the Bankruptcy Code, in order for the Sellers to assume and assign the Transferred Contracts to the Buyer pursuant to this Agreement ("Undisputed Cure Claims").  Upon request of the Buyer, the Sellers will use commercially reasonable efforts to provide the Buyer with (i) copies of each Contract and (ii) information as to the Liabilities under each Contract sufficient for the Buyer to make a reasonably informed assessment whether to designate any Contract as an Excluded Asset.

(b)      Subject to the entry of the Bidding Procedures Order and to the terms and provisions thereof, no later than the fifth (5th) Business Day after the deadline for Debtors to provide the Assumption and Assignment Notice (as defined in the Bidding Procedures) to non-Debtor contract counterparties under the Bidding Procedures, the Sellers shall file with the Court and cause to be published on the case website a copy of the Executory Contract List, and shall serve on each Executory Contract counterparty a list of Executory Contracts that are relevant to them.  The Executory Contract List shall (i) identify the Undisputed Cure Claim, if any, associated with each Contract listed therein, (ii) identify the Buyer and indicate the proposed sale of the Transferred Assets to the Buyer (subject to the submission of higher or otherwise better offers in the Auction), and (iii) indicate that the Buyer will, if necessary, provide evidence of adequate assurance of future performance at the Sale Hearing; provided that the Sellers shall reasonably cooperate with the Buyer to the extent necessary to provide any evidence of adequate assurance of future performance.  Any counterparty to an Executory Contract included on the Executory Contract List shall have the time period prescribed by the Bidding Procedures Order, or, if no such time period is given, a reasonable amount of time prior to the Auction, to object to the Cure Claims listed on the Executory Contract List and to adequate assurance of future performance.

(c)      To the extent a counterparty to an Executory Contract objects or otherwise challenges the Undisputed Cure Claims determined by the Sellers and asserts that a different monetary amount must be paid and/or nonmonetary obligations otherwise must be satisfied, including pursuant to Section 365(b)(1)(A) and (B) of the Bankruptcy Code, in order for the Sellers to assume and assign such Executory Contract to the Buyer pursuant to this Agreement, the difference between the Undisputed Cure Claims determined by the Sellers and such amounts and/or nonmonetary obligations determined by such counterparty shall be referred to as the "Disputed Cure Claims."

(d)      At any time at least five (5) Business Days before the date of the Auction (the "Pre-Auction Designation Date"), the Buyer may, in its sole discretion, designate in writing any Executory Contract as a Transferred Contract to be assumed by it pursuant to this Agreement or remove any Executory Contract previously designated by the Buyer as a Transferred Contract; provided, that, with respect to any newly designated Transferred Contracts, the Sellers shall promptly (x) serve notice on the applicable counterparties setting forth the Sellers' intention to assume and assign such Executory Contracts to Buyer (which notice shall include the applicable proposed Cure Claims) and (y) file or otherwise make any necessary motions before the Bankruptcy Court seeking approval of such assumption and assignment.  For clarity, subject to

Section 2.6(e), any Executory Contract not designated by the Buyer as a Transferred Contract pursuant to this Section 2.6(d) shall be automatically designated as an Excluded Contract. Subject to entry of the Sale Order and consummation of the Closing, Buyer shall pay the Cure Claims (including the Undisputed Cure Claims) and cure any and all other undisputed defaults and breaches under the Transferred Contracts so that such Transferred Contracts may be assumed by the applicable Seller and assigned to Buyer in accordance with the provisions of Section 365 of the Bankruptcy Code and this Agreement; provided that, (A) the Buyer shall pay any Disputed Cure Claim associated with the assumption of a Transferred Contract that is an Executory Contract pursuant to an Order of the Bankruptcy Court or mutual agreement between the Sellers, the Buyer and the counterparty to the applicable Transferred Contract, and (B) such payment shall, in the case of any Cure Claim, be made as soon as reasonably practicable following the Closing and, in the case of any Disputed Cure Claim, pursuant to an Order of the Bankruptcy Court provided, that the parties do not reach a negotiated settlement regarding such Disputed Cure Claim. To the extent any Transferred Contract is subject to a Cure Claim, the Buyer shall pay such Cure Claim directly to the applicable counterparty. Notwithstanding anything contained herein to the contrary, the Buyer shall only assume, and shall only be responsible for, Contracts designated by it as Transferred Contracts.

(e)      Buyer shall continue to be entitled to designate in writing any Contract as a Transferred Contract and/or remove any Executory Contract previously designated by the Buyer as a Transferred Contract following the Pre-Auction Designation Date but prior to the fifth (5th) Business Day prior to the Closing Date (and, in the event of any such designation, the Sellers shall use commercially reasonable efforts to comply with the notice and filing obligations set forth in clauses (x) and (y) of the first sentence of Section 2.6(d)). For the avoidance of doubt, the Buyer shall pay all Cure Claims associated with the assumption of any Transferred Contract designated as such pursuant to this Section 2.6(e), which payment shall, in the case of any Cure Claim, be made as soon as reasonably practicable following the Closing and, in the case of any Disputed Cure Claim, pursuant to an Order of the Bankruptcy Court.

(f)      Notwithstanding the foregoing, an Executory Contract shall not be a Transferred Contract hereunder and shall not be assigned to, or assumed by the Sellers and assigned to the Buyer to the extent that such Executory Contract (i) expires by its terms (and is not extended) on or prior to such time as it is to be assumed by the Sellers and assigned to the Buyer as a Transferred Contract hereunder or (ii) requires any (x) approval, consent, ratification, permission, waiver or authorization, or an Order of the Bankruptcy Court that deems or renders the foregoing unnecessary (each of the foregoing, a "Consent") or (y) Permit (other than, and in addition to, that of the Bankruptcy Court), in the case of each of (x) and (y), in order to permit the sale or transfer to Buyer of the applicable Seller's rights under such Executory Contract in accordance with applicable Law, and such Consent or Permit has not been obtained. In the event that any Executory Contract that would otherwise have been assigned to Buyer is deemed not to be assigned pursuant to clause (ii) of the first sentence of this Section 2.6(f), the Closing shall, subject to the satisfaction of the conditions set forth in Article VII, nonetheless take place subject to the terms and conditions set forth herein, and, thereafter, through the earliest of (x) such time as such Consent or Permit is obtained, (y) the expiration of the term of such Executory Contract in accordance with its current terms and (z) the execution of a replacement Executory Contract by Buyer, the Sellers and Buyer shall (A) use reasonable best efforts to secure such Consent or Permit as promptly as practicable after the Closing and (B) cooperate in good faith in any lawful and commercially reasonable

arrangement proposed by Buyer, including subcontracting, licensing, or sublicensing to Buyer any or all of any Seller's rights and obligations with respect to any such Executory Contract, under which (1) Buyer shall receive the claims, rights, remedies and benefits under, or arising pursuant to, the terms of such Executory Contract with respect to which the Consent and/or Permit has not been obtained and (2) subject to receiving any such claims, rights, remedies and benefits, Buyer shall thereafter assume and bear all Assumed Liabilities with respect to such Executory Contract from and after the Closing (as if such Executory Contract had been transferred to Buyer as of the Closing) in accordance with this Agreement (including by means of any subcontracting, sublicensing or subleasing arrangement).  Upon satisfying any requisite Consent or Permit requirement applicable to such Executory Contract after the Closing, such Executory Contract shall promptly be transferred and assigned to Buyer in accordance with the terms of this Agreement, the Sale Order and the Bankruptcy Code, and otherwise without any further additional consideration.  Without limitation of the foregoing, prior to the Closing, Endo Companies shall cooperate with Buyer in connection with obtaining any Consent, Permit, Regulatory Approval, including by providing Buyer with reasonable access to and facilitating discussions with the applicable counterparties (provided Buyer shall provide Sellers a reasonable opportunity to consult with Buyer, and, if reasonably practicable, an opportunity to be present (but not participate) at any meeting) in respect of such Consents, Permit or Regulatory Approval and shall use reasonable best efforts to assist Buyer with obtaining such Consents, Permits or Regulatory Approvals as promptly as practicable after the date hereof and prior to the Closing.

(g)     Notwithstanding anything to the contrary set forth herein, with respect to any Consent, Permit or Regulatory Approval reasonably required for Buyer to operate the Business in the Ordinary Course of Business, the Endo Companies shall use reasonable best efforts to obtain, sell, assign, transfer, convey or make or cause to be obtained, sold, assigned, transferred, conveyed or made, by or for the benefit of Buyer, any such Consent, Permit and/or Regulatory Approval or filing or application therefore, as required pursuant to Law, as reasonably required for Buyer to continue the Business after the Closing in the Ordinary Course of Business, and Buyer shall provide reasonable cooperation to the Endo Companies in connection therewith as reasonably requested by Sellers, in each case to the extent obtaining or making any such Consent, Permit or Regulatory Approval or filing or application therefor is allowed to occur prior to the Closing pursuant to applicable Law.  If any such Consent, Permit or Regulatory Approval is not obtained prior to the Closing, then, until the earlier of such time as (i) such Consent, Permit or Regulatory Approval is obtained by the Endo Companies and transferred (or permitted to be transferred) to Buyer and (ii) Buyer separately obtains any such Consent, Permit or Regulatory Approval (sufficient to conduct the business of the Endo Companies in the Ordinary Course of Business), the Endo Companies shall continue to use reasonable best efforts to obtain, or cause to be obtained, and transfer to Buyer such Consent, Permit or Regulatory Approval, and Buyer shall provide reasonable cooperation to Sellers, subject to any approval of the Bankruptcy Court that may be required, and the Endo Companies shall enter into an arrangement reasonably acceptable to Buyer intended to both (x) provide Buyer, to the fullest extent not prohibited by applicable Law, the claims, rights, remedies and benefits under, and pursuant to, such Consent, Permit or Regulatory Approval and (y) cause Buyer, subject to Buyer receiving such claims, rights, remedies and benefits, to assume and bear all Assumed Liabilities with respect to such Consent, Permits or Regulatory Approval from and after the Closing (as if such Consent, Permit or Regulatory Approval had been transferred to or obtained by Buyer as of the Closing) in accordance with this Agreement (including by means of any subcontracting, sublicensing or subleasing arrangement).

Upon obtaining the relevant Consent, Permit or Regulatory Approval, each Endo Company, as applicable, shall, promptly sell, convey, assign, transfer and deliver to Buyer such Consent, Permit or Regulatory Approval for no additional consideration.  All reasonable and documented out-of-pocket costs and expenses payable prior to Closing in connection with transferring any Consents, Permits or Regulatory Approvals as contemplated by this Agreement shall be borne by Buyer. Notwithstanding anything contained herein, it is acknowledged and agreed that any obligations hereunder of the Endo Companies in respect of the Consents, Permits or Regulatory Approvals procured or required for the Business of the Indian Subsidiaries shall be: (A) limited to providing to the Buyer information, documents and such other cooperation as may be reasonably requested by the Buyer; and (B) only in respect of Consents, Permits or Regulatory Approvals, which pursuant to Law, require any action to, approval of, or notification to, the relevant Governmental Authority in relation to acquisition of the Indian Subsidiaries by the Buyer.

Section 2.7    <u>Consideration</u>.  Without duplication, the aggregate consideration for the sale, assignment, transfer, conveyance and delivery of the Transferred Assets to the Buyer at the Closing shall consist of (collectively, the "<u>Purchase Price</u>") (a) a credit bid, pursuant to Section 363(k) of the Bankruptcy Code, in full satisfaction of the Prepetition First Lien Indebtedness, (b) the $5 million in cash on account of unencumbered Transferred Assets, (c) the Wind Down Amount in cash, (d) the Pre-Closing Professional Fee Reserve Amounts in cash ((b)-(d) comprising the "<u>Cash Component</u>"), and (e) the assumption at the Closing of the Assumed Liabilities, including, for the avoidance of doubt, the Non-U.S. Sale Transaction Taxes.  For the avoidance of doubt, any cash amounts required to be paid by the Buyer may be funded and paid from the Transferred Cash at Closing or, to the extent a Cure Claim is not due and payable at Closing, after Closing.

Section 2.8    <u>Wind-Down Amount</u>.

(a)    At Closing, Buyer shall deliver one hundred and twenty-two million dollars ($122 million) of cash, which may be funded from Transferred Cash, (the "<u>Wind-Down Amount</u>") to fund an orderly wind down process during the Wind-Down Period, subject to a budget (the "<u>Wind-Down Budget</u>"), in a manner consistent with Exhibit D of the Restructuring Term Sheet, that will be in form and substance reasonably acceptable to the Buyer.

(b)    Unless otherwise agreed by the Buyer, (i) on or immediately after the Closing Date, to the extent any cash is available to the Endo Companies to fund the Wind-Down Amount in excess of the Wind-Down Amount (the "<u>Excess Cash</u>"), the Wind-Down Amount shall be reduced on a dollar-for-dollar basis to account for such Excess Cash and (ii) if, at any time after the Wind-Down Amount has been funded, the Endo Companies receive any Excess Cash or there is otherwise Excess Cash made available to the Endo Companies, the Endo Companies shall remit such Excess Cash to the Buyer within five (5) Business Days.  Except as set forth herein, any subsequent adjustments to the Wind-Down Amount and the Wind-Down Budget will require the consent of the Buyer, which consent shall not be unreasonably withheld.

(c)    The Buyer agrees to provide cash that will be in excess of the Wind-Down Amount, both in an amount and pursuant to a budget in form and substance reasonably acceptable to the Buyer with respect to (i) fees incurred by (x) the unsecured creditors committee, (y) the official opioid committee, and (z) the future claims representative ((x)–(z), the "<u>Committees/FCR</u>"), and (ii) in the event there is a recovery available for general unsecured creditors (taking into account

the cost of the Claims Processes (as defined below)), a noticing and bar date process and proof of claims process (the "Claims Processes"); provided that if the Endo Companies and the Buyer cannot reach agreement as to a budget for such entities, the Endo Companies will be entitled to seek an order from the Bankruptcy Court to resolve the issue.  For the avoidance of doubt, any amounts will take into account the likelihood of success in confirming a plan and the expected recovery to general unsecured creditors.

(d)    To the extent any of the Wind-Down Amount remains after satisfaction of the items set forth in the Wind-Down Budget at the completion of the Wind-Down Period or any Excess Cash becomes available at any time post-Closing, any such remainder or Excess Cash shall be remitted by the Endo Companies to the Buyer within five (5) Business Days.

Section 2.9    Professional Fee Escrow Accounts.  No later than ten (10) Business Days before the Closing, the Debtors shall deposit the Pre-Closing Professional Fee Reserve Amounts, which shall be funded from Transferred Cash, in segregated professional fee escrow accounts for each professional the Debtors' estates are obligated to pay (the "Professional Fee Escrow Accounts"), including, without limitation, all of the professionals retained under sections 326 through 331 of the Bankruptcy Code and ordinary course professionals.  For the avoidance of doubt, the Wind-Down Amount shall be in addition to the funds used to fund the Professional Fee Escrow Accounts.

Section 2.10    Closing.

(a)    The closing of the transactions contemplated by this Agreement (the "Closing") shall take place at the offices of Skadden, Arps, Slate, Meagher & Flom LLP; One Manhattan West; New York, New York 10001, or by the electronic exchange of documents, unless another place is agreed to in writing by the Sellers and Buyer, on the date that is the third (3rd) Business Day following the satisfaction or, to the extent permitted by applicable Law, waiver of all conditions to the obligations of the Parties set forth in Article VII (other than such conditions as may, by their terms, only be satisfied at the Closing but subject to the satisfaction or waiver thereof at the Closing), or at such other place or at such other time or on such other date as the Sellers and the Buyer mutually may agree in writing.  The day on which the Closing takes place is referred to as the "Closing Date."  Notwithstanding that the Closing shall take place at 10:00 a.m. New York time on the Closing Date, for purposes of this Agreement, the Closing shall be deemed to occur and be effective as of 12:01 a.m., New York time on the Closing Date.

(b)    Immediately prior to the Closing and following which Closing shall occur automatically, the NewCo Parents shall sell and the Buyer shall acquire the Irish Specified Equity Interests for consideration of $1.00 and the NewCo Parents shall deliver to the Buyer:

(i)    stock transfer forms substantially in the form of Exhibit 4 (the "Irish Stock Transfer Form") in respect of the Irish Specified Equity Interests, duly executed by the NewCo Parents;

(ii)    board resolutions of the NewCo Sellers, at which the directors of each NewCo Seller shall (x) approve the transfer of the relevant Irish Specified Equity Interests to the Buyer and the registration of the Buyer as a member in respect of the Irish Specified Equity

41

Interests pursuant to the Irish Stock Transfer Form and (y) appoint such persons as the Buyer many nominate as directors, company secretary and auditor of the NewCo Sellers;

(iii)    (a) if requested by the Buyer, letters of resignation in a form acceptable to the Buyer from the directors and company secretary of each of the NewCo Sellers, and (b) the common seal and all registers, minute books, and other statutory books of each of the NewCo Sellers that are required to be kept pursuant to the Companies Act 2014 of Ireland; and

(iv)    to the extent required by applicable Law, the Buyer shall deliver to the NewCo Parents, the Irish Stock Transfer Form duly executed by the Buyer as a transferees.

(c)    At or prior to the Closing, the Endo Companies shall deliver or cause to be delivered to the Buyer (or the applicable Designated Buyer(s)):

(i)    one or more bills of sale substantially in the form of Exhibit 2 (the "Bill of Sale"), duly executed by the applicable Sellers;

(ii)    confirmatory deed of release in respect of any Encumbrance that is governed by the laws of Ireland granted by any Endo Company in respect of the Transferred Assets in an agreed form duly executed together with such duly executed forms and filings that are required in order to register such release in Ireland;

(iii)    one or more intellectual property assignment agreements substantially in the form of Exhibit 3 (the "IP Assignment Agreement"), duly executed by the applicable Sellers;

(iv)    with respect to any Seller transferring a "United States Real Property Interest" as defined in Section 897(c) of the Code, such Seller shall deliver a duly executed and acknowledged certification, in form and substance acceptable to the Buyer and in compliance with the Code and the Treasury Regulations thereunder, certifying such facts as to establish that the sale of the United States Real Property Interest is exempt from withholding under Section 1445 of the Code;

(v)    a duly executed certificate of an executive officer of Seller Parent certifying the fulfillment of the conditions set forth in Sections 7.3(a) and (d);

(vi)    duly executed quit claim deeds for the Acquired Owned Real Property in a form approved by the Sellers together with drafts of related transfer tax or other similar forms required to be filed in the applicable jurisdiction, in each case subject to the Sale Order;

(vii)    all of the Transferred Assets which are capable of transfer by delivery, when by virtue of such delivery title to those Transferred Assets shall pass to the Buyer;

(viii)    duly executed resignation letters from the Existing Indian Directors resigning from the board of directors of the relevant Indian Subsidiaries with effect from completion of the transfer of the Specified Equity Interests in the Indian Subsidiaries;

(ix)    duly executed copies of all Tax election forms to be delivered by the Parties pursuant to Section 6.4;

42

(x)    all other documents, instruments or writings of conveyance reasonably necessary or customary to consummate the Agreement to be prepared by the Buyer; provided such documents are (A) in form and substance reasonably acceptable to the applicable Endo Company, (B) required to be executed only by the Sellers or an agent of Sellers (in his or her capacity as such), or in the case of any Participating Endo Debtor, by such Participating Endo Debtor or by the First Lien Collateral Trustee, and (C) identified and provided by Buyer to the Endo Companies in a form acceptable to such Buyer at least seven (7) Business Days before the Closing Date;

(xi)    novation agreements executed by Finco I (to the extent that such entity is a Seller), Buyer and PFPL for novation in favor of the Buyer, of: (a) the loan agreements executed between PFPL with Finco I, (b) loan agreements executed between PFPL and Finco II read with the novation agreements executed between PFPL, Finco I and Finco II (for the transfer of loans granted by Finco II to PFPL, in favor of Finco I) (collectively, "PFPL ECB Novation Agreements"), with effect from the Closing;

(xii)    novation agreements executed by Finco I (to the extent that such entity is a Seller), Buyer and PAT for novation in favor of the Buyer, of the loan agreements executed between PAT and Finco II read with the novation agreements executed between PAT, Finco I and Finco II (for the transfer of loans granted by Finco II to PAT, in favor of Finco I) (collectively, "PAT ECB Novation Agreements"), with effect from the Closing;

(xiii)    approval obtained from the authorised dealer banks of PFPL and PAT in connection with the change in lender under the PFPL ECB Novation Agreements and PAT ECB Novation Agreements, with effect from the Closing; and

(xiv)    all Consents of the board of directors (or equivalent governing bodies) and shareholders of the Endo Companies, in each case as required by the applicable Organizational Document and Laws.

(d)    At or prior to the Closing, the Buyer shall deliver or cause to be delivered:

(i)    to Seller Parent,

(A)    the Cash Component by wire transfer of immediately available funds to an escrow account or accounts designated in writing by Seller Parent to the Buyer at least two (2) Business Days prior to the Closing Date; provided that if any portion of the Cash Component is funded and paid from the Transferred Cash, such Transferred Cash shall remain with the applicable Sellers and/or Participating Endo Debtors, as applicable, and not be transferred to the Buyer at Closing, and the obligation of Buyer to deliver or cause to be delivered the Cash Component to Seller Parent shall be satisfied with the retention of such portion of the Transferred Cash by the applicable Sellers and/or Participating Endo Debtors;

(B)    a duly executed certificate of an executive officer of the Buyer certifying that the Buyer will pay the Cure Claims for Transferred Contracts in accordance with Section 2.6(d); and

(C)    a duly executed certificate of an executive officer of the Buyer describing the status of any trusts, agreements or other arrangements made by the Buyer with respect to any Opioid Claims;

(D)    one or more instruments representing an Act of Required Secured Parties (as defined in the Collateral Trust Agreement), in each case substantially in the form of Exhibit 5 hereto and duly executed by the Required Holders and the First Lien Collateral Trustee, pursuant to which the Required Holders have directed the First Lien Collateral Trustee to (x) exercise and enforce its interests, rights, powers and remedies in respect of the Collateral (as defined in the Collateral Trust Agreement) and under the Security Documents (as defined in the Collateral Trust Agreement) and applicable Law, by credit bidding up to the full amount of the outstanding Secured Obligations (as defined in the Collateral Trust Agreement) as provided in Section 2.7 of this Agreement and, if necessary, to appoint Buyer as its agent pursuant to Section 5.2 of the Collateral Trust Agreement to exercise all interests, rights, powers and remedies of the Collateral Trustee under the Collateral Trust Agreement and the Applicable Securities Documents to credit bid, (y) appoint Buyer as its delegate pursuant to Section 12.1 of each Receivables Pledge Agreements (as defined in the Direction Letter) and reasonably cooperate with such steps necessary to release the Pledge (as defined in the Receivables Pledge Agreements) created under the Receivables Pledge Agreements on the applicable collateral in satisfaction of the Secured Obligations secured thereby, and reasonably cooperate with such steps necessary to transfer, convey, charge or assign the applicable collateral to facilitate the enforcement of the Pledge on such applicable collateral, and (z) reasonably cooperate with the Required Holders and the Buyer with respect to any actions necessary or required in furtherance of the credit bit or any other aspect of the Sale Order (the "Direction Letter");

(ii)    to the Endo Companies, the Bill(s) of Sale, duly executed by the Buyer;

(iii)    to the Sellers:

(A)    the IP Assignment Agreement(s), duly executed by the Buyer;

(B)    a duly executed certificate of an executive officer of the Buyer certifying the fulfillment of the conditions set forth in Section 7.2(b);

(C)    duly executed copies of all Tax election forms to be delivered by the Parties pursuant to Section 6.4; and

(D)    a duly executed counterpart to quit claim deeds for the Acquired Owned Real Property in a form approved by the Sellers and the Buyer and related Transfer Tax or other similar forms required to be filed in the applicable jurisdiction, in each case subject to the Sale Order.

(iv)    to the Indian Subsidiaries,

(A)    a duly executed consent letter in Form DIR-2 from the Indian Nominee Directors to act as directors of the relevant Indian Subsidiaries;

(B)    a declaration from the Indian Nominee Directors in Form DIR-8;

44

(C)    a declaration of interest in other entities in Form MBP-1 from the Indian Nominee Directors to the relevant Indian Subsidiaries;

(D)    the PFPL ECB Novation Agreements and PAT ECB Novation Agreements duly executed by the Buyer, with effect from the Closing; and

(E)    a copy of the prior approval of the Government of India (through the Department of Pharmaceuticals, Ministry of Chemicals and Fertilizers) for transfer of Specified Equity Interests in the Indian Subsidiaries to the Buyer in accordance with the (Indian) Consolidated Foreign Direct Investment Policy, 2020, as amended from time to time and the Foreign Exchange Management (Non-debt Instruments) Rules, 2019, as amended from time to time ("FDI Approval"); and

(v)    to the Sellers, all other documents, instruments or writings of conveyance reasonably necessary or customary to consummate this Agreement to be prepared by the Endo Companies; provided such documents are (A) in form and substance reasonably acceptable to Buyer, (B) required to be executed only by the Buyer or an agent of Buyer (in his or her capacity as such) and (C) identified and provided by Sellers to Buyer in a form acceptable to such Buyer at least seven (7) Business Days before the Closing Date.

(e)    On or immediately after the Closing Date (after receipt of the Transferred Cash by the Buyer) and upon receipt of the corresponding portion of the Purchase Price (for the Specified Equity Interests in the Indian Subsidiaries as mutually agreed between the Sellers and the Buyer in writing at least five (5) Business Days prior to the Closing) by the Sellers, the following actions shall be completed (in the sequence listed herein below) in relation to the transfer of Specified Equity Interests in the Indian Subsidiaries:

(i)    the Buyer shall deliver to Par Pharmaceutical Inc. the receipt and/or any other documents evidencing payment of the Transfer Taxes (applicable on the transfer of Sale Shares held by Par Pharmaceutical Inc. in PFPL to the Buyer);

(ii)    Par Pharmaceutical Inc. shall issue irrevocable delivery instructions to its depository participant for the transfer of its Sale Shares (held in dematerialised form) in PFPL from its account to the Buyer's demat account and provide a copy of such delivery instructions to the Buyer;

(iii)    the Buyer shall deliver to Par LLC the receipt and/or any other documents evidencing payment of the Transfer Taxes applicable on the transfer of one Sale Share held by Par LLC in PFPL to the Buyer;

(iv)    Par LLC and the Buyer (or the Buyer's nominee) shall execute Form SH-4 for the transfer of one Sale Share (held in physical form) in PFPL from Par LLC to the Buyer (or the Buyer's nominee) and submit the duly stamped and executed Form SH-4 to PFPL;

(v)    the Buyer shall deliver to Par Pharmaceutical Inc. the receipt and/or any other documents evidencing payment of the Transfer Taxes (applicable on the transfer of one Sale Share held by Par Pharmaceutical, Inc. in PBPL to the Buyer);

(vi)    Par Pharmaceutical Inc. and the Buyer (or a Designated Buyer nominee) shall execute Form SH-4 for the transfer of one Sale Share (held in physical form) in PBPL from Par Pharmaceutical Inc. to the Buyer (or a Designated Buyer nominee) and submit the duly stamped and executed Form SH-4 to PBPL;

(vii)    the Buyer shall deliver to Par Pharmaceutical Inc. the receipt and/or any other documents evidencing payment of the Transfer Taxes (applicable on the transfer of CCDs held by Par Pharmaceutical Inc. in PFPL to the Buyer);

(viii)    Par Pharmaceutical Inc. and the Buyer shall execute Form SH-4 for the transfer of the CCDs (held in physical form) in PFPL from Par Pharmaceutical Inc. to the Buyer and submit the duly stamped and executed Form SH-4 to PFPL; and

(ix)    The boards of directors of the relevant Indian Subsidiaries shall take on record the change in the ownership of the Sale Shares and CCDs, and the Indian Subsidiaries shall (x) ensure that necessary entries are made in their respective statutory registers and to register the Buyer as the registered holder of the Sale Shares and CCDs; and (y) authorize all regulatory filings and secretarial compliances in relation to the transfer of Sale Shares and CCDs.

Section 2.11   Purchase Price Allocation.  Within one hundred eighty (180) days of the Closing Date, Seller Parent shall provide the Buyer with an allocation of the applicable consideration amongst the Transferred Assets for applicable Tax purposes (the "Purchase Price Allocation"). The Purchase Price Allocation shall reflect the allocation of the applicable consideration (i) among the Sellers as set forth on Section 2.11 of the Disclosure Letter as further allocated among the Transferred Assets by the Sellers acting in good faith and in consultation with the Buyer or (ii) as otherwise agreed between the Sellers and the Buyer. The Parties agree that the amount of the Purchase Price allocated to the Transferred Assets of the Canadian Sellers will be equal to the fair market value of such Transferred Assets on the Closing Date. The Buyer shall not, through the expiration of the Wind-Down Period, take a position that is inconsistent with the Purchase Price Allocation in reporting the consequences of the transaction contemplated by this Agreement to any Taxing Authority.

Section 2.12   Designated Buyer(s).

(a)    In connection with the Closing and consistent with the Transaction Steps, the Buyer shall be entitled to designate, in accordance with the terms and subject to the limitations set forth in this Section 2.12, one (1) or more Affiliates to (i) purchase specified Transferred Assets (including specified Transferred Contracts) and pay or cause to be paid the corresponding portion of the Purchase Price, as applicable, (ii) assume specified Assumed Liabilities, and/or (iii) employ specified Transferred Employees on and after the Closing Date (any such Affiliate of the Buyer that shall be properly designated by the Buyer in accordance with this clause, a "Designated Buyer").  At the Closing, the Buyer shall, or shall cause each Designated Buyer(s) to, honor its obligations at the Closing.  Any reference to the Buyer made in this Agreement in respect of any purchase, assumption or employment obligation referred to in this Agreement or any representations and warranties (including the representation in Section 4.3(c)) made in this Agreement shall include reference to the appropriate Designated Buyer(s), if any.  After the Closing, all obligations of the Buyer and any Designated Buyer(s) under this Agreement shall be

several and not joint as amongst the Buyer and each Designated Buyer and the only party with Liability as to a particular Assumed Liability shall be the Buyer or the Designated Buyer assuming such obligation at the Closing and no other Buyer or Designated Buyer.

(b)      The above designation in Section 2.12(a) shall be made by the Buyer by way of a written notice to be delivered to the Sellers in no event later than five (5) Business Days prior to Closing which written notice shall identify the Designated Buyer(s) and indicate which Transferred Assets, Assumed Liabilities and/or Business Employees the Buyer intends such Designated Buyer(s) to purchase, assume and/or employ, as applicable, hereunder and shall include a signed counterpart to this Agreement, agreeing to be bound by the terms of this Agreement as it relates to such Designated Buyer(s) and authorizing the Buyer to act as such Designated Buyer(s)' agent for all purposes hereunder.

(c)      The Buyer intends to incorporate and designate a corporation incorporated under the laws of Canada or a province therein as a Designated Buyer (the "Canadian Buyer") in respect of any Transferred Assets used in connection with the Business carried on in Canada, and is entering into this Agreement in part on behalf of such corporation.

Section 2.13    Withholding.  Any amount paid to an Endo Company shall be made free and clear of any withholding Tax or other Tax of a similar nature imposed with respect to the transactions contemplated hereby; provided, that (i) the Endo Companies shall cooperate with the Buyer to minimize the amount of any applicable withholding or deduction that is required under applicable Law (including by timely delivering the statements described in Sections 2.10(c)(iv) and 6.2(e), and using commercially reasonable efforts to timely deliver any other statements, certifications or other documents reasonably required to establish an exemption from or reduction in any applicable withholding) and (ii) the Buyer shall pay to the Sellers the corresponding portion of the Purchase Price for the Specified Equity Interests in the Indian Subsidiaries subject to the deduction of withholding Tax determined in accordance with the capital gains tax computation provided by the Sellers under Section 6.2(e). The Buyer shall deposit an amount corresponding to such withholding Tax with the relevant tax authorities in the manner, form and within the timeline prescribed under the Indian Income Tax Act, 1961 and the proof of such payment shall be delivered to the Seller within two (2) Business Days from the date of such deposit, but no later than the due date prescribed under the Indian Income Tax Act, 1961. The Buyer shall also file the applicable withholding Tax return (within the prescribed due date) in accordance with the Indian Income Tax Act, 1961 with the governmental authorities.

Section 2.14    Post-Closing Actions.

(a)      As soon as practicable following the Closing, each Indian Subsidiary shall file Form DIR-12 with the jurisdictional Registrar of Companies in India in relation to the appointment of the Indian Nominee Directors to its board of directors and the resignation of the Existing Indian Directors from its board of directors.

(b)      As soon as practicable following the Closing, each Indian Subsidiary shall notify the relevant Governmental Authority (including the Licensing Authority under the Drugs and Cosmetics Rules, 1945 and Unit Approval Committee, Indore Special Economic Zone), in relation to the change in constitution, change in shareholding and change in directors of the Indian

47

Subsidiaries (as applicable) as required under and within the time period specified under applicable Law.

# ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF THE ENDO COMPANIES

Except as disclosed in any Company Reports filed and publicly available prior to the date hereof (but excluding any such disclosures (x) with respect to Indebtedness and Encumbrances or (y) set forth in any section entitled "Risk Factors" or in any "forward-looking statements" section that are cautionary, forward-looking or predictive in nature set forth therein, in each case other than any specific historical factual information contained therein, which shall not be excluded) or set forth in the corresponding sections or subsections of the schedules accompanying this Agreement (collectively, the "Disclosure Letter"), each of (1) the Endo Companies (excluding the NewCo Sellers) and each of the Sellers (excluding the NewCo Sellers) jointly and severally represent and warrant to the Buyer as of the date hereof and as of the Closing Date (or, as to those representations and warranties that address matters as of particular dates, as of such dates) and (2) each of the NewCo Sellers severally represent and warrant to the Buyer as of the date hereof and as of the Closing Date (or, as to those representations and warranties that address matters as of particular dates, as of such dates), as follows:

Section 3.1    Organization.

(a)    Each Endo Company is duly organized, validly existing and in good standing (where such concept is recognized under applicable Law) under the laws of the jurisdiction of its organization and, except as a result of the Bankruptcy Cases, has all necessary corporate (or equivalent) power and authority to own, lease and operate its properties (including the Transferred Assets owned by it) and to carry on its business (including the Business) as it is now being conducted and to perform its obligations hereunder and under any Ancillary Agreement, in each case except as a result of the Bankruptcy Cases, the Canadian Recognition Case (solely in respect of the Canadian Sellers) or as would not, individually or in the aggregate, materially and adversely affect the ability of each Seller to carry out its obligations under this Agreement or to consummate the transaction contemplated hereby.

(b)    Each of the Seller Parent's Subsidiaries (other than the Sellers) is duly organized, validly existing and in good standing (where such concept is recognized under applicable Law) under the laws of the jurisdiction of its organization and, except as a result of the Bankruptcy Cases, has all necessary corporate (or equivalent) power and authority to own, lease and operate its properties (including the Transferred Assets owned by it) and to carry on its business (including the Business) as it is now being conducted and to perform its obligations hereunder and under any Ancillary Agreement, in each case except as a result of the Bankruptcy Cases, the Canadian Recognition Case (solely in respect of the Canadian Sellers) or as would not, individually or in the aggregate, materially and adversely affect the ability of each Seller to carry out its obligations under this Agreement or to consummate the transaction contemplated hereby.

Section 3.2    Authority.    Subject to (i) the Bankruptcy Cases and to the extent that any Bankruptcy Court approval is required and (ii) solely in respect of the Canadian Sellers, the Canadian Recognition Case and to the extent that any Canadian Court approval is required, (a)

48

each Endo Company has the corporate (or equivalent) power and authority to execute and deliver this Agreement and each of the Ancillary Agreements to which it is or will be a party, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby, (b) the execution, delivery and performance by each Endo Company (which is a Party) of this Agreement and each of the Ancillary Agreements to which it will be a party and the consummation by such Endo Company of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary corporate (or equivalent) action and no other corporate proceedings on the part of any Endo Company is necessary to authorize such execution, delivery or performance and (c) this Agreement has been, and upon their execution, each of the Ancillary Agreements to which such Endo Company will be a party will have been, duly executed and delivered by such Endo Company and, assuming due execution and delivery by each of the other parties hereto and thereto, this Agreement constitutes, and upon their execution, each of the Ancillary Agreements to which such Endo Company will be a party will constitute, the valid and binding obligations of such Endo Company (which is a Party), enforceable against such Endo Company in accordance with their respective terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and by general principles of equity (regardless of whether considered in a proceeding in equity or at law).

Section 3.3    No Conflict; Required Filings and Consents; Pre-Signing Matters.

(a)    Except for (i) the Bankruptcy Cases and to the extent that any Bankruptcy Court approval is required and (ii) solely in respect of the Canadian Sellers, the Canadian Recognition Case and to the extent that any Canadian Court approval is required, and except as set forth on Section 3.3(a) of the Disclosure Letter, the execution, delivery and performance by each Endo Company (which is a Party) of this Agreement and each of the Ancillary Agreements to which such Endo Company will be a party, the consummation of the transactions contemplated hereby and thereby, or compliance by each Endo Company (which is a Party) with any of the provisions hereof, (i) do not and will not conflict with, result in any breach of, constitute a default (or an event that, with notice or lapse of time or both, would become a default) under, or give rise to a right of termination, modification, notice or cancellation or require any consent of any Person pursuant to (A) the Organizational Documents of such Endo Company, (B) any Law applicable to such Endo Company, the Business or any of the Transferred Assets, (C) any Order of any Governmental Authority, (D) any Transferred Contract, except in the case of clause (B), (C) or (D), for any such conflicts, breaches, defaults or other occurrences that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect or (ii) do not and will not result in the creation of (or give rise to the right of any Person to require the grant of) any Encumbrance (other than a Permitted Encumbrance or an Assumed Liability) upon any of the assets of any Endo Company.

(b)    The Endo Companies are not required to file, seek or obtain any notice, authorization, registration, approval, order, permit or consent of or with any Governmental Authority in connection with the execution, delivery and performance by the Endo Companies of this Agreement and each of the Ancillary Agreements to which each Endo Company will be a party or the consummation of the transactions contemplated hereby or thereby, except (i) for any filings required to be made under the HSR Act, the Competition Act, the Investment Canada Act or other applicable Antitrust Law, (ii) for requisite Bankruptcy Court approval, (iii) to the

49

Government of India, (iv) for entry of the Sale Order, (v) for entry of the Canadian Sale Recognition Order, and (vi) where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(c)    (i) the sale, assignment, transfer, conveyance and delivery to the NewCo Sellers of the rights, title and interest in and to the business and assets of Endo Ventures Limited, Endo Global Aesthetics Limited and Endo Global Biologics Limited, conveyed pursuant to business transfer agreements dated [●] and made between (a) Endo Global Aesthetics Limited, New Holdco 1 and NewCo 1; (b) Endo Global Biologics Limited, New Holdco 2 and NewCo 2; and (c) Endo Ventures Limited, New Holdco 3 and NewCo 3, occurred on [●]; and (ii) each of the NewCo Sellers filed a stamp duty return in respect of the transfers described in clause (i) of this Section 3.3(c), in each case claiming stamp duty relief under section 80 of the Irish Stamp Duties Consolidation Act 1999, in the manner and within the timeframe prescribed by the Stamp Duty (e-Stamping of Instruments and Self-Assessment) Regulations 2012 (S.I. No. 234 of 2012), in and in any event before the Closing Date; and

(d)    no act or omission has been taken by any Endo Company to reverse, unwind or challenge the validity of any of the matters referred to in Section 3.3(c).

Section 3.4    Transferred Assets.

(a)    Except as would not be expected to materially impact the Business, each Seller, as applicable, has good and valid title to each of the owned Transferred Assets, or with respect to leased Transferred Assets, valid leasehold interests in, or with respect to licensed Transferred Assets, valid licenses to use such Transferred Assets. The Transferred Assets are sufficient for the conduct of the Business (other than the Business undertaken by the Indian Subsidiaries) after the Closing in substantially the same manner as conducted prior to the Closing and constitute all assets that are necessary for the conduct of the Business (other than the Business undertaken by the Indian Subsidiaries).

(b)    Except as set forth on Section 3.4(b) of the Disclosure Letter, this Agreement and the instruments and documents to be delivered by the Sellers to the Buyer at or following the Closing shall be adequate and sufficient to transfer to the Buyer good and valid title to the Transferred Assets, or with respect to leased Transferred Assets, valid leasehold interests, free and clear of any and all Interests other than Permitted Encumbrances and Assumed Liabilities, subject to (A) the Bankruptcy Cases, (B) entry of the Sale Order and (C) solely in respect of the Canadian Sellers, the Canadian Sale Recognition Order.

(c)    Except as set forth on Section 3.4(c) of the Disclosure Letter, the Transferred Assets, any Executory Contract not designated by the Buyer as a Transferred Contract pursuant to Section 2.6, the Excluded Assets, including any asset designated as an Excluded Asset by the Buyer pursuant to Section 2.1(c) and any asset, permit, claim or right not transferred pursuant to Section 2.5 will immediately following the Closing be generally sufficient for the continued conduct of the Business (other than the Business undertaken by the Indian Subsidiaries) after the Closing in substantially the same manner as conducted prior to the Closing.

50

(d)     Except as set forth on <u>Section 3.4(d)</u> of the Disclosure Letter, each of the Transferred Assets which comprise plant, machinery, vehicles and other equipment, furniture and fittings used in or in connection with the Business is in good operating condition subject to reasonable wear and tear, and are adequate and sufficient for all purposes for which currently utilized.

(e)     The Branded Pharmaceuticals, Sterile Injectables, Generic Pharmaceuticals and International Pharmaceuticals business segments constitute all of operating businesses owned and operated by the Endo Companies as of the date hereof.

Section 3.5     <u>Company Reports; Financial Statements; No Undisclosed Liabilities</u>.

(a)     Seller Parent has filed, furnished or otherwise transmitted on a timely basis all forms, reports, statements, certifications and other documents (including all exhibits, amendments and supplements thereto) required to be filed or furnished by it with the SEC and the Canadian Securities Administrators since January 1, 2020 (all such forms, reports, statements, certificates and other documents filed since January 1, 2020 and prior to the filing date of the Bidding Procedures Motion, collectively, the "<u>Company Reports</u>").  As of their respective filing dates (or, if amended or superseded by a subsequent filing prior to the filing date of the Bidding Procedures Motion, as of the date of such amendment or superseding filing), each of the Company Reports complied as to form in all material respects with the applicable requirements of Securities Laws, as in effect on the date so filed or furnished with the SEC or the Canadian Securities Administrators, as applicable.  None of the Seller Parent's Subsidiaries is required to file any continuous or periodic reports with the SEC or any of the Canadian Securities Administrators.  As of their respective filing dates with the SEC or the Canadian Securities Administrators, as applicable (or, if amended or superseded by a subsequent filing prior to the filing date of the Bidding Procedures Motion, as of the date of such amendment or superseding filing), the Company Reports did not contain any untrue statement of a material fact or "misrepresentation" (as defined under the *Securities Act* (Québec) and any other applicable Canadian Securities Laws) or omit to state a material fact required to be stated or incorporated by reference therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading.  As of the filing date of the Bidding Procedures Motion, to the Knowledge of Sellers, there are no outstanding or unresolved comments in comment letters received from the SEC staff or the staff of any Canadian Securities Administrators with respect to the Company Reports.

(b)     The audited consolidated financial statements of Seller Parent and its Subsidiaries (including any related notes thereto) included (or incorporated by reference) in the Company Reports since January 1, 2020 (the "<u>Seller Financial Statements</u>"), fairly present, in all material respects, Seller Parent and its Subsidiaries' consolidated earnings, consolidated comprehensive income, consolidated changes in equity, consolidated cash flows and consolidated financial position for the respective fiscal periods or as of the respective dates set forth therein.  Such consolidated financial statements (including the related notes) complied, as of the date of filing, in all material respects, with applicable accounting requirements and with the published rules and regulations of the SEC and the Canadian Securities Administrators, as applicable, with respect thereto and each of such financial statements (including the related notes) was prepared in accordance with GAAP consistently applied during the periods involved, except in each case as indicated in such statements or in the notes thereto.

51

(c)      Management of Seller Parent (i) has implemented and maintains disclosure controls and procedures (as defined in Rule 13a-15(e) of the Exchange Act and in National Instrument 52-109 – Certification of Disclosure in Issuers' Annual and Interim Filings) designed to (A) ensure that material information relating to Seller Parent, including its consolidated Subsidiaries, is made known to the chief executive officer and the chief financial officer of Seller Parent by others within those entities, and (B) provide reasonable assurance that information required to be disclosed by Seller Parent in its annual filings, interim filings or other reports to be filed or submitted by it under Securities Laws is recorded and reported within the time periods required by applicable Securities Laws, (ii) has implemented and maintains a system of internal control over financial reporting (as defined in Rule 13a-15(f) of the Exchange Act and in National Instrument 52-109 – Certification of Disclosure in Issuers' Annual and Interim Filings) that is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements in accordance with GAAP.  Management of Seller Parent has disclosed, based on the most recent evaluation of its chief executive officer and its chief financial officer prior to the date of this Agreement, to Seller Parent's outside auditors and the audit committee of the board of directors (x) any significant deficiencies in the design or operation of the Seller Parent's internal control over financial reporting that are reasonably likely to adversely affect the Seller Parent's ability to record and report financial information and (y) any fraud, to the Knowledge of Sellers, whether or not material, that involves management or other employees who have a significant role in the Seller Parent's internal controls over financial reporting.  To the Knowledge of Sellers, no events, facts or circumstances have arisen or become known since January 1, 2020 of the type referred to in clauses (ii)(x) or (ii)(y) of the immediately preceding sentence.

(d)      Neither Seller Parent nor any of its Subsidiaries has any Liabilities or obligations required by GAAP to be disclosed or reflected on or reserved against a consolidated balance sheet (or the notes thereto) of Seller Parent and its Subsidiaries, except for Liabilities and obligations (i) reflected or reserved against in Seller Parent's consolidated balance sheet as of June 30, 2022 (or the notes thereto) (the "Balance Sheet") included in the Company Reports, (ii) incurred in the Ordinary Course of Business since the date of the Balance Sheet, (iii) which have been discharged or paid in full prior to the filing date of the Bidding Procedures Motion, (iv) incurred pursuant to the transactions contemplated by this Agreement or (v) which would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 3.6      Absence of Certain Changes or Events.

(a)      Since June 30, 2022, except for the Bankruptcy Cases and related matters and as set forth on Section 3.6(a) of the Disclosure Letter, there has not been any circumstance, change, effect, event, occurrence, state of facts or development that, in combination with any other circumstance, change, effect, event, occurrence, state of facts or development, whether or not arising in the Ordinary Course of Business, has had or would be reasonably expected to have a Material Adverse Effect.

(b)      Except as expressly contemplated by this Agreement and for the Bankruptcy Cases and related matters, since December 31, 2021 through the filing date of the Bidding Procedures Motion, each Endo Company has conducted its business in the Ordinary Course of Business in all material respects.

Section 3.7    Compliance with Law; Permits.

(a)    Since January 1, 2020, the Business has been conducted in compliance with, and the Endo Companies have complied, in all material respects, with all applicable Laws relating to the operation of the Business and the Transferred Assets.  Since January 1, 2020, no Endo Company (i) has received any written communication (or, to the Knowledge of Sellers, any other communication) from any Governmental Authority or private party alleging noncompliance in any material respect with any applicable Law or (ii) has incurred any material Liability for failure to comply with any applicable Law.  To the Knowledge of Sellers, there is no investigation, proceeding or disciplinary action currently pending or threatened against any Endo Company by a Governmental Authority, except, in each case, for any such investigation, proceeding or disciplinary action that, if adversely determined, would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  Since January 1, 2020, each Endo Company has filed all material reports, notifications and other filings required to be filed with any Governmental Authority pursuant to applicable Law, and has paid all fees and assessments due and payable in connection therewith.

(b)    The Sellers and the Indian Subsidiaries (as applicable) are in possession of, and, to the extent applicable, have timely filed applications to renew, all Regulatory Approvals and all permits, licenses, franchises, approvals, certificates, consents, clearances, variances, tariffs, rate schedules, waivers, concessions, exemptions, orders, registrations, notices or other authorizations of any Governmental Authority (the "Permits") necessary for them to own, lease and operate the Transferred Assets and to carry on the Business as currently conducted, except for Permits that the failure to be in possessions of would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  All material Permits held by the Sellers and Indian Subsidiaries are valid and in full force and effect and no Seller or Indian Subsidiary is in default under, or in violation of, any such Permit, except for such defaults or violations that would not reasonably be expected, individually or in the aggregate, to materially restrict or interfere with Buyer's ability to operate the Business as currently operated and, to the Knowledge of Sellers, no suspension or cancellation of any such Permit is pending.

(c)    Except as set forth on Section 3.7(c) of the Disclosure Letter, the sale, assignment, transfer, conveyance and delivery of the Permits (other than the Permits obtained by the Indian Subsidiaries, which will be retained by the Indian Subsidiaries) by each Seller of this Agreement to the Buyer does not and will not conflict with, result in any breach of, constitute a default (or an event that, with notice or lapse of time or both, would become a default) under, or give rise to a right of termination, modification, notice or cancellation or require any consent of any Person pursuant to (A) any Law applicable to such Seller, the Business or any of the Transferred Assets or (B) any Order of any Governmental Authority except for any such conflicts, breaches, defaults or other occurrences that would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the Business.

Section 3.8    Litigation.

(a)    Since January 1, 2020, except for (i) the Bankruptcy Cases, any Order entered in the Bankruptcy Cases, (ii) the Canadian Recognition Case and any Order entered into the Canadian Recognition Case, and (iii) and except as set forth on Section 3.8(a) of the Disclosure Letter, there

is no Action by or against any Endo Company, in connection with the Business, the Transferred Assets or the Assumed Liabilities pending, or to the Knowledge of the Sellers, threatened that would, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. No Endo Company is subject to any outstanding Order of any court or other Governmental Authority, or any settlement with a third party, that would, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)    The Endo Companies are not, in relation to the Business, subject to any order, ruling, decision or judgment given by any court or Governmental Authority or other authority, department, board, body, tribunal, administrative body or agency or has not been a party to any court or Governmental Authority or other authority, department, board, body, tribunal order, ruling, decision or judgment or agency which is still in force.

Section 3.9    Employee Plans.

(a)    Section 3.9(a) of the Disclosure Letter sets forth a true, complete and correct list of each material Employee Plan, other than any Employee Plan required to be maintained under the laws of any jurisdiction outside of the United States without discretion as to the level of benefits provided under such Employee Plan ("Mandatory Non-U.S. Plans").  As applicable with respect to each material Employee Plan other than Mandatory Non-U.S. Plans, the Sellers have made available to the Buyer a true and complete copy of the following documents:  (i) the most recent plan document, including all amendments thereto, and in the case of an unwritten plan, a written description thereof, (ii) the current summary description of each material Employee Plan and any material modifications thereto, (iii) all current trust documents and funding vehicles relating thereto, (iv) the most recently filed annual report (Form 5500 and all Sections thereto), (v) the most recent determination or opinion letter from the IRS, if any, with respect to any Employee Plan intended to be qualified under Section 401(a) of the Code, (vi) the most recent summary annual report and actuarial report, (vii) any non-routine correspondence with any Governmental Authority since January 1, 2019, (viii) template contracts of employment, and (ix) all material insurance policies effected solely for the purposes of an Employee Plan.

(b)    Each Employee Plan has been operated and administered in all material respects in accordance with its terms and applicable Law and administrative or governmental rules and regulations, including ERISA and the Code.  There are no, and since January 1, 2019 there have been no, pending audits or investigations by any Governmental Authority involving any Employee Plan or the employment of any Business Employee, and no pending or, to the Knowledge of the Sellers, threatened claims (except for individual claims for benefits payable in the normal operation of the Employee Plans) or Actions involving any Employee Plan.

(c)    Each Employee Plan intended to be "qualified" within the meaning of Section 401(a) of the Code has received a favorable determination or opinion letter as to such qualification from the IRS and, to the Knowledge of Sellers, nothing has occurred that could adversely impact the tax qualification of any such Employee Plan.

(d)    Neither Sellers nor any of their respective ERISA Affiliates has adopted, maintained, sponsored, contributed to (or has been required to adopt, maintain, sponsor or contribute to), or has any direct or contingent liability with respect to, any (i) "multiemployer plan"

(within the meaning of Section 3(37) of ERISA); (ii) employee benefit plan or arrangement subject to Title IV or Section 302 of ERISA, (iii) "multiple employer plan" (within the meaning of Section 210 of ERISA or Section 413(c) of the Code), (iv) "multiple employer welfare arrangements" (within the meaning of Section 3(40) of ERISA), (v) "defined benefit scheme" (within the meaning of section 2 of the Irish Pensions Act 1990 (as amended)) or (vi) any other Employee Plan not covered by (i) through (v) that provides for defined benefit pension obligations.

(e)      Except as required by Section 4980B of the Code or similar Law, the Sellers and their Affiliates have no obligation to provide post-employment welfare benefits.

(f)      In all material respects, all contributions, premiums or other payments that have become due have been paid on a timely basis with respect to each Employee Plan or, to the extent not yet due, accrued in accordance with GAAP.  The Sellers and their ERISA Affiliates have not incurred (whether or not assessed) any material penalty or Tax under Sections 4980B, 4980D, 4980H, 6721 or 6722 of the Code and to the Knowledge of the Sellers no circumstances exist or events have occurred that could result in the imposition of any such material penalties or Taxes. There have been no "prohibited transactions" within the meaning of Section 4975 of the Code or Sections 406 or 407 of ERISA and not otherwise exempt under Section 408 of ERISA and no breaches of fiduciary duty (as determined under ERISA) with respect to any Employee Plan, in each case with respect to which the Sellers and their ERISA Affiliates would reasonably be expected to have any material liability.

(g)      In all material respects, with respect to each Employee Plan maintained under the laws of any jurisdiction outside of the United States:  (i) if required to have been approved by any non-U.S. Governmental Authority (or permitted to have been approved to obtain any beneficial Tax or other status), such Employee Plan has been so approved or timely submitted for approval and no such approval has been revoked (nor, to the Knowledge of the Sellers, has revocation been threatened) and no event has occurred since the date of the most recent approval or application therefor that is reasonably likely to affect any such approval or increase the costs relating thereto; (ii) if intended to be funded and/or book reserved, such Employee Plan is fully funded and/or book reserved, as appropriate, based upon reasonable actuarial assumptions; and (iii) the financial statements of such Employee Plan (if any) accurately reflect such Employee Plan's liabilities.

(h)      Neither the execution nor delivery of this Agreement nor the consummation of the transactions contemplated by this Agreement, whether alone or together with any other event, will (i) entitle any Business Employee to any payment or benefit; (ii) increase the amount or value of any compensation, benefit or other obligation payable or required to be provided to any Business Employee; (iii) accelerate the time of payment or vesting, or increase the amount of compensation due any Business Employee or accelerate the time of any funding (whether to a trust or otherwise) of compensation or benefits under any Employee Plan; or (iv) result in the payment of any amounts that would not be deductible for federal income tax purposes by reason of Section 280G of the Code or would be subject to excise tax under Section 4999 of the Code.  No Employee Plan provides for the reimbursement of any Tax incurred under Section 409A or 4999 of the Code.

(i)      There are no excluded Business Employees in respect of whom the Sellers are obliged to provide access to a standard PRSA in accordance with section 121 of the Irish Pensions Act 1990 (as amended).

Section 3.10    Labor and Employment Matters.

(a)    Section 3.10 of the Disclosure Letter (which may be delivered by the Endo Companies to the Buyer at any time until the date that is thirty (30) days after the date hereof), to the extent permitted under applicable Law and on a no-name basis where required by applicable Law, a true, complete and correct list, as of the filing date of the Bidding Procedures Order, of all Business Employees and including, for each such Business Employee, as applicable:  employee identification number, date of commencement of employment, job position or title, location of employment, recognized years of service, notice periods, base salary or wage rate, overtime pay, bonus, incentive pay, any written arrangements or assurances whether or not legally binding for the payment of compensation on termination of employment, exempt status, accrued vacation amounts, or other paid time off, whether employed further to a work permit or visa and the type of work permit or visa, whether having signed a written employment agreement, commission, full-time or part-time, temporary or permanent status, active or inactive status (and, if inactive, the anticipated return to work date) and union status (the "Employee Census").

(b)    Other than as disclosed in Section 3.10(b) of the Disclosure Letter, the Endo Companies are not a party to any collective bargaining agreement or other agreement or arrangement with a labor union, trade union, works council, labor organization or other employee-representative body (each a "Collective Bargaining Agreement") that pertains to the Business or to any Business Employees.  No Business Employees are represented by any labor union, trade union, works council, labor organization or other employee-representative body with respect to their employment with the Endo Companies.  There are no material pending or, to the Knowledge of the Sellers, threatened Actions concerning labor matters or unfair labor practices with respect to the Business.

(c)    Since January 1, 2020, there have been no material work stoppages, slowdowns, strikes, disputes, or lockouts relating to labor matters against any Endo Companies with respect to the Business and, to the Knowledge of the Sellers, no such actions are threatened.  To the Knowledge of the Sellers, there are no, and during the past three (3) years have been no, material union drives or union organizing activities that could affect the Business pending with any Business Employees or any labor organization.

(d)    To the Knowledge of the Sellers, the Endo Companies are and since January 1, 2020 have been in material compliance with all applicable Laws respecting employment, including discrimination or harassment in employment, TUPE, terms and conditions of employment, termination of employment, wages, overtime classification and requirements, hours, occupational safety and health, employee whistle-blowing, immigration, employee privacy, pay equity, human rights, workers' compensation, employment practices and classification of employees, consultants and independent contractors, in connection with the Business. To the Knowledge of the Sellers, the Endo Companies are not engaged in any unfair labor practice, as defined in the National Labor Relations Act or other applicable Laws, in connection with the Business. No unfair labor practice or labor charge or complaint is pending or, to the Knowledge of the Sellers, threatened with respect to the Business, the Endo Companies in connection with the Business before the National Labor Relations Board, the Equal Employment Opportunity Commission or any other Governmental Authority.

(e)      No trade union has applied to have any Endo Company declared a common or related employer pursuant to the Labour Relations Act (Ontario) or any similar legislation in any jurisdiction in which the Endo Companies carry on business.

(f)      Other than as disclosed in <u>Section 3.10(f)</u>, since January 1, 2019, (i) no allegations of workplace sexual harassment, discrimination or other sexual misconduct have been made, initiated, filed or, to the Knowledge of the Sellers, threatened against any current or former directors, officers or employees of the Business at the level of Senior Vice President and above, and (ii) neither the Business nor the Endo Companies in connection with the Business have entered into any settlement agreement related to allegations of sexual harassment, discrimination or other sexual misconduct by any of their directors, officers or employees described in clause (i) hereof or any independent contractor.

(g)      Since January 1, 2020, the Endo Companies have complied in all material respects with all notice and other requirements under the WARN Act, or any similar applicable state, provincial or local Law, and have not taken any action at any single site of employment, in the ninety (90) day period prior to the Closing Date, that would constitute, as of the Closing Date, a "mass layoff", "plant closing", "group termination" or "collective dismissal" with respect to the Business within the meaning of the WARN Act, or any similar applicable state, provincial or local Law.

(h)      There are no material written notices of penalties, fines, charges, surcharges, assessment, provisional assessment, reassessment, supplementary assessment, penalty assessment or increased assessment (collectively, "<u>Assessments</u>") or any other material written communications related thereto with respect to the Business, which the Endo Companies received from any workers' compensation or workplace safety and insurance board or similar authorities in any jurisdictions where the Business is carried on that would, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(i)      All material orders, inspection reports, derogations, notices of infractions, claims, penalties or fines under applicable Occupational Health and Safety Laws relating to the Employees and the Business and any of its facilities, have been provided to the Buyer, and the Endo Companies have complied and are in compliance with same and there are no appeals of same currently outstanding.  Other than as disclosed in <u>Section 3.10(i)</u> of the Disclosure Letter, there are no charges, procedures or audits pending or in progress, under Occupational Health and Safety Laws, in respect of Business Employees or the Business or any of its facilities.  In the last three (3) years, there have been no fatal accidents in respect of the Business Employees or the Business or any of its facilities, or any other material accidents or incidents which might reasonably be expected to lead to charges involving the Business.

Section 3.11    <u>Real Property</u>.

(a)      Seller Parent or one of the other Endo Companies, as applicable, has good and valid fee simple title to the real estate owned by the Endo Companies (together with all buildings and other structures, facilities or improvements located thereon and all easements, licenses, rights and appurtenances of Seller Parent or such Subsidiary, as applicable, relating to the foregoing) (the "<u>Owned Real Property</u>") free and clear of all Encumbrances, except for Specified Interests.

Section 3.11(a) of the Disclosure Letter sets forth all of the Owned Real Property owned by the address and owner of all such Owned Real Property.  All buildings and structures, located on, under or within the Owned Real Property, and all other material aspects of each parcel of Owned Real Property are in good operating condition, reasonable wear and tear excepted and taking into account the relative ages and/or service period of such assets, and are structurally sound and free of any material defects that would reasonably be expected to be materially adverse to the Endo Companies, taken as a whole.  Section 3.11(a) of the Disclosure Letter sets forth all of the Owned Real Property owned by the Endo Companies.  Sellers have delivered or made available to Buyer complete and correct copies of the following, if any, in the possession of the Endo Companies: title insurance policies and land survey documents with respect to the Owned Real Property.

(b)    Except as set forth on Section 3.11(b) of the Disclosure Letter, to the Knowledge of Sellers:  (i) there are no outstanding options, repurchase rights or rights of first refusal to purchase or lease any Owned Real Property, or any portion thereof or interest therein; (ii) no Endo Company is a lessor under, or otherwise a party to, any lease, sublease, license, concession or other agreement pursuant to which such Endo Company has granted to any Person the right to use or occupy all or any portion of the Owned Real Property; (iii) there is no, and no Endo Company has received written notice from any Governmental Authority regarding, presently pending or threatened condemnation or eminent domain proceedings or their local equivalent affecting or relating to any of the Owned Real Property; and (iv) no Endo Company has received written notice from any Governmental Authority or other Person that, the use and occupancy of any of the Owned Real Property, as currently used and occupied, and the conduct of the business thereon, as currently conducted, violates in any material respect any applicable law consisting of building codes, zoning, subdivision or other land use or similar laws.

(c)    Section 3.11(c) of the Disclosure Letter lists (i) the street address of each parcel of Leased Real Property, (ii) if applicable, the unit designation of the space leased under the applicable Lease, (iii) the identity of the lessor of each such parcel of Leased Real Property and (iv) if applicable, the identity of each sublessee or occupant other than the Endo Companies at each such parcel of Leased Real Property.  The Endo Company party thereto has a valid leasehold estate in all Leased Real Property, free and clear of all Interests, other than Specified Interests.  Subject to the approval of the Bankruptcy Court pursuant to the Sale Order and the assumption and assignment of the Leases pursuant thereto, to the Knowledge of the Sellers, each of the Leases relating to Leased Real Property (i) is a valid and subsisting leasehold interest of the applicable Endo Company, free of Encumbrances (other than Specified Interests), except as limited by the Bankruptcy Code, (ii) is a binding obligation of the applicable Endo Company, enforceable against such Endo Company in accordance with its terms, and (iii) is in full force and effect.  To the Knowledge of Sellers, following the assumption and assignment of such Leases by Sellers to Buyer in accordance with the provisions of Section 365 of the Bankruptcy Code and the requisite Order of the Bankruptcy Court, there will be no monetary defaults thereunder and no circumstances or events that, with notice or the passage of time or both, would constitute defaults under such leases except, in either instance, for defaults that, individually or in the aggregate, do not or would not reasonably be expected to have a material impact on the use of such property or are unenforceable due to operation of Section 365(b)(2) of the Bankruptcy Code or have been or shall be cured pursuant to Section 365(b)(1) of the Bankruptcy Code and the provisions of this Agreement.

(d)      Except in connection with the already existing Indebtedness, the Endo Companies have not granted to any Person (other than pursuant to this Agreement) any right or option to acquire, occupy or possess any portion of the Real Property, other than as set forth in Section 3.11(d) of the Disclosure Letter.  The Endo Companies' interests with respect to the Leases have not been assigned or pledged and are not subject to any Encumbrances (other than Specified Interests).  No Endo Company has vacated or abandoned any portion of the Real Property or given written notice to any Person of their intent to do the same.

(e)      No Endo Company is a party to or obligated under any option to lease any of the Real Property or any portion thereof or interest therein to any Person other than the Buyer.

(f)      With respect to the Leased Real Property, no Endo Company has given any written notice to any landlord under any of the Leases indicating that it will not be exercising any extension or renewal options under the Leases.  All security deposits required under the Leases have been paid to and are being held by the applicable landlord under the Leases.

Section 3.12      Intellectual Property and Data Privacy.

(a)      Section 3.12(a)(i) of the Disclosure Letter sets forth (i) a true, correct and complete (in all material respects) list of all U.S. and foreign (a) issued Patents and pending Patent applications, (b) registered Trademarks and applications to register any Trademarks, (c) registered Copyrights and applications to register Copyrights, and (d) material domain name registrations, and (ii) a list of unregistered Intellectual Property that is material to the Business, in each case, that are owned by or registered to an Endo Company and included in the Transferred Assets. Except as otherwise set forth in Section 3.12(a)(i) of the Disclosure Letter, Sellers are the sole and exclusive beneficial and record owners of all of the Intellectual Property set forth in Section 3.12(a)(i) of the Disclosure Letter, and all such material issued or registered Intellectual Property is subsisting, enforceable and, to the Knowledge of Sellers, valid.  A Seller exclusively owns, or has a valid and enforceable license or other right to use, all of the Transferred Intellectual Property in the manner used in the conduct of the Business as currently conducted.   The Transferred Intellectual Property constitutes all Intellectual Property owned by the Sellers that is used in the conduct of the Business as currently conducted (other than, for clarity, exclusively in connection with the Excluded Assets), and the Transferred Intellectual Property, together with Intellectual Property licensed or otherwise made available to the Sellers pursuant to the Transferred Contracts, constitutes all Intellectual Property that is material to or otherwise necessary for the conduct of the Business as currently conducted, except as would not be expected to materially impact the Business.

