**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re | **Chapter 11** |
| **ENDO INTERNATIONAL plc, et al.,** | **Case No. 22-22549 (JLG)** |
| **Debtors.**[1] | **(Jointly Administered)** |
|  | **Related Docket No. 728** |

**JOINT LIMITED OBJECTION AND RESERVATION OF RIGHTS OF CERTAIN DISTRIBUTORS, MANUFACTURERS, AND PHARMACIES TO THE DEBTORS' MOTION FOR AN ORDER (I) ESTABLISHING BIDDING, NOTICING, AND ASSUMPTION AND ASSIGNMENT PROCEDURES, (II) APPROVING CERTAIN TRANSACTION STEPS, (III) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS AND (IV) GRANTING RELATED RELIEF**

The Distributors, Manufacturers, and Pharmacies listed on the attached **Exhibit A** (together, the "DMPs")[2], by and through their respective undersigned counsel, hereby submit this limited objection and reservation of rights (the "Objection")[3] to the Debtors' Motion for an *Order (i) Establishing Bidding, Noticing, and Assumption and Assignment Procedures, (ii) Approving*

---

[1] The last four digits of Debtor Endo International plc's tax identification number are 3755. Due to the large number of debtors in these chapter 11 cases, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Endo. The location of the Debtors' service address for purposes of these chapter 11 cases is: 1400 Atwater Drive, Malvern, PA 19355.

[2] The DMPs joining in this Objection are each represented by separate counsel, and they each hereby join in the objections raised herein in their separate capacities. Certain factual arguments raised herein do not apply to all DMPs and each DMP joins in arguments only to the extent applicable. Teva adopts only the arguments in sections A, C and D hereto. Other than as reflected in this Objection, no DMP acts, represents, or speaks on behalf of (or purports to act, represent or speak on behalf of) any other DMP or any other entities in connection with these Chapter 11 Cases.

[3] Capitalized terms used but not defined in this Objection shall have the meaning ascribed to them in the Motion and its exhibits.

4876-3422-0358.v2

*Certain Transaction Steps, (iii) Approving the Sale Of Substantially all of the Debtors' Assets and (iv) Granting Related Relief* [ECF 728] (the "<u>Motion</u>"). In support of this Objection, the DMPs respectfully state as follows[4]:

## <u>PRELIMINARY STATEMENT</u>

1.      The DMPs submit this Objection to the Motion to preserve their rights under the Bankruptcy Code and applicable law,[5] including those rights and interests of certain DMPs under numerous executory contracts and insurance policies, and request this Court protect and preserve those rights. This Objection is not intended to be a full exposition of all the objections the DMPs may have to the Motion including the proposed assumption and assignment of their various contracts, but is an overview of  the flawed bidding process the Debtors propose which must be changed prior to and as a condition to the proposed Sale.

2.      As it stands, the Motion cannot be granted because it is inconsistent with the language and purpose of the Bankruptcy Code in numerous ways. For example, the assumption and assignment procedures outlined in the Notice of Proposed Assumption and Assignment of Certain Executory Contracts (the "<u>Assumption and Assignment Procedures</u>") violate the Bankruptcy Code because, among other things, they seek Court approval to excise critical provisions from the DMPs' contracts, thereby contravening 11 U.S.C. § 365. More particularly, the Debtors, through the inclusion of the Assumption and Assignment Procedures in the Motion, seek approval of a procedure leading to a Sale which impermissibly:

---

**A.**      [4] The DMPs have spoken with Debtors' counsel in an effort to resolve the issues raised in this Objection, and will continue to work with the Debtors and other constituents toward a consensual resolution prior to the Sale Hearing.

[5] In this Objection, unless otherwise noted, the term "Bankruptcy Code" refers to Title 11 of the United States Code, and the specific sections and chapters of the Bankruptcy Code, set forth in 11 U.S.C. §§ 101–1532, inclusive, are referred to as "Section []" or "§ []" and "chapter []," respectively.

4876-3422-0358.v2

- cherry-picks provisions from the DMPs' contracts with the Debtors (the "Contracts"), and in so doing, alters the Contracts in a manner that the Debtors alone deem favorable and unilaterally discards those provisions that the Debtors dislike, such as the indemnity provisions related to the distribution of the Debtors' products, and imposes an improper "deemed consent" construct to amendments of the Contracts, all in violation of Section 365, as construed by and within the Second Circuit;

- limits the DMPs' ability to defend themselves in on-going litigation by, for example, eliminating the ability to argue about fault apportionment, which is impermissible under well settled law;[6]

- limits the DMPs' rights of setoff and recoupment or other similar rights in respect of opioid and non-opioid matters; and

- contains improper and overbroad non-consensual releases of third parties.

3.      In both *Purdue* and *Mallinckrodt* , the debtors tried this same gambit — seeking to unilaterally change contract terms and eliminate litigation rights and property interests in insurance contracts without the DMPs' consent — and ultimately recognized that they could not confirm their chapter 11 plans with these illegal provisions. The Debtors' efforts in this case to do so through an anticipated sale process is equally illegal and should be remedied before that process begins.

4.      For these reasons, as more fully set forth herein, the Court should deny the Motion because it seeks to strip the DMPs of their rights in violation of basic tenets of the Bankruptcy Code and other applicable law.

---

[6] In both *In re Purdue Pharma, L.P., et al*, Case No. 19-23649(SHL) (Bankr. S.D.N.Y.) ("Purdue") and *In re Mallinckrodt plc, et al,* Case No. 20-12522 (JTD)(Bankr. D.Del.) ("Mallinckrodt"), the debtors recognized that they could not eliminate the DMPs' ability to defend themselves and, in both cases, agreed all potential defenses — what the parties termed "Co-Defendant Defensive Rights" or "Defensive Rights" — were preserved.

