Andrew N. Rosenberg
Alice Belisle Eaton
Andrew M. Parlen
Claudia R. Tobler
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990

*Attorneys for the Ad Hoc Cross-Holder Group*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| **ENDO INTERNATIONAL plc**, *et al.*, | Case No. 22–22549 (JLG) |
| Debtors.[1] | (Jointly Administered) |

## THE AD HOC CROSS-HOLDER GROUP'S OBJECTION
## TO THE DEBTORS' EXTENSION OF EXCLUSIVITY AND STATEMENT
## REGARDING THE PROPOSED PROCESS GOING FORWARD FOR THESE CASES

---

[1]    The last four digits of Debtor Endo International plc's tax identification number are 3755. Due to the large number of debtors in these chapter 11 cases, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Endo. The location of the Debtors' service address for purposes of these chapter 11 cases is: 1400 Atwater Drive, Malvern, PA 19355.

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ..................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................... 1

BACKGROUND ....................................................................................................................... 6

I.   The Chapter 11 Cases ........................................................................................................ 6

II.   The Pending Motions ....................................................................................................... 7

OBJECTION .............................................................................................................................. 8

I.   The Debtors Fail to Evidence a Sound Business Purpose for Their Proposed Path
Forward............................................................................................................................. 8

II.   No Cause Exists to Extend the Debtors' Exclusive Filing Period and the Request
Should Be Denied........................................................................................................... 15

        A.   Cause Does Not Exist to Extend Exclusivity to Pursue a Sale as a Matter
of Law ................................................................................................................ 16

        B.   The Debtors Cannot Meet Their Evidentiary Burden That Cause for an
Exclusivity Extension Exists............................................................................. 16

        C.   Permitting the Filing of an Alternate Plan Would Benefit Interested Parties
without Prejudicing the Debtors ........................................................................ 22

III.   The Debtors Pursue an Impermissible *Sub Rosa* Plan.................................................... 24

IV.   Other Aspects of the Debtors' Process Are Objectionable ................................................ 26

        A.   The Opioid Claim and Bar Date Noticing are Excessive .................................... 26

        B.   Reservation of Rights Regarding Certain Relief ................................................. 26

RESERVATION OF RIGHTS ................................................................................................ 27

CONCLUSION........................................................................................................................ 28

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Adelphia Commc'ns Corp.*,
    352 B.R. 578 (Bankr. S.D.N.Y. 2006).................................................................17, 18, 20, 21

*In re Borders Grp., Inc.*,
    460 B.R. 818 (Bankr. S.D.N.Y. 2011)........................................................................15, 16, 19

*Comm. of Equity Sec. Holders* v. *Lionel Corp.*,
    722 F.2d 1063 (2d Cir. 1983)................................................................................................8

*In re Crowthers McCall Pattern Inc.*,
    114 B.R. 877 (Bankr. S.D.N.Y. 1990)..................................................................................24

*Czyzewski* v. *Jevic Holding Corp.*,
    137 S. Ct. 973 (2017)...........................................................................................................25

*In re Dow Corning Corp.*,
    208 B.R. 661 (Bankr. E.D. Mich. 1997)..............................................................................21

*In re General Bearing Corp.*,
    136 B.R. 361 (Bankr. S.D.N.Y. 1992)..................................................................................22

*In re GMG Capital Partners III, L.P.*,
    503 B.R. 596 (Bankr. S.D.N.Y. 2014)..................................................................................15

*In re Interco, Inc.*,
    137 B.R. 999 (Bankr. E.D. Mo. 1992)..................................................................................24

*In re Iridium Operating LLC*,
    478 F.3d 452 (2d Cir. 2007).................................................................................................25

*In re Mallinckrodt Plc, et al.*,
    Case No. 20-12522-JTD (Bankr. D. Del. May 2, 2022) ECF No. 6660....................................5

*Pension Benefit Guar. Corp.* v. *Braniff Airways, Inc.* (*In re Braniff Airways, Inc.*),
    700 F.2d 935 (5th Cir. 1983) ..............................................................................................25

*In re Public Service Co. of New Hampshire*,
    88 B.R. 521 (Bankr. D.N.H. 1988) ......................................................................................24

*In re Purdue Pharma L.P., et al.*,
Case No. 19-23649-RDD (Bankr. S.D.N.Y. September 17, 2021) ECF No.
3787............................................................................................................................5

*In re R.G. Pharm., Inc.*,
374 B.R. 484 (Bankr. D. Conn. 2007) ..................................................................15

*Teachers Ins. And Annuity Ass'n* v. *Lake in the Woods* (*In re Lake in the Woods*),
10 B.R. 338 (E.D. Mich. 1981)...............................................................................8

*In re Texaco, Inc.*,
76 B.R. 322 (Bankr. S.D.N.Y. 1987).........................................................8, 15, 18

**Statutes**

Bankruptcy Code, Section 363(b)........................................................... *passim*

Bankruptcy Code, Section 505 ........................................................................4, 11

Bankruptcy Code, Section 524(g).......................................................................24

Bankruptcy Code, Section 1112(b) ....................................................................14

Bankruptcy Code, Section 1121 .........................................................................16

The *ad hoc* group (the "Ad Hoc Cross-Holder Group") of certain unaffiliated holders of loans, notes, or other indebtedness issued by the Debtors,[1] by and through its undersigned counsel, hereby objects to the *Motion of Debtors for an Order Pursuant to Bankruptcy Code Section 1121(d) Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof* [ECF No. 979] (the "Exclusivity Motion") and raises the following issues regarding the Debtors' other process-related motions (the "Statement").[2] The Ad Hoc Cross-Holder Group also reserves its rights with respect to the Bid Procedures Motion, the Bar Date Motion and the orders sought to be entered in connection with the relief the Debtors seek therein.  In support thereof, the Ad Hoc Cross-Holder Group respectfully states as follows:

## PRELIMINARY STATEMENT

1.      Courts generally honor a debtor's business judgment to decide the path of its chapter 11 case, but do so relying on legal standards that protect the integrity of the Bankruptcy Code and competing stakeholder interests.  Thus, courts will not grant exclusivity extensions in the absence of cause, and similarly, will not approve impermissible *sub rosa* plans masked as Section 363(b) sales.

2.      But the Debtors seek to have it both ways.  They want an extension of their exclusivity period even though they refuse to pursue a reorganization plan, and have indicated that confirming a liquidating plan at the conclusion of the sale will be challenging.  At the same

---

[1]   The identities and disclosable economic interests of each member of the Ad Hoc Cross-Holder Group are set forth in the *Second Amended Verified Statement of the Ad Hoc Cross-Holder Group Pursuant to Bankruptcy Rule 2019* [ECF No. 999].  Each member of the Ad Hoc Cross-Holder Group files this Statement exclusively on its own behalf and does not assume any fiduciary or other duties to any other member or to any other entity or individual.

