| | |
|---|---|
| **BINDER & SCHWARTZ LLP**<br>675 Third Avenue, 26th Floor<br>New York, New York 10017<br>(212) 510-7008<br>Eric B. Fisher<br>efisher@binderschwartz.com | Hearing Date/Time:  Aug. 4, 2023 at 11:00am (ET)<br>Objection Deadline:  July 14, 2023 at 12:00pm (ET)<br>Reply Deadline:       July 26, 2023 at 12:00pm (ET)<br><br>Related Docket Nos.:  728, 1765, 2240, 2254, 2360,<br>                                   2366, 2383, 2413 |

*Counsel to Public School District Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>ENDO INTERNATIONAL plc, *et al.*,<br><br>                                        Debtors.[1] | Chapter 11<br><br>Case No. 22-22549 (JLG)<br><br>(Jointly Administered) |

# OBJECTION OF THE PUBLIC SCHOOL DISTRICT CREDITORS
# TO THE PROPOSED SALE OF SUBSTANTIALLY ALL OF THE ASSETS OF
# <u>ENDO INTERNATIONAL PLC AND ITS DEBTOR AFFILIATES</u>

---

[1] The last four digits of Debtor Endo International plc's tax identification number are 3755. Due to the large number of debtors in these chapter 11 cases, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Endo. The Debtors' service address for purposes of these chapter 11 cases is: 1400 Atwater Drive, Malvern, PA 19355.

**TABLE OF CONTENTS**

*Page*

PRELIMINARY STATEMENT ........................................................................................................ 1

BACKGROUND ............................................................................................................................... 3

OBJECTION ..................................................................................................................................... 7

I.   The Proposed Sale Does Not Satisfy The *Lionel* Guidelines ............................................. 9

II.  The Proposed Sale Is An Impermissible *Sub Rosa* Plan of Reorganization ..................... 12

III. The Proposed Sale Undervalues The Debtors' Unencumbered Assets ............................. 14

CONCLUSION ................................................................................................................................ 14

## TABLE OF AUTHORITIES

**Cases** ***Page(s)***

*In re Beker Indus. Corp.*,
64 B.R. 900 (Bankr. S.D.N.Y. 1986) ........................................ 10

*In re Breitburn Energy Partners LP*,
582 B.R. 321 (Bankr. S.D.N.Y. 2018) ........................................ 14

*In re Chrysler LLC*,
576 F.3d 108 (2d Cir. 2009) ........................................ 9, 10, 11, 13

*Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*,
722 F.2d 1063 (2d Cir. 1983) ........................................ 9, 10, 11

*Czyzewski v. Jevic Holding Corp.*,
580 U.S. 451 (2017) ........................................ 13

*DISH Network Corp. v. DBSD N. Am., Inc.* (*In re DBSD N. Am., Inc.*),
634 F.3d 79 (2d Cir. 2011) ........................................ 12

*In re Gen. Motors Corp.*,
407 B.R. 463 (Bankr. S.D.N.Y. 2009) ........................................ 11

*Ind. Police Pension Tr. v. Chrysler LLC*,
558 U.S. 1087 (2009) ........................................ 9

*In re Latam Airlines Grp. S.A.*,
620 B.R. 722 (Bankr. S.D.N.Y. 2020) ........................................ 11, 12, 13

*Motorola Inc, v. Off. Comm. of Unsecured Creditors* (*In re Iridium Operating LLC*),
478 F.3d 452 (2d Cir. 2007) ........................................ 11, 12, 14

*Off. Comm. of Unsecured Creditors of Tower Auto. v. Debtors* (*In re Tower Auto. Inc.*),
251 F.R.D. 162 (S.D.N.Y. 2006) ........................................ 12

*Pension Benefit Guar. Corp. v. Braniff Airways, Inc.* (*In re Braniff Airways, Inc.*),
700 F.2d 935 (5th Cir. 1983) ........................................ 12, 13

*In re SAS AB*,
644 B.R. 267 (Bankr. S.D.N.Y. 2022) ........................................ 10, 13

