*Solicitation Version*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re* | **Chapter 11** |
| **ENDO INTERNATIONAL plc,** *et al.,* | **Case No. 22-22549 (JLG)** |
| **Debtors.**[1] | **(Jointly Administered)** |

## DISCLOSURE STATEMENT WITH RESPECT TO THE SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF ENDO INTERNATIONAL PLC AND ITS AFFILIATED DEBTORS

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Paul D. Leake
Lisa Laukitis
Shana A. Elberg
Evan A. Hill
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
Fax: (212) 735-2000

*Counsel for Debtors and Debtors in Possession*

Dated: January 16, 2024
     New York, New York

---

[1] The last four digits of Debtor Endo International plc's tax identification number are 3755. Due to the large number of debtors in these chapter 11 cases, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' Solicitation Agent (as defined below) at https://restructuring.ra.kroll.com/Endo. The location of the Debtors' service address for purposes of these chapter 11 cases is: 1400 Atwater Drive, Malvern, PA 19355.

## DISCLAIMER

THIS DISCLOSURE STATEMENT WITH RESPECT TO THE JOINT CHAPTER 11 PLAN OF REORGANIZATION OF ENDO INTERNATIONAL PLC AND ITS AFFILIATED DEBTORS CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION AND CERTAIN OTHER DOCUMENTS AND FINANCIAL INFORMATION. THE INFORMATION INCLUDED IN THIS DISCLOSURE STATEMENT IS PROVIDED FOR THE PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND SHOULD NOT BE RELIED UPON FOR ANY PURPOSES OTHER THAN TO DETERMINE WHETHER AND HOW TO VOTE ON THE PLAN.

THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE. THE SUMMARIES OF THE FINANCIAL INFORMATION AND THE DOCUMENTS WHICH ARE ATTACHED TO, OR INCORPORATED BY REFERENCE IN, THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO SUCH INFORMATION AND DOCUMENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR THE OTHER DOCUMENTS AND FINANCIAL INFORMATION INCORPORATED IN THIS DISCLOSURE STATEMENT BY REFERENCE, THE PLAN OR THE OTHER DOCUMENTS AND FINANCIAL INFORMATION, AS THE CASE MAY BE, SHALL GOVERN FOR ALL PURPOSES.

THE STATEMENTS AND FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAVE BEEN MADE AS OF THE DATE OF THIS DISCLOSURE STATEMENT UNLESS OTHERWISE SPECIFIED. HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT ASSUME AT THE TIME OF SUCH REVIEW THAT THERE HAVE BEEN NO CHANGES IN THE FACTS SET FORTH IN THIS DISCLOSURE STATEMENT SINCE THE DATE OF THIS DISCLOSURE STATEMENT.

EACH HOLDER OF A CLAIM OR INTEREST ENTITLED TO VOTE ON THE PLAN SHOULD CAREFULLY REVIEW THE PLAN AND THIS DISCLOSURE STATEMENT IN THEIR ENTIRETIES BEFORE CASTING A BALLOT. THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. ANY ENTITY OR PERSON DESIRING ANY SUCH ADVICE SHOULD CONSULT WITH THEIR OWN ADVISORS.

NO REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY HAVE BEEN AUTHORIZED BY THE DEBTORS OTHER THAN AS EXPLICITLY SET FORTH IN THIS DISCLOSURE STATEMENT AND THE DOCUMENTS ATTACHED TO THIS DISCLOSURE STATEMENT. ANY INFORMATION, REPRESENTATIONS, OR INDUCEMENTS MADE TO OBTAIN AN ACCEPTANCE OF THE PLAN WHICH ARE OTHER THAN AS SET FORTH IN, OR INCONSISTENT WITH, THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, THE DOCUMENTS ATTACHED TO THIS DISCLOSURE STATEMENT, AND THE PLAN SHOULD NOT BE RELIED UPON BY ANY HOLDER OF A CLAIM OR INTEREST.

WITH RESPECT TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER PENDING, THREATENED, OR POTENTIAL LITIGATION OR OTHER ACTIONS, THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN THE CONTEXT OF SETTLEMENT NEGOTIATIONS UNDER RULE 408 OF THE FEDERAL RULES OF EVIDENCE.

THE FINANCIAL INFORMATION CONTAINED IN OR INCORPORATED BY REFERENCE IN THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED, UNLESS SPECIFICALLY INDICATED OTHERWISE.

THE FINANCIAL PROJECTIONS DESCRIBED IN THIS DISCLOSURE STATEMENT, HAVE BEEN PREPARED BY THE DEBTORS' MANAGEMENT TOGETHER WITH THEIR ADVISORS. THE FINANCIAL PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE DEBTORS' MANAGEMENT AND THEIR ADVISORS AT THE TIME SUCH FINANCIAL PROJECTIONS WERE PREPARED, MAY NOT ULTIMATELY BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET, AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE AS TO THE ACCURACY OF THESE PROJECTIONS OR TO THE ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE. FURTHER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE FINANCIAL PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. THEREFORE, THE FINANCIAL PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND MAY NOT HAVE BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES. THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE SUCH FINANCIAL PROJECTIONS.

THE PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE U.S. SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION AND NEITHER THE U.S. SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN OR THEREIN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. NEITHER THE SOLICITATION NOR THIS DISCLOSURE STATEMENT CONSTITUTES AN OFFER TO SELL, OR THE SOLICITATION OF AN OFFER TO BUY, SECURITIES IN ANY STATE OR JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.

PLEASE REFER TO ARTICLE VII (*RISK FACTORS TO BE CONSIDERED*) OF THIS DISCLOSURE STATEMENT FOR A DISCUSSION OF CERTAIN FACTORS THAT A CREDITOR VOTING ON THE PLAN SHOULD CONSIDER.

**IN THE OPINION OF THE DEBTORS, THE PLAN IS PREFERABLE TO ALL OTHER AVAILABLE ALTERNATIVES AND PROVIDES FOR A LARGER DISTRIBUTION TO THE DEBTORS' STAKEHOLDERS THAN WOULD OTHERWISE RESULT IN ANY OTHER SCENARIO. ACCORDINGLY, THE DEBTORS RECOMMEND THAT HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN VOTE TO ACCEPT THE PLAN AND SUPPORT CONFIRMATION OF THE PLAN.**

**THE COMMITTEES ENCOURAGE EACH CREDITOR TO VOTE TO ACCEPT THE PLAN. THE COMMITTEES' RESPECTIVE POSITIONS REGARDING THE MATTERS IN THIS DISCLOSURE STATEMENT ARE MORE SPECIFICALLY SET FORTH IN THEIR RESPECTIVE LETTERS TO UNSECURED CREDITORS AND OPIOID CLAIMANTS (THE "*UCC LETTER*" AND THE "*OCC LETTER*," RESPECTIVELY), WHICH ARE INCLUDED IN THE SOLICITATION MATERIALS. THE COMMITTEES ENCOURAGE EACH CREDITOR TO REVIEW THE APPROPRIATE LETTER AND COMMUNICATE DIRECTLY WITH THE APPROPRIATE COMMITTEE REGARDING ANY QUESTIONS THEY HAVE ABOUT THE APPLICABLE LETTER, THE PLAN, OR THIS DISCLOSURE STATEMENT.**

## SPECIAL NOTICE REGARDING SECURITIES LAWS

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS. THE SECURITIES TO BE ISSUED ON OR AFTER THE EFFECTIVE DATE WILL NOT HAVE BEEN THE SUBJECT OF A REGISTRATION STATEMENT FILED WITH THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") UNDER THE SECURITIES ACT, ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE UNDER ANY STATE SECURITIES LAW ("BLUE SKY LAWS"), OR ANY SIMILAR FOREIGN REGULATORY AGENCY. EACH OF THE DISCLOSURE STATEMENT AND THE PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SEC OR ANY STATE REGULATORY AUTHORITY AND NEITHER THE SEC, ANY STATE REGULATORY AUTHORITY, NOR ANY FEDERAL REGULATORY AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR THE PLAN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

UPON CONFIRMATION OF THE PLAN, CERTAIN OF THE SECURITIES DESCRIBED IN THIS DISCLOSURE STATEMENT WILL BE ISSUED WITHOUT REGISTRATION UNDER THE SECURITIES ACT, OR SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN LAWS, IN RELIANCE ON THE EXEMPTION SET FORTH IN SECTION 1145 OF THE

BANKRUPTCY CODE TO THE EXTENT PERMITTED UNDER APPLICABLE LAW. OTHER SECURITIES MAY BE ISSUED PURSUANT TO OTHER APPLICABLE EXEMPTIONS UNDER THE FEDERAL SECURITIES LAWS.    TO THE EXTENT EXEMPTIONS FROM REGISTRATION UNDER SECTION 1145 OF THE BANKRUPTCY CODE OR APPLICABLE FEDERAL SECURITIES LAW DO NOT APPLY, THE SECURITIES MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO A VALID EXEMPTION OR UPON REGISTRATION UNDER THE SECURITIES ACT.  NEITHER THE SOLICITATION & VOTING PROCEDURES NOR THIS DISCLOSURE STATEMENT CONSTITUTES AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY SECURITIES IN ANY STATE OR JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.

## VOTING

FOR A VOTE ON THE PLAN TO BE COUNTED, THE BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED BY KROLL RESTRUCTURING ADMINISTRATION LLC, THE DEBTORS' CLAIMS, NOTICING, AND SOLICITATION AGENT ("KROLL" OR THE "SOLICITATION AGENT"), NO LATER THAN **4:00 P.M. (PREVAILING EASTERN TIME) ON FEBRUARY 22, 2024** (THE "VOTING DEADLINE"). BALLOTS SHOULD BE CAST IN ACCORDANCE WITH THE SOLICITATION & VOTING PROCEDURES ATTACHED TO THE DISCLOSURE STATEMENT ORDER AS EXHIBIT 1 AND SUMMARIZED IN ARTICLE VIII OF THIS DISCLOSURE STATEMENT.    ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE SHALL NOT BE COUNTED UNLESS OTHERWISE DETERMINED BY THE DEBTORS, WITH THE CONSENT OF THE REQUIRED CONSENTING GLOBAL FIRST LIEN CREDITORS, THE CREDITORS' COMMITTEE SOLELY WITH RESPECT TO ANY SUCH BALLOTS IN CLASSES 4(A)-(F), AND THE OPIOID CLAIMANTS' COMMITTEE SOLELY WITH RESPECT TO ANY SUCH BALLOTS IN CLASSES 7(A)-(E).

**PLEASE BE AWARE THAT VOTING TO ACCEPT OR REJECT THE PLAN, OR ABSTAINING FROM VOTING ON THE PLAN, MAY IMPACT WHETHER YOU ARE BOUND BY THE APPLICABLE RELEASES IN THE EVENT THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT. YOU WILL BE GIVEN THE OPPORTUNITY _NOT TO_ GRANT THE APPLICABLE RELEASES ONLY IF YOU VOTE TO REJECT THE PLAN OR IF YOU ABSTAIN FROM VOTING ON THE PLAN.**

**IF YOU VOTE TO ACCEPT THE PLAN, YOU WILL BE BOUND BY THE APPLICABLE RELEASES AND WILL BE RELEASING CLAIMS AGAINST THE APPLICABLE RELEASED PARTIES UNDER THE PLAN, WHICH INCLUDE CERTAIN NON-DEBTOR THIRD-PARTIES.  IF YOUR CLAIM WILL BE CHANNELED TO A TRUST UNDER THE PLAN, YOU MAY ALSO BE ENTITLED TO AN ADDITIONAL PAYMENT FROM THE APPLICABLE TRUST IN EXCHANGE FOR GRANTING THE APPLICABLE RELEASES.**

**IF YOUR CLAIM WILL BE CHANNELED TO A TRUST UNDER THE PLAN AND YOU ABSTAIN FROM VOTING ON THE PLAN, YOU MAY BE REQUIRED TO TAKE AFFIRMATIVE ACTION TO GRANT THE APPLICABLE RELEASES TO BE ENTITLED TO RECEIVE AN ADDITIONAL PAYMENT.  IF YOU DO NOT AFFIRMATIVELY GRANT THE APPLICABLE RELEASES—OR ARE NOT DEEMED TO GRANT THE APPLICABLE RELEASES—AND THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT, YOU WILL NOT BE ENTITLED TO ANY ADDITIONAL PAYMENT AND, AS A RESULT, YOU WILL RECEIVE A LOWER DISTRIBUTION THAN OTHER SIMILARLY SITUATED CREDITORS WHO GRANT OR ARE DEEMED TO GRANT THE APPLICABLE RELEASES.**

**IF YOU VOTE TO REJECT THE PLAN, YOU WILL BE REQUIRED TO TAKE AFFIRMATIVE ACTION TO GRANT THE APPLICABLE RELEASES.  IF YOUR CLAIM WILL BE CHANNELED TO A TRUST UNDER THE PLAN AND YOU VOTE TO REJECT THE PLAN, _AND_ IF YOU DO NOT AFFIRMATIVELY GRANT THE**

**APPLICABLE RELEASES, YOU WILL NOT BE ENTITLED TO ANY ADDITIONAL PAYMENT—AS A RESULT, YOU WILL RECEIVE A LOWER DISTRIBUTION THAN OTHER SIMILARLY SITUATED CREDITORS WHO VOTE TO REJECT THE PLAN AND AFFIRMATIVELY OPT TO GRANT THE RELEASES.**

**IF YOU ARE A CLAIMANT ELIGIBLE TO VOTE ON THE PLAN, AS SET FORTH IN THEIR LETTERS TO CREDITORS AND CLAIMANTS, BOTH THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS AND THE OFFICIAL COMMITTEE OF OPIOID CLAIMANTS ENCOURAGE YOU TO VOTE IN FAVOR OF THE PLAN AND GRANT THE RELEASES EXPLAINED IN THE PLAN.**

## CONFIRMATION

THE CONFIRMATION HEARING WILL COMMENCE ON **MARCH 19, 2024, AT 10:00 A.M. (PREVAILING EASTERN TIME)**, BEFORE THE HONORABLE JAMES L. GARRITY, UNITED STATES BANKRUPTCY JUDGE FOR THE SOUTHERN DISTRICT OF NEW YORK. THE CONFIRMATION HEARING MAY TAKE PLACE AT THE UNITED STATES BANKRUPTCY COURT, ONE BOWLING GREEN, NEW YORK, NEW YORK 10004 AND/OR MAY BE HELD TELEPHONICALLY OR VIA ZOOM IF SO ORDERED BY THE COURT. THE DEBTORS MAY CONTINUE THE CONFIRMATION HEARING FROM TIME TO TIME WITHOUT FURTHER NOTICE OTHER THAN AN ADJOURNMENT ANNOUNCED IN OPEN COURT OR A NOTICE OF ADJOURNMENT FILED WITH THE BANKRUPTCY COURT AND SERVED ON THE MASTER SERVICE LIST AND ANY PARTY WHO HAS FILED AN OBJECTION TO THE PLAN. THE BANKRUPTCY COURT, IN ITS DISCRETION AND BEFORE THE CONFIRMATION HEARING, MAY PUT IN PLACE ADDITIONAL PROCEDURES GOVERNING THE CONFIRMATION HEARING. THE PLAN MAY BE MODIFIED, IF NECESSARY, PRIOR TO, DURING, OR AS A RESULT OF THE CONFIRMATION HEARING, WITHOUT FURTHER NOTICE TO PARTIES IN INTEREST.

THE PLAN OBJECTION DEADLINE IS **FEBRUARY 22, 2024, AT 4:00 P.M. (PREVAILING EASTERN TIME)**. ALL PLAN OBJECTIONS MUST BE FILED WITH THE BANKRUPTCY COURT AND SERVED ON THE DEBTORS AND CERTAIN OTHER PARTIES IN INTEREST IN ACCORDANCE WITH THE DISCLOSURE STATEMENT ORDER SO THAT THEY ARE RECEIVED ON OR BEFORE THE PLAN OBJECTION DEADLINE.

THE PLAN, THIS DISCLOSURE STATEMENT, AND THE PLAN DOCUMENTS, ONCE FILED, AND OTHER DOCUMENTS AND MATERIALS RELATED THERETO MAY BE OBTAINED, FREE OF CHARGE, BY: (A) ACCESSING THE DEBTORS' RESTRUCTURING WEBSITE AT HTTPS://RESTRUCTURING.RA.KROLL.COM/ENDO, (B) EMAILING ENDOINFO@RA.KROLL.COM (WITH "ENDO SOLICITATION" IN THE SUBJECT LINE), (C) CALLING THE DEBTORS' RESTRUCTURING HOTLINE AT (877) 542-1878, TOLL FREE WITHIN THE UNITED STATES OR CANADA, OR +1 (929) 284-1688, OUTSIDE OF THE UNITED STATES AND CANADA, OR (D) ACCESSING THE BANKRUPTCY COURT'S WEBSITE AT HTTP://WWW.NYSB.USCOURTS.GOV.

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ...................................................................................................1

II.    OVERVIEW OF THE DEBTORS' BUSINESS AND CAPITAL STRUCTURE ..........18
      A.    The Debtors' Business ...........................................................................18
      B.    Prepetition Corporate and Capital Structure........................................21

III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE
        STATEMENT AND PLAN...................................................................................29
      A.    What Is Chapter 11?................................................................................29
      B.    Why Are the Debtors Sending Me this Disclosure Statement?............................30
      C.    What Happens to My Recovery If the Plan Is Not Confirmed or Does Not
            Become Effective?..................................................................................30
      D.    If the Plan Provides that I Get a Distribution, Do I Get It Upon
            Confirmation or When the Plan Becomes Effective, and What Is Meant By
            "Confirmation," "Effective Date," and "Consummation"?..................................30
      E.    Is There Potential Litigation Related to the Plan?.................................................30
      F.    Will There Be Releases and Exculpation Granted to Parties in Interest as
            Part of the Plan?.....................................................................................31
      G.    How Do the Releases Work and What is the Impact of Giving the
            Releases?...............................................................................................31
      H.    When Is the Deadline to Vote on the Plan?.............................................................32
      I.    How Do I Vote for or Against the Plan?.................................................................32
      J.    Why Is the Bankruptcy Court Holding a Confirmation Hearing and When
            Will It Occur?........................................................................................34
      K.    How will Executory Contracts and Unexpired Leases be Treated under the
            Plan?.....................................................................................................34
      L.    What Is the Effect of the Plan on the Debtors' Business? .....................................34
      M.    Who Will Serve as the Directors or Officers of the Purchaser Entities? .............35
      N.    How is the Restructuring Transaction Being Implemented?.................................35
      O.    Does the Plan Affect the Resolution with the States and Tribes? ........................35
      P.    What is the Purchaser Equity? Where can I find more information about
            the terms and conditions of the Purchaser Equity?.............................................36
      Q.    Who Do I Contact If I Have Additional Questions With Respect to This
            Disclosure Statement or the Plan? ......................................................................36
      R.    Do the Debtors Recommend Voting in Favor of the Plan?..................................37
      S.    What is the Scheme, and Why Are the Debtors Proposing the Scheme in
            Addition to the Plan?.............................................................................37
      T.    Do I Need to Vote or Do Anything Additional in Relation to the Scheme?.........37
      U.    Why is the Bar Date Being Extended for Exclusively Foreign Claims? .............38
      V.    I am a Third-Party Payor But Have Not Yet Determined Whether I Have a
            TPP Claim Against the Debtors, How Can I Give a Release When I Don't
            Yet Know If I Have a TPP Claim? ......................................................................39

IV.     EVENTS LEADING TO THE CHAPTER 11 FILINGS .............................................39
        A.      Declining Business Performance and Significant Litigation Costs Leads to
                Overleveraged Capital Structure.......................................................................40
        B.      Prepetition Restructuring Efforts .......................................................................47

V.      THE CHAPTER 11 CASES ...............................................................................50
        A.      Administration of the Chapter 11 Cases ............................................................50
        B.      Retention of Professionals..................................................................................53
        C.      Appointment of Statutory Committees and FCR................................................54
        D.      Foreign Proceedings...........................................................................................56
        E.      Preliminary Injunction and Voluntary Injunction..............................................56
        F.      Appointment of Monitor .....................................................................................57
        G.      Sale of Chestnut Ridge Facility .........................................................................57
        H.      Discontinuance of Qwo......................................................................................58
        I.      Adversary Proceedings........................................................................................58
        J.      Joint Standing Motion and Motion to Intervene.................................................59
        K.      Sale Process and Bidding Procedures .................................................................60
        L.      Intercompany Transaction Steps.........................................................................61
        M.      Mediation............................................................................................................62
        N.      Voluntary Public/Tribal Opioid Trust Resolution .............................................68

VI.     THE PLAN OF REORGANIZATION .................................................................69
        A.      Settlements ..........................................................................................................71
        B.      Debtor, Non-GUC, and GUC Releases...............................................................71
        C.      Exculpations and Injunction ...............................................................................80
        D.      The Scheme .........................................................................................................88

VII.    RISK FACTORS TO BE CONSIDERED.............................................................89
        A.      General ................................................................................................................89
        B.      Bankruptcy Specific Risk Factors......................................................................89
        C.      Risks Relating to the Capital Structure of the Purchaser Entities ......................94
        D.      Business and Industry-Specific Risk Factors ...................................................100
        E.      Forward Looking Statements.............................................................................106
        F.      Disclosure Statement Disclaimer......................................................................107
        G.      Liquidation Under Chapter 7 ............................................................................108

VIII.   SOLICITATION AND VOTING PROCEDURES ..............................................109
        A.      Voting Status of Each Class ..............................................................................109
        B.      Classes Entitled to Vote ...................................................................................110
        C.      Voting Procedures.............................................................................................111
        D.      Voting on the Scheme ......................................................................................113

IX.     STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN ...........114
        A.      The Confirmation Hearing ................................................................................114
        B.      Confirmation Standards.....................................................................................114
        C.      Liquidation Analysis ........................................................................................116
        D.      Financial Feasibility..........................................................................................117

E.    Acceptance by Impaired Classes .......................................................................118
F.    Confirmation Without Acceptance by All Impaired Classes ............................118

X.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE
PLAN ...........................................................................................................................119
A.    Continuation of the Chapter 11 Cases..............................................................119
B.    Approval of the Sale .........................................................................................120
C.    Alternative Plans of Reorganization .................................................................120
D.    Liquidation Under Chapter 7 or Chapter 11 .....................................................120

XI.    U.S. FEDERAL INCOME TAX CONSIDERATIONS.................................................121
A.    Introduction ......................................................................................................121
B.    Considerations to the Debtors and Purchaser Entities .......................................122
C.    U.S. Federal Income Tax Considerations of the Plan to U.S. Holders of
Claims ...............................................................................................................124
D.    U.S. Federal Income Tax Considerations of the Plan to Non-U.S. Holders
of Claims ...........................................................................................................138
E.    FATCA...............................................................................................................143

XII.    CERTAIN MATERIAL IRISH TAX CONSEQUENCES ..........................................143
A.    Introduction ......................................................................................................143
B.    Certain Irish Tax Consequences to the Debtors ................................................144
C.    Certain Irish Tax Consequences to Non-Irish Holders of Claims .....................146

XIII.    SECURITIES LAW MATTERS....................................................................................146
A.    Issuance of the Purchaser Equity .....................................................................146

XIV.    PLAN SUPPLEMENT ..................................................................................................148

XV.    RECOMMENDATION AND CONCLUSION ..............................................................148

**EXHIBITS[2]**

**Exhibit A**    Plan

**Exhibit B**    Corporate Organizational Chart

**Exhibit C**    U.S. Government Economic Term Sheet

**Exhibit D**    Liquidation Analysis

**Exhibit E**    Financial Projections

---

[2]    The exhibits are each incorporated herein by reference.

## I.    INTRODUCTION

On August 16, 2022, Endo International plc ("Endo Parent") and seventy-five of its affiliates (collectively, the "Original Debtors"), as debtors and debtors in possession in the above-captioned chapter 11 cases, each commenced a case (collectively, with any subsequently filed cases, the "Chapter 11 Cases") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). On May 25, 2023, Operand Pharmaceuticals Holdco II Limited and Operand Pharmaceuticals Holdco III Limited (together, the "Additional Debtors") each commenced a Chapter 11 Case in accordance with the Reconstruction Steps (described further below). On May 31, 2023, Operand Pharmaceuticals II Limited and Operand Pharmaceuticals III Limited (together with the Original Debtors and the Additional Debtors, the "Debtors," and together with their non-debtor affiliates, the "Company" or "Endo") each commenced a Chapter 11 Case in accordance with the Reconstruction Steps. The Debtors continue to operate their business and manage their assets as debtors and debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code.

The Debtors submit this disclosure statement (as amended, modified, or supplemented, the "Disclosure Statement") pursuant to section 1125 of the Bankruptcy Code in connection with the solicitation of votes with respect to the *Second Amended Joint Chapter 11 Plan of Reorganization of Endo International plc and its Affiliated Debtors* dated January 9, 2024 (as amended, modified, or supplemented, the "Plan").[3] The Plan is annexed hereto as **Exhibit A** and is incorporated herein by reference.

Endo Parent is, concurrently with this Disclosure Statement, publishing a scheme circular (the "Scheme Circular") describing the terms of a proposed "scheme of arrangement" under Part 9 of the Irish Companies Act 2014 (the "Scheme"). As described in the Scheme Circular and below in Section VI.D (*The Scheme*), the Scheme will operate in parallel with the Plan to implement certain terms of the Plan as a matter of the law of Ireland ("Irish Law"). As described further in the Scheme Circular, in connection with the Scheme, the Debtors are seeking authorization from the Bankruptcy Court for Endo Parent to enter into an Irish Law governed deed poll of indemnity and contribution (the "Deed of Indemnity and Contribution"), pursuant to which Endo Parent will agree to guarantee all liabilities of all other Debtors other than liabilities for Administrative Expense Claims, priority Claims, and Claims falling within the Scheme Excluded Plan Classes (as defined below). All holders of Claims subject to the Deed of Indemnity and Contribution will be entitled to enforce the Deed of Indemnity and Contribution directly against Endo Parent and, accordingly, are creditors or contingent creditors (as applicable) of Endo Parent entitled to vote on the Scheme. Further information regarding how to vote for or against the Scheme is set out below in Section VIII.D (*Voting on the Scheme*) and in the Scheme Circular. If you are a Scheme Creditor (as defined in the Scheme Circular), you should read the Scheme Circular for full details on, among other things, how the Plan and the Scheme interrelate, and how to submit votes in respect of the Scheme. If you are not a Scheme Creditor, you do not need to review the Scheme Circular.

---

[3]    Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Plan. To the extent any inconsistencies exist between this Disclosure Statement and the Plan, the Plan shall govern.

This Disclosure Statement contains, among other things, descriptions and summaries of provisions of the Debtors' proposed Plan. The Debtors reserve the right to modify the Plan consistent with section 1127 of the Bankruptcy Code, Rule 3019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and section 12.1 of the Plan.

The Plan is the result of multiple resolutions reached through a months-long mediation process among the Debtors and key parties in interest, including the Ad Hoc First Lien Group, Multi-State Endo Executive Committee, the Committees, and the FCR (each as defined below), and provides for an equitable distribution of recoveries to the Debtors' creditors. The Debtors, the Ad Hoc First Lien Group, the Committees, and the FCR believe that the Plan represents the optimal means of implementation for the resolution of these Chapter 11 Cases and the settlements set forth therein, as described herein, relative to other alternatives. **For these reasons, the Debtors urge you vote to accept the Plan.**

**WHO IS ENTITLED TO VOTE:** Under the Bankruptcy Code, only holders of claims or interests in "impaired" classes are entitled to vote on the Plan. Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" unless (a) the Plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (b) notwithstanding any legal right to an accelerated payment of such claim or interest, the Plan, among other things, cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

**There are 21 creditor groups entitled to vote on the Plan whose votes are being solicited: Classes 3, 4(A), 4(B), 4(C), 4(D), 4(E), 4(F), 5, 6(A), 6(B), 6(C), 7(A), 7(B), 7(C), 7(D), 7(E), 8, 9, 10, 11, and 12.**

**Holders of Claims in Classes 3, 4(A), 4(B), 4(C), 4(D), 4(E), 4(F), 6(A), 6(B), 6(C), 7(A), 7(B), 7(C), 7(D), 7(E), 8, 9, 10, 11, and 12 are also Scheme Creditors entitled to vote on the Scheme. Holders of Claims or Interest in Classes 1, 2, 5, 13, 14, 15, and 16 (collectively, the "Scheme Excluded Plan Classes") are not entitled to vote on the Scheme.**

**THE PLAN PROVIDES THAT HOLDERS OF CLAIMS AND INTERESTS WHO (A) VOTE TO ACCEPT THE PLAN, (B) ARE ELIGIBLE TO VOTE, BUT ABSTAIN FROM VOTING ON THE PLAN AND WHO DO NOT OPT OUT OF OR OPT IN TO, AS APPLICABLE, GIVING THE APPLICABLE RELEASES PURSUANT TO THE INSTRUCTIONS SET FORTH ON THEIR APPLICABLE BALLOT, (C) VOTE TO REJECT THE PLAN AND WHO AFFIRMATIVELY OPT IN TO GIVING THE APPLICABLE RELEASES PURSUANT TO THE INSTRUCTIONS SET FORTH ON THEIR APPLICABLE BALLOT, AND (D) ARE PRESUMED TO ACCEPT OR DEEMED TO REJECT THE PLAN BUT DO NOT OPT OUT OF GIVING THE APPLICABLE RELEASES BY FOLLOWING THE INSTRUCTIONS ON THE APPLICABLE NOTICE OF NON-VOTING STATUS ARE DEEMED TO HAVE GRANTED THE APPLICABLE RELEASES THEREIN.**

The following table summarizes (a) the treatment of any claim under section 101(5) of the Bankruptcy Code ("Claims") and any equity interest in the Debtors under section 101(16) of the Bankruptcy Code ("Interests") under the Plan, (b) which classes of Claims and Interests classified pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code ("Classes") are impaired by the Plan, and (c) which Classes are entitled to vote on the Plan. The table is qualified in its entirety by reference to the full text of the Plan.

Pursuant to the Plan, the Debtors will use the net proceeds from the Syndicated Exit Financing (to the extent implemented), the net proceeds from the Rights Offerings, and cash on hand to fund Plan payments and distributions that are payable in cash. In the period before the Confirmation Hearing, the Debtors intend to file a motion seeking approval of and authorization to pursue the Rights Offerings and the Backstop Commitment Agreements, which motion may be heard at the same time as the Confirmation Hearing. The Rights Offerings and the Backstop Commitment Agreements are a key component of the Plan. The Rights Offerings are integrated with the treatment of Allowed First Lien Claims, Allowed Second Lien Deficiency Claims, and Allowed Unsecured Notes Claims.

The Plan provides that holders of Claims in Class 1 (Priority Non-Tax Claims) and Class 2 (Other Secured Claims) will receive payment in full in cash on the Effective Date of the Plan or reinstatement or such other treatment that the Debtors elect that results in holders of such Claims or Interests being unimpaired. At the election of the Debtors, with the consent of the Required Consenting Global First Lien Creditors, holders of Claims or Interests in Class 13 (Intercompany Claims) and Class 14 (Intercompany Interests) will be either unimpaired or impaired and not receive any distribution under the Plan.

Holders of Claims in Classes 3, 4(A), 4(B), 4(C), 4(D), 4(E), 4(F), 5, 6(A), 6(B), 6(C), 7(A), 7(B), 7(C), 7(D), 7(E), 8, 9, 10, 11, and 12 are impaired and entitled to vote on the Plan (the "Voting Classes"). For the reasons stated herein, the Debtors urge the holders of Claims in the Voting Classes to vote to accept the Plan. Holders of Claims and Interests in Class 15 (Subordinated, Recharacterized, or Disallowed Claims) and Class 16 (Existing Equity Interests) are impaired but are not entitled to vote on the Plan because under the Plan they will receive no recovery and are deemed to reject the Plan. In addition, certain Voting Classes entitled to vote on the Plan are Scheme Excluded Plan Classes not entitled to vote on the Scheme because, among other things, the Debtors have formed the view that it is not necessary to subject such Claims to the Scheme in order to achieve the purpose of the Scheme, which is to implement certain relevant terms of the Plan applicable to Scheme Creditors as a matter of Irish Law.

Over 900,000 Proofs of Claim were filed in these Chapter 11 Cases by the General Bar Date. Close to 885,000 of those Proofs of Claim, approximately 97% of the total, did not state a claim amount. The approximately 3% of the Proofs of Claim that did state an amount asserted, in the aggregate, Claims of close to $975 billion. The vast majority of the filed Proofs of Claim assert unsecured Claims relating to opioid products, mesh products, or ranitidine products allegedly manufactured or sold by the Debtors, including Claims in the following classes: Class 4(C) (Mesh Claims), Class 4(D) (Ranitidine Claims), Class 4(E) (Generics Price Fixing Claims); Class 4(F) (Reverse Payment Claims), Class 5 (U.S. Government Claims), Class 6(A) (State Opioid Claims), Class 6(B) (Local Government Opioid Claims), 6(C) (Tribal Opioid Claims), Class 7(A) (PI Opioid Claims), Class 7(B) (NAS PI Claims), Class 7(C) (Hospital Opioid Claims), Class

3

7(D) (TPP Claims), Class 7(E) (IERP II Claims), Class 8 (Public School District Claims), Class 9 (Canadian Provinces Claims), Class 11 (Other Opioid Claims), and Class 12 (EFBD Claims). The Claims in the aforementioned Classes are contingent, unliquidated, and/or disputed, and many of those Claims are based upon novel or untested legal theories. In addition to the legal uncertainties, the value of such Claim will depend greatly on the facts and circumstances of the Claim, and a number of highly particularized judgments about the quantum of economic and non-economic damages that the claimant has allegedly incurred and that may be compensable under applicable law. The information necessary to determine these amounts is also generally not available from the Proofs of Claim, and, in litigation, would be learned through fact and expert discovery. Any estimate of the aggregate value of the Claims in the aforementioned Classes, and any estimate of the aggregate percentage recovery of a Class of such Claims, would be so uncertain as not to provide creditors with information useful to make judgments about the proposed Plan.

For the reasons described above, a traditional recovery percentage for each impaired Class is not provided. The treatment provided to such Classes is summarized below. This summary does not take into account the timing of such Distributions or other important factors and does not describe procedures for making Distributions to individual creditors under the Trust Documents.

| Class | Claim or Interest | Treatment / Impairment / Entitlement to Vote |
|---|---|---|
| 1 | Priority Non-Tax Claims | Except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to less favorable treatment, on the later of (i) the Effective Date; and (ii) the date that is 30 days after the date such Priority Non-Tax Claim becomes an Allowed Claim or, in each case, as soon as reasonably practicable thereafter, each holder of an Allowed Priority Non-Tax Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such holder's Allowed Priority Non-Tax Claim, (1) Cash in an amount equal to such Allowed Priority Non-Tax Claim; or (2) such other treatment that shall render such claim Unimpaired under the Bankruptcy Code.<br><br>***Impairment***: Unimpaired<br><br>***Entitlement to Vote***: No (conclusively presumed to accept) |
| 2 | Other Secured Claims | Except to the extent that a holder of an Allowed Other Secured Claim against the Debtors agrees to a less favorable treatment of such Claim, each holder of an Allowed Other Secured Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for such Claim, at the sole option of the Debtors or the applicable Post-Emergence Entities, as applicable: (i) Cash in an amount equal to such Claim, payable on the later of (1) the Effective Date; (2) the date that is a maximum of 30 days after the date on which such Other Secured Claim becomes an Allowed Other Secured Claim; or (3) such other date as agreed to by the Debtors or the applicable Post-Emergence Entities, as applicable, and such holder, or as soon after the applicable of the foregoing clause (1), (2), or (3) as is reasonably practicable; (ii) delivery of collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; or (iii) such other treatment rendering such holder's Allowed Other Secured Claim Unimpaired under the Bankruptcy Code; provided, that, Other Secured Claims that arise in the ordinary course of the Debtors' business and that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the |

| Class | Claim or Interest | Treatment / Impairment / Entitlement to Vote |
|---|---|---|
| | | terms thereof. *Impairment*: Unimpaired *Entitlement to Vote*: No (conclusively presumed to accept) |
| 3 | First Lien Claims | Except to the extent that a holder of an Allowed First Lien Claim agrees to less favorable treatment, on the Effective Date, each holder of an Allowed First Lien Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for such Claim, such holder's pro rata share of: (i) 96.30% of the Purchaser Equity (subject to dilution by any issuances of Purchaser Equity under or pursuant to (1) the Rights Offerings and the Backstop Commitment Agreements; and (2) the Management Incentive Plan); (ii) (1) if the Exit Minimum Cash Sweep Trigger occurs, Cash from the Exit Minimum Cash Sweep; and/or (2) the net proceeds of the Syndicated Exit Financing, if any, after giving effect to the transactions occurring on the Effective Date; and/or (3) the New Takeback Debt; (iii) the First Lien Accrued and Unpaid Adequate Protection Payments; and (iv) the First Lien Subscription Rights. *Impairment*: Impaired *Entitlement to Vote*: Yes |
| 4(A) | Second Lien Deficiency and Unsecured Notes Claims | Except to the extent that a holder of a Second Lien Deficiency Claim or Unsecured Notes Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for the Second Lien Deficiency Claims and Unsecured Notes Claims, the GUC Trust shall receive the GUC Trust Consideration in accordance with the GUC Trust Documents, and (i) holders of Allowed Second Lien Deficiency Claims and Allowed Unsecured Notes Claims shall receive GUC Subscription Rights; provided, that, the exercise of such GUC Subscription Rights shall be subject to the terms and conditions set forth in the GUC Rights Offering Documents; and (ii) on the Effective Date, each Second Lien Deficiency Claim and each Unsecured Notes Claim shall automatically, and without further act, deed, or court order, be channeled exclusively to the GUC Trust pursuant to Section 10.9 of the Plan, and all of the Debtors' liability for such Claim shall be assumed by the GUC Trust and such Claim shall thereafter be asserted exclusively against the GUC Trust. The sole recourse of any holder of a Second Lien Deficiency Claim or an Unsecured Notes Claim on account thereof shall be to the GUC Trust and only in accordance with the terms, provisions, and procedures of the GUC Trust Documents, which shall provide that such Claims shall be Allowed in the amounts set forth above and administered by the GUC Trust and holders of Allowed Second Lien Deficiency Claims and Allowed Unsecured Notes Claims shall receive: |

| Class | Claim or Interest | Treatment / Impairment / Entitlement to Vote |
|-------|-------------------|----------------------------------------------|
|  |  | (1) such holders' applicable share of the GUC Trust Purchaser Equity; and |
|  |  | (2) such holders' pro rata share of GUC Trust Class A Units. |
|  |  | *Incremental Trust Distributions in Exchange for Granting GUC Releases.* The procedures governing Distributions set forth in the GUC Trust Documents shall provide for an additional payment by the GUC Trust to any holder of an Allowed Second Lien Deficiency Claim or Allowed Unsecured Notes Claim who is entitled to receive a Distribution from the GUC Trust and who grants or is deemed to grant, as applicable, the GUC Releases. Such additional payment from the GUC Trust shall be in exchange for such holder's granting or being deemed to grant, as applicable, the GUC Releases and shall be calculated by multiplying (i) the amount of any Distribution to be made to such holder pursuant to Section 4.4(e)(ii) of the Plan, by (ii) a multiplier of 4x. Notwithstanding the foregoing, Section 4.4(f) of the Plan shall not apply with respect to GUC Subscription Rights or any Purchaser Equity issued or distributed as a result of the exercise of GUC Subscription Rights as contemplated by Section 4.4(e)(i) of the Plan. |
|  |  | *Impairment*: Impaired |
|  |  | *Entitlement to Vote*: Yes |
| 4(B) | Other General Unsecured Claims | Except to the extent that a holder of an Other General Unsecured Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, settlement, release, and discharge of, and in exchange for the Other General Unsecured Claims, (i) the GUC Trust shall receive the GUC Trust Consideration in accordance with the GUC Trust Documents; and (ii) each Other General Unsecured Claim shall automatically, and without further act, deed, or court order, be channeled exclusively to the GUC Trust pursuant to Section 10.9 of the Plan, and all of the Debtors' liability for such Claim shall be assumed by the GUC Trust, and such Other General Unsecured Claim shall thereafter be asserted exclusively against the GUC Trust and treated solely in accordance with the terms, provisions, and procedures of the GUC Trust Documents, which shall provide that Other General Unsecured Claims shall be either Allowed and administered by the GUC Trust or otherwise Disallowed and released in full. Holders of Allowed Other General Unsecured Claims shall receive a recovery, if any, from the GUC Trust Consideration. The sole recourse of any holder of an Other General Unsecured Claim on account thereof shall be to the GUC Trust and only in accordance with the terms, provisions, and procedures of the GUC Trust Documents. |
|  |  | *Incremental Trust Distributions in Exchange for Granting GUC Releases.* The procedures governing Distributions set forth in the GUC Trust Documents shall provide for an additional payment by the GUC Trust to any holder of an Allowed Other General Unsecured Claim who is entitled to receive a Distribution from the GUC Trust and who grants or is deemed to grant, as applicable, the GUC Releases. Such additional payment from the GUC Trust shall be in exchange for such holder granting or being deemed to grant, as applicable, the GUC Releases and shall be calculated by multiplying (i) the amount of any Distribution to be made to such holder pursuant to the GUC Trust Documents, |

| Class | Claim or Interest | Treatment / Impairment / Entitlement to Vote |
|-------|-------------------|----------------------------------------------|
|  |  | by (ii) a multiplier of 4x.  Notwithstanding the foregoing, Section 4.5(d) of the Plan shall not apply with respect to GUC Subscription Rights or any Purchaser Equity issued or distributed as a result of the exercise of GUC Subscription Rights.<br><br>*Impairment*: Impaired<br><br>*Entitlement to Vote*:  Yes |
| 4(C) | Mesh Claims | Except to the extent that a holder of a Mesh Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, settlement, release, and discharge of, and in exchange for the Mesh Claims, (i) the GUC Trust shall receive the GUC Trust Consideration, including the Mesh Claims Trust Consideration, in accordance with the Mesh Claims Trust Documents; and (ii) each Mesh Claim shall automatically, and without further act, deed, or court order, be channeled exclusively to the GUC Trust pursuant to Section 10.9 of the Plan, and all of the Debtors' liability for such Claim shall be assumed by the GUC Trust.  Mesh Claims shall be exclusively handled by the Mesh Claims Trust, which shall be funded with the Mesh Claims Trust Consideration in accordance with the Mesh Claims Trust Documents, and Mesh Claims shall be treated solely in accordance with the terms, provisions, and procedures of the Mesh Claims Trust Documents, which shall provide that Mesh Claims shall be either Allowed and administered by the Mesh Claims Trust or otherwise Disallowed and released in full.  Holders of Allowed Mesh Claims shall receive a recovery, if any, from the Mesh Claims Trust Consideration and shall be entitled to no other asset of the GUC Trust.  The sole recourse of any holder of a Mesh Claim on account thereof shall be to the Mesh Claims Trust and only in accordance with the terms, provisions, and procedures of the Mesh Claims Trust Documents.<br><br>*Incremental Trust Distributions in Exchange for Granting GUC Releases.*  The procedures governing Distributions set forth in the Mesh Claims Trust Documents shall provide for an additional payment by the Mesh Claims Trust to any holder of an Allowed Mesh Claim who is entitled to receive a Distribution from the Mesh Claims Trust and who grants or is deemed to grant, as applicable, the GUC Releases.  Such additional payment from the Mesh Claims Trust shall be in exchange for such holder granting or being deemed to grant, as applicable, the GUC Releases and shall be calculated by multiplying (i) the amount of any Distribution to be made to such holder pursuant to the Mesh Claims Trust Documents, by (ii) a multiplier of 4x.<br><br>*Impairment*: Impaired<br><br>*Entitlement to Vote*:  Yes |
| 4(D) | Ranitidine Claims | Except to the extent that a holder of a Ranitidine Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, settlement, release, and discharge of, and in exchange for the Ranitidine Claims, (i) the GUC Trust shall receive the GUC Trust Consideration, including the Ranitidine Claims Trust Consideration, in accordance with the Ranitidine Claims Trust Documents; and (ii) each Ranitidine Claim shall automatically, and without further act, deed, or court order, be channeled exclusively to the GUC Trust pursuant to Section 10.9 of the Plan, and all of the Debtors' liability for such |

| Class | Claim or Interest | Treatment / Impairment / Entitlement to Vote |
|---|---|---|
| | | Claim shall be assumed by the GUC Trust. Ranitidine Claims shall be exclusively handled by the Ranitidine Claims Trust, which shall be funded with the Ranitidine Claims Trust Consideration in accordance with the Ranitidine Claims Trust Documents, and Ranitidine Claims shall be treated solely in accordance with the terms, provisions, and procedures of the Ranitidine Claims Trust Documents, which shall provide that Ranitidine Claims shall be either Allowed and administered by the Ranitidine Claims Trust or otherwise Disallowed and released in full. Holders of Allowed Ranitidine Claims shall receive a recovery, if any, from the Ranitidine Claims Trust Consideration and shall be entitled to no other asset of the GUC Trust. The sole recourse of any holder of a Ranitidine Claim on account thereof shall be to the Ranitidine Claims Trust and only in accordance with the terms, provisions, and procedures of the Ranitidine Claims Trust Documents. <br><br> *Incremental Trust Distributions in Exchange for Granting GUC Releases.* The procedures governing Distributions set forth in the Ranitidine Claims Trust Documents shall provide for an additional payment by the Ranitidine Claims Trust to any holder of an Allowed Ranitidine Claim who is entitled to receive a Distribution from the Ranitidine Claims Trust and who grants or is deemed to grant, as applicable, the GUC Releases. Such additional payment from the Ranitidine Claims Trust shall be in exchange for such holder granting or being deemed to grant, as applicable, the GUC Releases and shall be calculated by multiplying (i) the amount of any Distribution to be made to such holder pursuant to the Ranitidine Claims Trust Documents, by (ii) a multiplier of 4x. <br><br> *Impairment*: Impaired <br><br> *Entitlement to Vote*: Yes |
| 4(E) | Generics Price Fixing Claims | Except to the extent that a holder of a Generics Price Fixing Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, settlement, release, and discharge of, and in exchange for the Generics Price Fixing Claims, (i) the GUC Trust shall receive the GUC Trust Consideration, including the Generics Price Fixing Claims Trust Consideration, in accordance with the Generics Price Fixing Claims Trust Documents; and (ii) each Generics Price Fixing Claim shall automatically, and without further act, deed, or court order, be channeled exclusively to the GUC Trust pursuant to Section 10.9 of the Plan, and all of the Debtors' liability for such Claim shall be assumed by the GUC Trust. Generics Price Fixing Claims shall be exclusively handled by the Generics Price Fixing Claims Trust, which shall be funded with the Generics Price Fixing Claims Trust Consideration in accordance with the Generics Price Fixing Claims Trust Documents, and Generics Price Fixing Claims shall be treated solely in accordance with the terms, provisions, and procedures of the Generics Price Fixing Claims Trust Documents, which shall provide that Generics Price Fixing Claims shall be either Allowed and administered by the Generics Price Fixing Claims Trust or otherwise Disallowed and released in full. Holders of Allowed Generics Price Fixing Claims shall receive a recovery, if any, from the Generics Price Fixing Claims Trust Consideration and shall be entitled to no other asset of the GUC Trust. The sole recourse of any holder of a Generics Price Fixing Claim on account thereof shall be to the Generics Price Fixing Claims Trust and only in accordance with the terms, provisions, and procedures of the Generics Price Fixing Claims Trust Documents. |

| Class | Claim or Interest | Treatment / Impairment / Entitlement to Vote |
|---|---|---|
| | | *Incremental Trust Distributions in Exchange for Granting GUC Releases.* The procedures governing Distributions set forth in the Generics Price Fixing Claims Trust Documents shall provide for an additional payment by the Generics Price Fixing Claims Trust to any holder of an Allowed Generics Price Fixing Claim who is entitled to receive a Distribution from the Generics Price Fixing Claims Trust and who grants or is deemed to grant, as applicable, the GUC Releases. Such additional payment from the Generics Price Fixing Claims Trust shall be in exchange for such holder granting or being deemed to grant, as applicable, the GUC Releases and shall be calculated by multiplying (i) the amount of any Distribution to be made to such holder pursuant to the Generics Price Fixing Claims Trust Documents, by (ii) a multiplier of 4x. <br><br> *Impairment*: Impaired <br><br> *Entitlement to Vote*: Yes |
| 4(F) | Reverse Payment Claims | Except to the extent that a holder of a Reverse Payment Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, settlement, release, and discharge of, and in exchange for the Reverse Payment Claims, (i) the GUC Trust shall receive the GUC Trust Consideration, including the Reverse Payment Claims Trust Consideration, in accordance with the Reverse Payment Claims Trust Documents; and (ii) each Reverse Payment Claim shall automatically, and without further act, deed, or court order, be channeled exclusively to the GUC Trust pursuant to Section 10.9 of the Plan, and all of the Debtors' liability for such Claim shall be assumed by the GUC Trust. Reverse Payment Claims shall be exclusively handled by the Reverse Payment Claims Trust, which shall be funded with the Reverse Payment Claims Trust Consideration in accordance with the Reverse Payment Claims Trust Documents, and Reverse Payment Claims shall be treated solely in accordance with the terms, provisions, and procedures of the Reverse Payment Claims Trust Documents, which shall provide that Reverse Payment Claims shall be either Allowed and administered by the Reverse Payment Claims Trust or otherwise Disallowed and released in full. Holders of Allowed Reverse Payment Claims shall receive a recovery, if any, from the Reverse Payment Claims Trust Consideration and shall be entitled to no other asset of the GUC Trust. The sole recourse of any holder of a Reverse Payment Claim on account thereof shall be to the Reverse Payment Claims Trust and only in accordance with the terms, provisions, and procedures of the Reverse Payment Claims Trust Documents. <br><br> *Incremental Trust Distributions in Exchange for Granting GUC Releases.* The procedures governing Distributions set forth in the Reverse Payment Claims Trust Documents shall provide for an additional payment by the Reverse Payment Claims Trust to any holder of an Allowed Reverse Payment Claim who is entitled to receive a Distribution from the Reverse Payment Claims Trust and who grants or is deemed to grant, as applicable, the GUC Releases. Such additional payment from the Reverse Payment Claims Trust shall be in exchange for such holder granting or being deemed to grant, as applicable, the GUC Releases and shall be calculated by multiplying (i) the amount of any Distribution to be made to such holder pursuant to the Reverse Payment Claims Trust Documents, by (ii) a multiplier of 4x. |

| Class | Claim or Interest | Treatment / Impairment / Entitlement to Vote |
|---|---|---|
| | | *Impairment*: Impaired |
| | | *Entitlement to Vote*:  Yes |
| 5 | U.S. Government Claims | On the Effective Date, in full and final satisfaction, settlement, release, and discharge of, and in exchange for such Claims, the holders of the U.S. Government Claims shall receive the U.S. Government Resolution Consideration pursuant to and in accordance with the terms of the U.S. Government Resolution Documents. |
| | | *Impairment*: Impaired |
| | | *Entitlement to Vote*:  Yes |
| 6(A) | State Opioid Claims | Except to the extent that a holder of a State Opioid Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, settlement, release, and discharge of, and in exchange for the State Opioid Claims, (i) the Public Opioid Trust shall receive the Public Opioid Consideration in accordance with the Public Opioid Distribution Documents; and (ii) each State Opioid Claim shall automatically, and without further act, deed, or court order, be channeled exclusively to the Public Opioid Trust pursuant to Section 10.9 of the Plan, and all of the Debtors' liability for such Claim shall be assumed by the Public Opioid Trust.  The sole recourse of any holder of a State Opioid Claim on account thereof shall be to the Public Opioid Trust and only in accordance with the terms, provisions, and procedures of the Public Opioid Distribution Documents, pursuant to which any holder of a State Opioid Claim that votes to accept the Plan shall be deemed to hold an Allowed State Opioid Claim and shall be eligible to participate in the Public Opioid Trust, in each case, in accordance with the Public Opioid Distribution Documents. |
| | | *Impairment*: Impaired |
| | | *Entitlement to Vote*: Yes |
| 6(B) | Local Government Opioid Claims | On the Effective Date, in full and final satisfaction, settlement, release, and discharge of, and in exchange for such Claims, holders of Local Government Opioid Claims shall be eligible to receive distributions from their respective State in accordance with such State's opioid abatement programs, subject to the laws and agreements of such State and such State's opioid abatement programs. For the avoidance of doubt, the treatment provided with respect to this Class 6(B) shall not prevent any Local Government from participating in its respective State's opioid abatement programs as provided by and in accordance with applicable State law and agreements, regardless of whether such Local Government filed a Local Government Opioid Claim and/or voted to accept or reject the Plan. |
| | | *Impairment*: Impaired |
| | | *Entitlement to Vote*: Yes |
| 6(C) | Tribal Opioid Claims | Except to the extent that a holder of a Tribal Opioid Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, settlement, release, and discharge of, and in exchange for the Tribal Opioid Claims, (i) the Tribal Opioid Trust shall receive the Tribal Opioid Consideration |

| Class | Claim or Interest | Treatment / Impairment / Entitlement to Vote |
|---|---|---|
|  |  | in accordance with the Tribal Opioid Distribution Documents; and (ii) each Tribal Opioid Claim shall automatically, and without further act, deed, or court order, be channeled exclusively to the Tribal Opioid Trust pursuant to Section 10.9 of the Plan, and all of the Debtors' liability for such Claim shall be assumed by the Tribal Opioid Trust. The sole recourse of any holder of a Tribal Opioid Claim on account thereof shall be to the Tribal Opioid Trust and only in accordance with the terms, provisions, and procedures of the Tribal Opioid Distribution Documents, which shall provide that (1) such Claims shall be either Allowed and administered by the Tribal Opioid Trust or otherwise Disallowed and released in full; and (2) holders of Tribal Opioid Claims shall receive the applicable shares of the Tribal Opioid Consideration allocated to such holders as set forth in the Tribal Opioid Distribution Documents, in each case, in accordance with and subject to the terms of the Tribal Opioid Distribution Documents.<br><br>***Impairment***: Impaired<br><br>***Entitlement to Vote***:  Yes |
| 7(A) | PI Opioid Claims | Except to the extent that a holder of a PI Opioid Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, settlement, release, and discharge of, and in exchange for the PI Opioid Claims, (i) the PI Trust shall receive the PI Trust Share in accordance with the PI Trust Documents; and (ii) each PI Opioid Claim shall automatically, and without further act, deed, or court order, be channeled exclusively to the PPOC Trust pursuant to Section 10.9 of the Plan and subsequently channeled to the PI Trust, and all of the Debtors' liability for such Claim shall be assumed by the PI Trust and such PI Opioid Claim shall be Allowed, Disallowed and released in full, or otherwise resolved, in each case, in accordance with the PI Trust Documents. Holders of Allowed PI Opioid Claims shall receive a recovery, if any, from the PI Trust Share, in each case, in accordance with and subject to the terms of the PI Trust Documents.<br><br>*Incremental Trust Distributions in Exchange for Granting Non-GUC Releases.* The procedures governing Distributions set forth in the PI Trust Documents shall provide for an additional payment by the PI Trust to any holder of an Allowed PI Opioid Claim who is entitled to receive a Distribution from the PI Trust and who grants or is deemed to grant, as applicable, the Non-GUC Releases. Such additional payment from the PI Trust shall be in exchange for such holder granting or being deemed to grant, as applicable, the Non-GUC Releases and shall be calculated by multiplying (i) the amount of any Distribution to be made to such holder pursuant to the PI Trust Documents, by (ii) a multiplier of 4x.<br><br>***Impairment***: Impaired<br><br>***Entitlement to Vote***:  Yes |
| 7(B) | NAS PI Claims | Except to the extent that a holder of a NAS PI Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, settlement, release, and discharge of, and in exchange for the NAS PI Claims, (i) the NAS PI Trust shall receive the NAS PI Trust Share in accordance with the NAS PI Trust Documents; and (ii) each NAS PI Claim shall automatically, and without |

| Class | Claim or Interest | Treatment / Impairment / Entitlement to Vote |
|---|---|---|
|  |  | further act, deed, or court order, be channeled exclusively to the PPOC Trust pursuant to Section 10.9 of the Plan and subsequently channeled to the NAS PI Trust, and all of the Debtors' liability for such Claim shall be assumed by the NAS PI Trust and such NAS PI Claim shall be Allowed, Disallowed and released in full, or otherwise with the NAS PI Trust Documents.  Holders of Allowed NAS PI Claims shall receive a recovery, if any, from the NAS PI Trust Share, in each case, in accordance with and subject to the terms of the NAS PI Trust Documents. <br><br> *Incremental Trust Distributions in Exchange for Granting Non-GUC Releases.* The procedures governing Distributions set forth in the NAS PI Trust Documents shall provide for an additional payment by the NAS PI Trust to any holder of an Allowed NAS PI Claim who is entitled to receive a Distribution from the NAS PI Trust and who grants or is deemed to grant, as applicable, the Non-GUC Releases.  Such additional payment from the NAS PI Trust shall be in exchange for such holder granting or being deemed to grant, as applicable, the Non-GUC Releases and shall be calculated by multiplying (i) the amount of any Distribution to be made to such holder pursuant to the NAS PI Trust Documents, by (ii) a multiplier of 4x. <br><br> ***Impairment***: Impaired <br><br> ***Entitlement to Vote***:  Yes |
| 7(C) | Hospital Opioid Claims | Except to the extent that a holder of a Hospital Opioid Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, settlement, release, and discharge of, and in exchange for the Hospital Opioid Claims, (i) the Hospital Trust shall receive the Hospital Trust Share in accordance with the Hospital Trust Documents; and (ii) each Hospital Opioid Claim shall automatically, and without further act, deed, or court order, be channeled exclusively to the PPOC Trust pursuant to Section 10.9 of the Plan and subsequently channeled to the Hospital Trust, and all of the Debtors' liability for such Claim shall be assumed by the Hospital Trust and such Hospital Opioid Claim shall be Allowed, Disallowed and released in full, or otherwise resolved, in each case, in accordance with the Hospital Trust Documents. Holders of Allowed Hospital Opioid Claims shall receive a recovery, if any, from the Hospital Trust Share, in each case, in accordance with and subject to the terms of the Hospital Trust Documents. <br><br> *Incremental Trust Distributions in Exchange for Granting Non-GUC Releases.* The procedures governing Distributions set forth in the Hospital Trust Documents shall provide for an additional payment by the Hospital Trust to any holder of an Allowed Hospital Opioid Claim who is entitled to receive a Distribution from the Hospital Trust and who grants or is deemed to grant, as applicable, the Non-GUC Releases.  Such additional payment from the Hospital Trust shall be in exchange for such holder granting or being deemed to grant, as applicable, the Non-GUC Releases and shall be calculated by multiplying (i) the amount of any Distribution to be made to such holder pursuant to the Hospital Trust Documents, by (ii) a multiplier of 4x. <br><br> ***Impairment***: Impaired |

| Class | Claim or Interest | Treatment / Impairment / Entitlement to Vote |
|---|---|---|
|  |  | *Entitlement to Vote*:  Yes |
| 7(D) | TPP Claims | Except to the extent that a holder of a TPP Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, settlement, release, and discharge of, and in exchange for the TPP Claims, (i) the TPP Trust shall receive the TPP Trust Share in accordance with the TPP Trust Documents; and (ii) each TPP Claim shall automatically, and without further act, deed, or court order, be channeled exclusively to the PPOC Trust pursuant to Section 10.9 of the Plan and subsequently channeled to the TPP Trust, and all of the Debtors' liability for such Claim shall be assumed by the TPP Trust and such TPP Claim shall be Allowed, Disallowed and released in full, or otherwise resolved, in each case, in accordance with the TPP Trust Documents.  Holders of Allowed TPP Claims shall receive a recovery, if any, from the TPP Trust Share, in each case, in accordance with and subject to the terms of the TPP PI Trust Documents.<br><br>*Incremental Trust Distributions in Exchange for Granting Non-GUC Releases.* The procedures governing Distributions set forth in the TPP Trust Documents shall provide for an additional payment by the TPP Trust to any holder of an Allowed TPP Claim who is entitled to receive a Distribution from the TPP Trust and who grants or is deemed to grant, as applicable, the Non-GUC Releases.  Such additional payment from the TPP Trust shall be in exchange for such holder granting or being deemed to grant, as applicable, the Non-GUC Releases and shall be calculated by multiplying (i) the amount of any Distribution to be made to such holder pursuant to the TPP Trust Documents, by (ii) a multiplier of 4x.<br><br>*Impairment*: Impaired<br><br>*Entitlement to Vote*:  Yes |
| 7(E) | IERP II Claims | Except to the extent that a holder of an IERP II Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, settlement, release, and discharge of, and in exchange for the IERP II Claims, (i) the IERP Trust II shall receive the IERP Trust II Share in accordance with the IERP Trust II Documents; and (ii) each IERP II Claim shall automatically, and without further act, deed, or court order, be channeled exclusively to the PPOC Trust pursuant to Section 10.9 of the Plan and subsequently channeled to the IERP Trust II, and all of the Debtors' liability for such Claim shall be assumed by the IERP Trust II and such IERP II Claim shall be Allowed, Disallowed and released in full, or otherwise resolved, in each case, in accordance with the IERP Trust II Documents.  Holders of Allowed IERP II Claims shall receive a recovery, if any, from the IERP Trust II Share, in each case, in accordance with and subject to the terms of the IERP Trust II Documents.<br><br>*Incremental Trust Distributions in Exchange for Granting Non-GUC Releases.* The procedures governing Distributions set forth in the IERP Trust II Documents shall provide for an additional payment by the IERP Trust II to any holder of an Allowed IERP II Claim who is entitled to receive a Distribution from the IERP Trust II and who grants or is deemed to grant, as applicable, the Non-GUC Releases.  Such additional payment from the IERP Trust II shall be in exchange for such holder granting or being deemed to grant, as applicable, the Non-GUC Releases and shall be calculated by multiplying (i) the amount of |

| Class | Claim or Interest | Treatment / Impairment / Entitlement to Vote |
|---|---|---|
| | | any Distribution to be made to such holder pursuant to the IERP Trust II Documents, by (ii) a multiplier of 4x.<br><br>*Impairment*: Impaired<br><br>*Entitlement to Vote*: Yes |
| 8 | Public School District Claims | As of the Effective Date, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, all Allowed Public School District Claims, the Opioid School District Recovery Trust shall be funded with the Opioid School District Recovery Trust Consideration in accordance with the Opioid School District Recovery Trust Governing Documents.<br><br>*Impairment*: Impaired<br><br>*Entitlement to Vote*: Yes |
| 9 | Canadian Provinces Claims | Except to the extent that a holder of a Canadian Provinces Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, settlement, release, and discharge of, and in exchange for the Canadian Provinces Claims, (i) the Canadian Provinces Trust shall receive the Canadian Provinces Consideration in accordance with the Canadian Provinces Distribution Documents, pursuant to which the aggregate amount of Canadian Provinces Consideration shall be subject to adjustment depending on the number of Canadian Provinces that grant or are deemed to grant, as applicable, the Non-GUC Releases; and (ii) each Canadian Provinces Claim shall automatically, and without further act, deed, or court order, be channeled exclusively to the Canadian Provinces Trust pursuant to Section 10.9 of the Plan, and all of the Debtors' liability for such Claim shall be assumed by the Canadian Provinces Trust. The sole recourse of any holder of a Canadian Provinces Claim on account thereof shall be to the Canadian Provinces Trust and only in accordance with the terms, provisions, and procedures of the Canadian Provinces Distribution Documents, which shall provide that (1) such Claims shall be either Allowed and administered by the Canadian Provinces Trust or otherwise Disallowed and released in full; and (2) the Canadian Provinces shall receive the applicable allocated portion of the Canadian Provinces Consideration set forth in the Canadian Provinces Term Sheet except as otherwise agreed between the Debtors, the Required Consenting Global First Lien Creditors, and the Canadian Provinces.<br><br>*Impairment*: Impaired<br><br>*Entitlement to Vote*: Yes |
| 10 | Settling Co-Defendant Claims | The DMP Stipulation and the DMP Stipulation Order are incorporated by reference into the Plan as though fully set forth therein. On the Effective Date, in full and final satisfaction, settlement, release, and discharge of, and in exchange for such Claim, each holder of a Settling Co-Defendant Claim shall receive the treatment set forth in the DMP Stipulation, pursuant to which such Settling Co-Defendant Claims shall be released or subordinated, as applicable, by the applicable Settling Co-Defendants subject to the other terms and conditions of the DMP Stipulation. Notwithstanding anything in the Plan to the contrary, in the event of any inconsistency between any provision in the Plan |

| Class | Claim or Interest | Treatment / Impairment / Entitlement to Vote |
|---|---|---|
| | | relating to Settling Co-Defendant Claims and any provision in the DMP Stipulation, the DMP Stipulation shall govern; *provided*, *however*, *that*, notwithstanding anything in the Plan or in the DMP Stipulation or the DMP Stipulation Order to the contrary, nothing in the DMP Stipulation or the DMP Stipulation Order shall affect the discharge provided in <u>Article X</u> of the Plan.<br><br>*Impairment*: Impaired<br><br>*Entitlement to Vote*: Yes |
| 11 | Other Opioid Claims[4] | Except to the extent that a holder of an Other Opioid Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, settlement, release, and discharge of, and in exchange for the Other Opioid Claims, (i) the Other Opioid Claims Trust shall receive the Other Opioid Claims Trust Consideration in accordance with the Other Opioid Claims Trust Documents; and (ii) each Other Opioid Claim shall automatically, and without further act, deed, or court order, be channeled exclusively to the Other Opioid Claims Trust pursuant to Section 10.9 of the Plan, and all of the Debtors' liability for such Claim shall be assumed by the Other Opioid Claims Trust and such Other Opioid Claim shall be Allowed, Disallowed and released in full, or otherwise resolved, in each case, in accordance with the Other Opioid Claims Trust Documents. Holders of Allowed Other Opioid Claims shall receive a recovery, if any, from the Other Opioid Claims Trust Consideration, in each case, in accordance with and subject to the terms of the Other Opioid Claims Trust Documents.<br><br>*Incremental Trust Distributions in Exchange for Granting Non-GUC Releases.* The procedures governing Distributions set forth in the Other Opioid Claims Trust Documents shall provide for an additional payment by the Other Opioid Claims Trust to any holder of an Allowed Other Opioid Claim who is entitled to receive a Distribution from the Other Opioid Claims Trust and who grants or is deemed to grant, as applicable, the Non-GUC Releases. Such additional payment from the Other Opioid Trust shall be in exchange for such holder granting or being deemed to grant, as applicable, the Non-GUC Releases and shall be calculated by multiplying (i) the amount of any Distribution to be made to such holder pursuant to the Other Opioid Trust Documents, by (ii) a multiplier of 4x.<br><br>*Impairment*: Impaired<br><br>*Entitlement to Vote*: Yes |
| 12 | EFBD Claims | Except to the extent that a holder of an EFBD Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, settlement, |

---

[4]    The Debtors performed a preliminary analysis of the filed Proofs of Claim to determine the extent of any Claims that may be part of Class 11 (Other Opioid Claims). Such review remains ongoing, and will be followed by a subsequent, in-depth claims reconciliation process to determine the full scope of Claims that should be included in Class 11. At this time, Other Opioid Claims includes, without limitation, Opioid Claims held by the Canadian First Nations and Canadian Municipalities.

| Class | Claim or Interest | Treatment / Impairment / Entitlement to Vote |
|-------|-------------------|----------------------------------------------|
| | | release, and discharge of, and in exchange for the EFBD Claims, (i) the EFBD Claims Trust shall receive the EFBD Claims Trust Consideration in accordance with the EFBD Claims Trust Documents; and (ii) each EFBD Claim shall automatically, and without further act, deed, or court order, be channeled exclusively to the EFBD Claims Trust pursuant to Section 10.9 of the Plan, and all of the Debtors' liability for such Claim shall be assumed by the EFBD Claims Trust and such EFBD Claim shall be Allowed, Disallowed and released in full, or otherwise resolved, in each case, in accordance with the EFBD Claims Trust Documents.  Holders of Allowed EFBD Claims shall receive a recovery, if any, from the EFBD Claims Trust Consideration, in each case, in accordance with and subject to the terms of the EFBD Claims Trust Documents; *provided*, *that*, the amount of any Distribution to a holder of an Allowed EFBD Claim on account of such Allowed EFBD Claim shall not exceed the amount of comparable Distributions provided by another Trust under the Plan to holders of similar Allowed Claims that were filed before the General Bar Date and channeled to such other Trust under the Plan; *provided*, *further*, *that*, the procedures for determining the maximum amount of any Distribution to be made by the EFBD Claims Trust shall be substantially similar to those provided in the Future PI Trust Distribution Procedures. <br><br> *Incremental Distributions in Exchange for Granting Non-GUC Releases.*  The procedures governing Distributions set forth in the EFBD Claims Trust Documents shall provide for an additional payment by the EFBD Claims Trust to any holder of an Allowed EFBD Claim who is entitled to receive a Distribution from the EFBD Claims Trust and who grants or is deemed to grant, as applicable, the Non-GUC Releases.  Such additional payment from the EFBD Claims Trust shall be in exchange for such holder granting or being deemed to grant, as applicable, the Non-GUC Releases and shall be calculated by multiplying (i) the amount of any Distribution to be made to such holder pursuant to the EFBD Claims Trust Documents, by (ii) a multiplier of 4x.  For the avoidance of doubt, such additional amount shall in no event be greater than the additional amount provided to any holder of an Allowed Present Private Opioid Claim or an Allowed GUC Trust Channeled Claim, as applicable, who received an additional payment in exchange for granting or being deemed to grant, as applicable, the Non-GUC Releases or the GUC Releases, as applicable. <br><br> *Impairment*: Impaired <br><br> *Entitlement to Vote*:  Yes |
| 13 | Intercompany Claims | On the Effective Date, each Intercompany Claim shall either be (i) reinstated; or (ii) settled or deemed automatically cancelled, extinguished, and discharged in the discretion of the Debtors, subject to the consent of the Required Consenting Global First Lien Creditors; provided, that, any Intercompany Claims of any Debtor (other than the Transferred Debtors) against any Purchaser Entity shall be cancelled, extinguished, and discharged. <br><br> *Impairment*: Unimpaired / Impaired <br><br> *Entitlement to Vote*:  No (conclusively presumed to accept / deemed to reject) |
| 14 | Intercompany Interests | On the Effective Date, each Intercompany Interest shall either be (i) transferred, directly or indirectly, to the applicable Purchaser Entities; (ii) reinstated; or |

16

| Class | Claim or Interest | Treatment / Impairment / Entitlement to Vote |
|---|---|---|
| | | (iii) deemed automatically cancelled, extinguished, and discharged, in each case, in the discretion of the Debtors, subject to the consent of the Required Consenting Global First Lien Creditors. *Impairment*: Unimpaired / Impaired *Entitlement to Vote*: No (conclusively presumed to accept / deemed to reject) |
| 15 | Subordinated, Recharacterized, or Disallowed Claims | On the Effective Date, each Subordinated, Recharacterized or Disallowed Claim, shall be cancelled, extinguished, and discharged, and each holder thereof shall not receive or retain any property under the Plan on account of such Claim. To the extent that any Claim in Class 15 arising out of or relating to Opioid-Related Activities or any Opioids or Opioid Products manufactured, marketed, or sold by the Debtors, including any Co-Defendant Claim, that is Disallowed pursuant to section 502(e) of the Bankruptcy Code is later Allowed in accordance with section 502(j) of the Bankruptcy Code, on the date of the Allowance of such Claim, such Claim shall automatically be subordinated pursuant to section 509(c) of the Bankruptcy Code and shall therefore be automatically deemed a Subordinated, Recharacterized, or Disallowed Claim and such Claim shall automatically be cancelled, extinguished, and discharged in accordance with Section 4.27(c) of the Plan. *Impairment*: Impaired *Entitlement to Vote*: No (deemed to reject) |
| 16 | Existing Equity Interests | On the Effective Date, each Existing Equity Interest, shall be cancelled, extinguished, and discharged, subject to applicable law, and each holder thereof shall not receive or retain any property under the Plan on account of such Existing Equity Interest. *Impairment*: Impaired *Entitlement to Vote*: No (deemed to reject) |

## II.    OVERVIEW OF THE DEBTORS' BUSINESS AND CAPITAL STRUCTURE[5]

### A.    The Debtors' Business[6]

Endo is a diversified specialty pharmaceutical company that develops, manufactures, markets, and distributes pharmaceutical products across four reportable segments: Branded Pharmaceuticals, Sterile Injectables, Generic Pharmaceuticals and International Pharmaceuticals. All products, except for those in the International Pharmaceuticals segment, are sold in the U.S. only.  A brief description of each segment is set forth below.

### 1.    Branded Pharmaceuticals

The Branded Pharmaceuticals segment focuses on products that have inherent scientific, regulatory, legal, and technical complexities, and markets such products under recognizable brand names that are trademarked.  After the completion of required clinical trials and testing, the Company seeks approvals from regulatory bodies, such as through the submission of applications to the Food and Drug Administration (the "FDA") for the marketing and sale of new drugs, called "New Drug Applications" ("NDAs") or applications to introduce new products into the U.S. market, called "Biologics License Applications."

The Branded Pharmaceuticals segment includes a variety of branded products across two product categories: (a) "Specialty Products," which includes products in the areas of urology, orthopedics, endocrinology, and bariatrics, among others; and (b) "Established Products," a portfolio that includes approximately ten products across diverse areas that are not actively promoted.[7]

---

[5]    In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' stakeholders than would otherwise result in any other scenario. Accordingly, the Debtors recommend that holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.  The Committees also encourage each creditor to vote to accept the Plan.  The Committees' respective position regarding the items in this Article II are more specifically set forth in the UCC Letter to unsecured creditors and OCC Letter to opioid claimants, which are included in the solicitation materials.  The Committees encourage each creditor to review the appropriate letter and communicate directly with the appropriate Committee regarding any questions they have about the applicable letter, the Plan, or this Disclosure Statement.

[6]    Solely for convenience, trademarks referred to herein may appear with or without the ® symbol, but such references are not intended to indicate in any way that the Debtors do not assert, to the fullest extent under applicable law, their rights to such trademarks.

[7]    Another product category, "Medical Aesthetics," which consists solely of Qwo, the first and only injectable treatment for moderate-to-severe cellulite, was discontinued following the Petition Date, as discussed further below.

The Specialty Products include the following key products, among others:

| Specialty Products Portfolio | Description | Revenues (in millions) FY 2022 |
|---|---|---|
| XIAFLEX® | A non-surgical treatment for Dupuytren's contracture (for adult patients with an abnormal buildup of collagen in the fingers that limits or disables hand function) and Peyronie's disease (for adult men with a collagen plaque and a penile curvature deformity). Additional pipeline indications that are in clinical development include plantar fibromatosis and plantar fasciitis. | $439 |
| SUPPRELIN® LA | A soft, flexible 12-month hydrogel implant based on Endo's hydrogel polymer technology that delivers histrelin acetate, a gonadotropin-releasing hormone agonist, and is indicated for the treatment of central precocious puberty in children. | $113 |

The Established Products portfolio include the following, among others:

| Established Products Portfolio | Description | Revenues (in millions) FY 2022 |
|---|---|---|
| PERCOCET® | This product is indicated for the management of pain severe enough to require an opioid analgesic and for which alternative treatments are inadequate. | $104 |
| TESTOPEL® | A long-acting implantable pellet indicated for testosterone replacement therapies in conditions associated with a deficiency or absence of endogenous testosterone. | $39 |

Endo's pain products, including its opioid products, have not been actively promoted in the U.S. since 2016. In December 2016, Endo eliminated its entire pain product field sales force in the United States. In 2022, the Branded Pharmaceuticals segment accounted for approximately 38% of Endo's total revenue.

## 2.    Sterile Injectables

The Sterile Injectables segment includes a portfolio of more than 30 product families. In this portfolio, there are several sterile injectable products that are protected by certain patent rights and have inherent scientific, regulatory, legal and technical complexities, as well as other generic injectable products that are difficult to formulate or manufacture or face complex legal and regulatory challenges. Endo's Sterile Injectables products are manufactured in sterile facilities and are administered at hospitals, clinics and long-term care facilities. In 2022, the Sterile

Injectables segment accounted for approximately 25% of Endo's total revenue.  The Sterile Injectables segment include the following key products, among others:

| Sterile Injectable Products Portfolio | Description | Revenues (in millions) FY 2022 |
|---|---|---|
| VASOSTRICT® | This product is indicated to increase blood pressure in adults with vasodilatory shock who remain hypotensive despite fluids and catecholamines.  Vasostrict was the first vasopressin injection with an NDA approved by the FDA. | $254 |
| ADRENALIN® | A non-selective alpha- and beta-adrenergic agonist indicated for emergency treatment of certain allergic reactions, including anaphylaxis. | $114 |

### 3.    Generic Pharmaceuticals

Endo's Generic Pharmaceuticals segment focuses on first-to-file or first-to-market opportunities that are difficult to formulate or manufacture.  Generic products are the pharmaceutical and therapeutic equivalents of branded products and are generally marketed under their generic (chemical) names rather than their brand names.  The Generic Pharmaceuticals segment consists of a portfolio of solid oral extended-release, solid oral immediate-release, liquids, semi-solids, patches, powders, ophthalmics, sprays, and includes products that treat and manage a wide range of medical conditions.  The Generic Pharmaceuticals segment includes approximately 100 generic product families.

Endo's generic portfolio also contains certain authorized generics, which are generic versions of branded products licensed by brand drug companies under an NDA and marketed as generics.  Authorized generics do not face the same regulatory barriers to introduction and are not prohibited from sale during the 180-day marketing exclusivity period granted to the first-to-file abbreviated NDA ("ANDA") applicant.  Endo's authorized generics include, among others, lidocaine patch 5% (the authorized generic of Endo's Lidoderm®), lubiprostone capsules (the authorized generic of Mallinckrodt Pharmaceuticals' Amitiza®), and sucralfate oral suspension 1 gm/10 ml (the authorized generic of AbbVie Inc.'s Carafate®).  In 2022, the Generic Pharmaceuticals segment accounted for approximately 34% of Endo's total revenue.

### 4.    International Pharmaceuticals

Endo's International Pharmaceuticals segment sells a variety of specialty pharmaceutical products outside the U.S., primarily in Canada through Debtor Paladin Labs Inc.  The key products of this segment serve various therapeutic areas, including attention deficit hyperactivity disorder, pain, women's health, oncology, and transplantation.  In 2022, approximately 4% of Endo's total revenue was from customers outside the U.S.  Revenues generated by this segment are primarily attributable to consumers located in Canada.

### 5.    Debtors' Major Customers

Approximately 80% of Endo's sales are to three wholesale distributors: AmerisourceBergen Corporation, McKesson Corporation, and Cardinal Health, Inc.  These three distributors, in turn, sell Endo products to retail drug store chains, pharmacies, and managed care

organizations, including health maintenance organizations, nursing homes, hospitals, clinics, pharmacy benefit management companies, and mail order customers.

### 6.    Debtors' Workforce

As of September 7, 2023, the Debtors had approximately 1,377 employees. Of this number, approximately 107 are engaged in research and development ("R&D") and regulatory work, 354 in sales and marketing, 434 in manufacturing, 214 in quality assurance, and 268 in general and administrative capacities. The Debtors also employ approximately 190 people outside of the United States. With the exception of certain production personnel at the Debtors' Rochester, Michigan manufacturing facility, its employees are generally not represented by unions.

### 7.    Regulatory Matters

The Debtors are subject to extensive and rigorous regulatory oversight by numerous governmental entities. The Federal Food, Drug, and Cosmetic Act ("FFDCA"), the Controlled Substances Act ("CSA"), and other federal and state statutes and regulations govern or influence the testing, manufacturing, packaging, labeling, storage, recordkeeping, approval, advertising, promotion, sale, and distribution of pharmaceutical products. The Debtors must comply with these laws and the regulations, as well as guidance documents and standards promulgated by, among others, the FDA, the Department of Health and Human Services, the Drug Enforcement Agency ("DEA"), the Bureau of Customs and Border Protection, and state boards of pharmacy.

Certain of the Debtors' subsidiaries sell products that are "controlled substances" as defined in the CSA and implementing regulations. The DEA regulates chemical compounds as Schedule I, II, III, IV, or V substances, with Schedule I substances considered to present the highest risk of substance abuse and Schedule V substances the lowest risk. The active ingredients in some of the Company's products are listed by the DEA as Schedule II or III substances under the CSA. Consequently, their manufacture, shipment, storage, sale and use are subject to a high degree of regulation.

Outside of the U.S., Endo is subject to laws and regulations that differ from those under which it operates in the U.S. In most cases, non-U.S. regulatory agencies evaluate and monitor the safety, efficacy and quality of pharmaceutical products, govern the approval of clinical trials and product registrations and regulate pricing and reimbursement. Certain international markets have differing product preferences and requirements and operate in an environment of government-mandated, cost-containment programs, including price controls, such as the Patented Medicine Prices Review Board in Canada.

### B.    Prepetition Corporate and Capital Structure

Endo Parent is a holding company that conducts business through its operating subsidiaries and, as noted above, is the ultimate parent of each Debtor in the Chapter 11 Cases. A full corporate organizational chart depicting the ownership structure of the Debtors and certain of the Debtors'

non-debtor affiliates is attached hereto as **Exhibit B**.  The following is a simplified organizational chart depicting Endo's principal holding and operating entities as of December 19, 2023.[8]



---

8    The simplified organizational chart is for illustrative purposes only.  Please refer to the full corporate organizational chart attached hereto as **Exhibit B** for further details.

As of the Petition Date, the Debtors' consolidated long-term debt obligations totaled approximately $8.15 billion arising under (a) one credit agreement, which consists of a revolving credit facility and a term loan facility, (b) four series of secured notes, and (c) four series of unsecured notes. The following is a summary of the Debtors' funded debt obligations as of the Petition Date:

| Debt Instrument | Facility Type/Notes Series | Maturity Date | Approximate Outstanding Principal Amount (in USD$ millions) |
|---|---|---|---|
| Revolving Credit Facility | Revolver | Various | $277.2 |
| Term Loan Facility | Term loan | Mar. 2028[9] | $1,975 |
| First Lien Notes | 5.875% Senior Secured Notes due 2024 | Oct. 2024 | $300 |
| | 7.500% Senior Secured Notes due 2027 | Apr. 2027 | $2,015.5 |
| | 6.125% Senior Secured Notes due 2029 | Apr. 2029 | $1,295 |
| Second Lien Notes | 9.500% Senior Secured Second Lien Notes due 2027 | July 2027 | $940.6 |
| Unsecured Notes | 5.375% Senior Notes due 2023 | Jan. 2023 | $6.1 |
| | 6.00% Senior Notes due 2028 | June 2028 | $1,260.4 |
| | 6.00% Senior Notes due 2025 | Feb. 2025 | $21.6 |
| | 6.00% Senior Notes due 2023 | July 2023 | $56.4 |
| | | **Total:** | **$8,147.8** |

### 1.    Revolving Credit Facility and Term Loan Facility

On April 27, 2017, Debtors Endo Parent, Endo Luxembourg Finance Company I S.à r.l. ("Lux Borrower"), and Endo LLC ("Co-Borrower," and together with Lux Borrower, the "Borrowers") entered into that certain Credit Agreement (as amended by that certain First Amendment, dated as of March 28, 2019, the "Prior Credit Agreement," as amended and restated by the Amendment and Restatement Agreement (as defined below) and as may be further amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), with JPMorgan Chase Bank, N.A., as swing line lender, issuing bank (in such capacity, the "Issuing Bank"), and administrative agent (in such capacity, the "Administrative Agent"), and the lenders party thereto from time to time (such lenders, as of immediately prior to the Petition Date, the "Prepetition First Lien Lenders" and, together with the Administrative Agent, Issuing Bank, First Lien Collateral Trustee (as defined below), and each of the other Secured Parties (as defined in the Credit Agreement), the "Prepetition First Lien Loan Secured Parties"). The Credit Agreement provides for a senior secured revolving credit facility (the "Revolving Credit Facility") and a senior secured term loan facility (the "Term Loan Facility"). In connection with the Credit Agreement, certain subsidiaries of Endo Parent entered into that certain subsidiary

---

[9]    Subject to an earlier springing maturity if the aggregate principal amount outstanding of the 7.500% Notes and the Second Lien Notes (each as defined below), in each case, is greater than or equal to $500 million and such notes are not refinanced or repaid prior to the date that is 91 days prior to the stated maturity thereof.

guaranty, dated as of April 27, 2017 (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Subsidiary Guaranty"), among Endo Parent, the Borrowers, the various guarantor parties thereto (including any subsidiary of Endo Parent that executed a joinder thereto, the "Guarantors"), and the Administrative Agent.

On March 25, 2021, Endo Parent, the Borrowers, and certain of the Prepetition First Lien Loan Secured Parties entered into that certain Amendment and Restatement Agreement (the "Amendment and Restatement Agreement"), which amended and restated the Prior Credit Agreement in order to, among other things, (a) refinance in full the existing term loans under the Prior Credit Agreement, which had approximately $3.295 billion of principal outstanding, with the proceeds from (i) a new tranche of senior secured term loans in an aggregate principal amount of $2 billion maturing in March 2028 (subject to an earlier springing maturity if the aggregate principal amount outstanding of the 7.500% Notes and the Second Lien Notes (each as defined below), in each case, is greater than or equal to $500 million and such notes are not refinanced or repaid prior to the date that is 91 days prior to the stated maturity thereof) and (ii) $1.295 billion of newly issued 6.125% Senior Secured Notes due 2029 (as defined below), and (b) extend the maturities of approximately $675.3 million of existing revolving commitments under the Revolving Credit Facility to March 2026.  After giving effect to the Amendment and Restatement Agreement, the Credit Agreement provided for a $1 billion Revolving Credit Facility (in total availability) and a $2 billion Term Loan Facility.  Prior to the Petition Date, borrowings under the Revolving Credit Facility bore interest, at Endo Parent and the Borrowers' election, at a rate per annum equal to (a) the London Interbank Offered Rate ("LIBOR") plus an applicable margin between 1.50% and 3.00% depending on the Company's total net leverage ratio or (b) the Alternate Base Rate (as defined in the Credit Agreement) plus an applicable margin between 0.50% and 2.00% depending on the Company's total net leverage ratio.  Prior to the Petition Date, borrowings under the Term Loan Facility bore interest, at Endo Parent and the Borrowers' election, at a rate per annum equal to (a) LIBOR plus 5.00%, subject to a LIBOR floor of 0.75%, or (b) the Alternate Base Rate plus 4.00%, subject to an Alternate Base Rate floor of 1.75%.  On the Petition Date, outstanding borrowings and unpaid interest under the Term Loan Facility and the Revolving Credit Facility became subject to an additional 2.00% default interest rate and all LIBOR borrowings were converted to Alternate Base Rate borrowings at the end of the existing interest period applicable to such borrowing immediately following the Petition Date.

To secure the obligations arising under the Credit Agreement, the Subsidiary Guaranty and the First Lien Notes (as defined below), Co-Borrower and certain Guarantors, as applicable, entered into, among other things, that certain US Pledge and Security Agreement, dated as of April 27, 2017 (as acknowledged and confirmed by that certain Acknowledgment and Confirmation, dated as of March 25, 2021, and as may be amended, restated, amended and restated, supplemented, acknowledged and confirmed or otherwise modified from time to time, the "US Pledge and Security Agreement") and that certain Canadian Pledge and Security Agreement dated as of April 27, 2017 (as subsequently amended, restated, amended and restated, supplemented, acknowledged and confirmed or otherwise modified from time to time, the "Canadian Pledge and Security Agreement," and together with the US Pledge and Security Agreement, the First Lien Collateral Trust Agreement (as defined below) and all other first-lien security documents executed and/or delivered by Endo Parent, the Borrowers, and the Guarantors, to or in favor of the Prepetition First Lien Secured Parties (as defined below), including, without limitation, all intellectual property security agreements, mortgages, and pledges, the "First Lien Prepetition

24

Security Documents"), granting Wilmington Trust, N.A., in its capacity as collateral trustee (in such capacity and including any successors thereto, the "First Lien Collateral Trustee"), first-priority liens on and security interests in substantially all of the Debtors' assets, including all proceeds thereof (the "Prepetition Collateral").[10]

As of the Petition Date, (a) approximately $277 million was outstanding under the Revolving Credit Facility, (b) approximately $1.98 billion was outstanding under the Term Loan Facility, and (c) approximately $2 million of letters of credit were issued and outstanding under the Credit Agreement.

### 2.    First Lien Notes and Second Lien Notes[11]

#### (a)    6.125% Notes

On March 25, 2021, Debtors Lux Borrower and Endo U.S. Inc. ("Endo US" and together with Lux Borrower, the "6.125% Notes Issuers"), issued the 6.125% Notes (the "6.125% Notes," and the holders thereof, the "6.125% Senior Secured Noteholders") pursuant to that certain Indenture, dated as of March 25, 2021 (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "6.125% Notes Indenture"), by and among Computershare Trust Company, National Association, as trustee ("Computershare" and in such capacity and including any predecessors and successors thereto, "6.125% Notes Indenture Trustee" and, together with the 6.125% Senior Secured Noteholders and the First Lien Collateral Trustee, collectively, the "6.125% Notes Secured Parties"), the Guarantors party thereto, and the 6.125% Notes Issuers.  The 6.125% Notes are secured on a *pari passu* basis by first-priority liens on, and security interests in, the Prepetition Collateral in accordance with the terms of the First Lien Prepetition Security Documents.  As of the Petition Date, approximately $1.295 billion was outstanding under the 6.125% Notes Indenture.

#### (b)    7.500% Notes

On March 28, 2019, Debtor Par Pharmaceuticals, Inc. ("Par Pharma") issued $1.5 billion aggregate principal amount of 7.500% senior secured notes due on April 1, 2027 (the "7.500% Notes," and the holders thereof, the "7.500% Senior Secured Noteholders"), pursuant to that certain Indenture, dated March 28, 2019 (as amended, restated, supplemented, or otherwise modified from time to time, the "7.500% Notes Indenture"), by and among Par Pharma, as issuer, the Guarantors party thereto, and Computershare, as trustee (in such capacity and including any

---

[10]   In addition to securing the obligations under the Credit Agreement, the US Pledge and Security Agreement and the Canadian Pledge and Security Agreement secure the obligations arising under the 6.125% Notes Indenture, 7.500% Notes Indenture, and the 5.875% Notes Indenture (each as defined below) with grants of first-priority liens and security interests.  The term "Secured Obligation" as used in the granting clauses of the US Pledge and Security Agreement and the Canadian Pledge and Security Agreement is defined by reference to the First Lien Collateral Trust Agreement (as defined below).  In that agreement, Secured Obligations include any debt designated as secured debt, including certain future debt.

[11]   As described in greater detail below, the Committees have sought standing to challenge the liens securing the Debtors' First Lien Notes and Second Lien Notes, and the global settlement embodied by the Plan represents, among other things, a settlement of the Committees' Joint Standing Motion (defined and described in Article V.J. below).

predecessors and successors thereto, the "7.500% Notes Indenture Trustee" and, together with the 7.500% Senior Secured Noteholders and the First Lien Collateral Trustee, the "7.500% Notes Secured Parties"). The 7.500% Notes are secured on a *pari passu* basis by first-priority liens on, and security interests in, the Prepetition Collateral in accordance with the terms of the First Lien Prepetition Security Documents. In June 2020, the Company executed certain transactions which included, among others, an additional issuance of 7.500% Notes under the 7.500% Notes Indenture in the aggregate principal amount of approximately $516 million. As of the Petition Date, approximately $2 billion was outstanding under the 7.500% Notes Indenture.

### (c) 5.875% Notes

On April 27, 2017, Debtors Endo Designated Activity Company ("Endo DAC"), Endo Finance LLC ("Endo Finance"), and Endo Finco Inc. ("Endo Finco," and together with Endo Finance and Endo DAC, the "5.875% Notes Issuers") issued $300 million aggregate principal amount of 5.875% senior secured notes due October 15, 2024 (the "5.875% Notes," and the holders thereof, the "5.875% Senior Secured Noteholders"; and the 5.875% Notes, together with the 7.500% Notes and the 6.125% Notes, the "First Lien Notes"), pursuant to that certain Indenture, dated April 27, 2017 (as amended, restated, supplemented, or otherwise modified from time to time, the "5.875% Notes Indenture"), by and among Computershare as trustee (in such capacity and including any predecessors and successors thereto, the "5.875% Notes Indenture Trustee" and, together with the 5.875% Senior Secured Noteholders and the First Lien Collateral Trustee, the "5.875% Notes Secured Parties"; and the 5.875% Notes Secured Parties, the 7.500% Notes Secured Parties, and the 6.125% Notes Secured Parties, collectively, the "Prepetition First Lien Notes Secured Parties," and together with the Prepetition First Lien Loan Secured Parties, the "Prepetition First Lien Secured Parties"), the Guarantors party thereto, and the 5.875% Notes Issuers. The 5.875% Notes are secured on a *pari passu* basis by first-priority liens on, and security interests in, the Prepetition Collateral in accordance with the terms of the First Lien Prepetition Security Documents. As of the Petition Date, approximately $300 million was outstanding under the 5.875% Notes Indenture.

### (d) Second Lien Notes

On June 16, 2021, Debtors Endo DAC, Endo Finance, and Endo Finco (the "Second Lien Notes Issuers") issued $940.6 million aggregate principal amount of 9.50% senior secured second lien notes due July 31, 2027 (the "Second Lien Notes," and the holders thereof, the "Second Lien Noteholders"), pursuant to that certain Indenture, dated June 16, 2020 (as amended, restated, supplemented, or otherwise modified from time to time, the "Second Lien Indenture"), by and among Wilmington Savings Fund Society, FSB, as trustee (in such capacity and including any predecessors and successors thereto, the "Second Lien Indenture Trustee"), the Second Lien Notes Issuers, and the Guarantors party thereto. The Second Lien Notes are secured by a second-priority lien on, and on a junior basis with respect to, the Prepetition Collateral in accordance with the terms of the Second Lien Prepetition Security Documents (as defined below). As of the Petition Date, approximately $941 million was outstanding under the Second Lien Indenture.

To secure the obligations arising under the Second Lien Indenture, Co-Borrower and certain Guarantors, as applicable, entered into, among other things, that certain Second Lien US Pledge and Security Agreement, dated as of June 16, 2020 (as may be amended, restated, amended

and restated, supplemented or otherwise modified from time to time, the "Second Lien US Pledge and Security Agreement,") and that certain Second Lien Canadian Pledge and Security Agreement dated as of June 16, 2020 (as subsequently amended, restated, amended and restated, supplemented, acknowledged and confirmed or otherwise modified from time to time, the "Second Lien Canadian Pledge and Security Agreement" and, together with the Second Lien US Pledge and Security Agreement and all other second lien security documents executed and/or delivered by Endo Parent, the Borrowers, and Guarantors, to or in favor of the Prepetition Second Lien Secured Parties (as defined below), including, without limitation, all intellectual property security agreements, mortgages, and pledges, the "Second Lien Prepetition Security Documents"), granting Wilmington Trust, N.A., in its capacity as collateral trustee (in such capacity, the "Second Lien Collateral Trustee," and together with the Second Lien Indenture Trustee and the Second Lien Noteholders, the "Prepetition Second Lien Secured Parties," and the Prepetition Second Lien Secured Parties, together with the Prepetition First Lien Secured Parties, the "Prepetition Secured Parties"), second-priority liens on, and security interests in, the Prepetition Collateral.

### 3.     Collateral Trust Agreements

On April 27, 2017, certain of the Debtors and the Prepetition First Lien Secured Parties entered into a collateral trust agreement (as amended, restated, supplemented or otherwise modified from time to time, including pursuant to any joinders, the "First Lien Collateral Trust Agreement"). The First Lien Collateral Trust Agreement governs, among other things, the respective rights, interests and obligations of the Prepetition First Lien Secured Parties with respect to the Prepetition Collateral and covers certain other matters relating to the administration of security interests.

On June 16, 2020, certain of the Debtors and the Prepetition Second Lien Secured Parties entered into that certain second lien collateral trust agreement (as amended, restated, supplemented or otherwise modified from time to time, including pursuant to any joinders, the "Second Lien Collateral Trust Agreement"). The Second Lien Collateral Trust Agreement governs, among other things, the interests and obligations of the Prepetition Second Lien Secured Parties with respect to the Prepetition Collateral and covers certain other matters relating to the administration of security interests.

Both the First Lien Collateral Trust Agreement and the Second Lien Collateral Trust Agreement provide that the Prepetition Secured Parties may exercise remedies with respect to the Prepetition Collateral (subject, in all respects, to the 1L-2L Intercreditor Agreement (as defined below)) by directing the First Lien Collateral Trustee or the Second Lien Collateral Trustee, as applicable, pursuant to an Act of Required Secured Parties (as defined in each of the First Lien Collateral Trust Agreement and the Second Lien Collateral Trust Agreement, respectively).[12]

---

[12]   Under the First Lien Collateral Trust Agreement, an "Act of Required Secured Parties" means a written direction delivered to the First Lien Collateral Trustee "by or with the written consent of either the holders of or the Secured Debt Representatives representing the holders of more than 50% of the sum of: (a) the aggregate outstanding principal amount of Secured Debt (including the face amount of outstanding letters of credit whether or not then available or drawn); and (b) other than in connection with the exercise of remedies, the aggregate unfunded commitments to extend credit which, when funded, would constitute Secured Debt." First Lien Collateral Trust Agreement § 1.1. The definition of the term "Act of Required Secured Parties" as used in the Second Lien

### 4.    1L-2L Intercreditor Agreement

The First Lien Collateral Trustee, the Second Lien Collateral Trustee, and certain of the Debtors are parties to that certain Intercreditor Agreement, dated as of June 16, 2020 (as amended, restated, supplemented or otherwise modified from time to time, the "1L-2L Intercreditor Agreement").  The 1L-2L Intercreditor Agreement governs, among other things, the relative rights, interests, obligations, priority and positions of the Prepetition First Lien Secured Parties on the one hand, and the Prepetition Second Lien Secured Parties on the other hand.  The 1L-2L Intercreditor Agreement provides, among other things, that the First Priority Representative (as defined in the 1L-2L Intercreditor Agreement) will have the exclusive right to exercise rights and remedies in respect to the Prepetition Collateral on behalf of the First Priority Secured Parties (as defined in the 1L-2L Intercreditor Agreement).  If the First Priority Representative consents to the use of cash collateral under the Bankruptcy Code, then the Second Priority Representative (as defined in the 1L-2L Intercreditor Agreement) is deemed to agree, on behalf of itself and the other Second Priority Secured Parties (as defined in the 1L-2L Intercreditor Agreement), to the use of such cash collateral.

### 5.    Unsecured Notes

Certain of the Debtors have also issued or guaranteed the following unsecured notes (collectively, the "Unsecured Notes"):[13]

- 5.375% Senior Notes due 2023 issued by Endo Finance and Endo Finco and guaranteed by the Guarantors, pursuant to that certain indenture, dated June 30, 2014, with U.S. Bank Trust Company, National Association ("U.S. Bank"), as trustee;

- 6.000% Senior Notes due 2025 issued by Endo DAC, Endo Finance, and Endo Finco and guaranteed by the Guarantors, pursuant to that certain indenture, dated January 27, 2015, with UMB Bank, National Association ("UMB"), as trustee;

- 6.000% Senior Notes due 2023 issued by Endo DAC, Endo Finance, and Endo Finco and guaranteed by the Guarantors, pursuant to that certain indenture, dated July 9, 2015, with UMB as trustee; and

---

Collateral Trust Agreement with respect to the Prepetition Second Lien Secured Parties is identical to the definition of the "Act of Required Secured Parties" as used in the First Lien Collateral Trust Agreement with respect to the Prepetition First Lien Secured Parties. *See* Second Lien Collateral Trust Agreement § 1.1.

[13]    In connection with the 2020 Refinancing Transactions, Endo DAC, Endo Finance and Endo Finco, as applicable, solicited, and obtained, the consent of the holders of the 6.000% 2023 unsecured notes, the 6.000% 2025 unsecured notes, and the 5.375% 2023 unsecured notes to, among other things, eliminate certain of the (a) restrictive covenants, (b) affirmative covenants, and (c) events of default.  On May 28, 2020, and June 4, 2020, the foregoing issuers and unsecured noteholders entered into supplemental indentures memorializing these terms.

- 6.000% Senior Notes due 2028 issued by Endo DAC, Endo Finance, and Endo Finco and guaranteed by the Guarantors, pursuant to that certain indenture, dated June 16, 2020, with U.S. Bank as trustee.

As of the Petition Date, approximately $1.345 billion was outstanding under the Unsecured Notes.

### 6.    Equity

As of the Petition Date, Endo had approximately 235 million ordinary shares issued and outstanding.  At the close of trading immediately before the Petition Date, the share price was $0.37.  Prior to the Petition Date, ordinary shares in Endo Parent traded on the Nasdaq under the ticker "ENDP."

On the Petition Date, Endo Parent's ordinary shares began trading exclusively on the over-the-counter market under the symbol ENDPQ. On September 14, 2022, Nasdaq filed a Form 25-NSE with the SEC and Endo Parent's ordinary shares were subsequently delisted from the Nasdaq. On December 13, 2022, Endo Parent's ordinary shares were deregistered under Section 12(b) of the Securities Exchange Act of 1934, as amended.

### 7.    Committees' Reservation of Rights

As described in further detail in <u>Article V.J</u> below, the Committees filed the Joint Standing Motion and four proposed complaints in January 2023.  The Joint Standing Motion has been held in abeyance pending implementation of the Committees Resolutions (as defined below).  If the Committees Resolutions are ultimately not approved, the Committees reserve all rights with respect to the statements made in this Disclosure Statement regarding the Prepetition Secured Parties' claims and liens, and with respect to any other litigation that the Committees might otherwise bring or seek to bring on behalf of the estates.

## III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND PLAN

### A.    What Is Chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor can reorganize its business for the benefit of itself, its creditors, and its interest holders. The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of a debtor as of the petition filing date. The Bankruptcy Code provides that a debtor may remain in possession of its assets and continue to operate its business as a debtor in possession.

The consummation of a chapter 11 plan is a means of resolving a chapter 11 case. A chapter 11 plan sets forth the terms and manner for satisfying or otherwise addressing claims against and interests in a debtor. Confirmation of a chapter 11 plan by a bankruptcy court makes such plan binding upon a debtor and any creditor of or equity interest holder in such debtor, whether or not such creditor or equity interest holder (a) is impaired under or has accepted the plan or (b) receives or retains any value under the plan. Subject to certain limited exceptions, and except as otherwise

provided in the plan or the confirmation order itself, a confirmation order discharges the debtor from any debt or claims that arose prior to the date of confirmation of the plan and substitutes for those debts the obligations specified under the confirmed chapter 11 plan.

### B.    Why Are the Debtors Sending Me this Disclosure Statement?

The Debtors will seek to obtain Bankruptcy Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all holders of Claims and Interests whose votes on the Plan are being solicited. This Disclosure Statement is being submitted in accordance with these requirements.

### C.    What Happens to My Recovery If the Plan Is Not Confirmed or Does Not Become Effective?

In the event that the Plan is not confirmed or does not become effective, there is no assurance that the Debtors will be able to reorganize their business. It is possible that any alternative may provide holders of Claims and Interests with less than they would have received pursuant to the Plan. A Liquidation Analysis (defined below) comparing projected recoveries of holders of Claims and Interests under the Plan to estimated recoveries in the event of a hypothetical chapter 7 liquidation is attached hereto as **Exhibit D**.

### D.    If the Plan Provides that I Get a Distribution, Do I Get It Upon Confirmation or When the Plan Becomes Effective, and What Is Meant By "Confirmation," "Effective Date," and "Consummation"?

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court ("Confirmation"). Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After Confirmation of the Plan by the Bankruptcy Court, several conditions need to be satisfied or waived so that the Plan can become effective. Initial distributions to holders of allowed claims will only be made on or after the date the Plan becomes effective (the "Effective Date"), as soon as reasonably practicable thereafter, or such other date as specified in the Plan. The terms "consummation" and "substantial consummation" are sometimes used to indicate the occurrence of the Effective Date. *See* Section VII.B.9 (*Conditions Precedent to Consummation of the Plan*) of this Disclosure Statement, for a discussion of the conditions precedent to consummation of the Plan.

### E.    Is There Potential Litigation Related to the Plan?

Many of the Debtors' key stakeholders, including the Ad Hoc First Lien Group, the Committees, and the FCR, support the Plan described in this Disclosure Statement in accordance with the terms thereof.  Nevertheless, parties in interest have the right to object to the approval of this Disclosure Statement and may object to Confirmation of the Plan as well. Such objections, if any, could potentially give rise to litigation.

**F.    Will There Be Releases and Exculpation Granted to Parties in Interest as Part of the Plan?**

Yes, please see Sections VI.A and B below. The Plan proposes that (a) the Debtors and the other GUC Releasing Parties will, on a consensual basis, release each of the GUC Released Parties and (b) the Non-GUC Releasing Parties will, on a consensual basis, release each of the Non-GUC Released Parties (subject to certain carve-outs with respect to releases provided by the PPOC Trust, the PPOC Sub-Trusts, and the Present Private Opioid Claimants), each to the extent set forth in the Plan, and claimants who grant the applicable releases will receive a higher recovery in exchange for granting such releases.  The Debtors' releases, the consensual third-party releases, and the exculpation provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts and were an essential element of the negotiations among the Debtors, the GUC Released Parties, and the Non-GUC Released Parties in obtaining their support for the Plan.

All of the Non-GUC Released Parties, GUC Released Parties, and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring efforts through, among other things, their efforts to negotiate and implement the Plan, which will maximize and preserve the value of the Debtors' business for the benefit of all parties in interest. In addition, certain Non-GUC Released Parties and certain Exculpated Parties may provide exit financing to the Debtors and have committed to participate in the Rights Offerings, the proceeds of which will fund certain of the distributions contemplated by the Plan and to provide the Purchaser Entities with sufficient working capital upon emergence. Accordingly, the Debtors believe each of the GUC Released Parties, Non-GUC Released Parties, and Exculpated Parties warrants the benefit of the release and exculpation provisions, as applicable.

Based on the foregoing, the Debtors believe that the release and exculpation provisions in the Plan are necessary and appropriate. If necessary, the Debtors will present evidence at the hearing on Confirmation of the Plan (the "Confirmation Hearing") to further demonstrate the basis for and propriety of the release and exculpation provisions.  The Plan's release, exculpation, and injunction provisions are set forth in Article VI of this Disclosure Statement and in Article X of the Plan.

**G.    How Do the Releases Work and What is the Impact of Giving the Releases?**

If you are a holder of a GUC Trust Channeled Claim, you have the opportunity to vote on the Plan and grant the GUC Releases to release any Claims you may have against the GUC Released Parties.  By voting to accept the Plan, you will be deemed to grant GUC Releases. In addition, you will be agreeing to the Covenant Not To Collect, which means that you may not recover, directly or indirectly, from the personal assets of any Excluded D&O Party on account of any Claim against those parties that is not a Released Claim.  If you vote to reject the Plan, you will still have the opportunity to opt in to grant the GUC Releases.  If you abstain from voting on the Plan and you are a holder of a Claim in Classes 4(A), 4(E), or 4(F), you must affirmatively opt out of granting the GUC Releases, otherwise you will be deemed to have consented to granting the GUC Releases.  If you abstain from voting on the Plan and you are a holder of a Claim in Classes 4(B), 4(C), or 4(D), you must affirmatively opt in to grant the GUC Releases, otherwise you will be deemed to have opted out of granting the GUC Releases.  If you are entitled to any

recovery from the GUC Trust or any of the Distribution Sub-Trusts, you may be entitled to receive an additional payment in exchange for your granting the GUC Releases.

If you are a holder of a Claim in any other Voting Class, you have the opportunity to vote on the Plan and grant the Non-GUC Releases to release any Claims you may have against the Non-GUC Released Parties. If you vote to reject the Plan, you will still have the opportunity to opt in to grant the Non-GUC Releases. If you abstain from voting on the Plan and you are a holder of a Claim in Classes 3, 6(B), 6(C), 7(C), 7(D), or 8-10, you must affirmatively opt out of granting the Non-GUC Releases, otherwise you will be deemed to have consented to granting the Non-GUC Releases. If you abstain from voting on the Plan and you are a holder of a Claim in Classes 7(A), 7(B), 7(E), 11, or 12, you must affirmatively opt in to grant the Non-GUC Releases, otherwise you will be deemed to have opted out of granting the Non-GUC Releases. If you are entitled to any recovery from the PPOC Trust, any PPOC Sub-Trust, the Other Opioid Claims Trust, or the EFBD Claims Trust, you may be entitled to receive an additional payment in exchange for your granting the Non-GUC Releases. If you are entitled to a recovery from the Opioid School District Recovery Trust, depending on the number of Public School District Creditors that grant, or are deemed to grant, the Non-GUC Releases, the total consideration funded to the Opioid School District Recovery Trust may be increased. If you are entitled to a recovery from the Tribal Opioid Trust, if a sufficient number of Tribes grant the Non-GUC Releases, the total consideration funded to the Tribal Opioid Trust from which you may recover will be increased. If you are entitled to a recovery from the Canadian Provinces Trust, if a sufficient number of Canadian Provinces grant the Non-GUC Releases, the total consideration funded to the Canadian Provinces Trust from which you may recover will be increased.

If you are a holder of a Claim or Interest in a Notice of Non-Voting Status Class (as defined in the Solicitation and Voting Procedures), you will have the opportunity to opt out of granting the Non-GUC Releases. If you do not affirmatively opt out of granting the Non-GUC Releases, you will be deemed to grant the Non-GUC Releases.

**H.    When Is the Deadline to Vote on the Plan?**

The Voting Deadline is February 22, 2024, at 4:00 p.m. (prevailing Eastern Time).

**I.    How Do I Vote for or Against the Plan?[14]**

Detailed instructions regarding how to vote on the Plan are contained on the Ballots that will be distributed to holders of Claims that are entitled to vote on the Plan.

If you are a holder of a Claim that relates to the Debtors' opioid, mesh, and/or ranitidine products and represented by an attorney, through your attorney or law firm (the "Firm"), you will have received the Solicitation Directive to choose whether to participate in the Non-Notes Direct Solicitation Method (pursuant to which you would directly receive a Ballot to vote on the Plan and make elections with respect to certain releases contained in Article X of the Plan (a "Release

---

[14]    Capitalized terms used in this Subsection I but not otherwise defined shall have the meanings ascribed to such terms in the Solicitation and Voting Procedures attached as Exhibit 1 to the Disclosure Statement Order (defined below) or Art. VIII.C below.

Election")) or the Non-Notes Master Ballot Solicitation Method (pursuant to which your Firm would submit a Non-Notes Master Ballot with your vote and Release Election, along with the votes and Release Elections of the Firm's other Eligible Clients) under the Non-Notes Master Ballot Solicitation Procedures. If you, through your Firm, elected to participate in the Non-Notes Master Ballot Solicitation Method, for your vote and Release Election to be counted, your Firm must complete and deliver the Non-Notes Master Ballot with your vote and Release Election in accordance with the Non-Notes Master Ballot Solicitation Procedures so that such Non-Notes Master Ballot is **actually received by February 22, 2024, at 4:00 p.m. (prevailing Eastern Time)** by the Solicitation Agent.

If you are the actual holder of the Claim (and, if applicable, have elected (through your attorney) to participate in the Direct Solicitation Method under the Non-Notes Master Ballot Solicitation Procedures, discussed further in Art. VIII.C herein), for your vote to be counted, your Ballot must be either (a) properly completed by hand, executed, and delivered in accordance with the instructions included in the Ballot by (i) first class mail, (ii) overnight courier, or (iii) hand delivery, so that such Ballot is **actually received by February 22, 2024, at 4:00 p.m. (prevailing Eastern Time)** at the following address: Endo Ballot Processing Center, c/o Kroll Restructuring Administration LLC ("Kroll"), 850 Third Avenue, Suite 412, Brooklyn, NY 11232 (the "Solicitation Agent") or (b) properly completed electronically no later than **February 22, 2024, at 4:00 p.m. (prevailing Eastern Time)** using the Solicitation Agent's E-Balloting online portal (the "Online Portal"). If you are a holder of a Notes Claim, for your vote to be counted, your vote must be included on a valid (i) Notes Master Ballot or (ii) a Beneficial Holder Ballot pre-validated by your Nominee so that such Ballot must be **actually received by February 22, 2024, at 4:00 p.m. (prevailing Eastern Time)** by the Solicitation Agent.

It is important that a holder of a Claim in a Voting Class follow the specific instructions provided on such holder's Ballot and the accompanying instructions. Except in the Debtors' sole discretion or as provided under the Master Ballot Solicitation Procedures, Ballots may not be transmitted by facsimile, email, or other electronic means, other than via the Solicitation Agent's Online Portal. Parties submitting a Master Ballot should follow the specific instructions provided in the accompanying instructions for completion and delivery to the Solicitation Agent. For more information regarding voting, please review the Solicitation and Voting Procedures attached as Exhibit 1 to the Disclosure Statement Order, a summary of which is provided in Article VIII of this Disclosure Statement.

As summarized in Subsection T below, the Solicitation and Voting Procedures provide that a vote submitted in respect of the Plan shall automatically also comprise a direction to the chairperson (the "Chairperson") of the meetings at which Scheme Creditors may vote on the Scheme (the "Scheme Meetings") to cast a proxy vote on behalf of the voting Scheme Creditors. A Scheme Creditor may also appoint another person as proxy to attend the applicable Scheme Meeting on its behalf. Details of the Scheme and voting on the Scheme are set out in the Scheme Circular.

### J.     Why Is the Bankruptcy Court Holding a Confirmation Hearing and When Will It Occur?

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a Confirmation Hearing and recognizes that any party in interest may object to Confirmation of the Plan.

The confirmation of a chapter 11 plan by a bankruptcy court binds a debtor, any issuer of securities under a plan of reorganization, any person acquiring property under a chapter 11 plan, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a chapter 11 plan discharges a debtor from any debt or claims that arose before the confirmation of such chapter 11 plan and provides for the treatment of such debt in accordance with the terms of the confirmed chapter 11 plan.

**The Confirmation Hearing is scheduled for March 19, 2024, at 10:00 a.m. (prevailing Eastern Time).**

To provide additional notice to parties in interest in these Chapter 11 Cases, the Debtors will post to a website maintained by the Solicitation Agent various chapter 11 documents, including the Plan and this Disclosure Statement. The website address is: https://restructuring.ra.kroll.com/endo. Further, the Debtors intend to request Bankruptcy Court approval to publish a notice in (a) *The New York Times* (National Edition and International Edition), (b) *Wall Street Journal*, (c) *The Times*, (d) *The Financial Times* (UK Edition and International Edition), (e) *The Irish Times*, (f) *The Irish Independent*, and (g) *The Globe and Mail* (National Canadian Edition).   Please note that the Confirmation Hearing may be held in-person, telephonically, or by Zoom (or a combination thereof) if so ordered by the Bankruptcy Court.

### K.     How will Executory Contracts and Unexpired Leases be Treated under the Plan?

The Bankruptcy Code authorizes a debtor, subject to the approval of the Bankruptcy Court, to assume, assume and assign, or reject executory contracts and unexpired leases. The Debtors will file as part of the Plan Supplement a schedule listing the Executory Contracts and/or Unexpired Leases the Debtors intend to reject under Article VII of the Plan (the "Rejection Schedule"), and any Executory Contracts and Unexpired Leases that are not listed on such Rejection Schedule will be deemed assumed or assumed and assigned, as applicable, under the Plan and in accordance with the PSA.  Executory Contract and Unexpired Lease counterparties are advised to review Article VII of the Plan, which discusses, among other things, the assumption, assumption and assignment, and rejection of Executory Contracts and Unexpired Leases, claims based on the rejection of Executory Contracts or Unexpired Leases, and the determination of assumption disputes.

### L.     What Is the Effect of the Plan on the Debtors' Business?

Following Confirmation, the Plan will be consummated on the Effective Date, which will be a date selected by the Debtors that is the first Business Day after which all conditions precedent to the Effective Date have been satisfied or waived in accordance with the Plan. On or after the

Effective Date, unless otherwise provided in the Plan, the Post-Emergence Entities may operate their business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. Additionally, upon the Confirmation Date, all actions contemplated by the Plan will be deemed authorized and approved.

### M.    Who Will Serve as the Directors or Officers of the Purchaser Entities?

The composition of the board of directors or managers of each Purchaser Entity will be disclosed in the Plan Supplement prior to the Confirmation Hearing in accordance with section 1129(a)(5) of the Bankruptcy Code.

Commencing on the Effective Date, each of the directors, managers, and officers of the Purchaser Parent shall be appointed or elected and serve pursuant to the terms of the Corporate Governance Documents, and the provisions of the Plan and the Bankruptcy Code, and such directors, managers, and officers may be replaced or removed in accordance with the Corporate Governance Documents.

### N.    How is the Restructuring Transaction Being Implemented?

Under the Plan, the Debtors are seeking approval of the Plan Transaction, among other things. The Plan Transaction shall be effected through at least two mechanisms: (i) the Assets of the Debtors that become Remaining Debtors shall be sold and transferred directly to the applicable newly-formed Purchaser Entities; and (ii) the Interests in the Transferred Debtors and certain Non-Debtor Affiliates shall be sold, issued, and/or transferred, directly or indirectly, to and subsequently held by the applicable newly-formed Purchaser Entities such that the Transferred Debtors and the applicable Non-Debtor Affiliates shall, as of and following the Effective Date, be owned, directly or indirectly, by Purchaser Parent, in each case, free and clear of all Liens, Claims, charges, or other encumbrances (other than to the extent provided in the PSA) to the fullest extent possible under the Bankruptcy Code. As of the Confirmation Date, the Debtors shall be authorized and empowered to execute, deliver, implement, and fully perform any and all obligations, instruments, documents, and papers and to take any actions reasonably necessary or appropriate to consummate the Restructuring Transactions, the Plan, the Plan Transaction, the PSA, and any other transactions contemplated by the foregoing, including but not limited to any transaction steps authorized pursuant to prior orders of the Bankruptcy Court in furtherance of the Debtors' restructuring for purposes of (a) streamlining their corporate structure; (b) obtaining tax and other efficiencies; (c) obtaining Regulatory Approvals; and (d) implementing the Plan and the PSA in non-U.S. jurisdictions.

### O.    Does the Plan Affect the Resolution with the States and Tribes?

No; as provided under Sections 4.11, 5.20(e), 6.16, and 6.17 of the Plan, the Plan provides for the implementation of the Voluntary Public/Tribe Opioid Trust Resolution (as defined below) through the establishment of trusts that will receive the Public Opioid Consideration and the Tribal Opioid Consideration, respectively, and make distributions to holders of Allowed State Opioid Claims and Allowed Tribal Opioid Claims. Under Section 4.12 of the Plan, Local Governments are still able to participate in their respective State opioid abatement programs as provided by and

in accordance with their respective State law and agreements, regardless of whether the Local Governments filed a Local Government Opioid Claim in these Chapter 11 Cases and/or vote to accept or reject the Plan.

**P.      What is the Purchaser Equity? Where can I find more information about the terms and conditions of the Purchaser Equity?**

On the Effective Date, Purchaser Parent is authorized to issue or cause to be issued and shall, as provided for in the Plan, issue the Purchaser Equity in accordance with the terms of the Plan. All of the shares, units or equity interests of the Purchaser Equity issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable and not to have been issued in violation of any preemptive rights, rights of first refusal or similar rights or any applicable law. Each issuance and distribution of Purchaser Equity shall be governed by the terms and conditions set forth in the Plan and by the terms and conditions of the instruments evidencing or relating to such issuance or distribution, which terms and conditions shall bind each entity receiving such issuance or distribution without the need for execution by any party thereto. Any entity's acceptance of Purchaser Equity shall be deemed as its agreement to the Corporate Governance Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with their respective terms. The Purchaser Equity will not be registered under the Securities Act. Moreover, although the current intention is for the Purchaser Equity to be listed on a national securities exchange, the Purchaser Equity may not be publicly listed as of the Effective Date.

**Q.      Who Do I Contact If I Have Additional Questions With Respect to This Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact Kroll, the Debtors' Solicitation Agent:

By regular mail, hand delivery, or overnight mail at:

> Endo Ballot Processing Center
> c/o Kroll Restructuring Administration LLC
> 850 Third Avenue, Suite 412
> Brooklyn, NY 11232

By electronic mail at:

> endoinfo@ra.kroll.com

By telephone at:

> (877) 542-1878 (U.S./Canada, toll-free)
> +1 (929) 284-1688 (International, toll)

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the Solicitation Agent at the address above or by downloading the exhibits and documents from the website of the Debtors' Solicitation Agent

36

at https://restructuring.ra.kroll.com/endo (free of charge) or the Bankruptcy Court's website at http://www.nysb.uscourts.gov (for a fee).

**R.    Do the Debtors Recommend Voting in Favor of the Plan?**

Yes.  The Plan contemplates recoveries for various creditors.  The Plan is the product of extensive arms'-length negotiations conducted through a months'-long mediation process among key stakeholders, including the Debtors, the Ad Hoc First Lien Group, the Multi-State Endo Executive Committee, the Committees, and the FCR. The Debtors believe that the Plan represents the best option available to the Debtors and all of their stakeholders, and will avoid value-destructive litigation that would reduce recoveries for all parties.  For this reason, the Debtors, the Ad Hoc First Lien Group, the Committees, and the FCR believe the Plan is in the best interests of all holders of Claims and Interests.

**S.    What is the Scheme, and Why Are the Debtors Proposing the Scheme in Addition to the Plan?**

A scheme of arrangement is a statutory process available under Part 9 of the Irish Companies Act 2014, which allows a company to implement a compromise with a class or classes of its creditors.  Endo Parent and a substantial number of other Debtor entities are incorporated, hold assets, and were subject to litigation in Ireland prior to the commencement of the Chapter 11 Cases.  To protect the Company's Irish entities and assets from the risk of value-destructive litigation and enforcement efforts not enjoined by the Plan, Endo Parent is proposing the Scheme in parallel with the Plan to implement certain terms of the Plan as a matter of Irish Law.  As described in the Scheme Circular and below in Section VI.D (*The Scheme*), if the Scheme is approved by the relevant majority of Scheme Creditors and sanctioned by the High Court of Ireland (the "Irish High Court"), all Claims against Endo Parent, the other Debtors, and related entities will be completely released and discharged as a matter of Irish Law.  The successful sanction and implementation of the Scheme will both protect the value of the Post-Emergence Entities and the ongoing business and reduce administrative costs by facilitating the orderly wind down of certain Irish Debtors (defined below) in connection with the Plan.  For these reasons, the Debtors, the Ad Hoc First Lien Group, the Committees, and the FCR believe the Scheme is in the best interests of all holders of Claims and Interests.

Further details about the Scheme are set out in the Scheme Circular.

**T.    Do I Need to Vote or Do Anything Additional in Relation to the Scheme?**

You only need to vote once, in accordance with the Solicitation and Voting Procedures attached as Exhibit 1 to the Disclosure Statement Order.  As described in the Scheme Circular and below in Section VIII.D (*Voting on the Scheme*), Scheme Creditors may vote on both the Plan and the Scheme by duly completing and submitting the applicable Ballot (or having a Master Ballot submitted on their behalf) prior to the Voting Deadline in accordance with the Solicitation and Voting Procedures.  The Solicitation and Voting Procedures provide that a vote submitted in respect of the Plan shall automatically also comprise a direction to the Chairperson of the relevant Scheme Meeting to cast a proxy vote on behalf of such creditor in respect of the Scheme. Consequently, Scheme Creditors do not need to attend the Scheme Meetings in order to be able to

37

vote in respect of the Scheme. Scheme Creditors may appoint a proxy (which may be the Chairperson of the Scheme Meetings or another person chosen by the Scheme Creditor, as described further in the Scheme Circular) to attend the applicable Scheme Meeting and vote on their behalf. If a Scheme Creditor (a) wishes to submit a proxy vote in relation to the Scheme that is different from its vote on the Plan; (b) is not entitled to vote on the Plan; (c) has voted on the Plan but does not wish to vote on the Scheme; (d) wishes to appoint a proxy other than the Chairperson for purposes of the relevant Scheme Meeting; (e) wishes to attend the relevant Scheme Meeting to vote in person; or (f) did not hold a General Unsecured Scheme Creditor's (as defined in the Scheme Circular) Claim as of the Voting Record Date under the Plan but is a transferee or assignee of such Claim as of the Scheme Voting Record Date and wishes to vote on the Scheme, the Scheme Creditor can obtain a scheme voting form by emailing the Solicitation Agent at endoinfo@ra.kroll.com (with "Endo Solicitation" in the subject line).

Further details about the Scheme, including the voting process, are set out in the Scheme Circular.

### U.      Why is the Bar Date Being Extended for Exclusively Foreign Claims?

The previously expired Bar Date is being extended solely for Exclusively Foreign Claims in connection with the Scheme that the Debtors are proposing in Ireland in order to implement certain terms of the Plan. "Exclusively Foreign Claims" are Claims against a Foreign Debtor (as defined in the Plan), which Claims are (a) governed by the law of a jurisdiction other than the United States (including any States or Territories) or Canada (including any of its provinces or territories); and (b) held by a Foreign Claimant. For the avoidance of doubt, any Claim against a Debtor that is not a Foreign Debtor shall not be an Exclusively Foreign Claim. "Foreign Claimants" are claimants that are (i) individuals that are not domiciled in the United States or Canada; or (ii) corporate Entities that are incorporated pursuant to the law of a jurisdiction other than the United States (including any States or Territories) or Canada (including any of its provinces or territories).

The Bar Date for Exclusively Foreign Claims (the "Extended Foreign Bar Date") will be the date that is **14 days following the Confirmation Date**.

Foreign Claimants that timely file Exclusively Foreign Claims after the General Bar Date but by the Extended Foreign Bar Date will be channeled to the EFBD Claims Trust and entitled to receive, to the extent Allowed, their recovery, if any, from the EFBD Claims Trust Consideration (up to $200,000 in Cash); *provided*, *that*, no holder of an EFBD Claim shall receive a Distribution in an amount greater than any Distribution made to holders of comparable Allowed Trust Channeled Claims. Procedures for determining the amounts of Distributions to be made to holders of Allowed EFBD Claims shall be set forth in the EFBD Claims Trust Distribution Procedures, which may be contained in or included as part of the EFBD Claims Trust Agreement. As described in Subsection G above, holders of EFBD Claims may be entitled to additional payments if they grant the Non-GUC Releases.

As discussed in Section V.A.3 below, the Debtors ran a thorough and extensive noticing program to notify all potential claimants and creditors of the Bar Date pursuant to the Supplemental Notice Plan (defined below). The Bankruptcy Court made findings with regard to the

Supplemental Notice Plan (*see* Docket No. 1765). Indeed, hundreds of thousands claimants timely filed Claims. However, and notwithstanding the fact that the Debtors are not required to extend the Bar Date for Foreign Claimants (*i.e.*, those outside the United States and Canada), in furtherance of the effectiveness of the Scheme, the Debtors have created Class 12 to provide some potential recovery for certain late filing Foreign Claimants who do not meet the Bankruptcy Code's standard for "excusable neglect" in filing a Claim after the Bar Date. To be clear, the potential recoveries available to such claimants will be no greater than those available to claimants who timely filed their Proofs of Claim and could well be less, depending on the number of EFBD Claims filed. Further, and for the avoidance of doubt, any claimant has the right to seek Bankruptcy Court approval to file a "late claim" pursuant to the Bankruptcy Code and, to the extent that the Bankruptcy Code approves such late filing as "timely filed" because it meets the requirements under the Bankruptcy Code for "excusable neglect", such Claim will be treated as "timely filed" (*i.e.*, not in Class 12 but in its applicable Class).

### V.    I am a Third-Party Payor But Have Not Yet Determined Whether I Have a TPP Claim Against the Debtors, How Can I Give a Release When I Don't Yet Know If I Have a TPP Claim?

As explained in the applicable Ballot, if a holder of a potential Class 7(D) TPP Claim elects to grant the Non-GUC Releases on a validly completed and timely submitted Ballot, or is deemed to have granted such releases in accordance with the Solicitation and Voting Procedures, such granting of the Non-GUC Releases will be conditional until such holder determines whether it holds a TPP Claim against the Debtors. If such holder ultimately determines that it ***does not*** hold a TPP Claim and such holder conditionally granted the Non-GUC Releases on a Ballot, such holder will ***not*** be deemed to have granted the Non-GUC Releases with respect to such TPP Claim. If such holder ultimately determines that it ***does*** hold a TPP Claim, and such holder made the election to conditionally grant, or is deemed to conditionally grant, the Non-GUC Releases, such holder will be deemed a Non-GUC Releasing Party, and the Non-GUC Releases granted, or deemed to be granted, by such holder will be deemed effective as of the Effective Date to the extent such holder elects on the TPP Claim submitted to the TPP Trust to receive an additional payment as described in Section 4.17(d) of the Plan.

## IV.    EVENTS LEADING TO THE CHAPTER 11 FILINGS[15]

A confluence of factors put downward pressure on the Company's financial performance and necessitated a comprehensive solution that could only have been achieved through a chapter 11 process. Principal among these factors were (a) an adverse litigation outcome relating to Vasostrict—one of the Company's leading revenue generators over the last several years—that

---

[15]    In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' stakeholders than would otherwise result in any other scenario. Accordingly, the Debtors recommend that holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan. The Committees also encourage each creditor to vote to accept the Plan. The Committees' respective position regarding the items in this Article IV are more specifically set forth in the UCC Letter to unsecured creditors and OCC Letter to opioid claimants, which are included in the solicitation materials. The Committees encourage each creditor to review the appropriate letter and communicate directly with the appropriate Committee regarding any questions they have about the applicable letter, the Plan, or this Disclosure Statement.

resulted in the early termination of federal patent protection for that product and the subsequent loss of substantial revenue; (b) a slower than expected growth for Xiaflex due to, among other factors, the COVID-19 pandemic; and (c) the litigation overhang on the Company from the thousands of lawsuits related to its manufacture, marketing, and sale of prescription opioids.[16]

### A. Declining Business Performance and Significant Litigation Costs Leads to Overleveraged Capital Structure

#### 1. Declining Financial Performance

The Company's financial performance deteriorated in the months preceding these Chapter 11 Cases. In connection with the Company's public filings for the second quarter of 2022, it reported an approximately 20% year-over-year decline in revenue and 53% decline in adjusted EBITDA. This decline was largely due to the precipitous drop in sales of Vasostrict, which accounted for approximately 30% of the Company's 2021 revenue.

The drop in Vasostrict sales was primarily attributable to increased generic competition as a result of the Company losing a lawsuit in the U.S. District Court (the "District Court") for the District of Delaware (the "District of Delaware"). Beginning in April 2018, Par Sterile Products, LLC ("PSP LLC") and Par Pharma received notice letters from Eagle Pharmaceuticals, Inc. ("Eagle"), among others, advising of the filing of ANDAs and NDAs for generic versions of Vasostrict. In May 2018, PSP LLC, Par Pharma, and Endo Par Innovation Company, LLC filed lawsuits against Eagle and others in the District of Delaware. A trial was held in July 2021, and in August 2021, the District Court held that Eagle's proposed generic product would not infringe Par Pharma's patent claims. The Company appealed this ruling. In August 2022, the Federal Circuit affirmed the District Court's decision.

During the first quarter of 2022, multiple competitive generic alternatives to Vasostrict were launched, beginning with Eagle's generic that was launched at risk and began shipping toward the end of January 2022.[17] Since then, additional competitive alternatives entered the market, including an authorized generic. As of the Petition Date, there were five participants competing in the market (including the Company). These third-party launches began to significantly impact both the Company's market share and product price toward the middle of the first quarter of 2022. The Company expects competition to continue to increase.

Further, beginning late in the first quarter of 2022, COVID-19-related hospital utilization levels began to decline, resulting in significantly decreased market volumes for both branded and competing generic alternatives to Vasostrict.

---

[16]  In the event that the Committees Resolutions and the FCR Resolution are not approved by the Bankruptcy Court, the Committees and the FCR reserve all rights with respect to the Debtors' description of the events leading up to the bankruptcy filing.

[17]  An "at risk" launch is when a company introduces a generic drug product before conclusion (including appeals) of any patent infringement litigation.

Consequently, the Company's revenue from Vasostrict declined significantly.  In 2022, Vasostrict revenue declined approximately 72% (or $648 million) year-over-year.  On a long-term basis, the Company expects Vasostrict sales to continue to fall.

Additionally, certain of the Company's physician-administered products, including Xiaflex (the Company's flagship product in its Branded Pharmaceuticals' portfolio), also experienced lower-than-expected sales volumes due to, among other things, the lower number of in-person patient office visits resulting from the COVID-19 pandemic, as well as medical and administrative staff shortages in physicians' offices.  These trends also dampened the future growth expectation for Xiaflex.

Due largely to the foregoing issues and the litigation overhang discussed below, the Debtors' existing capital structure became unsustainable.  As of June 30, 2022, the Company had approximately $8.15 billion of funded debt outstanding, approximately 700% of its prior twelve months of adjusted EBITDA (approximately $1.22 billion) and greater than 1,000% of its anticipated 2022 EBITDA (approximately $775 million). Such figures exclude contingent liabilities that could potentially significantly increase such leverage figures.  The Company's anticipated decline in profitability was expected to further exacerbate the leverage issues facing the Company.

Additionally, the cost to service the Company's existing debt balance constrained its ability to reinvest in its business.  The Company spent over $550 million per year on cash interest expense, and an additional $20 million on mandatory debt amortization (excluding maturities).  The cost of servicing such debt limited the Company's free-cash flow available for operations and capital expenditures.  In addition to the Company's already prohibitive debt service costs, approximately 28% of its debt was tied to floating interest rates.  In an increasing interest rate environment, these floating interest rates further added to the Company's already elevated cash interest expense.

The Company operates in a highly competitive pharmaceutical space in which its competitors are constantly pursuing internal R&D, external acquisitions, and business development opportunities.  Over the past few years, the Company's elevated leverage constrained its ability to invest in its pipeline and pursue value-enhancing development opportunities.  As this is the lifeblood of any pharmaceutical company, the Company needed to reduce its debt service burden and leverage in order to effectively compete for future opportunities.  Thus, to emerge as a healthy enterprise that is able to compete, the Company needed to address the issues related to its overleveraged capital structure in a focused and constructive manner without disruption to its operations.

### 2.      Unsustainable Litigation

#### (a)      Opioid Lawsuits

Certain of the Debtors are named as defendants in over 3,500 lawsuits seeking to hold such Debtors liable for their marketing and sale of certain FDA-approved opioid products (the "Opioid

Lawsuits"), including, without limitation, Opana® and Opana® ER (together, the "Opana Medications"), which were approved by the FDA in 2006.

As described in the *Declaration of Mark Bradley in Support of Chapter 11 Petitions and First Day Papers* [Docket No. 38] (the "First Day Declaration"), in 2016, the Company ceased promoting the Opana Medications and all other opioid products to healthcare providers in the U.S., eliminated its entire U.S. pain salesforce, and discontinued all R&D of new opioid products. In 2017, at the request of the FDA, the Company voluntarily removed Opana® ER from the market, despite the FDA and the DEA having never taken any enforcement steps against the Company in connection with the Opana Medications. Since June 2019, the Debtors have not sold any Opana Medications. However, as described further below, certain of the Debtors continue to manufacture and sell generic opioid medication.

The majority of the Opioid Lawsuits were filed on behalf of governmental entities, including states, counties, municipalities, and other political subdivisions; plaintiffs also include private hospitals, individuals seeking damages for alleged personal injuries, and third-party payors seeking damages for alleged economic injuries (collectively, the "Opioid Plaintiffs"). The overwhelming majority of the Opioid Lawsuits have been filed in the U.S.; certain Opioid Lawsuits have been filed in Canada as proposed class actions. The Opioid Lawsuits are primarily directed at the Company's historical manufacture, marketing, and sale of the Opana Medications, but some complaints include allegations about other products and/or opioid medications generally. The Opioid Plaintiffs assert a variety of claims in addition to those described above, including, without limitation, statutory and/or common law claims for public nuisance, alleged violations of consumer protection or unfair trade practices laws, racketeering, and common law fraud and negligence, among other claims (collectively, the "Opioid Claims"). The Opioid Claims are generally based on allegations that the defendant Debtors, among others, (a) made misrepresentations and/or omissions in connection with their sale and marketing of prescription opioid medications, and (b) failed to take adequate steps to identify and report suspicious orders and to prevent abuse and diversion.

The Opioid Plaintiffs allege that the defendant Debtors' misleading marketing led health care providers to prescribe opioids inappropriately, which in turn led to addiction, misuse, and abuse of the Debtors' opioid products. The Opioid Plaintiffs seek various remedies, including: (a) declaratory and/or injunctive relief; (b) compensatory, punitive and/or treble damages; and (c) restitution, disgorgement, civil penalties, abatement, and attorneys' fees and costs. Many Opioid Plaintiffs, particularly the government entities, seek very substantial recovery for costs they allegedly incurred or expect to incur in the future to address the consequences of opioid-related addiction, including the provision of various public services that they allege are related to opioid addiction, or otherwise abate the opioid crisis.

The Company disputes all of the allegations made by the Opioid Plaintiffs. In the eight years since the first opioid lawsuit was filed against the Company, no verdicts have been rendered against any Debtor on the merits, there have been around a dozen settlements, and the one case against the Company that did reach judgment on the merits (which included among the plaintiffs the most populous county in the United States) was rendered in the Company's favor on all counts, including on claims of public nuisance, false advertising, and unfair competition. *See People v. Purdue Pharma L.P.*, Case No. 30-2014-00725287-CU-BT-CXC, 2021 WL 7186146 (Cal. Super.

Dec. 14, 2021).  The remaining Opioid Lawsuits against the Company were at various stages of development as of the Petition Date, and the very few that had advanced close to the trial stage settled for vastly less than the amount of alleged damages or other monetary relief sought.

Since 2019, the Company and/or its subsidiaries have executed 12 settlement agreements to resolve Opioid Claims brought by Opioid Plaintiffs.  Notably, since late 2021, the Company and/or certain of its subsidiaries have executed numerous significant opioid-related settlement agreements with governmental Opioid Plaintiffs, including with the offices of the New York Attorney General, Alabama Attorney General, Texas Attorney General, Florida Attorney General, Louisiana Attorney General, West Virginia Attorney General, Arkansas Attorney General, Mississippi Attorney General, and the San Francisco City Attorney.  As of the Petition Date, the Company had paid approximately $242 million pursuant to various opioid-related settlements.

While the foregoing settlements made some inroads in reducing the number of pending Opioid Lawsuits, prior to the Petition Date, the Debtors still faced more than 3,100 Opioid Lawsuits and the potential for significant further lawsuits from a variety of claimants.  Given the immense number of lawsuits, the complexity of the issues involved, the varying stages of development of the cases, and the cost to defend each one to judgment, the Debtors determined that they needed to utilize the tools afforded by the Bankruptcy Code to bring some level of resolution to these matters.  As of the Petition Date, the Company estimates it has incurred expenses of approximately $344 million in defending the Opioid Lawsuits.  In addition to this financial drain, defending against the Opioid Lawsuits required the Debtors' management team and key employees to devote substantial time and focus to, among other things, defense strategies, settlement proposals, diligence, discovery, and depositions.  In short, the continued litigation of the Opioid Lawsuits was simply unsustainable.

### (b)    Other Material Litigation

The Debtors' prepetition litigation exposure also extended to matters unrelated to the Opioid Lawsuits.  Most of these lawsuits stem from claims falling within four major categories: (a) generics pricing; (b) transvaginal mesh products; (c) other antitrust; and (d) ranitidine products.

***Generics Pricing***.  Private plaintiffs (specifically, direct purchasers, end-payers, and indirect purchaser resellers), state attorneys general and other governmental entities have filed complaints against certain Debtors, as well as other pharmaceutical manufacturers, alleging price-fixing and other anticompetitive conduct with respect to a variety of generic pharmaceutical products.  The various complaints generally assert claims under (1) federal and/or state antitrust law, (2) state consumer protection statutes, and/or (3) state common law, and seek damages, treble damages, civil penalties, disgorgement, declaratory and injunctive relief, and costs and attorneys' fees.  These lawsuits, which include putative class actions as well as non-class action lawsuits, have been filed in various federal and state courts in the U.S.; there is also a proposed class action in Canada.  Most of the U.S. cases (*i.e.*, those filed in or removed to U.S. federal courts) are currently pending in a multidistrict litigation ("MDL") in the U.S. District Court for the Eastern District of Pennsylvania.  Some claims are based on alleged product-specific price-fixing conspiracies and other claims allege broader, multiple-product price-fixing conspiracies.  Under these overarching theories, plaintiffs generally seek to hold all alleged participants in a particular

43

alleged conspiracy jointly and severally liable for all harms caused by the alleged conspiracy, not just harms related specifically to a particular defendant's products.

*Mesh Claims*.  The Company and certain of its subsidiaries, including American Medical Systems Holdings, Inc. (which subsequently converted to Astora Women's Health Holding LLC and merged into Astora Women's Health LLC), have been named as defendants in multiple lawsuits in various state and federal courts in the U.S., and in Canada, Australia, and other countries.  These lawsuits generally allege personal injury resulting from the use of transvaginal surgical mesh products designed to treat pelvic organ prolapse or stress urinary incontinence.  The plaintiffs generally allege that the products caused personal injury, including chronic pain, incontinence, inability to control bowel function, and permanent deformities.

As of June 30, 2022, various settlement agreements resolved approximately 71,000 filed and unfiled U.S. mesh claims.  As of June 30, 2022, the Company had made approximately $3.6 billion of payments related to its mesh liabilities, $67.5 million of which remained in qualified settlement funds related to these liabilities.

*Other Antitrust Claims*.  In addition to the generics pricing cases described above, the Company faces various other antitrust and related claims under Sections 1 and 2 of the Sherman Act, Section 5 of the Federal Trade Commission Act, state antitrust and consumer protection statutes, and/or state common law.  These cases generally seek monetary relief (*e.g.*, damages, treble damages, disgorgement of profits, restitution, attorneys' fees and costs), equitable relief, and/or injunctive relief.  A brief description of each follows:

- Opana® ER: Direct and indirect purchasers of Opana® ER, individual retailers, and health care benefit plans filed complaints against Endo Health Solutions Inc. ("EHSI"), Endo Pharmaceuticals Inc. ("EPI"), Impax Laboratories, LLC ("Impax") and Penwest Pharmaceuticals Co. (which EPI had acquired) alleging violations of antitrust law arising from an agreement reached by EPI and Impax to settle certain patent infringement litigation and EPI's introduction of reformulated Opana® ER, a pain relief medication.  The cases were consolidated into an MDL in the U.S. District Court for the Northern District of Illinois.  Both classes of plaintiffs were certified in June 2021.  In July 2022, a jury returned a verdict in favor of EHSI and EPI.  Recently, the plaintiffs filed a motion for judgment as a matter of law or a new trial.

- AndroGel®: Beginning in 2009, the FTC and multiple private plaintiffs sued the entity now known as Endo Generics Holdings, Inc. (f/k/a Par Pharmaceutical Companies, Inc.) and Par Pharma, among others, alleging violations of antitrust law arising from the settlement of certain patent litigation concerning the generic version of AndroGel, a testosterone medication.  While the majority of these cases were consolidated into an MDL and voluntarily dismissed or settled, there remains one lawsuit pending in the U.S. District Court for the Eastern District of Pennsylvania that was filed in August 2019 by several alleged direct purchasers.

- <u>Exforge®</u>: Proposed classes of direct and indirect purchasers and certain retailers have filed complaints in the U.S. District Court for the Southern District of New York against Par Pharma, EPI, and Endo Parent, among others, alleging violations of antitrust law arising out of the settlement of certain patent litigation concerning the generic version of Exforge, a hypertension medication. The claims against EPI and Endo Parent have been dismissed. In 2022, the putative class plaintiffs filed motions for class certification and the defendants filed motions for summary judgment. In January 2023, certain direct purchaser plaintiffs dismissed their claims against Par Pharma with prejudice and, in February 2023, certain indirect purchaser plaintiffs agreed to do the same.

- <u>Seroquel XR®</u>: Proposed classes of direct and indirect purchasers and certain retailers have filed putative class action complaints in the U.S. District Court for the Southern District of New York against Par Pharma, among others, alleging violations of antitrust law arising out of the settlement of certain patent litigation concerning generic versions of Seroquel XR, an antipsychotic medication. In August 2020, the cases were transferred to the U.S. District Court for the District of Delaware. In January 2021, the defendants, including Par Pharma, filed motions to dismiss. In July 2022, the court dismissed certain claims asserted under state law but otherwise denied the defendants' motions to dismiss.

- <u>Xyrem®</u>: A proposed class of indirect purchasers and others have filed individual and putative class actions against Par Pharma, among others, in connection with the settlement of certain patent litigations concerning generic versions of Xyrem, a narcolepsy drug. Those cases filed in federal court are currently coordinated in an MDL pending in the U.S. District Court for the Northern District of California; these cases are currently in discovery. In May 2022, Aetna filed a complaint against Par Pharma in California state court alleging similar claims. In July 2022, Par Pharma filed a motion to quash the Aetna action for lack of personal jurisdiction, and in December 2022, the California state court granted the motion to quash and, in January 2023, Aetna filed an amended complaint that did not name Par Pharma as a defendant.

- <u>Amitiza®</u>: A proposed class of direct purchasers have filed putative class action complaints in the U.S. District Court for the District of Massachusetts against Par Pharma alleging violations of antitrust law arising out of the settlement of certain patent litigation concerning generic versions of Amitiza, a constipation and irritable bowel syndrome treatment. In December 2021, Par Pharma filed a motion to dismiss. In August 2022, plaintiffs voluntarily dismissed all claims against Par Pharma without prejudice.

- <u>Colcrys®</u>: A proposed class of purchasers has filed a putative class action complaint in the U.S. District Court for the Eastern District of Pennsylvania

45

alleging violations of federal antitrust law in connection with the settlement of certain patent litigation related to generic versions of Colcrys, an anti-inflammatory drug.  In February 2022, the defendants filed a motion to dismiss the amended complaint, which the court granted in part and denied in part in March 2022.  In September 2022, the plaintiff voluntarily dismissed all claims against Par Pharma with prejudice in exchange for Par Pharma's agreement to provide certain limited discovery as a non-party.  In March 2023, the court denied the plaintiff's motion for class certification, and in April 2023, the court authorized the filing of an amended complaint adding certain additional plaintiffs, which amended complaint named Par Pharma again as a defendant.  In September 2023, the active parties represented to the court that the matter was settled, and the court dismissed the action with prejudice and closed the case.

- Impax: The FTC has filed a lawsuit in the U.S. District Court for the District of Columbia alleging that the 2017 settlement of a contract dispute between EPI and Impax (now called Amneal) constituted unfair competition in violation of Section 5(a) of the FTC Act.  In March 2022, the court granted the defendants' motion to dismiss; in May 2022, the FTC appealed to the U.S. Court of Appeals for the District of Columbia (the "Court of Appeals").  Following the conclusion of the briefing on appeal, oral arguments took place in May 2023.  On August 25, 2023, the Court of Appeals affirmed the dismissal.

*Ranitidine Claims*.  Along with numerous other manufacturers and distributors of branded and generic ranitidine products, Debtor Par Pharma was named in an MDL pending in the U.S. District Court for the Southern District of Florida.  The lawsuits generally allege that under certain conditions the active ingredient in ranitidine medications can break down to form an alleged carcinogen.  The complaints assert a variety of claims, including but not limited to various product liability, breach of warranty, fraud, negligence, statutory and unjust enrichment claims.  These plaintiffs generally seek various remedies including, without limitation, compensatory, punitive, and/or treble damages; restitution, disgorgement, civil penalties, and abatement; attorneys' fees and costs; and injunctive and/or other relief.  The MDL court has dismissed all claims against Par Pharma and other generics manufacturers, excluded all of the plaintiffs' expert witnesses on the general causation issue of whether ranitidine can cause certain types of cancer, and begun to enter final judgment in all cases involving those cancers as the alleged injury.  Because of the bankruptcy stay applicable to Debtor Par Pharma, however, the MDL court ordered Par Pharma severed from each of the lawsuits in which it is entering final judgment.  Appeals also remain pending in the U.S. Court of Appeals for the Eleventh Circuit.  Par Pharma also was named in similar complaints filed in certain state courts, including California, Pennsylvania, and Illinois, but was dismissed from most of those actions after the Petition Date.

Defending these and other pending lawsuits has resulted in significant professional fees and costs.  Indeed, in 2021, in the aggregate, the Company spent approximately $21 million per month on litigation-related fees and expenses (including those related to the Opioid Lawsuits)—notably, on an annual basis, this was approximately 2x capital invested in R&D in 2021.  These lawsuits, in addition to the Opioid Lawsuits, created even more uncertainty over the Company's

ability to resolve its litigation exposure, either consensually or by litigating each lawsuit through judgment and all levels of appeals.

### B.    Prepetition Restructuring Efforts

In January 2018, the Company retained Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") as its legal advisor in connection with exploring potential strategic alternatives to address the burdens imposed on the Company by the Opioid Lawsuits.  Thereafter, the Company also engaged other restructuring advisors, retaining PJT Partners ("PJT") in February 2018 and Alvarez & Marsal ("A&M") in May 2021 as its financial advisors.

Over the last few years, the Company's restructuring efforts evolved.  Until the beginning of 2022, the Company was principally focused on attempting to negotiate an out-of-court settlement with certain governmental Opioid Plaintiffs, as the thousands of Opioid Lawsuits represented enterprise-threatening litigation.  The Company believed a broad-based resolution with these plaintiffs was necessary to provide clarity to stakeholders by removing the uncertainty around this litigation, including the associated risk of one or more large adverse judgments.

As the Company's financial condition continued to deteriorate and little headway was being made towards a consensual comprehensive resolution with the governmental Opioid Plaintiffs, the Company more actively started exploring strategic alternatives to address its capital structure and other contingent liabilities. In connection with these efforts, in September 2021, the Company began discussions with advisors to an ad hoc group consisting of holders of Prepetition First Lien Indebtedness, Second Lien Notes and Unsecured Notes (the "Ad Hoc Cross-Holder Group").  The Company also authorized PJT to launch a formal sale process around this time. After preparing robust marketing materials, PJT contacted approximately 76 parties, including 36 strategic and 40 financial buyers regarding potential interest in an acquisition of the Company. The Company informed potentially interested parties that they were receptive to bids to acquire the business, as a whole or by business segment.  Of the potential bidders contacted, 23 executed non-disclosure agreements and 8 ultimately submitted indications of interest.  Five bidders received management presentations and were granted access to a virtual data room.  The Company determined to pause this sale process in January 2022 to expand its exploration of strategic alternatives with the Ad Hoc Cross-Holder Group, the Plaintiffs' Executive Committee ("PEC") appointed in the MDL pending in the U.S. District Court for the Northern District of Ohio, and an executive committee of state attorneys general (the "Multi-State Endo Executive Committee," and together with PEC, the "Public Opioid Committees").

In April 2022, the Company began discussions with advisors to an ad hoc group consisting primarily of Prepetition First Lien Lenders and Prepetition First Lien Notes Secured Parties (the "Ad Hoc First Lien Group," and together with the Ad Hoc Cross-Holder Group, the "Ad Hoc Groups").

### 1.    Prepetition Opioid Settlement Negotiations

Starting in 2019, the Company at various times actively negotiated with the Public Opioid Committees to attempt to reach a broad resolution of Opioid Claims.  In March 2020, the Company agreed to pay for professionals to advise the Multi-State Endo Executive Committee in settlement

negotiations with the Company. Thereafter, the Company's and Public Opioid Committees' advisors (a) held numerous calls, (b) exchanged hundreds of emails, (c) exchanged voluminous documents, and (d) discussed various constructs for a potential global settlement of Opioid Claims.

Ultimately, several threshold challenges impacted these discussions. For example, the Public Opioid Committees did not have the ability to bind, control, or deliver the agreement of other Opioid Plaintiffs to any resolution that the Company reached with the Public Opioid Committees, and did not represent the interests of any claimants that were not governmental entities. Therefore, in an out-of-court context, the Company did not have a clear path to achieve full closure with respect to the Opioid Lawsuits. In addition, the Multi-State Endo Executive Committee sought prospective injunctive terms that the Company believed were overly burdensome. Thus, despite extensive efforts by both sides, the parties were unable to reach agreement on injunctive terms at the time.

Another impediment to these negotiations was the parties' disagreement on settlement value. In the Company's view, the Public Opioid Committees' settlement demands consistently were out of proportion to the Company's view of its liabilities and its ability to pay. While the Company believes the Opioid Plaintiffs' theories of liability are without merit, it nonetheless was prepared to make a significant, long-term financial contribution to the Opioid Plaintiffs to resolve the Opioid Lawsuits. However, the Public Opioid Committees were demanding settlement amounts that the Company did not believe it could afford, especially in light of the Company's significant other obligations and contingent liabilities.

Negotiations with the Public Opioid Committees slowed around the time the Company announced its 2022 first quarterly earnings. As discussed above, the Company's revenue and earnings dropped during this time period, primarily as a result of the loss of patent exclusivity with respect to the Company's Vasostrict product. Taking into account this impact on the Company's financial performance, it became clear that (a) the Company's unsecured creditors may not be entitled to any recovery in potential chapter 11 proceedings, (b) the Company would burn a substantial portion of its approximately $1 billion of cash over the subsequent 24 months, and (c) the Company might have been unable to refinance its debt in the future as it became due, especially in light of its contingent liabilities. This confluence of factors—namely, among others, the inability to reach an out-of-court resolution with the Public Opioid Committees, numerous upcoming trials, discovery demands and associated legal expenditures, deteriorating financial performance, and a burdensome capital structure—led the Company to further explore its chapter 11 alternatives.[18]

### 2.    Negotiations with the Ad Hoc Groups

Beginning in late 2021, the Company commenced active discussions regarding potential restructuring frameworks with the Ad Hoc Cross-Holder Group. The Company had previously agreed to pay for the Ad Hoc Cross-Holder Group's advisors, including counsel, investment

---

[18]    In furtherance of this process, on July 28, 2022, the Debtors negotiated and entered into an engagement letter with Roger Frankel to represent the interests of future opioid claimants, in addition to future vaginal mesh and ranitidine claimants, in connection with discussions and negotiations regarding the Debtors' potential restructuring.

bankers, and/or financial advisors, to assist in their development of a workable solution. As the Company's circumstances changed and its prospects and profitability deteriorated, and taking into account the Company's nearly $7 billion of indebtedness secured by liens on substantially all of the Company's assets, the Company ramped up its engagement with the Ad Hoc First Lien Group in late April 2022. Subsequently, the Company and its advisors worked tirelessly with the Ad Hoc First Lien Group, engaging in substantial diligence efforts and exploring various strategic alternatives. During this period, the Company also continued to engage with, and provide diligence to, the Ad Hoc Cross-Holder Group.

During the first half of 2022, advisors to the Company and the Ad Hoc Groups exchanged various proposals regarding the implementation of a potential transaction. During these negotiations, while the Company discussed a chapter 11 plan of reorganization proposal with the Ad Hoc Cross-Holder Group, the Company reached the conclusion that pursuing a plan path presented unique challenges for the Company in light of the composition of its creditor constituencies, the lack of necessary consensus to achieve a feasible plan, and the nature of its contingent liabilities. Specifically, the Company determined that confirming and consummating a chapter 11 plan of reorganization in lieu of a sale would require, at a minimum, at least two major categories of litigation absent resolutions with various key stakeholders, including (a) litigation over the dischargeability of alleged fraud claims held by governmental opioid plaintiffs and (b) multiple complex litigation matters in connection with potential confirmation of a plan (*e.g.*, valuation, feasibility, and scope and amount of priority tax claims).

Although the Company believed it had valid arguments with respect to these potential litigations, and there was a chance it could ultimately prevail in these litigations—particularly with respect to any dispute over the dischargeability of alleged fraud claims held by governmental opioid plaintiffs—any such outcome was uncertain, the timetable for each was expected to be in excess of a year, and a setback in either litigation could potentially make confirming a plan very difficult, if not impossible. Additionally, the Company believed that a plan process would likely result in a contested valuation hearing, and the Company would also face the assertion by the IRS (defined below) of potentially hundreds of millions of dollars of priority tax claims related to certain transfer pricing and other disputes with the Company. For these reasons, among others, the Company had determined, at that time, that pursuing such a long, expensive, and uncertain plan path would not be in the best interest of the Company and other parties in interest.

As a result, by July 2022, the Company determined to focus on a sale of its business pursuant to section 363 of the Bankruptcy Code (a "363 Sale" or "Sale") as the most viable path forward. Thereafter, the Company evaluated 363 Sale proposals received from both the Ad Hoc First Lien Group and the Ad Hoc Cross-Holder Group, and ultimately executed the RSA with the Ad Hoc First Lien Group memorializing the terms of a proposed 363 Sale that would provide other bidders, including the Ad Hoc Cross-Holder Group, with the opportunity to submit higher or better bids.

### 3.    The RSA and the Stalking Horse Bid

Once the Debtors' path towards a 363 Sale came into focus, the Debtors and the Ad Hoc First Lien Group worked quickly to develop and negotiate the RSA, a sale term sheet (the "Sale Term Sheet"), and bidding procedures. The centerpiece of the RSA was a stalking horse bid (the

"Stalking Horse Bid") to be provided by one or more entities formed in a manner acceptable to the Ad Hoc First Lien Group (the "Stalking Horse Bidder" or "Buyer") to purchase substantially all of the Company's assets.  The Stalking Horse Bid provided a value "floor" to entice further bidding.

The Debtors determined that moving forward with the Stalking Horse Bid represented the best available path to address the Debtors' challenges.  The Stalking Horse Bid, if consummated, would have ensured that the Debtors' business continued as a going concern, saved thousands of jobs, and enabled the Buyer to fund, over time, trusts with hundreds of millions of dollars of consideration for the benefit of qualifying Opioid Plaintiffs who elected to voluntarily participate in such trusts, as discussed further below. The consummation of the Stalking Horse Bid also would have preserved certain voluntary injunctive terms sought by opioid claimants regarding the Debtors' ongoing and future opioid-related business activities.

As more fully set forth in the RSA, the Stalking Horse Bid included an offer to purchase substantially all of the Debtors' assets for an aggregate purchase price comprised of (a) a credit bid in full satisfaction of the Prepetition First Lien Indebtedness (as defined in the RSA) (approximately $6 billion), (b) $122 million (later reduced to $116 million) to wind-down the Debtors' operations following the Sale closing date, (c) $5 million in cash on account of certain unencumbered Transferred Assets (as defined in the RSA), (d) pre-closing professional fees, and (e) the assumption of certain liabilities.  Importantly, the Stalking Horse Bidder also agreed to make offers of employment to all of the Company's active employees.

As set forth in the Sale Term Sheet, the Stalking Horse Bidder was not entitled to a break-up fee and was only entitled to reimbursement for reasonable and documented fees and expenses incurred by it in connection with, among other things, the negotiation and execution of the Sale Transaction (as defined in the RSA), not to exceed $7 million, to the extent not otherwise provided under the Cash Collateral Order.  Further, the Stalking Horse Bidder agreed to act as the "back-up" bidder in the event it was not selected as the successful bidder pursuant to the Bidding Procedures (defined below).

## V.    THE CHAPTER 11 CASES

### A.    Administration of the Chapter 11 Cases

To ensure a smooth transition in the Chapter 11 Cases and facilitate the administration of the Chapter 11 Cases, the Debtors requested and obtained various forms of relief from the Bankruptcy Court, some of which are briefly summarized below.

### 1.    First-Day Papers

Recognizing that any interruption of the Debtors' business, even for a short period, could negatively impact customer and vendor relationships and the Debtors' goodwill, revenue, and profits, which would be detrimental to the value of the Debtors' estates, on the Petition Date, the Debtors filed a number of "first-day" motions authorizing the Debtors to continue operating their business in the ordinary course (collectively, the "First-Day Papers").  The First-Day Papers sought to stabilize the Debtors' operations, facilitate a smooth transition into chapter 11, and ease the strain on the Debtors' business as a consequence of the filing of the Chapter 11 Cases.  A

description of the First-Day Papers is set forth in the *Declaration of Mark Bradley in Support of Chapter 11 Petition and First Day Papers* [Docket No. 38].

### 2.    Cash Collateral

On August 17, 2022, the Debtors filed the *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to Use Cash Collateral; (II) Granting Adequate Protection to Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* [Docket No. 17] (the "Cash Collateral Motion"), which was granted on an interim basis on August 21, 2022 [Docket No. 98].  Multiple parties objected to the Cash Collateral Motion, including the Committees and an ad hoc group of holders of Unsecured Notes (the "Ad Hoc Group of Unsecured Noteholders").  After extensive negotiation, the final order approving the Cash Collateral Motion (the "Final Cash Collateral Order") was presented to the Bankruptcy Court on a fully consensual basis, and the Final Cash Collateral Order was entered by the Bankruptcy Court on October 20, 2022 [Docket No. 499] (as amended [Docket No. 535]).

The Final Cash Collateral Order afforded the Debtors access to much needed cash during the Chapter 11 Cases, allowing the Debtors to preserve value for their stakeholders through their continued operations of their business during the pendency of the Chapter 11 Cases, which allowed the Debtors to avoid a value drain while parties worked, through the Mediation (defined below) process, to explore and negotiate potential resolutions of disputed issues.  The Final Cash Collateral Order also provided for the payment of all the professional fees for the Committees, the FCR, and certain other professionals. In exchange for consenting to the consensual use of the Debtors' cash collateral, the Prepetition Secured Parties received various forms of adequate protection under the Final Cash Collateral Order, including adequate protection payments, payment of their professional fees, and information and consultation rights, among others.  The Final Cash Collateral Order also established a deadline for any party in interest to challenge the validity of the Prepetition Secured Parties' claims or liens, after which those liens and claims would be deemed valid for purposes of the Chapter 11 Cases and going forward.

### 3.    Schedules and Bar Dates

On August 24, 2022, the Bankruptcy Court entered an order extending the Debtors' deadline to file their Schedules of Assets and Liabilities (the "Schedules") and Statements of Financial Affairs (together with the Schedules, the "Schedules and Statements") to September 29, 2022 [Docket No. 106].  On November 17, 2022, the Bankruptcy Court entered an order further extending the Debtors' deadline to file the Schedules and Statements to November 30, 2022.  On November 10, 2022, the Debtors filed their Schedules and Statements.  On April 26, 2023, the Debtors filed certain amended Schedules.  On May 26, 2023, and July 14, 2023, respectively, the Debtors filed certain additional Schedules and Statements for those Debtors that commenced their Chapter 11 Cases on May 25, 2023, and May 31, 2023, respectively.

On April 3, 2023, the Bankruptcy Court entered the *Order (I) Establishing Deadlines for Filing Proofs of Claim; (II) Approving Procedures for Filing Proofs of Claim; (III) Approving the Proof of Claim Forms; (IV) Approving the Form and Manner of Notice Thereof; and (V) Approving the Confidentiality Protocol* [Docket No. 1767], which was amended on June 23,

2023 [Docket No. 2253] and July 14, 2023 [Docket No. 2442] (as amended, the "Bar Date Order"), which, among other things, established the following deadlines for filing proofs of claim:

- **General Bar Date**: July 7, 2023, at 5:00 p.m. (prevailing Eastern Time) as the deadline for persons and non-governmental entities (including, without limitation, individuals, partnerships, joint ventures, and trusts) to file proofs of claim against the Debtors.

- **Governmental Bar Date**: May 31, 2023, at 5:00 p.m. (prevailing Eastern Time) as the deadline for Governmental Units (as defined in section 101(27) of the Bankruptcy Code) to file proofs of claim (other than for certain claims relating to opioids) against the Debtors.

- **Rejection Bar Date**: the later of (i) the General Bar Date or the Governmental Bar Date, as applicable, and (ii) 5:00 p.m. (prevailing Eastern Time) on the date that is 30 days after the effective date of rejection of an executory contract or unexpired lease.

- **Amended Schedules Bar Date**: the later of (i) the General Bar Date or the Governmental Bar Date, as applicable, and (ii) 30 days after the date a negatively impacted claimant is served notice that the Debtors have amended, modified, or supplemented the Schedules to reduce the undisputed, non-contingent, and liquidated amount or changed the nature or classification of their claim against the Debtors.

- **State/Local Governmental Opioid Bar Date**: the earlier of (i) 10:00 a.m. (prevailing Eastern Time) on the date set for the hearing for the approval of the Disclosure Statement and (ii) 5:00 p.m. (prevailing Eastern Time) on the date that is 35 days after the date on which the Debtors file on the docket and serve a supplemental notice setting a deadline for all Local Governments, Tribes, States, and Territories (each as defined in the Bar Date Order) to file proofs of claim against the Debtors based on or involving opioid products manufactured, marketed, and/or sold by the Debtors, which claims arose or are deemed to have arisen prior to the Petition Date.

The Debtors' notice plan provided actual notice of the bar dates to known claimants, and included a supplemental notice plan (the "Supplemental Notice Plan") to provide an extraordinarily broad array of forms of publication notice to unknown claimants whose claims could relate to opioids, transvaginal mesh, and/or ranitidine products manufactured, marketed, or sold by the Debtors.

The Supplemental Notice Plan, as detailed in the *Supplemental Declaration of Jeanne C. Finegan, APR in Connection with Sale Motion and Bar Date Motion* [Docket No. 2518], which was effectively completed as of June 30, 2023, reached the target audience via (i) broadcast, cable, and connected television; (ii) social media ads and hashtags; (iii) various online display banner ads, internet search terms, and YouTube video ads; (iv) traditional print media such as magazines and newspapers; (v) press releases; and (vi) community outreach via a one-page notice sent to

institutions and third-party organizations that service likely users of the Company's opioid, transvaginal mesh, and ranitidine products. The media components of the Supplemental Notice Plan reached an estimated 95% of all adults in the United States and an estimated 90% of all adults in Canada.

### 4.    Extensions of Exclusive Periods

Section 1121(b) of the Bankruptcy Code provides for a period of 120 days after the commencement of a chapter 11 case during which a debtor has the exclusive right to file a chapter 11 plan (the "Exclusive Filing Period"). In addition, section 1121(c)(3) of the Bankruptcy Code provides that if the debtor files a chapter 11 plan within the Exclusive Filing Period, it shall have a period of 180 days after commencement of the chapter 11 case to obtain acceptance of such plan (the "Exclusive Solicitation Period," and together with the Exclusive Filing Period, the "Exclusive Periods"). Pursuant to section 1121(d) of the Bankruptcy Code, the Bankruptcy Court may, upon a showing of cause, extend the Exclusive Periods.

The Debtors' Exclusive Filing Period and Exclusive Solicitation Period were initially set to expire on December 14, 2022, and February 12, 2023, respectively. On December 14, 2022, the Debtors filed a motion requesting an extension of the Exclusive Periods by 180 days [Docket No. 979] (the "First Exclusivity Motion"). Following the adjournment of the First Exclusivity Motion, on February 3, 2023, and March 22, 2023, the Bankruptcy Court entered orders extending the Exclusive Periods pending a hearing on the First Exclusivity Motion, first through March 20, 2023, and again through April 6, 2023. Following a hearing, on April 3, 2023, the Bankruptcy Court entered an order approving the First Exclusivity Motion, extending the Exclusive Filing Period through and including June 12, 2023, and the Exclusive Solicitation Period through and including August 11, 2023 [Docket No. 1766]. On June 12, 2023, the Debtors filed a second motion requesting an additional extension of the Exclusive Periods [Docket No. 2168] (the "Second Exclusivity Motion"). On July 31, 2023, the Bankruptcy Court approved the Second Exclusivity Motion, extending the Exclusive Filing Period through and including October 10, 2023, and the Exclusive Solicitation Period through and including December 9, 2023 [Docket No. 2560]. On October 10, 2023, the Debtors filed a third motion requesting an additional extension of the Exclusive Periods [Docket No. 3007] (the "Third Exclusivity Motion"). On November 20, 2023, the Bankruptcy Court approved the Third Exclusivity Motion, extending the Exclusive Filing Period through and including January 8, 2024, and the Exclusive Solicitation Period through and including March 8, 2024 [Docket No. 3119]. On January 8, 2024, the Debtors filed a fourth motion requesting an additional extension of the Exclusive Periods [Docket No. 3533].

### B.    Retention of Professionals

### 1.    Applications for Retention of Debtors' Professionals

The Bankruptcy Court approved the Debtors' retention of certain professionals to represent and assist the Debtors in connection with the Chapter 11 Cases. These professionals include: (a) Skadden as counsel for the Debtors, approved on September 30, 2022 [Docket No. 319]; (b) Togut, Segal & Segal LLP as co-counsel for the Debtors, approved on October 3, 2022 [Docket No. 322]; (c) A&L Goodbody LLP as special counsel for the Debtors, approved on October 20, 2022 [Docket No. 502]; (d) O'Melveny & Myers LLP as special counsel for the Debtors, approved

on December 9, 2022 [Docket No. 945]; (e) A&M as financial advisor for the Debtors, approved on October 6, 2022 [Docket No. 343]; and (f) PJT as investment banker for the Debtors, approved on October 20, 2022 [Docket No. 503].

### 2.    Interim Compensation Procedures

With respect to the above-mentioned professionals retained by the Debtors and the professionals retained by the Committees and FCR (as discussed in further detail below), the Bankruptcy Court entered an order establishing procedures by which professionals may seek interim compensation and reimbursement of expenses [Docket No. 326].

### 3.    Ordinary Course Professionals

In the ordinary course of business, the Debtors retain various attorneys who render services to the Debtors in matters unrelated to the Chapter 11 Cases. The Bankruptcy Court entered an order permitting the Debtors to employ and compensate such professionals in the ordinary course of business [Docket No. 378].

### 4.    Appointment of Fee Examiner

On December 19, 2022, the Bankruptcy Court entered the *Order Authorizing Independent Fee Examiner Pursuant to 11 U.S.C. § 105(a) and Modifying Interim Compensation Procedures for Certain Professionals Employed Pursuant to 11 U.S.C. § 327* [Docket No. 989], appointing David M. Klauder as the independent fee examiner in these Chapter 11 Cases to review and assess all fee applications filed by the professionals retained in the Chapter 11 Cases and, among other things, prepare summaries and reports for the Bankruptcy Court to aid in the review and approval of the fee applications.

## C.    Appointment of Statutory Committees and FCR

### 1.    Appointment of the Creditors' Committee

On September 2, 2022, the Official Committee of Unsecured Creditors (the "Creditors' Committee") was appointed by the U.S. Trustee pursuant to section 1102(a) of the Bankruptcy Code to represent the interest of unsecured creditors in the Chapter 11 Cases [Docket No. 161].

The members of the Creditors' Committee are AmerisourceBergen Drug Corporation, Bayer AG, U.S. Bank Trust Company, National Association (as indenture trustee for certain Unsecured Notes), UMB Bank, National Association (as indenture trustee for certain Unsecured Notes), CQS Directional Opportunities Master Fund Limited, AFSCME District Counsel 47 Health & Welfare Fund, and Catherine Brewster.

The Creditors' Committee retained Kramer Levin Naftalis & Frankel LLP as counsel, Lowenstein Sandler as special counsel, Gilbert LLP as special insurance counsel,[19] William Fry

---

[19]    Gilbert LLP also serves as special insurance counsel for the FCR.  *See* Docket No. 1305.

as Irish counsel, Berkeley Research Group, LLC and Dundon Advisors LLC as co-financial advisors, Grant Thornton as tax advisor, and Lazard Freres & Co. LLC as investment banker.

## 2.    Appointment of the Opioid Claimants' Committee

On September 2, 2023, the Official Committee of Opioid Claimants (the "Opioid Claimants' Committee" and together with the Creditors' Committee, the "Committees") was appointed by the U.S. Trustee pursuant to section 1102(a) of the Bankruptcy Code to represent the interest of private opioid claimants in the Chapter 11 Cases [Docket No. 163].

The members of the Opioid Claimants' Committee are Blue Cross and Blue Shield Association, Erie County Medical Center Corporation, Michael Masiowski, M.D., Alan MacDonald, Sean Higginbotham, Robert Asbury (as guardian ad litem for certain infants diagnosed with Neonatal Abstinence Syndrome ("NAS")), and Sabrina Barry.  The Opioid Claimants' Committee also has one *ex officio* member, Rochester City School District, representing the interests of certain public school districts.

The Opioid Claimants' Committee retained Cooley LLP as lead and general counsel, Akin Gump Strauss Hauer & Feld LLP as special counsel, Jefferies LLC as investment banker, Province, LLC as financial advisor, Maples Group as special foreign counsel and Klestadt Winters Jureller Southard & Stevens, LLP as conflicts counsel.

## 3.    Appointment of FCR

Immediately following the Petition Date, the Debtors requested that the Bankruptcy Court appoint a representative for potential individuals (a) who, after the Effective Date, may assert personal injury claims against a Debtor or successor of the Debtors' businesses based on the Debtors' conduct either: (i) before the Effective Date (as it relates to opioid products); or (ii) before the Petition Date (as it relates to transvaginal mesh or ranitidine products); (b) whose claims arise from opioid products, or transvaginal mesh products, or ranitidine products; and (c) who could not assert such claims in the Chapter 11 Cases because, among other reasons, the claimant: (i) was unaware of the injury as of the Effective Date; (ii) has a latent manifestation of the injury after the Effective Date; or (iii) as of the Effective Date, was otherwise unable or incapable of asserting the claims based on the injury.  Given the nature of such parties' claims, such parties may be unable to assert their claims and protect their interests in the Chapter 11 Cases.  On September 30, 2022, the Bankruptcy Court entered the *Order (I) Appointing Roger Frankel as Future Claimants' Representative, Effective as of the Petition Date, and (II) Granting Related Relief* [Docket No. 318] appointing Roger Frankel as the future claimants' representative (the "FCR") to represent the interests of individual future opioid, NAS, mesh, and ranitidine claimants in these Chapter 11 Cases.  On August 7, 2023, the Bankruptcy Court entered the *Amended Order (I) Appointing Roger Frankel as Future Claimants' Representative, Effective as of the Petition Date, and (II) Granting Related Relief* [Docket No. 2582], which removed the ranitidine future claimants from the FCR's original mandate.

The FCR retained Frankel Wyron LLP and Young Conaway Stargatt & Taylor LLP as its co-counsel, Gilbert LLP as special insurance counsel, Ducera Partners LLC as investment banker, and NERA Economic Consulting as consultant.

### D.    Foreign Proceedings

#### 1.    Canadian Recognition Proceedings

On August 19, 2022, the Ontario Superior Court of Justice (Commercial List) in Toronto, Ontario, Canada (the "Canadian Court") entered the *Initial Recognition Order (Foreign Main Proceeding)* (the "Initial Recognition Order") pursuant to Part IV of the *Companies' Creditors Arrangement Act*, R.C.S. 1985, c. C-36 (as amended, the "CCAA"), that, among other things, recognized the Chapter 11 Cases in respect of Paladin Labs Inc. and Paladin Labs Canadian Holding Inc. (collectively, the "Canadian Debtors") as foreign main proceedings (Court File No. CV-22-00685631-00CL).

The Initial Recognition Order and other orders subsequently issued by the Canadian Court, among other things, (i) recognized the Chapter 11 Cases as foreign main proceedings under the CCAA; (ii) stayed the commencement or continuation of any proceedings in Canada against or in respect of the Canadian Debtors or their affiliates named as defendants in any Canadian litigation; (iii) appointed KSV Restructuring Inc. as information officer tasked with reporting to the Canadian Court, creditors and other stakeholders in Canada with respect to the status of the Chapter 11 Cases; and (iv) recognized certain orders subsequently entered in the Chapter 11 Cases.

As it relates to the Canadian Debtors, the implementation of the Plan and the transactions contemplated thereby is conditional on the granting of an order of the Canadian Court recognizing and giving full force in Canada to the Confirmation Order and the Plan, which recognition the Canadian Debtors shall seek prior to the occurrence of the Effective Date.

#### 2.    English Recognition Proceedings

On September 16, 2022, the High Court of England and Wales issued an order recognizing the Chapter 11 Case in respect of Debtor Astora Women's Health LLC as a foreign main proceeding pursuant to the *Cross Border Insolvency Regulations 2006*, with effect from August 16, 2022.

#### 3.    Australian Recognition Proceedings

On October 26, 2022, the Federal Court of Australia issued an order pursuant to the *Cross-Border Insolvency Act 2008* recognizing the Chapter 11 Case in respect of Debtor Astora Women's Health, LLC as a foreign main proceeding, recognizing Mark Bradley as the foreign representative of Astora Women's Health, LLC, granting a stay of proceedings against the Debtors in Australia, and providing for notification of creditors.

### E.    Preliminary Injunction and Voluntary Injunction

On September 9, 2022, the Debtors filed an adversary complaint and the *Debtors' Motion for a Preliminary Injunction Pursuant to Section 105(a) of the Bankruptcy Code* [Ad. Proc. No. 22-07039, Docket No. 2] (the "Preliminary Injunction Motion") seeking entry of a preliminary injunction pursuant to Bankruptcy Rules 7001(7) and 7065 and section 105(a) of the Bankruptcy Code (the "Preliminary Injunction"). Under the Preliminary Injunction Motion, the Debtors sought to enjoin for a period of 270 days judicial, administrative, and other actions and proceedings

relating solely to civil (as opposed to criminal) matters pending against the Debtors brought by governmental entities, including, without limitation, states, counties, municipalities, public hospitals, school districts, and Native American tribes.  The Debtors also requested that the Bankruptcy Court enter a voluntary operating injunction agreed to by the Debtors and various non-federal governmental units that would govern the Debtors' conduct with respect to their opioid businesses (the "Voluntary Operating Injunction").

On November 16, 2022, the Bankruptcy Court entered an order (i) granting the Preliminary Injunction requested by the Debtors for a period of 270 days from the date of the order, to August 12, 2023, and (ii) entering the Voluntary Operating Injunction requested by the Debtors [Ad. Proc. No. 22-07039, Docket No. 63].  Notably, the Opioid Claimants' Committee, the Multi-State Endo Executive Committee, and nearly all of the other governmental defendants either affirmatively agreed with the Debtors' request for the Preliminary Injunction or did not oppose it.

On June 30, 2023, Debtors filed a motion to extend the Preliminary Injunction for 180 days from the date of an order granting the motion [Ad. Proc. No. 22-07039, Docket No. 79].  On August 13, 2023, the Bankruptcy Court entered an order further extending the Preliminary Injunction to February 8, 2024 [Ad. Proc. No. 22-07039, Docket No. 87].

### F.    Appointment of Monitor

On December 29, 2022, the Debtors filed the *Motion of Debtors for Entry of an Order (I) Appointing R. Gil Kerlikowske as Monitor for Voluntary Operating Injunction and (II) Approving the Monitor's Employment of Saul Ewing as Counsel at the Cost and Expense of the Debtors* [Docket No. 1030], requesting the appointment of R. Gil Kerlikowske, through Gil Kerlikowske LLC, as monitor (the "Monitor") for the purposes of evaluating and monitoring the Debtors' compliance with the Voluntary Operating Injunction.  On January 29, 2023, the Bankruptcy Court entered an order appointing the Monitor [Docket No. 1262].

On March 16, 2023, the Monitor filed the *Initial Monitor Report* [Docket No. 1479] (the "Initial Monitor Report") with the Bankruptcy Court, describing the actions taken by the Monitor to determine the Debtors' compliance with the terms and conditions of the Voluntary Operating Injunction, summarizing the Monitor's observations, providing a set of recommendations, and describing anticipated next steps.  In the Initial Monitor Report, the Monitor stated that the Company "provided helpful assistance to the Monitor in the exercise of his duties and, in the Monitor's view, is in substantial compliance with the [Voluntary Operating Injunction]."

### G.    Sale of Chestnut Ridge Facility

Prior to the Petition Date, on June 20, 2022, Debtor Par Pharma entered into a definitive agreement to sell certain additional assets located in Chestnut Ridge, New York to Ram Ridge Partners BH LLC (the "Facility Sale"). The assets primarily consisted of property, plant, and equipment. On October 27, 2022, the Bankruptcy Court approved the Facility Sale [Docket No. 534], which closed during the fourth quarter of 2022. As a result of this Facility Sale, Par Pharma received approximately $18.5 million in cash.

### H.    Discontinuance of Qwo

On December 7, 2022, the Debtors filed the *Motion of the Debtors for Entry of an Order Pursuant to Section 105(a) and 363(b) of the Bankruptcy Code (I) Authorizing the Debtors to Cease Production and Commercialization of Qwo and (II) Granting Related Relief* [Docket No. 927] (the "Qwo Discontinuance Motion"), requesting relief to cease production and marketing of the cellulite treatment Qwo, a product that the Company did not believe would be successful or profitable in the future.  The Company elected not to pursue a standalone sale of Qwo because production of Qwo uses the same enzyme, and therefore implicates the same trade secrets, as the production of Xiaflex; and the intellectual property relating to both Qwo and Xiaflex were among the assets that were marketed in the Sale Process (defined and discussed below).  On December 28, 2022, the Bankruptcy Court entered an order granting the Qwo Discontinuance Motion [Docket No. 1022].  The Company estimated that the discontinuance of Qwo will generate $50 million in annual savings, $15-20 million in one-time charges, and $220-230 million in asset impairment.

### I.    Adversary Proceedings

#### 1.    Nevakar Matter

On August 22, 2022, Debtor Endo Ventures Limited ("EVL") filed an adversary complaint seeking declaratory and injunctive relief, and alleging breach of contract, breach of the covenant of good faith and fair dealing, and tortious interference with a prospective economic advantage against Nevakar, Inc. and Nevakar Injectables, Inc. (collectively, "Nevakar"), in connection with the parties' Development, License and Commercialization Agreement (the "2018 Agreement") and an Asset Purchase Agreement [Ad. Proc. No. 22-07034].  Nevakar argued that it properly and timely terminated the 2018 Agreement on August 11, 2022 (the "August Termination"), based on EVL's alleged failure to comply with the 2018 Agreement.  EVL denied Nevakar's contention, alleging that the August Termination was ineffective, and alleged, among other things, that Nevakar breached the 2018 Agreement.  In November 2022, EVL and Nevakar reached a settlement in principle with respect to this litigation.  On January 11, 2023, the Bankruptcy Court approved the parties' settlement [Ad. Proc. No. 22-07034, Docket No. 68], and the settlement agreement thereafter went effective.

#### 2.    Blankenship Matter

On March 3, 2023, Travis Blankenship filed an adversary complaint in the Bankruptcy Court against Endo Parent and certain of its products liability insurers seeking a declaratory judgment as to the nature and extent of his, Endo Parent's, and other creditors' rights under certain of Endo's product liability insurance policies [Ad. Proc. No. 23-07007].  On March 31, 2023, Endo Parent moved to dismiss or stay the complaint, arguing that Blankenship does not have standing to pursue such relief and that the Bankruptcy Court lacks subject matter jurisdiction or, alternatively, that the complaint should be stayed to protect the Debtors' restructuring efforts [Ad. Proc. No. 23-07007, Docket No. 9].  On May 15, 2023, Mr. Blankenship filed a notice voluntarily dismissing the adversary case without prejudice [Ad. Proc. No. 23-07007, Docket No. 103], and the case was closed on June 12, 2023.

### J.      Joint Standing Motion and Motion to Intervene

On January 23, 2023, the Committees filed the *Motion of the Official Committee of Unsecured Creditors and the Official Committee of Opioid Claimants for (I) Entry of an Order Granting Leave, Standing, and Authority to Commence and Prosecute Certain Claims on Behalf of the Debtors and (II) Settlement Authority in Respect of Such Claims* [Docket No. 1243] (the "Joint Standing Motion"), pursuant to which the Committees sought standing and authority to investigate, prosecute, and/or settle certain proposed alleged claims on behalf of the Debtors. The Joint Standing Motion attached the forms of four proposed complaints:

- the first proposed complaint annexed to the Joint Standing Motion sought, among other things, a declaration that the secured creditors' alleged liens on the Debtors' U.S. deposit accounts were unperfected as of the Petition Date;

- the second proposed complaint sought declarations that a variety of other assets (excluding the U.S. deposit accounts at issue in the first proposed complaint) were also unencumbered or subject to avoidable liens, including deposit accounts held in the name of Luxembourg Debtors; certain equity interests, including the Debtors' equity interests in their valuable non-debtor Indian affiliates; certain commercial tort claims, including for patent infringement; the Debtors' leasehold interests in certain real property and fixtures; and certain assets owned by Debtor entities incorporated in Ireland, including deposit accounts, intellectual property, receivables, inventory, and other assets;

- the third proposed complaint sought to avoid as preferences and challenge as fraudulent transfers the prepaid compensation paid to executives and other potential "insiders" in the days and months before the Petition Date, and alleged that the Debtors' directors breached their fiduciary duties in approving such payments; and

- the fourth proposed complaint sought to challenge as constructively and/or intentionally fraudulent three debt transactions the Debtors undertook between 2019 and 2021.

On the same day, the FCR filed the *Future Claimants' Representative's Motion to Preserve Standing to Seek to Intervene* [Docket No. 1242], pursuant to which the FCR sought to preserve his standing to seek to intervene in any challenge brought by the Committees in accordance with the Cash Collateral Order (the "Intervention Preservation Motion"). As a result of the Mediation and the Resolutions (as defined below), detailed further below, the Joint Standing Motion and the Intervention Preservation Motion are held in abeyance pending Confirmation of the Plan. *See Stipulation Among the Debtors, Official Committee of Unsecured Creditors, Official Committee of Opioid Claimants, and Ad Hoc First Lien Group Regarding Resolution of Joint Standing Motion and Related Matters* [Docket No. 1505]; and *Notice of Adjournment of Hearing on the Future Claimants' Representative's Motion to Preserve Standing to Seek To Intervene* [Docket No. 1316].

### K.      Sale Process and Bidding Procedures

#### 1.      Bidding Procedures

On November 23, 2022, the Debtors filed a motion seeking approval of, among other things, bidding procedures in connection with the 363 Sale (the "Bidding Procedures," and such motion, the "Bidding Procedures Motion") [Docket No. 728]. The Debtors received multiple objections to the Bidding Procedures Motion (the "Bidding Procedures Objections"), including, among others, from the Committees, the FCR, the Ad Hoc Cross-Holder Group, and the Prepetition First Lien Secured Parties that were not signatories to the RSA (the "Non-RSA 1Ls"), all predominantly objecting to the Debtors' pursuit of a Sale rather than, or in addition to, a chapter 11 plan. As detailed further below, as a result of the court-approved Mediation (as defined and discussed below), the Debtors and the Ad Hoc First Lien Group were able to resolve the Bidding Procedures Objections, and the Committees agreed to hold the Joint Standing Motion in abeyance.

Accordingly, following a series of hearings at which the Bankruptcy Court was advised that the Debtors reached resolutions with respect to the objections of various parties, on April 3, 2023, the Bankruptcy Court entered an order approving, among other things, the Bidding Procedures [Docket No. 1765] (the "Bidding Procedures Order"), over the remaining objections of the FCR and the U.S. Trustee. As contemplated by the RSA, the Bidding Procedures Order approved a marketing process and auction to be conducted under the supervision of the Bankruptcy Court (the "Sale Process"), during which interested parties had an opportunity to conduct due diligence and determine whether to submit a bid to acquire the Debtors' assets. In the months following the entry of the Bidding Procedures Order, the Debtors, with the assistance of PJT, conducted a robust marketing process. Specifically, PJT contacted over 150 potential bidders, which included 75 strategic buyers and more than 75 financial buyers. Of the over 150 potential bidders contacted, 40 potential bidders executed non-disclosure agreements and received access to the data room, and of those parties, 19 parties submitted non-binding indications of interest.

Following the passing of the deadline for potential bidders to submit indications of interest, on June 20, 2023, in accordance with the Bidding Procedures Order, the Company filed with the Bankruptcy Court a notice of termination of the Sale Process, naming the Stalking Horse Bidder as the Successful Bidder (as defined in the Bidding Procedures Order) and accelerating the hearing to approve the sale (the "Sale Hearing") from August 31, 2023, to July 28, 2023, which was thereafter adjourned. As discussed further below, the Debtors, in discussion with the Ad Hoc First Lien Group and in light of the Resolutions reached between the Ad Hoc First Lien Group and the various key stakeholders, which resolved key issues that had previously presented barriers to confirming a chapter 11 plan, determined to pursue a largely consensual chapter 11 plan that incorporates the key terms of the restructuring contemplated under the RSA and the Resolutions. Therefore, on December 19, 2023, the Debtors filed the original Plan and determined to hold the Sale Motion and Sale Hearing in abeyance during the pendency of the process by which the Debtors pursue the Plan.

#### 2.      Reconstruction Steps

As part of the Bidding Procedures Order, the Bankruptcy Court also approved certain internal restructuring transactions under Irish Law that would allow the Company to consummate

the Sale in a tax-efficient manner (the "Reconstruction Steps"). The Reconstruction Steps as approved in the Bidding Procedures Order were completed on May 31, 2023, and involved, among other things: (i) the re-registration from private limited companies to private unlimited companies under Irish Law of the Company's subsidiaries Endo Ventures Limited and Endo Global Biologics Limited and their consequent change of name to Endo Ventures Unlimited Company ("EVU") and Endo Global Biologics Unlimited Company ("EGBU"), respectively; (ii) the transfer of substantially all of the businesses and certain assets of EVU and EGBU to Operand Pharmaceuticals II Limited and Operand Pharmaceuticals III Limited (together, the "Newcos"), which on completion of the Reconstruction Steps became wholly owned subsidiaries of the Company; and (iii) the Newcos each commencing a Chapter 11 Case. It was originally intended that certain remaining assets of EVU and EGBU, such as the legal interests in their third-party contracts and unexpired leases (the beneficial and economic interests having previously transferred to the Newcos as part of the Reconstruction Steps) (the "Remaining EVU/EGBU Assets"), would be transferred to the Buyer upon the Sale closing, since the Buyer would only be purchasing the equity of the Newcos and leaving behind EVU and EGBU. Under the Plan, it is anticipated that Purchaser Parent will take the equity of each of the Newcos and Operand Pharmaceuticals Holdco I Limited (the parent entity of the Newcos), and the Remaining EVU/EGBU Assets will be transferred to the Newcos as of the Effective Date pursuant to the Plan.

### 3.      India Internal Reorganization

On June 29, 2023, the Debtors filed the *Debtors' Motion for an Order Authorizing Internal Reorganization Transaction* [Docket No. 2352] (the "India Internal Reorganization Motion"), pursuant to which the Debtors sought approval to transfer the Debtors' Indian business to two of the Debtors' subsidiaries, a newly formed holding company and an existing non-debtor subsidiary (the "India Internal Reorganization"). On July 31, 2023, the Bankruptcy Court approved the India Internal Reorganization Motion [Docket No. 2559] (the "India Internal Reorganization Order"). Consummation of the India Internal Reorganization requires that the Debtors obtain a Foreign Direct Investment ("FDI") approval from the Government of India. Accordingly, on July 28, 2023, the Debtors submitted an application (the "FDI Application") to obtain FDI approval, and on September 25, 2023, the Government of India approved the FDI Application. Pursuant to the Plan, the Debtors will effectuate the India Internal Reorganization on the Effective Date. Although the proposed India Internal Reorganization transactions under the Plan will result in the same transfer of the Debtors' Indian business to the same two subsidiary entities as provided in the India Internal Reorganization Order, the transaction steps will not include all of the steps approved in the India Internal Reorganization Order, certain of which are no longer necessary in the context of the Plan given that the consummation of the India Internal Reorganization and the Effective Date of the Plan shall effectively occur simultaneously. Therefore, no creditors' rights will be impacted by the India Internal Reorganization.

### L.      Intercompany Transaction Steps

On November 30, 2023, the Debtors filed the *Debtors' Motion for an Order Authorizing Certain Transaction Steps* [Docket No. 3297] (the "Transaction Steps Motion"), through which the Debtors are seeking the Bankruptcy Court's authority to take certain steps that would, among other things, facilitate their ultimate exit from chapter 11. The steps are (a) aimed to provide tax and operational efficiencies ahead of new tax rules taking effect in 2024 and to streamline the

overall Company structure for the ultimate restructuring transactions at the conclusion of these Chapter 11 Cases (the "2023 Steps") and (b) will enable an expedited emergence from the Chapter 11 Cases upon the Bankruptcy Court's confirmation of either the Sale or the Plan (the "Exit Preparation Steps").  The Transaction Steps Motion is scheduled to be heard at the December 21, 2023 omnibus hearing before the Bankruptcy Court, after which time and upon the Bankruptcy Court's approval, the Debtors will begin taking the 2023 Steps and Exit Preparation Steps.  The 2023 Steps, if approved in time, will be taken before the end of 2023 in connection with the Debtors' end-of-year, bi-annual steps plan.  The Exit Preparation Steps will be taken as necessary to prepare the go-forward business so that it has necessary regulatory and other third-party authority to consummate the ultimate restructuring transactions at the conclusion of these Chapter 11 Cases and emerge as an operational business.

## M.    Mediation[20]

At a hearing in January 2023, the Bankruptcy Court directed the Debtors and certain key parties in interest in the Chapter 11 Cases to participate in a mediation process (the "Mediation") to attempt to resolve certain objections and contested issues relating to the Bidding Procedures Motion, the Sale, the First Exclusivity Motion, and other critical matters in the Chapter 11 Cases, including the Bidding Procedures Objections and the Joint Standing Motion. On January 27, 2023, the Bankruptcy Court entered the *Stipulation and Order (A) Granting Mediation and (B) Referring Matters to Mediation* [Docket No. 1257], pursuant to which the Hon. Shelley C. Chapman (Ret.) was appointed as mediator (the "Mediator") and provided that the Mediation would automatically terminate on February 16, 2023, unless (i) concluded earlier, (ii) extended by the Bankruptcy Court, or (iii) extended to a date no later than March 2, 2023, by notice of the Mediator to the Bankruptcy Court.  On February 15, 2023, the Mediator filed the *Mediator's Notice of Extension of Mediation* [Docket No. 1342], pursuant to which the Mediation was extended to March 1, 2023.  The Mediation was subsequently extended multiple times, to:  March 31, 2023 [Docket No. 1475], April 28, 2023 [Docket No.  1475], May 31, 2023 [Docket No. 1827], June 16, 2023 [Docket No. 2123], July 7, 2023 [Docket No. 2245], August 4, 2023 [Docket No. 2399], August 16, 2023 [Docket No. 2570], September 13 or 14, 2023 [Docket No. 2654], and through the last day of the adjourned Sale Hearing, whenever such hearing is scheduled by the Bankruptcy Court [Docket No. 2861].

The Mediation parties included, among others, the Debtors, the Ad Hoc First Lien Group, the Non-RSA 1Ls, the Committees, the FCR, the Multi-State Endo Executive Committee, the U.S. Government, and the U.S. Trustee.  *See Stipulation and Order (A) Granting Mediation and (B) Referring Matters to Mediation* [Docket No. 1257]; *Order Modifying the Mediation Procedures* [Docket No. 1912].

As a result of the Mediation, the Ad Hoc First Lien Group, as the prospective owners of the Debtors' business in connection with the Sale, reached various resolutions with certain parties in interest in the Chapter 11 Cases. The resolutions were negotiated directly between the Ad Hoc First Lien Group and the applicable parties in interest in the context of the Debtors' proposed Sale

---

[20]    Certain matters regarding the Resolutions (defined below) described in this Section M are subject to ongoing Mediation and are qualified in entirety by, and is subject to, the terms of the Plan.  In the event of any conflict between the summaries herein and the Plan, the terms of the Plan shall control.

and contemplated the Stalking Horse Bidder, in its capacity as the prospective purchaser under the proposed Sale, making certain payments of its own volition following the closing of the Sale to trusts or other vehicles for the benefit of certain parties in interest in the event such parties were eligible and chose to participate in such trusts or other vehicles.  However, in light of the broad success of the Mediation, which included the resolution of significant issues that would have otherwise impeded the Debtors' ability to successfully pursue a plan, the Debtors made the determination to implement revised resolutions through the settlements contemplated in the Plan, as summarized below (collectively, the "Resolutions"), and otherwise implement the Sale Transaction pursuant to the Plan.

### 1.    UCC Resolution

The resolution reached between the Ad Hoc First Lien Group and the Creditors' Committee (the "UCC Resolution") provides that, upon the closing date of the 363 Sale or as soon as reasonably practicable thereafter, the Stalking Horse Bidder would form a trust (the "GUC Trust") for the benefit of certain eligible general unsecured creditors, which would have been vested with a variety of forms of consideration, as set forth below.  As part of the UCC Resolution, the Creditors' Committee agreed to hold in abeyance the Joint Standing Motion, and the UCC Resolution otherwise resolved the Creditors' Committee's objection to the Bidding Procedures and the First Exclusivity Motion.  In connection with the Plan, the Debtors will implement certain key terms of the UCC Resolution through the proposed treatments of Allowed Claims classified in Classes 4(A), 4(B), 4(C), 4(D), 4(E), and 4(F), which treatment will result in the Claims held by the originally-contemplated beneficiaries of the GUC Trust being channeled to the GUC Trust, which will receive from the Debtors and/or the Purchaser Entities: (i) $60 million in cash (the "GUC Trust Cash Consideration"); (ii) up to 4.02% of Purchaser Equity (subject to dilution only by equity issued under the Management Incentive Plan), including 0.32% of the Purchaser Equity that will be deposited with a third-party escrow agent acceptable to the Required Consenting Global First Lien Creditors and the Creditors' Committee and subject to an escrow agreement that shall be in form and substance acceptable to the Required Consenting Global First Lien Creditors and the Creditors' Committee (the "Escrowed Equity"), to be distributed directly to holders of Allowed Second Lien Deficiency Claims and Allowed Unsecured Notes Claims in accordance with the Plan and the GUC Trust Documents; (iii) the right to pursue certain estate claims and causes of action against certain non-continuing directors and former officers (with recoveries limited to proceeds, if any, of certain specified insurance policies), and certain specified third-parties, including certain third-party advisors to the Debtors and parties to certain prepetition transactions with the Debtors; (iv) certain rights to insurance proceeds; and (v) Purchaser Equity to be issued to those general unsecured creditors that subscribed in July 2023 to participate in a rights offering for up to $160 million of the Purchaser Equity (the "GUC Rights Offering") (the foregoing forms of consideration, the "GUC Trust Consideration").  The Creditors' Committee participated in further Mediation with the Mediator to allocate the GUC Trust Consideration among the various groups of general unsecured creditors eligible to participate in the GUC Trust. The UCC Resolution provides for the following distributions to holders of General Unsecured Claims:

- **Second Lien Deficiency and Unsecured Notes Claims (Class 4(A)):** Holders of Allowed Second Lien Deficiency Claims and Allowed Unsecured Notes Claims will be entitled to receive (a) approximately $23.3 million in cash, (b) 3.70%[21] of the Purchaser Equity, (c) 100% of the subscription rights to participate in the GUC Rights Offering, and (d) a 93.09% interest in the proceeds of the estate litigation Claims and Causes of Action, and insurance rights transferred to the GUC Trust (the consideration described in this clause (d), the "Litigation Trust Consideration").

- **Other General Unsecured Claims (Class 4(B)):** Holders of Allowed Other General Unsecured Claims will be entitled to receive (a) their portion of a reserve for such claims funded with up to $2 million in Cash from the GUC Trust Cash Consideration and (b) up to a 1.80% interest in the proceeds of the Litigation Trust Consideration.

- **Mesh Claims (Class 4(C)):** Holders of Allowed Mesh Claims will be entitled to receive (a) their portion of the $2 million in Cash from the GUC Trust Cash Consideration, (b) 50% of certain products liability insurance proceeds allocable to liability for Mesh Claims pursuant to the GUC Trust Agreement, and (c) a 1.75% interest in the proceeds of the Litigation Trust Consideration in accordance with the GUC Trust Agreement, in each case, to be distributed by the GUC Trust to the Mesh Claims Trust to be used as set forth in the Mesh Claims Trust Agreement, including for Distributions to holders of Allowed Mesh Claims in accordance with the Mesh Claims Trust Documents.

- **Ranitidine Claims (Class 4(D)):** Holders of Allowed Ranitidine Claims will be entitled to receive (a) their portion of the $200,000 in Cash from the GUC Trust Cash Consideration and (b) 20% of insurance proceeds allocable to liability for Ranitidine Claims in accordance with the GUC Trust Agreement, in each case, to be used as set forth in the Ranitidine Claims Trust Documents, including for Distributions to holders of Allowed Ranitidine Claims.

- **Generic Price Fixing Claims (Class 4(E)):** Holders of Allowed Generic Price Fixing Claims will be entitled to receive their portion of the $16 million in cash from the GUC Trust Cash Consideration.

- **Reverse Payment Claims (Class 4(F)):** Holders of Allowed Reverse Payment Claims will be entitled to receive (a) their portion of the $6.5 million in Cash from the GUC Trust Cash Consideration and (b) a 3.36% interest in the proceeds of the Litigation Trust Consideration.[22]

---

[21] The amount of Escrowed Equity to be distributed to holders of Allowed Second Lien Deficiency Claims and Allowed Unsecured Notes Claims shall be determined pursuant to the Net Debt Equity Split Adjustment (as defined in the Plan), and any Escrowed Equity not so distributed shall be returned to the Purchaser Parent and cancelled.

[22] $10 million in cash from the GUC Trust Cash Consideration being provided to the GUC Trust will be used to fund administrative expenses and pursuit of the Litigation Trust Consideration.

With respect to any Cash proceeds of the GUC Trust Litigation Consideration in excess of $100 million (excluding, for the avoidance of doubt, the 50% of proceeds of the products liability tower allocable to holders of Mesh Claims and 20% of proceeds of the products liability tower allocable to holders of Ranitidine Claims), 5% of such Cash proceeds will be paid to the Purchaser Entities, up to a maximum aggregate amount of $2.2 million, and the remaining 95% will be allocated among the Class 4 sub-Classes per the above.

On the Effective Date, Claims in Classes 4(A), 4(B), 4(C), 4(D), 4(E), and 4(F) will be channeled to the GUC Trust and will be Allowed, Disallowed, or otherwise resolved by the GUC Trust and/or any applicable sub-trust thereof.[23]  Ultimate recoveries to holders of Allowed Claims channeled to the GUC Trust will be determined by the trustee of the GUC Trust or any applicable sub-trust thereof, in each case, in accordance with the applicable trust distribution procedures and based on an array of factors, including whether such holder consensually grants the GUC Releases in accordance with the Plan.

For additional information regarding the UCC Resolution and the GUC Trust, please refer to the UCC Letter.

### 2.    OCC Resolution

The resolution reached between the Ad Hoc First Lien Group and the Opioid Claimants' Committee (the "OCC Resolution" and together with the UCC Resolution, the "Committees Resolutions") provides that, upon the closing date of the 363 Sale or as soon as reasonably practicable thereafter, the Stalking Horse Bidder would form a trust (the "PPOC Trust") for the benefit of certain private present opioid claimants (which excludes future opioid claimants and governmental entities), which would have been vested with up to $119.7 million of gross Cash consideration payable in three installments (subject to the exercise of the prepayment options set forth in the OCC Resolution Term Sheet, as well as a prepayment requirement in the event the Stalking Horse Bidder prepaid either or both of the Voluntary Public/Tribal Opioid Trusts).  In connection with the Plan, the Debtors will implement certain key terms of the OCC Resolution through the proposed treatments of Allowed Claims classified in Classes 7(A), 7(B), 7(C), 7(D), and 7(E), which treatment will result in the Claims held by the originally-contemplated beneficiaries of the PPOC Trust and its sub-trusts (the "PPOC Sub-Trusts") being channeled to the PPOC Trust, which will receive from the Debtors and/or the Purchaser Entities the same consideration described above on essentially the same terms.  On the Effective Date, Claims in Classes 7(A), 7(B), 7(C), 7(D), and 7(E) will be channeled to the PPOC Trust and thereafter further channeled to the applicable PPOC Sub-Trust, and will be resolved by the trustee of the PPOC Trust and/or the applicable PPOC Sub-Trust, in each case, in accordance with the applicable trust distribution procedures.  Ultimate awards to holders of Allowed Claims channeled to the PPOC Trust and/or a PPOC Sub-Trust will be determined by the trustee of the PPOC Trust and/or the applicable PPOC Sub-Trust, in each case, in accordance with the applicable trust distribution procedures and based on an array of factors, including whether such holder consensually grants the Non-GUC Releases in accordance with the Plan.

---

[23]    The trustee for the Generics Price Fixing Sub-Trust will determine an allocation of funds among holders of Generic Price Fixing Claims in accordance with the Distribution Sub-Trust Documents.

As part of the OCC Resolution, the Opioid Claimants' Committee agreed to hold in abeyance the Joint Standing Motion, and the OCC Resolution otherwise resolved the Opioid Claimants' Committee's objection to the Bidding Procedures and the First Exclusivity Motion.

### 3.    Ad Hoc Cross-Holder Group Resolution

The resolution reached between the Ad Hoc First Lien Group and the Ad Hoc Cross-Holder Group provides that the First Lien Claims held by the Ad Hoc Cross-Holder Group will be treated *pari passu* with the First Lien Claims held by the Ad Hoc First Lien Group.  In order to implement this resolution in the Plan, the Debtors will treat (i) First Lien Claims held by the Ad Hoc Cross-Holder Group as First Lien Claims classified in and receiving the treatment proposed for Class 3 (First Lien Claims); and (ii) Claims relating to Second Lien Notes held by the Ad Hoc Cross-Holder Group as unsecured deficiency Claims classified in Class 4(A) (Second Lien Deficiency Claims and Unsecured Notes Claims) and receiving the treatment proposed for such Class, rendering such holders eligible to participate in the GUC Trust, in each case, as provided in the Plan.  The Claims relating to the Unsecured Notes held by the Ad Hoc Cross-Holder Group will also be classified in Class 4(A) (Second Lien Deficiency Claims and Unsecured Notes Claims).

For additional information regarding the OCC Resolution, the PPOC Trust, and the PPOC Sub-Trusts, please refer to the OCC Letter.

### 4.    Non-RSA 1Ls Resolution

The resolution reached between the Ad Hoc First Lien Group and the Non-RSA 1Ls provides that the Non-RSA 1Ls will receive *pari passu* treatment with the Ad Hoc First Lien Group.  In order to implement this resolution in the Plan, the Debtors will treat such Claims as First Lien Claims classified in and receiving the treatment proposed for Class 3 (First Lien Claims).

### 5.    Ad Hoc Group of Unsecured Noteholders Resolution

The resolution reached between the Ad Hoc First Lien Group and the Ad Hoc Group of Unsecured Noteholders provides that the fees and expenses in the amount of $950,000 incurred the advisors to the Ad Hoc Group of Unsecured Noteholders, would be paid on or immediately after the Effective Date.  These fees and expenses will constitute Restructuring Expenses under the Plan and paid in accordance with the terms of the Plan.

### 6.    FCR Resolution

The resolution reached between the Ad Hoc First Lien Group and the FCR (the "FCR Resolution") provides that upon the closing date of the 363 Sale or as soon as reasonably practicable thereafter, the Stalking Horse Bidder would form a trust (the "Future PI Trust") for the benefit of certain individual future private opioid and mesh claimants whose first injury did not manifest until after the General Bar Date or the Extended Foreign Bar Date, as applicable, or in the case of individuals diagnosed with NAS, natural persons who are born after the General Bar Date or the Extended Foreign Bar Date, as applicable, but before the date that is the later of (i) 10 months after the General Bar Date or the Extended Foreign Bar Date, as applicable, and (ii) the Effective Date, and diagnosed with NAS resulting from such natural person's intrauterine exposure to Qualifying Opioids, which Future PI Trust would have been vested with up to $11.88 million

of gross cash consideration—$11.385 million for individual future private opioid claimants and $495,000 for individual future mesh claimants—payable in installments over 10 years (for Future Opioid PI Claims and Future NAS PI Claims) and one year (for Future Mesh Claims), respectively. In connection with the Plan, the Debtors will implement certain key terms of the FCR Resolution in accordance with which the Future PI Trust will receive from the Debtors and/or the Purchaser Entities the same consideration described above on no less favorable terms to the Future PI Trust, and the Claims of eligible individual private future opioid and mesh claimants shall be channeled to the Future PI Trust and Allowed, Disallowed, or otherwise resolved by the Future PI Trust. Ultimate awards to holders of Allowed Future Opioid PI Claims, Allowed Future NAS PI Claims, and Allowed Future Mesh Claims will be determined by the Future PI Trustee based on an array of factors, and holders shall only receive an award, if any, if such holder consensually grants the Non-GUC Releases in accordance with the Plan.

### 7.    Voluntary Public School District Creditors Resolution

The resolution reached between the Ad Hoc First Lien Group and a group of independent public school district opioid claimants (the "Public School District Creditors") (such resolution, the "Voluntary Public School District Creditors Resolution") provides that, upon the closing date of the 363 Sale or as soon as reasonably practicable thereafter, the Stalking Horse Bidder would fund the Opioid School District Recovery Trust (as defined in the Plan) with a minimum of $1.5 million and a maximum of $3 million (subject to a prepayment right) over a period of three years, with the amount of funding dependent on the number of Public School District Creditors that grant the Non-GUC Releases in accordance with the Plan.  Under the Plan, the Debtors will implement certain key terms of the Voluntary Public School District Creditors Resolution through the proposed treatment of Allowed Claims classified in Class 8, which treatment will result in the Debtors and/or the Purchaser Entities funding the same consideration described above, which funds will be used to (i) provide grants and funding for specified opioid use/misuse abatement or remediation programs and (ii) fund the fees, costs, and expenses of administering and implementing the foregoing.

### 8.    Voluntary Canadian Provinces Resolution

The resolution reached between the Ad Hoc First Lien Group and the Canadian Provinces (the "Voluntary Canadian Provinces Resolution") provides that, upon the closing date of the 363 Sale or as soon as reasonably practicable thereafter, the Stalking Horse Bidder would form a voluntary trust for the benefit of the Canadian Provinces that (a) elect to become beneficiaries thereof and (b) release their claims against the Debtors, the Committees, the Ad Hoc First Lien Group, the Prepetition First Lien Secured Parties, certain other parties, and certain representatives and related parties of the foregoing.  The Stalking Horse Bidder would fund such trust in an aggregate amount of up to $7.25 million (subject to a prepayment right) in 11 equal installments over 10 years, subject to downward adjustment depending on the number of releases delivered by the Canadian Provinces.  In connection with the Plan, the Debtors will implement certain key terms of the Voluntary Canadian Provinces Resolution through the proposed treatment of Allowed Claims classified in Class 9, which treatment will result in the Debtors and/or the Purchaser Entities funding the same consideration described above on essentially the same terms, which funds will be used to implement government programs and services aimed at assisting Canadians who suffer from opioid misuse or addiction disorder.

### 9.    U.S. Government Resolution[24]

In connection with the Mediation, the Ad Hoc First Lien Group and certain representatives of the U.S. Government (as defined in the Plan), including the DOJ, negotiated the key economic terms of a potential resolution of all U.S. Government Claims summarized in the term sheet attached hereto as **Exhibit C** (the "U.S. Government Economic Term Sheet" and such terms, together with any subsequently negotiated terms referenced below, the "U.S. Government Resolution").

Certain other terms that are integral to a settlement with the U.S. Government remain unresolved but under consideration, including:

- **Criminal and Civil Terms**:  As set forth in the U.S. Government Term Sheet, the agreements set forth therein are subject to reaching a satisfactory resolution acceptable to the Debtors, the U.S. Government and the Ad Hoc First Lien Group of the U.S. Government's civil and criminal investigations related to the sale and marketing of Opana ER.  As of the date hereof, the Debtors and the U.S. Government have not reached an agreement to resolve these matters. However, the Debtors are willing to consider a possible resolution whereby a Remaining Debtor agrees to (i) enter a criminal guilty plea and (ii) a civil resolution provided, among other things, that the Purchaser Entities would not be excluded from participation in federal health care programs.  Any associated economic terms would be resolved as set forth in the U.S. Government Economic Term Sheet.

*As of the date hereof, the U.S. Government Resolution has not yet been reached nor approved by the U.S. Government, the Debtors, their applicable boards of directors or any other constituencies and remains subject to and conditioned upon (a) agreement on definitive terms of any U.S. Government Resolution, which, if and when reached, shall be reflected in the U.S. Government Resolution Documents (which shall be filed as part of the Plan Supplement) and (b) each such party obtaining any necessary approvals of the terms embodied in the U.S. Government Resolution.*

### N.    Voluntary Public/Tribal Opioid Trust Resolution

As contemplated in the RSA, in connection with the 363 Sale, the Ad Hoc First Lien Group agreed to cause the Stalking Horse Bidder to form (i) a trust for the benefit of holders of State Opioid Claims (the "Public Opioid Trust") that voluntarily elect to participate in such trust, which trust would have been funded with an aggregate amount of $460,048,000 in cash (subject to prepayment rights of the Stalking Horse Bidder and the Multi-State Endo Executive Committee,

---

[24]    Any references in this Disclosure Statement or any other Plan Documents to the U.S. Government Resolution and the U.S. Government Resolution Documents are qualified in their entirety by the final terms of the agreed U.S. Government Resolution and the U.S. Government Resolution Documents, which, as of the date hereof, are subject to continued negotiations.  For the avoidance of doubt, no party has consented to the U.S. Government Resolution or the U.S. Government Resolution Documents and all parties to such resolution and documents reserve their respective rights with respect thereto.

respectively) over 10 years; and (ii) a trust for the benefit of certain holders of Tribal Opioid Claims (the "Tribal Opioid Trust," and together with the Public Opioid Trust, the "Voluntary Public/Tribal Opioid Trusts"), which would have been funded with an aggregate amount of up to $15 million in cash (subject to a prepayment right) over 10 years (collectively, the "Voluntary Public/Tribal Opioid Trust Resolution").[25]

In connection with the Plan, the Debtors will implement certain key terms of the Voluntary Public/Tribal Opioid Trust Resolution through the proposed treatments of State Opioid Claims classified in Class 6(A), Local Government Opioid Claims classified in Class 6(B), and Tribal Opioid Claims classified in Class 6(C), which treatment will result in the Debtors and/or the Purchaser Entities funding the Voluntary Public/Tribal Opioid Trusts with the same consideration described above on essentially the same terms, provided that holders of Local Government Opioid Claims shall not receive any direct distributions under the Plan, or receive or retain any property under the Plan on account of such Local Government Opioid Claims, and may receive distributions from the their respective State in accordance with such State's opioid abatement programs, subject to the laws and agreements of such State and such State's opioid abatement programs.

As of the date of this Disclosure Statement, (a) 45 States not previously paid under settlements reached with the Debtors before the Petition Date, (b) the District of Columbia, and (c) 4 Territories have indicated, subject to final documentation and approvals, to support the establishment of the Public Opioid Trust under the Plan, and the Tribes will have the option to support the establishment of and/or participate in the Tribal Opioid Trust under the Plan. Each of the foregoing States, Territories, and the District of Columbia have also each agreed to grant the Non-GUC Releases in accordance with the Plan, and the Tribes participating the Voluntary Public/Tribal Opioid Trust and the Local Governments of the foregoing States shall have the opportunity to grant the Non-GUC Releases under the Plan.

## VI.    THE PLAN OF REORGANIZATION

The Plan is attached to this Disclosure Statement as **Exhibit A**. The following chart provides an overview of certain important provisions in the Plan:

| Category | Description | Location in Plan |
|---|---|---|
| Treatment of Unclassified Claims | Detailed information relating to the treatment of Administrative Claims, professional fees and expenses, and Non-IRS Priority Tax Claims. | Article II |
| Classification and Treatment of Claims and Interests | Detailed information relating to the classification and treatment of Claims and Interests, including proposed distributions under the Plan to creditors and equity holders. | Articles III and IV |

---

[25]    As part of the resolutions achieved during the Mediation, the States agreed to reduce the gross amount of the settlement from $465,200,000 to $460,048,000 in exchange for receiving the right to elect to receive payment on the Effective Date of the prepayment amount of $273,616,966.26 (which is the present value of the reduced gross amount applying the agreed-upon discount rate of 12.75%). The Multi-State Endo Executive Committee has informed the Debtors and the Ad Hoc First Lien Group that the States intend to exercise the prepayment option.

| Means for Implementation | Describes the means for implementing the Plan, including details regarding, among other things, the sources of cash for required distributions, the Exit Financing, post-emergence governance structure, Restructuring Transactions, and the creation of the Trusts. | Article V |
|---|---|---|
| Plan Settlements and Trusts | Describes the implementation of the Resolutions through the Plan, including details regarding the Trusts. | Article VI |
| Treatment of Executory Contracts and Unexpired Leases | Details regarding the assumption and rejection of Executory Contracts and Unexpired Leases, including with respect to claims arising from rejections, assumption cure determinations, and insurance policies. | Article VII |
| Distributions | Details regarding distributions under the Plan including, among other things, the record date for distributions, timing and calculation of amounts to be distributed, and rights and powers of the Disbursing Agent. | Article VIII |
| Procedures for Resolving Contingent, Unliquidated, and Disputed Claims | Describes procedures for resolving contingent, unliquidated, and Disputed Claims. | Article IX |
| Settlement, Release, Injunction, Exculpation, and Related Provisions | Describes settlements, releases, injunctions, and exculpation under the Plan. **These provisions are set forth below**. | Article X |
| Conditions Precedent | Sets forth the conditions precedent to Confirmation of the Plan and the Effective Date, including various required Court approvals. | Article XI |

Cash obtained from the Syndicated Exit Financing (to the extent implemented), the Rights Offerings, and cash on hand will be used to fund the Debtors' payments required by the Plan. The Plan provides that holders of claims in Class 1 (Priority Non-Tax Claims) and Class 2 (Other Secured Claims) will be reinstated, receive payment in full in cash on the Effective Date of the Plan, or receive such other treatment that the Debtors elect that results in holders of such claims or interests being unimpaired. Holders of Claims in Classes 3, 4(A), 4(B), 4(C), 4(D), 4(E), 4(F), 5, 6(A), 6(B), 6(C), 7(A), 7(B), 7(C), 7(D), 7(E), 8, 9, 10, 11, and 12 are impaired and entitled to vote on the Plan. Holders of Claims and Interests in Class 13 (Intercompany Claims) and Class 14 (Intercompany Interests) will be either unimpaired and therefore conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, or impaired and not receiving any distribution under the Plan, in which case such holders will be deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY, AND IS SUBJECT TO, THE PLAN AS WELL AS THE EXHIBITS THERETO AND DEFINITIONS THEREIN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF SOME OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN. REFERENCE IS MADE TO THE PLAN AND TO SUCH

DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN CONTROL THE ACTUAL TREATMENT OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS UNDER THE PLAN. UPON OCCURRENCE OF THE EFFECTIVE DATE, THE PLAN AND ALL SUCH DOCUMENTS WILL BE BINDING UPON ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS AND THEIR ESTATES AND ALL OTHER PARTIES IN INTEREST. IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT, ON THE ONE HAND, AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, ON THE OTHER HAND, THE TERMS OF THE PLAN AND SUCH OTHER OPERATIVE DOCUMENT WILL CONTROL.

**THE PLAN CONTAINS CERTAIN IMPORTANT SETTLEMENT, RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS. THOSE PROVISIONS ARE RESTATED BELOW FOR YOUR CONVENIENCE.**

A.      **Settlements**

1.      **Section 10.1**. Compromise and Settlement of Claims, Interests, and Controversies

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of (a) all Released Claims; and (b) all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any Distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and holders of Claims and Interests, and is fair, equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Post-Emergence Entities may compromise and settle Claims against them and Causes of Action against other Persons.

B.      **Debtor, Non-GUC, and GUC Releases**

1.      **Section 10.2**. Debtor Releases

(a)      Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, the Debtors, their Estates, and the Post-Emergence Entities are deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each Debtor Released Party from any and all Released Claims.  Notwithstanding anything in the Plan to the contrary, the Debtor Releases do not release any post-Effective Date obligations of any Person or Entity under the Plan, any Plan Document, the Plan Transaction, any Restructuring

71

Transaction, or any document, instrument, or agreement executed to implement the Plan and the Plan Transaction, and shall not result in a release, waiver, or discharge of any Indemnification Obligations assumed by the Purchaser Entities as set forth in the Plan; provided, however, that, nothing in Section 10.2 of the Plan shall be construed to release (i) the GUC Trust Litigation Claims; or (ii) any Person or Entity from a claim for intentional fraud or willful misconduct, in each case, as determined by a Final Order.

(b)     Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Releases and, further, shall constitute the Bankruptcy Court's finding that the Debtor Releases are: (i) in exchange for the good and valuable consideration provided by the Debtor Released Parties, including, without limitation, the Debtor Released Parties' contributions to facilitating the Debtors' restructuring and the implementation of the Plan; (ii) a good faith settlement and compromise of the Released Claims; (iii) in the best interests of the Debtors, their Estates, and all holders of Claims and Interests; (iv) fair, equitable, and reasonable; (v) given and made after due notice and opportunity for hearing; and (vi) a bar to any of the Debtors, their Estates, or the Post-Emergence Entities asserting any Released Claim.

(c)     In addition to the foregoing Debtor Releases, the Debtors shall release the applicable Claims against the Settling Co-Defendants set forth in, and in accordance with the terms of, the mutual releases by the Debtors, their Estates, and the Post-Emergence Entities, on the one hand, and the Settling Co-Defendants, on the other hand, in each case, as set forth in the DMP Stipulation.  For the avoidance of doubt, any Releases with respect to Settling Co-Defendants shall be subject to the terms of the DMP Stipulation.

## 2.     Section 10.3. Non-GUC Releases

(a)     Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, and to the fullest extent allowed by applicable law, each Non-GUC Releasing Party is deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each Non-GUC Released Party from any and all Released Claims.  For the avoidance of doubt, no Non-GUC Releasing Party shall release any Excluded Party (including, solely with respect to any Non-GUC Release granted by any Specified Opioid Claimant Releasing Party, any Additional Opioid Excluded Parties).

(b)     For the avoidance of doubt and without limitation of the foregoing, each holder of a State Opioid Claim and each holder of a Tribal Opioid Claim that (i) is a governmental unit (as defined in section 101(27) of the Bankruptcy Code) or a Tribe; and (ii) grants or is deemed to grant, as applicable, the Non-GUC Releases shall, in each case, be deemed to have released all Released Claims that have been asserted or are, or have been, assertible by (1) such governmental unit (as defined in section 101(27) of the Bankruptcy Code) or Tribe in its own right, in its parens patriae or sovereign enforcement capacity, or on behalf, or in the name, of another Person; or (2) any other governmental official, employee, agent, or Representative acting or purporting to act in a parens patriae, sovereign enforcement, or quasi-sovereign enforcement capacity, or any other capacity,

on behalf of such governmental unit (as defined in section 101(27) of the Bankruptcy Code) or Tribe.

(c)    Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, the Non-GUC Releasing Parties are deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each Non-GUC Released Party from any and all Released Claims.  Notwithstanding anything in the Plan to the contrary, the Non-GUC Releases do not release (i) any Excluded Party; (ii) any post-Effective Date obligations of any Person or Entity under the Plan, any Plan Document, the Plan Transaction, any Restructuring Transaction, or any document, instrument, or agreement executed to implement the Plan and the Plan Transaction, and shall not result in a release, waiver, or discharge of any Indemnification Obligations assumed by the Purchaser Entities as set forth in the Plan; (iii) any GUC Trust Litigation Claim; (iv) any Person or Entity from a claim for intentional fraud or willful misconduct as determined by a Final Order; (v) with respect to the States, (1) any Regulatory Approval process required by the States (including their respective State agencies) in connection with the Plan Transaction; (2) any criminal action or criminal proceeding arising under a criminal provision of any State statute or law by a Governmental entity that has authority to bring a criminal action or proceeding or to adjudicate a Person's guilt or to set a convicted Person's punishment; or (3) any Claims or Causes of Action against (x) any Excluded Party; or (y) any party identified in clauses (j) or (l) of the definition of "Non-GUC Released Parties," in their capacities as such (and, solely with respect to such parties, any party identified in clauses (m) or (n) of the definition of "Non-GUC Released Parties"); *provided*, *that*, for the avoidance of doubt, the States shall not release any VOI-Specific Post-Emergence Entities of any Claims or Causes of Action relating to such entities' (A) compliance with the Voluntary Opioid Operating Injunction; and (B) acts occurring after the Effective Date; and (vi) with respect to the Canadian Provinces, (1) any Regulatory Approval process required by the Canadian Provinces (including their respective agencies) in connection with the Plan Transaction; (2) any criminal action or criminal proceeding arising under a criminal provision of any statute or law by a Governmental Authority that has authority to bring a criminal action or proceeding or to adjudicate a person's guilt or to set a convicted person's punishment; (3) any Claims or Causes of Action against any Excluded Party; or (4) the ability of each of the Canadian Provinces to legislate, regulate, or administer and enforce federal, provincial, or territorial legislation (including regulations) such as the Criminal Code, Food and Drugs Act, and the Controlled Drugs and Substances Act (*provided*, *that*, such activity does not seek to recover civil damages, civil restitution, or other relief of the kind that was sought or could have been sought in the Canadian Provinces Class Action or in the Canadian Provinces McKinsey Action).

(d)    Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Non-GUC Releases and, further, shall constitute the Bankruptcy Court's finding that the Non-GUC Releases are: (i) essential to the Confirmation of the Plan; (ii) consensually given in exchange for the good and valuable consideration provided by the Non-GUC Released Parties, including, without limitation, the Non-GUC Released Parties' contributions to facilitating the restructuring and implementation of the Plan and the Plan Transaction; (iii) a good faith settlement and compromise of the Released Claims; (iv) in the best interests of the Debtors and their Estates; (v) fair, equitable, and reasonable; (vi) given and made

after due notice and opportunity for hearing; and (vii) a bar to any of the Non-GUC Releasing Parties asserting any Released Claim.

### 3.    Section 10.4. GUC Releases

(a)    Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, the GUC Releasing Parties are deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each GUC Released Party from any and all Released Claims.  Notwithstanding anything in the Plan to the contrary, (i) the GUC Releases do not release any (1) post-Effective Date obligations of any Person or Entity under the Plan, any Plan Document, the Plan Transaction, any Restructuring Transaction, or any document, instrument, or agreement executed to implement the Plan and the Plan Transaction, and shall not result in a release, waiver, or discharge of any Indemnification Obligations assumed by the Purchaser Entities as set forth in the Plan; (2) GUC Trust Litigation Claim; or (3) Person or Entity from a claim for intentional fraud or willful misconduct as determined by a Final Order; (ii) none of the GUC Releasing Parties release or shall be deemed to release any GUC Trust Litigation Claim (and such Claims and Causes of Action are preserved, in each case, subject to the Covenant Not To Collect); and (iii) the Covenant Not To Collect shall be binding on any transferee, successor, or assign in connection with any transfer, pledge, sale, hypothecation, assignment, or other disposal of Claims solely against the Excluded D&O Parties, and the failure of any recipient of any Claims solely against any Excluded D&O Party to agree to such covenant shall render any such transfer, pledge, sale, hypothecation, assignment, or other disposal of Claims void ab initio. The Excluded D&O Parties are third-party beneficiaries with rights of enforcement with respect to the Covenant Not To Collect.  For the avoidance of doubt, no GUC Releasing Party shall release or be deemed to release any GUC Trust Litigation Claims.

(b)    Upon granting or being deemed to grant, as applicable, the GUC Releases, the GUC Releasing Parties shall be deemed to covenant (the "Covenant Not To Collect") that (a) any recovery by the GUC Trust or any other GUC Releasing Party on account of any Claim or Cause of Action, direct or indirect, against an Excluded D&O Party including, in each case, by way of settlement or judgment, shall be satisfied solely by and to the extent of the proceeds of the GUC Trust D&O Insurance Policies; (b) any party, including any GUC Trustee or Trustee of a Distribution Sub-Trust and all other GUC Releasing Parties, seeking to execute, garnish, or otherwise attempt to collect on any settlement of or judgment on account of Claims or Causes of Action against Excluded D&O Parties shall do so solely upon available insurance coverage, if any, from the GUC Trust D&O Insurance Policies; and (c) the GUC Releasing Parties shall not otherwise attempt to collect, directly or indirectly, from the personal assets of any Excluded D&O Party.  The Covenant Not To Collect shall be binding on any transferee, successor, or assign in connection with any transfer, pledge, sale, hypothecation, assignment, or other disposal of Claims or Causes of Action against the Excluded D&O Parties and, in connection with any such transfer, the failure of a transferee to agree to the Covenant Not To Collect shall render such transfer void ab initio.  Each of the Excluded D&O Parties are express third-party beneficiaries of this Covenant Not To Collect.

(c)    Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the GUC Releases and, further, shall constitute the

74

Bankruptcy Court's finding that the GUC Releases are: (i) in exchange for the good and valuable consideration provided by the GUC Released Parties, including, without limitation, the GUC Released Parties' contributions to facilitating the Debtors' restructuring and the implementation of the Plan; (ii) a good faith settlement and compromise of the Released Claims; (iii) in the best interests of the Debtors, their Estates, and all holders of Claims and Interests; (iv) fair, equitable, and reasonable; (v) given and made after due notice and opportunity for hearing; and (vi) a bar to any GUC Releasing Party asserting any Released Claim.

      **4.**    **Section 10.5.**  **Effect of Releases to Holders of Trust Channeled Claims**

(a)     Holders of Trust Channeled Claims shall have the option to grant or opt out of granting, as applicable, the Non-GUC Releases or the GUC Releases, as applicable.

(b)     In addition to the amount of any Distribution to be provided by a Trust to a holder of an Allowed Trust Channeled Claim (other than a (i) Canadian Provinces Claim; (ii) State Opioid Claim; or (iii) Tribal Opioid Claim) that is a Non-GUC Releasing Party or a GUC Releasing Party, as applicable, such Non-GUC Releasing Party or GUC Releasing Party, as applicable, shall receive an additional payment in exchange for granting or being deemed to grant, as applicable, the Non-GUC Releases or the GUC Releases, as applicable.

      **5.**     **Definitions**

"***Additional Opioid Excluded Parties***" means (a) the Co-Defendants; and (b) any distributor, manufacturer, or pharmacy engaged in the distribution, manufacture, or dispensing/sale of Opioids, Opioid Products, or, solely with respect to the Canadian Provinces, Canadian First Nations, and Canadian Municipalities, Canadian Opioid Products. The Additional Opioid Excluded Parties shall be deemed Excluded Parties solely with respect to the Releases granted or deemed to be granted, as applicable, by the Specified Opioid Claimant Releasing Parties; *provided*, *that*, for the avoidance of doubt, the Additional Opioid Excluded Parties shall not be Excluded Parties with respect to the Releases granted or deemed to be granted by any Non-GUC Releasing Party other than the Specified Opioid Claimant Releasing Parties or any GUC Releasing Party.

"***Excluded Parties***" means (a) the McKinsey Parties; (b) the Arnold & Porter Parties; (c) any of the Debtors' current or former third-party agents, partners, representatives, or consultants involved in the production, distribution, marketing, promotion, or sale of Opioids, Opioid Products, or, solely with respect to the Canadian Provinces, the Canadian First Nations, and the Canadian Municipalities, Canadian Opioid Products (in each case of clauses (a), (b), and (c), excluding the Debtors' (i) current and former officers, directors, and employees (in each case, solely in their respective capacities as such); and (ii) Professionals retained by the Debtors in the Chapter 11 Cases (which, for the avoidance of doubt, shall (1) include any ordinary course professionals; but (2) exclude any Additional Advisor Excluded Parties)); (d) Practice Fusion, Inc.; (e) the Publicis Health Parties; (f) the ZS Associates Parties; and (g) solely with respect to the Specified Opioid Claimant Releasing Parties, the Additional Opioid Excluded Parties, solely in their respective capacities as such. Notwithstanding anything to the contrary in the Plan, none of the following shall be an "Excluded Party": the Debtors' (1) current and former directors (including any Persons in analogous roles under applicable law), officers, and employees, in each

case, solely in their respective capacities as such; and (2) Professionals retained by the Debtors in the Chapter 11 Cases (which, for the avoidance of doubt, shall (A) include any ordinary course professionals; but (B) exclude any Additional Advisor Excluded Parties) and, for the avoidance of doubt, each Person identified in the foregoing clauses (1) and (2) shall be a Non-GUC Released Party.

"*__GUC Excluded Parties__*" means (a) the Excluded Parties; and (b)(i) the TPG Parties; (ii) the Insurance Advisor Parties; (iii) the Additional Advisor Excluded Parties; (iv) the Additional Third-Party Excluded Parties and (v) the Excluded D&O Parties (subject to the Covenant Not To Collect).

"*__GUC Released Parties__*" means (a) the Debtors and their Estates; (b) the Non-Debtor Affiliates; (c) the Post-Emergence Entities; (d) each Consenting First Lien Creditor and Prepetition Secured Party, in each case, solely in their respective capacities as such; (e) the Ad Hoc Cross-Holder Group, the Ad Hoc First Lien Group, and each of the members of the foregoing, in each case, solely in their respective capacities as such, and each of the advisors thereto or of the individual members thereof, in each case, solely in their respective capacities as such; (f) the Opioid Claimants' Committee and each of the members thereof, in each case, solely in their respective capacities as such, and each of the advisors thereto or of the individual members thereof, in each case, solely in their respective capacities as such; (g) the Creditors' Committee and each of the members thereof, in each case, solely in their respective capacities as such, and each of the advisors thereto or of the members thereof, in each case, solely in their respective capacities as such; (h) the FCR, solely in his capacity as such, and the advisors to the FCR, solely in their respective capacities as such; (i) the Endo EC and each of the States that are members thereof and their respective officers and Representatives, in each case, solely in their respective capacities as such; (j) the Trusts and the Trustees, administrators, boards or governing bodies of, any advisors to, and any other Persons with similar administrative or supervisory roles in connection with any of the foregoing, in each case, solely in their respective capacities as such; (k) the First Lien Backstop Commitment Parties and the GUC Backstop Commitment Parties, in each case, solely in their respective capacities as such; (l) the Unsecured Notes Indenture Trustees, solely in their respective capacities as such; (m) the Debtors' current officers (as of or after the Petition Date); (n) the Debtors' directors (including any Persons in any analogous roles under applicable law) that continue serving in their capacity as directors with, or become directors of, any of the Purchaser Entities after the Effective Date or continue or begin serving in any other prior senior-level employment position[26] after the Effective Date and performing services commensurate with such prior position;[27] (o) current and former officers and directors (including any Persons in any analogous roles under applicable law) of subsidiaries of Endo International plc that are not UCC Specified Subsidiaries; (p) with respect to each of the foregoing Persons listed in clauses (a) through (c), such Persons' predecessors, successors, assigns, current and former subsidiaries and

---

[26]    For the avoidance of doubt, any individual serving in a position of Band D or higher shall be deemed to be serving in a senior-level employment position.

[27]    For the avoidance of doubt, if a director does not continue in the same position or one or more position(s) of similar seniority post-Effective Date, such individual shall not be a GUC Released Party or a Non-GUC Released Party under this clause (n); *provided*, *that*, to the extent employed immediately prior to the Effective Date in a senior-level non-director position, such individual was offered employment by any of the Purchaser Entities.

76

Affiliates, heirs, executors, estates, nominees, current and former employees, advisors, agents, and consultants (including any professional retained by the Debtors in the Chapter 11 Cases except, with respect to ordinary course professionals, as may be agreed on a case-by-case basis, and excluding the Arnold & Porter Parties, the McKinsey Parties, the Insurance Advisor Parties, the Additional Advisor Excluded Parties, and any other GUC Excluded Party), in each case, solely in their respective capacities as such; and (q) with respect to each of the foregoing Persons listed in <u>clauses (d)</u> through <u>(l)</u>, such Persons' predecessors, successors, permitted assigns, current and former subsidiaries and Affiliates, respective heirs, executors, estates, nominees, current and former officers, directors (including any Persons in any analogous roles under applicable law), employees, and Representatives, in each case, solely in their respective capacities as such.  For the avoidance of doubt, no GUC Excluded Party shall be a GUC Released Party.

"***GUC Releasing Parties***" means (a) the GUC Trust; (b) each Distribution Sub-Trust; (c) each holder of (i) an Other General Unsecured Claim; (ii) a Mesh Claim; or (iii) a Ranitidine Claim, in each case, that (1) votes to accept the Plan; (2) was solicited to vote to accept or reject the Plan but who does not vote either to accept or reject the Plan and, further, opts in to grant the GUC Releases; or (3) votes to reject the Plan and opts in to grant the GUC Releases; (d) each holder of (i) a Second Lien Deficiency Claim; (ii) an Unsecured Notes Claim; (iii) a Generics Price Fixing Claim; or (iv) a Reverse Payment Claim, in each case, that (1) votes to accept the Plan; (2) was solicited to vote to accept or reject the Plan but who does not vote either to accept or reject the Plan and, further, does not opt out of granting the GUC Releases; or (3) votes to reject the Plan and opts in to grant the GUC Releases; and (e) Representatives of each Person in the foregoing <u>clauses (a)</u> through <u>(d)</u>, in each case, solely in their respective capacities as such.

"***Non-GUC Released Parties***" means (a) the Debtors and their Estates; (b) the Non-Debtor Affiliates; (c) the Post-Emergence Entities; (d) each Consenting First Lien Creditor and Prepetition Secured Party, solely in their respective capacities as such; (e) the Ad Hoc Cross-Holder Group, the Ad Hoc First Lien Group, and each of the members of the foregoing, in each case, solely in their respective capacities as such, and each of the advisors thereto or of the individual members thereof, in each case, solely in their respective capacities as such; (f) the Opioid Claimants' Committee and each of the members thereof, in each case, solely in their respective capacities as such, and each of the advisors thereto or of the individual members thereof, in each case, solely in their respective capacities as such; (g) the Creditors' Committee and each of the members thereof, in each case, solely in their respective capacities as such, and each of the advisors thereto or of the members thereof, in each case, solely in their respective capacities as such; (h) the FCR, solely in his capacity as such, and the advisors to the FCR, solely in their respective capacities as such; (i) the Endo EC and each of the States that are members thereof and their respective officers and Representatives, in each case, solely in their respective capacities as such; (j) the Trusts and the Trustees, administrators, boards or governing bodies of, any advisors to, and any other Persons with similar administrative or supervisory roles in connection with, any of the foregoing, in each case, solely in their respective capacities as such; (k) the First Lien Backstop Commitment Parties and the GUC Backstop Commitment Parties, in each case, solely in their respective capacities as such; (l) the Unsecured Notes Indenture Trustees, solely in their respective capacities as such; (m) with respect to each of the foregoing Persons listed in <u>clauses (a)</u> through <u>(l)</u>, such Persons' predecessors, successors, permitted assigns, current and former subsidiaries and Affiliates, respective heirs, executors, estates, and nominees, in each case, solely in their respective capacities as such; and (n) with respect to each of the foregoing Persons listed

in clauses (a) through (m), such Persons' current and former officers, directors (including any Persons in any analogous roles under applicable law), employees, and Representatives, in each case, solely in their respective capacities as such. Notwithstanding the foregoing or anything to the contrary in the Plan or in any other Plan Document, "Non-GUC Released Parties" shall not include any Excluded Party and all Claims and Causes of Action against such Persons shall be preserved and not released in accordance with the Plan.

"***Non-GUC Releasing Parties***" means each (a) Non-GUC Released Party, other than (i) the Debtors; and (ii) the Post-Emergence Entities; (b) holder of a State Opioid Claim; (c) holder of (i) a PI Opioid Claim; (ii) a NAS PI Claim; (iii) an IERP II Claim; (iv) an Other Opioid Claim; or (v) an EFBD Claim, in each case, that (1) votes to accept the Plan; (2) was solicited to vote to accept or reject the Plan but that does not vote to either accept or reject the Plan and, further, opts in to grant the Non-GUC Releases; or (3) votes to reject the Plan and opts in to grant the Non-GUC Releases; (d) holder of (i) a Priority Non-Tax Claim; (ii) an Other Secured Claim; (iii) a First Lien Claim; (iv) a Local Government Opioid Claim; (v) a Tribal Opioid Claim; (vi) a Hospital Opioid Claim; (vii) a TPP Claim; (viii) a Public School District Claim; (ix) a Canadian Provinces Claim; (x) a Settling Co-Defendant Claim; (xi) a Subordinated, Recharacterized, or Disallowed Claim; or (xii) an Existing Equity Interest, in each case, that (1) votes to accept the Plan; (2) is presumed to accept the Plan and does not opt out of granting the Non-GUC Releases; (3) is deemed to reject the Plan and does not opt out of granting the Non-GUC Releases; (4) was solicited to vote to accept or reject the Plan but who does not vote either to accept or reject the Plan and, further, does not opt out of granting the Non-GUC Releases; or (5) votes to reject the Plan and opts in to grant the Non-GUC Releases; and (e) Representatives of each Person in the foregoing clauses (a), (b), (c), and (d), in each case, solely in their respective capacities as such.

"***Released Claims***" means any and all Claims and Causes of Action arising at any time prior to or on the Effective Date and relating in any way to the Debtors (whether as the Debtors existed prior to the Petition Date or as debtors-in-possession), the Estates, the Debtors' business, or the Chapter 11 Cases or related foreign recognition proceedings, including, without limitation, any and every Cause of Action, including any and every Claim and action, class action, cross-claim, counterclaim, third-party Claim, controversy, dispute, demand, right, lien, indemnity, contribution, right of subrogation, reimbursement, guaranty, suit, obligation, liability, debt, damage, judgment, loss, cost, attorneys' fees and expenses, account, defense, remedy, offset, power, privilege, license, or franchise, in each case, of any kind, character, or nature whatsoever, asserted or unasserted, accrued or unaccrued, known or unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, foreseen or unforeseen, direct or indirect, choate or inchoate, Secured or unsecured, Allowed, Disallowed, or Disputed, assertible directly or derivatively (including, without limitation, under alter-ego theories), in rem, quasi in rem, in personam, or otherwise, whether arising before, on, or after the Petition Date, whether arising under federal statutory law, state statutory law, common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, in contract or in tort, at law, in equity, or pursuant to any other theory or principle of law, including fraud, negligence, gross negligence, recklessness, reckless disregard, deliberate ignorance, public or private nuisance, breach of fiduciary duty, avoidance (other than any Specified Avoidance Action), willful misconduct, veil piercing, unjust enrichment, disgorgement, restitution, contribution, indemnification, rights of subrogation, and joint liability, regardless of where in the world accrued or arising, including, for

the avoidance of doubt, (a) any Cause of Action held by a natural person who is not yet born or who has not yet attained majority as of the Petition Date or as of the Effective Date, as applicable; (b) any right of setoff, counterclaim, or recoupment, and any Cause of Action for breach of contract or for breach of duty imposed by law or in equity; (c) the right to object to or otherwise contest Claims or Interests; (d) any Cause of Action pursuant to section 362 of the Bankruptcy Code or chapter 5 of the Bankruptcy Code; (e) any claim or defense, including fraud, mistake, duress and usury, and any other defense set forth in section 558 of the Bankruptcy Code; and (f) any claim under any federal, state, or foreign law, including for the recovery of any fraudulent transfer or similar theory (other than any Specified Avoidance Action) arising at any time prior to or on the Effective Date and relating in any way to the Debtors (whether as the Debtors existed prior to the Petition Date or as debtors-in-possession), the Estates, the Debtors' business, the Chapter 11 Cases, or foreign recognition proceedings relating to the Chapter 11 Cases, including, without limitation, any and all Claims and Causes of Action based on or relating to, or in any manner arising from, in whole or in part: (i) Opioids, Opioid Products, Canadian Opioid Products, and Opioid-Related Activities; (ii) the Debtors' use of Cash in accordance with the Cash Collateral Order; (iii) any Avoidance Actions that are not Specified Avoidance Actions (for the avoidance of doubt, Specified Avoidance Actions shall not be Released Claims); (iv) the negotiation, formulation, preparation, dissemination, filing, or implementation of, prior to the Effective Date, the Sale Process, the Bidding Procedures Order, the Plan, the Plan Transaction, the Plan Documents, the Transaction Steps Order, the Plan Settlements, the Trusts, the Trust Documents, the Opioid School District Recovery Trust Governing Documents, the U.S. Government Resolution Documents, the Exit Financing Documents, the Rights Offering Documents, the RSA, the Restructuring Transactions, the India Internal Reorganization, the Scheme, the Scheme Circular, and any contract, instrument, release, or any other similar document or agreement entered into in connection with the foregoing or any transactions or other actions or omissions contemplated thereby; (v) the administration and implementation of the Plan, including the Restructuring Transactions, the Exit Financing, the Rights Offerings and the Backstop Commitment Agreements, the Plan Transaction, and the Plan Settlements, the issuance or distribution of equity and/or debt securities and/or indebtedness in connection therewith or with the Plan, and any other transactions, actions, omissions, or documents contemplated thereby or by the Plan; (vi) the establishment and funding of the Trusts, the implementation of the Plan Settlements, and any other actions taken in connection therewith or contemplated thereby; and (vii) any other act or omission, transaction, agreement, event, or other occurrence or circumstance taking place on or before the Effective Date related or relating to any of the foregoing.  For the avoidance of doubt, "Released Claims" shall not include any (1) Claims or Causes of Action against any Excluded Party or, solely with respect to the GUC Releasing Parties, any GUC Excluded Party; or (2) GUC Trust Litigation Claims.

"***Specified Opioid Claimant Releasing Parties***" means (a) the PPOC Trust; (b) each PPOC Sub-Trust; (c) each Present Private Opioid Claimant; (d) the Future PI Trust; (e) each Future PI Claimant; (f) the Canadian Provinces Trust; (g) each Canadian Province; (h) each Canadian First Nation; (i) each Canadian Municipality; and (j) each Public School District Creditor, in each case, that grants or is deemed to grant, as applicable, the Non-GUC Releases, solely in their respective capacities as such.

### C.    Exculpations and Injunction

#### 1.    <u>Section 10.6</u>. Exculpation

(a)    Notwithstanding anything contained in the Plan to the contrary, and to the maximum extent permitted by applicable law, no Exculpated Party shall have or incur liability for, and each Exculpated Party is released and exculpated from, any Exculpated Claim, obligation, Cause of Action or liability for any Exculpated Claim, except for gross negligence, intentional fraud, or willful misconduct (to the extent such duty is imposed by applicable non-bankruptcy law), but in all respects such Persons shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. For the avoidance of doubt, this exculpation shall be in addition to, and not in limitation of, the Releases and all other releases, indemnities (including the Indemnification Obligations), exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability. For the avoidance of doubt, the Debtors, their Estates, and the Post-Emergence Entities are not (i) exculpating any (1) Excluded Party; (2) TPG Party; (3) Insurance Advisor Party; (4) Additional Advisor Excluded Party; or (5) Additional Third-Party Excluded Party; or (ii) releasing any GUC Trust Litigation Claims.

(b)    The Exculpated Parties have, and upon Confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws and provisions of the Bankruptcy Code with regard to the solicitation of votes on, and Distribution of consideration (including securities) pursuant to, the Plan and, therefore, are not, and on account of such Distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such Distributions made pursuant to the Plan, including, in each case, any Distribution made by any Trust in accordance with the Plan and the applicable Trust Documents. Notwithstanding anything to the contrary in the foregoing, the exculpation set forth above does not release or exculpate any claim relating to any post-Effective Date obligations of any Person under the Plan, any Restructuring Transaction, the Plan Transaction, or any Plan Document or other document, instrument, or agreement executed to implement the Plan.

#### 2.    <u>Section 10.7</u>. Discharge of Claims and Termination of Interests

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the Distributions, rights, and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release, and discharge to the fullest extent permitted by section 1141 of the Bankruptcy Code, effective as of the Effective Date, of all Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against the Debtors or the Debtors' Estates or any of their Assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (a) a Proof of Claim or Interest based upon such Claim, debt, right, or Interest is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest based upon such Claim, debt, right, or Interest is Allowed pursuant

to section 502 of the Bankruptcy Code; (c) the holder of such a Claim or Interest has voted to accept the Plan; or (d) the holder of such Claim or Interest has voted or failed to vote to accept or reject the Plan.  All Claims and Interests shall be satisfied, discharged, and released in full, and the Debtors' liability with respect thereto shall be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code.  All Entities shall be precluded from asserting any Claims against the Debtors, their Estates, the Post-Emergence Entities, their respective successors and assigns, and their respective Assets and properties, and any other Claims or Interests based upon any documents, instruments, or any act of omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date.  The Confirmation Order shall be a judicial determination (i) of the discharge of all Claims and Interests, subject to the Effective Date; and (ii) that no Claims shall be excepted from discharge under section 1141(d)(6) of the Bankruptcy Code.

      3.      **Section 10.8.** **Plan Injunction**

**EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN, THE PLAN SUPPLEMENT, ANY OTHER PLAN DOCUMENT, OR ANY OTHER RELATED DOCUMENTS, OR FOR OBLIGATIONS ISSUED PURSUANT TO THE PLAN, ALL PERSONS WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS OR INTERESTS THAT HAVE BEEN RELEASED PURSUANT TO ARTICLE X OF THE PLAN, DISCHARGED PURSUANT TO SECTION 10.7 OF THE PLAN, OR ARE SUBJECT TO EXCULPATION PURSUANT TO SECTION 10.6 OF THE PLAN, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST THE RELEASED PARTIES, INCLUDING, FOR THE AVOIDANCE OF DOUBT, IN EACH CASE, THE DEBTORS, THEIR ESTATES, THE POST-EMERGENCE ENTITIES, AND ANY OF THEIR ASSETS, AND THE EXCULPATED PARTIES, AS APPLICABLE: (A) COMMENCING OR CONTINUING IN ANY MANNER OR IN ANY PLACE ANY ACTION, EMPLOYMENT OF PROCESS, OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (B) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH PERSONS ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (C) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE OF ANY KIND AGAINST SUCH PERSONS OR THE PROPERTY OR ESTATES OF SUCH PERSONS ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; AND (D) ASSERTING A SETOFF, RIGHT OF SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY DEBT, LIABILITY, OR OBLIGATION DUE TO THE DEBTORS ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS, EXCEPT AS SET FORTH IN SECTION 10.9 OF THE PLAN.  NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE PLAN, SECTION 10.8 OF THE PLAN SHALL NOT ENJOIN THE GUC TRUST'S PURSUIT OF ANY GUC TRUST LITIGATION CLAIMS.**

4.    __Section 10.9__. Channeling Injunction

(a)    In order to preserve and promote the resolutions contemplated by and provided for in the Plan and to supplement, where necessary, the injunctive effect of the Plan Injunction and the releases set forth in Article X of the Plan, and pursuant to the exercise of the equitable jurisdiction and power of the Bankruptcy Court under section 105(a) of the Bankruptcy Code, upon the channeling of the Trust Channeled Claims, all Persons that have held or asserted, that hold or assert or that may in the future hold or assert any Trust Channeled Claim shall be (x) deemed to release any Trust Channeled Claims held by such Persons against the Debtors and the Post-Emergence Entities; and (y) permanently and forever stayed, restrained and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering or receiving payments, satisfaction, recovery or judgment of any form from or against any of the Debtors or Post-Emergence Entities, as applicable, with respect to any Trust Channeled Claim, including:

(i)    commencing, conducting, or continuing, in any manner, whether directly or indirectly, any suit, action, or other proceeding, in each case, of any kind, character or nature, in any forum in any jurisdiction with respect to any Trust Channeled Claims, against or affecting any of the Debtors or the Post-Emergence Entities, as applicable, or any property or interests in property of any of the Debtors or the Post-Emergence Entities, as applicable, with respect to any Trust Channeled Claims;

(ii)    enforcing, levying, attaching, collecting, or otherwise recovering, by any means or in any manner, either directly or indirectly, any judgment, award, decree, or other order against any of the Debtors or the Post-Emergence Entities, as applicable, with respect to any Trust Channeled Claims;

(iii)    creating, perfecting, or enforcing, by any means or in any manner, whether directly or indirectly, any Lien of any kind against any of the Debtors or the Post-Emergence Entities, as applicable, or the property of any of the Debtors or the Post-Emergence Entities, as applicable, in each case, with respect to any Trust Channeled Claims;

(iv)    asserting or accomplishing any setoff, right of subrogation, indemnity, contribution, or recoupment of any kind, whether directly or indirectly, in respect of any obligation due to any of the Debtors or Post-Emergence Entities, as applicable, or against the property of any of the Debtors or the Post-Emergence Entities, as applicable, in each case, with respect to Trust Channeled Claims; and

(v)    taking any act, by any means or in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan or any Plan Document (including, for the avoidance of doubt, any Trust Document) with respect to any Trust Channeled Claims.

(b)    Notwithstanding anything to the contrary in Section 10.9 of the Plan or the Confirmation Order, this Channeling Injunction shall not stay, restrain, bar, or enjoin:

(i)    the rights of holders of Trust Channeled Claims to the treatment afforded to them under the Plan and the Plan Documents, including the rights of holders of Trust

82

Channeled Claims to assert such Trust Channeled Claims solely in accordance with the Plan and the Trust Documents;

(ii)       the rights of Persons to assert any Claim, debt, litigation, or liability for payment of Trust Operating Expenses against the applicable Trust;

(iii)       the rights of any Person to assert any Claim, Cause of Action, debt, or litigation against any Excluded Party;

(iv)       the rights of the GUC Trust to assert any GUC Trust Litigation Claims against any GUC Excluded Party, subject to the Covenant Not To Collect;

(v)       the rights of the GUC Trust to pursue and enforce any GUC Trust Litigation Claims, including the GUC Trust Insurance Rights;

(vi)       the Distribution Sub-Trusts from enforcing their respective rights against the GUC Trust under the Plan and the GUC Trust Documents;

(vii)       the PPOC Trust from enforcing its rights against the Purchaser Entities under the Plan and the PPOC Trust Documents;

(viii)       the PPOC Sub-Trusts from enforcing their respective rights against the PPOC Trust under the Plan and the PPOC Trust Documents; or

(ix)       the Future PI Trust from enforcing its rights against the Purchaser Entities under the Plan and the Future PI Trust Documents.

(c)       There can be no modification, dissolution, or termination of the Channeling Injunction, which shall be a permanent injunction, and nothing in the Plan or any Plan Document (including, for the avoidance of doubt, any Trust Document) shall be construed in any way to limit the scope, enforceability, or effectiveness of the Channeling Injunction issued in connection with the Plan.  The Debtors' compliance with the requirements of Bankruptcy Rule 3016 shall not constitute an admission that the Plan provides for an injunction against conduct not otherwise enjoined under the Bankruptcy Code.

(d)       In the event that any Person takes any action that a Released Party or Exculpated Party, as applicable, believes violates the releases provided in the Plan or the Channeling Injunction as it applies to any Released Party or Exculpated Party, as applicable, such Released Party or Exculpated Party, as applicable, shall be entitled to make an emergency application to the Bankruptcy Court for relief, and may proceed by contested matter rather than by adversary proceeding.  The Bankruptcy Court shall have jurisdiction and authority to enter Final Orders in connection with any dispute over whether an action violates the releases provided in the Plan or

the Channeling Injunction. Upon determining that such a violation has occurred, the Bankruptcy Court, in its discretion, may award any appropriate relief against such violating Person.

### 5.   [Section 10.10. Specified Debtor Insurer Injunction

(a)   Terms

In accordance with section 105(a) of the Bankruptcy Code, on the Effective Date, all persons that have held or asserted, that hold or assert, or that may in the future hold or assert any Claim based on, arising out of, attributable to, or in any way connected with any GUC Trust Insurance Policy or GUC Trust D&O Insurance Policy (but not, for the avoidance of doubt, any Non-GUC Trust D&O Insurance Policy) shall be permanently enjoined from taking any action for purposes of directly or indirectly collecting, recovering, or receiving payment on account of any such Claim, whether sounding in tort, contract, warranty, or any other theory of law, equity, or admiralty, including:

(i)   commencing, conducting, or continuing, in any manner, any action or other proceeding of any kind (including an arbitration or other form of alternate dispute resolution) against any Specified Debtor Insurer, or against the property of any Specified Debtor Insurer, (1) on account of any Claim based on, arising under, or attributable to a GUC Trust Insurance Policy or GUC Trust D&O Insurance Policy; or (2) on account of any rights of any Person under a "direct action" statute to proceed directly against any Specified Debtor Insurer;

(ii)   enforcing, attaching, levying, collecting, or otherwise recovering, by any manner or means, any judgment, award, decree, or other order against any Specified Debtor Insurer, or against the property of any Specified Debtor Insurer, on account of any Claim based on, arising under, or attributable to any GUC Trust Insurance Policy or GUC Trust D&O Insurance Policy;

(iii)   creating, perfecting, or enforcing, in any manner, any Lien of any kind against any Specified Debtor Insurer, or against the property of any Specified Debtor Insurer, on account of any Claim based on, arising under, or attributable to any GUC Trust Insurance Policy or GUC Trust D&O Insurance Policy;

(iv)   asserting or accomplishing any setoff, right of subrogation, indemnity, contribution, or recoupment of any kind, whether directly or indirectly, against any obligation due to any Specified Debtor Insurer, or against the property of any Specified Debtor Insurer, on account of any Claim based on, arising under, or attributable to any GUC Trust Insurance Policy or GUC Trust D&O Insurance Policy; and

(v)   taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan applicable to any Claim based on, arising under, or attributable to any GUC Trust Insurance Policy or GUC Trust D&O Insurance Policy.

(b)    Reservations

Notwithstanding anything to the contrary in Section 10.10(a) of the Plan, the provisions of the Specified Debtor Insurer Injunction:

(i)    shall not (1) preclude the GUC Trust from pursuing any Claim based on, arising under, or attributable to any GUC Trust Insurance Policy or GUC Trust D&O Insurance Policy, or any other Claim that may exist under any GUC Trust Insurance Policy or GUC Trust D&O Insurance Policy against any Specified Debtor Insurer; or (2) enjoin the rights of the GUC Trust to prosecute any action based on or arising from the GUC Trust Insurance Policies or GUC Trust D&O Insurance Policies or the rights of the GUC Trust to assert any Claim, debt, obligation, Cause of Action for liability for payment against a Specified Debtor Insurer based on or arising from the GUC Trust Insurance Policies, in all cases, including GUC Trust Litigation Claims;

(ii)    are not issued for the benefit of any Specified Debtor Insurer, and no such insurer is a third-party beneficiary of this Specified Debtor Insurer Injunction; provided, that, this Specified Debtor Insurer Injunction shall not enjoin, impair or affect any Claims between or among unsettled Specified Debtor Insurers;

(iii)    shall not apply to any D&O Insured Person with respect to such D&O Insured Person's coverage under any GUC Trust D&O Insurance Policy; and

(iv)    shall be subject in all respects to the terms of the DMP Stipulation.

(c)    For the avoidance of doubt, Section 10.10 of the Plan shall not apply with respect to any Non-GUC Trust Insurance Policy, including any Non-GUC Trust D&O Insurance Policy, and no amendment to, or modification of, nor any proposed amendment to nor modification of, the Specified Debtor Insurer Injunction shall adversely impact (i) any Non-GUC Trust Insurance Policy; or (ii) the rights of any D&O Insured Person with respect to such D&O Insured Person's coverage under any Debtor Insurance Policy (including, for the avoidance of doubt, the GUC Trust Insurance Policies, the GUC Trust D&O Insurance Policies, and the Non-GUC Trust Insurance Policies).

(d)    The GUC Trust shall have the sole and exclusive authority at any time, upon written notice to any insurer under any of the GUC Trust Insurance Policies or GUC Trust D&O Insurance Policies, to terminate, reduce or limit the scope of this Specified Debtor Insurer Injunction with respect to any Specified Debtor Insurer; provided, however, that, no modification shall affect the rights of any D&O Insured Person with respect to such D&O Insured Person's coverage under any

Debtor Insurance Policy (including, for the avoidance of doubt, the GUC Trust Insurance Policies, the GUC Trust D&O Insurance Policies, and the Non-GUC Trust Insurance Policies).][28]

### 6.    Section 10.11.    Voluntary Opioid Operating Injunction.

(a)     From and after the date of entry of the Confirmation Order approving the Voluntary Opioid Operating Injunction, the business operations of the VOI-Specific Debtors and/or VOI-Specific Post-Emergence Entities, as applicable, and the business operations of any successors of either of the foregoing, in each case, relating solely to the manufacture and sale of VOI Opioid Products in the States and Territories shall be subject to the terms of the Voluntary Opioid Operating Injunction.

(b)     The VOI-Specific Debtors and VOI-Specific Post-Emergence Entities, as applicable, consent to the entry of a final judgment or consent order on the Effective Date effectuating all of the provisions of the Voluntary Opioid Operating Injunction in the state court in each of the Supporting Governmental Entities.

(c)     After the Effective Date, the Voluntary Opioid Operating Injunction will be enforceable in the state court in each of the Supporting Governmental Entities.  The VOI-Specific Debtors and VOI-Specific Post-Emergence Entities agree that seeking entry or enforcement of such a final judgment or consent order will not violate any other injunctions or stays that it will seek, or that may otherwise apply, in connection with the Chapter 11 Cases or Confirmation.

### 7.    Section 10.12.    Term of Injunctions or Stays.

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

### 8.    Definitions

"*Exculpated Claim*" means, in each case, solely to the extent related to an act or omission, or arising, prior to the Effective Date, any Claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss, and liability for any Claim related to any act or omission in connection with, relating to, or arising out of the Debtors' in- or out-of-court restructuring efforts leading up to the Chapter 11 Cases, the Chapter 11 Cases, or the administration of the Chapter 11 Cases; any foreign recognition proceedings or the administration of such foreign recognition proceedings; the Sale Process, including the negotiation and pursuit thereof, any documents related thereto, and any transactions contemplated thereby or in connection therewith; the negotiation and pursuit of the Plan and the Plan Documents, the Disclosure Statement, the RSA, the Exit Financing, the Rights Offerings, the Scheme, and the Scheme Circular; the Plan, the Plan Transaction, the Restructuring Transactions, the Plan Settlements, and any other transactions contemplated in

---

[28]     [**Note to Draft**: under consideration.]

connection with the foregoing; the negotiation and establishment of the PPOC Trust, any of the PPOC Sub-Trusts, the GUC Trust, any of the Distribution Sub-Trusts, the Future PI Trust, the Public Opioid Trust, the Tribal Opioid Trust, the Canadian Provinces Trust, the EFBD Claims Trust, the Other Opioid Claims Trust, the Trust Documents, the Opioid School District Recovery Trust Governing Documents, the U.S. Government Resolution, and the U.S. Government Resolution Documents; the solicitation of votes for, and Confirmation of, the Plan, the Plan Transaction, and any other transactions or documents contemplated thereby or by the Plan or in connection therewith or with the Plan; the funding of the Plan; the pursuit of Confirmation; the occurrence of the Effective Date; the closing of the Plan Transaction; the implementation and administration of the Plan; or any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; *provided, however, that*, "Exculpated Claims" shall not include (a) any Claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss, or liability for any Claim for, or relating to, any act or omission, in each case, determined by a Final Order to be intentional fraud, gross negligence, or willful misconduct; or (b) any GUC Trust Litigation Claim.

"***Exculpated Parties***" means (a)(i) the Debtors, solely in their respective capacities as such; (ii) the Post-Emergence Entities, solely in their respective capacities as such; (iii) the Creditors' Committee and each of the members thereof, in each case, solely in their respective capacities as such, and each of the advisors thereto or of the individual members thereof, in each case, solely in their respective capacities as such; (iv) the Opioid Claimants' Committee and each of the members thereof, in each case, solely in their respective capacities as such, and each of the advisors thereto or of the individual members thereof, in each case, solely in their respective capacities as such; (v) the FCR, solely in his capacity as such, and each of the advisors thereto, solely in their respective capacities as such; and (vi) the Plan Administrator and any advisors thereto, in each case, solely in their respective capacities as such; (b) solely to the extent consistent with section 1125(e) of the Bankruptcy Code: (i) the Prepetition Secured Parties, solely in their respective capacities as such; (ii) the Ad Hoc First Lien Group and each of the members thereof, in each case, solely in their respective capacities as such, and each of the advisors thereto or of the individual members thereof, in each case, solely in their respective capacities as such; (iii) the Ad Hoc Cross-Holder Group and each of the members thereof, in each case, solely in their respective capacities as such, and each of the advisors thereto or of the individual members thereof, in each case, solely in their respective capacities as such; (iv) the PPOC Trust, each PPOC Sub-Trust, the GUC Trust, each Distribution Sub-Trust, the Future PI Trust, the Public Opioid Trust, the Tribal Opioid Trust, and the Trustees, administrators, boards or governing bodies of, any advisors to, and any other Persons with similar administrative or supervisory roles in connection with any of the foregoing, in each case, solely in their respective capacities as such; (v) the GUC Backstop Commitment Parties, solely in their respective capacities as such; (vi) the First Lien Backstop Commitment Parties, solely in their respective capacities as such; (vii) the Unsecured Notes Indenture Trustees, solely in their respective capacities as such; and (viii) the Endo EC and each of the States that are members thereof and their respective officers and Representatives, in each case, solely in their respective capacities as such; and (c)(i) with respect to the Persons listed in the foregoing clauses (a) and (b), such Persons' predecessors, successors, permitted assigns, current and former subsidiaries and Affiliates, respective heirs, executors, estates, and nominees, in each case, solely in their respective capacities as such; and (ii) current and former directors (including any Persons in analogous roles under applicable law), officers, employees, and Representatives of each of the Persons listed in the foregoing clauses (a) through (c)(i), in each case, solely in their respective capacities as such. For

the avoidance of doubt, and notwithstanding anything to the contrary in the Plan, (1) no Excluded Party or GUC Excluded Party (other than the Excluded D&O Parties) shall be an Exculpated Party; and (2) with respect to the Excluded D&O Parties, no Excluded D&O Party shall be exculpated from any GUC Trust Litigation Claim.

### D.    The Scheme

In connection with the Plan, Endo Parent is concurrently proposing the Scheme.  The Scheme is an Irish statutory mechanism to ensure that all of the impaired creditors of Endo Parent and other Foreign Debtors are bound by the terms of the Plan as a matter of Irish Law.  The Scheme is being implemented, and will operate, in parallel with the Plan.  As a matter of Irish Law, the Scheme will purport to implement the Plan's treatment of the Scheme Creditors—which will be treated in a substantially similar way under the Scheme as they are under the Plan—and will contain certain release, exculpation and discharge provisions similar in scope to those under the Plan.

As described further in the Scheme Circular, in connection with the Scheme, the Debtors are seeking authorization from the Bankruptcy Court for Endo Parent to enter into the Deed of Indemnity and Contribution, pursuant to which Endo Parent will agree to guarantee all liabilities of all other Debtors other than liabilities relating to Claims or Interests that fall within the Scheme Excluded Plan Classes.  All holders of Claims subject to the Deed of Indemnity and Contribution will be entitled to enforce the Deed of Indemnity and Contribution directly against Endo Parent and, accordingly, are creditors or contingent creditors (as applicable) of Endo Parent entitled to vote on the Scheme.

On January 15, 2024, the Irish High Court, on Endo Parent's application, ordered that the Scheme Meetings be convened for purposes of voting on the Scheme.  The Irish High Court also approved the Scheme Circular, which the Debtors are publishing contemporaneously with, and should be read together with, this Disclosure Statement.

As detailed in the Scheme Circular, the Scheme Meetings will be held on March 7, 2024, at the offices of A&L Goodbody LLP, 3 Dublin Landings, North Wall Quay, Dublin 1, D01 C4E0, Ireland.  Scheme Creditors do not need to submit a separate Ballot to vote on the Scheme, and Scheme Creditors are not required to attend the relevant Scheme Meeting in person (although they are entitled to do so if they wish).  The Ballot to be returned by Scheme Creditors in respect of the Plan will constitute a proxy appointing the Chairperson of the relevant Scheme Meeting to submit the Scheme Creditor's vote to accept or reject the Scheme.  Further information regarding how to vote for or against the Scheme is set out below in <u>Section VIII.D</u> (*Voting on the Scheme*) and in the Scheme Circular.  Although Scheme Creditors will be asked to vote on both the Plan and the Scheme, such creditors will only receive a single distribution in respect of their Claim (if such Claim is Allowed in accordance with the terms of the Plan).

If the Scheme is approved by Scheme Creditors representing at least 75% by value and a majority in number of those voting (either in person or by proxy) at each Scheme Meeting, then Endo Parent will apply to the Irish High Court to schedule a hearing (the "<u>Sanction Hearing</u>") at which it will request an order sanctioning the Scheme (the "<u>Sanction Order</u>").  Endo Parent will request that the Sanction Hearing be scheduled as soon as possible after the Confirmation Hearing.

If sanctioned, the Scheme will become binding when Endo Parent delivers the Sanction Order to Companies Registration Office in Ireland for registration.  However, the operative clauses will take effect only upon the occurrence of the Effective Date of the Plan.  Sanction of the Scheme is a condition precedent to the effectiveness of the Plan that can be waived in accordance with the Plan.

Please refer to the Scheme Circular for full details regarding the Scheme, including how to vote to approve or reject the Scheme and how it will interact with the Plan.

## VII.    RISK FACTORS TO BE CONSIDERED

PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS THAT ARE IMPAIRED AND ENTITLED TO VOTE SHOULD READ AND CAREFULLY CONSIDER THE FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT. ALTHOUGH THESE RISK FACTORS ARE MANY, THESE FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESS OR THE PLAN AND ITS IMPLEMENTATION.

As noted above, there can be no guarantee that the assumptions, estimates, and projections underlying the Plan will continue to be accurate or valid at any time after the date hereof. This section of this Disclosure Statement explains that there are certain risk factors that each voting holder of a Claim should consider in determining whether to vote to accept or reject the Plan. Accordingly, each holder of a Claim who is entitled to vote on the Plan should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference herein), before deciding whether to vote to accept or to reject the Plan.

### A.    General

The Plan sets forth the treatment of all Claims against and Interests in the Debtors. Certain Claims are not expected to be paid in full or at all. Nevertheless, the reorganization of the Debtors' business under the proposed Plan avoids the potentially adverse impact of the likely increased delays and costs associated with the Sale or a chapter 7 liquidation of the Debtors. The Plan has been proposed after careful consideration of all reasonable restructuring alternatives. Despite the risks inherent in the Plan, as described herein, the Debtors believe that the Plan is in the best interests of creditors when compared to all reasonable alternatives.

### B.    Bankruptcy Specific Risk Factors

#### 1.    The Plan May Not Be Accepted by Sufficient Holders of Impaired Claims.

The Plan is subject to a vote of holders of impaired Claims in voting classes and to Confirmation by the Bankruptcy Court. Article IX hereof summarizes the numerous requirements for Confirmation of the Plan, including that the Plan be accepted by at least one Class of impaired Claims.  The Consenting First Lien Creditors, who represent the majority of the holders of the First

Lien Claims, are expected to support and vote in favor of the Plan. In addition, as discussed above, certain of the Debtors' key stakeholders, including the Committees and the FCR, support the Plan. However, until all votes are collected, there can be no assurance that the requisite acceptances to confirm the Plan will be obtained. Thus, while the Debtors believe the Plan is confirmable under the standards set forth in section 1129 of the Bankruptcy Code, there is no guarantee that the Plan will be accepted by the requisite Classes entitled to vote on the Plan.

### 2.    The Bankruptcy Court May Not Confirm the Plan.

Even if all Voting Classes vote in favor of the Plan, or even if with respect to any impaired Class that votes to reject the Plan, the requirements for "cramdown" (discussed in more detail in Section IX.E herein) are met, the Bankruptcy Court, which, as a court of equity, has substantial discretion concerning Confirmation of the Plan, may choose not to confirm the Plan. Section 1129 of the Bankruptcy Code requires, among other things, a showing that Confirmation of the Plan will not be followed by liquidation or the need for further financial reorganization of the Debtors, and that the value of distributions to dissenting holders of Claims and Interests will not be less than the value such holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code, *see infra* Section IX.C. Although the Debtors believe that the Plan satisfies such tests, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 3.    Non-Consensual Confirmation.

If any impaired class of Claims or Interests does not accept or is deemed not to accept a plan of reorganization, a bankruptcy court may nevertheless confirm such plan at the proponent's request if at least one impaired class has voted to accept the plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. If any Class votes to reject the Plan, then these requirements must be satisfied with respect to such rejecting Classes. The Debtors believe that the Plan satisfies these requirements.

### 4.    The Debtors are Subject to Risks and Uncertainties Associated with the Chapter 11 Cases.

For the duration of the Chapter 11 Cases, the Debtors will be subject to risks and uncertainties associated with bankruptcy. These risks include:

(a)    the Debtors' ability to obtain Bankruptcy Court approval with respect to motions filed in the Chapter 11 Cases;

(b)    the Debtors' ability to develop, prosecute, confirm, and consummate the proposed Plan or to successfully pursue any other plan of reorganization or sale with respect to the Chapter 11 Cases; and

(c)    the ability of third parties to seek and obtain court approval to terminate or shorten the Exclusive Periods, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 cases.

### 5.    The Debtors Could Suffer From a Long and Protracted Restructuring.

The Debtors seek to emerge from chapter 11 and implement their Plan in a timely manner to minimize any damage to the Debtors' business and the continued accrual of bankruptcy-related costs.  Failure to obtain approval of the Plan in a timely manner could adversely affect the Debtors and erode their value to the detriment of all stakeholders.

### 6.    Classification and Treatment of Claims and Interests

Section 1122 of the Bankruptcy Code requires that the Plan classify Claims against, and Interests in, the Debtors.  The Bankruptcy Code also provides that the Plan may place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests of such Class.  The Debtors believe that all Claims and Interests have been appropriately classified in the Plan.

To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtors may seek (i) to modify the Plan to provide for whatever classification might be required for Confirmation and (ii) to use the acceptances received from any creditor or equity holder pursuant to this solicitation for the purpose of obtaining the acceptance of the Class or Classes of which such creditor or equity holder ultimately is deemed to be a member.  Any such reclassification of creditors or equity holders, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such creditor or equity holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the number of votes required for approval of the Plan.  There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification.  Except to the extent that modification of any classification in the Plan requires re-solicitation, the Debtors will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan by any holder of Claims or Interests pursuant to this solicitation will constitute a consent to the Plan's treatment by such holder regardless of the Class as to which such holder is ultimately deemed to be a member.  The Debtors believe that under the Bankruptcy Rules, they would be required to resolicit votes for or against the Plan only if a modification adversely affects the treatment of the Claim or Interest of any creditor or equity holder.

The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim or Interest of a particular Class unless the holder of a particular Claim or Interest agrees to a less favorable treatment.  The Debtors believe that the Plan complies with the requirement of equal treatment within a Class.  To the extent that the Bankruptcy Court finds that the Plan does not satisfy such requirement, the Bankruptcy Court could deny Confirmation of the Plan.

Issues or disputes relating to classification and/or treatment of Claims or Interests could result in a delay in the Confirmation and consummation of the Plan and could increase the risk that the Plan will not be confirmed and/or consummated.

### 7. Distribution to Holders of Allowed Claims Under the Plan

Projected distributions are based upon good faith estimates of the total amount of Claims ultimately Allowed and the funds available for distribution. Both the actual amount of Allowed Claims in a particular Class and the funds available for distribution for such Class may differ from the Debtors' estimates. If the total amount of Allowed Claims in a Class is higher than the Debtors' estimates or the funds available for distribution to such Class are lower than the Debtors' estimates, the percentage recovery to holders of Allowed Claims in such Class will be less than projected.

### 8. Distributions under the Trusts

The Trust Channeled Claims will be resolved pursuant to and in accordance with the terms and procedures set forth in the applicable Trust Documents. There can be no certainty as to the precise amount that will be distributed by the Trusts to holders of Trust Channeled Claims in any particular time period or when the Trust Channeled Claims will be resolved by the Trusts. Further, the Trusts will be funded by the Debtors and/or the Purchaser Entities, as applicable, as set forth in the Plan. The Debtors' and/or the Purchaser Entities' ability to fund the Trusts may be impacted by factors outside of the Debtors' control that cannot be predicted, which could impact distributions and there is no guarantee that the Purchaser Entities will continue to fund the Trusts or that any litigation commenced against the Purchaser Entities to fund the Trusts will be successful and, in any event, may cause significant delays in holders of Allowed Trust Channeled Claims receiving distributions from the Trusts. In addition, the Trust Documents require creditors to take certain actions in order to be eligible to receive distributions from the Trusts. In the event those actions are not taken by a creditor otherwise eligible to receive a distribution from one of the Trusts, there is a risk that such a creditor will not receive any distribution to which it may otherwise be entitled.

### 9. Conditions Precedent to Consummation of the Plan

Article XI of the Plan provides for certain conditions that must be satisfied (or waived) prior to the Effective Date for the Plan to be consummated. As of the date of this Disclosure Statement, there can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived). Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated and the restructuring completed.

### 10. Risk of Non-Occurrence of the Effective Date

There can be no assurance as to timing of the Effective Date, or as to whether the Effective Date will, in fact, occur.

### 11. Funding Necessary for the Consummation of the Plan

The Debtors contemplate that the net proceeds from the Syndicated Exit Financing (to the extent implemented), the net proceeds from the Rights Offerings, and the Debtors' cash on hand will provide the Debtors with the necessary liquidity to fund the Debtors' cash distributions under the Plan and their business operations upon emergence from bankruptcy. Further, the Plan will allow the Debtors or the Post-Emergence Entities, as the case may be, to transfer funds among themselves as they determine to be necessary or appropriate to enable the applicable

Post-Emergence Entities to satisfy any obligations under the Plan and the PSA.  To the extent the Plan obligates the Remaining Debtors to make any payments or Distributions or take any other action under the Plan, the amount of such payments or Distributions or the cost of taking such actions shall be funded solely by the Purchaser Entities.

### 12. Releases, Injunction, and/or Exculpation Provisions May Not Be Approved

Article X of the Plan provides for certain releases, injunctions, and exculpations for Claims and Causes of Action that may otherwise be asserted against the Debtors, the Post-Emergence Entities, their representatives, the Exculpated Parties, the Non-GUC Released Parties, or the GUC Released Parties, as applicable.  The release, injunction, and exculpation provisions included in the Plan may be subject to objection by parties in interest and may not be approved.  If the release and/or exculpation provisions are not approved, certain parties may not be considered Non-GUC Releasing Parties, GUC Releasing Parties, Non-GUC Released Parties, GUC Released Parties, or Exculpated Parties, and certain Non-GUC Released Parties, GUC Released Parties, or Exculpated Parties may withdraw their support for the Plan.

### 13. Risk of Non-Occurrence of Channeling of Claims

Under the terms of the Plan, all Trust Channeled Claims shall automatically be channeled exclusivity to the Trusts, and this will, among other things, bar assertion of any of these Claims against the Debtors' estates and any Debtor, Post-Emergence Entity, and certain representatives thereof.  Although the Plan and the Trust Documents have been drafted with the intention of obtaining approval of a channeling injunction pursuant to section 105(a) of the Bankruptcy Code, there is no guarantee that all Trust Channeled Claims shall automatically be channeled to the Trusts or that the channeling of all Trust Channeled Claims to the Trusts will not be challenged, either before or after Confirmation of the Plan.  While the Debtors believe that the Plan satisfies the requirements of the Bankruptcy Code, certain objections might be lodged on grounds that the requirements of the Bankruptcy Code cannot be met given the unique facts of the Chapter 11 Cases.

### 14. Risk of Termination of the RSA

The RSA contains certain provisions that give the parties thereto the ability to terminate the RSA upon the occurrence or non-occurrence of certain events, including failure to achieve certain milestones in these Chapter 11 Cases.  Termination of the RSA could result in protracted Chapter 11 Cases, which could significantly and detrimentally impact the Debtors' business and relationships with vendors, suppliers, employees, and major customers, and the Debtors may no longer have the ability to consensually use cash collateral to administer the Chapter 11 Cases.

### 15. Conversion into Chapter 7 Cases

If no plan of reorganization can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interests of holders of Claims and Interests, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed to liquidate the Debtors' assets for distribution in accordance with the order of priorities established by the Bankruptcy Code.  However, as reflected in the Liquidation Analysis,

the Debtors believe that recoveries in a converted chapter 7 case will be greatly reduced from the recoveries contemplated under the Plan.

### 16.    Risk of Non-Dischargeability of Claims

Certain creditors have taken or may take the position their claims are non-dischargeable under the Bankruptcy Code.   Such creditors may make such allegations at any time, notwithstanding the existence of deadlines established by the Bankruptcy Rules or applicable Court order, entry of the Confirmation Order, or the occurrence of the Effective Date.   Such assertions of non-dischargeability could result in the denial of Confirmation, changes to the Plan, withdrawal of the Plan, or, if asserted after occurrence of the Effective Date, the Post-Emergence Entities being required to litigate the validity of or become subject to such claims.

### 17.    Future Litigation

Given the nature of the Debtors' business, there is a risk that new litigation claims may be asserted against the Purchaser Entities in the future.   Future litigation could result in material judgment(s) against the Purchaser Entities.   Such litigation, and any judgment in connection therewith, could have a material negative effect on the Purchaser Entities.

### 18.    The Scheme

The Scheme implements certain terms of the Plan as a matter of Irish Law.   If the Scheme cannot be sanctioned (whether because it is not approved by the requisite qualified majorities of claimants or the Irish High Court refuses to sanction the Scheme), certain creditors may take the position that the Post-Emergence Entities will not have the benefit of the discharge of Claims as a matter of Irish Law and could attempt to assert Irish or other foreign claims against the Post-Emergence Entities.

### C.    Risks Relating to the Capital Structure of the Purchaser Entities

### 1.    Variances from Financial Projections

The Financial Projections (defined below) set forth in **<u>Exhibit E</u>** hereto reflect numerous assumptions, which involve significant levels of judgment and estimation concerning the anticipated future performance of the Purchaser Entities, as well as assumption with respect to the prevailing market, economic and competitive conditions, which are beyond the control of the Purchaser Entities, and which may not materialize.   Any significant differences in actual future results versus estimates to prepare the Financial Projections, such as lower sales, lower volume, lower pricing, increases in production costs, technological changes, environmental and safety issues, litigation, workforce disruptions, competition, regulatory decisions about pipeline products, or changes in the regulatory environment, could result in significant differences from the Financial Projections.   However, unanticipated events and circumstances occurring subsequent to the preparation of the Financial Projections may affect the Debtors' and the Purchaser Entities' ability to initiate the endeavors and meet the financial benchmarks contemplated by the Plan.   Therefore,

the actual results achieved throughout the period covered by the Financial Projections necessarily will vary from the projected results, and these variations may be material and adverse.

## 2.      Leverage

Although the Purchaser Entities will have less indebtedness as of the Effective Date than the Debtors did prior to the Effective Date, the Purchaser Entities will still have a significant amount of secured indebtedness.  On the Effective Date, after giving effect to the transactions contemplated by the Plan, the Purchaser Entities will have approximately $2.5 billion in secured funded indebtedness.

The degree to which the Purchaser Entities will be leveraged could have important consequences because, among other things, it could affect the Purchaser Entities' ability to satisfy their obligations under their indebtedness following the Effective Date should they fail to meet the Financial Projections, and a portion of the Purchaser Entities' cash flow from operations will be used for debt service and obligations under the Plan and unavailable to support operations, or for working capital, capital expenditures, expansion, acquisitions, or general corporate or other purposes.  As a result, to meet their obligations in such a circumstance, the Purchaser Entities may be required to refinance all or part of its indebtedness, sell assets, reduce or delay capital expenditures or seek to raise additional capital.  The Purchaser Entities' ability to obtain additional debt financing or equity financing, or pursue mergers, acquisitions, and asset sales, may be limited. The Purchaser Entities' operational flexibility in planning for, or reacting to, changes in their business may be limited.

In addition, subject to the terms of the Exit Financing Documents, the Purchaser Entities and their respective subsidiaries may be able to incur substantial additional indebtedness in the future, including secured indebtedness. If new indebtedness is added to their current debt levels, the related risks that the Purchaser Entities and their respective subsidiaries face could intensify.

## 3.      Ability to Service Debt

Although the Purchaser Entities will have less indebtedness as of the Effective Date than the Debtors did prior to the Effective Date, the Purchaser Entities will still have significant interest expense and principal repayment obligations.  The Purchaser Entities' ability to make payments on and to refinance their debt will depend on their future financial and operating performance and their ability to generate cash in the future.  This, to a certain extent, is subject to general economic, business, finance, competitive, legislative, regulatory, and other factors that are beyond the control of the Purchaser Entities.

Although the Debtors believe the Plan is feasible, there can be no assurances that the Purchaser Entities will be able to generate sufficient cash flow from operations or that sufficient future borrowings will be available to pay off the Purchaser Entities' debt obligations.  The Purchaser Entities may need to refinance all or a portion of their debt on or before maturity or otherwise obtain additional liquidity by selling assets, reducing or delaying capital expenditures or seeking to raise additional capital.  There can be no assurances that the Purchaser Entities will be able to refinance any of their debt or otherwise obtain additional capital on a timely basis and on commercially reasonable terms or at all.  Furthermore, any future borrowings by the Purchaser

Entities could also have variable interest rates.  As a result, to the extent they have not hedged against rising interest rates, an increase in the applicable benchmark interest rates would increase the Purchaser Entities' cost of servicing such indebtedness and the related risks that the Purchaser Entities and its subsidiaries face could intensify.

### 4.      Obligations Under Certain Financing Agreements

The Purchaser Entities' obligations under the Exit Financing will be secured by liens on substantially all of the assets of the Purchaser Entities (subject to certain exclusions set forth therein).  If the Purchaser Entities become insolvent or are liquidated, or if there is a default under certain financing agreements, including, but not limited to, the documentation for the Exit Financing, and payment on any obligation thereunder is accelerated, the lenders under and holders of the Exit Financing would be entitled, subject to the applicable credit documents, to exercise the remedies available to a secured lender under applicable law, including foreclosure on the collateral that is pledged to secure the indebtedness thereunder, and they would have a claim on the assets securing the obligations under the applicable facility that would be superior to any claim of the holders of unsecured claims.

### 5.      Restrictive Covenants

The financing agreements governing the Purchaser Entities' indebtedness, including the Exit Financing, are expected to contain various covenants that may limit the discretion of the Purchaser Entities' management by restricting the Purchaser Entities' ability to, among other things, incur indebtedness and liens to secure such indebtedness, make investments, and make restricted payments such as dividends.  As a result of these covenants, the Purchaser Entities may be limited in the manner in which they conduct their business and they may be unable to engage in favorable business activities or finance future operations or capital needs.

Any failure to comply with the restrictions of the financing agreements may result in an event of default thereunder.  An event of default may allow the creditors to accelerate the related debt as well as any other debt to which a cross-acceleration or cross-default provision applies.  If the Purchaser Entities are unable to repay amounts outstanding under their financing agreements when due, the lenders thereunder could, subject to the terms of the financing agreements, seek to foreclose on the collateral that is pledged to secure the indebtedness outstanding under such facilities.

The Purchaser Entities' assets and cash flows may be insufficient to fully repay borrowings under its outstanding financing agreements if the obligations thereunder were accelerated upon an event of default.  The Purchaser Entities may need to conduct asset sales or pursue other alternatives.  The covenants are expected to be subject to a number of exceptions, including the ability to incur certain additional amounts of secured and unsecured indebtedness, which could exacerbate any of these risks.

### 6.      Market for Securities

There is currently no market for the Purchaser Equity and there can be no assurance as to the development or liquidity of any market for such securities.  Moreover, while a public listing of the Purchaser Equity may be pursued to be effective on the Effective Date, there can be no

assurance that the Purchaser Equity will be listed or traded on any securities exchange or any over-the-counter market on or after the Effective Date.  If a trading market does not develop, is not maintained, or remains inactive, holders of the securities may experience difficulty in reselling such securities or may be unable to sell them at all.  Even if such a market were to exist, such securities could trade at prices higher or lower than the estimated value set forth in this Disclosure Statement depending upon many factors including, without limitation, prevailing interest rates, markets for similar securities, industry conditions, and the performance of, and investor expectations for, the Purchaser Entities.  Accordingly, holders of the securities may bear certain risks associated with holding securities for an indefinite period of time.

Furthermore, persons to whom the Purchaser Equity is issued pursuant to the Plan may prefer to liquidate their investments rather than hold such securities on a long-term basis. Accordingly, the market price for such securities could decline and any market that does develop for such securities may be volatile.

### 7.      Potential Dilution

The ownership percentage represented by the Purchaser Equity distributed under the Plan as of the Effective Date to holders of Second Lien Deficiency Claims and Unsecured Notes Claims will be subject to dilution from the Purchaser Equity issued in connection with the Management Incentive Plan.  The Purchaser Equity otherwise distributed under the Plan as of the Effective Date will be subject to dilution from the equity issued in connection with the (a) Rights Offerings and (b) Management Incentive Plan. In the future, additional equity financings or other equity issuances by Purchaser Parent (including the issuance of instruments convertible into equity) may dilute the economic and voting rights of its existing equity holders and could materially and adversely affect the value of the Purchaser Equity. The amount and dilutive effect of any of the foregoing could be material.

### 8.      Significant Holders of Purchaser Equity

Certain holders of Allowed First Lien Claims are expected to acquire significant ownership interests in the Purchaser Parent.  Thus, such holders could be in a position to control the outcome of all actions of Purchaser Parent requiring the approval of equity holders, including the election of directors or managers, without the approval of other equity holders and the interests of the holders of the Allowed First Lien Claims could differ materially from, or conflict with, those of the Purchaser Parent and its other equity holders.  This concentration of ownership could also facilitate or hinder a negotiated change of control of Purchaser Parent and, consequently, have an impact upon the value of the Purchaser Equity.

### 9.      Interests Subordinated to the Purchaser Entities' Indebtedness

In any subsequent liquidation, dissolution, or winding up of Purchaser Parent, the Purchaser Equity would rank below all debt claims against Purchaser Parent, including the Purchaser Entities' obligations under the Exit Financing, or any future preferred equity issued by the Purchaser Parent, if any.  As a result, holders of the Purchaser Equity will not be entitled to receive any payment or other distribution of assets upon the liquidation, dissolution, or winding

97

up of Purchaser Parent until after all applicable holders of debt, preferred equity (if any), and other liabilities have been paid in full.

### 10. Estimated Valuations of the Debtors and the Purchaser Equity, and Estimated Recoveries to Holders of First Lien Claims and Unsecured Claims Are Not Intended to Represent Potential Market Values

The Debtors' estimated recoveries to Allowed holders of First Lien Claims, Second Lien Deficiency Claims, or Unsecured Notes Claims are not intended to represent the market value of the Debtors' securities. The estimated recoveries are based on numerous assumptions (the realization of many of which will be beyond the control of the Debtors), including, among others: (a) the successful reorganization of the Debtors; (b) an assumed date for the occurrence of the Effective Date; (c) the Debtors' ability to achieve the operating and financial results included in the Financial Projections; (d) the Debtors' ability to maintain adequate liquidity to fund operations; (e) the assumption that capital and equity markets remain consistent with current conditions; and (f) the Debtors' ability to maintain critical existing customer relationships.

### 11. Dividends

Purchaser Parent may not pay any dividends on the Purchaser Equity. Any declaration and payment of future dividends to equity holders will be at the sole discretion of the board of directors of the Purchaser Parent and will depend on many factors, including its financial condition, earnings, capital requirements, level of indebtedness, statutory and contractual restrictions applying to the payment of dividends and other considerations that its board of directors deems relevant. Accordingly, until such time as the Purchaser Parent elects to a dividend, the success of an investment in the Purchaser Equity will depend entirely upon any future appreciation in the value of the Purchaser Equity. There is, however, no guarantee that the Purchaser Equity will ever appreciate in value or even maintain its initial value.

### 12. Restrictions on Ability to Resell Purchaser Equity

Upon the Effective Date, the issuance of Purchaser Equity will not be registered under the Securities Act or any Blue Sky Laws of the states of the United States.

To the extent that shares of the Purchaser Equity issued under the Plan are covered by section 1145(a) of the Bankruptcy Code, such securities may be resold by the holders thereof without registration under the Securities Act unless the holder is an "underwriter," as defined in section 1145(b) of the Bankruptcy Code with respect to such securities; provided, however, such rights or shares of such Purchaser Equity will not be freely tradeable if, at the time of transfer, the holder is an "affiliate" of the Purchaser Parent as defined in Rule 144(a)(1) under the Securities Act or had been such an "affiliate" within 90 days of such transfer. Such affiliate holders would only be permitted to sell such securities without registration if they are able to comply with an applicable exemption from registration, including Rule 144 under the Securities Act. Holders of securities issued pursuant to the exemption from registration under section 1145 of the Bankruptcy Code who are deemed to be "underwriters" under section 1145(b) of the Bankruptcy Code ("Section 1145 Underwriters") will be subject to resale restrictions. Section 1145 Underwriters

should be aware that they may be required to bear the financial risk of an investment in the affected securities including Purchaser Equity for an indefinite period of time.

To the extent that securities issued pursuant to the Plan are not covered by section 1145(a)(1) of the Bankruptcy Code, such securities shall be issued pursuant to section 4(a)(2) or Regulation S under the Securities Act, as applicable, and will be deemed "restricted securities" that may not be sold, exchanged, assigned, or otherwise transferred unless they are registered, or an exemption from registration applies, under the Securities Act. Holders of such restricted securities will not have a right to have their restricted securities registered and will therefore not be able to resell them except in accordance with an available exemption from registration under the Securities Act.

Under Rule 144 of the Securities Act, the resale of restricted securities is permitted if certain conditions are met, and these conditions vary depending on whether the holder of the restricted securities is an "affiliate" of the issuer, as defined in Rule 144. A non-affiliate who has not been an affiliate of the issuer during the preceding ninety days may resell restricted securities after a one-year holding period. An affiliate may also resell restricted securities after a one-year holding period but only if certain current public information regarding the issuer is available at the time of the sale and only if the affiliate also complies with the volume, manner of sale, and notice requirements of Rule 144. Since the Purchaser Parent may not be subject to the reporting requirements of the Exchange Act and will not have any of its securities listed on a national stock exchange on the Effective Date, there can be no assurance that there will be current public information available about the issuer of the Purchaser Equity.

Holders of Purchaser Equity who are deemed to be "underwriters" under section 1145(b) of the Bankruptcy Code will also be subject to restrictions under the Securities Act on their ability to resell those securities.

### 13.    If a United States Person is Treated as Owning At Least 10% of Certain of the Debtors, Such Holder May Be Subject to Adverse U.S. Federal Income Tax Consequences

Many of Endo Parent's non-U.S. subsidiaries are classified as "controlled foreign corporations" for U.S. federal income tax purposes due to the application of certain ownership attribution rules within a multinational corporate group. If a United States person is treated as owning (directly, indirectly or constructively) at least 10% of the value or voting power of Endo Parent's shares, such person may be treated as a "United States shareholder" (a "10% U.S. Holder") with respect to one or more of Endo Parent's controlled foreign corporation subsidiaries. In addition, if the equity of Endo Parent is treated as owned more than 50% (by voting power or value) by 10% U.S. Holders, Endo Parent itself would be treated as a controlled foreign corporation. A 10% U.S. Holder may be required to annually report and include in its U.S. taxable income, as ordinary income, its pro rata share of "Subpart F income," "global intangible low-taxed income" and investments in U.S. property by controlled foreign corporations, whether or not Endo Parent makes any distributions to such 10% U.S. Holder. If the Plan is confirmed, the Debtors will consummate a series of transactions intended to be treated as taxable sales of assets and/or stock for U.S. federal income tax purposes. Any such taxable transactions could require a 10% U.S. Holder to report and include its pro rata share of Subpart F income and global intangible low-taxed

income. An individual United States shareholder generally would not be allowed certain tax deductions or foreign tax credits that would be allowed to a corporate United States shareholder. A failure by a 10% U.S. Holder to comply with its reporting obligations may subject the 10% U.S. Holder to significant monetary penalties and may extend the statute of limitations with respect to the 10% U.S. Holder's U.S. federal income tax return for the year for which such reporting was due. Neither Endo Parent nor Purchaser Parent can provide any assurances that it will assist investors in determining whether it or any of its non-U.S. subsidiaries are controlled foreign corporations or whether such investors are required to report and include any amounts of Subpart F income and global intangible low-taxed income as a result of the transactions consummated pursuant to the Plan. Additionally, neither Endo Parent nor Purchaser Parent can guarantee that it will furnish to 10% U.S. Holders information that may be necessary for them to comply with the aforementioned obligations. 10% U.S. Holders should consult their tax advisors regarding the U.S. federal income tax consequences of the Plan.

### D.    Business and Industry-Specific Risk Factors

**THE FOLLOWING PROVIDES A SUMMARY OF CERTAIN OF THE RISKS ASSOCIATED WITH THE DEBTORS' BUSINESS. HOWEVER, THIS SECTION IS NOT INTENDED TO BE EXHAUSTIVE. ADDITIONAL RISK FACTORS CONCERNING THE DEBTORS' BUSINESS ARE CONTAINED IN THE DEBTORS' PREVIOUSLY-FILED ANNUAL REPORT ON FORM 10-K FOR THE FISCAL YEAR ENDED DECEMBER 31, 2022.**

### 1.    The Debtors' Chapter 11 Cases May Negatively Impact Future Operations

While the Debtors believe they will be able to emerge from chapter 11 relatively expeditiously, there can be no assurance as to timing for Confirmation of the Plan or the Debtors' emergence from chapter 11. For example, certain conditions precedent to consummating the Plan, such as regulatory approvals, are outside of the Debtors' control. A substantial delay in emerging from the Chapter 11 Cases may adversely affect the Debtors' business and relationships with existing vendors, suppliers, and customers and their ability to attract new customers.

### 2.    The Availability of Third-Party Reimbursement for the Debtors' Products Is Uncertain, the Debtors May Find it Difficult to Maintain Current Price Levels, and the Market May Not Accept Such Products for Which Third-Party Reimbursement Is Not Adequately Provided.

The Debtors' ability to commercialize their products depends, in part, on the extent to which reimbursement for the costs of these products is available from government healthcare programs, such as Medicaid and Medicare, private health insurers and others. The Debtors cannot be certain that, over time, third-party reimbursements for their products will be adequate for the Debtors to maintain price levels sufficient for realization of an appropriate return on investment. Government payers, private insurers and other third-party payers are increasingly attempting to contain healthcare costs by: (i) limiting both coverage and the level of reimbursement (including adjusting co-pays) for products; (ii) refusing, in some cases, to provide any coverage for off-label

uses for products; and (iii) requiring or encouraging, through more favorable reimbursement levels or otherwise, the substitution of generic alternatives to branded products.

For instance, government agencies or third-party payors could attempt to reduce reimbursement for physician administered products through their interpretation of complex government price reporting obligations and payment and reimbursement coding rules, and could attempt to reduce reimbursement for separate physician administered products that share an active ingredient by requiring the blending of sales and pricing information in the same payment and reimbursement code.

There have been several recent U.S. Congressional inquiries, hearings and proposed and enacted federal and state legislation and rules, as well as executive orders, designed to, among other things: (i) reduce or limit the prices of drugs and make them more affordable for patients, such as by tying the prices that Medicare reimburses for physician administered drugs to the prices of drugs in other countries; (ii) reform the structure and financing of Medicare Part D pharmaceutical benefits, including through increasing manufacturer contributions to offset Medicare beneficiary costs; (iii) bring more transparency to how manufacturers price their medicines; (iv) enable the government to directly negotiate prices for drugs covered under Medicare; (v) revise rules associated with the calculation of Medicaid Average Manufacturer Price and Best Price, including with regard to the manner in which pharmaceutical manufacturers may provide copayment assistance to patients and the identification of "line extension" drugs, which affect the amount of rebates that manufacturers must pay on prescription drugs under Medicaid; (vi) eliminate anti-kickback statute discount safe harbor protection for manufacturer rebate arrangements with Medicare Part D Plan Sponsors and pharmacy benefit managers on behalf of Part D Plan Sponsors; (vii) create new anti-kickback statute safe harbors applicable to certain point-of-sale discounts to patients and fixed-fee administrative fee payment arrangements with pharmacy benefit managers; and (viii) facilitate the importation of certain lower-cost drugs from other countries.  In addition, state legislatures have enacted legislation and regulations designed to control pharmaceutical and biological product pricing, including restrictions on pricing or reimbursement at the state government level, marketing cost disclosure and transparency measures, and, in some cases, policies to encourage importation of drugs from other countries (subject to federal government approval) and bulk purchasing, including the National Medicaid Pooling Initiative.  While the Debtors cannot predict the final form of any pending legislative, regulatory and/or administrative measures, some of the pending and enacted legislative proposals or executive rulemaking, such as those incorporating International Pricing Index or Most-Favored-Nation models, could significantly reduce the coverage and levels of reimbursement for products.

In addition, in August 2022, the U.S. enacted the Inflation Reduction Act of 2022.  Subject to subsequent rulemaking, this act, among other changes: (i) gives the Department of Health and Human Services ("HHS") the ability and authority to directly negotiate with manufacturers the price that Medicare will pay for certain drugs; (ii) requires manufacturers of certain Part B and Part D drugs to issue rebates to HHS based on certain calculations and triggers, such as when drug price increases outpace the rate of inflation; (iii) places certain limitations on out-of-pocket spending for Medicare Part D enrollees; (iv) implements a 15% corporate alternative minimum tax on book income on corporations whose average annual adjusted financial statement income during the most recently-completed three-year period exceeds $1.0 billion; (v) implements a 1% excise tax on net stock repurchases; and (vi) implements several tax incentives to promote clean energy.

101

While the impact of the Inflation Reduction Act of 2022 was not material to the Debtors in 2022, the Debtors are continuing to evaluate the act and its requirements, as well as any potential impact on their business. It is possible that the act will have a material adverse effect on the Debtors' business, financial condition, results of operations and cash flows in the future.

The unavailability of or a reduction in the reimbursement of the Debtors' products could have a material adverse effect on the Debtors' business, financial condition, results of operations and cash flows.

### 3.   The Debtors' Intellectual Property May be Misappropriated or the Debtors May Be Subject to Infringement Claims

The Debtors rely on a combination of patents, trademarks, trade secrets, proprietary know-how, market exclusivity gained from regulatory approval processes, and other intellectual property to conduct their business. The Debtors' failure to adequately maintain and protect their intellectual property could materially affect the Debtors' intellectual property rights. The Debtors' intellectual property rights could be challenged, invalidated or circumvented by others and may be insufficient in scope and strength to meaningfully protect the Debtors. While the Debtors will continue to strive to protect their intellectual property rights, the Debtors cannot guarantee that they will be successful in defending such rights against third parties who may infringe upon them. Similarly, it is possible that third parties will make claims of infringement against the Debtors, and there is no guarantee that the Debtors will successfully defend or otherwise resolve such claims. Any such claims, even if meritless, could disrupt or impose significant costs on the Debtors' business.

### 4.   The Loss of Key Personnel Could Disrupt Operations and Adversely Affect Financial Results

The Debtors are, and the Purchaser Entities will be, highly dependent upon the availability and performance of their respective executive officers. Accordingly, the loss of services of any of the Debtors' executive officers could materially and adversely affect the Purchaser Entities' business, financial condition and operating results.

### 5.   Regulatory Risks

As a manufacturer of controlled substances and prescription and over-the-counter pharmaceutical products, the Debtors are subject to regulatory oversight by numerous governmental entities. For example, the Debtors must comply with laws, regulations, guidance documents and standards promulgated by the FDA, the DEA, the HHS, the Centers for Medicare and Medicaid Services, the Environmental Protection Agency, state boards of pharmacy, state controlled substance authorities and comparable foreign government entities.

If the Debtors fail to comply with applicable federal, state, and foreign laws and regulations, the Debtors could face substantial enforcement actions, including civil, criminal and administrative penalties which may impose product seizures and injunctions, damages, and fines and exclusion from federal or state healthcare programs. If any such enforcement actions are taken, the Debtors' financial condition and business operations could be adversely affected. Although compliance programs can mitigate the risks of investigation and prosecution for violation of these laws, these risks are not entirely eliminated. In addition, in order to operate their business, the Debtors are

102

required to maintain licenses under various state, federal and foreign laws, and failure to obtain, maintain or renew such licenses may result in adverse effects on their financial condition and operations as well as regulatory proceedings and other administrative, civil or criminal penalties. In connection with implementing the Restructuring Transaction and the Resolutions embodied in the Plan (including, without limitation, the U.S. Government Resolution), the Purchaser Entities will need to seek licensing approvals. Licensing authorities have significant discretion to grant or deny approvals. There is no guarantee that all such approvals will be obtained or will be obtained in a timely manner. The failure to obtain, or delay in obtaining, one or more approvals could have a material adverse effect on the Purchaser Entities' business.

Moreover, continued compliance with prevailing laws and regulations imposes significant financial and operational costs on the Debtors, including because these laws and regulations are subject to ongoing government review and interpretation, which can result in shifts in review protocols, government interpretations, and government implementation and enforcement methods. Additionally, governments and regulators may modify existing laws or regulations or impose new ones, which may increase the Debtors' costs of compliance significantly. All of these factors can have material impacts on the Debtors' business.

### 6.    The Debtors Operate in a Highly Competitive Industry

The pharmaceutical industry is intensely competitive and the Debtors face competition in both the Debtors' U.S. and international branded and generic pharmaceutical businesses. Competitive factors include, without limitation, product development, technological innovation, safety, efficacy, commercialization, marketing, promotion, product quality, price, cost-effectiveness, reputation, service, patient convenience and access to scientific and technical information. Many of the Debtors' competitors have, and future competitors may have, greater resources than the Debtors do, and the Debtors cannot predict with certainty the timing or impact of competitors' products and commercialization strategies. Furthermore, recent market consolidation in this industry may further concentrate financial, technical and market strength and increase competitive pressure in the industry. In addition, the Debtors' competitors may make greater R&D investments and have more efficient or superior processes and systems and more experience in the development of new products that permit them to respond more quickly to new or emerging technologies and changes in customer demand which may make the Debtors' products or technologies uncompetitive or obsolete. Furthermore, academic institutions, government agencies and other public and private organizations conducting research may seek patent protection and may establish collaborative arrangements for competitive products or programs. If the Debtors fail to compete successfully, it could have a material adverse effect on the Debtors' business, financial condition, results of operations and cash flows.

Certain of the Debtors' branded products do not currently compete with on-market generic products but are likely to face generic competition in the future. The entrance of generic competitors can occur at any time and cannot be predicted with certainty. Generic products the Debtors currently sell with generic exclusivity could in the future be subject to competition from other generic competitors. Some of the Debtors' other branded and generic products, such as Vasostrict, already face generic competition and are at risk of additional generic competitors entering the market. During the first quarter of 2022, multiple competitive generic alternatives to Vasostrict were launched, beginning with a generic that was launched at risk and began shipping

103

toward the end of January 2022. Since then, additional competitive alternatives entered the market, including authorized generics.

Manufacturers of generic products typically invest far less in R&D than research-based companies. Additionally, generic competitors, including Asian or other overseas generic competitors, may be able to manufacture products at costs lower than the Debtors. For these reasons, competitors may price their products lower than the Debtors, and such differences could be significant. Due to lower prices, generic versions, where available, may be substituted by pharmacies or required in preference to branded versions under third-party reimbursement programs. As a result, generic competition could have a material adverse effect on the Debtors' business, financial condition, results of operations and cash flows. Legislation encouraging early and rapid approval of generic drugs could also increase the degree of generic competition the Debtors face.

In addition, the Debtors' generics business faces competition from brand-name pharmaceutical companies, which have taken and may continue to take aggressive steps to thwart or delay competition from generic equivalents of their brand-name products, including bringing litigation alleging patent infringement or other violations of intellectual property rights. The actions taken by competing brand-name pharmaceutical companies may increase the costs and risks associated with the Debtors' efforts to introduce generic products and may delay or prevent such introduction altogether. For example, if a brand-name pharmaceutical company's patent were held to be valid and infringed by the Debtors' generic products in a particular jurisdiction, the Debtors would be required to either obtain a license from the patent holder or delay or cease the manufacture and sale of such generic product. Any of these factors could have a material adverse effect on the Debtors' business, financial condition, results of operations and cash flows.

The Debtors' sales may also suffer as a result of changes in consumer demand for the Debtors' products, including as a result of fluctuations in consumer buying patterns, changes in market conditions or actions taken by the Debtors' competitors, including the introduction of new products or price reductions for existing products. Any of these factors could have a material adverse effect on the Debtors' business, financial condition, results of operations and cash flows.

> **7.     The Debtors May Fail to Successfully Identify and Develop Additional Branded and Generic Pharmaceutical Products, Obtain and Maintain Exclusive Marketing Rights for Branded and Generic Products or Fail to Introduce Branded and Generic Products on a Timely Basis**

The Debtors' financial results depend, to a significant extent, upon the Debtors' ability, and the ability of the Debtors' partners, to identify, develop, obtain regulatory approval for, launch, and commercialize a pipeline of commercially successful branded and generic products, including first-to-file or first-to-market opportunities. Due to the significant competition the Debtors face and the importance of being the first (or one of the first) to market with respect to any given product, no assurances can be given that the Debtors will be able to develop, introduce and maintain commercially successful products in the future. Competition could cause the Debtors' revenues to decrease significantly, which could have a material adverse effect on the Debtors' business, financial condition, results of operations and cash flows.

Identifying and developing additional product candidates are prone to risks of failure inherent in product development.  The Debtors conduct R&D to enable the Debtors to manufacture and market pharmaceutical products in accordance with specific government regulations.  Much of the Debtors' product development effort is focused on technically difficult-to-formulate products and/or products that require advanced manufacturing technology.  Typically, expenses related to research, development and regulatory approval of compounds for the Debtors' branded products are significantly greater than those expenses associated with generic products.  Should the Debtors expand their R&D efforts, the Debtors' research expenses are likely to increase.  Because of the inherent risk associated with R&D efforts in the healthcare industry, particularly with respect to new products, the Debtors' R&D expenditures may not result in the successful regulatory approval and introduction of new products and failure in the development of any new product can occur at any point in the process, including late in the process after substantial investment.  Also, after the Debtors submit a regulatory application, the relevant governmental health authority may require that the Debtors conduct additional studies, including, for example, studies to assess the product's interaction with alcohol.  As a result, the Debtors may be unable to reasonably predict the total R&D costs required to develop a particular product and there is a significant risk that the funds the Debtors invest in R&D will not generate financial returns.  In addition, the Debtors' operating results and financial condition may fluctuate as the amount the Debtors spend to research and develop, commercialize, acquire or license new products, technologies, and businesses changes.

The process of developing and obtaining regulatory approvals for new products is time-consuming, costly, and inherently unpredictable.  Even if the Debtors are able to identify and develop additional product candidates, the Debtors may fail to obtain exclusive marketing rights, such as the 180-day ANDA first-filer marketing exclusivity period provided for in the Hatch-Waxman amendments to the FFDCA, or the 180-day exclusivity for competitive generic therapies established by the FDA Reauthorization Act of 2017, for such product candidates.  Even if the Debtors were to secure such exclusivities, risks associated with securing timely approval, as well as risks of unfavorable litigation dispositions, put such exclusivities at risk of being forfeited.  The approval of the Debtors' ANDAs may also be stayed by the FDA for up to 30 months if such ANDAs become the subject of patent litigation.  Even where the Debtors are awarded marketing exclusivity, the Debtors may be required to share the exclusivity period with other ANDA applicants or with authorized generics that are not prohibited from sale during the 180-day marketing exclusivity period.  The Debtors' revenues have historically included sales of generic products with limited competition resulting from marketing exclusivity or other factors, and the failure to timely and effectively file any NDA, ANDA, Biologics License Application or Supplemental Biologics License Application with the FDA or similar filings with other regulatory agencies, or to partner with parties that have obtained marketing exclusivity, could have a material adverse effect on the Debtors' business, financial condition, results of operations, and cash flows.

Furthermore, the successful commercialization of a product is subject to a number of factors, including:

- the effectiveness, ease of use, and safety of the Debtors' products as compared to existing products;

- customer demand and the willingness of physicians and customers to adopt the Debtors' products over competitors' products to which they may have more loyalty or familiarity and overcoming any biases toward competitors' products or against the Debtors' products;

- the cost of the Debtors' products compared to alternative products and the pricing and commercialization strategies of the Debtors' competitors;

- the success of the Debtors' launch and marketing efforts;

- adverse publicity about the Debtors, the Debtors' products, the Debtors' competitors and their respective products or the industry as a whole, or favorable publicity about competitors or their respective products;

- the advent of new and innovative alternative products;

- any unforeseen issues or adverse developments in connection with the Debtors' products and any resulting litigation, regulatory scrutiny, and/or harm to the Debtors' reputation; and

- other risks that may be out of the Debtors' control, including the decision by a collaboration partner to make substantial changes to a product's formulation or design, or a collaboration partner refusing to perform its obligations under a collaboration agreement, any of which may cause delays and additional costs in developing and marketing a product.

E.    **Forward Looking Statements**

This Disclosure Statement may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate," or "continue" or the negative thereof or other variations thereon or comparable terminology. All forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The Liquidation Analysis, anticipated distributions, and other information contained and/or described herein and/or attached hereto are estimates only, and the timing and amount of actual distributions to holders of Allowed Claims may be affected by many factors that cannot be predicted. Therefore, any analyses, estimates, or recovery projections may or may not turn out to be accurate.

Any financial information contained in this Disclosure Statement has not been audited. In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation. The Debtors have used their reasonable business judgment to ensure the accuracy of the financial information provided in this Disclosure Statement, which they believe is materially accurate. Nevertheless, the Debtors are unable to warrant or represent that any financial information contained in this Disclosure Statement or the Plan is without inaccuracies.

There are uncertainties associated with any forward looking statements, including projections and estimates, and such forward looking statements should not be considered assurances or guarantees of the amount of funds or amount of Claims that might be allowed in the various Classes. The Company cautions each reader of this Disclosure Statement to carefully consider those factors set forth above and the acknowledgements contained in this "Risk Factors" section of this Disclosure Statement. Such factors have, in some instances, affected, and in the future could affect, the ability of the Company to achieve the projected results and may cause actual results to differ materially from those expressed in this Disclosure Statement or the Plan. The Company undertakes no obligation to update any forward looking statements in this Disclosure Statement.

**F.     Disclosure Statement Disclaimer**

**1.     This Disclosure Statement Was Not Approved by the SEC**

This Disclosure Statement has not and will not be filed with the SEC or any state regulatory authority. Neither the SEC nor any state regulatory authority has approved or disapproved of the securities described in this Disclosure Statement or has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained in this Disclosure Statement.

**2.     No Legal or Tax Advice Is Provided by This Disclosure Statement**

This Disclosure Statement is not and shall not be deemed to be legal, business, or tax advice. The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each holder of a Claim or Interest should consult such holder's own legal counsel and accountant with regard to any legal, tax and other matters concerning such holder's Claim or Interest. This Disclosure Statement may not be relied upon for any purpose other than to provide information to aid holders of Claims or Interests in determining how to vote on the Plan or whether to object to the Confirmation of the Plan.

**3.     No Admissions Made**

The information and statements contained in this Disclosure Statement will neither (i) constitute an admission of any fact or liability by any entity (including, without limitation, the Debtors) nor (ii) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, holders of Allowed Claims or Interests, or any other parties in interest.

**4.     No Waiver of Right to Object or Right to Recover Transfers and Assets**

The vote by a holder of an Allowed Claim does not constitute a waiver or release of any claims or rights of the Debtors (or any party in interest, as the case may be) to object to such holder's Allowed Claim, or to recover any preferential, fraudulent or other voidable transfer or assets, regardless of whether any claims or causes of action of the Debtors or their estates are specifically or generally identified herein.

5.      **Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors**

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not independently verified the information contained herein.

6.      **Potential for Inaccuracies Exists and the Debtors Have No Duty to Update**

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date. While the Debtors have used their reasonable business judgment in determining that the information provided in this Disclosure Statement and in the Plan is as accurate as possible, the Debtors nonetheless cannot, and do not confirm, and will not be construed as having confirmed, the accuracy of any statement appearing in this Disclosure Statement. Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

7.      **No Representations Outside this Disclosure Statement Are Authorized**

No representations concerning or relating to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement or other materials included in the Solicitation Package (as defined in the Disclosure Statement Order). Any representations or inducements made to secure your acceptance or rejection of the Plan that are different from those contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to the Debtors' counsel and the United States Trustee.

G.      **Liquidation Under Chapter 7**

If no chapter 11 plan can be confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code or, in respect of Debtors incorporated in a foreign jurisdiction, to liquidation proceedings under local law, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the order of priorities established by the Bankruptcy Code of applicable local law. A discussion of the effects that liquidation would have on recoveries of holders of Claims and the Debtors' Liquidation Analysis is attached hereto as **Exhibit D**.

## VIII.    SOLICITATION AND VOTING PROCEDURES[29]

### A.    Voting Status of Each Class

Under the Bankruptcy Code, creditors are entitled to vote on the Plan if their contractual rights are impaired by the Plan and they are receiving a distribution under the Plan. Creditors and equity holders are not entitled to vote if their contractual rights are unimpaired by the Plan or if they will receive no distribution of property under the Plan. The following table sets forth which Classes of Claims and Interests will or will not be entitled to vote on the Plan:

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| 1 | Priority Non-Tax Claims | Unimpaired | No (conclusively presumed to accept) |
| 2 | Other Secured Claims | Unimpaired | No (conclusively presumed to accept) |
| 3 | First Lien Claims | Impaired | Yes |
| 4(A) | Second Lien Deficiency and Unsecured Notes Claims | Impaired | Yes |
| 4(B) | Other General Unsecured Claims | Impaired | Yes |
| 4(C) | Mesh Claims | Impaired | Yes |
| 4(D) | Ranitidine Claims | Impaired | Yes |
| 4(E) | Generics Price Fixing Claims | Impaired | Yes |
| 4(F) | Reverse Payment Claims | Impaired | Yes |
| 5 | U.S. Government Claims | Impaired | Yes |
| 6(A) | State Opioid Claims | Impaired | Yes |
| 6(B) | Local Government Opioid Claims | Impaired | Yes |
| 6(C) | Tribal Opioid Claims | Impaired | Yes |
| 7(A) | PI Opioid Claims | Impaired | Yes |
| 7(B) | NAS PI Claims | Impaired | Yes |
| 7(C) | Hospital Opioid Claims | Impaired | Yes |
| 7(D) | TPP Claims | Impaired | Yes |
| 7(E) | IERP II Claims | Impaired | Yes |
| 8 | Public School District Claims | Impaired | Yes |
| 9 | Canadian Provinces Claims | Impaired | Yes |
| 10 | Settling Co-Defendant Claims | Impaired | Yes |
| 11 | Other Opioid Claims | Impaired | Yes |
| 12 | EFBD Claims | Impaired | Yes |

---

[29]    This section is only meant to provide a summary of some of the provisions contained in the Solicitation and Voting Procedures. For complete information, please review the procedures attached to the Disclosure Statement Order as Exhibit 1.

| 13 | Intercompany Claims | Unimpaired / Impaired | No (conclusively presumed to accept / deemed to reject) |
| 14 | Intercompany Interests | Unimpaired / Impaired | No (conclusively presumed to accept / deemed to reject) |
| 15 | Subordinated, Recharacterized, or Disallowed Claims | Impaired | No (deemed to reject) |
| 16 | Existing Equity Interests | Impaired | No (deemed to reject) |

## B.    Classes Entitled to Vote

Based on the chart above, only holders of Claims in the following Voting Classes are entitled to vote to accept or reject the Plan:

| Class | Claim or Interest |
|-------|-------------------|
| 3 | First Lien Claims |
| 4(A) | Second Lien Deficiency and Unsecured Notes Claims |
| 4(B) | Other General Unsecured Claims |
| 4(C) | Mesh Claims |
| 4(D) | Ranitidine Claims |
| 4(E) | Generics Price Fixing Claims |
| 4(F) | Reverse Payment Claims |
| 5 | U.S. Government Claims |
| 6(A) | State Opioid Claims |
| 6(B) | Local Government Opioid Claims |
| 6(C) | Tribal Opioid Claims |
| 7(A) | PI Opioid Claims |
| 7(B) | NAS PI Claims |
| 7(C) | Hospital Opioid Claims |
| 7(D) | TPP Claims |
| 7(E) | IERP II Claims |
| 8 | Public School District Claims |
| 9 | Canadian Provinces Claims |
| 10 | Settling Co-Defendant Claims |
| 11 | Other Opioid Claims |
| 12 | EFBD Claims |

If your Claim or Interest is not included in a Voting Class, you are not entitled to vote and you will not receive a package containing relevant solicitation materials. If you are not entitled to vote, you will instead receive a separate package containing a notice of non-voting status, details regarding the Confirmation Hearing (such as key dates and deadlines), and a release form that will allow you to opt out of or opt in to, as applicable, granting the releases provided in Article X of the Plan.

Under the Bankruptcy Code, acceptance of a plan of reorganization by a class of claims or interests is determined by calculating the number and the amount of claims and interests voting to accept the plan in such class, based on the actual total allowed claims voting on the plan. Acceptance by a Class of Claims requires more than one-half of the number of total Allowed Claims in the Class to vote in favor of the Plan and at least two-thirds in dollar amount of the total Allowed Claims in the Class to vote in favor of the Plan, counting in each case only those who actually vote.

## C.      Voting Procedures

On December 19, 2023, the Debtors filed the *Debtors' Motion for an Order (I) Scheduling a Combined Hearing for Approval of the Disclosure Statement and Confirmation of the Plan; (II) Conditionally Approving the Adequacy of the Disclosure Statement; (III) Approving (A) Procedures for Solicitation, (B) Forms of Ballots and Notices, (C) Procedures for Tabulation of Votes, and (D) Procedures for Objections; and (IV) Granting Related Relief* [Docket No. 3357] (the "Disclosure Statement Motion" and the order approving the Disclosure Statement Motion, the "Disclosure Statement Order"). The Disclosure Statement Motion will be heard at a hearing to consider the adequacy of this Disclosure Statement on a conditional basis (the "Disclosure Statement Hearing") and sets forth, and seeks approval of, the Plan solicitation procedures, as described herein and therein. The Debtors have requested that the Court schedule the Disclosure Statement Hearing on January 9, 2024, at 3:00 p.m. (prevailing Eastern Time). The Debtors will seek final approval of this Disclosure Statement at the Confirmation Hearing.

> **PLEASE REFER TO THE INSTRUCTIONS ACCOMPANYING THE BALLOT OR MASTER BALLOT FOR MORE INFORMATION REGARDING VOTING REQUIREMENTS, RULES AND APPLICABLE VOTING PROCEDURES.**

### 1.      Voting Record Date

The Debtors have requested that the Court set January 2, 2024, as the voting record date under the Plan (the "Voting Record Date"). The Voting Record Date is the date for determining (a) which holders of Claims are entitled to vote to accept or reject the Plan and receive a Solicitation Package in accordance with the procedures for soliciting the Plan, as set forth in the Disclosure Statement Order and (b) whether Claims have been properly assigned or transferred to an assignee under Bankruptcy Rule 3001(e) such that the assignee can vote as the holder of a Claim. The Voting Record Date and all of the Debtors' solicitation and voting procedures shall apply to all of the Debtors' creditors, equity holders, and other parties in interest.

Under the Scheme, Endo Parent will request to set February 22, 2024, as the voting record date as it pertains to voting on the Scheme for Classes 4(B)-(F), 6(A)-(C), 7(A)-(E), and 8-12

(the "Scheme Voting Record Date").  For Classes 3 and 4(A), the Voting Record Date under the Plan shall apply for purposes of voting on the Scheme.

**2.      Ballots**

To be counted as votes to accept or reject the Plan, votes must be submitted on the appropriate ballot (each, a "Ballot") or master ballot.  There are two types of master ballots:  first, there is a notes master ballot (the "Notes Master Ballot") that will be used to solicit votes from the bank, brokerage firm, trust company, dealer, or other agent or nominee (each a "Nominee") of beneficial holders of Notes Claims in Classes 3 and 4(A) of the Plan (the "Beneficial Holder(s)"); second, there is a non-notes master ballot (the "Non-Notes Master Ballot," and together with the Notes Master Ballots, the "Master Ballots") that will be used to solicit votes from Classes 4(B)-(F), 6(B)-(C), 7(A)-(E), 8, and 10 pursuant to the Non-Notes Master Ballot Solicitation Procedures (as defined in the Solicitation and Voting Procedures).

**3.      General Voting Instructions**

For your vote to be counted, your Ballot or Master Ballot, as applicable, must be properly executed, completed, dated, and delivered by following the instructions set forth on the Ballot or Master Ballot, as applicable, so it is **actually received by Voting Deadline (February 22, 2024, at 4:00 p.m. (prevailing Eastern Time))** by the Solicitation Agent.  Each Ballot or Master Ballot will include an option to make an election with respect to certain of the releases contained in Article X of the Plan.

It is important that the holder of a Claim in a Voting Class follow the specific instructions provided on such holder's Ballot and the accompanying instructions. The holder of a Claim should also provide all of the information requested by the Ballot, and, if completing the Ballot by hand, should complete and return all Ballots received in the enclosed, self-addressed, postage-paid envelope provided with each such Ballot or by regular mail, overnight courier, or hand delivery to the Solicitation Agent at the following address: Endo Ballot Processing Center, c/o Kroll Restructuring Administration LLC, 850 Third Avenue, Suite 412, Brooklyn, NY 11232.  Except in the Debtors' sole discretion or as provided under the Master Ballot Solicitation Procedures, Ballots may not be transmitted by facsimile, email, or other electronic means, other than the Solicitation Agent's Online Portal.[30]

Parties submitting Master Ballots, including Firms submitting Non-Notes Master Ballots pursuant to the Non-Notes Master Ballot Solicitation Method, should follow the specific instructions provided in the accompanying instructions for completion and delivery to the Solicitation Agent.

---

[30]   Notes Master Ballots and Beneficial Holder Ballots that have been 'pre-validated' by the Beneficial Holder's Nominee may be submitted to the Solicitation Agent by electronic mail to EndoBallots@ra.kroll.com (with "Endo Solicitation Ballot Submission" in the subject line).

112

IF A BALLOT OR MASTER BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED UNLESS THE DEBTORS DETERMINE OTHERWISE IN THEIR SOLE AND ABSOLUTE DISCRETION.

ANY BALLOT THAT IS PROPERLY EXECUTED BY THE HOLDER OF A CLAIM BUT THAT DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN OR ANY BALLOT THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.

EACH HOLDER OF A CLAIM MUST VOTE ALL OF ITS CLAIMS WITHIN A PARTICULAR CLASS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT SUCH VOTES. BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM HAVE BEEN CAST.

IT IS IMPORTANT TO FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON EACH BALLOT OR MASTER BALLOT, AS APPROPRIATE, WHEN SUBMITTING A VOTE.

IF YOU ARE A HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN AND YOU DID NOT RECEIVE A BALLOT, YOU RECEIVED A DAMAGED BALLOT, OR YOU LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THIS DISCLOSURE STATEMENT, THE PLAN, OR PROCEDURES FOR VOTING ON THE PLAN, PLEASE CONTACT THE SOLICITATION AGENT, KROLL, AT (877) 542-1878.

### 4.    Miscellaneous

All Ballots must be signed by the holder of Claims in the appropriate Class. An otherwise properly executed Ballot that attempts to partially accept and partially reject the Plan will likewise not be counted.  If you cast more than one Ballot voting the same Claim(s) before the Voting Deadline, the last valid Ballot received on or before the Voting Deadline will be deemed to reflect your intent and, thus, to supersede any prior Ballot.

### D.    Voting on the Scheme

As described in the Scheme Circular, Scheme Creditors may vote on both the Plan and the Scheme by duly completing and submitting the applicable Ballot (or having a Master Ballot submitted on their behalf) prior to the Voting Deadline in accordance with the Solicitation and Voting Procedures.  A Ballot of a Scheme Creditor (or a Master Ballot with the votes of Scheme Creditors) constitutes a joint Ballot (or joint Master Ballot) for both the Plan and the Scheme, so Scheme Creditors do not need to submit separate Ballots to vote on the Scheme.  If you are a Scheme Creditor, your Ballot (or a Master Ballot including your vote) will provide that if you submit a vote for or against the Plan, such vote will also appoint the Chairperson of the relevant Scheme Meeting as a proxy to submit an equivalent vote either for or against the Scheme. Consequently, Scheme Creditors do not need to attend the Scheme Meeting in order to be able to vote in respect of the Scheme.  Scheme Creditors may appoint a proxy (which may be the Chairperson of the relevant Scheme Meeting or another person chosen by the Scheme Creditor) to attend the Scheme Meeting and vote on their behalf.  If a Scheme Creditor (a) wishes to submit a

proxy vote in relation to the Scheme that is different from its vote on the Plan; (b) is not entitled to vote on the Plan; (c) has voted on the Plan but does not wish to vote on the Scheme; (d) wishes to appoint a proxy other than the Chairperson for purposes of the relevant Scheme Meeting; (e) wishes to attend the relevant Scheme Meeting to vote in person; or (f) did not hold a General Unsecured Scheme Creditor's Claim as of the Voting Record Date under the Plan but is a transferee or assignee of such Claim as of the Scheme Voting Record Date and wishes to vote on the Scheme, the Scheme Creditor must obtain a scheme voting form by emailing the Solicitation Agent at endoinfo@ra.kroll.com (with "Endo Scheme Vote Form" in the subject line).

The voting procedures in respect of the Scheme are described in full the Scheme Circular. Voting for the Scheme will happen at the Scheme Meetings which will be held on March 7, 2024, at 2:00 p.m. (Dublin Time) and 2:30 p.m. (Dublin Time). Scheme Creditors may, but are not required to, attend the Scheme Meetings in person.

## IX.   STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

The following is a brief summary of the Confirmation process. Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and to consult with their own advisors.

### A.   The Confirmation Hearing

Section 1128(a) of the Bankruptcy Code provides that the Bankruptcy Court, after notice, may conduct a Confirmation Hearing.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of the Plan.

### B.   Confirmation Standards

The following requirements must be satisfied under section 1129(a) of the Bankruptcy Code before the Bankruptcy Court may confirm the Plan:

1.     The Plan complies with the applicable provisions of the Bankruptcy Code.

2.     The proponents of the Plan have complied with the applicable provisions of the Bankruptcy Code.

3.     The Plan has been proposed in good faith and not by any means forbidden by law.

4.     Any payment made or to be made by the proponents of the Plan, a Debtor, or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with the Chapter 11 Cases, in connection with the Plan and incident to the Chapter 11 Cases, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable.

5.     The proponents of the Plan have disclosed the identity and affiliations of any individual proposed to serve, after Confirmation of the Plan, as a director, officer, or voting trustee

114

of the Debtors, an affiliate of the Debtors participating in a joint Plan with a Debtor or a successor to a Debtor under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and holders of Interests and with public policies.

6.      The proponents of the Plan have disclosed the identity of any "insider" (as defined in the Bankruptcy Code) that will be employed or retained by the Purchaser Entities and the nature of any compensation for such insider.

7.      Any governmental regulatory commission with jurisdiction, after Confirmation, over the rates of the Debtors has approved any rate change provided for in the Plan.

8.      With respect to each holder within an impaired Class of Claims or Interests, each such holder (i) has accepted the Plan or (ii) will receive or retain under the Plan on account of such Claim or Interest property of value, as of the Effective Date of the Plan, that is not less than the amount that such holder would so receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

9.      With respect to each Class of Claims or Interests, such Class (i) has accepted the Plan or (ii) is unimpaired under the Plan; *provided*, *however*, that if the Plan is rejected by an impaired Class, the Plan may be confirmed if it "does not discriminate unfairly" and is "fair and equitable" as to such Class, is feasible, and is in the "best interests" of holders of Claims and Interests that are impaired under the Plan.

10.     Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that:

(a)     with respect to a Claim of a kind specified in sections 507(a)(2) or (3) of the Bankruptcy Code, on the Effective Date, the holder of the Claim will receive on account of such Claim cash equal to the allowed amount of such Claim, unless otherwise agreed;

(b)     with respect to a Class of Claim of the kind specified in sections 507(a)(1), (4), (5), (6), or (7) of the Bankruptcy Code, each holder of a Claim of such Class will receive (i) if such Class has accepted the Plan, deferred cash payments of a value, on the Effective Date of the Plan, equal to the Allowed amount of such Claim or (ii) if such Class has not accepted the Plan, cash on the Effective Date equal to the Allowed amount of such Claim; and

(c)     with respect to a priority tax Claim of a kind specified in section 507(a)(8) of the Bankruptcy Code, the holder of such Claim will receive on account of such claim deferred Cash payments, over a period not exceeding five years after the date of the order for relief, of a value, as of the Effective Date, equal to the allowed amount of such Claim.

11.     If a Class of Claims is impaired under the Plan, at least one Class of Claims that is impaired under the Plan has accepted the Plan, determined without including any acceptance of the Plan by any "insider" (as defined by the Bankruptcy Code).

12.     Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan

(other than the liquidation of any Debtors that will not be Purchaser Entities), unless such liquidation or reorganization is proposed in the Plan.

13.     All fees payable under section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of all such fees on the Effective Date.

14.     The Plan provides that following the Effective Date and subject to the Purchaser Entities' rights, if any, under applicable non-bankruptcy law, unless otherwise ordered by the Bankruptcy Court, the Purchaser Entities shall continue to pay all retiree benefits (as defined in section 1114 of the Bankruptcy Code) at the level established under sections 1114(e)(1)(B) or (g) of the Bankruptcy Code, at any time prior to Confirmation, for the duration of the period the Debtors has obligated itself to provide such benefits.

## C.     Liquidation Analysis

Section 1129(a)(7) of the Bankruptcy Code requires that each holder of an impaired Claim or Interest either (i) accepts the Plan or (ii) receives or retains under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. This condition is often referred to as the "Best Interests Test."

In determining whether the Best Interests Test has been met, the proceeds that would be generated from a hypothetical liquidation of the Debtors' assets in chapter 7 cases must be determined.  Such amount then would be reduced by the costs and expenses of the liquidation. Prior to determining whether the Best Interests Test has been satisfied, available cash and the proceeds from the liquidation of the Debtors' assets would be applied to secured claims (to the extent of the value of the underlying collateral) and to satisfy administrative, priority tax and other priority claims, all of which are senior in priority to unsecured claims, including any incremental administrative claims that may result from the termination of the Debtors' businesses and the liquidation of their assets.  Any remaining cash would be available for distribution to holders of unsecured claims and equity holders in accordance with the distribution hierarchy established by section 726 of the Bankruptcy Code.

The Debtors prepared the liquidation analysis (the "Liquidation Analysis"), attached hereto as **Exhibit D**, with assistance from their financial advisors. The Liquidation Analysis represents the Debtors' best estimate of the cash proceeds, net of liquidation related costs, which would be available for distribution to the holders of Claims and Interests if the Debtors were to be liquidated in chapter 7 cases that would not preserve the potential future value of the Debtors' estates. Underlying the Liquidation Analysis are a number of estimates and assumptions regarding liquidation proceeds that, although developed and considered reasonable by the Debtors and their professionals, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors.

As further set forth in the Liquidation Analysis, the Debtors submit that because of, among other things, discounts to asset values caused in part by (1) the anticipated accelerated time frame in which the Debtors' assets would be marketed and sold in a chapter 7 liquidation scenario, (2) the

116

illiquid nature of certain of the assets and disynergies associated with a piecemeal liquidation, and (3) the forced nature of a sale of the Debtors' assets in a chapter 7 liquidation scenario, as well as the incurrence of additional priority claims if these Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code, holders of impaired Claims and Interests will receive at least as great of a recovery under the proposed Plan as in a chapter 7 liquidation. The Debtors therefore believe that the Plan satisfies the Best Interests Test under section 1129(a)(7) of the Bankruptcy Code. The Debtors caution that the assumptions used in the Liquidation Analysis may ultimately vary and actual recoveries in a chapter 7 liquidation could be substantially less than recoveries set forth in this Liquidation Analysis.

### D.    Financial Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization. This condition is often referred to as the "feasibility" of a plan. For purposes of determining whether the Plan meets the feasibility requirement, the Debtors have analyzed their ability to meet their obligations under the Plan.

The Debtors believe that the Plan meets the feasibility requirement. As part of this analysis, the Debtors' management, with the assistance of their advisors, have prepared the financial projections attached hereto as **Exhibit E** (the "Financial Projections"). Based on the Financial Projections, the Debtors believe that they will be able to make all payments required under the Plan. Therefore, the Debtors believe Confirmation and consummation of the Plan is not likely to be followed by liquidation or the need for further reorganization.

THE FINANCIAL PROJECTIONS, INCLUDING THE UNDERLYING ASSUMPTIONS, SHOULD BE CAREFULLY REVIEWED IN EVALUATING THE PLAN. WHILE MANAGEMENT BELIEVES THE ASSUMPTIONS UNDERLYING THE FINANCIAL PROJECTIONS, WHEN CONSIDERED ON AN OVERALL BASIS, ARE REASONABLE IN LIGHT OF CURRENT CIRCUMSTANCES AND EXPECTATIONS, NO ASSURANCE CAN BE GIVEN THAT THE PROJECTIONS WILL BE REALIZED. THE DEBTORS MAKE NO REPRESENTATION OR WARRANTY AS TO THE ACCURACY OF THE FINANCIAL PROJECTIONS.

The Financial Projections have not been examined or compiled by independent accountants. The Debtors make no representations as to their ability to achieve the projected results. Many of the assumptions on which the Financial Projections are based are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors and their management. Inevitably, some assumptions will not materialize and unanticipated events and circumstances may affect the actual financial results. Therefore, the actual results achieved may vary from the projected results, and the variations may be material. All holders of Claims that are entitled to vote to accept or reject the Plan are urged to carefully examine all of the assumptions on which the Financial Projections are based in connection with their evaluation of the Plan.

### E.      Acceptance by Impaired Classes

The Bankruptcy Code also requires, as a condition to Confirmation, that each Class of Claims or Interests that is impaired but still receives distributions under the Plan vote to accept the Plan, unless the Debtors can "cramdown" such Classes, as described below. A Class that is unimpaired is presumed to have accepted the Plan and, therefore, solicitation of acceptances with respect to such Class is not required. A Class is impaired unless (i) the Plan leaves unaltered the legal, equitable, and contractual rights to which the Claim or Interest entitles the holder of such Claim or Interest, or (ii) the Debtors cure any default and reinstate the original terms of the obligation.

Under sections 1126(c) and (d) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code: (i) an impaired Class of Claims has accepted the Plan if the holders of at least two-thirds in dollar amount and more than one-half in number of the voting allowed Claims have voted to accept the Plan and (ii) an impaired Class of Interests has accepted the Plan if the holders of at least two-thirds in amount of the allowed Interests of such Class actually voting have voted to accept the Plan.

### F.      Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows the Bankruptcy Court to confirm the Plan, even if the Plan has not been accepted by all impaired Classes, provided that the Plan has been accepted by at least one impaired Class entitled to vote, without counting the vote of any "insider" (as defined in section 101(31) of the Bankruptcy Code).  Section 1129(b) of the Bankruptcy Code permits the Debtors to confirm the Plan, notwithstanding the failure of any impaired Class to accept the Plan, in a procedure commonly known as "cramdown," so long as the Plan "does not discriminate unfairly" and is "fair and equitable" as to each impaired Class that has not accepted the Plan.

#### 1.      No Unfair Discrimination

A plan "does not discriminate unfairly" if (i) the legal rights of a non-accepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are similar to those of the non-accepting class and (ii) no class receives payments in excess of that which it is legally entitled to receive for its claims or interests.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."

The Debtors do not believe the Plan discriminates unfairly against any impaired Class of Claim or Interests.  The Debtors believe the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfies the foregoing requirements for non-consensual Confirmation.

#### 2.      Fair and Equitable Treatment

With respect to a dissenting class of claims or interests, the "fair and equitable" standard requires that a plan provide that either the claims or interests in each class receive everything to which they are legally entitled or, with respect to unsecured claims, that classes junior in priority to the class receive nothing.

The Bankruptcy Code establishes different "fair and equitable" tests for holders of secured claims, unsecured claims, and interests, which may be summarized as follows:

(a)    *Secured Claims*.  With respect to the secured amount of its allowed claim, either (i) each holder of a claim in an impaired class of secured claims retains its liens securing its secured claim and it receives on account of its secured claims deferred cash payments having a present value equal to the amount of its allowed secured claim, (ii) each holder of a claim in an impaired class of secured claims realizes the indubitable equivalent of its allowed secured claim, or (iii) the property securing the claim is sold free and clear of liens, which such liens to attach to the proceeds and the treatment of such liens on proceeds as provided in clause (i) or (ii) of this subparagraph (a).

(b)    *Unsecured Claims*.  Either (i) each holder of a claim in an impaired class of unsecured claims receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the chapter 11 plan, subject to the applicability of the judicial doctrine of contributing new value or for administrative convenience purposes only.

(c)    *Interests*.  Either (i) each holder of an equity interest in an impaired class of interests will receive or retain under the chapter 11 plan property of a value equal to the greater of (y) the fixed liquidation preference or redemption price, if any, of such equity interest or (z) the value of the equity interest or (ii) the holders of interests that are junior to the stock will not receive any property under the chapter 11 plan, subject to the applicability of the judicial doctrine of contributing new value or for administrative convenience purposes only.

The Debtors believe that the distributions provided under the Plan satisfy the "fair and equitable" requirements of the Bankruptcy Code.  Certain Classes of Claims and Interests will receive no distribution under the Plan and are therefore conclusively deemed to reject the Plan. Accordingly, the Debtors will seek to confirm the Plan under section 1129(b) of the Bankruptcy Code with respect to such Classes.

## X.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtors believe that the Plan affords holders of Claims and Interests the potential for the greatest realization of the value of the Debtors' assets and, therefore, the Confirmation and consummation of the Plan is in the best interests of such holders. If the Plan is not confirmed, however, theoretical alternatives include, without limitation: (i) continuation of the pending Chapter 11 Cases, (ii) approval of the Sale, (iii) an alternative plan or plans of reorganization, or (iv) the liquidation of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code.

### A.    Continuation of the Chapter 11 Cases

If the Debtors remain in chapter 11, they could continue to operate and manage their assets as debtors in possession, but they would remain subject to the restrictions imposed by the Bankruptcy Code.  It is not clear whether the Debtors could survive as a going concern in protracted Chapter 11 Cases, which could significantly and detrimentally impact the Debtors' relationships with vendors, suppliers, employees, and major customers.

B.     **Approval of the Sale**

Although the Debtors are confident that the Sale would have been approved by the Bankruptcy Court, the Debtors believe that, in light of the various resolutions with key stakeholders that have resolved significant issues that would have otherwise impeded the Debtors' ability to successfully pursue a chapter 11 plan, the Plan is the optimal path for emergence for the Debtors at this time.  In the event Confirmation is denied or the Plan is not otherwise a reasonably viable framework to resolve the Chapter 11 Cases, the Debtors may seek to re-schedule the Sale Hearing and seek the Bankruptcy Court's approval of the Sale.

C.     **Alternative Plans of Reorganization**

If the Plan is not confirmed, the Debtors, or, after the expiration of the Debtors' Exclusive Periods, any other party in interest in the Chapter 11 Cases, could propose a different plan or plans. Additionally, until the Plan is consummated, the Debtors may determine to withdraw the Plan and propose and solicit different plans of reorganization. Any such plans proposed by the Debtors or other parties in interest might involve either a reorganization and continuation of the Debtors' business, or an orderly liquidation of its assets, or a combination of both.

Although alternative plans of reorganization are possible, the Debtors believe that the present Plan represents a value maximizing resolution to these Chapter 11 Cases and provides a clear pathway for the Debtors to emerge from chapter 11 promptly and without unnecessarily draining estate resources.  Additionally, the Debtors believe that any alternative plan may be subject to litigation and, without the benefit of the Resolutions embodied in the present Plan, provide diminished recoveries to parties in interest.

D.     **Liquidation Under Chapter 7 or Chapter 11**

If no plan is confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code. In chapter 7 cases, a trustee or trustees would be appointed to liquidate the assets of the Debtors.

However, the Debtors believe that creditors would lose value if the Debtors were forced to liquidate. In addition, the Debtors believe that, in a liquidation under chapter 7, before creditors received any distribution, additional administrative expenses involved in the appointment of a trustee or trustees and attorneys, accountants, and other professionals to assist such trustees would cause a substantial diminution in the value of the Debtors' estates. Debtors incorporated outside of the United States would likely enter into local insolvency or liquidation proceedings, further increasing administrative expenses.  The assets available for distribution to creditors would be reduced by such additional administrative expenses and by Claims, some of which would be entitled to priority, which would arise by reason of the liquidations and the failure to realize the greater going concern value of the Debtors' assets.  Additionally, if there were no Plan, the Trusts to be established in connection therewith may not be established.  The Plan is the result of extensively negotiated resolutions which avoid costly and time-consuming litigation that would have depleted funds otherwise available for creditors.

The Liquidation Analysis attached hereto as **Exhibit D** illustrates the recoveries the Debtors anticipate in a chapter 7 liquidation scenario. In the Liquidation Analysis, the Debtors

have taken into account the nature, status, and underlying value of their assets, the ultimate realizable value of their assets, and the extent to which such assets are subject to liens and security interests. The likely form of any liquidation in a chapter 7 proceeding would be the sale of individual assets. Based on this analysis, it is likely that a chapter 7 liquidation of the Debtors' assets would produce less value for distribution to each class of creditors than that recoverable under the Plan. In the Debtors' opinion, the recoveries projected to be available in a chapter 7 liquidation are not likely to afford holders of Claims and Interests as great a realization potential as does the Plan.

The Debtors may also be liquidated under a chapter 11 plan. In a liquidation under chapter 11, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7. Thus, a chapter 11 liquidation might result in larger recoveries than a chapter 7 liquidation would, but the delay in distributions could result in lower present values received and higher administrative costs. Because a trustee is not required in a chapter 11 case, expenses for professional fees could be lower than in a chapter 7 case (in which a trustee must be appointed). However, any distributions to holders of Claims or Interests under a chapter 11 liquidation plan probably would be delayed substantially. In addition, as with a chapter 7 liquidation, the Debtors believe that creditors would lose the materially higher going concern value if the Debtors were forced to liquidate under a chapter 11 plan.

## XI.   U.S. FEDERAL INCOME TAX CONSIDERATIONS

### A.   Introduction

The following discussion is a summary of U.S. federal income tax considerations of the consummation of the Plan to the Debtors, the Purchaser Entities, and certain holders of Claims. The following summary does not address the U.S. federal income tax consequences to holders of Claims not entitled to vote to accept or reject the Plan. This summary is based on the U.S. Internal Revenue Code of 1986, as amended (the "Code"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial authorities, published administrative positions of the U.S. Internal Revenue Service (the "IRS"), all as in effect on the date hereof and all of which are subject to change or differing interpretations, possibly with retroactive effect. Any such changes, or new or differing interpretations, could significantly affect the U.S. federal income tax consequences described below. The Debtors have not requested, and do not intend to request, any ruling or determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This discussion does not address non-U.S., state, local or non-income tax consequences of the Plan (including such consequences with respect to the Debtors), nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a holder of a Claim in light of its individual circumstances or to a holder of a Claim that may be subject to special tax rules (including, for example, banks, governmental authorities or agencies, pass-through entities, beneficial owners of pass-through entities, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, expatriates, controlled foreign corporations, passive foreign investment companies, small business investment companies, persons who are

related to the Debtors within the meaning of the Code, persons using a mark-to-market method of accounting, holders of Claims who are themselves in bankruptcy, and regulated investment companies and those holding, or who will hold, the Purchaser Equity as part of a hedge, straddle, conversion, or other integrated transaction). Furthermore, this summary assumes that a holder of a Claim holds only Claims in a single Class and holds a Claim only as a "capital asset" (within the meaning of the Code). This summary also assumes that Claims will be treated in accordance with their form for U.S. federal income tax purposes and that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of Section 897 of the Code. The U.S. federal income tax consequences of the consummation of the Plan to the Debtors and holders of Claims described below may also vary depending on the nature of the Plan Transaction and any Restructuring Transactions that the Debtors engage in. This summary does not discuss differences in tax consequences to holders of Claims that act or receive consideration in a capacity other than any other holder of a Claim of the same Class or Classes, and the tax consequences for such holders may differ materially from that described below.

For purposes of this discussion, a "U.S. Holder" is a holder of a Claim that, for U.S. federal income tax purposes, is: (1) an individual citizen or resident of the United States; (2) a corporation created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons (within the meaning of Section 7701(a)(30) of the Code) has authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person (within the meaning of Section 7701(a)(3)) of the Code. For purposes of this discussion, a "Non-U.S. Holder" is any holder that is not a U.S. Holder or a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a holder of a Claim, the tax treatment of a partner (or other beneficial owner) will generally depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity. Partners (or other beneficial owners) of partnerships (or other entities treated as partnerships or other pass-through entities) that are holders of Claims should consult their tax advisors regarding the U.S. federal income tax consequences of the Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY. ALL HOLDERS OF CLAIMS SHOULD CONSULT THEIR TAX ADVISORS AS TO THE FEDERAL, STATE, LOCAL, NON-U.S., NON-INCOME, AND OTHER TAX CONSEQUENCES OF THE PLAN.**

### B.    Considerations to the Debtors and Purchaser Entities

The tax consequences of the implementation of the Plan to the Debtors will differ depending on whether the Plan Transaction is structured as a taxable sale of the assets and/or stock of any Debtor (a "Taxable Transaction") or as a reorganization of the Debtors that qualifies under

section 368(a)(1)(G) of the Code (a "G Reorganization") pursuant to which the Debtors would not recognize gain or loss for U.S. federal income tax purposes. If the Plan Transaction is structured as a Taxable Transaction, the Debtors will generally realize gain or loss upon the transfer in an amount equal to the difference between the fair market value of the assets transferred by the Debtors and the Debtors' tax basis in such assets.

In response to the objection filed by the United States on behalf of the IRS, the U.S. Department of Justice, the U.S. Department of Health and Human Services, and the U.S. Department of Veterans Affairs (the "USG Objection"), the Debtors, the Ad Hoc First Lien Group, and the United States have agreed to the U.S. Government Resolution. Pursuant to the U.S. Government Resolution, the Debtors have agreed to pay to the United States the U.S. Government Resolution Consideration in complete satisfaction of all of the U.S. Government Claims. Moreover, the Debtors, the Ad Hoc First Lien Group, and the United States intend that the Plan Transaction shall be treated for U.S. federal income tax purposes as a taxable sale of the Debtors' assets and that the U.S. Government Resolution Consideration shall fully satisfy any U.S. federal tax liability of the Debtors due with respect to, among other things, the Plan Transaction and fully resolve any disputes with the IRS relating to the IRS Claim or other pre-Effective Date Taxes of the Debtors (the "Plan Transaction Tax Treatment").

Assuming the Plan Transaction is a Taxable Transaction, then the Debtors will generally realize gain or loss ("Asset Sale Income") upon the transfer in an amount equal to the difference between the fair market value of the assets transferred by the Debtors and the Debtors' tax basis in such assets. In addition, absent an exception, the Debtors will realize cancellation of debt income ("COD Income") for U.S. federal income tax purposes upon satisfaction of their outstanding indebtedness for total consideration (including any consideration received by the Debtors from the Taxable Transaction) less than the adjusted issue price of such indebtedness. However, pursuant to the U.S. Government Resolution and in connection with a Taxable Transaction, Asset Sale Income and COD Income are not expected to negatively impact the Debtors.  The Purchaser Entities would, pursuant to the Plan Transaction Tax Treatment, for U.S. federal income tax purposes have a fair market value basis as of the Effective Date in its assets (provided that the U.S. Government Resolution sets forth that the aggregate basis of the assets shall not be less than $3,500,000,000.00 and shall not exceed $4,650,000,000.00) and the Purchaser Entities' holding period for such assets would begin on the day following the Effective Date. The Purchaser Entities will not succeed to any of the tax attributes of any of the Debtors.

The following discussion assumes that the Plan Transaction will be treated as a Taxable Transaction for U.S. federal income tax purposes. Holders of Claims should consult their tax advisors regarding the U.S. federal income tax considerations of the Plan if the Plan Transaction were to be treated as other than a Taxable Transaction for U.S. federal income tax purposes.

### C.    U.S. Federal Income Tax Considerations of the Plan to U.S. Holders of Claims

#### 1.    General U.S. Federal Income Tax Considerations

##### (a)    Consequences to the Holders of First Lien Claims (Class 3)

Pursuant to the Plan, in exchange for full and final satisfaction, compromise, settlement, release, and discharge of their First Lien Claims, each holder of a First Lien Claim will receive its pro rata share of (a) 96.30% of the Purchaser Equity (subject to dilution by (1) the Rights Offerings and (2) any issuances of Purchaser Equity under the Management Incentive Plan), (b)(1) if the Exit Minimum Cash Sweep Trigger occurs, Cash from the Exit Minimum Cash Sweep; and/or (2) the net proceeds of the Syndicated Exit Financing, if any; and/or (3) the New Takeback Debt, (c) the First Lien Accrued and Unpaid Adequate Protection Payments, and (d) the First Lien Subscription Rights. Each such holder's exchange of its First Lien Claims for such consideration should be treated as a taxable exchange under the Code. Accordingly, other than with respect to any amounts received that are attributable to accrued but unpaid interest (or original issue discount, if any), each U.S. Holder should recognize gain or loss in an amount equal to the difference, if any, between (x) the sum of (A) the fair market value of the Purchaser Equity, the New Takeback Debt, and the First Lien Subscription Rights, and (B) the amount of Cash (including Cash from the Exit Minimum Cash Sweep, the First Lien Accrued and Unpaid Adequate Protection Payments and any net proceeds of the Syndicated Exit Financing), in each case, received in respect of the First Lien Claims and (y) such U.S. Holder's adjusted basis in such First Lien Claims. The character of such gain or loss will be determined by a number of factors, including, among other things, the tax status of the U.S. Holder, the rules regarding "market discount" (described below) and accrued but unpaid interest (or original issue discount), and whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to its First Lien Claims. If recognized gain or loss is capital in nature, it would generally be long-term capital gain or loss if the U.S. Holder held its First Lien Claims for more than one year as of the Effective Date. Such U.S. Holder's tax basis in the Purchaser Equity and any New Takeback Debt received, as applicable, should equal the fair market value of such property as of the Effective Date. Such U.S. Holder's holding period in the Purchaser Equity and the New Takeback Debt received should begin on the day after the Effective Date.

##### (b)    Consequences to the Holders of Second Lien Deficiency Claims and Unsecured Notes Claims (Class 4(A))

Pursuant to the Plan, in exchange for full and final satisfaction, compromise, settlement, release, and discharge of their Second Lien Deficiency Claims and Unsecured Notes Claims, each holder of a Second Lien Deficiency Claim or Unsecured Notes Claim will receive its pro rata share of the GUC Trust Consideration.  Each such holder's exchange of its Second Lien Deficiency Claims and Unsecured Notes Claims for such consideration should be treated as a taxable exchange under the Code.  Accordingly, other than with respect to any amounts received that are attributable to accrued but unpaid interest (or original issue discount, if any), each U.S. Holder should recognize gain or loss in an amount equal to the difference, if any, between (x) the GUC Trust Consideration received in respect of the Second Lien Deficiency Claims and Unsecured Notes Claims and (y) such U.S. Holder's adjusted basis in such Second Lien Deficiency Claims and Unsecured Notes Claims. The character of such gain or loss will be determined by a number

of factors, including, among other things, the tax status of the U.S. Holder, the rules regarding "market discount" (described below) and accrued but unpaid interest (or original issue discount), and whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to its Second Lien Deficiency Claims or Unsecured Notes Claims. If recognized gain or loss is capital in nature, it generally would be long-term capital gain or loss if the U.S. Holder held its Second Lien Deficiency Claims or Unsecured Notes Claims for more than one year as of the Effective Date. Such U.S. Holder's tax basis in the Purchaser Equity received, as applicable, should equal the fair market value of such property as of the Effective Date. Such U.S. Holder's holding period in the Purchaser Equity should begin on the day after the Effective Date.

As further described below in Section XI.C.3(a) (*The GUC Trust*) of this Disclosure Statement, for U.S. federal income tax purposes, the GUC Trust is intended to qualify as a "liquidating trust" described in Treasury Regulation section 301.7701-4(d). Because the tax consequences under the Plan relevant to U.S. Holders of Second Lien Deficiency Clams and Unsecured Notes Claims will depend on facts particular to each holder, all U.S. Holders of such claims should consult their tax advisors as to their proper tax treatment under the Plan in light of their particular facts and circumstances.

(c)    Consequences to the Holders of Other General Unsecured Claims (Class 4(B))

The Plan provides that on the Effective Date, in full and final satisfaction, settlement, release, and discharge of, and in exchange for the Other General Unsecured Claims, each Other General Unsecured Claim shall automatically, and without further act, deed, or court order, be channeled exclusively to the GUC Trust and all of the Debtors' liability for such Claim shall be assumed by the GUC Trust. Holders of Allowed Other General Unsecured Claims shall receive a recovery, if any, from the GUC Trust Consideration.

As further described below in Section XI.C.3(b) (*The GUC Trust Disputed Claims Reserve*) below, for U.S. federal income tax purposes, the GUC Trust Disputed Claims Reserve is intended to qualify as a disputed ownership fund described in Treasury Regulation section 1.468B-9.

Because the tax consequences under the Plan relevant to U.S. Holders of Other General Unsecured Claims will depend on facts particular to each holder, all U.S. Holders of such claims should consult their tax advisors as to their proper tax treatment under the Plan in light of their particular facts and circumstances.

(d)    Consequences to the Holders of Mesh Claims (Class 4(C))

The Plan provides that on the Effective Date, in full and final satisfaction, settlement, release, and discharge of, and in exchange for the Mesh Claims, each Mesh Claim shall automatically, and without further act, deed, or court order, be channeled exclusively to the GUC Trust and all of the Debtors' liability for such Claim shall be assumed by the Mesh Claims Trust. Holders of Mesh Claims shall receive a recovery, if any, from the Mesh Claims Trust Consideration. The Mesh Claims Trust is intended to be treated as a "qualified settlement fund" for U.S. federal income tax purposes. The U.S. federal income tax consequences to a U.S. Holder of a Mesh Claim—including whether such holder may have income or loss on account of

distributions it receives in respect of the Claim or payments made in satisfaction of obligations of such holder or whether such holder may be entitled to claim a deduction on account of a distribution that satisfied an obligation of such holder—will generally depend upon the nature and origin of the Claim and the particular circumstances applicable to such holder, including whether the holder has previously claimed deductions or losses for U.S. federal income tax purposes with respect to such Claim. Because the tax consequences under the Plan relevant to U.S. Holders of Mesh Claims will depend on facts particular to each holder, all U.S. Holders of Mesh Claims should consult their tax advisors as to their proper tax treatment under the Plan in light of their particular facts and circumstances.

(e)    Consequences to the Holders of Ranitidine Claims (Class 4(D))

The Plan provides that on the Effective Date, in full and final satisfaction, settlement, release, and discharge of, and in exchange for the Ranitidine Claims, each Ranitidine Claim shall automatically, and without further act, deed, or court order, be channeled exclusively to the GUC Trust and all of the Debtors' liability for such Claim shall be assumed by the Ranitidine Claims Trust. Holders of Ranitidine Claims shall receive a recovery, if any, from the Ranitidine Claims Trust Consideration. The Ranitidine Claims Trust is intended to be treated as a "qualified settlement fund" for U.S. federal income tax purposes. The U.S. federal income tax consequences to a U.S. Holder of a Ranitidine Claim—including whether such holder may have income or loss on account of distributions it receives in respect of the Claim or payments made in satisfaction of obligations of such holder or whether such holder may be entitled to claim a deduction on account of a distribution that satisfied an obligation of such holder—will generally depend upon the nature and origin of the Claim and the particular circumstances applicable to such holder, including whether the holder has previously claimed deductions or losses for U.S. federal income tax purposes with respect to such Claim. Because the tax consequences under the Plan relevant to U.S. Holders of Ranitidine Claims will depend on facts particular to each holder, all U.S. Holders of Ranitidine Claims should consult their tax advisors as to their proper tax treatment under the Plan in light of their particular facts and circumstances.

(f)    Consequences to the Holders of Generics Price Fixing Claims (Class 4(E))

The Plan provides that on the Effective Date, in full and final satisfaction, settlement, release, and discharge of, and in exchange for the Generics Price Fixing Claims, each Generics Price Fixing Claim shall automatically, and without further act, deed, or court order, be channeled exclusively to the GUC Trust and all of the Debtors' liability for such Claim shall be assumed by the Generics Price Fixing Claims Trust. Holders of Generics Price Fixing Claims shall receive a recovery, if any, from the Generics Price Fixing Claims Trust Consideration. The Generics Price Fixing Claims Trust is intended to be treated as a "qualified settlement fund" for U.S. federal income tax purposes. The U.S. federal income tax consequences to a U.S. Holder of a Generics Price Fixing Claim—including whether such holder may have income or loss on account of distributions it receives in respect of the Claim or payments made in satisfaction of obligations of such holder or whether such holder may be entitled to claim a deduction on account of a distribution that satisfied an obligation of such holder—will generally depend upon the nature and origin of the Claim and the particular circumstances applicable to such holder, including whether the holder has previously claimed deductions or losses for U.S. federal income tax purposes with

126

respect to such Claim. Because the tax consequences under the Plan relevant to U.S. Holders of Generics Price Fixing Claims will depend on facts particular to each holder, all U.S. Holders of Generics Price Fixing Claims should consult their tax advisors as to their proper tax treatment under the Plan in light of their particular facts and circumstances.

(g)    Consequences to the Holders of Reverse Payment Claims (Class 4(F))

The Plan provides that on the Effective Date, in full and final satisfaction, settlement, release, and discharge of, and in exchange for the Reverse Payment Claims, each Reverse Payment Claim shall automatically, and without further act, deed, or court order, be channeled exclusively to the GUC Trust and all of the Debtors' liability for such Claim shall be assumed by the Reverse Payment Claims Trust. Holders of Reverse Payment Claims shall receive a recovery, if any, from the Reverse Payment Claims Trust Consideration. The Reverse Payment Claims Trust is intended to be treated as a "qualified settlement fund" for U.S. federal income tax purposes. The U.S. federal income tax consequences to a U.S. Holder of a Reverse Payment Claim—including whether such holder may have income or loss on account of distributions it receives in respect of the Claim or payments made in satisfaction of obligations of such holder or whether such holder may be entitled to claim a deduction on account of a distribution that satisfied an obligation of such holder—will generally depend upon the nature and origin of the Claim and the particular circumstances applicable to such holder, including whether the holder has previously claimed deductions or losses for U.S. federal income tax purposes with respect to such Claim. Because the tax consequences under the Plan relevant to U.S. Holders of Reverse Payment Claims will depend on facts particular to each holder, all U.S. Holders of Reverse Payment Claims should consult their tax advisors as to their proper tax treatment under the Plan in light of their particular facts and circumstances.

(h)    Consequences to the Holders of State Opioid Claims (Class 6(A))

The Plan provides that (i) on the Effective Date, in full and final satisfaction, settlement, release, and discharge of the Debtors' obligations in respect of the State Opioid Claims, the Public Opioid Trust shall receive the Public Opioid Consideration, (ii) as of the Effective Date, any liability of the Debtors for any State Opioid Claims shall be channeled exclusively to the Public Opioid Trust and all of the Debtors' liability for such Claim shall be assumed by the Public Opioid Trust, and (iii) holders of Allowed State Opioid Claims shall receive the applicable shares of the Public Opioid Consideration allocated to such holders as set forth in the Public Opioid Distribution Documents. The Plan further provides that the Public Opioid Trust is intended to be treated as a "qualified settlement fund" for U.S. federal income tax purposes. The U.S. federal income tax consequences to a U.S. Holder of a State Opioid Claim—including whether such holder may have income or loss on account of distributions it receives in respect of the Claim or payments made in satisfaction of obligations of such holder or whether such holder may be entitled to claim a deduction on account of a distribution that satisfied an obligation of such holder—will generally depend upon the nature and origin of the Claim and the particular circumstances applicable to such holder, including whether the holder has previously claimed deductions or losses for U.S. federal income tax purposes with respect to such Claim. Because the tax consequences under the Plan relevant to U.S. Holders of State Opioid Claims will depend on facts particular to each holder, all U.S. Holders of State Opioid Claims should consult their tax advisors as to their proper tax treatment under the Plan in light of their particular facts and circumstances.

127

(i)    Consequences to the Holders of Tribal Opioid Claims (Class 6(C))

The Plan provides that (i) on the Effective Date, in full and final satisfaction, settlement, release, and discharge of the Debtors' obligations in respect of the Tribal Opioid Claims, the Tribal Opioid Trust shall receive the Tribal Opioid Consideration, (ii) as of the Effective Date, any liability of the Debtors for any Tribal Opioid Claims shall be channeled exclusively to the Tribal Opioid Trust and all of the Debtors' liability for such Claim shall be assumed by the Tribal Opioid Trust, and (iii) holders of Tribal Opioid Claims shall receive the applicable shares of the Tribal Opioid Consideration allocated to such holders as set forth in the Tribal Opioid Distribution Documents. The Plan further provides that the Tribal Opioid Trust is intended to be treated as a "qualified settlement fund" for U.S. federal income tax purposes. The U.S. federal income tax consequences to a U.S. Holder of a Tribal Opioid Claim—including whether such holder may have income or loss on account of distributions it receives in respect of the Claim or payments made in satisfaction of obligations of such holder or whether such holder may be entitled to claim a deduction on account of a distribution that satisfied an obligation of such holder—will generally depend upon the nature and origin of the Claim and the particular circumstances applicable to such holder, including whether the holder has previously claimed deductions or losses for U.S. federal income tax purposes with respect to such Claim. Because the tax consequences under the Plan relevant to U.S. Holders of Tribal Opioid Claims will depend on facts particular to each holder, all U.S. Holders of Tribal Opioid Claims should consult their tax advisors as to their proper tax treatment under the Plan in light of their particular facts and circumstances.

(j)    Consequences to the Holders of PI Opioid Claims (Class 7(A))

The Plan provides that (i) on the Effective Date, in full and final satisfaction, settlement, release, and discharge of the Debtors' obligations in respect of the PI Opioid Claims, the PI Trust shall receive from the PPOC Trust the PI Trust Share, (ii) as of the Effective Date, any liability of the Debtors for any PI Opioid Claims shall be channeled exclusively to the PPOC Trust and subsequently channeled to the PI Trust, and all of the Debtors' liability for such Claim shall be assumed by the PI Trust, and (iii) holders of Allowed PI Opioid Claims shall receive the applicable shares of the PI Trust Share allocated to such holders as set forth in the PI Trust Documents. The Plan further provides that the PI Trust is intended to be treated as a "qualified settlement fund" for U.S. federal income tax purposes. The U.S. federal income tax consequences to a U.S. Holder of a PI Opioid Claim—including whether such holder may have income or loss on account of distributions it receives in respect of the Claim or payments made in satisfaction of obligations of such holder or whether such holder may be entitled to claim a deduction on account of a distribution that satisfied an obligation of such holder—will generally depend upon the nature and origin of the Claim and the particular circumstances applicable to such holder. Amounts received or treated as received by a U.S. Holder of a PI Opioid Claim generally are not expected to be taxable to such holder for U.S. federal income tax purposes to the extent they represent payment for damages (other than punitive damages) received on account of personal physical injuries or physical sickness, within the meaning of Section 104 of the Code. However, to the extent such payments are attributable to medical expense deductions allowed under Section 213 of the Code for a prior taxable year, such payments are expected to be taxable as ordinary income to the U.S. Holder. To the extent a payment from the PI Trust is treated as a payment on account of damages in respect of a Claim other than for personal physical injury or physical sickness, whether the payment will be includable in the gross income of the holder will depend upon the nature and

128

origin of the Claim and the particular circumstances applicable to the holder, including whether the holder has previously claimed deductions or losses for U.S. federal income tax purposes with respect to such Claim. Because the tax consequences under the Plan relevant to U.S. Holders of PI Opioid Claims will depend on facts particular to each holder, all U.S. Holders of PI Opioid Claims should consult their tax advisors as to their proper tax treatment under the Plan in light of their particular facts and circumstances.

(k)    Consequences to the Holders of NAS PI Claims (Class 7(B))

The Plan provides that (i) on the Effective Date, in full and final satisfaction, settlement, release, and discharge of the Debtors' obligations in respect of the NAS PI Claims, the NAS PI Trust shall receive from the PPOC Trust the NAS PI Trust Share, (ii) as of the Effective Date, any liability of the Debtors for any NAS PI Claims shall be channeled exclusively to the PPOC Trust and subsequently channeled to the NAS PI Trust, and all of the Debtors' liability for such Claim shall be assumed by the NAS PI Trust, and (iii) holders of Allowed NAS PI Claims shall receive the applicable shares of the NAS PI Trust Share allocated to such holders as set forth in the NAS PI Trust Documents. The Plan further provides that the NAS PI Trust is intended to be treated as a "qualified settlement fund" for U.S. federal income tax purposes. The U.S. federal income tax consequences to a U.S. Holder of a NAS PI Claim—including whether such holder may have income or loss on account of distributions it receives in respect of the Claim or payments made in satisfaction of obligations of such holder or whether such holder may be entitled to claim a deduction on account of a distribution that satisfied an obligation of such holder—will generally depend upon the nature and origin of the Claim and the particular circumstances applicable to such holder. Amounts received or treated as received by a U.S. Holder of a NAS PI Claim generally are not expected to be taxable to such holder for U.S. federal income tax purposes to the extent they represent payment for damages (other than punitive damages) received on account of personal physical injuries or physical sickness, within the meaning of Section 104 of the Code. However, to the extent such payments are attributable to medical expense deductions allowed under Section 213 of the Code for a prior taxable year, such payments are expected to be taxable as ordinary income to the U.S. Holder. To the extent a payment from the NAS PI Trust is treated as a payment on account of damages in respect of a Claim other than for personal physical injury or physical sickness, whether the payment will be includable in the gross income of the holder will depend upon the nature and origin of the Claim and the particular circumstances applicable to the holder, including whether the holder has previously claimed deductions or losses for U.S. federal income tax purposes with respect to such Claim. Because the tax consequences under the Plan relevant to U.S. Holders of NAS PI Claims will depend on facts particular to each holder, all U.S. Holders of NAS PI Claims should consult their tax advisors as to their proper tax treatment under the Plan in light of their particular facts and circumstances.

(l)    Consequences to the Holders of Hospital Opioid Claims (Class 7(C))

The Plan provides that (i) on the Effective Date, in full and final satisfaction, settlement, release, and discharge of the Debtors' obligations in respect of the Hospital Opioid Claims, the Hospital Trust shall receive from the PPOC Trust the Hospital Trust Share, (ii) as of the Effective Date, any liability of the Debtors for any Hospital Opioid Claims shall be channeled exclusively to the PPOC Trust and subsequently channeled to the Hospital Trust, and all of the Debtors' liability for such Claim shall be assumed by the Hospital Trust, and (iii) holders of Allowed

129

Hospital Opioid Claims shall receive the applicable shares of the Hospital Trust Share allocated to such holders as set forth in the Hospital Trust Documents. The Plan further provides that the Hospital Trust is intended to be treated as a "qualified settlement fund" for U.S. federal income tax purposes. The U.S. federal income tax consequences to a U.S. Holder of a Hospital Opioid Claim—including whether such holder may have income or loss on account of distributions it receives in respect of the Claim or payments made in satisfaction of obligations of such holder or whether such holder may be entitled to claim a deduction on account of a distribution that satisfied an obligation of such holder—will generally depend upon the nature and origin of the Claim and the particular circumstances applicable to such holder. Amounts received or treated as received by a U.S. Holder of a Hospital Opioid Claim generally are not expected to be taxable to such holder for U.S. federal income tax purposes to the extent they represent payment for damages (other than punitive damages) received on account of personal physical injuries or physical sickness, within the meaning of Section 104 of the Code. However, to the extent such payments are attributable to medical expense deductions allowed under Section 213 of the Code for a prior taxable year, such payments are expected to be taxable as ordinary income to the U.S. Holder. To the extent a payment from the Hospital Trust is treated as a payment on account of damages in respect of a Claim other than for personal physical injury or physical sickness, whether the payment will be includable in the gross income of the holder will depend upon the nature and origin of the Claim and the particular circumstances applicable to the holder, including whether the holder has previously claimed deductions or losses for U.S. federal income tax purposes with respect to such Claim. Because the tax consequences under the Plan relevant to U.S. Holders of Hospital Opioid Claims will depend on facts particular to each holder, all U.S. Holders of Hospital Opioid Claims should consult their tax advisors as to their proper tax treatment under the Plan in light of their particular facts and circumstances.

(m)    Consequences to the Holders of TPP Claims (Class 7(D))

The Plan provides that (i) on the Effective Date, in full and final satisfaction, settlement, release, and discharge of the Debtors' obligations in respect of the TPP Claims, the TPP Trust shall receive from the PPOC Trust the TPP Trust Share, (ii) as of the Effective Date, any liability of the Debtors for any TPP Claims shall be channeled exclusively to the PPOC Trust and subsequently channeled to the TPP Trust, and all of the Debtors' liability for such Claim shall be assumed by the TPP Trust, and (iii) holders of Allowed TPP Claims shall receive the applicable shares of the TPP Trust Share allocated to such holders as set forth in the TPP Trust Documents. The Plan further provides that the TPP Trust is intended to be treated as a "qualified settlement fund" for U.S. federal income tax purposes. The U.S. federal income tax consequences to a U.S. Holder of a TPP Claim—including whether such holder may have income or loss on account of distributions it receives in respect of the Claim or payments made in satisfaction of obligations of such holder or whether such holder may be entitled to claim a deduction on account of a distribution that satisfied an obligation of such holder—will generally depend upon the nature and origin of the Claim and the particular circumstances applicable to such holder. Amounts received or treated as received by a U.S. Holder of a TPP Claim generally are not expected to be taxable to such holder for U.S. federal income tax purposes to the extent they represent payment for damages (other than punitive damages) received on account of personal physical injuries or physical sickness, within the meaning of Section 104 of the Code. However, to the extent such payments are attributable to medical expense deductions allowed under Section 213 of the Code for a prior taxable year, such payments are expected to be taxable as ordinary income to the U.S. Holder. To the extent a

payment from the TPP Trust is treated as a payment on account of damages in respect of a Claim other than for personal physical injury or physical sickness, whether the payment will be includable in the gross income of the holder will depend upon the nature and origin of the Claim and the particular circumstances applicable to the holder, including whether the holder has previously claimed deductions or losses for U.S. federal income tax purposes with respect to such Claim. Because the tax consequences under the Plan relevant to U.S. Holders of TPP Claims will depend on facts particular to each holder, all U.S. Holders of TPP Claims should consult their tax advisors as to their proper tax treatment under the Plan in light of their particular facts and circumstances.

(n)    Consequences to the Holders of IERP II Claims (Class 7(E))

The Plan provides that (i) on the Effective Date, in full and final satisfaction, settlement, release, and discharge of the Debtors' obligations in respect of the IERP II Claims, the IERP Trust II shall receive from the PPOC Trust the IERP Trust II Share, (ii) as of the Effective Date, any liability of the Debtors for any IERP II Claims shall be channeled exclusively to the PPOC Trust and subsequently channeled to the IERP Trust II, and all of the Debtors' liability for such Claim shall be assumed by the IERP Trust II, and (iii) holders of Allowed IERP II Claims shall receive the applicable shares of the IERP Trust II Share allocated to such holders as set forth in the IERP Trust II Documents. The Plan further provides that the IERP Trust II is intended to be treated as a "qualified settlement fund" for U.S. federal income tax purposes. The U.S. federal income tax consequences to a U.S. Holder of a IERP II Claim—including whether such holder may have income or loss on account of distributions it receives in respect of the Claim or payments made in satisfaction of obligations of such holder or whether such holder may be entitled to claim a deduction on account of a distribution that satisfied an obligation of such holder—will generally depend upon the nature and origin of the Claim and the particular circumstances applicable to such holder. Amounts received or treated as received by a U.S. Holder of a IERP II Claim generally are not expected to be taxable to such holder for U.S. federal income tax purposes to the extent they represent payment for damages (other than punitive damages) received on account of personal physical injuries or physical sickness, within the meaning of Section 104 of the Code. However, to the extent such payments are attributable to medical expense deductions allowed under Section 213 of the Code for a prior taxable year, such payments are expected to be taxable as ordinary income to the U.S. Holder. To the extent a payment from the IERP Trust II is treated as a payment on account of damages in respect of a Claim other than for personal physical injury or physical sickness, whether the payment will be includable in the gross income of the holder will depend upon the nature and origin of the Claim and the particular circumstances applicable to the holder, including whether the holder has previously claimed deductions or losses for U.S. federal income tax purposes with respect to such Claim. Because the tax consequences under the Plan relevant to U.S. Holders of IERP II Claims will depend on facts particular to each holder, all U.S. Holders of IERP II Claims should consult their tax advisors as to their proper tax treatment under the Plan in light of their particular facts and circumstances.

(o)    Consequences to the Holders of Settling Co-Defendant Claims (Class 10)

The Plan provides that on the Effective Date, in full and final satisfaction, settlement, release, and discharge of, and in exchange for the Settling Co-Defendant Claims, each holder of a Settling Co-Defendant Claim shall receive the treatment set forth in the DMP Stipulation. The U.S.

131

federal income tax consequences to a U.S. Holder of a Settling Co-Defendant Claim is uncertain, including whether any portion of the payment of attorneys' fees would give rise to taxable income to such holder. Such holders should consult their tax advisors as to their proper tax treatment under the Plan in light of their particular facts and circumstances.

(p)    Consequences to the Holders of Other Opioid Claims (Class 11)

The Plan provides that (i) on the Effective Date, in full and final satisfaction, settlement, release, and discharge of the Debtors' obligations in respect of the Other Opioid Claims, the Other Opioid Claims Trust shall receive the Other Opioid Claims Trust Consideration in accordance with the Other Opioid Claims Trust Documents, (ii) as of the Effective Date, any liability of the Debtors for any Other Opioid Claims shall be channeled exclusively to the Other Opioid Claims Trust and all of the Debtors' liability for such Claim shall be assumed by the Other Opioid Claims Trust, and (iii) holders of Allowed Other Opioid Claims shall receive recovery, if any, from the Other Opioid Claims Trust Consideration in respect of Other Opioid Claims. The Plan further provides that the Other Opioid Claims Trust is intended to be treated as a "qualified settlement fund" for U.S. federal income tax purposes.  The U.S. federal income tax consequences to a U.S. Holder of an Other Opioid Claim—including whether such holder may have income or loss on account of distributions it receives in respect of the Claim or payments made in satisfaction of obligations of such holder or whether such holder may be entitled to claim a deduction on account of a distribution that satisfied an obligation of such holder—will generally depend upon the nature and origin of the Claim and the particular circumstances applicable to such holder. Amounts received or treated as received by a U.S. Holder of Other Opioid Claims generally are not expected to be taxable to such holder for U.S. federal income tax purposes to the extent they represent payment for damages (other than punitive damages) received on account of personal physical injuries or physical sickness, within the meaning of Section 104 of the Code. However, to the extent such payments are attributable to medical expense deductions allowed under Section 213 of the Code for a prior taxable year, such payments are expected to be taxable as ordinary income to the U.S. Holder. To the extent a payment from the Other Opioid Claims Trust is treated as a payment on account of damages in respect of a Claim other than for personal physical injury or physical sickness, whether the payment will be includable in the gross income of the holder will depend upon the nature and origin of the Claim and the particular circumstances applicable to the holder, including whether the holder has previously claimed deductions or losses for U.S. federal income tax purposes with respect to such Claim. Because the tax consequences under the Plan relevant to U.S. Holders of Other Opioid Claims will depend on facts particular to each holder, all U.S. Holders of Other Opioid Claims should consult their tax advisors as to their proper tax treatment under the Plan in light of their particular facts and circumstances.

(q)    Accrued Interest and Original Issue Discount

A portion of the consideration received by U.S. Holders of Claims under the Plan may be attributable to accrued but unpaid interest (or original issue discount) on such Claims. Such amount should be taxable to that U.S. Holder as ordinary interest income if such accrued interest (or original issue discount) has not been previously included in such U.S. Holder's gross income for U.S. federal income tax purposes. Conversely, U.S. Holders of Claims may be able to recognize a deductible loss to the extent that any accrued interest (or original issue discount) on such Claims

132

was previously included in such U.S. Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

If the fair market value of the consideration received by a U.S. Holder is not sufficient to satisfy all principal and interest on any such Claims, the extent to which such consideration will be attributable to accrued interest is unclear.  Under the Plan, the aggregate consideration to be distributed to U.S. Holders of Claims will be allocated first to the principal amount of Claims, with any excess allocated to unpaid interest that accrued on these Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, and certain case law generally indicates that a final payment on a distressed debt instrument that is insufficient to repay outstanding principal and interest will be allocated to principal, rather than interest. Certain Treasury Regulations treat payments as allocated first to any accrued but unpaid interest. Accordingly, the IRS could take the position that the consideration received by a U.S. Holder should first be allocated to any accrued but unpaid interest. U.S. Holders of Claims should consult their tax advisors regarding the proper allocation of the consideration received by them under the Plan.

(r)    Market Discount

Under the "market discount" provisions of the Code, some or all of any gain realized by an exchanging U.S. Holder of a Claim on the Effective Date may be treated as ordinary income (instead of capital gain), to the extent of the amount of accrued "market discount" on the debt instruments constituting the exchanged Claim.  In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if the U.S. Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount, its adjusted issue price, in each case, by at least a de minimis amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

U.S. Holders should consult their tax advisors concerning the application of the market discount rules to their Claims.

(s)    Issue Price

The determination of the "issue price" of any New Takeback Debt issued in the Exit Financing will depend, in part, on whether such debt instruments and other property issued to the U.S. Holder, or the property surrendered by the U.S. Holder, under the Plan are treated as traded on an "established securities market" at any time during the 60-day period ending thirty (30) days after the Effective Date. In general, a debt instrument (or the stock or property exchanged therefor) will be treated as traded on an established market if (a) it is listed on (i) a qualifying national securities exchange, (ii) certain qualifying interdealer quotation systems, or (iii) certain qualifying non-U.S. securities exchanges; (b) it appears on a system of general circulation that provides a reasonable basis to determine fair market value; or (c) in certain situations the price quotations are readily available from dealers, brokers or traders. The issue price of a debt instrument that is traded

on an established market (or that is issued for stock or securities so traded) would be the fair market value of such debt instrument (or such stock or securities so traded) on the issue date as determined by such trading; provided if both the property exchanged and the property received therefor are treated as traded, the trading price of the property so received controls. The issue price of a debt instrument that is neither so traded nor issued for property so traded would be its stated principal amount (provided that the interest rate on the debt instrument exceeds the applicable federal rate published by the IRS). Debt issues under $100 million are not treated as traded for these purposes.

In general, U.S. Holders of Claims must follow the Purchaser Entities' determination of issue price with respect to each debt instrument issued under the Plan, unless any such U.S. Holder specifically discloses its disagreement with such determination on its own tax return. The Purchaser Entities will publish their determination of the issue price in accordance with applicable Treasury Regulations.

### 2. U.S. Federal Income Tax Considerations to Owning and Disposing of New Takeback Debt

#### (a) Ownership, Interest and Original Issue Discount on New Takeback Debt

Stated interest paid on New Takeback Debt to a U.S. Holder will be includible in the U.S. Holder's gross income as ordinary interest income at the time interest is received or accrued in accordance with the U.S. Holder's regular method of tax accounting for U.S. federal income tax purposes.

If the "stated redemption price at maturity" of the New Takeback Debt received by U.S. Holders exceeds the "issue price" of the New Takeback Debt (as determined pursuant to the "issue price" discussion above) by an amount equal to or greater than a statutorily defined de minimis amount, the New Takeback Debt will be considered to be issued with original issue discount for U.S. federal income tax purposes. The stated redemption price at maturity of the New Takeback Debt is the total of all payments due on the New Takeback Debt other than payments of "qualified stated interest." In general, qualified stated interest is stated interest that is payable unconditionally in cash or in property (other than debt instruments of the issuer) at least annually at a single fixed rate (or at certain qualifying floating rates).

For purposes of determining whether there is original issue discount, the de minimis amount is generally equal to one fourth of one percent of the principal amount of the New Takeback Debt multiplied by the number of complete years to maturity from their original issue date, or if the New Takeback Debt provides for payments other than payments of qualified stated interest before maturity, multiplied by the weighted average maturity of the New Takeback Debt (as determined under applicable Treasury Regulations). If the New Takeback Debt is issued with original issue discount, a U.S. Holder (i) will generally be required to include the original issue discount in gross income as ordinary interest income as it accrues on a constant yield to maturity basis over the term of the Takeback Debt, in advance of the receipt of the cash attributable to such original issue discount and regardless of the holder's method of accounting for U.S. federal income tax purposes, but (ii) will generally not be required to recognize additional income upon the receipt

of any cash payment on the New Takeback Debt that is attributable to previously accrued original issue discount that has been included in its income.

        (b)   <u>Acquisition Premium or Amortizable Bond Premium on New Takeback Debt</u>

If a U.S. Holder's initial tax basis in the New Takeback Debt is greater than the issue price of such debt but less than the stated principal amount of such debt, such New Takeback Debt will have an "acquisition premium." Under the acquisition premium rules, the amount of original issue discount that must be included in gross income with respect to the applicable New Takeback Debt for any taxable year will be reduced by the portion of the acquisition premium properly allocable to that year. Alternatively, if a U.S. Holder's initial tax basis in New Takeback Debt exceeds its stated principal amount, the U.S. Holder will be considered to have acquired the New Takeback Debt with "amortizable bond premium" and will not be required to include any original issue discount in income. A U.S. Holder may generally elect to amortize the bond premium over the remaining term of the New Takeback Debt on a constant yield method as an offset to stated interest when includible in income under such U.S. Holder's regular accounting method. Once made, this election applies to all debt obligations held or subsequently acquired by the U.S. Holder on or after the first day of the first taxable year to which the election applies and may not be revoked without the consent of the IRS. If a U.S. Holder elects to amortize bond premium, such U.S. Holder must reduce its tax basis in the New Takeback Debt by the amount of the premium used to offset stated interest. If a U.S. Holder does not elect to amortize the bond premium, that premium will decrease the gain or increase the loss otherwise recognized on disposition of the Takeback Debt. If a U.S. Holder's initial tax basis in the New Takeback Debt is less than the issue price of such debt, see the "Market Discount" discussion above.

        (c)   <u>Sale, Redemption, or Repurchase of the New Takeback Debt</u>

Upon the sale, exchange or other taxable disposition of the New Takeback Debt, a U.S. Holder will generally recognize gain or loss equal to the difference, if any, between the amount realized on the sale, exchange or other taxable disposition (other than amounts attributable to accrued but unpaid interest (or original issue discount), which will generally be taxable as interest) and the U.S. Holder's adjusted tax basis in their interest in the New Takeback Debt. A U.S. Holder's initial tax basis in the New Takeback Debt will be increased by any original issue discount previously included in such U.S. Holder's income and decreased by any payments on the New Takeback Debt other than qualified stated interest. Any such gain or loss will generally be capital gain or loss and will generally be long-term capital gain or loss if the interest in the New Takeback Debt has been held for more than one year at the time of its sale, exchange or other taxable disposition. Certain non-corporate U.S. Holders (including individuals) may be eligible for preferential rates of U.S. federal income tax in respect of long-term capital gains. The deductibility of capital losses is subject to limitations.

### 3. U.S. Federal Income Tax Treatment of the GUC Trust and the GUC Trust Disputed Claims Reserve

(a)  <u>The GUC Trust</u>

For U.S. federal income tax purposes, the GUC Trust is intended to qualify as a "liquidating trust" as described in Treasury Regulation Section 301.7701-4(d).  In general, a liquidating trust is not a separate taxable entity, but rather is treated for U.S. federal income tax purposes as a "grantor trust" (*i.e.*, all income and loss is taxed directly to the liquidating trust beneficiaries). Pursuant to the Plan, and in conformity with Revenue Procedures 82-58, 1980-2, C.B. 847 and Revenue Procedure 94-45, 1994-2 C.B. 684, all parties (including, without limitation, the Debtors, the GUC Trustee, and holders of beneficial interests in the GUC Trust) shall treat, for U.S. federal income tax purposes, the GUC Trust as a grantor trust. The holders of beneficial interests in the GUC Trust are the owners and grantors of the GUC Trust. The GUC Trust does not intend to request a ruling from the IRS concerning the tax status of the GUC Trust as a grantor trust, and there can be no assurance that the IRS would not take a contrary position. If the IRS were to successfully challenge the classification of the GUC Trust, the U.S. federal income tax consequences to the GUC Trust and the holders of beneficial interests in the GUC Trust, respectively, and the Debtors could vary from those discussed herein (including the potential for an entity-level tax on income of the GUC Trust).

The following discussion assumes that the GUC Trust will be so respected for U.S. federal income tax purposes. Accordingly, subject to the discussion below concerning the GUC Trust Disputed Claims Reserve, each holder of a beneficial interest in the GUC Trust will be treated as receiving its share of the GUC Trust Consideration.  Each holder of a beneficial interest in the GUC Trust must report on its U.S. federal income tax return its pro rata allocable share of income, gain, loss, deduction and credit recognized or incurred by the GUC Trust.

As soon as reasonably practicable after the transfer of the GUC Trust Consideration to the GUC Trust, the GUC Trustee shall make a good faith valuation of the GUC Trust Consideration. All parties to the GUC Trust (including, without limitation, the Debtors and holders of beneficial interests) must consistently use such valuation for all U.S. federal income tax purposes. The valuation will be made available, from time to time, as relevant for tax reporting purposes.

Taxable income or loss allocated to a holder of a beneficial interest in the GUC Trust will be treated as income or loss with respect to holder's undivided interest in the GUC Trust Consideration, and not as income or loss with respect to its prior Allowed Claim. The character of any income and the character and ability to use any loss will depend on the particular situation of the holder of a beneficial interest in the GUC Trust.

The U.S. federal income tax obligations of a holder with respect to its beneficial interest in the GUC Trust are not dependent on the GUC Trust distributing any Cash or other proceeds. Thus, a holder may incur a U.S. federal income tax liability with respect to its allocable share of GUC Trust income even if the GUC Trust does not make a concurrent distribution to the holder. In general, other than in respect of Cash retained on account of Disputed Claims and distributions resulting from undeliverable distributions (the subsequent distribution of which still relates to a holder's Allowed Claim), a distribution of Cash by the GUC Trust will not be separately taxable

136

to a holder of a beneficial interest in the GUC Trust since the beneficiary is already regarded for U.S. federal income tax purposes as owning the underlying assets (and was taxed at the time the cash was earned or received by the GUC Trust). Holders should consult their tax advisors regarding the appropriate U.S. federal income tax treatment of any subsequent distributions of cash originally retained by the GUC Trust on account of Disputed Claims.

The GUC Trustee will comply with all applicable governmental withholding requirements. Thus, in the case of any holders of beneficial interests in the GUC Trust that are not U.S. persons, the GUC Trustee may be required to withhold up to 30% of the income or proceeds allocable to such persons, depending on the circumstances (including whether the type of income is subject to a lower treaty rate).

The GUC Trustee will file with the IRS tax returns for the GUC Trust consistent with its classification as a grantor trust pursuant to Treasury Regulation section 1.671-4(a). Except as discussed below with respect to the GUC Trust Disputed Claims Reserve, the GUC Trustee also will send annually to each holder of a beneficial interest in the GUC Trust a separate statement regarding the receipts and expenditures of the GUC Trust as relevant for U.S. federal income tax purposes and will instruct all such holders to use such information in preparing their U.S. federal income tax returns or to forward the appropriate information to such holder's underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns.

(b)   The GUC Trust Disputed Claims Reserve

The GUC Trust Disputed Claims Reserve is intended to qualify as a "disputed ownership fund" as described in Treasury Regulation section 1.468B-9. If so treated, any payment of Cash or distribution of GUC Trust Units made out of the GUC Trust Disputed Claims Reserve should not be deemed to have been made to any recipient until, and to the extent that, the amount to which the recipient is entitled has been determined and distributed. At such time, the recipient (including the holders of GUC Trust Units upon the disallowance of a Disputed Claim) will take such amount into account for U.S. federal income tax purposes as an amount received in respect of its Claim. Upon the disallowance of a Disputed Claim, the GUC Trust Disputed Claims Reserve will be treated as having distributed to holders of GUC Trust Units the portion of the GUC Trust Assets allocable to such Disputed Claim. Recipients of amounts from the GUC Trust Disputed Claims Reserve should report these amounts consistently with the foregoing and should consult their tax advisors concerning the federal, state, local, and other tax consequences of the receipt of amounts from the GUC Trust Disputed Claims Reserve.

Upon the allowance or disallowance of a Disputed Claim, the GUC Trust Disputed Claims Reserve will generally be treated as having sold or exchanged the portion of the GUC Trust Assets allocable to such Claim for purposes of Code Section 1001(a). Any income realized by the GUC Trust Disputed Claims Reserve will be reported as income of and taxable to the GUC Trust Disputed Claims Reserve.

**D.** **U.S. Federal Income Tax Considerations of the Plan to Non-U.S. Holders of Claims**

**1.** **U.S. Federal Income Tax Considerations to Non-U.S. Holders of Claims**

The following discussion assumes that the Debtors will undertake the Plan currently contemplated by the Plan as a Taxable Transaction, and includes only certain U.S. federal income tax consequences of the Plan to Non-U.S. Holders. The discussion does not include any non-U.S. tax considerations. The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex. Non-U.S. Holders of Claims should consult their tax advisors regarding the tax consequences of the Restructuring Transactions.

(a)   Gain Recognition

Any gain realized by a Non-U.S. Holder on the exchange of its Claims will generally not be subject to U.S. federal income taxation unless (a) the Non-U.S. Holder is an individual who was treated as present in the United States for 183 days or more during the taxable year in which the Plan Transaction occurs and certain other conditions are met or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, the Non-U.S. Holder will generally be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange. If the second exception applies, the Non-U.S. Holder will generally be subject to U.S. federal income tax with respect to any gain realized on the exchange in the same manner as a U.S. Holder. In order to claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates). In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

(b)   Accrued but Unpaid Interest (and Original Issue Discount)

Payments made to a Non-U.S. Holder by a Debtor organized in the United States under the Plan that are attributable to accrued but unpaid interest (or original issue discount) will generally not be subject to U.S. federal income or withholding tax, provided that (i) such Non-U.S. Holder does not actually or constructively own 10 percent or more of the total combined voting power of all classes of the stock of the Debtors (and has provided the withholding agent with the required statement to that effect), (ii) the Non-U.S. holder is not a controlled foreign corporation that is related to such Debtor (directly or indirectly) through stock ownership and (iii) the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E, as applicable, or other applicable IRS Form W-8) establishing that the Non-U.S. Holder is not a U.S. person. A Non-U.S. Holder that does not satisfy the foregoing requirements will generally be exempt from U.S. federal withholding tax with respect to interest

paid on the notes if the holder establishes such interest (or original issue discount) is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (and if an income tax treaty applies, is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (x) will generally not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued but unpaid interest (or original issue discount) at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

A Non-U.S. Holder that does not qualify for exemption from withholding tax with respect to accrued but unpaid interest (or original issue discount) that is not effectively connected income will generally be subject to withholding of U.S. federal income tax at a 30 percent rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on payments from a Debtor organized in the United States that are attributable to accrued but unpaid interest (or original issue discount).

### 2. U.S. Federal Income Tax Consequences to Non-U.S. Holders of Owning and Disposing of Purchaser Equity

#### (a) Dividends on Purchaser Equity

Purchaser Parent will be a U.S. corporation or other U.S. entity classified as a corporation for U.S. federal income tax purposes. Any distributions made with respect to Purchaser Equity will constitute dividends for U.S. federal income tax purposes to the extent of Purchaser Parent's current or accumulated earnings and profits as determined under U.S. federal income tax principles. To the extent that a Non-U.S. Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the Non-U.S. Holder's basis in its shares. Any such distributions in excess of a Non-U.S. Holder's basis in its shares (determined on a share-by-share basis) will generally be treated as capital gain from a sale or exchange (and the respective excess distributions as proceeds from a sale or exchange).

Except as described below, dividends paid with respect to Purchaser Equity held by a Non-U.S. Holder that are not effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (or if an income tax treaty applies, are not attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) will be subject to U.S. federal withholding tax at a rate of 30 percent (or lower treaty rate or exemption from tax, if applicable). A Non-U.S. Holder will generally be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under a tax treaty by filing IRS Form W-8BEN or W-8BEN-E (or successor form) upon which the Non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower treaty rate or exemption from tax with respect to such payments. Dividends paid with respect to

139

Purchaser Equity held by a Non-U.S. Holder that are effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, are attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) will generally be subject to U.S. federal income tax in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

If Purchaser Parent is considered a "U.S. real property holding corporation" for U.S. federal income tax purposes (a "USRPHC"), distributions to a Non-U.S. Holder will generally be subject to withholding by Purchaser Parent at a rate of 15 percent to the extent they are not treated as dividends for U.S. federal income tax purposes. In the event the Purchaser Equity is regularly traded on an established securities market, withholding would not be required if the Non-U.S. Holder does not directly or indirectly own more than 5 percent of the value of such interest during a specified testing period. However, even if the Purchaser Equity is regularly traded on an established securities market, non-dividend distributions to Non-U.S. Holders who directly or indirectly own more than 5 percent of the value of the Purchaser Equity during a specified testing period will generally be subject to the 15 percent withholding tax described above. The Debtors have not yet determined whether the Purchaser Equity, if publicly traded as the Debtors and the holders of Claims intend, will be regularly traded on an established securities market on, or any time after, the Effective Date.

In general, a corporation is a USRPHC as to a Non-U.S. Holder if the fair market value of the corporation's U.S. real property interests (as defined in the Code and applicable Treasury Regulations) equals or exceeds 50 percent of the aggregate fair market value of its worldwide real property interests and its other assets used or held for use in a trade or business (applying certain look-through rules to evaluate the assets of subsidiaries) at any time within the shorter of the 5-year period ending on the effective time of the applicable disposition or the period of time the Non-U.S. Holder held such interest. The Debtors do not anticipate that Purchaser Parent will be a USRPHC following the Plan, although no guarantees can be made in this regard. Each Non-U.S. Holder should consult its tax advisor regarding the possible impact of the USRPHC rules.

(b)    Sale, Redemption, or Repurchase of Purchaser Equity

A Non-U.S. Holder will generally not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition (including a cash redemption) of Purchaser Equity unless:

i.    such Non-U.S. Holder is an individual who is treated as present in the United States for 183 days or more in the taxable year of disposition and certain other requirements are met;

ii.    such gain is effectively connected with such Non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States); or

iii.    Purchaser Parent is or has been during a specified testing period a USRPHC.

140

If the first exception applies, the Non-U.S. Holder will generally be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition of Purchaser Equity.

If the second exception applies, the Non-U.S. Holder will generally be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

If the third exception applies, the Non-U.S. Holder will generally be subject to U.S. federal income tax on any gain recognized on the disposition of all or a portion of its Purchaser Equity under the Foreign Investment in Real Property Tax Act ("FIRPTA"). Taxable gain from the disposition of an interest in a USRPHC (generally equal to the difference between the amount realized and such Non-U.S. Holder's adjusted tax basis in such interest) will constitute effectively connected income. Further, the buyer of the Purchaser Equity will be required to withhold a tax equal to 15 percent of the amount realized on the sale. The amount of any such withholding would be allowed as a credit against the Non-U.S. Holder's federal income tax liability and may entitle the Non-U.S. Holder to a refund, provided that the Non-U.S. Holder properly and timely files a tax return with the IRS. In the event the Purchaser Equity is regularly traded on an established securities market, the withholding obligation described above would not apply, even if a Non-U.S. Holder is subject to the substantive FIRPTA tax and is required to file a U.S. federal income tax return.

3.      **U.S. Federal Income Tax Consequences to Non-U.S. Holders of Owning and Disposing of New Takeback Debt Received Under the Plan**

(a)      Payments on New Takeback Debt

Payments to a Non-U.S. Holder with respect to the New Takeback Debt that are treated as interest, including payment attributable to any original issue discount (see discussion above) will generally not be subject to U.S. federal income or withholding tax, provided that (i) such Non-U.S. Holder does not actually or constructively own 10 percent or more of the total combined voting power of all classes of the stock of the Purchaser Entities (and has provided the withholding agent with the required statement to that effect), (ii) the Non-U.S. Holder is not a controlled foreign corporation that is related to Purchaser Parent (directly or indirectly) through stock ownership and (iii) the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E, as applicable, or other applicable IRS Form W-8) establishing that the Non-U.S. Holder is not a U.S. person. A Non-U.S. Holder that does not satisfy the foregoing requirements will generally be exempt from U.S. federal withholding tax with respect to interest paid on the notes if the holder establishes such interest (or original issue discount) is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (and if an income tax treaty applies, is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) (in which case, provided the Non-U.S.

141

Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (x) will generally not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued but unpaid interest (or original issue discount) at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

A Non-U.S. Holder that does not qualify for exemption from withholding tax with respect to interest that is not effectively connected income will generally be subject to withholding of U.S. federal income tax at a 30 percent rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on payments that are attributable to interest, including any OID.

For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, as applicable, or other applicable IRS Form W-8, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

(b)    Sale, Redemption, or Repurchase of the New Takeback Debt

Any gain recognized by a Non-U.S. Holder on the sale, exchange or other disposition of the New Takeback Debt (other than an amount representing accrued but untaxed interest (or original issue discount) on the New Takeback Debt, which is subject to the rules discussed above under "*Payments on New Takeback Debt*") will generally not be subject to U.S. federal income taxation unless (i) the Non-U.S. Holder is an individual who was treated as present in the United States for 183 days or more during the taxable year in which the disposition occurs and certain other conditions are met or (ii) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, the Non-U.S. Holder will generally be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange. If the second exception applies, the Non-U.S. Holder will generally be subject to U.S. federal income tax with respect to any gain realized on the exchange in the same manner as a U.S. Holder. To claim an exemption from withholding tax, such Non-U.S. Holder will generally be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates). In addition, if such a Non-U.S. Holder is a corporation for U.S. federal income tax purposes, it may also be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

E.    **FATCA**

Under the Foreign Account Tax Compliance Act and the regulations and administrative guidance promulgated thereunder ("FATCA"), withholding at a rate of 30% will generally be required on payments of interest on notes held by or through certain foreign financial institutions (including investment funds), unless such institution otherwise qualifies for an exemption or (i) enters into, and complies with, an agreement with the IRS to report, on an annual basis, information with respect to interests in, and accounts maintained by, the institution that are owned by certain U.S. persons and by certain non-U.S. entities that are wholly or partially owned by U.S. persons and to withhold on certain payments, or (ii) if required under an intergovernmental agreement between the United States and an applicable foreign country, reports such information to its local tax authority, which will exchange such information with the U.S. authorities. An intergovernmental agreement between the United States and an applicable foreign country, or other guidance, may modify these requirements. Similarly, in certain circumstances, interest payments in respect of notes held by an investor that is a non-financial non-U.S. entity that do not qualify under certain exemptions will generally be subject to withholding at a rate of 30%, unless such entity either (i) certifies that such entity does not have any "substantial United States owners" or (ii) provides certain information regarding the entity's "substantial United States owners," which we will in turn provide to the IRS. Accordingly, the entity through which the notes are held will affect the determination of whether withholding under the rules described in this paragraph is required. Non-U.S. Holders will not be paid any additional amounts in respect of any amounts withheld. Prospective investors should consult their tax advisors regarding the possible implications of these rules on an investment in the notes.

**THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND DOES NOT CONSTITUTE TAX ADVICE. THE POTENTIAL TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, EACH HOLDER OF CLAIMS OR INTERESTS SHOULD CONSULT ITS TAX ADVISOR ABOUT THE U.S. FEDERAL, STATE, LOCAL, AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE CONSUMMATION OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN AND THE OWNERSHIP OF PURCHASER EQUITY.**

**XII.    CERTAIN MATERIAL IRISH TAX CONSEQUENCES**

A.    **Introduction**

The following is a summary of certain material Irish tax considerations of the consummation of the Plan for the Debtors and Non-Irish Holders (as defined below) of Claims. The summary does not purport to be a comprehensive description of all of the tax considerations that may be relevant to the Debtors and each of the Non-Irish Holders of Claims. The summary relates only to the position of persons who are the absolute beneficial owners of the Claims and may not apply to certain other classes of persons such as dealers in securities or shares.

The summary is based upon Irish tax laws and the practice of the Irish Revenue Commissioners as at the date of the Plan. Changes in law and/or administrative practice may result

143

in alteration of the tax considerations described below. This summary does not address non-Irish tax consequences of the contemplated transactions, nor does it address the Irish tax consequences of the transactions to special classes of taxpayers (e.g., individuals, regulated investment companies, real estate investment trusts, banks and certain other financial institutions, insurance companies, tax-exempt organisations, retirement plans, individual retirement and other tax-deferred accounts, holders that are, or hold their Claims through partnerships or other pass-through entities for Irish tax purposes persons, whose function currency is not euro, dealers in securities or foreign currency, traders that mark-to-market their securities and persons whose Claims are part of a straddle, hedging, constructive sale, or conversion transaction). In addition, this discussion does not address the Foreign Account Tax Compliance Act or the Common Reporting Standard or Irish taxes other than income tax, corporation tax, capital gains tax and stamp duty.

This summary does not constitute tax advice and is intended only as a general guide. The summary is not exhaustive and Non-Irish Holders should consult their own tax advisers about the Irish tax consequences (and tax consequences under the laws of other relevant jurisdictions) of the Plan.

For purposes of this discussion, a "Non-Irish Holder" is any holder of a Claim that is not resident or ordinarily resident in Ireland for tax purposes and who does not (i) hold their Claim in connection with a trade or business carried on in Ireland or (ii) hold their Claim through a branch or agency through which it carries on a trade; and an "Irish Debtor" is a Debtor that is resident in Ireland for Irish tax purposes.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN IRISH TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY.  ALL HOLDERS OF CLAIMS SHOULD CONSULT THEIR TAX ADVISORS AS TO THE FEDERAL, STATE, LOCAL, IRISH, OTHER NON-U.S., NON-INCOME, AND OTHER TAX CONSEQUENCES OF THE PLAN.**

### B.        Certain Irish Tax Consequences to the Debtors

#### 1.        Irish Tax on Chargeable Gains

Upon the transfer of any assets (including equity Interests) as part of the implementation of the Plan, the Irish Debtors will generally realise a gain or loss for Irish tax purposes in an amount equal to the difference between the value of the consideration received for the transfer of those assets and the relevant Irish Debtor's Irish CGT (as defined below) basis in such assets. The Irish Debtors may be liable to Irish corporation tax on chargeable gains ("Irish CGT") on any such gains arising (subject to the availability of any exemptions or reliefs). The current rate of Irish CGT, where applicable, is 33%.

Endo DAC (the "DAC Seller") has been advised that, based on current facts, it is expected that DAC Seller is likely to be able to avail of the participation exemption from Irish CGT in respect of the disposal of equity Interests in Endo US Holdings Luxembourg I S.a.r.l. ("LuxCo"). Accordingly, based on current facts, it is expected that any gain arising on the disposal by the DAC Seller of equity Interests in LuxCo is likely to be exempt from Irish CGT. However, availability of the participation exemption requires a fact based analysis of the profile of the Debtor group at

144

the point in time that the disposal of equity Interests in LuxCo occurs or is deemed, for Irish CGT purposes, to occur. This analysis will need to be undertaken on the date of disposal, for Irish CGT purposes, of equity Interests in LuxCo by DAC Seller in order to confirm the availability of the participation exemption at that time.

The acquisition of the Purchaser Equity, the Exit Financing or the proceeds thereof and Cash (to the extent denominated in a currency other than euro) (together the "DAC Seller Consideration") from the Purchaser Entities will result in the acquisition of chargeable assets by the DAC Seller. However, on the basis that (i) the DAC Seller Consideration is disposed of by the DAC Seller in accordance with the Plan on the same day on which it is acquired; and (ii) the value of the equity Interests in LuxCo transferred by Endo DAC to the Purchaser Entities equals the aggregate market value of the DAC Seller Consideration received, no Irish CGT should arise in respect of the disposal by the DAC Seller of the DAC Seller Consideration. To the extent the DAC Seller Consideration is not transferred on the same day, then Irish CGT may arise on any increase in the value of the Purchaser Equity, the Exit Financing or the proceeds thereof and Cash (including taking into account foreign exchange rate differences against the euro value).

### 2.    Irish Stamp Duty

The rate of stamp duty (where applicable) on transfer of shares of Irish incorporated companies is 1% of the price paid or the market value of the shares acquired, whichever is greater. Transfers of shares in non-Irish incorporated companies are exempt from Irish stamp duty (provided the transfer does not relate to immovable property situated in Ireland or stock or marketable securities of an Irish incorporated company). The transfer by the DAC Seller of the Interests in LuxCo should be exempt from Irish stamp duty as LuxCo is a company incorporated in Luxembourg.

The rate of stamp duty (where applicable) on transfers of other assets to be transferred by the Debtors under the Plan is 7.5% of the price paid or the market value of the assets acquired, whichever is greater. A number of reliefs and exemptions from Irish stamp duty are available depending on the nature of the assets transferring. For example, an exemption from Irish stamp duty applies on the transfer of intellectual property assets that fall within the meaning of "specified intangible assets" under section 291A Taxes Consolidation Act 1997.

Where Irish stamp duty arises, it is generally a liability of the transferee. To the extent that any transfers of assets by the Debtors to the Purchaser Entities pursuant to the Plan fall within the charge to Irish stamp duty and do not qualify for exemption, the Debtors should not be liable provided any such transfers do not operate as voluntary dispositions.

### 3.    Pillar 2

From January 1, 2024 Endo Parent, as the ultimate parent entity of the consolidated group (the "Endo Group") and the Debtors will be subject to new tax rules which are currently being implemented into domestic law in Ireland, as required by the EU Council Directive 2022/2523 on ensuring a global minimum level of taxation for multinational enterprise groups and large-scale domestic groups in the Union (the "EU Minimum Tax Directive"), which implements the OECD Pillar 2 Model Rules (together, "Pillar 2").

From January 1, 2024, Endo Parent will be required, under the income inclusion rule ("IIR"), to determine whether the Endo Group has paid a minimum effective tax rate (as computed in accordance with Pillar 2) of 15% in each jurisdiction in which it operates. To the extent that the Endo Group has an effective tax rate (as computed in accordance with Pillar 2) of less than 15% in any jurisdiction in which it operates, Endo Parent will be subject to a "top-up tax" in Ireland so that the effective tax rate in that jurisdiction is increased to 15%. As the ultimate parent entity of the Endo Group, Endo Parent will be required to comply with the IIR and discharge any top-up tax liability arising. Irish tax resident companies in the Endo Group will be subject to a qualifying domestic top-up tax ("QDTT") in Ireland to increase the effective tax rate for those entities to 15%. The QDTT will apply in preference to the IIR.

The tax base for Pillar 2 purposes is calculated by reference to financial accounting rules subject to certain adjustments (in accordance with Pillar 2 rules). The sale of assets and/or equity Interests of the Debtors pursuant to the Plan may result in an amount of or an increase in the amount of top-up tax payable by Endo Parent under the IIR and/or QDTT paid by Irish tax resident companies in the Endo Group. Certain gains and losses arising on the disposal of equity Interests are excluded from the computation of Pillar 2 profit or loss calculations where certain conditions are met.

### C.    Certain Irish Tax Consequences to Non-Irish Holders of Claims

#### 1.    Capital Gains Tax

Non-Irish Holders of Claims should not be subject to Irish CGT on the receipt of their pro rata share of the Purchaser Equity, Exit Financing or the proceeds thereof, Cash, or GUC Trust Consideration in exchange for full and final satisfaction, compromise, settlement, release, and discharge of their Claims.

#### 2.    Stamp Duty

No Irish stamp duty should arise on the receipt by any Non-Irish Holder of their pro rata share of the Purchaser Equity, Exit Financing or the proceeds thereof, Cash, or GUC Trust Consideration in exchange for full and final satisfaction, compromise, settlement, release, and discharge of their Claims.

## XIII.  SECURITIES LAW MATTERS

### A.    Issuance of the Purchaser Equity

On the Effective Date, the Purchaser Parent is authorized to issue or cause to be issued and shall, as provided for in the Plan, issue the Purchaser Equity in accordance with the terms of the Plan.  The Purchaser Parent shall be authorized, without the need for any further corporate or other action by the Debtors or by Holders of any Claims or Interests, to issue the Purchaser Equity and consummate the transactions contemplated in the Plan in accordance with the terms of the Plan. The Purchaser Equity shall be issued and distributed free and clear of all Liens, Claims, and other Interests.

146

All of the shares of the Purchaser Equity issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable and not to have been issued in violation of any preemptive rights, rights of first refusal or similar rights or any applicable law.  Each distribution and issuance of Purchaser Equity shall be governed by the terms and conditions set forth in the Plan applicable to such issuance or distribution and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each entity receiving such distribution or issuance without the need for execution by any party thereto.  Any entity's acceptance of Purchaser Equity shall be deemed as its agreement to the Corporate Governance Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with their respective terms.  The Purchaser Equity will not be registered under the Securities Act.  Moreover, although the current intention is for the Purchaser Equity to be listed on a national securities exchange, the Purchaser Equity may not be publicly listed as of the Effective Date.

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of the Purchaser Equity in respect of eligible Allowed Claims shall be exempt from, among other things, the registration and/or prospectus delivery requirements of section 5 of the Securities Act and any other applicable federal, state, local or other law requiring registration and/or delivery of prospectuses prior to the offering, issuance, distribution, or sale of securities.  Such Purchaser Equity (a) will not constitute "restricted securities" as defined in rule 144(a)(3) under the Securities Act and (b) will be freely tradable and transferable in the United States by each recipient thereof that (i) is an entity that is not an "underwriter" as defined in section 1145(b)(1) of the Bankruptcy Code, (ii) is not an "affiliate" of Purchaser Parent as defined in Rule 144(a)(1) under the Securities Act, (iii) has not been such an "affiliate" within ninety (90) days of the time of the transfer, and (iv) has not acquired such securities from an "affiliate" in a transaction or chain of transactions not involving any public offering within one year of the time of transfer.  Notwithstanding the foregoing, such Purchaser Equity shall remain subject to compliance with applicable securities laws and any rules and regulations of the SEC, if any, applicable at the time of any future transfer, and any restrictions in the Corporate Governance Documents.

Should the Purchaser Parent elect on or after the Effective Date to reflect any ownership of the securities to be issued under the Plan through the facilities of DTC, and subject to such securities being eligible to be held through the facilities of DTC, the Purchaser Parent need not provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of the securities to be issued under the Plan under applicable securities laws.  DTC shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether the securities to be issued under the Plan are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.  Notwithstanding anything to the contrary in the Plan, no entity (including, for the avoidance of doubt, DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the securities to be issued under the Plan are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

**THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN IRISH TAX CONSEQUENCES OF THE PLAN AND DOES NOT CONSTITUTE TAX ADVICE.  THE POTENTIAL TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S**

**PARTICULAR CIRCUMSTANCES. ACCORDINGLY, EACH HOLDER OF CLAIMS OR INTERESTS SHOULD CONSULT ITS TAX ADVISOR ABOUT THE U.S. FEDERAL, STATE, LOCAL, IRISH, AND OTHER FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE CONSUMMATION OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN AND THE OWNERSHIP OF PURCHASER EQUITY.**

## XIV.   PLAN SUPPLEMENT

Exhibits to the Plan not attached thereto will be filed with the Plan Supplement. The Plan Supplement (and amendments thereto) filed by the Debtors will be deemed an integral part of the Plan and will be incorporated by reference as if fully set forth therein. The Plan Supplement may be viewed at the office of the clerk of the Bankruptcy Court or its designee during normal business hours, by visiting the Bankruptcy Court's website at http://www.nysb.uscourts.gov (PACER account required) or at the Solicitation Agent's website at https://restructuring.ra.kroll.com/endo, or by written request to the Solicitation Agent at:

By regular mail, hand delivery, or overnight mail at:

Re: Endo International plc
c/o Kroll Restructuring Administration LLC
850 Third Avenue, Suite 412,
Brooklyn, NY 11232

By electronic mail at:

endoinfo@ra.kroll.com

By telephone at:

(877) 542-1878 (US/Canada, toll free) or +1 (929) 284-1688 (International, toll)

The documents contained in the Plan Supplement shall be subject to approval by the Bankruptcy Court pursuant to the order confirming the Plan.

## XV.   RECOMMENDATION AND CONCLUSION

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' stakeholders than would otherwise result in any other scenario. Accordingly, the Debtors recommend that holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

The Committees also encourage each creditor to vote to accept the Plan. The specific position of the Committees are set forth in the UCC Letter and the OCC Letter included in the solicitation materials. The Committees encourage each member of their respective constituencies to review the appropriate letter and communicate directly with the relevant Committee regarding any questions they have about the applicable letter, the Plan, or this Disclosure Statement.

Dated: January 16, 2024

ENDO INTERNATIONAL PLC
on behalf of itself and its Debtor affiliates

*/s/ Mark Bradley*
Name: Mark Bradley
Title:   Chief Financial Officer

## Exhibit A

**Plan**

*Filed Separately on the Docket*

## **Exhibit B**

**Corporate Organizational Chart**



## **Exhibit C**

## **U.S. Government Economic Term Sheet**

**GIBSON, DUNN & CRUTCHER LLP**
Scott J. Greenberg
Michael J. Cohen
Joshua K. Brody
Christina M. Brown
200 Park Avenue
New York, New York 10166
Telephone: (212) 351-4000
Facsimile: (212) 351-4035

*Counsel to the Ad Hoc First Lien Group*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| *In re* | **Chapter 11** |
| **ENDO INTERNATIONAL plc,** *et al.*, | **Case No. 22-22549 (JLG)** |
| **Debtors.**[1] | **(Jointly Administered)** |
|  | **Related Docket No. 1257** |

<u>**NOTICE OF FILING OF TERM SHEET**</u>

    **PLEASE TAKE NOTICE** that, on November 23, 2022, the Debtors filed the *Debtors' Motion for an Order (I) Establishing Bidding, Noticing, and Assumption and Assignment Procedures, (II) Approving Certain Transaction Steps, (III) Approving the Sale of Substantially All of the Debtors' Assets and (IV) Granting Related Relief* [Docket No. 728] (the "**Sale Motion**").

    **PLEASE TAKE FURTHER NOTICE** that, on January 27, 2023, the Court entered an order [Docket No. 1257] (the "**Mediation Order**")[2] referring certain matters to mediation ("**Mediation**").

    **PLEASE TAKE FURTHER NOTICE** that, prior to Sale Objection Deadline (as defined in the Bidding Procedures Order), the Ad Hoc First Lien Group and the United States of America

---

[1]    The last four digits of Debtor Endo International plc's tax identification number are 3755. Due to the large number of debtors in these chapter 11 cases, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Endo. The location of the Debtors' service address for purposes of these chapter 11 cases is: 1400 Atwater Dr., Malvern, PA 19355.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Mediation Order or the proposed order attached as Exhibit A to the *Notice of Filing of Revised Proposed Order (A) Approving the Purchase and Sale Agreement, (B) Authorizing the Sale of Assets, (C) Authorizing the Assumption and Assignment of Contracts and Leases, and (D) Granting Related Relief; and Revised Stalking Horse Agreement* [Docket No. 2577], as applicable.

(the "***United States***") engaged in Mediation with respect to certain disputes related to the Sale Motion.

**PLEASE TAKE FURTHER NOTICE** that, on July 18, 2023, prior to the Sale Objection Deadline, the United States, on behalf of the Internal Revenue Service, the U.S. Department of Justice, the U.S. Department of Health and Human Services, and the U.S. Department of Veterans Affairs, by its attorney, Damian Williams, United States Attorney for the Southern District of New York, filed the *Objection of the United States of America to the Debtors' Motion for an Order (I) Establishing Bidding, Noticing, and Assumption and Assignment Procedures, (II) Approving Certain Transaction Steps, (III) Approving the Sale of Substantially All of the Debtors' Assets and (IV) Granting Related Relief – and – Memorandum of Law in Support of Motion to Appoint Chapter 11 Trustee* [Docket No. 2460] (the "***USG Objection***").

**PLEASE TAKE FURTHER NOTICE** that, following the filing of the USG Objection, the United States and the Ad Hoc First Lien Group voluntarily resumed Mediation.

**PLEASE TAKE FURTHER NOTICE** that the Mediation Order authorizes the disclosure of Proposal Information.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Mediation, the Proposal Information attached hereto as **Exhibit A** (the "***Term Sheet***") is a summary of key terms under discussion in the interest of reaching a potential resolution of the USG Objection and certain related claims and disputes and is the product of Mediation discussions among certain representatives of the United States and certain representatives of the Ad Hoc First Lien Group. Specifically, with respect to the United States, once an acceptable resolution of the civil fraud and criminal investigations is reached (as noted in paragraph 5 of the Term Sheet), and further once appropriate documents are negotiated to implement the terms embodied in the Term Sheet, then trial counsel at the United States Attorney's Office for the Southern District of New York have agreed to recommend the terms of the Term Sheet for approval to the appropriate officials within the U.S. Department of Justice who are empowered to authorize settlements of the government claims at issue.

**PLEASE TAKE FURTHER NOTICE** that the Term Sheet has not yet been approved by either the United States or the Required Consenting Global First Lien Creditors, and remains subject to and conditioned upon (i) each such party obtaining any necessary approvals of the terms embodied in the Term Sheet, (ii) agreement on definitive documentation implementing the Term Sheet (including a potential chapter 11 plan that may be proposed prospectively by the Debtors), and (iii) agreement by and among the Debtors, the United States, and the Required Consenting Global First Lien Creditors on the resolution of all civil fraud and criminal investigations of the Debtors by the U.S. Department of Justice (which resolution discussions, for the avoidance of doubt, remain ongoing), as noted in paragraph 5 of the Term Sheet.

**PLEASE TAKE FURTHER NOTICE** that none of the Debtors, their applicable boards of directors, or any other case constituencies (to the extent applicable) have approved or agreed to support the terms set forth in the Term Sheet. In the event any such approval or support is necessary, it will be sought at the appropriate time.

**PLEASE TAKE FURTHER NOTICE** that (i) the Term Sheet and the negotiations related thereto are subject to Rule 408 of the Federal Rule of Evidence, all other applicable rules of evidence, and the Mediation Order, (ii) all negotiations relating to the Term Sheet shall not be admissible into evidence in any proceeding, and (iii) the rights of the United States, the Ad Hoc First Lien Group, the Debtors, the official committees, and other case constituencies with respect to all issues in the above-captioned chapter 11 cases (the "***Chapter 11 Cases***") are fully reserved.

Dated: November 20, 2023
       New York, New York

Respectfully submitted,

 /s/ *Michael J. Cohen*

**GIBSON, DUNN & CRUTCHER LLP**
Scott J. Greenberg
Michael J. Cohen
Joshua K. Brody
Christina M. Brown

SGreenberg@gibsondunn.com
MCohen@gibsondunn.com
JBrody@gibsondunn.com
Christina.Brown@gibsondunn.com

200 Park Avenue
New York, New York 10166
Telephone:    (212) 351-4000
Facsimile:    (212) 351-4035

*Counsel to the Ad Hoc First Lien Group*

## Exhibit A

## Term Sheet

**PLEASE TAKE NOTICE** that the Term Sheet remains (i) subject to separate and ongoing approval processes to be undertaken by the United States and the Required Consenting Global First Lien Creditors and (ii) contingent on certain to be agreed contributions of other constituencies in the Chapter 11 Cases as outlined in the Term Sheet.  The Debtors and applicable interested parties reserve all of their respective rights, subject to the terms and conditions set forth in the Restructuring Support Agreement, with respect to the resolution of the criminal matters raised by the United States and the definitive documents related to the Term Sheet (including a chapter 11 plan) and to any amendment, revision, modification, or supplement to any such documents at any time before the effective date of a chapter 11 plan, or any such other date as may be provided for by such plan or by order of the Bankruptcy Court.

Subject to Mediation Privilege & FRE 408
Confidential – draft

### Key Terms of DOJ-Ad Hoc First Lien Resolution

1. $364.9 million nominal, payable over 10 years in equal installments with the first payment payable 12 months after the closing of the sale or the effective date of a chapter 11 plan for the Debtors (the "Plan") (such date, the "Resolution Effective Date").  The parties agree that in any sale or plan scenario, the transaction will be treated as a taxable sale of assets for federal income tax purposes.  The Ad Hoc First Lien Group is not prepared to have the Resolution Obligor (defined as Newco, in the event of a sale, or the ultimate parent of the reorganized business in the event of a Plan) fund the full $364.9 million payment ($200 million on a net present value basis based on the discounting factors in 1a below), and is in the process of mediating with other constituencies the extent to which any constituencies will provide contributions to such payment.

   a. The Resolution Obligor[1] can elect to pre-pay the balance in whole or in part at any time using the following discounting factors: (i) 10 year, equal installment payment stream (or such amounts remaining to be paid under the original 10-year schedule) and (ii): 12.75% annual discount rate. For the avoidance of doubt, if the Resolution Obligor elects to prepay the entire amount on the Resolution Effective Date, the payment would be $200 million.

   b. DOJ will have a one-time election to demand the $200 million payment on the Resolution Effective Date.

2. $100 million contingent note payable annually based on EBITDA outperformance during the calendar years 2024-2028, the material terms of which note are set forth on Exhibit 1 hereto.

3. If DOJ doesn't elect to receive the upfront payment detailed in 1b above, should the Resolution Obligor file for bankruptcy prior to full satisfaction of the cash payment obligations herein, the unpaid balance would receive priority status in a subsequent bankruptcy case of the Resolution Obligor.

4. Parties agree that (a) no tax credits or other potentially beneficial tax attributes (such as net operating losses) are acquired by the Newco from the Debtors in the event of a sale or by any party (including the Reorganized Debtor) in the event of a reorganization, and (b) the Resolution Obligor's tax basis in the acquired or post-emergence assets (as applicable) will be stipulated to be in the range of $3.5 billion to $4.65 billion, with such tax basis to be established by the Resolution Obligor following the Resolution Effective Date pursuant to a fair market valuation of such assets by a nationally recognized accounting firm retained by the Resolution Obligor.

5. This deal is subject to satisfactory resolution of the criminal and civil fraud claims against the Debtors related to the sale and marketing of opioid products, the financial component of which will be included within the payments described in paragraphs 1-2, and shall be acceptable to the DOJ, Debtors and the Ad Hoc First Lien Group.

---

[1] The obligations hereunder of the Resolution Obligor shall not be structurally junior to any of obligations outstanding under any other resolution reached with any other case constituency.

1

**Subject to Mediation Privilege & FRE 408**
**Confidential – draft**

6.  These considerations would satisfy all pre-petition and administrative claims of the government against the Debtors.

7.  The Debtors and Ad Hoc First Lien Group will resolve any outstanding objections from the US Trustee to the proposed transaction.

**Subject to Mediation Privilege & FRE 408**
**Confidential – draft**

**Exhibit 1**

**Material Terms of Contingent Note**

Subject to Mediation Privilege & FRE 408
Confidential – draft

- **Instrument:** a promissory note issued at Resolution Effective Date with a face amount of $100 million that shall rank as a senior unsecured obligation of the Resolution Obligor (the "**Contingent Note**"), which the Parties agree is among the consideration given in respect of the resolution of the IRS's tax claims.

- **Contingent payment amount:**  Periodic payment amount determined by EBITDA outperformance relative to benchmark projections.  For each year from 2024 through 2027, payment on the Contingent Note is triggered by the Resolution Obligor's outperformance over the February 2023 LTP. For the year 2028 (which is not included in the February 2023 LTP), the target EBITDA (defined below) shall be $949 million[2].

  - Use Earnings Before Interest, Taxes, Depreciation and Amortization ("**EBITDA**") as a metric to measure outperformance on an annual basis.  EBITDA will be calculated as disclosed in Item 2.02 of Endo's Current Report on Form 8-K dated August 8, 2023 ("EBITDA represents Net income (loss) before Interest expense, net; Income tax expense; Depreciation; and Amortization, each prepared in accordance with GAAP.").

  - EBITDA threshold will be adjusted upward/downward dollar for dollar based upon the EBITDA contribution of acquired/sold assets upon the closing of such acquisitions/sales; provided, that any single or series of sale transactions within a twelve-month period that represent more than 66.7% of the EBITDA of the preceding measurement period shall constitute a Liquidity Event (defined below) (such a series of sales within such a twelve-month period, a "**Qualifying Series Liquidity Event**").  Any EBITDA threshold adjustment should account for the timing of the acquisition/sale.

  - Outperformance as measured by actual annual EBITDA reported in any single year during 2024 – 2028 (the "**Contingent Note Period**") exceeding projected EBITDA by a percentage equal or greater than the applicable incremental percentage set forth below would trigger a payment:

| Year | Outperformance Percentage |
|------|---------------------------|
| 2024 | 35% |
| 2025 | 20% |
| 2026 | 20% |
| 2027 | 20% |
| 2028 | 20% |

  - Outperformance in any single year would trigger a payment of $25 million (the "**Contingent Note Payment Amount**"), subject to adjustment as set forth below. Each year's outperformance is evaluated on a standalone basis (*i.e.*, irrespective of performance in any prior year). For the avoidance of doubt, the sum of payments shall never exceed $100 million in the aggregate.

---

[2]  Based on EBITDA growth rate equal to 2027 EBITDA growth rate in February 2023 LTP

Subject to Mediation Privilege & FRE 408
Confidential – draft

- o No clawback is permitted if the Resolution Obligor's audited financial statements are subsequently restated.

- **Liquidity Event Accelerator:**

  - o (A) Upon the occurrence of (i) a single transaction that, in form or substance, effects a sale of the Resolution Obligor that closes during the Contingent Note Period at an implied Total Enterprise Value (defined below) that exceeds the applicable Threshold Enterprise Value (defined below), then the Contingent Note will become fully due and payable upon the applicable Liquidity Event Trigger Date, or (ii) a Qualifying Series Liquidity Event, the final sale of which closes during the Contingent Note Period, whereby (1) the sum of (w) the total purchase price paid or payable for each such sale on the Liquidity Event Trigger Date, (x) the book value of the outstanding interest-bearing indebtedness of the Resolution Obligor on the Liquidity Event Trigger Date, and (y) the average daily closing market capitalization of the Resolution Obligor's publicly traded equity for the 30 consecutive trading days following the applicable Liquidity Event Trigger Date,[3] *minus* (z) the consolidated cash of the Resolution Obligor as of the most recent calendar month-end before the Liquidity Event Trigger Date, exceeds (2) the applicable Threshold Enterprise Value, then the Contingent Note will become fully due and payable upon the applicable Liquidity Event Trigger Date.

  - o (B) Upon the occurrence of (i) any single sale of, or (ii) multiple sales aggregating $500 million or more in value of shares by two or more unaffiliated shareholders acting in concert (not the Resolution Obligor or the Voluntary GUC Trust) that (1) is organized and managed by an investment bank or broker-dealer engaged by the selling shareholders and is not an open market sale, or (2) is a secondary registered offering of such shares that is underwritten by an underwriter, which, in each case, closes during the Contingent Note Period at an implied Total Enterprise Value exceeding the Threshold Enterprise Value on the applicable Liquidity Event Trigger Date (each of the transactions described in this clause (B), a "**Stock Sale Liquidity Event**"), then the Resolution Obligor shall pay the Applicable Amount upon such Liquidity Event Trigger Date, which payment shall reduce the balance of the Contingent Note. Following the payment of any Applicable Amount, the Contingent Note Payment Amount payable in any subsequent calendar year shall be equal to the product of (i) the Contingent Note Payment Amount prior to the payment of such Applicable Amount and (ii) 1 minus the result of (a) the amount raised in the applicable Stock Sale Liquidity Event divided by (b)(x) in the case of a Stock Sale Liquidity Event described in clause (B)(i) above, the total equity value implied by the price per each share sold in such Stock Sale Liquidity Event or (y) in the case of a Stock Sale Liquidity Event described in clause (B)(ii) above, the average equity value implied by the price per each share sold in the sales comprising such Stock Sale Liquidity Event.

    - ▪ "**Liquidity Event**" means any of the transactions described in clauses (A)(i) and (ii) above and any Stock Sale Liquidity Event. For the avoidance of doubt, the listing by the Resolution Obligor of its shares on a stock exchange after the

---

[3] In the event the equity of the Resolution Obligor is not publicly listed on such date, such equity value shall be determined by a nationally recognized investment banking or valuation firm selected by the Resolution Obligor with DOJ's approval, and retained by the Resolution Obligor.

Subject to Mediation Privilege & FRE 408
Confidential – draft

Resolution Effective Date or an individual shareholder's sale of its shares (whether in a block trade or multiple trades), in each case, is not a Liquidity Event.

▪ "**Liquidity Event Trigger Date**" means, as applicable, (1) the closing date in the case of a Liquidity Event described in clause (A)(i) above, (2) the final closing date in the series of sales that are the subject of a Qualifying Series Liquidity Event described in clause (A)(ii) above, (3) the closing date of a sale of shares comprising a Stock Sale Liquidity Event under clause (B)(i), or (4) the final closing date in the series of sales comprising a Stock Sale Liquidity Event under clause (B)(ii).

▪ "**Applicable Amount**" means the amount equal to the product of (1) (A) in the case of a sale under clause (B)(i), the amount raised in the applicable Stock Sale Liquidity Event divided by the total equity value implied by the price per each share sold in such Stock Sale Liquidity Event or (B) in the case of a series of sales under clause (B)(ii), the aggregate amount raised in the applicable sales comprising such Stock Sale Liquidity Event divided by the average equity value implied by the price per each share sold in the sales comprising such Stock Sale Liquidity Event and (2) the face amount of the Contingent Note outstanding immediately before the Liquidity Event Trigger Date in respect of such Stock Sale Liquidity Event.

▪ "**Total Enterprise Value**" means (i) the market capitalization of the Resolution Obligor *plus* the book value of the outstanding interest-bearing indebtedness of the Resolution Obligor, in each case, on the Liquidity Event Trigger Date *minus* (ii) consolidated cash of the Resolution Obligor as of the most recent calendar month-end before the Liquidity Event Trigger Date.

▪ "**Threshold Enterprise Value**" means the amount set forth below with respect to the applicable calendar year in which a Liquidity Event Trigger Date occurs; *provided* that the Threshold Enterprise Value for each calendar year shall be subject to a dollar-for-dollar adjustment upward or downward equal to the purchase price of assets purchased or sold during the Contingent Note Period, as applicable:

| ($ in millions) | 2024 | 2025 | 2026 | 2027 | 2028 |
|---|---|---|---|---|---|
| **Threshold Enterprise Value** | $6,772 | $7,085 | $7,997 | $8,534 | $9,110 |

## Exhibit D

**Liquidation Analysis**

# LIQUIDATION ANALYSIS

## INTRODUCTION

Under the "best interests" of creditors test ("Best Interests Test") set forth in section 1129(a)(7) of the Bankruptcy Code, the Bankruptcy Court may not confirm a plan of reorganization unless the plan provides each holder of a Claim or Interest who does not otherwise vote in favor of the plan with property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code. See 11 U.S.C. § 1129(a)(7). Accordingly, to demonstrate that the Debtors' Plan satisfies the Best Interests Test, the Debtors have prepared this hypothetical liquidation analysis ("Liquidation Analysis") presenting recoveries that may be obtained by Holders of Claims and Interests upon a disposition of assets in a hypothetical chapter 7 liquidation as an alternative to recoveries provided under the Plan.

The Liquidation Analysis presents information based on, among other information, the Debtors' books and records and good-faith estimates regarding asset recoveries and Claims resulting from a hypothetical liquidation under chapter 7 of the Bankruptcy Code. The determination of the proceeds from the hypothetical liquidation of assets involves the use of estimates and assumptions. Although the Debtors consider the estimates and assumptions underlying the Liquidation Analysis to be reasonable under the circumstances, such estimates and assumptions are subject to business, economic, competitive, political, and regulatory uncertainties and contingencies beyond the Debtors' control. Accordingly, the forecasted results set forth by the Liquidation Analysis may not be realized if the Debtors were liquidated. Actual results in such a case could vary from those presented herein, which could result in distributions (if any) to members of applicable Classes of Claims that differ from those set forth in this Liquidation Analysis.

The Liquidation Analysis indicates an estimated range of recovery values which may be realized by the Classes of Claims upon disposition of the Debtors' assets and their non-Debtor affiliates ("Non-Debtors") pursuant to a liquidation if the Debtors' current Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code, as an alternative to the Debtors' proposed Plan. As illustrated by the Liquidation Analysis, no holder of a Claim or Interest would receive or retain property under the Plan of a value that is less than such holder would receive in a chapter 7 liquidation scenario as illustrated by the Liquidation Analysis. Therefore, the Debtors believe that the Plan satisfies the Best Interests Test as set forth in section 1129(a)(7) of the Bankruptcy Code.

The Debtors, with the assistance of their legal and financial advisors, have prepared this Liquidation Analysis in connection with the Debtors' Plan and Disclosure Statement pursuant to chapter 11 of the Bankruptcy Code. The Liquidation Analysis has been prepared assuming that the Debtors' chapter 7 liquidation would commence on or around March 31, 2024 (the "Conversion Date") and a chapter 7 trustee (the "Trustee") would be appointed to convert all of the Debtors' and Non-Debtors' assets into cash. Unless stated otherwise, the Liquidation Analysis is based on net book values as of June 30, 2023, which is assumed to be representative of the Debtors' and Non-Debtors' assets as of the Conversion Date.

**The Liquidation Analysis is a hypothetical exercise that has been prepared for the sole purpose of presenting a reasonable good-faith estimate of the proceeds that would be realized if the Debtors were liquidated in accordance with chapter 7 of the Bankruptcy Code. The Liquidation Analysis is not intended and should not be used for any other purpose. The Liquidation Analysis does not purport to be a valuation of the Debtors' assets in the context of a holistic reorganization, and there may be a difference between the Liquidation Analysis and the values that may be realized, the going concern value, or Claims generated in an actual liquidation. The Liquidation Analysis should be read in conjunction with the assumptions, qualifications, and explanations set forth in the Disclosure Statement and the Plan in their entirety as well as the notes and assumptions set forth below.**

**Nothing contained in the Liquidation Analysis is intended to be, or constitutes, a concession, admission, waiver, or allowance of or related to any Claim by the Debtors. The actual amount or priority of Allowed Claims in the Chapter 11 Cases could differ from the estimated amounts set forth and used in the Liquidation Analysis. The Debtors reserve all rights to supplement, modify, or amend the analysis set forth herein.**

Nothing contained in this Liquidation Analysis is intended to be, or constitutes, a concession, admission, waiver, or endorsement by the Ad Hoc First Lien Group with respect to the likely recoveries for holders of Allowed First Lien Claims in a liquidation of the Debtors. The realizable value and the application of recoveries through a debtor-by-debtor waterfall could materially differ from the estimated amounts set forth and used in the Liquidation Analysis. The Ad Hoc First Lien Group reserves all of its rights, including its right to contest the statements and calculations set forth in the Liquidation Analysis, in the event the Plan is not consummated.

Nothing contained in this Liquidation Analysis is intended to be, or constitutes, a concession, admission, waiver, or endorsement by the Committees with respect to the likely recoveries for any general unsecured creditors in a liquidation of the Debtors. The realizable value, the resolution of the myriad litigation (including the litigation contemplated by the Joint Standing Motion and litigation with respect to intercompany claims) and the application of recoveries through a debtor-by-debtor waterfall could materially differ from the estimated amounts set forth and used in the Liquidation Analysis. The Committees reserve all rights to contest the statements and calculations set forth in the Liquidation Analysis in the event the Plan is not consummated.

NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS OF A LIQUIDATION OF THE DEBTORS WOULD OR WOULD NOT APPROXIMATE THE ESTIMATES OR PROJECTED RESULTS SET FORTH HEREIN. THE ACTUAL LIQUIDATION VALUE OF THE DEBTORS IS SPECULATIVE AND RESULTS COULD VARY MATERIALLY FROM ESTIMATES PROVIDED HEREIN.

## METHODOLOGY AND RELATED KEY ASSUMPTIONS

This Liquidation Analysis assumes that proceeds available to creditors would be distributed in accordance with sections 726 and 1129(b) of the Bankruptcy Code. Proceeds available for distribution that would be available for satisfaction of Claims would consist of the proceeds resulting from the disposition of the assets and properties of the Debtors in addition to cash held by the Debtors, as of the Conversion Date. The Debtors operate a highly complex and regulated business that includes various foreign operations. Debtors organized under foreign laws and Non-Debtor foreign affiliates are all assumed to be liquidated in a similar order of priority for distribution of value as described herein, although differing priorities may govern under applicable foreign law. Value from Non-Debtor affiliates may be available to the Debtors through the equity ownership of these entities as well as through collection of intercompany receivables to the extent available, as demonstrated under a high case scenario. The Debtors prepared this Liquidation Analysis and reviewed recoveries on a Debtor-by-Debtor basis.

This Liquidation Analysis assumes: (i) rapid, distressed sales of the Debtors' Branded Pharmaceuticals, Sterile Injectables, Generic Pharmaceuticals, and International Pharmaceuticals assets within 90 days post-conversion with certain operations being sold as operating business units; (ii) Non-Debtor affiliates will wind-down and liquidate in conjunction with the Debtors' liquidation; (iii) during the liquidation sales period, the Trustee will attempt to maintain operations related to the Branded Pharmaceuticals, Sterile Injectables, Generic Pharmaceuticals, and International Pharmaceuticals segments in an effort to maximize recoveries; (iv) an additional three (3) to nine (9) months to wind-down the estates under the supervision of the Trustee to allow for monetization of assets and assessment of Claims which could take longer; (v) the continuation and cooperation of any accounting, treasury, tax, information technology support, and other corporate services necessary to wind-down the estates; and (vi) the Trustee has unrestricted access to cash and proceeds from asset sales held by foreign Debtors, and the Trustee is able to repatriate proceeds. If there are foreign proceedings across non-U.S. jurisdictions and the Trustee is unable to access cash and sale proceeds generated at foreign entities, recoveries to creditors will be negatively impacted.

The Debtors face various litigation Claims, including Opioid-related, mesh-related, generics pricing, and other antitrust Claims. Various litigation creditors have asserted Claims against the Debtors in amounts totalling billions of dollars and such Claims are alleged to be at several or all Debtors in many instances. Allowed unliquidated or contingent Claims could meaningfully reduce recoveries to Holders of other General Unsecured Claims at the respective Debtors where these Claims are asserted. Under chapter 7, the Claims asserted by the United States government, including the IRS Priority Tax Claims and Opioid-related Claims, or any portion of such Claims, would need to be resolved through litigation and the Trustee would need to engage litigation counsel to defend and liquidate those Claims.  As such, litigation in a chapter 7 liquidation is likely to be meaningfully more costly and time-consuming than resolving all such Claims through the Resolutions incorporated in the Plan and the Trusts established

under the Plan. Litigation with respect to these Claims could extend beyond the contemplated wind-down period and could result in significant costs that would further dilute recoveries in a chapter 7 liquidation. All such litigation expenses would be paid in full ahead of any recovery to general unsecured creditors in a chapter 7 liquidation.

Upon conversion to a chapter 7 liquidation, the Resolutions reached with various key stakeholders are assumed to be null and void, and the RSA terminated.

Proceeds from potential preference, fraudulent conveyance, or other Causes of Action, if any, may be available for distribution to holders of claims in accordance with the Bankruptcy Code's priority scheme. However, litigation with respect to these Causes of Action would likely be extremely contentious, involve numerous parties and issues, and could extend for many years beyond the contemplated wind-down period. This would result in significant costs that would be paid in full ahead of any recovery to general unsecured creditors in a chapter 7 liquidation. Accordingly, the Liquidation Analysis reflects limited proceeds from potential Causes of Action that might be asserted by any Debtor's estate.

Upon conversion to chapter 7, a Trustee would be appointed to manage the Debtors' affairs, conduct a sale of the Branded Pharmaceuticals, Sterile Injectables, Generic Pharmaceuticals, and International Pharmaceuticals segments and wind-down the Debtors' operations. Given the specialized nature of the Debtors' business that operates in a highly regulated environment, the Trustee would continue to rely upon existing management as well as specialized professionals to conduct the sale of the assets. Current employees and professionals will also need to be retained to assist with the wind-down of the estates. The Debtors conduct their manufacturing and distribution of pharmaceuticals drugs not only in the U.S., but also have significant operations and assets in various foreign jurisdictions. The Liquidation Analysis assumes the liquidation process is administered under the Bankruptcy Court in the U.S.; however, foreign jurisdictions may require separate foreign proceedings which could delay the liquidation process and reduce potential recoveries to creditors.

In order to maximize value from the liquidation of assets, the Debtors assume the Trustee will continue ordinary course operations of manufacturing and distributing product for certain of the Debtors' products. The Trustee will rely on continuing arrangements with Non-Debtor affiliates that manage certain manufacturing capabilities and administer key personnel.

The sale of the Debtors' business operations includes the intellectual property or product know-how, a normalized working capital, and the Debtor-owned manufacturing facilities used to manufacture products (the "Liquidated Operations"). For the remaining assets, which include Non-Debtor manufacturing facilities, a range of liquidation values has been estimated assuming distressed sales. Furthermore, the Debtors reviewed their product pipeline and included no recoverable value for certain developmental products. The Liquidation Analysis assumes that existing commercial arrangements are maintained as well as all regulatory authorizations, acknowledging the inherent challenges. If the commercial relationships are not maintained or regulatory authorizations are impeded, recoveries to creditors will be negatively impacted. The estimated net sales proceeds realized take into consideration, among other factors, the distressed nature of such a sales process, the likely negative press coverage and market reaction associated with conversion to chapter 7 liquidation, the difficulty of transferring marketing authorization or assigning contract manufacturing arrangements, and the Trustee's limited ability to provide adequate representations, warranties, and indemnities to a buyer.

Furthermore, the Debtors believe there are additional factors that could negatively impact proceeds realized and recoveries to creditors as set forth in the Liquidation Analysis, which include, but are not limited to (a) turnover of key personnel; (b) challenging economic conditions; (c) delays in the liquidation process; (d) withdrawal of marketing authorizations by regulatory bodies due to the chapter 7 proceedings; (e) termination of manufacturing contracts limiting the Debtors' ability to maintain continuity of supply; (f) termination of distribution arrangements or loss of customers; (g) negative impact from the termination of the Resolutions with various key stakeholders; (h) complications related to assets and business operations held in foreign jurisdictions; and (i) possible negative impacts from litigation related to opioid products. These factors may limit the amount of the liquidation proceeds available to the Trustee to satisfy Allowed Claims under this hypothetical liquidation as well as delay the Trustee's ability to distribute funds to the respective creditors in an orderly and timely manner.

For the avoidance of doubt and as stated above, the Liquidation Analysis does not include estimated proceeds from insurance or indemnity recoveries.

## PROCEEDS FROM LIQUIDATED OPERATIONS

1.    **Proceeds from Core Business Assets (Liquidated Operations)** include proceeds from the distressed sales of the Liquidated Operations. These sales include the applicable intellectual property, owned manufacturing facilities, machinery & equipment, as well as a normalized working capital. These individual assets are held by different entities and the estimated value realized is allocated to the respective Debtors or Non-Debtors. Proceeds from Liquidated Operations include proceeds from Non-Debtor operations, which are assumed to be liquidated with some residual proceeds in a high case scenario, while they do not include proceeds from Non-Debtor operations in a low case scenario. Debtors assume that the vast majority of assets are assumed by potential buyers through the sale of Liquidated Operations. Range of values assumed in the Liquidation Analysis is based on the non-binding, indicative third-party part bids received during 363 sale process conducted during the Chapter 11 Cases, with a discount of 33% to 50% applied due to the accelerated and distressed nature of a Chapter 7 liquidation.

## ASSET RECOVERIES

2.    **Cash & Cash Equivalents** includes cash held in the Debtors and Non-Debtors' domestic and foreign bank accounts, cash equivalents, and money market accounts. The Debtors' cash is estimated as of the Conversion Date.[1] Estimated recovery of cash and cash equivalents is 100%.

3.    **Accounts Receivable, net of reserves** includes all third-party trade accounts receivable, net of chargebacks, rebates, allowances and bad debt reserves. The liquidation of accounts receivable assumes that the Trustee will retain certain personnel from the Debtors and foreign Non-Debtors to oversee collection of outstanding trade accounts receivable. Recoveries are estimated for certain accounts receivables not included in the proceeds from Liquidated Operations. The estimated recoveries used in this Liquidation Analysis take into consideration the inevitable difficulty of collections during a liquidation process, and related concessions that might be required to facilitate the collection of certain receivables. The estimated recovery range for accounts receivable is 45% to 85% of net book value. Collections of trade receivables during a liquidation could be significantly compromised as customers attempt to set off outstanding amounts owed to the Debtors and Non-Debtors against alleged damage, breach of contract, and other Claims, which could reduce recoveries.

4.    **Prepaid Expenses** consist of various expenses such as prepaid rent, prepaid maintenance and prepaid insurance. The Debtors estimate that there would be no recoverable value related to prepaid expenses because any prepayment would likely be depleted.

5.    **Other Current Assets** includes VAT/sales tax receivables, insurance receivables, deposits, operating leases ROU assets and other receivables. Restricted cash, also included, are controlled by third-parties and include, among others, the Professional Fee Reserve, qualified settlement funds related to mesh Claims, and insurance accounts. These funds may not be considered property of the Debtors' estates and may otherwise be difficult to recoup and recoverable value is estimated to be 0% of book value, except for recovery of certain of the qualified settlement funds to the extent approved by the Bankruptcy Court pursuant to the *Motion of the Debtors for an Order (I) Confirming that (A) the Automatic Stay Does Not Apply to Payments to Certain Claimants Under Certain Qualified Settlement Funds and (B) the Debtors are Authorized to Request the Return of Funds Subject to Reversionary Interests to Their Estates, and (II) Granting Related Relief* [Docket No. 2351]. The estimated range of recovery for all Other Current Assets, including Current Restricted Cash, is 6% to 7%. Recoveries are estimated for certain Other Current Assets not included in the proceeds from Liquidated Operations.

6.    **Property, Plant, and Equipment, net** includes the Debtors' land, building & building improvements, manufacturing machinery & equipment, furniture & fixtures, leasehold improvements, and capitalized

---

[1]    Cash at Conversion Date is assumed to be in line with cash as of March 31, 2024 as per the financial projections reflected in the Financial Projections in **Exhibit E**.

software. The owned manufacturing machinery & equipment, land, and buildings related to the Liquidated Operations are included in the Proceeds from Liquidated Operations. Given the difficulty and cost of liquidating the remaining property, plant and equipment assets in a compressed timeframe, the Debtors assume the blended recovery range of 19% to 29%.

7.    **Other Non-Current Assets** includes long-term deposits, investments, insurances, restricted cash, and other non-current assets. The Debtors assume that the restricted cash relating to a reserve held for the benefit of a contract counterparty would be fully recoverable in a high case scenario only for purposes of the Liquidation Analysis. The estimated range of recovery for all Other Non-Current Assets, including Non-Current Restricted Cash, is 0% to 96%. Recoveries are estimated for certain Other Non-Current Assets not included in the proceeds from Liquidated Operations.

8.    **Intercompany Receivables** include intercompany transactions both between Debtors and with Non-Debtor affiliates. Intercompany transactions relate to trade activities from the sale and purchase of goods and services amongst entities, payment for management and corporate services, cash pooling arrangements and intercompany loans. Intercompany transactions are governed by distribution and supply agreements (primarily for cross-border activities), service agreements, cash management agreements, and intercompany loan documents. Transfer pricing used for product transfers and services comply with the Debtors' debt document requirements. Any transfer pricing used is monitored and documented regularly. In a low case scenario, Debtors assume no recovery on intercompany receivables, either debt or trade related. In a high case scenario, the Debtors assume only intercompany debt transactions are settled only as between Debtors and Non-Debtors.

9.    **Investment in Subsidiary** includes any potential value available for distribution to parent entities after satisfying all creditors at the respective legal entity. Any potential distribution to multiple parent entities is based on the equity percentage ownership. Debtors assume no recovery on investment in subsidiaries.

10.    **Net Operating Cash Flow – Conversion Through Sale** includes the net operating cash flows generated during the 90-day liquidation sales period. Upon conversion to chapter 7, the Trustee maintains ordinary course operations for 90 days in order to maximize potential recoveries to creditors. During the 90 days after the Conversion Date, the Debtors are estimated to generate no positive free cash flow after assuming loss of sales, minimal vendor payment terms given the risks of continuing to do business with a company in a liquidation, as well as payment of adequate protection in accordance with Debtors' Cash Collateral Order.[2]

11.    **Avoidance Actions** recoveries are given no value in the Liquidation analysis given the uncertainties around such recoveries or any potential preference, fraudulent transfer, or other litigation action.

## CHAPTER 7 LIQUIDATION COSTS

The conversion of these Chapter 11 Cases to chapter 7 under the Bankruptcy Code will result in additional costs to the Debtors, including compensation of the Trustee, as well as retained counsel and other professionals, to oversee the wind-down of the Debtors' and Non-Debtors' estates in both domestic and foreign jurisdictions. The chapter 7 costs include the following:

12.    **Chapter 7 Trustee Fees** include fees associated with the appointment of the Trustee in accordance with section 326 of the Bankruptcy Code. Chapter 7 Trustee Fees are assumed to be 3.0%, in accordance to Section 326 of the Bankruptcy Code which provides for statutory Trustee fees of 3.0% for liquidation proceeds in excess of $1,000,000, excluding recoveries related to cash on hand. Chapter 7 Trustee Fees are allocated to the Debtor entities based on their pro-rata share of "Gross Proceeds Available for Distribution."

---

[2]    The Debtors assume for purposes of this Liquidation Analysis that the Prepetition First Lien Secured Parties do not exercise their rights to terminate the Cash Collateral Order and that the Cash Collateral Order survives conversion pursuant to paragraph 14 of the Cash Collateral Order.

13.    **Chapter 7 Commission Fees** include fees associated with the appointment of potential intermediary agents to support the sale of assets and Liquidated Operations. Chapter 7 Commission Fees are assumed to be 1.5%.

14.    **Chapter 7 Trustee Professional Fees** include the cost of financial advisors, attorneys, and other professionals retained by the Trustee in connection with the wind-down of the Debtors' domestic and foreign operations. The fees represent tax, legal, accounting, claims reconciliation, regulatory and other related services to support the Trustee in this complex, expansive liquidation. The Debtors estimate the chapter 7 Trustee professionals will be retained up to a 12-month period to not only manage the liquidation of the Debtors' assets but also wind-down the corporate estates both in the U.S. and in foreign jurisdictions, including Ireland, England & Wales, Cyprus, Bermuda, Luxembourg, India, and Canada. The fees are estimated to cover the monetization of the various assets as well as up to an additional nine (9) months to wind-down the U.S. and foreign operations with fees scaling down during the period. The Debtors estimate Chapter 7 Trustee Professional Fees are estimated to be approximately $27 million to $54 million, excluding commission and transaction fees incurred as part of liquidating the Debtors' assets.

Absent resolutions with the Ad Hoc First Lien Group, DOJ, the public and private opioid plaintiffs, and other unsecured creditors, litigation amongst the creditor constituents could take many years and lead to a significant cost to the estates. The Liquidation Analysis assumes litigation could take up to three years or longer. The Trustee will need to retain professionals to assist with litigation related to issues that may include the validity of liens, claims allowance, estimation, and allocation of recoveries, and to the extent such litigation implicates any of the Debtors' secured creditors, the estate may also be required to bear such parties' legal expenses. Such litigation will likely delay the Trustee's ability to distribute proceeds to creditors. The chapter 7 litigation professional fee costs are estimated to be approximately $125 million to $150 million. Litigation-related fees could be materially higher and further reduce recoveries to creditors. Total Chapter 7 Trustee Professional Fees are allocated to the Debtor entities based on their pro-rata share of "Gross Proceeds Available for Distribution."

15.    **Plan Administration Estimate** includes retention costs and expenses associated with the wind-down of the Debtors' remaining estates, including the Non-Debtors affiliates, after completing the sale of the Debtors' assets. Costs include additional retention compensation necessary to preserve the sales organization, supply chain, manufacturing, regulatory, clinical services and other functions during the liquidation sales process. The Debtors assume all sales, marketing, clinical services, manufacturing, supply chain, and other operating costs will essentially cease upon the completion of the asset sales. However, given the complex nature of the Debtors' business operations across various domestic and foreign jurisdictions, additional costs will be incurred to wind-down the corporate affairs, including legal, tax, accounting, claims reconciliation, compliance, and other necessary functions. The Trustee will retain a number of corporate employees to assist with facilitating the liquidation of the Debtors' assets, providing historical knowledge and insight to the Trustee regarding the Debtors' complex business and the Chapter 11 Cases, and concluding the administrative wind-down of the organization in the various foreign jurisdictions where the Debtors have domiciled entities.

The estimated wind-down costs are based on a reduction to the current monthly run-rate operating expenses by department with further reductions throughout the wind-down period to complete the necessary wind-down activities. Wind-down costs for the nine (9) month period after the initial asset sale period are estimated to be approximately $140 million to $175 million, including employee retention costs, federal U.S., Canadian, and state and local taxes. In addition, the estimated wind-down costs include and assume incremental retention programs are initiated to retain necessary key employees with institutional knowledge to assist the Trustee in facilitating an efficient wind-down process.

## DISTRIBUTION OF PROCEEDS

The Liquidation Analysis assumes that net proceeds from the sale of the assets will be distributed following the absolute priority rule provided in section 1129(b)(2) and in accordance with section 726 of the Bankruptcy Code, and no distributions will be made to holders of equity Interests until all creditors are satisfied in full.

## SECURED CLAIMS

The recoveries related to Secured Claims can be found in the table below:

**Summary of Recoveries to Secured Claims**
*($ in 000s)*

| | Estimated Allowed Claims | | | | Estimated Recovery | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Lower | | Higher | | Lower | | Higher | |
| **Secured Carve Out Claims** | | | | | | | | |
| Carve Out Claims | $ | 68 | $ | 55 | $ | 68 | 100% | $ | 55 | 100% |
| **Secured Debt Claims** | | | | | | | | |
| First Lien Revolving Credit Facility Claims | $ | 278 | $ | 278 | $ | 84 | 30% | $ | 125 | 45% |
| First Lien Term Loan Facility Claims | $ | 1,985 | $ | 1,985 | $ | 601 | 30% | $ | 893 | 45% |
| First Lien Senior Secure Notes Claims | $ | 3,703 | $ | 3,703 | $ | 1,122 | 30% | $ | 1,666 | 45% |
| Letters of Credit | $ | 2 | $ | 2 | $ | 1 | 30% | $ | 1 | 45% |
| | $ | 6,036 | $ | 6,024 | $ | 1,876 | | $ | 2,740 | |

16.     **Carve Out** includes certain unpaid holdback and accrued professional fees and costs entitled to priority above Secured Claims as outlined in the Cash Collateral Order. The Cash Collateral Order provides for a "Carve Out" (as defined therein) that is senior to all liens and Claims (including any Adequate Protection Superpriority Claims (as defined in the Cash Collateral Order)) held by the Prepetition First Lien Secured Parties. For purposes of the Liquidation Analysis, the Debtors assumed that the "Carve Out Trigger Notice" (as defined in the Cash Collateral Order) is delivered on the Conversion Date, requiring the Debtors to fund a reserve from the Debtors' cash on hand in the amount equal to the then unpaid amounts of Allowed Professional Fees (as defined in the Cash Collateral Order) plus reasonably estimated fees and expenses not yet allowed for the period through and including the Conversion Date. The Carve Out costs are estimated to be approximately $55 million to $68 million. This total includes accrued but unpaid fees and expenses incurred by the chapter 11 retained Professionals, in addition to fees payable to the U.S. Trustee. Carve Out Claims are assumed to be paid from encumbered asset proceeds; however, such payments can be made out of unencumbered asset proceeds which would reduce recoveries to unsecured creditors.

17.     **Class 2 – Other Secured Claims** include estimated Claims of $0.7 million of Secured Claims against the Debtors that are not First Lien Claims relating to the Debtors' surety bonds.

18.     **Class 3 - First Lien Claims** include estimated Claims of $278 million for the First Lien Revolving Credit Facility Claims, $1,985 million for the First Lien Term Loan Facility Claims, $3,703 million for the First Lien Senior Secured Notes Claims, and $2 million for the Letters of Credit. First Lien Claims amounts include accrued interest using the pre-petition interest rate. The First Lien Revolving Credit Facility Claims and First Lien Term Loan Claims are allocated amongst the obligor and issuer entities pro rata based on the respective obligor entities' "Net Estimated Proceeds Available for Distribution". Secured contribution claims are asserted on a joint and several liability basis at obligor and issuer entities as specified in the Credit Agreement.

## ADMINISTRATIVE AND PRIORITY CLAIMS

19.     **Administrative Expense and Priority Claims**[3] include Administrative Expense Claims, Non-IRS Priority Tax Claims, IRS Priority Tax Claims, state and local Priority Tax Claims, and Priority Non-Tax Claims, asserted at certain Debtors based on the Debtors' books and records.  With respect to the IRS Priority Tax Claims, the Liquidation Analysis assumes that the DOJ Resolution is null and void, and that the full amount asserted by the IRS would need to be litigated, to the extent there is value available to be distributed for such amount. The Debtors assume that there will be no employment-related Claims (including under the "WARN Act") as of the Conversion Date, and, following the Conversion Date, that potential buyers will assume related employee obligations as part of any sale. Administrative Expense Claims include certain estimated expenses that are not expected to be assumed by the potential buyers as part of the normalized working capital of the Liquidated Operations. To the extent any such Claims arise,

---

[3]     Classification of the Claims asserted by the IRS is illustrative, and the Debtors are not conceding that such Claims are entitled to priority even if the analysis herein may present them as such.

recoveries to General Unsecured Claims at certain Debtor entities would be reduced. The Liquidation Analysis also assumes that there are no Priority Non-Tax Claims.

## UNSECURED CLAIMS

Unsecured Claims consist of all unsecured, non-priority Claims arising prior to the Petition Date. Estimates of such Claims are based on the Debtors' books and records and a preliminary review of the Proofs of Claim filed against the Debtors in these Chapter 11 Cases. The Liquidation Analysis includes known estimated contract rejection damage Claims. To the extent additional contract rejection damage Claims exist, the recovery to unsecured creditors at the respective Debtors where these Claims arise could be less.

Below are the various categories of Claims, described according to their Classes under the Plan, that would all be *pari passu* in chapter 7. The Liquidation Analysis reflects only liquidated Claims at the respective Debtors, as amounts associated with unliquidated claims, such as litigation Claims, are unknown. As previously described, the Debtors face various litigations Claims including Opioid-related, generics pricing, mesh-related, and antitrust Claims. Various litigation creditors have asserted Claims against the Debtors in amounts totalling billions of dollars, and such Claims are alleged to be at several or all Debtors, in many instances. In the event there are any recoveries for unsecured Claims, Allowed unliquidated or contingent Claims could meaningfully reduce recoveries to other unsecured creditors at the respective Debtors where these Claims are asserted.

20.     **Class 4(A) – Second Lien Deficiency and Unsecured Notes Claims** include estimated Claims of approximately $989 million of Second Lien Notes that are not secured and constitutes a deficiency Claim pursuant to section 506(a) of the Bankruptcy Code and approximately $1,355 million of Unsecured Notes on the Conversion Date.

21.     **Classes 4(B)-(F)** includes unsecured non-opioid-related Claims, certain of which Claims are unliquidated, contingent, and/or disputed, and the aggregate amount of such Claims is undetermined.

22.     **Classes 6(A)-(C), 7(A)-(E), 8-11 –** includes unsecured opioid-related Claims that are unliquidated, contingent, and/or disputed, and the aggregate amount of such Claims is undetermined. The opioid-related Claims are further discussed in Article I of the Disclosure Statement.

23.     **Class 5 – U.S. Government Claims** include unsecured Claims asserted in each of the Proofs of Claim filed by the U.S. Government and any other Claims of the U.S. Government (but excluding (a) any Statutory Fees or expenses owed to the U.S. Trustee and (b) any Claim held by any State, Territory, Local Government, Tribe, or any Non-U.S. federal Governmental Authority), in each case, against any of the Debtors.

24.     **Class 12 – Intercompany Claims** includes prepetition intercompany payables assertable by a Debtor against another Debtor or a Non-Debtor Affiliate.

## SUBORDINATED UNSECURED & EQUITY CLASSES OF CLAIMS

25.     **Class 13 - Intercompany Interests** include any value available for distribution to parent entities after satisfying all creditors at the respective legal entities.

26.     **Class 14 – Subordinated, Reclassified, or Disallowed Claims** include Claims (a) subject to subordination under section 509(c) or 510 of the Bankruptcy Code; (b) recharacterized as equity by an order of the Bankruptcy Court; or (c) as of the relevant time, Disallowed under section 502(e) of the Bankruptcy Code (subject, however, to section 502(j) of the Bankruptcy Code). These Subordinated, Reclassified, or Disallowed Claims are unliquidated, contingent, and/or disputed and the aggregate amount of such Claims are unknown. No recoverable value is available for Subordinated, Reclassified, or Disallowed Claims.

27.     **Class 15 – Existing Equity Interests** include any value available for distribution to the holders of the equity Interest in Endo International plc. In the Liquidation Analysis, there is no recoverable value available to holders of the Existing Equity Interests.

**OTHER CONSIDERATIONS**

Under chapter 7, the Claims in Classes 4 to 11, to the extent there is value available to be distributed to such Claims, would be resolved through litigation, and the Trustee would need to engage litigation counsel to defend and litigate these Claims. Claim estimates for unliquidated, contingent, or disputed Claims are unknown at the time the Disclosure Statement was filed. The Debtors do not have sufficient information to properly estimate the amount of these Claims for purposes of this analysis, and therefore, no value has been assigned to Claims in Classes 4, 6, 7, 8, 9, 10, and 11; and thus no recovery value is projected.

**PLAN OF REORGANIZATION COMPARISON**

28.     **An Estimate of Distributable Value** under the low end Plan scenario range is based on the mid-point of the non-binding, third-party indications of interest received during the 363 sale process conducted during the Chapter 11 Cases. Such indications of interest were non-binding, conditional in nature, and not pursued following the Debtors' termination of their 363 sale process. The high end of the Plan scenario range is the Stalking Horse Bid amount, which is primarily based on the principal amount of the Debtors' Prepetition First Lien Indebtedness and was not a product of the Debtors' previously conducted Sale Process. The Debtors are not submitting the Stalking Horse Bid amount as representative of the Debtors' enterprise value. Remaining assumptions for Proceeds from Liquidated Operations are consistent with Liquidation Analysis, reference Note 1.

29.     **Asset Recoveries** under Plan assumed at High estimate recovery range. Remaining assumptions for Asset Recoveries are consistent with Liquidation Analysis, reference Note 2-7.

30.     **Net Operating Cash Flow - Conversion Through Sale** assumed to be $0 as under a Plan there would not be a gap between Conversion Date and Effective Date.

31.     **Avoidance Actions** under Plan are assumed to be waived, as such, no recovery is ascribed.

32.     **Chapter 7 Trustee Fees and Chapter 7 Commission Fees** under Plan are not applicable and reflected as $0.

33.     **Plan Administration Estimate** under Plan is currently estimated to be about $38 million. The estimate is based on the transaction structure as of December 28, 2023. The costs set forth in the Plan Administration Estimate are subject to various uncertainties and contingencies beyond the Debtors' control. Accordingly, the Plan Administration Estimate is subject to adjustment, and nothing in the Plan Administration Estimate is or shall be deemed to be a cap on costs to be incurred in association therewith. Any subsequent changes to the structure and anticipated, but not quantifiable, expenses will require adjustments to the Plan Administration Estimate.

34.     **Carve-Out Claims and Other Fees and Implementation Costs** are shown as accrued and unpaid professional fees and transaction fees for all professionals involved in the Chapter 11 Cases. These Claims also include anticipated transaction costs related to the Rights Offerings, including under any backstop commitment agreements. Such transaction costs are greater in the high end of the Plan scenario than in the low end of the Plan scenario because certain of such costs are based upon the equity value of the post-reorganization business. In addition, the Carve-Out Claims incorporate an estimate of the Escrowed Equity agreed to as part of the UCC Resolution.

35.     **Class 3 - First Lien Claims** under Plan are consistent with Liquidation Analysis assumptions in Note 18. Recoveries are reflected as distributable value remaining net of all Resolutions with the DOJ, the Committees, the FCR, the Mult-State Endo Executive Committee, the Public School District Creditors, and the Canadian Governments.

36.     **Administrative Expense and IRS Priority Tax Claims** recoveries under the Plan, respectively, are (a) assumed, to the extent not already covered elsewhere, in connection with the implementation of the Plan and recoveries are therefore not reflected in the Plan scenario and (b) are comprised in the Net Present Value of negotiated U.S. Government Resolution. With respect to the IRS Priority Tax Claims, as the U.S. Government Resolution does not provide an allocation of settlement amounts between IRS and other U.S. Government Claims, for illustrative purposes, 100% of the recoveries are shown under General Unsecured Recoveries in Note 37.

37.     **General Unsecured Recoveries** under Plan include the Net Present Value of all negotiated Settlements with the DOJ, the Committees, the FCR, the Mult-State Endo Executive Committee, the Public School District Creditors, and the Canadian Governments. Recovery for the general unsecured creditors does not include certain causes of action that are assignable to the GUC Trust in accordance with the UCC Resolution.

**Hypothetical Liquidation Analysis**
*(USD in Millions, unless otherwise indicated)*

| | Note Ref | Pro Forma Value At Conversion | Estimated Recovery % Low | High | Estimated Recovery $ Low | High | Note Ref | Plan of Reorganization Estimated Recovery Low | High | Plan of Reorganization Comparison Variance to High Liq. Anal. Recovery $ Low | High |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Gross Recoveries:** | | | | | | | | | | | |
| Gross Recoveries from Core Business Assets: | [1] | N/A | | | 1,758 | 2,477 | [28] | 3,615 | 5,383 | 1,138 | 2,906 |
| **Gross Recoveries from Remaining Assets:** | | | | | | | | | | | |
| Cash | [2] | 561 | 100% | 100% | 561 | 561 | [29] | 561 | 561 | - | - |
| Restricted Cash | [5] | 159 | 6% | 6% | 9 | 10 | [29] | 10 | 10 | - | - |
| Restricted Cash Non Current | [7] | 85 | 0% | 100% | - | 85 | [29] | 85 | 85 | - | - |
| Accounts and Notes Receivable | [3] | 4 | 45% | 85% | 2 | 3 | [29] | 3 | | - | (3) |
| Prepaid Expenses | [4] | 41 | 0% | 0% | - | - | [29] | - | | - | - |
| Other Current Assets | [5] | 10 | 1% | 21% | 0 | 2 | [29] | 2 | | - | (2) |
| Property, Plant and Equipment | [6] | 16 | 19% | 29% | 3 | 5 | [29] | 5 | | - | (5) |
| Other Non Current Assets | [7] | 8 | 4% | 58% | 0 | 5 | [29] | 5 | | - | (5) |
| Intercompany | [8 & 9] | 276,904 | 0% | 0% | - | 90 | | - | | (90) | (90) |
| Eliminations | [8 & 9] | (276,944) | 0% | 0% | | | | | | - | - |
| Recoveries from Remaining Assets: | | $ 844 | 68% | 90% | $ 575 | $ 760 | [29] | $ 670 | $ 656 | $ (90) | $ (104) |
| **Other Gross Recoveries:** | | | | | | | | | | | |
| Net Operating Cash Flow - Conversion Through Sale | [10] | - | - | | - | - | [30] | - | | - | - |
| Avoidance Actions | [11] | - | - | | - | - | [31] | - | | - | - |
| Other Recoveries: | | | | | - | - | | - | | - | - |
| **Total Assets and Gross Recovery** | | $ 2,333 | | | $ 3,237 | | | $ 4,285 | $ 6,038 | $ 1,048 | $ 2,802 |
| | | | | | | | | | | | |
| **Liquidation Adjustments:** | | | | | | | | | | | |
| Chapter 7 Trustee Fees | [12] | | | | (53) | (77) | [32] | - | - | 77 | 77 |
| Chapter 7 Commission Fees | [13] | | | | (26) | (39) | [32] | - | - | 39 | 39 |
| Plan Administration Estimate | [14 & 15] | | | | (378) | (291) | [33] | (38) | (38) | 252 | 252 |
| **Total Chapter 7 Liquidation Costs** | | | | | $ (457) | $ (407) | | $ (38) | $ (38) | $ 369 | $ 369 |
| | | | | | | | | | | | |
| **Net Proceeds Available for Distribution to Creditors:** | | | | | $ 1,876 | $ 2,830 | | $ 4,247 | $ 6,000 | $ 1,417 | $ 3,170 |

**Allocation of Net Proceeds Available for Distribution to Creditors:**

| | Note Ref | Estimated Claim Value $ Low | High | Estimated Recovery % Low | High | Estimated Recovery $ Low | High | Note Ref | Estimated Recovery Low | High | Variance to High Liq. Anal. Recovery $ Low | High |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Secured Carve-Out Claims and Other Fees and Implementation Costs** | | | | | | | | | | | | |
| Total Carve Out and Other Fees and Implementation Costs | [16] | $ 68 | $ 55 | 100% | 100% | $ 68 | $ 55 | [34] | $ 251 | $ 604 | $ 196 | $ 549 |
| | | | | | | | | | | | | |
| Remaining Distributable Value | | | | | | $ 1,808 | $ 2,774 | | $ 3,996 | $ 5,396 | $ 1,221 | $ 2,622 |
| | | | | | | | | | | | | |
| **Class 2 & 3 | Secured Claims** | | | | | | | | | (257) | (257) | | |
| 1L Secured Lender Claims by Entity | [18] | 5,966 | 5,966 | 30% | 45% | 1,807 | 2,684 | [35] | 3,301 | 4,636 | 617 | 1,953 |
| Letters of Credit | [18] | 2 | 2 | 30% | 45% | 1 | 1 | [35] | 1 | 2 | 0 | 1 |
| Surety Bonds | [17] | 1 | 1 | 0% | 0% | 0 | 0 | | 0 | 0 | 0 | 0 |
| Total recovery | | $ 5,969 | $ 5,969 | 30% | 45% | $ 1,808 | $ 2,685 | | $ 3,302 | $ 4,638 | $ 617 | $ 1,953 |
| | | | | | | | | | | | | |
| Remaining Distributable Value | | | | | | - | $ 90 | | $ 694 | $ 758 | $ 604 | $ 668 |
| | | | | | | | | | | | | |
| **Admin Claims & IRS Priority Tax Claims** | | | | | | | | | | | | |
| Administrative Claims | [19] | 50 | 100 | 0% | 0% | - | - | | N/A | N/A | N/A | N/A |
| IRS Priority Tax Claims | [19] | 3,524 | 3,524 | 0% | 0% | - | - | [36] | N/A | N/A | N/A | N/A |
| Total recovery | | $ 3,574 | $ 3,624 | 0% | 0% | - | - | | - | - | - | - |
| | | | | | | | | | | | | |
| Remaining Distributable Value | | | | | | - | $ 90 | | $ 694 | $ 758 | $ 604 | $ 668 |
| | | | | | | | | | | | | |
| **Classes 4 to 13 | General Unsecured Recoveries** | | | | | | | | | (558)(7) | (558)(7) | | |
| First and Second Lien Deficiency and Unsecured Notes Claims | Class 4(A) | 6,506 | 5,629 | 0% | 0% | - | - | [37] | 694 | 758 | 694 | 758 |
| General and Other Unsecured Claims | Class 4(B) to 11 | N/A | N/A | 0% | 0% | - | - | [37] | - | | - | - |
| Intercompany Claims & Interests | Class 12 & 13 | N/A | N/A | 0% | 0% | - | 90 | | - | - | (90) | (90) |
| Total recovery | [20 to 25] | N/A | N/A | 0% | 0% | - | $ 90 | | $ 694 | $ 758 | $ 604 | $ 668 |
| | | | | | | | | | | | | |
| **Classes 14 & 15 | Subordinated Claims** | | | | | | | | | | | | |
| Preferred Equity Cumulative Dividends & Par | [26] | 673 | 673 | 0% | 0% | - | - | | - | - | - | - |
| Existing Equity Interests | [27] | - | - | 0% | 0% | - | - | | - | - | - | - |
| Total recovery | | $ 673 | $ 673 | 0% | 0% | - | - | | - | - | - | - |
| | | | | | | | | | | | | |
| Remaining Distributable Value | | | | | | - | - | | - | - | - | - |

**Notes:**
(1) As set forth in the Liquidation Analysis notes, certain of the claims in these classes are unliquidated, contingent, disputed, and/or based upon novel and untested legal theories. The aggregate amount of such claims is undetermined.
(2) Distributable value for Secured Claims is reflected net of voluntary settlement amounts with DOJ, the Committees, the FCR, the Mult-State Endo Executive Committee, the Public School District Creditors, and the Canadian Governments.
(3) As the negotiated U.S. Resolution does not provide an allocation of settlement amounts between the IRS and U.S. Government Claims, for illustrative purposes, 100% is allocated to the U.S. Government Claims.
(4) Estimated recoveries for tax claims assume that the implementation of the U.S. Government Resolution would result in no additional U.S. federal, state, and local taxes beyond what is agreed to in the U.S. Government Resolution.
(5) Classification of the Claims asserted by the IRS is illustrative, and the Debtors are not conceding that such Claims are entitled to priority even if the analysis herein may present them as such.
(6) The distributable value would be distributed pro rata to First and Second Lien Deficiency Claims, Unsecured Notes Claims, and General and Other Unsecured Claims, which are all pari passu.
(7) Secured Claims and General Unsecured Recoveries under a Plan or Reorganization both exclude the value of the Escrowed Equity, which is included within the Total Carve-Out and Other Fees and Implementation Costs.

<u>**Exhibit E**</u>

**Financial Projections**

# FINANCIAL PROJECTIONS

## A. Introduction

The Debtors have prepared the Projections (as defined below) to assist the Bankruptcy Court in determining whether the Plan meets the "feasibility" requirements of section 1129(a)(11) of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors believe that the Plan meets such requirements. In connection with the negotiation and development of the Plan and for the purpose of determining whether the Plan meets the feasibility standard outlined in the Bankruptcy Code, the Debtors analyzed the Purchaser Entities' (as the post-emergence owner of the Debtors' principal business segments) ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources during the Projection Period (as defined below). With this consideration in mind, the Debtors' management, with assistance from their financial advisors, prepared these consolidated financial projections (the "Projections") based on the business plan as presented in the Debtors' Form 8-K filed on November 6, 2023, for the fiscal year ending December 31, 2024 through the fiscal year ending December 31, 2028 (the "Projection Period"). The Projections have been prepared on a consolidated basis, consistent with the Company's non-GAAP financial reporting practices, and include all Purchaser Entities (hereafter defined as the "Company").

The Debtors do not, as a matter of course, publish their projections, strategies, or forward-looking projections of the financial position, results of operations, and cash flows. Accordingly, the Debtors do not anticipate that they will, and disclaim any obligation to, furnish updated projections to the holders of Claims or equity interests after the date of this Disclosure Statement, or to include such information in documents required to be filed with the Securities and Exchange Commission ("SEC") or to otherwise make such information public. The assumptions disclosed herein are those that the Debtors believe to be significant to the Projections and, along with the Projections, are "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. The Company's actual results may differ from its expectations, estimates and projections and consequently, readers should not rely on these forward-looking statements as predictions of future events. Forward-looking statements also include, but are not limited to, statements regarding the Company or expectations, hopes, beliefs, intentions or strategies regarding the future. In addition, any statements that refer to projections, forecasts or other characterizations of future events or circumstances, including any underlying assumptions, are forward-looking statements. The words "anticipate," "believe," "budget," "forecast," "continue," "could," "estimate," "expect," "intend," "may," "might," "plan," "possible," "potential," "predict," "project," "should," "could," "strive," "will," "would" and similar expressions may identify forward-looking statements, but the absence of these words does not mean that a statement is not forward-looking. The Projections and other forward-looking statements involve significant risks and uncertainties that could cause the actual results to differ materially from the expected results. Readers should carefully consider the risks and uncertainties described in the "Risk Factors" section of the Debtors' annual report and other documents filed from time to time with the SEC. These filings identify and address other important risks and uncertainties that could cause actual events and results to differ materially from those contained in the Projections and other forward-looking statements. Most of these factors are outside the Debtors' control and are difficult to predict. The Projections and other forward-looking statements are predictions about future events that are based on current expectations and assumptions and, as a result, are subject to risks and uncertainties. Readers are cautioned not to put undue reliance on the Projections and other forward-looking statements, and no person assumes any obligation and no person intends to update or revise the Projections or other forward-looking statements, whether as a result of new information, future events, or otherwise.

The Projections present, to the best of the Debtors' knowledge and belief, the Purchaser Entities' projected balance sheet, results of operations, and cash flows for the Projection Period, all on an adjusted and non-GAAP basis, and reflect the Debtors' assumptions and judgments of the projections based on an assumed emergence date of March 31, 2024 (the "Emergence Date"). The impact of the restructuring transaction and the recapitalization of the Debtors' capital structure is shown on the balance sheet for the Purchaser Entities, as of March 31, 2024. However, The Projections do not reflect any adjustments that would be necessary to implement fresh-start accounting on the Emergence Date pursuant to ASC 852-10, including but not limited to detailed asset valuations and reassessment of the useful lives of depreciable and amortizable assets.

Although the Debtors believe these assumptions are reasonable under current circumstances, such assumptions are subject to inherent uncertainties, including but not limited to, material changes to the economic environment, pricing pressure on certain products due to potential legislative changes, potential legal challenges, changes in health insurers' and governmental health administration authorities' reimbursement practices, changes in the competitive environment, pipeline drug developments, and other factors affecting the Company's businesses. The likelihood, and related financial impact, of a change in any of these factors cannot be predicted with certainty. Consequently, actual financial results could differ materially from the Projections. The Projections assume the Plan will be implemented in accordance with its stated terms. The Projections should be read in conjunction with the assumptions and qualifications contained herein. Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in either the Disclosure Statement or the Plan, as applicable.

THE PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES ("GAAP") IN THE UNITED STATES.  FURTHERMORE, THE PROJECTIONS HAVE NOT BEEN AUDITED OR REVIEWED BY A REGISTERED INDEPENDENT PUBLIC ACCOUNTING FIRM.

THE PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE BASED UPON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH MAY NOT BE REALIZED AND ARE SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES WHICH ARE BEYOND THE CONTROL OF THE DEBTORS.  CONSEQUENTLY, THE PROJECTIONS SHOULD NOT BE REGARDED AS A REPRESENTATION OR WARRANTY BY THE DEBTORS, THE PURCHASER ENTITIES, OR ANY OTHER PERSON, AS TO THE ACCURACY OR PRECISION OF THE PROJECTIONS OR THAT THE PROJECTIONS WILL BE REALIZED.  ACTUAL RESULTS MAY DIFFER MATERIALLY FROM THOSE PRESENTED IN THE PROJECTIONS.  HOLDERS OF CLAIMS OR EQUITY INTERESTS MUST MAKE THEIR OWN ASSESSMENT AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE PROJECTIONS IN MAKING THEIR DETERMINATION OF WHETHER TO ACCEPT OR REJECT THE PLAN.

## B.   Summary of Significant Assumptions

The Projections were developed by the Debtors' management using detailed assumptions for revenue and costs, which were developed using a combination of both "bottoms-up" and "top-down" estimation techniques for each of the Company's business segments: Branded Pharmaceuticals, Sterile Injectables, Generic Pharmaceuticals and International Pharmaceuticals.  In developing the Projections, the Debtors considered several factors including, but not limited to:

- Current and projected market conditions for key products within each of the Company's respective business segments;
- Commercial, R&D and capital investments required to support current on-market and pipeline product growth assumptions;
- Working capital levels necessary to support the Projections based on historical trends and expected future on-market growth and pipeline product launch assumptions; and
- The Debtors' emergence from chapter 11 on the Emergence Date

The Projections are intended to reflect the inclusion of all Purchaser Entities.  Additionally, the Projections do not contemplate any new product licenses, acquisitions or divestitures.

The Projections have been presented using accounting policies and practices that are consistent with those applied in the Debtors' historical non-GAAP financial statements.  For the avoidance of doubt, the accounting policies and assumptions described below do not purport to be a comprehensive set of accounting policies that would be applied by the Company in the preparation of its consolidated financial statements in accordance with U.S. GAAP.  Furthermore, the Projections do not reflect any adjustments that would be necessary to implement fresh-start accounting on the Emergence Date pursuant to ASC 852-10, including but not limited to detailed asset valuations and reassessment of the useful lives of depreciable and amortizable assets.

## C.    The Company's Business Operations

Post-emergence the Company will be a global business consisting of multiple wholly owned subsidiaries that develop, manufacture, market, and distribute specialty pharmaceutical products across four reportable segments: Branded Pharmaceuticals, Sterile Injectables, Generic Pharmaceuticals and International Pharmaceuticals. All products, except for those in the International Pharmaceuticals segment, will be sold in the U.S. only. The following chart depicts the estimated revenue distribution by segment for fiscal year 2023.



**2023E Revenue by Segment**
**(UNAUDITED)**
($ million)

$1,989

43% — Branded
22% — Sterile Injectables
32% — Generics
3% — International

### Branded Pharmaceuticals

The Branded Pharmaceuticals segment focuses on products that have inherent scientific, regulatory, legal, and technical complexities, and markets such products under recognizable brand names that are trademarked. After the completion of required clinical trials and testing, the Company seeks approvals from regulatory bodies, such as through the submission of applications to the Food and Drug Administration. The Branded Pharmaceuticals segment includes a variety of branded products across two portfolio categories: Specialty Products and Established Products. The charts below show estimated fiscal year 2023 revenue for certain key products in the Branded Pharmaceuticals segment.

*Specialty Products*

The Specialty Products portfolio includes products in the areas of urology, orthopedics, endocrinology and bariatrics, among others. The Specialty Products include XIAFLEX® and SUPPRELIN® LA, among others.

| Product | Description | 2023E Revenue *$ million* |
|---------|-------------|---------------------------|
| XIAFLEX® | A non-surgical treatment for Dupuytren's contracture (for adult patients with an abnormal buildup of collagen in the fingers that limits or disables hand function) and Peyronie's disease (for adult men with a collagen plaque and a penile curvature deformity). Additional pipeline indications that are in clinical development include plantar fibromatosis and plantar fasciitis. | $475 |
| SUPPRELIN® LA | A soft, flexible 12-month hydrogel implant based on the Company's hydrogel polymer technology that delivers histrelin acetate, a gonadotropin-releasing hormone agonist, and is indicated for the treatment of central precocious puberty in children. | $97 |

*Established Products*

The Established Products portfolio includes approximately ten products across diverse areas that are not actively promoted. The Established Products portfolio includes PERCOCET® and TESTOPEL®, among others.  The Company's pain products, including its opioid products, are not, and have not been, actively promoted in the U.S. since 2016.  In December 2016, Endo eliminated its entire U.S. pain product field sales force.

| Product | Description | 2023E Revenue<br>*$ million* |
|---|---|---|
| PERCOCET® | This product is indicated for the management of pain severe enough to require an opioid analgesic and for which alternative treatments are inadequate. | $104 |
| TESTOPEL® | A long-acting implantable pellet indicated for testosterone replacement therapies in conditions associated with a deficiency or absence of endogenous testosterone. | $41 |

**Sterile Injectables**

The Sterile Injectables segment includes a portfolio of more than 30 product families.  In this portfolio, there are several sterile injectable products that are protected by certain patent rights and have inherent scientific, regulatory, legal and technical complexities, as well as other generic injectable products that are difficult to manufacture or face complex legal and regulatory challenges.  The Company's sterile injectables products are manufactured in sterile facilities and are administered at hospitals, clinics and long-term care facilities.  The Sterile Injectables segment consists primarily of branded sterile injectable products such as VASOSTRICT® and ADRENALIN® among others, and certain generic sterile injectable products, including ertapenem for injection (the authorized generic of Merck's Invanz®), among others.  The chart below shows estimated fiscal year 2023 revenue for certain key products in the Sterile Injectables segment.

| Product | Description | 2023E Revenue<br>*$ million* |
|---|---|---|
| ADRENALIN® | A non-selective alpha- and beta-adrenergic agonist indicated for emergency treatment of certain allergic reactions, including anaphylaxis. | $105 |
| VASOSTRICT® | This product is indicated to increase blood pressure in adults with vasodilatory shock who remain hypotensive despite fluids and catecholamines. Vasostrict was the first vasopressin injection with an NDA approved by the FDA | $86 |

**Generic Pharmaceuticals**

The Generic Pharmaceutical segment focuses on first-to-file or first-to-market opportunities that are difficult to formulate or manufacture. Generic products are the pharmaceutical and therapeutic equivalents of branded products and are generally marketed under their generic (chemical) names rather than their brand names. The Generic Pharmaceuticals segment consists of a portfolio of solid oral extended-release products, solid oral immediate-release products, liquids, semi-solids, patches, powders, ophthalmics, and sprays and includes products that treat and manage a wide variety of medical conditions.  This segment includes approximately 100 generic product families.

The Company's generic portfolio also contains certain authorized generics, which are generic versions of branded products licensed by brand drug companies under an NDA and marketed as generics.  Authorized generics do not face the same regulatory barriers to introduction and are not prohibited from sale during the 180-day marketing exclusivity period granted to the first-to-file Abbreviated NDA applicant.  The Company's authorized generics include, among others, lidocaine patch 5% (the authorized generic of Endo's Lidoderm®), lubiprostone capsules (the authorized generic of Mallinckrodt Pharmaceuticals' Amitiza®), and sucralfate oral suspension 1 gm/10 ml (the authorized generic of AbbVie Inc.'s Carafate®). The chart below shows estimated fiscal year 2023 revenue for certain key products in the Generic Pharmaceuticals segment.

| Product | Description | 2023E Revenue $ million |
|---------|-------------|-------------------------|
| Varenicline Tablets | A selective alpha4-beta2 neuronal nicotinic acetylcholine receptor partial agonist approved as an aid to smoking cessation therapy.  It is the generic equivalent of the brand Chantix® that was previous sold by Pfizer. | $160 |
| Dexlansoprazole DR Caps | An oral capsule that is used to treat heartburn, stomach ulcers, reflux disease, or other conditions caused by too much stomach acid. It works by reducing the amount of acid in the stomach.  It is the generic equivalent of the brand Dexilant® sold by Takeda Pharmaceuticals U.S.A., Inc. | $108 |

**International Pharmaceuticals**

International Pharmaceuticals sells a variety of specialty pharmaceutical products outside the U.S., primarily in Canada through Debtor Paladin Labs Inc.  The key products of this segment serve various therapeutic areas, including attention deficit hyperactivity disorder, pain, women's health, oncology, and transplantation.  Revenue from the International Pharmaceuticals segment is expected to be less than 5% of consolidated total revenue.

**Income Statement Assumptions**

## A. Revenue

The Projections project revenue by product in each segment. Products in each of the business segments operate in competitive marketplaces with unique challenges and opportunities. To develop these portions of the Projections, the Debtors evaluated market conditions, surveyed the competitive landscape, assessed price and volume dynamics, and applied specific knowledge of trends to the products in each segment. Key factors considered in determining the revenue projections include, but are not limited to:

- Overall trends and changing dynamics in the broader markets for key products in each segment;
- Historical performance of existing on-market product and portfolio performance;
- The impact of anticipated competitive entrants and changes in the expected number of competitors and the corresponding impact on pricing and market shares; and
- An assessment of the current and projected competitive landscape, development timelines and commercial readiness for pipeline products.

As is typical for pharmaceutical products, the Company's revenues are based on its gross product revenues, less estimated amounts of various government-mandated and/or privately- negotiated rebates, sales incentives, chargebacks, distribution service agreements fees, returns, fees for services, and administration fees and discounts, among other adjustments. These "gross-to-net" adjustments differ across products and product categories.

*Branded Pharmaceuticals*

Branded Pharmaceutical segment revenue growth is expected to be driven by continued growth in Xiaflex on-market and pipeline indications that are expected late in the Projection Period. Xiaflex growth is expected to be partially offset by the impact of the loss of exclusivity on other Specialty products including Aveed. Additionally, the Established Brands portfolio is expected to continue to erode from competitive and pricing pressures.

*Sterile Injectables*

Sterile Injectables segment revenue growth is expected to be driven by a robust pipeline of ready-to-use and other differentiated product candidates that are in development and expected to launch over the Projection Period. The strong growth from new product launches is expected to be partially offset by erosion of on-market products due to the impact of continued competition on key products (e.g., Adrenalin and Vasostrict), coupled with continuing competitive and pricing pressures on other products in the portfolio.

*Generic Pharmaceuticals*

Generic Pharmaceutical revenue is expected to decline over the Projection Period as existing key products (i.e., Varenicline and Dexlansoprazole) lose exclusivity and face competition. Limited additional opportunities exist within the current generic pipeline to offset expected continued erosion from competitive and pricing pressures. Accordingly, the Generic Pharmaceuticals segment is primarily focused on optimizing portfolio profitability while continuing to pursue opportunistic new product launches over time.

*International Pharmaceuticals*

International Pharmaceuticals revenue is expected to remain relatively flat through 2024 and then grow over the Projection Period due to growth in recent product approvals and launches. The International Pharmaceuticals segment has historically relied heavily on product acquisition and licensing agreements to sustain and grow revenue and, as such, the number of planned future new product launches is limited.

## B. Cost of Goods Sold

The Company's cost of goods sold ("COGS") includes costs such as raw materials and manufacturing costs associated with the processing of materials to convert them into finished goods, royalty expenses, handling costs (costs incurred to store, move, and prepare product for shipment), and other plant costs.

Manufacturing costs include wages and benefit costs, processing costs, maintenance costs, utility costs and other costs that are directly attributable to the production of products. Manufacturing costs have both fixed and variable cost components.

COGS as a percentage of revenue is expected to decrease from approximately 33% to 31% over the Projection Period driven by changes in product mix over time coupled with impact from on-going manufacturing network optimization initiatives.

## C.  Selling, General and Administrative

Selling, General and Administrative ("SG&A") expenses include all direct and indirect selling, marketing, and administrative costs.  Selling expense includes marketing expense, employee wages and benefits for the various commercial teams, commissions, and office expenses.  General and administrative expense includes administrative employee wages and benefits, legal, travel, rents, corporate overhead, insurance, information technology costs, office-related expenses, stock compensation expense, and other expenses.  SG&A excludes restructuring and reorganization expenses.

SG&A expense as a percentage of net sales is expected to decrease from approximately 28% to 24% over the Projection Period as revenue is expected to grow twice as fast as the growth in SG&A expenses.

## D.  Research & Development

Research & Development ("R&D") expenses consist of internal research and development costs.  These expenses include salary and benefits, allocated overhead and occupancy costs, clinical trial and related clinical manufacturing costs, contract services, and other related costs.

From time to time, the Company may enter into licensing or collaborative agreements with third parties to develop a new drug candidate or intellectual property asset.  These agreements may include R&D, marketing, promotion and selling activities to be performed by one or all parties involved.  These collaborations generally include upfront, milestone and royalty or profit-sharing payments contingent upon future events tied to the developmental and commercial success of the asset.  In general, upfront and development milestone payments made to third parties under these agreements are expensed as incurred up to the point of regulatory approval of the product and reflected in R&D expense.  However, the Projections do not contemplate any new licensing or collaborative agreements with third parties.

R&D expense is expected to remain relatively stable at approximately 7% or revenue over the Projection Period.

## E.  Interest Expense

Interest expense reflects interest on post-emergence funded debt and estimated refinancing fees.  The Projections do not include debt-related financing fees paid at emergence.  Funded debt interest expense post-emergence is based upon projected debt levels and assumed interest rates for funded debt obligations, including forecasts of SOFR (see Debt Obligations below), and is assumed to be paid in cash as incurred.  For the avoidance of doubt, 2024 only reflects interest expense for the 9 months ending December 31, 2024.

## F.  Taxes

The Projections forecast taxes for the Company after the Effective Date that are payable in several taxing jurisdictions, most notably in the U.S. and Ireland, based upon the anticipated capital structure and the elimination of U.S. tax attributes that are expected to be utilized directly in the implementation of the Plan.  Taxable income projections include deductions for certain depreciable and amortizable assets subject to limitations.

**Balance Sheet Assumptions**

**A.  Cash & Cash Equivalents**

The Company classifies cash on hand and deposits in banks, including money market accounts with original maturities of three months or less when purchased and other investments it may hold from time to time, as cash and cash equivalents.

**B.  Restricted Cash**

The Company classifies cash and cash equivalents that are restricted as to withdrawal or use under the terms of certain contractual agreements as restricted cash and cash equivalents.

**C.  Accounts Receivable**

Trade accounts receivable are presented net of an allowance for expected credit losses. The allowance for expected credit losses reflects an estimate of losses inherent in the Company's accounts receivable portfolio and is determined based several factors, including but not limited to historical loss experience and expected potential future losses.  Accounts receivable balances are generally written off when management determines they are uncollectible.  Trade accounts receivable are also presented net of reserves related to certain sales deductions where we have the right of offset with the customer.

**D.  Inventory**

Inventories are recorded at the lower of cost or net realizable value, using the first-in, first-out convention. Inventory that is in excess of the amount expected to be sold within one year is classified as long-term inventory.  The Company reduces the carrying value of inventories for those items that are potentially excess, obsolete, or slow-moving based on changes in customer demand, technology developments or other economic factors.

**E.  Prepaids and Other Current Assets**

Prepaids and other current assets primarily include prepaid expenses, miscellaneous accounts receivable, royalties receivable, insurance receivable, and deposits.

**F.  Property, Plant & Equipment**

Property, plant, and equipment is stated at cost less accumulated depreciation. Major renewals and improvements are capitalized, while routine maintenance and repairs are expensed as incurred.

Depreciation for property, plant, and equipment, other than land and construction in process, is generally based upon the following estimated useful lives, using the straight-line method:

- Buildings: 1 - 30 years
- Machinery and Equipment: 1 - 15 years
- Computer equipment and software: 1 - 10 years
- Furniture and fixtures: 1 - 10 years

The carrying value of property, plant and equipment and related depreciation expense do not reflect the adjustments necessary to implement fresh-start accounting on the Emergence Date pursuant to ASC 852-10, including but not limited to detailed asset valuations and reassessment of the useful lives of depreciable assets.

**G.  Other Non-Current Assets**

Other non-current assets primarily include right of use operating lease assets, long-term investments, certain inventories in excess of the amount expected to be sold in one-year, non-current insurance receivable, and certain restricted cash balances.

## H.  Intangible Assets

For purposes of these Projections, Intangible Assets includes Goodwill and other intangible assets.  The carrying values do not reflect the adjustments necessary to implement fresh-start accounting on the Emergence Date pursuant to ASC 852-10, including but not limited to detailed asset valuations and reassessment of the useful lives of amortizable assets.

Amortization for intangible assets with a finite life are amortized according to the pattern in which the economic benefit of the asset is realized over their estimated useful lives.  Amortization does not reflect any adjustments necessary to implement fresh-start accounting on the Emergence Date pursuant to ASC 852-10, including but not limited to detailed asset valuations and reassessment of the useful lives of amortizable assets.

For purposes of these Projections and consistent with the Debtors' historical adjusted non-GAAP financial statements, amortization has not been reflected in the non-GAAP income statement.

## I.  Accounts Payable

For purposes of these Projections, the days payable are assumed to remain relatively stable at the Emergence Date and throughout the Projection Period.

## J.  Accrued Expenses and Other Liabilities

Accrued Expenses and Other Liabilities primarily include accrued trade payables, accrued gross-to-net adjustments where the Company does not have the right of offset with the customer, accrued employee payroll and payroll-related costs, accrued utility expense, and accrued taxes, among others.

## K.  Debt Obligations

Upon consummation of the Plan and for purposes of these Projections only, the Company is assumed to have $2,500 million of new or take-back debt in the form of a term loan at an annual interest rate of SOFR + 500 bps.  For purposes of these Projections, all cash in excess of $200 million is illustratively assumed to be used to pay down debt each year over the Projection Period.

## L.  Other Non-current Liabilities

Other Liabilities includes deferred tax liabilities and other non-current liabilities.

## M.  Shareholder Equity

Shareholder equity at the Emergence Date includes the effect of the conversion of debt into new equity. Shareholder equity does not reflect any adjustments necessary to implement fresh-start accounting on the Emergence Date pursuant to ASC 852-10, including but not limited to detailed asset valuations and reassessment of the useful lives of amortizable assets.

**Cash Flow Assumptions**

**A.  Cash Flow from Operations Activities**

The Company is expected to generate stable cash from operations during the Projection Period.  Net working capital is projected to be a use of cash over the course of the Projection Period driven by increasing accounts receivable due to increasing revenue and a gradual build-up in inventory, slightly offset by increased accounts payable consistent with the trend in revenue and operating expenses.  Cash interest expense and cash taxes are also expected to be a use of cash over the course of the Projection Period.

**B.  Cash Flow from Investing Activities**

Cash usage from investing activities over the Projection Period is expected to be primarily related to capital spending to support routine and customary maintenance of manufacturing operations and for information technology and other miscellaneous investments in enabling functions.

**C.  Cash Flow from Financing Activities**

Cash usage from financing activities over the Projection Period reflects repayment of funded debt.

**Pro Forma Estimated**
**Non-GAAP Cash Sources and Uses**
**(UNAUDITED)**

The unaudited Pro Forma Estimated Non-GAAP Cash Sources and Uses at the Emergence Date set forth below presents the estimated sources and uses of funds for the consummation of the restructuring transactions contemplated in the Plan (the "Restructuring Transactions"). These amounts are subject to adjustment and may differ at the time of the consummation of the Restructuring Transactions depending on several factors, including but not limited to, differences in estimated transaction fees and expenses, differences between actual and projected operating results and any differences in the contemplated debt financing when consummated.

| Sources of Cash | $ million |
|---|---|
| Cash From Balance Sheet | $ 561 |
| Restricted cash release [a] | 31 |
| Proceeds from Rights Offerings | 500 |
| New/take-back Debt | 2,500 |
| **Total** | **$ 3,591** |

| Uses of Cash | $ million |
|---|---|
| Trust payments [b] | $ 381 |
| DOJ settlement [c] | 200 |
| UCC cash settlement [c] | 60 |
| Professional and other fees [d] | 155 |
| Plan adminstration | 38 |
| Exit financing fees/OID [e] | [TBD] |
| Cash to Balance Sheet | 200 |
| Paydown 1L Claims | 2,557 |
| **Total** | **$ 3,591** |

Notes:

[a]   Represents certain professional fee holdbacks that are expected to be released upon emergence. Up to approximately $135 million of restricted cash is also expected to be released into unrestricted cash before or shortly after emergence.
[b]   Represents settlements with the public, private and tribal opioid claimants; FCR; public school districts and the Canadian government; assumes amounts are fully funded upon emergence.
[c]   Illustratively assumes amounts are fully funded upon emergence.
[d]   Represents estimated carried professional fees, professional fee holdbacks, and certain contingent professional and other fees expected to be paid upon emergence.
[e]   Exit financing fees, including any OID, will be subject to exit financing process.

11

**Projected Non-GAAP Pro Forma**
**Consolidated Balance Sheet**
**(UNAUDITED)**

The Projected Non-GAAP Pro Forma Consolidated Balance Sheet as of the Emergence Date set forth below presents (a) the projected consolidated financial position of the Company as of March 31, 2024, prior to the consummation of the transactions contemplated in the Plan; (b) the pro forma adjustments to such projected consolidated financial position required to reflect the Restructuring Transactions; and (c) the pro forma projected consolidated financial position of Company as of the assumed Emergence Date, after giving effect to the Restructuring Transactions.  The Restructuring Transactions set forth in the columns captioned "Plan Effects" and "New Capital" reflect the anticipated and assumed effects of the Restructuring Transactions.  The Projected Pro Forma Consolidated Balance Sheet does not reflect any adjustments that would be necessary to implement fresh-start accounting on the Emergence Date pursuant to ASC 852-10, including but not limited to detailed asset valuations and reassessment of the useful lives of depreciable and amortizable assets.

| $ million | 3/31/2024E Pre-emerg [a] | | Plan Effects [b] | | New Capital [c] | | 3/31/2024PF Post-emerg | |
|---|---|---|---|---|---|---|---|---|
| Cash and equivalents | $ | 561 | $ | (861) | $ | 500 | $ | 200 |
| Restricted cash | | 168 | | (31) | | - | | 137 |
| Accounts receivable | | 428 | | - | | - | | 428 |
| Inventory | | 288 | | - | | - | | 288 |
| Prepaids & other current assets | | 101 | | - | | - | | 101 |
| **Current assets** | **$** | **1,546** | **$** | **(891)** | **$** | **500** | **$** | **1,155** |
| PP&E | $ | 463 | $ | - | $ | - | $ | 463 |
| Intangibles | | 2,768 | | - | | - | | 2,768 |
| Other Assets | | 150 | | - | | - | | 150 |
| **Total assets** | **$** | **4,927** | **$** | **(891)** | **$** | **500** | **$** | **4,535** |
| Accounts payable | $ | 226 | $ | - | $ | - | $ | 226 |
| Accrued expenses and other | | 296 | | 50 | | - | | 346 |
| **Current liabilities** | **$** | **523** | **$** | **50** | **$** | **-** | **$** | **573** |
| LSTC | $ | 8,859 | $ | (1,762) | $ | (7,096) | $ | - |
| New/take-back debt | | - | | - | | 2,500 | | 2,500 |
| Other non-current liabilities | | 64 | | 62 | | - | | 126 |
| **Total liabilities** | **$** | **9,445** | **$** | **(1,650)** | **$** | **(4,596)** | **$** | **3,198** |
| **Equity** | **$** | **(4,518)** | **$** | **759** | **$** | **5,096** | **$** | **1,337** |
| **Total liabilities and equity** | **$** | **4,927** | **$** | **(891)** | **$** | **500** | **$** | **4,535** |

Notes:

[a]  The pre-emergence balance sheet is an illustrative view as of March 31, 2024, and prior to the execution of the transactions contemplated in the Plan.  For purposes of this analysis, LSTC reflects the gross, undiscounted obligations associated with the recently announced preliminary economic settlement agreement in principle between the Ad Hoc First Lien Group and the Department of Justice (DOJ).  Such amounts are preliminary and may be subject to further adjustment as additional information becomes available and is contingent upon the final resolution of certain remaining matters related to such agreement in principle or otherwise.

[b]  Plan effects includes cash payments pursuant to the Plan, including (i) opioid trust settlements, (ii) DOJ cash settlement, (iii) UCC and OCC cash settlements, (iv) estimated contingent professional fees, (v) TBD exit financing fees and (vi) the anticipated discharge of certain general unsecured obligations of the Debtors.

[c]  Reflects settlement of funded debtholder claims with a combination of cash from the Equity Rights Offering, new debt and new equity.

**Projected Non-GAAP Pro Forma**
**Consolidated Income Statement**
**(UNAUDITED)**

The Projected Non-GAAP Pro Forma Consolidated Income Statement set forth below presents the projected consolidated results of operations of the Company on an adjusted basis for the fiscal years ending 2024, 2025, 2026, 2027 and 2028.

| *$ million* | 2024E | 2025E | 2026E | 2027E | 2028E |
|---|---|---|---|---|---|
| **Revenue** | **$ 1,728** | **$ 1,867** | **$ 2,035** | **$ 2,166** | **$ 2,217** |
| *YoY % Δ* | *-13%* | *8%* | *9%* | *6%* | *2%* |
| **Gross Profit** | **$ 1,154** | **$ 1,285** | **$ 1,399** | **$ 1,484** | **$ 1,524** |
| *GM%* | *67%* | *69%* | *69%* | *69%* | *69%* |
| SG&A | 478 | 487 | 504 | 515 | 540 |
| R&D | 120 | 135 | 137 | 137 | 140 |
| **OPEX** | **$ 598** | **$ 622** | **$ 641** | **$ 652** | **$ 680** |
| *OPEX%* | *35%* | *33%* | *31%* | *30%* | *31%* |
| **EBITDA** | **$ 630** | **$ 745** | **$ 845** | **$ 922** | **$ 946** |
| (-) Depreciation | (52) | (58) | (60) | (62) | (73) |
| (-) Stock Based Compensation | (22) | (25) | (26) | (28) | (29) |
| (-) Interest Expense | (195) | (230) | (193) | (147) | (123) |
| (-) Income Taxes | (93) | (108) | (128) | (152) | (165) |
| **Net Income** | **$ 267** | **$ 325** | **$ 438** | **$ 533** | **$ 556** |

13

**Projected Non-GAAP Pro Forma**
**Consolidated Balance Sheet**
**(UNAUDITED)**

The Projected Non-GAAP Pro Forma Consolidated Balance Sheet set forth below presents the projected consolidated financial position of the Company as of March 31, 2024, after giving effect to the Restructuring Transactions, and as of each fiscal year ending 2024, 2025, 2026, 2027 and 2028.

| *$ million* | 3/31/24PF | 2024E | 2025E | 2026E | 2027E | 2028E |
|---|---|---|---|---|---|---|
| Cash and equivalents [a] | $ 200 | $ 200 | $ 200 | $ 200 | $ 200 | $ 200 |
| Restricted cash | 137 | 137 | 137 | 137 | 137 | 137 |
| Accounts receivable | 428 | 392 | 412 | 435 | 457 | 468 |
| Inventory | 288 | 294 | 306 | 313 | 315 | 318 |
| Prepaids and other current assets | 101 | 105 | 124 | 137 | 148 | 159 |
| **Current assets** | **$ 1,155** | **$ 1,128** | **$ 1,179** | **$ 1,222** | **$ 1,258** | **$ 1,282** |
| PP&E | $ 463 | $ 465 | $ 455 | $ 441 | $ 426 | $ 407 |
| Intangibles | 2,768 | 2,583 | 2,351 | 2,141 | 2,007 | 1,894 |
| Other assets | 150 | 150 | 150 | 150 | 150 | 150 |
| **Total assets** | **$ 4,535** | **$ 4,326** | **$ 4,135** | **$ 3,954** | **$ 3,840** | **$ 3,733** |
| Accounts payable | $ 226 | $ 200 | $ 213 | $ 234 | $ 243 | $ 248 |
| Accrued expenses and other | 346 | 346 | 346 | 346 | 346 | 346 |
| **Current liabilities** | **$ 573** | **$ 547** | **$ 559** | **$ 580** | **$ 590** | **$ 594** |
| New debt | $ 2,500 | $ 2,302 | $ 1,981 | $ 1,524 | $ 974 | $ 388 |
| Other non-current liabilities | 126 | 126 | 126 | 126 | 126 | 126 |
| **Total liabilities** | **$ 3,198** | **$ 2,974** | **$ 2,666** | **$ 2,230** | **$ 1,689** | **$ 1,109** |
| **Equity** | **$ 1,337** | **$ 1,352** | **$ 1,469** | **$ 1,724** | **$ 2,151** | **$ 2,624** |
| **Total liabilities and equity** | **$ 4,535** | **$ 4,326** | **$ 4,135** | **$ 3,954** | **$ 3,840** | **$ 3,733** |

Notes:

[a]    Assumes all cash in excess of $200 million is used to pay down funded debt.

14

**Projected Non-GAAP Pro Forma
Consolidated Cash Flow Statement
(UNAUDITED)**

The Projected Non-GAAP Pro Forma Consolidated Cash Flow Statement set forth below presents the projected cash flows of the Company for the year ending December 31, 2024, after giving effect to the Restructuring Transactions, and for the fiscal years ending 2025, 2026, 2027 and 2028.

| $ million | 2024E | 2025E | 2026E | 2027E | 2028E |
|---|---:|---:|---:|---:|---:|
| Net Income | $ 267 | $ 325 | $ 438 | $ 533 | $ 556 |
| Depreciation | 52 | 58 | 60 | 62 | 73 |
| SBC | 22 | 25 | 26 | 28 | 29 |
| Δ NWC | (5) | (19) | (9) | (16) | (8) |
| Other [a] | (941) | (19) | (13) | (11) | (11) |
| **Cash From Operations** | **$ (604)** | **$ 369** | **$ 503** | **$ 597** | **$ 640** |
| CAPEX | (52) | (48) | (46) | (47) | (54) |
| Other | - | - | - | - | - |
| **Cash From Investing** | **$ (52)** | **$ (48)** | **$ (46)** | **$ (47)** | **$ (54)** |
| Debt payments | (198) | (321) | (457) | (550) | (585) |
| Other [b] | 352 | - | - | - | - |
| **Cash From Financing** | **$ 154** | **$ (321)** | **$ (457)** | **$ (550)** | **$ (585)** |
| **Net Δ Cash** | **$ (501)** | **$ -** | **$ -** | **$ -** | **$ -** |
| **Beginning Cash** | **$ 701** | **$ 200** | **$ 200** | **$ 200** | **$ 200** |
| **Ending Cash** | **$ 200** | **$ 200** | **$ 200** | **$ 200** | **$ 200** |

Notes:

[a]   Includes changes in other assets and liabilities and miscellaneous one-time and contingent payments; 2024E includes cash flows associated with the Plan Effects described above.

[b]   2024E includes pre-emergence adequate protection payments and proceeds from the Rights Offerings.

15