(b)      The conduct of the Business (including the products and services of the Endo Companies) does not Infringe (and, since January 1, 2019, has not Infringed), in any material respect, any Person's Intellectual Property.  There is no material Action pending or, to the Knowledge of Sellers, threatened, against any Endo Company alleging that the conduct of the Business (including the products and services of the Endo Companies) Infringes any Person's Intellectual Property.

(c)      To the Knowledge of Sellers, no Person is Infringing, in any material respect, any Intellectual Property owned by or exclusively licensed to the Endo Companies and included in the

59

Transferred Assets, and no Endo Company, or to Knowledge of Sellers any other Person, has asserted or threatened any Action against any Person alleging that such Person Infringes any such Intellectual Property since January 1, 2019.

(d)    Each Endo Company takes commercially reasonable measures to protect the confidentiality of Trade Secrets included in the Transferred Assets.  To the Knowledge of Sellers, no employee, independent contractor, consultant or agent of any Endo Company has misappropriated any trade secrets or other confidential information of any other Person in the course of the performance of his or her duties as an employee, independent contractor, consultant or agent of an Endo Company.

(e)    No present or former employee, officer or director of any Endo Company, or agent, outside contractor or consultant of any Endo Company, owns or holds any right, title or interest in or to any Transferred Intellectual Property and all Persons involved in the development of any Transferred Intellectual Property have entered into written agreements wherein such Person has assigned all of their right, title and interest in the Transferred Intellectual Property to the applicable Endo Company.

(f)    Since January 1, 2019, the Endo Companies have not experienced any material defects in the Software included in the Transferred Assets that remain unremedied.  Since January 1, 2020, there have been no material failures, crashes, security breaches or other adverse events affecting the software, computer hardware, firmware, networks, interfaces and related systems used by the Endo Companies, which have caused material disruption to the Business or which resulted in the loss of Personal Data that required the notification of the applicable Governmental Authorities and of the affected Persons.  The Endo Companies take commercially reasonable efforts to provide for the back-up and recovery of material data and have implemented commercially reasonable disaster recovery plans, procedures and facilities and, as applicable, have taken all commercially reasonable steps to implement such plans and procedures.

(g)    Since January 1, 2020, the Business has been conducted in compliance with, and the Endo Companies have complied with, in all material respects, all applicable Information Privacy and Security Laws, and the Endo Companies have processed and protected all Personal Data in their possession or control in compliance in all material respects with their published data privacy policies.  Since January 1, 2020, no Endo Company has received any written communication (or, to the Knowledge of Sellers, any other communication) from any Governmental Authority or private party alleging noncompliance in any material respect with any Information Privacy and Security Law or Endo Companies' published data privacy policies.  To the Knowledge of Sellers, there are no facts or circumstances that would require any Endo Company to give notice to any Person of any security breach pursuant to any applicable Information Privacy and Security Laws, to the extent any of such notice has not already been given.

(h)    Since January 1, 2017, the activities, processes, methods, products or services used, manufactured, dealt in or supplied on or before the date of this Agreement by the Business:  (i) do not as of the filing date of the Bidding Procedures Order, nor did they at the time used, manufactured, dealt in or supplied, infringe the Intellectual Property (including, without limitation, moral rights) of another Person, and (ii) have not and shall not give rise to a claim against the Endo Companies, in each case in any material respect.

60

(i)      Since January 1, 2020, to the Knowledge of Sellers, no party to an agreement relating to the use by the Endo Companies of Intellectual Property owned by a third party is, or has at any time been, in material breach of the agreement.

Section 3.13   Taxes.

(a)      Since January 1, 2019, all income and other material Tax Returns (a) relating to the Transferred Assets or the Business and (b) of the Acquired Subsidiaries that were required to be filed have been duly and timely filed, and all such Tax Returns were true, correct and complete in all material respects when filed.  Subject to any obligation of the Sellers under the Bankruptcy Code, since January 1, 2019, all Taxes (x) relating to the Business or the Transferred Assets or (y) for which any Acquired Subsidiary is liable (i) that were due and payable have been duly and timely paid and (ii) that are incurred in or attributable to a Tax period ending on or before the Closing Date or to the Pre-Closing Tax Period and are not yet due and payable, have had adequate provision in accordance with GAAP made for their payment. No representation or warranty is made under this Section 3.13(a) in respect of any Tax Returns due or Taxes arising in connection with the Transaction Steps.

(b)      Since January 1, 2019, no investigation or audit or search and / or seizure or any other proceeding initiated by any Tax authority is pending against the Indian Subsidiaries.

(c)       Since January 1, 2019, all transactions undertaken by the Indian Subsidiaries have been in compliance with the transfer pricing regulations as applicable under the Indian Income Tax Act, 1961.

(d)      There are no Encumbrances for Taxes upon the Transferred Assets other than Permitted Encumbrances described in clause (a) of the definition thereof.

(e)      Paladin Labs Inc. is a registrant for the purposes of (i) the goods and services tax/harmonized sales tax imposed under Part IX of the ETA with registration number 100783950 RT0001; and (ii) the QST, with registration number 1018211650 TQ0001.

(f)      The representations and warranties set forth in this Section 3.13 are the Sellers' sole and exclusive representations with respect to Tax matters in this Agreement.

(g)      The information and documents provided by the Indian Subsidiaries to the independent chartered accountant for the purpose of determination of the fair market value (FMV) of the shares held in the Indian Subsidiaries are true, correct, and complete in all respects, and not misleading.

(h)      The information and documents provided by Par Pharmaceutical Inc. and Par LLC to the independent chartered accountant for the purpose of preparation of the capital gains tax computation in relation to sale of shares held in the Indian Subsidiaries are true, correct, and complete in all respects, and not misleading.

(i)      Par Pharmaceutical Inc. and Par LLC do not have any pending proceedings in relation to Taxes under the Indian Income Tax Act, 1961 and/ or any demands in connection with

61

Taxes under the Indian Income Tax Act, 1961, which may render the sale of any of the Sale Shares void under Section 281 of the Indian Income Tax Act, 1961.

(j)    All representations, facts, documents, and information provided by Par Pharmaceutical Inc. and Par LLC for the purpose of obtaining the Section 281 no-objection certificate are true, correct and complete in all respects, and not misleading.

(k)    No Acquired Subsidiary has ever elected to be nor has any Acquired Subsidiary been notified that it must be a member of a group for value added tax purposes (except where it is grouped with other Acquired Subsidiaries, as applicable). No Acquired Subsidiary has entered into any transactions, schemes or arrangements which give rise to a liability under Sections 590, 623, 625, 625A, or 626 of the Irish Taxes Consolidation Act 1997 (as amended) (the "TCA"); nor has any Acquired Subsidiary entered into any transactions, schemes or arrangements to which Sections 630 to 638 of the TCA apply or could apply. No Acquired Subsidiary has made a claim for group relief or surrendered any amount by way of group relief under the provisions of Sections 411 to 424 and Section 429 TCA. No representation or warranty is made under this Section 3.13(k) in respect of any transactions, schemes or arrangements undertaken as part of the Transaction Steps.

Section 3.14    Regulatory Matters.

(a)    Section 1.1(e) of the Disclosure Letter (which may be updated by the Endo Companies, solely by adding new products, and delivered to the Buyer at any time until the date that is fourteen (14) days after the date hereof) sets forth a true, accurate and complete list of all products manufactured, distributed, marketed or developed by any Endo Company. The Endo Companies, and to the Knowledge of Sellers, each third party that is a contract manufacturer, packager, labeler, importer, exporter, distributor, wholesaler or agent for any Products, are, and at all times after January 1, 2019 were, in all material respects, in compliance with all applicable Health Care Laws to the extent applicable to their activities in respect of the Products or related to the operation or conduct of the Business.  To the Knowledge of Sellers, there are no facts or circumstances that would reasonably be expected to give rise to any failure by the Seller Parent and other Endo Companies to be in compliance, in all material respects, under any applicable Health Care Laws.

(b)    Except as would not, individually or in the aggregate, reasonably be expected to be material to the Business (taken as a whole), the Endo Companies have all Regulatory Approvals (including all Product Approvals) and each such Regulatory Approval is valid and in full force and effect.  The Endo Companies are in compliance in all material respects with, and since January 1, 2019, have fulfilled and performed in all material respects their respective obligations under, each such Regulatory Approval.  There is no action or proceeding by any Governmental Authority pending or, to the Knowledge of the Sellers, threatened seeking the revocation or suspension of any of the Regulatory Approvals, and since January 1, 2019, to the Knowledge of the Sellers, no event has occurred or condition or state of facts exists that would constitute a material breach or default, or would reasonably be expected to cause revocation, termination, suspension or material modification of any of the Regulatory Approvals.  Since January 1, 2019, the Endo Companies have filed with the FDA, Health Canada and any other applicable Governmental Authority all filings, notices, registrations, reports or submissions that are required under any Regulatory Approval or by any Health Care Law to have been filed or obtained as of the filing date of the

Bidding Procedures Order, except as would not, individually or in the aggregate, reasonably be expected to be material to the Business. All such documents were when filed or submitted (or as corrected or completed in a subsequent filing), and continue to be, in material compliance with applicable Health Care Laws and to the Knowledge of the Sellers, no material deficiencies have been asserted by any applicable Governmental Authority with respect to any such filings or Regulatory Approvals since January 1, 2019.

(c)    All Product Regulatory Materials disclosed to Buyer are true, correct and complete in all material respects.

(d)    Since January 1, 2019, the Endo Companies have not received any written notice of adverse finding, written notice of violation, warning letter, untitled letter, regulatory letter, notice of inspectional observations (including Form FDA 483), correspondence regarding the termination or suspension, delay or material modification, of any ongoing clinical or pre-clinical studies or tests, establishment inspection reports or other correspondence or notice from the FDA or any other applicable Governmental Authority that asserts (i) any deficiency in the conduct of any research, formulation, pre-clinical or other testing, clinical trial, investigation, post-market research (including research required by a Governmental Authority) in connection with the Products, or the procurement, possessing, manufacturing, processing, packaging, labeling, holding, distribution, storage, importing, exporting, marketing, promotion, supply or selling of the Products, or (ii) any other lack of compliance with applicable Health Care Laws in connection with the Products. Since January 1, 2019, the Endo Companies have not received written notice from the FDA or any other applicable Governmental Authority of any pending or threatened civil, criminal, administrative or regulatory claim, suit, proceeding, hearing, enforcement, audit, investigation, arbitration, inquiry, search warrant, subpoena, or request for information by any Governmental Authority relating to any violation of applicable Health Care Laws against the Endo Companies or, to the Knowledge of the Sellers, any person that has or is conducting or overseeing any research, development, pre-clinical or clinical testing of the Products, or that manufactures, packages, labels, imports, exports, stores, procures, supplies, distributes, promotes, advertises or sells the Products pursuant to a manufacturing, distribution, supply or other arrangement with the Endo Companies, in each case since January 1, 2019.

(e)    Neither the Endo Companies, nor, to the Knowledge of the Sellers, any member, officer, director, partner, employee, contractor or agent of any of the Endo Companies has made an untrue statement of fact or a fraudulent statement to the FDA or any other Governmental Authority, failed to disclose a fact required to be disclosed to the FDA or any other Governmental Authority, or committed an act, made a statement or failed to make a statement that, at the time such disclosure was made, would reasonably be expected to provide a basis for the FDA to invoke its policy respecting "Fraud, Untrue Statements of Material Facts, Bribery, and Illegal Gratuities", set forth in 56 Fed. Reg. 46191 (September 10, 1991) or for any other Governmental Authority to invoke any applicable policy since January 1, 2019. Neither the Endo Companies nor, to the Knowledge of the Sellers, any member, officer, director, partner, employee, contractor or agent of the Endo Companies has been assessed or threatened with assessment of a civil monetary penalty, debarred or convicted of any crime or engaged in any conduct that would reasonably be expected to result in debarment under 21 U.S.C. Section 335a or any applicable Health Care Laws or exclusion under 42 U.S.C. Section 1320a 7 or any applicable Health Care Laws since January 1, 2019. Neither the Endo Companies nor, to the Knowledge of the Endo Companies, any member,

63

officer, director, partner, employee or agent of the Endo Companies, are subject to any proceeding by any Governmental Authority that would reasonably be expected to result in such suspension, exclusion or debarment and to the Knowledge of the Sellers, there are no facts that would reasonably be expected to give rise to such suspension, exclusion or debarment.  Except for the (i) Bankruptcy Cases and any Order entered by the Bankruptcy Court and (ii) the Canadian Recognition Case and any Order entered by the Canadian Court, the Endo Companies are not currently, and have not been, since January 1, 2019, (i) a party to any consent decree, judgment, order, or settlement, or any actual or potential settlement agreement, corporate integrity agreement or certification of compliance agreement, or (ii) a defendant or named party in any unsealed qui tam/False Claims Act litigation, in each case that relates to the Products.

(f)     To the Knowledge of the Sellers, since January 1, 2019, the Endo Companies have not received any notice or other correspondence from the FDA, any other Governmental Authority or any safety oversight board commencing, or threatening to initiate, any action to place a clinical hold order on, or to terminate, delay, suspend, or materially modify any proposed or ongoing clinical or pre-clinical studies or tests sponsored by or conducted on behalf of the Endo Companies relating to any Product.

(g)     All manufacturing, packaging, labeling, storage, handling, importing and distributing operations conducted by or on behalf of the Endo Companies related to the Products have been, since January 1, 2019, and are being conducted, in all material respects, in accordance with all Health Care Laws, including all good manufacturing practice requirements for the Products and there has not been any notice or other correspondence from the FDA or any other Governmental Authority to recall, suspend or otherwise restrict the sale or manufacture of the Products since January 1, 2019.  Except as would not, individually or in the aggregate, reasonably be expected to be material to the Business (taken as a whole), since January 1, 2019, the Endo Companies have not either voluntarily or involuntarily initiated, conducted or issued, or caused to be initiated, conducted or issued, any recall, field notifications, field corrections, market withdrawal or replacement, safety alert, warning, "dear doctor" letter, investigator notice, or other notice or action relating to an alleged lack of safety, efficacy or regulatory compliance (to the extent applicable in the jurisdiction of their operations) of any Product ("Recall").  To the Knowledge of the Sellers, there are no facts that are reasonably likely to cause the Recall of any Product.

Section 3.15   Environmental Matters.

(a)     The Endo Companies and the Business are, and since January 1, 2020 have been, in compliance with all applicable Environmental Laws in all material respects.

(b)     The Sellers, the Indian Subsidiaries and the Business are in possession of, and have since January 1, 2020 been, in compliance with all Environmental Permits required in connection with the conduct or operation of the Business and the ownership or use of the Transferred Assets in all material respects as currently conducted, operations and held.  All such Environmental Permits are in full force and effect and to the Knowledge of the Sellers, there is no claim or action currently pending or threatened that is or would reasonably be expected to result in a Material Adverse Effect.  Neither Seller Parent nor any of its Subsidiaries has received any written notice

64

regarding the revocation, suspension or material amendment of any Environmental Permit that would, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(c)    There is no Environmental Claim that is pending or, to the Knowledge of Sellers, threatened in writing or any basis for an Environmental Claim, against Seller Parent or any other Endo Company that would, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.    No Endo Company is subject to any Order imposed by any Governmental Authority pursuant to Environmental Laws.

(d)    No Hazardous Materials have been Released or permitted to be Released by any Endo Company, and to the Knowledge of Sellers, no Hazardous Materials are present on, at, in or under any real or immoveable property currently or formerly owned, leased or used by any of the Endo Companies (including the Acquired Owned Real Property and the Acquired Leased Real Property), in each case, in violation of or in excess of applicable limits pursuant to Environmental Laws that would reasonably be expected to result in any material Liability to the Endo Companies under Environmental Laws.

(e)    Copies of all reports and other material documents relating to the environmental matters affecting the Endo Companies, the Transferred Assets or any real or immoveable property currently or formerly owned, leased or used by any of the Endo Companies (including the Acquired Owned Real Property and the Acquired Leased Real Property) which are in the possession or under the control of the Endo Companies have been provided to the Buyer.  To the Knowledge of Sellers, there are no other reports or material documents relating to environmental matters affecting the Endo Companies, the Transferred Assets or any real or immoveable property currently or formerly owned, leased or used by any of the Endo Companies (including the Acquired Owned Real Property and the Acquired Leased Real Property) which have not been made available to the Buyer.

Section 3.16    Material Contracts.

(a)    Except as disclosed in any Company Report filed and publicly available or as set forth on Section 3.16 of the Disclosure Letter, or to the extent any such Contracts constitute Employee Plans, as of the filing date of the Bidding Procedures Order no Endo Company is party to or bound by (each such Contract, a "Material Contract" and collectively, the "Material Contracts"):

(i)    Contracts with any Affiliate or current or former officer or director of any Endo Company (other than employment-related Contracts or Employee Plans).

(ii)    Contracts relating to any material business, equity or asset acquisition by any Endo Company or any disposition of any significant portion of the business, equity or assets of any Endo Company (in each case other than acquisitions or dispositions involving aggregate payments of less than $1,000,000 or the acquisition, sale or disposition of Inventory in the Ordinary Course of Business), in each case, since January 1, 2022;

(iii)    any Contract that (A) relates to Indebtedness under clauses (a) or (b) of the definition thereof of any Endo Company; (B) relates to the mortgaging or pledging of, or otherwise placing an Encumbrance (other than a Permitted Encumbrance) on, any of the assets or properties of any Endo Company; or (C) is in the nature of a capital or direct financing lease that is required

65

by GAAP to be treated as a long-term liability involving payments above $1,000,000 annually, in each case other than any Contract under which the Liabilities of the applicable Endo Company will be fully discharged under the Bankruptcy Code;

(iv)    any Collective Bargaining Agreement;

(v)    any Contract pursuant to which an Endo Company (A) is granted or obtains or agrees to grant or obtain any right to use or otherwise exploit any Intellectual Property that is material to the Business, (B) is restricted in its right to use or register any Intellectual Property included in the Transferred Assets that is material to the Business, or (C) permits or agrees to permit any other Person to use, enforce or register any material Intellectual Property included in the Transferred Assets, including any such license agreements, coexistence agreements and covenants not to sue; in each case excluding any Contracts (i) containing non-exclusive licenses of Intellectual Property relating to the development, manufacture, marketing, advertising, promotion, distribution, sale or other commercialization of Products entered into in the Ordinary Course of Business, in each case that are not individually material to the Business or (ii) entered into for commercially available "off-the-shelf" Software licensed to a Seller on a non-exclusive basis;

(vi)    any Contract or consent decree with or from any Governmental Authority;

(vii)    any Contract that imposes on any Endo Company or any of their respective Affiliates (including Buyer and its Affiliates following the Closing) (other than those contained in confidentiality agreements or similar Contracts) (A) any restriction on soliciting customers or employees or any non-competition restrictions, (B) any restriction on entering into any line of business, or from freely providing services or supplying products to any customer or potential customer, or in any part of the world, (C) a "most favored nation" pricing provision or exclusive marketing or distribution rights relating to any products or territory or minimum purchase obligations or exclusive purchase obligations with respect to any goods or services binding such Endo Company or its Affiliates in favor of the counterparty, or (D) other than restrictions that will cease to be effective on and after the Closing, any restriction on either the payment of dividends or distributions or the incurrence of Encumbrances on the property or assets of any Endo Company;

(viii)    any Contract with the customers and suppliers required to be listed on Section 3.18(a) or Section 3.18(b) of the Disclosure Letter;

(ix)    any Contract with a sole source supplier, pursuant to which such supplier provides to an Endo Company equipment, materials or services that are necessary for the sale, performance, manufacturing or support of the Business;

(x)    any irrevocable power of attorney given by any Endo Company to any Person for any purpose whatsoever with respect to any Endo Company; and

(xi)    any agreement relating to any strategic alliance, joint development, joint marketing, partnership, joint venture or similar arrangement (including any such Contract involving a sharing of revenues, profits, losses, costs or liabilities).

(b)      Except as set forth on Section 3.16(b) of the Disclosure Letter, Sellers have made available to Buyer a true, correct and complete copy of each Material Contract, as amended to date. As of the filing date of the Bidding Procedures Order, each Material Contract is, and as of the Closing Date and subject to approval of the Bankruptcy Court, assuming payment of the Cure Claims, each Transferred Contract will be, valid and binding on the Endo Companies and, to the Knowledge of the Sellers, the counterparties thereto, and in full force and effect, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and by general principles of equity (regardless of whether considered in a proceeding in equity or at law).  As of the filing date of the Bidding Procedures Order, to the Knowledge of the Sellers, no party has repudiated in writing any material provision of a Material Contract or given written notice that a Material Contract has terminated or will be terminating and, excluding the effect of the Bankruptcy Cases, no Endo Company is in breach of, or default under, in any material respect, a Material Contract to which it is a party.  As of the filing date of the Bidding Procedures Order, except for violations, breaches or defaults which have been cured and for which no Endo Company has any Liability, or which will be cured as a result of the payment of the applicable Cure Claims, no Endo Company and, to the Knowledge of the Sellers, no other party to any Material Contract, has breached or defaulted in any material respect under, or has improperly terminated, revoked or accelerated, any Material Contract, and there exists no condition or event which, after notice, lapse of time or both, would constitute any such breach, default, termination, revocation or acceleration, in each case as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(c)      Section 3.16(c) of the Disclosure Letter lists each material insurance policy maintained by the Endo Companies as of the filing date of the Bidding Procedures Order, and the deductibles and coverage limits for each such policy.  To the Knowledge of Sellers, (a) the Endo Companies own or hold policies of insurance, or are self-insured, of the types and in amounts providing reasonably adequate coverage against all risks customarily insured against by companies in similar lines of business as the Endo Companies or as may otherwise be required by applicable Law and (b) all such insurance policies are in full force and effect except for any expiration thereof in accordance with the terms thereof occurring after the date of this Agreement.  The Endo Companies have not received written notice of cancelation or modification with respect to such insurance policies other than in connection with ordinary renewals, and there is no existing default or event which, with the giving of notice or lapse of time or both, would constitute a default by any insured thereunder.  All premiums in respect of each insurance policy maintained by the Endo Companies have been paid, or will be paid, when due.  There is no claim pending under any such insurance policies as to which coverage has been questioned, denied or disputed by the underwriters of such policies.

Section 3.17   Accounts Receivable; Inventory.

(a)      The accounts receivable shown in the Seller Financial Statements or that constitute Transferred Assets arose in the Ordinary Course of Business.  Allowances for doubtful accounts set forth in the Seller Financial Statements have been prepared and recorded in accordance with GAAP and in accordance with the past practices of the Endo Companies.  The accounts receivable constituting Transferred Assets are not subject to any material claim of offset, recoupment, set off or counter-claim and, to the Knowledge of the Sellers, there are no specific facts or circumstances that would give rise to any such claim in any such case, except to the extent collected or otherwise

reflected in the allowances for doubtful accounts or returns reserve as provided for in the Seller Financial Statements.

(b)        The Inventory is, in all material respects, of a quality and quantity usable and, in the case of finished goods, saleable, in the Ordinary Course of Business, except for obsolete, damaged, defective or slow moving items as reflected in the reserves in the Seller Financial Statements.

(c)        Section 3.17(c) of the Disclosure Letter contains a true and correct representation of the Inventory of each Product and the expiration dates of each Product as of date hereof. The Sellers have good and marketable title to the Inventory of the Products free and clear of all Encumbrances (other than Permitted Encumbrances).  The Inventory of the Products have and will have been manufactured, tested, packaged, labelled and stored in material compliance with applicable Laws and binding guidelines, including applicable current good manufacturing practices as prescribed by Law, from time to time, and the relevant product specifications.  The Inventory levels have been maintained at the amounts required for the operations of the Business as historically conducted and such Inventory levels are adequate for such operations.

Section 3.18    Customers and Suppliers.

(a)        Listed in Section 3.18(a) of the Disclosure Letter are the ten (10) largest customers of the Business, taken as a whole by revenue for the year ended December 31, 2021.  No Endo Company has received any written notice, or to the Knowledge of the Sellers, oral notice, that any of the customers listed on Section 3.18(a) of the Disclosure Letter has materially decreased since January 1, 2021, or will materially decrease, its purchase of the products, equipment, goods and services of the Business.  To the Knowledge of Sellers, there has been no termination, cancellation, or material limitation of, or any material modification or change in, the business relationship between any Endo Company, and any customer listed on Section 3.18(a) of the Disclosure Letter.

(b)        Listed in Section 3.18(b) of the Disclosure Letter are the ten (10) largest suppliers of services, raw materials, supplies, merchandise and other goods for the Business, taken as a whole by cost for the year ended December 31, 2021.  No Endo Company has received any written notice or, to the Knowledge of the Sellers, oral notice that any such supplier will not provide such services or sell such raw materials, supplies, merchandise and other goods to the Business at any time after the Closing on terms and conditions materially similar to those used in its current sales to the Endo Companies, subject only to general and customary price increases or decreases and the effects of the filing and administration of the Bankruptcy Cases.

Section 3.19    Certain Payments.    Since January 1, 2020, no Endo Company (nor, to the Knowledge of the Sellers, any of their respective directors, executives, representatives, agents or employees, in the course of their actions for, or on behalf of, any of the Sellers or the Indian Subsidiaries) (a) has used or is using any corporate funds for any illegal contributions, gifts, entertainment or other unlawful expenses relating to political activity; (b) has used or is using any corporate funds for any direct or indirect unlawful payments to any foreign or domestic governmental officials or employees; (c) has violated or is violating any material provision of the Foreign Corrupt Practices Act of 1977, Irish Criminal Justice (Corruption Offences) Act 2018, Irish Ethics in Public Office Acts 1995 and 2001, Irish Proceeds of Crime Acts 1996 – 2016, Irish

68

Criminal Justice (Theft and Fraud Offences) Act 2001, the United Kingdom Bribery Act 2010 and the (Indian) Prevention of Corruption Act, 1988; (d) has established or maintained, or is maintaining, any unlawful fund of corporate monies or other properties; or (e) has made any bribe, unlawful rebate, payoff, influence payment, kickback or other unlawful payment of any nature to any foreign or domestic government official or employee.

Section 3.20    Brokers.    Except for PJT Partners LP, Evercore Group LLC, Perella Weinberg Partners L.P., Ducera Partners LLC and Houlihan Lokey Capital, Inc., the fees, commissions and expenses of which will be paid by the Endo Companies, in each case, in accordance with the terms of any executed engagement letter or reimbursement agreement previously agreed to by the Debtors in writing (all of which have been delivered to the Buyer), no broker, finder or investment banker engaged by or on behalf of the Endo Companies is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated hereby.

Section 3.21    Exclusivity of Representations and Warranties.    EXCEPT FOR THOSE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN THIS ARTICLE III, NO SELLER OR ANY OF ITS AFFILIATES, OR ANY OF THEIR RESPECTIVE REPRESENTATIVES, DIRECTORS, MANAGERS, PARTNERS, OFFICERS OR DIRECT OR INDIRECT EQUITYHOLDERS HAS MADE OR MAKES, AND BUYER HAS NOT RELIED UPON, ANY REPRESENTATIONS OR WARRANTIES, WHETHER EXPRESS OR IMPLIED, OF ANY NATURE WHATSOEVER, WITH RESPECT TO ANY SELLER OR ANY OF ITS AFFILIATES, THE TRANSFERRED ASSETS, THE ASSUMED LIABILITIES OR THE BUSINESS, OR ANY MATTER RELATING TO ANY OF THEM, INCLUDING THEIR RESPECTIVE BUSINESS, AFFAIRS, ASSETS, LIABILITIES, FINANCIAL CONDITION OR RESULTS OF OPERATIONS, OR WITH RESPECT TO THE ACCURACY OR COMPLETENESS OF ANY OTHER INFORMATION PROVIDED OR MADE AVAILABLE TO BUYER OR ANY OF ITS AFFILIATES, OR ANY OF THEIR RESPECTIVE REPRESENTATIVES BY OR ON BEHALF OF SELLERS, OR OTHERWISE IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED HEREBY, AND ANY SUCH REPRESENTATIONS OR WARRANTIES ARE EXPRESSLY DISCLAIMED. EXCEPT TO THE EXTENT SET FORTH IN THOSE REPRESENTATIONS AND WARRANTIES SET FORTH IN THIS ARTICLE III, NONE OF SELLERS OR ANY OF THEIR AFFILIATES, OR ANY OTHER PERSON OR ENTITY ON BEHALF OF SELLERS OR ANY OF THEIR AFFILIATES, HAS MADE OR MAKES ANY REPRESENTATION OR WARRANTY, WHETHER EXPRESS OR IMPLIED, WITH RESPECT TO ANY PROJECTIONS, FORECASTS, ESTIMATES OR BUDGETS MADE AVAILABLE TO BUYER OR ANY OF ITS AFFILIATES OR ANY OF THEIR RESPECTIVE REPRESENTATIVES OF FUTURE REVENUES, FUTURE RESULTS OF OPERATIONS (OR ANY COMPONENT THEREOF), FUTURE CASH FLOWS OR FUTURE FINANCIAL CONDITION (OR ANY COMPONENT THEREOF) OF SELLERS OR ANY OF THEIR AFFILIATES OR OF THE BUSINESS (INCLUDING THE REASONABLENESS OF THE ASSUMPTIONS UNDERLYING ANY OF THE FOREGOING), WHETHER OR NOT INCLUDED IN ANY MANAGEMENT PRESENTATION OR IN ANY OTHER INFORMATION MADE AVAILABLE TO BUYER, ITS AFFILIATES OR ANY OF THEIR RESPECTIVE REPRESENTATIVES OR ANY OTHER PERSON, AND ANY SUCH REPRESENTATIONS OR WARRANTIES ARE EXPRESSLY DISCLAIMED.

**ARTICLE IV**
**REPRESENTATIONS AND WARRANTIES OF THE BUYER**

The Buyer represents and warrants to the Endo Companies as of the date hereof and as of the Closing Date (or, as to those representations and warranties that address matters as of particular dates, as of such dates), as follows:

Section 4.1    Organization. The Buyer is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and has all necessary corporate (or equivalent) power and authority to carry on its business as it is now being conducted, except (other than with respect to Buyer's due incorporation and valid existence) as would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Buyer's ability to consummate the transactions contemplated by this Agreement and perform its obligations hereunder and under any Ancillary Agreement. As of the execution of this Agreement, the Buyer has made available to Seller Parent a copy of its Organizational Documents, as in effect as of such date, and is not in violation of any provision of such documents, except as would not reasonably be expected to be material to the Buyer.

Section 4.2    Authority. The Buyer has the corporate power and authority to execute and deliver this Agreement and each of the Ancillary Agreements to which it is or will be a party, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The Buyer has obtained the requisite approvals of the Required Holders, including a duly executed copy of the Direction Letter, and no further authorization or approval is required for Buyer to execute and deliver this Agreement and each of the Ancillary Agreements to which it is or will be a party, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance by the Buyer of this Agreement and each of the Ancillary Agreements to which it will be a party and the consummation by the Buyer of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary corporate action and no other proceedings on the part of the Buyer is necessary to authorize such execution, delivery or performance. This Agreement has been, and upon their execution each of the Ancillary Agreements to which the Buyer will be a party will have been, duly executed and delivered by the Buyer and assuming due execution and delivery by each of the other parties hereto and thereto, this Agreement constitutes, and upon their execution each of the Ancillary Agreements to which the Buyer will be a party will constitute, the valid and binding obligations of the Buyer, enforceable against the Buyer in accordance with their respective terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and by general principles of equity (regardless of whether considered in a proceeding in equity or at law).

Section 4.3    No Conflict; Required Filings and Consents.

(a)    The execution, delivery and performance by the Buyer of this Agreement and each of the Ancillary Agreements to which the Buyer will be a party, and the consummation of the transactions contemplated hereby and thereby, or compliance by the Buyer with any of the provisions hereof, (i) do not and will not conflict with, result in any breach of, constitute a default (or an event that, with notice or lapse of time or both, would become a default) under, or give rise to a right of termination, modification, notice or cancellation or require any consent of any Person

70

pursuant to (A) the Organizational Documents of the Buyer, (B) any Law applicable to the Buyer or by which any property or asset of the Buyer are bound or affected, (C) any Order of any Governmental Authority or (D) any material contract or agreement to which the Buyer is a party, except, in the case of clause (B), (C) or (D), for any such conflicts, violations, breaches, defaults or other occurrences that would not, individually or in the aggregate, reasonably be expected to have a Buyer Material Adverse Effect or (ii) do not and will not result in the creation of (or give rise to the right of any Person to require the grant of) any Encumbrance upon any of the assets of the Buyer, except as expressly contemplated by this Agreement or as would not, individually or in the aggregate, reasonably be expected to have a Buyer Material Adverse Effect.

(b)    The Buyer is not required to file, seek or obtain any notice, authorization, approval, order, permit or consent of or with any Governmental Authority in connection with the execution, delivery and performance by the Buyer of this Agreement and each of the Ancillary Agreements to which it will be a party or the consummation of the transactions contemplated hereby or thereby, except for (i) any filings required to be made for Regulatory Approval under the HSR Act, the Competition Act or other applicable Law or Antitrust Law, as well as any foreign direct investment filings required to be made in India pursuant to the (Indian) Consolidated Foreign Direct Investment Policy, 2020, the Foreign Exchange Management (non-Debt Instruments) Rules, 2019 or any rule, regulation, notification, press note released by the Department for Promotion of Industry and Internal Trade, Government of India or in Ireland or other jurisdictions, (ii) other filings to be made to the Government of India and the Irish Minister for Enterprise, Trade and Employment in respect of the transfer of the Specified Equity Interests and/or the Transferred Assets, or (iii) where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, would not, individually or in the aggregate, reasonably be expected to have a Buyer Material Adverse Effect.