3

## FACTUAL BACKGROUND

### A.    PROCEDURAL BACKGROUND

5.    On August 16, 2022 (the "Petition Date"), each of the Debtors (together, the "Debtors" or "Endo") filed voluntary, prearranged chapter 11 petitions in the Southern District of New York Bankruptcy Court ostensibly in an effort to resolve the threats posed by the thousands of lawsuits regarding the manufacture, distribution and sale of opioid products currently pending throughout the United States (the "Opioid Litigation").[7]

6.    The Debtors are authorized to continue to operate their businesses and manage their properties as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

7.    On September 2, 2022, the United States Trustee appointed an Official Committee of Unsecured Creditors, *see* ECF No. 161, and an Official Committee of Opioid Claimants, *see* ECF No. 163.

8.    On November 23, 2022, the Debtors filed the Motion, pursuant to which the Debtors seek approval of an auction process to sell substantially all their assets to the Ad Hoc First Lien Group, which serves as the stalking horse bidder, or any other successful bidder.

9.    The Debtors have not yet filed a disclosure statement or plan.

---

[7] The DMPs have disputed the allegations in the Opioid Litigation, and each DMP reserves all rights to assert any and all claims, defenses, rights of setoff, recoupment and other rights available to it, as applicable, in connection with the Opioid Litigation. In addition, the DMPs have asserted or may assert their rights under applicable law to seek allocation of fault to the Debtors and other defendants in connection with any judgment issued in the Opioid Litigation even if a defendant's liability is discharged under a plan. The DMPs also have defenses available to them under applicable law that could mitigate or eliminate their liability in the Opioid Litigation. Nothing contained herein shall be an admission of any fact or theory in connection with the Opioid Litigation or construed to abrogate or affect any settlement of Opioid Litigation by any DMP.

4876-3422-0358.v2

B.    **THE DEBTORS' BUSINESS**

10.    The Debtors are one of the country's leading specialty pharmaceutical companies.[8] The Debtors commenced operations in 1997 by acquiring certain pharmaceutical products, related rights, and assets from The DuPont Merck Pharmaceutical Company. Today, the Debtors develop, manufacture, and sell life-enhancing branded and generic products to customers in a wide range of medical fields, including endocrinology, orthopedics, urology, oncology, neurology, and other specialty areas (the "Products").[9]

11.    The Debtors have four principal operating segments: (a) branded pharmaceuticals, (b) sterile injectables, (c) generic pharmaceuticals, and (d) international pharmaceuticals. All Products, except for those in the International Pharmaceuticals segment, are sold in the U.S. only.[10]

12.    The vast majority of Endo's sales are to three wholesale distributors. For the year ended December 31, 2021, and through the first half of 2022, the fulfillment of orders by AmerisourceBergen Corporation, McKesson Corporation, and Cardinal Health, Inc., and their respective subsidiaries, collectively, accounted for approximately 90% of Endo's revenues (the "Distributors"). These three Distributors, in turn, sell the Products to retail drug store chains, pharmacies, and managed care organizations, including health maintenance organizations, nursing homes, hospitals, clinics, pharmacy benefit management companies, and mail order customers.[11]

---

[8] The description of the Debtors' business in this Objection are excerpted from the Debtors' own filings, e.g., Declaration of Mark Bradley in Support of Chapter 11 Petitions and First Day Motions (hereinafter, "Bradley Dec.") [ECF 38]; and Motion of the Debtors for Entry of Interim and Final Orders (i) Authorizing Debtors to Honor Prepetition Obligations to Customers and Related Third Parties and to Otherwise Continue Customer Programs; (ii) Granting Relief From Stay to Permit Setoff in Connection with the Customer Programs; (iii) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers; and (iv) Granting Related Relief [ECF 10] (hereinafter, the "Customer Motion").

[9] Bradley Dec., ¶ 6.

[10] Bradley Dec., ¶ 7.

[11] Bradley Dec., ¶ 17.

4876-3422-0358.v2

13.    Several of the DMPs are part of the Debtors' network and facilitate their ability to sell their products and conduct their business. The signatories to this Objection include the Distributors, manufacturers of products licensed to, or distributed by, the Debtors, as well as retail pharmacies vital to the Debtors' business operations, namely CVS Pharmacy, Inc., and its affiliates, Walmart, and Walgreen Co. and its affiliates (together, the "Pharmacies").[12]   Other DMPs include, but are not limited to, Johnson & Johnson, Henry Schein, Inc., Teva, Mylan and Sanis.

14.    From the outset of these Chapter 11 Cases, the Debtors acknowledged the critical importance of the Distributors, Pharmacies, and other third-party customers (the "Customers").[13] To quote the Debtors:

> Maintaining the goodwill of their Customers through the use of these Customer Programs is critical to the Debtors' ongoing operations and the preservation and maximization of stakeholder value, particularly in such a competitive industry. If the Debtors are unable to preserve the loyalty of their Customers, the Debtors' businesses would likely suffer material harm. It is essential, therefore, that the Debtors fulfill their Customer Obligations and continue the Customer Programs to ensure customer satisfaction and maintain the goodwill of their Customers, which is critical to the Debtors' ongoing operations and to preserving and maximizing stakeholder value. Indeed, absent the ability to continue the Customer Programs and to satisfy Customer Obligations, the Debtors risk losing their current market share, negatively impacting their future business and revenue growth and adversely affecting the Chapter 11 Cases.[14]

15.    The Distributors, Pharmacies, and certain of the other DMPs are parties with one or more of the Debtors to certain Contracts, such as distribution agreements, supply agreements, wholesale agreements and/or license agreements. These Contracts pertain to the distribution of both opioid and non-opioid Products. Many of these Contracts contain indemnification and/or

---

[12] *See infra* ex. A (listing DMPs).