[2]   Capitalized terms used but not defined herein have the meanings ascribed to them in the Exclusivity Motion, the Bid Procedures Motion, and the *Declaration of Mark Bradley in Support of Chapter 11 Petitions and First Day Papers* [ECF No. 38] (the "First Day Declaration").

time they want to prosecute a Section 363(b) sale (with all the trappings of a *sub rosa* plan) in the absence of any exigency.  But the Bankruptcy Code does not afford them the option to benefit from an exclusive time period designed to facilitate a reorganization plan while seeking authority to conduct a sale that guts the Bankruptcy Code's plan confirmation protections, with no urgency that justifies doing so.  The Ad Hoc Cross-Holder Group therefore objects to extending the Debtors' exclusivity and files this Statement to ensure that these Chapter 11 cases move forward with all proper procedural protections intact, including the opportunity for stakeholders and the Court to consider a parallel plan and sale process.  In sum, the Ad Hoc Cross-Holder Group does not object to the Debtors continuing the sales process, but the Debtors cannot simultaneously extend exclusivity to foreclose consideration of everything else.

3.     The Ad Hoc First Lien Group might argue that objecting to an extension of exclusivity violates the 1L-2L Intercreditor Agreement.  It would be wrong.  For starters, the Debtors chose to let exclusivity expire.  Their inability to evidence that "cause" exists to *extend* this period now, as the Ad Hoc Cross-Holder Group maintains, results entirely from the Debtors' own voluntary conduct.  Regardless, the Ad Hoc Cross-Holder Group is not objecting to the Sale with this Statement.  All that the Ad Hoc Cross-Holder Group wants to do is protect the opportunity of stakeholders to pursue and consider a plan in addition to a sale.  Doing so does not trigger any contractual limitations that the second lien priority secured parties may have regarding a sale that the first lien priority secured parties support.[3]  Regardless, no Sale exists here that the Ad Hoc Cross-Holder Group can object to.  The Debtors state that they are not asking the Court to approve one now.  Moreover, the Debtors cannot select a Successful Bidder

---

[3]     *See* 1L-2L Intercreditor Agreement § 5.6, attached hereto as Exhibit A.

or even execute the Stalking Horse Agreement until the Reconstruction Steps are completed, so there is no sale pending before this Court to object to.

4.      The absence of an executed stalking horse bid and a convoluted process to obtaining a sale supported by the Ad Hoc First Lien Group does not, however, mean that the Debtors are on the right path.  A chapter 11 plan proposal has been put together by the UCC (and is supported by the Ad Hoc Cross-Holder Group) that combines reinstatement and voluntary equitization of first lien debt, and that deleverages the Company while locking-in favorable interest rates.  The Ad Hoc Cross-Holder Group believes this chapter 11 plan proposal is (and will remain) viable and that stakeholders would benefit from pursuing this proposal to the next stage.  This chapter 11 plan proposal would result in both a feasible post-emergence capital structure *and* recovery for junior stakeholders, including general unsecured creditors.  And there is no reason to believe that such a proposal when turned into a plan would disturb the opioid settlement trusts, the channeling injunction and the claims process that the Debtors are now seeking to impose on creditors – but it would do so with all the creditor protections that Section 1129 requires for plan confirmation, including both a creditor vote and a full disclosure statement.  If such a plan were to go forward, the stakeholders and the Court could then decide whether such plan or a sale result is ultimately best.

5.      The Debtors say they oppose a plan process because they fear that the IRS may "potentially" assert hundreds of millions of dollars of priority tax claims related to various disputed tax positions which the Debtors argue would render the plan unfeasible.[4]  At the same time, the Debtors "believe they have strong legal arguments on these issues" and believe that

---

[4]     *Declaration of Mark G. Barberio in Support of Entry of the Bidding Procedures Order* [ECF No. 729] (the "Barberio Declaration") at ¶ 8.

they "could prevail in these disputes."[5]  But the Debtors provide no evidence of what efforts, if

any, they have undertaken with respect to addressing and potentially resolving these speculative

tax claims.  At some level, they must believe that a settlement with the IRS is possible because

their RSA wind-down budget provides that the "Debtors, after consultation with the Ad Hoc

First Lien Group, reserve the right to use a portion of the funds under the wind-down budget to

settle priority claims."[6]  In fact, Section 505 provides a framework for doing exactly that *during*

these cases, and it is not limited to a liquidating estate.

6.       Touting the inability to resolve *speculative* IRS claims as a fatal impediment to a

plan process, the Debtors then turn around and pursue a sales trajectory that, absent the

implementation of the Reconstruction Steps, undeniably *does* trigger Irish transfer and gains

taxes likely in the hundreds of millions of dollars.  True, the Debtors believe they can defer these

taxes and to do so, they seek approval of the Reconstruction Steps.   But the byzantine

Reconstruction Steps (a) introduce significant, and potentially indefinite, delays by among other

things, requiring extensive regulatory approvals from no less than four different jurisdictions, a

process which the Debtors admit prevents them from setting a firm deadline for submitting

letters of interest;  (b) add layers of additional administrative expenses as the various

professionals funded by the estates will need to carefully review the currently undrafted

transaction documents necessary for implementation; and (c) are untested in a bankruptcy of this

size and complexity.  The entire risk that these complex corporate transactions do not succeed,

and which the Debtors do not fully control, falls on the estates and their creditors.  The Stalking

Horse Bidder can walk away from the proposed sale if the Reconstruction Steps fail or cannot be

implemented within a timeframe of its choosing.

---

[5]    Barberio Declaration at ¶ 9.

[6]    *Notice of Filing of Restructuring Support Agreement* [ECF No. 20] (the "RSA"), Exhibit D at 176.

7.      The Ad Hoc Cross-Holder Group therefore struggles to understand how the Debtors' process reflects a sound exercise of their business judgment that justifies a single minded pursuit of a sale process to the exclusion of even consideration of any other alternatives. The Debtors do not face an existential threat of the kind that courts have found justifies a preconfirmation Section 363(b) sale of this magnitude in other cases.  Nor are the Debtors on the verge of financial ruin, liquidation or a liquidity crisis.  In fact, the Debtors have been operating for over four months in the ordinary course in chapter 11 and have actually continued to generate positive cash flow.  The Debtors also filed these Chapter 11 Cases with a Voluntary Opioid Trust Settlement[7] that is substantively and economically similar to those that were approved as part of confirmed plans in Purdue and Mallinckrodt.[8]  They have not identified, much less proven, any factors which would not allow this settlement structure to be portable to a chapter 11 plan construct.  Indeed, unlike a Section 363(b) sale, a plan would provide the added benefits of a court-ordered channeling injunction and litigation trust, while also affording the ability to address unknown future claims.

8.      The arguments in favor of allowing an actual plan to be pursued in tandem with a sale process are also likely to grow with the passage of time.  The Debtors have publicly stated both (a) a refusal to proceed with a plan process and (b) a desire to reach consensus with as many parties as possible.  These two concepts can only be married through the creation of additional trusts or voluntary settlements.  These would both require Court approval and, by necessity, be appended to a sale structure that would look more and more like a plan with each additional settlement.  At best, the hull of the Debtors' existing sale process is already buckling under the

---

[7]   As defined in the RSA, Exhibit E at 180.