**Statutes**

11 U.S.C. § 363 ...................................................................................................................3, 10, 13

11 U.S.C. § 1123 ...........................................................................................................................13

11 U.S.C. § 1129 ...........................................................................................................................13

**Rules**

Fed. R. Bankr. P. 9019 ..................................................................................................................14

The Rochester City School District, together with the public school districts identified in the Amended Rule 2019 Statement [ECF No. 2417] (collectively, the "Public School District Creditors"), in their individual and representative capacities, by and through undersigned counsel, respectfully submit this objection to the proposed sale (the "Sale") of substantially all of the assets of Endo International plc and its debtor affiliates (collectively, the "Debtors").

## PRELIMINARY STATEMENT

The effect of the opioid epidemic on America's children has been devastating, including in the classrooms of America's public schools. The consequences of the opioid crisis—including prenatal exposure to opioids—has increased the numbers of public school children requiring special education or supplemental educational services, placing significant strains on a system that has been and remains chronically underfunded. America's public schools are uniquely positioned to meet the developmental and educational challenges faced by children affected by the opioid crisis, but the necessary programs and services are not without costs, and those costs can be staggering.

America's public schools are without parallel in their capacity to make a lasting difference in the lives of opioid-affected children through, among other things, early intervention programs and remediating services delivered directly to children in need. That the public schools have an indispensable role to play in any comprehensive opioid abatement effort was recognized in the Purdue Pharma L.P. and the Mallinckrodt plc bankruptcies: The plans of reorganization in each of those proceedings provided expressly for dedicated funding of special education initiatives in the public schools, helping to ensure that in the inevitable competition for finite and dwindling estate assets, the needs of the public schools would not be overlooked.

The Debtors here have taken a path very different than the one followed in Purdue and Mallinckrodt. Intent on dispensing with the rigors and safeguards of Chapter 11, the Debtors

propose a shortcut sale by which a select group of creditors—favored to the exclusion of all others—would be permitted in essence to swallow the Debtors whole. All remaining creditors—representing billions of dollars in claims—would be left to compete among themselves over what little is left behind. Indeed, countless creditors with claims based on opioid-related harm, including the public schools, would be left, at best, with nothing but a vague promise that in exchange for forfeiting all of their rights of redress against the Debtors, they may conceivably be permitted access, sometime in the indeterminate future, to compensation funds administered by third-party entities outside of this Court's control, subject to disbursement priorities yet to be disclosed.

      For the Public School District Creditors, the illusory nature of this arrangement is cause for alarm. The opioid epidemic has done real and ongoing harm to America's public schools, and the Debtors should not be permitted to escape their share of the responsibility by dangling before the public schools a purely hypothetical prospect of meager compensation at some point in the indefinite future, all while demanding complete immunity for themselves in the here and now. The Public School District Creditors have raised these concerns once already, in their earlier objection to the bidding procedures. Even then it was clear that the Debtors' proposal threatened to sideline the needs of the public schools, and as discussed below, recent revisions to the proposed trust framework have sharply exacerbated that risk. Absent a definitive allocation of funds for special and supplemental educational services in the public schools—an allocation of precisely the sort incorporated into the Purdue Pharma and Mallinckrodt reorganization plans—it is unclear whether the Debtors' proposed arrangement would, or even theoretically could, result in any meaningful compensation for the public schools at all. For these reasons,

and as discussed below, the Public School District Creditors respectfully submit that approval of the Sale should be denied.

## BACKGROUND

The Debtors commenced these Chapter 11 cases on August 16, 2022, having entered into a restructuring support agreement with certain first lien creditors earlier that same day.[2] The restructuring support agreement outlined a sale transaction by which the Debtors proposed to convey, pursuant to Section 363 of the Bankruptcy Code, all "right, title and interest" to substantially all of the Debtors' "properties and assets" in exchange for (among other things) a credit bid in full satisfaction of certain first lien indebtedness and a cash payment of $5 million on account of certain unencumbered assets.[3] The restructuring support agreement contemplated a sale by auction and a stalking horse bidder (the "Purchaser") who would agree to establish separate trusts for the benefit of "public, tribal, and private opioid claimants," with funding to be made available only to those claimants who released "any and all Opioid Claims" against the "Released Parties."[4]

---

[2] *See* Voluntary Petition, ECF No. 1 (Aug. 16, 2022); Notice of Filing of Restructuring Support Agreement, ECF No. 20 (Aug. 17, 2022).