(c)    The execution, delivery and performance by the Buyer of this Agreement and each of the Ancillary Agreements to which the Buyer will be a party, and the consummation of the transactions contemplated hereby and thereby, or compliance by the Buyer with any of the provisions hereof does not require an approval of the Government of India under Press Note No. 3 (2020 series) dated April 17, 2020 read with Rule 6(a) of the the Foreign Exchange Management (Non-debt Instruments) Rules, 2019.

Section 4.4    Brokers.  The fees, commissions and expenses of any broker, finder or investment banker engaged by or on behalf of the Buyer in connection with the transactions contemplated hereby will be paid by the Buyer.  Notwithstanding the foregoing, and solely to the extent required by the terms of an executed engagement letter with the Debtors, the fees, commissions and expenses of Evercore Group LLC will be paid by the Endo Companies.

Section 4.5    Credit Bid.

(a)    The Required Holders own, of record and beneficially, obligations in a sufficient amount of the aggregate obligations outstanding under the Prepetition First Lien Indebtedness to direct the First Lien Collateral Trustee pursuant to an Act of Required Secured Parties (as defined in the Collateral Trust Agreement) to (x) direct the First Lien Collateral Trustee to exercise and enforce its interests, rights, powers and remedies in respect of the Collateral (as defined in the Collateral Trust Agreement) and under the Security Documents (as defined in the Collateral Trust

Agreement) and applicable Law, by credit bidding up to the full amount of the outstanding Secured Obligations (as defined in the Collateral Trust Agreement) as provided in <u>Section 2.7</u> of this Agreement and, if necessary, to appoint Buyer as its agent pursuant to Section 5.2 of the Collateral Trust Agreement to exercise all interests, rights, powers and remedies of the Collateral Trustee under the Collateral Trust Agreement and the applicable Security Documents (as defined in the Collateral Trust Agreement) to credit bid, (y) appoint Buyer as its delegate pursuant to Section 12.1 of each Receivables Pledge Agreements (as defined in the Direction Letter) and reasonably cooperate with such steps necessary to release the Pledge (as defined in the Receivables Pledge Agreements) created under the Receivables Pledge Agreements on the applicable collateral in satisfaction of the Secured Obligations secured thereby, and reasonably cooperate with such steps necessary to transfer, convey, charge or assign the applicable collateral to facilitate the enforcement of the Pledge on such applicable collateral, and (z) reasonably cooperate with the Required Holders and the Buyer with respect to any actions necessary or required in furtherance of the credit bit or any other aspect of the Sale Order.

(b)    On the date this Agreement is executed, Buyer has provided to Seller Parent a duly executed copy of the Direction Letter, which has been delivered by the Required Holders, as holders of the Prepetition First Lien Indebtedness, to the First Lien Collateral Trustee, on or prior to the filing of the Bidding Procedures Motion, which directed the First Lien Collateral Trustee to (x) credit bid up to the full amount of the outstanding Secured Obligations as contemplated by <u>Section 2.7</u>, and, if necessary, to assign such right to credit bid to Buyer, (y) cooperate with the Sellers in order to sell, assign, transfer, convey and deliver any assets subject to the Transaction Steps and (z) take any other actions (including enforcing security as approved by the Bankruptcy Court to the extent such approval is required) necessary to implement and consummate the transactions contemplated hereby, including the credit bid contemplated in <u>Section 2.7</u>.  Without the prior written consent of Seller Parent, the Direction Letter has not been amended in any way that would have an adverse impact to Buyer's ability to perform and comply with this Agreement and consummate the transactions contemplated hereby.

Section 4.6    <u>Buyer's Investigation and Reliance</u>.

(a)    The Buyer is a sophisticated purchaser and has made its own independent investigation, review and analysis regarding the Business, the Transferred Assets, the Assumed Liabilities and the transactions contemplated hereby, which investigation, review and analysis was conducted by the Buyer together with expert advisors, including legal counsel, that it has engaged for such purpose.  The Buyer and its Representatives have been provided with reasonable access to the Representatives, properties, offices, plants and other facilities, books and records of the Endo Companies relating to the Business and other information that they have requested in connection with their investigation of the Business, the Transferred Assets, the Assumed Liabilities and the transactions contemplated hereby.  In entering into this Agreement, the Buyer acknowledges that it has relied solely upon (i) the aforementioned investigation, review and analysis and (ii) the representations and warranties set forth in <u>Article III</u> (and is not relying on any other factual representations or opinions of the Sellers or its representatives).  The Buyer acknowledges that, should the Closing occur, the Buyer shall acquire the Business and the Transferred Assets without any surviving representations or warranties, on an "as is" and "where is" basis and, other than the representations and warranties of the Endo Companies set forth in <u>Article III</u>, none of the Endo Companies, any of their Affiliates, or any of their respective officers, directors, employees, agents,

Representatives or direct or indirect equityholders make or have made any representation or warranty, express or implied, at law or in equity, as to any matter whatsoever relating to the Business, the Transferred Assets, the Assumed Liabilities or any other matter relating to the transactions contemplated by this Agreement including as to: (a) merchantability or fitness for any particular use or purpose; (b) the operation of the Business by the Buyer after the Closing in any manner; or (c) the probable success or profitability of the Business after the Closing. Except as expressly set forth in the representations and warranties of the Endo Companies set forth in Article III, none of the Endo Companies, any of their Affiliates or any their respective officers, directors, employees, agents, Representatives or stockholders will have or, except in the case of Fraud, will be subject to any Liability or indemnification obligation to the Buyer or any other Person resulting from the distribution to the Buyer or its Affiliates or Representatives of, or the Buyer's use of, any information relating to the Business or any other matter relating to the transactions contemplated by this Agreement, including any descriptive memoranda, summary business descriptions or any information, documents or material made available to the Buyer or its Affiliates or representatives, whether orally or in writing, in certain "data rooms," management presentations, functional "break-out" discussions, responses to questions submitted on behalf of the Buyer or in any other form in expectation of the transactions contemplated by this Agreement. The Buyer acknowledges and agrees that the representations and warranties of the Endo Companies in Article III are the result of arms' length negotiations between sophisticated parties, and that the First Lien Collateral Trustee give any representations or warranties in connection with this Agreement.

(b)    The Buyer has such knowledge in financial and business matters that it is fully capable of evaluating the merits and risks of acquiring the Specified Equity Interests. The Buyer acknowledges that it is able to fend for itself in the transaction contemplated by this Agreement and that it has the ability to bear the economic risk of acquiring the Specified Equity Interests. The Specified Equity Interests were not offered to the Buyer through, and the Buyer is not aware of, any form of general solicitation or general advertising, including, without limitation, (i) any advertisement, articles, notice or other communication published in any newspaper, magazine or similar media or broadcast over television or radio, and (ii) any seminar or meeting whose attendees have been invited by any general solicitation or general advertising. The Buyer understands that the Specified Equity Interests are not registered and therefore are "restricted securities" under the federal securities laws inasmuch as they are being acquired from the Endo Companies in a transaction not involving a public offering, and that, under such laws and applicable regulations, such securities may not be transferred or resold without registration under the Securities Act or pursuant to an exemption therefrom. In this connection the Buyer represents that it is familiar with Rule 144 under the Securities Act, and understands the resale limitations imposed thereby and by the Securities Act.

**ARTICLE V**
**COVENANTS**

Section 5.1    Conduct of Business Prior to the Closing.

(a)    Except (1) as otherwise contemplated by this Agreement, (2) as set forth in Section 5.1 of the Disclosure Letter, (3) as required by the Bankruptcy Code or by Order of the Bankruptcy Court (it being understood that no provision of this Section 5.1 will require the Endo

73

Companies to make any payment to any of its creditors with respect to any amount owed to such creditors on the Petition Date or which would otherwise violate the Bankruptcy Code), (4) as otherwise required by Law or any Order including, solely in respect of the Canadian Sellers, any Order of the Canadian Court, or (5) with the prior written consent of the Buyer, from the date hereof until the Closing Date, the Endo Companies shall:

(i)        conduct the Business in the Ordinary Course of Business; and

(ii)       use commercially reasonable efforts to preserve the Business, the Endo Companies' relationships with third parties (including creditors, lessors, licensors, customers, suppliers, distributors, Business Employees, and others with whom the Endo Companies deal in the Ordinary Course of Business).

Notwithstanding the foregoing, no action or failure to take action with respect to matters specifically addressed by any of the provisions of Section 5.1(b) shall constitute a breach under this Section 5.1(a) unless such action or failure to take action would constitute a breach of such provision of Section 5.1(b) and this Section 5.1(a).

(b)       Except (1) as otherwise contemplated by this Agreement, (2) as set forth in Section 5.1 of the Disclosure Letter, (3) as required by the Bankruptcy Code or by Order of the Bankruptcy Court (it being understood that no provision of this Section 5.1 will require the Endo Companies to make any payment to any of its creditors with respect to any amount owed to such creditors on the Petition Date or which would otherwise violate the Bankruptcy Code), (4) as otherwise required by Law or any Order including, solely in respect of the Canadian Sellers, any Order of the Canadian Court or (5) with the prior written consent of the Buyer (which consent, solely in respect of actions set forth in Sections 5.1(b)(vi), 5.1(b)(vii), 5.1(b)(viii), 5.1(b)(ix), 5.1(b)(x), 5.1(b)(xi), and 5.1(b)(xv)) will not be unreasonably withheld), from the date hereof until the Closing Date or earlier termination of this Agreement, the Endo Companies shall not:

(i)        sell, transfer, lease, sublease or otherwise dispose of any Transferred Assets in excess of $500,000 individually or $5 million in the aggregate on a 12-month rolling basis, other than Inventory sold or disposed of in the Ordinary Course of Business; provided, however, that any such sale or disposition of Transferred Assets shall not entail the payment or other transfer of any cash by the applicable Endo Company and any applicable Prepetition Liens (as defined in the Cash Collateral Order) shall attach to the proceeds of such sale or disposition in accordance with applicable Law;

(ii)       acquire any corporation, partnership, limited liability company, other business organization or division or material portion of the assets thereof (other than acquisitions of assets that do not require the Buyer to pay more than a de minimis amount of additional cash consideration in connection with the transactions contemplated by this Agreement);

(iii)      merge or consolidate with or into any legal entity, dissolve, liquidate or otherwise terminate its existence;

(iv)       engage in any investment, declare or make any dividend or incur Indebtedness (other than Indebtedness incurred in the Ordinary Course of Business including any trade credits or advances);

74

(v)    redeem or make or declare any dividends, distributions, or other payments on account of Equity Interests, or otherwise make any transfers or payments on account of Equity Interests, except as otherwise approved in an Order of the Bankruptcy Court

(vi)    other than in the Ordinary Course of Business, enter into, terminate, amend or otherwise modify any Material Contract;

(vii)    permit any Encumbrance on the Transferred Assets other than Permitted Encumbrances or Encumbrances that will be removed by operation of the Sale Order;

(viii)    other than in the Ordinary Course of Business, amend, waive or otherwise modify in any material respect or terminate any Transferred Contract or modify, waive, release or assign any material rights or claims thereunder, in each case whether in connection with any extension, renewal or replacement of such Transferred Contract, or otherwise;

(ix)    other than as required by applicable Law, or required by the terms of any Employee Plan, Contract or Collective Bargaining Agreement, (A) enter into, establish, adopt, materially amend or terminate any Employee Plan (or any arrangement that would be an Employee Plan if in effect on the date of date hereof), except for non-material modifications to Employee Plans in the Ordinary Course of Business and actions permitted by the following clause (B), (B) grant, announce or effectuate any increase or modification in the salaries, bonuses or other compensation and benefits payable or to become payable to any Business Employee, except for such actions in the Ordinary Course of Business for Business Employees with annual base salary or annual wage rate of less than $350,000 or (C) other than in the Ordinary Course of Business for individuals with annual base compensation of less than $350,000, hire or promote any Business Employee (or any individual who would be a Business Employee if employed on the date hereof) or engage any individual independent contractor to service the Business or terminate the employment of any Business Employee other than in the Ordinary Course of Business;

(x)    unless required by applicable Law or the terms of any Collective Bargaining Agreement, (i) modify, extend or enter into any Collective Bargaining Agreement, or (ii) recognize or certify any labor union, labor organization, works council, or group of employees as the bargaining representative for any Business Employees;

(xi)    institute any Action other than in the Ordinary Course of Business, including any Action concerning any material Intellectual Property included in the Transferred Assets;

(xii)    make, revoke or change any material election relating to Taxes of the Business or Transferred Assets;

(xiii)    make any change in any method of accounting or accounting practice or policy, except as required by applicable Law or GAAP;

(xiv)    amend or otherwise modify their Organizational Documents;

(xv)    (A) other than in the Ordinary Course of Business, reject or terminate any Material Contract or seek Bankruptcy Court approval to do so, or (B) fail to use commercially

reasonable efforts to oppose any action by a third party to terminate (including any action by a third party to obtain Bankruptcy Court approval to terminate) any Material Contract;

(xvi)    with respect to any Transferred Asset, (A) agree to allow any form of relief from the automatic stay in the Bankruptcy Cases (other than pursuant to the Sale Order); or (B) fail to oppose any action by a third party to obtain relief from the automatic stay in the Bankruptcy Cases, unless such relief would have a *de minimis* impact on the transactions contemplated by this Agreement; or

(xvii)    agree, authorize or commit to take any of the foregoing actions.

(c)    Except (1) as otherwise contemplated by this Agreement, (2) as set forth in Section 5.1 of the Disclosure Letter, (3) as required by the Bankruptcy Code or by Order of the Bankruptcy Court (it being understood that no provision of this Section 5.1 will require the Endo Companies to make any payment to any of its creditors with respect to any amount owed to such creditors on the Petition Date or which would otherwise violate the Bankruptcy Code), (4) as otherwise required by Law or any Order including, solely in respect of the Canadian Sellers, any Order of the Canadian Court, or (5) with the prior written consent of the Buyer, from the date hereof until the Closing Date or earlier termination of this Agreement, the Endo Companies shall not:

(i)    pursue or seek, or fail to oppose any third party in pursuing or seeking, a conversion of the Bankruptcy Cases to cases under chapter 7 of the Bankruptcy Code, the appointment of a trustee under chapter 11 or chapter 7 of the Bankruptcy Code and/or the appointment of an examiner with expanded powers;

(ii)    file or support another party in filing (which support, for the avoidance of doubt, shall not include complying with discovery or diligence requests by parties in interest) with the Bankruptcy Court or any other court (A) a motion, application, pleading, or proceeding challenging the amount, validity, enforceability, extent, perfection, or priority of, or seeking avoidance or subordination of, any Claim held by any Consenting First Lien Creditor against the Endo Companies or any liens or security interests securing such Claim, or (B) a motion, application, pleading or proceeding asserting (or seeking standing to assert) any purported Claims or causes of action against any of the Consenting First Lien Creditors, or take corporate action for the purpose of authorizing any of the foregoing, other than in connection with, arising out of or related to the Consenting First Lien Creditors' breach of the Restructuring Support Agreement;

(iii)    issue, sell, encumber or grant any stock, equity or voting interests of any of the Endo Companies;

(iv)    waive, release, assign, institute, compromise or settle any litigation related to any Endo Company involving cash payment by any Endo Company in excess of $250,000 individually or $2,500,000 million in the aggregate;

(v)    make or authorize capital expenditures beyond the capital expenditures already included in the Seller Parent's 2022 or 2023, as applicable, fiscal year plan in excess of $500,000; or

76

(vi)    incur, assume, or otherwise become, directly or indirectly, liable with respect to any Indebtedness other than Indebtedness that is an Excluded Liability and not secured by any Encumbrances (other than any Permitted Encumbrances) on any Transferred Asset.

Section 5.2    <u>Covenants Regarding Information</u>.

(a)    From the date hereof until the Closing Date, upon reasonable request, the Endo Companies shall afford the Buyer and its Representatives reasonable access during normal business hours to all of the properties, offices and other facilities, Books and Records (including Tax records, documents and materials related to any Regulatory Approvals, Product Approvals, and Transaction Steps and the consummation thereof) of the Endo Companies, and shall furnish the Buyer and its Representatives with such financial, operating and other data and information, and provide reasonable access, upon reasonable request, to all the officers, key employees, accountants and other Representatives of the Endo Companies as the Buyer may reasonably request.  Notwithstanding anything to the contrary in this Agreement, the Endo Companies shall not be required to disclose any information to the Buyer or its Representatives if such disclosure would reasonably be expected to adversely affect any attorney-client or other legal privilege or contravene any applicable Laws; <u>provided</u> that the Endo Companies shall use commercially reasonable efforts to provide a reasonable alternative means of accessing any such information in a manner that would not result in the waiver of any legal privilege or violation of applicable Laws.

(b)    For a period of twelve (12) months following the Closing Date, upon reasonable request, the Endo Companies shall afford the Buyer and its Representatives reasonable access during normal business hours to the Books and Records (including Tax records, Regulatory Approvals and Product Approvals) of the Endo Companies and the Buyer shall afford the Endo Companies and their respective Representatives reasonable access during normal business hours to the Books and Records.

Section 5.3    <u>Notification of Certain Matters</u>.  Until the Closing, each Party hereto shall promptly notify the other Parties hereto in writing of any fact, change, condition, circumstance or occurrence or nonoccurrence of any event of which it is aware that will or is reasonably likely to result in any of the conditions set forth in <u>Article VII</u> of this Agreement becoming incapable of being satisfied.

Section 5.4    <u>Employee Matters</u>.

(a)    The Endo Companies shall update the Employee Census as of five (5) days prior to the Closing Date.  Within ten (10) days prior to the anticipated Closing Date, the Endo Companies shall provide the Buyer with a list of any applicable individuals (on a no-name basis where required by applicable Law) who are expected to be Qualified Leave Recipients as of the Closing Date, including the Qualified Leave Recipient's employee identification number, type of leave and their respective expected date of return, if known, and shall update that list from time to time through the Closing Date as necessary.

(b)    Prior to the Closing, the Buyer shall provide (or cause one of its Affiliates to provide) to each Offer Employee an offer of employment for such position and with such responsibilities that are no less favorable than each Offer Employee's current position and current responsibilities with the Endo Companies and such other terms as set forth in <u>Section 5.4(f)</u>, in each case to

77

commence on the Closing Date; provided, however, that the terms and conditions of employment of any Offer Employee subject to a Collective Bargaining Agreement shall be in accordance with the applicable Collective Bargaining Agreement; provided, further, that with respect to any Offer Employee who is a Qualified Leave Recipient immediately prior to the Closing such offer of employment shall be made upon such individual's return to active employment. Each Offer Employee who accepts an offer of employment made pursuant to this Section 5.4 and who becomes an active employee of the Buyer or of one of its Affiliates shall be an "Offer and Acceptance Employee". The Endo Companies shall reasonably cooperate with the Buyer in effecting the Offer and Acceptance Employees' transfer of employment from the Endo Companies to the Buyer or an Affiliate of the Buyer to commence on the Closing (or for a Qualified Leave Recipient, the applicable return to work date) as contemplated hereby. Each offer of employment made pursuant to this Section 5.4 shall be contingent upon the Closing and the issuance of the Sale Order. The Endo Companies shall reasonably cooperate with the Buyer in effecting the Offer and Acceptance Employees' transfer of employment from the Endo Companies to the Buyer or an Affiliate of the Buyer as contemplated hereby. The Endo Companies and the Buyer anticipate that the Automatic Transfer Employees will transfer by operation of Law under TUPE or Canadian Labor Laws, as applicable, and, subject to any specific exemptions under applicable local Laws, the contracts of employment of the Automatic Transfer Employees shall have effect from the Closing Date as if originally made between the Buyer (or an Affiliate of the Buyer as the case may be) and the Automatic Transfer Employee; provided, however, that with respect to all Automatic Transfer Employees employed in Canada, their transfer and continued employment as of and from the Closing Date with the Buyer or an Affiliate of the Buyer, including all terms and conditions of employment, will be in accordance with Canadian Labor Laws and in any event no less favorable than currently in place and as in effect immediately prior to the Closing. The Buyer and its Affiliates as applicable agree to perform, discharge and fulfil their obligations as successor employer as required by applicable Canadian Labor Laws with respect to the Automatic Transfer Employees in Canada whose employment is transferred by operation of Canadian Labor Laws on Closing. The Buyer and its Affiliates as applicable shall recognize the periods of employment of all Transferred Employees for all purposes on the same basis and to the same extent as recognized by the Sellers. Each of the Endo Companies shall procure the delivery to the Automatic Transfer Employees of such information as is required to notify the Automatic Transfer Employees of the transfer of their employment in accordance with TUPE and Canadian Labor Laws, as applicable. The Buyer shall provide reasonable cooperation to the Endo Companies to facilitate the discharge of their obligations in the preceding sentence, and each Party shall provide the other Party with such information as such Party may request to allow them to perform their obligations under TUPE and Canadian Labor Laws, as applicable.

(c)     On or before the Closing Date, Sellers shall provide a list of the name (or employee identification number where no-name disclosure is required by Law) and site of employment of any and all employees of Sellers who have experienced, or will experience, an employment loss or layoff as defined by the WARN Act, or any other similar applicable state, provincial or local Law, within ninety (90) days prior to the Closing Date. Sellers shall update this list up to and including the Closing Date. For a period of ninety (90) days after the Closing Date, Buyer shall not engage in any conduct that would result in an employment loss or layoff for a sufficient number of employees of Buyer which, if aggregated with any such conduct on the part of the Sellers prior to the Closing Date, would trigger the WARN Act or any other similar applicable state, provincial or local Law, to the extent that such conduct would result in liability for Sellers (for greater

certainty, including any "mass layoff", "plant closing", "group termination" or collective dismissal" with respect to the Business under any of the foreign Laws).

(d)       As promptly as practicable (but no later than 30 days) after the date hereof, Buyer and the Endo Companies shall cooperate in good faith to (i) identify the Assumed Plans, together with any funding arrangements relating thereto (including but not limited to all assets, trusts, insurance policies and administration service contracts related thereto) to the extent relating to Transferred Employees and contracts and (ii) effect the assignment and assumption of such Assumed Plans and funding arrangements related thereto from the Sellers to the Buyer or its Affiliates, as applicable, effective as of the Closing, including all assets and liabilities related to such Assumed Plans.

(e)       The Buyer shall pay, at the times such amounts are due, all unpaid base wages and base salaries and other accrued compensation, employee expenses and benefits, in respect of Transferred Employees, excluding workers' compensation claims for injuries arising prior to the Closing, which are earned or accrued on or at any time prior to Closing.

(f)       Subject to the terms of any Collective Bargaining Agreement, Buyer shall provide, or cause one of its Affiliates to provide, for a period of one (1) year from and after the Closing Date, each Transferred Employee with:  (i) a base salary or wage rate, as applicable, that is no less favorable to the base salary or wage rate provided to such Transferred Employee as of immediately prior to the Closing Date (or for a Qualified Leave Recipient, the applicable return to work date), (ii) short- and long-term target incentive compensation opportunities that are no less favorable to the short- and long-term target incentive compensation opportunities provided to such Transferred Employee based on their target incentive compensation for 2022, as effective immediately prior to filing of the Petitions (iii) other compensation and benefits (excluding any one-time or special bonus payments that do not constitute target incentive compensation) that are no less favorable in the aggregate than the other compensation and benefits provided to such Transferred Employee as of immediately prior to the Closing Date (or for a Qualified Leave Recipient, the applicable return to work date), and (iv) recognition of all prior service on the same basis as recognized by the Sellers.

(g)       On the Closing Date, the Buyer shall adopt a management incentive plan (the "MIP") which will provide for an equity reserve equal to five percent (5%) of the Buyer's fully diluted equity measured immediately after Closing (the "MIP Reserve"), to be issued in the form of equity-based awards to certain Transferred Employees comprised of management and other key employees of the Business.  No later than ninety (90) days after the Closing Date, the Buyer will grant equity awards to MIP participants equal to three-fifths (3/5s) of the MIP Reserve subject to such terms and conditions (including, without limitation, performance metrics and vesting schedules) to be determined by the Buyer's board of directors.

(h)       To the extent permitted by Law or any applicable Collective Bargaining Agreement, all accrued and unused vacation and paid time off of the Transferred Employees accrued as of the Closing Date shall, effective as of the Closing Date (or for a Qualified Leave Recipient, the applicable return to work date) or, if later, the date on which such Transferred Employee becomes an employee of the Buyer, be transferred to and assumed by the Buyer and the Buyer shall honor such accrued vacation on the same basis as under the Endo Companies' vacation policy as in effect

immediately prior to the Closing, which vacation policy would be provided by the Endo Companies to the Buyer provided under <u>Section 5.4(d)</u>.

(i)    The Buyer shall (i) offer and provide COBRA continuation coverage for all (i) Business Employees and their respective spouses and dependents and (ii) assume all health plan coverage obligations under Section 4980B of the Code with respect to all "M&A qualified beneficiaries" as defined in Treasury Regulation section 54.4980B-9.

(j)    Without prejudice to any other provision of this Agreement or other obligation of the Buyer and its Affiliates hereunder, for purposes of eligibility, vesting, and participation (excluding, with respect to benefit accrual, retiree welfare benefits and defined benefit pension benefits) under any employee benefit plans of the Buyer or one of its Affiliates in which Transferred Employees participate after the Closing Date (collectively, the "<u>Buyer Plans</u>"), the Buyer shall credit each Transferred Employee with his or her years of service with Sellers before the Closing Date to the same extent as such Transferred Employee was entitled, before the Closing Date, to credit for such service under the comparable Employee Plans in which such Transferred Employees participated immediately prior to the Closing (such Seller Plans, the "<u>Seller Plans</u>"), except to the extent such credit would result in a duplication of benefits.

(k)    For purposes of each Buyer Plan providing medical, dental, hospital, pharmaceutical or vision benefits to any Transferred Employee, the Buyer shall use commercially reasonable efforts to cause to be waived all pre-existing condition exclusions, waiting periods and actively-at-work requirements of such Buyer Plan for such Transferred Employee and his or her covered dependents (unless such exclusions or requirements were applicable under the Seller Plans).  In addition, the Buyer shall use commercially reasonable efforts to cause any co-payments, deductible and other eligible expenses incurred by such Transferred Employee and/or his or her covered dependents under any Seller Plan providing, medical, dental, hospital, pharmaceutical or vision benefits during the plan year during which the Closing Date occurs to be credited for purposes of satisfying all deductible, coinsurance and maximum out-of-pocket requirements applicable to such Transferred Employee and his or her covered dependents for the applicable plan year of each comparable Buyer Plan in which he or she participates, provided that Sellers timely provide the Buyer such information as it reasonably requests to comply with such obligation.

(l)    The Buyer shall or shall cause one of its Affiliates to assume each Collective Bargaining Agreement immediately following the Closing.

(m)    The Parties acknowledge that TUPE will not apply to Offer Employees who, as of the Closing Date, have accepted offers of employment with the Sellers but have not yet entered into contracts of employment or commenced employment.  The Sellers agree to engage with such Offer Employees no later than one (1) month prior to the Closing Date, to inform them at a high level of the transactions contemplated by this Agreement, and the impact of the same on their proposed employment by the Sellers.  The Buyer agrees to make offers of employment to such Offer Employees on no less favourable terms as the offers previously made by the Sellers to the Offer Employees, and further agrees (to the extent reasonably required by the Sellers) to provide assistance to the Sellers for the purposes of the aforementioned information process.

80

(n)    The provisions of this Section 5.4 are for the sole benefit of the Parties to this Agreement and the Indian Subsidiaries only and shall not be construed to grant any rights, as a third party beneficiary or otherwise, to any person who is not a Party to this Agreement or an Indian Subsidiary, nor shall any provision of this Agreement be deemed to be the adoption of, or an amendment to, any employee benefit plan, as that term is defined in Section 3(3) of ERISA, or otherwise to limit the right of the Buyer or Endo Companies to amend, modify or terminate any such employee benefit plan or to modify the terms and conditions of any individual's employment. In addition, nothing contained herein shall be construed to (i) prohibit any amendments to or termination of any employee benefit plans or (ii) prohibit the termination or change in terms of employment of any employee (including any Transferred Employee) as permitted under applicable Law.    Nothing herein, expressed or implied, shall confer upon any employee (including any Business Employee or Transferred Employee) any rights or remedies (including, without limitation, any right to employment or continued employment for any specified period) of any nature or kind whatsoever, under or by reason of any provision of this Agreement.

Section 5.5    Consents and Filings; Further Assurances.

(a)    Each of the Parties shall take, or cause to be taken, all appropriate action to do, or cause to be done, all things necessary, proper or advisable under applicable Law or otherwise to consummate and make effective the transactions contemplated by this Agreement and the Ancillary Agreements and to confirm Buyer's ownership of the Transferred Assets as promptly as practicable, including to obtain all necessary waivers, consents and approvals and effecting all necessary registrations, notices and filings, including all necessary waivers, consents and approvals from customers and other parties; provided that, except for the filing and prosecution of the Sale Motion and any other pleadings before the Bankruptcy Court as contemplated in this Agreement, nothing in this Agreement or any Ancillary Agreement shall require any of the Parties or any of their respective Affiliates to make any payment or initiate any Action to obtain consent to the transfer of any Transferred Asset as contemplated by this Agreement or any Ancillary Agreement.    Without limiting the generality of the previous sentence and in each case subject to this Section 5.5, the Parties shall take any and all actions that are necessary or advisable, and shall use their best efforts to collaborate with one another to (i) obtain from Governmental Authorities all consents, approvals, authorizations, qualifications and orders and avoid or eliminate each and every impediment under any Law that may be asserted by any Governmental Authority or any other Person, including consenting to any divestiture or other structural or conduct relief or undertakings as are necessary for the consummation of the transactions contemplated by this Agreement and the Ancillary Agreements and the Buyer's ownership and operation of the Transferred Assets and the Business or of the Buyer's ownership to the Sale Shares, immediately following the Closing; (ii) to the extent not delivered prior to the date hereof, as soon as practicable following the date hereof deliver all necessary notices and filings (including any notification and report form and related material required under the HSR Act, the Competition Act, if required, the Indian Competition Act, 2002, and for seeking the FDI Approval) to the relevant Government Authorities, and promptly submit all information and documents as may be required by the Government of India for issuance of an FDI Approval, and thereafter promptly make any other required submissions, with respect to this Agreement required under applicable Law or otherwise requested for by the Government of India for issuance of an FDI Approval; (iii) comply at the earliest practicable date with any request under applicable Law for additional information, documents or other materials received by each of them or any of their respective Subsidiaries from

81

any Governmental Authority including the Federal Trade Commission, the Antitrust Division of the United States Department of Justice in respect of such notices or filings or otherwise with respect to this Agreement or in connection with the transactions contemplated hereby; (iv) cooperate with each other in connection with any such notice or filing or request (including, to the extent permitted by applicable Law, providing copies of all such documents to the non-filing parties prior to filing and considering in good faith all reasonable additions, deletions or changes suggested in connection therewith) and in connection with resolving any investigation or other inquiry of any of the Governmental Authority under applicable Law with respect to any such filing or otherwise with respect to this Agreement or in connection with the transactions contemplated hereby; (v) not extend any waiting period or similar period under applicable Law or enter into any agreement with a Governmental Authority not to consummate the transactions contemplated hereby; and (vi) defend and resolve any investigation or other inquiry of any Governmental Authority under all applicable Laws, including by defending against and contesting administratively and in court any litigation or adverse determination initiated or made by a Governmental Authority under applicable law; provided, that in the case of the preceding clauses (i) through (vi) of this Section 5.5, the Buyer shall not be obligated to consent to any divestiture or other structural or conduct relief or undertakings that would, individually or in the aggregate, have a Material Adverse Effect. Buyer shall pay all filing fees and other charges for the filing under the HSR Act or other Antitrust Law by the Parties.  For the avoidance of doubt, the obligations of this Section 5.5(a) apply solely to the Endo Companies and Buyer, and such obligations do not apply to (and Buyer shall not be obligated under this Section 5.5(a) to make any requests to) the Required Holders, other holders of Secured Debt, or any other party with an interest in the Buyer that is not itself a Buyer under this Agreement; provided, that, Buyer shall cause Required Holders to provide any information reasonably necessary for Buyer to comply with its obligations under this Section 5.5(a). The Buyer shall lead the process of applying for and obtaining the FDI Approval and approval from the Competition Commission of India and the Endo Companies shall co-operate in good faith and provide reasonable support to the Buyer in this regard. The Buyer shall provide the Seller Parent the opportunity to review and comment on applications for the FDI Approval and approval from the Competition Commission of India, and such comments shall be reasonably considered by the Buyer.

(b)     Each of the Parties shall promptly notify the other Parties of any communication it or any of its Affiliates receives from any Governmental Authority with respect to this Agreement or in connection with the transactions contemplated hereby and permit the other Parties to review in advance any proposed communication by such Party to any Governmental Authority.  No Party shall agree to participate in any meeting with any Governmental Authority in respect of any notices, filings, investigation or other inquiry unless it consults with the other Parties in advance and, to the extent permitted by such Governmental Authority, gives the other Parties the opportunity to attend and participate at such meeting.  The Parties will coordinate and cooperate fully with each other in exchanging such information and providing such assistance as the other Parties may reasonably request in connection with the foregoing and in seeking early termination of any applicable waiting or similar periods under applicable Law.  Subject to applicable Law, the Parties will provide each other with copies of all correspondence, filings or communications between them or any of their Representatives, on the one hand, and any Governmental Authority or members of its staff, on the other hand, with respect to this Agreement and the transactions contemplated hereby.