[13] The list of Customers includes pharmaceutical manufacturing companies, contract manufacturers, other associated industrial customers, and more; *see* Customer Motion, ¶ 9.

[14] Customer Motion, ¶ 12.

4876-3422-0358.v2

insurance provisions that are material to the Contracts and were negotiated at length between the contract parties. As the Debtors acknowledge, termination of the Contracts would be catastrophic and cause "material harm" to the Debtors. [15] These Contracts as written (which include indemnification and insurance provisions) must therefore be seen as critical to the viability of the Debtors' business relationships with the Distributors, Manufacturers, Pharmacies, and other Customers.

16.    Among the products that the DMPs manufacture, license, distribute and/or dispense are opioid medications and opioid abatement products. At the proper time, the DMPs may file proofs of claim against the Debtors (the "DMP Claims")[16] related to the Opioid Litigation; which claims may arise under the applicable Contracts. The DMP Claims are based on contractual indemnification rights, rights of common law contribution and common law indemnity, and other contractual and common law rights related to the Opioid Litigation and other litigation (such as product liability claims) involving the Debtors' other Products. Certain DMPs also may assert additional general unsecured trade claims and/or other types of claims.[17]

17.    The DMP Claims also include hundreds of millions of dollars in liquidated amounts, based on, among other things, contractual arrears, settlement payments and/or attorneys' fees that have been incurred or paid in connection with the Opioid Litigation or which will be paid by certain DMPs to resolve current and future opioid claims under several settlement agreements. Some aspects of the DMP Claims are presently contingent and/or unliquidated.

---

[15] *Id*.

[16] Certain DMPs may also have trade claims and contractual indemnity rights based upon their contracts, among other claims.

[17] The nature of the DMP Claims vary among the DMPs. For example, certain DMPs do not have contracts with one or more Debtors. Accordingly, each DMP joins in this Objection solely to the extent applicable to its particular DMP Claims.

4876-3422-0358.v2

18.     The Debtors maintain insurance contracts providing for general liability, life sciences and products liability coverage, that provides, may provide, or may have provided, the Debtors with coverage with respect to Opioid Claims (the "Opioid Insurance Policies").

19.     Certain of the DMPs (the "Additional Insured DMPs") have provisions in their Contracts with the Debtors that, *inter alia*, require the Debtors to indemnify those DMPs and name them as additional insureds under the Opioid Insurance Policies. In fact, many of the Opioid Insurance Policies require the Debtors to name the Additional Insured DMPs as "additional insureds for claims arising out of the Products" and require the relevant policy to cover defense costs.

## ARGUMENT

**A.     The Debtors May Not Assume And Assign Contracts With Modifications unless such Modifications are agreed to by the Non-Debtor Contract Parties.**

20.     In the Motion, the Debtors seek to establish procedures to assume and assign DMP Contracts with modifications to which the non-Debtor contract parties have not agreed and will not agree. This is contrary to hornbook law and must not be approved.

21.     The law is well-established that assumption and assignment of a contract is subject to the *cum onere* principle, i.e., assumption and assignment must be performed on a holistic basis as to a particular agreement (or series of interrelated agreements forming a single, integrated arrangement), which means the estate representative may not assume(or assume and assign) just the desirable portions of an agreement and reject the rest. 11 U.S.C. §365(f) (requiring debtor to first assume an executory contract or lease in accordance with section 365 and Bankruptcy law before it can assign such contract to a third party); s*ee, e.g.*, *National Labor Relations Board v. Bildisco & Bildisco*, 465 U.S. 513, 532 ("Should the debtor-in-possession elect to assume the executory contract, however, it assumes the contract *cum onere* ...."); *Thompson v. Texas Mexican*

8

*Ry. Co.*, 328 U.S. 134, 141 (1946) ("Cancellation of a contract pursuant to its terms alters, of course, rights and duties of the trustee. But the bankruptcy rule is that he takes the contracts of the debtor subject to their terms and conditions. Contracts adopted by him are assumed *cum onere*."); *In re MF Glob. Holdings Ltd.,* 466 B.R. at 239, 241 (Bankr. S.D.N.Y. 2012) ("The trustee must either assume the entire contract, cum onere, or reject the entire contract, shedding obligations as well as benefits."); *AGV Productions, Inc., v. Metro–Goldwyn–Mayer, Inc., and Orion Pictures Corporation,* 115 F.Supp.2d 378, 391 (S.D.N.Y. 2000) ("Under the law of bankruptcy, a contract cannot be assumed in part or rejected in part"); *In re Leslie Fay Cos., Inc.*, 166 B.R. 802, 808 (Bankr. S.D.N.Y.1994)("An executory contract cannot be assumed in part and rejected in part.").