[8]   *See In re Mallinckrodt Plc, et al.,* Case No. 20-12522-JTD (Bankr. D. Del. May 2, 2022) ECF No. 6660; *In re Purdue Pharma L.P., et al.*, Case No. 19-23649-RDD (Bankr. S.D.N.Y. September 17, 2021) ECF No. 3787.

weight of its *sub rosa* aspects, including over possibly wildly disparate treatment for first lien creditors who are or are not part of the Ad Hoc First Lien Group. It is sure to break entirely if more and more settlements are tacked on. At that point, any sale would simply be a plan in everything but name.

9.      The Ad Hoc Cross-Holder Group accordingly asks this Court to deny the Exclusivity Motion to the extent necessary to permit a dual plan and sale process. Alternatively, the Ad Hoc Cross-Holder Group welcomes the opportunity to engage in mediation with the Debtors, the Ad Hoc First Lien Group and other parties in interest, including the statutory committees. Mediation would level the playing field among stakeholders, and permits an inclusive exploration of how best to achieve a consensual, value-maximizing process. A mediator could fairly assess whether the proposed Section 363(b) sale – including the complicated and potentially irreversible Reconstruction Steps – really are as beneficial for *all* stakeholders as the Debtors maintain. If they are not, and if a plan is feasible, the mediator could objectively assess that outcome as well. Notably, the Ad Hoc Cross-Holder Group does not object to a limited extension of exclusivity to permit such mediation to proceed. But no cause exists to extend exclusivity to permit the Debtors' current process to proceed without the ability to pursue alternatives.

## **BACKGROUND**

### I.      **The Chapter 11 Cases**

10.     On August 16, 2022 ("Petition Date") the Debtors filed a petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

11.     Since the Petition Date, the Debtors have continued to operate their business as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

12.     On September 2, 2022, the Office of the United States Trustee for the Southern

District of New York (the "U.S. Trustee") appointed an Official Committee of Unsecured

Creditors (the "UCC") [ECF No. 161] and an Official Committee of Opioid Claimants (the

"OCC") [ECF No. 163].  On September 30, 2022, the Court appointed Roger Frankel as the

future claims representative (the "FCR") [ECF No. 318].

## II.     The Pending Motions

13.     On November 23, 2022, the Debtors filed the Bid Procedures Motion.  The Bid

Procedures Motion seeks approval of (a) bidding procedures to govern the sale of all assets; (b) a

stalking horse expense reimbursement to approve the required expense reimbursement under the

purchase agreement with the Ad Hoc First Lien Group; (c) Irish reconstruction steps to facilitate

an Irish spin transaction to mitigate Irish corporate gains taxes triggered by the Sale; (d) noticing

procedures to notify creditors of both the Sale and the Bar Dates; and (e) contract and lease

assumption and assignment procedures.  The requirements of the Ad Hoc First Lien Group's

Stalking Horse Bid are unchanged from the RSA.[9]

14.     On November 23, 2022, the Debtors filed the Bar Date Motion.  The Debtors

request the establishment of dates and deadlines related to claimants submitting proofs of claim

and procedures providing notice thereof.

15.     On December 14, 2022, the Debtors filed the Exclusivity Motion.  The Debtors

request a 180-day extension of the exclusive periods during which only the Debtors may file a

chapter 11 plan and solicit votes for acceptance of that plan.

---

[9]     *Motion to Sell Property Free and Clear of Liens Under Section 363(f) Debtors Motion for an Order (I)
Establishing Bidding, Noticing, and Assumption and Assignment Procedures, (II) Approving Certain
Transaction Steps, (III) Approving the Sale of Substantially all of the Debtors Assets and (IV) Granting Related
Relief* [ECF No. 728] (the "Bid Procedures Motion") at ¶ 1.

## OBJECTION

16.     The Debtors want what the Bankruptcy Code does not offer:  the cover of exclusivity to pursue a plan in the guise of a sale.  They attempt to eschew the complex plan confirmation provisions of Section 1129, which Congress designed to safeguard parties in interest.[10]   At the same time, the Debtors want to prevent interested parties from filing a reorganization plan now that their exclusivity period expired, thereby upending the careful balance of negotiating strength that Congress intended for debtors and creditors during the plan negotiation period set forth in Section 1121.[11]

17.     No sound business purpose supports this process to the exclusion of all others. The Debtors have not filed a reorganization plan during their exclusivity period.  Indeed, the Debtors initiated these cases with an RSA that drastically limits their ability to pursue any kind of plan whatsoever.  Nor have the Debtors obtained approval for their "central objective," which is to "conduct an open and transparent sale process."[12]   The Debtors therefore cannot evidence that either the cause needed to extend exclusivity *or* that pursuing their Section 363(b) Sale to the exclusion of consideration of a parallel plan process is warranted.

I.     **The Debtors Fail to Evidence a Sound Business Purpose for Their Proposed Path Forward**

18.     The Ad Hoc Cross-Holder Group has grave concerns about the Debtors' request to extend exclusivity for purposes of controlling their case trajectory:  The Debtors want to impose a highly uncertain and costly process on these estates, one that clearly favors a credit bid. Given the state of the markets which render an overbid improbable at this time, the Debtors'

---

[10]    *See Comm. of Equity Sec. Holders* v. *Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983).

[11]    *See, e.g.*, *In re Texaco, Inc.*, 76 B.R. 322, 325 (Bankr. S.D.N.Y. 1987); *Teachers Ins. And Annuity Ass'n* v. *Lake in the Woods* (*In re Lake in the Woods*), 10 B.R. 338, 343 (E.D. Mich. 1981).

[12]    Exclusivity Motion at ¶ 24.

process today virtually ensures that the Stalking Horse Bid will prevail at an auction, if one is held at all.  At the same time, the Debtors want to prevent stakeholders from considering a potentially more value maximizing, and more inclusive, plan process.

19.      A viable plan alternative exists, but the Debtors have refused to consider, let alone negotiate, its terms.  Instead, the Debtors let their exclusivity period expire without progressing their auction process at all – an unprecedented development in a sale case of this size.  Rather than trying to advance any type of plan construct, the Debtors stay mute and try to control dissent with their purse strings.  For example, they seek this Court's approval to assume professional fee agreements with the Multi-State Endo Executive Committee that expressly prohibit the Debtors from paying any of the committee's professional fees incurred in connection with "supporting or otherwise advancing any transaction that is an alternative to the Sale."[13]  These fee agreements are dated August 2022 and earlier.[14]  Thus, it is clear that the Debtors never intended to seriously negotiate anything but a sale *during* these cases, at least not with the governmental opioid claimants who are also, according to the Debtors, likely their largest unsecured creditor group.[15]

20.      In these circumstances, it is not enough for the Debtors to say that they exercised their business judgment by signing an RSA with the Ad Hoc First Lien Group that cements in place a framework for a credit bid sale to the Stalking Horse Bidder.[16]  Their business judgment must be reasonable and sound, and in the context of these Chapter 11 Cases and the Debtors'

---

[13]    *Motion of Debtors to Assume the Fee Agreements for the Endo EC Professionals and to Pay the Endo EC Professionals' Reasonable and Documented Fees and Expenses* [ECF No. 1112] (the "EC Assumption Motion") at ¶ 26.

[14]    *See id.* at Exhibit B.

[15]    *Id.* at ¶ 7.