[3] *See* Notice of Filing of Restructuring Support Agreement, ECF No. 20 (Aug. 17, 2022), Exhibit 1 ("First RSA"); First RSA, Exhibit A ("Restructuring Term Sheet").

[4] *See* First RSA, Exhibit A ("Restructuring Term Sheet"). Under the Voluntary Opioid Trust Term Sheet, an "Opioid Claim" was defined to include, among other things, any claim against any of the Debtors that arose out of or related to "opioid products manufactured or sold by any of the Debtors, any Non-Debtor Affiliate, or any of their respective predecessors prior to the Closing Date." *See* Restructuring Term Sheet, Exhibit E ("Voluntary Opioid Trust Term Sheet"). The "Released Parties" were expansively defined to include—among many others—the Debtors themselves, all of the Debtors' predecessors, successors, subsidiaries and affiliates, and all of the Debtors' current and former agents, consultants, directors, employees, officers and "other professionals." *See id.*

3

The proposed restructuring support agreement included a "Voluntary Opioid Trust Term Sheet," which clarified that among the trusts to be established by the Purchaser was a "Public Opioid Settlement Trust," participation in which would be open—subject to the "terms and conditions" of as-yet-undisclosed "Public Opioid Trust Documents"—to any "Governmental Unit holder of an Opioid Claim."[5] A separate trust—the "Tribal Opioid Settlement Trust"—was to be established for tribal holders of opioid claims, while all other claimants would fall into the "Private Opioid Claimant" category.[6]

On November 23, 2022, the Debtors sought this Court's approval of the proposed bidding procedures.[7] The Debtors indicated that the holders of a majority of the Debtors' first-lien debt had agreed to serve—through a separate entity formed on their behalf—as the stalking horse bidder in the proposed auction.[8] According to the Debtors, the stalking horse bidder had agreed to submit a credit bid in the full amount of approximately $6 billion of first-lien indebtedness.[9] The stalking horse bidder had further agreed to assume a "significant number" of the Debtors' trade contracts, to offer employment to all of the Debtors' employees on their current terms, and

---

[5] *See* Restructuring Term Sheet, Exhibit E ("Voluntary Opioid Trust Term Sheet").

[6] *See id*.

[7] *See* Notice of Hearing on the Debtors' Motion for an Order (i) Establishing Bidding, Noticing, and Assumption and Assignment Procedures, (ii) Approving Certain Transaction Steps, (iii) Approving the Sale of Substantially All of the Debtors' Assets and (iv) Granting Related Relief ("Sale Motion"), ECF No. 728 (Nov. 23, 2022).

[8] *See* Debtors' Motion for an Order (i) Establishing Bidding, Noticing, and Assumption and Assignment Procedures, (ii) Approving Certain Transaction Steps, (iii) Approving the Sale of Substantially All of the Debtors' Assets and (iv) Granting Related Relief ("Sale Motion") ¶ 1, ECF No. 728 (Nov. 23, 2022).

[9] *See id*. ¶ 1(a).

4

to establish "voluntary trusts" in an amount of "up to $550 million" for the benefit of "eligible opioid claimants" who elected to participate.[10]

The Public School District Creditors opposed the Debtors' motion, recognizing that the proposed bidding procedures threatened to set the bankruptcy proceeding "on a course that would deprive the Public School District Creditors of the value to which they are entitled."[11] Subsequently, the Public School District Creditors provisionally withdrew their objections—but only for purposes of the hearing on the bidding procedures, based on and subject to their participation in an agreed-upon mediation framework, and without prejudice to the assertion of objections at a later date.[12] Since that time, the Public School District Creditors have sought diligently and in good faith to achieve a consensual resolution of their claims through mediation, but to date those mediation efforts have not resolved the Public School District Creditors' claims.[13] The Public School District Creditors believe that further mediation under the auspices of retired Bankruptcy Judge Chapman have the potential to be productive.