(c)     From time to time, whether at or following the Closing, the Endo Companies and the Buyer shall execute, acknowledge and deliver all such further conveyances, notices, assumptions and releases and such other instruments, and shall take such further actions, as may be necessary or appropriate to vest in the Buyer all the right, title, and interest in, to or under the Transferred Assets, to provide the Buyer and the Sellers all rights and obligations to which they are entitled and subject pursuant to this Agreement and the Ancillary Agreements, and to otherwise make effective as promptly as practicable the transactions contemplated by this Agreement and the Ancillary Agreements.  Subject to and without limiting Section 5.5(a), each of the Parties will use its commercially reasonable efforts to cause all of the obligations imposed upon it in this Agreement to be duly complied with and to cause all conditions precedent to such obligations to be satisfied.

(d)     Except as specifically required by this Agreement, the Buyer will not take any action, or refrain from taking any action, the effect of which would be to delay or impede the ability of the Parties to consummate the purchase and sale of the Transferred Assets pursuant to this Agreement.  Without limiting the generality of the foregoing, the Buyer shall not, directly or indirectly, acquire or agree to acquire by merging or consolidating with, or by purchasing a substantial portion of the assets of or equity in, or by any other manner, any business of any Person or other business organization or division thereof, or otherwise acquire or agree to acquire any assets if the entering into of a definitive agreement relating to, or the consummation of, such acquisition, merger or consolidation could reasonably be expected to (i) impose any delay in the obtaining of, or increase the risk of not obtaining, any authorization, consent, order, declaration or approval of any Governmental Authority necessary to consummate the purchase and sale of the Transferred Assets pursuant to this Agreement or the expiration or termination of any applicable waiting period, (ii) increase the risk of any Governmental Authority entering an order prohibiting the purchase and sale of the Transferred Assets pursuant to this Agreement, (iii) increase the risk of not being able to remove any such order on appeal or otherwise, or (iv) delay or prevent the consummation of the purchase and sale of the Transferred Assets pursuant to this Agreement.

Section 5.6     Refunds and Remittances.

(a)     After the Closing:  (i) if the Endo Companies or any of their Affiliates receive any refund or other amount that is a Transferred Asset or is otherwise properly due and owing to the Buyer in accordance with the terms of this Agreement, the Endo Companies promptly shall remit, or shall cause to be remitted, such amount (including, in the case of any Tax refunds, any interest on such refunds that is payable by the applicable Governmental Authority, net of any Taxes thereon) to the Buyer and (ii) if the Buyer or any of its Affiliates receive any refund or other amount that is an Excluded Asset or is otherwise properly due and owing to the Endo Companies or any of their Affiliates in accordance with the terms of this Agreement, the Buyer promptly shall remit, or shall cause to be remitted, such amount to the Endo Companies.

(b)     In the event that, after the Closing Date, (i) Sellers or any of their Affiliates have retained ownership of an asset (including any Contract) that is a Transferred Asset as contemplated by this Agreement, for no additional consideration to the Sellers or any of their Affiliates, the Sellers shall and shall cause their controlled Affiliates to convey, assign or transfer promptly such Transferred Asset to the Buyer, and the Parties hereto shall execute all other documents and instruments, and take all other lawful actions reasonably requested, including in the case of the

Sellers with respect to any Contracts identified as Transferred Contracts after the Closing Date to make the requisite filings with the Bankruptcy Court and deliver the requisite notices to counterparties under any such Transferred Contracts, in order to assign and transfer such Transferred Asset to the Buyer or its designees or (ii) an Excluded Asset has been conveyed to the Buyer or any of its Affiliates, the Buyer shall (or shall cause its Affiliate to), for no consideration, convey, assign or transfer promptly such Excluded Asset to the Sellers, and the Parties shall execute all other documents and instruments, and take all other lawful actions reasonably requested, in order to assign and transfer such Excluded Asset to Sellers or their designee.

Section 5.7    <u>Public Announcements</u>.  On and after the date hereof and through the Closing Date, the Parties shall consult with each other before making any press release or otherwise making any public statements with respect to this Agreement or the transactions contemplated hereby, and neither the Buyer nor the Endo Companies shall make any press release or any public statement prior to obtaining the Seller Parent's (in the case of the Buyer) or the Buyer's (in the case of the Endo Companies) written approval, which approval shall not be unreasonably withheld, except that no such approval shall be necessary to the extent, in the reasonable judgement of Buyer or the Endo Companies, as applicable, (x) disclosure may be required by applicable Law in connection with the Bankruptcy Case or by applicable Securities Laws or the rules of any stock exchange on which equity securities of Seller Parent are listed, or (y) such statements are consistent with previously approved statements or communications plans, <u>provided</u> that if there are no such previously approved statements or communications plans applicable to the subject matter of the disclosure required under clause (x) above, the Party intending to make such disclosure shall use its reasonable best efforts to consult in advance with the other Parties with respect to the form and text thereof (and will consider in good faith all reasonable comments of the other Parties thereto).

Section 5.8    <u>Bankruptcy Court Filings and Approval</u>.

(a)    The Endo Companies shall (i) have filed and served a motion seeking approval of (1) the Bidding Procedures Order, which shall be in form and substance reasonably acceptable to the Buyer and the Endo Companies; and (2) the form of this Agreement and the Endo Companies' authority to enter into this Agreement (the motion filed pursuant to clauses (2), the "<u>Sale Motion</u>"); <u>provided</u> that the Sellers may modify the Sale Order pursuant to discussions with the U.S. Trustee assigned to the Bankruptcy Cases, the Bankruptcy Court, any Committees/FCR, or any other party in interest but solely to the extent that the Sale Order, as modified, is in form and substance acceptable to the Buyer in its sole discretion.  Notwithstanding the foregoing, in connection with seeking approval of the Bidding Procedures, the Debtors shall seek, and the Bidding Procedures Order shall provide the authorization of the Bankruptcy Court for the Debtors' implementation of the Transaction Steps (or such steps as the Endo Companies and the Buyer may mutually agree) and preserve the First Lien Collateral Trustee's ability to credit bid in respect of the assets subject to such transaction steps in a manner consistent with such transaction steps.

(b)    From the date hereof until the earlier of (i) the termination of this Agreement in accordance with <u>Article VIII</u> and (ii) the Closing Date, the Endo Companies shall have used or shall use, as applicable, commercially reasonable efforts to pursue the entry of (i) the Bidding Procedures Order and (ii) the Sale Order, in each case, by the Bankruptcy Court.

(c)     The Endo Companies and Buyer shall reasonably cooperate in obtaining the Bankruptcy Court's entry of the Sale Order and any other Order reasonably necessary in connection with the transactions contemplated by this Agreement as promptly as reasonably practicable, including furnishing affidavits, non-confidential financial information, or other documents or information for filing with the Bankruptcy Court and making such advisors of Buyer and Endo Companies and their respective Affiliates available to testify before the Bankruptcy Court for the purposes of, among other things, providing adequate assurances of performance by Buyer as required under Section 365 of the Bankruptcy Code, and demonstrating that Buyer is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.

(d)     Each of the Endo Companies and Buyer shall appear formally or informally in the Bankruptcy Court if reasonably requested by the other Party or required by the Bankruptcy Court in connection with the transactions contemplated by this Agreement and keep the other reasonably apprised of the status of material matters related to this Agreement, including, upon reasonable request promptly furnishing the other with copies of notices or other communications received by any Endo Company from the Bankruptcy Court or any third party and/or any Governmental Authority with respect to the transactions contemplated by this Agreement.

(e)     The Buyer agrees and acknowledges that the Endo Companies and their Affiliates shall be permitted, and shall be permitted to cause their Representatives, to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, respond to any unsolicited inquiries, proposals or offers submitted by, and enter into any discussions or negotiations regarding any of the foregoing with, any Person (in addition to the Buyer and its Affiliates and Representatives) relating to a Competing Bid ("Competing Bid Obligations"), in each case subject to the Bidding Procedures and the Bidding Procedures Order.

(f)     The Buyer acknowledges that this Agreement and the sale of the Transferred Assets is subject to higher or otherwise better bids and Bankruptcy Court approval.  The Buyer acknowledge that Sellers must take reasonable steps to demonstrate that they have sought to obtain the highest or otherwise best price for the Transferred Assets, including giving notice thereof to the creditors of Sellers and other interested parties, providing information about the Endo Companies to prospective bidders, entertaining higher or otherwise better offers from such prospective bidders, and, in the event that additional qualified prospective bidders desire to bid for the Transferred Assets, conducting an Auction.

(g)     If the Successful Bidder, to the extent such party is not the Buyer, fails to consummate the applicable Alternative Transaction as a result of a breach or failure to perform on the part of such Successful Bidder, the next highest or otherwise best bidder (the "Backup Bidder") will be deemed to have the new prevailing bid.  In the event that the Buyer is not selected as the Successful Bidder but is otherwise the next highest or best alternative bid, the Buyer will serve as the Backup Bidder for the Transferred Assets and the Endo Companies shall be required to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement; provided, however, that Buyer shall only be required to keep Buyer's bid to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be improved upon in the Auction) open and irrevocable until the date of closing of an Alternative Transaction with the Successful Bidder.

(h)     In the event an appeal is taken or a stay pending appeal is requested, from the Sale Order, the Endo Companies shall promptly notify the Buyer of such appeal or stay request and shall provide to the Buyer a copy of the related notice of appeal or order of stay.  The Endo Companies shall also provide the Buyer with written notice of any motion or application filed in connection with any appeal from such orders.  The Endo Companies agree to take all action as may be reasonable and appropriate to defend against such appeal or stay request and the Endo Companies and the Buyer agree to use their reasonable efforts to obtain an expedited resolution of such appeal or stay request; provided, that nothing herein shall preclude the parties hereto from consummating the transactions contemplated hereby, if the Sale Order shall have been entered and has not been stayed and the Buyer, in its sole and absolute discretion, waives in writing the condition that the Sale Order be a Final Order.

(i)     After entry of the Sale Order, to the extent the Buyer is the Successful Bidder, the Endo Companies shall not take any action which is intended to, or fail to take any action the intent of which failure to act is to, result in the reversal, voiding, modification or staying of the Sale Order unless the Buyer specifically consents to such action in writing.

Section 5.9     Endo Marks.  Except as provided in this Section 5.9, the Endo Companies shall, as promptly as practicable (but in no event later than thirty (30) Business Days) after the Closing, (i) cease using and displaying any and all trademarks that are included in the Transferred Assets and (ii) cause the name of each Endo Company in the caption of the Bankruptcy Cases to be changed to the new name of each Endo Company that does not use any Endo Marks.  Notwithstanding the foregoing or anything else in this Agreement to the contrary, the Endo Companies may for a period of up to one (1) year after Closing use and as reasonably required permit the use of the Endo Marks in their respective corporate names and business names and otherwise in connection with their respective operations or the exploitation of any Excluded Assets on a transitional basis solely in the manner in which the Endo Marks were used by the Endo Companies in the exploitation of the Excluded Assets prior to the Closing (except that the Endo Companies may also use the Endo Marks in connection with any proceedings before the Bankruptcy Court or the Canadian Court or any applicable regulatory filings and to undertake any other activities reasonably required to wind down), and shall maintain quality in connection therewith generally consistent with (and in no event less than) that associated with the Endo Marks as of Closing (it being understood that, for the avoidance of doubt, nothing in this Agreement shall be construed as preventing any Endo Company from making any fair, non-trademark use of any of the Endo Marks).

Section 5.10     IP License. Effective as of the Closing Date, Buyer hereby grants to each Seller a non-exclusive, fully paid-up, royalty-free, irrevocable (during the IP Wind-Down Period), non-sub-licensable (except as set forth in this Section 5.10) license for a period of up to one (1) year (the "IP Wind-Down Period") under all Transferred Intellectual Property solely to the extent necessary for each Seller (i) to conduct the Business as related to the Excluded Assets and Excluded Liabilities, in substantially the same manner as conducted prior to the date hereof, solely in connection with and during the wind down and (ii) to undertake activities reasonably required to wind down. The foregoing license is sub-licensable solely to the extent (i) that sub-licenses were granted prior to the Closing Date in the Ordinary Course of Business or (ii) reasonably necessary in connection with such wind down.

Section 5.11    <u>Assumed Liabilities; Adequate Assurance of Future Performance</u>.  Buyer shall provide adequate assurance of future performance of the Transferred Contracts as required under Section 365 of the Bankruptcy Code.  Buyer agrees that it will take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Transferred Contracts, such as furnishing affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court and making Buyer's advisors available to testify before the Bankruptcy Court.

Section 5.12    <u>Sale Free and Clear</u>.  The Endo Companies acknowledge and agree, and the Sale Order shall provide, to the fullest extent permitted under applicable Law, that, (a) on the Closing Date and concurrently with the Closing, all then existing or thereafter arising obligations, Liabilities and Interests, against or created by the Endo Companies, any of their Affiliates, or the bankruptcy estate shall be fully released from and with respect to the Transferred Assets (other than Permitted Encumbrances and Assumed Liabilities); (b) (i) as soon as reasonably practicable after the Closing Date, the Buyer, on behalf of the NewCo Sellers, is authorized and directed to file a notice of dismissal of the NewCo Debtor Cases (the "<u>Dismissal Notice</u>") with the Bankruptcy Court, in form and substance acceptable to the Buyer and the Seller Parent, (ii) the Debtors agree that they will take all actions reasonably required to assist the Buyer in dismissing the NewCo Debtor Cases, and (iii) after the filing of the Dismissal Notice, the NewCo Debtors Cases shall be dismissed; and (iv) the Buyer hereby covenants and undertakes to the Endo Companies that after the dismissal of the NewCo Debtors cases, the NewCo Sellers shall be wound up, liquidated or otherwise dissolved on a solvent basis under the Companies Act 2014 of Ireland; and (c) the Buyer is not a successor to any Seller or the bankruptcy estate by reason of any theory of law or equity, and the Buyer shall not assume or in any way be responsible for any Liability of the Sellers, any of their Affiliates and/or the bankruptcy estate, except as expressly provided in this Agreement. On the Closing Date, the Transferred Assets shall be transferred to the Buyer free and clear of any and all Interests, other than Permitted Encumbrances and Assumed Liabilities, to the fullest extent permitted by Section 363 of the Bankruptcy Code.

Section 5.13    <u>Product Liability Insurance</u>.  The Buyer shall obtain (through assumption, in accordance with <u>Section 2.6</u> hereof, or otherwise at or prior to the Closing, at Buyer's sole discretion) and maintain customary product liability insurance coverage in respect of all Transferred Assets, consistent with the Endo Companies' past practice, for not less than seven (7) years following the Closing, which coverage shall (x) include the Endo Companies as named insureds and (y) be maintained at a level consistent with the Endo Companies' past practices; <u>provided</u>, that such coverage of similar scope is commercially available and at a substantially similar cost to the Endo Companies' historical cost for such coverage.  Buyer shall endeavor, whether under assumption or otherwise, to secure coverage with insurance companies currently providing the Endo Companies' product liability insurance policies (or, alternatively with an insurance company of similar reputation and creditworthiness).  In lieu of the coverage described in the immediately preceding sentences, Buyer may, in its sole discretion, execute the "tail" provision under the current Endo Companies product liability insurance policies in respect of all Transferred Assets with an extended reporting claims period of not less than seven (7) years from the Closing.

Section 5.14    Intellectual Property Registrations.  Prior to the Closing Date, the Endo Companies shall execute or have executed and file any documents reasonably requested, drafted and provided by Buyer to effect the change of ownership and recordals with any applicable patent, trademark, and copyright offices and domain name registrars and other similar authorities (i) where Intellectual Property included in the Transferred Assets is still recorded in the name of legal predecessors of any Endo Company or any Person other than an Endo Company or (ii) where the relevant recordals of the patent, copyright, and trademark offices, and domain name registrars, and other similar authorities with respect to any Endo Company's Intellectual Property included in the Transferred Assets are materially incorrect for any other reason; provided that, in each case, the form and content of any such documents shall be subject to Seller Parent's agreement, not to be unreasonably withheld, conditioned or delayed.  Buyer shall reimburse Sellers for any reasonable out of pocket costs incurred by Sellers in fulfilling Sellers' obligations under this Section 5.14.

Section 5.15    Corporate Existence.  The Parties acknowledge and agree that nothing in this Agreement or any Ancillary Agreement shall require any Endo Company to maintain its corporate (or similar) existence, or prevent any Endo Company from winding down its operations, for more than 30 days following the Closing Date.

Section 5.16    Regulatory Approvals.

(a)    The Endo Companies and the Buyer shall cooperate, both prior to and promptly after Closing, as required, to prepare (including providing required information), identify and file with the FDA and any other applicable Governmental Authority the notices, applications, submissions and information required pursuant to any applicable Law or requirement to transfer the Regulatory Approvals from the Endo Companies to the Buyer and to reasonably assist Buyer with obtaining Regulatory Approvals in its (or its designees') own name, including any Distribution Licenses, that are not, pursuant to applicable Health Care Laws, able to be transferred from the Endo Companies to Buyer. Sellers shall use reasonable best efforts to submit to the applicable Governmental Authority prior to Closing, all notices, applications, submissions, and information required to transfer the Regulatory Approvals to the Buyer, to the extent permitted by Law or permitted or requested by the applicable Governmental Authority. The Parties also agree to use all reasonable best efforts to take any and all other actions required by the FDA and any other applicable Governmental Authority to effect the transfer of the Regulatory Approvals from the Endo Companies to the Buyer. Notwithstanding anything contained herein, it is acknowledged and agreed that any obligations hereunder of the Endo Companies in respect of the Consents, Permits or Regulatory Approvals procured or required for the Business of the Indian Subsidiaries shall be: (A) limited to providing to the Buyer, information, documents and such other cooperation as may be reasonably requested by the Buyer; and (B) only in respect of Consents, Permits or Regulatory Approvals, which pursuant to Law, require any action to, approval of, or notification, the relevant Governmental Authority in relation to acquisition of the Indian Subsidiaries by the Buyer.

(b)    Subject to terms of the Transition Services Agreement (if such agreement is executed), with respect to each Product in each jurisdiction, from and after the Closing Date, until the date on which the Buyer receives an assignment or transfer of the Regulatory Approval for such Product in such jurisdiction, or a replacement thereof naming the Buyer as the Regulatory Approval holder for such Product in such jurisdiction, and until such time as Buyer has all required

Regulatory Approvals, including Distribution Licenses, that will allow Buyer to operate the Business in respect of such Products, the Endo Companies shall, with respect to each such Product in each such jurisdiction, maintain in continuous effect all applicable Regulatory Approvals, including, for the benefit of the Buyer, all Distribution Licenses.

(c)     Buyer shall promptly reimburse all of the Endo Companies' reasonable and documented costs and expenses including upon the presentation of a reasonably detailed invoice, all of the Endo Companies' reasonable legal fees incurred as a result of it complying with its obligations pursuant to this Section 5.16.  Buyer shall indemnify, defend and hold the Sellers harmless from and against any and all Liabilities arising out of or in connection with any Regulatory Approval from and after the Closing through the date on which the Buyer receives an assignment or transfer of such Product Approval (or the related Regulatory Approval) for such Product, or a replacement thereof naming the Buyer as the Product Approval (or the related Regulatory Approval) holder for such Product, except for any and all Liabilities that result from the Sellers' failure to comply with or maintain the Regulatory Approvals as required under applicable Laws.

(d)     Prior to the Closing and for a period of one (1) year following the Closing, the Endo Companies and Buyer shall each use reasonable best efforts to cooperate with each other to obtain any Regulatory Approvals as required under applicable Laws in order to carry on the Business or in connection with the execution, delivery and performance of this Agreement and each of the Ancillary Agreements contemplated pursuant to this Transaction.  Each of the Sellers and Buyer shall be responsible for its own costs in providing such cooperation; provided, that neither Party hereto shall be required to make any payments to any third parties in connection with such cooperation.

Section 5.17   Communication with Customers and Suppliers.  Prior to the Closing, the Buyer and the Endo Companies shall reasonably cooperate with each other in coordinating their communications with any customer, supplier or other contractual counterparty of the Endo Companies in relation to this Agreement and the transactions contemplated hereby subject to applicable Law.

Section 5.18   Post-Closing Cooperation.  Following the Closing, the Sellers shall reasonably cooperate in good faith with the Buyer to assist in the orderly transfer of the Transferred Assets (including all Consents, Permits and Regulatory Approvals), including in connection with any matters for which the Sellers' institutional knowledge may be reasonably required in order to consummate the transactions contemplated by this Agreement.

Section 5.19   Buyer Expenses.   The Sellers shall pay Buyer's reasonable and documented professional fees and expenses in full at or prior to Closing.

**ARTICLE VI**
**TAX MATTERS**

Section 6.1   Transfer Taxes.  Any and all value added tax (including GST/HST and QST), sales, use, retail, excise, stock transfer, real property transfer, transfer stamp, registration, documentary, recording or similar Taxes payable as a result of the sale or transfer of the Transferred Assets and

the Irish Specified Equity Interests and the assumption of the Assumed Liabilities pursuant to this Agreement, and all recording and filing fees that may be imposed by reason of the sale, transfer, assignment and delivery of the Transferred Assets and the Irish Specified Equity Interests ("Transfer Taxes") imposed by or payable to any Taxing Authority (U.S.) shall be an obligation of the Sellers and shall be paid by the Sellers when due.  All Transfer Taxes imposed by or payable to any Taxing Authority (Non-U.S.) shall be an obligation of the Buyer, shall be paid by the Buyer when due.  The Sellers and the Buyer shall be responsible for preparing and filing all Tax Returns with respect to Transfer Taxes which they are obligated to satisfy and shall file all such Tax Returns when due.  The Sellers and the Buyer shall use commercially reasonable efforts and cooperate in good faith to mitigate, reduce, or eliminate any such Transfer Taxes, including in the making of the Tax elections referred to in Section 6.4.  For the avoidance of doubt, Transfer Taxes shall not include any Taxes imposed on or measured by reference (in whole or in part) to overall net income, profits, capital gains, gains, and similar Taxes.

Section 6.2    Tax Cooperation and Information.

(a)    The Buyer and the Sellers agree to furnish or cause to be furnished to each other, upon reasonable request, as promptly as practicable, such information and assistance relating to the Business, the Transferred Assets and the Assumed Liabilities as is reasonably necessary for the filing of all Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any Governmental Authority and the prosecution or defense of any claim, suit or proceeding relating to any Tax.

(b)    The Sellers will cooperate in good faith with the Buyer and will use reasonable best efforts to provide any information and analyses necessary to enable the Buyer to make Tax-related determinations, including by providing reasonable access to the Sellers' employees and outside advisors (e.g., tax accountants, lawyers, and other consultants), subject to Section 5.2 and except as would be materially adverse to the Sellers.

(c)    Any reasonable expenses incurred in furnishing any information or assistance pursuant to this Section 6.2 shall be borne by the Party requesting it.  With respect to any Tax related matters involving the Debtors other than the transactions contemplated by this Agreement, the Debtors and their advisers shall not provide information or analyses that would conflict with any applicable requirements of Law or any binding agreement, or that would waive any attorney-client or similar privilege or any work product doctrine.

(d)    The Indian Subsidiaries shall provide a fair valuation report, to the satisfaction of the Buyer, issued on a reliance basis, by an independent chartered accountant certifying the fair market value (FMV) of the shares of Indian Subsidiaries as per Section 56(2)(x) of the Indian Income Tax Act, 1961 read with Rule 11UA of the Income Tax Rules, 1962.

(e)    Par Pharmaceutical Inc. and Par LLC shall provide a capital gains tax computation, to the satisfaction of the Buyer, in relation to any Tax required to be withheld by the Buyer from the Purchase Price in respect of the sale of the Sale Shares, in accordance with the provisions of the Indian Income Tax Act, 1961, issued by an independent chartered accountant on a reliance basis.

(f)      Par Pharmaceutical Inc. and Par LLC shall provide a Section 281 no-objection certificate issued on the letterhead of and duly signed by an independent chartered accountant on a reliance basis, in form and substance acceptable to the Buyer, providing the status of current Tax demands and income-tax proceedings of the respective Seller under Section 281 of the Indian Income Tax Act, 1961, together with relevant screenshots from the e-filing portal of the Income Tax Department, Government of India, as of five business days prior to the Closing.

Section 6.3    Structure and Pre-Closing Steps.    The Endo Companies agree to, subject to Bankruptcy Court approval and subject to any approval of the Canadian Court as may be required in respect of the Canadian Sellers, prior to the Closing take or amend steps to effect the transactions contemplated by this Agreement that are reasonably agreed to after the date hereof by the Endo Companies and the Buyer (the "Transaction Steps"), provided that (i) the Endo Companies shall agree to take such steps as reasonably requested by the Buyer so long as the Transaction Steps as requested are not materially adverse to the Endo Companies, (ii) the Buyer and the Endo Companies shall use reasonable best efforts to effect any such steps prior to the Outside Date, and (iii) without limiting the generality of Section 7(a)(x)(F) of the Restructuring Support Agreement, the Outside Date will otherwise be extended as determined by the Seller Parent in good faith, solely if and to the extent reasonably necessary to permit the implementation of the Transaction Steps, (including any amended version thereof) to occur prior to such extended Outside Date. The Endo Companies and the Buyer agree that this Agreement shall be amended as necessary, as determined by the Endo Companies and the Buyer, to permit the implementation of the Transaction Steps.

Section 6.4    Certain Tax Elections.    The Buyer and the Endo Companies agree:

(a)      to use the "standard procedure" described in Section 4 of IRS Revenue Procedure 2004-53, 2004-2 C.B. 320 with respect to the Endo Companies' Tax filing and payment obligations relating to the Business and the Business Employees (and/or the local equivalent insofar as may be applicable to the Automatic Transfer Employees);

(b)      that the Buyer shall file (or cause to be filed) an IRS Form W-2 for each Business Employee (and/or the local equivalent insofar as may be applicable to the Automatic Transfer Employees) with respect to the portion of the year during which such Business Employee is employed by the Buyer that includes the Closing Date, excluding the portion of such year that such Business Employee was employed by the Endo Companies or their respective Affiliates;

(c)      that (i) to the extent permitted under applicable Law, each applicable Canadian Seller and the Canadian Buyer shall jointly execute, on closing, an election under subsection 167(1) of the ETA, section 75 of the QST Legislation, and any equivalent or corresponding provision under applicable provincial or territorial Tax Law, in the form prescribed for such purposes, such that no GST/HST, or QST or other applicable provincial or territorial Tax is payable in respect of the sale of the Transferred Assets of each applicable Canadian Seller, and (ii) that Canadian Buyer shall file such elections within the time prescribed by the ETA, the QST Legislation and such other applicable Tax Law. Notwithstanding such election(s), in the event it is determined by the Canada Revenue Agency or Revenue Québec (or another applicable provincial or territorial Tax authority) that there is a liability of the Canadian Buyer to pay, or of any Canadian Sellers to collect and remit, any Taxes payable under the ETA or the QST Legislation (or under any applicable provincial or territorial Tax Law) in respect of the sale and transfer of the Transferred Assets, such

Taxes shall be paid by the Canadian Buyer and the Buyer shall indemnify and save the Canadian Sellers (and any current or former directors and officers of any Canadian Sellers) harmless with respect to any such Taxes and costs payable resulting from such determination or assessment; and

(d)    that with respect to each Canadian Seller, each such Canadian Seller and the Canadian Buyer will, to the extent permitted under applicable Law, jointly execute an election under section 22 of the Canadian Tax Act, and any equivalent or corresponding provision under applicable provincial or territorial Tax Law, in respect of the sale of the accounts receivable of each Canadian Seller to the Canadian Buyer. The Canadian Buyer and each Canadian Seller shall file within the prescribed time the prescribed election form required to give effect to the foregoing. For the purposes of such elections, the Canadian Buyer and each Canadian Seller will, acting reasonably, jointly determine the amount that the parties will designate as the portion of the Purchase Price allocable to the debts in respect of which such elections are made. For greater certainty, each Canadian Seller and the Canadian Buyer agree to prepare and file their respective Tax Returns in a manner consistent with such election(s).

Section 6.5    <u>Apportionment of Certain Taxes</u>.  All real property, personal property and similar ad valorem Taxes, if any, levied with respect to the Transferred Assets for a taxable period which includes (but does not end on) the Closing Date (collectively, the "<u>Apportioned Taxes</u>") shall be apportioned between the Sellers and the Buyer based on the number of days of such taxable period ending on and including the Closing Date (such portion of such taxable period, the "<u>Pre-Closing Tax Period</u>") and the number of days in such taxable period after the Closing Date (such portion of such taxable period, the "<u>Post-Closing Tax Period</u>").  The Sellers shall be responsible for the proportionate amount of such Apportioned Taxes that is attributable to the Pre-Closing Tax Period, and the Buyer shall be responsible for the proportionate amount of such Apportioned Taxes that is attributable to the Post-Closing Tax Period.  Any Apportioned Taxes shall be timely paid, and all applicable Tax Returns shall be timely filed, as provided by applicable Law.  The paying Party shall be entitled to reimbursement from the non-paying Party for the non-paying Party's portion of the Apportioned Taxes in accordance with this <u>Section 6.5</u>.  Upon payment of any such Apportioned Taxes, the paying Party shall present a statement to the non-paying Party setting forth the amount of reimbursement to which the paying Party is entitled under this <u>Section 6.5</u>, together with such supporting evidence as is reasonably necessary to calculate the amount to be reimbursed. The non-paying Party shall make such reimbursement by wire transfer in immediately available funds within ten (10) days of receipt of such statement to an account designated by the paying Party.

Section 6.6    <u>Retention of Tax Records</u>.  After the Closing Date and for a period of six (6) years from the Closing Date, Buyer shall retain possession of all accounting, business, financial, and Tax records and information that (a) relate to the Transferred Assets and are in existence on the Closing Date and (b) come into existence after the Closing Date but relate to the Transferred Assets before the Closing Date, and Buyer shall give Sellers notice and a reasonable opportunity to retain any such records in the event that Buyer determines to destroy or dispose of them during such period.  In addition, from and after the Closing Date, Buyer shall provide to Sellers (after reasonable notice and during normal business hours) reasonable access to the books, records, documents, and other information relating to the Transferred Assets as Sellers may reasonably deem necessary to properly prepare for, file, prove, answer, prosecute, and defend any Tax Return, claim, filing, Tax audit, Tax protest, suit, proceeding, or answer.  Such access shall include access

to any computerized information systems that contain data regarding the Transferred Assets.  The provisions contained in this Section 6.6 are intended to, and shall, supplement and not limit the generality of the provisions contained in Section 5.2 above.

Section 6.7    Tax Refunds.  Without limiting the generality of Section 5.6(a), any Tax refunds that are received by an Endo Company, and any amounts credited against Taxes to which an Endo Company (or Affiliate thereof) becomes entitled, that are attributable to Taxes that are paid by the Buyer (or any of its Affiliates) (including, for clarity's sake, any such Taxes that are Assumed Liabilities or that arise from other transactions contemplated herein and, in each case, and are paid, funded or reimbursed by the Buyer (or any of its Affiliates)), shall be for the account of the Buyer (such refunds or credits for the account of Buyer, the "Buyer Refunds").  The applicable Endo Company (or Affiliate thereof) shall pay over to the Buyer any such Buyer Refund within ten (10) days after receipt thereof or entitlement thereto.  If any amount paid to the Buyer pursuant to this Section 6.7 is subsequently challenged successfully by any Governmental Authority, the Buyer shall repay such amount (together with any interest and penalties assessed by such Governmental Authority in respect of such amount) to the applicable Endo Company (or its applicable Affiliate).

Section 6.8    Canadian Tax Treatment. The Parties agree that the consideration received or deemed to be received by the Canadian Sellers in respect of the transfer of their Transferred Assets (other than the assumption or payment of any Non-U.S. Sale Transaction Taxes or other Assumed Liabilities and other than any cash retained by the Canadian Sellers) will be treated (i) to the extent received by Paladin Labs Inc., as a distribution to Paladin Labs Canadian Holding Inc., first as a repayment of debt, second, to the extent of any excess, as a return of capital, and third, to the extent of any excess, as a demand non-interest-bearing loan, and (ii) from Paladin Labs Canadian Holding Inc to Endo Luxembourg Finance Company I S.à.r.l., first as a repayment of debt and second, to the extent of any excess, as a return of capital.

Section 6.9    Interim Payments of Taxes. At any time prior to the Closing, subject to any obligation of the Endo Companies under the Bankruptcy Code, the Endo Companies shall be permitted to make any and all payments, estimated payments, deposits, remittances, or other similar transmittals in respect of Taxes of any kind accrued in, attributable to, retained in, withheld in, or remitted in any taxable period or portion thereof ending on or prior to the Closing Date, in each case, (i) in the Ordinary Course of Business and (ii) to the extent the amount of any such Taxes is material, subject to the prior written approval of the Buyer (not to be unreasonably conditioned, withheld or delayed). For the avoidance of doubt, any refunds of Taxes paid, deposited, remitted or similarly transmitted pursuant to the preceding sentence shall be for the account of the Buyer and the second and third sentences of Section 6.7 shall apply to such refunds *mutatis mutandis*.