22.     The Debtors seek to, among other things, illegally amend DMP Assigned Contracts by stripping out indemnification rights and extinguishing additional insured rights arising under the Assigned Contracts, all without the consent of the DMP parties to such Contracts. As stated in the Assumption and Assignment Procedures, absent an objection by the DMPs to such Contracts, the Debtors "contemplate that indemnification provisions in the Assigned Contracts will be deemed amended to render null and void any rights to reimbursement relating to an opioid-related litigation or dispute."[18]

23.     The law is clear the Debtors cannot, as they intend, "cherry-pick" the favorable provisions of contracts they want to assume and assign to a successful bidder, while rejecting the provisions of those agreements they find unfavorable. The Debtors' attempt to circumvent the plain language of Section 365 and other applicable provisions of the Bankruptcy Code, by excising both insurance and indemnification protections in the Assigned Contracts, without consent, has

---

[18] Motion, ¶ 126.

been tried before without success. Both the Purdue and Mallinckrodt debtors attempted to eliminate the rights of contract counterparties, indemnitees, and insureds in their original draft plans of reorganization, only to withdraw such provisions when they realized that these provisions were likely to fail and derail confirmation of their plans in their entirety. The Debtors should be guided by *Mallinckrodt* and *Purdue* and amend the procedures accordingly. *See, e.g., Purdue,* Transcript of  Hearing at 49 – 54 (August 27, 2021), attached as **Exhibit B**. Because the Bankruptcy Court is without jurisdiction or authority under the Bankruptcy Code to approve the Debtors' attempted unilateral modification of existing agreements, the Motion must be denied. *In re Atlantic Computer Sys., Inc.,* 173 B.R. 844, 849 (Bankr. S.D.N.Y.1994).

**B.    The Court Lacks Jurisdiction Or Authority Under The Bankruptcy Code To Alter Property Rights Among Non-Debtors.**

24.    The Debtors seek to, among other things, illegally amend the Contracts with the Additional Insured DMPs to strip out indemnification rights and extinguish additional insured rights to coverage arising under not only the Opioid Insurance Policies, but also with regard to any other insurance contracts. According to the Assumption and Assignment Procedures that are proposed, the Contracts of those DMPs that object to such one-sided and illegal amendments will instead be rejected. But rejection of the Additional Insured DMPs' contracts cannot and will not eliminate the Additional Insured DMPs' property interests in the Opioid Insurance Policies or any other insurance policies in which the Additional Insured DMPs are additional or named insureds. As explained herein, the Debtors simply have no legal basis to strip these property rights away from the Additional Insured DMPs. And with respect to the other one-sided contractual modifications that the Debtors propose, applicable law is clear: the Debtors cannot rewrite the Contracts to their liking, if doing so is not agreed to by the DMP parties to such Contracts. If these Contracts are critical to the Debtors' business (as the Debtors have stated in the Motion and

elsewhere), the Debtors must either assume the agreements or negotiate amendments that are acceptable to the DMP counterparties. What the Debtors cannot do is use their sales procedures and a sale order to amend the Contracts unilaterally and unfairly.

25.    As "case law recognizes[,] … any individual insured has a contractually-distinct status that runs directly between itself and the insurer." *In re Petters Co.*, 419 B.R. 369, 376 (Bankr. D. Minn. 2009), *quoted in, e.g.*, *Caesars Entm't Operating Co. v. BOKF, N.A. (In re Caesars Entm't Operating Co.)*, 533 B.R. 714, 734–35 (Bankr. N.D. Ill. 2015), *rev'd on other grounds*, 808 F.3d 1186 (7th Cir. 2015). Consequently, "the right to receive payment on a covered claim [is] the property of that insured itself." *In re Petters Co.*, 419 B.R. at 376; *see also, e.g.*, *In re Caesars Entm't Operating Co.*, 533 B.R. at 734–35 (quoting *In re Petters Co.*, 419 B.R. at 376); *In re Forty-Eight Insulations, Inc.*, 133 B.R. 973, 978 (Bankr. N.D. Ill. 1991), *aff'd*, 149 B.R. 860 (N.D. Ill. 1992) (finding additional insured to have separate legal and equitable interests in the debtors' policies including the right to make direct claims against the insurer). In addition, as the Court explained in *In re SelectBuild Illinois, LLC*, third parties identified as additional insureds with respect to a debtor's insurance policy have "independent contractual rights" respecting the insurer. Case No. 09-12085, 2015 Bankr. LEXIS 1790, 2015 WL 3452542, at *1 (Bankr. D. Del. May 28, 2015) (citing, for support, *Overton's, Inc. v. Interstate Fire & Cas. Ins. Co. (In re SportsStuff, Inc.)*, 430 B.R. 170, 178 (B.A.P. 8th Cir. 2010)).

26.    These independent property and contract rights preclude a finding that the Additional Insured DMPs' rights are merely derivative of the rights of one or more Debtors. *See, e.g.*, *In re W.R. Grace & Co.*, 607 B.R. 419, 424 (Bankr. D. Del. 2019) ("[I]f a plaintiff's claim against a third party is not based upon the debtor's liability and the third party's liability to the debtor but, rather, an entirely independent claim held by the plaintiff directly against the third party, then the plaintiff's claim is nonderivative."); *see also In re Adelphia Commc'ns Corp.*, 364

4876-3422-0358.v2

B.R. 518, 525, 527 (Bankr. S.D.N.Y. 2007)("Adelphia")(explaining that additional insureds' rights to payments from insurers pursuant to "their own policy entitlements" would be received from the insurers "as a contractual entitlement, not from the property being sold, as a kind of *in rem* right, and would be independent of anything the Estate sought or received").

27.     Because an additional insured's rights to coverage under a policy are not derivative of a debtor's rights, the bankruptcy court is without jurisdiction to adjudicate determinations with respect to those rights. *See In re SportsStuff, Inc.*, 430 B.R. at 178 (deciding that a bankruptcy court did "not have the jurisdiction or authority to impair or extinguish" the independent contractual rights of additional insured when it approved a settlement agreement between the debtor and certain insurers),[19] *cited in, e.g., In re SelectBuild Ill., LLC*, 2015 WL 3452542, at *1. While a bankruptcy court may exercise jurisdiction over a debtor's interest in such a policy, "'the interests of the co-insured, a nondebtor, are not property of the estate ... and [t]o hold otherwise would allow the court to impair a third party's contract and property rights.'" *In re SportsStuff, Inc.*, 430 B.R. at 178 n.15 (quoting SUSAN N.K. GUMMOW, BANKRUPTCY AND INSURANCE LAW MANUAL 166 (2d ed. 2007)).