[16]    Barberio Declaration at ¶ 7 ("the Debtors determined in their business judgment to pursue a restructuring support agreement … with the Ad Hoc First lien Group setting forth the framework for an in-court sale to the Stalking Horse Bidder").

request to extend exclusivity to permit a Section 363(b) sale, that means they need to provide affirmative evidence that their preferred process is superior to a competing plan. The Debtors have not provided such evidence because as of now none exists.

21.    The Debtors claim that they proceeded with a sale process after "extensive consideration and careful study of all of the available alternatives," and "in recognition of the major challenges that accompanied other alternatives and the value maximizing nature of the Sale."[17] But the mere "consideration" of alternative processes does not demonstrate that the Debtors' chosen path is actually value maximizing or a sound exercise of their business judgment. Examined carefully, the Debtors' contention that an alternate plan process is not feasible and that a sale is the only possible path proves to be nothing more than what it is: a simple belief stated without evidentiary support and directly contradicted by the undisputed facts of these cases. The way to find out if the Debtors are right is to put them to their proof and let both processes proceed.

22.    The Debtors give two main reasons why a plan alternative to a sale will not work: (a) confirmation litigation generally and (b) potential priority IRS claims. They substantiate neither and both lack substance. Regarding litigation risk, the Debtors merely speculate that a reorganization plan "*likely* involves *potentially* years of litigation with an uncertain conclusion, tremendous amounts of professional fees, and serious risks to the Debtors' businesses."[18] But the Debtors' belief that litigation *may* arise in connection with plan confirmation is not evidence that it will, that a plan is not feasible as a result or that the Section 363(b) process is superior to a plan. In fact, most of the potential litigation the Debtors identify concerns routine confirmation issues like valuation or plan feasibility, issues that arise in nearly every chapter 11 proceeding

---

[17]    Bid Procedures Motion at ¶ 4.

[18]    *Id.* at 5; Barberio Declaration at ¶ 8.

and which are routinely adjudicated in reasonable timeframes. Nondischargeability litigation may be rarer generally, but is commonly raised by governmental claimants in opioid cases like the Debtors' and it did not prevent Purdue and Mallinckrodt from confirming their chapter 11 plans.

23.     The Debtors cite requests from governmental units seeking extensions of time to file nondischargeability complaints as evidence that the risk of "nondischargeability litigation is real and exists today."[19]   But requests for consensual extensions of time, and the Debtors' demonstrated success in attracting support from governmental opioid claimants, more likely evidences the opposite: that the governmental units want to avoid this litigation entirely. In fact, this is precisely what happened in both Purdue and Mallinckrodt, and the Debtors provide no evidence why they think a different outcome should happen here.

24.     The risk that the potential priority IRS claims render the plan unfeasible is equally unsubstantiated. The Debtors speculate that the IRS will "potentially" assert hundreds of millions of dollars of priority tax claims related to various disputed tax positions with the Debtors.[20]   At the same time, the Debtors "believe they have strong legal arguments on these issues" and believe that they "could prevail in these disputes."[21]   Importantly for purposes of the Exclusivity Motion, the Debtors provide no evidence of what efforts, if any, they have undertaken with respect to addressing and potentially settling these tax claims. They do not explain why Section 505 does not permit their estimation or resolution. Despite the lack of detail on their efforts to do so, however, the Debtors must believe that a settlement is possible because their Section 363 wind-down budget provides that the "Debtors, after consultation with the Ad

---

[19]    Bid Procedures Motion at ¶ 12, n.4.

[20]    Barberio Declaration at ¶ 8.

[21]    *Id.* at ¶ 9.

Hoc First Lien Group, reserve the right to use a portion of the funds under the wind-down budget to settle priority claims."[22]

25.     In contrast to the speculative litigation and tax claims that the Debtors think make a plan process "difficult or impossible," the Debtors are proceeding with a sale process that *will* trigger a 33% capital gains tax and 7.5% stamp tax under Irish law.[23]  Assuming for sake of argument that the aggregate first lien Term Loan of $1.9 billion that the Stalking Horse Bidder will credit bid represents the minimum market value of the Debtors' assets, and assuming nominal corresponding acquisition costs, the Irish capital gains tax alone could be hundreds of millions of dollars.[24]

26.     True, the Debtors seek approval of the Reconstruction Steps to defer these tax liabilities.[25]  But the uncertainty, delay, cost and execution risk of these proposed transactions must be considered against whatever litigation risks a plan confirmation may face.   The Reconstruction Steps are inordinately complex, requiring among other things, that three Debtors holding some of the Company's most valuable intellectual property transfer their businesses and assets to three Newcos, which will then file their own chapter 11 cases.[26]  The Debtors have provided no analysis as to whether or not the new structure will facilitate or deter bidding. Moreover, prior to the closing of the Reconstruction Steps, the Debtors and the Newcos will need to comply with a number of healthcare-related regulatory requirements and approvals in

---

[22]    RSA, Exhibit. D at 176.

[23]    Bid Procedures Motion at ¶ 24; *Declaration of Peter Maher in Support of Entry of the Bidding Procedures Order* [ECF No. 731] (the "Maher Declaration") at ¶ 6.

[24]    *See* Maher Declaration at ¶ 6 ("The Capital Gains Tax liability would generally be at the rate of 33% and based on the difference between the disposal proceeds (or market value) of each asset and the acquisition costs of that asset."); Bid Procedures Motion at ¶ 24 ("In this case, that tax would be very substantial.").

[25]    Bid Procedures Motion. at ¶¶ 20–29.

[26]    *Id.* at ¶ 25.

various jurisdictions, "including with respect to certain Irish marketing and distribution authorizations; Indian manufacturing, import, and export licenses; Canadian product authorizations; and U.S. FDA product authorizations and establishment regulations."[27]  Finally, the Reconstruction Steps must be completed now, before the Sale Order is entered or a Sale is approved.[28]  It is for this reason that the Debtors must delay execution of the Stalking Horse Agreement, and they cannot set a firm deadline by which competing bidders must submit indications of interest.[29]  All of these transactions need to be documented and implemented, a process that statutory fiduciaries like the OCC and UCC, and other stakeholders like the Ad Hoc Cross-Holder Group whose liens are being separated from their claims as part of the Reconstruction Steps, will need to carefully scrutinize.  This will undoubtedly generate significant professional fees that the estates must pay, and the Debtors submit no evidence how these fees compare with those that might arise from the speculative litigation they believe may exist under an alternate plan path.

27.     Notably, the Reconstruction Steps are wholly unnecessary for an alternate plan path because a reorganization plan does not generally trigger Irish capital gains or stamp taxes. The Debtors' conclusory belief that "(i) the ability of the Stalking Horse Bidder to utilize a credit bid structure, (ii) proceeding with the Reconstruction Steps, and (iii) the sale process timeline, reduces the execution risk of a sale and maximizes value" thus rings hollow.[30]  In fact, the Debtors do not provide any evidence about how the execution risk of the Reconstruction Steps compare to an alternate plan path.  The Debtors provide no evidence that reconstruction steps as

---

[27]    *Id.* at ¶ 45.

[28]    *Id.* at ¶ 76.