On March 24, 2023, the Debtors filed an amended and restated restructuring support agreement, attaching (among other things) amended versions of the purchase and sale agreement, the restructuring term sheet, and what had been the Voluntary Opioid Trust Term Sheet (now

---

[10] *See id*. ¶¶ 1(b)-(d). Attached as Exhibit B to the Sale Motion was a so-called "Stalking Horse Agreement," an early version of the purchase and sale agreement.

[11] *See* Objection of the Public School District Creditors to the Debtors' Motion for an Order Establishing Bidding Procedures and Public School District Creditors' Joinder in the Objection of the Official Committee of Opioid Claimants, ECF No. 1146 (Jan. 6, 2023).

[12] *See* Notice of Filing of Third Amended Chart Summarizing Outstanding Objections to (i) the Proposed Bidding Procedures Order and (ii) Proposed Exclusivity Order, ECF No. 1508 (March 24, 2023) ("The Debtors understand that the objections from the Public Schools have been withdrawn for purposes of the Bidding Procedures Hearing, based on and subject to an agreed mediation framework and without prejudice to being reasserted at a later date if the objections are not resolved through mediation.").

[13] The Public School District Creditors are awaiting a response from certain first lien creditors.

5

dubbed the "Amended Voluntary Public/Tribal Opioid Trust Term Sheet").[14] The "Amended Voluntary Public/Tribal Opioid Trust Term Sheet" continued to call for the Purchaser's establishment of a "Public Opioid" trust, but the scope of that trust was redefined to *exclude* all claimholders save States and Territories.[15]

On April 3, 2023, this court approved a set of bidding procedures and scheduled a hearing on the proposed sale.[16] On June 20, 2023, the Debtors gave notice that the stalking horse bidder had been designated as the sole successful bidder and that the sale and marketing process had been terminated.[17] The Debtors also announced their intent to seek final approval from this Court to sell substantially all of their assets to the stalking horse bidder.[18]

On June 29, 2023 the Debtors filed a "Motion for an Order Authorizing Internal Reorganization Transaction."[19] Tucked away as an attachment to that motion was another

---

[14] *See* Notice of Filing of Amended & Restated Restructuring Support Agreement ("Notice of Amended RSA"), ECF No. 1502 (March 24, 2023); Notice of Amended RSA, Exhibit 1 ("Amended RSA"); Amended RSA, Exhibit A ("Amended Term Sheet"); Amended Term Sheet, Exhibit C ("Amended Voluntary Public/Tribal Opioid Trust Term Sheet"); Amended Term Sheet, Exhibit F ("Amended PSA").

[15] *See* Amended Voluntary Public/Tribal Opioid Trust Term Sheet (definitions of "Public Opioid Claimant," "State," and "Territory"). Under the Voluntary Public/Tribal Opioid Trust Term Sheet, non-federal domestic Governmental Units that are neither States nor Territories—defined as "Local Governments"—have no recourse except to "distributions/grants to be made" in accordance with unspecified "applicable State agreements and laws" or to hypothetical "default distribution provisions similar to the provisions adopted in the *Mallinckrodt plc* bankruptcy case." *See id*.

[16] *See* Order (i) Establishing Bidding, Noticing, and Assumption and Assignment Procedures, (ii) Approving Certain Transaction Steps, and (iii) Granting Related Relief, ECF No. 1765 (Apr. 3, 2023).

[17] *See* Notice of (i) Debtors' Termination of the Sale & Marketing Process, (ii) Naming the Stalking Horse Bidder as the Successful Bidder, and (iii) Scheduling of the Accelerated Sale Hearing, ECF No. 2240 (June 20, 2023).