## ARTICLE VII
## CONDITIONS TO CLOSING

Section 7.1    General Conditions.   The respective obligations of the Buyer and the Endo Companies to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions, any of which may, to the extent permitted by applicable Law, be waived in writing by any Party in its sole discretion (provided that such waiver shall only be effective as to the obligations of such Party):

93

(a)      No Governmental Authority of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Law or Order (whether temporary, preliminary or permanent), that is then in effect and that enjoins, restrains, makes illegal or otherwise prohibits the consummation of the transactions contemplated by this Agreement or the Ancillary Agreements.

(b)      The waiting period (and any extension thereof) under the HSR Act applicable to the transactions contemplated by this Agreement and the Ancillary Agreements, if any, shall have expired or shall have been terminated.

(c)      All approvals which may be required under Irish foreign investment screening Law shall have been obtained from the Irish Minister for Enterprise, Trade and Employment for the transfer of the Irish Specified Equity Interests and the Transferred Assets.

(d)      All requisite regulatory consents, approvals, authorizations, qualifications and necessary orders from the Governmental Authorities in respect of the transactions contemplated by this Agreement or the Ancillary Agreements, including any authorizations required under the applicable Antitrust Law or any foreign direct investment authorizations, in each case set forth on Schedule 7.1(d) (other than the approvals or authorizations specifically listed in Section 7.2 below) shall have been obtained. For the avoidance of doubt, with respect to the Indian Subsidiaries, such "authorization" shall include the acknowledgement of filing of notice with the Competition Commission of India to the extent the "green channel" procedure is applicable in connection with the transfer of Sale Shares, or, in all other cases, the approval of the Competition Commission of India in connection with the transfer of Sale Shares.

(e)      The Bankruptcy Court shall have entered the Sale Order and the Bidding Procedures Order, and the Sale Order and the Bidding Procedures Order shall each be a Final Order.

(f)      Solely as it relates to the consummation of the transactions contemplated by this Agreement by the Canadian Sellers, the Canadian Court shall have entered the Canadian Sale Recognition Order and the Canadian Sale Recognition Order shall be a Final Order.

(g)      Completion of the transfer of the Irish Specified Equity Interests immediately prior to the Closing pursuant to Section 2.1(a)(i).

(h)      Solely as it relates to the consummation of the transactions contemplated by this Agreement by the Canadian Sellers, the Competition Act Approval and the ICA Approval shall have been obtained, in each case, if required.

Section 7.2      Conditions to Obligations of the Endo Companies.

(a)      The obligations of the Endo Companies to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions, any of which may be waived in writing by Seller Parent in its sole discretion:

(b)    Other than the representations and warranties of Buyer contained in <u>Section 4.1</u> (Organization), <u>Section 4.2</u> (Authority) and <u>Section 4.4</u> (Brokers) (the "<u>Buyer Fundamental Representations</u>"), the representations and warranties of the Buyer contained in this Agreement or any certificate delivered pursuant hereto shall be true and correct as of the Closing Date, or in the case of representations and warranties that are made as of a specified date, such representations and warranties shall be true and correct as of such specified date, except where the failure to be so true and correct (without giving effect to any limitation or qualification as to "materiality" (including the word "material") or "Buyer Material Adverse Effect" set forth therein) would not, individually or in the aggregate, reasonably be expected to have a Buyer Material Adverse Effect. The Buyer Fundamental Representations shall be true and correct in all respects as of the Closing Date, or in the case of representations and warranties that are made as of a specified date, such representations and warranties shall be true and correct as of such specified date, except for *de minimis* inaccuracies.  The Buyer shall have, in all material respects, performed all obligations and agreements and complied with all covenants and conditions required by this Agreement or any Ancillary Agreement to be performed or complied with by it prior to or at the Closing.

(c)    The Endo Companies shall have received an executed counterpart of each document listed in <u>Section 2.10(d)</u>, signed by each party other than the Endo Companies (to the extent applicable).

Section 7.3    <u>Conditions to Obligations of the Buyer</u>.    The obligations of the Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions, any of which may be waived in writing by the Buyer in its sole discretion:

(a)    Other than the representations and warranties of Sellers contained in <u>Section 3.1</u> (Organization), <u>Section 3.2</u> (Authority), <u>Section 3.3(c)</u>, <u>Section 3.3(d)</u>, and <u>Section 3.20</u> (Brokers) (the "<u>Seller Fundamental Representations</u>"), the representations and warranties of the Sellers contained in this Agreement or any certificate delivered pursuant hereto shall be true and correct as of the Closing Date, or in the case of representations and warranties that are made as of a specified date, such representations and warranties shall be true and correct as of such specified date, except where the failure to be so true and correct (without giving effect to any limitation or qualification as to "materiality" (including the word "material") or "Material Adverse Effect" set forth therein) would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. The Seller Fundamental Representations shall be true and correct in all respects as of the Closing Date, or in the case of representations and warranties that are made as of a specified date, such representations and warranties shall be true and correct as of such specified date, except for *de minimis* inaccuracies.  The Endo Companies shall have, in all material respects, performed all obligations and agreements and complied with all covenants and conditions required by this Agreement or any Ancillary Agreement to be performed or complied with by them prior to or at the Closing; <u>provided</u>, that the Endo Companies' performance of Competing Bid Obligations shall be disregarded for the purpose of determining whether this condition has been satisfied.

(b)    The Buyer shall have received an executed counterpart of each document listed in <u>Section 2.10(b)</u>, <u>Section 2.10(c)</u>, and <u>Section 2.10(d)(ii)</u>, <u>(iv)</u> and <u>(vi)</u>, signed by each party other than the Buyer (to the extent applicable).

(c)    The Bankruptcy Court shall have approved and authorized the assumption and assignment of the Transferred Contracts.

(d)    After the date hereof, there shall not have occurred and be continuing any changes, effects or circumstances constituting a Material Adverse Effect.

(e)    All Regulatory Approvals and Product Approvals (A) associated with the Products and (B) any other Regulatory Approvals and Product Approvals the absence of which would be reasonably likely to result in a material adverse effect on the Business, including the financial condition or results of operations of the Business, shall have been transferred to or obtained by the Buyer, and the Buyer shall have received applicable documentation or certifications reasonably necessary to evidence the transfer or receipt (as the case may be) of such Regulatory Approvals or Products Approvals; provided, however, that this condition shall be deemed satisfied with respect to any given Regulatory Approval or Product Approval referenced in clause (A) or (B) hereof to the extent that the Buyer can reasonably be expected to be permitted to operate the Business after the Closing in compliance with applicable Law and consistent with Law or past practice by or instructions provided by the relevant Governmental Authority to, Buyer or the Endo Companies in respect of the applicable Product in reliance on the arrangements contemplated by, and on the terms consistent with, the provisions of Section 5.16 and the applicable terms of the Transition Services Agreement, until the applicable Regulatory Approval or Product Approval is transferred or obtained.

# ARTICLE VIII
# TERMINATION

Section 8.1    Termination.

(a)    This Agreement may be terminated at any time prior to the Closing:

(i)    by mutual written consent of the Buyer and Seller Parent;

(ii)    by either Seller Parent or Buyer, by written notice, if:

(A)    the Closing shall not have occurred by the later of (i) the Outside Date as defined in the Restructuring Support Agreement to the extent the Restructuring Support Agreement remains in full force and effect at the time this termination event is triggered, and (ii) July 12, 2023[1] (as such date may be extended pursuant to this Section 8.1(a)(ii)(A) or Section 6.3, the "Outside Date"); provided, however, that if the conditions set forth in Sections 7.1(a) or (b) (but for the purposes of Section 7.1(a), only if such Law or Order is under or pursuant to an Antitrust Law) shall not have been satisfied or duly waived but all other conditions to the Closing set forth in Article VII have been satisfied by the Outside Date (other than those conditions that by their nature cannot be satisfied until the Closing Date, provided such conditions remain capable of being satisfied), then either Party may extend the Outside Date by written notice to the other Party by an additional 120 days; provided, further that the Seller Parent shall have the right to extend the Outside Date as provided for under Section 6.3; provided, still further, that the right to

---

[1] **Note to Draft**: Such date subject to extension pursuant to the terms of the Restructuring Support Agreement.

terminate this Agreement under this <u>Section 8.1(a)(ii)(A)</u> shall not be available to any Party if the failure of the transactions contemplated by this Agreement to occur on or before the Outside Date was primarily caused by a Party's or their Affiliate's failure to perform any covenant or obligation under this Agreement;

(B)    any Governmental Authority, shall have issued an order, judgment, decree or ruling or taken any other action restraining, enjoining, rendering illegal, or otherwise prohibiting the transactions contemplated by this Agreement and such order, judgment, decree, ruling or other action shall have become final and nonappealable; <u>provided</u> that the Party so requesting termination shall have complied with <u>Section 5.5</u>, and <u>provided</u>, <u>further</u>, that no termination may be made by a Party under this <u>Section 8.1(a)(ii)(B)</u> if the issuance of such Order was primarily caused by the breach by such Party (including, with respect to Sellers, any of the Endo Companies) with respect to, or action or inaction of such Party (including, with respect to Sellers, any of the Endo Companies) in violation of, any obligation or condition of this Agreement;

(C)    (i) the Bankruptcy Court enters an Order granting relief against any Consenting First Lien Creditor (or the First Lien Collateral Trustee or any Secured Debt Representative, each in its representative capacity on behalf of the applicable holders of Prepetition First Lien Indebtedness) with respect to (A) a motion, application, pleading, or proceeding challenging the amount, validity, enforceability, extent, perfection, or priority of, or seeking avoidance or subordination of, any Claims held by any Consenting First Lien Creditor against any Debtor or any liens or security interests securing such Claims, <u>provided</u>, <u>that</u>, such Order reduces the amount of the Claims, liens, or security interests held by the Consenting First Lien Creditors by more than $5 million, or (B) a motion, application, pleading or proceeding asserting any purported Claims or causes of action against any of the Consenting First Lien Creditors (or the First Lien Collateral Trustee or any Secured Debt Representative, each in its representative capacity on behalf of the applicable holders of First Lien Indebtedness), in each case, or otherwise issues a ruling or enters an Order, which (x) prevents or impedes the Buyer's ability to credit bid on any of the Transferred Assets, or (y) render the obligations of the Buyer under this Agreement incapable of performance; and (ii) the Required Consenting First Lien Creditors have terminated the Restructuring Support Agreement pursuant to Section 7(a)(viii) thereof;

(D)    (1) the Auction has concluded and Buyer was not the Successful Bidder, (2) any of the Endo Companies enters into a definitive agreement for an Alternative Transaction or consummates any Alternative Transaction, or (3) the Bankruptcy Court enters an Order approving an Alternative Transaction or denying the Sale Motion as it relates to authorizing the Endo Companies to consummate the transactions contemplated pursuant to this Agreement; <u>provided</u> that if Buyer is the Backup Bidder at the Auction, the right of Buyer to terminate this Agreement pursuant to this <u>Section 8.1(a)(ii)(D)</u> shall not be available to Buyer until the Back-Up Bid Outside Date (as defined in the Bidding Procedures);

(E)    at 11:59 p.m. on the date that an Order is entered by the Bankruptcy Court or a court of competent jurisdiction either: (x) converting any of the Bankruptcy Cases to cases under chapter 7 of the Bankruptcy Code, (y) involuntarily dismissing any of the Bankruptcy Cases, (z) appointing of a trustee, liquidator or analogous officeholder or examiner with expanded powers (as such term is used in the Bankruptcy Code) in one or more of the Bankruptcy Cases, (aa) winding up any Endo Company and/or appointing a provisional or official liquidator to any

97

Endo Company pursuant to the Irish Companies Act, (bb) appointing an examiner (including an interim examiner) to any Debtor pursuant to the Irish Companies Act, (cc) enforcing any right to (1) appoint one or more receivers and/or receivers and managers over any of the shares and/or assets of any Endo Company or (2) enforce security over any of the shares or assets of any Endo Company, or (dd) any other order that is analogous to any of the foregoing under the laws of any jurisdiction, the effect of which would render the transactions contemplated by this Agreement incapable of consummation on the material terms set forth in this Agreement; provided that no right to terminate will arise if such order is entered or any of steps (x) through (dd) (subject to Bankruptcy Court approval) is taken for the purpose of completing the transactions set forth in this Agreement; and provided further that the Party so requesting termination shall have complied with Section 5.5;

(F)    the Bankruptcy Court fails to enter the Sale Order substantially consistent with the Restructuring Term Sheet and the terms of this Agreement and in compliance with the applicable milestone under the Restructuring Support Agreement; or

(G)    the Restructuring Support Agreement has been terminated by mutual, written agreement of the Debtors and the Required Consenting First Lien Creditors pursuant to Section 7(d)(i) thereof.

(iii)    by the Buyer, if:

(A)    the Buyer is not in material breach of this Agreement and the Endo Companies breach or fail to perform in any respect any of their representations, warranties or covenants contained in this Agreement or any Ancillary Agreement and such breach or failure to perform (A) has rendered the satisfaction of any condition set forth in Section 7.3 impossible and (B) the Endo Companies have failed to cure such breach within fifteen (15) days following receipt of notification thereof by the Buyer;

(B)    (i) any Debtor breaches, in any material respect, any of the undertakings or covenants of the Debtors set forth in the Restructuring Support Agreement that, if capable of being cured, remains uncured under the terms of the Restructuring Support Agreement; and (ii) the Required Consenting First Lien Creditors have terminated the Restructuring Support Agreement pursuant to Section 7(a)(i) thereof;

(C)    the Bankruptcy Court enters an order granting relief from the automatic stay imposed by section 362 of the Bankruptcy Code authorizing any party to proceed against any material asset of the Debtors that would have a Material Adverse Effect on (x) the Debtors' ability to operate their businesses in the ordinary course or (y) the ability of either party to this Agreement to consummate the transaction contemplated hereby;

(D)    (i) any Debtor files any motion, pleading, petition, or related document with the Bankruptcy Court or any other court of competent jurisdiction that is materially inconsistent with the Restructuring Support Agreement, the Restructuring Term Sheet, the Bidding Procedures, the Sale Process, the Cash Collateral Order, or the other Definitive Documents (or any amendment, modification or supplement to any of the foregoing, as applicable) and such motion, pleading, petition, or related document has not been withdrawn or amended to cure such

98

inconsistency in accordance with the terms of the Restructuring Support Agreement; and (ii) the Required Consenting First Lien Creditors have terminated the Restructuring Support Agreement pursuant to Section 7(a)(iv) thereof;

(E)    (i) any Definitive Document (excluding this (a) Agreement, (b) the Cash Collateral Order, (c) the Bidding Procedures, (d) the Bidding Procedures Order, (e) any postpetition key employee incentive and/or retentive based compensation program, and (f) all motions, pleadings, declarations, and proposed court orders that the Debtors file on or after the Petition Date and seek to have heard on an expedited basis at the "first day hearing" (or any amendment, modification or supplement thereto) that is necessary to implement the transaction contemplated hereby that is filed by a Debtor or any related order entered by the Bankruptcy Court, in the Bankruptcy Cases, is inconsistent with the terms and conditions set forth in the Restructuring Support Agreement or is otherwise not in accordance with the Restructuring Support Agreement, in each case to the extent material, or, which remains uncured under the terms of the Restructuring Support Agreement; and (ii) the Required Consenting First Lien Creditors have terminated the Restructuring Support Agreement pursuant to Section 7(a)(v) thereof;

(F)    (x) the Bidding Procedures Order or the Sale Order is reversed, dismissed, vacated, reconsidered, modified, or amended without the consent of the Buyer (with such consent not to be unreasonably withheld), or (y) a motion for reconsideration, reargument, or rehearing with respect to any such order has been filed and the Debtors have failed to object timely to such motion;

(G)    (i) except as permitted or the subject of a reservation of rights in the Restructuring Support Agreement or in the Definitive Documents, any Debtor has filed or supports another party in filing any plan of reorganization, liquidation, dissolution, administration, moratorium, receivership, winding up, bankruptcy, or sale of all or substantially all of any Debtor's assets other than as contemplated by the Sale Process, the Restructuring Support Agreement, and this Agreement, or takes any corporate action for the purpose of authorizing any of the foregoing, which event remains uncured under the terms of the Restructuring Support Agreement; and (ii) the Required Consenting First Lien Creditors have terminated the Restructuring Support Agreement pursuant to Section 7(a)(vii) thereof;

(H)    without the prior consent of the Buyer (not to be unreasonably withheld) or otherwise as consistent with the Restructuring Support Agreement, the Debtors apply for or consent to the appointment of a receiver, administrator, administrative receiver, trustee, custodian, sequestrator, conservator or similar official, trustee or an examiner pursuant to section 1104 of the Bankruptcy Code in any of the Bankruptcy Cases;

(I)    the Bankruptcy Court fails to enter the Sale Order not later than 11:59 p.m. prevailing Eastern Time on May 15, 2023 (unless otherwise expressly and mutually agreed in writing (including by email) by the Buyer (or Gibson, Dunn & Crutcher, LLP);

(J)    the termination of the use of cash collateral on a consensual basis occurs under the Cash Collateral Order;

(K)    (i) (1)(a) any Debtor enters into any settlement or other agreement or (b) any Debtor commences, supports, or encourages a motion, proceeding, or other action seeking, or otherwise consenting to any settlement of, or other agreement, in each case, with respect to any claims, clauses of action, or other rights related to, or in connection with, (x) any Opioid Claims or holders of Opioid Claims or (y) other than with respect to trade creditors in the ordinary course of business, any administrative expense Claim in excess of $5,000,000 individually or $20,000,000 in the aggregate or (2) the Bankruptcy Court enters an Order allowing any of the claims described in the immediately preceding clauses (x) and (y), in each case of clauses (1) and (2), without the consent of the Buyer not to be unreasonably withheld, provided, that it shall not constitute a termination event if the Debtors settle any claim for an amount in excess of the consent thresholds set forth herein in accordance with the Wind-Down Budget without such consent of the Buyer if (x) such settled claim is not payable prior to the Closing Date, and (y) to the extent such claim is otherwise contemplated to be payable from the Wind-Down Budget, the Debtors provide to Gibson, Dunn & Crutcher LLP written notice of their election to reduce the Wind-Down Budget by the amount payable pursuant to such settlement, in which case the Wind-Down Budget shall be reduced, upon payment of such settlement, in an amount equal to such settlement payment; and (ii) Buyer has terminated the Restructuring Support Agreement pursuant to Section 7(a)(xv) thereof;

(L)    (i) the Debtors (x) publicly announce their intention not to support the transaction contemplated hereby or the Restructuring (as defined in the Restructuring Support Agreement), (y) provide notice to Gibson, Dunn, & Crutcher LLP of the exercise of their Fiduciary Out (as defined in the Restructuring Support Agreement), or (z) publicly announce, or execute a definitive written agreement with respect to, an Alternative Proposal (as defined in the Restructuring Support Agreement); and (ii) Buyer has terminated the Restructuring Support Agreement pursuant to Section 7(a)(xviii) thereof;

(M)    the Endo Companies withdraw or seek authority to withdraw the Sale Motion; or

(N)    a trustee, receiver or examiner is appointed with expanded powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code.

(iv)    by Seller Parent, if:

(A)    the Endo Companies are not in material breach of this Agreement and the Buyer breaches or fails to perform in any respect any of its representations, warranties or covenants contained in this Agreement or any Ancillary Agreement and such breach or failure to perform (A) has rendered the satisfaction of any condition set forth in Section 7.2 impossible and (B) Buyer has failed to cure such breach within fifteen (15) days following receipt of notification thereof by Sellers;

(B)    the Seller Parent determines in good faith based on (i) its analysis as of the date of such determination of the relevant facts and circumstances (which may include, among other things, any information that may reasonably inform the probability of any contingent events occurring) and/or (ii) claims actually asserted against the Debtors as of the date of such determination, that the consummation of the Sale Transaction would be reasonably likely to result

100

in the Company having insufficient cash to pay its administrative expense claims that are generated by the Sale Transaction.  Prior to terminating this Agreement pursuant to this <u>Section 8.1(a)(iv)(B)</u>, the Seller Parent shall provide the Required Holders with at least fifteen (15) Business Days' notice, during which time the Seller Parent and the Required Holders will discuss a proposed resolution in good faith; or

(C)    the Seller Parent determines, in good faith and after consultation with its advisors, that continued performance under this Agreement or any Ancillary Agreement would be inconsistent with the exercise of its directors' fiduciary duties under Law.

(b)    The Party seeking to terminate this Agreement pursuant to this <u>Section 8.1</u> (other than <u>Section 8.1(a)(i)</u>) shall, if such Party is Seller Parent, give prompt written notice of such termination to the Buyer, and if such Party is a Buyer, give prompt written notice of such termination to Seller Parent.  Prior to the Buyer terminating this Agreement pursuant to <u>Section 8.1(a)(ii)(F)</u>, the Buyer shall provide the Debtors with at least fifteen (15) Business Days' notice, during which time the Debtors and the Buyer will discuss a proposed resolution in good faith.

Section 8.2    <u>Effect of Termination</u>.

(a)    In the event of termination of this Agreement as provided in <u>Section 8.1</u>, this Agreement shall forthwith become void and, except as otherwise provided in this <u>Section 8.2</u>, there shall be no Liability on the part of any Party except (i) for the provisions of <u>Section 3.20</u> and <u>Section 4.4</u> relating to broker's fees and finder's fees to the extent such fees are due and owing pursuant to and solely to the extent required by the terms of an executed engagement letter with the Debtors or the Cash Collateral Order, <u>Section 5.7</u>  relating to public announcements, <u>Section 9.3</u> relating to fees and expenses, <u>Section 9.6</u> relating to notices, <u>Section 9.9</u> relating to third-party beneficiaries, <u>Section 9.10</u> relating to governing law, <u>Section 9.11</u> relating to submission to jurisdiction, <u>Section 9.14</u> relating to enforcement, <u>Section 9.22</u> and this <u>Article VIII</u> and (ii) that nothing herein shall relieve any Party from Liability for Fraud or any Willful Breach of this Agreement or any Ancillary Agreement; <u>provided</u> that the Endo Companies shall not be liable to Buyer for any breach of their Competing Bid Obligations.

(b)    If, following entry of the Bidding Procedures Order, this Agreement is terminated in the circumstances set forth in <u>Section 8.3(a)</u>, then the Endo Companies, jointly and severally, shall pay to Buyer the Expense Reimbursement Amount, subject to and in accordance with <u>Section 8.3(a)</u> and <u>Section 8.3(b)</u>, and Buyer's right to enforce payment thereof shall survive the termination of this Agreement.  For the avoidance of doubt, the Stalking Horse Expense Reimbursement (as defined in the Restructuring Term Sheet) shall be in addition to the Debtor's obligations to pay reasonable and documented fees and expenses of the Required Holders' Advisors pursuant to the Cash Collateral Order, <u>provided</u>, <u>however</u>, that this provision does not provide an entitlement to recover duplicative amounts on account of the same fees and expenses.

Section 8.3    <u>Expense Reimbursement Amount</u>.

(a)    If this Agreement is terminated in accordance with the terms set forth in (i) <u>Section 8.1(a)(ii)(D)</u>, not later than two (2) Business Days following the consummation of an

Alternative Transaction, or (ii) in accordance with the terms set forth in Section 8.1(a)(iv)(C), not later than two (2) Business Days following receipt of documentation referenced in this Section 8.3(a), the Endo Companies, jointly and severally, shall pay to the Buyer in cash, in each case, subject to receipt of documentation supporting the request for reimbursement of previously unreimbursed out-of-pocket costs, fees and expenses, an amount equal to the reasonable and documented out-of-pocket costs, fees and expenses incurred by the Required Holders' Advisors; provided, however, individual Required Holders shall not be entitled to reimbursement for fees and expenses of their own advisors, in connection with the development, execution, delivery and approval by the Bankruptcy Court of this Agreement and the transactions contemplated hereby in an amount not to exceed $7,000,000 (the "Expense Reimbursement Amount"), in each case subject to the terms of any applicable engagement agreement signed by the Sellers and by wire transfer of immediately available funds to an account specified by the Buyer to the Endo Companies in writing.

(b)    The obligations of the Endo Companies to pay the Expense Reimbursement Amount as provided herein shall be entitled to administrative expense status pursuant to Sections 503(b)(1) and 507(a)(2) of the Bankruptcy Code.

(c)    The Parties agree and understand that in no event shall the Endo Companies be required to pay the Expense Reimbursement Amount on more than one occasion.  Notwithstanding anything to the contrary in this Agreement, other than in the case of Fraud or Willful Breach of this Agreement or any Ancillary Agreement by an Endo Company, the payment of the Expense Reimbursement Amount from or on behalf of the Endo Companies in the circumstances in which it is payable shall be the sole and exclusive remedy of the Buyer against the Endo Companies and their Affiliates and none of the Endo Companies or any of their respective Affiliates shall have any further liability or obligation (whether at law, or equity, in contract, in tort or otherwise) in connection with this Agreement's termination.

(d)    For the avoidance of doubt, the Expense Reimbursement shall be in addition to the Debtors' obligations to pay reasonable and documented fees and expenses of the Required Holders' Advisors pursuant to the Cash Collateral Order, provided, however, that this provision does not provide an entitlement to recover duplicative amounts on account of the same fees and expenses.

## ARTICLE IX
## GENERAL PROVISIONS

Section 9.1    Nonsurvival of Representations, Warranties and Covenants.    The respective representations, warranties and covenants of the Endo Companies, Newco Sellers and the Buyer contained in this Agreement and the Ancillary Agreements and any certificate delivered pursuant hereto shall terminate at, and not survive, the Closing, and after the Closing, except for Fraud, no Party shall make any claim whatsoever for any breach of or inaccuracy in any such representation, warranty or covenant hereunder, subject to Section 8.2 and Section 8.3; provided that, subject to Section 8.2, this Section 9.1 shall not limit any covenant or agreement of the Parties that by its terms requires performance after the Closing.

Section 9.2    Indemnification by Buyer.  From and after Closing and until the expiration of the Wind-Down Period, the Buyer will pay, defend, discharge, indemnify, and hold harmless the Endo

Companies and their respective officers, directors, employees, and agents from and against any and all Liability to the extent arising out of, resulting from, or attributable to any Non-U.S. Sale Transaction Taxes or any other Assumed Liability.  The Endo Companies and the Buyer agree to treat (and cause their Affiliates to treat) any payments received pursuant to this <u>Section 9.2</u> as adjustments to the Purchase Price for all Tax purposes, unless otherwise required by applicable Law, a closing agreement with an applicable Taxing Authority, or a final judgment of a court of competent jurisdiction.  Notwithstanding anything herein to the contrary, Buyer shall not pay, defend, discharge, indemnify, or hold harmless the Endo Companies for any Excluded Liabilities (including Excluded Taxes).

Section 9.3      <u>Fees and Expenses</u>.  Except as otherwise provided herein, all fees and expenses incurred in connection with or related to this Agreement and the Ancillary Agreements and the transactions contemplated hereby and thereby shall be paid by the Party incurring such fees or expenses, whether or not such transactions are consummated.  In the event of termination of this Agreement, the obligation of each Party to pay its own expenses will be subject to any rights of such Party arising from a breach of this Agreement by the other and <u>Section 8.3</u>.

Section 9.4      <u>Amendment and Modification</u>.  This Agreement may not be amended, modified or supplemented in any manner, whether by course of conduct or otherwise, except by an instrument in writing specifically designated as an amendment hereto, signed on behalf of each Party.

Section 9.5      <u>Waiver</u>.  No failure or delay of any Party in exercising any right or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such right or power, or any course of conduct, preclude any other or further exercise thereof or the exercise of any other right or power.  Any agreement on the part of either Party to any such waiver shall be valid only if set forth in a written instrument executed and delivered by a duly authorized officer on behalf of such Party.

Section 9.6      <u>Notices</u>.    All notices, requests, permissions, waivers, demands and other communications hereunder shall be in writing and shall be deemed duly given (a) on the date of delivery if delivered personally, or if by facsimile, upon written confirmation of receipt by facsimile or otherwise, (b) on the first Business Day following the date of dispatch if delivered utilizing a next-day service by a recognized next-day courier, (c) on the day of transmission if sent via e-mail transmission to the e-mail address(es) given below during regular business hours on a Business Day and, if not, then on the following Business Day or (d) on the earlier of confirmed receipt or the fifth (5th) Business Day following the date of mailing if delivered by registered or certified mail, return receipt requested, postage prepaid.  All notices hereunder shall be delivered to the addresses set forth below, or pursuant to such other instructions as may be designated in writing from time to time by the Party to receive such notice:

      (i)        if to the Endo Companies, to:

          Endo International plc
          First Floor, Minerva House, Simmonscourt Road
          Ballsbridge, Dublin 4, Ireland

Attention: [•]
E-mail: [•]

with a copy (which shall not constitute notice) to:

Skadden, Arps, Slate, Meagher & Flom LLP
One Manhattan West
New York, NY 10001
Phone:  (212) 735-3000
Email:          Brandon.VanDyke@skadden.com
                Shana.Elberg@skadden.com
                Maxim.MayerCesiano@skadden.com
                Lisa.Laukitis@skadden.com

Attention:      Brandon Van Dyke, Esq.
                Shana A. Elberg, Esq.
                Maxim Mayer-Cesiano, Esq.
                Lisa Laukitis, Esq.

(ii)    if to the Buyer, to:

Tensor Limited
2nd Floor, Palmerston House, Denzille Lane
Dublin, Dublin 2, D02 WD37, Ireland
Attention:  Ronan Donohoe
E-mail:  RDonohoe@caficointernational.com

with a copy (which shall not constitute notice) to:

Gibson Dunn & Crutcher LLP
200 Park Ave
New York, New York 10166
Attention:      Scott Greenberg,
                Michael J. Cohen, and
                Joshua K. Brody

E-mail:         SGreenberg@gibsondunn.com;
                MCohen@gibsondunn.com;
                JBrody@gibsondunn.com

Section 9.7    Interpretation.  When a reference is made in this Agreement to a Section, Article, Exhibit or Schedule such reference shall be to a Section, Article, Exhibit or Schedule of this Agreement unless otherwise indicated.  The table of contents and headings contained in this Agreement or in any Exhibit or Schedule or the Disclosure Letter are for convenience of reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.  All words used in this Agreement will be construed to be of such gender or number as the circumstances require.  Any capitalized terms used in any Exhibit, Schedule or the Disclosure

104

Letter but not otherwise defined therein shall have the meaning as defined in this Agreement. All Exhibits and Schedules annexed hereto or referred to herein and the Disclosure Letter are hereby incorporated in and made a part of this Agreement as if set forth herein. The word "including" and words of similar import when used in this Agreement will mean "including, without limitation," unless otherwise specified. The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to the Agreement as a whole and not to any particular provision in this Agreement. The term "or" is not exclusive. The word "will" shall be construed to have the same meaning and effect as the word "shall." References to days mean calendar days unless otherwise specified. When calculating the number of days before which, within which or following which, any act is to be done or step is to be taken pursuant to this Agreement, the date from which such period is to be calculated shall be excluded from such count; provided, however, that if the last calendar day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day. For purposes of this Agreement, if the Endo Companies or a Person acting on its behalf posts a document to the online data room hosted on behalf of the Endo Companies and located at www.intralinks.com prior to the date hereof, such document shall be deemed to have been "delivered," "furnished" or "made available" (or any phrase of similar import) to Buyer by the Endo Companies if the Buyer or its Representatives have access to such document prior to the execution of this Agreement.

Section 9.8    Entire Agreement.    This Agreement (including the Annexes, Exhibits and Schedules hereto) and the Ancillary Agreements constitute the entire agreement between the Parties, and supersede all prior written agreements, arrangements, communications and understandings and all prior and contemporaneous oral agreements, arrangements, communications and understandings between the Parties with respect to the subject matter hereof and thereof. Neither this Agreement nor any Ancillary Agreement shall be deemed to contain or imply any restriction, covenant, representation, warranty, agreement or undertaking of any Party with respect to the transactions contemplated hereby or thereby other than those expressly set forth herein or therein or in any document required to be delivered hereunder or thereunder, and none shall be deemed to exist or be inferred with respect to the subject matter hereof. Notwithstanding any oral agreement or course of conduct of the Parties or their Representatives to the contrary, no Party to this Agreement shall be under any legal obligation to enter into or complete the transactions contemplated hereby unless and until this Agreement shall have been executed and delivered by each of the Parties.

Section 9.9    Parties in Interest.    This Agreement shall be binding upon and inure solely to the benefit of each Party hereto, and nothing in this Agreement, express or implied, is intended to or shall confer upon any Person (including employees of the Endo Companies) other than the Parties and their respective successors and permitted assigns any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

Section 9.10    Governing Law.    Except to the extent of the mandatory provisions of the Bankruptcy Code, this Agreement and all Actions arising out of or relating to this Agreement or the transactions contemplated hereby (including those in contract or tort) shall be governed by, and construed in accordance with the internal laws of the State of New York, without regard to the laws of any other jurisdiction that might be applied because of the conflicts of laws principles of the State of New York.