28.     The rationale of these cases accords with the widely followed approach of the United States Bankruptcy Court for the Southern District of New York (the "New York Bankruptcy Court") in *Adelphia, supra*. In *Adelphia*, the debtor sought approval of a settlement with its insurers for a D&O policy buy back under Section 363, which policies also provided coverage to the debtor's directors and officers. 364 B.R. at 520. The New York Bankruptcy Court

---

[19] While the Second Circuit held in *MacArthur v. Johns-Manville Corp.*, 837 F.2d 89, 94 (2d Cir. 1988), that the bankruptcy court had authority to enjoin a coinsured from seeking direct claims against a debtor's insurer, it made its determination that it "had jurisdiction over an 'insured vendor's' rights in the debtor's insurance policies because those rights [were] 'completely derivative' of the debtor's rights as the named insured." *In re SportsStuff, Inc.*, 430 B.R. at 177 (thusly construing *MacArthur*). Here, in contrast, the Additional Insured DMPs have independent, non-derivative rights in and under the Opioid Insurance Policies and/or other insurance contracts.

4876-3422-0358.v2

found that the sale was appropriate under Bankruptcy Rule 9019 and Section 363(b), but it concluded that the directors and officers had independent property rights under the policies vis-à-vis the carrier. *Id.* at 527. Reasoning that the power to cleanse "interests" under Section 363(f)(5) applied only to the debtor's property, and the directors' and officers' rights under the policies were not derivative of the debtor's rights, that tribunal concluded that these rights could only be extinguished if the additional insureds received a full third-party release and all claims against them were subject to a channeling injunction. *Id.* at 527–28. Put simply, in *Adelphia*, the bankruptcy court found no authority, and therefore refused to extend Section 363(f) to reorder the property rights between an additional insured and a debtors' insurance carrier. See also, *Purdue* and *Mallinckrodt*.

29.    Here, the Assumption and Assignment Procedures attempt to do exactly what *Adelphia* prohibited: illegally stripping the Additional Insured DMPs of their property rights in the Opioid Insurance Policies (and other insurance contracts) and permanently enjoining them from making claims against the Debtors' insurers, while at the same time still ensuring that the DMPs remain fully liable for all claims against them covered by the Opioid Insurance Policies (and the insurance contracts).[20] Thus, for all of these reasons, as well as for the reasons guiding the debtors in *Purdue* and *Mallinckrodt*, the Motion must be denied.

**C.    Even If The Additional Insured DMPs' Claims Against The Opioid Insurance Policies And/Or the Insurance Contracts Are Derivative, Their Claims Must Be Adequately Protected.**

---

[20] Likewise, in *Purdue*, Judge Drain would not confirm the debtors' plan to the extent the plan stripped the DMPs of their property interests in Purdue's insurance policies. As a direct result, the Purdue debtors removed the offending provision from their plan. The Debtors in this case should do the same.

4876-3422-0358.v2

30.    Even if an Additional Insured DMP's rights are entirely derivative of the Debtors' insurance rights (which they are not), at a minimum, the Debtors are required to adequately protect such rights as additional insureds. *See, e.g.*, *In re SportStuff, Inc.*, 430 B.R. at 179 (reversing bankruptcy court's approval of settlement with insurance carrier as not "fair and reasonable," in part, because additional insureds did not consent or receive adequate compensation); *MacArthur v. Johns-Manville Corp.*, 837 F.2d 89, 94 (2d Cir. 1988) (approving debtor's sale of tort claims policy back to insurer pursuant to Section 363(f) for this reason); *Adelphia*, 364 B.R. at 528–29 (thusly reading *MacArthur*). As the Second Circuit explained in *MacArthur*, "[i]t has long been recognized that when a debtor's assets are disposed of free and clear of third-party interests, the third party is adequately protected if his interest is assertable against the proceeds of the disposition." 837 F.2d at 94; *see also, e.g.*, *In re DVI Inc.*, 306 B.R. 496, 504 (Bankr. D. Del. 2004) (authorizing sale of estate property free and clear of interests where interests attached to proceeds of sale). Thus, rights of an additional insured must be adequately protected, even if the possibility of a recovery is highly speculative. *See MacArthur*, 837 F.2d at 91, 94 (so concluding); *see also, e.g.*, *Contrarian Funds LLC v. Aretex LLC (In re Westpoint Stevens, Inc.)*, 600 F.3d 231, 257 (7th Cir. 2010) ("[P]ermitting the sale of the Debtor's assets free and clear of encumbrances but attaching replacement liens on the proceeds of such sale to the same extent, validity, and priority as the original liens [is] 'squarely within the letter and purpose of [adequate protection.]'" (citations omitted)). See also, *Bath Iron Works Corp. v. Congoleum Corp. (In re Congoleum Corp.)*, 627 B.R. 62, 70 (Bankr. D.N.J. 2021) (where Bankruptcy Court determined that additional insured's rights could not be taken away without giving full value back to the additional insured in the form of adequate protection).