[29]    *Id.* at ¶ 50, n. 28 (Indication of Interest Deadline is "[S]ubject to extension if the Reconstruction Steps have not been completed by this date.").

[30]    Barberio Declaration at ¶ 10.

complex as the ones contemplated here, which include additional chapter 11 filings by the yet-to-be formed Newcos, have ever been successfully implemented in a bankruptcy.[31]  Their belief that "there is no reason that [the Reconstruction Steps] cannot be used in a bankruptcy" provides cold comfort, especially in light of the fact that the Stalking Horse Bidder can terminate the Stalking Horse Agreement if the Reconstruction Steps fail.[32]

28.    Likewise, the Debtors' assertion that these steps can simply be "unwound without any material adverse effects on the Debtors or their estates" is equally unsupported.[33]  The evidence that the Debtors cite to support their belief only states that relief from capital gains tax and stamp duty are available if the businesses transferred to the Newcos need to be transferred back to the Transferor Debtors.[34]  That may be so, but it is a far cry from evidence that the Reconstruction Steps are easily, quickly or cheaply unwound.  It strains credulity that doing so is simple given (a) the extensive regulatory approvals needed to effect the initial business transfers to the Newcos; and (b) the fact that the Newcos will be chapter 11 debtors in their own right who will likely have been operating in chapter 11 for months by the time such an unwinding takes place, all while owning some of the company's most valuable intellectual property, and unable to dismiss their own chapter 11 cases unilaterally without a court hearing.[35]

29.    In sum, while it is not the Ad Hoc Cross-Holder Group's burden to demonstrate that no cause exists to extend exclusivity, it is clear that the Debtors have not met their burden to establish that cause does exist.  In fact the Debtors cannot affirmatively prove that the Sale

---

[31]    Bid Procedures Motion at ¶ 20.

[32]    *See id.*

[33]    Bid Procedures Motion at ¶ 80.

[34]    *See* Maher Declaration at ¶ 14.

[35]    *See* 11 U.S.C. § 1112(b)(1) (requiring cause for dismissal or conversion and consideration of best interests of creditors and the estate).

process for which they want more exclusive time to pursue is superior to an alternate plan process or reflects a sound exercise of their business judgment. To the contrary, their own pleadings actually evidence that a parallel path should be pursued to protect against the fact that the Section 363 process (a) entails significant execution risk; (b) imposes substantial professional and administrative expense on the estates; (c) involves material delay and uncertainty, including from factors (such as obtaining regulatory approvals) outside the Debtors' control; (d) is untested; and (e) at best "help[s] to bolster the estates' administrative solvency" but in fact, only maximizes value for a credit bid (*i.e.*, the Stalking Horse Bidder).[36]

## II.    No Cause Exists to Extend the Debtors' Exclusive Filing Period and the Request Should Be Denied

30.    A court's decision to extend a debtor's exclusive period "is a serious matter."[37] Extensions "are not granted routinely or cavalierly," and "courts have not hesitated to deny a first motion to extend exclusivity where the circumstances warrant it."[38]    The Debtors have the burden of proving cause exists to extend exclusivity.[39]    To meet their burden, they must produce affirmative evidence to support a finding of cause.[40]

---

[36]    Bid Procedures Motion at ¶ 77; Barberio Declaration at ¶ 10 (testifying that the proposed sale process establishes a value-maximizing framework for the Debtors because of "the ability of the Stalking Horse Bidder to utilize a credit bid structure.").

[37]    *In re Borders Grp., Inc.*, 460 B.R. 818, 821 (Bankr. S.D.N.Y. 2011).

[38]    *Id.* (Citing *In re McLean Indus., Inc.*, 87 B.R. 830, 834 (Bankr. S.D.N.Y. 1987)); *In re GMG Capital Partners III, L.P.*, 503 B.R. 596, 601 (Bankr. S.D.N.Y. 2014).

[39]    *See In re R.G. Pharm., Inc.,* 374 B.R. 484, 487 (Bankr. D. Conn. 2007) (stating debtor has burden in motion to extend); *In re Texaco*, 76 B.R. at 326 (finding that party seeking either an extension or a termination of exclusivity bears the burden of proving cause).

[40]    *See In re Borders*, 460 B.R. at 821 (*citing In re Parker St. Florist & Garden Ctr., Inc.*, 31 B.R. 206, 207 (Bankr. D. Mass.1983)) (concluding that debtor's assertion that it did not want the interference of competing plans was insufficient to make an affirmative showing of cause).

### A.    Cause Does Not Exist to Extend Exclusivity to Pursue a Sale as a Matter of Law

31.    The Debtors cannot establish cause to extend exclusivity as a matter of law because they want more time to pursue a sale, not a plan.  The Bankruptcy Code is clear: exclusivity is for purposes of filing a plan.  Thus, only the Debtors "may file a *plan*" during the first 120 days of the case.[41]    Thereafter, "[*a*]*ny* party in interest, including . . . a creditors' committee . . . [or] a creditor" may *file a plan* if the debtor has not done so.[42]    Section 1121(d) further provides that the debtors may seek to extend the exclusive period for "cause," but the relevant "cause" is the need for more time to file a *reorganization plan*, not to *start* a Section 363(b) sale.

32.    The Debtors chose to pursue a Section 363(b) sale, not a plan.  Their exclusivity period has now expired, and no start to the sale process (let alone a plan) is imminent.  No "cause" therefore exists to extend exclusivity as a matter of law.[43]

### B.    The Debtors Cannot Meet Their Evidentiary Burden That Cause for an Exclusivity Extension Exists

33.    Even if the Debtors' chosen Section 363(b) path does not preclude extending exclusivity as a matter of law, they have not and cannot make an affirmative, evidentiary showing that cause exists to do so here.  A court must carefully balance the needs of the debtor with those of all of its creditors when deciding whether to extend exclusivity.[44]    Thus, the Bankruptcy Code's legislative history recognizes "the need for the debtor to remain in control *to*

---

[41]    11 U.S.C. § 1121(b) (emphasis added).

[42]    *Id.* (emphasis added).

[43]    *See, e.g., Borders*, 460 B.R. at 821 ("Events explicitly recognized by statute that end the exclusivity period include a failure to file a plan within 120 days of the order for relief.").

[44]    *Id.*

16

*some degree*," but also "the legitimate interests of creditors" in the process.[45]  To that end, "[i]n

most cases, 120 days will give the debtor adequate time to negotiate a settlement, without unduly

delaying creditors."[46]

34.     Courts consider the following so-called *Adelphia* factors when deciding whether

cause exists to grant an extension of exclusivity: "(a) the size and complexity of the case; (b) the

necessity for sufficient time to permit the debtor to negotiate a plan of reorganization and prepare

adequate information; (c) the existence of good faith progress toward reorganization; (d) the fact

that the debtor is paying its bills as they become due; (e) whether the debtor has demonstrated

reasonable prospects for filing a plan; (f) whether the debtor has made progress in negotiations

with its creditors; (g) the amount of time which has elapsed in the case; (h) whether the debtor is

seeking an extension of exclusivity in order to pressure creditors to submit to the debtor's

reorganization demands; and (i) whether an unresolved contingency exists."[47]

35.     These factors are not relevant to extending exclusivity for a sale, but even if some

of them can be stretched to fit a sale framework, they weigh against extending exclusivity here.