[18] *See id*.

[19] *See* Debtors' Motion for an Order Authorizing Internal Reorganization Transaction, ECF No. 2352 (June 29, 2023).

amended version of the proposed purchase and sale agreement.[20] The hearing on the sale was subsequently adjourned, and the briefing schedule for objections to the sale was adjusted.[21]

On July 7, 2023, the Debtors filed a tentative "working draft" of an order approving the sale, followed by numerous accompanying trust agreements and distribution procedure documents.[22] On July 13, 2023—less than twenty-four hours before the Sale Objection Deadline—the Debtors filed a revised "working draft" of the proposed sale order.[23] The Debtors cautioned that the proposed order remained "subject to continuing negotiations," that no party had "consented to such document as being in final form," and that the "final version" of the order may differ materially from the "working draft."[24]

## OBJECTION

The Public School District Creditors are a broad cross-section of the nation's public school districts—urban and rural, large and small—all of which have been harmed by Endo

---

[20] *See id.*, Exhibit C ("PSA"). According to Debtors, this inconspicuously filed version of the purchase and sale agreement is the currently operative version. *See* Notice of Filing of Exhibits to the Proposed Order (a) Approving the Purchase and Sale Agreement, (b) Authorizing the Sale of Assets, (c) Authorizing the Assumption and Assignment of Contracts and Leases, and (d) Granting Related Relief, at 1 n.3, ECF No. 2384 (July 7, 2023).

[21] *See* Notice of Supplemental & Adjusted Sale-Related Deadlines, ECF No. 2360 (June 30, 2023); Corrected Notice of Supplemental & Adjusted Sale-Related Deadlines, ECF No. 2366 (July 3, 2023).

[22] *See* Notice of Filing of Proposed Order (a) Approving the Purchase and Sale Agreement, (b) Authorizing the Sale of Assets, (c) Authorizing the Assumption and Assignment of Contracts and Leases, and (d) Granting Related Relief, ECF No. 2383 (July 7, 2023); Notice of Filing of Exhibits to the Proposed Order (a) Approving the Purchase and Sale Agreement, (b) Authorizing the Sale of Assets, (c) Authorizing the Assumption and Assignment of Contracts and Leases, and (d) Granting Related Relief, ECF No. 2384 (July 7, 2023).

[23] *See* Notice of Filing of Revised Proposed Order (a) Approving the Purchase and Sale Agreement, (b) Authorizing the Sale of Assets, (c) Authorizing the Assumption and Assignment of Contracts and Leases, and (d) Granting Related Relief, ECF No. 2413 (July 13, 2023).

[24] *See id.*

International plc and its coconspirator opioid defendants through their contributions to the opioid epidemic.

In other opioid-related bankruptcy proceedings—*In re Purdue Pharma L.P.*, Case No. 19-23649 (Bankr. S.D.N.Y.), and *In re Mallinckrodt plc*, Case No. 20-12522 (Bankr. D. Del.)—the claims of the Public School District Creditors were resolved by creating a dedicated Public Schools' Special Education Initiative Trust. The arrangement proposed by the Debtors here does not provide for any such trust, nor does it otherwise allocate funds for the distinctive needs of the public schools. Indeed, the terms of the proposal appear to have been deliberately designed to shut the public schools out. The Public School District Creditors object to the proposed sale both because it threatens to diminish value for unsecured creditors generally and because it offers no assurance that America's public schools will be afforded any relief at all.

The Debtors' proposal is simple enough in principle. The Debtors intend to hand over substantially all their assets to a group of first-lien creditors, in exchange for what amounts to the cancellation of approximately $6 billion in outstanding debt. The Debtors propose to give away just about everything they have to give to this favored set of creditors. And once the Debtors' assets have been dispensed with in this way, what is left for the Debtors' myriad other creditors? For opioid claimants who decline to grant immunity to the Debtors, the answer is *nothing at all*. Such claimants would be left only with a hollow claim against the Debtors—*after* the Debtors' value has been drained to the dregs.[25] And what of the opioid claimants who opt to release the Debtors from liability? Having relinquished their claims against the Debtors, such claimants will

---

[25] Under the proposed purchase and sale agreement, the Purchaser will be permitted to make off with substantially all of the Debtors' assets while assuming none of the Debtors' existing liabilities for opioid-related claims. *See* PSA §§ 1.1, 2.4.