Section 9.11    Submission to Jurisdiction.  Without limitation of any Party's right to appeal any Order of the Bankruptcy Court, (x) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby and (y) any and all claims relating to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Action or proceeding.  Each of the Parties agrees not to commence any action, suit or proceeding relating thereto except in the Bankruptcy Court, other than actions in any court of competent jurisdiction to enforce any judgment, decree or award rendered by the Bankruptcy Court as described herein.  Each of the Parties further agrees that notice as provided herein shall constitute sufficient service of process and the Parties further waive any argument that such service is insufficient.  Each of the Parties hereby irrevocably and unconditionally waives, and agrees not to assert, by way of motion or as a defense, counterclaim or otherwise, in any action or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby, (a) any claim that it is not personally subject to the jurisdiction of the courts as described herein for any reason, (b) that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) and (c) that (i) the suit, action or proceeding in any such court is brought in an inconvenient forum, (ii) the venue of such suit, action or proceeding is improper or (iii) this Agreement, or the subject matter hereof, may not be enforced in or by such courts.  Each of the Parties consents to the entry of a final order by the Bankruptcy Court under 28 U.S.C. § 157 and Article III of the U.S. Constitution.

Section 9.12    Disclosure Generally.  Notwithstanding anything to the contrary contained in the Disclosure Letter or in this Agreement, the information and disclosures contained in any Disclosure Letter shall be deemed to be disclosed and incorporated by reference in any other Disclosure Letter as though fully set forth in such Disclosure Letter for which applicability of such information and disclosure is reasonably apparent on its face.  The information contained in this Agreement and in the Disclosure Letter and Exhibits hereto is disclosed solely for purposes of this Agreement, and no information contained herein or therein shall be deemed to be an admission by any party hereto to any third party of any matter whatsoever (including any violation of Law or breach of contract).  Such information and the dollar thresholds set forth herein shall not be used as a basis for interpreting the terms "material" or "Material Adverse Effect" or other similar terms in this Agreement.

Section 9.13    Assignment; Successors.

(a)    Other than as permitted by Sections 9.13(b) or (c), neither this Agreement nor any of the rights, interests or obligations under this Agreement may be assigned or delegated, in whole or in part, by operation of law or otherwise, by any Endo Company without the prior written consent of the Buyer, and by the Buyer without the prior written consent of Seller Parent, and any such assignment without such prior written consent shall be null and void; provided, however, that no assignment shall limit the assignor's obligations hereunder.

(b)       Notwithstanding Section 9.13(a), the Buyer may without the prior written consent of Seller Parent subject to applicable Laws, assign any of its interests, rights and/or obligations in this Agreement: (x) for the purposes of providing security to any bank, financial institution, credit institution, person ordinarily engaged in the business of commercial lending or any other person or persons providing finance to the Buyer or (y) to any of its Affiliates, subject to the Buyer providing evidence reasonably satisfactory to Seller Parent that any such assignee has the ability to fully discharge perform and discharge the obligations of the assignor hereunder; provided, however, that in either case of (x) or (y), no assignment shall (i) limit the assignor's obligations hereunder; or (ii) be inconsistent with the Transaction Steps.

(c)       Subject to Sections 9.13(a) and (b), this Agreement will be binding upon, inure to the benefit of, and be enforceable by, the Parties and their respective successors and assigns.

Section 9.14   Enforcement.  The Parties agree that irreparable damage, for which monetary damages (even if available) would not be an adequate remedy, would occur in the event that any of the provisions of this Agreement are not performed (including failing to take such actions as are required of them hereunder to consummate the transactions contemplated hereby) in accordance with their specified terms or are otherwise breached.  Accordingly, each of the Parties shall be entitled to specific performance of the terms hereof, including an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement. Each of the Parties hereby further waives (a) any defense in any action for specific performance that a remedy at law would be adequate and (b) any requirement under any law to post security as a prerequisite to obtaining equitable relief.  Any party entitled to (i) an injunction or injunctions to prevent breaches of this Agreement; (ii) enforce specifically the terms and provisions of this Agreement; or (iii) other equitable relief, in each case, shall not be required to show proof of actual damages or to provide any bond or other security in connection with any such remedy.

Section 9.15   Currency.  All references to "dollars" or "$" in this Agreement or any Ancillary Agreement refer to United States dollars, which is the currency used for all purposes in this Agreement and any Ancillary Agreement.

Section 9.16   Severability.  Whenever possible, each provision or portion of any provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable Law, but if any provision or portion of any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable Law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or portion of any provision in such jurisdiction, and this Agreement shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision or portion of any provision had never been contained herein.

Section 9.17   Waiver of Jury Trial.  EACH OF THE PARTIES HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING UNDER THIS AGREEMENT OR (B) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO IN RESPECT OF THIS AGREEMENT OR ANY OF THE TRANSACTIONS RELATED HERETO, IN EACH CASE WHETHER NOW

EXISTING OR HEREAFTER ARISING, AND WHETHER IN CONTRACT, TORT, EQUITY OR OTHERWISE.  EACH PARTY TO THIS AGREEMENT HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT THE PARTIES TO THIS AGREEMENT MAY FILE A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

Section 9.18    Counterparts.  This Agreement may be executed in two or more counterparts, all of which shall be considered one and the same instrument and shall become effective when one or more counterparts have been signed by each of the Parties and delivered to the other Parties.

Section 9.19    Electronic Signature.  This Agreement may be executed by .pdf signature and a .pdf signature shall constitute an original for all purposes.

Section 9.20    Time of Essence.  Time is of the essence with regard to all dates and time periods set forth or referred to in this Agreement.  When calculating the period of time before which, within which or following which, any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

Section 9.21    Damages Limitation.  The Parties hereto expressly acknowledge and agree that no Party hereto shall have any liability under any provision of this Agreement for any special, incidental, consequential, exemplary or punitive damages (other than special, incidental or consequential damages to the extent reasonably foreseeable or awarded to a third party) relating to the breach or alleged breach of this Agreement.

Section 9.22    No Recourse Against Nonparty Affiliates.    Notwithstanding anything to the contrary contained herein, (a) all claims, obligations, liabilities, or causes of action (whether in contract or in tort, in law or in equity, or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or relate in any manner to this Agreement or the Ancillary Agreements, or the negotiation, execution, or performance of this Agreement or the Ancillary Agreements (including any representation or warranty made in, in connection with, or as an inducement to, this Agreement or the Ancillary Agreements), may be made only against (and are those solely of) the Persons that are expressly named as parties thereto (and then only with respect to the specific obligations set forth herein with respect to such party) (the "Named Parties")  and (b) no Person other than the Named Parties, including any Affiliate or any director, officer, employee, incorporator, member, partner, manager, stockholder, agent, attorney, or representative of, or any financial advisor or lender to, any Named Party or any of its Affiliates, or any director, officer, employee, incorporator, member, partner, manager, shareholder, Affiliate, agent, attorney, or representative of, or any financial advisor or lender to, any of the foregoing ("Nonparty Affiliates") nor any debt financing source, shall have any liability (whether in contract or in tort, in law or in equity, or granted by statute) for any claims, causes of action, obligations, or liabilities arising under, out of, in connection with, or related in any manner to this Agreement or the Ancillary Agreements or the transactions contemplated hereby or thereby or based on, in respect of, or by reason of this Agreement or the Ancillary Agreements or its negotiation, execution, performance, or breach or the transactions contemplated hereby or thereby.

107

Section 9.23    Bulk Sales.  Notwithstanding any other provisions in this Agreement, the Buyer and the Endo Companies hereby waive compliance with all "bulk sales," "bulk transfer" and similar Laws that may be applicable with respect to the sale and transfer of any or all of the Transferred Assets to the Buyer.

Section 9.24    No Presumption Against Drafting Party.   Each of the Buyer and the Endo Companies acknowledges that each Party to this Agreement has been represented by legal counsel in connection with this Agreement and the transactions contemplated by this Agreement. Accordingly, any rule of law or any legal decision that would require interpretation of any claimed ambiguities in this Agreement against the drafting Party has no application and is expressly waived.

Section 9.25    Conflicts; Privileges.

(a)    It is acknowledged by each of the parties that the Endo Companies have retained Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") to act as its counsel in connection with this Agreement and the transactions contemplated hereby (the "Current Representation"), and that no other party has the status of a client of Skadden for conflict of interest or any other purposes as a result thereof.  Buyer hereby agrees that after the Closing, Skadden may represent the Endo Companies or any of their Affiliates or any of their respective shareholders, partners, members or representatives (any such Person, a "Designated Person") in any matter involving or arising from the Current Representation, including any interpretation or application of this Agreement or any other agreement entered into in connection with the transactions contemplated hereby, and including for the avoidance of doubt any litigation, arbitration, dispute or mediation between or among Buyer or any of its Affiliates, and any Designated Person, even though the interests of such Designated Person may be directly adverse to Buyer or any of its Affiliates, and even though Skadden may have represented Buyer in a substantially related matter, or may be representing Buyer in ongoing matters.  Buyer hereby waives and agrees not to assert (1) any claim that Skadden has a conflict of interest in any representation described in this Section or (2) any confidentiality obligation with respect to any communication between Skadden and any Designated Person occurring during the Current Representation.

(b)    Buyer hereby agrees that as to all communications (whether before, at or after the Closing) between Skadden and any Designated Person that relate in any way to the Current Representation, the attorney-client privilege and all rights to any other evidentiary privilege, and the protections afforded to information relating to representation of a client under applicable rules of professional conduct, the Current Representation belong to Sellers and may be controlled by the Endo Companies and shall not pass to or be claimed by Buyer or any of its representatives and Buyer hereby agrees that it shall not seek to compel disclosure to Buyer or any of its Representatives of any such communication that is subject to attorney client privilege, or any other evidentiary privilege.

[The remainder of this page is intentionally left blank.]

107

IN WITNESS WHEREOF, the Endo Companies and the Buyer have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

Endo International plc

By: _____
     Name:
     Title:

Tensor Limited

By: _____
     Name:
     Title:

[SELLERS]

By: _____
     Name:
     Title:

[PARTICIPATING ENDO DEBTORS]

By: _____
     Name:
     Title:

*[Signature Page to the Purchase and Sale Agreement]*

Annex A-1

<u>Sellers</u>

1.      Par Pharmaceutical, Inc.

2.      Actient Pharmaceuticals LLC

3.      70 Maple Avenue, LLC

4.      Endo International plc

5.      Endo Ventures Limited

6.      Anchen Incorporated

7.      CPEC LLC

8.      Astora Women's Health Bermuda ULC

9.      Astora Women's Health Technologies

10.     Generics International (US), Inc.

11.     Anchen Pharmaceuticals, Inc.

12.     DAVA Pharmaceuticals, LLC

13.     Endo Par Innovation Company, LLC

14.     Generics Bidco I, LLC

15.     Innoteq, Inc.

16.     JHP Acquisition, LLC

17.     JHP Group Holdings, LLC

18.     Kali Laboratories, LLC

19.     Moores Mill Properties L.L.C.

20.     Par Pharmaceutical Companies, Inc.

21.     Par Pharmaceutical Holdings, Inc.

22. Par Sterile Products, LLC

23. Par, LLC

24. Quartz Specialty Pharmaceuticals, LLC

25. Vintage Pharmaceuticals, LLC

26. Actient Therapeutics LLC

27. Astora Women's Health Ireland Limited

28. Astora Women's Health, LLC

29. Auxilium International Holdings, LLC

30. Auxilium Pharmaceuticals, LLC

31. Auxilium US Holdings, LLC

32. Bermuda Acquisition Management Limited

33. BioSpecifics Technologies LLC

34. Branded Operations Holdings, Inc.

35. DAVA International, LLC

36. Endo Aesthetics LLC

37. Endo Bermuda Finance Limited

38. Endo Designated Activity Company

39. Endo Eurofin Unlimited Company

40. Endo Finance IV Unlimited Company

41. Endo Finance LLC

42. Endo Finance Operations LLC

43. Endo Finco Inc.

44. Endo Generics Holdings, Inc.

45.  Endo Global Aesthetics Limited

46.  Endo Global Biologics Limited

47.  Endo Global Development Limited

48.  Endo Global Finance LLC

49.  Endo Global Ventures

50.  Endo Health Solutions Inc.

51.  Endo Innovation Valera, LLC

52.  Endo Ireland Finance II Limited

53.  Endo LLC

54.  Endo Management Limited

55.  Endo Pharmaceuticals Finance LLC

56.  Endo Pharmaceuticals Inc.

57.  Endo Pharmaceuticals Solutions Inc.

58.  Endo Pharmaceuticals Valera Inc.

59.  Endo Procurement Operations Limited

60.  Endo TopFin Limited

61.  Endo U.S. Inc.

62.  Endo Ventures Aesthetics Limited

63.  Endo Ventures Bermuda Limited

64.  Endo Ventures Cyprus Limited

65.  Generics International (US) 2, Inc.

66.  Generics International Ventures Enterprises LLC

67.  Hawk Acquisition Ireland Limited

68.    Kali Laboratories 2, Inc.

69.    Paladin Labs Canadian Holding Inc.

70.    Paladin Labs Inc.

71.    Par Laboratories Europe, Ltd.

72.    Par Pharmaceutical 2, Inc.

73.    Slate Pharmaceuticals, LLC

74.    Timm Medical Holdings, LLC

Annex A-2

<u>Participating Endo Debtors</u>

1.      Endo Luxembourg Finance Company I S.A.R.L.

2.      Endo Luxembourg Holding Company  S.A.R.L.

3.      Endo Luxembourg International Financing  S.A.R.L.

4.      Endo US Holdings Luxembourg I S.A R.L.

5.      Luxembourg Endo Specialty Pharmaceuticals Holding I S.A R.L.

## **Exhibit C**

***Takata*** **Pre-Restructuring Steps Motion and Entered Order**

## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF DELAWARE

------------------------------------------------------x
   :
In re                   :      **Chapter 11**
   :
**TK HOLDINGS INC.,** *et al.*,   :      **Case No. 17-11375 (BLS)**
   :
Debtors.[1]        :      **Jointly Administered**
   :
   : **Hearing Date: December 5, 2017 at 10:00 a.m. (EST)**
   : **Obj. Deadline:  November 28, 2017 at 4:00 p.m. (EST)**
------------------------------------------------------x

### MOTION OF DEBTORS PURSUANT TO 11 U.S.C. §§ 363 AND 105(a) FOR AUTHORITY TO EFFECT CERTAIN PRE-RESTRUCTURING STEPS AND TRANSACTIONS WITH RESPECT TO THE DEBTORS' MEXICAN AFFILIATES NECESSARY FOR THE GLOBAL TRANSACTION

TK Holdings Inc. ("***TKH***") and its affiliated debtors in the above-captioned chapter 11

cases (the "***Chapter 11 Cases***"), as debtors and debtors in possession (collectively, the "***Debtors***"),

respectfully represent as follows in support of this motion (this "***Motion***"):

### Relief Requested

1.      By this Motion, pursuant to sections 363(b) and 105(a) of title 11 of the United

States Code (the "***Bankruptcy Code***"), the Debtors request authority to perform certain preparatory, pre-

restructuring transactions with respect to the Debtors' Mexican affiliates to timely implement the Global

Transaction (as defined below) if and when it is subsequently approved by this Court.

2.      A proposed form of order granting the relief requested herein on a final basis is

annexed hereto as **Exhibit A** (the "***Proposed Order***").

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  Takata Americas (9766); TK Finance, LLC (2753); TK China, LLC (1312); TK Holdings Inc. (3416); Takata Protection Systems Inc. (3881); Interiors in Flight Inc. (4046); TK Mexico Inc. (8331); TK Mexico LLC (9029); TK Holdings de Mexico, S. de R.L. de C.V. (N/A); Industrias Irvin de Mexico, S.A. de C.V. (N/A); Takata de Mexico, S.A. de C.V. (N/A); and Strosshe-Mex, S. de R.L. de C.V. (N/A).  Except as otherwise set forth herein, the Debtors' international affiliates and subsidiaries are not debtors in these chapter 11 cases.  The location of the Debtors' corporate headquarters is 2500 Takata Drive, Auburn Hills, Michigan 48326.

3.      In support of this Motion, the Debtors submit the declaration of Kris Sherbine, Director of Materials and Customer Service of TKH, (the "**Sherbine Declaration**"), a copy of which is attached hereto as <u>**Exhibit B**</u>.

<u>**Jurisdiction**</u>

4.      The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b) and, pursuant to Rule 9013–1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

<u>**Background**</u>

5.      On June 25, 2017 (the "**Petition Date**"), each of the Debtors commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On July 7, 2017, the United States Trustee for Region 3 appointed the statutory committee of unsecured creditors pursuant to section 1102(a)(1) of the Bankruptcy Code (the "**Creditors' Committee**") and the statutory committee of tort claimant creditors pursuant to section 1102(a)(2) of the Bankruptcy Code (the "**Tort Claimants' Committee**" and, together with the Creditors' Committee, the "**Committees**").  On September 6, 2017, the Court, pursuant to sections 105 and 1109(b) of the Bankruptcy Code, appointed Roger Frankel as the legal representative for individuals who sustain injuries related to PSAN Inflators after the Petition Date (the "**Future Claimants' Representative**") [Docket No. 703].  No trustee or examiner has been appointed in these Chapter 11 Cases.  The Debtors' Chapter 11

Cases have been jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1.

6.        On the Petition Date, in coordination with the commencement of the Chapter 11 Cases, Takata Corporation, the Debtors' ultimate corporate parent ("**TKJP**" and, together with its direct and indirect global subsidiaries, including TKH, "**Takata**"), together with Takata Kyushu Corporation and Takata Service Corporation, commenced civil rehabilitation proceedings under the Civil Rehabilitation Act of Japan in the 20th Department of the Civil Division of the Tokyo District Court (the "**Japanese Proceedings**").  On August 9, 2017, TKJP and two Japanese affiliates filed petitions with the Court seeking recognition of the Japanese Proceedings.  On June 28, 2017, the Debtors also commenced an ancillary proceeding under the Companies' Creditors Arrangement Act (Canada), R.S.C. 1985, c. C-36 as amended (the "**CCAA**") in the Ontario Superior Court of Justice (Commercial List) (the "**Canadian Court**") in Ontario, Canada.  On October 13, 2017, the Canadian Court entered an order recognizing the Chapter 11 Cases and the Japan Proceedings.

7.        Additional information regarding the circumstances leading to the commencement of these Chapter 11 Cases and information regarding the Debtors' businesses and capital structure is set forth in the *Declaration of Scott E. Caudill in Support of Debtors' Chapter 11 Petitions and First Day Relief*, dated June 25, 2017 [Docket No. 19] (the "**Caudill Declaration**").

## The Pre-Restructuring Steps

8.        On November 3, 2017, after many months of robust, multi-lateral negotiations among Takata, certain of Takata's customers (the "**Initial Consenting OEMs**"), and Joyson KSS Auto Safety S.A. (collectively with one or more of its current or future Subsidiaries and or Affiliates (as such terms are defined in the U.S. APA (defined below)), "**KSS**" or the "**Plan Sponsor**"), the Debtors filed proposed forms of definitive transaction documents required to implement the global sale of Takata to

3

KSS (the "***Global Transaction***").  With respect to the Debtors, the Global Transaction will be

implemented through a series of documents including, without limitation, the following:

(i)    The *Joint Chapter 11 Plan of Reorganization of TK Holdings Inc. and its Affiliated Debtors* [Docket No. 1108] (including all exhibits and schedules attached thereto and each as may be amended, modified, or supplemented from time to time, the "***Plan***");

(ii)    That certain Asset Purchase Agreement, by and among certain of the Debtors, the Plan Sponsor, and KSS Holdings, Inc. (solely for purposes of section 7.22 thereof) [Docket No. 1110] (including all exhibits and schedules attached thereto and each as may be amended, modified, or supplemented from time to time, the "***U.S. APA***"); and

(iii)    That certain Restructuring Support Agreement for U.S. Debtors [Docket No. [1109] (including all exhibits and schedules attached thereto and each as may be amended, modified, or supplemented from time to time, the "***RSA***").[2]

9.    Although substantial progress has been made since the Petition Date, significant

work remains to be done for the Debtors to comply with the February 27, 2018 deadline (the "***Outside***

***Date***") for completion of the Global Transaction imposed under the terms of the settlement between TKJP

and the Department of Justice.  The documents that comprise the Global Transaction include numerous

conditions precedents and closing conditions that must be satisfied in order to close on the U.S. APA,

including, without limitation, approval of a disclosure statement and solicitation, and confirmation of the

Plan, and receiving necessary governmental approvals.

10.    In order to satisfy all of the conditions in the U.S. APA so that the parties thereto

can close the transaction contemplated therein (the "***U.S. Closing***"), the sellers thereunder (Takata

Americas, TKH, TK Mexico LLC; TK Holdings de Mexico, S. de R.L. de C.V. ("***TKHDM***"), Industrias

Irvin de Mexico, S.A. de C.V. ("***IIM***"), Takata de Mexico, S.A. de C.V. ("***TDM***"), and Strosshe-Mex, S.

de R.L. de C.V. ("***SMX***"), and together, collectively, the "***Sellers***") must undertake, or cause to be

undertaken, certain internal pre-restructuring steps with respect to the Mexican Debtors and certain of

---

[2] Capitalized terms used but not otherwise herein defined shall have the meanings ascribed to such terms in the RSA.

their non-Debtor Mexican affiliates (the "***Pre-Restructuring Steps***") in order to prepare for the separation

of the assets being sold to the Plan Sponsor.  These Pre-Restructuring Steps include, without limitation,

(i) creating a new Mexican trading company, (ii) TDM and IIM's transfer to Equipo Automotriz

Americana, S.A. de C.V. ("***Equipo***") of their respective assets and liabilities, other than those related to

the manufacture, design, assembly, sale, distribution, or handling of phase-stabilized ammonium nitrate

("***PSAN***") airbag inflators (the "***Equipo Transfer***"), (ii) transferring certain Mexican employees between

and among the Mexican Debtors and certain of their Mexican non-Debtor affiliates, (iv) submitting

necessary applications for certain licenses and permits, and (v) incurring related professional fees.

       11.    The initial Pre-Restructuring Steps are small and of modest expense and include

filing applications with local government agencies with respect to certain ordinary course permits and

incurring certain de minimis fees in connection therewith.  Under applicable Mexican law, in order to

complete the Global Transaction by the Outside Date it was necessary for the Debtors to commence the

first of these ordinary course Pre-Restructuring Steps prior to October 31, 2017.  However, certain

processes that must be commenced before the end of 2017 are more expensive, and are expected to cost

approximately $12 million on a gross basis through the date of the U.S. Closing.  This $12 million

estimate is actually approximately $4.5 million net of approximately $7.5 million[3] in value added taxes

that the Debtors expect to recover once an asset appraisal is obtained, certain filings are made with the

Mexican government, and certain receivables are collected.[4]  This estimate includes administrative fees,

---

[3] For the avoidance of doubt, this sum represents the amount of recoverable value-added taxes associated with the Pre-Restructuring Steps that the Debtors expect that they would ultimately recover if the Global Transaction were *not* consummated.  The U.S. APA and the other regional purchase agreements will govern the allocation of value-added taxes and corresponding refunds (or other recovery) between Takata and the Plan Sponsor in the event the Global Transaction is consummated.  The allocation and treatment of value-added taxes (and refunds or other recovery) under the U.S. APA is complex.  If the Global Transaction is not consummated, any recovery of value-added taxes would necessarily inure to the Debtors' benefit.

[4] The cost estimates in this Motion reflect the Debtors' reasonable estimates; however, the figures are approximate, and remain subject to change.  Additional certainty is expected once an appraisal of the Debtors' Mexican affiliates' assets is completed.  That appraisal is underway and the appraiser's report will be delivered in December 2017.

application fees, professional fees, certain taxes, and certain other expenses associated with preparing the
Debtors' Mexican affiliates for the Global Transaction. The Debtors are filing this Motion requesting the
Bankruptcy Court's authority to perform the Pre-Restructuring Steps before they undertake any significant
non-ordinary course transactions or incur the related expenses.

        12.      Specifically, the Pre-Restructuring Steps include the following transactions:

***New Mexican Trading Company***

        13.      Pursuant to section 7.20(a) of the U.S. APA, the Sellers are required to create a new
Mexican trading company to facilitate the sale of product in Mexico to domestic Mexican customers. In
particular, prior to the closing of the Global Transaction, TKHDM, TK Mexico LLC and/or SMX must, or
must cause one or more of their affiliates approved by the Plan Sponsor to, incorporate a new subsidiary in
Mexico ("***New Mexican Trading Company***") and cause certain assets and liabilities of SMX to be
transferred to the New Mexican Trading Company. The Debtors intend to incorporate the New Mexican
Trading Company as a subsidiary of SMX and TKHDM, with TKHDM as a minority shareholder. The
largest portion of the anticipated recoverable value added taxes (up to approximately $6 million) is
associated with the sale of receivables from SMX to the New Mexican Trading Company. The creation of
the New Mexican Trading Company and transfer of SMX assets must commence in January 2018 so that
the New Mexican Trading Company is able to operate independently for a sufficient amount of time in
advance of the U.S. Closing to ensure a smooth transfer of SMX receivables and contracts to the Plan
Sponsor. The transfer of assets from SMX to the New Mexican Trading Company will be structured in a
manner that ensures that SMX's value is preserved and that ensures that the anticipated allocation of
SMX's value within the larger context of the Global Transaction is maintained.

*Equipo Transfer*

14.     Pursuant to section 7.20(b) of the U.S. APA, the Sellers are required to effect a transfer of certain assets and liabilities to Equipo to facilitate the transfer of Takata's businesses to the Plan Sponsor.  In particular, prior to the U.S. Closing, IIM and TDM must sell, transfer, assign, convey and/or deliver certain assets and liabilities to Equipo.  The Equipo Transfer is expected to trigger approximately $4 million in tax liability, including approximately $2 million in value added taxes and approximately $2 million in real estate taxes, income taxes, and employee profit sharing.  The value added taxes may have to be paid in late December 2017 or January, 2018, but are expected to be recoverable later in 2018.  The Equipo Transfer must commence in January 2018 so that any operational or regulatory integration issues, which may take a number of weeks to resolve, can be resolved sufficiently in advance of the U.S. Closing.  The Equipo Transfer will be structured in a manner that ensures that IIM's and TDM's value is preserved and that ensures that the anticipated allocation of those entities' value within the larger context of the Global Transaction is maintained.

*Transfer of Mexican Employees*

15.     Pursuant to section 8.2 of the U.S. APA and the Mexican Employees Transfer Agreement, which will be executed concurrently with the U.S. APA, the Sellers must take certain steps to transfer certain Mexican employees (other than those employees designated as PSAN Employees (as defined in the U.S. APA)) not currently employed by Equipo to Equipo prior to the closing through an employer substitution process.  Many of these employees are unionized, and their employment and transfer are subject to collective bargaining agreements and a host of Mexican employment laws.

16.     The transfer process is highly formal, and involves the publication of certain notices and delivery of certain letters and employer substitution notices to the transferring employees, the

publication and filing of the employer substitution notices with certain governmental agencies, as well as

the delivery of a number of applications to state and local government agencies.  New collective

bargaining agreements replicating the prior collective bargaining agreements covering the transferring

employees must also be negotiated and entered into by Equipo.  This process, which is expected to affect

approximately 12,000 workers, must be commenced in early January 2018[5] to ensure that the Global

Transaction can be closed by the Outside Date.  This timing is required not only to comply with applicable

Mexican law since the employer substitution must be carried out at the same time or after the Equipo

Transfer, but also to ensure that the transition is as smooth as possible for Mexican employees.  All

employee benefits will be respected, and layoffs are not expected.

### Licenses, Permits, and Professional Fees

17.     In preparation for the Global Transaction, and pursuant to section 7.18 of the U.S.

APA, the Debtors' Mexican affiliates also need to apply for certain government permits and licenses.

These permits, among others, include permits to allow the Debtor' Mexican affiliates to act and continue

operations as "Maquiladoras" and permits from the Mexican Ministry of Defense to import, buy, store,

and handle energetic materials (*e.g.*, propellant for airbag inflators).  Because of the processing times

associated with certain of these permits, the Debtors and their Mexican affiliates have begun to prepare the

necessary paperwork, and in some cases, to actually file the paperwork with Mexican government

agencies.  The application fees associated with these licenses and permits are nominal; however, there will

be professional fees incurred by local Mexican counsel to prepare the necessary applications.  Additional

professional fees will also be incurred in connection with the other Pre-Restructuring Steps described

above.  Altogether, the Debtors and their Mexican affiliates are expected to incur approximately $1.2

---

[5] The transfer of Mexican employees must occur concurrently with, or sometime after, the Equipo Transfer.

million in professional fees in connection with the Pre-Restructuring Steps and the Mexican aspects of the Global Transaction. To date, these professional fees have been nominal; however, they are expected to ramp up over time between now and the U.S. Closing.

18. To be clear, the Debtors are not asking the Bankruptcy Court to approve the Global Transaction by this Motion. The Debtors are only asking the Bankruptcy Court to authorize the Debtors to implement the Pre-Restructuring Steps and to approve the Debtors' expenditure of approximately $12 million – of which an estimated $7.5 million consists of recoverable value added taxes – to ensure that the Global Transaction can be timely consummated in accordance with the transaction structure negotiated between the Debtors and the Plan Sponsor if and when it is approved. Although certain of the Pre-Restructuring Steps are not reversible if the Global Transaction with the Plan Sponsor is not ultimately consummated, these actions are not harmful to the Debtors and their Mexican affiliates' operations. In the event the Global Transaction does not close, the Debtors and their Mexican affiliates will be able to continue operations in Mexico, as restructured, without interruption and without meaningful harm to the Debtors' estates. Accordingly, to ensure that the Debtors are able to emerge by the Outside Date, the Pre-Restructuring Steps should be approved.

## **Basis for Relief Requested**

### A.    **The Debtors Are Exercising Sound Business Judgment in Effecting the Pre-Restructuring Steps**

19. The Debtors seek approval, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code to enter into the Pre-Restructuring Steps. The Pre-Restructuring Steps constitute a sound exercise of business judgment and are in the best interest of the Debtors.

20. Section 363(b)(1) of the Bankruptcy Code provides in relevant part that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). Further, pursuant to section 105(a) of the Bankruptcy Code,

the "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." *Id.* § 105(a).

21.     Under applicable case law in this and other circuits, if a debtor's proposed use of its assets pursuant to section 363(b) of the Bankruptcy Code represents the exercise of the debtor's reasonable business judgment, such use should be approved.  *See Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (noting that, under normal circumstances, the court defers to the trustee's judgment so long as there is a "legitimate business justification"); *In re Del. & Hudson R.R.*, 124 B.R. 169, 176 (D. Del. 1991) (courts have applied the "sound business purpose" test to evaluate motions brought pursuant to section 363(b)); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983) (requiring an "articulated business justification").

22.     If a valid business justification exists for the use or sale of property of the estate, a debtor's decision enjoys a strong presumption that "in making a business decision the directors . . . acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Official Comm. of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)); *see also In re Bridgeport Holdings, Inc.*, 388 B.R. 548, 567 (Bankr. D. Del. 2008) (stating that directors enjoy a presumption of honesty and good faith with respect to negotiating and approving a transaction involving a sale of assets).  Indeed, when applying the "business judgment" standard, courts show great deference to a debtor's business decisions.  *See Stanziale v. Nachtomi (In re Tower Air, Inc.)*, 416 F.3d 229, 238 (3d Cir. 2005) ("Overcoming the presumptions of the business judgment rule on the merits is a near-Herculean task.  Delaware courts have said that it may be accomplished by showing either irrationality or inattention."); *In re Global Home Prods., LLC*, 369 B.R. 778, 783 (Bankr. D. Del. 2007) (applying the business judgment standard to transactions under section 363 of the Bankruptcy Code).

23.     Section 105(a) of the Bankruptcy Code further provides that the court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  Section 105(a) allows the bankruptcy court to "craft flexible remedies that, while not expressly authorized by the [Bankruptcy] Code, effect the result the [Bankruptcy] Code was designed to obtain."  *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 235-36 (3d Cir. 2004) (citing *Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 568 (3d Cir. 2003)).

24.     Here, the Debtors' decision to enter into the Pre-Restructuring Steps satisfies the business judgment test.  The Pre-Restructuring Steps are necessary in order to pave the way for the Global Transaction.  Many of the Pre-Restructuring Steps are low impact, and qualify as ordinary course transactions, and the Debtors are seeking Bankruptcy Court approval out of an abundance of caution.  Furthermore, the Pre-Restructuring Steps will not harm the Debtors' estates or their creditors.  The Debtors and their non-Debtor affiliates are taking steps to ensure that any movement of assets or liabilities in Mexico is structured in a way that preserves the transferor entities' value.

25.     If the Pre-Restructuring Steps are not commenced now, the Global Transaction will not be able to close by the Outside Date, which may trigger a termination of certain key restructuring documents in these Chapter 11 Cases, including the RSA, which may derail the entire Global Transaction.  The Global Transaction provides Takata with a viable path — and possibly the only path — forward and ensures that it can satisfy its ongoing recall-related obligations.  The benefits of commencing the Pre-Restructuring Steps now and ensuring that the Global Transaction can close by the Outside Date far outweigh the costs associated therewith.  In addition, though the Pre-Restructuring Steps will modify the prepetition corporate structure and entity-by-entity asset breakdown in Mexico, the Pre-Restructuring Steps will not prejudice the Debtors' ability to pursue an alternative transaction should the Global

Transaction not close. If the Global Transaction does not ultimately close, the Debtors may have incurred up to approximately $4.5 million in unrecoverable expenses; however, if the Pre-Restructuring Steps are not started immediately, it is a certainty that the Global Transaction will not close by the Outside Date, which will jeopardize the Debtors' ability to restructure, reorganize, and meet its ongoing commitments.