31.    The proposed Assumption and Assignment Procedures make no provision, let alone provide adequate protection, for the Additional Insured DMPs' rights under the Opioid Insurance

14

Policies or any other insurance contracts. Instead, the Motion proposes to strip the Additional

Insured DMPs of their particular interests in this unique form of property, thereby leaving them

without claims awarded by or the adequate protection mandated by the Bankruptcy Code. That

this result fails to conform to clear statutory requirements is as clear as the Debtors' seeming lack

of concern for the DMPs' insurance rights in the run-up to these Chapter 11 Cases—and in the

months that have since passed. *See* 11 U.S.C. § 363(e). Accordingly, the Motion cannot be granted

to the extent it deprives the Additional Insured DMPs, of their rights as "additional insureds".

**D.      The Sale Seeks To Illegally Extinguish The DMPs' Defensive Rights.**

32.      The proposed Sale and Assumption And Assignment Procedures illegally seek to

extinguish the DMPs' ability to defend themselves in two significant ways.

33.      First, to the extent the Debtors allege they hold claims against the DMPs (which

the DMPs dispute exist), the Debtors seemingly propose that the sale would assign such claims to

the buyer while extinguishing the ability of the DMPs to raise their defenses to these alleged claims

or to offset the DMPs' counterclaims through the defenses of setoff or recoupment (collectively,

the "Defensive Rights").[21]  There is simply no statutory basis on which the Debtors may use a sale

order, an assumption and assignment order, or even a confirmation order, to deprive a third party

of that third party's ability to defend itself or to exercise a right of set-off or recoupment. And the

fact that the Debtors are using the chapter 11 sale process as a means to protect themselves from

significant opioid liability does not change the equation – simply put, the fact that the Debtors are

facing significant liabilities does not allow the Debtors to trample over the Defensive Rights of the

---

[21] Assumption and Assignment Procedures, Sec. I, ¶ 6-7. The Assumption Notice even goes so far as to direct the Sale Closing be considered an "agreement" by a Counterparty to release the Debtors and insurers under any insurance policy to which the Debtors are a party "from any and all … rights of recovery arising under or relating to such indemnification and reimbursement rights." *Id.*

4876-3422-0358.v2

DMPs.[22] Indeed, the debtors in both *Purdue* and *Mallinckrodt* ultimately recognized that they could not eliminate the DMPs' Defensive Rights through similarly aggressive releases and both of those plans preserved all of those rights.

34.    Ample case law supports the conclusion that the Debtors cannot do what they appear to be proposing to do here. The case law holds that setoff rights (which are statutorily preserved under Section 553) cannot be discharged. *See United States v. Cont'l Airlines (In re Cont'l Airlines)*, 134 F.3d 536, 541–42 (3d Cir. 1998) (allowing for waiver of setoff rights only where a creditor fails to object to such a provision); *In re Bousa Inc.*, Case No. 89-B-13380, 2006 Bankr. LEXIS 2733, at *22, 2006 WL 2864964 (Bankr. S.D.N.Y. Sept. 29, 2006) (collecting cases, including *In re Lykes Bros. S.S. Co.*, 217 B.R. 304, 310 (Bankr. M.D. Fla. 1997) and *IRS v. Driggs*, 185 B.R. 214, 215 (D. Md. 1995)); *In re Twins, Inc.*, 318 B.R. 90, 96 (Bankr D.S.C. 2004) (same); *cf. In re Bare*, 284 B.R. 870, 874 (Bankr. N.D. Ill. 2002) (holding that IRS was not barred from effecting a setoff after plan confirmation, notwithstanding that it had asserted an unsecured, priority tax claim and had not objected to confirmation of the plan). If such rights cannot be stripped in the plan process, they certainly cannot be stripped through a sale, which lacks the protections for creditors set forth in Section 1129 of the Code. Simply put, the Debtors cannot lawfully circumvent Section 553's express preservation of the DMPs' setoff rights.

35.    The Sale also disregards the fact that the DMPs' rights of setoff are entitled to be treated as secured claims and cannot be unilaterally rendered unsecured. 11 U.S.C. 506(a); *see also In re Treco*, 240 F.3d 148, 161–62 (2d Cir. 2001) (A "claim is deemed secured to the extent of the right of setoff."). Further, to the extent any DMPs have valid claims for recoupment, they too

---

[22] Belying the fact that the Debtors are asking for extraordinary and illegal relief due to the severity of the opioid claims they face is the fact that the Debtors seek this extraordinary relief related to all of the products they sell, including non-opioid products.

.

4876-3422-0358.v2

cannot be extinguished by the Sale. *See In re Ditech Holding Corp.*, 606 B.R. 544, 596 (Bankr. S.D.N.Y. 2019) (recoupment rights "cannot be extinguished in bankruptcy—whether through a sale or discharge under a plan—because they are neither 'claims' nor 'debts,' nor 'interests.'"). The Motion is not clear whether the Debtors seek to strip setoff and recoupment rights with regard to transferred claims, but to the extent they do, Section 363(e) requires that the DMPs be provided adequate protection, yet none is offered.[23] This is particularly true in the case of the Stalking Horse Bidder's credit bid, which would provide no proceeds to which any setoff or recoupment rights could attach. The improper extinguishment of setoff and recoupment rights, especially without any corresponding consideration or adequate protection, renders the proposed Sale process untenable. *See generally Matter of Rash*, 31 F.3d 325, 330 (5th Cir. 1994) ("[W]hile reorganization is an important goal, this goal cannot be pursued by exterminating a secured creditor's property interest. Reorganization is not a Holy Grail to be pursued at any length.").

36.    Second, as drafted, this non-consensual discharge of liability could be read to force the DMPs to release their defenses against non-debtor third parties, including the right under state law to seek judgment reduction, offset and/or allocation of fault. This attempt to force a release of the DMP's Defensive Rights against third parties is equally illegal and the sales procedures and assumption and assignment procedures should make it clear to all parties that this will not be allowed.