      **(a)**    **Both the Debtors' size and complexity and the need for adequate time
to negotiate a plan of reorganization are irrelevant to the Section
363(b) process**

36.     The Debtors argue that "the size and complexity of these Chapter 11 Cases,

standing alone, warrants extending the Exclusive Period."[48]  Yet, the size and complexity of the

case is irrelevant to plan formulation where, as here, the Debtors are pursuing a Section 363(b)

---

[45]    H.R. Rep. No. 95-595, at 232, *as reprinted in* 1978 U.S.C.C.A.N. 5963, 6191 (emphasis added).

[46]    *Id.*

[47]    *In re Adelphia Commc'ns Corp.*, 352 B.R. 578, 587 (Bankr. S.D.N.Y. 2006).

[48]    Exclusivity Motion at ¶ 20.

sale of substantially all of their assets.[49]   After the sale to the Stalking Horse Bidder, only $122 million in cash and wind-down budget remains, the balance of which reverts to 1L NewCo after payment of the administrative costs of winding down the estates.[50]   No need exists to provide time to *negotiate a plan of reorganization* or prepare adequate information for a sale or liquidating plan, assuming one is even possible in the absence of any cash and, if the Debtors are right about the tax claim, a probably administratively insolvent estate.[51]

> **(b)**     **The Debtors have not made any good-faith progress towards a** ***reorganization***, **demonstrated a reasonable prospect for filing a viable plan or made progress in negotiations with creditors**

37.     The Debtors claim that they "have made substantial progress advancing these Chapter 11 Cases toward a value-maximizing outcome."[52]   In support thereof, the Debtors point to milestones such as the RSA, creation of voluntary opioid trusts, and the Court entering first day relief.[53]   Other than the largely uncontested first day pleadings, however, substantially all of this "progress" is embedded in the RSA and occurred prepetition.   But even if the Debtors' prepetition activities could evidence progress *during* the chapter 11 cases, all that this "progress" evidences is the Debtors' prepetition decision to set forth "the framework for an in-court sale to the Stalking Horse Bidder," subject to higher or otherwise better bids, not a plan.   Accordingly,

---

[49]   *Cf. In re Texaco*, 76 B.R. at 326 ("The large size of the debtor and the consequent difficulty in *formulating a plan of reorganization* for a huge debtor with a complex financial structure are important factors which generally constitute cause for extending the exclusivity periods.") (Emphasis added).

[50]   Exclusivity Motion at ¶ 23; RSA, Exhibit D (wind-down budget totals $122,071,000) and n.1(1) ("Debtors proposed wind-down budget would provide that any excess cash remaining after dissolution of the Remaining Entities would revert to the Purchaser.").

[51]   *See In re Adelphia*, 352 B.R. at 588 ("[T]he Debtors . . . have already filed a *plan*, that can be quickly solicited.") (Emphasis added).

[52]   Exclusivity Motion at ¶ 23.

[53]   *See id.*

18

the Debtors do not have evidence that they engaged in good-faith progress towards reorganization, as *Adelphia* requires, a fact which the Debtors admit.[54]

38.      The Debtors' reliance on *In re Borders* for the proposition that advancing towards a sale supports a finding of cause to extend exclusivity is unfounded.  In *Borders*, the debtors were pursuing "parallel tracks for an exit from bankruptcy–through a section 363 sale *or a stand-alone chapter 11 reorganization plan*."[55]  When considering extending exclusivity in that case, the court specifically found that it "cannot conclude, at this early stage, that a stand-alone reorganization plan would not be viable."[56]  Furthermore, the court found that the debtors' post-petition conduct favorably informed their likely ability to reorganize.[57]  In other words, in *Borders* the debtors adequately evidenced that they had a potential to reorganize and that they were actively taking steps to do so.[58]  Here, the opposite is true.  The Debtors outright disclaim the plan process.  The Debtors therefore cannot satisfy this *Adelphia* factor, unless they concede that their Section 363(b) sale is enough of a *sub rosa* plan that it should be considered, effectively, a plan (at least for exclusivity purposes).

39.      Recognizing their conundrum, the Debtors give lip-service to the Section 1121's statutory text by saying they are "thinking through" a potential wind down after selling nearly all of their assets.  This does not demonstrate a reasonable prospect for filing a viable reorganization

---

[54]   *See id.* at ¶ 24 ("The Debtors have so far taken the necessary steps toward achieving their central objective for these Chapter 11 Cases: conduct an open and transparent *sale process* . . . .") (Emphasis added).

[55]   460 B.R. at 822–23.

[56]   *Id.* at 824.

[57]   *Id.*

[58]   *See id.* (Discussing a stand-alone reorganization plan may be viable because of the debtors' cost-cutting initiatives and access to a DIP facility, and noting "[i]t is certainly premature to write-off the Debtors' efforts to stabilize their business and implement a sustainable business model").

plan.[59]   Moreover, the Debtors do not explain why they need more time to draft a liquidating

plan at all, given that no reorganization will be feasible at that time and a liquidating plan simply

distributes any cash in excess of the wind-down amounts in accordance with the Bankruptcy

Code's statutory waterfall.  Given the simplicity of that endeavor, the Debtors do not need more

time to do so.  In any event, the Debtors are asking for more time to market and sell their assets

without the alleged distraction of a competing plan process.[60]  They are not asking for more time

to pursue a plan, even a liquidating one.

40.     The Debtors also have not made any progress in negotiating with their non-opioid

creditors. To their credit, they do not really claim to have done so.  Instead, the Debtors point to

their numerous *prepetition* agreements that set the path for these Chapter 11 Cases.[61]   The

Debtors argue that exclusivity should be extended so that they can "seize" on this almost entirely

prepetition "groundwork [that] they have laid" and continue "moving the process" towards an

auction.[62]   But the Debtors do not provide evidence that they engaged in any meaningful

post-petition actual negotiations with their creditors.  They point to the fact that nearly all of the

governmental opioid claimants supported the Debtors' request for extension of the preliminary

injunction as "underscoring the Debtors' consensus-building in these Chapter 11 Cases."[63]  But

substantially all of these claimants agreed *prepetition* to the Voluntary Opioid Trust Settlement.

Moreover, as noted above, the Debtors can refuse to pay the professional fees of the Multi-State

---

[59]   *Cf. In re Adelphia*, 352 B.R. at 588 ("[W]e aren't talking about the *filing* of a plan (since a plan has been filed, and its solicitation is imminent), but rather are focusing principally on whether this plan (or a modification of it) will secure favorable reaction from the Debtors' creditors.").

[60]   Exclusivity Motion at ¶ 31.

[61]   *Id.* at ¶¶ 23-25.

[62]   *Id.* at ¶ 25.

[63]   *Id*. at ¶ 23.

Endo Executive Committee if the committee supports any transaction other than the Debtors'

proposed Section 363(b) sale.