8

generally be left to compete among themselves, subject to rules and conditions that remain to be determined, over a limited and dwindling set of funds.[26]

The position of America's public schools may be even more tenuous than this suggests, for under the latest version of the trust structure, a whole class of state, local and municipal governmental entities—the "Local Governments"—are barred from participation in the Public Opioid Trust. If public school districts are deemed to fall within that "Local Governments" category, then they can expect to be shut out of the trust participation process completely, with no ability to make any direct claim at all on the Public Opioid Trust funds. Even in the best-case scenario, however, the Debtors' proposed arrangement offers vanishingly little recourse or benefit to the public schools.

## I. The Proposed Sale Does Not Satisfy The *Lionel* Guidelines

Where, as here, a "quick, plenary sale" of estate assets is on the table, courts must guard against the risk that the sale may improperly "circumvent[] key features of the Chapter 11 process." *See In re Chrysler LLC*, 576 F.3d 108, 114 (2d Cir. 2009), *vacated as moot*, *Ind. Police Pension Tr. v. Chrysler LLC*, 558 U.S. 1087 (2009). Approval of such a sale is warranted only where the bankruptcy court is satisfied, based on the "evidence presented . . . at the hearing," that the sale is supported by a "sound business reason" and that its terms adequately address the "equity interests required to be weighed and considered under Chapter 11." *See Comm. of Equity Sec. Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d 1063, 1070-71 (2d Cir. 1983). Among other things, the Court should consider whether the sale may undermine

---

[26] The Sale Motion indicated that the stalking horse bidder had agreed to "establish voluntary trusts funded with up to $550 million over time." Sale Motion ¶ 1(d). The latest opioid trust term sheet contemplates the establishment of two opioid settlement trusts—a public trust and a tribal trust—to be funded in the amounts of approximately $465 million and $15 million, respectively. *See* Amended Voluntary Public/Tribal Opioid Trust Term Sheet.

9

those Chapter 11 protections that would otherwise "afford debt and equity holders the opportunity to vote on a proposed plan of reorganization after receiving meaningful information." *See In re Chrysler*, 576 F.3d at 114. The court should look to "all salient factors pertaining to the proceeding," including the "diverse interests of the debtor, creditors and equity holders alike." *See In re Lionel Corp.*, 722 F.2d at 1071; *see also In re Beker Indus. Corp.*, 64 B.R. 900, 905-06 (Bankr. S.D.N.Y. 1986), *rev'd in part on other grounds*, 89 B.R. 336 (S.D.N.Y. 1988). Under no circumstances will the mere "appeasement of major creditors" justify approval of a Section 363 sale. *See In re Lionel Corp.*, 722 F.2d at 1070.

The Debtors have maintained that any effort to confirm or even formulate a plan at this juncture would be prohibitively time-consuming, expensive, and fraught with uncertainty. *See* Sale Motion ¶¶ 5-6, 96-101. But as the Second Circuit has held, a mere desire to streamline bankruptcy proceedings is no sound basis for dispensing with Chapter 11 safeguards. *See In re Lionel Corp.*, 722 F.2d at 1071 (concerns over "long delay" insufficient to justify Section 363 sale). Nor is a Section 363 sale properly used as a vehicle for predetermining the "elements of a future plan of reorganization" based "solely on the suggestion that a debtor's management thinks that doing so would represent an exercise of sound business judgment." *In re SAS AB*, 644 B.R. 267, 271-72 (Bankr. S.D.N.Y. 2022). The Debtors' insistence that their own judgment should supplant this Court's is thus a non-starter. The Second Circuit has squarely rejected any such "*carte blanche*" approach and has instead identified many non-exclusive factors to guide the court's review. *See In re Lionel Corp.*, 722 F.2d at 1069-71; *see also In re Chrysler*, 576 F.3d at 116-17 ("*Lionel*'s multi-factor analysis remains the proper, most comprehensive framework for judging the validity of § 363(b) transactions.").