26.    Accordingly, the Debtors' decision to commence the Pre-Restructuring Steps and incur the modest preparatory costs now is a sound exercise of their business judgment and is in the best interest of the Debtors, their estates, their creditors, and all parties in interest.

### Request for Waiver of Stay

27.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). The Debtors request that any order approving the Motion be effective immediately upon entry by providing that the 14-day stay shall not apply. Immediate implementation of the Pre-Restructuring Steps is in the best interests of the Debtors and their stakeholders.

### Notice

28.    Notice of this Motion has been provided to (i) the Office of the United States Trustee for the District of Delaware (Attn: David Buchbinder, Esq. and Jane Leamy, Esq.); (ii) the Committees; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the Offices of the United States Attorney for each of the District of Delaware and the Eastern District of Michigan; (vi) NHTSA; (vii) each of the Initial Consenting OEMs; (viii) the Plan Sponsor; (ix) the Future Claimants' Representative; and (x) all parties who have requested service of notices in these Chapter 11 Cases pursuant to Bankruptcy Rule 2002. Based on the urgency of the circumstances surrounding this Motion and the nature of the relief requested herein, the Debtors respectfully submit that no further notice is required.

**No Previous Request**

29.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE the Debtors respectfully request entry of the Proposed Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated:  November 14, 2017
        Wilmington, Delaware

/s/ Brett M. Haywood
RICHARDS, LAYTON & FINGER, P.A.
Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Amanda R. Steele (No. 5530)
Brett M. Haywood (No. 6166)
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

-and-

WEIL, GOTSHAL & MANGES LLP
Marcia L. Goldstein
Ronit J. Berkovich
Matthew P. Goren
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

*Attorneys for the Debtors*
*and Debtors in Possession*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

-------------------------------------------------------x

|  |  |  |
|---|---|---|
| | : | |
| **In re** | : | **Chapter 11** |
| | : | |
| **TK HOLDINGS INC.,** *et al.*, | : | **Case No. 17-11375 (BLS)** |
| | : | |
| **Debtors.**[1] | : | **Jointly Administered** |
| | : | |
| | : | **Hearing Date: December 5, 2017 at 10:00 a.m. (EST)** |
| | : | **Obj. Deadline: November 28, 2017 at 4:00 p.m. (EST)** |

-------------------------------------------------------x

### NOTICE OF MOTION AND HEARING

PLEASE TAKE NOTICE that, on November 14, 2017, TK Holdings Inc. and its

affiliated debtors in the above-captioned chapter 11 cases, as debtors and debtors in possession

(collectively, the "***Debtors***"), filed the *Motion of Debtors Pursuant to 11 U.S.C. §§ 363 and 105(a)*

*for Authority to Effect Certain Pre-Restructuring Steps and Transactions with Respect to the*

*Debtors' Mexican Affiliates Necessary for the Global Transaction* (the "***Motion***") with the United

States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***").

PLEASE TAKE FURTHER NOTICE that any responses or objections to the Motion

must be in writing, filed with the Clerk of the Bankruptcy Court, 824 North Market Street, 3rd Floor,

Wilmington, Delaware 19801, and served upon and received by the undersigned counsel for the

Debtors on or before **November 28, 2017 at 4:00 p.m. (Eastern Time)**.

PLEASE TAKE FURTHER NOTICE that if any objections to the Motion are

received, the Motion and such objections shall be considered at a hearing before The Honorable

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Takata Americas (9766); TK Finance, LLC (2753); TK China, LLC (1312); TK Holdings Inc. (3416); Takata Protection Systems Inc. (3881); Interiors in Flight Inc. (4046); TK Mexico Inc. (8331); TK Mexico LLC (9029); TK Holdings de Mexico S. de R.L. de C.V. (N/A); Industrias Irvin de Mexico, S.A. de C.V. (N/A); Takata de Mexico, S.A. de C.V. (N/A); and Strosshe-Mex, S. de R.L. de C.V. (N/A). Except as otherwise set forth herein, the Debtors' international affiliates and subsidiaries are not debtors in these chapter 11 cases. The location of the Debtors' corporate headquarters is 2500 Takata Drive, Auburn Hills, Michigan 48326.

Brendan L. Shannon, Chief United States Bankruptcy Judge for the District of Delaware, at the

Bankruptcy Court, 824 North Market Street, 6th Floor, Courtroom No. 1, Wilmington, Delaware

19801 on **December 5, 2017 at 10:00 a.m. (Eastern Time).**

**PLEASE TAKE FURTHER NOTICE THAT IF NO OBJECTIONS TO THE**

**MOTION ARE TIMELY FILED, SERVED AND RECEIVED IN ACCORDANCE WITH**

**THIS NOTICE, THE BANKRUPTCY COURT MAY GRANT THE RELIEF REQUESTED**

**IN THE MOTION WITHOUT FURTHER NOTICE OR HEARING.**

Dated: November 14, 2017
      Wilmington, Delaware

               */s/ Brett M. Haywood*
               RICHARDS, LAYTON & FINGER, P.A.
               Mark D. Collins (No. 2981)
               Michael J. Merchant (No. 3854)
               Amanda R. Steele (No. 5530)
               Brett M. Haywood (No. 6166)
               One Rodney Square
               920 N. King Street
               Wilmington, Delaware 19801
               Telephone:  (302) 651-7700
               Facsimile:  (302) 651-7701

               -and-

               WEIL, GOTSHAL & MANGES LLP
               Marcia L. Goldstein
               Ronit J. Berkovich
               Matthew P. Goren
               767 Fifth Avenue
               New York, New York  10153
               Telephone:  (212) 310-8000
               Facsimile:  (212) 310-8007

               *Attorneys for the Debtors and Debtors in Possession*

2

## Exhibit A

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

-------------------------------------------------------x
:
In re                                                                      :        **Chapter 11**
:
**TK HOLDINGS INC.,** *et al.,*                        :        **Case No. 17-11375 (BLS)**
:
Debtors.[1]                                                       :        **(Jointly Administered)**
:
-------------------------------------------------------x        Re:  Docket No.

**ORDER PURSUANT TO 11 U.S.C. §§ 363 AND 105(a)**
**FOR AUTHORITY TO EFFECT CERTAIN PRE-RESTRUCTURING**
**STEPS AND TRANSACTIONS WITH RESPECT TO THE DEBTORS'**
**MEXICAN AFFILIATES NECESSARY FOR THE GLOBAL TRANSACTION**

Upon the motion, dated November 14, 2017 (the "***Motion***"),[2] of TK Holdings Inc.

and its affiliated debtors, as debtors and debtors in possession (collectively, the "***Debtors***"),

pursuant to sections 363 and 105(a) of title 11 of the United States Code (the "***Bankruptcy***

***Code***") for authority to perform certain pre-restructuring transactions in preparation for, and in

furtherance of, the Global Transaction (as defined in the Motion) all as more fully set forth in the

Motion; and this Court having jurisdiction to consider the Motion and the relief requested therein

pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the

United States District Court for the District of Delaware dated February 29, 2012; and

consideration of the Motion and the requested relief being a core proceeding pursuant to 28

U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  Takata Americas (9766); TK Finance, LLC (2753); TK China, LLC (1312); TK Holdings Inc. (3416); Takata Protection Systems Inc. (3881); Interiors in Flight Inc. (4046); TK Mexico Inc. (8331); TK Mexico LLC (9029); TK Holdings de Mexico, S. de R.L. de C.V. (N/A); Industrias Irvin de Mexico, S.A. de C.V. (N/A); Takata de Mexico, S.A. de C.V. (N/A); and Strosshe-Mex, S. de R.L. de C.V. (N/A).  Except as otherwise set forth herein, the Debtors' international affiliates and subsidiaries are not debtors in these chapter 11 cases.  The location of the Debtors' corporate headquarters is 2500 Takata Drive, Auburn Hills, Michigan 48326.

[2] Capitalized terms used but not otherwise herein defined shall have the meanings ascribed to such terms in the Motion.

1409; and due and proper notice of the Motion having been provided to the parties listed therein, and it appearing that no other or further notice need be provided; and this Court having reviewed the Motion; and this Court having held a hearing on the Motion; and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, creditors, and all parties in interests; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor,

## IT IS HEREBY ORDERED THAT:

1.      The Motion is granted as provided herein.

2.      The Debtors are authorized, but not directed, pursuant to sections 363 and 105(a) of the Bankruptcy Code, to complete the Pre-Restructuring Steps.

3.      Notwithstanding the provisions of Bankruptcy Rule 6004(h), this Order shall be immediately effective and enforceable upon its entry.

4.      The Debtors are authorized to take all steps necessary or appropriate to carry out this Order.

5.      This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

Dated: _____, 2017
          Wilmington, Delaware

_____
THE HONORABLE BRENDAN L. SHANNON
CHIEF UNITED STATES BANKRUPTCY JUDGE

**<u>Exhibit B</u>**

**Sherbine Declaration**

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

------------------------------------------------------------x
                                    :

In re                          :          **Chapter 11**

                                      :

**TK HOLDINGS INC.,** *et al.*,      :          **Case No. 17-11375 (BLS)**

                                      :

              **Debtors.**[1]        :          **Jointly Administered**

                                        :

------------------------------------------------------------x

### DECLARATION OF KRIS SHERBINE IN SUPPORT OF
### MOTION OF DEBTORS PURSUANT TO 11 U.S.C. §§ 363 AND 105(a)
### FOR AUTHORITY TO EFFECT CERTAIN PRE-RESTRUCTURING
### STEPS AND TRANSACTIONS WITH RESPECT TO THE DEBTORS'
### MEXICAN AFFILIATES NECESSARY FOR THE GLOBAL TRANSACTION

Pursuant to 28 U.S.C. § 1746, I, Kris Sherbine, hereby declare as follows under penalty of perjury:

1.      I am the Director of Materials and Customer Service for TK Holdings Inc.'s ("***TKH***") airbag/inflator division.  In that capacity, I am responsible for production planning, raw material releases, inventory management, strategic planning, and customer order fulfillment for mass production programs and recall activities.  I am also responsible for the operational development, implementation, and execution of the Global Transaction (as defined below)[2] in North America.  In particular, I am the primary point of contact for Reorganized Takata planning – coordinating replacement kits, communicating with the independent monitors,

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  Takata Americas (9766); TK Finance, LLC (2753); TK China, LLC (1312); TK Holdings Inc. (3416); Takata Protection Systems Inc. (3881); Interiors in Flight Inc. (4046); TK Mexico Inc. (8331); TK Mexico LLC (9029); TK Holdings de Mexico, S. de R.L. de C.V. (N/A); Industrias Irvin de Mexico, S.A. de C.V. (N/A); Takata de Mexico, S.A. de C.V. (N/A); and Strosshe-Mex S. de R.L. de C.V. (N/A).  Except as otherwise set forth herein, the Debtors' international affiliates and subsidiaries are not debtors in these chapter 11 cases.  The location of the Debtors' corporate headquarters is 2500 Takata Drive, Auburn Hills, Michigan 48326.

[2] Capitalized terms used but not otherwise herein defined shall have the meaning ascribed to such terms in the Motion.

and managing the day-to-day activities associated with implementing the Global Transaction.  I

have held my position since 2008.  I have extensive operational experience with Takata.  I joined

Automotive Occupant Restraint Systems (an entity that has since been absorbed into TKH) in

1994 as a manufacturing supervisor, and have held numerous operational and leadership roles in

the areas of Plant Management, Purchasing, Supplier Quality, and Corporate Planning over the

last 23 years

       2.      I am intimately familiar with the North American aspects of the Global

Transaction, including, in particular, the steps required in Mexico to prepare for, and implement,

the Global Transaction.

       3.      I submit this declaration (the "***Declaration***") in support of the *Motion of*

*Debtors Pursuant to 11 U.S.C. §§ 363 and 105(a) for Authority to Effect Certain Pre-*

*Restructuring Steps and Transactions with Respect to the Debtors' Mexican Affiliates Necessary*

*for the Global Transaction*, filed with the Court by TKH and certain of its affiliates and

subsidiaries (collectively, the "***Debtors***") contemporaneously herewith.

       4.      Except as otherwise indicated herein, the facts set forth in this Declaration

are based upon my personal knowledge, my review of relevant documents, and information

provided to me by the Debtors and their professionals.  If called upon to testify, I would testify

competently to the facts set forth in this Declaration.  I am authorized to submit this Declaration

on behalf of the Debtors.

### The Pre-Restructuring Steps

       1.      On November 3, 2017, after many months of robust, multi-lateral

negotiations among Takata, certain of Takata's customers (the "***Initial Consenting OEMs***"), and

Joyson KSS Auto Safety S.A. (collectively with one or more of its current or future Subsidiaries

and or Affiliates (as such terms are defined in the U.S. APA (defined below)), "***KSS***" or

2

the "**Plan Sponsor**"), the Debtors filed proposed forms of definitive transaction documents

required to implement the global sale of Takata to KSS (the "**Global Transaction**").  With

respect to the Debtors, the Global Transaction will be implemented through a series of

documents including, without limitation, the following:

(i)     The *Joint Chapter 11 Plan of Reorganization of TK Holdings Inc. and its Affiliated Debtors* [Docket No. 1108] (including all exhibits and schedules attached thereto and each as may be amended, modified, or supplemented from time to time, the "**Plan**");

(ii)    That certain Asset Purchase Agreement, by and among certain of the Debtors, the Plan Sponsor, and KSS Holdings, Inc. (solely for purposes of section 7.22 thereof) [Docket No. 1110] (including all exhibits and schedules attached thereto and each as may be amended, modified, or supplemented from time to time, the "**U.S. APA**"); and

(iii)   That certain Restructuring Support Agreement for U.S. Debtors [Docket No. [1109] (including all exhibits and schedules attached thereto and each as may be amended, modified, or supplemented from time to time, the "**RSA**").[3]

2.      Although substantial progress has been made since the Petition Date,

significant work remains to be done for the Debtors to comply with the February 27, 2018

deadline (the "**Outside Date**") for completion of the Global Transaction imposed under the terms

of the settlement between TKJP and the Department of Justice.  The documents that comprise the

Global Transaction include numerous conditions precedents and closing conditions that must be

satisfied in order to close on the U.S. APA, including, without limitation, approval of a

disclosure statement and solicitation, and confirmation of the Plan, and receiving necessary

governmental approvals.

3.      In order to satisfy all of the conditions in the U.S. APA so that the parties

thereto can close the transaction contemplated therein (the "**U.S. Closing**"), the sellers

---

[3] Capitalized terms used but not otherwise herein defined shall have the meanings ascribed to such terms in the RSA.

thereunder (Takata Americas, TKH, TK Mexico LLC; TK Holdings de Mexico, S. de R.L. de C.V. ("***TKHDM***"), Industrias Irvin de Mexico, S.A. de C.V. ("***IIM***"), Takata de Mexico, S.A. de C.V. ("***TDM***"), and Strosshe-Mex, S. de R.L. de C.V. ("***SMX***"), and together, collectively, the "***Sellers***") must undertake, or cause to be undertaken, certain internal pre-restructuring steps with respect to the Mexican Debtors and certain of their non-Debtor Mexican affiliates (the "***Pre-Restructuring Steps***") in order to prepare for the separation of the assets being sold to the Plan Sponsor. These Pre-Restructuring Steps include, without limitation, (i) creating a new Mexican trading company, (ii) TDM and IIM's transfer to Equipo Automotriz Americana, S.A. de C.V. ("***Equipo***") of their respective assets, other than those related to the manufacture, design, assembly, sale, distribution, or handling of phase-stabilized ammonium nitrate ("***PSAN***") airbag inflators (the "***Equipo Transfer***"), (ii) transferring certain Mexican employees between and among the Mexican Debtors and certain of their Mexican non-Debtor affiliates, (iv) submitting necessary applications for certain licenses and permits, and (v) incurring related professional fees.

4.    The initial Pre-Restructuring Steps are small and of modest expense and include filing applications with local government agencies with respect to certain ordinary course permits and incurring certain de minimis fees in connection therewith. I understand that under applicable Mexican law, in order to complete the Global Transaction by the Outside Date it was necessary for the Debtors to commence the first of these ordinary course Pre-Restructuring Steps prior to October 31, 2017. However, certain processes that must be commenced before the end of 2017 are more expensive, and are expected to cost approximately $12 million on a gross basis through the date of the U.S. Closing. I understand that this $12 million estimate is actually

approximately $4.5 million net of approximately $7.5 million[4] in value added taxes that the

Debtors expect to recover once an asset appraisal is obtained, certain filings are made with the

Mexican government, and certain receivables are collected.[5]  This estimate includes

administrative fees, application fees, professional fees, certain taxes, and certain other expenses

associated with preparing the Debtors' Mexican affiliates for the Global Transaction.  The

Debtors are filing the Motion requesting the Bankruptcy Court's authority to perform the Pre-

Restructuring Steps before they undertake any significant non-ordinary course transactions or

incur the related expenses.

    5.  Specifically, the Pre-Restructuring Steps include the following

transactions:

### *New Mexican Trading Company*

    6.  I understand that pursuant to section 7.20(a) of the U.S. APA, the Sellers

are required to create a new Mexican trading company to facilitate the sale of product in Mexico

to domestic Mexican customers.  In particular, prior to the closing of the Global Transaction,

TKHDM, TK Mexico LLC and/or SMX must, or must cause one or more of their affiliates

approved by the Plan Sponsor to, incorporate a new subsidiary in Mexico ("***New Mexican***

***Trading Company***") and cause certain assets and liabilities of SMX to be transferred to the New

---

[4] For the avoidance of doubt, this sum represents the amount of recoverable value-added taxes associated with the Pre-Restructuring Steps that the Debtors expect that they would ultimately recover if the Global Transaction were *not* consummated.  The U.S. APA and the other regional purchase agreements will govern the allocation of value-added taxes and corresponding refunds (or other recovery) between Takata and the Plan Sponsor in the event the Global Transaction is consummated.  I understand that the allocation and treatment of value-added taxes (and refunds or other recovery) under the U.S. APA is complex.  If the Global Transaction is not consummated, any recovery of value-added taxes would necessarily inure to the Debtors' benefit.

[5] The cost estimates in the Motion reflect the Debtors' reasonable estimates; however, the figures are approximate, and remain subject to change.  Additional certainty is expected once an appraisal of the Debtors' Mexican affiliates' assets is completed.  That appraisal is underway and I understand that the appraiser's report will be delivered in December 2017.

Mexican Trading Company.  The Debtors intend to incorporate the New Mexican Trading

Company as a subsidiary of SMX and TKHDM, with TKHDM as a minority shareholder.  The

largest portion of the anticipated recoverable value added taxes (up to approximately $6 million)

is associated with the sale of receivables from SMX to the New Mexican Trading Company.

The creation of the New Mexican Trading Company and transfer of SMX assets must commence

in January 2018 so that the New Mexican Trading Company is able to operate independently for

a sufficient amount of time in advance of the U.S. Closing to ensure a smooth transfer of SMX

receivables and contracts to the Plan Sponsor.  The transfer of assets from SMX to the New

Mexican Trading Company will be structured in a manner that ensures that SMX's value is

preserved and that ensures that the anticipated allocation of SMX's value within the larger

context of the Global Transaction is maintained.

### *Equipo Transfer*

7.    I understand that pursuant to section 7.20(b) of the U.S. APA, the Sellers

are required to effect a transfer of certain assets and liabilities to Equipo to facilitate the transfer

of Takata's businesses to the Plan Sponsor.  In particular, prior to the U.S. Closing, IIM and

TDM must sell, transfer, assign, convey and/or deliver certain assets and liabilities to Equipo.

The Equipo Transfer is expected to trigger approximately $4 million in tax liability, including

approximately $2 million in value added taxes and approximately $2 million in real estate taxes,

income taxes, and employee profit sharing.  The value added taxes may have to be paid in late

December 2017 or January, 2018, but are expected to be recoverable later in 2018.  The Equipo

Transfer must commence in January 2018 so that any operational or regulatory integration

issues, which may take a number of weeks to resolve, can be resolved sufficiently in advance of

the U.S. Closing.  The Equipo Transfer will be structured in a manner that ensures that IIM's and

TDM's value is preserved and that ensures that the anticipated allocation of those entities' value within the larger context of the Global Transaction is maintained.

***Transfer of Mexican Employees***

8.      I understand that pursuant to section 8.2 of the U.S. APA and the Mexican Employees Transfer Agreement, which will be executed concurrently with the U.S. APA, the Sellers must take certain steps to transfer certain Mexican employees (other than those employees designated as PSAN Employees (as defined in the U.S. APA)) not currently employed by Equipo to Equipo prior to the closing through an employer substitution process. Many of these employees are unionized, and their employment and transfer are subject to collective bargaining agreements and a host of Mexican employment laws.

9.      The transfer process is highly formal, and involves the publication of certain notices and delivery of certain letters and employer substitution notices to the transferring employees, the publication and filing of the employer substitution notices with certain governmental agencies, as well as the delivery of a number of applications to state and local government agencies. New collective bargaining agreements replicating the prior collective bargaining agreements covering the transferring employees must also be negotiated and entered into by Equipo. This process, which is expected to affect approximately 12,000 workers, must be commenced in early January 2018[6] to ensure that the Global Transaction can be closed by the Outside Date. This timing is required not only to comply with applicable Mexican law, but also to ensure that the transition is as smooth as possible for Mexican employees. All employee benefits will be respected, and layoffs are not expected.

---

[6] The transfer of Mexican employees must occur concurrently with, or sometime after, the Equipo Transfer.

*Licenses, Permits, and Professional Fees*

10.     In preparation for the Global Transaction, and pursuant to section 7.18 of the U.S. APA, I understand that the Debtors' Mexican affiliates also need to apply for certain government permits and licenses.  These permits, among others, include permits to allow the Debtor' Mexican affiliates to act and continue operations as "Maquiladoras" and permits from the Mexican Ministry of Defense to import, buy, store, and handle energetic materials (*e.g.*, propellant for airbag inflators).  Because of the processing times associated with certain of these permits, the Debtors and their Mexican affiliates have begun to prepare the necessary paperwork, and in some cases, to actually file the paperwork with Mexican government agencies.  The application fees associated with these licenses and permits are nominal; however, there will be professional fees incurred by local Mexican counsel to prepare the necessary applications. Additional professional fees will also be incurred in connection with the other Pre-Restructuring Steps described above.  Altogether, the Debtors and their Mexican affiliates are expected to incur approximately $1.2 million in professional fees in connection with the Pre-Restructuring Steps and the Mexican aspects of the Global Transaction.  To date, these professional fees have been nominal; however, they are expected to ramp up over time between now and the U.S. Closing.

11.     Although certain of the Pre-Restructuring Steps are not reversible if the Global Transaction with the Plan Sponsor is not ultimately consummated, I believe that these actions are not harmful to the Debtors and their Mexican affiliates' operations.  Many of the Pre-Restructuring Steps are low impact, and the Debtors and their non-Debtor affiliates are taking steps to ensure that any movement of assets or liabilities in Mexico is structured in a way that preserves the transferor entities' value.  In the event the Global Transaction does not close, I understand that the Debtors and their Mexican affiliates will be able to continue operations in

Mexico, as restructured, without interruption and without meaningful harm to the Debtors'

estates. Accordingly, to ensure that the Debtors are able to emerge by the Outside Date, I believe

that the Pre-Restructuring Steps should be approved.

12.     If the Pre-Restructuring Steps are not commenced now, the Global

Transaction will not be able to close by the Outside Date, which I understand may trigger a

termination of certain key restructuring documents in these Chapter 11 Cases, including the

RSA, which may derail the entire Global Transaction. I believe that the Global Transaction

provides Takata with a viable path — and possibly the only path — forward and ensures that it

can satisfy its ongoing recall-related obligations. I believe that The benefits of commencing the

Pre-Restructuring Steps now and ensuring that the Global Transaction can close by the Outside

Date far outweigh the costs associated therewith. In addition, though the Pre-Restructuring Steps

will modify the prepetition corporate structure and entity-by-entity asset breakdown in Mexico,

the Pre-Restructuring Steps will not prejudice the Debtors' ability to pursue an alternative

transaction should the Global Transaction not close. If the Global Transaction does not

ultimately close, the Debtors may have incurred up to approximately $4.5 million in

unrecoverable expenses; however, if the Pre-Restructuring Steps are not started immediately, it is

a certainty that the Global Transaction will not close by the Outside Date, which will jeopardize

the Debtors' ability to restructure, reorganize, and meet its ongoing commitments.

13.     The Pre-Restructuring Steps are necessary in order to pave the way for the

Global Transaction. Accordingly, I believe that the Debtors' decision to commence the Pre-

Restructuring Steps and incur the modest preparatory costs now is a sound exercise of their

business judgment and is in the best interest of the Debtors, their estates, their creditors, and all

parties in interest.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 14th day of November, 2017

/s/ *Kris Sherbine*
Kris Sherbine
Auburn Hills, Michigan

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF DELAWARE

--------------------------------------------------------x
                       :

In re                       :         **Chapter 11**

                       :

**TK HOLDINGS INC.,** *et al.,*    :         **Case No. 17-11375 (BLS)**

                       :

        **Debtors.**[1]        :         **(Jointly Administered)**

                       :

--------------------------------------------------------x    Re: Docket No. 1157

## ORDER PURSUANT TO 11 U.S.C. §§ 363 AND 105(a)
## FOR AUTHORITY TO EFFECT CERTAIN PRE-RESTRUCTURING
## STEPS AND TRANSACTIONS WITH RESPECT TO THE DEBTORS'
## MEXICAN AFFILIATES NECESSARY FOR THE GLOBAL TRANSACTION

Upon the motion, dated November 14, 2017 [Docket No. 1157] (the "***Motion***"),[2]

of TK Holdings Inc. and its affiliated debtors, as debtors and debtors in possession (collectively,

the "***Debtors***"), pursuant to sections 363 and 105(a) of title 11 of the United States Code

(the "***Bankruptcy Code***") for authority to perform certain pre-restructuring transactions in

preparation for, and in furtherance of, the Global Transaction (as defined in the Motion) all as

more fully set forth in the Motion; and this Court having jurisdiction to consider the Motion and

the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing*

*Order of Reference* from the United States District Court for the District of Delaware dated

February 29, 2012; and consideration of the Motion and the requested relief being a core

proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Takata Americas (9766); TK Finance, LLC (2753); TK China, LLC (1312); TK Holdings Inc. (3416); Takata Protection Systems Inc. (3881); Interiors in Flight Inc. (4046); TK Mexico Inc. (8331); TK Mexico LLC (9029); TK Holdings de Mexico, S. de R.L. de C.V. (N/A); Industrias Irvin de Mexico, S.A. de C.V. (N/A); Takata de Mexico, S.A. de C.V. (N/A); and Strosshe-Mex, S. de R.L. de C.V. (N/A). Except as otherwise set forth herein, the Debtors' international affiliates and subsidiaries are not debtors in these chapter 11 cases. The location of the Debtors' corporate headquarters is 2500 Takata Drive, Auburn Hills, Michigan 48326.

[2] Capitalized terms used but not otherwise herein defined shall have the meanings ascribed to such terms in the Motion.

28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided to

the parties listed therein, and it appearing that no other or further notice need be provided; and

this Court having reviewed the Motion; and this Court having held a hearing on the Motion; and

this Court having determined that the legal and factual bases set forth in the Motion establish just

cause for the relief granted herein; and it appearing that the relief requested in the Motion is in

the best interests of the Debtors, their estates, creditors, and all parties in interests; and upon all

of the proceedings had before the Court and after due deliberation and sufficient cause appearing

therefor,

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is granted as provided herein.

2.      Subject to the terms of this Order, the Debtors are authorized, but not

directed, pursuant to sections 363 and 105(a) of the Bankruptcy Code, to complete the Pre-

Restructuring Steps (as defined in the Motion).

3.      The Debtors shall ensure, and shall cause their non-Debtor Mexican

affiliates to ensure, that the Pre-Restructuring Steps are structured and effected in a manner that,

excluding the expenses associated with the Pre-Restructuring Steps, preserves and recognizes the

respective values of the Debtors that will be transferring assets and liabilities pursuant to the Pre-

Restructuring Steps, with such values to be measured at the time of such transfer.

4.      The Debtors shall ensure, and shall cause their non-Debtor Mexican

affiliates to ensure, that any transfer of Debtor assets and liabilities in connection with the Pre-

Restructuring Steps shall reflect the fair market value of such assets and liabilities.

5.    The New Mexican Trading Company (as defined in the Motion) shall be an entity ninety nine percent (99%) owned by Strosshe-Mex, S. de R.L. de C.V. ("*SMX*") and one percent (1%) owned by TK Holdings de Mexico, S. de R.L. de C.V. ("*TKHDM*").

6.    Absent further order of this Court after notice and a hearing, SMX and TKHDM shall cause the New Mexican Trading Company (as defined in the Motion) not to voluntarily incur any liabilities or obligations in advance of the closing of the Global Transaction except for (i) debts or liabilities incurred in connection with the Pre-Restructuring Steps, including the execution and delivery of a promissory note payable to SMX in exchange for the assets and liabilities transferred to New Mexican Trading Company as described in the Motion, which promissory note may be offset by SMX in connection with a subscription for additional shares of the New Mexican Trading Company, and (ii) in the ordinary course of business.

7.    Absent further order of this Court after notice and hearing, the Debtors shall cause Equipo Automotriz Americana, S.A. de C.V. ("*Equipo*") not to voluntarily incur any new debts or liabilities between the occurrence of the Equipo Transfer (as defined in the Motion) and the closing of the Global Transaction (as defined in the Motion) except for (i) debts or liabilities incurred in connection with the Pre-Restructuring Steps, including the execution and delivery of promissory notes payable to TDM and IIM in exchange for the assets and liabilities transferred to Equipo as described in the Motion, which promissory notes may be offset by TDM and IIM in connection with a subscription for additional shares of Equipo, and (ii) in the ordinary course of business.

8.    Notwithstanding anything to the contrary in this Order, the sale of TDM and IIM assets and liabilities to Equipo described in the Motion shall not occur until January 15, 2018 or later.  The Debtors shall provide no less than three (3) business days' prior written notice

3

to counsel to the Initial Consenting OEMs (as defined in that certain Accommodation Agreement

dated July 18, 2017 [Docket No. 289] (as it may be amended or supplemented,

the "*Accommodation Agreement*")), counsel to the Official Committee of Unsecured Creditors

(the "*UCC*"), counsel to the Future Claimants' Representative (the "*FCR*"), and counsel to the

Official Committee of Unsecured Tort Claimant Creditors (the "*TCC*", and together with the

UCC, FCR, and TCC, the "*Objecting Parties*") before commencing such asset sale.

9.      Notwithstanding anything to the contrary in this Order, the Objecting

Parties' rights to seek entry of an order from the Bankruptcy Court preventing the sale of TDM

and IIM assets and liabilities to Equipo prior to the occurrence of such sale are expressly

reserved.

10.     Notwithstanding anything to the contrary in this Order, the sale of

receivables from SMX to the New Mexican Trading Company shall not occur until after the

Bankruptcy Court enters an order confirming a chapter 11 plan of reorganization for SMX. The

Debtors shall provide no less than three (3) business days' prior written notice to counsel to the

Initial Consenting OEMs (as defined in the Accommodation Agreement), counsel to the UCC,

counsel to the FCR, and counsel to the TCC before commencing the sale of the receivables from

SMX to the New Mexican Trading Company.

11.     Notwithstanding anything to the contrary in this Order, the Objecting

Parties' rights to seek entry of an order from the Bankruptcy Court preventing the sale of the

receivables from SMX to the New Mexican Trading Company are expressly reserved.

12.     The Debtors shall share the final results of the third-party fairness opinion

described in the Motion with counsel to the Initial Consenting OEMs (as defined the

Accommodation Agreement), counsel to the UCC, counsel to the FCR, and counsel to the TCC

once such results are available.

      13.    Notwithstanding anything to the contrary in this Order or the underlying

Motion, no software, applications, programs, databases or products subject to any agreement

("**Oracle Agreements**") between Oracle America, Inc., including any of its predecessors-in-

interest) ("**Oracle**"), on the one hand, and IIM or TDM, on the other hand, shall be transferred,

assumed or assigned to Equipo as part of the Equipo Transfer (as defined in the Motion), except

upon Oracle's consent, further order of Court, or as provided for by the Oracle Agreements.

      14.    Notwithstanding the provisions of Bankruptcy Rule 6004(h), this Order

shall be immediately effective and enforceable upon its entry.

      15.    Notwithstanding any other provision in this Order, nothing in this Order,

nor the consummation of the Pre-Restructuring Steps, shall constitute approval of the Global

Transaction, or otherwise prejudice or limit the right of any party-in-interest to object to the

Global Transaction, the U.S. APA, and the Plan.

      16.    The Debtors are authorized to take all steps necessary or appropriate to

carry out this Order.

      17.    This Court shall retain jurisdiction to hear and determine all matters

arising from or related to the implementation, interpretation, or enforcement of this Order.

Dated: ___Dec 5___, 2017
      Wilmington, Delaware

                        THE HONORABLE BRENDAN L. SHANNON
                        CHIEF UNITED STATES BANKRUPTCY JUDGE