37.    The DMP's Defensive Rights include, where provided by applicable non-bankruptcy law, the right to allocate or set-off claims against them for the proportionate liability of the Debtors. To the extent the Assumption and Assignment Procedures can be read to release

---

[23] While attaching a lien to proceeds would normally satisfy adequate protection, here there are no proceeds to attach. Cf. "[i]t has long been recognized that when a debtor's assets are disposed of free and clear of third-party interests, the third party is adequately protected if his interest is assertable against the proceeds of the disposition." *See MacArthur Co. v. Johns-Manville Corp.* 837 F.2d 89, 94 (2d Cir. 1988).

4876-3422-0358.v2

the DMPs' Defensive Rights that would not result in any affirmative claim on the Debtors' estates, altering such rights as between the DMP's and third parties is outside of this Court's jurisdiction. *See Dunaway v. Purdue Pharm. L.P. (In re Purdue Pharm. L.P.)*, 619 B.R. 38, 54 (S.D.N.Y. 2020) (noting that the DMP's opioid-related litigation would not pass the "conceivable effect" test for "related to" jurisdiction); *Lynch v. Lapidem Ltd. (In re Kirwan Offices S.A.R.L.)*, 592 B.R. 489, 504, 506 (S.D.N.Y. 2018) ("a third-party release *must be sufficiently related to* the issues before the bankruptcy court in order for core jurisdiction to cover an order extinguishing that claim.") (emphasis added); *In re SunEdison, Inc.*, 576 B.R. 453, 462–63 (Bankr. S.D.N.Y. 2017) (declining to approve non-consensual releases of claims between third parties insufficiently related to the bankruptcy).

38.     In sum, the Sale and Assumption and Assignment Procedures should be corrected now to put all bidders on notice that the Defensive Rights of the DMPs are preserved and are not eliminated or modified by the proposed sale or the assumption or assignment of any contracts with the DMPs.

**E.     The Debtors Seek To Compel The Acceptance Of Improper Third-Party Releases Through The Sale Process.**

39.     The Debtors' Sale and Assumption and Assignment Procedures attempt to force the acceptance of broadly applicable third-party releases through a sale order rather than plan solicitation, and deemed consent by those who fail to object. Such a tactic rests on extremely weak legal ground. As the Court in *In re SunEdison* noted, "implying a 'consent' to the third-party releases based on [a parties'] inaction, is simply not realistic or fair, and would stretch the meaning of 'consent' beyond the breaking point." 576 B.R. 453, 461 (Bankr. S.D.N.Y. 2017) ("SunEdison"). The DMPs acknowledge this Court's unpublished ruling in *In re LATAM Airlines* allowing an opt out approach to non-debtor releases in a plan and distinguishing the rationale in *SunEdison* on the

18

basis that creditors in that case faced "meager recoveries" and were thus less likely to have focused on the releases. Case No. 20-11254 (JLG), 2022 Bankr. LEXIS 1725, at *144 n.88 (Bankr. S.D.N.Y. June 18, 2022) ("LATAM Airlines"). But a plan and the extensive disclosure around it provide significantly more notice to creditors than a sale motion, and as the Court noted in *LATAM Airlines* the releases were a fundamental – and well-advertised – element of the plan. That is not the case here. In addition, third-party releases in plans – though obviously subject to continuing controversy in the courts  -- are relatively common features. Deemed consent to a release through a sale order is sufficiently extraordinary, and indeed the DMPs are aware of no other example, as not to be reasonably contemplated by creditors. In these circumstances, consent should not be found through silence, as the Court found in *SunEdison. See also, In re Emerge Energy Services LP*, Case No. 19-11563, 2019 Bankr. LEXIS 3717 at * 17, 2019 WL 7634308 (Bankr. D. Del. Dec. 5, 2019) (holding that silence cannot be construed as consent to releases unless contract principles indicate the parties have so bargained).

## **RESERVATION OF RIGHTS**

40.     The DMPs are continuing to review the Motion, including, but not limited to, related Bidding Procedures and Assumption and Assignment Procedures, and reserve the right to raise additional objections to the Motion before and at the Sale Hearing, as well as at the time of assumption and assignment of the Contracts, through the anticipated plan process.

## **CONCLUSION**

For all of the foregoing reasons, the DMPs respectfully request that the Court deny the Motion and grant such further relief as may be just.

4876-3422-0358.v2

Dated: January 6, 2023      Respectfully submitted,

*/s/  Scott A. Zuber*
**CHIESA SHAHINIAN & GIANTOMASI PC**
Scott A. Zuber
Terri Jane Freedman (admitted *pro hac vice*)
One Boland Drive
West Orange, New Jersey 07052
Telephone: (973) 530-2046
E-mail: szuber@csglaw.com
E-mail: tfreedman@csglaw.com

*Counsel for Cardinal Health, Inc. and Related Entities*


*/s/  Morton R. Branzburg*
**KLEHR HARRISON HARVEY
BRANZBURG LLP**
Morton R. Branzburg (admitted *pro hac vice)*
1835 Market Street, Suite 1400
Philadelphia, PA 19103
Phone: 215-569-2700
Facsimile: 215-568-6603
Email: mbranzburg@klehr.com

    - and –


**NOVOADVISORS**
Claudia Z. Springer
1310 Meetinghouse Road
Gwynedd, PA 19436
Phone: 215-896- 3775
Email: cspringer@novo-advisors.com