### (c)    No unresolved contingencies favor extension of exclusivity

41.    The Debtors claim to have significant unresolved contingencies.[64]  In support, the

Debtors principally cite the unknown results of the auction.  To that end, the Debtors note they

"cannot formulate a chapter 11 plan because they do not know the quantum of sale proceeds

available for distribution or whether a higher and/or better restructuring proposal will

materialize."[65]  Even putting aside the fact that their Section 363(b) process does not advance a

plan of reorganization,[66] the auction is not an unresolved contingency "external to the case

itself," as *Adelphia* requires.[67]  The auction and Section 363(b) process are the central objectives

of the Debtors' intended chapter 11 process and are entirely of the Debtors' own making.

### (d)    The remaining *Adelphia* factors weigh *against* extending exclusivity or are irrelevant here

42.    The remaining *Adelphia* factors weigh against extending exclusivity or have no

relevance here.[68]  It is clear that the Debtors want more time in order to pressure creditors to

submit to their sale path without the opportunity to consider a plan option.[69]  That is their stated

purpose: "[u]ntil the auction occurs, however, the Debtors should be afforded an opportunity to

market and sell their assets without the distraction, cost, and delay a competing plan process

---

[64]    *Id.* at ¶ 29.

[65]    *Id.*

[66]    *See In re Dow Corning Corp.*, 208 B.R. 661, 666 (Bankr. E.D. Mich. 1997) ("The Court . . . rejects the notion that the lengthy delay in the Court's ruling on the contested estimation motions is the type of unresolved contingency which is meant to excuse a debtor from *serious plan negotiations*.") (Emphasis added).

[67]    *Id.*

[68]    *See* Exclusivity Motion at ¶¶ 26–27.

[69]    *See Adelphia*, 336 B.R. at 674.

would entail."[70]  But the Debtors had an unqualified 120 days in which to do so, and did not.  By

their own admission, these cases are still "in their infancy."[71]  The Debtors' desire to extend

exclusivity to keep control of the sale process, without more, does not satisfy *Adelphia* or

constitute "cause" to extend exclusivity.[72]

43.    The amount of time that has elapsed in the case therefore also cuts *against*

extending exclusivity.  No other chapter 11 case of this size and magnitude in which a debtor

sought a Section 363(b) sale took four *months* for bidding procedures to be approved.  Lastly, the

fact that the Debtors are paying their bills as they come due can just as easily be said to establish

the absence of any financial exigency that justifies a Section 363(b) sale.  It does not evidence

that cause exists to extend exclusivity.  This *Adelphia* factor is at best neutral, if not simply

irrelevant, to the "cause" analysis here.

### C.    Permitting the Filing of an Alternate Plan Would Benefit Interested Parties without Prejudicing the Debtors

44.    Terminating the Debtors' plan exclusivity to allow other parties in interest to file

and solicit acceptances to a plan is in the best interests of the Debtors' creditors and their estates

and would not prejudice the Debtors.  Presently, creditors face only one outcome – the

Section 363(b) sale.  The proposed Section 363(b) process leaves non-opioid creditors (other

than the Ad Hoc First Lien Group) with no recoveries,[73] no ability to vote, and none of the

protections that Section 1129 of the Bankruptcy Code otherwise affords.

---

[70]   *See* Exclusivity Motion at ¶ 25.

[71]   *Id.* at ¶ 22.

[72]   *See, e.g., In re General Bearing Corp.*, 136 B.R. 361 (Bankr. S.D.N.Y. 1992) ("Section 1121 was designed, and should be faithfully interpreted, to limit the delay that makes creditors the hostages of Chapter 11 debtors.").

[73]   Absent a topping bid by the Ad Hoc Cross-Hold Group, which is speculative at the time given the state of the financing markets.

45.     A viable plan option exists.[74]  The following are certain significant terms that such a plan might include:

(a)     Short-term funded first lien debt claims, such as the 5.875% Notes and the Revolving Credit Facility, may be paid in cash in full and thereby rendered unimpaired;

(b)     Other first lien debt may also be unimpaired through reinstatement, and holders may be provided a voluntary option to equitize at plan value;

(c)     The members of the Ad Hoc Cross-Holder Group may agree to voluntarily equitize their first lien funded debt claims to assist in deleveraging, subject to a minimum amount of total debt on emergence;

(d)     Second lien debt claims may receive a percentage of common equity at plan value, and the ability to participate in a rights offering;

(e)     The Opioid Settlement remains intact, and Opioid Claims may be fully prepaid in cash upon plan effectiveness based on the existing terms of the Voluntary Opioid Trust Settlement;[75]

(f)     Settlement or estimation of US tax claims could be pursued, and any liability may be paid over five years with the first installment payment made upon plan effectiveness; and

(g)     Unsecured funded debt claims and general unsecured claims may receive a percentage of common equity, the ability to participate in the rights offering (subject to participation from second lien claims), and/or may benefit from a general unsecured claims trust funded upon plan effectiveness.

46.     Terminating the Debtors' exclusivity to permit stakeholders to negotiate and pursue a plan comes without cost to the Debtors.  The Debtors may still pursue their Section 363(b) sale and a sale may still prove a value-maximizing option.  A dual plan and sale process would not create needless confusion.  In fact, so called "toggle" plans are common these

---

[74]   The following description of a potentially viable plan is for informational purposes only and is included solely as support for this Statement.  By this Statement, the Ad Hoc Cross-Holder Group is not proposing a plan, is not soliciting acceptances or rejections of any plan and is not obligating itself to support a plan (with such terms or otherwise).

[75]   We understand the private Opioid Claimants have not yet agreed to the Voluntary Opioid Trust Settlement.  The Ad Hoc Cross-Holder Group would hope to negotiate a consensual settlement with the private Opioid Claimants.

days and courts have recognized that allowing competing restructuring processes may be efficient and can be used as appropriate means of facilitating reorganization.[76]

### III.     The Debtors Pursue an Impermissible *Sub Rosa* Plan

47.     The Debtors want to extend exclusivity so that they can transfer substantially all of their assets and their value to an acquisition vehicle owned by members of the Ad Hoc First Lien Group through a series of integrated requests for relief.  Because the Debtors' process is in furtherance of what may one day be found to be an impermissible *sub rosa* plan of reorganization, no cause exists to extend exclusivity.  Stakeholders should be permitted to pursue a dual sale and plan process to protect against this possibility.

48.     The Bankruptcy Code confers certain rights upon parties in interest, including several critical protections with regard to the formulation and confirmation of a plan of reorganization.[77]   Such creditors' rights include, among others, the right to post-petition disclosure pursuant to Section 1125, the right for an impaired class of creditors to vote on a plan pursuant to Section 1126 and the right to "fair and equitable" treatment and to be free from unfair discrimination pursuant to Section 1129 if such creditors' claims are to be subject to a "cram-down" plan under section 1129(b).  Mass tort trusts and channeling injunctions generally also require the heightened protections of Section 524(g) which include, among other things, that affected claimants vote, by at least 75 percent of those voting, in favor of their treatment for it to

---

[76]     *See, e.g., In re Interco, Inc.*, 137 B.R. 999, 1001 (Bankr. E.D. Mo. 1992) (noting that "simultaneous consideration of competing plans may be an efficient procedure"); *In re Public Service Co. of New Hampshire*, 88 B.R. 521, 539 n. 16 (Bankr. D.N.H. 1988) ("If taken literally, the debtor's position would mean that the debtor must have the sole power to present a plan, because multiple plans will bring chaos; therefore, the debtor's exclusivity period must be continued indefinitely.").