10

As the *Lionel* factors make clear, particular care is required where, as here, the asset in question is nothing more nor less than substantially everything that a debtor owns, leaving no meaningful "residuum" for distribution under a plan of reorganization. *See In re Chrysler*, 576 F.3d at 117; *see also In re Lionel Corp.*, 722 F.2d at 1071 (bankruptcy court should consider "proportionate value of the asset to the estate as a whole"); *In re Gen. Motors Corp.*, 407 B.R. 463, 492 n.54 (Bankr. S.D.N.Y. 2009) ("close factual scrutiny" required where "proportionate value of the assets being sold is high"). Another important factor—perhaps *the* most important—is "whether the asset is increasing or decreasing in value." *See In re Lionel Corp.*, 722 F.2d at 1071. But the Debtors here are not confronted with a "melting ice cube" scenario, *see In re Chrysler*, 576 F.3d at 119, and have not pretended otherwise. Thus, neither the "proportionate value of the asset" nor the trajectory of its value favors approval of the Debtors' proposed sale. *See In re Lionel Corp.*, 722 F.2d at 1071. Other less critical considerations—the "amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization"—also point in the same direction. *See id*. The Debtors proposed the sale in tandem with their Chapter 11 filing and clearly intended that it should serve as an alternative to a plan of reorganization. The proposed sale is, in short, designed not to "clear[] the way for implementation of a reorganization plan" but instead aims to *supplant* a reorganization plan, such that approval of the sale would almost assuredly render any plan of reorganization largely or entirely superfluous. *See Motorola Inc, v. Off. Comm. of Unsecured Creditors* (*In re Iridium Operating LLC*), 478 F.3d 452, 467 (2d Cir. 2007); *see also In re Latam Airlines Grp. S.A.*, 620 B.R. 722, 819 (Bankr. S.D.N.Y. 2020) ("[T]he Debtors are not asking the Court to approve a transaction that will merely bring them a step closer to plan confirmation . . . .").

II.     **The Proposed Sale Is An Impermissible *Sub Rosa* Plan of Reorganization**

The proposed sale is additionally improper because it would "amount to a *sub rosa* plan of reorganization." *See In re Iridium Operating*, 478 F.3d at 466; *see also In re Latam Airlines*, 620 B.R. at 812. As this Court has recognized, *sub rosa* concerns may be raised by any transaction that "adversely impacts on interested parties' rights to participate in the restructuring process." *In re Latam Airlines*, 620 B.R. at 813; *see also Pension Benefit Guar. Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 700 F.2d 935, 940 (5th Cir. 1983) ("The debtor and the Bankruptcy Court should not be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of the plan *sub rosa* in connection with a sale of assets."). These concerns are particularly pronounced where, as here, the proposed sale would "dispose of all or substantially all" of a debtor's assets. *See Off. Comm. of Unsecured Creditors of Tower Auto. v. Debtors (In re Tower Auto. Inc.)*, 251 F.R.D. 162, 169 (S.D.N.Y. 2006).

By its terms, the sale transaction here would dispense with substantially all the Debtors' assets, leaving "little prospect or occasion for further reorganization" and thus "reinforc[ing the] view that this is in fact a reorganization." *See In re Braniff Airways*, 700 F.2d at 940. The Debtors seek to portray the contemplated trust disbursements as gifts to be bestowed by the Purchaser, but at the same time the Debtors seek to mandate these supposed gifts through a Court order that would result in *de facto* distributions to unsecured opioid claimants under allocation priorities that are yet to be determined and that may leave out the public schools altogether. *See DISH Network Corp. v. DBSD N. Am., Inc. (In re DBSD N. Am., Inc.)*, 634 F.3d 79, 93-101 (2d Cir. 2011) (reorganization plan violated absolute priority rule by providing for purported "gift" by lien-holders to shareholder). The terms of the proposed sale would, moreover, effectively lock in the conditions of such distributions, essentially compelling all creditors (save certain