*Counsel for AmerisourceBergen Drug Corporation and Related Entities*

4876-3422-0358.v2

*/s/ Jeffrey K. Garfinkle*
**BUCHALTER**
Jeffrey K. Garfinkle (admitted *pro hac vice*)
18400 Von Karman Avenue, Suite 800
Irvine, California 92612-0514
Telephone: (949) 760-121
E-mail: jgarfinkle@buchalter.com

- and -

**JENNER & BLOCK LLP**
Catherine L. Steege
353 N. Clark Street
Chicago, IL 60654-3456
Phone: 312-923-2952
Facsimile: 312- 840- 7352
Email: csteege@jenner.com

*Counsel for McKesson Corporation and Certain Affiliates*


*/s/  Evan M. Jones*
**O'MELVENY & MYERS LLP**
Evan M. Jones (admitted *pro hac vice*)
Jordan Weber (admitted *pro hac vice*)
400 South Hope Street
Los Angeles, California 90071
Telephone: (213) 430-6000
E-mail: ejones@omm.com
E-mail: jweber@omm.com

*Counsel for Johnson & Johnson, Janssen Pharmaceuticals, Inc.,*
*Ortho-McNeil-Janssen Pharmaceuticals, Inc.*
*n/k/a Janssen Pharmaceuticals, Inc.,*
*Janssen Pharmaceutica, Inc. n/k/a Janssen Pharmaceuticals, Inc.,*
*Alza Corporation, and Janssen Ortho LLC*

4876-3422-0358.v2

*/s/ Matthew E. Linder*
**WHITE & CASE LLP**
Matthew E. Linder (admitted *pro hac vice*)
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Telephone: (312) 881-5400
Email: mlinder@whitecase.com

Jessica C. Lauria (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Email: jessica.lauria@whitecase.com

Amanda Parra Criste (admitted *pro hac vice*)
200 South Biscayne Boulevard, Suite 4900
Miami, Florida 33131
Telephone: (305) 371-2700
Email: aparracriste@whitecase.com

*Counsel for Teva Pharmaceuticals USA, Inc. and Certain Affiliates*

*/s /Jennifer Y. Lee*
**HOGAN LOVELLS US LLP**
Christopher R. Bryant
Jennifer Y. Lee
390 Madison Avenue
New York, NY 10017
Telephone: (212) 918-3000
Facsimile: (212) 918-3100
Email: chris.bryant@hoganlovells.com
Email jennifer.lee@hoganlovells.com

*Counsel for Viatris Inc., Mylan Inc., Mylan
Pharmaceuticals Inc., Mylan Institutional Inc.,
Mylan Technologies Inc., Mylan Specialty, L.P.,
and Mylan Bertek Pharmaceuticals Inc.*

4876-3422-0358.v2

*/s/ Alissa M. Nann*
**FOLEY & LARDNER LLP**
Alissa M. Nann
90 Park Avenue
New York, NY 10016-1314
Tel: (212) 682-7474
Fax: (212) 687-2329
E-mail:  anann@foley.com

-and-

Geoffrey S. Goodman (*pro hac vice* application pending*)*
Emil P. Khatchatourian (*pro hac vice* application pending*)*
321 N. Clark Street, Suite 3000
Chicago, Illinois 60654-4762
Tel: (312) 832-4500
Fax: (312) 832-4700
E-mail: ggoodman@foley.com
Email:  ekhatchatourian@foley.com

*Counsel for CVS Pharmacy, Inc. and Related Entities*


*/s/ John P. McDonald*
**LOCKE LORD LLP**
John P. McDonald (admitted *pro hac vice*)
Brandan Montminy (admitted *pro hac vice*)
Nicholas S. Graber (admitted *pro hac vice*)
Katherine S. Wright (*pro hac vice* application pending)
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201
Telephone: (214) 740-8000
Facsimile: (214) 740-8800
Email: jpmcdonald@lockelord.com
Email: brandan.montminy@lockelord.com
Email: nick.graber@lockelord.com
Email: katie.wright@lockelord.com

*Counsel for Henry Schein, Inc. and Related Entities*

4876-3422-0358.v2

*/s/  Joseph D. Frank*
**FRANKGECKER LLP**
Joseph D. Frank (*pro hac vice* admission pending)
1327 W. Washington Blvd., Suite 5 G-H
Chicago, Illinois 60607
Telephone: (312) 276-1400
Facsimile:  (312) 276-0035
Email:  jfrank@fgllp.com

*Counsel for Walgreen Co., Walgreen Eastern Co., Inc.,*
*Walgreen Arizona Drug Co., and Certain of their Corporate*
*Affiliates and Subsidiaries.*


*/s/ Jeremy W. Ryan*
**POTTER ANDERSON & CORROON LLP**
Jeremy W. Ryan (admitted *pro hac vice*)
R. Stephen McNeill (admitted *pro hac vice*)
Sameen Rizvi
1313 North Market Street, 6th Floor
Wilmington, Delaware 19801
Telephone:    (302) 984-6000
Facsimile:    (302) 658-1192
Email: jryan@potteranderson.com
Email:rmcneill@potteranderson.com
Email:srizvi@potteranderson.com

*Counsel for Walmart Inc.*


**OSLER,  HOSKIN & HARCOURT LLP**
Deborah Glendinning (admitted in Canada only)
Mary Paterson(admitted in Canada only)
100 King Street West
1 First Canadian Place
Suite 6200, P.O. Box 50
Toronto ON  M5X 1B8
Telephone: (416)862-4714
Facsimile: (416)862-6666
Email: dglendinning@osler.com
Email: MPaterson@osler.com


*Counsel for Loblaw Companies Ltd., Shoppers Drug Mart Inc., and*
*Sanis Health Inc.*

4876-3422-0358.v2