[77]     *See In re Crowthers McCall Pattern Inc.*, 114 B.R. 877, 881 (Bankr. S.D.N.Y. 1990).

be approved.[78]  Additionally, all parties-in-interest have the right to be heard at a confirmation

hearing as to matters affecting confirmation, such as good faith and feasibility.

49.    The proposed Sale is not up for approval at this time.  But at a minimum, the *sub*

*rosa* plan issues embedded in the current Sale structure support a parallel process in that the

current process may never be allowed to proceed to completion.[79]  As the Supreme Court

explained, debtors in chapter 11 are not permitted to enter into transactions that "circumvent the

[Bankruptcy] Code's procedural safeguards."[80] So-called "*sub rosa* plans are prohibited . . .

based on a fear that a debtor-in-possession will enter into transactions that will, in effect, short

circuit the requirements of Chapter 11 for confirmation of a reorganization plan."[81]

50.    Significant portions of the relief the Debtors seek may be outside the scope of

Section 363(b) because, viewed together, they could amount to much more than the "use, sale or

lease" of Debtors' property.[82]  These include:

> (a)    Transfer of the Debtors' value to junior creditor classes through settlement
> trust structures funded by the Debtors' balance sheet cash in violation of the absolute
> priority rule;[83]

> (b)    Using no less than $16 million[84] in estate funds for a supplemental
> noticing plan designed to mimic a channeling injunction by "cleansing" the Debtors'

---

[78]    11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb).

[79]    *See e.g.*, *Pension Benefit Guar. Corp.* v. *Braniff Airways, Inc.* (*In re Braniff Airways, Inc.*), 700 F.2d 935, 940
(5th Cir. 1983) ("The debtor and the Bankruptcy Court should not be able to short circuit the requirements of
Chapter 11 for confirmation of a reorganization plan by establishing the terms of a plan sub rosa in connection
with the sale of assets.").

[80]    *See Czyzewski* v. *Jevic Holding Corp.*, 137 S. Ct. 973, 986 (2017).

[81]    *In re Iridium Operating LLC*, 478 F.3d 452, 466 (2d Cir. 2007) (internal quotation marks omitted) (citing *In re
Braniff Airways, Inc*, 700 F.2d at 940).

[82]    *In re Braniff Airways, Inc.*, 700 F.2d at 939 (proposed sale had "practical effect of dictating some of the terms
of any future reorganization plan", and debtor was not permitted to "short circuit the requirements of Chapter 11
for confirmation of a reorganization plan by establishing the terms of the plan *sub rosa* in connection with a sale
of assets.").

[83]    *See* RSA, Exhibit D at 12.

going-concern value for the Ad Hoc First Lien Group's benefit under the guise of needing to establish a general unsecured claims bar date, even though (x) no recoveries are expected for general unsecured claims; (y) the restructuring term sheet does not contemplate establishing a bar date or spending funds on a claims process until *after* the sale closes and when the need for such a process can be determined; and (z) the opioid term sheet requires the opioid trusts to bear the costs and expenses of their own claims administration procedures;[85]

      (c)     Effectively fixing enterprise value through a credit bid, settlement trusts and the wind-down budget;

      (d)     Cherry-picking which liabilities to assume and which ones to leave behind, thereby determining creditor distributions without the protections the section 1129 confirmation requirements otherwise provide; and

      (e)     Seeking approval of the complex, untested Reconstruction Steps under Irish law that (i) introduce potentially significant delay; (ii) predetermine the assets for which potential buyers can bid; (iii) favor a credit bid; and (iv) are triggered only because the Debtors are pursuing a sale rather than a reorganization plan.

## IV.    Other Aspects of the Debtors' Process Are Objectionable

### A.    The Opioid Claim and Bar Date Noticing are Excessive

51.    The Ad Hoc Cross-Holder Group objects to the relief sought in the Bar Date Motion to the extent that the estates, rather than the voluntary opioid trusts or 1L NewCo, are paying for the extensive noticing and claims administration processes.  No reason exists why the estates should pay over $16 million[86] for their benefit now, when the express terms of the RSA and related term sheets provide otherwise.

### B.    Reservation of Rights Regarding Certain Relief

52.    In addition, if the Court is inclined to grant some of the Debtors' requested relief, the Ad Hoc Cross-Holder Group asks that the following be included in the various orders:

      (a)     Reservation of rights and right to review and comment on all documents implementing the Reconstruction Steps;

---

84    Bar Date Motion at ¶ 26.

85    *See* RSA, Exhibit A at 52–53; RSA, Exhibit A at 58; RSA, Exhibit E at 186–87.

86    Bar Date Motion at ¶ 26.

(b)      Reservation of rights to seek judicial review before this Court or an Irish court of competent jurisdiction of any Reconstruction Steps that impair the Ad Hoc Cross-Holder Group's secured liens and claims;

(c)      Reservation of rights to object to any alternate plan;

(d)      Reservation of rights to participation in the Sale process; and

(e)      Reservation of rights under the Credit Agreement and 1L-2L Intercreditor Agreement.

## **RESERVATION OF RIGHTS**

53.      The Ad Hoc Cross-Holder Group and each of its members also reserve the right to (a) amend or supplement this Statement and otherwise take any additional or further action with respect to the subject matter hereof, and (b) be heard before this Court to raise additional arguments or issues in connection therewith.   Nothing herein is intended to nor shall be construed as a waiver or limitation of any of the rights or remedies of the Ad Hoc Cross-Holder Group or any of its respective members, all of which are fully preserved.

## <u>CONCLUSION</u>

For the reasons set forth above, the Court should (A) deny the Exclusivity Motion to the extent necessary to permit a dual plan and sale process; (B) alternatively, mandate mediation; (C) direct modification of the Orders approving the Pending Motions as set forth above in the event the Court is inclined to grant them; and (D) grant such other relief as is just and proper under the circumstances.

Dated:  January 9, 2023
      New York, New
        York

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**

By:  */s/ Andrew N. Rosenberg*
Andrew N. Rosenberg
Alice Belisle Eaton
Andrew M. Parlen
Claudia R. Tobler
1285 Avenue of the Americas
New York, New York 10019-6064
Email:  arosenberg@paulweiss.com
      aeaton@paulweiss.com
      aparlen@paulweiss.com
      ctobler@paulweiss.com

*Attorneys for the Ad Hoc Cross-Holder Group*

## EXHIBIT A

Intercreditor Agreement § 5.6

5.6    <u>Asset Dispositions in an Insolvency Proceeding</u>. In an Insolvency Proceeding, neither the Second Priority Representative nor any other Second Priority Secured Party shall oppose any sale or disposition of any assets of any Grantor that is supported by the First Priority Secured Parties, and the Second Priority Representative and each other Second Priority Secured Party will be deemed to have consented under Section 363 of the Bankruptcy Code (and otherwise) to any sale supported by the First Priority Secured Parties and to have released their Liens on such assets.