12

first-lien creditors) to pursue their recoveries (if any) through a post-sale allocation process that the Debtors insist must unfold outside the bankruptcy context and beyond this Court's review. *See In re Latam Airlines*, 620 B.R. at 819 (rejecting transaction that would "fix" certain "terms of a plan yet to be filed"); *see also In re SAS AB*, 644 B.R. at 272 ("The terms of a plan should be decided through the plan process, and not otherwise.").

The proposed sale would thus accomplish what amounts to a reorganization that circumvents key Chapter 11 safeguards. Nothing in the proposed post-sale allocation process purports to comport with the Bankruptcy Code's requirement that claims within a class be accorded the same treatment, *see* 11 U.S.C. § 1123(a)(4), or that distributions adhere to the priority rules and be "fair and equitable" with respect to non-consenting creditors whose claims are impaired. *See* 11 U.S.C. §§ 1129(a)-(b); *see also Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464-71 (2017) (emphasizing "importance of the priority system" and rejecting "structured dismissal" that would have provided distributions in violation of "ordinary priority rules" and "without the affected creditors' consent"); *In re Chrysler*, 576 F.3d at 118 (approving Section 363 asset sale where bankruptcy court had "demonstrated proper solicitude for the priority between creditors and deemed it essential that the [s]ale in no way upset that priority"). In addition, the proposed arrangement would by its terms provide for broad releases of the Debtors (and an expansive array of others) outside of any Chapter 11 plan. *See In re Braniff Airways*, 700 F.2d at 940 (finding that release of claims against debtor and others was "not authorized" by Section 363(b)). Because the proposed arrangement would bring about what amounts to a

reorganization, but without the guardrails provided by Chapter 11's protective framework, it constitutes an impermissible *sub rosa* plan.[27]

### III.   The Proposed Sale Undervalues The Debtors' Unencumbered Assets

Finally, the Debtors propose to sell substantially all their unencumbered assets—including actions for the avoidance and recovery of substantial pre-petition bonus payments—in exchange for a modest $5 million. *See* Sale Motion ¶¶ 19, 49(d); PSA § 2.7. The Debtors have not tried to justify this price, which on its face substantially undervalues the assets while at the same time threatening to deliver "more than full compensation" to the first-lien creditors. *See In re Breitburn Energy Partners LP*, 582 B.R. 321, 350 (Bankr. S.D.N.Y. 2018). The structure of the bidding may in fact have suppressed value by bundling the bids for encumbered and unencumbered assets. Because the bidding procedures did not permit separate bidding on the unencumbered assets, the independent value of those assets has never been market-tested.

### CONCLUSION

For the reasons set forth above, the Public School District Creditors respectfully submit that approval of the Sale should be denied.

---

[27] The proposed arrangement would also be improper if regarded as a settlement of opioid claims. The Bankruptcy Rules require the court to review and approve any settlement before its terms can be deemed effective, *see* Fed. R. Bankr. P. 9019(a), and the "clear purpose" of that requirement is to "prevent the making of concealed agreements which are unknown to the creditors and unevaluated by the court." *See In re Iridium Operating*, 478 F.3d at 461-62 (citation and internal quotation marks omitted). Before a settlement may be approved, the Court must accordingly assure itself that the parties "have not employed [the] settlement as a means to avoid the priority strictures of the Bankruptcy Code." *See id.* at 464.

14

Dated: July 14, 2023

Respectfully submitted,

**BINDER & SCHWARTZ LLP**

/s/ Eric B. Fisher
Eric B. Fisher
675 Third Avenue, 26th Floor
New York, NY 10017
(212) 510-7008
efisher@binderschwartz.com

Counsel to Public School District Creditors